UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

INNA GUDAVADZE, LIANA ZHMOTOVA and IYA
PATARKATSISHVILI,

                                Plaintiffs,

                 v.

                                08-Civ-3363 (RJS)

JOSEPH KAY (A/K/A JOSEPH KAKALASHVILI,
A/K/A JOSEPH KEJ, A/K/A IOSEB KAKALASHVILI,
A/K/A IOSEB KAKIASHVILI) AND EMANUEL
ZELTSER,

                         Defendants

-------------------------------------------------------------------x

# DECLARATIONS IN SUPPORT OF MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S APPLICATION FOR AN ORDER TO SHOW CAUSE

1.    Lasha Birkaia

2.    Paul Blyumkin

3.    Michelle Dunkin

4.    Inna Gudavadzde

5.    Anatoly Motkin

6.    Vladimir Voronoff

DEBEVOISE & PLIMPTON LLP
Christopher K. Tahbaz
Jennifer R. Cowan
919 Third Avenue
New York, NY 10022
Tel. (212) 909-6000

Attorneys for Plaintiffs

Dated: New York, New York

Birkaia Declaration

ЛАША БИРКАИА, проживающий по адресу ул. Саакадзе, д. 50, Тбилиси, Грузия, настоящим заявляет, в соответствии с Сводом законов США (28 U.S.C. § 1746), что все нижеизложенное является правдивым и точным:

1. Я делаю данное заявление в поддержку иска, заявленного женой и дочерьми Бадри Патаркацишвили против Джозефа Кея и Эммануила Зелцера.

2. Я знаком с законами и конституцией Республики Грузия в качестве адвоката в судах этой страны в течение приблизительно 10 лет. Моя юридическая практика включает консультации по вопросам, связанным с наследством и правопреемством. В силу вышесказанного, я достаточно квалифицирован, чтобы заявить, кто именно обладает бенефициарным правом на имущество покойного согласно законодательству и конституции Грузии.

3. Я делаю это заявление на основании информации, предоставленной мне Юлием Дубовым, являющимся, как мне объяснили, другом и бывшим деловым партнером г-на Патаркацишвили и, следовательно, в силу своего положения обладающим информацией, которая представлена в приведенных ниже параграфах 4-6 и которую я считаю достоверной.

4. Мне сообщили и я полагаю, что Аркадий (Бадри) Шалвович Патаркацишвили ("Покойный"), проживавший по адресу кв. 88, корпус 10, район Гидани, Тбилиси, Грузия, скончался 12 февраля 2008 года в Англии. Однако, как мне сообщили и как я полагаю, непосредственно перед смертью и на момент смерти Покойный имел место жительства и прописку в Грузии и являлся гражданином Грузии.

5. На момент данного заявления мне неизвестно, оставил ли Покойный завещание.

6. Насколько мне известно, у Покойного имеются следующие наследники первой очереди по закону:

   (a)    его вдова, Инна Гивиевна Гудавадзе;

   (b)    его дочери, Ия Патаркацишвили и Лиана Жмотова, обе старше 18 лет;

   (c)    его сын, Давид Патаркацишвили, в возрасте 14 лет; и

   (d)    его мать, Натела Патаркацишвили.

7. Согласно законодательству Грузии, имущество Покойного делится следующим образом:

   (a)    Пятьдесят процентов имущества, приобретенного Покойным после заключения брака, принадлежит жене Покойного, Инне Гивиевне Гудавадзе, по праву общей собственности;

(b)  Остальное имущество, приобретенное после заключения брака (за исключением имущества, полученного Покойным по наследству или в дар), делится поровну между наследниками, перечисленными выше в параграфах 6(a) - 6(d);

(c)  Остальное имущество делится поровну между всеми наследниками первой очереди по закону.

8.  Следовательно, согласно законодательству и конституции Грузии, единственными лицами, обладающими бенефициарным правом на имущество Покойного, являются Инна Гивиевна Гудавадзе, Ия Патаркацишвили, Лиана Жмотова, Давид Патаркацишвили и Нетела Патаркацишвили.

9.  К данным показаниям прилагаются копии выдержек из Гражданского кодекса Грузии и иных законов Грузии, которые имеют отношение к вопросам, отвеченным в данных показаниях. Этими выдержками являются:

(a)  статьи 1158, 1161, 1336, 1337, 1339, 1350 и статьи с 1371 по 1374 Гражданского кодекса Грузии; и

(b)  статья 55 Закона Грузии о международном частном праве.

10.  Данные показания были даны мною на русском языке. Для удобства работы Суда, я официально подтверждаю под присягой оба варианта - на английском и русском языках. Поскольку я сам не понимаю английский вариант, я подтверждаю под присягой его подлинность на том основании, что мне разъяснили его содержание и я верю в точность и правдивость перевода русского варианта. В случае какого-либо несоответствия между этими двумя вариантами, в качестве представляющего мои показания рассматривается вариант на русском языке.

Под угрозой ответственности за дачу заведомо ложных показаний по законам Соединенных Штатов Америки, я заявляю, что вышеизложенное является правдивым и точным.

Подписано 3 апреля 2008 года в Тбилиси, Грузия.

Лаша Биркаиа

LASHA BIRKAIA, of 50 Saakadze Str. Tbilisi, Georgia, hereby declares, pursuant to 28 U.S.C. § 1746, the following to be true and correct:

1.    I make this declaration in support of an action filed by the wife and daughters of Badri Patarkatsishvili against Joseph Kay and Emanuel Zeltser.

2.    I am familiar with the laws and constitution of the Republic of Georgia and have practiced as a lawyer in the courts of that country for approximately ten years. My legal practice includes advising on issues in relation to inheritance and succession. I am therefore qualified to state who is beneficially entitled to a deceased's estate under the laws and constitution of Georgia.

3.    I make this declaration on the basis of information provided to me by Yuliy Dubov, who I am told is Mr. Patarkatsishvili's friend and former business associate, and therefore in a position to know this information, which is set out at paragraphs 4 to 6 below and which I believe to be true.

4.    I am informed and believe that Arkady (Badri) Shalvovich Patarkatsishvili (the "Deceased") of apt. 88 block 10 Gidani District, Tbilisi, Georgia died on 12 February 2008 in England. However, I am informed and believe that the Deceased was domiciled in Georgia immediately prior to and at the time of his death and was a citizen of Georgia.

5.    At the time of making this declaration I am not aware that the Deceased left a will.

6.    As far as I am aware, the Deceased is survived by the following heirs of first degree by law:

    (a)    his widow, Inna Givievna Gudavadze;

    (b)    his daughters, Iya Patarkatsishvili and Liana Zhmotova, both of whom are over the age of 18;

    (c)    his son, David Patarkatsishvili, who is aged 14; and

    (d)    his mother, Natela Patarkatsishvili.

7.    According to Georgian law, the estate of the Deceased is divided as follows:

    (a)    fifty per cent of the estate acquired by the Deceased since the date of his marriage belongs to the Deceased's wife, Inna Givievna Gudavadze, by virtue of co-ownership;

(b)    the remainder of the estate acquired since the date of his marriage (excluding the estate obtained by the Deceased as an inheritance or a gift) is left in equal shares to the heirs referred to at paragraphs 6(a) to 6(d) above; and

(c)    the remainder of the estate is left in equal shares to all heirs of first degree by law.

8.    Therefore, under the laws and constitution of Georgia, the only persons beneficially entitled to the estate of the Deceased are Inna Givievna Gudavadze, Iya Patarkatsishvili, Liana Zhmotova, David Patarkatsishvili and Natela Patarkatsishvili.

9.    Attached as exhibits to this declaration are copies of extracts from the Georgian Civil Code and other laws of Georgia, which are relevant to the matters covered in this declaration. These extracts are:

(a)    Articles 1158, 1161, 1336, 1337, 1339, 1350 and 1371 to 1374 of the Georgian Civil Code; and

(b)    Article 55 of the Law of Georgia on Private International Law.

10.    This declaration is made by me in the Russian language. For the sake of the convenience of the Court, I am formally swearing both the English and Russian versions. As I do not personally understand the English version, I am swearing as to its truth on the basis that I am informed and believe that it is an accurate and faithful translation of the Russian version. In the event of any inconsistency between the two versions, the Russian version represents my evidence.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 3 April 2008 in Tbilisi, Georgia.

(Lasha Birkaia)

Lasha Birkaia

2

Birkaia Exhibits

 იურისტის ბიბლიოთეკა

# საქართველოს

# სამოქალაქო

# კოდექსი

ანბანურ-საგნობრივი საძიებლით

ცვლილებებითა და დამატებებით

2007 წლის 10 აგვისტომდე

თბილისი

2007



## III. კანონით დადგენილი ქონებრივი უფლებები და მოვალეობები

### მუხლი 1158. მეუღლეთა თანასაკუთრება

1. მეუღლეთა ნივრ ქორწინების განმავლობაში შეძენილი ქონება წარმოადგენს მათ საერთო ქონებას (თანასაკუთრებას), თუ მათ შორის საქორწინო ხელშეკრულებით სხვა რამ არ არის დადგენილი.

2. ასეთ ქონებაზე მეუღლეთა თანასაკუთრების უფლება წარმოიშობა მაშინაც, თუ ერთ-ერთი მათგანი ქორწინების განმავლობაში ოჯახში შემოსავალილა ან სხვა საპატიო მიზეზის გამო არ ქონდა დამოუკიდებელი შემოსავალი.

### მუხლი 1159. თანასაკუთრებაში არსებული ქონების მართვა

თანასაკუთრებაში არსებულ ქონებაზე მეუღლეებს ამ თანაბარი უფლებები. ამ ქონების ფლობა, სარგებლობა და განკარგვა ხორციელდება მეუღლეთა ურთიერთშეთანხმებით.

### მუხლი 1160. თანასაკუთრებაში არსებული ქონების განკარგვა ურთიერთშეთანხმებით (29.06.2007 N5127)

1. იმ ქონების განკარგვა, რომელიც მეუღლეთა თანასაკუთრებაშია, ხდება მეუღლეთა შეთანხმებით, მიუხედავად იმისა, თუ რომელი მეუღლე განკარგავს ამ ქონებას.

2. მეუღლეთა თანასაკუთრებაში არსებული ქონების განკარგვისათვის დაკავშირებული ერთის მიერ დადებული გარიგება ვერ იქნება ბათილად ცნობილი მეორის მოთხოვნით იმ საფუძვლებზე, რომ:

ა) მან არ იცოდა გარიგების შესახებ;

ბ) ის არ ეთანხმებოდ გარიგებას.

3. მეუღლეს, როგორც თანამესაკუთრეს, უფლება აქვს, მოითხოვოს ქონების განკარგვეთი მიღებული სარგებელი.

### მუხლი 1161. მეუღლეთა ინდივიდუალური საკუთრება

თითოეული მეუღლის საკუთრება წარმოადგენს:

ა. ქონება, რომელიც საკუთრება წარმოადგენდა ნებამდე;

ბ. ქონება, რომელიც ქორწინების განმავლობაში მიღებულ მემკვიდრეობით ან ჩუქებით.

### მუხლი 1162. ქორწინების განმავლობაში შექმნილი ინდივიდუალური სარგებლობის ნივთები

ინდივიდუალური სარგებლობის ნივთები, ძვირფასეულობის გარდა, თუნდაც ქორწინების განმავლობაში იყოს შექმნილი მეუღლეთა საერთო სახსრებით, ჩაითვლება იმ მეუღლის საკუთრებად, რომელიც სარგებლობს ამ ნივთებით.



### მუხლი 1334. თანამმკვიდრეები

თუ მემკვიდრე რამდენიმეა, მათ შორის სამკვიდროს გაყოფამდე იგი ერთიანი ქონების სახით ექცევიან ყველა თანამემკვიდრეს. ამ ქონებიდან შეიძლება გადახდილ იქნეს მამკვიდრებლის მოვალის და უკანასკნელი ავადმყოფობის მკურნალობის, დაკრძალვის, სამკვიდროს დაცვისა და მართვის, ხელფასის ვასტუმრების, ანდერძის აღსრულების აუცილებელი ხარჯები, ასევე მოითხოვება უნდა დაკმაყოფილდეს სამკვიდროს ღირებულებიდან ყველა სხვა, მათ შორის, ალიმენტისა და სხვა გირაოთი უზრუნველყოფილი ყველა ოვნების უპირატესსად.

### მუხლი 1335. სამკვიდროდან ნივთის გამოთხოვის უფლება

1. თუ მოამდიდრემ არასწორად დაუტოვა მემკვიდრეს ნივთი, ამ ნივ- თის მესაკუთრეს უფლება აქვს გამოითხოვოს იგი საერთო წესის მიხედვით.

2. თუ გარდაცვლილის ქონებამ ფარულად არის სხვა პირის ქონება, აუცილებელია ქონების ამ ნაწილის გამოყოფა და გადაცემა საკუთრო პირ- ისათვის.

## თავი მეორე
## მემკვიდრეობა კანონით

### მუხლი 1336. კანონით მემკვიდრეები

კანონით მემკვიდრეობის დროს თანასწორი წილის უფლებით მემკვი- დრეებად ითვლებიან:

1. პირველი რიგში – გარდაცვლილის შვილები, გარდაცვლილის შვილი, რომელიც მისი სიკვდილის შემდეგ დაიბადა, მეუღლე, მშობლები (მშვილე- ბლები).

ნაშვილები და მისი შთამომავლები, როგორც მემკვიდრეთა ან მისი ნათესავების მემკვიდრეებს, გათანაბრებულნი არიან მემკვიდრის ან მისი ანასა შთამომავლებთან. ნაშვილები და აღმავალი ხაზის სხვა ლევიდან ნათესავების, ამავე ანდერძისა და ძმების გარდაცვალების შემ- დევისა და ძმების გარდაცვალების შემდეგ.

შვილთმფლები, შვილიშვილის შვილებისა და ამ უკანასკნელთა შვილე- ბი კანონით მემკვიდრეებად ჩაითვლებიან, თუ სამკვიდროს გახსნის შვილა- აყოს ცოცხალი აღარ არის მათი მშობლი, რომელიც მამკვიდრებლის მემკ- ვიდრე უნდა ყოფილიყო, და თანასწორად იყოფენ ნაწილს, რომელიც მათ გარ- ნით მემკვიდრეობის დროს მათ გარდაცვალიყო ილებინ ნაწილი, რომელიც კანო- შვილიშვილს, შვილიშვილის შვილების მშობელს ერგებოდა.

2. ვერ გახდებიან მემკვიდრეები, თუ მათხა მშობლებისა და ამ უკანასკნელთა შვილე- კვიდროს მოესდა.ზ. მშვილების და მათა მშობლებმა უარი თქვეს სამ- სა და მისი შთამომავლობის მემკვიდრეები, გათანასწორებულ არიან ნაშ- ვილების შმობლებისა და სხვა ლევიდ ნათესავებთან. ნაშვილების წინაპ- აღმავალი ხაზის სხვა ლევიდ ნათესავებსა და და-ძმებს არიან ნაშ- ნით მემკვიდრეობა ნაშვილების ან მისი შთამომავლების გარდაცვალების შემდეგ.

278

II. მეორე რიგში - გარდაცვლილის დები და ძმები. მამკვიდრებლის დისწულები და ძმისწულები და მათი შვილები კანონით მემკვიდრეებად ითვლებიან, თუ სამკვიდროს გახსნის დროისათვის ცოცხალი აღარ იყო მათი მშობელი, რომელიც მამკვიდრებლის მემკვიდრე იქნებოდა. ისინი თანასწორ-რად იღებენ სამკვიდროს იმწილს, რომელიც კანონით მემკვიდრეობის დროს მათ გარდაცვლილ მშობელს ერგებოდა.

III.მესამე რიგში - ბებია და პაპა, ბებიის დედ-მამა და პაპის დედ-მამა,როგორცც დედის, ისე მამის მხრიდან. ბებიის დედ-მამა და პაპის დედ-მამა კანონით მემკვიდრეებად ითვლებიან, თუ სამკვიდროს გახსნის დროი-ასთვის ბებია და პაპა ცოცხლები აღარ არიან.

IV. მეოთხე რიგში - ბიძები (დედის ძმა და მამის ძმა), დეიდები და მა-მიდები.

V. მეხუთე რიგში - ბიძაშვილები, დეიდაშვილები და მამიდაშვილები, თუ ეს უკანასკნელნი არ არიან; მაშინ - მათი შვილები.

### მუხლი 1337. რიგითობა კანონით მემკვიდრეობისას

წინა რიგის უუნდაცდა ერთ-ერთი მემკვიდრის არსებობა გამორიცხავს შემდგომ რიგის მემკვიდრეობას.

### მუხლი 1338. არასრულმისაწნარიან პირთა უფლებები მემკვიდრეობისას

არამორმისაწნარიან პირები, რომლებიც მამკვიდრებლის რჩენაზე იყვნენ და დამოუკიდებლად თავის შენახვა არ შეუძლიათ, თუ მათ შესახებ ანდერძში მითითებული არ არის, უფლება აქვს მოითხოვონ სარჩო (ალიმენტო) სამკვიდროდან, თანხის ოდენობა, რაც გადახდილ უნდა იქნეს სარ-ჩოს სახით, შეიძლება შემცირდეს სამკვიდროს აქტივის მოცულობის გათვალისწინებით.

### მუხლი 1339. ცოცხლად დარჩენილი მეუღლის უფლება თანასაკუთრების წილზე

ცოცხლად დარჩენილი მეუღლის მემკვიდრეობის უფლება არ ეხება ქონების იმ ნაწილს, რომელიც მას მეუღლეთა თანასაკუთრებიდად ეკუთ-ვნის.

### მუხლი 1340. განკარონებზული მეუღლეთა მდგომარეობა

მემკვიდრეობისას განკარონებზული მეუღლეთა მდგომარეობა დგება იყვნენ ერთმანეთის გარდაცვალების შემდეგ.

### მუხლი 1341. მემკვიდრეობის უფლების ჩამორთვა

განკარონებზისას სასამართლოს გადაწყვეტილებით მეუღლეს შეე-ძლება ჩამორთვს კანონით მემკვიდრეობის უფლება, თუ დადასტურდე-ბა იქნება, რომ ქორწინება მამკვიდრებლის უფლება, თუ დადასტურებ-მამკვიდრ არანაკლებ სამი წლის შეწყვეტილი იყო და მეუღლეები ცალ-

279

ლმონწერილი
ყა შესაბამის
ქრდება კონ-

ჲუნდა იქნეს
ამის თანამ-

ალებების

მიღებული
ოანდერძის
ხერ ხელის
ცჲ დაადას-
ტებნიკური
ჭრება უნდა
ჯოუნებელე,
ჲ.ნადო ნარ-
ა აქდგილის

ვასტურონ
მითხევებში

ვა მიუთი-
შმათი თან-

თარილის
რ გაქან-
ამდენიმ
ვმირებუ-

ჰერცებ-

დღეს და
ბა ზვდ
ა მოთუ
ასებ.

## თავი მეხუთე
### მემკვიდრის მემკვიდრის დანიშვნა

### მუხლი 1370. სათადარიგო მემკვიდრე

(სათადარიგო მემკვიდრე) იმ შემთხვევისათვის, თუ მის მიერ დანიშნული მემკვიდრე სამკვიდროს გახსნამდე გარდაიცვალება, სამკვიდროს არ მიიღებს ან მემკვიდრეობის უფლება ჩამოერთმევა.

2. ანდერძით მემკვიდრის ურთ სამკვიდროზე არამემკვიდრის მემკვი-
დრეს დანიშნული პირის სასარგებლოდ არ დაიშვება.

3. სათადარიგო მემკვიდრედ შეიძლება იყოს ყოველი პირი, რომელიც
1307–1309-ე მუხლებით შეიძლება იყოს მემკვიდრე.

## თავი მექვსე
### სავალდებულო წილი

### მუხლი 1371. ცნება

ნის მოუხედავად, ეკუთვნის სავალდებულო წილი, რომელიც უნდა იყოს იმ
წილის ნახევარი, რაც თითოეულ მათგანს კანონით მემკვიდრეობის დროს
ერგებოდა (სავალდებულო წილი).

### მუხლი 1372. სავალდებულო წილის მოთხოვნის უფლების
### წარმოშობის მომენტი

სავალდებულო წილის მოთხოვნის უფლება წარმოიშობა სამკვიდროს
გახსნის მომენტიდან. ასეთი მოთხოვნის უფლება გადადის მემკვიდრეობით.

### მუხლი 1373. სავალდებულო წილის მოცულობის გან-
### საზღვრა

სავალდებულო წილის მთელიანი მოცულობის განსაზღვრება მთელი
სამკვიდროდან იმ ქონების ჩათვლით, რომელიც გათვალისწინებულია
სახელდოდ დანაკისრის ან საერთოსასარგებლო მიზნით რაიმე მოქმედების
შესასრულებლად.

### მუხლი 1374. თითოეული მემკვიდრის სავალდებულო წილის
### განსაზღვრა

თითოეული მემკვიდრის სავალდებულო წილის განსაზღვრისას მხედ-
ველი იქნებიანდეს სამკვიდროს ყველა კანონით მემკვიდრე, რომელიც
ანდერძით მემკვიდრეები მხდდვლობაში არ მიიღებიან.

### მუხლი 1375. მიღებული ქონების ჩათვლა სავალდებულო
### წილში

პირი, რომელსაც აქეს სავალდებულო წილის მიღების უფლება, მოვ-
სავალდებულო წილში ჩათვალოს ყველაფერი, რაც მამკვიდრებლისა-

### Article 1155. Joint Settlement of Family Affairs

Matters of upbringing of children and other family affairs are settled by spouses jointly.

### Article 1156. Freedom in Choice of Activity

Each spouse may freely choose activity and occupation.

### Article 1157. Free Choice of Residence

Each spouse may choose the residence at his/her discretion unless this contradicts the family interests.

### III. Proprietary Rights and Duties Established by Law

### Article 1158. Common Property of Spouses

1. Property purchased by the spouses during their marriage is their common property unless the marriage contract made between them provides otherwise.

2. The right of spouses on such property arises also if one of them has held house, taken care of children or had not independent income for other good reason.

### Article 1159. Management of Common Property by Mutual Consent

The spouses obtain equal rights on their common property. Owning, use and disposal of this property is exercised by the mutual consent of spouses.

### Article 1160. Disposal of Common Property by Mutual Consent

Disposal of common property of the spouses is exercised under spouses agreement, notwithstanding which spouse disposes this property. A contract made by one of the spouses in connection with disposal of the property may be recognized invalid at request of the other spouse, only if the spouse disposing the property had no such right and if it is proved that he/she knew or should know that he/she had not such powers.

### Article 1161. Individual Property of Spouses

Property of each spouse is the following:

a) property owned by him/her before the marriage;

b) property received by succession or as a gift during the marriage.

### Article 1162. Things of Individual Use Purchased During Marriage

transferred to a successor with the right of ownership under the established custom. These things may be also received by the successor who has refused to accept the succession.

2.  The documents relating to the testator's personality, his/her family or the entire estate remain as the common property.

### Article 1333. Consequences of Increase of Immovable Property Under Will

If a testator after making a will increased the immovable property specified in the will by acquiring additional property, such property though being attached to the immovable property will not be included in the estate unless there is a new disposition as regards the property acquired after making of the will.

### Article 1334. Co-successors

If inheritors are several, the estate, prior to its division among them, shall be in their common ownership. The expenses for the testator's maintenance, treatment, funeral, the protection and management of the estate, payment of wages and salaries, and other necessary expenses in connection with the fulfillment of the will may be payable from this property. These claims shall be satisfied from the value of the estate before all other claims, including the ones secured with hypothecation and other pledge.

### Article 1335. Claiming a Thing from Estate

1.  If a testator has incorrectly given a thing as a succession to a successor, he/she has the right to claim it back in according with established procedure.

2.  If the estate of the deceased contains the property of another person, the part of the property shall be revealed and transferred to a proper person.

## CHAPTER 2. INTESTATE SUCCESSION

### Article 1336. Intestate Successors

In intestate succession, successors with equal shares succeed in the following order:

1.  First order successors -  the children of the deceased, a child of the deceased born after his/her death, spouse, parents (adoptive parents).

    Adopted child and his/her descendants, as heirs of the adoptive parent or his/her relatives are equalized with children of the adoptive parent and his/her descendants. An adopted child is not considered to be an intestate successor any more after the death of his/her parents and other biological relatives on the ascending line, as well as after the death of the sisters and brothers.

    **Grandchildren.** Children of grandchildren and children of the latter are considered to be intestate successors if by the time of opening of a succession their parent is not alive. They

succeed in equal shares to the share of the estate to which their deceased parent would have had the right.

**Grandchildren.** Descendants of grandchildren and children of the latter will not become successors if their parents have refused to accept the succession.

An adoptive parent and his/her relatives, as heirs of the adopted child and his/her descendants are equated with the parents of the adopted child and his/her natural relatives. Parents of the adopted child, other natural relatives on the ascending line and siblings are not eligible to intestate succession after the death of the adopted child or his/her descendants.

2. Second order successors - sisters and brothers of the deceased, his/her nieces and nephews and their children are considered to be intestate successors if by the time of opening of a succession their parent is not alive. They succeed in equal shares to the share of the estate to which their deceased parents would have had the right.

3. Third order successors - grandparents, parents of grandparents on the mother's as well as on father's side. Parents of grandparents are considered to be instate successors if by the time of opening of a succession grandparents are not alive.

4. Fourth order successors - uncles (mother's brother and father's brother) and aunts.

5. Fifth order successors - cousins, or their children where the cousins are absent.

## Article 1337. Order in Instate Succession

The existence of at least one successor of the previous order excludes the subsequent order succession.

## Article 1338. Rights of Incapacitated Persons in Succession

Incapacitated persons which had been supported by an the testator and are incapable to support themselves independently have a right to claim support from the succession if they are not mentioned in the will. The support amount may be reduced taking into consideration the amount of assets of the estate.

## Article 1339. Right of Surviving Spouse to Co-ownership Share

The succession right of the surviving spouse does not apply to that share of the estate which belongs to him/her out of co-ownership of spouses.

## Article 1340. Condition of Divorced Spouses in Succession

Divorced spouses may not be successors after the death of each other.

### Article 1348. Specification of a Share by Testator

1. A testator may specify shares of successors in the estate, or indicate which property will be given to a particular successor. If there is no such indication in a will the estate is equally distributed among successors.

2. If several successors are nominated in a will, but only one successor's share is specified the successors whose shares are unspecified succeed in equal shares to the part of the estate not included in shares of the estate.

### Article 1349. Distribution of Estate Among Testate Successors

If several successor are nominated in a will and the property specified for one of the successors comprises the entire estate, all the successors by the will shall have equal shares.

### Article 1350. Succession to Property Outside a Will

If a share of the successors nominated in a will does not comprise the entire estate, the property remaining outside the will - shall be subject to intestate succession, which also applies to the intestate successors which were bequeathed a part of the property unless otherwise provided by the will.

### Article 1351. Equal Increase of Shares Among Testate Successors

If there are only testate successors will, their shares will be equally increased if each of the successors' share is specified in the will, but the shares left to them total less than the entire estate.

### Article 1352. Inadmissibility of Participation of a Third Person in Share Specification

A testator may not entrust by a will another person to specify who is a person to receive a share in the estate and in what amount.

### Article 1353. Impossibility of Clear Definition of Successors

If a testator makes a disposition in a will for the benefit of a person who he/she describes in a manner which applies to several persons and it is unclear who is meant, the disposition shall be deemed to be made for the benefit of all the persons in equal shares.

### Article 1354. Deprivation of a Right of Intestate Succession

1. A testator may deprive one, several or all the successors of instate succession and is not obliged to indicate a reason therefor.

# CHAPTER 5. NOMINATION OF ALTERNATIVE SUCCESSOR

### *Article 1370. Alternative Successor*

1. A testator may nominate in his/her will another successor (alternative successor) if a person nominated as a successor dies before the opening of the succession, renounces the succession, does not accept the succession or is unworthy to succeed.

2. The refusal of a testate successor to accept the succession for the benefit of an alternative successor is not allowed.

3. An alternative successor may be nominated from among any persons entitled to succession pursuant to Articles 1307-1309.

# CHAPTER 6. COMPULSORY PORTION

### *Article 1371. Concept*

The children, parents and the spouse of the testator are eligible to a compulsory portion an estate notwithstanding the content of a will which shall be one-half of the share of an estate which each of them would have received in intestacy (compulsory portion).

### *Article 1372. Claiming of Compulsory Portion*

The right to claim a compulsory portion arises from the moment of the opening of a succession. The right of such a claim is transferred by succession.

### *Article 1373. Size of Compulsory Portion*

The total amount of a compulsory portion is determined on the basis of the entire estate including the property which is envisaged for the execution of a testamentary obligation or for performance of any action with the of generally useful purpose.

### *Article 1374. Definition of a Compulsory Portion of Each Successor*

In defining a compulsory portion of each successor all intestate successors shall be taken into consideration, which would have been invited to receive the succession had not there been a will. The testate successors are not taken into consideration.

### *Article 1375. Inclusion of the Received Property into a Compulsory Portion*

25.07.2003

# საერთაშორისო სამართალი

საკანონმდებლო აქტების
კრებული

თბილისი

2001



საქართველოს  კანონი

# საერთაშორისო კერძო სამართლის შესახებ

## თავი I

## ზოგადი დებულებანი

### მუხლი 1. გამოყენების სფერო

ეს კანონი განსაზღვრავს, თუ რომელი სამართლებრივი წესრიგი გამოიყენება უცხო ქვეყნის სამართალთან დაკავშირებულ საქმეს ფაქტობრივი გარემოებების არსებობისას, აგრეთვე საპროცესო სამართლის იმ ნორმებს, რომლებიც გამოიყენება ასეთი საქმის წარმოებისას.

### მუხლი 2. საერთაშორისო ხელშეკრულებები

საერთაშორისო ხელშეკრულებებით გათვალისწინებულ წესსაც აქვს უპირატესი იურიდიული ძალა ამ კანონით განსაზღვრულ წესებთან შედარებით.

### მუხლი 3. უცხო ქვეყნის სამართლის ნორმების არსის დადგენა

1. უცხო ქვეყნის სამართლის გამოყენებისას საქართველოს სასამართლო იღებს საქმეში ზომებს მისი ნორმების არსის დასადგენად, შესაბამის ქვეყანაში მათი ოფიციალური განმარტებების, გამოყენების პრაქტიკისა და დოქტრინის გათვალისწინებით.

2. თუ უცხო ქვეყნის სამართლის ნორმების არსის დადგენა ამ მუხლის პირველი პუნქტით გათვალისწინებულ ღონისძიებათა განხორციელების მუხედავად უშედეგია ან მოითხოვს გაუმართლებელ ხარჯებს, ხოლო პროცესის არც ერთ მხარეს არ შეუძლია ნორმების არსის დადგენა და მათი გამოყენების დასაბუთება, სასამართლო იყენებს საქართველოს სამართალს.

### მუხლი 4. მითითება

1. სხვა ქვეყნის (იგულისხმება მესამე ქვეყანაც) სამართალზე მითითება გულისხმობს ამ ქვეყნის საერთაშორისო კერძო სამართლის გამოყენებასაც, თუ ეს მითითება მითითების ჯერს არ ეწინააღმდეგება ან თუ ეს მითითება არ გულისხმობს მხოლოდ კონკრეტულ საქმესთან

176

ერთი ან ორივე მეუღლის მიერ ექცემდეარება იმ ქვეყნის სამართალს, რომელიც ჭორწინების ზოგადი შედეგების მიმართ გამოიყენება.

#### მუხლი 53. თანხმობის ბარიერები

ბავშვის და მასთან საოჯახო-სამართლებრივი ურთიერთობებში მყოფი პირის მიერ თანხმობის მიცემის საკითხი შეისება ავც, აგრეთვე მამობის აღიარებასა და სახელის დარქმევაზე დამატებით ექცემდეარება იმ ქვეყნის სამართალსაც, რომელსაც ეს ბავში განეკუთვნება. თუ ბავშვის ინტერესებისათვის აუცილებელია, ამ ქვეყნის სამართლის ნაცვლად გამოიყენება საქართველოს სამართალი.

#### მუხლი 54. მეურვეობა და მზრუნველობა

1. მეურვეობის, მზრუნველობის ან მოვლის სხვა ფორმების წარმოშობა, შინაარსის შეცვლა და შეწყვეტა ექცემდეარება იმ ქვეყნის სამართალს, რომელსაც სამეურვეო პირი განეკუთვნება. უცხოელებს ან ლტოლვილილებს, რომლესდსაც საცხოვრებელი აღგილი საქართველოში აქვთ, შეიძლება დაენიშნოთ მეურვე ან მზრუნველი საქართველოს სამართლის მიხედვით.

2. თუ მეურვეობის ღონისძიების გატარება აუცილებელია, მაგრამ დადგენილი არ არის, ვინ მონაწილეობას მეურვეობაში, ან თუ მონაწილე სხვა ქვეყანაში იმყოფება, გამოიყენება იმ ქვეყნის სამართალი, რომელიც ყველაზე ხელსაყრელია სამეურვეო პირისათვის.

3. მეურვეობის, მზრუნველობის ან მოვლის დროებითი ღონისძიებები ექცემდეარება მეურვეობის დამწესებელი ქვეყნის სამართალს.

### თავი VIII

### საემკვიდრეო სამართალი

#### მუხლი 55. მემკვიდრეობითი ურთიერთობები

მემკვიდრეობითი ურთიერთობები წესრიგდება იმ ქვეყნის სამართლით, რომელსაც მამკვიდრებელი გარდაცვალებისას განეკუთვნებოდა. მოქალაქეობის არმქონე პირის მიმართ გამოიყენება იმ ქვეყნის სამართალი, სადაც მას ჰქონდა უკანასკნელი ჩვეულებრივი აღგილსამყოფელი. ასეთის არარსებობის შემთხვევაში გამოიყენება საქართველოს სამართალი.

193

2.    Where the conduct of guardianship measures is necessary, but the guardianship participants are not determined, or if a participant is in other country, law of the country which is most appropriate for a person under guardianship shall apply.

3.    Temporary guardianship, curatorship or care measures shall be subject to law of the country fixing guardianship.

## CHAPTER VIII
## LAW OF SUCCESSION

### Article 55. Hereditary Relations

Hereditary relations shall be governed by law of the country to which the testator belonged at the time of his/her decease. In relation to a stateless person law of the country where the latter had the last usual location shall be applied. In the absence of such, law of Georgia shall be applied.

### Article 56. Form of Testament

A testament is considered as made with observance of the form if it complies with law of the country:-

  a)  to which the testator belonged at the time of his/her decease;

  b)  where the testator had his/her usual location;

  c)  where the real estate which the testament concerns is located.

## CHAPTER IX
## STANDARDS OF PROCEDURE

### Article 57. Major Principle

Nationals and legal persons of a foreign country, as well as stateless persons in a legal procedure on the territory of Georgia shall enjoy the same legal guarantees as Georgian nationals and legal persons.

### Article 58. Giving a Legal Costs Compensation Guarantee

1.    Where the plaintiff is a foreign national, legal person or stateless person and has usual location or residence outside Georgia, he/she may, on the basis of the defendant's application, be assigned with the issue of a guarantee for compensating legal costs by the date fixed.

2.    The guarantee shall not be required if:-

Blyumkin Declaration

PAUL BLYUMKIN, hereby declares, pursuant to 28 U.S.C. § 1746, the following to be true and correct:

1.    My name is Paul Blyumkin and my business address is Salford (UK) Limited, 78 Pall Mall, London SW1Y 5ES. I am a US citizen.

2.    I make this declaration in support of an action filed by the wife and daughters of Badri Patarkatsishvili against Joseph Kay and Emanuel Zeltser.

3.    My current position is COO/CFO at Salford Capital Partners ("Salford") as well as Managing Director of Salford (UK) Ltd. I have worked at Salford since 2001.

4.    My responsibilities include operational management of the Salford group, which includes supervision of regional offices, active participation in investment transactions as well as relationship management with counterparties and service providers.

5.    As part of my duties at Salford, I interacted with Badri Patarkatsishvili, who was an investor in numerous projects under management by Salford, and I am acquainted with many of his business associates and his family.

6.    In February 2008, my colleague Eugene Jaffe of Salford, and I met Emanuel Zeltser and Joseph Kay on two occasions, which I describe below.

7.    I had previously met Mr. Kay on several occasions through my work with Mr. Patarkatsishvili. My understanding was that Mr. Kay was Mr. Patarkatsishvili's distant relative as well as an associate of Mr. Patarkatsishvili who at times dealt with some of the mechanics, including funding, necessary to implement certain of Mr. Patarkatsishvili's investments. My understanding was that Mr. Kay was an employee of Mr. Patarkatsishvili and that he had dealings primarily in relation to the latter's business

interests in the United States. In all of my dealings with Mr. Kay it was apparent to me that he was administering Mr. Patarkatsishvili's money, not his own, and that he was merely executing Mr. Patarkatsishvili's orders. In other words, it appeared to me that the ultimate beneficiary of the investments that I knew Mr. Kay to be handling was always Mr. Patarkatsishvili himself.

8.    I first met Mr. Zeltser at the home of Mr. Patarkatsishvili and his wife, Inna Gudavadze, in Surrey, England on 14 February, 2008, two days after the death of Mr. Patarkatsishvili. Mr. Zeltser was there with Mr. Kay. On that day, a number of friends, family and colleagues of Mr. Patarkatsishvili and gathered for a kind of impromptu wake which lasted most of the day. Mr. Jaffe was also present with me during this visit to Mr. Patarkatsishvili's home.

9.    I recall that it was Mr. Patarkatsishvili's son-in-law, Alexander Zhmotov, who during my visit mentioned to me that Mr. Zeltser was Mr. Kay's lawyer and that he wanted to talk to Mrs. Gudavadze about Mr. Patarkatsishvili's will. I had never heard of Mr. Zeltser before, and I did not know anything about the existence of such a will.

10.    In several conversations that Mr. Jaffe and I had with them during the course of the day, Mr. Kay and Mr. Zeltser referred to the terms of the alleged will. Among other things, Mr. Zeltser told us that the contents of the will could not be disclosed for six months. I understood this to mean that the terms of the will itself provided that it should not be so disclosed. This struck me as an extremely unusual provision for a will, although I did not feel it was the appropriate occasion to question Mr. Zeltser about this.

2

11. At one point during the course of the day, Mr. Kay stated to Mr. Jaffe and me that he was the sole executor of the will, which Mr. Zeltser confirmed. I also recall Mr. Zeltser at the same time confirming that he had been granted a Power of Attorney to manage the assets of Mr. Patarkatsishvili.

12. In addition, on 14 February, 2008, Mr. Kay and Mr. Zeltser asked Mr. Jaffe and me if they could meet with us the following day to discuss Mr. Patarkatsishvili's investments that were managed by Salford. We agreed to meet the next day at Salford's offices in London.

13. The meeting on 15 February, 2008 began at approximately 11 a.m. and lasted until approximately 5 p.m., without a break for lunch. Mr. Kay and Mr. Zeltser arrived together. Mr. Kay was immediately confrontational. He began by telling Mr. Jaffe and me that he now effectively stood in the shoes of Mr. Patarkatsishvili and that Salford should treat him accordingly, and he demanded documentation and information about Mr. Patarkatsishvili's investments. Mr. Jaffe responded that unless and until Salford saw valid original documents establishing Mr. Kay's authority to act on behalf of Mr. Patarkatsishvili's estate, Salford would not accede to any of his requests for documentation or information regarding Mr. Patarkatsishvili's business interests.

14. The meeting was not ordered or structured. Mr. Kay and Mr. Zeltser were both very confrontational and were constantly making demands. There were a lot of raised voices and heated discussions. Mr. Jaffe appeared frustrated by our visitors' conduct, and on a number of occasions threatened to end the discussions unless Mr. Kay and Mr. Zeltser behaved professionally.

3

15.   I specifically recall Mr. Kay demanding to see all information regarding certain of Mr. Patarkatsishvili's investments, including details about the structure and the directors of the investment vehicles. Mr. Jaffe and I explained that without documentation establishing Mr. Kay's authority to act on behalf of Mr. Patarkatsishvili, we could make no such disclosures, but could only talk with them in general terms about the investments based on information in the public domain.

16.   In response to our insistence on seeing documentation, Mr. Zeltser showed me a document on the laptop computer that he had brought to the meeting. I recall that this was a copy of a New York Power of Attorney purportedly signed by Mr. Patarkatsishvili in favor of Mr. Zeltser and I assumed this to be the Power of Attorney Mr. Zeltser had referred to the previous day. To the best of my recollection, the document that Mr. Zeltser showed me on his laptop computer screen is the same document entitled "General Durable Power of Attorney" dated December 14, 2006, which is attached to this Declaration as Exhibit A. However, Mr. Zeltser did not give me a copy of the document on his laptop, so I have not compared the two documents. I distinctly recall Mr. Zeltser emphasizing the point that this Power of Attorney had been drafted specifically so as to remain valid even after Mr. Patarkatsishvili's death.

17.   Mr. Zeltser urged me to release documentation and information to him immediately because he said he needed information about Mr. Patarkatsishvili's assets in order to make certain filings with the court in New York the following Tuesday (19 February, 2008). He did not give any details of these alleged New York court proceedings and I did not ask him any further questions. Mr. Zeltser was pushing me to proceed, insisting that there was no time for further delay.

4

18.    I repeated once again that we would not disclose any non-public information until they had provided valid documentation in original form establishing their authority to act for Mr. Patarkatsishvili, and until Salford's lawyers had reviewed such documentation. After speaking with Salford's in-house counsel, I again told our visitors that I would not release any non-public information to them and suggested that they request the information directly from the directors of the relevant investment companies. Mr. Kay and Mr. Zeltser were angered by the position we were taking.

19.    After some further discussions regarding the same issues, Mr. Kay and Mr. Zeltser eventually left the Salford offices. During the course of the day, we provided Messrs. Kay and Zeltser some information that was in the public domain, such as, for example, on the Salford website.

20.    I have had no further interactions with either Mr. Kay or Mr. Zeltser since that day, although I recall seeing them at Mr. Patarkatsishvili's funeral in Tbilisi, Georgia on 28 February, 2008.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _3_ April 2008 in _London_

Paul Blyumkin

London, United Kingdom
[3] April 2008

5



# General Durable Power of Attorney

*TO ALL WHOM THIS MAY COME, BE IT KNOWN THAT:* I, ARKADI (BADRI) PATARKATSISHVILI, a citizen of Georgia, born on October 31, 1955, in Tbilisi, resident of the City of Tbilisi, Gldani bldg. 10, Apt. 88, passport # 1508037, personal # 65002001339, issued by the Ministry of Justice of the Republic of Georgia on December 17, 2005 (PRINCIPAL) do hereby appoint my personal lawyer, EMANUEL ZELTSER, Esq. (AGENT) my true agent and attorney-in-fact to do and to act in my name, place and stead with respect to ANY AND ALL MATTERS, as I myself could or might do if I were personally present, to the extent that I may be permitted by law to act through an agent, including without limitations, effecting any and all transactions with respect to my personal and business property, wherever situated, banking, real estate, chattel, securities, commodities and investments transactions; business operating and insurance transactions; estate, last wills and testament administration; claims and litigations; and all other matters of whatsoever nature. It is the intention of the Principal that this General Durable Power of Attorney be construed in the broadest manner, so as to give the Agent each and every power to act for the Principal in his own unhampered discretion.

This Power of Attorney is given with full and unqualified authority to delegate any and all of the foregoing powers to any person or persons whom my Agent shall select in his discretion.

Hereby ratifying and confirming all that said Agent or substitute may do or may cause to be done.

This Power of Attorney is durable and irrevocable and is granted for valuable consideration, sufficiency of which is hereby acknowledged and shall not be affected by my subsequent death, disability or incompetence.

Photostatic copy of this Power of Attorney shall have the same force and effect as the original.

## HOLD HARMLESS

I, the undersigned Principal, request that all third parties to whom this Power of Attorney may come, rely upon and honor this Power of Attorney and as an inducement thereof, I agree and pledge to indemnify and hold harmless any third party acting in reliance thereupon and his/her/its agents, employees, successors and assigns from any and all claims or damages arising out of such third party's reliance upon and honoring this Power of Attorney.

_____
ARKADI (BADRI) PATARKATSISHVILI

*On this 14ᵗʰ day of December in the year 2006, before me, Alexander Fishkin, a Notary Public and Constitutional Officer of the State of New York, County of New York, personally came Arkadi (Badri) Patarkatsishvili personally known to me to be the Principal named in the within General Durable Power of Attorney. I have been satisfied that Mr. Patarkatsishvili is of sound mind and has full understanding of the document, which he is executing herein and that he does so on his own free will and as his own considered free deed. Thereafter Arkadi (Badri) Patarkatsishvili executed the within General Durable Power of Attorney in favor of the Agent, under his own hand in my presence.*



ALEXANDER  FISHKIN, ESQ.
Notary Public * State of New York
Qualified in New York County
No. 31-5000163
Commission exp. Aug. 10, 2010

Dunkin Declaration

MICHELLE DUNCAN hereby declares, pursuant to 28 U.S.C. § 1746, the following to be true and correct.

1.    I make this declaration in support of the action filed by the wife and daughters of Badri Patarkatsishvili against Joseph Kay and Emanuel Zeltser.

2.    I am a litigation partner with the law firm of Cadwalader Wickersham & Taft LLP, resident in the firm's London office. My business address is 265 Strand, London, WC2R 1BH.

3.    I represented Inna Gudavadze for a period of time after Badri Patarkatsishvili's death on 12 February 2008. In that capacity, I met and spoke on the telephone with both Joseph Kay and Emanuel Zeltser about the documents that they claim give them authority to speak and act on behalf of Mr. Patarkatsishvili and his estate. I also was permitted to view images of some of those documents on Mr. Zeltser's laptop computer screen.

4.    On 20 February 2008, I met with Mr. Kay and Mrs. Gudavadze and several other people at her home outside of London. I asked Mr. Kay some questions about the documents related to Mr. Patarkatsishvili's estate. Mr. Kay said he did not know where Mr. Patarkatsishvili's will was but agreed that it should be produced. When I asked Mr. Kay about his relationship with Mr. Zeltser, he became confrontational and would not answer my questions. He did say that he did not know Mr. Zeltser well; that Mr. Zeltser had contacted him after Mr. Patarkatsishvili died; and that when Mr. Kay told Mr. Zeltser that he was going to Mrs. Gudavadze's home on 14 February 2008, Mr. Zeltser asked to accompany him.

5.    I asked Mr. Kay if he would arrange for Mr. Zeltser to meet with me and give me copies of the documents related to Mr. Patarkatsishvili's estate. Mr. Kay said he could only ask Mr. Zeltser to meet with me, he could not insist that Mr. Zeltser do so and he could not ask Mr. Zeltser to provide copies of the documents.

6.    Mrs. Gudavadze asked Mr. Kay to meet with me to help me identify Mr. Patarkatsishvili's assets. Mr. Kay agreed and said he would call later that day or the next day to schedule a meeting.

7.    Late in the afternoon of 20 February 2008, Mr. Zeltser left me a voicemail message in which he said that he understood from Mr. Kay that it would be a good idea to call. Shortly thereafter I returned Mr Zeltser's call. During that conversation, I told Mr. Zeltser that I thought the Power of Attorney allegedly granted from Mr. Patarkatsishvili to Mr. Zeltser, which he had previously shown to some of Mr. Patarkatsishvili's business associates and which I had subsequently seen, had become invalid when Mr. Patarkatsishvili died. Mr. Zeltser insisted that the Power of Attorney remained valid. He then said that the Power of Attorney was not important because he had many other documents on which he could rely for authority with respect to Mr. Patarkatsishvili's estate.

8.    Mr. Zeltser told me that he had represented Mr. Patarkatsishvili since 1995 or 1996 and that Mr. Patarkatsishvili had signed a will on 14 November 2007 in New York. Mr. Zeltser also said that Mr. Patarkatsishvili had named Mr. Kay as the executor of his estate with fairly significant powers and much discretion.

2

9.      During our discussion, I told Mr. Zeltser that Mrs. Gudavadze and I doubted that Mr. Patarkatsishvili had signed the Power of Attorney, and that we would therefore want to have any other document that he claimed Mr. Patarkatsishvili had signed, including the alleged will, examined by an expert. Mr. Zeltser said that he would not object to this; he told me that he understood that I would challenge the authenticity of the signatures and that he expected this, as it was standard practice.

10.     Mr. Zeltser insisted that Mr Patarkatsishvili's signatures on the documents were genuine. He said that the will had been notarized by a "most meticulous man", Alexander Fishkin. He also said that each document had been witnessed by two independent witnesses. He commented that the signatures didn't matter; even if there was only a cross as a signature, that was sufficient because the execution was witnessed and notarized.

11.     Prior to my phone call with Mr. Zeltser on 20 February, I was aware that on 14 February 2008, Mr. Zeltser had told Mrs. Gudavadze and others that Mr. Patarkatsishvili had a fourteen-year-old son named David Patarkatsishvili by a Russian citizen named Olga Safonova. It was my understanding that before Mr. Zeltser made this disclosure to Mrs. Gudavadze, two days after Mr. Patarkatsishvili died, Mrs. Gudavadze had no knowledge of Ms. Safonova or her son.

12.     During my phone call with Mr. Zeltser on 20 February, he told me that it was Mr. Patarkatsishvili's intent to leave a significant portion of his estate to Ms. Safonova and her son and a significant portion to Mrs. Gudavadze and their daughters.

3

13.     I asked Mr. Zeltser why he had refused to show anyone the documents related to Mr. Patarkatsishvili's estate.  He said that he had not produced the documents to those whom he had approached thus far because they had taken an "adversarial" position towards him.  He also claimed that, because both Mrs. Gudavadze and Ms. Safanova were named as beneficiaries, he had been directed to show each beneficiary only the part of the documents relating to that person, so as to keep the identities of the other beneficiaries secret.  And as he could not show anyone the entirety of the documents, he had decided not to show them to anyone.  However, he added, he would show me at least one of the relevant documents when we met in person.

14.     I asked Mr. Zeltser when we could meet, and we agreed to meet in New York on Friday, 22 February.  Mr. Zeltser subsequently emailed me and asked to move the meeting to Sunday, 24 February, and we agreed on 2.30 p.m.  On the morning of 24 February, Mr Zeltser emailed me and told me to call his cell phone to discuss where we were going to meet.  I did so, and Mr. Zeltser told me to meet him at the Buddha Bar, 25 Little West 12th Street, New York, New York.

15.     On 22 February 2008, not having heard from Mr. Kay, I called him to schedule a meeting to discuss Mr. Patarkatsishvili's assets, as we had discussed on 20 February.  Mr. Kay said that he was only willing to communicate with me through his personal lawyer, Mr. Zeltser.

16.     On 24 February 2008, I and a colleague met with Mr. Zeltser and two of his colleagues, Alexander Fishkin and Alexsandr Cherny, at the Buddha Bar.  The Buddha Bar was closed to the public at that time.  The participants in our meeting sat at

4

one table. Mr. Fishkin and Mr. Cherny were present during our discussion but did not speak.

17.     At another table was a group of young men and women. I was not introduced to them, and they did not participate in our discussion.

18.     Mr. Zeltser began the meeting by asking whether we agreed that these were quasi-settlement discussions and that therefore the discussions and the documents he was going to show us were privileged; I told him that I would not agree to that limitation. Mr. Zeltser also told me that he was attending the meeting in his capacity as Mr. Kay's personal lawyer.

19.     Mr. Zeltser showed me images on his computer related to Ms. Safanova, whom he claimed was legally married to Mr. Patarkatsishvili at the time of his death. The documents purported to be (i) a marriage certificate for Mr. Patarkatsishvili and Ms. Safonova; (ii) an invitation to their wedding; (iii) passports in Ms. Safonova's name issued by Russia and Georgia; (iv) health insurance cards for Ms. Safonova, David, and Mr. Patarkatsishvili; (v) an invitation to a dacha addressed to Ms. Safonova, Mr. Patarkatsishvili, and David; and (vi) photographs of Ms. Safonova and Mr. Patarkatsishvili's wedding.

20.     Mr. Zeltser also told me that in about 1996, Mr. Patarkatsishvili and Mrs. Gudavadze were divorced and that Mr. Zeltser would be able to obtain documents evidencing the divorce in a few weeks.

21.     Mr. Zeltser commented that everyone involved in resolving Mr. Patarkatsishvili's estate had an interest in ensuring that his wishes were carried out and

5

that the people whom he loved, specifically Mrs. Gudavadze and Ms. Safonova and their

respective children, were taken care of.  He then commented that if Mrs. Gudavadze

were to successfully challenge the testamentary documents that Mr. Zeltser held, and if

Ms. Safonova was, in fact, Mr. Patarkatsishvili's legal wife, then in the absence of a valid

will, Ms. Safonova would inherit as the legal spouse, and Mrs. Gudavadze would receive

nothing.  I interpreted this as a threat from Mr. Zeltser that Mrs. Gudavadze should

concede the validity of the documents that Mr. Zeltser held or risk inheriting nothing.

22.    During our meeting, Mr. Zeltser showed me images of several documents

on his laptop computer screen and allowed me to take handwritten notes about the

documents.  One of the documents was a one-page "Deed of Appointment of Executor,"

which said that Mr. Kay was:

> "the sole executor of the Appointor's entire estate and
> possessions wherever in the world situated, and the sole
> Administrator of any and all of the Appointor's last wills
> and testaments or the Appointor dies intestate of any and all
> properties and possessions wherever situated and grants to
> and vests upon the Executor all powers to administer the
> Appointor's estate at the Executor's sole and uncontrolled
> discretion for the benefit of the Appointor's beneficiaries.
>
> It is the Appointor's wish and intent that the powers of the
> Executor named herein be construed as broadly as possible
> and that the Executor's discretion in administering and
> carrying out the Appointor's wishes as have been conveyed
> by the Appointor to the Executor and known by the
> Executor, be unhampered in any way, shape or form."

The "Deed of Appointment of Executor" appeared to have been signed by Mr.

Patarkatsishvili, witnessed by two people, notarized by Mr. Fishkin and dated 14

November 2007.

6

23.     Mr. Zeltser also showed me an image of a "Statement of Wishes" which was several pages long and asserted that Ms. Safanova, described as Mr. Patarkatshisvili's wife, would inherit 25% of his estate; Mrs. Gudavadze, described as Mr. Patarkatsishvili's former wife, would inherit 25%; each of his three children would inherit 10%; and the remaining 20% would be divided among his mother, two sisters and a fourth person whose name I did not recognize but whom I was later told was the half brother of Mr Patarkatsishvili. The "Statement of Wishes" also appeared to have been signed by Mr. Patarkatsishvili, witnessed by two people, notarized by Mr. Fishkin and dated 14 November 2007.

24.     The "Statement of Wishes" was not in a format that either my colleague or I recognized. When I asked Mr. Zeltser about this, he said that he did not know who had prepared it, but that it had been created in Europe and brought to New York for execution.

25.     When he showed us the "Statement of Wishes" and "Deed of Appointment of Executor," Mr. Zeltser took some time to show us the signature pages and pointed out that the documents had been witnessed by two witnesses and notarized by Mr. Fishkin. While doing that, he gestured to the people sitting at the other table in the restaurant. It was my impression that the people sitting at that table were the witnesses to the documents, and they had been brought to the meeting to indicate their availability to testify about the execution of the documents.

26.     Mr. Zeltser also showed me an image of a different "Letter of Wishes" dated 25 July 2000, which appeared to be addressed to the trustees of a trust, in which

7

Mrs. Gudavadze was described as Mr. Patarkatsishvili's wife and granted 10% of the

estate, and Ms. Safonova (who was named but not described) was granted 6%. I pointed

out to Mr. Zeltser that this document seemed to contradict his claim that Mrs. Gudavadze

and Mr. Patarkatsishvili were divorced in 1996. He did not respond to that point.

27.     I asked Mr. Zeltser to give me copies of the documents. Mr. Zeltser said

that he expected to be able to do so later that day or the next day but first needed to check

with other people.

28.     On 25 February 2008, not having heard from him, I emailed Mr. Zeltser

and again requested copies of the documents.

29.     On 27 February 2008, I again sent an email to Mr. Zeltser and asked him

to provide copies of the documents. He responded via email that he was in Georgia for

Mr. Patarkatsishvili's funeral and would update me when he returned to New York.

Copies of that email correspondence are attached hereto as Exhibit A. At no time did Mr.

Zeltser give me copies of the documents.

30.     On 3 March 2008, I sent a letter to the Prosecutor General of Belarus,

notifying him that Mr. Patarkatsishvili may have had substantial assets in Belarus and

that Defendants and certain associates might attempt improperly to gain access to those

assets. A copy of that letter is attached hereto as Exhibit B.

31.     On 5 March 2008, I met with Mr. Zeltser, Mrs. Gudavadze and others at

the Four Seasons Hotel in Park Lane, London. During that meeting, Mrs. Gudavadze and

I again asked Mr. Zeltser questions about the documents related to Mr. Patarkatsishvili's

estate and asked him to provide us with copies. Mr. Zeltser avoided answering the

questions and made various excuses about why he would not provide us with copies of

the documents.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 19 April 2008 in London, England.

Michelle Duncan



Exhibit A

**Duncan, Michelle**

| | |
|---|---|
| **From:** | Sternik & Zeltser [lawmail@rambler.ru] |
| **Sent:** | 27 February 2008 15:54 |
| **To:** | Duncan, Michelle |
| **Subject:** | Re: |

Michelle, I am in Georgia for the funeral, have only very linited access to the Internet and emails. I am not sure what my NY office has received. Will be back during the weekend and will update you on the situation.

Thanks, yours, Emanuel

----- Original Message -----
**From:** Duncan, Michelle
**To:** lawmail@rambler.ru
**Sent:** Wednesday, February 27, 2008 8:36 AM

Emanuel,
I haven't heard from you since we exchanged emails on Monday. Have you received any of the other documents that you mentioned? If so, are we able to arrange a further meeting that I can inspect them? In any event, when we met on Sunday you indicated that you expected to be able to provide us with copies of the documents that you showed us at the meeting either later on Sunday or on Monday. Unfortunately I have not yet received anything. Are you able to scan or fax the documents to me? Please let me know.

I look forward to hearing from you.

Regards,

Michelle

NOTE: The information in this email is confidential and may be legally privileged. If you are not the intended recipient, you must not read, use or disseminate the information; please advise the sender immediately by reply email and delete this message and any attachments without retaining a copy. Although this email and any attachments are believed to be free of any virus or other defect that may affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Cadwalader, Wickersham & Taft LLP for any loss or damage arising in any way from its use.

31/03/2008



Exhibit B

# CADWALADER

Cadwalader, Wickersham & Taft LLP
New York  London  Charlotte  Washington  Beijing

265 Strand, London, WC2R 1BH
Tel +44 (0) 20 7170 8700
Fax +44 (0) 20 7170 8600
DX: 238 (Chancery Lane)
www.cadwalader.com

3 March 2008

Our Ref:  MD//94052.003/MD

Mr Grigory Vasilevich
Prosecutor General
24 Internatzionalnaya st.
Minsk
220050
Belarus

Dear Sir,

**Arkadi Patarkatsishvili**

We act for Inna Gudavadze, the wife of Arkadi Patarkatsishvili, a prominent Georgian businessman and politician who died in the United Kingdom on 12 February 2008.

Since Mr Patarkatsishvili's death a number of individuals have attempted to gain information and documents regarding his estate and business interests both in the United Kingdom and elsewhere, acting in reliance on invalid and, we believe, forged documents. These individuals appear to have embarked on a concerted attempt to gain improper and unlawful access to Mr Patarkatsishvili's worldwide assets through the use of such false and improper documents.

We bring these matters to your attention as we believe that Mr Patarkatsishvili had or may have had substantial assets within your jurisdiction at the time of his death and it is important that those assets now be preserved for Mr Patarkatsishvili's lawful heirs, namely his wife and children.

Our concerns have arisen largely as a result of the following:

1.  On Friday 15 February 2008, only three days after Mr Patarkatsishvili's death, a Mr Joseph Kay visited the offices of Salford, a company in London in which Mr Patarkatsishvili had significant investments. Mr Kay is a distant relative of Mr Patarkatsishvili and prior to Mr Patarkatsishvili's death had some involvement in certain of his business interests. On arriving at Salford's premises, Mr Kay informed its' executives that he was authorised to act in place of Mr Patarkatsishvili and demanded that he be given signing authority over all accounts that Mr Patarkatsishvili had maintained with the

Cadwalader, Wickersham & Taft LLP is a registered limited liability partnership established under the laws of the State of New York. The personal liability of our partners is limited to the extent provided in such laws. Additional information is available upon request or at www.cadwalader.com. A list of our partners, who are Solicitors or Registered Foreign Lawyers in England and Wales. Is available for inspection at the above address. Regulated by the Solicitors Regulation Authority

UKActive 1608721.1

# CADWALADER

Mr. Grigory Vasilevich
3 March 2008

company and that he be given information regarding Mr Patarkatsishvili's investments with Salford. Mr Kay at this stage did not produce any evidence in support of his assertion that he was empowered to act for Mr Patarkatsishvili and Salford, quite rightly, refused to give him any documents or information regarding Mr Patarkatsishvili's affairs or signing authority over any of the accounts. Mr Kay was accompanied to that meeting by a Mr Emanuel Zeltser, a New York lawyer.

2.   Also on 15 February 2008, Mr Zeltser telephoned Mr Nicholas Keeling, one of Mr Patarkatsishvili's main investment fund managers, claiming that he had been Mr Patarkatsishvili's attorney for 16 years and that he held a Power of Attorney which had been granted by Mr Patarkatsishvili in favour of Mr Kay. Mr Zeltser demanded of Mr Keeling that he immediately provide to Mr Zeltser all information he had regarding Mr Patarkatsishvili and his business interests and affairs worldwide.

3.   Two days later, on Monday 18 February 2008, Mr Zeltser produced a copy of the alleged Power of Attorney to Mr Keeling's lawyers. A copy of that document is enclosed with this letter together with copies of the email correspondence passing between Mr Zeltser on the one hand and Mr Keeling and his lawyers on the other. There are a number of unusual features about the Power of Attorney including the astounding assertion that it is irrevocable even in the event of the death of Mr Patarkatsishvili. Further, although the document was purported to have been signed by Mr Patarkatsishvili and notarised, the notary's signature and seal appear on a separate page from that of the purported signature of Mr Patarkatsishvili. Mr Alexander Fishkin, the notary who purportedly notarised the document, is a close associate of Mr Zeltser and, we believe, has regularly collaborated with him in the past. We have good reason to believe that the Power of Attorney is probably a forgery. In any event, the Power of Attorney, even if it had otherwise been valid, became invalid and unenforceable immediately upon Mr Patarkatsishvili's death. In this regard we note that it is a well known legal rule, both in New York, where the Power of Attorney was allegedly executed, and elsewhere, that a Power of Attorney does not survive the death of the grantor. We believe that Mr Zeltser was attempting to use this invalid document to lure the Mr Keeling and possibly others, into disclosing to him information regarding Mr Patarkatsishvili's affairs to which he was clearly not entitled.

# CADWALADER

Mr. Grigory Vasilevich
3 March 2008

4.  On 19 February 2008, Mr Zeltser was informed by the Mr Keeling's lawyers that the Power of Attorney upon which he purported to rely was invalid. His response was to claim that he had various other documents, including a Will, for Mr Patarkatsishvili, which gave him full authority to the documents and information that he was seeking. Subsequently, on Sunday 24 February 2008, a meeting took place in New York between members of this firm and Messrs Fishkin and Zeltser and a third person, a Mr Aleksandr Cherny. At that meeting Mr Zeltser indicated that he was also acting for Mr Kay. He then presented a number of documents which he appeared to have scanned onto his laptop computer. These documents included: (i) a "Deed of Appointment of Executor" by which Mr Patarkatsishvili purportedly appointed Mr Kay as executor of his estate, with sole and uncontrolled discretion to manage his affairs; and (ii) a "Letter of Wishes" in which Mr Patarkatsishvili set out how he wished his estate to be distributed after his death. Both documents were allegedly dated 14 November 2007 and were purportedly signed by Mr Patarkatsishvili, witnessed by two independent witnesses and notarised by Mr Fishkin. Mr Zeltser did not provide us with copies of these documents and although he indicated that he would do so, as of today no copies have been produced. At that meeting Mr Zeltser also indicated that Mr Patarkatsishvili had a Will that had been executed in 2004/2005 although he admitted that he did not have a copy of that document. We have no doubt that the Deed of Appointment of Executor and the Letter of Wishes are forgeries. In this regard we can produce evidence in the form of Witness Statements and other records that will prove that Mr Patarkatsishvili could not have signed either of these documents on 14 November 2007 and that he did not even meet with either Mr Zeltser, Mr Fishkin or Mr Kay on that date. In brief, our evidence conclusively shows that Mr Patarkatsishvili did not arrive in the United States until approximately 9.45 pm on 14 November 2007 and that from the time he landed until approximately 2.00 am on the morning of 15 November 2007 he was constantly engaged with various friends and business associates who can testify that he signed no such document on 14 November 2007.

5.  Based on publicly available information which we have obtained via the Internet and other sources, it appears that this is not the first time that Messrs Zeltser and Fishkin have worked together in concert and they have in the past been accused of fraud and forgery in conjunction with various legal actions in the United States. In this regard we attach a number of articles which may be of interest to you.

# C A D W A L A D E R

Mr. Grigory Vasilevich
3 March 2008

6. On around 16 February 2008, Mr Kay travelled to Georgia where he apparently sought to meet with Georgian government officials regarding Mr Patarkatsishvili's assets and estate in Georgia. During his visit, Mr Kay met with Georgi Jaoshvili, who was holding on behalf of Mr Patarkatsishvili the Share Certificates for one of Mr Patarkatsishvili most important assets in Georgia, namely Imedi, a television station. Mr Kay showed Mr Jaoshvili an English language document which we believe to be either the "Deed of Appointment of Executor" or the purported "Power of Attorney" referred to above. Mr Kay claimed that such document gave him full power and authority to represent Mr Patarkatsishvili and deal with his affairs. On the basis of such document, Mr Kay persuaded Mr Jaoshvili to give to him the Share Certificates for Imedi. As is noted above, if the document Mr Kay produced to Mr Jaoshvili was the Power of Attorney then it was invalid (if it was not a forgery). If it was the Deed of Appointment of Executor, it was a forgery.

As noted at the outset, we believe that the above events demonstrate that Messrs Kay, Zeltser, Fishkin and possibly others are working together on a course of conduct which is aimed at defrauding Mr Patarkatsishvili's estate and depriving his lawful heirs of their inheritance.

To date they have attempted to gain access to information and assets in at least two jurisdictions of which we are aware and we strongly suspect that they have embarked, or may embark, on a similar course in other jurisdictions.

We bring this matter to your attention in the hope that you will act speedily and vigilantly in the event that any of Messrs Kay, Zeltser or Fishkin attempt to gain illegal and/or improper access to Mr Patarkatsishvili's assets in your jurisdiction by use of the above or any similar materials. In this regard we wish to point out that as of today's date neither Mr Zeltser, Mr Kay nor any other individual has applied to the Court in any jurisdiction for validation either of any of the above-mentioned documents nor for recognition of Mr Kay as Mr Patarkatsishvili's authorised representative. Accordingly, as of today neither Mr Kay, Mr Zeltser nor Mr Fishkin has any authority as regards Mr Patarkatsishvili's estate and in fact no-one has as yet been granted power to administer Mr Patarkatsishvili's estate.

If you wish to discuss any of the above or require any further information regarding Messrs Kay, Zeltser or Fishkin please do not hesitate to contact Michelle Duncan, solicitor for Inna Gudavadze, by email to michelle.duncan@cwt-uk.com or by telephone on +44 (0) 20 7170 8734. In any event we would be grateful if you would immediately inform us in the event

# C A D W A L A D E R

Mr. Grigory Vasilevich
3 March 2008

that you become aware of any action taken by any of Messrs Kay, Zeltser or Fishkin to
obtain access to any of Mr Patarkatsishvili's assets in your jurisdiction.

Yours faithfully,


Michelle Duncan


cc:     Mr. Vladimir Naumov
        Minister of Interior
        2 Gorodskoi Val st.
        Minsk
        Belarus

Encs

# DEBEVOISE & PLIMPTON LLP

Tower 42
Old Broad Street
London EC2N 1HQ
Tel +44 20 7786 9000
Fax +44 20 7588 4180
www.debevoise.com

10 March 2008

BY EMAIL AND COURIER

Emanuel Zeltser, Esq.
Sternik & Zeltser
119 West 72nd Street #229
New York, NY 10023
USA

**Patarkatsishvili Family Assets**

Dear Mr. Zeltser:

We act for Inna Gudavadze and her daughters Iya Patarkatsishvili and Liana Zhmotova, the heirs of Badri Patarkatsishvili. We are writing to you because we understand you represent Joseph Kay. If our understanding is incorrect, please advise us of that fact immediately, and we will contact Mr. Kay directly.

It has come to the attention of Mrs Gudavadze that Mr. Kay may have been identifying himself as executor to Badri Patarkatsishvili's estate and purporting to exercise authority and control over assets that belong to Mrs Gudavadze and her family. If Mr. Kay has been making such representations, we hereby demand that he immediately cease and desist from doing so. Only Mrs Gudavadze and her daughters are authorised to speak on behalf of Mr. Patarkatsisvili, and they reserve their rights to pursue all available legal remedies to protect their interests in this matter.

We would also like to arrange to meet with Mr. Kay to discuss the extent to which he or entities he controls may share ownership of assets that form a part of Mr. Patarkatsivili's estate. Also, if Mr. Kay believes he has documentation establishing that he in fact has authority to speak on behalf of Mr. Patarkatsishvili in any capacity, notwithstanding our belief to the contrary, we would request that you provide us with copies of that documentation as soon as possible, and in any event in advance of the meeting we seek, so that we may discuss that documentation when we meet. We expect to contact you soon to arrange such a meeting.

Please do not hesitate to contact us if you have any questions concerning the matters set forth herein. Please mark all correspondence for the attention of Lord Goldsmith (phgoldsmith@debevoise.com), Mark Friedman (mwfriedman@debevoise.com) and Christopher Tahbaz (cktahbaz@debevoise.com).

Debevoise & Plimpton LLP is a registered limited liability partnership established under the laws of the State of New York
A list of the partners' names and their professional qualifications is open to inspection at the above address
The partners are either solicitors or registered foreign lawyers The firm is regulated by the Solicitors Regulation Authority

New York • Washington, D C • London • Paris • Frankfurt • Moscow • Hong Kong • Shanghai

Emanuel Zeltser, Esq.                    2                    10 March 2008

Yours sincerely,

*Debevoise and Plimpton*

Debevoise & Plimpton LLP

Gudavadze Declaration

INNA GUDAVADZE hereby declares, pursuant to 28 U.S.C. § 1746, the following to be true and correct:

1.    I am a citizen of the Russian Federation and reside in the United Kingdom. My address in the United Kingdom is Downside Manor, Downs Lane, Leatherhead, Surrey.

2.    I was the wife of Arkady (Badri) Patarkatsishvili from 1979 until his death on 12 February 2008.

3.    I am making this declaration in support of the lawsuit brought by me and my daughters, Liana Zhmotova and Iya Patarkatsishvili, against Joseph Kay and Emanuel Zeltser. The purpose of our lawsuit is to prevent Messrs. Kay and Zeltser from representing themselves as the authorized representatives of my husband's estate, and seeking to exercise control over the assets in my husband's estate, unless and until such time as they are able to prove they have such authority. As I will explain below, Mr. Kay and Mr. Zeltser have refused to provide me with any evidence that they have such authority. I believe this is because in fact they have no such authority, and that any documents they claim give them such authority are in reality fraudulent or otherwise defective.

4.    Joseph Kay was the half-cousin and a business associate of my husband. I met Mr. Kay for the first time in 1992 or 1993 when I traveled to the United States with my husband, and I saw him periodically after that. Because Mr. Kay lived in the United States with his mother, my understanding is that Badri did not meet him until 1991.

5.     I met Mr. Zeltser once about a decade ago.  My husband and I were in New York, and Badri introduced me to Mr. Zeltser as an attorney, but Badri did not say or suggest that Mr. Zeltser acted as his attorney.  After that meeting, Badri never spoke to me about Mr. Zeltser or about granting him a power of attorney.  That meeting was the only time I recall seeing Mr. Zeltser until he came to my home in February 2008.

6.     Mr. Kay and Mr. Zeltser came to visit me in my home in Leatherhead, England, on 14 February 2008, two days after my husband died.  Many other people were there that day; friends, family and colleagues had gathered to remember Badri.

7.     Mr. Kay introduced Mr. Zeltser as a lawyer who had Badri's will.  During his visit, Mr. Zeltser also told me (and others at my home) that he had acted as my husband's attorney and that he had possession of my husband's will.  He also said that my husband had appointed Mr. Kay as the executor of his estate.  In a private conversation he had with me, Mr. Zeltser told me that my husband had left his entire estate to his family, and that I was the main beneficiary.

8.     At no time during his visit to my house did Mr. Zeltser show me the will or any other document supporting these claims.  I will admit that I did not ask him to see such documents at this time; I cannot say why, other than that I was in a state of grief and mourning for the loss of my husband.  At one point when Mr. Zeltser was discussing these matters in front of others, Nikolay Glushkov, who is an old friend and business associate of Badri, asked Mr. Zeltser if he was reading from the will.  Mr. Zeltser said that he was not, but that he was passing along information that Badri had asked him to convey to us.

9.    Mr. Zeltser and Mr. Kay returned to my house in the evening of the next day, 15 February 2008. A number of people were visiting that day, and because Mr. Kay was a distant relative, I did not think it was odd that he was there, but I was surprised that Mr. Zeltser had accompanied him. I asked Mr. Kay why Mr. Zeltser had come, and he said he did not know but suggested that I ask him. I did that, and in response, Mr. Zeltser simply replied that he had nothing in particular to discuss with me. I found this odd but was too distraught and distracted to follow up on it. Mr. Zeltser remained in our home for several hours, during which time he walked from room to room and played the piano, which I also found odd. I do not recall discussing the will or matters related to the estate with either Mr. Kay or Mr. Zeltser on 15 February.

10.    On 20 February, 2008, I met with Mr. Kay, Michelle Duncan, a lawyer at Cadwalader, Wickersham & Taft LLP, who was representing me at the time, and several others at my home outside London. The purpose of the meeting was to learn more about the documents that Mr. Kay and Mr. Zeltser had claimed to possess.

11.    Ms. Duncan asked Mr. Kay some questions about the documents related to Mr. Patarkatsishvili's estate. Mr. Kay said he did not know where the will was but agreed that it should be produced. When Ms. Duncan asked him about his relationship with Mr. Zeltser, he became confrontational and would not answer her questions.

12.    Ms. Duncan asked Mr. Kay if he would have Mr. Zeltser meet with her and give her copies of Badri's will and the other documents related to his estate. Mr. Kay said he could only ask Mr. Zeltser to meet with Ms. Duncan, he could not insist that Mr. Zeltser do it, and he couldn't ask Mr. Zeltser to provide copies of the documents.

3

13.     During that meeting, I also asked Mr. Kay to meet with Ms. Duncan and help her identify my husband's assets, and I explained to him that I was asking many business associates of my husband to do this. Mr. Kay agreed to assist and said he would call Ms. Duncan either late that day or the next day to set up a meeting. I have been told that Mr. Kay did not do this and when Ms. Duncan called him, he told her that she must only communicate with Mr. Zeltser, who is his counsel.

14.     Towards the end of the meeting, Mr. Kay told me that he had sold Imedi, a broadcasting company in Georgia which had stopped broadcasting in late 2007 by order of the Georgian government. I knew that my husband had a controlling beneficial interest in Imedi's parent company. I was deeply shocked by Mr. Kay's news. I could not believe that Mr. Kay could have acted behind my back by taking over the television station, especially since Badri had been deceased for little more than one week and the family had never consented to a sale. I was completely devastated and upset.

15.     On 27 February 2008, the day before Badri's funeral, I met with Mr. Kay in Tbilisi, Georgia, where Badri and I also maintained a home. I asked him to come to my house in the morning to discuss how and why he had acquired ownership of Imedi without the family's consent. My daughter Liana (Lika) Zhmotova was also present at the meeting.

16.     During this meeting, I asked Mr. Kay to give me copies of the documents related to my husband's estate, but Mr. Kay told me that I knew as much about the documents as he did. I took that response to mean that Mr. Kay did not have copies of the documents.

17.    During that meeting, Mr. Kay kept trying to show me a text message on his cellular phone, which he claimed Badri had sent to him sometime before he died in order to express his wishes. I refused to see the text message because I did not believe that message to be sufficient evidence of my husband's wishes. Mr. Kay had shown Nana Patarkatsishvili, Badri's sister, that text message earlier and Nana told me that all it said was something vague along the lines that Mr. Kay should go and do what Badri wanted him to do. At the meeting on 27 February, Mr. Kay claimed that that message was firm proof that my husband wanted him to sell Imedi Television, but I rejected that idea.

18.    I told Mr. Kay that I and my family are the beneficiaries of Badri's estate, and that he should therefore transfer control of Imedi to us. He told me that he would not do that.

19.    Later on 27 February 2008, in the evening, I had another meeting at another family residence in Tbilisi with Mr. Kay, as well as three other men: Martin Pompadur and Vladimir Voronov, whom I understand to be executives of News Corporation, and Irakli Rukhadze, a business associate of my husband. My daughter Lika was also present at that meeting. I had requested this meeting to discuss the fate of Imedi. I asked the News Corporation executives to attend because I knew that, pursuant to an agreement with Badri, News Corporation had been managing Imedi.

20.    At the meeting, I again asked Mr. Kay how he had come to control Imedi; he responded that control was transferred to him. I told him again that I and my family were the beneficiaries of Badri's estate, and that he should therefore transfer control to

us. Mr. Kay repeated that he would not do that, and he repeated the same message to me during a telephone conversation a few days later.

21.     Also, at the meeting on 27 February, Mr. Pompadur and Mr. Voronov asked Mr. Kay for copies of the documents establishing his authority to act on behalf of Badri's estate. Mr. Kay told them to speak with his lawyer, Mr. Zeltser.

22.     I have met with and spoken on the telephone with Mr. Kay several times since 27 February. I recall meeting with him twice on 7 March 2008. The first meeting took place in the afternoon at one of my family's residences in Tbilisi. My daughter Lika was present at the meeting.

23.     I asked Mr. Kay again to show me the documents that he claimed authorized him to act on behalf of Badri. He claimed that he was told that I saw these documents on a laptop, just like he did. I denied that I saw those documents. I then asked him how he could act without any documents confirming his authority. Mr. Kay responded that all he did was to acquire a controlling interest in Imedi, which was Badri's wish. He stressed that he was acting in the interests of the family and simply taking steps to secure assets of the estate.

24.     I had previously learned that Mr. Kay and Mr. Zeltser had met with executives at Salford Capital Partners, a private equity firm that managed some of Badri's investments, and, relying on a Power of Attorney allegedly from Badri to Mr. Zeltser, had demanded information and documents about Badri's investments with Salford. So, at the meeting on 7 March, I challenged Mr. Kay by reminding him that he also went to

6

Salford's office and demanded information. He responded that he was invited there by Eugene Jaffe, an executive at Salford.

25.    I met with Mr. Kay again in the evening of 7 March at another family residence in Tbilisi. I requested this meeting because many members of my and Badri's family wanted to meet with Mr. Kay and confront him about his recent actions. Badri's mother, Natela Patarkatsishvili, his sisters Nana Patarkatsishvili and Mzia Totladze, my daughters Lika and Iya, my brother Grigori Gudavadze, and other family members were present at the meeting. It was a heated and contentious meeting. Several of my relatives asked Mr. Kay to show them the documents he claimed to have related to Badri's estate, but Mr. Kay came up with all sorts of excuses and declined to show me and my family anything. Among other things, he told us that Mr. Zeltser had the documents. His standard response to the repeated question as to why he was dealing with Badri's, and, therefore, the estate's assets, was that he was merely securing the assets in the interests of the family.

26.    The last time I saw Mr. Zeltser was at a meeting with Michelle Duncan, in a bar of the Four Seasons Hotel in London. I do not recall when the meeting occurred but I have been told that it occurred on 5 March 2008. Mr. Zeltser, Ms. Duncan, Ms. Duncan's colleague Steve, Natalia Nosova, and I attended that meeting.

27.    I recall that during that meeting, Ms. Duncan and I asked Mr. Zeltser questions about the documents related to Badri's estate and asked Mr. Zeltser to provide us with copies of the documents. Mr. Zeltser avoided answering the questions and made various excuses about why he would not provide us with copies of the documents.

28.    I had hoped to resolve this issue without litigation, and I have asked Mr. Kay numerous times to stop representing himself as acting on behalf of me, my daughters, or my husband's estate. I have also asked him repeatedly to give me copies of the documents that he claims authorize him to act on behalf of Badri.

29.    Mr. Kay has refused my requests to change his behavior, and he has refused to give me the documents I seek. Mr. Kay's explanation for Mr. Zeltser's refusal to produce documents to me was that Mr. Zeltser could not disclose the documents until he had filed them with the court in New York. I do not know what type of court filing Mr. Kay was referring to and he did not provide any further explanations.

30.    I have never authorized Mr. Zeltser or Mr. Kay to act or speak on behalf of me, my family or my husband's estate. To the best of my knowledge, none of the other potential beneficiaries of Badri's estate, including Badri's mother and children, has ever authorized Mr. Zeltser or Mr. Kay to act or speak on behalf of me, my family, or Badri's estate.

31.    I do not understand why Mr. Kay and Mr. Zeltser have refused to provide me with copies of the documents by which they claim my late husband appointed Mr. Kay as his executor and expressed his wishes for the disposition of his estate. If these documents genuinely conveyed the authority as Mr. Kay and Mr. Zeltser have represented, I can think of no good reason why they would not want to share these documents with me and my lawyers, and to seek our cooperation in settling my husband's estate. Because Mr. Kay and Mr. Zeltser have refused to do so, I can only

conclude that the documents they claim to have are in fact fraudulent or otherwise defective.

32.    I am also worried about the fate of my husband's estate, because I have reason to believe that Mr. Kay is attempting to gain control over various of my late husband's assets. As I have stated above, it appears that Mr. Kay has already gained control over my late husband's stake in I-Media, although he continues to refuse to explain how this happened, save for his vague references to executing Badri's wishes.

33.    Also, I understand from some of my husband's former business associates and financial advisors, in addition to Salford, that Mr. Kay has attempted to obtain information about certain of my late husband's investments by claiming that he is the executor of Badri's estate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 4 April 2008 in Tbilisi, Georgia.

Inna Gudavadze

9

Motkin Declaration

ANATOLY MOTKIN hereby declares, pursuant to 28 U.S.C. § 1746, the following to be true and correct:

1.    Since April 2006 I have worked with Arkady Patarkatsishvili ("Badri") as a political advisor.

2.    In this declaration, I describe the events that took place during a trip I made to the United States with Badri in November 2007.

3.    On 14 November 2007 I was at Badri's house, Downside Manor in Leatherhead, just outside of London where, together with Badri and others including Vasily Trunin, Vladimir Voronoff and Georgi Targamadze, we were discussing future lobbying efforts in USA concerning the Georgian elections. At around 3 or 4 pm, during the course of those discussions Vasily Trunin suggested that it would probably be more beneficial to have these discussions in New York because *"that is where everything happens."*

4.    Badri agreed and decided that we would leave for the United States immediately. He asked me whether I had a valid United States visa which, fortunately, I did. We drove to Luton airport and by around 8:00 p.m. London time were en route for New York. In addition to Badri and me, Valdimir Voronoff of News Corporation and Georgi Targamadze of Imedi TV were on the plane together with the crew. Joseph Kay, who I understand to be a relative of Badri's and who also worked with Badri from time to time, was not on the plane and we did not see him at any time during what was to be our brief visit to the United States.

5.    We landed in New York at around 9:45 p.m. New York time on 14 November 2007. We were met at the airport by Dmitry Sidorov, "Kommersant's" journalist in Washington. Someone had arranged for cars and drivers to take us to Manhattan. Badri traveled in one of the cars together with Dmitry Sidorov and Vladimir Voronoff, and the rest of us went in the second car. There was no one else in the car that Badri traveled in apart from the driver, who was Georgian.

6.    When we reached Manhattan we went immediately to a restaurant "Nobu next door" where we had dinner with Irakly Kakabadze and Anna Dolidze, two Georgian dissidents who were I believe living in New York at the time. No one else joined us at the dinner and at no stage during the dinner was Badri given any documents to read or sign.

7.    We stayed at dinner until around 1:00 a.m. New York time on the morning of 15 November 2007 following which we drove up to the St. Regis hotel on the corner of 5th Avenue and 55th Street where we checked in.

8.    After we checked in, I spent some time chatting with Badri in his room. I believe I left him at around 2:00 a.m. when I went to bed. No one else visited Badri while I was with him, and he was not given any documents to read or sign.

9.    I met Badri in the hotel lobby at around 10 a.m. the next morning. Alex Goldfarb joined us at that stage. We (Badri, me and Georgi Targamadze) then went to meetings with Vladimir Gusinsky of RTVi, a Russian television station in the United States, which lasted until around 3:00 p.m.. After those meetings we returned to the hotel and after further meetings in the hotel restaurant we checked out, returned to the airport

2

and flew to Washington for further meetings. We left the United States and returned to the UK from Washington on the evening of 16 November 2007.

10.     Except for when he was in his hotel room or when we were traveling in separate cars. I was with Badri almost constantly during our visit to the United States. At no time while I was with him was Badri given any documents to read and he did not read or sign any documents in my presence. As to my best knowledge while we were in New York on 14 and 15 November, he did not meet with any one whom I do not know.

I declare under penalty of perjury under the laws of the United Stated of America that the foregoing is true and correct.

Executed on *April 13*, 2008 in *London*.

_____
Anatoly Motkin

Voronoff Declaration

4.      We arrived in New York late in the evening of 14 November and immediately drove to Manhattan where we had dinner at a restaurant called Nobu Next Door. I traveled in the same car as Badri and Dimitry Sidorov, a journalist working in Washington DC. Dimitry met us at the airport when we landed. The only other person in the car was the driver.

5.      After dinner, which finished in the early hours of the morning of 15 November, we were driven up to the St. Regis Hotel where we checked in and I went to bed.

6.      I was with Badri constantly from the time that our flight left London until we arrived at the St. Regis Hotel in the early hours of the morning of 15 November. During the time that I was with him he did not read nor was he asked to read any documents nor did he sign nor was he asked to sign any documents. Joseph Kay, who I had met many times before, did not accompany us on the trip and I did not see him during our entire visit. While we were at Nobu Next Door, Joseph's son arrived to say hello to Badri. He only stayed a short time and did not give him any documents. At no state during the evening of 14 November did Badri speak with or meet with anybody that I did not know.

7.      On the morning of 15 November we met for breakfast in the restaurant at the St. Regis Hotel. After breakfast Badri, together with Anatoly Motkin, went to a meeting with RTV-I, the Russian television channel that Vladmiir Gusinsky operate in the United States. I understand that he was interviewed by RTV-I. Later in the afternoon we met at the St. Regis Hotel for further meetings following which we flew down to

2

VLADIMIR VORONOFF hereby declares, pursuant to 28 U.S.C. § 1746, the following to be true and correct:

1.      I make this witness statement to describe the events that took place during a trip I made to the United States with Arkady Patarkatsishvili ("Badri") and others in November 2007.

2.      On November 2007 I was at a meeting in Badri's house, Downside Manor, just outside of London, together with a number of others including Badri, Anatoly Motkin and Georgi Targamadze.  We were discussing the political situation in Georgia. Late in the afternoon, during the course of those discussions we decided to fly to the United States to try to talk with lobbyists and politicians in New York and Washington, DC regarding the political situation in Georgia.  I work closely with News Corporation which was following the situation in Georgia very closely, not least because it has a substantial investment in Imedi TV, the only independent television station in Georgia. Imedi was substantially owned and controlled by Badri.  On 7 November, a week before our trip to the US, Imedi had been forcibly shut down by the Georgian government and one of the reasons for our trip was to see if we could obtain assistance and support in the United States for our efforts to have the television station reopened.

3.      After we decided to fly to the US, I went home to pack and I joined the others at Luton airport later that evening where we took a private jet to New York.  In addition to the crew there were four of us on the flight: Badri, me, Anatoly Motkin who worked for Badri, and Georgi Targamadze who works at Imedi.

Washington DC where we checked in to the Four Seasons Hotel on the evening of 15 November.

8.     On 16 November Badri had meetings in Washington and we flew home later that evening.  During the time that I spent with Badri on 15 and 16 November he neither read nor signed any documents.

I declare under penalty of perjury under the laws of the United Stated of America that the foregoing is true and correct.

Executed on 21 April, 2008 in London.

_____

Vladimir Voronoff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
INNA GUDAVADZE, LIANA ZHMOTOVA and IYA          :
PATARKATSISHVILI,                               :
                                                :
                                 Plaintiffs,    :
                                                :
                    v.                          :     08-Civ-3363 (RJS)
                                                :
                                                :
JOSEPH KAY (A/K/A JOSEPH KAKALASHVILI,          :
A/K/A JOSEPH KEJ, A/K/A IOSEB KAKALASHVILI,     :
A/K/A IOSEB KAKIASHVILI) AND EMANUEL            :
ZELTSER,                                        :
                                 Defendants        x
----------------------------------------------------------------------
.

## CERTIFICATE OF SERVICE


I, Jennifer R. Cowan, am a member of the bar of the State of New York and of

this Court and counsel in the New York office of the law firm of Debevoise & Plimpton

LLP, attorneys for Plaintiffs Inna Gudavadze, Liana Zhmotova and Iya Patarkatsishvili.

I am over eighteen (18) years of age.  On April 21, 2008, per the Order to Show

Cause issued by Judge Preska on April 21, 2008, I caused to be served copies of the

within:

   i)     Order to Show Cause as issued by Judge Preska on April 21, 2008;

   ii)    Memorandum Of Law In Support Of Plaintiffs' Application For An Order

          To Show Cause;

   iii)   Declaration Of Jennifer R. Cowan, Esq. In Support Of Plaintiffs'

          Application For An Order To Show Cause For A Preliminary Injunction

And Expedited Discovery, And Expedited Schedule For Motion For

Partial Summary Judgment;

iv)     [Proposed] Order For Preliminary Injunction And Expedited Proceedings;

and

v)      Declarations And Accompanying Exhibits In Support Of Plaintiffs'

Application For An Order To Show Cause

by overnight courier upon Defendant Emanuel Zeltser at the following address:

Emanuel Zeltser, Esq.
235 W. 76th Street, Apt. 16A
New York, NY 10023

Per the direction of Judge Preska, I also served copies by overnight courier on

Mark Zeltser, the brother of Defendant Emanuel Zeltser at the following address, per the

request of Mark Zeltser:

Mr. Mark Zeltser
1919 NE 33rd Avenue
Fort Lauderdale, FL 33305

Pursuant to 28 U.S.C. § 1746, I certify under the penalty of perjury that the

foregoing is true and correct.

Executed on April 21, 2008

s/ Jennifer Cowan

_____

Jennifer R. Cowan

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

INNA GUDAVADZE, LIANA ZHMOTOVA and IYA
PATARKATSISHVILI,

                                    Plaintiffs,

                    v.                                 :    08-Civ-3363 (RJS)

JOSEPH KAY (A/K/A JOSEPH KAKALASHVILI,
A/K/A JOSEPH KEJ, A/K/A IOSEB KAKALASHVILI,
A/K/A IOSEB KAKIASHVILI) AND EMANUEL
ZELTSER,

                                    Defendants        x

-----------------------------------------------------------------

## CERTIFICATE OF SERVICE

I, Naila McKenzie, am employed as a law clerk by the law firm of Debevoise &

Plimpton LLP, attorneys for Plaintiffs Inna Gudavadze, Liana Zhmotova and Iya

Patarkatsishvilli.

I am over eighteen (18) years of age.  On the 21st day of April 2008, per the

Order to Show Cause issued by Judge Preska on April 21, 2008, I served copies of the

within:

1.    Declaration of Jennifer R. Cowan, Esq. In Support of Plaintiffs'
      Application for an Order to Show Cause for Preliminary
      Injunction, Expedited Discovery, and Expedited Schedule for
      Motion for Partial Summary Judgment and Accompanying
      Exhibits;

2.    Memorandum of Law in Support of Plaintiffs' Application For an
      Order to Show Cause;

3.  Declarations and Accompanying Exhibits in Support of Plaintiff's Application for an Order to Show Cause

4.  [Proposed] Order for Preliminary Injunction And Expedited Proceedings;

by hand to:

Edward Little, Esq.
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, N.Y.  10004-1482
USA

Although not formally retained, Mr. Little acted as counsel for Defendant Joseph Kay (A/K/A Joseph Kakalashvilli, A/K/A Joseph Kej, A/K/A Ioseb Kakalashvili, A/K/A Ioseb Kakiashvili) in connection with the conference before Judge Preska regarding the Order To Show Cause and per the Order To Show Cause issued by Judge Preska and Mr. Little's request, was served with the papers as counsel for Defendant Kay.

Pursuant to 28 U.S.C. § 1746, I certify under the penalty of perjury that the foregoing is true and correct.

Executed on April 22, 2008.

_____
Nana McKenzie

22718775v1