FILED
ELECTRONICALLY

Christopher K. Tahbaz
Jennifer R. Cowan
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York  10022
Tel. (212) 909-6000
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X

INNA GUDAVADZE, LIANA ZHMOTOVA and IYA  :
PATARKATSISHVILI,

                                                       :

                                 Plaintiffs,

                                                       :

v.                                                            08-Civ-3363 (RJS)

                                                       :

JOSEPH KAY (A/K/A JOSEPH KAKALASHVILI, A/K/A  :
JOSEPH KEJ, A/K/A IOSEB KAKALASHVILI, A/K/A
IOSEB KAKIASHVILI) AND EMANUEL ZELTSER,

                                                   :

                                     Defendants.
-------------------------------------------------------------------- x

**DECLARATION OF JENNIFER R. COWAN, ESQ. IN SUPPORT OF
PLAINTIFFS' APPLICATION FOR AN ORDER TO SHOW CAUSE
FOR A PRELIMINARY INJUNCTION AND
EXPEDITED DISCOVERY, AND EXPEDITED
<u>SCHEDULE FOR MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

       I, Jennifer R. Cowan, declare as follows:

       1.       I am a member of the bar of the State of New York and of this Court and

counsel in the New York office of the law firm of Debevoise & Plimpton LLP, attorneys

for Plaintiffs Inna Gudavadze, Liana Zhmotova and Iya Patarkatsishvili.

       I submit this declaration in support of Plaintiffs' motion on an order to show

cause, pursuant to the Federal Rules of Civil Procedure and the Local Rules of this

Court, for a preliminary injunction, expedited discovery, and an expedited briefing schedule for a motion for partial summary judgment with respect to the validity of a document titled "General Durable Power of Attorney" notarized on December 14, 2006, purportedly given by Arkady (Badri) Patarkatsishvili in favor of Defendant Emanuel Zeltser (attached as Exhibit A hereto). Plaintiffs seek this expedited relief through an order to show cause to prevent the continuing irreparable harm done to them by Defendants' misrepresentations.

3.      As set forth more fully in Plaintiffs' Complaint in this action, Defendants Joseph Kay (a/k/a Joseph Kakalashvili, a/k/a Joseph Kej, a/k/a Ioseb Kakalashvili, a/k/a Ioseb Kakiashvili) and Emanuel Zeltser ("Defendants") have misrepresented themselves as empowered to control the assets of Plaintiffs' deceased husband and father, Arkady (Badri) Patarkatsishvili, and misrepresented themselves as authorized to act or speak as representatives of Mr. Patarkatsishvili and his estate, in part by relying on documents that are fraudulent or otherwise invalid, and which they have refused to provide to Plaintiffs.

4.      Plaintiffs have periodically searched the dockets of surrogate courts in New York, Florida, England, and the country of Georgia, the most likely jurisdictions in which Defendants would seek to probate Mr. Patarkatsishvili's will. Although more than two months have passed since Mr. Patarkatsishvili's death, I believe that neither Defendant has sought to have their authority confirmed by a court.

5.      Through these misrepresentations, Defendants have seized control of at least one asset which is properly included in Mr. Patarkatsishvili's estate, attempted to take control of other assets, and interfered with Plaintiffs' efforts to ensure the lawful

2

distribution of Mr. Patarkatsishvili's assets and the orderly administration of Mr. Patarkatsishvili's estate.

6.    By their actions, Defendants have shown themselves willing to rely on these misrepresentations and employ these fraudulent or otherwise invalid documents even when confronted with challenges to their authenticity or validity. According to news reports, Defendant Zeltser is detained in Belarus because he attempted to use fraudulent documents to take control of an asset properly included in Mr. Patarkatsishvili's estate.

7.    It is my understanding that Defendant Kay has used his control of JSC JMG Consulting to seize financial documents regarding other assets of Mr. Patarkatsishvili, and he is seeking to assert control over additional assets of Mr. Patarkatsishvili. Plaintiffs continue to learn of additional persons from whom Defendant Kay has sought information or the transfer of assets.

8.    Plaintiffs continue to be harmed by Defendant Kay's misrepresentations and use of these documents, and Plaintiffs do not know when Defendant Zeltser will be released from prison and may again misrepresent his authority to act on behalf of Mr. Patarkatsishvili and his estate.

9.    Based on the repeated fraudulent representations of Defendants Kay and Zeltser, Plaintiffs are left with no alternative but to seek injunctive relief in the hope of halting, as expeditiously as possible, the irreparable harm resulting from Defendants' misrepresentations, their seizure of assets properly included in Mr. Patarkatsishvili's estate, and Defendants' interference with the administration of the estate.

10.    In connection with their application for injunctive relief, Plaintiffs seek expedited discovery to obtain the documents on which Defendants have been relying (and which Defendants have refused to produce to Plaintiffs despite repeated requests); to learn the identities of the people to whom Defendants have misrepresented their authority to act on behalf of the estate; and to obtain information concerning any assets owned in whole or in part by Mr. Patarkatsishvili over which Defendants have asserted control.

11.    Only two months after the untimely death of their husband and father, Plaintiffs are being forced to devote themselves to countering Defendants' misrepresentations, and upon information and belief, Mr. Patarkatsishvili's business associates are expending considerable time and effort in responding to Defendants' demands rather than focusing on how best to administer the business interests after his death.

12.    As the accompanying memorandum of law demonstrates, pursuant to Rule 57 of the Federal Rules of Civil Procedure, a speedy hearing is permitted in an action for declaratory judgment.  And given the specific circumstances here, expedited discovery is essential to enable the Plaintiffs to quickly develop an appropriate evidentiary record so this Court can act on Plaintiffs' underlying action.  If the ordinary time periods governing discovery are maintained, potentially grave harm may be done to Plaintiffs, as beneficiaries of Mr. Patarkatsishvili's estate, before discovery is complete.

13.    The requested expedited discovery should work no hardship or prejudice on Defendants, nor will it frustrate the policy that underlies the standard time periods

applicable to commencing discovery and discovery responses. The material requested is not voluminous.

14.    Because the media has reported that Defendant Zeltser is imprisoned in Belarus, Plaintiffs are seeking from him only that document discovery which should either be available from Defendant Kay or from Defendant Zeltser's colleagues.

15.    Defendants already have been served with copies of a detailed complaint, spelling out the particular factual allegations underlying the claims of fraud and conspiracy to defraud. Accordingly, Defendant Kay has already had the opportunity to consult with counsel to consider his response. The usual waiting periods, therefore, are unnecessary to protect the Defendants' rights.

16.    On April 18, 2008, I sent letters, which notified Defendants of Plaintiffs' intention to apply for an order to show cause at 1:oo p.m. on April 21, 2008, via overnight courier for delivery on Saturday, to Defendant Kay's home address in Dix Hills, NY and Defendant Zeltser's home and business addresses in Manhattan. On April 19, 2008, I emailed a copy of that letter to Defendant Zeltser's business email address. On the morning of April 21, 2008, I telephoned Defendant Zeltser's law firm and left a voicemail stating our intention to apply for an order to show cause. I also left a message with a man who identified himself as "Tom" at one telephone number that I had for Defendant Kay and left a voicemail message at another telephone number.

17.    Attached hereto as Exhibit O is a copy of Plaintiffs' First Request for the Production of Documents Directed to Defendant Kay. Attached hereto as Exhibit P is a copy of Plaintiffs' First Request for the Production of Documents Directed to Defendant

Zeltser. Attached hereto as Exhibit Q is a copy of Plaintiffs' Notice of Deposition

Directed to Defendant Kay. Plaintiffs will cooperate with counsel for Defendants to

accommodate any reasonable request as to time and place of discovery.

18.    Plaintiffs' motion for an expedited briefing schedule for a motion for

partial summary judgment is similarly consistent with an expedited hearing under Federal

Rule of Civil Procedure 57. As discussed in the accompanying memorandum of law, the

question of whether, as a matter of law, the "Power of Attorney" became ineffective upon

Mr. Patarkatsishvili's death is narrow, so Plaintiffs respectfully propose a schedule of

five business days for the motion and supporting memorandum; three business days for

the memorandum in opposition and two business days for any reply.

19.    A speedy ruling on Plaintiffs' claim for a declaratory judgment with

respect to the validity of the "Power of Attorney" would greatly help to address the

continued harm suffered by Plaintiffs due to Defendants' misrepresentations.

20.    No previous application for the relief requested herein has been made.

### Exhibits Referenced In The Application For An Order To Show Cause

21.    Attached to this Declaration as Exhibit A is a true and correct copy of a

"General Durable Power of Attorney" allegedly signed by Mr. Patarkatsishvili and

notarized December 14, 2006.

22.    Attached to this Declaration as Exhibit B is a true and correct copy of

email correspondence dated February 15 through 20, 2008 between Emanuel Zeltser and

Michael Lindley.

23.     Attached to this Declaration as Exhibit C is a true and correct copy of a letter dated February 17, 2008 from Emanuel Zeltser to Nick Keeling.

24.     Attached to this Declaration as Exhibit D is a true and correct copy of a letter, dated March 10, 2008 from Debevoise & Plimpton LLP to Emanuel Zeltser as counsel for Joseph Kay.

25.     Attached to this Declaration as Exhibit E is a true and correct copy of an email, dated March 10, 2008, from Emanuel Zeltser to Peter Goldsmith.

26.     Attached to this Declaration as Exhibit F is a true and correct copy of the Confirmation from Global Jet Concept, dated November 14, 2007, of Mr. Patarkatsishvili's flight on November 14-16, 2007.

27.     Attached as Exhibit G is a true and correct copy of an article, "Georgia: Imedi TV's Present Owner Confirms Purchase of TV Station." Red Orbit News, March 21, 2008, available at http://www.redorbit.com/news/space/1305887/georgia_imedi_tvs_present_owner_confir ms_purchase_of_tv_station/index.html?source=r_space, last visited April 20, 2008.

28.     Attached to this Declaration as Exhibit H is a true and correct copy of an article, "KGB confirms arrest of US lawyer Emanuel Zeltser Two Weeks Ago." Belarus News, March 23, 2008, available at http://naviny.by/rubrics/inter/2008/03/26/ic_news_259_288200/, last visited April 19, 2008.

29.    Attached to this Declaration as Exhibit I is a true and correct copy of an article, "Belarus: American Lawyer Charged With Using Fake Documents." Seattle Post Intelligencer, March 27, 2008.

30.    Attached to this Declaration as Exhibit J is a true and correct copy of a Memorandum Opinion, dated March 3, 2008, in *Nord Service, Inc. v. Palter* No. 2:06 CV 548 (E.D. Tex.) (Docket No. 211).

31.    Attached to this Declaration as Exhibit K is a true and correct copy of the Affidavit of Arthur H. Christy, dated April 25, 1997, *Zeltser v. Inkombank*, No. 95 Civ. 0796, 1998 (S.D.N.Y.), and attached exhibits (Docket No. 121).

32.    Attached to this Declaration as Exhibit L is a true and correct copy of the Affidavit of Arthur H. Christy, dated June 3, 1997, *Zeltser v. Inkombank*, No. 95 Civ. 0796, 1998 (S.D.N.Y.), and attached exhibits (Docket No. 129).

33.    Attached to this Declaration as Exhibit M is a true and correct copy of an Opinion in *Zeltser v. Inkombank*, No. 95 Civ. 0796, 1998 U.S. Dist. LEXIS 8200 (S.D.N.Y. June 4, 1998).

34.     Attached to this Declaration as Exhibit N is a true and correct copy of an

Opinion in *Zeltser v. SARL Manager,* No. 11364/90 (N.Y. Sup. Ct. filed Feb. 28, 1991),

dated February 28, 1991.

*     *     *

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       April 21, 2008

Respectfully submitted,

/s/ Jennifer Cowan

_____

Jennifer R. Cowan, Esq.

9

Exhibit A

# General Durable Power of Attorney

*TO ALL WHOM THIS MAY COME, BE IT KNOWN THAT:* I, ARKADI (BADRI) PATARKATSISHVILI, a citizen of Georgia, born on October 31, 1955, in Tbilisi, resident of the City of Tbilisi, Gldani bldg. 10, Apt. 88, passport # 1508037, personal # 65002001339, issued by the Ministry of Justice of the Republic of Georgia on December 17, 2005 (PRINCIPAL) do hereby appoint my personal lawyer, EMANUEL ZELTSER, Esq. (AGENT) my true agent and attorney-in-fact to do and to act in my name, place and stead with respect to ANY AND ALL MATTERS, as I myself could or might do if I were personally present, to the extent that I may be permitted by law to act through an agent, including without limitations, effecting any and all transactions with respect to my personal and business property, wherever situated, banking, real estate, chattel, securities, commodities and investments transactions; business operating and insurance transactions; estate, last wills and testament administration; claims and litigations; and all other matters of whatsoever nature. It is the intention of the Principal that this General Durable Power of Attorney be construed in the broadest manner, so as to give the Agent each and every power to act for the Principal in his own unhampered discretion.

This Power of Attorney is given with full and unqualified authority to delegate any and all of the foregoing powers to any person or persons whom my Agent shall select in his discretion.

Hereby ratifying and confirming all that said Agent or substitute may do or may cause to be done.

This Power of Attorney is durable and irrevocable and is granted for valuable consideration, sufficiency of which is hereby acknowledged and shall not be affected by my subsequent death, disability or incompetence.

Photostatic copy of this Power of Attorney shall have the same force and effect as the original.

### HOLD HARMLESS

I, the undersigned Principal, request that all third parties to whom this Power of Attorney may come, rely upon and honor this Power of Attorney and as an inducement thereof, I agree and pledge to indemnify and hold harmless any third party acting in reliance thereupon and his/her/its agents, employees, successors and assigns from any and all claims or damages arising out of such third party's reliance upon and honoring this Power of Attorney.

ARKADI (BADRI) PATARKATSISHVILI

*On this 14ᵗʰ day of December in the year 2006, before me, Alexander Fishkin, a Notary Public and Constitutional Officer of the State of New York, County of New York, personally came Arkadi (Badri) Patarkatsishvili personally known to me to be the Principal named in the within General Durable Power of Attorney. I have been satisfied that Mr. Patarkatsishvili is of sound mind and has full understanding of the document, which he is executing herein and that he does so on his own free will and as his own considered free deed. Thereafter Arkadi (Badri) Patarkatsishvili executed the within General Durable Power of Attorney in favor of the Agent, under his own hand in my presence.*



ALEXANDER FISHKIN, ESQ.
Notary Public * State of New York
Qualified in New York County
No. 31-5000163
Commission exp. Aug. 10, 2010

Exhibit B

-----Original Message-----
From: "Sternik & Zeltser" <lawmail@rambler.ru>

Date: Wed, 20 Feb 2008 00:49:49
To:"Michael Lindley" <mlindley@streathers.co.uk>,"Keeling, Nick" <npk@mainstay.gi>
Cc:"Margaret.Kirov@SternikLawyersMoscow" <law@russianlaw.org>,<alexfishkin2000
@mail.ru>,"Margaret Kirov" <lawyers@inbox.ru>
Subject: Re: Badri Patarkatsishvili

☐

Dear Mr Lindley,
We thank you for expressing your position. Respectfully, we seriously doubt that a New
York attorney would give you an advice as absurd as the one expressed in your previous
email. However if you wish to provide us with the name and contact information of the
purported New York attorney our attorneys will be happy to communicate with him/her. In
the interim, we are under the duty to pursue all lawful avenues in order to ensure that
our legal responsibilities are fulfilled. Given the expressed and respectfully erroneous
posture you have taken, we now have little choice but to instruct our counsel in
Gibraltar, UK, Georgia, RF and other jurisdictions to connect with proper authorities and
commence appropriate actions, inter alia, in the US, in order to protect the interests
vested in us. At the risk of stating the obvious, we expect that you will take all
appropriate steps to ensure that pending the investigations and rulings by appropriate
judicial forums you ensure that the assets within your and/or your clients custody or
control are not dissipated.
Of course, our door remains open to constructive dialogue, should you, at some point deem
such advised
Yours truly,

 <http://russianlaw.org/directors_ez.htm> Emanuel Zeltser
http://www.russianlaw.org/directors_ez.htm <http://www.russianlaw.org/directors_ez.htm>
STERNIK & ZELTSER
Counselors at Law
119 West 72nd Street # 229
New York, NY 10023
tel/fax: 212 656 1810
If this e-mail is not addressed to you, please inform us and delete the e-mail. * Si vous
n'êtes pas le destinataire de cet e-mail, nous vous prions de nous en informer et de
l'effacer  * Ist diese E-Mail nicht an Sie adressiert, bitten wir Sie, uns zu informieren
und die E-Mail zu löschen. * Если это сообщение адресовано не Вам, пожалуйста,  удалите
его и сообщите нам. * This message may be confidential and privileged and prohibited from
disclosure under the laws of US, UK and other countries.  Reproduction or dissemination
is strictly prohibited. IRS Circular 230 Disclosure: unless otherwise expressly

1

indicated, any federal tax advice contained in this communication, including attachments and enclosures, is not intended or written to be used, and may not be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein

----- Original Message -----
From: Michael Lindley <mailto:mlindley@streathers.co.uk>
To: Sternik &amp; Zeltser <mailto:lawmail@rambler.ru>
Cc: Keeling, Nick <mailto:npk@mainstay.gi>
Sent: Tuesday, February 19, 2008 5:46 PM
Subject: RE: Badri Patarkatsishvili

Dear Mr Zeltser,
I refer to your email of today. Given that the purported Power of Attorney is governed by New York law, I have taken advice from our New York lawyers. I have been advised that, as a matter of New York law, the Power of Attorney on which you purport to rely is not, and may never have been, valid. In the circumstances it is clearly not appropriate for either my client or me, or indeed any other party, to provide you with any information or documents which may in any way relate to Mr Patarkatsishvili's affairs.
Yours sincerely

Michael Lindley

Direct dial: 020 7034 4207


-----------------
From: Sternik & Zeltser [mailto:lawmail@rambler.ru]
Sent: 19 February 2008 13:30
To: Michael Lindley
Cc: Keeling, Nick
Subject: Re: Badri Patarkatsishvili


Gentlemen,

Thank you for your message.


As discussed, it was our client's wish that the will and ancillary documents remain confidential and be disclosed only to specific beneficiaries and to the extent of their interest at an appropriate time, I am sure you are familiar with these instruments. More importantly, as discussed, our present request is based upon our General Durable Power of Attorney [previously provided at your request] not necessarily related to the issues of estate or powers of the executor. As expressly stated in the POA, provided to you, we have been appointed by Mr. Patarkatsishvili: "to do and to act in [his] name, place and stead with respect to ANY AND ALL MATTERS, as [he himself] could or might do if [he] were personally present".. including without limitations, effecting any and all transactions with respect to [his]personal and business property, wherever situated and all other matters of whatsoever nature."
POA further provides: "It is the intention of the Principal that this General Durable Power of Attorney be construed in the broadest manner, so as to give the Agent each and every power to act for the Principal in his own unhampered discretion", and still further states: "This Power of Attorney is durable ... and shall not be affected by my subsequent death, disability or incompetence." [Emphasis in the original]
Hence, our authority, vested upon us by Mr. Patarkatsishvili, himself, to demand and to receive the information, set forth in our request, as Mr. Patarkatsishvili could do himself, may not be in dispute
Accordingly, we reiterate our request to produce the information and records without

2

further delay  Kindly, let me know at your earliest opportunity whether it is your
intention to comply with our client's wishes  Should you have any further questions,
please feel free to call me.
Many thanks, yours, Emanuel

  '

  <http://russianlaw org/directors_ez htm> Emanuel Zeltser
STERNIK & ZELTSER
Counselors at Law
119 West 72nd Street # 229
New York, NY 10023
tel/fax: 212 656 1810

If this e-mail is not addressed to you, please inform us and delete the e-mail  * Si vous
n'êtes pas le destinataire de cet e-mail, nous vous prions de nous en informer et de
l'effacer  * Ist diese E-Mail nicht an Sie adressiert, bitten wir Sie, uns zu informieren
und die E-Mail zu löschen  * Если это сообщение адресовано не Вам, пожалуйста,  удалите
его и сообщите нам. * This message may be confidential and privileged and prohibited from
disclosure under the laws of US, UK and other countries . Reproduction or dissemination
is strictly prohibited. IRS Circular 230 Disclosure: unless otherwise expressly
indicated, any federal tax advice contained in this communication, including attachments
and enclosures, is not intended or written to be used, and may not be used, for the
purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or (ii)
promoting, marketing or recommending to another party any tax-related matters addressed
herein

----- Original Message -----
From: Michael Lindley <mailto:mlindley@streathers co.uk>
To: Sternik &amp; Zeltser <mailto:lawmail@rambler ru>
Sent: Monday, February 18, 2008 2:24 PM
Subject: RE: Badri Patarkatsishvili

☐
Dear Mr Zeltser,

It was a pleasure to talk to you on Friday.

So that we can move forward can you please send me:

a    Letter of authority signed by the executor;
b.   Copy of the Will of the deceased (or at least the extract showing appointment of the
executor and the signature clause of the Will)

Kind regards

Michael Lindley

Direct dial: 020 7034 4207

--------------------
 From: Sternik & Zeltser {mailto:lawmail@rambler ru}
Sent: 18 February 2008 03:42
To: Keeling, Nick
Cc: Michael Lindley
Subject: Badri Patarkatsishvili

Dear Nick,

3

Sorry, forgot to attach the POA  Now attached
Thanks, yours, Emanuel

<http://russianlaw.org/directors_ez.htm> Emanuel Zeltser
STERNIK & ZELTSER
Counselors at Law
119 West 72nd Street # 229
New York, NY 10023
tel/fax: 212 656 1810

If this e-mail is not addressed to you, please inform us and delete the e-mail. * Si vous n'êtes pas le destinataire de cet e-mail, nous vous prions de nous en informer et de l'effacer. * Ist diese E-Mail nicht an Sie adressiert, bitten wir Sie, uns zu informieren und die E-Mail zu löschen  * Если это сообщение адресовано не Вам, пожалуйста,  удалите его и сообщите нам  * This message may be confidential and privileged and prohibited from disclosure under the laws of US, UK and other countries.. Reproduction or dissemination is strictly prohibited  IRS Circular 230 Disclosure: unless otherwise expressly indicated, any federal tax advice contained in this communication, including attachments and enclosures, is not intended or written to be used, and may not be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein

----- Original Message -----
From: Sternik &amp; Zeltser <mailto:sternik@russianlaw.org>
To: Keeling, Nick <mailto:npk@mainstay.gi>
Cc: Lindley, Michael <mailto:mlindley@streathers co uk>
Sent: Sunday, February 17, 2008 5:00 PM
Subject: Badri Patarkatsishvili

STREATHERS SOLICITORS LLP
128 Wigmore Street London W1U 3SA
TEL: 020 7034 4200 - FAX: 020 7034 4303 - DX: 9050 West End
IMPORTANT NOTICE
Streathers Solicitors LLP is a Limited Liability Partnership registered in England and Wales under number OC323349.
This LLP is regulated by the Solicitors Regulation Authority.  A list of the names of the members and consultants is available for inspection at the above office.
This e-mail is confidential and may contain legally privileged information.  If you are not named above as an addressee it may be unlawful for you to read, copy, distribute, disclose or otherwise use the information in this e-mail.  If you are not the intended recipient of this e-mail, please telephone us on 020 7034 4200.
E-mails are susceptible to data corruption, interception, falsification, delay, unauthorised amendment and viruses.  You should therefore carry out such virus and other checks as you consider appropriate.  Streathers do not accept liability for any such events or any consequences thereof in respect of e-mails sent or received.  If the content of this transmission is important, you should not rely on its integrity without verifying it by telephone or facsimile

STREATHERS SOLICITORS LLP
128 Wigmore Street London W1U 3SA
TEL: 020 7034 4200 - FAX: 020 7034 4303 - DX: 9050 West End
IMPORTANT NOTICE
Streathers Solicitors LLP is a Limited Liability Partnership registered in England and Wales under number OC323349
This LLP is regulated by the Solicitors Regulation Authority.  A list of the names of the members and consultants is available for inspection at the above office.
This e-mail is confidential and may contain legally privileged information.  If you are not named above as an addressee it may be unlawful for you to read, copy, distribute, disclose or otherwise use the information in this e-mail.  If you are not the intended

recipient of this e-mail, please telephone us on 020 7034 4200
E-mails are susceptible to data corruption, interception, falsification, delay,
unauthorised amendment and viruses. You should therefore carry out such virus and other
checks as you consider appropriate. Streathers do not accept liability for any such
events or any consequences thereof in respect of e-mails sent or received. If the
content of this transmission is important, you should not rely on its integrity without
verifying it by telephone or facsimile

Exhibit C

STERNIK & ZELTSER
ATTORNEYS AT LAW
\* \* \*
119 West 72nd Street # 229
New York NY, 10023 USA
tel/fax: +1-212-656-1810
email: lawmail@rambler.ru

EMANUEL E. ZELTSER
Admitted in New York and R.F.
Writer's direct line: +1-917-816-7613

MEMBER: AMERICAN RUSSIAN LAW INSTITUTE
www.russianlaw.org
www.russianlaw.org/directors_ex.htm

February 17, 2008

Nick P. Keeling, Esq
Mainstay Trust Limited
Suite 975 Europort
P.O. Box 714
Gibraltar
via email: npk@mainstay.gi

PRIVILEGED and CONFIDENTIAL

RE:    Badri Patarkatsishvili

Dear Mr Keeling,

It was a pleasure speaking with you on February 15, 2007, and I gratefully appreciate your kind assistance.

As discussed, we were counsel for Mr. Patarkatsishvili and remain counsel for his estate. A copy of the durable power of attorney is annexed herewith as per your request.

Pursuant to our discussion, we request that you provide us any and all information, documents and records in your custody or within your control or power to obtain concerning Mr. Patarkatsishvili and any of his financial and business interests, whether held in his own name or through or in conjunction with any third party or parties, directly or indirectly, overtly or covertly or through any nominee (legal entity or physical person), in which you know or have a reason to believe Mr. Patarkatsishvili had interest or business or other involvement, no matter how small, or was a shadow director or a principal *de facto*

For example, we understand that Mr Patarkatsishvili was in true and in fact an undisclosed principal of Salford Capital Partners ("Salford") and/or of multiple entities managed or controlled by or affiliated with Salford in the UK, Georgia and other jurisdictions. Accordingly, without limiting the generality of this request, we hereby request that you produce, *inter alia*, any and all information and records concerning Salford and companies owned or controlled or affiliated with Salford.

As you may be aware, on February 13, 2008, London Police referred the investigation into the circumstances of Mr Patarkatsishvili's death to a major crimes investigation team. We understand

Nick Keeling, Esq.    February 17, 2008    Page 2

that authorities of other countries also conduct probes into this matter. We are committed to cooperating with and assisting law enforcement authorities in their enquiries. Accordingly, we would be grateful if the requested information and materials be provided at your earliest opportunity. We also request that any information concerning our client, including this request and any communications related thereto, be treated as strictly confidential.

We thank you in advance for your prompt attention to this matter. Should you have any questions related thereto, please feel free to contact the undersigned directly.

Grateful for your cooperation and courtesy, we remain,

Yours truly,

*Sternik & Zeltser*

by:    *Emanuel Zeltser*

cc:    Michael Lindley, Esq.
       Streathers Solicitors, LLP
       (via email: mlindley@streathers.com)

# General Durable Power of Attorney

*TO ALL WHOM THIS MAY COME, BE IT KNOWN THAT:* I, ARKADI (BADRI) PATARKATSISHVILI, a citizen of Georgia, born on October 31, 1955, in Tbilisi, resident of the City of Tbilisi, Gldani bldg. 10, Apt. 88, passport # 1508037, personal # 65002001339, issued by the Ministry of Justice of the Republic of Georgia on December 17, 2005 (PRINCIPAL) do hereby appoint my personal lawyer, EMANUEL ZELTSER, Esq. (AGENT) my true agent and attorney-in-fact to do and to act in my name, place and stead with respect to ANY AND ALL MATTERS, as I myself could or might do if I were personally present, to the extent that I may be permitted by law to act through an agent, including without limitations, effecting any and all transactions with respect to my personal and business property, wherever situated, banking, real estate, chattel, securities, commodities and investments transactions; business operating and insurance transactions; estate, last wills and testament administration; claims and litigations; and all other matters of whatsoever nature. It is the intention of the Principal that this General Durable Power of Attorney be construed in the broadest manner, so as to give the Agent each and every power to act for the Principal in his own unhampered discretion.

This Power of Attorney is given with full and unqualified authority to delegate any and all of the foregoing powers to any person or persons whom my Agent shall select in his discretion.

Hereby ratifying and confirming all that said Agent or substitute may do or may cause to be done.

This Power of Attorney is durable and irrevocable and is granted for valuable consideration, sufficiency of which is hereby acknowledged and shall not be affected by my subsequent death, disability or incompetence.

Photostatic copy of this Power of Attorney shall have the same force and effect as the original.

### HOLD HARMLESS

I, the undersigned Principal, request that all third parties to whom this Power of Attorney may come, rely upon and honor this Power of Attorney and as an inducement thereof, I agree and pledge to indemnify and hold harmless any third party acting in reliance thereupon and his/her/its agents, employees, successors and assigns from any and all claims or damages arising out of such third party's reliance upon and honoring this Power of Attorney.

ARKADI (BADRI) PATARKATSISHVILI

*On this 14th day of December in the year 2006, before me, Alexander Fishkin, a Notary Public and Constitutional Officer of the State of New York, County of New York, personally came Arkadi (Badri) Patarkatsishvili personally known to me to be the Principal named in the within General Durable Power of Attorney. I have been satisfied that Mr. Patarkatsishvili is of sound mind and has full understanding of the document, which he is executing herein and that he does so on his own free will and as his own considered free deed. Thereafter Arkadi (Badri) Patarkatsishvili executed the within General Durable Power of Attorney in favor of the Agent, under his own hand in my presence.*



ALEXANDER FISHKIN, ESQ.
Notary Public • State of New York
Qualified In New York County
No. 31-5000163
Commission exp. Aug. 10, 2010

Exhibit D

# DEBEVOISE & PLIMPTON LLP

Tower 42
Old Broad Street
London EC2N 1HQ
Tel  +44 20 7786 9000
Fax  +44 20 7588 4180
www.debevoise.com

10 March 2008

BY EMAIL AND COURIER

Emanuel Zeltser, Esq.
Sternik & Zeltser
119 West 72nd Street #229
New York, NY 10023
USA

**Patarkatsishvili Family Assets**

Dear Mr. Zeltser:

We act for Inna Gudavadze and her daughters Iya Patarkatsishvili and Liana Zhmotova, the heirs of Badri Patarkatsishvili. We are writing to you because we understand you represent Joseph Kay. If our understanding is incorrect, please advise us of that fact immediately, and we will contact Mr. Kay directly.

It has come to the attention of Mrs Gudavadze that Mr. Kay may have been identifying himself as executor to Badri Patarkatsishvili's estate and purporting to exercise authority and control over assets that belong to Mrs Gudavadze and her family. If Mr. Kay has been making such representations, we hereby demand that he immediately cease and desist from doing so. Only Mrs Gudavadze and her daughters are authorised to speak on behalf of Mr. Patarkatsisvili, and they reserve their rights to pursue all available legal remedies to protect their interests in this matter.

We would also like to arrange to meet with Mr. Kay to discuss the extent to which he or entities he controls may share ownership of assets that form a part of Mr. Patarkatsisvili's estate. Also, if Mr. Kay believes he has documentation establishing that he in fact has authority to speak on behalf of Mr. Patarkatsishvili in any capacity, notwithstanding our belief to the contrary, we would request that you provide us with copies of that documentation as soon as possible, and in any event in advance of the meeting we seek, so that we may discuss that documentation when we meet. We expect to contact you soon to arrange such a meeting.

Please do not hesitate to contact us if you have any questions concerning the matters set forth herein. Please mark all correspondence for the attention of Lord Goldsmith (phgoldsmith@debevoise.com), Mark Friedman (mwfriedman@debevoise.com) and Christopher Tahbaz (cktahbaz@debevoise.com).

Debevoise & Plimpton LLP is a registered limited liability partnership established under the laws of the State of New York
A list of the partners' names and their professional qualifications is open to inspection at the above address
The partners are either solicitors or registered foreign lawyers  The firm is regulated by the Solicitors Regulation Authority

New York • Washington, D C • London • Paris • Frankfurt • Moscow • Hong Kong • Shanghai

Emanuel Zeltser, Esq.                    2                    10 March 2008

Yours sincerely,

Debevoise and Plimpton

Debevoise & Plimpton LLP

Exhibit E

| | |
|---|---|
| **From:** | Sternik & Zeltser [lawmail@rambler.ru] |
| **Sent:** | Monday, March 10, 2008 5:20 PM |
| **To:** | Goldsmith, Peter H. |
| **Cc:** | alexfishkin2000@mail.ru; Aleksandr Cherny |
| **Subject:** | Re: Wikipedia |

Dear Peter,

Good to hear from you again, albeit under these sad circumstances. I have your letter of today. As you are aware, we have in fact acted as counsel for Joseph Kay and Badri (in the latter case, regrettably, former counsel) for the past 14 years. Hence, any communication from you to Mr. Kay should of course be addressed solely to our office.

Contrary to your suggestion, at no time has Mr. Kay purported to exercise control over any assets belonging to Mrs. Gudavadze and her family, or made any representations to that effect. Nor does Mr. Kay have any interest in Mrs. Gudavadze's assets. If you have evidence to the contrary, I would appreciate your providing same to us. Further, we would be utterly interested in reviewing the evidence (if any) supporting your statement that "only Mrs Gudavadze and her daughters are authorised to speak on behalf of Mr. Patarkatsisvili". Kindly clarify "authorized" by whom?

The documents expressing Badri's wishes, vested in us as his counsel, are being disclosed in due course to proper bodies in such jurisdictions as are appropriate and in strict accordance with our client's final instructions. As a courtesy, we recently met with Mrs. Gudavadze's counsel, Cadwalader, Wickersham & Taft LLP, in New York and permitted them to review a number of these documents, take notes and copy long-hand the portions of their interest. In addition, a few days ago, at the request of Mrs. Gudavadze, we have met with her and her counsel again in London and discussed matters of their interest

As regards your suggestion to meet with Mr. Kay personally, regrettably, it is not our policy to permit clients to interact directly with lawyers, especially after they threaten to "pursue all available legal remedies"against them. However, if you require another discussion concerning the interests of your clients, we will be happy to accommodate you at a mutually convenient time and place. Indeed, such conference may also help you in terms of assessing whether your current representation may present a conflict given your prior representation of Badri and certain of his interests. Hence, kindly advise, whenever you are ready.

Let me conclude by assuring you that we are always prepared to extend all possible courtesies to any fellow-counsel. Feel free to contact me at this email, which is monitored 24/7 with any questions or concerns you may have.

Thanks, yours, Emanuel

**Emanuel Zeltser**
**STERNIK & ZELTSER**
**Counselors at Law**
119 West 72nd Street # 229
New York, NY 10023
tel/fax: 212 656 1810

If this e-mail is not addressed to you, please inform us and delete the e-mail. * Si vous n'êtes pas le destinataire de cet e-mail, nous vous prions de nous en informer et de l'effacer. * Ist diese E-Mail nicht an Sie adressiert, bitten wir Sie, uns zu informieren und die E-Mail zu löschen. * Если это сообщение адресовано не Вам, пожалуйста, удалите его и сообщите нам. * This message may be confidential and privileged and prohibited from disclosure under the laws of US, UK and other countries.. Reproduction or dissemination is strictly prohibited. IRS Circular 230 Disclosure: unless otherwise expressly indicated, any federal tax advice contained in this communication, including attachments and enclosures, is not intended or written to be used, and may not be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein

Exhibit F



# GLOBAL JET
## CONCEPT SA

From : Clémentine Veticoz
Tel   : +41 22 939 30 20
Fax   : +41 22 939 30 28
Email : supervision@globaljetconcept.com

To:   Michael *Cotlick
Tel :
Fax :
Mail : cotlick@yahoo.co.uk

# FLIGHT CONFIRMATION

N°:  **006917.01**

Geneva,    02 03 2008

Dear Sir,

Further to our different conversations, we are pleased to confirm your flight as follows:

Type of aircraft:   **Global Express**      Satellite phone:   +1 321 426 31 32
Registration:       **VP-CEB**              Aircraft mobile:   +44 7850 418450

| Date | DepTime | From | To | ArrTime | FltTime | Pax |
|------|---------|------|-----|---------|---------|-----|
| 14.11.07 | 20:10 | LONDON, LUTON | TETERBORO | 21:45 | 06:35 | 4* |
| 15.11.07 | 23:00 | TETERBORO | WASHINGTON, WASHINGTON DULLES INT | 23:45 | 00:45 | 6* |
| 16.11.07 | 19:54 | WASHINGTON, WASHINGTON DULLES INT | LONDON, LUTON | 07:33 | 06:39 | 6* |

Remarks:  All flights are subject to overflight, landing and parking permissions

* Passengers from Luton to Teterboro: A. Motkin, A. Patarkatsishvili, G. Targamadze and V. Voronoff.

* Passengers from Teterboro to Washington Dulles: A. Motkin, A. Patarkatsishvili, G. Targamadze and V. Voronoff + 2TBA.

* Passengers from Washington Dulles to Luton: A. Motkin, A. Patarkatsishvili, G. Targamadze, V. Voronoff Yevhen Hunyak and Iya Patarkatsishvili.

For above mentioned flight, the crew will be composed of:

Captain          : Bucek Patrick
Copilot          : Jensen Anders
Flight Attendant : Garner Karl

| Handling Agents in: | Name: | Phone: |
|---------------------|-------|--------|
| LONDON LUTON | HARRODS AVIATION | +44 1582 589317 |
| TETERBORO | JET AVIATION | +1 201 462 4000 |
| WASHINGTON DULLES INT | SIGNATURE FSO | +1 703-572-0001 |

Once again we thank you for the confidence shown towards Global Jet Concept and remain at your disposal should you require further information

Best Regards,

Global Jet Concept
Clémentine Veticoz
Supervision



# Georgia: Imedi TV's Present Owner Confirms Purchase of TV Station

Text of report by private Georgian TV station Rustavi-2 on 21 March

[Presenter] [Rustavi-2 TV station's news programme] Kurieri has contacted the present owner of the Imedi TV station, Joseph Kay [alias Soso Kakiashvili]. In a telephone conversation, Joseph Kay confirmed reports that the TV station is in his ownership, but refrained from specifying legal details.

As regards any agreements with the [Georgian] authorities, the businessman denied such reports. Joseph Kay expressed the hope that the Imedi TV station will soon reappear on the air

[Correspondent] Is it true that you purchased the Imedi TV station?

[Kay] Yes, that is indeed so. As regards your first question on the alleged involvement of the government in these matters, that is indeed nonsense. No government structures are trying... [changes tack] At any rate, they have not had such talk with me, and I am the present owner, which means that they should be speaking with me. Given this, that is indeed nonsense.

As regards comments by Natela [Imedi's former owner late Badri Patarkatsishvili's mother], I think that she... [changes tack] It is difficult for me to make any comments now. I do not know why she said that and what has forced her to say that. However, I can imagine what it is.

Originally published by Rustavi-2 TV, Tbilisi, in Georgian 0800 21 Mar 08.

(c) 2008 BBC Monitoring Central Asia. Provided by ProQuest Information and Learning. All rights Reserved.

Story from REDORBIT NEWS:
http://www.redorbit.com/news/display/?id=1305887

Published: 2008/03/21 06:00:05 CDT

© RedOrbit 2005

Exhibit G

**■▀ БЕЛОРУССКИЕ**
**▀■ НОВОСТИ**

18 апреля 2008 года
Пятница, 19:25

http://naviny.by/rubrics/inter/2008/03/26/ic_news_259_288200/

# KGB confirms arrest of US lawyer Emanuel Zeltser two weeks ago

↗ 26.03 // 19:06 // English

**The Belarusian Committee for State Security (KGB) has officially confirmed that Emanuel Zeltser was arrested in Minsk on March 12.**

The US lawyer's secretary, Russian citizen Vladlena Funk, who was traveling with him, was also arrested, KGB spokesman Valery Nadtachayew told *BelaPAN*.

The two were charged under Part 2 of the Criminal Code's Article 318 that penalizes the deliberate use of counterfeit documents by a group of people, he said.

Russian-born Zeltser, 54, who heads a non-governmental organization called the Russian-American Law Institute, was arrested after he arrived in the Belarusian capital city for meetings with clients. He has been held in the KGB detention center since then.

The KGB initially declined to comment on the arrest of the pair.

In 2001, Mr. Zeltser was a defense lawyer for Pavel Borodin, who is now state secretary of the Belarusian-Russian Union State, when he was arrested in New York City on money laundering charges.

In 1995, Mr. Zeltser sued Inkombank, once Russia's second largest bank, in a US federal court, accusing it of misappropriating funds from depositors in collaboration with the Bank of New York. He previously worked for the bank, but claimed that he was dismissed from his post after initiating an investigation into evidence of theft and fraud.

http://naviny.by/rubrics/inter/2008/03/26/ic_news_259_288200/

Хостинг в Минске. Трафик бесплатно. Подробнее...

Exhibit H

## Материалы по теме

- Все материалы по теме

## Материалы рубрики «English»

- 18.04 // 18:27 Milinkevich invited to meet deputy justice minister // Новость
- 18.04 // 18:25 European Parliament calls for further support for Chernobyl relief effort // Статья
- 18.04 // 14:51 Video: Belarusian designer accuses NATO summit organizers of using her work as logo without authorization // Медиа
- 18.04 // 14:05 Vice premier confident of fast GDP growth throughout this year // Новость
- 18.04 // 10:31 United Civic Party will adopt alternative to Lukashenka's annual address to nation, National Assembly, chairman says // Новость
- Все материалы рубрики «English»

## Microfinance Empowers

Join us in enabling the poorest of the poor to improve their own lives

Public Service Ads by Google

## Интересные факты

Цена автомобилей подскочит на 20%
На рынке недвижимости грядет ветер перемен
Ищу девушку в квартиру на съем с одним диваном
Доллар или евро: куда вложить деньги?
Будущее США: и Нострадамуса не зови

© 2002 – 2008 БелаПАН
Все права защищены

 Дизайн и программирование

Exhibit I

2 of 3 DOCUMENTS

Copyright 2008 Seattle Post-Intelligencer
THE SEATTLE POST-INTELLIGENCER

March 27, 2008 Thursday

**SECTION:** NEWS; Pg. A3

**LENGTH:** 558 words

**HEADLINE:** BELARUS: AMERICAN LAWYER CHARGED WITH USING FAKE DOCUMENTS

**BODY:**

An American lawyer who is an expert on money laundering in the former Soviet Union has been charged with possession of fake documents, Belarus' top security agency said Wednesday. The agency, which goes by its Soviet-era title, KGB, confirmed that Emanuel Zeltser has been in its custody since he was detained March 12 as he arrived to meet with clients.

The agency gave no further details about the circumstances of his arrest or what the documents were allegedly used for. Zeltser faces up to three years in prison if convicted, the KGB said.

The Russian-born lawyer heads the nongovernmental American Russian Law Institute in New York.

PAKISTAN

Suicide blast suspect freed due to a lack of evidence

A man with suspected links to a suicide bombing that killed 150 people at a rally last year for opposition leader Benazir Bhutto was ordered freed from custody Wednesday. Bhutto survived the October bombing in Karachi but died in another suicide bomb and gun attack near Islamabad two months later.

Qari Saifullah Akhtar was arrested in Lahore last month and was transferred to police in Karachi for questioning. On Wednesday, a court ordered Akhtar freed because authorities had insufficient evidence to continue holding him. Police were still collecting evidence and could arrest Akhtar again in the future.

LATVIA

Teen kidnapped as a baby

may soon see mom again

Police in Riga have found a 16-year-old boy who was kidnapped as a baby, and he soon could be reunited with his mother, authorities said Wednesday. The discovery came when the woman who had raised him was arrested in a separate case and questions arose about his identity.

The boy had no birth certificate or personal ID code - obligatory in Latvia - which prompted investigators to reopen the 1992 kidnapping case that was closed six years ago because of a lack of leads. The boy's mother had gone shopping and left her 11/2 month-old child in a baby carriage outside a store. When she came out, the child and carriage had disappeared.

MONTANA

Student pilot survives icy trek after mountain crash

A student pilot whose plane crashed into a mountainside survived a freezing night by wrapping himself in a tarp, then hiked a mile through waist-deep snow in shorts to meet rescuers, officials said Wednesday.

BELARUS: AMERICAN LAWYER CHARGED WITH USING FAKE DOCUMENTS THE SEATTLE
POST-INTELLIGENCER March 27, 2008 Thursday

The Rocky Mountain College freshman was on a solo training flight to Pryor, Wyo., when his small plane crashed into a forested slope on Big Pryor Mountain after taking off from Billings late Tuesday.

Andrew Scheffer, 18, apparently veered off course and hit near the top of the mountain about 40 miles south of Billings. When he met up with rescuers around 11:30 a.m., Scheffer was suffering from hypothermia.

MINNESOTA

Dozens injured by chlorine leak in school's pool area

Nearly 40 students were injured Wednesday by a chlorine gas leak in the pool area of a Cold Spring high school where a shooting more than four years ago killed two boys. Thirty-six students and one adult were taken to hospitals from Rocori High School. At least one other person was injured.

Six students and the adult will be kept overnight at St. Cloud Hospital for further treatment. None of the patients was critically ill. St. Cloud Hospital set up a decontamination tent outside the emergency room for incoming patients.

Chlorine gas can damage the eyes, skin, throat or lungs. Long-term health problems are unlikely.

**NOTES:** THE WORLD IN MINUTES

**GRAPHIC:** Photos, (1) CHANNI ANAND/AP: INDIA -- A rag picker uses his bare hands Wednesday to collect lubricant oil for recycling at an automobile yard on the outskirts of Jammu.; (2) SAURABH DAS/AP: NEPAL -- A Tibetan woman sings the Tibetan national anthem at the end of a candlelight vigil at a prayer meeting Wednesday in Katmandu. The meeting called attention to China's crackdown on protesters. Related story on A4.; (3) PASCAL LE SEGRETAIN/GETTY IMAGES: BRITAIN -- The Horse Guards are seen in front of Windsor Castle on Wednesday. French President Nicolas Sarkozy and Carla Bruni-Sarkozy are on a two-day state visit to London and Windsor. Story on A6.

**LOAD-DATE:** March 28, 2008

Exhibit J

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| NORD SERVICE, INC. | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | CASE NO. 2:06 CV 548 |
| | § | |
| JACOB PALTER, BORIS KEYSER, | § | |
| DAVIDSON DRILLING, LLC, DAVIDSON | § | |
| ENERGY, LLC, AND NORD FORMATION | § | |
| CUTTING TECHNOLOGY, INC. | § | |
| Defendants | § | |
| | § | |

## MEMORANDUM OPINION

Nord Service, Inc. ("NSI") sued Jacob Palter, Boris Keyser, Davidson Drilling, LLC, Davidson Energy, LLC, and Nord Formation Cutting Technology, Inc. (collectively "Defendants") and alleged Palter and Keyser breached their fiduciary duties to NSI, converted NSI's property, breached their contractual obligations to NSI, made false representations to NSI, and defrauded NSI. Additionally, NSI alleges Defendants misappropriated NSI's trade secrets, stole NSI's property, conspired to appropriate NSI's property, and committed unfair trade practices against and unfairly competed with NSI.

Defendants allege NSI lacked capacity to initiate the current action and that the lawsuit is an ultra vires act. The Court held a day and a half evidentiary hearing on the issues of NSI's ownership, who NSI's officers and directors are, and whether Sergey Nikolayevich Veselkov, who authorized the lawsuit purportedly on NSI's behalf, had the authority to bring the lawsuit on NSI's behalf. The Court has considered the testimony, exhibits, arguments of counsel, and supporting memoranda, and now details its Findings of Fact and Conclusions of Law below pursuant to Federal

Rule of Civil Procedure 52(a).[1] Defendants' Emergency Motion to Dismiss for Lack of Authority (Docket No. 129) is **DENIED**.

At the hearing, Defendants moved to strike the testimony of NSI's forensic document expert, Erich Speckin, on the basis that Speckin based a substantial portion of his opinion on the examination of photocopies. For the reasons stated herein, Defendants' Motion to Strike is **DENIED**.

## BACKGROUND

NSI was founded for the purpose of commercializing services that employed and refined certain proprietary technologies designed to increase the productivity of, and to otherwise service, oil and gas well operations. Palter served as on NSI's Board of Directors and as NSI's Secretary and Treasurer from around August 2004 to September 2005. During his tenure, Palter hired his son-in-law, Keyser, who was also elected to NSI's Board of Directors. Keyser served as NSI's Vice President of Marketing and was on NSI's Board of Directors. Keyser was affiliated with NSI between August 2004 and September 2005.

Around September 2005, Palter's and Keyser's relationship with NSI soured. NSI claims Palter enticed NSI's investors to invest over one million dollars in NSI and Palter and Keyser misused those funds. NSI claims Palter and Keyser paid personal expenses with NSI funds and used NSI for their personal benefit. Further, NSI claims Palter and Keyser used its resources to start and operate competing businesses, specifically Davidson Drilling, LLC, Davidson Energy, LLC, and Nord Formation Cutting Technology, Inc. ("NFCT"). Finally, NSI claims Palter and Keyser stole NSI's assets when they resigned.

---

[1] To the extent that any conclusion of law is deemed to be a finding of fact, it is adopted as such; and likewise, any finding of fact that is deemed to be a conclusion of law is so adopted.

Sergey Veselkov, allegedly with NSI's authorization, initiated this lawsuit on behalf of NSI on December 29, 2006. Defendants contend NSI cannot sue Defendants under two theories: (1) Palter and Keyser own NSI and did not authorize this lawsuit; and (2) another company, Nefco Petroleum, LLC ("Nefco"), actually owns NSI, and Boris Goldstein, Chairman and CEO of Nefco subsidiary NSI, did not authorize this lawsuit. Under the second theory, Defendants also claim NSI released Palter and Keyser from liability. Defendants further claim NSI, as Nefco's subsidiary, owns Davidson Energy, LLC, Davidson Drilling, LLC, and NFCT. All theories challenge NSI's standing to bring the current suit against Defendants.

## APPLICABLE LAW

NSI must demonstrate by a preponderance of the evidence that it has standing to pursue its claims against Defendants. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). The Constitution minimally requires NSI to show: (1) an injury in fact; (2) that the injury is fairly traceable to the alleged misconduct of the Defendants; and (3) that a favorable decision is likely to redress the injury. *See id.* To prove an "injury in fact," NSI must show Defendants invaded a legally protected interest which is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *See id.* (internal quotations omitted).

In the present action, to prove standing, NSI must show Veselkov properly authorized this lawsuit. NSI is a Delaware corporation and Delaware law applies to determine the effect of NSI's corporate actions.

## PARTIES' CONTENTIONS

### NSI's Position

NSI contends Veselkov, as NSI's President and sole shareholder, properly authorized this lawsuit on behalf of NSI. NSI admitted the following evidence at the hearing.

3

On August 3, 2004, Alex Mostovoi sent an email to Palter to confirm Palter's instructions to incorporate NSI in Delaware with Veselkov as NSI's sole shareholder. Plaintiff's Ex. 121. Mostovoi filed NSI's Certificate of Incorporation with the Delaware Secretary of State Office the following day. Plaintiff's Ex. 70. The Certificate of Incorporation authorizes NSI to issue 100,000 shares of capital stock. *Id.* On August 9, 2004, Veselkov, Miohail Yuryevich Popov, Keyser, Anatoly Nikolayevich Ivanov, Valentin Timofeyevich Grebennikov, and Palter, all of whom comprised NSI's Board of Directors, signed a Unanimous Consent of the Board of Directors wherein the Board of Directors adopted Bylaws, elected officers, ratified the acts of the incorporator, and accepted Veselkov's offer to subscribe for 100 shares of common stock for $100.[2] Plaintiff's Ex. 74. NSI admitted into evidence an undated stock certificate that states Veselkov owns 100 shares of NSI common stock. Plaintiff's Ex. 269.

On July 18, 2005, NSI filed a Delaware franchise tax return. The Secretary of State's records show NSI was authorized to issue 100,000 shares of common stock and lists Veselkov as a director and Palter as an officer.[3] On February 21, 2007, NSI filed a Delaware franchise tax return for NSI and the Secretary of State's records show NSI was authorized to issue 100,000 shares of common stock and lists Boureiko as a director and an officer.[4]

---

[2] Defendants previously asserted Anatoly Nikolayevich's signature was a forgery. *Nord Service, Inc. v. Palter*, 2:06cv548, Docket No. 104. Defendants did not offer any evidence at the hearing in support of their theory and did not contest the authenticity of the Unanimous Consent of the Board of Directors document. Further, the parties stipulated, which the Court approved, that documents produced by NSI and Defendants that are identical shall be deemed authentic and admissible over any challenges to authenticity. Plaintiff's Ex. 212; *Nord Service Inc. v. Palter*, 2:06cv548, Docket Nos. 84, 85. NSI and Defendants each produced the Unanimous Consent of the Board of Directors. Plaintiff's Ex. 74 (document produced by NSI); Plaintiff's Ex. 75 (document produced by Defendants). Thus, the Unanimous Consent of the Board of Directors is authentic.

[3] NSI did not introduce this document into evidence. However, the Court takes judicial notice of the franchise tax return under Federal Rule of Evidence 201.

[4] NSI did not introduce this document into evidence. However, the Court takes judicial notice of the franchise tax return under Federal Rule of Evidence 201.

On September 15, 2005, Veselkov executed a limited durable power of attorney that gave Boureiko the power to act on behalf of NSI to request, collect, and obtain information regarding the activity and operations of NSI and its officers, directors, and employees since NSI's incorporation on August 4, 2004. Plaintiff's Ex. 78.

On September 19, 2005 Palter and Keyser signed a resignation letter and resigned from NSI as officers and directors. Plaintiff's Ex. 79, Ex. 80.

On September 22, 2005, Veselkov, as NSI's sole shareholder, waived the shareholder notice requirement and called a special shareholder meeting. Plaintiff's Ex. 224, Ex. 225. The meeting minutes state "[t]he current directors have been recalled and have resigned, requiring the election of new directors."[5] Plaintiff's Ex. 224. At the meeting Veselkov elected Boureiko and himself to the Board of Directors. *Id.* Boureiko and Veselkov subsequently accepted their director positions. Plaintiff's Ex. 226, Ex. 228. Veselkov and Boureiko then waived the notice requirement, called a special Board of Directors meeting, elected Veselkov as NSI's President and Boureiko as NSI's CEO and Treasurer, elected other officers, and elected two new directors. Plaintiff's Ex. 224, 230, Ex. 231.

On September 13, 2006, NFCT filed its 2005 federal income tax return as an S Corporation. Plaintiff's Ex. 262. The return lists Keyser and Palter as each owning 50% of NFCT's stock during the 2005 tax year. *Id.* NSI's expert witness, Jonathan E. Kemmerer, CPA, testified it would be improper for NFCT to elect S Corporation status if NSI, which is a C Corporation, owned NFCT stock.

On September 25, 2006, Davidson Energy, LLC filed its 2005 federal income tax return.

---

[5] NSI did not submit evidence that Veselkov, Miohail Yuryevich Popov, Anatoly Nikolayevich Ivanov, or Valentin Timofeyevich Grebennikov resigned from NSI's Board of Directors.

Plaintiff's Ex. 100. The tax return lists Palter and Keyser as each owning a 50% share of Davidson Energy, LLC's profits, losses, and capital during the 2005 tax year. *Id.*

Davidson Drilling, LLC filed its 2006 federal income tax return on April 14, 2007. Plaintiff's Ex. 102. The tax return lists Keyser as owning 50% of Davidson Drilling, LLC's profits, losses, and capital during the 2006 tax year. *Id.* The produced tax return includes the first page of Schedule K-1 for Palter but does not include the page that would delineate his ownership interest in Davidson Drilling, LLC. *Id.*

On December 26, 2007, Jake and Inna Palter filed their 2005 federal income tax return. Plaintiff's Ex. 103. The tax return lists nonpassive losses from NFCT and Davidson Energy, LLC that passed through those entities to Palter as a partner or shareholder. *Id.* The tax return also claims a $168,600 loss that resulted from the Palters' sale of Nord Services, Inc. stock they held from August 19, 2004 to December 31, 2005. *Id.*

**Defendants' Position**

Defendants contend NSI cannot sue Defendants under two theories: (1) Palter and Keyser own NSI and did not authorize this lawsuit; and (2) Nefco owns NSI, and Boris Goldstein, Chairman and CEO of Nefco subsidiary NSI, did not authorize this lawsuit. Under the second theory, Defendants also claim NSI released Palter and Keyser from liability. Defendants further claim NSI, as Nefco's subsidiary, owns Davidson Energy, LLC, Davidson Drilling, LLC, and NFCT. Defendants admitted the following evidence at the hearing.

On October 30, 2007, Nonna Fisher produced a copy of NSI's Bylaws dated July 25, 2004 (the "In Formation Bylaws"). Plaintiff's Ex. 16. The In Formation Bylaws contain the words "in formation" written on the front page and contains the signatures of Palter, Keyser, Veselkov, and Fisher. *Id.* Handwritten next to Veselkov's name is the date "January 25, 2004." *Id.* The In

6

Formation Bylaws list Palter and Keyser as the original stockholders, each owning 100,000 shares. *Id.*

Fisher testified she signed the In Formation Bylaws and saw Veselkov sign it in front of her. She further testified she saw Veselkov write "In Formation" on the front of the bylaws and write the "July 25, 2004" date next to his name. Palter's deposition testimony generally corroborates Fisher's testimony.

Fisher also produced a copy of "Agreement No. 24/A," dated July 25, 2004, signed by Veselkov on behalf of Danfil Company Ltd. and Palter on behalf of NSI (the "Danfil Agreement"). Plaintiff's Ex. 249; Defendants' Ex. 51. Under the Danfil Agreement, Danfil Company Ltd. agreed to loan NSI between five and six million dollars. *Id.* NSI promised to pay 28% interest on the loan and promised to pay 33% of its net profits to Veselkov each quarter. *Id.* The Danfil Agreement also contains images of embossments from what appear to be NSI and Danfil Company Ltd. seals. *Id.*

Defendants admitted a letter dated June 11, 2005 from Nefco's attorneys to Veselkov that states Nefco intended to file civil and criminal complaints against Veselkov and others in Russia. Defendants' Ex. 9. Veselkov testified he never saw this letter prior to the current action.

Boris Goldstein produced a document titled "Agreement for Sale of Substantially All Assets," dated August 18, 2005, and signed by Tanya Sturman on behalf of NSI, Eve Goldstein on behalf of Nefco, and a witness. Plaintiff's Ex. 5; Defendants' Ex. 11. Boris Goldstein originally produced a copy, labeled BG57, and produced the original before the hearing. Under the Agreement, NSI agreed to sell "all or substantially all" of its assets to Nefco who agreed to purchase NSI's assets. *Id.* NSI also warranted it would deliver NSI's common stock to Nefco. *Id.* On January 28, 2008, Lena Founk produced a draft copy of the "Agreement for Sale of Substantially

All Assets" that contained additional handwritten notes allegedly made by Veselkov. Plaintiff's Ex. 17.

Founk testified Veselkov had her translate the draft of the Agreement and she billed him $86.00 for one to two hours of translation services. In particular, she translated the paragraph of the Agreement that covered the amount of consideration Nefco paid NSI. Founk further testified she spoke to Veselkov on the phone and had translated many documents for him.

Eve Goldstein testified she signed the Agreement and witnessed both Sturman, Veselkov's alleged "right-hand woman," and "some witness" sign the Agreement. Zlata Stepanenko testified she signed as a witness to the Agreement and saw both Sturman and Eve Goldstein sign the Agreement.

Boris Goldstein produced a copy of a document titled "General Release," labeled BG59, dated September 11, 2005, and signed by Boris Goldstein and Veselkov. Plaintiff's Ex. 7; Defendants' Ex. 13. The copy also contains an image an embossment of what appears to be NSI's corporate seal. *Id.* The General Release purports to release all outgoing directors from all claims NSI had or may acquire against them. *Id.*

Boris Goldstein produced a document titled "Corporate Resolution Authorizing Bulk Sale of Assets of Nord Service, Inc.," labeled BG56, dated December 10, 2005, and signed by Veselkov as an outgoing director. Plaintiff's Ex. 4; Defendants' Ex. 22. The document also contains an embossment from what appears to be NSI's corporate seal. *Id.* The Corporate Resolution adopts the Asset Purchase Agreement (BG57). *Id.* Though Boris Goldstein initially produced a copy, the original was later produced. Eve Goldstein testified she witnessed Veselkov sign and emboss the resolution.

**NSI's Rebuttal Evidence**

Speckin testified he tested documents to determine if handwriting, signatures, and images of embossed seals had been manipulated. He testified he also chemically examined ink on three documents to determine how long the ink had been on the paper. Finally, he testified as to whether the embossed seal on the Corporate Resolution Authorizing Bulk Sale of Assets of NSI (BG56) matched the seal NSI introduced into evidence. Veselkov also testified to rebut Defendants' allegations.

In Formation Bylaws

Veselkov testified he did not sign the In Formation Bylaws and had never met Fisher. Speckin concluded Fisher's signature on the In Formation Bylaws was copied from her signature on her October 25, 2007 affidavit. Speckin also testified that signatures of Keyser and Veselkov from the In Formation Bylaws were identical to their signatures on the  Minutes of the Special Meeting of NSI (BG62).

Danfil Agreement

Speckin concluded Veselkov's signature from the Unanimous Consent of the Board of Directors had been copied to the Danfil Agreement. Speckin also concluded Palter's signature from the Unanimous Consent of the Board of Directors was identical to his signature on the Danfil Agreement.

Agreement for Sale of Substantially All Assets (BG57)

Veselkov testified he had not seen the Agreement for Sale of Substantially All Assets prior to the litigation, that he did not know Sturman, and that the marks on the Founk draft were his handwriting but were copied from an unrelated sketch he gave to Palter and Keyser. Veselkov testified he did not know Founk and did not have her translate the Agreement.

9

Speckin concluded Veselkov's handwritten notes on the Founk draft were copied from Veselkov's handwritten notes on another document produced by Founk. Speckin examined the original document and concluded the signatures from Eve Goldstein and Sturman contained ink from the same manufacturer. Speckin could not conclude when the paper was signed but testified it was most likely signed at least six months prior to the hearing.

Boris Goldstein produced Sturman's resignation letter, labeled BG58, dated September 19, 2005, where she resigned her position from NSI. Plaintiff's Ex. 6. Speckin concluded Sturman's signature on the Agreement had been traced from her resignation letter based on the shaky line quality of the signature. He examined a copy of the resignation letter to make this determination.

NSI Stock Certificate that Shows Nefco Owns 100,000 Shares (BG63)

Boris Goldstein produced a copy of a stock certificate, labeled BG63, dated August 22, 2005, and signed by Boris Goldstein and Fisher. Plaintiff's Ex. 9. The copy of the stock certificate states Nefco owns 100,000 shares of NSI's common stock. *Id.* The copy also contains the image of an embossment from what appears to be NSI's corporate seal. *Id.*

Speckin concluded Fisher's signature on the stock certificate copy was copied from her signature on her October 25, 2007 affidavit.

Nefco Resolution of the Sole Shareholder (BG64)

Boris Goldstein produced a document titled "Nefco Petroleum LLC Resolution of the Sole Shareholder," dated August 22, 2005, and signed by Boris Goldstein. Plaintiff's Ex. 10. Boris Goldstein originally produced a copy, labeled BG64, and someone later provided an original to Speckin. The Resolution elects Boris Goldstein as Chairman of the Board and CEO of NSI, Eve Goldstein as Director and Vice President of NSI, and Fisher as NSI's Corporate Secretary. *Id.*

Speckin concluded Boris Goldstein's signatures on the Nefco Resolution and the Resolution

10

of Board of Directors of NSI that authorized New York lawsuit are identical.  Speckin also concluded that Boris Golstein's signature on a document that purported to be the original of the Nefco Resolution is not same signature on the copy.

General Release (BG59)

Speckin concluded Veselkov's signature from the Unanimous Consent of the Board of Directors had been copied to the General Release.  Speckin also concluded the embossment image had been copied from the embossment on the Corporate Resolution Authorizing Bulk Sales of Assets to NSI (BG56).  Speckin also testified that the location of the embossment image—on the center of the page—indicated the embossment image was copied from the Corporate Resolution Authorizing Bulk Sales of Assets to NSI (BG56), as most pressure seals cannot reach into the center of the page.

Minutes of the Special Meeting of NSI (BG62)

Boris Goldstein produced a document titled "Minutes of the Special Meeting of Nord Service, Inc.," labeled BG62, dated December 9, 2005, signed by Palter, Keyser, Veselkov, and Fisher. Plaintiff's Ex. 8. The document, which is a copy, also contains an image of an embossment of what appears to be NSI's corporate seal. *Id.* The document states "Mr. Veselkov then proposed that it is in the best interests of [NSI] to conduct certain operations through and in the name of its wholly-owned subsidiaries, Nord Formation Cutting Technology Inc., Davidson Energy LLC; and Davidson Drilling LLC . . . ." *Id.* The document states NSI's Board of Directors unanimously adopted Veselkov's proposed agenda. *Id.* This document is the only evidence NSI owns NFCT, Davidson Energy, LLC, or Davidson Drilling, LLC.

Speckin concluded Fisher's signature on the copy of the Minutes of the Special Meeting was copied from her signature on her October 25, 2007 affidavit. Speckin concluded Palter's signature

on the Unanimous Consent of the Board of Directors was identical to his signature on the Minutes of the Special Meeting.  Speckin also testified that the signatures of Keyser and Veselkov from the In Formation Bylaws were identical to their signatures on the  Minutes of the Special Meeting.

Speckin concluded the seal image had been copied from the embossment on the Corporate Resolution Authorizing Bulk Sales of Assets to NSI (BG56).  Speckin also testified that the location of the image—on the center of the page—indicated the image was copied from the Corporate Resolution Authorizing Bulk Sales of Assets to NSI (BG56), as most pressure seals cannot reach into the center of the page.

Corporate Resolution Authorizing Bulk Sale of Assets of NSI (BG56)

Veselkov testified he never signed the resolution.  He further testified he signed three blank sheets of paper for Palter to use to register NSI in Veselkov's absence.

Speckin examined the Corporate Resolution and tested the ink from Veselkov's signature. Speckin concluded Veselkov's signature had been on the paper since at least February, 2005. Speckin also testified that Veselkov's signatures on almost every other document touched the writing or text above or below the signature block and that Veselkov's signature did not align with the document's text.  Defendants presented Speckin with other documents where Veselkov's signature did not touch any text.  Defendant's Ex. 32.

Speckin testified that the original embossment on the Corporate Resolution Authorizing Bulk Sales of Assets to NSI (BG56) had a different image than the NSI seal introduced into evidence.

Resolution of Board of Directors of NSI that Authorized New York Lawsuit

On September 10, 2007, Boris Goldstein, as NSI's purported President and CEO, issued a Resolution of the Board of Directors that authorized Emanuel Zeltser, attorney for Defendants in the current action, to bring suit against Veselkov and Boureiko, among others.  Plaintiff's Ex. 18.

On December 2, 2007, Boris Goldstein swore in an affidavit filed with the Supreme Court of New York that Nefco owns 100% of NSI and Veselkov and Boureiko are not officers, directors, or shareholders of NSI. Plaintiff's Ex. 255.

Speckin concluded Fisher's signature on the copy of the Resolution of the Board of Directors that retained Sterik & Zeltser was copied from her signature on her October 25, 2007 affidavit. Speckin also concluded Boris Goldstein's signatures on the Nefco Resolution of the Sole Shareholder (BG64) and the Resolution of Board of Directors of NSI that Authorized NY Lawsuit were identical.

## MOTION TO STRIKE SPECKIN'S TESTIMONY

### Applicable Law

Federal Rule of Evidence 702 allows testimony of a witness qualified as an expert by knowledge, skill, experience, training, or education if scientific, technical, or other specialized knowledge testimony will assist the trier of fact to understand the evidence or determine a fact in issue. The expert witness may proffer fact and opinion testimony if: (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case. FED. R. EVID. 702.

Courts decide preliminary questions that concern a witness's qualifications and the admissibility of evidence. FED. R. EVID. 104(a). Courts assess a nonexclusive list of factors to determine whether scientific expert testimony is reliable. *Id.* (advisory committee notes, 2000 amendments); *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 593–94 (1993). These factors include: (1) whether others can or have objectively tested the expert's technique or theory; (2) whether the technique or theory has been subject of peer review and publication; (3) the known or

potential error rate of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the scientific community has generally accepted the technique or theory. FED. R. EVID. 702 (advisory committee notes, 2000 amendments); *Daubert*, 509 U.S. 593–94.

**Analysis**

As recounted above, Speckin testified many of the documents in the case were not authentic after he matched signatures, dated ink on original documents, and compared embossment images. Defendants object to Speckin's testimony under Rule 702 and cite *United States v. Garza*, 448 F.3d 294 (5th Cir. 2006). The *Garza* Court held the lower court did not abuse its discretion when it excluded Garza's forensic document examiner under Rule 702, as the expert based her opinions upon an examination of photocopied documents. *Id.* at 300. Garza's expert planned to testify that the witness signatures on Garza's confessions were forgeries. *Id.* at 299. The expert's opinion was based upon examination of six photocopied documents, four of which the expert knew the witness had signed and two of which Garza alleged were forgeries. *Id.*

The district court concluded "I find that [the expert's] testimony, based on the examination of copies, comparing them . . . without any knowledge about how often they had been copied, whether that's a . . . a copy of a copy, I find that [the expert's] testimony would not be reliable under Rule 702." *Id.* at 300. The appellate court noted that even if the trial court erred when it excluded Garza's expert, the error was harmless, as the fact finder can compare signatures to determine authenticity.[6] *Id.* Further, the trial court admitted the copies into evidence and gave Garza the opportunity to cross examine the person who allegedly signed as a witness to Garza's confession

---

[6] In addition, the trial court excluded the expert's testimony on the basis that Garza did not follow the Court's discovery rules. *U.S. v. Garza*, 448 F.3d 294, 299–300 (5th Cir. 2006).

and consent to search documents. *Id.*

Speckin's examination of photocopies does not exclude his testimony under Rule 702. The excluded expert in *Garza* was to testify as to whether, after an examination of four photocopies of the witness's signature and two photocopies of the confession and consent to search documents, the person who signed the four photocopies also signed the confession and consent to search documents.

Speckin did not perform a handwriting analysis, and it is irrelevant how often each document had been copied. Speckin testified that marks, signatures, and corporate seal embossments had been copied from originals or were copies of each other. This determination necessarily requires examination of at least one photocopy. Thus, *Garza* does not exclude Speckin's testimony under Rule 702.[7]

## ANALYSIS

### Authenticity of Documents

At the hearing, NSI put in issue the authenticity of many documents. Under Federal Rule of Evidence 901(a), a document's authenticity is a condition precedent to that document's admission into evidence.[8] To show a document is authentic, the document's proponent must produce evidence sufficient to support a finding that the document is what its proponent claims. *Id.*

<u>In Formation Bylaws</u>

The In Formation Bylaws, dated July 25, 2004, are not authentic. Fisher's signature is

---

[7] Defendants did not object to Speckin's testimony on the basis that he was not a qualified expert or that his testing methods, had he not used copies to form certain opinions, would render his testimony inadmissable under Rule 702. Additionally, even if *Garza* applied, the Court could still compare the signatures on the documents to determine their authenticity. *Garza*, 448 F.3d at 300.

[8] Many of these documents were only introduced into evidence by NSI for the limited purpose to show they are not authentic. Defendants introduced into evidence the following documents: Danfil Agreement; Agreement for Sale of Substantially All Assets; General Release; and Corporate Resolution Authorizing Bulk Sale of Assets of NSI. The Court, however, will address each document that supports Defendants' theories.

copied from her signature on her October 30, 2007 affidavit. Veselkov testified he never signed the bylaws and the testimony of Fisher and Palter to the contrary was not credible. Second, the In Formation Bylaws purport to issue 200,000 shares of stock while the Delaware Secretary of State franchise tax returns show NSI was authorized to issue 100,000 shares of stock.

However, even if the In Formation Bylaws were authentic, they would not be sufficient to show Palter and Keyser each own 50% of NSI. Under Delaware law, a corporation comes into existence when the certificate of incorporation is filed with Delaware Secretary of State. 8 Del. Code § 106. The parties do not dispute Mostovoi incorporated NSI on August 4, 2004. At the time that Palter, Keyser, Veselkov, and Fisher allegedly signed the In Formation Bylaws, NSI did not exist as a corporation and could not issue stock. Further, there is no evidence NSI adopted the In Formation Bylaws.[9] Thus, NSI is not governed by In Formation Bylaws, and Palter and Keyser do not own 50% of NSI's common stock.

### Danfil Agreement

Defendants did not prove the Danfil Agreement, dated July 25, 2004, is authentic. Veselkov's signature was copied from the Unanimous Consent of the Board of Directors, dated August 9, 2004. The void in Veselkov's signature on the Unanimous Consent of the Board of Directors, which runs through most of that document, appears in Veselkov's signature on the Danfil Agreement.

### Agreement for Sale of Substantially All Assets (BG57)

Defendants did not prove the Agreement for Sale of Substantially All Assets, dated August

---

[9] Even if NSI adopted the In Formation Bylaws, the provision that issues 200,000 shares would be ineffective, as it conflicts with the certificate of incorporation. 8 Del. Code § 109(b) ("The bylaws may contain any provision, not inconsistent with law or with the certificate of incorporation, relating to the business of the corporation, the conduct of its affairs, and its rights or powers or the rights or powers of its stockholders, directors, officers or employees.").

18, 2005, or its draft copy are authentic. Sturman's signature was most likely traced from the signature on her resignation from the Board of Directors, dated September 19, 2005 (BG58). The handwritten markings on the draft copy are identical to and most likely were copied from Veselkov's notes on another document. Eve Goldstein's testimony, in addition to Stepanenko's testimony, was not credible. Defendants also did not provide testimony from Sturman.

## NSI Stock Certificate that Shows Nefco Owns 100,000 Shares (BG63)

The NSI stock certificate that shows Nefco owns 100,000 shares of NSI stock, dated August 22, 2005, is not authentic. Fisher's signature on the copy of the stock certificate was copied from her signature on her October 25, 2007 affidavit.

## Nefco Resolution of the Sole Shareholder (BG64)

The Nefco Resolution, dated August 22, 2005, is not authentic. The original document Defendants produced had a different signature on it than the copy. Further, Defendants did not produce Boris Goldstein or any witness with knowledge of the document.

Even if the Nefco Resolution were authentic, Boris Goldstein could not call a special shareholder meeting as there is no evidence he or Nefco owned at least 40% of NSI stock on August 22, 2005.[10] Further, there is no evidence NSI shareholders, to the extent others owned NSI stock,

---

[10] Under Delaware law, a corporation's Bylaws may contain any provision, not inconsistent with law or the Certificate of Incorporation, that relates to the business of the corporation, the conduct of the corporation's affairs, and the rights and powers of the corporation, its stockholders, directors, officers, or employees. 8 Del. Code § 109(b). NSI's Bylaws state the following:

Section 2.2. Special Meetings. Special meetings of stockholders, unless otherwise prescribed by law, may be called at any time by the Chairman of the Board or by order of the Board of Directors or by the holder or holders of at least 40% of the voting power of the outstanding shares of the capital stock of the Corporation. Special meetings of stockholders shall be held at such place within or without the State of Delaware as shall be designated in the notice of meeting, or may be held by telephone conference or other similar means, or by written consent.

Plaintiff's Ex. 77.

were provided notice or waived the notice requirement.[11]  Even if the Agreement for Sale of Substantially All Assets (BG57) were authentic, Defendants did not show Sturman, even if she acted on behalf of NSI, had the authority to convey Veselkov's NSI stock. *See* 8 Del. Code § 159 ("The shares of stock in every corporation shall be deemed personal property . . . .").   Thus, Boris Goldstein, as sole owner of Nefco, could not call a shareholder meeting and elect new directors of NSI who would subsequently elect new officers.

General Release (BG59)

Defendants did not prove the General Release, dated September 11, 2005, is authentic. Veselkov's signature was copied from the Unanimous Consent of the Board of Directors and the image of an embossment from NSI's corporate seal, located on the middle of the page, was copied from the Corporate Resolution Authorizing Bulk Sale of Assets (BG56), dated December 10, 2005.

Minutes of the Special Meeting of NSI (BG62)

The Minutes of the Special Meeting, dated December 9, 2005, are not authentic.  Fisher's signature on the copy of the Minutes of the Special Meeting was copied from her signature on her October 25, 2007 affidavit. Additionally, the image of the embossment of NSI's corporate seal was copied from the Corporate Resolution Authorizing Bulk Sale of Assets (BG56), dated December 10,

---

[11] NSI's Bylaws state the following:

Section 2.6. Notice of Meetings.  Written notice, stating the place, date and time of the meeting, and in the case of a special meeting, the purpose of purposes for which the meeting is called, shall be given to each stockholder entitled to vote thereat at his address as it appears on the records of the corporation, not less than ten (10) days nor more than sixty (60) days before the date of the meeting.

Section 7.4. Waiver of Notice.  Whenever any notice is required to by given under any provision of law, the Certificate of Incorporation or these Bylaws, a written wavier thereof, signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to notice.

Plaintiff's Ex. 77.

2005.

The Minutes of the Special Meeting of NSI also conflict with NFCT's and Davidson Energy, LLC's 2005 federal income tax returns, which do not list NSI as owning any interest in either entity. Further, the parties do not dispute that Palter and Keyser resigned from NSI's Board of Directors in September 19, 2005, two months before they, as NSI directors, allegedly signed the Minutes of the Special meeting. In total, Defendants presented no evidence that NSI purchased Davidson Energy, LLC, Davidson Drilling, LLC, or NFCT.

<u>Corporate Resolution Authoring Bulk Sale of Assets to NSI (BG56)</u>

Defendants did not prove the Corporate Resolution, dated December 10, 2005, is authentic. The ink from Veselkov's signature is at least ten months older than the document's date, which is consistent with Veselkov testimony that he gave Palter three sheets of paper signed in the blank. Second, the embossment on the document does not match the embossment from the seal NSI produced at the hearing.

**Standing**

Under Delaware law, a corporation comes into existence when the incorporator files the Certificate of Incorporation with the Delaware Secretary of State. 8 Del. Code § 106. Thus, NSI came into existence on August 4, 2004. The Certificate of Incorporation authorized issuance of 100,000 shares of capital stock.

The Board of Directors, unless limited by the Certificate of Incorporation or Bylaws, manages the corporation's business and affairs. 8 Del. Code § 141(a). A corporation's Board of Directors can act by unanimous consent, and on August 9, 2004, NSI's Board of Directors acted by unanimous consent and adopted NSI's Bylaws, elected officers, ratified the acts of the incorporator, and, in exchange for $100, issued 100 shares of NSI common stock to Veselkov. 8 Del. Code §

141(f); 8 Del. Code § 152 ("The board of directors may authorize capital stock to be issued for consideration consisting of cash, any tangible or intangible property or any benefit to the corporation, or any combination thereof."). NSI produced a stock certificate that states Veselkov owns 100 shares of NSI common stock.

A corporation's Bylaws may contain any provision, not inconsistent with law or the Certificate of Incorporation, that relates to the business of the corporation, the conduct of the corporation's affairs, and the rights and powers of the corporation, its stockholders, directors, officers, or employees. 8 Del. Code § 109(b). Under Section 2.2 of NSI's Bylaws, the holder of at least 40% of the voting power of the outstanding shares of NSI's capital stock may call a special shareholder meeting. Under Section 3.4, shareholders may elect directors at a special shareholder meeting by a plurality of votes cast at the special meeting. Section 2.6 requires each shareholder to receive written notice of the place, date, time and purpose of the shareholder meeting at least 10 days before and not more than 60 days before the meeting's date. A shareholder entitled to notice under Section 2.6 can waive the notice requirement in writing under Section 7.4.

On September 22, 2005, Veselkov, as NSI's sole shareholder, called a special shareholder meeting and waived the notice requirement in writing. The meeting minutes state that all directors had resigned. NSI did not admit evidence at the hearing that the entire Board of Directors had resigned as of September 22, 2005. The Court construes the meeting minutes statement that all directors had resigned as evidence that Veselkov removed the remaining directors at the special shareholder meeting. Veselkov, as NSI's sole shareholder, had this removal power under Section 3.6 of the Bylaws, which allows a majority of the voting power of the shares then entitled to vote to, with or without cause, remove any director at any time. Veselkov, as sole shareholder, subsequently elected himself and Boureiko to the Board of Directors.

20

Section 3.12 of NSI's Bylaws allows special Board of Directors meetings upon the request of two directors. Under Section 3.7, the existing Board of Directors may fill vacant directorships. Under Section 4.2, the Board of Directors may elect newly created or vacant principal officers at a special meeting of the Board of Directors. Section 3.13 requires NSI to give notice of a special Board of Directors meeting to each director but the notice requirement is waived if all directors are present at the meeting. Directors entitled to notice under Section 3.3 may waive the notice requirement under Section 7.4.

After the special shareholder meeting, Veselkov and Boureiko held a special Board of Directors meeting. As every NSI director was present, notice was not required, though Veselkov and Boureiko waived the notice requirement in writing. At the meeting, the Board of Directors elected Veselkov as President and Boureiko as CEO and Treasurer, elected two new directors, and elected other officers.

On December 29, 2006, NSI sued Defendants. At that time, Veselkov owned 100% of NSI's common stock and was NSI's President. Thus, Veselkov had authority to initiate suit on NSI's behalf.[12] As a result, NSI had, and continues to have, standing to sue Defendants.

---

[12] The Board of Directors exercises all corporate powers, which includes the power to conduct litigation that seeks to redress harm inflicted upon the corporation. *See Agostino v. Hicks*, 845 A.2d 1110, 1115–16 (Del. Ch. 2004) (citing 8. Del. Code § 141(a)). In the instant case, there is no evidence that NSI's Board of Directors authorized or objected to the instant action. However, three of NSI's four directors, Veselkov, Boureiko, and Valentin Timofeyevich Grebennikov, were sworn in as witnesses at the hearing and appeared on NSI's witness list. *Nord Service, Inc. v. Palter*, 2:06cv548, Docket No. 188. Thus, it is unlikely NSI's Board of Directors did not authorize the current lawsuit, as a plurality of its directors appeared at the hearing on NSI's behalf.

Section 4.9 of NSI's Bylaws give the President "general supervision over the business" of NSI and "all powers and duties usually incident to the office of the President except as specifically limited by a resolution of the Board of Directors." As there is no evidence the Board of Directors authorized or objected this suit, Veselkov, as President, has the power to sue Defendants to protect NSI's interests until limited by NSI's Board of Directors. There is no evidence NSI's Board of Directors have so limited Veselkov's power.

Finally, even if NSI's Board of Directors were required to pass a resolution to authorize this suit but refused to do so, Veselkov, as NSI's sole shareholder, could call a special shareholder meeting under Section 2.2 of NSI's Bylaws, remove objecting directors under Section 3.6 of NSI's Bylaws, and initiate suit. Thus, it is unlikely NSI's Board of Directors, elected by Veselkov and Boureiko, oppose Veselkov's initiation of this action on NSI's behalf.

## CONCLUSION

For the abovementioned reasons, the Court **DENIES** Defendants' Motion to Strike Speckin's testimony. NSI has shown by a preponderance of the evidence that Veselkov, as NSI's sole shareholder and President, properly authorized this lawsuit on NSI's behalf. Thus, NSI has standing to sue Palter, Keyser, Davidson Drilling, LLC, Davidson Energy, LLC, and NFCT. Defendants' Emergency Motion to Dismiss for Lack of Authority (Docket No. 129) is **DENIED**.

Exhibit K

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------

EMANUEL E. ZELTSER,

Plaintiff,

-against-

JOINT STOCK BANK INKOMBANK, ET AL.,

Defendants.

------------------------------

ORIGINAL

95 Civ. 0796 (KTD)

AFFIDAVIT OF ARTHUR H.
CHRISTY IN SUPPORT OF JOINT
STOCK BANK INKOMBANK'S
MOTION FOR PARTIAL SUMMARY
JUDGMENT DISMISSING
EMANUEL E. ZELTSER'S CLAIM
FOR LEGAL FEES AND EXPENSES

STATE OF NEW YORK )
                  ) ss.:
COUNTY OF NEW YORK )

KEVIN THOMAS DUFFY
USDJ SD NY

ARTHUR H. CHRISTY, being duly sworn, hereby deposes and says:

1.      I am a member of the Bar of this Court, and a partner of Christy & Viener,

counsel for defendant/counterclaim plaintiff Joint Stock Bank Inkombank ("Inkombank"). I

submit this affidavit in support of Inkombank's motion for partial summary judgment dismissing

"attorney" Emanuel E. Zeltser's ("Zeltser") claims for unpaid legal fees and expenses, pleaded in

the second through fifth causes of action of Zeltser's complaint, dated February 2, 1995 (the

"Complaint"), because the irrefutable evidence is Zeltser never attended law school, and

obtained admission to the Bar through fraud. Inkombank submits this motion in conjunction

with its recent application for an expedited trial of this case, now more than two years old.

Resolving the single, discrete issue of Zeltser's lack of legal education -- and thus his inability to

sue for legal fees and improper legal representation of Inkombank -- would significantly narrow

the key issues needed to be tried and therefore expedite the trial of this case.

2.      Zeltser's claim for legal fees and expenses should be dismissed because he

fraudulently gained admission to the New York State Bar, and was thereby engaged in the

111984.1

unauthorized practice of law, when he allegedly incurred the "legal fees and expenses" sought herein. As discussed in the accompanying memorandum of law, New York statutory and decisional law strictly prohibit one who is engaged in the unauthorized practice of law from recovering "legal fees" or expenses for services rendered.[1]

3.    The evidence proves that Zeltser, a career con-man,[2] fraudulently gained admission to the New York State Bar, Appellate Division, First Department by lying about his education in the former Soviet Union and forging a phony "diploma" and "transcript." Zeltser claims he graduated in 1974 from the law school of Kishinev State University (the "Law School"), named after V.I. Lenin ("KSU").[3] However, three witnesses - KSU's Rector, KSU's Head of Personnel, and a graduate of the 1974 Law School's class - each unequivocally state in accompanying affidavits that Zeltser never went to the Law School and that his "diploma" and "transcript" are forgeries. Actually, Zeltser studied piano at the Moldovan State Institute of Arts

---

[1]    Zeltser's other claims -- defamation and tortious interference -- stem from Inkombank's counterclaims, which contend that Zeltser used his false position as "lawyer" to steal nearly $6 million from investment accounts that Inkombank and one of its subsidiaries, Hoverwood, Ltd., maintained in Manhattan.

[2]    Dating back to at least the early 1980's, Zeltser has been repeatedly sued for having engineered various scams. In one case, Zeltser was sued for operating an automobile "export" company that never delivered the cars to their purchasers, while in another he was sued for contracting to sell land in France, accepting the purchase price and then failing to deliver the land. In all of these frauds, Zeltser works with the same crew, many of whom participated in the fraud upon Inkombank, and forges documents on a routine basis. In fact, in the case involving the "sale" of French land, Justice Myriam Altman of New York State Supreme Court chastised Zeltser for having submitted a fabricated document to the Court. A copy of Justice Altman's decision is annexed hereto as Exhibit A. A copy of the complaint in the automobile "export" company case is annexed as Exhibit B. See footnote 5 infra.

[3]    KSU is located in Kishinev, the capital city of the Republic of Moldova. Now a sovereign nation, Moldova (then known as Moldavia) was, until 1991, one of the Soviet Union's 15 Republics.

("MSIA") at the time he claims to have been studying law, as demonstrated in the accompanying affidavit and supporting documentation submitted by MSIA's Director of Studies.

4.    Though the Moldovan affidavits are conclusive,[4] it should not be forgotten that Zeltser himself testified under oath at a July 1989 deposition, less than 15 months before his admission, that he never studied law.[5] Zeltser has been confronted with this testimony on several occasions, but can only dissemble.

Zeltser's Alleged Legal Education And His "Diploma" and "Transcript"

5.    The New York State Official Register of Admitted Attorneys and Counselors-at-Law lists Zeltser as having been admitted to the New York State Bar, Appellate Division, First Department, on September 24, 1990. A copy of a letter from the State of New York Unified Court System Office of Management Support setting forth this information is annexed hereto as Exhibit D. According to the Committee on Character and Fitness for the First Appellate Division, Zeltser gained admission to the Bar by representing that he: (i) graduated from the Law School in 1974; and (ii) had been admitted to the University of Denver's Graduate Tax Program (the "Tax Program"). Records of the University of Denver reflect that Zeltser in fact gained admission to the Tax Program in October 1989 by falsely stating he graduated the Law School, but that he never matriculated or attended the University of Denver. Zeltser was

---

[4]    Should the Court consider it necessary, each of the Moldovan affiants has stated they would voluntarily come to the United States to testify.

[5]    This deposition occurred in yet another lawsuit based on a Zeltser fraud, this one stemming from Zeltser's role in physically commandeering a medical clinic from its rightful owners. Captioned American Urgy Medical Center, Inc. v. Richard Lipsky, Emanuel Zeltser, et al. (A-2549-92T1), in the New Jersey Superior Court (the "New Jersey Action"), Zeltser was ultimately assessed $589,496, inclusive of interest, in compensatory damages, and $1.5 million in punitive damages for his misconduct. Copies of the decisions reflecting these judgments are annexed hereto as Exhibit C.

able to gain admission because of a rule in effect in 1990 enabling those with foreign law degrees to sit for the Bar exam simply by "meeting the educational requirements for admission to an approved law school in the United States for an L.L.M. or S.J.D. degree in law." (Emphasis added.) Matriculating, attending or graduating from an L.L.M. or S.J.D. program was not necessary. A copy of this rule, Rule 520.5 of the New York State Court of Appeals Rules, as it read in 1990, is annexed hereto as Exhibit E. By gaining admission to the Tax Program by tricking the University of Denver and then tricking the Committee of Character and Fitness into believing he graduated from the Law School, Zeltser was permitted to sit for the Bar exam (which he, or an imposter acting on his behalf, apparently passed).

6.    Inkombank demanded that Zeltser produce his diploma throughout this litigation, but Zeltser, tellingly, fought tooth and nail to avoid producing it -- even arguing that it is privileged and irrelevant. Zeltser produced his "diploma" only when so ordered by the presiding Magistrate Judge, Sharon E. Grubin. Copies of Zeltser's "diploma" (with English translation) and Magistrate Grubin's order are annexed hereto as Exhibits F and G, respectively. Zeltser's "diploma," dated May 29, 1974, states that he enrolled at the Law School in 1970 and "in 1974, completed the full course of studies ... on an experimental program with a specialization in International Law" and by virtue thereof is "qualified as a Lawyer."

7.    Pursuant to a subpoena issued in accordance with Rule 45 of the Federal Rules of Civil Procedure, Inkombank obtained from the University of Denver copies of the materials that Zeltser provided in support of his application to the Tax Program. A copy of Inkombank's subpoena, and the affidavit of service attesting to contemporaneous notice to each of the parties, is annexed hereto as Exhibit H. The University of Denver produced copies of Zeltser's "diploma" and "transcript" and an application form. Copies of the documents are

annexed hereto as Exhibit I (Zeltser only provided the University of Denver with English translations of his "diploma" and "transcript" documents).[6] Zeltser's "transcript," entitled "Kishinev State University, named after Lenin, Academic Audit Registry Book," identifies roughly 30 courses that he allegedly completed at the Law School between 1970 and 1974. Blatantly tailored to approximate the course of study offered by a United States law school program, representative listings in Zeltser's "transcript" include "Introduction to International Law," "Comparative Review, Soviet vs. American Legal Systems," "Succession in American Law," and "American Federal Courts." Zeltser's University of Denver application form asks him, at line 12, to list "all colleges and universities attended, regardless of length of attendance." Zeltser identifies only the Law School, claiming that he studied there from 1970-1974, graduating in May 1974 as a "jurist" with a major in international law. A copy of Zeltser's application form is annexed hereto as Exhibit K.

8.    Zeltser shifted tack during the litigation as Inkombank scrutinized his alleged career at the Law School. Though his "diploma" and "transcript" state that he graduated from the Law School, and though he identified no school other than the Law School on the Tax

---

[6]    Alla Waters, a long-time Zeltser associate, who participated in the Inkombank frauds, translated Zeltser's "diploma" and "transcript" for the University of Denver. Zev Siegel, who was also involved in defrauding Inkombank, notarized Ms. Water's translator's certification. Inkombank served Waters and Siegel with Rule 45 subpoenae months ago, but neither voluntarily complied. Waters completely ignored Inkombank's subpoena, forcing Inkombank to move to hold her in contempt. That motion is currently pending with the Court. Siegel, a Pennsylvania resident, filed objections to Inkombank's subpoena with the United States District Court for the Western District of Pennsylvania, the Honorable Douglas J. Lee presiding. Judge Lee granted Inkombank's motion to compel Siegel to comply. A copy of this decision is annexed hereto as Exhibit J. Siegel is represented by Herbert Derman, Esq., Foreign Investors Portfolio Management's ("FIPM") counsel of record and Zeltser's long-time personal lawyer .

Program application form, Zeltser claimed at his deposition in this case that he earned his law degree at the Universitca de Stat de Marxism Leninism ("MLU"), located in Kishinev.  Copies of the pertinent pages (p. 30, lines 12-25, p. 31, lines 2-12) of the transcript of Zeltser's deposition are annexed hereto as Exhibit L.

Zeltser Never Attended the Law School

9.      Based on the attached affidavits of KSU's Head of Personal, KSU's Rector, and a member of the 1974 Law School class (Messrs. George S. Zhitar, Grigori E. Rusnak and Alexei V. Potynga respectively), it is now clear that Zeltser never attended the Law School or MLU and that his "diploma" and "transcript" are phonies.  Messrs. Zhitar, Rusnak and Potynga's affidavits, attached as Exhibits M, N, and O, are summarized below.

George S. Zhitar, KSU'S Head Of Personnel

10.     Mr. Zhitar is currently, and since 1985 has been, KSU's Head of Personnel.  As such, he is custodian of records for KSU's entire archives, specifically including, but not limited to, the KSU documents which identify individuals who have matriculated at, and/or graduated from, all of KSU's departments or schools, including the Law School. Mr. Zhitar reviewed the pertinent records in KSU's archives and is certain there is no record of Zeltser attending any of KSU's departments or schools at any time between 1966 and 1982. Mr. Zhitar also reviewed Zeltser's "diploma" and his "transcript," and is certain both are crude forgeries.  Mr Zhitar further states that Zeltser could not conceivably have earned a law degree at MLU because MLU was merely a Soviet political indoctrination school, which never offered an

academic course of study, and was never intended to, or capable of, qualifying its students as "jurists."[7] More specifically, Mr. Zhitar affirms that:

(1)    as KSU's custodian of records, he is familiar with KSU's record-keeping procedures and the types of documents it maintains in its archives. He knows, for example, that KSU maintains in the ordinary course of business complete lists of all those who have entered and/or graduated from any of KSU's schools from the 1950's to the present. He has reviewed the list of all students to have matriculated at and/or graduated from any of KSU's schools or departments, including the Law School, between 1966 and 1982 and is certain there is no reference to Zeltser. Mr. Zhitar states that it would be impossible for a student's file to have been misplaced or destroyed or never to have been created (Zhitar Aff., ¶ 1);

(2)    he has reviewed the Diploma Issuance Registry for the 1974 class (which identifies each graduating student, the number of each diploma issued, and each graduate's post-graduate assignment), and the 1974 Orders of the Rector, which identify the students authorized to receive diplomas. Mr. Zhitar is certain there is no reference to Zeltser in either the Diploma Issuance Registry or the Orders of the Rector, copies of which he attaches to his affidavit (Zhitar Aff., ¶ 3);

(3)    he clearly remembers the members of the class of 1974 -- he signed each of the diplomas issued that year in his capacity as Chairman of the KSU State Examination Committee (this is the body that determines which graduating law students would be qualified as jurists) -- and is certain there was no Zeltser in the class and that he never signed a diploma for Zeltser (Zhitar Aff., ¶ 4);

(4)    he has reviewed Zeltser's "diploma" and "transcript" and is certain both are fabricated. Mr. Zhitar states that the "diploma" contains several obvious errors that prove it is fake. First, Zeltser's "diploma" asserts that Zeltser graduated from the Law School on May 29, 1974, when, in fact, KSU's academic year did not end until late June or early July. Mr. Zhitar reviewed KSU's archives and found that each of the diplomas issued in 1974 is dated in early July 1974. Second, Zeltser's diploma states that he entered KSU in 1970 and graduated in

---

[7]    Interestingly, Zeltser's "diploma" contains a stamp of the "Marxism-Leninism Archives." KSU's Rector and Head of Personnel both state in their affidavits that KSU never was affiliated with MLU, that KSU diplomas do not bear an MLU stamp, and that KSU documents never were stored in MLU's archives. Zeltser's former secretary, Janna Boulakh, testified at deposition that he told her he had fabricated a law diploma of MLU. Copies of the pertinent pages (p. 257, lines 2-9) of Ms. Boulakh's deposition is annexed hereto as Exhibit P.

1974. From 1966 to the present, however, KSU has required a five year course of study and, until the fall of the Soviet regime in 1991, never permitted students to graduate on an accelerated basis. Third, Zeltser's "diploma" states that he graduated from an "experimental program" with a "specialization in international law." In fact, as Mr. Zhitar states, KSU offered no "experimental programs" in the 1970's (or for decades before, or thereafter) and there were no areas of speciality within its law program in 1974 or for decades before or thereafter. Moreover, Mr. Zhitar states that it is ludicrous for Zeltser to claim that he majored in international law because, reflective of the Cold War dynamics of the time, KSU offered only one class relating to foreign law to the class of 1974, and that class lasted for only a half-year and was taught by a visiting lecture (Zhitar Aff., ¶¶ 6,7);

(5)    the physical appearance of Zeltser's "diploma" confirms that it is a fabrication. First, the words "Workers of the World Unite" appear on Zeltser's "diploma" but do not appear on a true Law School diploma. Second, diplomas issued by the Law School, like diplomas issued throughout the Soviet Union, contained a letter or letters before the number of the diploma. There is no letter or letters before the number on Zeltser's "diploma." Moreover, the number on Zeltser's "diploma" -- 294362 -- is much lower than the numbers of the diplomas issued to the class of 1974, which ranged from IO 426451 to IO 436973 and from IO 726108 to IO 726198. Mr. Zhitar also states that a true KSU diploma would not contain a stamp of the "Marxism-Leninism University, Archives" as Zeltser's does, and attaches a true Law School diploma to his affidavit for purposes of comparison (Zhitar Aff., ¶¶ 8,10);

(6)    he has reviewed Zeltser's "transcript" and is certain that it is false. Of the 33 classes identified in Zeltser's "transcript," only five were actually offered by the Law School in the 1970's. The vast majority of the 28 fake classes listed on Zeltser's transcript evince an emphasis on American and foreign law that is wholly at odds with the Cold War reality of the Soviet Union in the early 1970's. For purposes of comparison, Mr. Zhitar annexes a list of the classes actually taught at the Law School in the early 1970's (Zhitar Aff., ¶ 11);

(7)    Zeltser could not have simultaneously studied at KSU and another educational institution. During the Soviet regime, it was unheard of for students simultaneously to pursue different degrees at different educational institutions (this is because the Soviet government funded students' educations and would not pay for double accreditation). Mr. Zhitar also states that KSU, like most, if not all, Soviet educational institutions, required students to provide the original of their high school diploma before they matriculated, and held the diploma until the student graduated. Thus, if Zeltser attended another educational institution he could not have provided KSU with the original of his high school diploma, and therefore could not have matriculated at KSU (Zhitar Aff., ¶ 13); and

(8)     because he served as the Chairman of the KSU State Examinations Committee from 1974 to 1978, he is familiar with the requirements for becoming a "jurist" then in effect and is certain that one could not become a "jurist" by studying at MLU.  According to Mr. Zhitar, MLU was a Soviet political indoctrination school which never offered an academic course of study and merely prepared students to give lectures as a Communist Party propagandist.  Mr. Zhitar also states that KSU never was affiliated with MLU, was never considered a part of the Soviet educational system, and was neither intended to, nor able to, qualify its students as "jurists." (Zhitar Aff., ¶ 12).

Grigori E. Rusnak, Rector Of KSU

11.     Mr. Rusnak, KSU's rector, confirms Mr. Zhitar's authority and

qualifications as KSU's Head of Personnel and custodian of records.  He corroborates every

important detail of Mr. Zhitar's testimony concerning KSU's record-keeping procedures, the

lack of any record of Zeltser in KSU's records, and that Zeltser's "diploma" and "transcript" are

fabrications.  Mr. Rusnak further states as follows:

(1)     that, in the ordinary course of business, KSU maintains complete lists of all students to have matriculated at, and/or graduated from, any of its departments or schools dating back to 1950.  Mr. Rusnak states that Mr. Zhitar is KSU's duly-qualified Head of Personnel and that he is the person in charge of KSU's archives. Mr. Rusnak further states that it would be impossible for a student to have studied at KSU without that fact being reflected in KSU's archives (Rusnak Aff., ¶ 2); and

(2)     he has reviewed the documents in KSU's archives pertaining to the Law School class of 1974, and is certain that there is no reference to an Emanuel Zeltser in any of these documents.  Mr. Rusnak also reviewed Zeltser's "diploma" and "transcript" and, like Mr. Zhitar, is certain that they are outright fabrications. Mr. Rusnak also states that KSU never was affiliated with MLU and that MLU did not offer any academic course of study and never could qualify one as a "Jurist" (Rusnak Aff., ¶¶ 3-5).

Alexei V. Potynga, Member of the Law School's 1974 Class

12.     Currently the Chief Prosecutor in the Civil Division of the Moldovan

Attorney General's Office, Mr. Potynga matriculated at the Law School in 1969 and graduated in

1974.  Mr. Potynga is certain that Zeltser never was a member of the 1974 class and did not

study at the Law School between 1969 and 1974. He is also certain that Zeltser's "diploma" and "transcript" are fake. Specifically, Mr. Potynga states as follows:

(1)    that he was extremely active in student affairs while at KSU -- he even represented the 1974 class on a University-wide Komsomol committee (the Komsomol was the Communist youth league) -- and remembers the names and faces of each of his classmates, as well as of the students in each of the other classes in the Law School. Mr. Potynga is certain that Zeltser never was a member of the 1974 class, and that Zeltser did not attend the Law School between 1969 and 1974. In fact, Mr. Potynga still possesses (and attaches to his affidavit) a picture of the class of 1974 and can identify each person in the picture by name. Mr. Potynga states that there is no Zeltser in the picture for the obvious reason that there was no Zeltser in the class (Potynga Aff., ¶ 2);

(2)    in more recent years, he has been involved in alumni relations for the Law School, just this year organizing the Law School's 22nd annual reunion. In connection with his work in alumni relations, Mr. Potynga frequently communicates with his surviving classmates, and is generally aware of what each is doing and where each is living. In all of his alumni work, Mr. Potynga states that he has never heard the name Zeltser (Potynga Aff., ¶ 3); and

(3)    that he has reviewed Zeltser's "diploma" and "transcript" and is certain both are fabrications. Among other things, Mr. Potynga notes that Zeltser could not have conceivably graduated in a five year program in four years, as stated in his "diploma" and that Zeltser's professed course of study -- a major in international law -- simply did not exist at the Law School in the 1970's. Mr. Potynga states that the date of Zeltser's "diploma," May 29, 1974, reveals the "diploma" as a fraud because the Law School's academic year did not end until late June. Mr. Potynga also notes that the physical appearance of Zeltser's "diploma" deviates in material respects from a true Law School diploma, and attaches his Law School diploma to his affidavit for purposes of his comparison (Potynga Aff., ¶¶ 4,5).

## Zeltser Studied Piano at the Moldovan State Institute of Arts from 1971 to 1973

13.    Based on records that she located in MSIA's archives, Ms. Platsinda, MSIA's Director of Studies and custodian of records, is certain that Zeltser studied full-time at

MSIA from 1971 to December 1973, majoring in piano.  In an affidavit annexed as Exhibit Q, Ms. Platsinda states:

> (1)    that she searched MSIA's archives to determine whether there was any record of Zeltser having attended MSIA.  She discovered a personal file for Zeltser reflecting that he was admitted to MSIA in the Summer of 1971 and expelled on December 17, 1973. Zeltser's personal file also shows that he entered MSIA the same year (1971) that he graduated from the E. Koki Specialized School of Music (also located in Kishinev), where he studied piano from the first grade. Ms. Platsinda also states that Zeltser's personal file reveals that he was expelled because he had voluntarily decided to leave the Soviet Union for Israel, and explains that it was customary practice in the Soviet Union for universities to expel students who had decided to emigrate (this is because the government would not fund the education of those who had decided to leave the Country). Ms. Platsinda also states that Zeltser's personal file show that MSIA, in keeping with the practice among Soviet universities,  held the original of Zeltser's high school diploma until he left the school in December 1973 (Platsinda Aff. ¶ 2); and

> (2)    that she is fully familiar with MSIA's record-keeping procedures and the types of documents in MSIA's archives, and is certain that Zeltser's file was maintained in the ordinary course of business in the same manner as all files for MSIA students (Platsinda Aff. ¶ 3).

## Zeltser Himself Testified That He Never Went To Law School

14.    On July 10, 1989, less than 15 months before he was admitted by fraud to the Bar, Zeltser provided deposition testimony in the New Jersey Action indicating that he did not go to Law School.  When asked on that day whether he had "any schooling in the Soviet Union," Zeltser made no mention of any legal training, instead testifying that he had a "Bachelor's Degree in International Trade, equivalent of Bachelor's Degree, four years" (pp. 11 (line 1.24) and 12 (line 1.4), annexed hereto as Exhibit R)[8].

---

[8]    As attested to by MSIA's archives, this too was a lie.

15.    After being asked whether he had "any schooling in the Soviet Union," Zeltser was specifically asked whether he had ever gone to law school. At page 12 of the deposition transcript, the following exchange occurs:

Q:    Any training in law?

A:    Yes. Well, I shouldn't go with law. I completed a course in admiralty.

(Deposition transcript, p. 12, lines 10-12, annexed hereto as Exhibit R).

16.    The questions could not have conceivably been clearer, and Zeltser's responses truly speak for themselves. Though Zeltser has been faced squarely with this testimony on several different occasions, he can only dissemble and has not yet produced a plausible explanation for his testimony. The real explanation, of course, is that Zeltser's statement "shouldn't go with law" is an instance where he truthfully answered a question because there was no reason to lie at the time.[9]

17.    A career con-man, Zeltser's admission to the New York State Bar attests to his formidable powers of deception, dexterity in manufacturing documents, and utter contempt for judicial bodies. Armed with a law license, Zeltser fleeced Inkombank of millions, and is now running amok as a pro se litigant, using the very skills that gained him admission to the Bar to

_____

[9]    Interestingly, Zeltser applied to the University of Denver Tax Program on August 17, 1989, just one month after denying he had ever gone to law school.

disrupt this case and obfuscate his misconduct. His claim against Inkombank should be dismissed.

_____
Arthur H. Christy
AC 2870

Sworn to before me this
25th day of April 1997

_____
Notary Public

PETER J. GALLAGHER
Notary Public, State of New York
No. 31-501-3899
Qualified in New York County
Commission Expires July 24, 19___

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK          )
                          ) ss.:
COUNTY OF NEW YORK         )

CHARLES FERNANDEZ, being duly sworn, deposes and says:

1.    That deponent is over eighteen years of age and is not a party to the action.

2.    That on the 13th day of August, 1986, deponent served the within Summons and Complaint on Mark Zeltser and Emmanuel Zeltser at 235 West 70th Street, New York, New York by delivering two copies to Doorman Errol Robathan.  Deponent also enclosed two copies in a postpaid, properly addressed envelope and depositing same in the Post Office Box regularly maintained at 919 Third Avenue, New York, New York 10022.

_____
CHARLES FERNANDEZ

Sworn to before me this
14th day of August, 1986.

_____
Notary Public

SCOTT K. HALEL
NOTARY PUBLIC, State of New York
No. 41-4834098
Qualified in Queens County
Certificate filed in New York County
Commission Expires March 30, 19 87

Exhibit K-A

Doc # 181    Ex. A

SUPREME COURT OF THE STATE OF NEW YORK - NEW YORK COUNTY

PRESENT:                                                     PART 14

    Hon.    MYRIAM J. ALTMAN
                                    Justice.

Emanuel E. Zeltser                    INDEX NUMBER  11364/9

    — against —                       MOTION DATE  1/8/91

SARL Manager, et al                   MOTION SEQ. NO.  001

                                      MOTION CAL. NO.  2

The following papers numbered 1 to _____ read on this motion to _____

                                                    PAPERS NUMBERED

Notice of Motion/Order to Show Cause - Affidavits - Exhibits _____

Answering Affidavits - Exhibits _____

Replying Affidavits _____

Upon the foregoing papers it is ordered that this motion  is decided in accordance
with accompanying memorandum decision.

FILED
FEB 28 1991
COUNTY CLERK'S OFF
NEW YORK

Dated  1/16/91

SUPREME COURT : NEW YORK COUNTY
IAS PART 14
------------------------------------------------

EMANUEL E. ZELTSER and
ANNA ZELTSER,

              Plaintiffs,

     -against-

SARL MANAGER, YANICK OLIVIER and        Index No.
MR. OTTAVIANO,

                        11364/90

              Defendants.
------------------------------------------------

MYRIAM J. ALTMAN, J.:

    Plaintiffs move for partial summary judgment and defendants cross-move to dismiss the complaint for lack of jurisdiction and on the ground of <u>forum</u> <u>non</u> <u>conveniens</u>. Defendants also seek sanctions in the amount of attorneys' fees incurred on this motion and cross motion.

    Plaintiffs, through their French company, Cigalous Properties Ltd., purportedly entered into a contract for the sale of their property located in France to defendant SARL Manager. Defendants Yanick Olivier and Daniel Ottaviano are apparently the principals of SARL Manager. The sale was never consummated and, some time in 1989, SARL Manager commenced an action against Cigalous Properties in France seeking specific performance.

    Plaintiff Emanuel Zeltser claims that he was fraudulently induced into signing the contract and plaintiff Anna Zeltser claims that her signature on the contract is a forgery.

001

In this action, commenced in February 1990, they seek damages for defendants' alleged fraud and misconduct. These same claims were asserted by Cigalous Properties in the French action in January 1990. Defendants have submitted a copy of the pleadings in the French action, but a translation has not been provided. However, from my limited knowledge of French, it appears that the claim is the same as that asserted in this action. Mr. Zeltser alleges that he neither reads nor writes nor speaks a word of French and that the sales contract was in French without an English translation. Mrs. Zeltser alleges that her signature was forged. Cigalous Properties seeks to have the contract declared a nullity and money damages. Plaintiffs do not deny that the fraud and forgery claims were previously raised in the French action.

It is unclear from the papers submitted whether there is jurisdiction over defendants, although it appears unlikely. SARL Manager is a French corporation and the individual defendants are apparently residents of France. In any event, they are not New York residents. Plaintiffs claim that there is long-arm jurisdiction because defendants transacted business in New York (CPLR 302 [a][1]) and committed tortious acts here (CPLR 302 [a][2]) through their agent, Michel Ringeval. It appears that Mr. Ringeval may in fact have been plaintiffs' broker, not defendants' agent. Defendants have submitted a copy of a letter dated June 10, 1988 from Mr. Zeltser giving Mr. Ringeval "power of attorney" to sell his property. Mr. Zeltser, however, claims

-2-

that he does "not recall signing anything granting 'power of attorney' to Mr. Ringeval . . . ." Mr. Zeltser alleges that Mr. Ringeval was acting on defendants' behalf when he brought the contract to New York to be signed by plaintiffs and that he falsely translated the document presented to plaintiffs at that time, fraudulently inducing Mr. Zeltser to sign. The information before me is insufficient to resolve the long-arm jurisdiction issue at this time.*

Contrary to plaintiffs' claim, there is no credible proof that defendants consented to jurisdiction in New York. Plaintiffs submit a page which states:

SUBJECT TO TRANSLATION AND COUNSEL'S REVIEW

Nothing herein contained shall prevent American party from resolving any dispute arising out of this transaction in New York Courts and according to the Law of the State of New York.

According to Mr. Zeltser, this page was annexed to the French document which he signed in December 1988. It is simply incredible that a document prepared entirely in French would contain one separate page in English. While plaintiffs may have sought to have this provision included in the contract, there is no evidence that defendants consented to such a provision.

Finally, there is no proof, as plaintiffs claim, that

_____

* Irrespective of the agency issue which cannot be resolved now, if a forgery occurred in New York, that is a matter for the appropriate law enforcement officials.

-3-

defendants are doing business in New York.

Irrespective of whether there is jurisdiction over defendants, this action must be dismissed on the ground of forum non conveniens. CPLR 327(a) provides, in relevant part, that "[w]hen the court finds that in the interest of substantial justice the action should be heard in another forum, the court, on the motion of any party may stay or dismiss the action in whole or in part . . ." A New York court is not required to retain litigation which has no substantial nexus to this state (see, Islamic Republic of Iran v Pahlavi, 62 NY2d 474, cert denied 469 US 1108). The court must balance the interests and convenience of the parties and determine whether the action would be better litigated in another forum (Silver v Great Amer. Ins. Co., 29 NY2d 356, 360).

This matter should be and, in fact, is already being litigated in France. While plaintiffs' corporation is a party to the French litigation and not the individual plaintiffs, the identical issues of fraud and forgery have been raised in that previously-commenced action. There is no indication that plaintiffs would be precluded from asserting their individual claims in France. The case involves property which is located in France. It is not unfair to require plaintiffs to litigate in France since they are apparently the principals of a French corporation and own property there.

-4-

Accordingly, defendants' cross motion to dismiss the complaint on the ground of _forum_ _non_ _conveniens_ is granted on condition that defendants not object if plaintiffs seek to add their individual claims in the French action. That branch of the cross motion seeking sanctions is denied. Plaintiffs' motion is denied as moot.

Settle order.

Dated: January 16, 1991

J. S. C.

FILED

FEB 2 8 1991

COUNTY CLERK'S OFFICE
NEW YORK

-5-

Exhibit K-B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - x

EMAR INTERNATIONAL, INC. and
EMAR ACQUISITION CORP.,

                Plaintiffs,

       -against-

M.E. ZELTSER SALES COMPANY
INC., MARK ZELTSER and
EMMANUEL ZELTSER,

                Defendants.

- - - - - - - - - - - - - - - x

Index No. 18890/86

VERIFIED COMPLAINT

FILED

AUG 15 1986

COUNTY CLERK'S OFFICE
NEW YORK

         Plaintiffs Emar International, Inc. and Emar Acquisi-
tion Corp. (collectively, "New Emar"), by their attorneys
Skadden, Arps, Slate, Meagher & Flom, for their Verified Com-
plaint, allege upon knowledge with respect to themselves and
their own acts and upon information and belief with respect to
all other matters as follows:

### SUMMARY OF THIS ACTION

        1.  New Emar brings this action to recover damages
arising from its purchase of substantially all the assets of
Emar International, Inc. ("Emar") in September 1985.  Defendants
are the sellers of Emar, the M.E. Zeltser Sales Company Inc.
(formerly Emar International Inc.) and its sole stockholders

EME COU
TY OF N.

EMAR INTERNATIONAL, INC. and
EMAR ACQUISITION CORP.,

Plaintiffs

against

M.E. ZELTSER SALES COMPANY INC.,
MARK ZELTSER and EMMANUEL ZELTSER,

Defendants

NEW YORK
County as the place of trial

The basis of the venue is Residence
of Defendants

Summons    18890/86

Plaintiff   resides at

County of

To the above named Defendant S :

**You are hereby summoned** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated, August 12, 1986
Defendant's address:

M.E. Zeltser Sales Co. Inc.
2067 Broadway
Suite 27
New York, New York  10023

Mark Zeltser
235 West 76th Street
New York, New York  10023

Emmanuel Zeltser
235 West 76th Street
New York, New York  10023

Skadden, Arps, Slate, Meagher & Flo
Attorney(s) for Plaintiff
Office and Post Office Address

919 Third Avenue
New York, New York  10022
(212)735-3000

Mark Zeltser and Emmanuel Zeltser (collectively, the "Zelt-sers").

2.  The business of Emar, formed by the Zeltsers in 1982, consisted of two basic operations:  the publication and sale of a catalog to consumers which purportedly provided infor-mation on how to purchase a European luxury car such as BMW, Audi, or Mercedes Benz direct from Europe at prices represented to be cheaper than those of United States dealers; and an im-porting service in which Emar would import the cars and guaran-tee the results.

3.  The Zeltsers represented Emar as a "going concern" with a then-current income of almost $1,000,000 as reflected on various accounting reports, and a healthy potential for more growth.  Unknown to New Emar, in truth and in fact, Emar's "business" was a sham because Emar had virtually no completed car sales in the preceding two years, and accordingly virtually no income.  To generate a paper income, the Zeltsers:

- pushed salesmen to write orders for cars and obtain the customary 25% deposit without regard to whether the sale was profitable and without regard to whether the cars could be obtained;

- diverted customers' deposits into a "profit" account, even though the deposits were to be forwarded to vendors in Europe and even though the sales had not been consummated;

- made up low prices at which the cars could be obtained in Europe without having a contract or price quote from the European vendors, in order to show high "profits";

2

- overstated sales of catalogs, and understated
  catalogs returned;

- understated the expenses of the business by not
  accounting for or paying current business ex-
  penses such as advertising and other like ex-
  penses.

4.  Knowing that the business could not withstand
close scrutiny, nor operate for long in this manner, the
Zeltsers' scheme was to obtain a purchaser who was unknowledge-
able in this type of business, to gain his trust and convince
him -- based on their misrepresentations and their apparent
willingness to guarantee against losses on all car orders and
undisclosed liabilities -- that the business was indeed profit-
able, and then to unload their liabilities and problems on the
unsuspecting purchaser of Emar.

5.  In order to induce New Emar to buy Emar, the
Zeltsers intentionally misrepresented almost every material
aspect of the business.  As set forth more fully below, among
other frauds, the Zeltsers represented:

   that Emar's business was regular in every way,
   without disclosing that Emar had been the sub-
   ject of an investigation by the Attorney Gener-
   al of the State of New York, the Department of
   Consumer Affairs and the Better Business Bu-
   reau;

   that only the Zeltsers possessed the "trade
   secrets" which made Emar profitable, without
   disclosing that two Emar employees -- close
   friends of the Zeltsers -- also knew the trade
   secrets and had left only weeks before the sale
   to begin a competing business;

3

. that Emar had a line of credit, without dis-
closing that it was secured by the $550,000 in
"profit" that the Zeltsers would take;

. that the payroll expenses were constant, with-
out disclosing that the Zeltsers had promised
all employees substantial raises.

6.  Furthermore, as a result of the sales push, the
Zeltsers convincingly represented that Emar had an inventory of
167 customer orders, (the "Guaranteed Orders") which were al-
ready ordered from vendors. As a condition of the sale, the
Zeltsers insisted that New Emar assume the obligation to deliver
these cars and fulfill the orders, knowing that such performance
would result in a huge financial loss to New Emar.  As set forth
more fully below, the Zeltsers knew but failed to disclose:

. that many of the Guaranteed Orders had not been
placed with vendors in Europe;

. that the dealers and vendors with which Guaran-
teed Orders had been placed had suffered severe
financial difficulties, had gone out of busi-
ness or had declared bankruptcy;

. that many of the orders for which deposits had
been accepted by Emar could not be placed be-
cause, inter alia, the manufacturers of automo-
biles had instituted quota systems or simply
discontinued sales to purchasers other than
manufacturer's authorized dealers.

7.  To prevent New Emar from discovering the extent of
their fraud, the Zeltsers induced New Emar to forego investiga-
tions prior to the sale by providing joint and several personal
guarantees, indemnities, covenants and warranties against all
losses incurred by New Emar for a period of five years.

8.    After New Emar paid $1,850,000 for the business, the Zeltsers continued to operate the business and retained responsibility for the catalog and car ordering operations under a consulting contract with New Emar which obligated them to report and disclose all relevant information and use their best efforts solely in the interest of New Emar.

9.    Instead of disclosing the facts which would expose this fraud, the Zeltsers, however, used their position of trust to insure that their fraud would remain concealed from New Emar. Among other things, they destroyed or caused to be destroyed corporate records which would have disclosed their wrongdoing. Moreover, the Zeltsers induced the Emar employees who had continued in the employ of New Emar, not to disclose the Zeltsers' activities or any irregularities. It was only recently that New Emar began to find out about the frauds and New Emar still is not able to quantify the full extent.

10.    As a direct result of the Zeltsers' widespread fraud, New Emar has been forced to infuse new funds to purchase cars for customers under the Guaranteed Orders, to return monies that were paid by customers to the Zeltsers which the Zeltsers took as profit without delivering any cars, and to pay bills of Emar's suppliers and creditors incurred by the Zeltsers but never recorded on the books, in the current amount of over $660,000.

5

11. The confusion, complaints and demands for repayment by both customers and suppliers of Emar has injured New Emar's reputation and severely impaired, if not made impossible, New Emar's ability to run the business as a going concern.

## THE PARTIES

12. Plaintiff Emar Acquisition Corp., the buyer, is a Delaware corporation which was organized to acquire the assets of Emar. Plaintiff Emar International, Inc., also a Delaware corporation and the parent of Emar Acquisition Corp., is the corporation through which the business is being conducted. Ronny Alcalay ("Alcalay") is President of both Emar Acquisition Corp. and Emar International Inc.

13. Defendant, M.E. Zeltser Sales Company Inc., the seller, is a New York corporation with its principal place of business in New York, New York, which name was previously Emar International Inc., the New York corporation which was sold. Defendants Mark Zeltser and Emmanuel Zeltser are citizens of the State of New York and both reside at 235 West 76th Street, New York, New York. Mark Zeltser is President and Emmanuel Zeltser is Chief Financial Officer of M.E. Zeltser Sales Company Inc. They are the only two stockholders of M.E. Zeltser Sales Company Inc. Until September 1985, Mark Zeltser was President and Emmanuel Zeltser was Vice President and Chief Operating Officer of Emar. They were the sole stockholders of Emar.

6

## THE FACTS

14. In early 1985, after learning that Emar's business was under investigation by the Attorney General of the State of New York, the Department of Consumer Affairs and the Better Business Bureau, the Zeltsers embarked on their scheme to unload Emar's problems, and approached several investors, including Alcalay, offering to sell Emar.

15. The Zeltsers described Emar's operations and gave Alcalay a written "corporate profile" which represented that Emar had been in operation for approximately three years and was a burgeoning business. The Zeltsers assured him that Emar's operations were totally regular and "above-board." They outlined Emar's purported business and provided Alcalay with written financial reports showing that Emar's operations would generate over $1,000,000 in income for the coming year.

16. The Zeltsers refused to answer certain of Alcalay's questions about the car ordering and importing business, telling Alcalay that vendors Emar used in Europe, the prices they obtained and how Emar placed its orders were all part of the "trade secrets" upon which Emar's financial success was based. While the Zeltsers refused to disclose the trade secrets until after Emar was sold, they assured Alcalay that the financial success of the business was a testament to the potency of the trade secrets.

7

17.  Alcalay negotiated the purchase of Emar with the Zeltsers throughout June and July while the Zeltsers provided glowing financial reports -- prepared by a CPA and certified as accurate -- which disclosed a current nine-month profit before taxes of $550,000.  They represented that the business was perfectly legitimate and all business operations which generated the income were proper.

18.  In reliance on these and other false representations and reports, in or about July 1985, Alcalay offered to purchase Emar for $1,050,000 in cash together with two corporate promissory notes of New Emar, in the face amount of $400,000 each, due in September 1988 and 1989.  The Zeltsers agreed on the conditions that the Zeltsers would take the approximately $550,000 in "profit" and Alcalay would do the deal quickly, because, according to the Zeltsers, another buyer was "waiting in the wings."  To "help" Alcalay move quickly, the Zeltsers offered to provide broad indemnifications, guarantees and warranties against any losses New Emar would suffer, and the right to set off any losses incurred against the notes, as an inducement for Alcalay to forego any investigation prior to the actual sale.  Apparently protected against loss by these warranties and guarantees, Alcalay relied upon the representations of the Zeltsers.

19. Specifically, the Zelters had represented the following facts, among others, to be true which in fact were false:

- that Emar's business was in all respects proper, when they knew Emar was under investigation by various consumer agencies based on irregular practices;

- that Emar's "lease" of office space from Equitable would be honored by Equitable after the sale when in fact they knew this would not occur;

- that Emar's line of credit of $400,000 would continue after the sale when in fact they knew this would not occur;

- that Emar's payroll expenses would not increase, when in fact they had earlier promised substantial pay raises to all Emar's employees;

- that Emar dealt with certain vendors in Europe, when in fact no business had ever been conducted;

- that Emar's "trade secrets" were unwritten and protected, when in fact they knew that two close friends had left Emar only weeks earlier to set up a competing business using the same "trade secrets" the Zeltsers were selling to New Emar;

- that Emar was capable of generating $1,000,000 in profit, when in fact they knew that the financial results were based upon false sales, false profits and records which excluded certain expenses and included fictitious revenues;

- that the returns on catalog sales were about 4%-5% when in fact returns were running at about 15%-20%;

9

that the advertising expenses which generated the catalog sales were as represented in the financials, when, in fact, the Zeltsers did not enter all the advertising bills in the books of Emar and that had they done so the catalog sales would have shown substantially less profit or even a loss;

that Emar had an inventory of 167 customer orders, when in fact, the "inventory" represented nothing more than a scheme to obtain 25% of the order to boost the cash position of Emar; and when in fact the orders if satisfied by New Emar on the terms negotiated by the Zeltsers would result in massive losses;

that all cars had been ordered, when, in fact, many of the Guaranteed Orders had not been placed with vendors in Europe;

that all customer orders could be satisfied, when in fact Emar was unable to place up to 100 of the orders because manufacturers in Europe had instituted quotas on sales of cars made to U.S. specs in Europe;

that all cars would be delivered, when, in fact, some dealers and vendors were unable to deliver the cars, because they had gone out of business or had declared bankruptcy

20. Consequently, on or about September 12, 1985 in direct reliance upon all the foregoing representations of the Zeltsers, New Emar bought the business for the agreed upon $1.85 million as reflected in an Asset Purchase Agreement (the "Agreement") . The Zeltsers also took about $550,000 in cash which they falsely represented to be "profits" on the 167 cars sold but not delivered. New Emar agreed to assume the Zeltsers' obligations to deliver approximately 167 cars -- the Guaranteed Orders -- on the basis that the Zeltsers would indemnify and

10

guarantee against _any_ losses to New Emar. Moreover, _all_ the representations of the Zeltsers which were embodied in the Agreement were to continue for five years under the express terms of the Agreement. A copy of the Agreement is attached hereto as Exhibit A.

21. Because the Zeltsers refused to disclose the unwritten trade secrets prior to the sale, New Emar retained the Zeltsers to run the business in the months following the sale so that the business would not suffer while Alcalay "learned" the trade secrets. In return for $300 per day, the Zeltsers agreed to act as consultants and to devote their full-time and "best efforts" to the business and interests of New Emar for a period of a year in a separate agreement (the "Consulting Agreement"), a copy of which is attached hereto as Exhibit B.

22. Pursuant to the Consulting Agreement, the Zeltsers continued to oversee New Emar's car and catalog operations in September, October, November and December 1985. In spite of their express promise to "promptly communicate and disclose" all information and to work for the best interests of the business, in fact, the Zeltsers failed to report the nature and extent of their fraud from New Emar by:

- blaming the "competition" for the lackluster financial performance which was steadily declining;

11

. inducing the employees originally hired by the
  Zeltsers to keep quiet about the true opera-
  tions;

. using Emar's corporate accounts for their own
  personal expenses and purposes;

. removing or destroying documents relating to
  bills and other incriminating evidence from New
  Emar's files;

. failing to report the real reasons for the
  financial problems;

. intercepting customer complaints before they
  reached Alcalay's attention.

23.  In or about mid-December 1985, while the Zeltsers
were still running New Emar's business, Alcalay found out that
New Emar was being dunned for bills incurred by Emar prior to
September 1985.  These bills had not been entered as accounts
payable on Emar's books when originally incurred.  Alcalay
promptly demanded the Zeltsers explain and pay the bills.  Alca-
lay also asked them if there were any other bills incurred which
they knew about which had not been paid or entered in Emar's
accounts as a liability.  The Zeltsers assured him there were
none, when in truth and in fact, there were such other obliga-
tions.

24.  Moreover, New Emar's monthly financial statements
began to show losses in contrast to the profits represented on
the financial reports furnished by the Zelsters.  Alcalay com-
plained that New Emar was not making the profits the Zeltsers
had represented and Alcalay questioned the Zeltsers closely

12

about the reasons for the losses New Emar was incurring. The Zeltsers told him repeatedly that the business was profitable and that it was the competition from Emar's former employees which was causing the losses, when in fact the Zeltsers knew that the losses were occurring as a result of New Emar having to deliver and close car sales which were unprofitable from the start.

25. The Zeltsers told Alcalay that they were sorry that New Emar's business was not proving as profitable as they had hoped. They proposed to "compensate" New Emar for the lost profits and unreported expenses by agreeing to cancel New Emar's $800,000 in notes -- against which New Emar had a right of set-off for all losses -- and to return $600,000 to New Emar.

26. In return, the Zeltsers insisted that New Emar give up the right to recover future losses by rescinding the Zeltsers' personal representations, warranties and indemnities. The Zeltsers failed to disclose a key fact unknown to Alcalay but known by them -- that Emar would continue to sustain heavy losses on the Guaranteed Orders -- losses so heavy that to make New Emar whole would require a return of the entire purchase price together with a massive infusion of cash. Ignorant of these financial irregularities, Alcalay agreed to the proposal.

13

27.    The Zeltsers' proposal was embodied a letter dated December 18, 1985 ("the December Document") in which the Zeltsers purportedly agreed to cancel and return the notes of New Emar, pay New Emar $250,000 in cash and amend the Asset Purchase Agreement to increase the cash account on the date of sale to New Emar by $350,000 and transfer such funds to New Emar.    In return, the Asset Purchase Agreement was to be purportedly amended to delete the various representations, warranties and indemnities of the Zeltsers.    A copy of the December Document is attached hereto as Exhibit C.

28.    Although both Alcalay and the Zeltsers signed the December Document, the Zeltsers failed to provide New Emar with the recited consideration in accordance with the terms therein.

29.    In order to keep its business intact, New Emar was forced to deliver the cars represented by the Guaranteed Orders, or refund the deposits -- taken as profits by the Zeltsers -- regardless of the losses, and to date has delivered virtually all the cars represented by these orders.    In so doing, New Emar has incurred losses of over $660,000 on the Guaranteed Orders alone, and faces further losses.    Since New Emar has only been able to uncover the extent of the fraud on a case-by-case basis, it is still in the process of trying to reconstruct how the present losses are occurring.

14

30.  During this time Alcalay had repeatedly approached the Zeltsers telling them about the magnitude of the losses and asking when the Zeltsers would pay the losses.  The Zeltsers never denied that Alcalay was entitled to payment for these losses but explained that under the Asset Purchase Agreement such payment was not due until September 1986.  At Alcalay's invitation, the Zeltsers recently spent several days examining New Emar's records which document the losses.  The Zeltsers have never disclosed the full nature of the fraud perpetrated upon Alcalay and New Emar.  It was only recently when Alcalay formally notified the Zeltsers of the losses, that the Zeltsers disclaimed all liability relying upon the December Document -- the same agreement under which they never performed.

<u>FIRST CAUSE OF ACTION</u>
(Fraud in the Inducement)

31.  Plaintiffs reallege paragraphs 1 through 30 as if fully set forth herein.

32.  On and prior to September 12, 1985, the Zeltsers falsely and fraudulently represented the material facts referred to above to Alcalay and New Emar with the intention that plaintiffs rely on those misrepresentations to induce them into entering into the Agreement.

33.  When the Zeltsers made these misrepresentations and omitted to state material facts concerning Emar, they knew

15

them to be false and material, and these representations and omissions were made with the intent to defraud and deceive plaintiffs and with the intent to induce plaintiffs to enter into the Agreement.

34. Plaintiffs reasonably and actually relied on the Zeltsers' representations to plaintiffs' detriment and purchased the purported assets of Emar.

35. Because the Zeltsers continued to run the business of New Emar under an obligation to use their best efforts to further New Emar's interests and to disclose and report all information, the Zeltsers were obligated to disclose to New Emar the nature and extent of this fraud. They failed to disclose the true state of facts prior to Alcalay and New Emar agreeing to the Zeltsers' proposal embodied in the December Document.

36. The Zeltsers remained silent with the intent to defraud and deceive plaintiffs into entering the December Document. Plaintiffs reasonably relied upon the silence in entering the December Document to its detriment.

37. As a result of the foregoing, plaintiffs were forced to order cars at a loss to satisfy Emar's customers, were forced to return customers' deposits when cars, supposedly ordered, could not be obtained because of quotas in Europe, and were forced to pay bills for expenses incurred by the Zeltsers that were not recorded on Emar's book, all of which are still

16

continuing, and have resulted in a loss in an amount of $660,000.

38.  Plaintiffs thus seek rescission of the Agreement and the December Document and the return of the $1,050,000 in cash paid to the Zeltsers, the New Emar notes of $800,000 and $660,000 in out-of-pocket loss sustained and future losses, together with attorneys' fees and interest.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

39.  Plaintiffs reallege paragraphs 1 through 38 as if full set forth herein.

40.  Pursuant to the Agreement, the Zeltsers warranted that plaintiffs would sustain no losses or expense on any Guaranteed Order, and that the Zeltsers would use all reasonable efforts to complete their obligations under those orders.

41.  The Zeltsers also guaranteed that there was no material adverse change in the financial condition or operations from that reflected in the financial statements provided to plaintiffs.

42.  The Zeltsers also guaranteed on a joint and several basis that New Emar would suffer no loss, damage, cost or expenses in connection with any Guaranteed Orders and gave New Emar the right to elect payment on any such losses.

43. As set forth above, plaintiffs sustained substantial losses on orders placed with Emar; the Zeltsers failed to use all reasonable efforts to complete their obligations under the orders -- and, in fact, intentionally diverted funds that should have been forwarded to vendors; and the financial statements provided to plaintiffs did not reflect the true and then current state of the financial picture of Emar.

44. As a result of the Zeltsers' breach of contract, plaintiffs have been damaged in an amount which is not presently fully known, but is believed to be not less than $660,000, exclusive of interest.

## THIRD CAUSE OF ACTION
### (Failure of Consideration)

45. Plaintiffs reallege paragraphs 1 through 44 as if fully set forth herein.

46. Pursuant to the December Document, in consideration for this purported amendment to the Agreement, the Zeltsers were to return to New Emar $800,000 in a three-year note and a four-year note, each marked "cancelled, 12/18/85" and, $250,000 and $350,000 in cash.

47. The Zeltsers failed to surrender the notes to New Emar or return the consideration recited in the Agreement to New Emar in accordance with the terms expressed therein.

18

48.   Thus, the December Document is null and void and without any purpose or effect for lack of consideration and failure of performance.

WHEREFORE, plaintiffs demand judgment:

I.   Awarding damages to plaintiffs in an amount to be determined but, in any event, not less than $1,665,000, plus interest together with return of all promissory notes;

II.   Ordering rescission of the Agreement and the December Document due to fraud in the inducement and the return to plaintiffs of the consideration paid, plus interest;

III.   Declaring the December Document null and void, and ordering rescission of the December Document due to lack of consideration;

IV.   Awarding punitive damages in an amount to be determined, but, in any event, no less than $3,000,000;

V.   Awarding costs and disbursements of this action, including reasonable attorneys' fees;

VI.   Awarding such further relief as the Court deems just and proper.

Dated:   New York, New York
         August 5, 1986

                         SKADDEN, ARPS, SLATE,
                           MEAGHER & FLOM
                         Attorneys for Plaintiffs
                         919 Third Avenue
                         New York, New York 10022
                         (212) 735-3000

                                19

VERIFICATION

STATE OF NEW YORK      )
                       : ss.:
COUNTY OF NEW YORK     )

Ronny Alcalay, being duly sworn, deposes and says:

1.  I am President of Emar International, Inc. and Emar Acquistion Corp. and have authority to submit this Verification.

2.  I have read the foregoing Verified Complaint and the same is true to my own knowledge except as to matters therein stated to be alleged on information and belief and as to those matters I believe them to be true.

_____
RONNY ALCALAY

Sworn to before me this
5th day of August, 1986.

_____
Notary Public

ROSELYN R. BAR
Notary Public, State of New York
No. 01-BA4710232
Qualified in Nassau County
Cert. filed in New York County
Commission Expires March 30, 8

Exhibit K – G

Exhibit K-C

NAGEL, RICE & DREIFUSS ESQS.
301 South Livingston Avenue
Livingston, New Jersey 07039
(201) 535-3100
Attorneys for Plaintiff

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

AMERICAN URGY PHYSICIAN      :   SUPERIOR COURT OF NEW JERSEY
SERVICES, P.A., AMERICAN     :   CHANCERY DIVISION
URGY MEDICAL CENTER, INC.,   :   BERGEN COUNTY
and STEVEN BECKER,           :   DOCKET NO.  L-3254-90
                             :
        Plaintiffs,          :
                             :
vs                           :        Civil Action
                             :
RICHARD E. LIPSKY, M.D.,     :
et al.,                      :
                             :   ORDER FOR PARTIAL JUDGMENT
        Defendants           :

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

THIS MATTER, having been tried before the Honorable Isabel

Stark commencing on September 14, 1992 through November 4, 1992,

in the presence of Nagel & Rice, attorneys for Dr. Steven

Becker, American Urgy Medical Center, Inc., American Urgy

Physician Services, P.A. ("Becker parties") Tom Wall, Esq.,

attorney for Dr. Inessa Bard, Dr. Richard Lipsky, pro se and

Emanuel Zeltser, pro se;  and a jury having rendered a verdict

in favor of the Becker parties and Dr. Bard against Dr. Richard

Lipsky and Emanuel Zeltser and the court having vacated the

verdict sua sponte, and the Appellate Division having issued an

Opinion dated May 12, 1995;

IT IS, on this 23 day of June, 1996

ORDERED, as follows:

1.   Judgment is hereby entered in favor of the Becker

parties against Dr. Richard Lipsky for liability in connection

with the breach of two partnership agreements.

2. Judgment is hereby entered in favor of Dr. Inessa Bard against Dr. Richard Lipsky on the issue of liability in connection with the breach of two partnership agreements.

3. Judgment is hereby entered in favor of the Becker parties against Emanuel Zeltser on the tortious interference claims in the amount of $230,000 plus interest from March 18, 1995 through September 30, 1995. Interest is computed at $108,908.00 through September 30, 1995, bringing the total judgment on this claim against Emanuel Zeltser to $338,908.00.

4. Judgment is hereby entered in favor of the Becker parties against Emanuel Zeltser for punitive damages arising out of his intentional and malicious acts. The matter shall be remanded to fix the amount of punitive damages *if any* against Mr. Zeltser.

5. Judgment is hereby entered in favor of Dr. Inessa Bard against Emanuel Zeltser on the tortious interference claims in the amount of $170,000 plus interest from March 18, 1988 through September 30, 1995. Interest is computed at $80,498.00 through September 30, 1995 to bring the total judgment on this claim to $250,498.00.

6. Judgment is entered in favor of Dr. Bard against Emanuel Zeltser for punitive damages arising out of his intentional and malicious acts. The matter shall be remanded to fix the amount of punitive damages *if any* against Mr. Zeltser.

7.   The amount of compensatory damages recoverable by the Becker parties and Dr. Bard against Dr. Richard Lipsky shall be remanded for trial on damages only.

_____
HONORABLE PETER CIOLINO, A.J.S.C.

c:\...\beck\post\order.wtl

ORDERED — That a copy of this order is to be served upon all counsel within 7 days of the date hereof

NOV 25 '96   12:16PM NAGEL & RICE

REC'D & FILED
SUPERIOR COURT OF NEW JERSEY

NOV 15 1996

Deputy Clerk

REC'D & FILED
SUPERIOR COURT OF NEW JERSEY

NOV 15 1996

Deputy Clerk

NAGEL, RICE & DREIFUSS ESQS.
301 South Livingston Avenue
Livingston, New Jersey 07039
(201) 535-3100
Attorneys for Plaintiffs American Urgy Medical Center, Inc.,
American Urgy Physician Services, P.A., Steven Becker, M.D.

| | |
|---|---|
| AMERICAN URGY MEDICAL CENTER INC., AMERICAN URGY PHYSICIAN SERVICES, P.A., and STEVEN BECKER, M.D. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION BERGEN COUNTY DOCKET NO. BER L 41053-88 L 3251-90 L 3254-90 |

Plaintiff

vs

RICHARD LIPSKY, M.D., and
EMANUEL ZELTSER, VIVIAN
BETHALA, M.D., ANTHONY
TARASENKO, M.D., INESSA BARD
M.D., ZEV SIEGEL, and
NORTHERN MEDICAL CORP.,

Civil Action

Defendants

ORDER FOR PARTIAL
JUDGMENT

RICHARD LIPSKY, M.D., VIVIAN
BETHALA, M.D., and ANTHONY
TARASENKO, M.D.,

Plaintiffs

vs

STEVEN BECKER, M.D., AMERICAN
URGY MEDICAL CENTER, INC.,
and AMERICAN URGY PHYSICIANS
SERVICES, P.A.,

Defendants

AMERICAN URGY MEDICAL CENTER
INC., AMERICAN URGY PHYSICIAN
SERVICES P.A., and STEVEN
BECKER, M.D.,

    Plaintiffs

vs

RICHARD LIPSKY, M.D., and
EMANUEL ZELTSER,
VIVIAN BETHALA, M.D.,
ANTHONY TARASENKO, M.D.,

    Defendants

and

INESSA BARD, M.D.,

    Defendant

---

THIS MATTER, having come before the Court on remand from the Appellate Division pursuant to its opinion dated May 12, 1995; and an Order for Partial Judgment having been entered on February 23, 1996 entering judgment in part in favor of the Becker parties against Emanuel Zeltser for punitive damages and a remand to fix the amount of punitive damages, if any; and said February 23, 1996 Order for Partial Judgment entering Judgment in part in favor of Dr. Inessa Bard against Emanuel Zeltser for punitive damages, and a remand to fix the amount of punitive damages, if any; and an Order having been entered on September 19, 1996, setting the aforesaid remanded issues for a preemptory trial date on November 12, 1996; and there being appearances by Jay J. Rice, Esq., of Nagel Rice & Dreifuss, Esqs., on behalf of Dr. Steven Becker, American Urgy Medical Center, Inc. and American Urgy Physicians Services, P.A.

NOV 25 '96  12:19PM NAGEL & RICE

(collectively the "Becker Parties") and Thomas Wall, Esq. of Shulman & Wall, Esqs., on behalf of Dr. Inessa Bard; and there being no appearance by Emanuel Zeltser, pro se, despite adequate notice of same; and the Court having found Emanuel Zeltser in default for failure to appear without justifiable reason or excuse, pursuant to R.1:2-4(a)(c) and the Court having determined that the matter proceed as a Proof Hearing, without a jury, pursuant to R. 4:43-2; and the Court having conducted a Proof Hearing on November 12, 1996 and there being appearances by Jay J. Rice, Esq. of Nagel Rice & Dreifuss, Esqs. for the Becker parties and Thomas Wall, Esq. of Shulman & Wall, Esqs. for Dr. Inessa Bard and there being no appearance by Emanuel Zeltser, despite adequate notice of same, and the Court having heard the testimony of the witnesses, having reviewed the exhibits marked into evidence, and for good cause having been shown;

IT IS ON THIS *15th* day of November, 1996

ORDERED as follows:

1.    Judgement is hereby entered in favor of the Becker parties against Emanuel Zeltser for punitive damages in the amount of $ *1,120,020.00*

2.    Judgement is hereby entered in favor of Dr. Inessa Bard against Emanuel Zeltser for punitive damages in the amount of $ *500,020.00*

ROBERT R. GUIDA, J.S.C.
Honorable Robert R. Guida, J.S.C.

Exhibit K - D

NYS OFFICE OF COURT AD TEL:212-417-2249          Dec 11 96  16:51 No.008 P.01



STATE OF NEW YORK
**UNIFIED COURT SYSTEM**
OFFICE OF MANAGEMENT SUPPORT
80 CENTRE STREET
NEW YORK, NEW YORK  10013

**JONATHAN LIPPMAN**
Chief Administrative Judge

**BARRY A. COZIER**
Deputy Chief Administrative Judge

212/417-5872
December 11, 1996

**LAURA WEIGLEY ROSS**
Director
Office of Administrative Services

**ANDREW F. ONDA**
Deputy Director
Office of Administrative Services

Abigail Weiss
Legal Assistant
Christy & Viener
620 Fifth Avenue
New York, N.Y.  10020-2857

re: Emanuel E. Zeltser

Please be advised that the Official Register of Admitted Attorneys and Counsellors-at-Law reflects that Emanuel E. Zeltser was admitted to practice law in New York State on September 24, 1990 in the Appellate Divison, First Department.

I hope that this information is helpful to you.

Very truly yours,

Renée B. Elias
Senior Management Analyst

Exhibit K – E

§ 520.7

cant to take a vacation shall not decrease the period of study required by this section.

(e) **Certificate of Commencement of Law Office Study.** It shall be the duty of the attorney or attorneys with whom a period of law office study is about to be commenced to obtain from, complete and file with, the Clerk of the Court of Appeals a certificate of commencement of clerkship.

(f) **Credit for Law Study in Law Office.** Credit shall be given only for study in a law office or offices completed subsequent to the filing of the certificate required by subdivision (e) of this section.

(g) **Proof Required.** Compliance with the requirements of this section shall be proved to the satisfaction of the New York State Board of Law Examiners.

## § 520.5    Study of Law in Foreign Country; Required Legal Education

(a) **General.** An applicant who has studied in a foreign country may qualify to take the New York State bar examination by submitting to the New York State Board of Law Examiners satisfactory proof of the legal education required by this section.

(b) **Legal Education.** The applicant shall show fulfillment of the educational requirements for admission to the practice of law in a country other than the United States by successful completion of a period of law study at least substantially equivalent in duration to that required, under subdivisions (d) and (e) of section 520.3 of this Part, in a law school or schools each of which, throughout the period of applicant's study therein, was recognized by the competent accrediting agency of the government of such other country, or of a political subdivision thereof, as qualified and approved; and

(1) that such other country is one whose jurisprudence is based upon the principles of the English Common Law, and that the program and course of law study successfully completed by the applicant were the substantial equivalent of the legal education provided by an approved law school in the United States; or

(2) if applicant does not meet the requirements of subdivision (b)(1) of this section, that applicant:

(i) has successfully completed a full-time or part-time program consisting of a minimum of 24 semester hours of credit, or the equivalent, in professional law subjects in an approved law school in the United States; or

(ii) meets the educational requirements for admission to an approved law school in the United States for an LL.M. or S.J.D. degree in law.

(c) **Proof Required.** The applicant shall submit to the New York State Board of Law Examiners

such proof of compliance with the provisions of this section as the board may require.

## § 520.6    Certification by Board of Law Examiners

(a) Except as provided in section 520.9 of this Part, no applicant for admission to practice in this State shall be admitted unless the New York State Board of Law Examiners shall have certified to the Appellate Division of the department in which, as shown by the papers filed by the applicant with the board, the applicant resides or, if not a resident of the State, in which such papers show that applicant is employed full-time, or, if the applicant does not reside and is not employed full-time in the State, to the Appellate Division of the Third Department, that the applicant:

(1) has passed the written bar examination prescribed in section 520.7 of this Part; and

(2) has also passed the Multistate Professional Responsibility Examination described in section 520.8 of this Part.

(b) The requirement of this Part shall first be applicable to those candidates for admission to practice law in New York who qualify for and take the July 1982 regular New York State bar examination and to all those who thereafter qualify for and take such examinations.

## § 520.7    New York State Bar Examination

(a) **General.** The New York State Board of Law Examiners shall twice each year conduct a written bar examination consisting of legal problems in both adjective and substantive law, and it shall by rule prescribe a list of subjects which will indicate the general scope of the bar examination. The board may use the Multistate Bar Examination as part of the bar examination.

(b) **Uniformity of Bar Examinations.** The bar examinations shall be as nearly uniform from year to year as is reasonably practicable.

(c) **Preservation of Papers.** Bar examination papers shall be preserved for a period of four months from the date of the announcement of the results of the bar examination, and may thereafter be destroyed.

(d) **Examination Fee.** Every applicant for a bar examination shall pay to the New York State Board of Law Examiners the fee prescribed by section 466 of the Judiciary Law.

**Cross References**

Judiciary Law, see McKinney's Book 29.

Exhibit K – F

DOCKETED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------x
EMANUEL E. ZELTSER, ESQ.,                :

            Plaintiff,                   :

    -against-                            :

JOINT STOCK BANK INKOMBANK, et al.,      :

            Defendants.                  :
-----------------------------------------x
JOINT STOCK BANK INKOMBANK,              :

            Counterclaim Plaintiff,      :

    -against-                            :

EMANUEL E. ZELTSER, et al.,              :          95 Civ. 0796 (KTD)(SEG)

            Counterclaim Defendants.     :
-----------------------------------------x          ORDER
ALEXANDER FISHKIN, ESQ.,                 :

            Third Party Plaintiff,       :

    -against-                            :

VLADIMIR PREOBRAJENSKY, et al.,          :

            Cross-claim Defendants,      :

    -and-                                :

KUDOS HOLDINGS, LTD., f/k/a              :
KUDOS INVESTMENTS LTD., et al.,          :

            Third Party Defendants.      :
-----------------------------------------x
FOREIGN INVESTORS PORTFOLIO
MANAGEMENT, INC.,                        :

            Third Party Plaintiff,       :

    -against-                            :

JOINT STOCK BANK INKOMBANK, et al.,      :

            Cross-claim Defendants,      :

    -and-                                :

JOINT STOCK COMPANY ROSSKAT,             :

            Third Party Defendant.       :
-----------------------------------------x

RECEIVED
NOV 30 1995

SHARON E. GRUBIN, United States Magistrate Judge:

        It is hereby ORDERED that the period for discovery is

extended to January 31, 1996.  The objections of counterclaim

defendants Reid and Mecheri and counterclaim defendant and

2

third party plaintiff Foreign Investors Portfolio Management
to the proposed depositions of Reid, Mecheri and A. Slavinsky
are overruled.  The objections of defendants to the proposed
depositions of V. Groshev, V. Pomolov, V. Udalov and A.
Kolotin are sustained.  Plaintiff's objection to defendants'
request for production of his law diploma and Honorary Doctor
of Laws is overruled.  They shall be produced by December 5,
1995.

        SO ORDERED.


Dated: New York, New York
       November 27, 1995

                                    _____
                                    SHARON E. GRUBIN
                                    United States Magistrate Judge

Exhibit K- G

<u>TRANSLATION FROM RUSSIAN</u>

Workers of the world, unite!

/National Emblem
of the Moldavian Soviet Socialist Republic/

Ministry of Higher Education
of the Moldavian Soviet Socialist Republic

Duplicate

DIPLOMA

No. 294362

This Diploma has been issued to EMANUEL EFIMOVICH ZELTSER in view of the fact that, in 1970, he enrolled in the Kishinev State University named after V.I. Lenin and, in 1974, completed the full course of studies at the Law Department of the aforementioned institution on an experimental program with a specialization in International Law.

By virtue of a decision of the State Board of Examiners, dated May 29, 1974, Mr. E.E. ZELTSER is qualified as a LAWYER.

Chairman of the State
Board of Examiners            /signature/

Rector                       /signature/

Registrar                    /signature/

City of Kishinev, May 29, 1974

Registration No. 2[?]

Senior Archivist             /signature/      [?? Popa/

/official seal/

/inked stamp:/
Marxism-Leninism University Archives
at the Central Committee of the Communist Party
of the Moldavian Soviet Socialist Republic

AO 88 (Rev. 11/91) Subpoena in a Civil Case

# United States District Court

DISTRICT OF COLORADO

EMANUEL E. ZELTSER, ESQ.

PLAINTIFF,

V.

JOINT STOCK BANK INKOMBANK, ET AL.

DEFENDANTS/COUNTERCLAIM
PLAINTIFFS

## SUBPOENA IN A CIVIL CASE

CASE NUMBER: 95 Civ. 0796 (KTD)
pending in the United States District
Court for the Southern District of
New York

TO: Legal Department
University of Denver
2199 South University Blvd.
Denver, Colorado 80208

Attention: Richard Gonzales

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| McKenna & Cuneo 370 17th Street, Suite 4800 Denver, Colorado 80202 | January 29, 1996 10:00 a.m. |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

Any and all documents concerning Emanuel E. Zeltser

| PLACE | DATE AND TIME |
|---|---|
| McKenna & Cuneo 370 17th Street, Suite 4800 Denver, Colorado 80202 | January 15, 1996 10:00 a.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b) (6)

ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)      DATE

*Frank E. Derby*      FD-2190

Frank E. Derby, Esq. Attorney for Joint Stock Bank Inkombank

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Christy & Viener
620 Fifth Avenue

Exhibit K- H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EMANUEL E. ZELTSER, ESQ.,

                    Plaintiff,

          -against-

JOINT STOCK BANK INKOMBANK, et al.,

                    Defendants.

**NOTICE OF DEPOSITION**

95 Civ. 0796  (KTD)

PLEASE TAKE NOTICE that, pursuant to Rule 45 of the Federal Rules of Civil Procedure, Joint Stock Bank Inkombank will take the deposition upon oral examination of the University of Denver pursuant to non-party subpoena before a notary public or other person authorized to administer oaths, at the law offices of McKenna & Cuneo, 370 17th Street, Suite 4800, Denver, Colorado 80202 on January 29, 1996 at 9:30 A.M.  The deposition shall continue from day to day until completed.  You are invited to attend and cross-examine.

Dated:      New York, New York
            January 4, 1996

                    CHRISTY & VIENER

                    By: _____
                        Frank E. Derby
                        FD-2190
                    Attorneys for Joint Stock Bank Inkombank
                    620 Fifth Avenue
                    New York, New York 10020-2402
                    (212) 632-5500

TO:

0075271.01

## CERTIFICATE OF SERVICE

I am a member of the Bar of this Court and hereby certify that, on the 10th day of January, 1996, I served copies of the within Notices of Deposition upon counsel for all parties who have appeared in this matter via regular mail at the addresses indicated below:

Fishkin & Reid, pro se
15 Penn Plaza, Suite 120
New York, NY 10001

Derman & Derman, Esqs.
Attorneys for plaintiff Pelaez and
Foreign Investors Portfolio Management, Inc.
420 Lexington Avenue
New York, NY 10170

Emanuel E. Zeltser, pro se
2 Penn Plaza, Suite 1500
New York, NY 10121

Frank E. Derby
FD-2190

Exhibit K- I

JAN-11-96 THU 02:34 PM    AES/GRAD TAX @ DU          FAX NO. 303 871 6359                P.07

Workers of the World, Unite

Copy

National Emblem of the
Moldavian Soviet Socialist Republic (MSSR)
Ministry of Higher Education of the MSSR
Diploma No. 294362

Holder of this, Comrade Zeltser, Emmanuil Efimovich enrolled
in 1970 and in 1974 completed the entire curriculum of
Kishinev State University named Lenin, the International Law
Special Experimental Programme thereof, the Jurisprudence
Department and by the decision of State Examination Board is
awarded the qualification "Jurist".

Chairman of the State Examination
Board – Signed
Director – Signed
Secretary – Signed

City of Kishinev
Registration No. 28
Official Seal

CERTIFICATION

I, Alla Waters, official translator for Alarco Corporation,
certify the present English translation is true and correct
to wit to the Russian document.

State of New York )
County of New York) ss:
City of New York )

By: _____
Alla Waters

Subscribed and sworn to
before me this 9th day
of August, 1989 at the
City of New York, USA.

Dated: August 9, 1989

_____
Zev M. Siegel
Notary Public

ZEV M. SIEGEL
Notary Public, State of New York
No. 31-480:000
Qualified in New York County
Commission Expires May 18, 19__

JAN-11-96 THU 02:35 PM   AES/GRAD TAX @ DU        FAX NO. 303 871 5358              P. 03

COPY

### KISHINEV STATE UNIVERSITY named LENIN

### ACADEMIC AUDIT REGISTRY BOOK

Issued same to Comrade Zeltser, Emmanuil Efimovich to witness that the above-mentioned has in fact completed the following below disciplines, passed the following exams and was awarded the following audits.

| No. | Classes | Quantity of units | Passed tests | exams |
|---|---|---|---|---|
| **FIRST YEAR** | | | | |
| 1 | Introduction to International Law | 2 | Passed | |
| 2 | Criminal Law principals in Common Law countries | 7 | | Excellent |
| 3 | History of Communist Party of USSR | 3 | Passed | |
| 4 | Contracts | 7 | | Excellent |
| 5 | Criminal Procedures Civil Law | 3 | | Excellent |
| 6 | Criminal Procedures Common Law | | | Excellent |
| 7 | Political Economy | 2 | Passed | |
| 8 | Comparative review Soviet vs. American Legal Systems | 3 | Passed | |
| 9 | Marxist-Leninist Theory and Law | 7 | | Excellent |

| No | Classes | Quantity of units | Passed tests | Passed exams |
|----|---------|-------------------|--------------|--------------|

FOURTH YEAR

| No | Classes | Quantity of units | Passed tests | Passed exams |
|----|---------|-------------------|--------------|--------------|
| 1 | Family law in civil system | 3 | Passed | |
| 2 | Soviet law on family | 3 | Passed | |
| 3 | Family Law in Common Law system | 3 | Passed | |
| 4 | Loans and property liens in civil and common law | 4 | | Excellent |
| 5 | American Federal Courts | 6 | | Excellent |
| 6 | Civil law, administrative procedures | 5 | Passed | |
| 7 | Pre-October Revolution Legal principals | 7 | Passed | |
| 8 | Scientific Communism | 6 | | Excellent |

## CERTIFICATION

I, Alla Waters, official translator for Alarco Corporation, certify the present English translation is true and correct to wit to the Russian document.

State of New York )
County of New York) ss:
City of New York  )

Subscribed and sworn to
before me this 9th  day
of August, 1989 at NY,NY.

By: _____
        Alla Waters

Dated: August 9, 1989

_____
Zev M. Siegel
Notary Public

ZEV M. SIEGEL
Notary Public, State of New York
No. 31-4931000
Qualified in New York County
Commission Expires May 16, 19 91

Exhibit K- J

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ZELTSER,                              )
                                      )
              Plaintiff,              )
                                      )
       vs.                            )
                                      ) Miscellaneous No. 96-508
JOINT STOCK BANK INKOMBANK,           )
et al,                                )
                                      )
              Defendant.              )
                                      )

## ORDER OF COURT

AND NOW, this 4th day of October, 1996, upon consideration of Motion to Hold Zev Siegel in Contempt of Court of the defendant, Joint Stock Bank Inkombank (Document No. 1), the Affirmation of Herbert B. Derman in Response to the Motion to Hold Zev Siegel in Contempt (Document No. 7) and the Affidavit of Zev Siegel in Response to Motion to Hold Zev Siegel in Contempt (Document No. 8), it is hereby

ORDERED that said motion (Document No. 1) is **DENIED WITHOUT PREJUDICE.**

It appears that the notice of deposition filed by the defendant and which was served on counsel of record, informed the parties that the deposition of Zev Siegel would be taken at the law offices of Christy & Viener, 620 Fifth Avenue, Sixth Floor, New York, New York 10020 on May 31, 1996, at 9:30 a.m. with documents to be produced on May 24, 1996, per attached Schedule A, while the subpoena appended to defendant's motion requires Mr. Siegel's appearance at the law offices of McClure & Watkins, P.C., 322

1

Boulevard of the Allies, Suite 400, Pittsburgh, Pennsylvania 15222, on May 31, 1996, at 9:30 a.m.

It further appears to the Court that the subpoena for Mr. Siegel's deposition and for production of documents at the law offices of McClure & Watkins, P.C., was properly filed and issued out of the United States District Court for the Western District of Pennsylvania where Mr. Siegel resides. See Fed.R.Civ.P. 45(a)(2). It also appears that Mr. Siegel's Non-Party Witness Zev Siegel's Objections and Responses to Rule 45 Subpoena Served by Christy & Viener was not properly filed in the United States District Court for the Western District of Pennsylvania. See Fed.R.Civ.P. 45(c)(3)(A).

The record reflects that by order of Magistrate Judge Sharon E. Grubin dated November 27, 1995, in the United States District Court for the Southern District of New York at 95 Civ. 0796, discovery in the underlying action closed January 31, 1996. The defendant may apply to the United States District Court for the Southern District of New York for clarification of its right to engage in further discovery and if discovery is permitted, it may reschedule the deposition of Zev Siegel pursuant to the Federal Rules of Civil Procedure.

for Donald J. Lee
United States District Judge

cc    John P. Edgar, Esquire
      McClure & Watkins
      322 Boulevard of the Allies
      Fourth Floor
      Pittsburgh, PA 15222

2

Exhibit K- K

JAN-11-96 THU 02:31 PM   AES/GRAD TAX @ DU        FAX NO. 303 871 6362                    P. 1

# UNIVERSITY OF DENVER
## GRADUATE TAX PROGRAM
### APPLICATION FOR ADMISSION

The completed application should be returned to the Graduate Tax Program, Admissions Committee, 1900 Olive St., Denver, CO 80220.

The following items will be required before this application can be considered by the committee:

1. A $25 application fee if never before registered as a degree-seeking student at the University of Denver

2. Official transcripts from each school you have attended. These must be sent directly from the school.

3. LSAT scores and class rank must be shown on the transcript or in a letter from the law school. GMAT results should be sent directly to the Program. The Program's GMAT code number is 4856. Candidate's copies of scores are not acceptable.

4. After admission, a photograph, not larger than 3" x 4", will be required for identification purposes. You may attach it now for convenience.

All materials become the property of the Program.
ALL INFORMATION SHOULD BE SENT TO THE ABOVE ADDRESS.

DO NOT WRITE IN THIS SPACE

| | | | | |
|---|---|---|---|---|
| A/L | 1 | | DA | 9/2 |
| FT/PT | FT | | AF | 7 |
| SR | 466681 | | AN | |
| CO | | CC | | MJ 77 |
| SU | | SX | | DS |
| AL | G | TR | GRADUA | |
| SY | 9 | PU | 277 | SC  AP |
| DT | | | SCR | |
| UGPA | | | UGIN | |
| L2YR | | | L2IN | |
| GGPA | | | GRIN | |
| DEP | | | AS | |

*Date you wish to enter Autumn Quarter Do you plan to complete the Program as a full-time student taking primarily day division courses Full Time or as a part-time student taking primarily evening division courses _____? PLEASE INDICATE ONE

1. FULL NAME    Zeltser                              Emanuel                         E.
   (Mr./Ms./Other)  (Last)                            (First)                        (Middle)

2. Current Address 235 West 76th Street, 92D  New York                 New York             10023
   (Number & Street)                                (City)              (State)     (Zip Code)

3. Current Employer Spocke & Dunn, Inc.

4. Work Address 250 West 57th Street, Suite 714, New York, NY 10019
   (Number & Street)                    (City)     (State)  (Zip Code)

5. Home Phone 212-724-7142

7. Date of Birth 11/09/53                    6. Work Phone 212-586-6040

9. Social Security Number 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         10. Place of Birth Kemerovo, USSR

11. Have you previously applied for admission to the University of Denver? N/A
    To which School? N/A                                                    NO
                                                            Former D.U. student number  N/A

12. List all colleges and universities attended regardless of length of attendance:

| Name of Institution | Location | Dates From | To | Degrees Rec'd or Expected | Date Rec'd | Major | GPA |
|---|---|---|---|---|---|---|---|
| Kishinev State University | Kishinev, USSR | 1970 | 1974 | Jurist | May 1974 | Intl. Law | N/A |

13. CPA Certification? State N/A       Date N/A

    Bar Admission? State N/A       Date N/A

*Admission is for Autumn or Summer Quarter except with special permission. A limited number of students with advanced backgrounds accounting or taxation will be admitted in the Winter Quarter.

FAX NO. 303 871 6359    P. 11

14. Professional Experience

Name of Firm
_Spocke & Dunn, Inc._

Dates worked
_1982-present_

Position held
_President since 1985_

15. List scholastic honors received (Phi Beta Kappa, cum laude, prizes, etc.).
_Diploma of Excellence (equiv. of "cum laude"), Red Diploma (equiv. of Phi Betta Kappa)_

16. Extracurricular activities. Include here any self support while in college
_Vice President of Student Union_

17. Publications _None_

18. If it has been more than three months since you attended an educational institution, explain what you have been doing in the interval/or present occupation _see attached letter and also #14 above_

19. Have you ever been suspended, placed on probation, or required to withdraw from any college or university? Explain. _NO_

20. Have you ever been convicted of a crime? Explain. _NO_

21. Have you served in the Armed Forces of the United States or any of its allies? If so, please state branch of service, period of service and nature of discharge _NO_

22. Will you be using VA benefits while attending the Graduate Tax Program? _NO_

23. State briefly your plans, if any, for outside work while attending the Graduate Tax Program
_see letter attached_

24. State briefly your reasons for wishing to do graduate tax work and your career goals after you have completed your work. _see letter attached_

25. Permanent Home Address: _same as #2 above_

26. Marital Status ~~married~~ Spouse's Name _Anna_ No. of Children _1_

27. I certify that information given by me on this application is complete and accurate in every respect. I understand that false answers to any of the above questions may constitute sufficient grounds for denial of admission or expulsion if admitted.

Signature of Applicant

Date _8/17/89_

Ethnic Origin: *Optional*, the information requested is voluntary and confidential; to be used only for Federal Government and accreditation agency reports and to promote Affirmative Action and ensure equal opportunity. Check one of the following: _____ American Indian or Alaskan Native _____ Black (not Hispanic) _____ Asian or Pacific Islander _X_ Caucasian (White, not of Hispanic origin) _____ Hispanic

Notes to the Applicant:
a. The Graduate Tax Program is desirous of maintaining the highest of standards of admission. Formal satisfaction of the above requirements alone does not assure admission.
b. Questions regarding Financial Aid should be directed to: Office of Financial Aid, University of Denver, Mary Reed Building, Denver, CO 80208. A limited number of fellowships are granted each year to law graduates who are chosen to work on the Tax Law Journal.

Interested applicants should submit writing samples to Professor Edward J. Roche at the Tax Program address.
c. Letters of recommendation, while not required, may be helpful. If available, they should be sent directly to the Program.
d. Applications will be reviewed by the Admissions Committee after all documents have been received. It is the responsibility of the applicant to insure that all material has been received.

Exhibit K- L

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
     EMANUEL E. ZELTSER, ESQ.,                                   X
4

5               Plaintiff,

6          v.                                              ORIGINAL

7    JOINT STOCK BANK INKOMBANK, VLADIMIR
     VINOGRADOV, ALEKSEY KOUZNETSOV, ROMAN
8    ZDRAYEVSKY, ANNA KOURSIKOVA, VLADIMIR
     DOUDKIN, ELENA EGORYCHEVA, MARINA
9    OSTRYAKOVA, ANDREY SHIMKEVITCH,
     RAFAEL NAGOPETYANTZ, AND VLADIMIR
10   PREOBRAJENSKY,

11   - - - - - - - - - - - - - - Defendants. - - - - - - - - - - - X
     JOINT STOCK BANK INKOMBANK,
12

13               Counterclaim plaintiff,

14        - against -

15   EMANUEL E. ZELTSER, ESQ.

16               Counterclaim defendant,

17        - and -                                 95 Civ.
                                                  0796(KTD)
18   ALEXANDER FISHKIN, ANNA REID,
     FISHKIN & REID, OMEGA BROKERAGE
19   SERVICES, INC., FOREIGN INVESTORS            And Related
     PORTFOLIO MANAGEMENT, INC., ELENA           Actions
20   PELAEZ, RACHIDA MECHERI, AND
     JOHN DOES 1-10,
21
                 Additional counterclaim
22               defendants.

23

24   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

25

Zeltser                                    30

Q.    When was that?

A.    To the best of my recollection, it was in the year of 1990.

Q.    Was that in the First Department?

A.    I believe so, yes.

Q.    Are you a member of the bar of any other state of the United States today?

MR. ZELTSER:  I'm going to pose the same objection to the question.

A.    The answer is no.

Q.    Did you ever attend any law school in the United States?

MR. ZELTSER:  Same objection.

A.    The answer is no.

Q.    Did you ever attend any law school in Russia?

A.    Yes, I did.

Q.    What law school did you attend in Russia?

A.    I have to write it down, otherwise the court reporter will not be able to take it.  I can pronounce it.  It's Universitca de Stat de Marxism Leninism.  Do you want me to write it for the court reporter?

Zeltser                                          31

Q.    I think she got it.  Where is that law school, Mr. Zeltser?

A.    Today?

Q.    Yes.

A.    I don't believe today it exists.

Q.    Withdrawn.  When did you attend that law school, approximately what years?

A.    About 22, 23, 24 years ago.

Q.    What city in Russia was the law school that you attended located?

A.    Kishnev, K-I-S-H-N-E-V.

Q.    Does that law school still exist today?

A.    As I --

MR. ZELTSER:  The question has been asked and answered.

Q.    Do you know the name?  Is it the same name today or is it a different name?

A.    I have testified that to the best of my knowledge, the university does not exist today. The country does not exist today either.

Q.    Did you receive a degree from that law school?

A.    Yes, I did.

Q.    What was that degree called in Russia?

PIROZZI & HILLMAN                    212-213-5858

Exhibit K- M

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

*Translated from Moldovan*

EMANUEL E. ZELTSER, ESQ

Plaintiff.

-against-

JOINT STOCK BANK INKOMBANK, ET AL.
Defendants.

95 Civ. 0796 (KTD)

AFFIDAVIT OF
G.S.ZHITAR

CITY OF KISHINEV )
) ss.:
COUNTRY OF MOLDOVA )

Republic of Moldova
City of Kishinev
Embassy of the United
States of America
Consular Section

George S. ZHITAR, under oath, does hereby give written testimony and state:

1. I am a citizen of the Republic of Moldova and reside in the City of Kishinev. Since 1985 I have been the Director of Personnel of Moldovan State University, previously known as Kishinev State University ("KSU"). Joint Stock Bank Inkombank ("Inkombank") requested that I submit this affidavit because I know that Emanuel Efimovich Zeltser ("Zeltser") did not, as he apparently claims, graduate from KSU's law school (the "Law School") in 1974.

2. As KSU's Director of Personnel, I am the custodian of records for all of KSU's departments and schools, including the Law School. I am therefore familiar with KSU's record-keeping procedures and the type of documents that it maintains in its archives. KSU maintains records of all students who graduated from all of its various departments or schools, including the Law School, dating back to 1959. Based on my knowledge of KSU's record-keeping procedures, I can state that it would be absolutely impossible for a student to have graduated from KSU at any time from 1959 to the present, without that fact being reflected today in KSU's archives.

3. At Inkombank's request, I searched KSU's archives to determine whether there was any record of an Emanuel Efimovich Zeltser having graduated from the Law School in 1974. I have thoroughly reviewed the pertinent documents in KSU's archives, and have concluded that there is no record of an Emanuel Efimovich Zeltser, or any person with a similar name, having graduated from the Law School's 1974 class. The documents that I reviewed include KSU's Diploma Issuance Registry (the "Diploma Registry") for 1974, which lists all 1974 graduates, identifies each graduates diploma number and post-graduate assignment, and is signed by each graduating student. The Diploma Registry even lists the name of a girl who had died before graduation, as well as a man who completed the Law School's program, but did not pass the States qualifying examination. There is no listing for Zeltser, or Zeltser's signature, in any of KSU's

departments or schools, including the Law School. I annex a copy of the Diploma Registry hereto as Exhibit A.

4. I also reviewed the 1974 Orders of the Rector, which enumerates the students who are authorized to graduate and receive diplomas. Here, too, there is no Zeltser' name listed in any of the orders for any of the departments of KSU, including the Law School. Nor is there Zeltser's name in the list of students identified in the orders of the Rector as having been admitted to KSU in 1969 and 1970. I annex copies of the Orders of the Rector hereto as Exhibit B. Moreover, because I was Chairman of the KSU State Examinations Committee from 1974 to 1978 (this is the KSU body that determines which graduating law student would qualify as Jurists), I remember the class of 1974 well, and indeed signed each of the diplomas for the graduates of that class. I would remember Zeltser if he had been in the class. I do not remember him because he was not in the class.

5. I have also reviewed KSU's archives for the years 1966 to 1982. I examined the list of students who graduated from all of the departments and schools at KSU in those years, and have found no reference to Zeltser. Based on my review of these documents, I can state unequivocally that Zeltser did not study at any of KSU's departments or schools, including the Law School, between 1966 and 1982.

6. Inkombank's attorneys have shown me a copy of the "diploma" that Zeltser claims he received from the Law School, and which he claims qualifies him as a jurist. I annex a copy of Zeltser's "diploma" hereto as Exhibit C, and, for purposes of comparison, a genuine diploma as Exhibit D. Zeltser's "diploma" contains several conspicuous mistakes which prove that it is fabricated. Zeltser's "diploma" is dated May 29, 1974. In fact, the Law School's academic year did not end until June and diplomas were not issued until late June or early July. I reviewed KSU's archives for the 1974 class, and found that each of the diplomas issued that year were dated July 2, 1974. For purposes of comparison, I attach hereto a copy of a representative diploma issued by the Law School in 1974. All of the Law School graduates graduated at the same time, and it is simply impossible that Zeltser could have graduated a month earlier.

7. Zeltser's "diploma" states that he entered the Law School in 1970 and graduated in 1974. From 1966 to the present, however, the Law School has required a five-year course of study, meaning that Zeltser could not conceivably have earned a degree in the period stated in his diploma. No student was ever permitted to graduate on an accelerated basis, and Zeltser's claim of earning a degree in four years is a falsehood. Zeltser's "diploma" states that he earned his degree in "an experimental program with a specialization in International Law." There were no "experimental programs" administered at the Law School in 1974, or decades thereafter. Nor did the Law School offer any type of "specialization in International Law" in 1974. In fact, in 1974, the Law School offered the same curriculum to all of its students, and there were no opportunities to specialize and get qualified in any particular area of law. At the Law School, for example, from the years 1960 to 1974, only one course in international law was taught, and that class was taught by a visiting scholar and lasted only a half-year. Zeltser's stated course of study simply did not exist at the Law School in 1974 or for decades thereafter.

8. The physical appearance of Zeltser's "diploma" also proves it is a fabrication. For instance, the words, Workers of the World Unite" appear in Zeltser's "diploma", but do not appear in a true Law School diploma. A genuine KSU diploma never bore the National Emblem of the Moldovan Soviet Socialist Republic, and was instead

decorated with the National Emblem of the USSR. A true Law School diploma includes a letter or letters before the number, as opposed to Zeltser's diploma, which has no letter. The number of Zeltser's diploma - 294362 - is much lower than those issued to the 1974 class. As reflected by the Diploma Registry, the diplomas issued to the class of 1974 were numbered  IO 426451 to IO 436973, and IO 726108 to IO 726198.

9. A genuine University diploma includes a registry number in the lower right corner which  reflects the number of registration in the University records and which corresponds to the quantity of diplomas granted by  KSU to its graduates in total. Zeltser's diploma has the registration number of 28. It confirms that Zeltser's diploma is a  forgery because the numbers run sequentially from KSU's establishment in 1946, without regard to departments or schools. For example, the registration numbers of graduates of 1974  were from 13522 to 13587. Zeltser's diploma states that "in 1970, he enrolled in Kishinev State University... and, in 1974, completed  the full course of studies at the Law Department of the aforementioned institute..."  Also, because "Universities" and "institutes" had a very different status in the Soviet Union, and because KSU was a university, a true KSU diploma  would never refer to KSU as an 'institute".

10. Further,  Zeltser's diploma includes a totally illegible seal.  Seals on copies of actual Law School diplomas clearly read: Kishinev State University.  Moreover, Zeltser's diploma contains a stamp of Marxism/Leninism University ("MLU"), which would never be on a true Law School diploma. Archives relating to the class of 1974, like all of KSU's records, are in KSU's custody and have never been kept at MLU, which never was affiliated with KSU. It is nothing short of absurd to suggest that MLU would ever hold KSU's records.

11. Inkombank's attorneys have also shown me a copy of the "transcript" that Zeltser claims memorialized his career at the Law School  I annex a copy of this "transcript" hereto as Exhibit E. Zeltser identifies 33 classes that he claims to have taken at the Law School.  Of those 33 classes, only 5 were actually taught at the Law School between 1969 and 1974(1). For  purposes of comparison, I attach hereto as Exhibit F a transcript of the course of study that the  Law School required for students entering in 1969 and graduating in 1974. In addition to the fact  that Zeltser's "transcript" lists 38 classes that simply were not taught at the Law School, Zeltser's  "transcript" omits many classes that were requirements at the Law School, and that he would  have had to take in order to graduate (for example, Latin, History of Russia, Theory of  State and Law, Logic, etc.). Many of the classes listed on Zeltser's "transcript" relate to American law (e.g.,  "American Federal Courts," American Constitution and Law," "Succession in American Law"). In fact, the Law School did not teach a single class on American law in the years that Zeltser claims he studied here.

12. Inkombank's attorneys inform me that Zeltser may claim that he earned his  jurist degree at MLU, and that he may claim KSU was  affiliated with MLU. I am certain that KSU never was affiliated with MLU. Moreover, even if Zeltser did graduated from MLU, this would have been  insufficient for him to be qualified as a jurist. Because I was the  Chairman of the KSU State Examinations Committee  from 1974 to 1978, I am aware of the requirements for  qualification as a jurist then in effect, as well as the type of curriculum offered by MLU    MLU  was a Soviet political indoctrination

---

(1)Those classes are: History of Communist Party of the USSR, Political Economy, Procedures in Civil Law, Family Law and Scientific Communism.

I know the signature of the above mentioned Notary, M. Colomeets, and the seal of the State Notary Office.

I compared the signature of the Notary and the seal of the Notary Office with the samples, which are kept in the Notary and Bar Department of the Ministry of Justice and confirm their authenticity.

Chief of the Notary and
Bar Department

T. Ungureanu

nr. 106
Seal: Ministry of Justice, Republic of Moldova

City of Chisinau
January 14, 1997

Translated by:

KONSTANTSA ZHOSANU





The consular department
of the Ministry of Foreign Affairs
of the Republic of Moldova
authenticated the preceding
signature and stamp

15. 01. 199 7 Nr. 0103

Chief of section
D.Socolan

school designed to certify its students to become propagandists of the Communist Party. MLU never offered an academic course of study, was not considered part of the Soviet educational system, and never was intended to prepare, or capable of preparing, students to become jurists. In fact, MLU did not even confer degrees upon those who completed its program, instead awarding them certificates of completion.

13. Inkombank's attorneys inform me that Zeltser studied piano at the Moldovan State Institute of Arts ("MSIA") from 1971 to the end of 1973. In the Soviet Union in general, and at KSU in particular, students simply did not simultaneously pursue different degrees at different educational institutions. Since the fall of the Soviet regime, KSU students have been permitted to study at different institutions at the same time, but I am certain that no KSU student in 1974 (or decades thereafter) ever did so. Thus, if Zeltser did indeed study at MSIA between 1971 and 1973, he could not have simultaneously studied at KSU. In this regard, I note that, KSU, like most other Soviet universities, required all matriculating students to file originals of their school diploma with the institution where they matriculated. As was customary practice in the Soviet Union, KSU did not return the original school diplomas until the student graduated. Thus, Zeltser could not have entered KSU unless he could produce the original of his school diploma. If Zeltser studies at MSIA until 1973, I believe MSIA would have kept the original of his school diploma until he left the MSIA, providing yet another reason why Zeltser could not possibly have studied at KSU.

14. For the reasons stated above, I am certain that Emanuel Efimovich Zeltser did not study at any of KSU's department or schools, including the Law School, at any time between 1966 and 1982. I am equally certain that his "diploma" and "transcript" are fabrications, and that one could not become a qualified jurist by attending MLU. I would testify to this effect in a court of law in the United States.

Signature _____
G.S. ZHITAR

On the fourteenth of January, nineteen ninety seven, Chisinau municipality, Republic of Moldova, I, Colomeets Maria Tudor, senior notary public of the State Notary Office number eight, Rascani district, Chisinau municipality, Republic of Moldova, authenticate the signature of the citizen who presented himself as George S.Zhitar, living in Chisinau, Mitropolit Dosoftei, block 100, apartament 24, known to me as the person mentioned in the present document, signed by him in my presence, hereby approving to me that he completed this document.
The Notary Public neither confirm nor authenticate the facts presented in this affidavit.

Listed in the Registry under the nr. 1 - 122
The State fee collected     90 b.
Senior Notary Public          (signature)
Seal:   Republic of Moldova, Ministry of Justice, State Notary Office nr. 8, Rascani district, Chisinau

I, Tatiana Ungureanu, chief of the Notary and Bar Department of the Ministry of Justice of Republic of Moldova, certify that this document is completed by Maria Colomeets, who at the moment of completion was in function of State Notary Public of the State Notary Office nr. 8, Chisinau and was authorized on legal basis to certify the signatures on this kind of documents.



**Schukin Translation Service**
68-61 Yellowstone Boulevard, Room 109
Forest Hills, New York, 11375 - USA
Tel: (718)261-6449; Fax: (718)261-6468

STATE OF NEW YORK)
COUNTY OF Queens ) SS.:

# CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate rendition into _English_ of _the Affidavit of George Zhitar of January 14, 1997_ written in _Moldavian_

The _5th_ day of _February_ 19_97_

Valerii M. Schukin, Manager

Sworn to and subscribed before me

This the _5_ day of _Feb_ 19_97_

Notary Public
Registered in the County of _____



JANE N. McKENNA
NOTARY PUBLIC, State of New York
No. 24-4934300
Qualified in Kings County
Commission Expires June 13, 1998

TRIBUNALUL REGIONAL S.U.A.
CARTIERUL SUDIC NEW YORK

--------------------------------------

EMANUEL E. ZELTSER, jurist,

reclamanti,

-impotriva-

BANCA DE ACTIUNI INKOMBANK SI ALT.,

inculpati.

--------------------------------------

95 CIV. 0796(KTD)

DECLARATIA
SCRISA
G. S. ZHITAR

ORASUL CHISINAU | 
                | ss.
MOLDOVA         |

Republica Moldova
orasul Chisinau
Ambasada Statelor
Unite ale Americii
Sectia consulara

George S. ZHITAR, sub juramant, declar in scris urmatoarele:

1. Sunt cetatean al Republicii Moldova si rezident al orasului Chisinau. Din 1985 sunt seful serviciului personal al Universitatii de Stat din Moldova, in trecut cunoscuta drept Universitatea de Stat Chisinau ("USC"). Banca de Actiuni Inkombank ("Inkombank") mi-a cerut sa prezint aceasta marturie pentru ca stiu ca Emanuel Efimovici Zeltser ("Zeltser") nu a absolvit, dupa cum pretinde Facultatea de drept din cadrul USC-ului (" Facultatea de drept") in 1974.

2. In calitate de sef al serviciul personal, tin sub ingrijire toate inregistrarile pentru toate facultatile si scolile din cadrul USC-ului, incluzand Facultatea de drept. De aceea, sunt familiarizat cu toate procedurile de pastrare a inregistrarilor si tipurile de documente care se pastreaza in arhivele. USC-ul pastreaza inregistrari pentru toti studentii care au absolvit oricare din variatele facultati si scoli, incluzand Facultatea de drept, incepand cu 1959. Pe baza cunostintelor mele despre pasrarea inregistrarilor la USC, pot sa declar ca ar fi absolut imposibil pentru un student sa fi absolvit USC-ul in orice perioada din 1959 pana in prezent fara ca acest fapt sa fie reflectat astazi in arhivele USC-ului.

3. La cererea Inkombank-ului, am cercetat arhivele USC-ului pentru a determina daca exista vreo inregistrare precum Emanuel Efimovich Zeltser ar fi absolvit Facultatea de drept in 1974. Am revazut cu atentie documentele in aceasta directie in arhivele USC-ului si am tras concluzia ca nu exista nici o inregistrare despre vreun Emanuel Efimovici Zeltser, ori vreo persoana cu nume asemanator, care sa fi absolvit Facultatea de drept in 1974. Documentele pe care le-am revazut includ "Registrul diplomelor" pentru 1974, care mentioneaza toti absolventii din 1974, identifica numerele de diplome pentru fiecare absolvent si repartizarea post-universitara si este semnata de catre fiecare absolvent. Registrul diplomelor

mentioneaza chiar numele unei fete care a murit inainte de absolvire, ca si numele unui barbat care a absolvit programul Facultatii de drept, dar nu a sustinut examenele de Stat de calificare. Nu exista nici o nota despre Zeltser, sau vreo semnatura de-a lui Zeltser, in niciuna din facultatile ori scolile USC-ului, incluzand  Facultatea de drept Eu anexez aici o copie a Registrului de diplome drept Exponat A.

4  Am revazut, de asemenea, Ordinele Rectorului din 1974, care enumera studentii care sunt autorizati sa absolveze si sa primeasca diplome. Aici, de asemenea, nu exista familia lui Zeltser listat in niciunul din ordine pentru oricare din facultatile USC, incluzand  Facultatea de drept. Nu exista familia Zeltser si in lista studentilor identificati in ordinele rectorului care au fost admisi la USC in 1969 si 1970. Eu anexez aici copii ale Ordinelor Rectorului drept Exponat B. Mai mult de atat, eu am fost presedintele Comisiei de Examinare de Stat a USC din 1974 pana in 1978 (acesta fiind organul USC care determina care din absolventii dreptului poate fi calificat drept jurist), imi amintesc bine cursul din 1974, si intr-adevar am semnat diploma fiecarui absolvent. Mi-as fi amintit de Zeltser daca ar fi facut parte din acest curs. Nu-mi amintesc de el ca ar fi fost absolventul acestui curs.

5. Am revazut, de asemenea arhivele USC din 1966 pana in 1982. Am examinat lista studentilor care au absolvit toate facultatile si scolile USC in acei ani, si n-am gasit nici o mentiune despre Zeltser. Bazandu-ma pe cercetarile pe care le-am efectuat asupra acestor documente, pot sa declar ferm ca Zeltser nu a studiat in niciuna din facultatile sau scolile USC, inclusiv  Facultatea de drept, intre 1966 si 1982

6. Juristii Inkombankului mi-au aratat o copie a "diplomei" pe care Zeltser declara ca a primit-o de la  Facultatea de drept, si care, declara el, il califica drept jurist. Eu anexez aici o copie a "diplomei" lui Zeltser drept Exponat C, si, pentru comparatie, o diploma originala drept Exponat D. "Diploma" lui Zeltser contine cateva greseli suspicioase care demonstreaza ca este fabricata. "Diploma" lui Zeltser dateaza din 29 mai 1974. De fapt, anul academic al Facultatii de drept nu se termina decat la sfarsitul lui iunie, iar diplomele nu erau eliberate decat spre sfarsitul lui iunie ori inceputul lui iulie. Am revazut arhivele USC pentru cursul din 1974 si am gasit ca fiecare din diplomele eliberate in acel an dateaza din 2 iulie 1974. Pentru comparatie, anexez aici o copie a unei diplome reprezentative eliberate de catre  Facultatea de drept in 1974. Toti absolventii Facultatii de drept au absolvit in acelasi timp, si pur si simplu este imposibil ca Zeltser sa fi absolvit cu o luna mai devreme.

7. "Diploma" lui Zeltser declara ca el a fost admis la  Facultatea de drept in 1970 si a absolvit in 1974. Din 1966 pana in prezent, in orice caz, Facultatea de drept a cerut un curs de studiu de cinci ani, ceea ce inseamna ca este de neconceput ca Zeltser sa fi putut sa obtina vreo calificare in perioada mentionata in diploma. Niciunui student nu i s-a permis vreodata sa absolveze in mod accelerat, si declaratia lui Zeltser ca ar fi obtinut o calificare in curs de patru ani este plina de falsitati. "Diploma" lui Zeltser mentioneaza ca el a obtinut calificarea sa in cadrul unui "program experimental cu specializarea in Drept international". Nu existau nici un fel de "programe experimentale" administrate la  Facultatea de drept in 1974, sau zeci de ani dupa. Nici nu a oferit  Facultatea de drept vreo "specializare in Drept international" in 1974. De fapt,  Facultatea de drept, in 1974, oferea acelasi curriculum pentru toti studentii sai, si nu existau nici un fel de posibilitati sa te specializezi si sa te califici in

vreun domeniu al dreptului. La Facultatea de drept, de exemplu, din 1960 pana in 1974, a fost predat un singur curs de drept international, si clasei respective i se preda de catre un bursier in vizita si a durat numai jumatate de an. Obiectele de studiu declarate de catre Zeltser pur si simplu n-au existat la Facultatea de drept in 1974 sau zeci de ani dupa.

8. Aspectul fizic al "diplomei" lui Zeltser demonstreaza, de asemenea, ca este o fabricatie. De exemplu, cuvintele, "Proletari ai Lumii, uniti-va" apar in "diploma" lui Zeltser, dar nu exista intr-o diploma originala a Facultatii de drept. Diploma originala USC nu purta niciodata Emblema Republicii Sovietice Socialiste Moldovenesti, dar era, in schimb, decorata cu Emblema Nationala a U.R.S.S. O diploma originala a Facultatii de drept include o litera sau litere inaintea numarului, ceea ce contravine diplomei lui Zeltser, care nu contine nici o astfel de litera. Numarul diplomei lui Zeltser - 294362 - este mult mai mic decat cele inmanate cursului din 1974. In masura in care o reflecta Registrul de diplome, diplomele eliberate cursului din 1974 erau numerotate de la IO 426451 pana la IO 436973 si de la IO 726108 pana la IO 726198

9. O diploma originala universitara include un numar de inregistrare in coltul exrem drept care reflecta numarul sub care este inregistrata in registrele Universitatii si care corespunde cantitatii de diplome acordate de catre USC absolventilor sai in total. Diploma lui Zeltser poarta numarul de inregistrare 28. Aceasta confirma ca diploma lui Zeltser este o falsificare pentru ca numerele se acorda in ordine crescatoare incepand cu ordinul USC-ului din 1946, fara deosebire pentru facultatile si scolile din cadrul ei. De exemplu, numerele de inregistrare ale absolventilor din 1974 erau de la 13522 pana la 13587. Diploma lui Zeltser declara ca "in 1970, el a fost admis la Universitatea de Stat Chisinau... si, in 1974 a absolvit intregul curs de studiu la Facultatea de Drept a sus-mentionatului institut...". De asemenea, pentru ca "Universitatile" si "instituturile" aveau un statut foarte diferit in cadrul Uniunii Sovietice, si pentru ca USC era o universitate, o diploma originala USC nu s-ar referi niciodata la USC drept "institut".

10. Mai mult, diploma lui Zeltser include o stampila cu totul neciteata. Stampilele diplomelor actuale a Facultatii de drept scriu clar: Universitatea de Stat Chisinau. Diploma lui Zeltser contine o stampila a Universitatii de Marxism Leninism ("UML"), care niciodata n-ar exista pe o diploma adevarata a Facultatii de drept. Arhivele legate de cursul din 1974, ca si toate inregistrarile USC, sunt sub ingrijirea USC si niciodate nu au fost in posesia UML, care niciodata nu a fost afiliata cu USC. Nu exista nimic mai absurd decat sa pretinzi ca UML ar pastra vreodata inregistrarile USC-ului.

11. Juristii Inkombankului mi-au aratat, de asemenea, o copie a "transcriptului" care, declara Zeltser, comemoreaza cariera sa la Facultatea de drept Eu anexez aici o copie a "transcriptului" drept Exponat E. Zeltser identifica aici 33 de obiecte pe care pretinde ca le-a frecventat la Facultatea de drept. Din cele 33 de obiecte numai 5 au fost practic predate la Facultatea de drept intre 1969 si 1974(1).

_____

(1) Acele obiecte sunt: Istoria Partidului Comunist al Uniunii Sovietice, Economia politica, Procedura civila, Dreptul familial si Comunismul stiintific.

Pentru comparatie, eu anexez aici, drept Exponat F, un transcript al cursului de studii pe care Facultatea de drept il cerea studentilor care erau admisi in 1969 si absolveau in 1974. In plus faptului ca "transcriptul" lui Zeltser enumera 38 de obiecte care, pur si simplu, nu erau predate la Facultatea de drept, "transcriptul" lui Zeltser omite multe obiecte care erau necesare la Facultatea de drept, si pe care el ar fi trebuit sa le treaca pentru a putea absolvi ( de exemplu, Latina, Istoria Rusiei, Teoria Statului si Dreptului, Logica si altele). Multe din obiectele listate pe "transcriptul" lui Zeltser sunt legate de Dreptul american (de ex.: "Tribunalele Federale Americane", "Dreptul si Constitutia americana", "Succesiunea in Dreptul american"). De fapt, Facultatea de drept nu a predat nici un obiect de Drept american in anii in care Zeltser pretinde ca a studiat acolo.

12. Juristii Inkombankului m-au informat ca Zeltser poate pretinde ca ar fi obtinut calificarea sa de jurist la UML, si ca poate pretinde ca USC ar fi fost afiliat cu UML. Sunt sigur ca USC n-a fost niciodata afiliat cu UML. Mai mult, chiar daca Zeltser ar fi absolvit UML, aceasta ar fi fost insuficient pentru el pentru a fi calificat drept jurist. Eu am fost Presedintele Comisiei de Examinare de Stat al USC-ului din 1974 pana in 1978, sunt informat care erau cerintele de atunci pentru a fi calificat drept jurist, ca si despre tipul de curriculum oferit de UML. UML era o scoala politica sovietica de indoctrinare conceputa pentru a certifica studentii sai sa devina propagandisti ai Partidului Comunist. UML n-a oferit niciodata un curs acdemic de studii, nici nu era considerata parte a sistemului educational sovietic, si niciodata, de fapt, n-a fost conceputa pentru a pregati, ori capabila sa pregateasca, studentii pentru a deveni juristi. De fapt, UML n-a conferit niciodata calificari celor care au completat programul sau, in schimb premiandu-i cu certificate de completare.

13. Juristii Inkombankului m-au informat ca Zeltser a studiat pianul la Institutul de Stat de Arte din Moldova ("ISAM") din 1971 pana la sfarsitul lui 1973. In general, in Uniunea Sovietica, si la USC, in particular, studentii pur si simplu nu urmau cursuri diferite simultan la institutii educationale diferite. De la caderea regimului sovietic, studentilor USC li s-a permis sa studieze la institutii diferite in acelasi timp, dar eu afirm ca nici un student la USC in 1974 (sau zeci de ani dupa) nu aveau o astfel de posibilitate. Astfel, daca Zeltser intr-adevar a studiat la ISAM intre 1971 si 1973, el n-ar fi putut sa studieze simultan la USC. In aceasta directie, notez ca USC, ca si majoritatea universitatilor sovietice, cerea tuturor studentilor inmatriculati sa prezinte originalele diplomelor lor scolare la institutia la care au fost inmatriculati. Fiind practica de traditie in Uniunea Sovietica, USC nu returna originalele diplomelor scolare pana la absolvirea studentilor. Astfel, Zeltser n-ar fi putut intra la USC doar daca ar fi prezentat originalul diplomei sale scolare. Daca Zeltser a studiat la ISAM pana in 1973, eu cred ca ISAM-ul a pastrat originalul diplomei sale scolare pana la plecarea sa din ISAM, demonstrand inca o data de ce nu este posibil ca Zeltser sa fi studiat la USC.

14. Reiesind din cele mentionate mai sus, sunt sigur ca Emanuel Efimovici Zeltser nu a studiat in niciuna din facultatile sau scolile USC, incluzand Facultatea de drept, in nici o perioada intre 1966 si 1982. Sunt, de asemenea, sigur ca "diploma" si "transcriptul" sunt fabricatii, si ca nimeni n-ar putea deveni jurist calificat



ffecventand UML-ul. Voi depune marturie in acesta directie intr-un tribunal din Statele Unite.

G. S. ZHITAR

Paisprezece ianuarie, o mie noua sute nouazeci si sapte, municipiul Chisinau, Republica Moldova, eu Colomeet Maria Tudor, notar superior la biroul notarial de stat, numarul opt, sectorul Rascani, municipiul Chisinau, Republica Moldova, legalizez semnatura cetateanului care s-a prezentat personal, George S. Zhitar, domiciliat in Chisinau, strada Mitropolitului Dosoftei, bloc 100, apartamentul 24, cunoscut de mine ca persoana mentionata in prezentul document si semnat de acesta in prezenta mea, confirmindu-mi astfel ca el a intocmit acest document

Faptele expuse in declaratia data notarul nu le controleaza si nu le autentifica.

Trecut in registru la Nr. _____ 1.122

s-a incasat taxa de stat _____ 90 b

Notar superior de stat _____

The consular department of the Ministry of Foreign Affairs of the Republic of Moldova authenticates the preceding signature and stamp

Chief of section
D. Socolan

Exhibit K- N

*Translated from Moldovan*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EMANUEL E. ZELTSER, ESQ | |
| Plaintiff, | 95 Civ. 0796 (KTD) |
| -against- | |
| JOINT STOCK BANK INKOMBANK, ET AL. | AFFIDAVIT OF |
| | G.E.RUSNAK |
| Defendants | |

| | | |
|---|---|---|
| CITY OF KISHINEV | ) | Republic of Moldova |
| | ) ss. | City of Kishinev |
| COUNTRY OF MOLDOVA | ) | Embassy of the United States |
| | | of America |
| | | Consular Section |

Grigori E. RUSNAK under oath, does hereby give written testimony and state;

1. I am a citizen of the Republic of Moldova and reside in the City of Kishinev. I am currently, and since 1993 have been, the Rector of Moldovan State University, previously known as Kishinev State University ("KSU") Joint Stock Bank Inkombank ("Inkombank") requested that I submit this affidavit because I have personal knowledge that Emanuel Efimovich Zeltser, did not, as he apparently claims, graduate from the law school of KSU (the "Law School") in 1974.

2. KSU's Director of Personnel, G.S. Zhitar, informed me that he has thoroughly searched KSU's archives, and has discovered that there is no record of Zeltser having studied at the Law School (or, for that matter, any other of KSU's department or schools) at any time between 1966 and 1982. As KSU's Rector, I am familiar with KSU's record-keeping procedures and the types of documents that are maintained in KSU's archives, as well as Mr. Zhitar's qualifications and authority. If a person had studied at any of KSU's departments or schools, KSU's archives would undoubtedly include records reflecting that fact. That Mr. Zhitar's search revealed no reference to Zeltser for the years 1966 to 1982 means that Zeltser did not study at KSU during this period.

3. Additionally, Mr. Zhitar has shown me some of the documents that he reviewed. I reviewed KSU's Diploma Issuance Registry (the "Diploma Registry") for 1974, which lists all 1974 graduates, identifies each graduate's diploma number and post-graduate assignment, and which is signed by each graduating student. There is no listing for Zeltser, or Zeltser signature, in any of KSU's departments or schools, including the Law School. I annex a copy of the Diploma Registry hereto as Exhibit A. I also reviewed the 1974 Orders of the

...и всех стран, соединяйтесь!

...ственный герб Молдавской Советской социалистической Респу...

...терство высшего образования МССР

...олжа

Диплом № ...

...настоящий диплом выдан т. ГЕНЦЛЕРУ ... ...Е ...ОВИЧУ в том,
что он в 1970 году поступил в Кишиневский Государственный универ-
ситет им. В.И. Ленина и в 1974 году окончил полный курс юридичес-
кого факультета названного института по специальной эксперимента-
льной программе "Международное право".

Решением Государственной комиссии от 29 мая 1974 года ГЕНЦЛЕРУ ...
присвоена квали...кация "ЮРИСТ".

Председатель Государственной
квали...кационной комиссии

Ректор                                         Подпись

Секретарь                                      Подпись

                                               Подпись

Город Кишинев
Рег. № 25

                                               29 мая 1974 года

Ст. ...                                        ...Е. Попа/

Архив Университета
Марксизма-Ленинизма при
ЦК КП Молдавской ССР

Rector, which enumerates the students who are authorized to graduate and receive diplomas. Here, too, there is no Zeltser listed in any of the orders for any of the departments of KSU, including the Law School. I annex copies of those Orders here to as Exhibit B. This too proves Zeltser did not graduate KSU in 1974.

4. Ikombank's attorneys have shown me a copy of the "diploma" that Zeltser claims he received from the Law School, and which he claims qualifies him as a jurist. I annex a copy of Zeltser's "diploma" hereto as Exhibit C. Zeltser's "diploma" contains several conspicuous mistakes which prove that it is crudely fabricated. Zeltser's "diploma" is dated May 29, 1974. In fact, the Law School's academic year does not end until June and diplomas are not issued until late June or early July. I reviewed KSU's archives for the 1974 class, and found that each of the diplomas issued that year were dated July 2, 1974. All of the Law School graduates graduated at the same time, and it is simply impossible that Zeltser could have graduated a month earlier, at a time when final exams had not yet been administered.

5. Zeltser's "diploma" states that he entered the Law School in 1970 and graduated in 1974. From 1966 to the present, however, the Law School has required a five-year course of study, meaning that Zeltser could not conceivably have earned a degree in the period stated in his diploma. No student was ever permitted to graduate on an accelerated basis, and Zeltser's claim of earning a degree in four years proves he did not graduate from the Law School. Zeltser's "diploma" states that he earned his degree in "an experimental program with a specialization in International Law." There were no experimental programs administered at the Law School in 1974, or for decades before or thereafter. Nor did the Law School offer any type of "specialization in International Law" in 1974. In fact, in 1974, the Law School offered the same curriculum to all of its students, and there were no opportunities to specialize in any particular area of law. The very notion of a specialization in International Law in Moldova in 1974 is ludicrous because at that time educational institutions throughout the Soviet Union (until 1991 Moldova was a Republic of the Soviet Union), including the Law School, were extremely insular and simply did not emphasize foreign studies. At the Law School, for example, from the years 1960 to 1974, only one course in international law was taught, and that class was taught by a visiting scholar and lasted for only a half-year. Zeltser's stated course of study simply did not exist at the Law School in 1974 or for decades before or thereafter.

6. The physical appearance of Zeltser's "diploma" also proves it is a fake. For purposes of comparison, I annex a copy of a genuine Law School diploma hereto as Exhibit D. For instance, the words, "Workers of the World Unite" appear in Zeltser's diploma" but do not appear in a true Law School diploma. A genuine University diploma never bore the National Emblem of the Moldovan Soviet Socialist Republic, but was instead decorated with the National Emblem of the USSR. Diplomas issued by the Law School, like diplomas issued by Soviet universities in general, contained a letter or letters before the number. There is no such letter before the number listed in Zeltser's "diploma." Moreover, the number of Zeltser's diploma -294362 - is much lower than those issued to the 1974 class. As reflected by the Diploma Registry, the diplomas issued to the class of 1974 were numbered IO 426451 to IO 436973, and IO 726108 to IO 726198. A true University diploma includes a registry number in the lower right corner which reflects the number of registration in the University records and which corresponds to the quantity of diplomas issued university wide. Zeltser's registration number - 28 - proves the "diploma" is fake because the diplomas of the class of 1974 bore registration numbers 13522 to 13587. Zeltser's diploma states that "in 1970, he enrolled in the Kishinev State University, named

after V I Lenin, and in 1974, completed the full course of studies at the Law Department of the aforementioned institute on experimental program..." In the former Soviet Union, however, universities and institutes had a very different status, and genuine KSU diplomas used the word "university" not "institute". Zeltser's diploma includes a totally illegible seal. The seals on the genuine Law Schools diplomas, by contrast, include seals which clearly read in Russian and Moldovan: Kishinev State University. Additionally, Zeltser's diploma includes a stamp of the archives of Marxism/Leninism University ("MLU"). There is absolutely no reason why a KSU diploma would bear the stamp of MLU, which never had any affiliation with KSU. At the risk of stating the obvious, all of KSU's archives - including those relating to the 1974 Law School class - are in KSU's custody and never were in MLU's archives.

7  Inkombank's attorneys have also shown me a copy of the "transcript" that Zeltser claims memorializes his career at the Law School. I annex a copy of this "transcript" hereto as Exhibit E. Zeltser identifies 33 classes that he claims to have taken at the Law School. Of those 33 classes, only 5 were actually taught at the Law School between 1969 and 1974.(1) For purposes of comparison, I attach hereto as Exhibit F a transcript of the course of study that the Law School required for students entering in 1969 and graduating in 1974. In addition to the fact that Zeltser's "transcript" lists 28 classes that simply were not taught at the Law School, Zeltser's "transcript" omits many classes that were requirements at the Law School, and that he would have had to take in order to graduate (for example, Latin, History of Russia, Theory of State and Law, Logic). Additionally, many of the classes listed on Zeltser's "transcript" relate to American law (e.g., "American Federal Courts," American Constitution and Law," "Succession in American Law"). In fact, the Law School did not teach a single class on American law in the years that Zeltser claims he studied here. In sum, Zeltser's "transcript" is not only inaccurate, it is ludicrous.

8. Inkombank's attorneys inform me that Zeltser may claim that he earned his jurist degree at MLU, and that KSU was in some way affiliated with MLU. I am certain that KSU never was affiliated with MLU. Moreover, even if Zeltser did graduate from MLU, this would have been insufficient for him to be qualified as a jurist. MLU was a Soviet political indoctrination school designed to certify students to become propagandists of the Communist Party. MLU never offered an academic course of study, was not even considered a part of Soviet educational system and never was intended to, or capable of, qualifying students to become jurists. In fact, MLU did not even confer degrees upon those who completed its program, instead awarding them certificates of completion.

9. Inkombank's attorneys inform me that Zeltser studied piano at the Moldovan State Institute of arts ("MSIA") from 1971 to the end of 1973. In the Soviet Union in general, and at KSU in particular, students simply did not simultaneously pursue different degrees at different educational institutions. Since the fall of the Soviet regime, KSU students have been permitted to study at different institutions at the same time, but I am certain that no KSU student in 1974 (or for decades before or thereafter) ever did so. Thus, if Zeltser did indeed study at MSIA between 1971 and 1973, he could not have simultaneously studied at KSU. In this regard, I note that KSU, like most other Soviet universities or institutes, required all matriculating students to file the originals of their school diploma with the institution where they matriculated. As was customary practice in the Soviet Union, KSU did not return the original diplomas until the student graduated. Thus, Zeltser could not have entered KSU unless he could produce the original of his school diploma. If Zeltser studied at MSIA until 1973, I believe MSIA would have kept the original of his school

diploma until he left MSIA, providing yet another reason why Zeltser could not have studied at KSU.

10. For the reasons stated above, I am certain that Emanuel Efimovich Zeltser did not study at any of KSU's department or schools, including the Law School, at any time between 1966 and 1982. I am equally certain that his "diploma" and "transcript" are fabricated, and that one could not become a qualified jurist by attending MLU. I would testify to this effect in a court of law in the United States.

Signature
G.E. RUSNAK

(1) Those classes are: History of the Communist Party of the USSR, Political Economy, Procedures in Civil Law, Family Law and Scientific Communism.

On the fourteenth of January, nineteen ninety seven, Chisinau municipality, Republic of Moldova, I, Colomeets Maria Tudor, senior notary public of the State Notary Office number eight, Rascani district, Chisinau municipality, Republic of Moldova, authenticate the signature of the citizen who presented himself as Grigori E. Rusnak, living in Chisinau, Avenue of Moscow, block 13/5, apartment 10, known to me as the person mentioned in the present document, signed by him in my presence, hereby approving to me that he completed this document.

The Notary Public neither confirm nor authenticate the facts presented in this affidavit.

Listed in the Registry under the nr. 1 - 120

The State fee collected        90 b.

Senior Notary Public        (signature)

Seal:   Republic of Moldova,
        Ministry of Justice,
        State Notary Office nr. 8,
        Rascani district, Chisinau

I, Tatiana Ungureanu, chief of the Notary and Bar Department of the Ministry of Justice of Republic of Moldova, certify that this document is completed by Maria Colomeets, who at the moment of completion was in function of State Notary Public of the State Notary Office nr. 8, Chisinau and was authorized on legal basis to certify the signatures on this kind of documents.

I know the signature of the above mentioned Notary, M. Colomeets, and the seal of the State Notary Office.

I compared the signature of the Notary and the seal of the Notary Office with the samples, which are kept in the Notary and Bar Department of the Ministry of Justice and confirm their authenticity.

Chief of the Notary and
Bar Department                          T.Ungureanu

nr. 108

City of Chisinau

January 14, 1997

Seal: Ministry of Justice, Republic of Moldova

Translated by:

KONSTANTSA ZHOSANU

№ 123



The consular department
of the Ministry of Foreign Affairs
of the Republic of Moldova
authenticates the preceding
signature and stamp

_____

_____

_____ O._____ 199_ Nr. _0104_

Chief of section

D.Socolan



**Schukin Translation Service**
68-61 Yellowstone Boulevard, Room 109
Forest Hills, New York, 11375 - USA
Tel: (718)261-6449; Fax: (718)261-6468



**STATE OF NEW YORK)**

**COUNTY OF** Queens )  **SS.:**

# CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate rendition into _English_ of _the Affidavit of Grigori Rusnak of January 14, 1997_ written in _Moldavian_

The _5th_ day of _February_ 19 _97_

_Valerii M. Schukin_

**Valerii M. Schukin, Manager**

Sworn to and subscribed before me

This the _5th_ day of _February_ 19 _97_

Notary Public
Registered in the County of _____

JANE N. McKENNA
NOTARY PUBLIC, State of New York
No. 24-4934300
Qualified in Kings County
Commission Expires June 13, 1998

TRIBUNALUL REGIONAL S.U.A.
CARTIERUL SUDIC NEW YORK

EMANUEL E. ZELTSER, jurist,

reclamanti,

-impotriva-

BANCA DE ACTIUNI INKOMBANK SI ALT.,

inculpati.

95 CIV. 0796(KTD)

DECLARATIA
SCRISA
G.E.RUSNAK

ORASUL CHISINAU |
                 | ss.;
MOLDOVA          |

Republica Moldova
orasul Chisinau
Ambasada Statelor
Unite ale Americii
Sectia consulara

Grigori E. RUSNAK, sub juramant, declar in scris urmatoarele:

1. Sunt cetatean al Republicii Moldova si rezident in orasul Chisinau. Sunt din 1993 si in prezent rector al Universitatii de Stat din Moldova, cunoscuta, in trecut, drept Universitatea de Stat din Chisinau ("USC"). Banca de Actiuni Inkombank ("Inkombank") mi-a cerut sa prezint aceasta declaratie pentru ca am cunostinte personale ca Emanuel Efimovich Zeltser nu a absolvit, precum se pare ca declara, Facultatea de drept la USC ("Facultatea de drept") in 1974.

2. Seful serviciului personal al USC, G.S.Zhitar, m-a informat ca el a cautat atent in arhivele USC, si n-a descoperit nici o inregistrare precum ca Zeltser ar fi studiat la Facultatea de drept (sau, in aceeasi idee, la nici o facultate ori scoala din cadrul USC) in perioada dintre 1966 si 1982. In calitate de rector al USC, sunt familiarizat cu procedurile de pastrare a registrelor la USC si cu tipurile de documente care sunt pastrate in arhivele USC, ca si cu autoritatea si calificarea domnului Zhitar. Daca o persoana ar fi studiat in oricare din facultatile USC, arhivele universitatii, fara nici un dubiu, ar fi inclus inregistrari privind acest fapt. Faptul ca toate cautarile d-ului Zhitar n-au revelat nici o referire la Zeltser intre 1966 si 1982 inseamna ca Zeltser nu a studiat la USC in aceasta perioada.

3. In plus, d-ul Zhitar mi-a aratat cateva documente pe care le-a revazut. Eu am revazut Registrul de diplome pentru anul 1974, care enumera toti absolventii din 1974, noteaza numarul diplomei a fiecarui absolvent si repartizarea post-universitara, si care este semnat de fiecare sudent absolvent. Nu exista nici o inregistrare despre Zeltser, sau vreo semnatura de-a lui, in nici una din facultatile ori scolile USC, incluzand Facultatea de drept. Anexez aici o copie a Registrului de diplome, drept Exponat A. Am revazut, de asemenea, Ordinele Rectorului din 1974, care enumera studentii care sunt autorizati sa absolveze si sa primeasca diplome. Aici, de asemenea, nu exista familia lui Zeltser inregistrata in vreun ordin pentru oricare din facultatile USC, inclusiv Facultatea de drept. Anexez aici copii ale acelor ordine drept Exponat B. Aceasta, de asemenea, demonstreaza ca Zeltser nu a absolvit USC in 1974.

4. Juristii Inkombankului mi-au aratat o copie a "diplomei" pe care Zeltser pretinde ca a primit-o de la Facultatea de drept, si care il califica drept jurist

Anexez aici o copie a "diplomei" lui Zeltser drept Exponat C. "Diploma" lui Zeltser contine cateva greseli suspicioase care demonstreaza ca este o fabricatie. "Diploma" lui Zeltser dateaza din 29 mai 1974. De fapt, anul academic la USC se termina nu mai devreme decat iunie si diplomele nu sunt scoase decat la sfarsitul lui iunie sau inceputul lui iulie. Am revazut arhivele USC-ului pentru clasa din 1974, si am descoperit ca toate diplomele scoase in acel an dateaza din 2 iulie 1974. Toti absolventii Facultatii de drept au absolvit in acelasi timp, si este pur si simplu imposibil ca Zeltser sa fi absolvit cu o luna mai devreme, in perioada cand examenele de absolvire inca nu erau administrate.

5. "Diploma" lui Zeltser noteaza ca el a fost admis la Facultatea de drept in 1970 si a absolvit in 1974. Din 1966 pana in prezent, in orice caz, Facultatea de drept a necesitat cinci ani de studiu, ceea ce inseamna ca e de neconceput ca Zeltser sa fi putut sa obtina vreo calificare in perioada mentionata in diploma. Niciunui student nu i s-a permis vreodata sa absolveze in mod accelerat, si faptul ca Zeltser pretinde ca ar fi obtinut o calificare in patru ani demonstreaza ca el nu a absolvit Facultatea de drept. "Diploma" lui Zeltser declara ca el si-ar fi obtinut calificarea in cadrul "unui program experimental cu specializarea in Drept international". In 1974 nu existau nici un fel de programe experimentale la Facultatea de drept, sau chiar zeci de ani inainte sau dupa acest an. Nici ca ar fi oferit Facultatea de drept vreo "specializare in Drept international" in 1974. De fapt, in 1974 Facultatea de drept oferea acelasi curriculum la toti studentii, si nu exista nici o sansa de a te specializa in vreun domeniu al dreptului. Insasi notiunea de specializare in Drept international in Moldova in 1974 pare ridicula, pentru ca, in acel timp, institutiile educationale pe intreg teritoriul Uniunii Sovietice (pana in 1991 Moldova a fost o republica a Uniunii Sovietice), incluzand Facultatea de drept, erau extrem de izolate si, pur si simplu, nu accentuau obiectele straine. La Facultatea de drept, de exemplu, din 1960 pana in 1974, era predat un singur curs de drept international, si era predat clasei respective de catre un bursier in vizita si a durat doar pentru o jumatate de an. Cursul de obiecte declarat de Zeltser pur si simplu nu a existat la Facultatea de drept in 1974 sau timp de zeci de ani inainte sau dupa.

6. Fateta fizica a diplomei lui Zeltser demonstreaza, de asemenea, ca este falsa. Pentru comparatie, anexez aici o copie a unei diplome originale drept Exponat D. De exemplu, cuvintele, "Proletari ai Lumii, uniti-va" apar in "diploma" lui Zeltser, dar nu apar intr-o diploma adevarata a Facultatii de drept. O diploma originala universitara nu purta niciodata Emblema nationala a Republicii Sovietice Socialiste Moldovenesti, dar, in schimb, purta Emblema nationala a U.R.S.S.. Diplomele scoase de catre Facultatea de drept, precum toate diplomele scoase de catre universitatile sovietice, in general, contineau o litera sau mai multe litere in fata numarului. Nu exista o astfel de litera in "diploma" lui Zeltser. In plus, numarul diplomei lui Zeltser - 294362 - este mult mai mic decat cele scoase clasei din 1974. Conform Registrului de diplome, diplomele scoase clasei din 1974 erau numerotate de la IO 426451 pana la IO 436973, si de la IO 726108 pana la IO 726198. O diploma adevarata universitara include un numar de inregistrare in unghiul extrem de dreapta care reflecta numarul de inregistrare in registrele universitatii si care corespunde cantitatii de diplome scoase pe toata universitatea. Numarul de inregistrare a lui Zeltser - 28 - dovedeste ca "diploma" este falsa, pentru ca diplomele clasei din 1974 purtau numerele de inregistrare 13522 pana la 13587. Diploma lui Zeltser declara ca " in 1970, el a fost admis la Universitatea de Stat din Chisinau, numita dupa V.I Lenin, si ca in 1974, si-a completat intregul curs de studii la facultatea de drept a sus-mentionatului institut in cadrul unui program experimental  " In fosta Uniune Sovietica, in orice caz, universitatile si institutiile aveau un statut foarte diferit, si diplomele USC-ului foloseau cuvantul "universitate"

nu "institut". Diploma lui Zeltser include o stampila cu totul ilezibila. Stampilele pe diplomele Facultatii de drept, din contra, includ stampile care, in mod clar, se citesc in rusa si moldoveneasca: Universitatea de Stat Chisinau. In plus, diploma lui Zeltser include o stampila a arhivelor din Universitatea de Marxism/Leninism ("UML"). Nu exista absolut nici un motiv pentru care o diploma a USC ar purta stampila a UML-ului, care niciodata n-a avut vreo afiliere cu USC. Cu riscul de-a afirma adevarul vadit, toate arhivele USC - incluzand acele legate de clasa din 1974 din Facultatea de drept - sunt in pastrarea USC-ului si niciodata n-au fost in arhivele UML-ului.

7. Juristii Inkombank-ului mi-au aratat, de asemenea, o copie a "transcriptului" care, pretinde Zeltser, comemoreaza cariera sa la Facultatea de drept. Eu anexez aici o copie a acestui "transcript" drept Exponat E. Zeltser identifica 33 de obiecte, din care numai 5 au fost practic predate la Facultatea de drept intre 1969 si 1974 (1). Pentru comparatie, anexez aici, drept Exponat F, un transcript a obiectelor de sudiu, pe care Facultatea de drept le cerea studentilor care erau admisi in 1969 si absolveau in 1974. In plus faptului ca transcriptul lui Zeltser enumera 28 de obiecte care pur si simplu nu erau predate la Facultatea de drept, "transcriptul" lui Zeltser omite multe obiecte care erau necesare la Facultatea de drept, si pe care trebuia sa le treaca pentru a putea absolvi (de exemplu, Latina, Istoria U.R.S.S., Teoria Statului si Dreptului, Logica). In plus, multe din obiectele listate pe "transcriptul" lui Zeltser sunt legate de Dreptul american (ex.: "Tribunalele Federale Americane", "Dreptul si Constitutia americana", "Succesiunea in Dreptul american"). De fapt, Facultatea de drept nu a predat nici un obiect in cadrul Dreptului american in anii in care Zeltser pretinde ca a studiat acolo. In concluzie, "transcriptul" lui Zeltser nu este numai incorect, ci este si ridicol.

8. Juristii Inkombank-ului m-au informat ca Zeltser poate declara ca el si-a obtinut calificarea de jurist la UML, si ca USC-ul era intr-un fel afiliat cu UML. Sunt sigur ca USC-ul n-a fost niciodata afiliat cu UML. Mai mult decat atat, chiar daca Zeltser ar fi absolvit UML-ul, aceasta ar fi fost insuficient pentru el ca sa fie calificat drept jurist. UML-ul era o Facultatea politica de indoctrinare, conceputa pentru a asigura studentii in ideea de a deveni propagandisti a Partidului Comunist. UML-ul n-a oferit niciodata un curs de studiu academic, nici macar nu era considerata o parte a sistemului educational sovietic si n-a avut niciodata intentia sau capacitatea sa califice studentii pentru a deveni juristi. De fapt, UML-ul n-a conferit nici macar calificari celor care au completat programul sau, premiandu-i, in schimb, cu certificate de completare a studiilor.

9. Juristii Inkombank-ului m-au informat ca Zeltser a studiat pianul la Institutul de Stat de Arte din Moldova ("ISAM") din 1971 pana in 1973. In cadrul Uniunii Sovietice, in general, si in particular la USC, studentii pur si simplu nu frecventau facultati diferite in institutii diferite in acelasi timp. De la caderea regimului sovietic studentilor USC-ului li s-a permis sa studieze la institutii diferite in acelasi timp, dar sunt sigur ca nici un student al USC-ului in 1974 (sau zeci de ani inainte sau dupa) n-a reusit s-o faca. Astfel, daca Zeltser a studiat intr-adevar intre 1971 si 1973 la ISAM, n-a putut, sigur, sa studieze simultan la USC. In acest sens, mentionez ca, precum in majoritatea institutiilor si universitatilor sovietice, USC-ul cerea tuturor studentilor inmatriculati sa prezinte originalele diplomelor lor scolare la institutiile in care erau inmatriculati. Conform practicii de traditie in Uniunea Sovietica, USC-ul nu returna originalele diplomelor pana la absolvirea studentului. Astfel, Zeltser n-ar fi putut sa intre la USC, daca nu prezenta originalul diplomei sale scolare. Daca Zeltser a studiat la ISAM pana in 1973, cred ca ISAM-ul ar fi pastrat originalul diplomei sale

scolare pana la plecarea sa din ISAM, demonstrand inca o data de ce Zeltser n-ar fi putut sa studieze la USC.

10. Reiesind din cele mentionate mai sus, sunt sigur ca Emanuel Efimovici Zeltser n-a studiat la nici o facultate ori Facultatea a USC-ului, incluzand Facultatea de drept, in nici o perioada intre 1966 si 1982. Sunt, de asemenea, sigur ca "diploma" si "transcriptul" sunt fabricate, si ca nimeni n-ar fi putut deveni jurist calificat frecventand UML-ul. Voi depune marturie in aceasta directie intr-un tribunal legal in Statele Unite.

G.E. RUSNAK

(1) Acele cursuri sunt: Istoria Partidului Comunist a Uniunii Sovietice, Economia politica, Procedura civila, Dreptul familial si Comunismul stiintific

Paisprezece ianuarie, o mie noua sute nouazeci si sapte, municipiul Chisinau, Republica Moldova, eu Colomeet Maria Tudor, notar superior la biroul notarial de stat, numarul opt, sectorul Rascani, municipiul Chisinau, Republica Moldova, legalizez semnatura cetateanului care s-a prezentat personal, Grigori E. Rusnak, domiciliat in Chisinau, bulevardul Moscovei, bloc 13/5, apartamentul 10, cunoscut de mine ca persoana mentionata in prezentul document si semnat de acesta in prezenta mea, confirmindu-mi astfel ca el a intocmit acest document

Faptele expuse in declaratia data notarul nu le controleaza si nu le autentifica.

Trecut in registru la Nr. ___ 1-120

S-a incasat taxa de stat ___ 90 8.

Notar superior de stat

108



The Consular Department
of the Ministry of Foreign Affairs
of the Republic of Moldova
authenticates the preceding
signature and stamp

_Illingureanu sef de sectie_
_protocol si legalizari_

15   01   1997   Nr. 0180

Chief of section

D. Socolan



Exhibit K- O

*Translated from Moldovan*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EMANUEL E. ZELTSER, ESQ.,

　　　　　　Plaintiff

-against-

JOINT STOCK BANK INKOMBANK, ET AL

　　　　　　Defendants.

95 Civ. 0796 (KTD)

AFFIDAVIT OF
ALEXEI V. POTYNGA



CITY OF KISHINEV　　　　　　　　)
　　　　　　　　　　　　　　　　) ss.:
COUNTRY OF MOLDOVA　　　　　　)

Republic of Moldova
City of Kishinev
Embassy of the United
States of America
Consular Section

Alexei V. POTYNGA, under oath, does hereby give written testimony and state:

1. I am a citizen of the Republic of Moldova and a licensed Moldovan attorney (in Moldovan terms, a "Jurist"). I am currently, and since 1983 have been, the Chief Prosecutor in the Civil Division of the Attorney General's Office of the Republic of Moldova. Joint Stock Bank Inkombank ("Inkombank") requested that I submit this affidavit because I have personal knowledge that Emanuel Efimovich Zeltser ("Zeltser") did not, as I understand he has claimed, graduate from Kishinev State University's law school (the "Law School") in 1974.

2. I graduated from the Law School in 1974 (I entered in 1969) and am absolutely certain that Zeltser not only did not graduate in 1974, but was not even a member of the 1974 graduating class at any time. When I was at the Law School, the classes were extremely small - there were only 66 people in the 1974 graduating class - and students tended to spend a great deal of time together and to become quite familiar with each other. Moreover, I was extremely involved in student affairs when I was at the Law School. Among other things, I represented the 1974 class on a University-wide Komsomol committee (now defunct, the Komsomol was the Soviet Union's communist youth league) and therefore had to know not only the names of each of my classmates but also the names and faces of every student at the Law School. If Zeltser had been a member of the 1974 class or even a student of the Law School at that time, I would know it. I am certain that he was not in the class and did not study at the Law School between 1969 and 1974. In fact, I still have a

picture of the 1974 graduating class (which I attach hereto as Exhibit A) and can identify each of the people in the picture by name. There is no Zeltser in the picture because there was no Zeltser in the class, or even in the Law School

3. I am currently active in alumni relations at the Law School, and therefore have occasion to correspond with my classmates, and to become generally aware of what each of my classmates is doing and where they are living. For the past twenty years we have had annual reunions and, just this year, I helped coordinate our 22nd reunion party, sending invitations to each of my classmates and spending many hours conversing with them about the members of our class and what they are doing. Needless to say, I did not send an invitation to Zeltser, never saw his name on any list of alumni and am certain that his name never was raised in any of my numerous conversations with my classmates for the obvious reason that he was not a student in our class.

4. Inkombank's attorneys have shown me a copy of the "diploma" that Zeltser claims he received from the Law School. Zeltser's "diploma" contains several obvious inaccuracies which prove that it is false. For purposes of comparison, I attach copies of Zeltser's "diploma" and the diploma that I received from the Law School as Exhibits B and C respectively. First, Zeltser's "diploma" is dated May 29, 1974, while the Law School's academic year did not end until June, and diplomas were not issued until early July. My diploma, like the ones distributed to each of my classmates, is dated July 2, 1974. Second, Zeltser's "diploma" states that he entered the Law School in 1970 and graduated in 1974. Zeltser could not have conceivably completed a degree in this period because the Law School required a five-year course of study for all students. Students simply were not permitted to graduate on an accelerated basis. Third, Zeltser's "diploma" states that he earned his degree in "an experimental program with a specialization in International Law". There were no "experimental programs" administered at the Law School in 1974, or in any of the five years that I studied there. Nor did the Law School offer any type of "specialization in International Law" (or, for the matter any specialization in any area of the Law). In fact, I recall that in my five years at the Law School only one International Law course - taught by a visiting scholar and for a half year only - was offered to our class. I am certain that Zeltser's professed course of study simply did not exist at the time he claims he studied at the Law School.

5. Zeltser's "diploma" also differs physically from a true Law School Diploma. For instance, the words, "Workers of the World Unite" appear in Zeltser's "diploma," but do not appear in mine. My diploma, like every diploma of every graduate of a Soviet university I have seen, includes a letter or letters in front of the number. Thus, the letter "Ю" appears before of the number in my diploma, while no letter or letters precede the number  In Zeltser's diploma. Moreover, the number of Zeltser's diploma - 294362 - is much lower than those issued to the 1974 class. My diploma, for example, is numbered  426482".

6. Inkombank's attorneys have also shown me a copy of the "transcript" that Zeltser claims memorializes his career at the Law School. I annex a copy of this "transcript" hereto as Exhibit D. Zeltser identifies 33 classes that he claims to have taken at the Law School. Of those 33 classes, only 5 were actually taught at the Law School between 1969 and 1974 (1). I was interested to note that the most of the 28 phony classes listed on Zeltser's transcript focus on American law and legal systems (e.g. "American Federal Courts," American Constitution and  Law", "Succession in American Law"). In reality courses on American law were not taught at the Law School.

7. Based on my personal knowledge, I can state unequivocally that Emanuel Zeltser never was a member of the Law School's 1974 class, that his "diploma" and "transcript" are false and that he did not study at the Law School between the years 1969 and 1974. If necessary, I will testify to this effect in a court of law in the United States.

Signature
ALEXEI V. POTYNGA

On the fourteenth of January, nineteen ninety seven, Chisinau municipality, Republic of Moldova, I, Colomeets Maria Tudor, senior notary public of the State Notary Office number eight, Rascani district, Chisinau municipality, Republic of Moldova, authenticate the signature of the citizen who presented himself as Alexei V. Potynga, living in Chisinau, Avenue of Moscow, block 10/2, apartment 47, known to me as the person mentioned in the present document, signed by him in my presence, hereby approving to me that he completed this document.

The Notary Public neither confirm nor authenticate the facts presented in this affidavit.

Listed in the Registry under the nr   1 - 125

The State fee collected       90 b.

Senior Notary Public        (signature)

Seal:   Republic of Moldova,
        Ministry of Justice,
        State Notary Office nr. 8,
        Rascani district, Chisinau

I, Tatiana Ungureanu, chief of the Notary and Bar Department of the Ministry of Justice of Republic of Moldova, certify that this document is completed by Maria Colomeets, who at the moment of completion was in function of State Notary Public of the State Notary Office nr. 8, Chisinau and was authorized on legal basis to certify the signatures on this kind of documents.

I know the signature of the above mentioned Notary, M. Colomeets, and the seal of the State Notary Office.

I compared the signature of the Notary and the seal of the Notary Office with the samples, which are kept in the Notary and Bar Department of the Ministry of Justice and confirm their authenticity.

Chief of the Notary and                    T. Ungureanu
Bar Department

nr. 111

City of Chisinau
January 14, 1997

Seal: Ministry of Justice, Republic of Moldova

Translated by:

KONSTANTSA ZHOSANU

15 · 01    19__ года, я _____
государственный нотариус государственной нотариальной конторы
_____
Подпись, сделанной _____
_____
Зарегистрировано в реестре за № 1 - 45
Взыскано государственной пошлины 0, 80 лей
Государственный нотариус

Татьяна _____

г. Кишинев

п. Обрежа

г. Кишинев

№ 120

The consular department
of the Ministry of Foreign Affairs
of the Republic of Moldova
authenticates the preceding
signature and stamp

*I. Ungureanu ref secr*
*notariat i avocatura*

" 01 " 199_ Nr. 0105

Chief of section
D. Socolan



𝕾𝖙𝖆𝖙𝖊 𝖔𝖋 𝕹𝖊𝖜 𝖄𝖔𝖗𝖐)

𝕮𝖔𝖚𝖓𝖙𝖞 𝖔𝖋 Queen )   𝕾𝕾.:

# 𝕮𝕰𝕽𝕿𝕴𝕱𝕴𝕮𝕬𝕿𝕴𝕺𝕹

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate rendition into _English_ of _the Affidavit of Alexei Potynga of January 14, 1997_ written in _Moldavian_

The _5th_ day of _February_ 19 _97_

_Vali M Schl_

Valerii M. Schukin, Manager

Sworn to and subscribed before me

This the _5th_ day of _February_ 199 _7_

Notary Public
Registered in the County of _____



JANE N. McKENNA
NOTARY PUBLIC, State of New York
No. 24-4934300
Qualified in Kings County
Commission Expires June 13, 1998

TRIBUNALUL REGIONAL S.U.A
CARTIERUL SUDIC NEW YORK

EMANUEL E. ZELTSER, jurist,

reclamanti,

-Impotriva-

DANCA DE ACTIUNI INKOMBANK SI ALT

inculpati,

95 CIV. 0796(KTD)

DECLARATIA
SCRISA
A. V. POTINGA

ORASUL CHISINAU |
                  | ss.;
MOLDOVA           |

Republica Moldova
orasul Chisinau
Ambasada Statelor
Unite ale Americii
Sectia consulara

Alexei V. POTINGA, sub juramant, declar in scris urmatoarele:

1. Sunt cetatean al Republicii Moldova si jurist calificat in Moldova. Sunt, din 1983, si in prezent sef de sectie a Biroului Procuraturii Generale din Republica Moldova. Banca de Actiuni Inkombank mi-a cerut sa prezint aceasta declaratie scrisa pentru ca am cunostinte personale despre aceea ca Emanuel Efimovici Zeltser nu a absolvit, precum a declarat, din ce am inteles, Facultatea de drept in cadrul Universitatii de Stat Chisinau ("Facultatea de drept") in 1974.

2. Eu am absolvit Facultatea de drept in 1974 (am fost admis in 1969) si sunt absolut sigur ca, Zeltser, nu numai ca nu a absolvit in 1974, dar ca,in mod sigur, nici macar nu a fost membru al clasei absolvente in 1974. Pe timpul cand am fost la Facultatea de drept clasele erau extrem de mici - erau numai 66 de persoane in cursul absolventa - si studentii tindeau sa petreaca mult timp impreuna si sa se cunoasca intre ei. In plus, eu eram foarte implicat in chestiunile studentesti pe timpul cand eram la Facultatea de drept. Pe langa altele, eu am reprezentat cursul din 1974 in comitetul komsomolist universitar (in prezent disparut, Komsomolul era uniunea tinerilor comunisti in Uniunea Sovietica) si, de aceea, trebuia sa stiu nu numai numele fiecarui din colegii mei dar, de asemenea, numele si fizionomia fiecarui student in Facultatea de drept. Daca Zeltser ar fi fost membru al clasei absolvente din 1974 in Facultatea de drept la acel timp, l-as fi stiut. Sunt sigur ca nu a fost in clasa si nu a studiat la Facultatea de drept intre 1969 si 1974. De fapt, eu mai pastrez o fotografie a cursului absolvent din 1974 (pe care o anexez aici drept Exponat A) si pot sa identific fiecare persoana din fotografie pe nume. Nu exista nici un Zeltser in fotografie pentru ca nu era nici un Zeltser in curs, sau chiar la Facultatea de drept.

3. Particip in prezent activ in relatiile "In alumni" (de rememorare) in cadrul Scolii de drept si, de aceea, am ocazia sa corespondez cu colegii si sa aflu in general cu ce se ocupa fiecare din colegii mei si unde locuiesc. In ultimii douazeci de ani am avut reuniuni anuale si, chiar acest an, am ajutat organizarea petrecerii de

revedere a 22-a, prin faptul ca am trimis invitatii la fiecare din colegii mei si, astfel, petrcand multe ore conversand cu ei despre membrii clasei noastre si despre ocupatiile lor. Nu e nevoie sa spun ca nu am trimis invitatie lui Zeltser si ca nu i-am vazut numele pe niciuna din listele in alumni si sunt sigur ca numele lui nu a fost niciodata pronuntat in niciuna din conversatiile numeroase pe care le-am avut cu colegii mei, pentru motivul vizibil ca el nu a fost student in cursul nostru.

4. Incombank-ul mi-a aratat copia diplomei pe care Zeltser declara ca a primit-o de la Facultatea de drept. "Diploma" lui Zeltser contine cateva vizibile inexactitati care dovedesc ca este falsa. Pentru comparatie, anexez copii ale "diplomei" lui Zeltser si diploma pe care am primit-o eu de la Facultatea de drept, respectiv drept exponate B si C. In primul rand, "diploma" lui Zeltser dateaza din 29 mai 1974, pe cand anul academic in Facultatea de drept nu se termina decat in iunie, si diplomele nu erau redactate decat la inceputul lui iulie. Diploma mea, ca si cele distribuite fiecarui din colegii mei dateaza din 2 iulie 1974. In al doilea rand, "diploma" lui Zeltser noteaza ca el a fost admis la Facultatea de drept in 1970 si a absolvit in 1974. E de neconceput ca Zeltser sa fi putut sa optina vreo calificare in aceasta perioada, pentru ca Facultatea de drept cerea cinci ani de studiu complet pentru toti studentii. Studentilor pur si simplu nu li se permitea sa absolveze in mod accelerat. In al treilea rand, "diploma" lui Zeltser noteaza ca el ar fi obtinut acest grad in cadrul "unui program experimental cu specializarea in Drept international". Nu existau nici un fel de "programe experimentale" administrate in Facultatea de drept in 1974, sau in niciunul din cei cinci ani in care am studiat eu. Nici nu era oferita vreo specializare in "Drept international" de catre Facultatea de drept (sau, chiar nici un fel de specializare in domeniul dreptului). De fapt, imi amintesc ca, in timpul celor cinci ani ai mei la Facultatea de drept, un singur curs de Drept international - predat de catre un bursier in vizita si numai pentru o jumatate de an - a fost oferit clasei noastre. Sunt sigur ca acest curs profesat de studiu pur si simplu nu exista la acel timp cand, Zeltser declara, ca a studiat la Facultatea de drept.

5. "Diploma" lui Zeltser este diferita, de asemenea, din punct de vedere fizic, de o diploma adevarata a Facultatii de drept. De exemplu, cuvintele, "Proletari ai Lumii, uniti-va" apar in "diploma" lui, pe cand nu apar in diploma mea. Diploma mea, ca si orice diploma a absolventilor universitatilor sovietice pe care le-am vazut, contine o litera sau litere in fata numarului. Astfel, litera "IO" apare in fata numarului in diploma mea, pe cand in "diploma" lui Zeltser nici o litera nu precede numarul. In plus, numarul diplomei lui Zeltser - 294362 - este mult mai mic decat cele scoase clasei din 1974. De exemplu, diploma mea este numerotata "426482".

6. Juristii Inkombankului mi-au aratat de asemenea o copie a "transcriptului", care, declara Zeltser, comemoreaza cariera sa in Facultatea de drept. Eu anexez o copie a acestui "transcript" drept exponat D. Zeltser identifica 33 de cursuri, numai 5 din ele au fost practic predate la Facultatea de drept intre 1969 si 1974 (I). Am fost preocupat sa notez ca majoritatea celor 28 de cursuri false mentionate in transcriptul lui Zeltser se axeaza pe Dreptul American si sisteme legale (de ex. "Tribunalul Federal American", "Constitutia si dreptul american", "Succesiunea in dreptul american"). In realitate, la acel timp, cursurile de drept american nu erau deloc predate la Facultatea de drept.

7. Bazandu-ma pe cunostintele mele personale, pot sa declar, nu o data, ca Emanuel Zeltser nu a fost niciodata membru al cursului 1974 a Scolii de drept, ca "diploma" si "transcriptul" sau sunt false si ca el nu a studiat la Facultatea de drept

intre 1969 si 1974. Daca va fi necesar, voi depune marturie pentru a dovedi cele expuse intr-un tribunal din Statele Unite.

*A. Potânga*
ALEXEI V. POTINGA

Paisprezece ianuarie, o mie noua sute nouazeci si sapte, municipiul Chisinau, Republica Moldova, eu Colomeet Maria Tudor, notar superior la biroul notarial de stat, numarul opt, sectorul Rascani, municipiul Chisinau, Republica Moldova, legalizez semnatura cetateanului care s-a prezentat personal, Alexei V. Potinga, domiciliat in Chisinau, bulevardul Moscovei, bloc 10/2, apartamentul 47, cunoscut de mine ca persoana mentionata in prezentul document si semnat de acesta in prezenta mea, confirmindu-mi astfel ca el a intocmit acest document.

Faptele expuse in declaratia data notarul nu le controleaza si nu le autentifica.



Trecut in registru la Nr. *1-125*

S-a incasat taxa de stat *90 b*

Notar superior de stat

Exhibit K- P

Zeltser vs. Inkombank

Boulakh 4/18/96

Page 246

```
 1
 2  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 3  ------------------------------X
    EMANUEL E. ZELTSER, ESQ.
 4                  Plaintiff,
        v.
 5  JOINT STOCK BANK INKOMBANK, VLADIMIR VINOGRADOV,
    ALEKSEY KOUZNETSOV, ROMAN ZDRAYEVSKY, ANNA
 6  KOUSSIKOVA, VLADIMIR DOUDKIN, ELENA EGORYCHEVA,
    MARINA OSTRYAKOVA, ANDREY SHIMKEVITCH, RAFAEL
 7  NAGOPETYANTZ, AND VLADIMIR PREOBRAJENSKY,
                    Defendants.
 8  ------------------------------X
    JOINT STOCK BANK INKOMBANK,
 9                  Counterclaim plaintiff,
        v.
10  EMANUEL E. ZELTSER, ESQ.
                    Counterclaim defendant,
11      - and -
    ALEXANDER FESHKIN, ANNA REID, FESHKIN & REID,
12  OMEGA BROKERAGE SERVICES, INC., FOREIGN INVESTORS
    PORTFOLIO MANAGEMENT, INC., ELENA PELAEZ, RACHIDA
13  MECHERI, AND JOHN DOES 1-10,
                    Additional counterclaim
14                  defendants.
15  ------------------------------X
16              April 18, 1996
                9:00 a.m.
17
18      Continued deposition of JANNA BOULAKH, at the
19  offices of Christy & Viener, 620 Fifth Avenue, New
20  York, N.Y., before Christina Diaz, a Registered
21  Professional Reporter and Notary Public of the
22  State of New York.
23
            PIROZZI & HILLMAN
24          274 Madison Avenue
            New York, N.Y. 10016
25          212-213-5858
```

Page 247

```
 1
 2  APPEARANCES:
 3
    CHRISTY & VIENER
 4      Attorneys for Joint Stock Bank Inkombank and
        Vladimir Vinogradov and Christy & Viener,
 5      Arthur H. Christy, John Cambria, and
        William Kracklauer
 6      620 Fifth Avenue
        New York, N.Y. 10020
 7  ARTHUR CHRISTY
    PETER GALLAGHER
 8      Of counsel
 9
    LAW OFFICES OF BARRY LEIBOWICZ
10      Attorneys for witness
        111 Great Neck Road
11      Great Neck, N.Y. 11021
    EARL L. SCOTT
12  PATRICIA BYRNE-BLAIR
        Of counsel
13
    PRESENT:
14
    Joel Blum
15
16      IT IS HEREBY STIPULATED AND AGREED, by and
17  between counsel for the respective parties hereto,
18  that the sealing and filing of the within
19  deposition be waived; that such deposition may be
20  signed and sworn to before any officer authorized
21  to administer an oath; that all objections, except
22  as to form, are reserved to the time of trial.
23
24
25
```

Page 248

```
 1
 2          MR. BLUM:  We are on camera.  Please
 3  proceed.
 4  JANNA BOULAKH,
 5  called as a witness, having been previously
 6  duly sworn, testified further as follows:
 7  EXAMINATION CONTINUED BY
 8  MR. GALLAGHER:
 9      Q.  Ms. Boulakh, do you understand that you
10  are still under oath from the last deposition
11  which I believe occurred on April 8th?
12      A.  Yes.
13      Q.  Ms. Boulakh, did you know Ms. Pelaez in
14  Russia?
15      A.  No, I don't.
16      Q.  Last time you testified to getting a
17  restraining order against your husband, is that
18  correct?
19      A.  Yes.
20      Q.  You also testified that there is at
21  least one occasion on which Mr. Zeltser played to
22  your husband a tape recording of a conversation he
23  had with you, is that correct?
24      A.  Absolutely.
25      Q.  Did you get the restraining order
```

Page 249

```
 1          Boulakh
 2  against your husband before or after Mr. Zeltser
 3  played the tape recording to your husband?
 4      A.  I can't recall it.  I think after.
 5  After.
 6      Q.  Did Mr. Zeltser's playing the tape
 7  recording for your husband have anything to do
 8  with your having to get a restraining order
 9  against your husband?
10      A.  Well, it's hard to say right now.  I
11  don't recall it.
12      Q.  I believe you testified that you have
13  had two jobs since you left Mr. Zeltser's office,
14  is that correct?
15      A.  Well, I would say that it was one job.
16  It was the travel business.
17      Q.  Have you worked for two different travel
18  agencies since you left Mr. Zeltser's office or
19  only one?
20      A.  Actually I work with travel agency, not
21  for travel agencies.  It was a commission-sharing
22  business.
23      Q.  Has Mr. Zeltser tried to interfere with
24  your employment in any way, contacting your
25  employer, anything along those lines?
```

Zeltser vs. Inkombank

Page 254

Boulakh

```
 1
 2   A. No. Later.
 3   Q. She found out afterwards?
 4   A. Yes.
 5   Q. Was he doing this to blackmail
 6 Ms. Pelaez?
 7   A. At that time when she was hearing the
 8 recording there was nothing to blackmail her, I
 9 think. I don't want to make this judgement.
10   Q. How many times did Mr. Zeltser threaten
11 you?
12   A. A lot of times. A lot of times and I
13 have a police report that Mr. Zeltser tried to
14 come to my house, tried to threaten me and even
15 all the concierges in my building have his picture
16 and they were aware that he not allowed to come to
17 the building where I live.
18   Q. Do you currently have a copy of that
19 police report?
20   A. I certainly have a police record that
21 the police report had been filed and it's very
22 easy to get it.
23   Q. What precinct did you file this report
24 with?
25   A. That was a precinct close to my house
```

Page 255

Boulakh

```
 1
 2 where I live that time. It was the closest
 3 precinct to 1112 East 73rd Street in Brooklyn.
 4   Q. But you don't remember the name of the
 5 precinct?
 6   A. The number of the precinct, I don't
 7 remember that.
 8   Q. Do you remember the complaint number of
 9 the complaint that you filed?
10   A. Of course not. It was years ago.
11   MR. GALLAGHER: I would call for the
12 production of any records that you have
13 relating to the report that you just
14 mentioned.
15   THE WITNESS: Okay.
16   Q. Do you recall when you filed the
17 complaint?
18   A. It was two years ago. I would say in
19 middle of April. It was certainly spring, yes.
20   Q. 1994?
21   A. Yes.
22   Q. Did you ever record Mr. Zeltser's
23 threats?
24   A. No. I never did.
25   Q. Do you know if Mr. Zeltser ever studied
```

Page 256

Boulakh

```
 1
 2 piano in the Soviet Union?
 3   A. Yes, he did.
 4   Q. Do you know if he studied piano at the
 5 Moldavian State Institute of Arts?
 6   A. I don't know where he studied, but he is
 7 a good player.
 8   Q. You testified that Mr. Zeltser never --
 9 told you that he never went to law school?
10   A. Yes.
11   Q. Does that mean that he did not go to law
12 school in the Soviet Union?
13   A. That means that he never go to law
14 school ever.
15   Q. In the Soviet Union or the United
16 States?
17   A. In Soviet Union or the United States.
18   Q. You testified that he told you that he
19 had studied at the Marxism-Leninism University, is
20 that correct?
21   A. That he got a diploma from that
22 university. He never told me that he studied law
23 or anything else in that university but that he
24 got a diploma from that place and show it here to
25 the board commission.
```

Page 257

Boulakh

```
 1
 2   Q. Did he tell you how he got the diploma?
 3   A. He just write it.
 4   Q. He wrote it himself?
 5   A. I think so.
 6   Q. But your understanding is that he never
 7 went to the Marxism-Leninism University, is that
 8 correct?
 9   A. Yes.
10   Q. Did Mr. Zeltser ever tell you why he
11 left the Soviet Union?
12   A. He didn't.
13   Q. Do you know if he was a political
14 refugee?
15   A. He is not a political refugee. He is a
16 refugee by his religion, I think.
17   Q. I'm sorry. A refugee?
18   A. By religion.
19   Q. What makes you say that?
20   A. He didn't say it, but it's obvious.
21   MR. SCOTT: Can I interrupt for a
22 moment. I would like an opportunity to
23 consult with my client outside for just a few
24 minutes.
25   MR. BLUM: Off camera.
```

Exhibit K- Q

TRIBUNALUL REGIONAL S.U.A.
CARTIERUL SUDIC NEW YORK

EMANUEL E. ZELTSER, jurist,

    reclamanti,

    -impotriva-

BANCA DE ACTIUNI INKOMBANK SI ALT.,

    inculpati,

95 CIV. 0796(KTD)

DECLARATIA
SCRISA
L.A.PLATSINDA

ORASUL CHISINAU |
          | ss;
MOLDOVA    |

Republica Moldova
orasul Chisinau
Ambasada Statelor
Unite ale Americii
Sectia consulara.

Lyudmila A. PLATSINTA, sub juramant, declar in scris urmatoarele:

1. Sunt cetatean al Republicii Moldova si sunt in prezent angajata ca sef de studii la Institutul de Stat al Artelor din Republica Moldova, cunoscut anterior drept Institutul de Stat de Arte al Republicii Moldova, numit dupa G. Muzicescu ("ISAM"). Eu prezint aceasta declaratie pentru a expune cateva fapte, in ceea ce priveste studiile lui Emanuil Efimovici Zeltser ("Zeltser"), bazate pe cunostintele mele personale si pe inregistrari pastrate in arhivele ISAM-ului.

2. La cererea adresata de Banca de Actiuni Inkombank, am cautat in arhivele ISAM pentru a determina daca exista vreo inregistrare precum Zeltser ar fi absolvit ISAM-ul. Am gasit un dosar personal a lui Zeltser, care pe langa altele noteaza ca Zeltser a fost admis la ISAM in iulie 1971 si a continuat studiile acolo ca student la zi, cu specialitatea pian, pana cand a fost exmatriculat pe 17 decembrie 1973. Anexez aici, drept Exponat A, o copie a dosarului personal al lui Zeltser. Additional, pentru a marca inceputul si sfarsitul carierei sale, dosarul personal arata ca Zeltser a fost admis la ISAM in acelasi an (1971) cand a absolvit scoala muzicala specializata E. Koki, localizata de asemenea in Kisinau, unde Zeltser a studiat pianul unsprezece ani, din clasa intai. Sunt incluse, de asemenea, in dosarul personal copii ale diferitor compozitii si orchestrari muzicale pe care Zeltser le-a scris in timp ce studia la ISAM. Cat despre motivul exmatricularii lui, dosarul contine un ordin al ISAM-ului, datand din 17 decembrie 1973, expulzandu-l pe Zeltser pentru ca a decis voluntar sa paraseasca Uniunea Sovietica pentru a pleca in Israel. Pentru ca guvernul sovietic finanta cheltuielile educationale ale studentilor, era o practica traditionala ca studentii care au decis sa emigreze sa fie exmatriculati. In final, notez ca dosarul personal indica ca ISAM-ul a pastrat originalul diplomei E.Koki incepand cu admiterea sa la ISAM pana pe 29 decembrie 1973. In cadrul Uniunii Sovietice, universitatile si/sau institutiile nu permiteau matricularea unui student fara prezentarea originalului diplomei scolare, pe care universitatea sau institutia il pastra pana la plecarea studentului.

3. In calitate de sef de studii al ISAM-ului, am cunostinte personale despre procedurile de pastrare ale registrelor la ISAM. Stiu ca este o procedura

standard a ISAM-ului sa fie pastrate dosarele personale pentru fiecare din studentii sai, si ca ISAM-ul pastreaza aceste dosare 75 ani, dupa plecarea studentilor. Nu am nici un dubiu ca dosarul lui Zeltser este autentic, si ca este compilat si a fost pastrat in ordinea normala a procedurilor, in acelasi fel cum sunt pastrate dosarele personale ale altor studenti.

L.A.PLATSINDA

Paisprezece ianuarie, o mie noua sute nouzeci si sapte, municipiul Chisinau, Republica Moldova, eu Colomeet Maria Tudor, notar superior la biroul notarial de stat, numarul opt, sectorul Rascani, municipiul Chisinau, Republica Moldova, legalizez semnatura cetateanului care s-a prezentat personal, Lyudmila A. Platsinda, domiciliat in Chisinau, strada Dimo, bloc 1/3, apartamentul 58, cunoscut de mine ca persoana mentionata in prezentul document si semnat de acesta in prezenta mea, confirmindu-mi astfel ca el a intocmit acest document.

Faptele expuse in declaratia data notarul nu le controleaza si nu le autentifica.

Trecut in registru la Nr. _____ 1-125

Incasat taxa de stat _____ 90 b.

_____ superior de stat _____

*Translated from Moldovan*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

EMANUEL E. ZELTSER, ESQ.,

Plaintiffs,

-against-

JOINT STOCK BANK INKOMBANK ET AL.,

Defendants

95 CIV. 0796(KTD)

AFFIDAVIT OF

L.A. PLATSINDA

| CITY OF KISHINEV | ) | Republic of Moldova |
|---|---|---|
| | ) ss.; | City of Kishinev |
| COUNTRY OF MOLDOVA | ) | Embassy of the United |
| | | States of America |
| | | Consular Section |

Lyudmila A. PLATSINDA, under oath, does hereby give written testimony and State:

1. I am a citizen of the Republic of Moldova, and am currently employed as the Director of Studies at the Moldovan State Institute of Culture, formerly known as the Moldovan State Institute of Arts, named after G. Muzichesku ("MSIA"). I submit this affidavit in order to set forth certain facts relating to the educational background of Emanuel Efimovich Zeltser ("Zeltser"), based on my personal knowledge and records kept in the MSIA's archives.

2. At the request of Joint Stock Bank Inkombank, I searched the MSIA's archives to determine whether there is any record of Zeltser having attended the MSIA. I found an MSIA personal file for Zeltser, which, among other things, shows that Zeltser was admitted to the MSIA in July 1971 and continued as a full-time student there, majoring in piano, until he was expelled on December 17, 1973. I attach hereto as Exhibit A a copy of Zeltser's personal file. In addition to marking the beginning and end of his career at MSIA, the personal file shows that Zeltser entered MSIA the same year (1971) that he graduated from the E. Koki Specialized Music School, also located in Kishinev, where Zeltser studied piano for eleven years, from the first grade. Copies of various composition and musical scores which Zeltser wrote while he studied at MSIA are also included in the personal file. As for the reason for his expulsion, the file includes an order of the MSIA, dated December 17, 1973, expelling Zeltser because he had voluntarily decided to leave the Soviet Union for Israel. Because the Soviet Government funded a student's educational expenses, it was customary practice to expel students who had decided to emigrate. Finally, I note that Zeltser's personal file indicates that MSIA held the original of his E.Koki diploma from his admission to MSIA until December 29, 1973. In the Soviet Union,

Universities and/or Institutes would not permit a student to matriculate without submitting the original of his school diploma, which the University or Institute would keep until the student left.

3. As the MSIA's Director of Studies, I have personal knowledge of the MSIA's record-keeping procedures. I know that it is standard MSIA policy to maintain personal files for each of its students, and that MSIA maintains these files for 75 years following the student's departure. There is no doubt in my mind that Zeltser's file is authentic, and that it was compiled and has been maintained in the regular course of business in the same manner as the personal files for all other MSIA students.

<div align="center">
Signature

L. A. PLATSINDA
</div>

On the fourteenth of January, nineteen ninety seven, Chisinau municipality, Republic of Moldova, I, Colomeets Maria Tudor, senior notary public of the State Notary Office number eight, Rascani district, Chisinau municipality, Republic of Moldova, authenticate the signature of the citizen who presented herself as Lyudmila A. Platsinda, living in Chisinau, Dimo street, block 1/3, apartment 58, known to me as the person mentioned in the present document, signed by her in my presence, hereby approving to me that she completed this document.

The Notary Public neither confirm nor authenticate the facts presented in this affidavit.

<div align="center">
Listed in the Registry under the nr. 1-123

The State fee collected        90 b.

Senior Notary Public        (signature)
</div>

Seal: Republic of Moldova, Ministry of Justice, State Notary Office nr. 8, Rascani district, Chisinau

I, Tatiana Ungureanu, chief of the Notary and Bar Department of the Ministry of Justice of Republic of Moldova, certify that this document is completed by Maria Colomeets, who at the moment of completion was in function of State Notary Public of the State Notary Office nr. 8, Chisinau and was authorized on legal basis to certify the signatures on this kind of documents.

I know the signature of the above mentioned Notary, M. Colomeets, and the seal of the State Notary Office.

I compared the signature of the Notary and the seal of the Notary Office with the samples, which are kept in the Notary and Bar Department of the Ministry of Justice and confirm their authenticity.

Chief of the Notary and                    T.Ungureanu
Bar Department

nr. 104

City of Chisinau
January 14, 1997

Seal: Ministry of Justice, Republic of Moldova

Translated by:

KONSTANTSA ZHOSANU

15. 01. 19__ года. Я, _____

государственный нотариус государственной нотариальной конторы _____

_____

_____

_____ в реестре за № ___1-46___

взыскано государственной пошлины _____

Государственный нотариус _____

Tatiana _____

_____

or. Orhei



**Schukin Translation Service**
68-61 Yellowstone Boulevard, Room 109
Forest Hills, New York, 11375 -USA
Tel: (718)261-6449; Fax: (718)261-6468

**STATE OF NEW YORK)**

**COUNTY OF** _Queens_ ) **SS.:**

# CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate rendition into _English_ of _the Affidavit of_ _Lyudmila Platsinda of January 14, 1997_ written in _Moldovian_

The _5th_ day of _February_ 19 _97_

_Valerii M. Schukin_

**Valerii M. Schukin, Manager**

Sworn to and subscribed before me

This the _5_ day of _February_ 19 _97_

**Notary Public**
**Registered in the County of** _____



JANE N. McKENNA
NOTARY PUBLIC, State of New York
No. 24-4934300
Qualified in Kings County
Commission Expires June 13 1998

The consular department
of the Ministry of Foreign Affairs
of the Republic of Moldova
authenticates the preceding
signature and stamp

T. Ungureanu șef secția
notariat și executări
15 01 199 7 Nr. 0102

Chief of section
D. Socolan



Exhibit K- R

ORIGINAL

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION: BERGEN COUNTY
DOCKET NO. C-15633-88E

- - - - - - - - -

AMERICAN URGY MEDICAL CENTER,      :
INC., AMERICAN PHYSICIAN           :
SERVICES, P.A. AND STEVEN          :
BECKER, M.D.,                      :

            Plaintiffs,            :   DEPOSITION OF:
                                   :   EMANUEL E. ZELTSER
        -vs-                       :
                                   :
RICHARD E. LIPSKY, M.D.,           :
VIVIAN BETHALDA M.D., ANTHONY      :
TARASENKO, M.D., INESSA BARD,      :
M.D.,"JOHN COHEN", a               :
fictitiously named company or      :
corporation,                       :
                                   :
            Defendants.            :
                                   :
        -and-                      :
                                   :
RICHARD E. LIPSKY, M.D.,           :
VIVIAN BETHALDA, M.D.,             :
AND ANTHONY TARASENKO, M.D.,       :
                                   :
            Plaintiffs,            :
                                   :
        -vs-                       :
                                   :

- - - - - - - - - - - - - - - - - - - - - - - -

                    July 10, 1989
                    Livingston, New Jersey
                    Commencing at 10:20 a.m.

- - - - - - - - - - - - - - - - - - - - - -

        Reporting Services Arranged Through:

            ROSENBERG & ASSOCIATES
            Certified Shorthand Reporters
            161 Eagle Rock Avenue
            Roseland, New Jersey 07068
                201-228-9100

C O M P U T E R - A I D E D   T R A N S C R I P T

2

1

2

STEVEN BECKER, M.D., AMERICAN          :
URGY MEDICAL CENTERS, INC., a          :
New Jersey Corporation and             :
AMERICAN URGY MEDICAL                  :
PHYSICIAN SERVICES, P.A.,              :
                                        :
        Defendants.                     :

MESSRS. NAGEL & RICE
BY: HERBERT EZOR, ESQ.
Attorneys for the Plaintiffs

MESSRS. SHULMAN AND WALL
BY: THOMAS J. WALL, ESQ.
Attorneys for Dr. Tarasenko

MESSRS. HARRISON & SCHLOSSBERG
BY: HARLAN SCHLOSSBERG, ESQ.
Attorneys for Dr. Bethalda

BY: JOHN P. LIBRETTI, ESQ.
Attorney for Mr. Siegel

1

2                        I N D E X

3    WITNESS              DIRECT CROSS REDIRECT RECROSS

4    Emanual Zeltser

5        By Mr. Ezor         4              138
                                            218
6        By Mr. Wall              43
         By Mr. Schlossberg       77                 195
7                                                    187
                                                     217
8        By Mr. Libretti         129                 225

9

10

11

12

13                   E X H I B I T S

14   IDENT.            DESCRIPTION           PAGE

15   DZ-1                receipt
                                             178
16

17

18

19

20

21

22

23

24

25

11

1   Zeltser - direct

2       Q.      Did you work for anybody doing this or

3   were you by yourself?

4       A.      I was doing it pretty much by myself.

5   I was obtained by a number of colleges but I was

6   doing it pretty much by myself.

7       Q.      Prior to 1976 what were you doing?

8       A.      Prior to 1976 I was a full-time student

9   at Juilliard School, 1975 when I started.

10      Q.      Did you get a degree from Juilliard?

11      A.      No. It was an advanced graduate course

12  in communication and professional studies.

13      Q.      So you got an advanced degree from --

14      A.      I did not get a degree.

15      Q.      You studied communications at

16  Juilliard?

17      A.      Communications and that was since 1975

18  -- 1976.

19      Q.      Prior to '75?

20      A.      Prior to '75 I worked as a busboy in

21  Burger King.  I just came from the Soviet Union in

22  1974.  That was my first job.  That was in Dallas,

23  Texas.

24      Q.      Did you have any schooling in the

25  Soviet Union?

Exhibit L

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EMANUEL E. ZELTSER, ESQ.

Plaintiff,

-against-

JOINT STOCK BANK INKOMBANK, ET AL.

Defendants.

95 Civ. 0796 ( K T D )

AFFIDAVIT OF ARTHUR H. CHRISTY IN SUPPORT OF INKOMBANK'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO THE CROSS-MOTIONS OF EMANUEL ZELTSER AND FIPM/ELENA PELAEZ

1.       I am a member of the Bar of this Court and a partner of Christy & Viener, counsel for defendant/counterclaim plaintiff Joint Stock Bank Inkombank ("Inkombank"). I am fully familiar with these proceedings and submit this affidavit in further support of Inkombank's motion for partial summary judgment dismissing Emanuel E. Zeltser's claim for legal fees (the "Motion") and in response to the answering papers served by Zeltser, and by counterclaim defendants Elena Pelaez and Foreign Investors Portfolio Management, Inc. ("FIPM"), both dated May 16, 1997. FIPM/Pelaez and Zeltser's papers, both of which oppose the Motion and cross-move on unrelated issues, are sometimes collectively referred to herein as the "Opposition Papers."[1] Zeltser, FIPM and Pelaez are sometimes collectively referred to as "Zeltser."

2.       With the record now complete, Zeltser's claim for legal fees should be dismissed because there is no reasonable doubt that Zeltser lied his way into admission to the

RECEIVED IN CHAMBERS
JUN 6 1997
KEVIN THOMAS DUFFY
USDJ SD NY

---

[1]     If FIPM/Pelaez truly were independent of Zeltser, it is unlikely they would incur legal fees to preserve a Zeltser claim. Tellingly, FIPM/Pelaez's attorney -- Herbert Derman, Esq. -- has represented Zeltser for more than a decade in various lawsuits stemming from Zeltser-engineered frauds. Here, too, Derman's true client is Zeltser, and FIPM/Pelaez's nominally independent participation is a charade.

130912.1

Bar by falsely claiming he graduated the law school (the "Law School") of Kishinev State University ("KSU"). As discussed in the June 3, 1997 memorandum of law accompanying this affidavit ("Inkombank Memo"), well-settled principles of New York contract law empower this Court to review the legitimacy of Zeltser's admission to the Bar in order to decide whether to dismiss his claim for legal fees.

3.    Because Zeltser cannot provide any probative evidence that his credentials are authentic, the Court should dismiss his claim for legal fees. Zeltser's principal arguments are that (i) the Consulate General of the USSR in New York (the "Consulate") certified the authenticity of his credentials; (ii) the New York State Board of Law Examiners recently stated he was properly admitted; and (iii) this Court should defer review of this issue to the Disciplinary Committee of the Appellate Division, First Department, of the State of New York (the "Committee"). Each of these arguments is meritless. The Consulate confirms in a statement accompanying this affidavit that it does not, and did not during Soviet times, certify the authenticity of documents. The New York State Board of Law Examiners letter to which Zeltser refers merely confirms that he qualified to sit for the Bar Examination in 1990 and is the same letter that Zeltser unsuccessfully tried to trick the Court with at a preliminary injunction hearing held in March 1996. Finally, aside from the fact that the applicable decisional law authorizes the Court to review Zeltser's credentials in order to decide this contract claim, the Committee itself has deferred review of the issue to the Court, stating that the authenticity of Zeltser's credentials is a natural element of this litigation and a proper subject of review by the Court.

4.    The cross-motions of Zeltser and FIPM/Pelaez (sometimes, collectively, the "Cross-Motions") should be denied because they improperly seek to revive issues that the Court has already indicated are frivolous ones filed for ulterior purposes in derogation of Rule 11

130912.1

- 2 -

of the Federal Rules of Civil Procedure. Zeltser's cross-motion, seeking, for the second time, summary dismissal of Inkombank's counterclaims based on it alleged lack of standing to contest transfers from Hoverwood, Limited ("Hoverwood"), and FIPM/Pelaez's cross-motion, requesting reinstatement of its claims against Christy & Viener, myself and two other Christy & Viener attorneys (collectively, "Christy & Viener")) are both factually and legally baseless, and are obviously designed to distract attention from Zeltser's false credentials. As such, the Cross-Motions are as subject to Rule 11 sanctions as the claims they seek to resuscitate.

I.    Zeltser's Claims For Legal Fees Should Be Dismissed Because He Is Not a Legitimate Attorney

5.    Zeltser offers no admissible evidence countering the overwhelming evidence presented in Inkombank's opening papers that he never graduated the Law School. More specifically, Inkombank submitted sworn statements from KSU's Rector, its custodian of records, and a member of the 1974 class, who all testify, based on their personal knowledge, that Zeltser did not attend the Law School, and that the documents he claims are his Law School "diploma" and "transcript" are in fact crude fabrications. Inkombank additionally presented the "best evidence" on this issue in properly-authenticated documents from the archives of the Law School and the Moldovan State Institute of Arts (the "Arts Institute") conclusively proving that Zeltser did not attend the Law School, but instead studied piano full-time at the Arts Institute in the years he claims to have been at the Law School.[2]

---

[2]    Zeltser's brother, Marek, and his former wife, Anna Reid, also attended the Arts Institute. Anna Reid gained admission to the New York State Bar in June 1992 by claiming she earned a law degree at the Institute de Stat de Uniona Sovetica, located in Bendery Moldavia. In fact, no such institution ever existed. Marek Zeltser is now a well-known classical pianist.

130912.1

- 3 -

6.    With his prevarication of having gone to the Law School unraveled, Zeltser reverses himself,[3] claiming in the Opposition Papers that he did not attend the Law School, but instead graduated a loosely-affiliated, top-secret, experimental program in international law administered to the academic elite through the Kishinev branch of the Soviet government's political-educational arm, the University of Marxism Leninism ("MLU"). In fact, this transparent about-face is also fabricated -- in statements appended hereto as Exhibit A, the Director of the Moldovan Public and Private Archives Service (the "Archives"), states that Zeltser did not attend MLU and that MLU never offered an academic course of study, but instead provided only Soviet political training.

7.    Inkombank's affirmative evidence aside, Zeltser's efforts to prove he graduated from MLU are woefully insufficient to prove the existence of a genuine issue of fact, and glaringly reveal his inability to authenticate his credentials through the institutions (first, KSU and now MLU) he claims to have attended. Because the records of MLU and KSU prove only his lies, Zeltser tries to authenticate his credentials through his own self-serving conclusory statements, entirely irrelevant documents emanating from the New York State licensing authorities, and inadmissible statements of opinion from two purported clients. Stripped of these

---

[3]    In his application for admission to the Bar, Zeltser stated that he went to KSU, with no mention whatsoever of MLU. When he applied to the University of Denver's tax program, Zeltser stated that KSU was the only university or institute he had ever attended. (See Affidavit of Arthur H. Christy, sworn to April 25, 1997, submitted with Inkombank's opening papers ("Christy Aff", ¶¶ 5, 7, Exhibit I)). Not until Inkombank challenged his credentials, did Zeltser, at his deposition in September 1995, claim he graduated from MLU. Independent of Inkombank's convincing evidence, Zeltser's inconsistency on an issue so fundamental as his education proves he is lying.

transparencies and irrelevancies, it is palpable that Zeltser never went to the Law School or MLU.[4]

8.    Zeltser's principal argument is that the Consulate, which Zeltser describes as the ultimate authority on the authenticity of USSR academic credentials, certified the authenticity of his "diploma" and "transcript." (Zeltser Affirmation, ¶¶ 8,9).  Notably, Zeltser does not corroborate his self-serving statement with a copy of the Consulate's certification or any statement from the Consulate that it vouched for the authenticity of Zeltser's credentials.  Zeltser is chary of providing such information for a simple reason: the Consulate does not now, and did not during Soviet times, certify the authenticity of documents.  Instead, as explained in the accompanying letter of A. Kizlov, Vice-consul of the Consulate, the Consulate merely certifies that a copy or translation of a document conforms to its original.  I annex a copy of Mr. Kizlov's letter hereto as Exhibit B.  Zeltser's "Consulate" story is simply another lie.

9.    Zeltser tries another sleight-of-hand by arguing that the New York State Board of Law Examiners confirmed, by letter dated May 24, 1995, that he legitimately acquired his law license (Id., ¶ 10).  In fact, the letter to which Zeltser refers (annexed to the Zeltser Affirmation as Exhibit 2) confirms only that the records of the Board of Law Examiners show that Zeltser qualified to sit for the New York State Bar Examination by submitting proof of legal education in the U.S.S.R.  Here, too, Zeltser intentionally misrepresents proof of his admission

---

[4]    It should not be forgotten that Zeltser himself, and his former secretary, testified at deposition that he never went to law school. When asked at a 1989 deposition whether he had ever gone to law school, Zeltser admitted that he "shouldn't go with law." (See Christy Aff., ¶ 14, Exhibit R). Zeltser tries to explain away his admission by arguing that the deposition room was chaotic and that he never executed an errata sheet. (Zeltser May 16, 1997 Affirmation, p. 12, fn. 11). Zeltser's former secretary, Janna Boulakh, testified at deposition in April 1996 that Zeltser bragged he never went to law school, and created the documents upon which his admission was based. (See, Christy Aff., p. 7, fn. 7).

130912.1

- 5 -

as evidence that he was properly admitted. As the Court may recall, Zeltser was caught attempting the same deception at the preliminary injunction hearing held on March 22, 1996, when he characterized the Board of Law Examiners letter as evidence of his proper admission. The following exchange occurred that day between the Court, Zeltser and my partner, Wayne Matus:

| | |
|---|---|
| Mr. Matus: | Do you have a document that says that the First Department says that you have provided them with adequate proof that has been given to you within the last six months? |
| Mr. Zeltser: | That is correct. I do. |
| Mr. Matus: | May I see it? |
| Mr. Zeltser: | Your Honor -- |
| The Court: | Do you have a document? |
| The Court: | Now, wait a minute. This is not from the Appellate Division, is it? |
| Mr. Zeltser: | No, your Honor. This letter is addressed to the First Department from the Board of Law Examiners that has verified my credentials before I was allowed to sit for the bar exam. |
| Mr. Matus: | Isn't it fair to state that all this document says is what the records show in Albany? |
| Mr. Zeltser: | That is correct. |

(Transcript of March 22, 1996 Preliminary Injunction Hearing, pp. 30-31; copies annexed hereto as Exhibit C).

10.      Zeltser next argues that the Appellate Division's October 10, 1990 Order (the "Order") admitting him to practice law in New York, proves that his credentials are legitimate (Id., ¶¶ 2-5). Zeltser argues that the Order proves he is duly licensed because it states that he "was duly admitted and licensed to practice as an attorney" (emphasis added by Zeltser).

130912.1

- 6 -

(Id., ¶ 3). This is nonsense and disingenuous to the extreme. Obviously, the use of the word "duly" signifies only the belief of the Appellate Division in 1990, which is an undisputed issue.

11.    At paragraph 11 of his affirmation, Zeltser cites to a Response to Interrogatories (the "Response") supposedly prepared and executed by Inkombank's former in-house counsel, Vladimir Petrov.[5] At paragraph 24 of the Response (which is annexed to Zeltser's Affirmation as Exhibit 7), Mr. Petrov states that he conducted "third party verifications of [Zeltser's] credentials" before recommending that Inkombank hire him. As Mr. Petrov makes perfectly clear in the Response, the third-parties with whom he verified Zeltser's credentials are the same clients of Zeltser who provide opinion statements on this motion. Indeed, at a deposition conducted in February 1996, Mr. Petrov confirmed that he never checked Zeltser's credentials with the Law School or MLU, and instead relied on representations made by other Zeltser clients. (See Transcript of February 23, 1996 Vladimir Petrov deposition, p. 63, lines 10-14, p. 44, lines 18-25, p. 45, lines 22-25; copies or the pertinent pages are annexed hereto as Exhibit D). As with his other "proof," the Response evidences only that Zeltser tricked Inkombank into believing he was a legitimate attorney.

12.    Zeltser's only other "proof" consists of an affidavit and an affirmation from two purported clients who claim they believe Zeltser's credentials are legitimate. Neither of these statements is made on the basis of personal knowledge and neither opinion is even based on specific facts in the record. As such, and as discussed in Inkombank's Memo at pp. 9-10, these statements of opinion are inadmissible on this motion, or are, at the very least, as a matter

---

[5]    For purposes of this motion, Inkombank assumes Petrov actually signed the Response, though it is of dubious origin. Dated December 13, 1995, the Response has never before appeared in the litigation, and is strikingly well-tailored to the issues raised in this motion. It may well be another Zeltser fabrication created to meet the evidence as it is presented.

of law, insufficiently probative to defeat this motion. (See Inkombank Memo, pp. 9-10) The first of these statements is submitted by one Alexander Borisov, who claims to be an employee of the Russian Ministry of Foreign Affairs (the "Ministry"), but submits the statement in his personal capacity. Mr. Borisov states that he reviewed Zeltser's credentials in connection with the Ministry's retainer of Zeltser and "tendered my recommendation that his credentials warranted his retainer." (Borisov Aff., ¶3.). Borisov does not claim to be affiliated with the Law School or MLU or to have communicated with either institution about Zeltser's credentials. Instead, his opinion is apparently based only on his visual inspection of Zeltser's "diploma" and "transcript," and on Zeltser's purported work on a treatise on Russian law. As also discussed in Inkombank's Memo (pp. 9-10), Borisov's conclusory, self-serving and entirely unsubstantiated claim that he is an expert on such matters (Id., ¶ 5), adds no probative value to his statement. Similarly, Borisov's unsubstantiated opinion that MLU offered the type of program Zeltser claims he attended, and that records of Moldovan universities are maintained in Russia, in no way evidences that Zeltser graduated from MLU (or KSU).

13.     Zeltser provides a similar statement in the name of Vladimir Postyshev, an employee of another purported Zeltser client, the Russian Ministry of Justice. Like Borisov, Postyshev has no personal knowledge of Zeltser's _bona fides_, and simply expresses his opinion that Zeltser is legitimately licensed. Postyshev identifies no facts upon which he bases this opinion, other than the Ministry of Justice's apparent occasional retainer of Zeltser's services. As with the Borisov affidavit, Postyshev's entirely-speculative affirmation is inadmissible on this motion, or at the very least, insufficiently probative to defeat this motion.[6]

---

[6]     In addition to the fact that it is nothing but an inadmissible statement of opinion, the Postyshev affidavit is yet another Zeltser fabrication. As attested to in the affidavit of Inkombank attorney Victor Koncha, sworn to May 27, 1997, annexed to this affidavit as

14.    Zeltser is unable to provide real evidence of having gone to MLU for the exceedingly simple reason that he never went there. In the certified statement appended to this Affidavit as Exhibit A, Mr. A. Chekirlan, the Director of the Archives, states, on the basis of his personal knowledge, that there is no record of Zeltser having attended MLU at any time between 1970 and 1974, though the Archives maintains records of the students who graduated from MLU. Mr. Chekirlan also annexes to his statement documents from the Archives describing MLU's purpose and the types of programs it offered. As these documents clearly prove, and as Mr. Chekirlan states, MLU did not offer an academic course of study, but instead provided only Soviet political indoctrination training.

15.    Mr. Chekirlan's statements and supporting documents corroborate the affidavits of Messrs. George Zhitar and Grigori Rusnak, submitted in Inkombank's opening papers. KSU's Rector and Director of Personnel, respectively, Messrs. Rusnak and Zhitar, testify that KSU had no affiliation with MLU and that MLU was nothing but a political indoctrination school designed to certify participants to become propagandists of the Communist party (Zhitar Affidavit, ¶12, Rusnak Affidavit, ¶8, annexed to the Christy's Aff. as Exhibits M and N, respectively). Mr. Zhitar's personal knowledge of the MLU curriculum is based, not only on information derived in his capacity as an official of KSU, but also on his position from 1974 to 1978 as Chairman of the State Examination Committee, the body that determined which Moldavian law students qualified as jurists. In this capacity, Mr. Zhitar testifies that he became familiar with the requirements for qualification as a jurist then in effect, as well as the

---

Exhibit E, Postyshev <u>did</u> <u>not</u> sign this affidavit. Mr. Postyshev further informed Mr. Koncha that "he has never seen the documents proving Zeltser's legal education and cannot judge their authenticity".

curriculum of MLU, and that, based on this knowledge, he can unequivocally state that MLU was incapable of preparing students to become jurists. (Zhitar Affidavit, ¶ 12).[7]

16.    Though Zeltser's legal challenges to the Motion are discussed extensively in Inkombank's Memorandum, certain issues raised by his legal arguments are addressed herein. First, Zeltser's chief legal contention -- that Inkombank has waived its right to challenge his credentials because the issue is not pleaded as an affirmative defense -- is incorrect for at least three reasons. First, the issue of Zeltser's credentials is not an affirmative defense, but is instead an indispensable element of Zeltser's claim, it being axiomatic that an attorney seeking legal fees bears the burden of proving the existence of a valid contract for legal fees, with all material circumstances known to the client. Second, Inkombank's Answer and Counterclaims provide notice of this issue insofar as they assert claims for malpractice and fraud. Third, there would be no waiver because the parties have extensively litigated this issue for years. Zeltser concedes at ¶ 6 of his affirmation that:

> all asinine assertions alleging insufficiency of affirmant's Russian law credentials have been controverted many times in affirmant's and other counsel's prior pleadings and submissions, and affirmant's testimony before this Court, and exhibits received therein ....

---

[7]    This fact is additionally confirmed by the affidavit of Aleksei I. Podberyozkin, annexed to this affidavit as Exhibit F. Deputy of the State Duma of the Federal Assembly of the Russian Federation, and President of the Russian-American University, Mr. Podberyozkin states that he has knowledge of Russia governmental agencies, including its universities. Mr. Podberyozkin states that MLU was never part of the academic or professional educational system, and never provided any professional or academic education. Mr. Podberyozkin further states that records evidencing a students attendance of a particular higher educational establishment are kept in the archives of such establishment, and that the absence of such data proves the person did not graduate from the establishment.

130912.1

At ¶ 3 of the affirmation of Herbert Derman, dated May 16, 1997, FIPM/Pelaez make the same point in virtually identical language. Given these and similar statements, no party can claim surprise or the need for additional discovery.

17.     Zeltser's other principal legal claim is to challenge the Court's authority to review the authenticity of his legal credentials, arguing that doing so would encroach upon the Committee's authority (Zeltser Memorandum of Law, pp.6-8). In addition to the fact that the applicable law is decidedly to the contrary, empowering the Court to review the authenticity of credentials to decide a contract claim (See Inkombank Memorandum, pp. 2-4), even if such a prohibition typically did exist, it would be inapplicable here because the Committee has deferred this issue to the Court. In April 1995, Inkombank filed a complaint with the Committee, alleging that Zeltser fraudulently acquired his law license by falsely claiming to have graduated from the Law School. After conducting its own investigation, in which it reviewed Inkombank's evidence, Zeltser's written responses and submissions, and questioned Zeltser, the Committee determined there was sufficient evidence to initiate a prosecution of Zeltser. In January 1997, however, after reviewing the pleadings in this matter, the Committee concluded that the issue of Zeltser's credentials would likely be litigated in this case, and that in the interest of avoiding redundant efforts it would defer its prosecution until the instant case is concluded. In its January 3, 1997 letter to Christy & Viener (copy annexed to this Affidavit as Exhibit G), the Committee explained its decision:

> After a review of the above matter and the pending litigation between Mr. Zeltser and your client, Inkombank, the Committee has determined that our investigation and disposition should await the results of the litigation. Mr. Zeltser's attorney status has been put in issue in the federal litigation ... in the context of Inkombank's defense against Mr. Zeltser's claims of fraud and for his legal fees, and your client's counterclaims against Mr. Zeltser for fraud or malpractice.

130912. 1

- 11 -

By means of this letter we formally request that you keep us informed of the progress of the federal litigation and of any court opinion or other event which may bear on our future consideration of this matter.

18.     The Committee has invited the Court to review the authenticity of Zeltser's credentials, and stated its opinion that this issue is a natural element of this litigation. This being the case, the Court would not impinge upon the Committee's authority by reviewing this issue, and significant injustice would result if this Court and the Committee simultaneously deferred review of this matter to the other.

II.     The Cross-Motions Are Meritless
        And Should Be Denied

19.     Seeking to revive two frivolous claims, without the benefit of material new evidence or controlling decisional law, the Cross-motions are meritless and should be denied. FIPM/Pelaez seek to reinstate their claims of fraud and malpractice against Christy & Viener, pleaded in the complaint they filed (with Zeltser as a third co-plaintiff) in the related action, Pelaez v. Regal V Worldwide Holdings, Ltd., 95 Civ. 3410 (the "Pelaez Action") (See Affirmation of Herbert Derman in Support of FIPM/Pelaez's Opposition and Cross-Motions ("Derman Aff."), pp. 8-23). By Memorandum and Order dated May 1, 1996 (the "Decision") (copy annexed hereto as Exhibit H), the Court dismissed these claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. In addition to finding that these claims failed to state a viable legal claim, the Court held (on page two of the Decision) that:

the naming of the Christy defendants in this suit appears to have resulted solely from their efforts to protect the interests of their client. This tactic appears to be nothing more than a flagrant attempt by Plaintiffs to conflict out the Christy firm and its members by naming them as parties to this suit.

130912.1

- 12 -

Based on this finding, the Court sua sponte ordered FIPM/Pelaez and Zeltser to show cause why they should not be sanctioned for filing frivolous claims with an ulterior motive. That order to show cause is still pending before the Court.

20.    FIPM/Pelaez's attempt to relitigate previously-dismissed, wholly frivolous, claims is itself frivolous. FIPM/Pelaez offer no new relevant law that would serve as a basis to reinstate their claim, and cite to no new material evidence. Instead, FIPM/Pelaez litter their papers with familiar ad hominem attacks on this firm, our client, and an important non-party witness, Zeltser's former secretary, Janna Boulakh. Essentially, FIPM/Pelaez allege that Ms. Boulakh is an employee of Inkombank and the mistress of an Inkombank officer, and that this firm is manipulating her to provide testimony injurious to Zeltser (See Derman Affirmation, pp. 8-23). While these allegations certainly reflect Zeltser's desperation to neutralize Ms. Boulakh's testimony, they have absolutely no bearing on FIPM/Pelaez's claims against Christy & Viener.

21.    Though it is unnecessary to address seriatim each of the delusional allegations appearing at pages 8-23 of Derman's Aff.[*], all addressing purported ties between Inkombank and Boulakh, and alleged nefarious conduct on the part of this firm and our client, one particularly absurd contention warrants a specific response. At paragraph 34, FIPM/Pelaez argue that Pelaez's claims for malpractice against Christy & Viener should be revived because a

---

[*]    Exhibits 7-22 of the Derman Affidavit, relating to Ms. Boulakh's personal and professional finances, were obtained illegally and should accordingly be barred in this litigation. Though Rule 45 of the Federal Rules of Civil Procedure expressly obligates a party issuing a subpoena to provide the other parties with notice, Zeltser obtained the documents attached to the Derman Affidavit as Exhibits 7-22 by issuing subpoenae without providing notice. Ms. Boulakh's attorney has filed a motion with the Court requesting a protective order prohibiting Zeltser from serving additional subpoenae relating to Ms. Boulakh. That motion is still pending.

130912.1

company supposedly affiliated with Inkombank allegedly funded a motion filed by Ms. Boulakh to quash Inkombank's subpoena and disqualify Christy & Viener as counsel. To the extent there is any conceivable logic to this convoluted argument, apparently it is that, because Pelaez joined in this motion, she was prejudiced by the Court's denial of the motion, which was based on its finding that neither Pelaez nor Boulakh satisfactorily alleged the existence of an attorney-client relationship with Inkombank. Because the Decision referred to the Court's denial of Ms. Boulakh's motion in dismissing Pelaez's malpractice claim, Pelaez apparently contends that the Decision is tainted and should be reconsidered. Pelaez conveniently neglects to mention, however, that she submitted her own 19-page letter brief in support of Ms. Boulakh's motion, and referenced an additional affidavit in which she reiterated her own allegations concerning her supposed attorney-client relationship with Christy & Viener (copies of Pelaez's letter brief and her affidavit are annexed hereto as Exhibit I). Naturally, and as the Decision indicates, the Court's dismissal of Pelaez's malpractice claim was based on the allegations contained in her complaint and the materials she submitted in support of Ms. Boulakh's motion. For this reason, the way in which Ms. Boulakh's motion was funded is utterly irrelevant, regardless of the fact that FIPM/Pelaez provide no proof whatsoever that Inkombank paid for the motion.

22.    Zeltser's cross-motion should also be denied because it simply regurgitates a previous frivolous summary judgment motion filed by Zeltser. As he argued in a summary judgment motion filed in April 1995, Zeltser contends in his cross-motion that Inkombank lacks standing to challenge funds transferred from Hoverwood accounts, and that the portions of the Counterclaims contesting transfers from Hoverwood accounts should therefore be dismissed. In making this claim, Zeltser claims he has irrefutable evidence that Hoverwood is not, as Inkombank claims, a subsidiary of Inkombank. According to Zeltser, Hoverwood is a free-

130912.1

company supposedly affiliated with Inkombank allegedly funded a motion filed by Ms. Boulakh to quash Inkombank's subpoena and disqualify Christy & Viener as counsel. To the extent there is any conceivable logic to this convoluted argument, apparently it is that, because Pelaez joined in this motion, she was prejudiced by the Court's denial of the motion, which was based on its finding that neither Pelaez nor Boulakh satisfactorily alleged the existence of an attorney-client relationship with Inkombank. Because the Decision referred to the Court's denial of Ms. Boulakh's motion in dismissing Pelaez's malpractice claim, Pelaez apparently contends that the Decision is tainted and should be reconsidered. Pelaez conveniently neglects to mention, however, that she submitted her own 19-page letter brief in support of Ms. Boulakh's motion, and referenced an additional affidavit in which she reiterated her own allegations concerning her supposed attorney-client relationship with Christy & Viener (copies of Pelaez's letter brief and her affidavit are annexed hereto as Exhibit I). Naturally, and as the Decision indicates, the Court's dismissal of Pelaez's malpractice claim was based on the allegations contained in her complaint and the materials she submitted in support of Ms. Boulakh's motion. For this reason, the way in which Ms. Boulakh's motion was funded is utterly irrelevant, regardless of the fact that FIPM/Pelaez provide no proof whatsoever that Inkombank paid for the motion.

22.    Zeltser's cross-motion should also be denied because it simply regurgitates a previous frivolous summary judgment motion filed by Zeltser. As he argued in a summary judgment motion filed in April 1995, Zeltser contends in his cross-motion that Inkombank lacks standing to challenge funds transferred from Hoverwood accounts, and that the portions of the Counterclaims contesting transfers from Hoverwood accounts should therefore be dismissed. In making this claim, Zeltser claims he has irrefutable evidence that Hoverwood is not, as Inkombank claims, a subsidiary of Inkombank. According to Zeltser, Hoverwood is a free-

standing entity, represented by attorneys in Russia and Bahrain, and has recently settled with FIPM all claims relating to the transfers that are the subject of the Counterclaims.

23.    The Court first rejected this claim in its order dated March 25, 1996 (the "March 1996 Order") (copy annexed hereto as Exhibit J). In its March 1996 Order, the Court held that there "are too many genuine issues of fact present in this case to record them in this memorandum. The motion is denied." Sanctioning Zeltser pursuant to Rule 11 of the Federal Rules of Civil Procedure, the March 1996 Order characterized Zeltser's motion (as well as other motions filed by Zeltser's associates) as "nothing more than frivolous motions designed to frustrate the resolution of this case."

24.    Zeltser's request for summary judgment is no less frivolous now than it was in March 1996. For Zeltser to win his cross-motion, he would have to show there is no genuine issue of fact regarding the relationship between Inkombank and Hoverwood. This he cannot conceivably do, as the evidence overwhelmingly shows that Inkombank owns Hoverwood. Inkombank's President, Vladimir Vinogradov, confirmed at his deposition that Inkombank has owned 100% of Hoverwood since January 1994. (See, p.34, lines 16-22, of Vladimir Vinogradov's September 1, 1995 deposition transcript, attached hereto as Exhibit K). Inkombank attorney Victor Koncha reconfirms this fact in an affidavit, sworn to on June 3, 1997, attached to this affidavit as Exhibit L. I annex hereto as Exhibit M copies of the stock certificates evidencing Inkombank's ownership of Hoverwood. A copy of the Minutes of the Meeting of Hoverwood Directors, authorizing the sale of Hoverwood's stock to Inkombank, is annexed hereto as Exhibit N.

25.    Even before it formally acquired Hoverwood, Inkombank owned the funds in Hoverwood's accounts. Formed in June 1992 at Inkombank's direction, Hoverwood existed

130912.1

for the purpose of investing funds owned by Inkombank and its clients. Between its inception and formal acquisition by Inkombank, Hoverwood was managed by a former Inkombank officer, Vladimir Doudkin, and two of his deputies, both of whom were Inkombank employees. Doudkin was a director of Hoverwood from July 1993 to January 28, 1994. Since then, Hoverwood has been non-operational and its balance sheet has been consolidated into that of Inkombank.[9]

26.     Even if the evidence cited above did not conclusively prove that Inkombank owns Hoverwood, it indisputably establishes the existence of genuine issues of fact. Leaving aside Inkombank's affirmative proof, Zeltser's submissions are entirely non-probative and attest only to Zeltser's ability to orchestrate an elaborate charade. Zeltser's principal position is that Hoverwood's independence is proven by correspondence, and proposed discovery submissions, emanating from purported attorneys in Russia and Bahrain (Messrs. Boris Kuznetsov and Ali Al Oriabi, respectively) claiming that they represent Hoverwood and that Hoverwood has no connection to Inkombank (See Zeltser Affirmation, ¶¶ 29-35, and Exhibits 17 and 23 ). It is abundantly clear, however, that these individuals have no real connection to Hoverwood, and serve only as Zeltser's mouthpieces, spinning Zeltser's Hoverwood fairy tale and introducing fabricated documents supporting Zeltser's fictional story.    Unable to offer any real proof, Zeltser even argues that this firm acknowledged Hoverwood's independence by referring to it in a letter as a "client" of Mr. Kuznetsov (Id., ¶ 31). Zeltser neglects to cite, however, a previous Christy & Viener letter fully setting forth its position:

---

[9]      When it responded to Zeltser's April 1995 motion for summary judgment, Inkombank advised the Court it would amend the Counterclaims to add Hoverwood as a party if the Court desired. Instead, the Court dismissed Zeltser's claim, and sanctioned him for having filed the motion.

130912.1

standing entity, represented by attorneys in Russia and Bahrain, and has recently settled with FIPM all claims relating to the transfers that are the subject of the Counterclaims.

23.     The Court first rejected this claim in its order dated March 25, 1996 (the "March 1996 Order") (copy annexed hereto as Exhibit J). In its March 1996 Order, the Court held that there "are too many genuine issues of fact present in this case to record them in this memorandum. The motion is denied." Sanctioning Zeltser pursuant to Rule 11 of the Federal Rules of Civil Procedure, the March 1996 Order characterized Zeltser's motion (as well as other motions filed by Zeltser's associates) as "nothing more than frivolous motions designed to frustrate the resolution of this case."

24.     Zeltser's request for summary judgment is no less frivolous now than it was in March 1996. For Zeltser to win his cross-motion, he would have to show there is no genuine issue of fact regarding the relationship between Inkombank and Hoverwood. This he cannot conceivably do, as the evidence overwhelmingly shows that Inkombank owns Hoverwood. Inkombank's President, Vladimir Vinogradov, confirmed at his deposition that Inkombank has owned 100% of Hoverwood since January 1994. (See, p.34, lines 16-22, of Vladimir Vinogradov's September 1, 1995 deposition transcript, attached hereto as Exhibit K). Inkombank attorney Victor Koncha reconfirms this fact in an affidavit, sworn to on June 3, 1997, attached to this affidavit as Exhibit L. I annex hereto as Exhibit M copies of the stock certificates evidencing Inkombank's ownership of Hoverwood. A copy of the Minutes of the Meeting of Hoverwood Directors, authorizing the sale of Hoverwood's stock to Inkombank, is annexed hereto as Exhibit N.

25.     Even before it formally acquired Hoverwood, Inkombank owned the funds in Hoverwood's accounts. Formed in June 1992 at Inkombank's direction, Hoverwood existed

for the purpose of investing funds owned by Inkombank and its clients. Between its inception and formal acquisition by Inkombank, Hoverwood was managed by a former Inkombank officer, Vladimir Doudkin, and two of his deputies, both of whom were Inkombank employees. Doudkin was a director of Hoverwood from July 1993 to January 28, 1994. Since then, Hoverwood has been non-operational and its balance sheet has been consolidated into that of Inkombank.[9]

26.    Even if the evidence cited above did not conclusively prove that Inkombank owns Hoverwood, it indisputably establishes the existence of genuine issues of fact. Leaving aside Inkombank's affirmative proof, Zeltser's submissions are entirely non-probative and attest only to Zeltser's ability to orchestrate an elaborate charade. Zeltser's principal position is that Hoverwood's independence is proven by correspondence, and proposed discovery submissions, emanating from purported attorneys in Russia and Bahrain (Messrs. Boris Kuznetsov and Ali Al Oriabi, respectively) claiming that they represent Hoverwood and that Hoverwood has no connection to Inkombank (See Zeltser Affirmation, ¶¶ 29-35, and Exhibits 17 and 23 ). It is abundantly clear, however, that these individuals have no real connection to Hoverwood, and serve only as Zeltser's mouthpieces, spinning Zeltser's Hoverwood fairy tale and introducing fabricated documents supporting Zeltser's fictional story.   Unable to offer any real proof, Zeltser even argues that this firm acknowledged Hoverwood's independence by referring to it in a letter as a "client" of Mr. Kuznetsov (Id., ¶ 31). Zeltser neglects to cite, however, a previous Christy & Viener letter fully setting forth its position:

---

[9]    When it responded to Zeltser's April 1995 motion for summary judgment, Inkombank advised the Court it would amend the Counterclaims to add Hoverwood as a party if the Court desired. Instead, the Court dismissed Zeltser's claim, and sanctioned him for having filed the motion.

130912.1

- 16 -

I read with amusement your December 1, 1996 letter to Mr. Vladimir Vinogradov, ostensibly written on behalf of Hoverwood, Ltd., received in this office on December 13, 1996 and noting a purported Hoverwood-FIPM settlement. You have no authority as regards Hoverwood, which is 100% owned by our client, Joint Stock Bank Inkombank.

(a copy of this letter is annexed hereto as Exhibit O).

27.    Zeltser's other attempts to disprove the Inkombank-Hoverwood relationship are equally transparent. At paragraphs 36 and 37 of his affirmation, Zeltser cites to records of the Companies Registration Office of the Republic of Ireland, which list the owners of Hoverwood but do not identify Inkombank. The document to which Zeltser refers identifies the nominal directors who held Hoverwood's stock before Inkombank acquired. That this document does not reflect the transfer of stock to Inkombank is immaterial because there is no requirement that all stockholders be identified in such papers, or that all transfers of stock be included in such papers. In fact, it is common practice to not reference transfers of stock in such documents.

28.    Zeltser next cites to Inkombank's 1994 audited financial statements as supposed proof that Inkombank does not own Hoverwood (Zeltser Affirmation, ¶ 37, Exhibit 25). Zeltser's point -- that there is no reference to Hoverwood in the list of Inkombank subsidiaries--- is crippled by the fact that the referenced page only specifically identifies certain subsidiaries and includes a generic "other subsidiary" category for those, such as Hoverwood, which are not specifically enumerated.

29.    At paragraph 40 of his Affirmation, Zeltser cites to a report of the Central Bank of Russia, stating that Inkombank had not provided it with sufficient documents confirming the existence of Hoverwood or of loans to Hoverwood. The Central Bank report to which Zeltser refers is a draft report which the Central Bank later repudiated. Apart from its

inaccuracy, the quoted Central Bank language is irrelevant because neither the existence of Hoverwood nor Inkombank-Hoverwood loans are it issue.

30.    At paragraph 41 of his Affirmation, Zeltser discusses a May 10, 1997 letter (annexed to his affidavit as Exhibit 30) ostensibly sent to the Securities and Exchange Commission by Hoverwood, claiming that Hoverwood has no relationship to Inkombank and that Mr. Doudkin embezzled millions of dollars from Hoverwood. This letter, bearing an illegible signature and indicating that replies are to be sent to the Russian lawyer, Boris Kuznetsov, is obviously probative of nothing and is believed to be another Zeltser fabrication designed to embarrass Inkombank and undermine its efforts to do business in the United States.

31.    Zeltser's "Supplemental Affirmation," dated May 22, 1997 and submitted after the deadline for answering papers, claims that Inkombank has harassed and otherwise tampered with witnesses in connection with this motion. This is false. I believe Zeltser knows it is false.

Arthur H. Christy

Sworn to and subscribed before me this 3rd day of June 1997

Notary Public

PETER J. GALLAGHER
Notary Public, State of New York
No. 31-501-3899
Qualified in New York County
Commission Expires July 24, 1977

Exhibit L- A

*129*

*[Emblem]*
State Archives Service of the Republic of Moldova

ARCHIVES OF PUBLIC AND POLITICAL ORGANIZATIONS

82 August 31, 1989, Street, Kishineu, 277012; Tel.: 23 74 10

*05.29.97   No. 1/1-20*

To your No. 126/189
of May 28, 1997

To: JSB "Inkombank"
Head of International Relations
Department
Mr. V. N. Koncha

The Archives of the Public and Political Organizations of the Republic of Moldova (APPO RM) are sending a number of documents requested by you. At the same time, we advise you that, pursuant to regulations current in the Republic, you cannot make copies of these documents and distribute them among other persons and establishments without the permission of the Archives.

Studying the materials in the Archives pertaining to your case allows me to inform you that there was a special order of accounting for students of the University of Marxism-Leninism (personal cards, lists) with their periods of maintenance according to the legislation.

According to the documents of the APPO RM for 1970-1974, Mr. Emmanuil Yefimovich Zeltser is not listed among the students who received the diploma of the UML in Kishinev.

Attachment: Archives extracts on 6 sheets, one copy.

Sincerely,

*[Signed]*

A. Chekirlan, Director of the Archives

V. M. Ivankova

*[Round Stamp:]* State Archives Service of the Republic of Moldova
ARCHIVES OF PUBLIC AND POLITICAL ORGANIZATIONS

*[Authentication in English]*

Exhibit L- B

Генеральное консульство
Российской Федерации
в Нью-Йорке

9 East 91st Street, New York, NY 10128



**Consulate General
of the Russian Federation
in New York**

Tel (212) 348-0926 Fax (212) 831-9162

**CHRISTY & VIENER**

*Rockefeller Center
620 Fifth Avenue
New York, NY 10020-2457*

Re: Your Zeltser V. Inkombank request

*Dear Mr. Arthur H. Christy:*

*The Russian Consulate General does not as a rule certify the authenticity of original documents issued on the territory of the Russian Federation since it is a time consuming procedure. As a common practice the Consulate merely certifies the conformity between a copy or a translation of the document and its original. This practice was followed in the former USSR.*

Sincerely your,

A. Kislov
Vice-consul

Exhibit L- C

1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    PELAEZ, et al.,

4                    Plaintiffs,

5               v.
                                      95 Civ. 3410 (KTD)
6    REGAL-V WORLDWIDE, et al.,

7                    Defendants.

8    ------------------------------x

9
                                      March 22, 1996
10                                    11:10 a.m.

     Before:
11

12                  HON. KEVIN T. DUFFY,

13                                    District Judge

14                        APPEARANCES

15   DERMAN & DERMAN
          Attorneys for Plaintiffs FIPM and Pelaez
16   BY:  HERBERT B. DERMAN

17   EMANUEL E. ZELTSER, pro se

18   ALEX FISHKIN, pro se

19

20   CHRISTY & VIENER
          Attorneys for Defendant Inkombank
21   BY:  ARTHUR H. CHRISTY
          WAYNE CHARLES MATUS
22        PETER J. GALLAGHER
          RODGER SMITH

23   ALSO PRESENT:  Valerii M. Schukin, Russian interpreter

24

25

63MAPELH

30                                                    Zeltser - cross

1          A.      That is correct.

2          Q.      Do you know that they told the First Department

3     that you didn't?

4          A.      No.

5          Q.      Do you know that the First Department is

6     investigating whether or not you ever went to law school?

7          A.      No, I do not know that they are investigating.  I

8     do know that, pursuant to Inkombank's and Christy & Viener's

9     totally false letter, there was an informal inquiry and I

10    was requested to provide certain documents, which I did, and

11    the board of examiners confirmed that I have provided all

12    the appropriate proof which they required to admit and to

13    sit for a bar exam.

14         Q.      Do you have a document that says that the First

15    Department says that you have provided them with adequate

16    proof that has been given to you within the last six months?

17         A.      That is correct.  I do.

18                 (Pause)

19                 MR. MATUS:  May I see it?

20                 THE WITNESS:  Your Honor --

21                 THE COURT:  Do you have a document?

22                 MR. MATUS:  Could I see a copy of it, please?

23                 I'm just asking to see a copy.

24    BY MR. MATUS:

25         Q.      You are presently under investigation, aren't

63MAPELH
31                                    Zeltser - cross

1     you, Mr. Zeltser?

2                    THE COURT:  Now, wait a minute.  This is not from

3     the Appellate Division, First Department, is it?

4                    THE WITNESS:  No, your Honor.  This letter is

5     addressed to the First Department from Board of Law

6     Examiners that has verified my credentials before I was

7     admitted to sit for bar exam.

8          Q.    Mr. Zeltser, isn't it fair to state that all this

9     document says is what the records show in Albany?

10         A.    That is correct.

11                   THE COURT:  I will mark it as Court's Exhibit

12    1003.

13                   (Court's Exhibit 1003 marked)

14         Q.    You never attended law school in the United

15    States, did you?

16         A.    No, I did not.

17         Q.    Do you recall when you were deposed in New

18    Jersey, back seven years ago, stating your educational

19    background?

20         A.    It is possible.  I cannot recall the particulars

21    right now, but it is very possible that I was asked those

22    questions.

23         Q.    Do you recall stating, in New Jersey, that --

24                   MR. DERMAN:  Your Honor --

25         Q.    -- you didn't go to law school?

SOUTHERN DISTRICT REPORTERS 212-637-0300

32                                                    Zeltser - cross

1          A.      I don't believe I stated that.

2          Q.      Do you recall hearing the following questions and

3    giving the following answers?

4                  THE COURT:  Page.

5                  MR. MATUS:  Beginning on page 11, your Honor, of

6    the deposition of July 10, 1989, in docket no. C15633-88E.

7    I have handed a copy to Mr. Derman.  It is my only other

8    copy, but I would be more than happy to hand it to the

9    Court.

10                 THE COURT:  Go ahead.  Read the question and

11   answer.

12                 MR. DERMAN:  What page is that?  I'm sorry.

13                 MR. MATUS:  Beginning on line 15, page 11:

14         Q.      "Question:  You studied communications at?

15            Julliard?

16                 "A.      Communications, that was with -- since

17            1975, '76.

18                 "Q.      Prior to '75?

19                 "A.      Prior to '75.

20                 "Q.      Prior to '75?

21                 "A.      Prior to '75, I worked as a busboy in

22            Burger King.  I just came from the Soviet Union in

23            1974.  That was my first job.  That was in Dallas,

24            Texas.

25                 "Q.      Did you have any schooling in the Soviet

63MAPELH

33

Zeltser - cross

1        Union?

2              "A.    Yes, I did.

3              "Q.    What did you study?

4              "A.    Bachelors degree in international trade,

5        equivalent of bachelors degree, four years.

6              "Q.    Did you have any training in accounting?

7              "A.    No, not specifically accounting, no.

8              "Q.    Any training in law?

9              "A.    Yes.  Well, I should go -- I shouldn't go

10       with law.  I completed a course in admiralty.

11             "Q.    Did you have any training in marketing?

12             "A.    Yes.  I have taken a number of graduate

13       courses in marketing, several times."

14             Do you remember giving those answers to those

15       questions?

16       A.    Well, again, if you are asking me about my

17       independent recollection of what happened at the deposition

18       nine years ago, I wouldn't be able to state it with

19       certainty, but the answers appear to be the answers that I

20       could have given, yes.

21       Q.    Mr. Zeltser, would it be fair to state that you

22       have been involved in four distinct attempted frauds from

23       Inkombank?

24       A.    I don't even understand the question, sir.

25       Q.    Let's talk about --

Exhibit L- D



1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x
EMANUEL E. ZELTSER, ESQ.,
                     Plaintiff,
          -against-                    Civil Action No.
                                       95 Civ. 0796 (KTD)
JOINT STOCK BANK INKOMBANK, VLADIMIR
VINOGRADOV, ALEKSEY KOUZNETSOV, ROMAN
ZDRAYEVSKY, ANNA KOURISKOVA, VLADIMIR
DOUDKIN, ELENA EGORYCHEVA, MARINA
OSTRYAKOVA, ANDREY SHIMKEVITCH, RAFAEL
NAGAPETYANTZ, and VLADIMIR PREOBRAZHENSKY,
                     Defendants.
------------------------------------------x
JOINT STOCK BANK INKOMBANK,
                     Counterclaim Plaintiff,
          -against-
EMANUEL E. ZELTSER, ESQ.
                     Counterclaim Defendant,
          -and-
ALEXANDER FISHKIN, ANNA REID,
FISHKIN & REID, OMEGA BROKERAGE SERVICES,
INC., FOREIGN INVESTORS PORTFOLIO MANAGEMENT,
INC., ELENA PELAEZ, RACHIDA MECHERI,
and JOHN DOES 1-10,
                     Additional Counterclaim
                     Defendants.
------------------------------------------x
                     February 23, 1996
                     2:48 p.m.

          DEPOSITION of VLADIMIR PETROV, pursuant to

Subpoena, held at the law offices of Derman &

Derman, Esqs., 420 Lexington Avenue, New York, New

York, before Judith Marer-Castore, a Shorthand

Reporter and Notary Public within and for the

State of New York.

63

Petrov

1
2  they received education in all the fields of

3  jurisprudence.

4       Q    Did you at any time make any effort

5  to check with Kishenev University to see if, in

6  fact, Mr. Zeltser had received his law degree?

7       A    I didn't have to since I had

8  references of Mr. Zeltser from the sources that I

9  already mentioned.

10      Q    My question to you is:  Did you at

11  any time check with Kishenev University to

12  determine whether Mr. Zeltser had, in fact,

13  graduated from there?

14      A    No, I didn't.

15      Q    Do you recall what other lawyers you

16  interviewed when you first came over here aside

17  from Mr. Zeltser?

18      A    We interviewed at least a couple of

19  lawyers.  I am afraid I won't be able to give you

20  the names but we definitely -- Mr. Zeltser was

21  second or the third lawyer that we met before we

22  hired him.

23      Q    Was there anybody from Inkombank with

24  you when you first met Mr. Zeltser?

25      A    Yes, there was a person and actually

44

Petrov

1    to see that your bills would be paid regularly and

2    properly.

3        Q    To the best of your recollection,

4    were they, in fact, paid regularly and properly?

5        A    There were not so many bills that you

6    sent to us, and I think that every bill that you

7    sent was effectively paid by Inkombank in

8    reasonable time period, sometimes there were

9    delays.

10       Q    Mr. Petrov, when you were -- at the

11   time when you had made a decision to retain my

12   services or to recommend my services to the

13   chairman of the board of Inkombank or management

14   of Inkombank, did you do any due diligence with

15   respect to who I am and what kind of lawyer I am,

16   what kind of human being I am?

17       A    Yes.  Of course we checked your

18   credentials; otherwise we wouldn't hire a lawyer

19   from this side.  I remember that you showed us all

20   the credentials that you had properly admitted to

21   practice law in the State of New York; we made

22   some inquiries about you at the Academy of

23   Jurisprudence.

24       MR. CHRISTY:  I am sorry.  What was

45

Petrov

that?

A    With the Academy of Jurisprudence.  I
think I checked you with the Russian consulate in
New York.

Q    Mr. Petrov, you were at one time in
your diplomatic career, you were the Secretary of
the Soviet Embassy in Washington; is that correct?

A    Yes, correct.

Q    Mr. Petrov, do you remember if you
ever checked my credentials with respect to my
representation to you that I graduated law school
in Russia with excellency diploma meaning straight
A's?

A    No.  My checking didn't go that far
into every details of what mark you received on
every credit that you had to pass with the
University in Kishenev but the recommendations
that I had were quite sufficient.

Please understand that the decision
to hire you was not taken only by myself but there
were other people checking also.

Q    Did you have the opportunity to check
my credentials with the Consulate Counsel General
of the Soviet Union at that time?

Exhibit L  – E

## MINISTRY OF JUSTICE OF THE RUSSIAN FEDERATION
## ACADEMY of JURISPRUDENCE of RUSSIA

# INSTITUTE of LEGAL POLICY and IMPLEMENTATION

Supreme Court of the State of New York
Appellate Division : First Judicial Department

In the Matter of Complaint of Mr. R. Nagopetiantz
Docket No. 0291/95 (JSG)

### AFFIRMATION OF VLADIMIR M. POSTYSHEV

The undersigned, Vladimir Postyshev, affirms on his honor and under the penalty of perjury as follows:

1.  I am an attorney duly qualified in Russia.

2.  I am also a Professor of Law and the President of the Institute of Legal Policy and Implementation of the Ministry of Justice of Russia, an institution of the Justice Ministry which is authorized by statute and charged with the duty to provide expert analyses and interpretation of legislative acts and statutes for the Russian Federal Agencies, and also provide advance legal education for the senior officials of the Ministry of Justice and senior judiciary. I serve as Staff Advisor to the Ministry of Justice, and Staff Expert of the Ministry of Finance of the Russian Federation. I have been certified as Expert by the World Bank (currently, being the only Russian jurist having been so honored.) I also serve as Consultant for the World Bank and lectured at many seminars in its Washington Headquarters. I personally drafted a number of conventions for the United Nations Organization in Geneva. I appeared as guest lecturer before the International Bar Association in Paris and Houston. I was a court appointed expert during the landmark matter of *"Norilski Nickel."* I am an author of many books, publications and textbooks on the subjects of complex legal issues concerning Russian and international laws and appeared as guest lecturer in a number of law schools throughout Russia and in the United States. I submit this affidavit to clarify certain issues concerning the Russian academic credentials of Mr. Zeltser, Esq.

3.  I would like to start by stating that Mr. Zeltser is an attorney for the Institute as well as for other agencies of the Ministry of Justice of Russia. Implying no rudeness by stating the obvious, I wish to confirm that we neither invite legal experts before thoroughly examining their credentials, nor engage persons with insufficient ones. Not meaning at all to be sarcastic I additionally certify that we have the benefit of adequate facilities for verification of person's <u>Russian law credentials</u>.

4.  As the President of the Institute who retained Mr. Zeltser as an attorney, I am well familiar with Mr. Zeltser's academics. Mr. Zeltser completed a program of a law study in the former USSR which was owned controlled, administered and endorsed by the Government of the USSR and qualified Mr. Zeltser as Jurist in the former USSR. Moreover, the program was academically far superior to the regular academic programs and was specially designed to

prepare graduates for dealing with complex international legal issues which regular college law programs did not offer.

5.    As all academic institutions in the former USSR, the Lenin University at Kishinev, (a/k/a Kishinev State University named after V.I. Lenin) was, since inception, owned, controlled and operated by the USSR government. Accordingly, all records of this institution were the property of the USSR government. Not implying any disrespect by stating something which is a common knowledge, the Government of Russia, <u>not</u> of a newly created country of Moldova is the lawful successor to the government of the USSR in all respects. Any statement to the contrary would be a <u>political</u> assertion, not the statement of fact and law.

6.    Unlike western countries, in former USSR, the government itself and not a college issued, certified, controlled and confirmed academic (and all other) credentials. No institution in Moldova (or in the former Moldavian Soviet Socialist Republic) ever had nor now has the power or the competence to affirm or disavow regalia issued by the government of the USSR, because this would be (i) legally wrong and (ii) considering the former USSR government record-keeping procedures (with which I am amply familiar), can only be based upon non-existent, or incomplete or inaccurate records. No institution in Moldova may be said to be a lawful inheritor of any records of the USSR *de juro* or *de facto.*

7.    If abovesaid falls deficient of clearing up the matter of Mr. Zeltser's credentials, I would respectfully add, that Mr. Zeltser, in 1992, was invited to assist me and the Minister of Justice of Russia, Hon. Nikolay Fedorov in drafting legislation for the Federation of Russia in the area of banking law and also the draft legislation concerning <u>Attorneys at Law Act.</u>

8.    All abovesaid notwithstanding, it is very troubling that this certification is even necessary in view of the fact that Mr. Zeltser's credentials bear the certification, the hand and the seal of the USSR Consul General in New York - the ultimate jurisdictional authority empowered to authenticate and confirm any documents issued in the USSR, <u>similarly to the United States Consul General in Moscow,</u> being the ultimate source for verification of official credentials issued in the US, which our respective countries agreed to honor. If our respective governments' assurances may be challenged by an employee of a school in Moldova, why sign the Geneva, the Hague and the UN Conventions?

Most respectfully presented, duly affirmed and certified on this 18th day of April of 1996 in the City and State of New York,

_____
Vladimir M. Postyshev

Exhibit L – F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EMANUEL ZELTSER, Esq.
         Plaintiff,

        - v -

JSB "INKOMBANK", et al.
         Defendants.

95 CIV 0796

AFFIDAVIT OF
ALEKSEI I.
PODBERYOZKIN

| CITY OF MOSCOW | ) | Russian Federation |
| COUNTRY OF RUSSIA | ) | City of Moscow |
|  | ) | USA Embassy |
|  |  | Consular Dept. |

Aleksei I. Podberyozkin, hereby, deposes and states under oath:

1. I am a deputy of the State Duma of the Federal Assembly of the RF, Deputy Chairman of the Committee for International Relations of the State Duma and have extensive experience in the field of international relations. I also have the learned degree of a Doctor of Historical Sciences and am a member of the Russian Academy of Natural Sciences and a member of the Academy of Military Sciences. I also hold the position of the President of the Russian-American University.

2. I am not a party to this court case and not interested in its outcome. In my official capacity, I have good knowledge of the operations of the powers and governing bodies of the Russian Federation, its governmental agencies, including its state establishments of higher learning.

3. I have familiarized myself with Mr. A. Y. Borisov's affidavit submitted by the Plaintiff in this case, Mr. E. Y. Zeltser, in support of his claims. As far as I know, Mr. Borisov is a teacher at the MSIIR University of the MFA of the RF, the Dean of the International Information Department, has the degree of a Doctor of Historical Sciences. He has not been awarded the degree of a Doctor of Political Sciences. He is not the official Representative of the Russian Federation in the European Council either.

4. As far as I know, the Ministry of Foreign Affairs of the RF has never had any official relations with Mr. E. Y. Zeltser, has not used and is not currently using Mr. E. Y. Zeltser's services as a lawyer.

5. In my official capacity, I also have good knowledge of the organization of the teaching process and the maintenance of documents at the state higher education establishments, both currently in Russia, and in the former USSR. The teaching process in the state higher education establish-

- 2 -

ments in the former USSR was based on programs approved by the Ministry of Higher Educa-tion. Any special or experimental programs, upon being approved by this Ministry, were in-cluded in the curriculum of a state establishment of higher learning, where they were taught on a compulsory basis. That is why the administration of a given higher education institution was directly involved in their implementation and had to know about them.

6. Diplomas of graduation from a given state higher education establishment were issued in the former USSR, and are issued now in Russia, only to those persons who entered, completed the full course of studies and passed the state examinations at that given state higher education establishment.

7. Admittance to a state higher education establishment and to the state examinations, as well as awarding qualifications and issuance of diplomas were done and are being done based on the orders of the Rector of the given state higher education establishment only. No person, who was not in this order of the Rector, could or can get such a diploma of graduation from this given state higher education establishment.

8. All orders about admittance to a given state higher education establishment, admittance to take the state examinations, awarding qualifications and issuance of diplomas, as well as personal files of students, are documents that must be kept in the archives for a long period of time (up to 75 years), and these documents are kept in the archives of this state higher education establish-ment. It is only the administration of a given state higher education establishment, based on those archives documents and at somebody's request, can verify the fact of graduation of this or that student from this given state higher education establishment. The absence of data about this or that person in the archives of a given state higher education establishment proves that this person did not graduate from this establishment and, respectively, did not get a diploma of its gradua-tion.

9. In the former USSR, pursuant to the order established for processing documents when entering higher education establishments, candidates were to submit a high school certificate, among other documents, to the admittance commission. In the event a candidate was admitted, his high school certificate was kept in his personal file of that state higher education establishment and was returned to him only upon graduation from that state higher education establishment, or when that student was expelled before graduation. This order did not allow one and the same person to study simultaneously at two state higher education establishments.

10. State higher education establishments in the former USSR had nothing to do with Univer-sities of Marxism-Leninism, were never integrated in them and never controlled by them. Moreover, Universities of Marxism-Leninism were never part of the system of professional education at all. They were a link in the system of party and political training and education of the CPSU. Universities of Marxism-Leninism have never given any higher or any professional education. A diploma of graduation from a University of Marxism-Leninism was never equaled with a diploma of graduation from a higher education establishment, could never and can never be deemed as proof of a higher education and does not grant any right to engage in professional

- 3 -

activity in this or that field.

11. Pursuant to the legislation of the former USSR and the current legislation of the RF, consular establishments if the MFA of the RF are authorized to perform notary functions and legalize documents. However, neither the list of notary functions, nor the concept of legalization, and hence, the authorities of the consular establishments of the MFA of the RF, includes authenti-cation of the validity of this or that document. Thus, legalizing a copy of a document, its tran-slation or the signature of a person, the consular establishment does not bear any responsibility for the validity or authenticity of the original or the information therein.

*[Signed]*

_____
Aleksei I. Podberyozkin

Sworn to before me this
_3d_ day of June, 1997
     *[Signed]*
_____
     Notary Public

*[Stamp:]* CHRISTOPHER T. ROBINSON
Vice Consul of the United States of America

FROM : INKOMBANK MOSCOW          PHONE NO. : 2984298          Jun. 03 1997 10:14AM  P02



В ОКРУЖНОЙ СУД СОЕДИНЕННЫХ ШТАТОВ
ЮЖНЫЙ ОКРУГ НЬЮ-ЙОРКА

ЭММАНУИЛ ЗЕЛЬЦЕР, ЭСКВ.,

Истец,

-против-

АКЦИОНЕРНОГО БАНКА "ИНКОМБАНК" и др.

Ответчики.

95 CIV. 0796

АФФИДЕВИТ
АЛЕКСЕЯ И.
ПОДБЕРЕЗКИНА

ГОРОД МОСКВА          )
                      )
СТРАНА РОССИЯ          )

Российская Федерация
Город Москва
Посольство
Соединенных
Штатов Америки,
Консульский отдел

Алексей И.Подберезкин, настоящим под присягой дает письменные показания и заявляет:

1.  Я являюсь депутатом Государственной Думы Федерального Собрания РФ, заместителем председателя Комитета по международным делам Государственной Думы и имею большой опыт в области международных отношений. Я также имею ученую степень доктора исторических наук и являюсь академиком Российской Академии естественных наук и академиком Академии военных наук. Я также занимаю должность Президента Российско-Американского Университета.

2.  Я не являюсь участником данного судебного процесса и не заинтересован в его исходе. По своему положению я хорошо осведомлен о деятельности органов власти и управления Российской Федерации, ее государственных учреждений, в том числе государственных высших учебных заведений.

3.  Я ознакомился с аффидевитом г-на Борисова А.Ю., представленным истцом по данному делу г-ном Зельцером Э.Е. в поддержку своих требований. Г-н Борисов, насколько мне известно, является преподавателем МГИМО-Университета МИД РФ, Деканом факультета Международной информации, имеет степень Доктора исторических

международной информации, имеет степень Доктора исторических наук. Ему не присуждалась степень Доктора политических наук. Он

также не является официальным Представителем Российской Федерации в Совете Европы.

4. Насколько мне известно, Министерство иностранных дел РФ  никогда не вступало в официальные отношения с г-ном Зельцером Э.Е., не пользовалось и не пользуется в настоящее время услугами г-на Зельцера Э.Е. в качестве адвоката.

5. По своему служебному положению я также хорошо знаком с порядком организации учебного процесса и ведения документации в государственных высших учебных заведениях как в настоящее время в России, так и в бывшем СССР. Учебный процесс в государственных высших учебных заведениях в бывшем СССР строился на основании программ, утвержденных Министерством высшего образования. Любые специальные либо экспериментальные программы, после утверждения в данном министерстве, в обязательном порядке включались в учебный план государственного высшего учебного заведения, в котором они преподавались. Поэтому администрация данного учебного заведения имела   самое непосредственное отношение к их осуществлению и не могла о них не знать.

6. Дипломы об окончании определенного государственного высшего учебного заведения выдавались в бывшем СССР и выдаются в России только тем лицам, которые поступили, окончили полный курс обучения и сдали государственные экзамены в данном государственном высшем учебном заведении.

7. Прием в государственное высшее учебное заведение и допуск к сдаче государственных экзаменов, а также присвоение квалификации и выдача дипломов осуществлялись и осуществляются только  на основании приказа Ректора данного государственного высшего учебного заведения. Ни одно лицо, не указанное в таком приказе Ректора не могло и не может получить диплом об окончании данного государственного высшего учебного заведения.

8. Все приказы о приеме в государственное высшее учебное заведение, допуске к сдаче государственных экзаменов, присвоении квалификации и выдаче дипломов, а также личные дела студентов являются

и выдаче дипломов, а также личные дела студентов являются документами длительного архивного хранения (до 75 лет) и хранятся в архиве этого государственного высшего учебного заведения. Только администрация государственного высшего учебного заведения на основании этих архивных документов по запросу может подтвердить факт окончания данного высшего учебного заведения тем или иным выпускником. Отсутствие сведений о том или ином лице в архиве определенного государственного высшего учебного заведения свидетельствует о том, что это лицо не оканчивало данное учебное заведение и соответственно не получало диплом о его окончании.

9. В бывшем СССР в соответствии с порядком, установленным для оформления документов при поступлении в высшие учебные заведения

абитуриенты были обязаны представить в приемную комиссию в числе прочих документов аттестат об окончании средней школы. В случае поступления абитуриента аттестат хранился в личном деле студента высшего учебного заведениям и возвращался ему лишь после окончания данного высшего учебного заведения либо в случае досрочного отчисления студента. Данный порядок не давал возможности одному и тому же лицу обучаться одновременно в двух государственных высших учебных заведениях.

10. Государственные высшие учебные заведения в бывшем СССР не имели ничего общего с Университетами Марксизма-Ленинизма, никогда не были в них интегрированы и не контролировались ими. Более того, Университеты Марксизма-Ленинизма никогда не входили в систему высшего образования СССР, и вообще в систему профессионального образования. Они являлись одним из звеньев системы партийно-политической учебы и просвещения КПСС. Университеты Марксизма-Ленинизма не давали ни высшего, ни какого-либо иного профессионального образования. Диплом об окончании Университета Марксизма-Ленинизма не приравнивается к диплому об окончании высшего учебного заведения, не мог и не может служить свидетельством получения высшего образования и не дает права заниматься профессиональной деятельностью в той или иной области.

11. В соответствии с законодательством бывшего СССР и действующим законодательством РФ консульские учреждения МИД РФ наделены полномочиями выполнять нотариальные действия, осуществлять легализацию документов. Однако ни в перечень нотариальных действий, ни в понятие легализации, а следовательно и в полномочия консульских учреждений МИД РФ не входит установление подлинности тех или иных документов. Таким образом, удостоверяя копию документа, его перевод или подпись лица, консульское учреждение не отвечает за подлинность оригинала или сведений, изложенных в нем.

АЛЕКСЕЙ И.ПОДБЕРЕЗКИН

Sworn to before me this
3rd day of June 1997

Notary Public

CHRISTOPHER T. ROBINSON
Vice Consul of the
United States of America

Exhibit L – G

DEPARTMENTAL DISCIPLINARY COMMITTEE
SUPREME COURT, APPELLATE DIVISION
FIRST JUDICIAL DEPARTMENT
41 MADISON AVENUE
NEW YORK, N.Y. 10010
(212) 685-1000
FAX: (212) 545-8981

HALIBURTON FALES, 2D, ESQ.
    CHAIRMAN
HON. THOMAS B. GALLIGAN
RET. ...EARCON, ESQ.
HON. SAMUEL J. SILVERMAN
  SPECIAL COUNSEL

JEROLD J. BENAVIE, ESQ.
GARDNER BOTSFORD
JOHN C. BRIGANDI, ESQ.
RACHEL CHILD
DONALD J. COHN, ESQ.
MICHAEL CONFORTI, ESQ.
LORRAINE COYLE, ESQ.
PROF. MARY C. DALY
LISA E. DAVIS, ESQ.
JOHN M. DELEHANTY, ESQ.
TELESFORO DEL VALLE, JR., ESQ.
JOAN L. ELLENBOGEN, ESQ.
ARTHUR NORMAN FIELD, ESQ.
CHARLOTTE MOSES FISCHMAN, ESQ.
PHILIP R. FORLENZA, ESQ.
JOHN J. GALBAN, ESQ.
MARTIN R. GOLD, ESQ.
ARTHUR W. GREIG, ESQ.
ROBERT L. HAIG, ESQ.
PATRICIA HANDAL
PATRICIA HATRY, ESQ.
LEONARD HOLLAND, ESQ.
JOHN R. HORAN, ESQ.
BARBARA M. HUGGINS
JOSEPH M. IROM, ESQ.
JOANNE SIDENER JOHNSON
STEPHEN R. KAYE, ESQ.
THEODORE B. KLEIN, ESQ.
STEVEN C. KRANE, ESQ.
JO...AN J. LERNER, ESQ.
...  ...E D. McGOVERN, ESQ.
JAMES MILLIGAN
MERCEDES A. NESFIELD
ARTHUR REIS, JR.
ARTHUR RICHENTHAL, ESQ.
...MIL M. SANCHEZ, ESQ.
BEVERLY FOLASADE SOWANDE, ESQ.
HOWARD S. STEIN
JAY TOPKIS, ESQ.
STEPHEN L. WEINER, ESQ.
SUSAN WELSHER
CHARLES L. WHITE, ESQ.
R. WALTER A. WICHERN, JR.
FREDERICK O. WILKINSON, JR.
COMMITTEE MEMBERS

AL R. LIEBERMAN
CHIEF COUNSEL

BARBARA S. GILLERS
FIRST DEPUTY CHIEF COUNSEL

...CHARD M. MALTZ
DEPUTY CHIEF COUNSEL

...ORAL H. BRATTON
...ERRY K. COHEN
...RGE DOPICO
...NIA M. EBRON-FUBARA
...DY J. EDELSTEIN
...THLEEN FEERICK
REMY S. GARBER
...OMI F. GOLDSTEIN
     POST
    ...A L. SCALISE
...EEN J. SHIELDS
...RENCE SMITH, JR.
...DITH N. STEIN
...CHARD SUPPLE
...YMOND VALLEJO
...AFF COUNSEL

...RAH JO HAMILTON

RS

January 3, 1997

PERSONAL AND CONFIDENTIAL

Arthur H. Christy, Esq.
Christy & Viener
Rockefeller Center
620 Fifth Avenue
New York, New York 10020-2457

Re:  Matter of Emanuel Zeltser, Esq.
     Docket No. 291/95

Dear Mr. Christy:

     After a review of the above matter and the pending litigation between Mr. Zeltser and your client, Inkombank, the Committee has determined that our investigation and disposition should await the results of the litigation.

     Mr. Zeltser's attorney status has been put in issue in the federal litigation (95 Civ. 0796 and 95 Civ. 3410) before the Honorable Kevin Thomas Duffy in the context of Inkombank's defense against Mr. Zeltser's claims of fraud and for his legal fees, and your client's counterclaim against Mr. Zeltser for fraud and malpractice.

     By means of this letter we formally request that you keep us informed of the progress of the federal litigation and of any court opinion or other event which may bear on our future consideration of this matter.  Thank you.

                         Very truly yours,

                         Hal R. Lieberman

Exhibit L – H

KEVIN THOMAS DUFFY, D.J.:

This Memorandum will dispose of two pending motions to dismiss in this case. The first was filed by the law firm of Christy & Viener on behalf of itself, Arthur Christy, Esq., John F. Cambria, Esq. and William F. Kracklauer, Esq., ("the Christy Defendants"), all members of the defendant law firm, seeking dismissal of the Complaint against them pursuant to Rules 8, 9(b), and 12(b)(5) and (6) of the Federal Rules of Civil Procedure. The second motion is made by Christy & Viener on behalf of their client, Inkombank, seeking dismissal of the Complaint against Defendant Inkombank pursuant to Rules 8, 9, and 12(b)(6) of the Federal Rules of Civil Procedure. For the following reasons, the motion to dismiss as to the Christy Defendants is granted, and the motion to dismiss as to Inkombank is granted in part and denied in part.

Plaintiffs' claims basically allege that officers of Defendant Inkombank and the Christy Defendants conspired by and among themselves to wilfully and maliciously injure Plaintiffs and to deprive Plaintiff Foreign Investors Portfolio Management, Inc., ("FIPM") of money and property. As a preliminary matter, the naming of the Christy Defendants in this suit appears to have resulted solely from their representation of Defendant Inkombank and their efforts to protect the interests of their client. This tactic appears to be nothing more than a flagrant attempt by Plaintiffs to conflict out the Christy firm and its members by naming them as parties to the suit.

APPEARANCES:

Derman & Derman
Herbert Derman, Esq.
Attorney for Plaintiff
Foreign Investors Portfolio Management, Inc.
420 Lexington Ave.
New York, NY 10170

Emanuel E. Zeltser, Esq.
Plaintiff Pro Se
Two Penn Plaza
Suite 1500
New York, NY   10121

Christy & Viener
Attorneys for Defendants Christy & Viener,
and Joint Stock Bank Inkombank
620 Fifth Avenue
New York, NY   10020

Of Counsel:      Arthur H. Christy
                 Wayne C. Matus
                 Peter Gallagher
                 Roger Smith

In determining a defendant's motion to dismiss the complaint, all factual allegations in the complaint must be construed in favor of the plaintiff. See Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). A complaint may be dismissed pursuant to Rule 12(b)(6) only if the plaintiff can prove no set of facts that would entitle him to relief. Frasier v. General Elec. Co., 930 F.2d 1004, 1007 (2d Cir. 1991), (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). Consequently, for purposes of this motion to dismiss, all allegations in Plaintiffs' complaint must be presumed true. IUE AFL-CIO Pension Fund v. Herrman, 9 F.3d 1049, 1052 (2d Cir. 1993), cert. denied, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994).

## FIRST CAUSE OF ACTION - BREACH OF CONTRACT

All of Plaintiffs' claims in this diversity suit arise under New York law. The first cause of action alleges a claim for breach of contract. To state a claim for breach of contract under New York law, a party must plead the formation of a contract; the plaintiff's performance of his obligations thereunder; defendant's failure to perform his obligations; and resulting damage. See Kleinschmidt Div. of SCM Corp. v. Futuronics Corp., 41 N.Y. 2d 972, 395 N.Y.S.2d 151 (1977); Sebro Packaging Corp. v. S.T.S. Industries, Inc., 93 A.D.2d 785, 461 N.Y.S.2d 812 (1st Dep't 1983).

Plaintiffs generally allege that "various lawful agreements,

mutual promises, warranties and covenants" were violated, but Plaintiffs fail to identify the parties to these agreements and how the Christy Defendants failed to perform their obligations thereunder. (Compl. ¶¶ 30-38). Plaintiffs have failed to allege the existence of any contract between themselves and the Christy Defendants, and therefore, cannot recover for any alleged breach. See Kleinschmidt, 395 N.Y.S.2d at 152, ("Without agreement there can be no contract, and of course, without a contract, there can be no breach."). The first cause of action for breach of contract is dismissed as to the Christy Defendants.

Plaintiffs allegations of breach of contract against Defendant Inkombank appear to be more properly pleaded. Dismissal of the breach of contract claim against Defendant Inkombank would be premature at this stage of the litigation. Defendant Inkombank's motion to dismiss the contract claim is therefore denied.

## SECOND CAUSE OF ACTION - FRAUDULENT MISREPRESENTATIONS

The second cause of action alleges that the Christy Defendants and various officers of Defendant Inkombank took part in a conspiracy to defraud and deceive Plaintiffs and to deprive Plaintiff FIPM of money and property. The fraud claims include allegations that Defendants plotted to hire Plaintiff Elena Pelaez and a third-party, Janna Boulakh, away from Plaintiff FIPM in an effort to get them to divulge confidential information and

subsequently removed to Federal Court and assigned to Your Honor.

This Letter-Brief is respectfully submitted in support of that branch of the motion by Barry Leibowitz, Esq., on behalf of non-party witness Janna Boulakh and returnable before this Court on July 18, 1995, with respect to disqualification of Christy & Viener as attorneys for defendant Joint Stock Bank Inkombank. This Letter-Brief is further submitted in support of counterclaim defendants FIPM and Pelaez's cross-motion to dismiss defendant Inkombank's counterclaim in its entirety on the grounds that, based upon the overwhelming evidence presented, (a) counterclaim defendant Elena Pelaez and non-party witness Janna Boulakh were clients of Christy & Viener and, further, (b) the matter of legal representation provided by Christy & Viener to Pelaez and Boulakh was directly related to the contested issues in the instant case and, further, (c) both Pelaez and Boulakh communicated to Christy & Viener confidential information under the patina of attorney-client privilege, and neither Pelaez nor Boulakh waived the privilege and, further, (d) Christy & Viener used privileged information in order to frame their counterclaims and, further, used it in other pleadings in the within action, hence, rendering the counterclaim a nullity.

In the alternative, movants respectfully pray that immediate trial be had on the issue of Christy & Viener's acting as legal counsel for Pelaez and Boulakh, and whether privileged information was unlawfully used by Christy & Viener.

As this Court is aware of, there is currently a motion sub

judice before this Court (filed on April 19, 1995, returnable on May 9, 1995) to dismiss defendant Inkombank's counterclaims on various grounds, including, inter alia, on the basis that Christy & Viener may not properly represent defendant Inkombank against counterclaim defendant Pelaez because Christy & Viener were attorneys for Pelaez in matters substantially related to controversy at bar. Affidavit of my client, Elena Pelaez, filed on April 19, 1995, submitted in support of the above motion to dismiss, states that information which my client entrusted to Christy & Viener in confidence, believing that Christy & Viener were acting as her attorneys, was unlawfully used against her and other litigants in the within action.

Now, a non-party, Christy & Viener's former client represented by a separate counsel, corroborates my client's statements and provides new evidence that counterclaims filed by Christy & Viener were, indeed, framed based upon unlawfully obtained information. Affidavit of Janna Boulakh unequivocally states:

    (a)  "The defendant Inkombank's attorney, Christy & Viener, [sic] has previously acted as my attorney. I retained Christy & Veiner in or about March, 1994. I retained Christy & Veiner to draft a consulting between Inkomcapital Ltd. (a/k/a Alpha Consulting Services Corp.) and the defendant Inkombank. I also retained Christy & Veiner to draft an employment agreement between myself and Alpha Consulting Services Corp." (Boulakh Aff., dated June 28, 1995, para. 5);

    (b)  "Christy & Veiner counseled me and encouraged me to confide in them. They assured me that they were acting as my attorneys and that everything said would be privileged and confidential" (Id., para. 6);

    (c)  "I also consulted with Christy & Veiner regarding my matrimonial difficulties" (Id., para. 7);

5

(d)  "During the period of my representation by Christy & Veiner, I, as their client, entrusted them with various confidential communications regarding, among other things, certain of the individuals and entities involved in this lawsuit." (Id., para 12);

(e)  "I was advised by Christy & Veiner that anything I spoke with them about was confidential since they were my attorney. I understand that as a result of my retaining Christy & Veiner and my subsequent communications with them, an attorney client privilege exists. I do not wish to waive this privilege." (Id., para. 13);

(f)  "It is clear that Christy & Viener came in possession of information which formed the basis of their subpoena to me as a result of confidential privileged communications with them as my attorneys." (Id., para. 14).

Obviously, in the event Christy & Veiner indeed unlawfully used privileged information to craft the counterclaims (which, at this point, very much appears to be the case), the counterclaims are nullity. Additionally, my clients would obviously seek a leave to amend claims against Christy & Viener, Arthur Christy, John Cambria and William Kracklauer to include additional counts. In any event, this action may not properly proceed until this issue is resolved. It would be a gross injustice to my clients to allow Christy & Viener to conduct any kind of discovery based on unlawfully obtained privileged information, whether such information was illegally obtained from my client or from Ms. Boulakh. Even when, subsequently, this information is suppressed and defendants' counterclaims are dismissed, my clients will be harmed by this improper disclosure.

POINT 1.  No attorney of Christy & Viener may properly represent any party in this action

New York Courts follow the Rules of Professional

Responsibility with respect to issues concerning attorneys participation in judicial proceedings. Section 1200.21 (DR 5-102) ("Withdrawal as counsel when the Lawyer becomes a witness") of the N.Y. Code of Professional Responsibility states, in pertinent part:

> "If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that the lawyer or a lawyer in his or her firm may be called as a witness other than on behalf of the client, the lawyer may continue the representation until it is apparent that the testimony is or may be prejudicial to the client at which point the lawyer and the firm must withdraw from acting as an advocate before the tribunal."

In the case at bar, Christy & Viener, who purport to act as counsel for defendant Inkombank[1] are also cross-claim and counter-claim defendants on claims of fraud, aiding and abetting fraud, and damages stemming from members of Christy & Viener law firm's numerous violations of 18 U.S.C. In addition, in the companion action before this Court, Elena Pelaez v. Regal V, et al., 95 Civ. 3410, Christy, Cambria, Kracklauer and Christy & Viener are party-defendants on affirmative claims by Pelaez for legal malpractice, and also by Pelaez and FIPM for fraud, and aiding and abetting fraud. Christy & Viener appeared pro se in this action as well as in the companion action before this Court. On April 19, 1995, Christy, Cambria and Kracklauer were noticed for depositions pursuant to Rule 30 and 45 of Fed.R.Civ.P. but never appeared. Instead, Christy, Cambria and Kracklauer submitted in this action

---

[1]    Plaintiff maintains that Christy & Viener do not, in fact, represent Joint Stock Bank Inkombank, but are retained by a renegade Russian mob controlled faction, and chose to be ignorant with respect to the nature of their representation. (See e.g., Plaintiff's motion for Rule 11 sanction).

and the companion action (Index No. 3410) a plethora of affidavits containing protracted self-serving testimony with respect to contested factual issues. Further, the law has generally treated lawyers in the same firm as a single lawyer for purposes of conflict of interest. In <u>Westinghouse Elec. Corp. v. Kerr-McGee Corp</u>. United States Court of Appeals, Seventh Circuit, 1978. 580 F.2d 1311, the Court held that the "chinese wall" theory should not be recognized as that modifying the presumption that actual knowledge of one or more lawyers in a firm is imputed to each member of that firm. Analogous opinions have been expressed in <u>Schloetter v. Railoc of Indiana, Inc</u>., 546 F.2d 706, 710 (7th Cir.1976) and <u>Fund of Funds, Ltd. v. Arthur Andersen & Co</u>., 435 F.Supp. 84, 96 (S.D.N.Y.), rev'd in part and aff'd in part, 567 F.2d 225, 229, n.10 (2d Cir.1977). At the present time, Christy & Viener represent Inkombank in 2 concurrent litigations, while being named (together with three members of the firm individually) as defendants on counts of fraud and legal malpractice. Obviously, it is an impossibility to imagine that someone in that firm is not aware of these proceedings in great details.

Christy & Viener's feeble argument in the companion action with respect to the absence of showing of attorney-client relationship between Elena Pelaez and Christy & Viener because "there is not a new client form", "retainer agreement", or "client's file" of Ms. Pelaez (Affs. in support of Arthur Christy and William F. Kracklauer, entered in companion action 95 Civ. 3410 on 5/18/95, entries ## 6 and 7) is simply irrelevant. Professional relationship

9

for purposes of the privilege of attorney-client communications hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice McCormick on Evidence (2d ed.1972, Section 88, p. 179). (See, e.g., R. Wise, Legal Ethics (1970) 284). Further, professional relationship is not dependent upon the execution of the formal agreement. Westinghouse v. Kerr-McGee, supra; (See, e.g., Udall v. Littell, 366 F.2d 668, 676 (D.C.Cir.1966), cert. denied, 385 U.S. 1007 (1967); E.F.Hutton & Co. v. Brown, 305 F.Supp. 371, 388 (S.D.Tex.1969), at 388.) Equally irrelevant are the endless self-serving affidavits of members of Christy & Viener denying their belief that Ms. Pelaez was a client of Christy & Viener. The deciding factor is what prospective client thought when he made the disclosure, not what lawyer thought. (McCormick, supra.) Christy & Viener's argument that there was no legal fees paid by Pelaez is without merit as well. Professional relationship is not dependent upon the payment of fees. Westinghouse v. Kerr-McGee, supra.; Allman v. Winkelman, 106 F.2d 663, 665 (9th Cir.1939), cert. denied, 309 U.S. 668 (1940) ("lawyer's advice to his client establishes a professional relationship though it be gratis"); E.F.Hutton & Co. v. Brown, supra. (Relation of attorney and client "is not dependent on the payment of a fee"). Further, defendants Christy and Kracklauer's affidavits stated that their work on behalf of Pelaez and Boulakh were performed at the request of Inkombank (Christy Aff., para. 24 and Kracklauer Aff., paras. 6-17) thus, clearly admitting that (a) the work was performed, and (b) that legal fees

were simply picked up by another client. Payment of legal fees by third party does not negate attorney-client relationship. In Fort Meyers Seafood Packers, Inc. v. Steptoe and Johnson, 381 F.2d 261, 262 (D.C.1967), cert. denied, 390 U.S. 946 (1968), the Court held "If appellant is not obligated to pay appellees for their services, it does not follow that there was no attorney-and-client relation". While the precise formulation of the attorney-client privilege varies from jurisdiction to jurisdiction, the most concise and best-known statement of the attorney-client privilege provides as follows: "Where legal advice of any kind is sought from a professional legal adviser in his capacity as such, the communications relating to that purpose, made in confidence by the client, are at his instance permanently protected from disclosure by himself or by the legal adviser, except the protection be waived."[2] Termination of the attorney-client relationship does not end the privilege; protection continues indefinitely. Matter of Doe (Stuart), 408 Mass. 480, 562 N.E.2d 69 (1990).

In the case at bar, there is no question that legal advice was sought of and provided by Christy & Viener lawyers to both Pelaez and Boulakh. Both, Elena Pelaez and Janna Boulakh, unequivocally state in their respective affidavits that Christy & Viener represented them in the matter of Inkom Capital, a/k/a Alpha Consulting, with respect to their employment as Vice President and President respectively. Boulakh further stated that Christy & Viener

---

[2]  8 Wigmore on Evidence Sec. 2292 (McNaughton] ed.1961.

counseled her with respect to her matrimonial difficulties, i.e.,
matters requiring disclosure of most intimate details of one's
personal and business affairs. Indeed, defendant Kracklauer admits
that Christy & Viener prepared Pelaez' and Boulakh's employment
agreements and the shareholders' agreements with Alpha Consulting
Services, Corp. (Kracklauer Aff., supra, in support of Christy &
Viener defendants' motion to dismiss, para. 12). Kracklauer further
admitted that Boulakh and Pelaez were Alpha's senior officers (i.e.,
President and Vice-President/Secretary, respectively)(Id., para.
13).

Defendant Christy appears not to be able to make up his
mind as to on whose behalf the agreements for Pelaez and Boulakh
were drafted. Christy Aff., supra, in para. 24 states that "although
Mr. Kracklauer did subsequently draft an employment agreement
regarding Pelaez, those services were performed at the request of
Inkombank". However, in a letter to Hon. Carol Arber dated February
25, 1995, Christy vigorously argued that the documents in question
were drafted by Christy & Viener "for Alpha Consulting Services,
Corp." (Aff. of Emanuel E. Zeltser entered in companion action No.
3410 on 6/6/95, entry # 11). Further, the documents which Christy
& Viener admit to drafting indicate Inkom Capital/Alpha's legal
address as c/o Christy & Viener, 620 Fifth Avenue, New York, NY
10020  (Boulakh's Aff., Exhibit B, p.1)

Defendant Kracklauer further admitted that at the meeting which
took place on March 10, 1994, at the offices of Christy & Viener
(Kracklauer Aff., paras. 7 and 10), "Inkombank, Christy & Viener and

Boulakh agreed that Boulakh should be the president and Pelaez should be the vice president and treasurer" of Alpha (Id., para. 13). At the same meeting it was "also determined" that defendant Preobrajensky, purportedly senior officer of defendant Inkombank, would be the Chairman of the Board of Alpha and defendant Kracklauer should be the secretary. Indeed, also considered was "appointing Arthur Christy a director of Alpha" (Id. para. 13). Further, at the very same meeting "Christy & Viener on Inkombank's behalf" determined that plaintiff Pelaez and Janna Boulakh would each hold a 24.5% ownership stake in Alpha. Obviously, drafting Pelaez' and Boulakh's agreements "for Alpha Consulting Services, Corp." as Christy asserts in his February 25, 1995, letter to Judge Arber, supra, unequivocally makes Boulakh and Pelaez (Alpha's President and Vice President) Christy & Viener's clients. However, even if we presume, arguendo, that "those services were performed at the request of Inkombank" (Christy Aff., para. 24), it does not follow that there was no attorney-client relation Fort Meyers v. Steptoe and Johnson, supra, Kracklauer, in his affidavit, further admits discussions between himself, Christy, Preobrajensky and Boulakh regarding organizational structure and general outline of ownership of Alpha, and drafting consulting agreements between Alpha and defendant Inkombank "following the general outline concerning ownership of Alpha contained in Boulakh's draft consulting agreement". (Kracklauer Aff., paras. 10-11). Under the circumstances, to suggest that Christy & Viener never rendered legal advice to Pelaez or Boulakh, or have not been privy to confidential

information is clearly in contradiction to all the evidence presented in the within proceedings.

Further, it is obvious from the assertions of Pelaez and Boulakh, as well as from admissions by Christy and Kracklauer, that matters discussed were directly related to the within litigation. Model Rules of Professional Conduct which serve as the basis for state lawyer codes in 38 states as of 1993, state in Rule 1.9(a) that a lawyer shall not: "represent another person in the same or a substantially related matter in which that persons' interests are materially adverse to the interests of the former client unless the former client consents after consultation." In T.C. Theatre Corp. v. Warner Brothers Pictures, Inc. 113 F.Supp. 265, 268-269 (S.D.N.Y.1953) Court held that "the former client need show no more than the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented him, the former client. The court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. It will not inquire into their nature and extent. Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained." Here, Christy & Viener not only accepted legal representation against Pelaez in the matter directly related to their legal representation of Pelaez, Boulakh and Inkom Capital/Alpha, but actually used information entrusted to them in

14

confidence by Pelaez and Boulakh to prosecute counterclaims against all litigants. Consequently, counterclaims were based on illegally obtained information and are nullity.

POINT 2    In the event the Court deems that evidence already presented in the within proceeding does not conclusively establish that Christy & Viner acted as counsel for Pelaez and Boulakh an immediate trial should be had on that issue.

It is noteworthy that Christy & Viener in their opposition to non-party witness Boulakh motion for disqualification do not argue that disqualification would not be proper in the event it is established that Christy & Viener indeed acted as Ms. Boulakh's counsel. In fact, defendants' Memorandum in Opposition, Point 2, is entitled "Christy & Viener should not be disqualified because it never represented Janna Boulakh." Further, defendants' Memorandum states that "Ms. Boulakh's argument as to Christy & Viener's disqualification must fail because Ms. Boulakh cannot show the existence of an attorney/client relationship with Christy & Viener. Until Ms. Boulakh makes such a showing, the arguments and cases in her Memorandum of Law are irrelevant". (Defts' Memo, page 11, footnote 2). Clearly, even Christy & Viener do not find it appropriate to argue that they could possibly remain as counsel for any party in these proceedings if it is determined that it acted as counsel for Ms. Boulakh. Same obviously would hold true with respect to Christy & Viener's acting as counsel for Elena Pelaez. Elena Pelaez and FIPM respectfully submit that there has already been sufficient showing of attorney-client relationship between Christy & Viener and both, Boulakh and Pelaez, including the admissions made

15

by members of Christy & Viener. However, in the event the Court deems that evidence already presented in the within proceeding does not conclusively establish that Christy & Viener acted as counsel for Pelaez and Boulakh an immediate trial should be had on that issue.

## CONCLUSION

Based upon the overwhelming evidence presented, counterclaim defendant Elena Pelaez and non-party witness Janna Boulakh were clients of Christy & Viener. The matter of legal representation was directly related to the contested issues in the instant case. Both, Pelaez and Boulakh, communicated to Christy & Viener confidential information under the patina of attorney-client privilege. Neither Pelaez nor Boulakh waived the privilege. Christy & Viener used privileged information in order to frame their counterclaims and, further, used it in other pleadings in the within action. Consequently, the counterclaims are nullity and should be dismissed in their entirety. Further, Christy & Viener should be disqualified from representing any party in the within action. Christy & Viener should be precluded from conducting any discovery in this action based upon the unlawfully obtained information. In the alternative, an immediate trial should be had on the issue of Christy & Viener's acting as legal counsel for Pelaez and Boulakh, and whether priveleged information was unlawfully used in the within proceedings

Exhibit L- I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Emanuel E. Zeltser, Esq.,

Plaintiff,                                    Case No. 95 Civ. 0796 (KTD)

- against -

Joint Stock Bank INKOMBANK,                   AFFIDAVIT   OF   ELENA  PELAEZ
Vladimir Vinogradov, Aleksey Kouznetsov,
Roman Zdrayevsky, Anna Koursikova,            IN SUPPORT OF PLAINTIFF'S
Vladimir Doudkin, Elena Egorycheva,           MOTION TO DISMISS DEFENDANT'S FIRST
Marina Ostryakova, Andrey Shimkevitch,        AMENDED   COUNTERCLAIM
Rafael Nagopetyantz, and Vladimir
Preobrajensky,

                Defendants.

Joint Stock Bank Inkombank,                   RECEIVED

- against -                                   APR 1 8 1995

                Counterclaim Plaintiff,       C&V

Emanuel E. Zeltser, Esq.,

                Counterclaim Defendant,

- and -

Alexander Fishkin, Anna Reid, Fishkin & Reid, Omega Brokerage Services, Inc., Foreign Investors Portfolio
Management, Inc., Elena Pelaez, Rachida Mecheri, and John Does 1-10,

                Additional Counterclaim Defendants.

Alexander Fishkin, Esq.,

                Third Party Plaintiff ,

- against -

Vladimir Preobrajensky, Vladimir Vinogradov, Aleksey Kouznetsov, Roman Zdrayevsky, Anna Koursikova,
Vladimir Doudkin, Elena Egorycheva, Marina Ostryakova, Andrey Shimkevitch, Rafael Nagopetyantz,
                Cross-Claim Defendants,

- and-

Kudos Holdings, Ltd., f/k/a Kudos Investments, Ltd., Inwesta Establishment, a/k/a "Vestina",
Arthur H. Christy, William F. Kracklauer, John F. Cambria, Christy & Viener, First Ten, S.A.,
Walesdon Financial Company, Laurel Finance, Ltd., Aspiration Holdings, Ltd., Linkvale, Ltd., Prontoservus,
Ltd., Manitesser Co. Ltd., Elena Kyriakou, Adviso Trust Co. Ltd., Savser Management, Ltd., Nashua Trading
Corp., Olga Klimenko, Victor Klimenko, Boris Ovchinnikov, Valeriy Baibakov, Tatiana Tokareva,
InkomCapital, Ltd. a/k/a Alpha Consulting Group, Ltd., and John Does 11-20,
                Third Party Defendants.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Index No. 95 CIV 0796 (KTD) (YL) Year 19

EMANUEL E. ZELTSER, ESQ.,

Plaintiff,

-against-

JOINT STOCK BANK INKOMBANK,
et al.,

Defendants.

AFFIRMATION JOINING IN MOTION TO DISQUALIFY CHRISTY & VIENER AS COUNSEL AND CROSS-MOTION TO DISMISS DEFENDANT INKOMBANK'S COUNTERCLAIM

DERMAN & DERMAN
Attorney at Law

Attorney for Plaintiff
Office and Post Office Address, Telephone
420 Lexington Avenue
NEW YORK, N.Y. 10170
(212) 697-1800

To
Attorney(s) for

Service of a copy of the within
is hereby admitted.

Dated,

Attorney(s) for

---

NOTICE OF ENTRY

Sir:-Please take notice that the within is a (certified) true copy of a
duly entered in the office of the clerk of the within
named court on                    19

Dated,

Yours, etc.,
DERMAN & DERMAN
Attorneys at Law

Office and Post Office Address
420 Lexington Avenue
NEW YORK, N.Y. 10170

Attorney(s) for

To

NOTICE OF SETTLEMENT

Sir:-Please take notice that an order
of which the within is a true copy will be presented
for settlement to the Hon.
one of the judges of the within named Court, at

on
Dated,         M.         19

Yours, etc.,
DERMAN & DERMAN
Attorneys at Law

Office and Post Office Address
420 Lexington Avenue
NEW YORK, N.Y. 10170

Attorney(s) for

To

AFFIDAVIT OF ELENA PELAEZ IN SUPPORT OF THE MOTION TO
DISMISS DEFENDANT INKOMBANK'S FIRST AMENDED COUNTERCLAIM

State of New York }
              }ss.
County of New York}

  The undersigned Elena Pelaez, being duly sworn and over 18,
deposes and says as follows:

 1. I am a counterclaim defendant in the within action, and I am fully
familiar with all the facts attested to below.

 2. I am making this affidavit in support of the Motion to Dismiss
defendant Inkombank's First Amended Counterclaim on the same grounds as in
plaintiff's Emanuel Zeltser Motion to Dismiss which I join and also
incorporate by reference all moving papers of the plaintiff.

 3. Sometime in February of 1994, Christy & Viener became attorneys
for a New York corporation Inkom Capital, Inc., a company which was formed
upon the instructions of Mr. Preobrajensky and other officers of Inkombank. I
was one of the officers of Inkom Capital, Ltd., and was promised by Mr.
Preobrajensky to be one of the partners together with him, other officers of
Inkombank and Mr. Kracklauer of Christy & Viener, and also with Ms. Janna
Boulakh, who, at the time, already worked for Inkombank.

 4. Mr. Christy said that he wanted to have the "arms length" between
Inkombank and Inkom Capital, Ltd., therefore, another attorney should register
this company.

 5. Once the company was formed, Mr. Christy and Mr. Preobrajensky
instructed me and Janna to deliver all corporate documents to them.

 6. Then, Mr. Preobrajensky told me on the phone that the name Inkom
Capital may too closely resemble Inkombank, and said that he instructed Mr.
Christy to change the name. He also sent a fax to this effect to Janna Boulakh
with the copy to me (Exhibit 1). I believe that Mr. Christy prepared the
necessary documents to change the name of Inkom Capital, Ltd. to "Alpha
Consulting Services, Corp." in March of 1994.

 7. I, at the suggestion of Mr. Christy, was an officer and director
of Inkom Capital, Ltd.--Alpha. On behalf of Inkom Capital, Ltd.-- Alpha

Consulting Services, Corp. Christy & Viener prepared several contracts with defendant Inkombank and others (Exhibit 2). Messrs. Christy, Preobrajensky and Kracklauer offered us salaries of $72,000 per year each and promised that we would act as Inkombank's "special representatives" in New York, and Mr. Preobrajensky, who was the Deputy Chairman of Inkombank, became the Chairman of the Board of Alpha.

8.    Mr. Christy told me and Janna Boulakh many times that Christy & Viener would be our attorneys, and would prepare employment and other contracts for us and for Alpha and later wrote in a letter to Judge Carol Arber of New York Supreme Court that Christy & Viener prepared these contracts for Alpha. (Exhibit 3). Christy & Viener also prepared documents indicating Alpha's address as c/o Christy & Viener, 620 Fifth Avenue, New York, NY 10020 (Exhibit 2, p. 1).

9.    Mr. Christy, first, made himself a corporate secretary, but then he said, that it would be a conflict of interest, and made his partner Mr. Kracklauer the corporate officer of Alpha Consulting Services, Corp.

10.    In the Lawsuit against Inkombank in the New York Supreme Court Mr. Christy first falsely stated that he did not know what Inkom Capital, Inc., is. But when he presented documents to "prove" that, these documents were all altered documents of Inkom Capital, Inc. When Mr. Fishkin, Esq. pointed out to Mr. Christy and to the Supreme Court Judge that the documents were forgery, Christy & Viener, wrote a letter to Judge Carol Arber on March 10, 1995, (Exhibit 3) and admitted that he submitted the fake documents, but blamed it on Janna Boulakh, and falsely said that she worked for Mr. Zeltser at the time.

11.    Mr. Christy also wrote letter to Judge Duffy on March 28, 1995 (Exhibit 4) and again falsely said that Janna Boulakh worked at the time for Mr. Zeltser. Mr. Christy knows very well that this is a lie. At that time Mr. Christy kissed Janna Boulakh's hand and told her to testify against Mr. Zeltser, and said that he hated Mr. Zeltser so much that will be her lawyer against Mr. Zeltser for free.

2

12.    Mr. Christy and Mr. Kracklauer said that they will be the attorneys for Alpha, Janna Boulakh and me, and that they will prepare the employment documents for Janna and me. Mr. Christy and Mr. Kracklauer several times asked me questions which they said they needed in order to negotiate the best conditions for me as employment with Inkombank and Alpha. In addition to others, they asked me questions about certain bank transactions which I made for clients of Mr. Fishkin. First, I did not understand why this information was needed for my employment with Alpha and Inkombank, but  Mr. Kraclauer or Mr. Christy said, that this is for our best interest to write the best agreement, and that this is confidential, because Christy & Viener is our attorneys.

13.    Mr. Christy wrote all the documents for Alpha, Janna Boulakh and me (Exhibit 2), and said that we will sign it, and that officers of Inkombank also will sign it. However, before signing these agreements Messrs. Preobrajensky, Christy and Kracklauer started asking me and Janna Boulakh more detailed questions about third parties and also asked me to bring to Christy & Viener some documents from the files of Fishkin & Reid, because I provided services to Fishkin & Reid and had access to their offices. Then Messrs. Preobrajensky, Kracklauer and Christy said that if any law suits would be started by Mr. Zeltser or Fishkin & Reid, we would be expected to testify against them and to say things which I knew were false.

14.    I (and as I believe Janna Boulakh) refused. Then Messrs. Preobrajensky, Kracklauer and Christy said that they withdraw their "employment offer", and also, Messrs. Christy and Mr. Kracklauer said that they cannot continue to be our lawyers, because that would be a conflict of interests, because in case Fishkin & Reid sues Inkombank, they would have to say that I was also involved in "wrongdoings".

15.    On April 24, 1994 Janna Boulakh wrote a letter to Mr. Christy saying that this was a plot to "pump us" for information (Exhibit 5) and gave me a copy.

16.    On February 21, 1995 I wrote a letter to Mr. Kracklauer demanding

3

that he explained to me what happened with the transaction between Alpha and Inkombank (Exhibit 6). As I got no response, on February 23, 1995 I wrote another letter (Exhibit 7) where I said that if I do not get the answer I was going to contact Attorneys Ethics Organization. The only response that I got was that Christy & Viener included me in this lawsuit.

17.    I believe that it is unfair that Christy & Viener first act (or even if they just pretended to act) as my lawyers to get some information, and then turn around and sue me, only because Inkombank is their client and can pay them a lot of money.

18.    Also, when I, at the request of Inkombank's officers, acted as a Secretary for Inkombank and some other companies, Inkombank made a corporate resolution stating that I would never be responsible for anything (Exhibit 8) When I gave a copy of this resolution to Mr. Christy in February-March of 1994, he said that it was fine. But on June 10, 1994 Mr. Christy wrote me a letter changing his opinion and saying that the Resolution is not "effective". I believe that it is not fair that I am first given a document indemnifying me, which even a lawyer for Inkombank said was fine, and then they say it is not "effective".

19.    Additionally, with regard to Omega Brokerage Services being a "criminal enterprize", and me "conspiring with Omega" - this is an absolute lie. Inkombank's maneuvre to sue Omega is simply a trick. On May 11, 1994 Inkombank wrote a letter to Republic National Bank of New York, stating that this is Inkombank's company and Kouznetsov and Zdrayevsky, Inkombank's deputy chairmen, are Omega's officers. (Exhibit 9).

20.    Because of Christy & Viener's improper scheme to act as my attorneys and, after getting confidential information from me, suing me because I refused to participate in their scheme with Inkombank, I lost a lot of monies and still lose money and time. Consequently, I filed a lawsuit against Christy & Viener in the Supreme Court of New York for malpractice and fraud (Exhibit 10).

*Elena Pelaez*
Elena Pelaez

4

Sworn to me this 17TH DAY
OF APRIL 1998.

SILVIA GUERRA
Notary Public, State of New York
No. 01GU5029347
Qualified in Kings County

REPLY LETTER-BRIEF ON BEHALF OF COUNTERCLAIM DEFENDANT
ELENA PELAEZ COUNTERCLAIM DEFENDANT AND CROSS-CLAIM AND THIRD
PARTY PLAINTIFF FOREIGN INVESTORS PORTFOLIO MANAGEMENT, INC.

IN SUPPORT OF NON-PARTY JANNA BOULAKH'S MOTION TO DISQUALIFY
CHRISTY & VIENER AS ATTORNEYS FOR ANY PARTY IN THE WITHIN
ACTION AND IN SUPPORT OF CROSS-MOTION TO DISMISS DEFENDANT
INKOMBANK'S COUNTERCLAIMS IN ITS ENTIRETY ON THE GROUNDS THAT
THE PLEADING WAS FRAMED UPON ILLEGALLY OBTAINED INFORMATION

July 13, 1995

Hon. Kevin Thomas Duffy
United States District Court
Southern District of New York
United States Courthouse
40 Foley Square
New York, NY 10007

RE:  EMANUEL E. ZELTSER, ESQ. -v- JOINT STOCK
BANK INKOMBANK, ET AL, 95 Civ. 0796 (KTD)

Honorable Sir:

        Please accept this Letter-Brief in lieu of a more formal

brief in support of the motion of non-party witness Janna Boulakh

for disqualification of Christy & Viener as attorneys for defendant

Joint Stock Bank Inkombank and, further, in support of cross-motion

to dismiss defendant Inkombank's counterclaims in its entirety on

the grounds that the pleading was framed upon illegally obtained

information.

        Undersigned represents counterclaim defendants Foreign

Investors Portfolio Management, Inc. ("FIPM") and Elena Pelaez

("PELAEZ") in the within action. Also, in the companion action Elena

Pelaez v. Regal V, et al., 95 Civ. 3410, the undersigned represents

FIPM and Pelaez as plaintiffs. The companion action was initially

commenced in the Supreme Court of the State of New York and

4

## TABLE OF AUTHORITIES

1. Allman v. Winkelman, 106 F.2d 663, 665 (9th Cir.1939), cert. denied, 309 U.S. 668 (1940)..............................10

2. E.F.Hutton & Co. v. Brown, 305 F.Supp. 371, 388 (S.D.Tex.1969), at 388.)...................................10

3. Fort Meyers Seafood Packers, Inc. v. Steptoe and Johnson, 381 F.2d 261, 262 (D.C.1967), cert. denied, 390 U.S. 946 (1968)...........................................11,13

4. Fund of Funds, Ltd. v. Arthur Andersen & Co., 435 F.Supp. 84, 96 (S.D.N.Y.), rev'd in part and aff'd in part, 567 F.2d 225, 229, n.10(2d Cir.1977).....................9

5. Matter of Doe (Stuart), 408 Mass. 480, 562 N.E.2d 69 (1990)..............................................11

6. Schloetter v. Railoc of Indiana, Inc., 546 F.2d 706, 710 (7th Cir.1976).....................................9

7. T.C. Theatre Corp. v. Warner Brothers Pictures, Inc. 113 F.Supp. 265, 268-269 (S.D.N.Y.1953)....................14

8. Udall v. Littell, 366 F.2d 668, 676 (D.C.Cir.1966), cert. denied, 385 U.S. 1007 (1967)............................10

9. Westinghouse Elec. Corp. v. Kerr-McGee Corp. United States Court of Appeals, Seventh Circuit, 1978. 580 F.2d 1311,.....................................9, 10

## STATUTES

Fed.R.Civ.P 30 and 45.........................................8

N.Y. Code of Professional Responsibility, Section 1200.21 (DR 5-102)..................................................8

McCormick on Evidence (2d ed.1972, Section 88, p. 179).....10

R. Wise, Legal Ethics (1970) 284).........................10

8 Wigmore on Evidence Sec. 2292 (McNaughton] ed.1961........8

Exhibit L- J

MEMO ENDORSED

ENDORSEMENT

Emanuel E. Zeltser, Esq. v. Joint Stock Bank Inkombank, et al.
95 Civ. 0796 (KTD)

The plaintiff, Emanuel Zeltser, Esq., representing himself, has brought a "motion to dismiss pursuant to Rule 56" (sic) the Federal Rules of Civil Procedure seeking dismissal of Defendant Joint Stock Bank Inkombank's ("Inkombank") First Amended Counterclaim against Zeltser and other counterclaim defendants. The First Amended Counterclaim includes allegations that Zeltser and the other counterclaim defendants were involved in a scheme of massive fraud, whereby they stole millions of dollars from Defendant Inkombank, who was once represented by Zeltser. Counterclaim Defendants Anna Reid, Esq., the law firm of Fishkin & Reid, Rachida Mecheri, Elena Palaez, and Foreign Investors Portfolio Management, Inc. ("FIPM") have joined in this motion. Zeltser has submitted affidavits and a Local Rule 3(g) Statement with this motion, so I will treat it as a motion for summary judgment. There are too many genuine issues of material fact present in this case to record them in this memorandum. The motion is denied.

Zeltser has also filed a motion seeking imposition of Rule 11 sanctions on Inkombank, Christy & Viener, Arthur H. Christy and John F. Cambria, allegedly in response to the filing of the First Amended Counterclaim. (The law firm of Christy & Viener, Mr. Christy and Mr. Cambria are named defendants in a related action brought by Zeltser, Palaez and FIPM). From a first reading of the counterclaim, and having sat through the first day of a preliminary injunction hearing wherein Zeltser represented himself, I find that Inkombank appears to have a well-documented claim for fraud against Zeltser. While Rule 11 sanctions might be appropriate in this case, Christy & Viener are not the attorneys who will be sanctioned. Zeltser's motion for imposition of Rule 11 sanctions is denied.

Janna Boulakh, a third-party witness who has refused to comply with a subpoena in this case and who refuses to make herself available for a deposition, has filed a motion to disqualify Christy & Viener, counsel for Inkombank. Elena Palaez and FIPM, both counterclaim defendants, join in this motion. The motion is based on affidavits filed by Palaez and Boulakh, which state that Christy & Viener served as counsel to Palaez and Boulakh. Palaez and Boulakh argue that Christy & Viener will use attorney-client privileged information against them in the current litigation. In response, Christy & Viener has submitted affidavits that make it clear that they never served as counsel to Palaez or Boulakh. No agreement for legal services was ever reached between Christy & Viener and these individuals. The only contact Christy & Viener had with these two individuals was in the course of their representation of Inkombank. Palaez and Boulakh have also failed to show how any of the alleged privileged material would have an effect on this litigation. The

motion to disqualify Christy & Viener is denied.

Janna Boulakh has also moved to quash a subpoena duces tecum issued by Inkombank on June 23, 1995, which seeks production of documents and deposition testimony from Boulakh.  Presumably, the passage of time has diminished the alleged burden of producing these documents within the original period provided in the subpoena.  Ms. Boulakh is ordered to produce the documents sought in the subpoena and make herself available to be deposed on April 8, 1996 at 9:30 a.m. at the place set forth in the subpoena.

At a preliminary injunction hearing that commenced on March 18, 1996, I granted Inkombank's motion to compel production of documents from Chemical Bank and Republic National Bank.  Mr. Zeltser was ordered to produce all documents related to the Chemical account by 9:30 a.m. on Thursday March 21, 1996.  I directed Christy & Viener to issue a subpoena for the Republic documents returnable for the same date and time.

The costs and attorneys' fees incurred by Defendant Inkombank for responding to these motions are to be paid by the plaintiff Emanuel Zeltser, the counterclaim defendants joining in these motions, Anna Reid, Esq., the law firm of Fishkin & Reid, Elena Palaez, FIPM, and Rachida Mecheri, and Barry Leibowicz, counsel to the third-party witness, Janna Boulakh. · These are nothing more than frivolous motions designed to frustrate the resolution of this case.


SO ORDERED.

DATED:    NEW YORK, NEW YORK
          March 21, 1996


                              KEVIN THOMAS DUFFY, U.S.D.J.

Exhibit L- K

[illegible]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------x
EMANUEL E. ZELTSER, ESQ.,

Plaintiff,

[illegible] ANNA INKOMBANK, VLADIMIR VINOGRADOV, ALEXEY KORIAKTSEV, [illegible] [illegible]SKY, ANNA KOURSIKOVA, VLADIMIR [illegible], ELENA KOROTCHKOVA, [illegible] [illegible], ANDREY SHINKEVITCH, RAFAEL NAGOPETYANTZ, AND VLADIMIR [illegible]SKY,

Defendants.
---------------------------------------x
JOINT STOCK BANK INKOMBANK,

Counterclaim plaintiff,

- against -

EMANUEL E. ZELTSER, ESQ.

Counterclaim defendant,

- and -

ALEXANDER FISHKIN, ANNA REID, FISHKIN & REID, OMEGA BROKERAGE SERVICES, INC., FOREIGN INVESTORS PORTFOLIO MANAGEMENT, INC., ELENA PELAEZ, NACHIDA MECHERI, AND JOHN DOES 1-10,

Additional counterclaim defendants.

95 Civ. 0796(KTD)

And Related Actions
---------------------------------------x

Page 2

September 1, 1995
10:00 a.m.

Deposition of VLADIMIR VINOGRADOV, at the offices of Christy & Viener, 620 Fifth Avenue, New York, N.Y., before Christina Diaz, a Registered Professional Reporter and Notary Public of the State of New York.

[illegible] & HILLMAN
Computerized Reporting
[illegible] Madison Avenue
New York, N.Y. 10016
212-213-5858

Vinogradov 9/1/95

Page 3

APPEARANCES:

EMANUEL E. ZELTSER, ESQ.
Plaintiff pro se
[illegible]
[illegible]
New York, N.Y. [illegible]

ALEXANDER FISHKIN
Counterclaim defendant pro se
[illegible]
Suite [illegible]
New York, N.Y. [illegible]

CHRISTY & VIENER
Attorneys for defendant Joint Stock Bank Inkombank and Vladimir Vinogradov and third-party defendants Christy & Viener, Arthur H. Christy, John Cambria, and William Krocklauer
620 Fifth Avenue
New York, N.Y.10020
ARTHUR CHRISTY
JOHN CAMBRIA
PETER GALLAGHER

DERMAN & DERMAN
Attorneys for plaintiff Elena Pelaez and Foreign Investors Portfolio Management, Inc.
420 Lexington Avenue
New York, N.Y.10170
HERBERT B. DERMAN
Of counsel

PRESENT:

Scott Mitchell
Dan Taylor
Vladimir Preobrajensky
Rafael Nagopetyantz
Alexander Fleroff

Page 4

IT IS HEREBY STIPULATED AND AGREED, by and between counsel for the respective parties hereto, that the sealing and filing of the within deposition be waived; that such deposition may be signed and sworn to before any officer authorized to administer an oath; that all objections, except as to form, are reserved to the time of trial.

MR. MITCHELL: We are going on the record at 10:08 a.m., Friday, September 1, 1995 in the matter of Emanuel Zeltser versus Inkombank and Inkombank versus Zeltser and related actions. This is the videotaped deposition of Mr. Vladimir Vinogradov. We begin tape one. Will counsel please introduce themselves.

MR. CAMBRIA: Yes. My name is John Cambria. I'm a partner at Christy & Viener. I will be defending the witness Mr. Vinogradov. To my left is Arthur Christy also a partner at Christy & Viener who is also defending the deposition with me. Behind us sitting down now is our associate,

Vinogradov                                    Page 33

2  Q. Would you know who could give the
3 information to your attorneys that Ms. Mecheri is
4 a native-born Russian?
5     MR. CAMBRIA: I object to the form. You
6 can answer.
7     A. I don't understand. That's the
8 responsibility of the attorneys. I don't know
9 what this has to do with the case.
10    MR. ZELTSER: Mr. Vinogradov, you cannot
11 question the relevance of the question. It's
12 only your lawyer can do that and,
13 Mr. Cambria, if you can explain that.
14    MR. CAMBRIA: I think he answered the
15 question. Why don't we move on?
16    MR. ZELTSER: Let's mark that for a
17 ruling, please.
18    Q. Mr. Vinogradov, paragraph 10 of your
19 counterclaim indicates that Omega Brokerage
20 Service has one of its addresses at 14/15
21 Parliament Street, Dublin 2 Ireland.
22 Mr. Vinogradov, do you know of any company that is
23 affiliated or is a subsidiary of Inkombank that
24 has the same address?
25    A. Let's translate the paragraph first.

Vinogradov                                    Page 34

2     MR. ZELTSER: Mr. Cambria, I'm going to
3 object to that. I'm asking a particular
4 question.
5     Q. Do you know of any subsidiary of
6 Inkombank other than Omega that is located at
7 14/15 Parliament Street, Dublin, Ireland? That's
8 all.
9     A. I affirm that Inkombank has
10 approximately half a thousand legal entities. All
11 of their addresses, I never knew and I don't have
12 to know within the framework of my position. That
13 is also -- it's the same for Omega Brokerage
14 Service. Those are not the responsibilities of
15 the president.
16    Q. Mr. Vinogradov, amongst the half a
17 thousand subsidiary companies of Inkombank, is
18 there a company by the name Hoverwood Limited,
19 Dublin?
20    A. Yes. From the end of January, there is.
21    Q. January of what year, Mr. Vinogradov?
22    A. '94.
23    Q. Prior to the end of January of 1994,
24 Hoverwood was not a subsidiary organization of
25 Inkombank, is that your testimony, Mr. Vinogradov?

Vinogradov                                    Page 35

2     A. I am affirming that -- the thing that I
3 am affirming is that Hoverwood was an affiliate,
4 daughter company, of Inkombank as of the end of
5 January or the beginning of February of '94.
6 That's what I'm affirming.
7     Q. Mr. Vinogradov, do you happen to know
8 the address of Hoverwood?
9     A. I protest. I already told you once that
10 it's not my responsibility to know all the
11 addresses.
12    Q. Mr. Vinogradov, with respect to the
13 period of approximately beginning 1993 and until
14 the time that Hoverwood became the subsidiary of
15 Inkombank, did Inkombank have any experience in
16 western banking or investments?
17    A. It's pretty long. Could you repeat the
18 question?
19    Q. In 1993, did Inkombank have any
20 experience in western-type of investments or
21 banking in the west?
22    MR. CAMBRIA: Object to the form. He
23 can answer it.
24    A. In accordance with the license,
25 Inkombank had the right to have -- to perform

Vinogradov                                    Page 36

2 operations in the international market as of 1992,
3 approximately from the month of November. If you
4 are talking about the breadth or the strength of
5 investment operations, then I think it's rather --
6 it's unnecessary to ask questions about this
7 because the experience that is total in this case
8 takes years and years to develop.
9     I affirm that Inkombank did not have
10 full, total experience, full or total experience
11 from the moment of receiving the general
12 operations license through the beginning of 1993
13 and it still doesn't have full and total necessary
14 experience. We are actively learning and
15 preparing ourselves. We know now a lot more than
16 we did then.
17    Q. Mr. Vinogradov, I'm going to --
18    MR. CAMBRIA: Tell him that the question
19 has been answered. That's enough.
20    Q. Mr. Vinogradov, is it true that prior to
21 1992, you had never made any investments in the
22 west?
23    A. I don't know.
24    Q. Is there anyone in your organization,
25 Mr. Vinogradov, who would know that?

Exhibit L- L

Exhibit L- M



копия

Number of Shares: —ONE—

# OVERWOOD LIMITED

### This is to Certify

That INKOM-BANK of Block-1, 14, Nametkina str., Moscow

is the registered holder of ONE share of IR£ 1.00 in the above named Company, subject to the Memorandum and Articles of Association of the Company

The common seal of the company has hereunto affixed in the presence of:

Director:

Secretary:

Dated this the 28th day of January 1994

Certificate No.

0280

No transfer of any of the above shares can be registered until this certificate has been deposited at the registered office/calling company



Certificate No: 5

Number of Shares: ONE

HOVERWOOD LIMITED

This is to Certify

That INKOM-BANK of Block 1, 14, Nametkina str. Moscow

is the registered holder of ONE share of IR£ 1.00 in the above limited Company

subject to the Memorandum and Articles of Association of the Company.

The common seal of the company has hereunto affixed in the presence of:

Director:

Secretary:

Dated this the 28th day of January 1994

No transfer of any of the above shares can be registered until this certificate has been deposited at the registered office of the company

0279

Exhibit L- N

HOVERWOOD LIMITED

КОПИЯ

Minutes of a Meeting of the Directors held
on the 28th day of January 1994

PRESENT    Dietmar Bertschler.    Sergio Bossi
Walter Herzog    Vladimir Doudkin

DIRECTORS
APPOINTMENTS:    The appointment of the undermentioned as Directors of the
company was noted :-

Dietmar Bertschler    Sergio Bossi
Walter Herzog    Vladimir Doudkin

DIRECTORS
RESIGNATIONS:    It was noted that ..... Doudkin resigned as Directors of the com-
pany on the 28th day of January 1994.

IT WAS RESOLVED

SHARE
TRANSFERS:    That the following Share Transfers be and are hereby approved
and passed for registration in the books of the company

Tr. N ... Sergio Bossi to Inkombank Moscow - One Ordinary
Share of IRL£1.00

Tr. N ... Dietmar Bertschler to Inkombank Moscow - One
Ordinary Share of IRL£1.00

SHARE
CERTIFICATES:    That the following Share Certificates be sealed, signed and
issued:

Cert.N: 5 Inkombank Moscow - One Ordinary Share of IRL£1.00

Cert.N. 6 Inkombank Moscow - One Ordinary Share of IRL£1.00

THERE BEING NO OTHER BUSINESS THE MEETING THEN CONCLUDED

DATE: 28th January 1994

Dietmar Bertschler    Sergio Bossi    Walter Herzog    Vladimir Doudkin

Exhibit L- O

NEW YORK, NY 10020-2457
TEL 212 632 5500
FAX 212 632 5555

DIRECT DIAL 212 632 5507
DIRECT FAX 212 907 3307
EMAIL 7429062@MCIMAIL.COM

December 24, 1996

**BY FACSIMILE**

O.L. Grant Accounts
P.O. Box 288
Manama, Bahrain

Re:    Your December 1, 1996 Letter

Dear Mr. Grant:

I read with amusement your December 1, 1996 letter to Mr. Vladimir Vinogradov, ostensibly written on behalf of Hoverwood, Ltd., received in this office on December 13, 1996 and noting a purported potential Hoverwood-FIPM settlement. You have no authority as regards Hoverwood, which is 100% owned by our client, Joint Stock Bank Inkombank.

Frankly, Mr. or Ms. "Grant," we wonder who you are or if you exist. You appear to have made yourself untraceable. You are not listed in Martindale Hubbell, the telephone number on your "stationery" appears to be non-operational and the only address identified on your "stationery" is a post office box. Given the somewhat comic appearance of fictional characters in this charade, we have good cause to doubt that, if you exist, you are who you say you are.

At the risk of stating the obvious, we will not honor your request for an affidavit attesting to Inkombank's ownership of Hoverwood, and regret your letter in its entirety. You are hereby instructed on behalf of Hoverwood, Ltd. to take no action at all.

Very truly yours,

Arthur H. Christy

cc:    Emanuel E. Zeltser, Esq.    (via facsimile)
       Herbert Derman, Esq.    (via facsimile)
       Alexander Fishkin, Esq.    (via facsimile)

112710. 1

Exhibit M

LEXSEE 1998 U.S. DIST. LEXIS 8200



Analysis
As of: Apr 20, 2008

**EMANUEL E. ZELTSER, PLAINTIFF, - against - JOINT STOCK BANK INKOMBANK, ET AL., DEFENDANTS. ELENA PELAEZ, ET AL., PLAINTIFFS, - against - REGAL V WORLD WIDE HOLDINGS, ET AL., DEFENDANTS.**

**95 Civ. 0796 (KTD), 95 Civ. 3410 (KTD)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1998 U.S. Dist. LEXIS 8200*

**June 3, 1998, Decided**
**June 4, 1998, Filed**

**COUNSEL:** [*1] Herbert B. Derman, Esq., Of Counsel, Derman & Derman, New York, NY, for Pelaez and Foreign Investors Portfolio Management, Inc.

Emanuel E. Zeltser, Esq., Pro Se, New York, NY.

Arthur H. Christy, Wayne C. Matus, Peter Gallagher, Roger Smith, Of Counsel, Christy & Viener, New York, NY, for Joint Stock Bank Inkombank and Christy & Viener.

Law Offices of Barry Leibowicz, Great Neck, NY, for Janna Boulakh.

Fishkin & Reid, Pro Se, New York, NY.

Edward J.M. Little, Of Counsel, Zuckerman, Spaeder & Goldstein, New York, NY, for Alexander Fishkin, Anna Reid, and Fishkin & Reid.

**JUDGES:** KEVIN THOMAS DUFFY, U.S.D.J.

**OPINION BY:** KEVIN THOMAS DUFFY

**OPINION**

MEMORANDUM & ORDER

**KEVIN THOMAS DUFFY, U.S.D.J.:**

I have tried to address all issues outstanding in both cases and have considered all papers as timely filed. The parties are directed to notify my chambers within ten days of the date hereof, via letter, if I overlooked any motions that were filed with the Clerk of the Court (other than those filed within the last month) and appear on the docket sheet. Notwithstanding the orders in this opinion or a motion to reconsider the rulings in this opinion, *before any party writes* [*2] *a letter to the court, files another motion, or issues subpoenas or requests for documents upon a party or non-party, the parties must attend a conference.*

I direct the parties to attend a Pre-Trial Conference on July 15, 1998 at 10:00 A.M. in courtroom 1306 of the U.S. Courthouse, 40 Foley Square, New York, New York. At the conference, the court will address: (i) matters referred to in this opinion that require a hearing; (ii) whether the cases should be consolidated pursuant to *FED. R. CIV. P. 42(a) (iii)* a date for completion of discovery; and (iv) any other outstanding issues. A date for filing a Pre-Trial Order shall be set at the conference.

**I.**

Plaintiffs, Elena Pelaez, Foreign Investors Portfolio Management, Inc. ("FIPM"), and Emanuel Zeltser, Esq., initially brought Pelaez, 95 Civ. 3410, in New York State Supreme Court, alleging breach of contract, fraud, legal malpractice, and aiding and abetting fraud. The action was removed to federal court on May 11, 1995, and assigned to me as a case related to one already pending before me, Zeltser, 95 Civ. 0796. The main difference between the two cases is that Pelaez involves a dispute over the ownership of excess [*3] collateral on a letter of credit and six promissory notes. In both cases, Joint Stock Bank Inkombank ("Inkombank"), a Russian bank based in Moscow, has filed counterclaims against FIPM and others. Inkombank claims that these parties participated in a scheme of massive fraud, whereby they stole millions of dollars from Inkombank, which at one time was represented by Zeltser.

**II.**

The Clerk of the Court is directed to remove the "Appeal" label on the docket sheet for Zeltser, 95 Civ. 0796. The Second Circuit has no record of a pending appeal. The confusion may be due to the second entry under No. 101 on the docket sheet, which refers to the appeal brought under Pelaez, 95 Civ. 3410. The Clerk of the Court is directed to delete this second entry under No. 101 of the Zeltser docket sheet.

For clarification, two appeals have been filed in Pelaez. The first, assigned Appeal No. 96-7331, was adjourned by stipulation on July 18, 1996. The second, assigned Appeal No. 96-7820, was decided on March 25, 1997. In that appeal, the Second Circuit affirmed my June 18, 1996 decision to grant Inkombank's motion for a preliminary injunction and assessed costs in the amount of [*4] $ 2,086.30 against appellants.

Several motions are pending in the above-captioned cases. Parts III through XIX below address each of them.

**III.**

Barry Leibowicz, counsel to the third-party witness, Janna Boulakh, moves (# 84 on Zeltser docket) to reconsider the portion of my Endorsement, dated March 21, 1996, that deemed the motion made by his office to be frivolous and assessed the "costs and attorneys' fees incurred by Defendant Inkombank for responding . . . to

be paid by the plaintiff Emanuel Zeltser, the counterclaim defendants joining in these motions, Anna Reid, Esq., the law firm of Fishkin & Reid, Elena Pelaez, FIPM, and Rachida Mecheri, and Barry Leibowicz".

My decision was based on Leibowicz' motion to quash a subpoena issued to Boulakh and to disqualify Christy & Viener, counsel for Inkombank. Pelaez and FIPM joined Leibowicz in this motion. In my decision, I wrote:

The motion is based on affidavits filed by Pelaez and Boulakh, which state that Christy & Viener served as counsel to Pelaez and Boulakh. Pelaez and Boulakh argue that Christy & Viener will use attorney-client privileged information against them in the current litigation. In response, Christy [*5] & Viener has submitted affidavits that make it clear that they never served as counsel to Pelaez or Boulakh. No agreement for legal services was ever reached between Christy & Viener and these individuals. The only contact Christy & Viener had with these two individuals was in the course of their representation of Inkombank. Pelaez and Boulakh have also failed to show how any of the alleged privileged material would have an effect on this litigation. The motion to disqualify Christy & Viener is denied.

(emphasis added). While I will not address whether sanctions were appropriate, Leibowicz's argument, that "the opinion of the Court [with regard to sanctions] may have been colored by the egregious conduct before the Court of the various defendants to the action," (Leibowicz Aff. of 4/3/96, P 3), is valid. After my review of Leibowicz's filings, I cannot say definitively now that Boulakh's motions were filed in bad faith. Accordingly, I expunge the sanctions for Leibowicz.

The sanctions assessed in my March 21, 1996 Endorsement are otherwise unaltered. See Part XVII, infra.

**IV.**

Christy & Viener, Arthur H. Christy, Esq., John F. Cambria, Esq., William F. [*6] Kracklauer, Esq., and

Vladimir Vinogradov move (# 36 on Zeltser docket) pursuant to *FED. R. CIV. P. 12(b)(6)* to dismiss (i) counterclaim defendant Alexander Fishkin's third-party complaint against Christy & Viener, Arthur H. Christy, Esq., John F. Cambria, Esq., and William F. Kracklauer, Esq., and (ii) Fishkin's cross-claim against Vladimir Vinogradov. As there is no record of a response from Fishkin, I grant both motions. [1]

> [1]   I note that even if a response were filed, Fishkin would have to overcome sound arguments presented by the movants. First, Fishkin alleges that the movants should indemnify him for any judgment he is found to owe Inkombank in connection with the counterclaims. The counterclaims, however, are based on counterclaim defendants' "alleged intentional looting of Inkombank accounts." (Christy & Viener Mem. of 6/18/95, at 38). An award of damages against Fishkin would therefore depend upon a finding that he engaged in intentional conduct. New York law, however, forbids indemnity in favor of an intentional tortfeasor. See, e.g., *Anderson v. Local Union No. 3, 582 F. Supp. 627, 633 (S.D.N.Y. 1984)*, aff'd, *751 F.2d 546 (2d Cir. 1984)*.
>
> Second, the indemnification claim against Vinogradov is based on Fishkin's contention that Vinogradov agreed to indemnify him for any judgment awarded against Fishkin in favor of Inkombank. Not only has Fishkin failed to offer an agreement, but under New York law, exculpatory agreements, including indemnification contracts, for losses caused by intentional misconduct are void as violative of public policy. See, e.g., *Great Northern Assoc., Inc. v. Continental Casualty Co., 192 A.D.2d 976, 596 N.Y.S.2d 938 (3d Dep't 1993)*.

[*7] V.

Inkombank, Christy & Viener, Arthur H. Christy, Esq., John F. Cambria, Esq., William F. Kracklauer, and Vladimir Vinogradov move (# 72 on Zeltser docket) to dismiss the cross-claims of counterclaim defendant FIPM, pursuant to *FED. R. CIV. P. 56 and 9(b)*.

A.

FIPM's cross-claims include two breach of contract

allegations against Inkombank. In its first cause of action for breach of contract, FIPM seeks indemnification for unspecified lawsuits and over eight million dollars in dividends for an alleged stock purchase agreement with Inkombank, dated June 18, 1993 (the "Agreement"). FIPM was not a party to the Agreement, but alleges that it acted "as agent and attorney-in-fact" for "three investors." In a reply memorandum, FIPM's counsel attempts to amend its pleadings by arguing that FIPM is "a real party in interest, both as a trustee as well as a holder in due course of [Inkombank's] equity and debt paper." (Reply Mem. of 1/12/96, at 8). I find that FIPM does not have standing under *FED. R. CIV. P. 17(a)*, however, and therefore dismiss the first claim for breach of contract.

As to the second breach of contract claim, Inkombank argues that since it is based [*8] on promissory notes allegedly guaranteed by Inkombank and "is at the heart of the Pelaez action", it is plead improperly in the Zeltser action. A decision on this point is premature until the court's conference.

B.

In its cross-claims, FIPM also alleges that Inkombank's counsel, Christy & Viener, filed false counterclaims with knowledge of their falsity and improperly attempted to influence witnesses and obtain documents. While FIPM's pleadings are not entirely clear, I dismiss the claims in their entirety. [2] The movants' legal arguments that focus on the cross-claims as plead are dispositive.

> [2]   The claims fall into four categories: (i) RICO; (ii) abuse of process; (iii) prima facie tort; and (iv) violation of *Section 487* of the New York State Judiciary Law as to Christy & Viener only.

As to the RICO claim, FIPM's response papers do not discuss *Von Bulow v. Auersperg, 657 F. Supp. 1134 (S.D.N.Y. 1987)*. In Bulow, the Court prohibited invocation of RICO, holding that claims based on improper [*9] filing and conduct of a litigation are not proper predicate acts. Although counsel for FIPM states that "nowhere in its cross-claim did [FIPM] assert claims based upon malicious prosecution," a reading of the cross-claims reveals a series of acts sounding in malicious prosecution. Thus, FIPM's RICO claim must be dismissed. See *I.S. Joseph Co. v. J. Lauritzen A/S, 751 F.2d 265, 267-68 (8th Cir. 1984)* ("If a suit is groundless or filed in bad faith, the law of torts may provide a

remedy. Resort to a federal criminal statute is unnecessary.").

FIPM's allegation also does not state a cognizable claim for abuse of process. In order to state such a claim, the "process" necessary for that tort "must involve an unlawful interference with one's person or property." *Curiano v. Suozzi, 63 N.Y.2d 113, 469 N.E.2d 1324, 480 N.Y.S.2d 466 (N.Y. 1984)*. Any other process -- "including a summons, and the process necessary to obtain jurisdiction and begin the lawsuit" -- is irrelevant for abuse of process purposes. Id. As no provisional remedy has been sought against FIPM (or any other party), the claim for abuse of process must be dismissed.

FIPM's allegations are also insufficient to [*10] state a prima facie tort claim. While the allegations could state a claim for malicious prosecution, FIPM must first await completion of the action before bringing a claim for civil malicious prosecution. Only then can the merits of their arguments be assessed properly.

Finally, FIPM's allegations are too conclusory to state a claim for violation of *Section 487 of the New York Judiciary Law*.

Accordingly, I grant FIPM twenty days from the date hereof to replead its cross-claims.

## VI.

Third party witness Janna Boulakh [3] moves (# 103 on Zeltser docket) for a protective order, pursuant to *FED. R. CIV. P. 26*, prohibiting Zeltser or another party from making an inquiry of Boulakh at her deposition regarding information and/or documents obtained through subpoenas to Citibank (4/26/96), Citibank Visa (9/16/96), American Express (9/16/96), Discover Card (9/16/96) and Philip Kouzmin (5/2/96). Boulakh further moves to compel Zeltser to obtain the court's permission for good cause shown prior to issuing any further subpoenas pertaining to her. Zeltser cross-moves (# 105 on Zeltser docket) for an order, pursuant to *FED. R. CIV. P. 45(e)*, to hold Boulakh in contempt of court for [*11] failure to obey this court's order to appear for cross-examination at her deposition.

3    Boulakh was Zeltser's secretary during the period that Zeltser represented Inkombank.

A.

Boulakh's motion for a protective order is denied. Although it is possible, as Boulakh suggests, that Zeltser has utilized information obtained through the subpoenas "to not only annoy and embarrass [her] . . . but also to submit her to an undue burden and to defame her character", (Leibowicz Aff. of 10/18/96, P 7), breaches of the court's confidentiality order pertaining to these issues will be addressed in a later section. For now, I find that Zeltser is entitled to use the information obtained from the subpoenas during Boulakh's cross-examination.

As to Boulakh's request regarding future subpoenas, I find that the facts of this case and the history of the parties require me to order that Zeltser obtain the court's permission prior to issuing any future subpoenas regarding Boulakh.

Arthur Christy claims that "Zeltser never [*12] notified Inkombank of any of the subpoenas, in violation of *Rule 45(b)(1) of the Federal Rules of Civil Procedure*." (Christy Aff. of 11/7/96, P 2). Zeltser is thus ordered to comply with *Rule 45(b)(1)* by filing affidavits of service with the court for all future subpoenas. Failure to do so will result in sanctions.

B.

Zeltser's cross-motion to hold Boulakh in contempt is also denied. On March 22, 1996, the court denied Boulakh's motion to quash a subpoena issued to her by the law firm, Christy and Viener. Boulakh then attended two days of examination on April 8, 1996, and April 18, 1996. Zeltser did not have an opportunity to cross-examine Boulakh on either day. Zeltser alleges that "Boulakh's counsel stated that Boulakh, immediately thereafter, was going on a month and a half long overseas trip and suggested that the next available date to commence Boulakh's cross-examination be June 4, 1996." (Zeltser Aff. of 10/29/96, P 4). Next, counsel for Boulakh responds that "[he] advised all interested parties that Boulakh would not appear at a deposition which had been tentatively scheduled for June 4, 1996." (Leibowicz Aff. of 11/22/96, P 10).

Boulakh's counsel offered Zeltser [*13] a reasonable explanation as to why Boulakh could not appear on June 4. In a letter dated May 30, 1996, Dr. Inga Zilberstein, Boulakh's obstetrician, wrote that Boulakh had "an estimated delivery date of June 30, 1996. At this late stage of the pregnancy it would be unhealthy for her and possibly her child to undergo a high stress examination."

(*Id.* Ex. A).

Zeltser's response to this explanation, on the other hand, does not seem as reasonable. Accordingly, I will not hold Boulakh in contempt for not attending a tentatively scheduled continued deposition.

Instead, I order Mr. Leibowicz to notify Boulakh to appear at the law offices of Christy & Viener, 620 Fifth Avenue, 6th Floor, NY, NY 10020, at 10:00 A.M., on June 15, 1998, and if necessary, from day to day thereafter at 10:00 A.M. There will be no adjournments.

## VII.

Anna Reid, Zeltser's former wife, moves for a protective order (# 115 on Zeltser docket), pursuant to *FED. R. CIV. P. 26*, directing Fordham University School of Law not to respond to the subpoena issued by Christy & Viener. The motion is denied.

Christy & Viener submit that through the documents produced by this subpoena, "Inkombank would be able to [*14] learn the name of the law school Reid told Fordham she attended . . . and prove that (i) Reid's admission to Fordham and the Bar was based on an outrageous lie, and that (ii) she used her false status as a lawyer to defraud Inkombank by engaging in the unauthorized practice of law, when she performed 'legal services' in 1993 and 1994 for Inkombank, and Inkombank's company, [FIPM]." (Matus Aff. of 1/13/97, P 3) (filed as # 75 in Pelaez docket). I find that sufficient reason has been established to enforce the challenged subpoena of Reid's records at Fordham University School of Law. The return date of such subpoena is set as June 12, 1998.

At the conference, the court will address any issues pertaining to the validity of exhibits attached to the parties' affidavits, including putting Reid on the witness stand if necessary. [4]

> 4   For example, Herbert Derman questions the validity of Exhibit Q to Mr. Matus' Affidavit, which "purport[s] to be written by Anna Reid on Mr. Zeltser's letterhead . . . ." (Derman's Reply Aff. of 1/16/ 97 P 10).

[*15] I need not address Derman's claim that "neither [Derman], nor any other counsel were ever served with copies of the subpoena served upon

Fordham." ( *Id. P 16*). I have no reason to believe that Christy & Viener did not provide each of its opponents with notice of the subpoena. (See Matus Aff. of 1/13/97, Ex. O).

## VIII.

Inkombank moves (# 85 on Zeltser docket), pursuant to *FED. R. CIV. P. 45(e)*, holding non-party witnesses Alla Waters and Svetlana Moisievich in contempt for failure to appear and be deposed and to produce certain documents responsive to subpoenas.

Arguments in opposition regarding alleged inaccuracies with the physical description of Moisievich in the Affidavit of Service as well as with the untimely service of the subpoenas after the expiration of discovery cut-off dates lack merit. [5]

> 5   Though there is confusion regarding whether discovery cut-off dates applied to non-party discovery, certain facts prove that it was clear that the parties were on notice that despite discovery cut-off dates for parties, non-party discovery would continue. For example, while the first discovery cut-off date was September 29, 1995, Derman served Inkombank with a subpoena calling for the production of documents on November 17, 1995 from Hoverwood, Ltd. (Christy Reply Aff. of May 16, 1996, at Ex. D). Additionally, while the second discovery cut-off date was January 31, 1996, on February 16, 1996, Derman served Inkombank with a *Rule 45* Notice of Deposition of non-party witness Vladimir Petrov. (Id. at Ex. A).

[*16] Thus, finding that Inkombank's service was proper in all aspects, the motion for contempt is denied. Counsel for Inkombank is directed to notify Moisievich to appear at the law offices of Christy & Viener, 620 Fifth Avenue, 6th Floor, NY, NY 10020, at 10:00 A.M., on June 15, 1998, and if necessary, from day to day thereafter at 10:00 A.M. Further, counsel for Inkombank is directed to notify Waters to appear at the law offices of Christy & Viener, at 10:00 A.M., on June 17, 1998, and if necessary, from day to day thereafter at 10:00 A.M. There will be no adjournments. [6]

> 6   Derman infers that his clients may have moved for a protective order if he had notice of the subpoenas. I find, however, that ample evidence

supports the fact that Derman was notified of the subpoenas and that Inkombank has set forth more than enough reasons to depose Waters and Moisievich. (Inkombank Mem. of Law of 4/10/96). Despite Derman's assertions, a motion for a protective order is probably futile, but may nevertheless be made if valid arguments support its basis.

**[*17] IX.**

Other objections to subpoenas on the dockets include Derman's objections (# 74 on Pelaez docket and # 96 on Zeltser docket) to a subpoena served by Christy & Viener on November 14, 1996 for non-party Zev Siegel, Christy & Viener's objections (# 76 on Pelaez docket) to a subpoena served by Zeltser on February 6, 1997 for non-party Alexei Berezhkov and Chemical Bank's objections (# 64 on Zeltser docket) to a subpoena served by Zeltser.

The court will address such objections at the conference. There, the party who filed the subpoena will be required to inform the court whether the deposition is still required and why. Each party will then have a brief opportunity to discuss *only substantive reasons* why it should or should not take place. Any procedural objections will be denied.

**X.**

Inkombank moves (# 47 on Pelaez docket) for a protective order, pursuant to *FED. R. CIV. P. 26(c)*, protecting Bank of New York ("BONY") from any obligation to produce documents in response to Fishkin's document requests. Because I do not find that the documents requested are reasonably calculated to lead to the discovery of admissible evidence, BONY need not respond **[*18]** to request numbers 5(a)-(m), 6(a)-(f), 7, 8(a)-(f), 10(a)-(b), 12, 13, 14, and 15 of the First Requests nor to any of Fishkin's Second Requests.

**XI.**

Inkombank moves (# 35 on Pelaez docket) for an order granting it partial summary judgment as to BONY's interpleader action and awarding Inkombank possession of the interpleaded funds. The motion is granted.

Inkombank establishes that in early 1994 it transferred $ 8,777,000 of its funds to BONY as

collateral for a letter of credit for $ 7,021,110. The letter of credit was for the benefit of one of Inkombank's clients, Joint Stock Company Rosskat ("Rosskat"), so that Rosskat could purchase equipment from Southwire Co. for the manufacture of copper coils and rods. In early 1995, BONY paid out $ 7,021,110 pursuant to the letter of credit to Southwire Co.

The difference in the two amounts above represents excess collateral to which BONY admits it has no claim. The only other party to state a claim is FIPM. As there is no record of a response by FIPM on the docket and FIPM's complaint and answer do not set forth a valid argument as to why it has a claim to the excess collateral, Inkombank's motion is granted. Inkombank is directed **[*19]** to submit a proper order [7] within ten days of the date hereof.

> 7    A proper order does not even suggest any relief other than that actually granted. Christy & Viener have a history of producing draft orders which are clearly not proper.

**XII.**

On behalf of Inkombank, Wayne C. Matus of Christy & Viener submitted a proposed Order to Show Cause "setting a trial date . . ., precluding the use at trial of any documents not produced to the parties by December 2, 1996, [and] prohibiting the use at trial or any preliminary hearing of all audio and/or video tape recordings, other than videotapes of depositions taken in this case."

I will not set a trial date until the Pre-Trial Conference mentioned above, but in order to save time, since Inkombank raises a legitimate concern regarding the authenticity of documents, Inkombank is ordered to serve each party with a copy of the Index that its counsel prepared. The parties have until June 30, 1998 (i) to produce any documents (including any audio or video tape **[*20]** recordings) that were not produced during the Initial Discovery Period, (ii) to file with the court any corrections to the Index and (iii) to prepare a Supplemental Index that itemizes each of the items that were produced after the Initial Discovery Period.

After the documents are produced, I will consider any of Inkombank's objections to their authenticity and admissibility at trial.

**XIII.**

Inkombank moves (# 92 on Zeltser docket) pursuant to *FED. R. CIV. P. 37* to dismiss the claims of FIPM, to enter a default against Foreign Investors Portfolio Management, Inc. ("FIPM"), and to direct the Clerk of the Court to accept no further filings from Emanuel Zeltser, FIPM, Elena Pelaez, Rachida Mecheri and/or Anna Reid. The motion is denied.

Inkombank argues that FIPM has not divulged the real name or address of its purported principal and sole decision-maker, Alexander Leo Slavinsky; and FIPM has failed to produce Slavinsky for his continued deposition on May 28, 1996.

Indeed, despite a court order that FIPM and its counsel, Derman, turn over Slavinsky's real name and address, the court received Slavinsky's business card via facsimile from Derman on March 29, 1996 containing [*21] false information. (See Matus Aff. of 4/26/96, PP 8-13). To date, Derman has not investigated either the validity of the business card he produced or Slavinsky's real name and address.

Though Edward Little, Esq., in a letter dated June 17, 1996, states that "the relevance [of Slavinsky's identity] has yet to be established," Slavinsky's alleged decision-making role for FIPM makes his identity very relevant. Further, there is no privilege for a man's name and address.

Accordingly, I direct FIPM, at its own cost, to schedule Slavinsky to appear at the law offices of Christy & Viener, 620 Fifth Avenue, 6th Floor, NY, NY 10020, at 10:00 A.M., on June 22, 1998, to pay the costs for a reporter and to forward a copy of the transcript of the deposition to the court within five days thereafter. At the deposition, FIPM is required to produce all of the names and addresses used by Slavinsky for any purpose whatsoever in the past five years and to specifically identify his given and current name(s), and current business and residential addresses. If Derman's concerns for Slavinsky's safety still exist, Derman may submit a supplemental confidentiality order for the court's review at least [*22] five days before Slavinsky's deposition.

If FIPM is unable to produce Slavinsky, counsel for FIPM is required to file a sworn affidavit with the court at least ten days before Slavinsky's scheduled deposition detailing his attempts to contact Slavinsky and why he is unable to appear. At that time, the court will reconsider Inkombank's motion to strike FIPM's pleadings.

## XIV.

In letter dated July 22, 1996, John F. Cambria of Christy & Viener, counsel for Inkombank, informs the court that "portions of the videotaped deposition of Vladimir Vinogradov, the president of Inkombank, taken in the companion case of Zeltser . . . were shown in Russian television." Included with such letters is the Affirmation of Arthur H. Christy attesting to the use of Mr. Vinogradov's videotaped deposition on Moscow television. Mr. Cambria asserts that this violates the Interim Stipulation Regarding Confidentiality (the "Stipulation"). The Stipulation, attached as Exhibit A to Christy's Affirmation, "expressly prohibits the dissemination of exhibits to the deposition and the videotape of Mr. Vinogradov's deposition, subject to penalties which include contempt."

Though suspicious, all parties have [*23] denied that they violated the Stipulation. [8] In any event, there is some question as to whether the Stipulation has expired and whether the parties will enter into a final confidentiality agreement. Therefore, until the conference, the terms of the Stipulation govern. In addition, due to numerous alleged leaks to the media in this case, I direct the parties not to discuss this case with the media in this country or abroad.

8    Mr. Christy attests:

> As Mr. Zeltser was in Moscow on or about 13, July 1996, according to a fax he sent me on 5 July 1996, I can only surmise that he, with the concurrence of Messrs. Derman and Fishkin, breached the Stipulation by delivering, or arranging the delivery of, a copy of the videotape of Mr. Vinogradov's deposition to Channel 1 (ORT), the Russian television station.

(Christy Affirmation P 7). Zeltser, in a letter dated July 26, 1996, denies these allegations. In a letter dated July 27, 1996, Fishkin responds that "I have not supplied Russian TV with any videotapes." In a letter dated July 29, 1996, Derman writes, "I can state that I have not communicated with anyone from Russian TV or given a copy of Vinogradov's

videotaped deposition."

**[*24] XV.**

Inkombank moves (# 118 and # 122 on Zeltser docket) to dismiss Zeltser's claim for legal fees and expenses, pleaded in the second through fifth claims for relief set forth in Zeltser's complaint, dated February 2, 1995. Zeltser cross-moves (# 123 on Zeltser docket) to dismiss the counterclaims based on Hoverwood's grievances. Pelaez cross-moves (# 82 on Pelaez docket) to reinstate the malpractice and fraud claims against Christy & Viener.

**A.**

At issue in Inkombank's motion is the authenticity of Zeltser's credentials. [9] An attorney seeking legal fees bears the burden of proving the existence of a valid contract for legal fees with all material circumstances known to the client. Accordingly, Zeltser's argument that Inkombank waived its right to challenge his credentials is without merit.

> [9]  The issue is properly before the court. In a letter dated January 3, 1997, the Disciplinary Committee of the Appellate Division, First Department, of the State of New York, writes that the "Committee has determined that our investigation and disposition [of Zeltser's attorney status] should await the results of the litigation." (Christy Aff. of 6/3/97, Ex. G).

**[*25]** While the evidence appears to establish that Zeltser did not obtain a law degree from Kishinev State, but studied piano full-time at the Moldovan State Institute of Arts, I will not rule on the motion at this time. At the conference, Zeltser will have an opportunity to make an oral argument and provide affidavits signed by professors and officials in the administrative offices at Kishinev State University. Only clear, unaltered evidence will be accepted by the court.

**B.**

Zeltser's cross-motion to dismiss the counterclaims based on Hoverwood's grievances is denied. Zeltser argues that Inkombank lacks standing to challenge funds transferred from Hoverwood accounts. Thus, while the portions of the counterclaims contesting transfers from Hoverwood accounts might eventually be dismissed, I

find that Inkombank has set forth more than enough evidence regarding its ownership of Hoverwood and accordingly deny the motion.

**C.**

Pelaez and FIPM seek to reinstate their claims of fraud and malpractice against Christy & Viener, pleaded in the complaint filed in Pelaez. In a Memorandum and Order, dated May 1, 1996, I dismissed these claims. The briefs offer no new material evidence. **[*26]** The motion is denied.

Nevertheless, the court seeks to unravel the truth of Derman's "incredible discovery" that "Boulakh's attorney's Leibowicz' legal fees for filing the motion to quash Inkombank's subpoena and to disqualify Inkombank's counsel, Christy & Viener, were paid by Inkombank itself." (Derman Aff. of 5/19/97, P 30). Therefore, at Derman's expense, Leibowicz is directed to appear at the conference and to bring with him Boulakh's canceled checks for his fees. Further, Leibowicz is also directed to prepare an Affidavit by Boulakh detailing where she obtained the money to pay Leibowicz to determine the truth of Derman's "incredible discovery".

I do, however, grant Pelaez leave to file an amended complaint within twenty days of the date hereof. If the amended complaint raises no new claims, however, counsel will be sanctioned.

**XVI.**

Inkombank's motion to hold Fishkin, Derman, and Zeltser in contempt is denied. Fishkin should retain counsel for the conference, however, to explain why he has failed to obey explicit orders of the court. Specifically, I ordered Fishkin to produce six promissory notes issued by Rosskat, a Russian corporation, to Southwire Co., a United States **[*27]** corporation, dated December 23, 1993, guaranteed by Inkombank in the aggregate amount of $ 15,615,157, which were assigned to FIPM. If Fishkin and Zeltser do not show up at the conference with the notes, Fishkin and Zeltser are directed to find out their exact location. Another letter from Boris Kuznetsov will not suffice. Details are required regarding the identity of Magister Marek Zabrocki and Kuznetsov's statement that the Rosskat notes "serve the function of the security-collateral for credit and investment supplied by Mr. Zabrocki clients through Potoszki Trust in the 2d of April of 1994."

## XVII.

In my Endorsement dated March 21, 1996, I assessed sanctions against Zeltser, Reid, the law firm of Fishkin & Reid, Pelaez, FIPM, and Rachida Mecheri, and Barry Leibowicz, counsel to the third-party witness, Janna Boulakh. Mr. Leibowicz was excused from paying sanctions in Part III of this decision.

Mr. Christy submits an affidavit stating that Inkombank's fees and expenses in connection with those claims and motions total $ 43,173.50. Mr. Little, who was asked by Fishkin and Reid to respond on this matter, states in a letter, dated November 12, 1996, that the "Court's order [*28] granting attorney's fees and costs was made without notice and an opportunity to be heard."

No notice is required. I find the reasonable value of legal services and expenses incurred by Inkombank, after subtracting the amount that would have been paid by Boulakh's counsel, to be $ 35,000. Inkombank is ordered to submit a judgment within five days of the date hereof.

## XVIII.

At the conference, the parties will discuss Inkombank's proposed Default Judgment regarding counterclaim defendant Omega Brokerage Services, Inc. Further, the parties will discuss what occurred regarding the penultimate paragraph of my Memorandum & Order dated May 1, 1996. I wrote that "Plaintiffs are therefore ordered to show cause within ten days of this order why they should not be sanctioned pursuant to *Rule 11 of the Federal Rules of Civil Procedure*." I have found no response on the docket. Finally, the parties will bring to court any decisions regarding sanctions assessed in American Urgy Medical Center, Inc. v. Richard Lipsky, Emanuel Zeltser et al. (A-2549-92T1).

## XIX.

As the parties are aware, my law clerk contacted the parties in good faith to verify my list of the outstanding motions. [*29] The only matter of import raised in the responses is found in Derman's letter dated December 3, 1997. Derman states that "FIPM and Pelaez will renew their application to accord protective measures to witnesses." In footnote 1 of a letter dated May 29, 1996, Zeltser writes that "defendants are well aware that on March 28, 1996, the court denied protective measures to Russian based witnesses and that such denial is tantamount to depriving FIPM of presenting any further witnesses in this case." Derman and Zeltser may present evidence on this issue at the conference.

After being contacted by my law clerk, the parties have once again attempted to inundate this court with paper. All of these new matters will be disposed of at the Pre-Trial Conference on July 15, 1998.

## XX.

Lawyers admitted to the bar of this court are unable to excuse themselves from practicing in a competent, civilized and ethical manner. I take this opportunity to warn all of the attorneys in this case that failure to conduct themselves with a renewed sense of professionalism will result in severe penalties.

SO ORDERED.

DATED: New York, New York

June 3, 1998

KEVIN THOMAS DUFFY, U.S.D.J.

Exhibit N

Doc # 121  Ex. A

MSO F-J

SUPREME COURT OF THE STATE OF NEW YORK - NEW YORK COUNTY

PRESENT:                                                              PART  14

Hon.    MYRIAM J. ALTMAN
_____ Justice.

Emanuel E. Zeltser          I.A.S. MOTION SUPPORT        INDEX NUMBER  11364/9_
                            PAPERS SUBMITTED
     —against—              JAN 1 6 1991                 MOTION DATE  1/8/91
SARL Manager, et al         NUMBERED                     MOTION SEQ. NO.  001

                                                         MOTH CAL. NO.  _____

The following papers numbered 1 to _____ read on this motion to _____

                                                         PAPERS NUMBERED
Notice of Motion/Order to Show Cause - Affidavits - Exhibits _____
Answering Affidavits - Exhibits _____
Replying Affidavits _____

Upon the foregoing papers it is ordered that this motion ____ is decided in accordance
with accompanying memorandum decision.

FILED
FEB 2 8 1991
COUNTY CLERK'S OFF
NEW YORK

Dated    1/16/91

SUPREME COURT : NEW YORK COUNTY
IAS PART 14
-------------------------------------

EMANUEL E. ZELTSER and
ANNA ZELTSER,

        Plaintiffs,

   -against-

SARL MANAGER, YANICK OLIVIER and
MR. OTTAVIANO,

        Defendants.

Index No.

11364/90

-------------------------------------

MYRIAM J. ALTMAN, J.:

    Plaintiffs move for partial summary judgment and defendants cross-move to dismiss the complaint for lack of jurisdiction and on the ground of forum non conveniens. Defendants also seek sanctions in the amount of attorneys' fees incurred on this motion and cross motion.

    Plaintiffs, through their French company, Cigalous Properties Ltd., purportedly entered into a contract for the sale of their property located in France to defendant SARL Manager. Defendants Yanick Olivier and Daniel Ottaviano are apparently the principals of SARL Manager. The sale was never consummated and, some time in 1989, SARL Manager commenced an action against Cigalous Properties in France seeking specific performance.

    Plaintiff Emanuel Zeltser claims that he was fraudulently induced into signing the contract and plaintiff Anna Zeltser claims that her signature on the contract is a forgery.

001

In this action, commenced in February 1990, they seek damages for defendants' alleged fraud and misconduct. These same claims were asserted by Cigalous Properties in the French action in January 1990. Defendants have submitted a copy of the pleadings in the French action, but a translation has not been provided. However, from my limited knowledge of French, it appears that the claim is the same as that asserted in this action. Mr. Zeltser alleges that he neither reads nor writes nor speaks a word of French and that the sales contract was in French without an English translation. Mrs. Zeltser alleges that her signature was forged. Cigalous Properties seeks to have the contract declared a nullity and money damages. Plaintiffs do not deny that the fraud and forgery claims were previously raised in the French action.

It is unclear from the papers submitted whether there is jurisdiction over defendants, although it appears unlikely. SARL Manager is a French corporation and the individual defendants are apparently residents of France. In any event, they are not New York residents. Plaintiffs claim that there is long-arm jurisdiction because defendants transacted business in New York (CPLR 302 [a][1]) and committed tortious acts here (CPLR 302 [a][2]) through their agent, Michel Ringeval. It appears that Mr. Ringeval may in fact have been plaintiffs' broker, not defendants' agent. Defendants have submitted a copy of a letter dated June 10, 1988 from Mr. Zeltser giving Mr. Ringeval "power of attorney" to sell his property. Mr. Zeltser, however, claims

-2-

that he does "not recall signing anything granting 'power of attorney' to Mr. Ringeval . . . ." Mr. Zeltser alleges that Mr. Ringeval was acting on defendants' behalf when he brought the contract to New York to be signed by plaintiffs and that he falsely translated the document presented to plaintiffs at that time, fraudulently inducing Mr. Zeltser to sign. The information before me is insufficient to resolve the long-arm jurisdiction issue at this time.*

Contrary to plaintiffs' claim, there is no credible proof that defendants consented to jurisdiction in New York. Plaintiffs submit a page which states:

SUBJECT TO TRANSLATION AND COUNSEL'S REVIEW

Nothing herein contained shall prevent American party from resolving any dispute arising out of this transaction in New York Courts and according to the Law of the State of New York.

According to Mr. Zeltser, this page was annexed to the French document which he signed in December 1988. It is simply incredible that a document prepared entirely in French would contain one separate page in English. While plaintiffs may have sought to have this provision included in the contract, there is no evidence that defendants consented to such a provision.

Finally, there is no proof, as plaintiffs claim, that

---

* Irrespective of the agency issue which cannot be resolved now, if a forgery occurred in New York, that is a matter for the appropriate law enforcement officials.

-3-

defendants are doing business in New York.

Irrespective of whether there is jurisdiction over defendants, this action must be dismissed on the ground of forum non conveniens. CPLR 327(a) provides, in relevant part, that "[w]hen the court finds that in the interest of substantial justice the action should be heard in another forum, the court, on the motion of any party may stay or dismiss the action in whole or in part . . ." A New York court is not required to retain litigation which has no substantial nexus to this state (see, Islamic Republic of Iran v Pahlavi, 62 NY2d 474, cert denied 469 US 1108). The court must balance the interests and convenience of the parties and determine whether the action would be better litigated in another forum (Silver v Great Amer. Ins. Co., 29 NY2d 356, 360).

This matter should be and, in fact, is already being litigated in France. While plaintiffs' corporation is a party to the French litigation and not the individual plaintiffs, the identical issues of fraud and forgery have been raised in that previously-commenced action. There is no indication that plaintiffs would be precluded from asserting their individual claims in France. The case involves property which is located in France. It is not unfair to require plaintiffs to litigate in France since they are apparently the principals of a French corporation and own property there.

-4-

Accordingly, defendants' cross motion to dismiss the complaint on the ground of forum non conveniens is granted on condition that defendants not object if plaintiffs seek to add their individual claims in the French action. That branch of the cross motion seeking sanctions is denied. Plaintiffs' motion is denied as moot.

Settle order.

Dated: January 16, 1991

M.P.S.
J. S. C.

FILED

FEB 2 8 1991
COUNTY CLERK'S OFFICE
NEW YORK

-5-



Exhibit O

Christopher K. Tahbaz
Jennifer R. Cowan
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Tel. (212) 909-6000
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
INNA GUDAVADZE, LIANA ZHMOTOVA and IYA        :
PATARKATSISHVILI,

                                              :

                                   Plaintiffs,        :

  v.        :

                                              :        08-Civ-3363 (RJS)

JOSEPH KAY (A/K/A JOSEPH KAKALASHVILI, A/K/A        :
JOSEPH KEJ, A/K/A IOSEB KAKALASHVILI, A/K/A
IOSEB KAKIASHVILI) AND EMANUEL ZELTSER,        :

-------------------------------------------------------------- 
                                    Defendants.        :
                                               x

## PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS DIRECTED TO DEFENDANT JOSEPH KAY (A/K/A JOSEPH KAKALASHVILI, A/K/A JOSEPH KEJ, A/K/A IOSEB KAKALASHVILI, A/K/A IOSEB KAKIASHVILI)

Plaintiffs Inna Gudavadze, Liana Zhmotova and Iya Patarkatsishvili, by their undersigned attorneys, Debevoise & Plimpton LLP, hereby request that Defendant Joseph Kay (a/k/a Joseph Kakalashvili, a/k/a Joseph Kej, a/k/a Ioseb Kakalashvili, a/k/a Ioseb Kakiashvili) produce the documents, electronically stored information and things requested herein for examination, inspection, and copying, pursuant to Rules 26 and 34 of

the Federal Rules of Civil Procedure, all applicable local rules, and the order of this Court dated _____ granting expedited discovery, by delivering such documents to the offices of Debevoise & Plimpton LLP, 919 Third Avenue, New York, NY 10022, Attention: Jennifer R. Cowan, Esq., on or before April __, 2008 at ____ _.m., or at such other time and place as agreed upon by the Parties' counsel.

## Definitions and Instructions

For purposes of this First Request for Production of Documents, the following instructions and definitions shall apply:

1.   The uniform definitions and rules of construction set forth in Rule 26.3 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York are incorporated herein by reference.

2.   "Complaint" means the complaint filed in this action by the Plaintiffs on April 4, 2008.

3.   The term "asset of Mr. Patarkatsishvili" includes any asset in which, to the best of your knowledge, Mr. Patarkatsishvili had an interest, whether directly, indirectly, beneficially, through a nominee or through another individual or entity, or in any other manner, or any asset which otherwise should properly be included in the estate of Mr. Patarkatsishvili.

4.   The term "Power of Attorney" means the General Durable Power of Attorney that purportedly appointed Emanuel Zeltser as attorney-in-fact for Arkadi

2

(Badri) Patarkatsishvili, which is undated but was purportedly notarized on December 14, 2006.

5. "Thing" means any tangible object. Any request for or reference to "documents" is also a request for or reference to "things."

6. "You" and "your" refers to Defendant and includes each of the present or former attorneys of Defendant, and all accountants, representatives, consultants, agents, officers, directors, employees, investigators, or anyone else acting on behalf of Defendant.

7. The use of the masculine pronoun shall include the feminine and vice versa and shall be construed as necessary to bring within the scope of the discovery request all responses that might otherwise be outside of its scope.

8. The present tense includes the past and future tenses.

9. If any portion of a document is considered responsive to any request, the request shall be construed as requesting production of the entire document.

10. Except when express reference is made to another paragraph, each paragraph herein should be construed independently and not by reference to any other paragraph herein for purpose of limitation.

11. Any and all examples or descriptions of documents herein are illustrative only and do not limit the request to those particular documents or types of documents, as if it were explicitly noted that such request was "not limited to" the stated examples.

12. Questions regarding the interpretation of these document requests should be resolved in favor of the broadest possible construction.

3

13.     Responsive documents shall be produced as they have been kept in the ordinary course of business or shall be organized and labeled to correspond with the enumerated requests in this demand, pursuant to Rule 34(b) of the Federal Rules of Civil Procedure. All attachments and appended or embedded links or files shall be produced if any one of them is responsive to any of these document requests. If with respect to any request there are no responsive documents, so state in writing.

14.     All electronically stored information shall be produced in the form in which it is ordinarily maintained.

15.     If part of an otherwise responsive document contains information that is subject to a claim of privilege, those parts of the document subject to the claim of privilege shall be deleted or redacted from the document, the deleted or redacted parts shall be clearly marked as such, and the rest of the document shall be produced.

16.     Pursuant to Local Civil Rule 26.2 of the Rules of the United States District Court for the Southern District of New York, if any document or part of a document responsive to this request is withheld under a claim of privilege, work-product immunity or other claimed privilege or protection from discovery, Defendant shall furnish a list setting forth as to each document: (a) the identity of each author or preparer of the document, including their name, title, and business affiliation, if other than Defendant; (b) the identity of the addressee and of every other person who received, read, or viewed the document ("recipients"), including their name, title, and business affiliation, if other than Defendant; (c) where not apparent, the relationship of the author, addressees, and recipients to each other; (d) the date the document bears; (e) the nature of the document,

4

*e.g.*, letter, memorandum, telegram; (f) either the title the document bears or the specific subject matter of the document, and a short description of the document sufficient to determine the validity of the assertion of the privilege; and (g) the nature of the privilege claimed. For all redactions or attachments withheld as privileged, also include identifying information, such as Bates number or file path, to indicate the document of which the redacted portion or attachment is a part.

17.    Pursuant to Local Civil Rule 26.2 of the Rules of the United States District Court for the Southern District of New York, if any other communication or part of a communication responsive to this request is withheld under a claim of privilege, work-product immunity or other claimed privilege or protection from discovery, Defendant shall furnish a list setting forth as to each communication: (a) the name of the person making the communication; (b) the names of persons present while the communication was made; (c) where not apparent, the relationship of the persons present to the person making the communication; (d) the date and place of communication; (e) the general subject matter of the communication, and a short description of the communication sufficient to determine the validity of the assertion of the privilege; and (f) the nature of the privilege.

18.    In responding to this document request, Defendant shall furnish all documents available to Defendant, wherever located, including documents in the possession of attorneys, representatives, agents, and all persons acting on Defendant's behalf. If Defendant cannot respond to this document request in full after exercising due

5

diligence to secure the documents requested, Defendant shall so state and respond to the extent possible, specifying the nature of its inability to respond to the remainder.

19.    If any documents or parts of documents called for by this demand have been destroyed, discarded, or otherwise disposed of, a list shall be furnished setting forth as to each document the following information: (a) the nature of the document, *e.g.,* letter, memorandum, telegram; (b) the name, address, title, and business affiliation, if other than Defendant, of each person who prepared, received, viewed or had possession, custody, or control of the document; (c) the date of the document; (d) the subject matter and a short description of the document; (e) the date of destruction or other disposition; (f) a statement of the reasons for destruction or other disposition; (g) the name, address, title, and business affiliation, if other than Defendant, of each person who authorized destruction or other disposition; and (h) the name, address, title, and business affiliation, if other than Defendant, of each person who destroyed or disposed of the document.

20.    If any documents or parts of documents called for by this demand are no longer in your possession, custody, or control, a list shall be furnished setting forth as to each document the following information: (a) the identity of each author or preparer; (b) the identity of each addressee, and of every other person who received, read or viewed the document, including their name, title, and business affiliation; (c) the date of the document; (d) the subject matter and a short description of the document; (e) the last date on which the document was in your control; (f) the identity of each person now in control of the document, including their name, title, and business affiliation; (f) the reasons for the release of the document; and (g) the identity of each person with any

6

knowledge concerning the document's release, including their name, title, and business affiliation, if other than Defendant.

21.    If you contend that a particular request, or a definition or an instruction applicable thereto, is ambiguous, such claim shall not provide a basis for refusing to respond. You are instructed to set forth the allegedly ambiguous language and the interpretation of that language that you have adopted in responding to the request in question.

22.    If any of these requests is objected to, Defendant shall serve a response in accordance with Rule 34(b) of the Federal Rules of Civil Procedure stating with particularity the reasons for the objection, and shall produce the requested documents to the extent that the request is not objectionable.

23.    The document requests that follow are to be continuing, and Defendant is requested to provide, by way of supplementary responses thereto, such additional documents as he or any persons acting on his behalf may hereafter obtain that will augment, clarify, or otherwise modify the response now given to these document requests. Such supplementary responses are to be served upon counsel for Plaintiffs immediately after the additional documents are discovered, but in no event later than five days after such discovery. In no event shall any supplemental response be served any later than the first day of trial.

24.    When a time period is not specified in a request, the time period shall be from 1995 through the present.

7

## Documents to be Produced

1.    The original, signed copy of the Power of Attorney, if it has not been previously provided to Plaintiffs pursuant to an agreement of the Parties or an order of this Court.

2.    Any and all documents concerning the Power of Attorney, including but not limited to any documents concerning any consideration allegedly given in exchange for the Power of Attorney or any interest conveyed simultaneously or in connection with the Power of Attorney.

3.    The original, signed copy of "Deed of Appointment of Executor" allegedly executed on November 14, 2007, if it has not been previously provided to Plaintiffs pursuant to an agreement of the Parties or an order of this Court.

4.    The original, signed copy of the "Letter of Wishes" allegedly executed on November 14, 2007, if it has not been previously provided to Plaintiffs pursuant to an agreement of the Parties or an order of this Court.

5.    Any and all documents concerning any and all purported testamentary instruments of Mr. Patarkatsishvili, whether currently effective or not, including but not limited to the "Deed of Appointment of Executor" allegedly executed on November 14, 2007; the "Letter of Wishes" allegedly executed on November 14, 2007; and the will allegedly executed on November 14, 2007.

6.    Any and all documents concerning any asset of Mr. Patarkatsishvili.

8

7.      Any and all documents concerning transfer of ownership or control of any asset of Mr. Patarkatsishvili in the past twelve (12) months, including but not limited to Blue Diamond & Hualapai Investments LLC; Blue Diamond & Warbonnet Investments LLC; Buddha Bar; Chapel St. Construction; Euro Fund Properties, Inc.; Euro Properties LLC; Fisher Island Holdings LLC; Fisher Island Ltd.; Global Metallurgical; Grosvenor Trading House Ltd.; JSC JMG Consulting Ltd.; and Little Rest Twelve, Inc.

8.      Any and all documents concerning the ownership, management and assets of JWL Entertainment Group, Inc.

9.      Any and all documents sufficient to identify all individuals with whom you have communicated since February 12, 2008 about any asset of Mr. Patarkatsishvili.

Dated:   New York, New York
         April __, 2008

Respectfully submitted,

DEBEVOISE & PLIMPTON LLP

By:    _____
         Christopher K. Tahbaz
         Jennifer R. Cowan

919 Third Avenue
New York, New York  10022
Tel: (212) 909-6000
Fax: (212) 909-6836

*Attorneys for Plaintiffs*

9



Exhibit P

Christopher K. Tahbaz
Jennifer R. Cowan
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Tel. (212) 909-6000
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------

INNA GUDAVADZE, LIANA ZHMOTOVA and IYA
PATARKATSISHVILI,

                          Plaintiffs,

v.

                                                        08-Civ-3363 (RJS)

JOSEPH KAY (A/K/A JOSEPH KAKALASHVILI, A/K/A
JOSEPH KEJ, A/K/A IOSEB KAKALASHVILI, A/K/A
IOSEB KAKIASHVILI) AND EMANUEL ZELTSER,

                          Defendants.

-------------------------------------------------------------------

## PLAINTIFFS' NOTICE OF DEPOSITION DIRECTED TO DEFENDANT JOSEPH KAY (A/K/A JOSEPH KAKALASHVILI, A/K/A JOSEPH KEJ, A/K/A IOSEB KAKALASHVILI, A/K/A IOSEB KAKIASHVILI)

PLEASE TAKE NOTICE THAT pursuant to Rules 26 and 30 of the Federal
Rules of Civil Procedure, and the Order of this Court dated _____, Plaintiffs Inna
Gudavadze, Liana Zhmotova and Iya Patarkatsishvili will take the deposition on oral
examination of Defendant Joseph Kay (a/k/a Joseph Kakalashvili, a/k/a Joseph Kej, a/k/a
Ioseb Kakalashvili, a/k/a Ioseb Kakiashvili), at __:__ _.m., on _____, 2008, at the
offices of Debevoise & Plimpton LLP, 919 Third Avenue, New York, New York 10022,
or at such other time and place agreed upon by counsel. The deposition will take place
before a notary public or other person authorized by law to administer oaths and will be

recorded by stenographic and videographic means. The deposition will continue from day to day or on adjourned dates until completed with such adjournments as to time and place as may be necessary.

Dated:         New York, New York
                      _____, 2008

                                    DEBEVOISE & PLIMPTON LLP


                                    By: _____
                                          Christopher K. Tahbaz
                                          Jennifer R. Cowan
                                          919 Third Avenue
                                          New York, New York 10022
                                          (212) 909-6000\

                                          *Attorneys for Plaintiffs*

*Exhibit* Q

Christopher K. Tahbaz
Jennifer R. Cowan
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York  10022
Tel. (212) 909-6000
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

INNA GUDAVADZE, LIANA ZHMOTOVA and IYA
PATARKATSISHVILI,                                    :

                                                     :

                            Plaintiffs,              :

v.                                                   :          08-Civ-3363 (RJS)

                                                     :

JOSEPH KAY (A/K/A JOSEPH KAKALASHVILI, A/K/A
JOSEPH KEJ, A/K/A IOSEB KAKALASHVILI, A/K/A      :
IOSEB KAKIASHVILI) AND EMANUEL ZELTSER,
                                                     :
                            Defendants.
---------------------------------------------------------------- x

### PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF
### DOCUMENTS DIRECTED TO DEFENDANT EMANUEL ZELTSER

Plaintiffs Inna Gudavadze, Liana Zhmotova and Iya Patarkatsishvili, by their

undersigned attorneys, Debevoise & Plimpton LLP, hereby request that Defendant

Emanuel Zeltser produce the documents, electronically stored information and things

requested herein for examination, inspection, and copying, pursuant to Rules 26 and 34 of

the Federal Rules of Civil Procedure, all applicable local rules, and the order of this Court

dated _____ granting expedited discovery, by delivering such documents to the

offices of Debevoise & Plimpton LLP, 919 Third Avenue, New York, NY 10022,

Attention: Jennifer R. Cowan, Esq., on or before April ___, 2008 at _____.m., or at such

other time and place as agreed upon by the Parties' counsel.

## Definitions and Instructions

For purposes of this First Request for Production of Documents, the following
instructions and definitions shall apply:

1.      The uniform definitions and rules of construction set forth in Rule 26.3 of
the Local Civil Rules of the United States District Courts for the Southern and Eastern
Districts of New York are incorporated herein by reference.

2.      "Complaint" means the complaint filed in this action by the Plaintiffs on
April 4, 2008.

3.      The term "asset of Mr. Patarkatsishvili" includes any asset in which, to the
best of your knowledge, Mr. Patarkatsishvili had an interest, whether directly, indirectly,
beneficially, through a nominee or through another individual or entity, or in any other
manner, or any asset which otherwise should properly be included in the estate of Mr.
Patarkatsishvili.

4.      The term "Power of Attorney" means the General Durable Power of
Attorney that purportedly appointed Emanuel Zeltser as attorney-in-fact for Arkadi
(Badri) Patarkatsishvili, which is undated but was purportedly notarized on December 14,
2006.

2

5.    "Thing" means any tangible object. Any request for or reference to "documents" is also a request for or reference to "things."

6.    "You" and "your" refers to Defendant and includes each of the present or former attorneys of Defendant, and all accountants, representatives, consultants, agents, officers, directors, employees, investigators, or anyone else acting on behalf of Defendant.

7.    The use of the masculine pronoun shall include the feminine and vice versa and shall be construed as necessary to bring within the scope of the discovery request all responses that might otherwise be outside of its scope.

8.    The present tense includes the past and future tenses.

9.    If any portion of a document is considered responsive to any request, the request shall be construed as requesting production of the entire document.

10.    Except when express reference is made to another paragraph, each paragraph herein should be construed independently and not by reference to any other paragraph herein for purpose of limitation.

11.    Any and all examples or descriptions of documents herein are illustrative only and do not limit the request to those particular documents or types of documents, as if it were explicitly noted that such request was "not limited to" the stated examples.

12.    Questions regarding the interpretation of these document requests should be resolved in favor of the broadest possible construction.

13.    Responsive documents shall be produced as they have been kept in the ordinary course of business or shall be organized and labeled to correspond with the

3

enumerated requests in this demand, pursuant to Rule 34(b) of the Federal Rules of Civil Procedure. All attachments and appended or embedded links or files shall be produced if any one of them is responsive to any of these document requests. If with respect to any request there are no responsive documents, so state in writing.

14.     All electronically stored information shall be produced in the form in which it is ordinarily maintained.

15.     If part of an otherwise responsive document contains information that is subject to a claim of privilege, those parts of the document subject to the claim of privilege shall be deleted or redacted from the document, the deleted or redacted parts shall be clearly marked as such, and the rest of the document shall be produced.

16.     Pursuant to Local Civil Rule 26.2 of the Rules of the United States District Court for the Southern District of New York, if any document or part of a document responsive to this request is withheld under a claim of privilege, work-product immunity or other claimed privilege or protection from discovery, Defendant shall furnish a list setting forth as to each document: (a) the identity of each author or preparer of the document, including their name, title, and business affiliation, if other than Defendant; (b) the identity of the addressee and of every other person who received, read, or viewed the document ("recipients"), including their name, title, and business affiliation, if other than Defendant; (c) where not apparent, the relationship of the author, addressees, and recipients to each other; (d) the date the document bears; (e) the nature of the document, e.g., letter, memorandum, telegram; (f) either the title the document bears or the specific subject matter of the document, and a short description of the document sufficient to

4

determine the validity of the assertion of the privilege; and (g) the nature of the privilege claimed. For all redactions or attachments withheld as privileged, also include identifying information, such as Bates number or file path, to indicate the document of which the redacted portion or attachment is a part.

17.    Pursuant to Local Civil Rule 26.2 of the Rules of the United States District Court for the Southern District of New York, if any other communication or part of a communication responsive to this request is withheld under a claim of privilege, work-product immunity or other claimed privilege or protection from discovery, Defendant shall furnish a list setting forth as to each communication: (a) the name of the person making the communication; (b) the names of persons present while the communication was made; (c) where not apparent, the relationship of the persons present to the person making the communication; (d) the date and place of communication; (e) the general subject matter of the communication, and a short description of the communication sufficient to determine the validity of the assertion of the privilege; and (f) the nature of the privilege.

18.    In responding to this document request, Defendant shall furnish all documents available to Defendant, wherever located, including documents in the possession of attorneys, representatives, agents, and all persons acting on Defendant's behalf. If Defendant cannot respond to this document request in full after exercising due diligence to secure the documents requested, Defendant shall so state and respond to the extent possible, specifying the nature of its inability to respond to the remainder.

19.    If any documents or parts of documents called for by this demand have been destroyed, discarded, or otherwise disposed of, a list shall be furnished setting forth as to each document the following information: (a) the nature of the document, *e.g.*, letter, memorandum, telegram; (b) the name, address, title, and business affiliation, if other than Defendant, of each person who prepared, received, viewed or had possession, custody, or control of the document; (c) the date of the document; (d) the subject matter and a short description of the document; (e) the date of destruction or other disposition; (f) a statement of the reasons for destruction or other disposition; (g) the name, address, title, and business affiliation, if other than Defendant, of each person who authorized destruction or other disposition; and (h) the name, address, title, and business affiliation, if other than Defendant, of each person who destroyed or disposed of the document.

20.    If any documents or parts of documents called for by this demand are no longer in your possession, custody, or control, a list shall be furnished setting forth as to each document the following information: (a) the identity of each author or preparer; (b) the identity of each addressee, and of every other person who received, read or viewed the document, including their name, title, and business affiliation; (c) the date of the document; (d) the subject matter and a short description of the document; (e) the last date on which the document was in your control; (f) the identity of each person now in control of the document, including their name, title, and business affiliation; (f) the reasons for the release of the document; and (g) the identity of each person with any knowledge concerning the document's release, including their name, title, and business affiliation, if other than Defendant.

6

21.    If you contend that a particular request, or a definition or an instruction applicable thereto, is ambiguous, such claim shall not provide a basis for refusing to respond.  You are instructed to set forth the allegedly ambiguous language and the interpretation of that language that you have adopted in responding to the request in question.

22.    If any of these requests is objected to, Defendant shall serve a response in accordance with Rule 34(b) of the Federal Rules of Civil Procedure stating with particularity the reasons for the objection, and shall produce the requested documents to the extent that the request is not objectionable.

23.    The document requests that follow are to be continuing, and Defendant is requested to provide, by way of supplementary responses thereto, such additional documents as he or any persons acting on his behalf may hereafter obtain that will augment, clarify, or otherwise modify the response now given to these document requests.  Such supplementary responses are to be served upon counsel for Plaintiffs immediately after the additional documents are discovered, but in no event later than five days after such discovery.  In no event shall any supplemental response be served any later than the first day of trial.

24.    When a time period is not specified in a request, the time period shall be from 1995 through the present.

## Documents to be Produced

1.      The original, signed copy of the Power of Attorney, if it has not been previously provided to Plaintiffs pursuant to an agreement of the Parties or an order of this Court.

2.      Any and all documents concerning the Power of Attorney, including but not limited to any documents concerning any consideration allegedly given in exchange for the Power of Attorney or any interest conveyed simultaneously or in connection with the Power of Attorney.

3.      The original, signed copy of "Deed of Appointment of Executor" allegedly executed on November 14, 2007, if it has not been previously provided to Plaintiffs pursuant to an agreement of the Parties or an order of this Court.

4.      The original, signed copy of the "Letter of Wishes" allegedly executed on November 14, 2007, if it has not been previously provided to Plaintiffs pursuant to an agreement of the Parties or an order of this Court.

5.      Any and all documents concerning any and all purported testamentary instruments of Mr. Patarkatsishvili, whether currently effective or not, including but not limited to the "Deed of Appointment of Executor" allegedly executed on November 14, 2007; the "Letter of Wishes" allegedly executed on November 14, 2007; and the will allegedly executed on November 14, 2007.

6.      Any and all documents concerning any asset of Mr. Patarkatsishvili.

7.    Any and all documents concerning transfer of ownership or control of any asset of Mr. Patarkatsishvili in the past twelve (12) months, including but not limited to Blue Diamond & Hualapai Investments LLC; Blue Diamond & Warbonnet Investments LLC; Buddha Bar; Chapel St. Construction; Euro Fund Properties, Inc.; Euro Properties LLC; Fisher Island Holdings LLC; Fisher Island Ltd.; Global Metallurgical; Grosvenor Trading House Ltd.; JSC JMG Consulting Ltd; and Little Rest Twelve, Inc.

8.    Any and all documents concerning the ownership, management and assets of JWL Entertainment Group, Inc.

9.    Any and all documents sufficient to identify all individuals with whom you have communicated since February 12, 2008 about any asset of Mr. Patarkatsishvili.

Dated:    New York, New York
          April___, 2008

Respectfully submitted,

DEBEVOISE & PLIMPTON LLP

By:    _____

        Christopher K. Tahbaz
        Jennifer R. Cowan

        919 Third Avenue
        New York, New York  10022
        Tel: (212) 909-6000
        Fax: (212) 909-6836

        *Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
INNA GUDAVADZE, LIANA ZHMOTOVA and IYA      :
PATARKATSISHVILI,                            :
                                             :
                            Plaintiffs,      :
                                             :
                  v.                         :    08-Civ-3363 (RJS)
                                             :
JOSEPH KAY (A/K/A JOSEPH KAKALASHVILI,       :
A/K/A JOSEPH KEJ, A/K/A IOSEB KAKALASHVILI,  :
A/K/A IOSEB KAKIASHVILI) AND EMANUEL         :
ZELTSER,                                     :
                            Defendants       x
-------------------------------------------------------------------
.

## CERTIFICATE OF SERVICE

I, Jennifer R. Cowan, am a member of the bar of the State of New York and of this Court and counsel in the New York office of the law firm of Debevoise & Plimpton LLP, attorneys for Plaintiffs Inna Gudavadze, Liana Zhmotova and Iya Patarkatsishvili.

I am over eighteen (18) years of age. On April 21, 2008, per the Order to Show Cause issued by Judge Preska on April 21, 2008, I caused to be served copies of the within:

i)     Order to Show Cause as issued by Judge Preska on April 21, 2008;

ii)    Memorandum Of Law In Support Of Plaintiffs' Application For An Order To Show Cause;

iii)   Declaration Of Jennifer R. Cowan, Esq. In Support Of Plaintiffs' Application For An Order To Show Cause For A Preliminary Injunction

And Expedited Discovery, And Expedited Schedule For Motion For

Partial Summary Judgment;

iv)    [Proposed] Order For Preliminary Injunction And Expedited Proceedings;

and

v)    Declarations And Accompanying Exhibits In Support Of Plaintiffs'

Application For An Order To Show Cause

by overnight courier upon Defendant Emanuel Zeltser at the following address:

Emanuel Zeltser, Esq.
235 W. 76th Street, Apt. 16A
New York, NY 10023

Per the direction of Judge Preska, I also served copies by overnight courier on

Mark Zeltser, the brother of Defendant Emanuel Zeltser at the following address, per the

request of Mark Zeltser:

Mr. Mark Zeltser
1919 NE 33rd Avenue
Fort Lauderdale, FL 33305

Pursuant to 28 U.S.C. § 1746, I certify under the penalty of perjury that the

foregoing is true and correct.

Executed on April 21, 2008

s/ Jennifer Cowan

_____

Jennifer R. Cowan

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x

INNA GUDAVADZE, LIANA ZHMOTOVA and IYA     :
PATARKATSISHVILI,     :

                     Plaintiffs,     :

                 v.                 :     08-Civ-3363 (RJS)

JOSEPH KAY (A/K/A JOSEPH KAKALASHVILI,     :
A/K/A JOSEPH KEJ, A/K/A IOSEB KAKALASHVILI,     :
A/K/A IOSEB KAKIASHVILI) AND EMANUEL     :
ZELTSER,     :

                     Defendants     x

---------------------------------------------------------------------

## CERTIFICATE OF SERVICE

      I, Naila McKenzie, am employed as a law clerk by the law firm of Debevoise &
Plimpton LLP, attorneys for Plaintiffs Inna Gudavadze, Liana Zhmotova and Iya
Patarkatsishvilli.

      I am over eighteen (18) years of age.  On the 21st day of April 2008, per the
Order to Show Cause issued by Judge Preska on April 21, 2008, I served copies of the
within:

          1.        Declaration of Jennifer R. Cowan, Esq. In Support of Plaintiffs'
                   Application for an Order to Show Cause for Preliminary
                   Injunction, Expedited Discovery, and Expedited Schedule for
                   Motion for Partial Summary Judgment and Accompanying
                   Exhibits;

          2.        Memorandum of Law in Support of Plaintiffs' Application For an
                   Order to Show Cause;

3.    Declarations and Accompanying Exhibits in Support of Plaintiff's Application for an Order to Show Cause

4.    [Proposed] Order for Preliminary Injunction And Expedited Proceedings;

by hand to:

Edward Little, Esq.
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, N.Y.  10004-1482
USA

Although not formally retained, Mr. Little acted as counsel for Defendant Joseph Kay (A/K/A Joseph Kakalashvilli, A/K/A Joseph Kej, A/K/A Ioseb Kakalashvili, A/K/A Ioseb Kakiashvili) in connection with the conference before Judge Preska regarding  the Order To Show Cause and per the Order To Show Cause issued by Judge Preska and Mr. Little's request, was served with the papers as counsel for Defendant Kay.

Pursuant to 28 U.S.C. § 1746, I certify under the penalty of perjury that the foregoing is true and correct.

Executed on April 22, 2008.


_____
Naila McKenzie

22718775v1