HAROLD M. HOFFMAN, ESQ.
1140 AVENUE OF THE AMERICAS, SUITE M-01
NEW YORK, NEW YORK 10036
(212) 486-6322
*ATTORNEY FOR DEFENDANT EMANUEL ZELTSER*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **INNA GUDAVADZE,** et al., | |
| Plaintiffs, | 08 Civ 3363 (RJS) |
| -against- | |
| **JOSEPH KAY** and **EMANUEL ZELTSER,** | |
| Defendants. | |

**MEMORANDUM OF DEFENDANT EMANUEL ZELTSER
IN SUPPORT OF CROSS-MOTION TO DISMISS ACTION
AND IN OPPOSITION TO PLAINTIFFS' ORDER TO SHOW CAUSE**

April 30, 2008

**Introduction**

In its landmark decision in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950), the United States Supreme Court firmly established the principle that an elementary and fundamental requirement of due process in any proceeding "is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections" 339 U.S. at 314. [1]

When counsel for plaintiffs at bar dispatched their process server to defendant Emanuel Zeltser's Manhattan home on April 5, 2008, they knew he would not be there; that the papers left with his doorman would never reach him; that he would never be permitted to review the claims against him or confer with counsel; and that, under all the circumstances, the "service" which they made would never apprise Mr. Zeltser of the pendency of the action and/or afford him an opportunity to defend himself.

Fundamental principles of law, equity, humanity and justice mandate that Emanuel Zeltser's cross-motion to dismiss be granted.

Moreover, as we show below, even were Emanuel Zeltser's KGB jailers miraculously to deliver his authentic waiver of objection to personal jurisdiction, still, plaintiff's extraordinary application for injunctive relief could not be granted. This, because of plaintiff's abject failure to demonstrate irreparable harm, probability of success, or any equities tipping in their favor.

---

[1] *Mullane* held that notice by publication was not sufficient with respect to an individual whose name and address are known or easily ascertainable. Similarly, in *Covey v. Town of Somers*, 351 U.S. 141 (1956), the Court held that notice by mailing, posting, and publication was inadequate where the individual involved was known by the town to be an incompetent without the protection of a guardian.

1

**The Relevant Facts**

I have been retained as Emanuel Zeltser's attorney by his brother, Mark Zeltser, an internationally renowned concert pianist (Decl. ¶ 1). I have not spoken or otherwise communicated with my client concerning this action, nor is he even aware of its pendency (Decl. ¶¶ 1, 5). As plaintiffs and their counsel know full well, and as they admit in their complaint (¶¶ 67-68), Emanuel Zeltser, an attorney admitted to practice before this Court, as well as the courts of New York, has, since March 12, 2008, been unlawfully detained in Minsk, Belarus by that country's committee on state security ("KGB").

The mortally precarious situation in which Emanuel Zeltser finds himself is hardly the product of happenstance. As we explain in our accompanying declaration, he had no visa for travel to Belarus – despite the mandatory requirement that he apply for and obtain same – and no reason to go to that country. As we also show in our declaration, plaintiffs and those acting in concert with them have comported themselves in a manner so morally base and in a fashion so shockingly inhumane, that even were they able to demonstrate irreparable injury and probability of success on the merits – they cannot – they would have forfeited any entitlement to affirmative relief from this honorable Court.

Emanuel Zeltser has not received this Court's process, nor read the plaintiff's pleading or motion papers. Since his arrest in Minsk, Belarus on March 12, 2008, he has effectively had no contact with the outside world. He has not spoken to a Western lawyer and he has not been brought before any judge or magistrate to answer the charges against him. He has been shifted back and forth between a specially designated KGB prison and a state psychiatric hospital, a well known "resting place" of political prisoners of the former Soviet Union era (See, Ex. A to

accompanying Declaration).

Since March 12, 2008, Emanuel Zeltser has been subjected to daily beatings and torture. He has been deprived of his much needed medications, although his KGB tormentors have taken the time to exhibit these life-saving medications to him, before taking them away. (Decl. ¶ 6; *and see* Ex. B).

On April 25, 2007, Ms. Mary Dickerson of the U.S. Department of State reported by telephone to Emanuel's brother Mark that Emanuel was being continually "struck in the head by the knuckles of his interrogators;" that "his health was rapidly deteriorating;" and, that "he was beaten upon asking his KGB interrogators to allow him to swear an affidavit of his condition for the United States consular official in Minsk." Permission to swear such affidavit was denied. (Decl. ¶ 7).

Yesterday, April 29, 2008, the U.S. Department of State issued a press release [Ex. E to Declaration] as follows:

> **U.S. Embassy Minsk Press Statement**
> **April 29, 2008**
>
> The United States is deeply concerned about the deteriorating health of American citizen Emanuel Zeltser, imprisoned in Belarus. Since his detention on March 12, the U.S. Embassy in Minsk has only been permitted to visit him on two occasions, March 27 and April 25.
>
> During the visit on April 25, the consular officer from the U.S. Embassy noticed a significant physical deterioration of Mr. Zeltser's health since the previous visit on March 27. Mr. Zeltser lost a considerable amount of weight and was very weak. Despite all efforts by the U.S. Embassy, his lawyer, and his U.S. doctor to comply with prison procedures, Mr. Zeltser has not been permitted to take his required daily medications, which may be causing irreversible internal damage.
>
> The United States is extremely concerned for the health and safety of Mr.

>Zeltser should he remain in the care and custody of the Government of Belarus. On April 25, the Department of State requested the Government of Belarus to release Emanuel Zeltser on humanitarian grounds immediately. We urge the Government of Belarus to favorably consider this request in order to save the life of an American citizen suffering in its custody.

Mr. Zeltser is presently represented by a KGB "approved" attorney named Dmitry Goryachko with whom, rather remarkably, the State Department and the Zeltser family remain in contact. On April 20, 2008, Mr. Goryachko provided an affirmation [Exhibit A], in which he confirms that:

> Emanuel suffers from diabetes, stomach ulcer and heart condition and started having frequent dizziness spells and shortness of breath. He also has an acute form of gouty arthritis and has been in constant excruciating pain due to the fact that he has been denied pain alleviating medications, along with other medicine critical to his health. He has been taken to an emergency room by ambulance several times.[2]
>
> On April 11, 2008, Emanuel was transferred to a state psychiatric hospital and placed under much harsher conditions of detention. He has lost a considerable amount of weight since his transfer and has complained of strong chest pain and severe headaches. Based on my observation, Emanuel's state of health has considerably deteriorated since our first meeting on March 21, 2008.
>
> I have a reason to believe that Emanuel's health is in real danger and his heart condition is life-threatening. There is a risk that Emanuel may not survive more than a few weeks under the circumstances described herein.

An organization no less prestigious than the *Association of the Bar of the City of New York*, an independent, non-governmental organization comprised of more than 22,000 lawyers, judges, law professors and government officials, has written to the President of Belarus protesting his arrest, mistreatment, and the conditions of his detention. Indeed, that Bar

---

[2] I am informed that no ER doctor was available to treat him, so he was simply returned to his cell.

Association, in their letter to the President of Belarus [Exhibit B], has described the charges lodged against him as having "no basis." In the words of the New York City Bar Association's president;

> In addition to the physical mistreatment, we understand that Mr. Zeltser has been repeatedly denied access to a U.S. consul, despite diplomatic protests filed by the United States Department of State with the Belarus Ministry of Foreign Affairs. The one visit that was granted, more than two weeks after his arrest, was reportedly held in the presence of a KGB official and thus was not confidential.
>
> Moreover, the charge that was finally brought against Mr. Zeltser and Ms. Funk – nearly 10 days after their arrest and detention – appears to have no basis to it. As reported to the Association, the charge, without any explanation or detail, alleges that Mr. Zeltser and Ms. Funk engaged in the use of forged documents, yet apparently neither individual was carrying any paper documents while traveling and both were taken into custody immediately upon arrival in Minsk. Concerns have thus been reported that this is a fabricated charge, created to justify their unlawful detention, and that self-exiled Russian businessman Boris Berezovsky may have instigated action against Mr. Zeltser for his work on behalf of a particular client.
>
> The City Bar is greatly concerned about the arrests and detention of Mr. Zeltser and Ms. Funk, and the reports of physical mistreatment of Mr. Zeltser. The conduct described above is inconsistent with Belarus' obligations under international agreements, including the International Covenant on Civil and Political Rights (ICCPR) and the Convention Against Torture and Other Inhuman or Degrading Treatment or Punishment (CAT).

**The Reprobate Conduct of Plaintiffs' Counsel**

Despite the protests of the torture, beatings and medical deprivations to which Emanuel Zeltser is subject, by the United States Department of State, the New York City Bar Association and other international organizations, and despite wide spread international media reporting of what is going in Minsk, Belarus, plaintiffs' counsel in this action, in a writing to Belarus prosecuting authorities, have taken the position that they "support the continuation" of the KGB's conduct and "are interested in cooperating." [Exhibit C to Declaration].

The circumstances of Emanuel Zeltser's arrest, detention and torture are intimately tied to the conduct of plaintiff's counsel and those acting in concert with them, including Boris Berezovsky, a wanted criminal Russian Oligarch who claims at least 50% interest in the assets of the estate of Arkady Patarkatsishvili, which lies at the heart of this civil action. Notably, Mr. Patarkatsishvili spent the last day of his life, together with Mr. Berezovsky, at the offices of plaintiff's London counsel; the same counsel who authored the despicable letter of March 19th to the Belarus prosecutor [Exhibit C].[3]

The events of the last day of Mr. Patarkatsishvili's life are reported at the *Wikipedia* online service as follows: Patarkatsishvili "spent his last day in the City of London office of international law firm Debevoise and Plimpton, meeting his business partner Boris Berezovsky, his spokesperson Lord Bell and his lawyer Lord Goldsmith [author of Ex. C]... From the City he left for Down Street, Mayfair, to visit Berezovsky's office, and at 7.00 pm was returned to Leatherhead with his Maybach. Shortly after dining, Patarkatsishvili told his family he felt unwell and went upstairs to his bedroom where he was found unconscious after a heart attack."

Berezovsky, who is represented in London by Michelle Duncan of London's Cadwalader firm, claims a 50% interest in the Patarkatsishvili estate.[4] Quite interestingly, prior to institution of this action by the Debevoise firm, the plaintiffs herein were also represented by Ms. Duncan

---

[3] Exhibit C was leaked to the Zeltser family by those in Belarus who support justice for their country and who oppose the dictatorial policies of its leadership who stand ready, at the request of a billionaire criminal seeking to expand his empire, to arrest and torture a U.S. national doing no more than advocating for a client. Without such honorable people, plaintiffs' counsel's abhorrent letter might never have become known.

[4] In an interview with UNA-Georgia online magazine which aired on March 22, 2008, three days after the writing of Ex. C, Berezovsky claimed a 50% beneficial interest in Patarkatsishvili's estate. *See*, http://www.civil.ge/eng/detail.php?id=17422.

[complaint ¶ 40]. Although Ms. Duncan was allegedly discharged on or about March 10, 2008, and the Debevoise firm hired [see Complaint, ¶ 56], her involvement in this matter, in behalf of the plaintiffs and Mr. Berezovsky, has not ceased.

Shockingly, and as recounted in Exhibit C hereto [never intended for viewing by the Zeltser side], Ms. Duncan, on March 19, 2008, met in Minsk with Emanuel Zeltser's jailers so that she could be briefed on the progress of his torture and provided with the "evidence" that had been elicited attendant to his beatings. In whose behalf was Ms. Duncan meeting with the Belarus authorities? According to the complaint, she no longer acted for the plaintiffs by that date, having been replaced approximately nine days earlier. She was, though, still representing Berezovsky who apparently maintained great interest in Mr. Zeltser's incarceration and torture. In light of the fact that <u>each and every</u> allegation of fraud made by plaintiffs in their April 4, 2008 complaint [including its *verification*] is made "on information and belief," it appears that even weeks of KGB torture have been unsuccessful in amplifying plaintiff's charges and producing the evidentiary particulars of fraud which are absent from their upon information and belief complaint at bar. It would seem that if more than three weeks of KGB torture have produced no evidence to buttress the complaint's charges, there may be none.

**How Did Emanuel Zeltser get to Belarus**

According to Emanuel Zeltser's brother Mark, Emanuel called him on or about March 11, 2008 and advised that he would be returning from London directly to Florida because he was fatigued and wanted to rest at Mark's Florida home. A U.S. citizen cannot enter Belarus without a visa and Emanuel Zeltser signed no application for a Belarus visa. I have written to the Belarus embassy in Washington and have requested a copy of Emanuel Zeltser's visa application. I have

received no response. I will receive no response because no such signed visa application exists. There was no purpose, in any event, in Emanuel Zeltser traveling to Belarus because Mr. Patarkatsishvili owned no assets in Belarus.[5]

Despite the absence of permission to enter the country and no reason to go, on March 12, 2008, Emanuel Zeltser found himself on Boris Berezovsky's private jet traveling from London to Belarus where he was immediately arrested and subject to beatings of the head by the knuckles of his interrogators. One week later, on March 19th, Berezovsky's lawyer, Michelle Duncan, was in Belarus to meet with the interrogators [sufficient time for torture had been allowed] and to be provided with the "evidence" that they had beaten out of Emanuel's head. On that same day, plaintiffs' lawyers at the Debevoise firm were writing to the interrogators offering their support and cooperation and also asking for the torture-induced "evidence." The complaint and the plaintiffs' moving papers at bar provide none.[6]

Ms. Duncan's involvement, on close examination, becomes even more sinister. Thus, on March 3, 2008, she wrote to the Belarus prosecutor urging him to act "speedily and vigilantly" in the event Emanuel Zeltser entered Belarus to gain access to Patarkatsishvili's [non-existent] assets. *See*, Ex. B to Duncan declaration in support of OTC. But, why was Ms. Duncan writing to the prosecutor of a jurisdiction where Patarkatsishvili had no assets and where Emanuel Zeltser would never have reason to travel. Two days later, March 5, Emanuel Zeltser was in

---

[5] Even plaintiffs have commenced no proceedings in Belarus relative to the Patarkatsishvili estate because there are no assets in that jurisdiction. The verified complaint makes reference to assets in England, Gibraltar and Georgia; none in Belarus.

[6] We are also left with the questions of how Duncan obtained a visa to enter Belarus and when did she apply for it. Further, did she also travel to Belarus on Berezovsky's private jet?

8

London (complaint ¶ 54). Yet, Ms. Duncan did not write to, or seek the aid of, UK authorities even though Mr. Zeltser was present in the jurisdiction and readily detainable. Why did she opt for a country whose tyrannical president maintains intimate ties with her client Berezovsky and how was it that Emanuel Zeltser, one week later and without a visa, was on Berezovsky's private jet flying to Belarus?

<u>The Equities</u>

It appears that plaintiffs and those acting in concert with them have presented a case predicated entirely on belief, innuendo and imagination. Not a single allegation of fraud in the complaint is supported by anything more persuasive than "information and belief." Knowing this, they and those acting in concert with them appear to have arranged for a more effective means of gaining "evidence," and/or stifling all competing claims. This is quite understandable as the estate which lies at the heart of this case may amount to as much as $15 billion. In light of this appetizing fact, they now desire the imprimatur of a United States District Judge, and his attendant honor, dignity and independence, to continue their voracious seizure of assets of the Patarkatsishvili estate. Such badge of approval should be resoundingly denied.

ARGUMENT

POINT I

**<u>THE "SERVICE" AT BAR DOES NOT CONFER PERSONAL JURISDICTION</u>**

The purported April 5, 2008 service at bar upon Emanuel Zeltser by delivery of process in Manhattan to his part time doorman is nothing short of comical. But for the fact that Emanuel

Zeltser is being slowly murdered in Minsk, Belarus – an effort in which plaintiffs' counsel have expressed the fervent desire to cooperate – it would be laugh out loud funny.

In the complaint and in the moving papers, plaintiffs and their counsel admit their awareness of Emanuel Zeltser's March 12, 2008 arrest in Belarus. As early as one week later, they knew that he was being tortured. They knew this not only from reports of the U.S. State Department, international news media, and from the Zeltser family and his Belarus lawyer, they knew it on personal knowledge because on March 19, 2008, Michelle Duncan, plaintiffs' lawyer until at least March 10, 2008, met with Emanuel Zeltser's interrogators in Minsk.

Still, more than two weeks later, they purportedly served Emanuel Zeltser with process in this action by delivery to his part time doorman in Manhattan [*see*, Ex. D]. But the United States Supreme Court has expressed the view that plaintiffs' counsel's pathetic efforts at humor are not to be countenanced.

In *Robinson v. Hanrahan*, 409 U.S. 38 (1972), quite analogous to the situation at bar, appellant was arrested on a charge of armed robbery and, immediately thereafter, the State of Illinois instituted forfeiture proceedings against appellant's automobile pursuant to the Illinois vehicle forfeiture statute. Appellant was held in custody in the Cook County jail from June 16, 1970, to October 7, 1970, awaiting trial. Nevertheless, the State mailed notice of the pending forfeiture proceedings, not to the jail facility, but to appellant's home, the address listed in official records. After a hearing, the court ordered a forfeiture and sale of appellant's vehicle. This, despite the undisputed fact that appellant, who remained in custody throughout the forfeiture proceedings, did not receive such notice until his release.

In its decision, the U.S. Supreme Court held that (409 U.S. at 40) plaintiff;

10

knew that appellant was not at the address to which the notice was mailed and, moreover, knew also that appellant could not get to that address since he was at that very time confined in the Cook County jail. Under these circumstances, it cannot be said that the State made any effort to provide notice which was 'reasonably calculated' to apprise appellant of the pendency of the forfeiture proceedings.

The fundamental concept of notice reasonably calculated to apprise a litigant of proceedings against him has, of course, been adhered to in this circuit. In *U.S. v. Braunig,* 553 F.2d 777, 780 (2d Cir. 1977), the Court held that "using a 'legal' form of notice knowing full well that [defendant] would never see or hear of it," was an unacceptable and unlawful farce which could not be countenanced. The underlying and most fundamental concept being protected by the Second Circuit in that case was that where the plaintiff knows that the opposing litigant's condition or location is such that he will not be adequately apprised of the proceeding in question through the statutory method of notice used, the due process clause will not have been complied with. In *Braunig*, the defendant was incarcerated in Canada, and the plaintiff knew as much.

Nor does the plaintiffs' purported service at bar comport with the Federal Rules of Civil Procedure. Specifically, Rule 4, Fed. R. Civ P., makes particular provision for service of an individual in a foreign country. The Rule states:

> **(f) Serving an Individual in a Foreign Country.**
>
> Unless federal law provides otherwise, an individual - other than a minor, an incompetent person, or a person whose waiver has been filed - may be served at a place not within any judicial district of the United States:
> (1) by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;

(2) if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice:
(A) as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction;
(B) as the foreign authority directs in response to a letter rogatory or letter of request; or
© unless prohibited by the foreign country's law, by:
(I) delivering a copy of the summons and of the complaint to the individual personally; or
(ii) using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt; or

(3) by other means not prohibited by international agreement, as the court orders.

Plaintiffs at bar employed none of these means, nor did they so much as attempt the service required by Rule 4, even though it is undisputed that they knew that they were attempting to effect service on an individual "in a foreign country." Moreover, the plaintiffs knew full well that the farcical service which they employed was not reasonably calculated to give defendant Emanuel Zeltser any notice of the proceedings against him. Plaintiffs were simply play-acting.

Their efforts at buffoonery should be rejected and the defendant's cross-motion granted.

## POINT II

## IRREPARABLE HARM

The facts show that plaintiffs and those acting in concert with them have already taken the steps necessary to insure that Emanuel Zeltser cannot inflict any harm on them. The record demonstrates the undeniable: Emanuel Zeltser is incapable of inflicting any irreparable harm on anyone or anything; much less the plaintiffs. The *sine qua non* of preliminary injunction cannot be shown.

A mere four days ago, the Second Circuit, in *County of Nassau v. Leavitt*, ____ F.3d ___, 2008 WL 1836382 (2d Cir. April 25, 2008), reiterated that :

> A party seeking a preliminary injunction in this circuit must show: (1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor. *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 476 (2d Cir.2004).

At bar, even in the absence of an injunction, Emanuel Zeltser will not be representing or presenting, to anyone, any words or documents evidencing his authority to act in behalf of the estate of the late Mr. Patarkatsishvili. [7]

Plaintiffs need not fear that he might do so. Based on the state of his health, it is unlikely that he will ever do so. Plaintiffs, and those acting in concert with them, have already, rather effectively, taken the steps necessary to see to this.

Absent any prospect of irreparable harm, no injunction can issue.

## POINT III

## LIKELIHOOD OF SUCCESS AND BALANCE OF THE EQUITIES

_____The plaintiffs and those acting in concert with them have presented a case predicated entirely on belief, innuendo and imagination. Not a single allegation of fraud in the complaint is supported by anything more persuasive than "information and belief." *See, e.g.*, Complaint ¶¶ 2, 3, 4, 5, 6, 7, 12, 13, 14, 22, 24, 26, 27, 29, 32, 34, 35, 37, 43, 44, 48, 51, 52, 57, 59, 60, 61, 62, 67, 68. This, is the face of black letter law that allegations of fraud based upon "information and

---

[7] In ¶ 71 of their verified complaint, plaintiffs allege that they will be irreparably harmed if Mr. Zeltser "continue[s] fraudulently to represent that [he is] authorized to speak and act on behalf of plaintiffs or the estate of Mr. Patarkatsishvili."

belief" are insufficient to state any cognizable claim. *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.,* 117 F.3d 655 (2d Cir. 1997).

Even after, at this point, seven full weeks of torture, there is not a scintilla of hard evidence showing any fraud by any defendant. This can hardly be said, though, for plaintiffs and those acting in concert with them. Indeed, counsel for plaintiffs in this case and those acting in concert with them have much to answer for, and will continue to do so, irrespective of the ultimate fate of Mr. Zeltser.

In any event, at this juncture, plaintiffs have demonstrated neither likelihood of success nor serious questions going to the merits; nor have they shown the balance of equities in their favor. They have shown only a remarkable absence of humanity and apparent complicity in a morally base attempt to achieve, by resort to extra-judicial measures, uncorrectable advantage in their voracious effort to seize the abundant wealth left by Mr. Patarkatsishvili. These efforts should not be rewarded with the imprimatur of this honorable Court.

**Conclusion**

For all of the foregoing reasons, and for those set forth in the accompanying Declaration, we respectfully ask that the plaintiff's order to show cause be rejected, and the cross-motion to dismiss granted.

Dated: April 30, 2008

>Respectfully submitted,
>
>__/s/_____
>Harold M. Hoffman
>*ATTORNEY FOR DEFENDANT EMANUEL ZELTSER*