**HAROLD M. HOFFMAN**
ATTORNEY AND COUNSELOR AT LAW

1140 AVENUE OF THE AMERICAS  Tel  + 1 212 486 6322
SUITE M-01   Fax  + 1 212 980 8748
NEW YORK, NEW YORK 10036-5803   hoffman.esq@verizon.net

Member:  New York & New Jersey Bars

May 18, 2008

Hon. Richard J. Sullivan, U.S.D.J.
United States Courthouse
500 Pearl Street, Room 615
New York, NY 10007

Re:   *INNA GUDAVADZE, et al. v. JOSEPH KAY and EMANUEL ZELTSER*
      **08 Civ 3363 (RJS)**

Honorable Judge Sullivan:

We write to provide the Court with documentary evidence received from the U.S. State Department this past Friday evening, May 16, 2008 (the "State Department Evidence"). We believe this evidence to be pertinent to, if not dispositive of, defendant Emanuel Zeltser's pending, renewed motion for discovery and to dismiss.

The State Department Evidence consists of an eight-page facsimile transmittal which is attached hereto and labeled "A1" - "A8."  It is substantively comprised of three parts.  The State Department's April 28, 2008 diplomatic note to the government of Belarus (A3-5); Statement given by Emanuel Zeltser on April 25, 2008 transcribed, by hand, by a U.S. consular officer in Mr. Zeltser's presence, at the conclusion of which an oath was administered to Mr. Zeltser by said consular officer (A6); and, the said consular officer's memorandum to the Department of State which recapitulates the under oath statement of Mr. Zeltser (A7).

Because the consular officer's written notes (received via facsimile delivery) are difficult to read, we rely upon said officer's typewritten memorandum (A7) for the substance of Mr. Zeltser's under oath statement.  This memorandum evidences that on March 13 and 14, Mr. Zeltser's 2nd and 3rd days in KGB custody, Mr. Zeltser was compelled by the KGB to make two telephone calls. The first, "to a client whom he was told to tell nothing about his detention but rather convince them to come to Belarus because of excellent business opportunities" (A7) and, the second "to a London hotel where he had left documents for a client, and told them to release the documents to Boris Berezovsky" (*Id.*).  It appears that neither of these telephone calls compelled by the KGB were successful in achieving their malevolent results. As compensation, Mr. Zeltser "received numerous knocks over the head, described as knuckles turned over his skull, which he said have caused intense headaches over the past six weeks" (*Id.*).

Hon. Richard J. Sullivan, U.S.D.J.                                              May 19, 2008
                                                                                Page 2

We have learned that the "client" referenced in telephone call no. 1 is Joseph Kay, co-defendant in this action. It was he whom the Belarus KGB wanted to lure to Minsk. We understand that Mr. Kay has previously turned over all evidence of this telephone call, including possibly a tape recording thereof, to the FBI.

The import of these telephone calls, compelled under torture, is plain. As we have contended all along, there was no purpose to Mr. Zeltser's travel to Belarus other than for plaintiffs and those acting with them, including their lawyers, to secure his physical detention, and that of Mr. Kay, so that they could be eliminated as contestants to control of assets in the estate of Arkady Patarkatsishvili. A further goal was for the plaintiffs and those acting in concert with them, including Berezovsky and plaintiffs' lawyers, to obtain, by violence, control of, and thus, the unavailability of documentary evidence pertinent to this action.

We now know the following:

■ The plot to liquidate the defendants was initiated on March 3, 2008 by Duncan's letter to the Belarus authorities urging "speedy and vigilant" action (see, Duncan Declaration in support of plaintiffs' Order to Show Cause and exhibit thereto). On March 3, Duncan was <u>plaintiffs' attorney of record</u>, as well as counsel for Berezovsky.

■ On March 15, 2008, one day after the compelled telephone calls described above, Duncan was in Minsk meeting with the Belarus KGB, apparently to discuss the failed effort to lure co-defendant Kay to Belarus and coordinate effort to have her clients seize the testamentary documents which would undermine their criminal grab at the multi-billion dollar estate of Patarkatsishvili.

■ On April 19, 2008, when she swore her declaration in support of plaintiffs' Order to Show Cause – which by its terms compelled Mr. Zeltser to produce certain documents – Duncan already knew that Zeltser did not have such documents and that her efforts to seize them by employing KGB torture and artifice had failed. She made no such (mandatory) disclosure to the Court, nor did the plaintiffs' present counsel Goldsmith, who also knew.

■ The fact that Goldsmith also knew of the failed attempt to lure Mr. Kay a Minsk jail cell and to seize documents by torture and violence is evidenced by document A7 (annexed hereto) together with Exhibit A to plaintiffs' May 14 letter to Court [docket entry no. 24]. Said Ex. A is a Debevoise e-mail, "<u>sent on behalf of Lord Goldsmith</u>" [emphasis in original] proposing a meeting with Sergei Vorobyov of the KGB. As noted in our May 15, 2008 letter to Court [docket entry no. 27], virtually no one in the West knows the identity of Vorobyov. Yet, Goldsmith knew. And, now we know how and why. He knew because he was in contact with Vorobyov, chief interrogator of Mr. Zeltser; the individual who supervised the compelled telephone calls followed by knuckles to Mr. Zeltser's head. Examination of A7 hereto shows

Hon. Richard J. Sullivan, U.S.D.J.  May 19, 2008
Page 3

Vorobyov to have been in the room with Mr. Zeltser and the U.S. consular officer who took Mr. Zeltser's sworn statement. Mere days after the failed attempt to kidnap defendant Kay and seize the relevant documents, and right after Duncan's follow-up personal meetings with the KGB on March 20-21 [Duncan Decl., Docket entry 25], Goldsmith was seeking his own personal meeting with Vorobyov. Yet, the consular officer's statement was taken from Zeltser on <u>April 25</u> and released only on <u>May 16</u>. No one in the West could have known of Vorobyov prior to that. Yet Goldsmith knew on <u>March 23</u>. Goldsmith's letter of March 23 was previously concealed by the Debevoise firm and now disclosed only after Goldsmith learned that his covert letters to the Belarus KGB were being leaked to defendant Zeltser's family by those in Minsk who oppose that country's tyrannical dictator (*see*, April 30, 2008 cross-moving declaration of Hoffman, at ¶ 12).[1]

■ The Order to Show Cause filed by plaintiffs in this Court is a cynical sham. By the time it was filed, plaintiffs and their attorneys already knew that the documents they were applying to have Zeltser produce were not in his control. Only after failed efforts to secure these materials by kidnapping, torture and deceit did they apply to this Court for judicial relief. In a marvelously cynical stroke, plaintiffs, aware of their unavailability, are seeking production of those documents through orders of this Court while at the same time attempting to seize, destroy and/or doctor them by employment of KGB torture.

■ The charges lodged against Mr. Zeltser in Belarus – possession of forged documents – are sham. The KGB knew immediately that he possessed no such documents when he entered Belarus and that there could be no basis to their charge of "possession" in that jurisdiction. Patently, the kidnapping to, and detention in, Belarus are not intended for purposes of legitimate criminal prosecution, but rather, extra-judicially, to advance the interests of plaintiffs, their attorneys, and Berezovsky, in civil litigation, and to facilitate the criminal seizure of Mr. Patarkatsishvili's wealth.

The evidence adduced to date shows that defendant Zeltser has a strong case for discovery in furtherance of his renewed motion. Without discovery, this Court cannot know with reasonable certainty whether plaintiffs' purported efforts to comport with "due process" were reasonably calculated under all circumstances to accord true notice to Mr. Zeltser of the pendency of this action. Further, this Court must allow development of a record, before ruling on the issue of personal jurisdiction raised by Mr. Zeltser, on the issue of whether the proceedings at bar will degrade and demean the process of this honorable United States District Court.

We contend, and we believe the evidence to date shows, that plaintiffs and those acting in concert with them, including their counsel, are attempting to use the process of this Court to

---

[1] As also noted in our May 15 letter to Court [docket entry 27], no one even knew of Mr. Zeltser's arrest until on or about March 18. Yet, plaintiffs' counsel already knew on March 15.

Hon. Richard J. Sullivan, U.S.D.J.                                                               May 19, 2008
                                                                                                                Page 4

further their criminal conspiracy to seize the late Mr. Patarkatsishvili's monumental wealth.

Respectfully yours,

  /s/
Harold M. Hoffman

cc: All Counsel



# U.S. Department of State
# Washington, DC

**FACSIMILE**     Date: 5-16-08

To  Mr. Mark Zeltser

Fax #  212 496-9100

From  William Fritzlen

Office of Policy Review and Interagency Liaison
Overseas Citizens Services
Bureau of Consular Affairs
2100 Pennsylvania Avenue, NW, 4th Floor
Washington, DC 20520
Tel. 202-736-9110   Fax 202-736-9111

Pages  7  (including cover)

Re: _____

CONFIDENTIALITY NOTICE: The document accompanying this telecopy transmission contains information which is confidential and may be legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this telecopied information is strictly prohibited. If you received this telecopy in error, please notify me by telephone to arrange for return of the original document.

A1



**United States Department of State**

*Washington, D.C. 20520*

May 16, 2008

HOME
ADDRESS →
REDACTED

Mr. Mark Zeltser

Re: Release of Records

Dear Mr. Zeltser:

This is in response to your request for the release of records maintained by the Department of State concerning the incarceration of your brother Emanuel Zeltser in Belarus. We have determined that we may release a number of records consistent with your brother's written waiver permitting the Department to release information regarding his arrest and incarceration. Please find the following enclosed documents:

- The Department's Diplomatic Note of April 28, 2008 to the Embassy of Belarus;
- A statement made by your brother and transcribed by a U.S. Consular Officer in his presence;
- A U.S. Consular Officer's communication with the Department reporting on a visit with your brother in prison. Portions of this document have been redacted in accordance with 5 U.S.C. 552(b)(5) and (6).

The Department will continue to make every effort to ensure your brother's welfare and Mary Dickerson will continue to be your point of contact at (202) 663-3945.

Sincerely,

Michelle Bernier-Toth
Managing Director
Overseas Citizens Services

A2

The Department of State refers the Embassy of Belarus to the matter of imprisoned American citizen, Emanuel Zeltser. Since his detention in Belarus on March 12, the U.S. Embassy in Minsk has only received permission to visit him on two occasions, March 27 and April 25, despite repeated requests to permit the United States to perform consular functions authorized under Articles 5(a) and (e) of the Vienna Convention on Consular Relations related to assisting and protecting nationals, and despite the fact that Belarus is obligated under international law to accord U.S. consular officers access to Mr. Zeltser "on a continuing basis" in accordance with paragraph 3 of the Protocol to the 1964 U.S.-U.S.S.R Consular Convention. Mr. Zeltser arrived in detention with serious health conditions requiring careful monitoring, including severe arthritis and diabetes, which have been reported to prison officials.

On April 25, Mr. Zeltser reported two physical beatings by prison officials on March 13 and March 14. The KGB investigator present did not allow Mr. Zeltser to write or sign a statement regarding this gross abuse of a prisoner's rights, and so he provided the consular officer with this

-2-

information under sworn oath. Moreover, he informed the consular officer that he was asked by the KGB to make two specific phone calls unrelated to his detention, but to what appeared to be business matters. The Department of State understands that when the phone calls did not achieve the desired results of the KGB employees, Mr. Zeltser received numerous strikes to the head, causing intense headaches that have not subsided.

The consular officer reported a significant physical deterioration of Mr. Zeltser's health between March 27 and April 25. On April 25, he had trouble standing and walking, and his hands constantly shook. Mr. Zeltser reported and exhibited signs of constant severe pain. Most troubling, he appeared to have lost a significant amount of weight and was quite weak. In addition, Mr. Zeltser had not been receiving required prescription medications. All necessary medications were delivered with the appropriate written instructions for administering them by his U.S. doctor as advised by the Ministry. The KGB investigator advised the consular officer that the prison doctor decides whether or not to permit him to receive the medication. Although Mr. Zeltser has seen the prison doctor, he has not received his medications.

A4

-3-

Because of the significant deterioration of Mr. Zeltser's physical condition while in the custody of the Government of Belarus, it has become evident that the prisoner is not receiving adequate medical care. The United States is extremely concerned about Mr. Zeltser's safety should he remain in detention. Therefore, the Department of State respectfully requests that the Government of Belarus give favorable consideration to the immediate release of American citizen Emanuel Zeltser on humanitarian grounds.

Department of State,

　　Washington, April 28, 2008



A5

His statement Mr. Teltser's Statement
19th March – 2nd Day in Custody
  Around – 13rd hour [illegible]
  – [illegible] office & another room
  – [illegible] given
  – told to make phone calls
    by people who introduced
    themselves as FSB employees
1) – to client – nothing about [illegible]
    – things are great – business
      opportunities → they should
      come here
2) – call London hotel where stayed
    had left docs for client
    – tell them to release [illegible]
      documents to B. Berezovsky
  → They told me not to [illegible]
    – that's why he's not [illegible]
  – several [illegible] over the head
    → headaches almost constant
    → dizziness
  – knuckles hurting over head

A6

05/16/2008 13:36 FAX 2027369111          OCS PRI                               ☒007

Page 1 of 2

From:
Sent: Friday, April 25, 2008 11:37 AM
To:
Cc:

Subject: RE: Zeltser visit

To confirm our earlier discussion, it was clear during the visit today that Mr. Zeltser's health has deteriorated considerably in the month since I last saw him. He had trouble standing and walking, his hands shook even while he was inactive, and he stated that his pain varies between 6 and 10 on a scale of one to ten, with ten being excruciating pain. I also observed that he was quite weak and has lost a significant amount of weight since last we met.
He told me that several efforts by his lawyer to pass the medications via the prison doctor, as instructed by the MFA, were not permitted. Without his medications, he said that he feels that his life is at risk. According to Mr. Zeltser, although he has seen a doctor, they do not have medical equipment at the prison with which to adequately treat him.

Regarding the situation with his medicines, the KGB investigator, who was present during the entire meeting, said that the Embassy can also request via dipnote to the MFA permission to attempt to pass the medicines to Mr. Zeltser ourselves. He stated that it was the prison doctor's decision whether to permit the medicines rather than his own.

Unlike last time, when Mr. Zeltser complained of no mistreatment even upon detailed questioning, this time he was willing to write and sign and sworn statement about being beaten on his 2nd and 3rd days in custody. However, the KGB investigator, Vorobyov, did not allow him to write or even sign such a document. Therefore, I took down the detailed statement and had Mr. Zeltser swear on oath that it was complete and accurate. He described a similar tale of that already told to us by Mr. Goryachko through Ms. Adler in which he was asked to make phone calls by 2 KGB employees – first to a client whom he was told to tell nothing about his detention but rather convince them to come to Belarus because of excellent business opportunities; then he said he called a London hotel where he had left documents for a client, and told them to release the documents to Boris Berezovsky. According to Mr. Zeltser, because his phone calls were not sufficiently successful in achieving the desired results, he received numerous knocks over the head, described as knuckles turned over his skull, which he said have caused intense headaches over the past 6 weeks.

Please don't hesitate to contact me with any follow-up questions or concerns.
Again, many thanks to all involved in making this visit possible.

All best,

_____

From:
Sent: Friday, April 25, 2008 4:58 PM
To:
Cc:
Subject: Zeltser visit

A7

7 FAM 470
SPECIAL ARREST CASES

(CT:CON-123; 12-23-2005)
(Office of Origin: CA/OCS/PRI)

7 FAM 471  CRITICALLY ILL PRISONERs

7 FAM 471.1  General

(CT:CON-123; 12-23-2005)

a.  The Department, except for protests regarding abuse or mistreatment, normally does not intercede in a foreign judicial system on behalf of private U.S. citizens or nationals. However, one general exception to this rule involves U.S. citizen prisoners who:

(1)  Are critically ill and for whom a medical diagnosis indicates that continued incarceration will prevent a reasonable recovery or will cause further deterioration in their condition; or

(2)  Have been diagnosed with a terminal disease, and in the opinion of competent medical authorities have only a limited time left to live.

b.  In these cases, work closely with the Department and senior post management developing an appropriate strategy for approaching the host government to request release of the prisoner on humanitarian grounds.

A8