Christopher K. Tahbaz                              FILED
Jennifer R. Cowan                                 ELECTRONICALLY
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York  10022
Tel. (212) 909-6000
*Attorneys for Plaintiffs*


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x
INNA GUDAVADZE, LIANA ZHMOTOVA and IYA          :
PATARKATSISHVILI,
                                                :
                                    Plaintiffs, :
                                                :
v.                                                      08-Civ-3363 (RJS)
                                                :
JOSEPH KAY (A/K/A JOSEPH KAKALASHVILI, A/K/A     :
JOSEPH KEJ, A/K/A IOSEB KAKALASHVILI, A/K/A
IOSEB KAKIASHVILI) AND EMANUEL ZELTSER,          :
                                    Defendants.  :
-------------------------------------------------------------------- x

### DECLARATION OF JENNIFER R. COWAN, ESQ.
### IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER
### AND ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION

I, Jennifer R. Cowan, declare as follows:

1.      I am a member of the bar of the State of New York and of this Court and

counsel in the New York office of the law firm of Debevoise & Plimpton LLP, attorneys

for Plaintiffs Inna Gudavadze, Liana Zhmotova and Iya Patarkatsishvili.

2.      I submit this declaration in support of Plaintiffs' application, pursuant to

the Federal Rules of Civil Procedure and the Local Rules of this Court, for a Temporary

Restraining Order ("TRO") and Preliminary Injunction with respect to Defendant Joseph Kay seeking an anti-suit injunction. Plaintiffs seek this expedited relief through a TRO and an Order to Show Cause to prevent imminent irreparable harm from Defendant Joseph Kay obtaining an anti-suit injunction prohibiting Plaintiffs from prosecuting this action before this Court.

3.      As set forth more fully in Plaintiffs' Complaint of April 4, 2008, Plaintiffs allege that Defendants Joseph Kay (a/k/a Joseph Kakalashvili, a/k/a Joseph Kej, a/k/a Ioseb Kakalashvili, a/k/a Ioseb Kakiashvili) and Emanuel Zeltser ("Defendants") have improperly sought to obtain control over the assets of Badri Patarkatsishvili.

4.      No previous application for the relief requested herein has been made.

**Exhibits Referenced In The Application For An Order To Show Cause**

5.      Attached to this Declaration as Exhibit A is a true and correct copy of a certified translation of the Claim Mr. Kay filed with the Georgia Court on May 7, 2008.

6.      Attached to this Declaration as Exhibit B is a true and correct copy of a certified translation of the Application for Security filed with the Georgia Court by Joseph Kay on May 14, 2008.

7.      Attached to this Declaration as Exhibit C is a true and correct copy of a certified translation of the May 14, 2008 Order of the Georgia Court.

8.      Attached to this Declaration as Exhibit D is a true and correct copy of a certified translation of Plaintiffs' appeal in the Georgia Action.

9.      Attached to this Declaration as Exhibit E is a true and correct copy of an uncertified translation of the June 10, 2008 decision of the Georgia Court rejecting Plaintiffs' appeal in the Georgia Action.

10.     Attached to this Declaration as Exhibit F is a true and correct copy of a certified translation of the amended Claim filed with the Georgia Court.

11.     Attached to this Declaration as Exhibit G is a true and correct copy of the first witness statements and attached exhibits of Andrew J. Baker, the managing director of Miselva Establishment, in the Gibraltar action.

12.     Attached to this Declaration as Exhibit H is a true and correct copy of the first witness statements and attached exhibits of Andrew J. Baker, the managing director of Miselva Establishment, in the Gibraltar action.

13.     Attached to this Declaration as Exhibit I is a true and correct copy of a Memorandum Order in *Motorola Credit Corp. v. Uzan*, No. 02 Civ. 666 (JSR) (S.D.N.Y. Jan. 7, 2003).

14.     Attached to this Declaration as Exhibit J is a true and correct copy of a report, United States Dep't of State, Bureau of Democracy, Human Rights, and Labor, *Georgia: Country Reports on Human Rights Practices – 2007* (Mar. 11, 2008).

15.     Attached to this Declaration as Exhibit K is a true and correct copy of an excerpt from a report, United Kingdom Foreign & Commonwealth Office, *Human Rights Annual Report 2006* (Oct. 2006).

16.     Attached to this Declaration as Exhibit L is a true and correct copy of a report, United Nations Human Rights Comm., *Concluding observations – Georgia*, U.N. Doc. CCPR/C/GEO/CO/3/CRP.1 (Oct. 19, 2007).

\*          \*          \*

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  New York, New York
        June 16, 2008

/s/ Jennifer R. Cowan

Jennifer R. Cowan, Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
INNA GUDAVADZE, LIANA ZHMOTOVA and IYA        :
PATARKATSISHVILI,                              :
                                               :
                            Plaintiffs,        :
                                               :
              v.                               :   08-Civ-3363 (RJS)
                                               :
                                               :
JOSEPH KAY (A/K/A JOSEPH KAKALASHVILI,         :
A/K/A JOSEPH KEJ, A/K/A IOSEB KAKALASHVILI,    :
A/K/A IOSEB KAKIASHVILI) AND EMANUEL           :
ZELTSER,                                       :
                            Defendants         x
-----------------------------------------------------------------------

## CERTIFICATE OF SERVICE

I, Jennifer R. Cowan, am a member of the bar of the State of New York and of

this Court and counsel in the New York office of the law firm of Debevoise & Plimpton

LLP, attorneys for Plaintiffs Inna Gudavadze, Liana Zhmotova and Iya Patarkatsishvili.

I am over eighteen (18) years of age.  On June 17, 2008, per the Order to Show

Cause issued by Judge Sullivan on June 17, 2008, I caused to be served copies of the

within:

    i)    Memorandum Of Law In Support Of Plaintiffs' Application For An Order

        To Show Cause;

    ii)    Declaration Of Jennifer R. Cowan, Esq. In Support Of Application For

        Temporary Restraining Order And An Order To Show Cause For

        Preliminary Injunction

iii)    [Proposed] Temporary Restraining Order And Order To Show Cause For

             Preliminary Injunction; and

iv)    Plaintiffs' Verified Complaint of April 4, 2008

by hand delivery upon Scott M. Himes, Esq., counsel for Defendant Joseph Kay,

at the following address:

        Scott M. Himes, Esq.
        Stillman, Friedman & Shechtman, P.C.
        425 Park Avenue
        New York, NY 10022

I also served copies by overnight courier on Harold M. Hoffman, Esq., counsel

for Defendant Emanuel Zeltser at the following address, per the request of Mr. Hoffman:

        Mr. Harold M. Hoffman, Esq.
        75 Grand Avenue
        Englewood, NJ  07631

I also sent an electronic copy of the Order to Show Cause as issued by Judge

Sullivan on June 17, 2008 via email to Mr. Hoffman's business email address and to Mr.

Himes' business email address.

Pursuant to 28 U.S.C. § 1746, I certify under the penalty of perjury that the

foregoing is true and correct.

Executed on June 18, 2008

                         /s/ Jennifer R. Cowan
                         Jennifer R. Cowan, Esq.

**Exhibit A**



**GEOTEXT**
Translations, Inc.

STATE OF NEW YORK ⟩
⟩ ss
⟩
COUNTY OF NEW YORK ⟩

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from Georgian into English of the attached Suit on behalf of Plaintiff

Joseph Key.

Ian Kemper, Project Manager
Geotext Translations, Inc.

Sworn to and subscribed before me

this 10 day of June , 20 08 .

EVAN FINCH
NOTARY PUBLIC-STATE OF NEW YORK
No. 01FI6134600
Qualified in New York County
My Commission Expires October 03, 2009

New York  259 West 30th Street, 17th Floor, New York, NY 10001, U.S.A. tel 212.631.7432 fax 212.631.7778
San Francisco  220 Montgomery Street, 3rd Floor, San Francisco, CA 94104, U.S.A. tel 415.576.9500 fax 415.520.0525
London  107-111 Fleet Street, London EC4A 2AB, United Kingdom tel +44.(0)20.7936.9002 fax +44.(0)20.7990.8909
Hong Kong  20th Floor, Central Tower, 28 Queen's Road, Central, Hong Kong tel +852.2159.9143 fax +852.3010.0082
translations@geotext.com  |  www.geotext.com

## Suit
### (On Civil Case)

Civil Case Board of Tbilisi City Court
Name of the court where the suit is filed

**Plaintiff:**

| | |
|---|---|
| Joseph Key<br>Name, Surname (Title) | 5 Chanturia St., Tbilisi<br>Main address (actual address) |

| Alternative address | Tel: Work | 93 36 25<br>Tel: Home | Cell phone | E-mail address |
|---|---|---|---|---|

| Workplace and actual workplace address | | 98 56 41<br>Fax | Optimal time of the day for service of notice |
|---|---|---|---|

---

## PLAINTIFF'S REPRESENTATIVE (IF SUIT IS FILED BY THE REPRESENTATIVE):

| | |
|---|---|
| Ketevan Kvartskhava<br>Name, Surname (Title) | 4 Gudiashvili Square, Tbilisi 0105<br>Main address (actual address) |

| Alternative address | 932503; 920086; 922491<br>Tel: Work | 96 00 20<br>Tel: Home | 899 510 109<br>Cell phone | ketti@blc.ge<br>E-mail address |
|---|---|---|---|---|

| Workplace and actual workplace address | | 934526<br>Fax | 10:00 a.m.–6:00 p.m.<br>Optimal time of the day for service of notice |
|---|---|---|---|

---

## DEFENDANT:

| | |
|---|---|
| Inna Gudavadze<br>Name, Surname (Title) | Kojori Highway V, VI km, Tbilisi<br>Main address (actual address) |

| Apt 88, Bldg 10, Gldani<br>3rd M/R, Tbilisi<br>Alternative address | Tel: Work | Tel: Home | Cell phone | E-mail address |
|---|---|---|---|---|

| Workplace and actual workplace address | Fax | Optimal time of the day for service of notice |
|---|---|---|

---

## CONTACT PERSON'S DETAILS:

| Ketevan Kvartskhava<br>Name, Surname (Title) | 932503; 920086; 922491<br>Tel: Work | 96 00 20<br>Tel: Home | 899 510 109<br>Cell phone | 934526<br>Fax | ketti@blc.ge<br>E-mail address |
|---|---|---|---|---|---|

_Note:_ alternative address, workplace and actual workplace address, telephone, e-mail address and fax shall be indicated if any, though _proceeding from fast and effective justice interests, it is recommended to give all the details._

It is not mandatory to _give the details of the contact person_ in the suit, though _they will help the court contact you and administer fast and effective justice._

The plaintiff, the plaintiff's representative (where the suit is filed by the representative) _must give correct details in the suit._

The suit and the documents attached thereto shall be submitted to the court in as many copies as the number of the defendants in the case.

If by filing the suit the plaintiff has already hired the representative in the claim he must indicate his own, the defendant's as well as the representative's, details.

You may use the additional paper

| Place of Seal<br>[signature] |
|---|

# LIST OF THE PERSONS TO BE SUMMONED TO THE COURT

| Witnesses, experts, specialists and interpreters may be summoned to the court. |
|---|

**I.**

_____    **As:**
Status of the person to be summoned

_____    _____
Name, Surname (Title)    Main address (actual address)

_____  _____  _____  _____  _____
Alternative address    Tel: Work    Tel: Home    Cell phone    E-mail address

_____    _____    _____
Workplace and actual workplace address    Fax    Optimal time of the day for
service of notice

**II.**

_____    **As:**
Status of the person to be summoned

_____    _____
Name, Surname (Title)    Main address (actual address)

_____  _____  _____  _____  _____
Alternative address    Tel: Work    Tel: Home    Cell phone    E-mail address

_____    _____    _____
Workplace and actual workplace address    Fax    Optimal time of the day for service
of notice

**III.**

_____    **As:**
Status of the person to be summoned

_____    _____
Name, Surname (Title)    Main address (actual address)

_____  _____  _____  _____  _____
Alternative address    Tel: Work    Tel: Home    Cell phone    E-mail address

_____    _____    _____
Workplace and actual workplace address    Fax    Optimal time of the day for service
of notice

**IV.**

_____    **As:**
Status of the person to be summoned

_____    _____
Name, Surname (Title)    Main address (actual address)

_____  _____  _____  _____  _____
Alternative address    Tel: Work    Tel: Home    Cell phone    E-mail address

_____    _____    _____
Workplace and actual workplace address    Fax    Optimal time of the day for service
of notice

*Note:* if you wish the court to summons this or that person as a witness, please consider that you are obliged to state in the petition column as to what relevance to the case fact such person can confirm. *The plaintiff, the plaintiff's representative (where the suit is filed by the representative) must give in the suit correct details of the witnesses as well as of any other person to be summoned to the hearing.*

[signature]

You may use the additional paper

**SUBJECT OF DISPUTE**

Acknowledging the plaintiff as a manager of heritage property of deceased Arkadi (Badri) Patarkatsishvili. Establishment of the existence or non-existence of the right.

**LEGAL INTEREST IF SUIT TO ACKNOWLEDGE IS FILED**

A suit may be filed for ascertainment of the existence or non-existence of a right or legal relation, recognition of the genuineness of documents or establishment of the falsehood of a document. *The plaintiff must consider the fact that an additional condition for admission of a suit to acknowledge is a legal interest, which means that the plaintiff must state the result(s), for the achievement of which he has applied to the court.* If in bringing suit of guilt, the plaintiff fails to state the legal interest, the suit to acknowledge shall not be admitted for hearing even if there are some other preconditions for admission of the suit.

Fulfilling the final will of deceased Arkadi (Badri) Patarkatsishvili cannot be achieved without consideration of this suit to acknowledge, as it involves the property that is not concentrated at one place or in the hands of one person or industry, which, if not managed in a systematized way, would humiliate the interests of heirs. Therefore, one of the legal interests behind this suit to acknowledge is to safeguard the interests of heirs as well.

In this section, the plaintiff *must give a brief account of the substance of the suit and talk in general as to what has caused the need to apply to the court and what right has been violated.* Filling out this section *is intended to provide the court with the information relevant to the case* and to help perceive the substance of the dispute and formulate the judge's inner conviction.

## BRIEF OVERVIEW OF THE SUBSTANCE OF THE DISPUTE

By the Act on Appointment Property Executive Manager made on November 14, 2008, before the legator's death, Joseph Key was appointed by Arkadi Badri Patarkatsishvili as manager of his estate (see Annex N2). According to the Act, the plaintiff and his company (JWL Entertainment Group, Inc.) must have performed management, possession and leadership of the estate directly or indirectly owned by Badri Patarkatsishvili, and if he died—sale of the estate via private management or auction. At the same time, after payment of all the debts, taxes and expenses, the company should have shared such property in accordance with Badri Patarkatsishvili's confidential instructions. However, in fulfilling the deceased's final will, the plaintiff is prevented by the defendant, who contests the plaintiff's right to act in the above capacity. Due to the above dispute, namely, due to the suit filed in the U.S. Court, on April 30, 2008 a security agreement was made, whereunder Joseph Key undertook not to act in respect of Badri Patarkatsishvili's estate until the court of competent jurisdiction proved otherwise (see Annex N2).

The plaintiff is not an heir to Badri Patarkatsishvili and it is not his goal to receive any part of the estate or benefit. Rather, his goal is to fulfill the last will of the deceased in accordance with the commission and protect the estate.

Proceeding from the specificity of the case and having regard to the assets that may be lost, transferred or destroyed beyond recovery because of delay unless the manager stands up for them, we decided to apply to the court with this suit.

[signature]

**SPECIFIC FACTS AND CIRCUMSTANCES, ON WHICH THE PLAINTIFF BASES HIS CLAIM. THE EVIDENCE THAT CONFIRMS THE FACTS ALLEGED BY THE PLAINTIFF**

This section is a sort of resume of the Substance of Dispute where the plaintiff itemizes the specific facts, which the plaintiff thinks are material to prove his claim and is aimed to draw the attention of the court to the facts, which must be addressed by the court and in the confirmation of which the plaintiff's claim shall be deemed reasonable and validated.

*Facts must be indicated individually, as per items and numbered with Arabic numerals. The facts must be set out briefly and clearly. Where the facts are related so that it is impossible to set them out separately or will make it difficult to perceive any event or fact or get the gyst of the event, some facts may be given together in one item.*

*After completion of the description of each fact, the plaintiff must refer right there to the evidence in support of the fact.*

Each fact must justify the plaintiff's claim and confirm the fact that the defendant has violated his rights. Taken together, these facts constitute the subject of substantiation.

The plaintiff determines on his own which facts to build his claim on.

*THE PLAINTIFF MUST CONSIDER WITHOUT FAIL THAT:*

*The plaintiff must not refer to the facts or circumstances, which have no direct bearing with the subject of dispute and cannot influence the resolution of the dispute;*

*The plaintiff must attach the claim with all the evidence indicated therein. If for good reason the plaintiff is unable to present evidence together with the claim, after giving the description of the relevant fact, he shall state what the good reason is about.*

*The plaintiff may request a reasonable time period for presentation of evidence.*

*If in the claim the plaintiff does not refer to evidence and/or is unable to present it together with the claim and fails to state the reason for his inability to present it, he shall be deemed to have no evidence in connection with this or that fact.*

I.    Be advised that plaintiff Joseph Key is a relative (cousin on mother's side) to businessman Badri Patarkatsishvili, who passed away on February 13, 2008.

II.    According to the Letter of Will made on November 14, 2008 before Arkadi (Badri) Patarkatsishvili passed away, the plaintiff and his company (JWL Entertainment Group, Inc.) should have applied for the management, possession, and leadership of the property directly or indirectly held or owned by Badri Patarkatsishvili, and in the event of his death to sell it via private management or auction. At the same time, after payment of all debts, taxes and expenses, the company should have shared such property in accordance with Badri Patarkatsishvili's confidential instructions (see Annex N1).

III.    Besides, before his death Arkadi Badri Patarkatsishvili appointed Joseph Kay as a manager of his heritage property under the November 14, 2008 "Act on Appointment Property Executive Manager" (see Annex N2).

IV.    After Badri Patarkatsishvili's death, the plaintiff visited Inna Gudavadze to inform her about the deceased's will, and Lawyer Emmannuel Zeltzer informed the family of Badri Patarkatsishvili's final will.

V.    Defendant Inna Gudavadze is one of the heirs to Badri Patarkatsishvili.

VI.    Deceased Arkadi (Badri) Patarkatsishvili is a citizen of Georgia, whose official place of residence was in Georgia as an ordinary place of location for approximately the last 6 years.

VII.    The heritage property of Badri Patarkatsishvili consists of the property with shares in industries throughout various countries in the world and real estate, the part of which has been transferred to other persons via management right, trust, or otherwise. A large part of movable property and real estate is located in Georgia. The estate manager had to gather above-mentioned property and if necessary to sell it partly or entirely through direct sale or public auction, and to share the rest of the sum to heirs.                                        [signature]

Such assignment stands fair in terms of the estate character too, as we are faced with the property, which is not concentrated at one place or in possession of one person or an industry, and which if not managed in a systematized way, would humiliate the interests of heirs.

VIII. The defendant contests the lawfulness of the plaintiff's right to act in the above capacity. Due to the above dispute, namely, due to the suit filed in the U.S. Court, on April 30, 2008 a security agreement was made, whereunder Joseph Key undertook not to act in respect of Badri Patarkatsishvili's estate until the court of competent jurisdiction proved otherwise (see Annex N2). According to the same agreement, Joseph Key reserves the right to apply to the competent court or administrative authority for settlement of any issue related to the estate management.

IX.   Plaintiff states that he is not Badri Patarkatsishvili's heir and his goal is not to have a part of heritage property and profit, but only to fulfill the final will and protect the heritage of the decedent under the content of his task.

X.    Proceeding from the specificity of the case and having regard to the assets that may be lost, transferred or destroyed beyond recovery because of delay unless the manager stands up for them, we decided to apply to the court with this suit.

**Concerning Jurisdiction**

I.    The permanent residential place of the plaintiff referred to in this suit is Georgia, and according to the information that we have, defendant Inna Gudavadze's permanent residential place is Georgia (the address is given at the beginning of the suit).

II.   Subject to Article 8 of the Law of Georgia in International Private Law, "the Georgian courts have international jurisdiction if the defendant has a place of residence, residence or ordinary location in Georgia." As already mentioned above, although we are unaware of the defendant's citizenship, her ordinary location is in Georgia.

III.  The goal of this suit for recognition is to clarify the estate relations and recognize the plaintiff as Estate manager, Executor so as described in the Letter of Will. Consequently, in connection with jurisdiction, Paragraph f) of Article 9 of the Law of Georgia in International Private Law applies, subject to which the Georgian courts have international jurisdiction if: "the subject of dispute is reinstatement of the right of succession, division of estate and a place of residence, ordinary location or in case of the legator's death if the legator had estate in Georgia."

[signature]

It is established beyond doubt that a large part of the estate is located in Georgia. Nor does anyone dispute that deceased Arkadi (Badri) Patarkatsishvili was a citizen of Georgia and when he died, had ordinary location in Georgia. Paragraph 4 of Article 16 of the Civil Procedure Code of Georgia has similar substance.

IV.    Proceeding out of the above, it is the Georgian court that has competent jurisdiction over this case.

[signature]

# სარჩელი
(სამოქალაქო სამმეზ)

ქ. თბილისის საქალაქო სასამართლოს
სამართლის დოსახელება, ნადდ შეჰაი სარჩელი

---

**მოსარჩელე:**

| ჯოზეფ კეი | ქ. თბილისი, ჯანტურიას ქ. №5 |
|---|---|
| სახელი, გვარი (სახელწოდება) | ძირითადი მისამართი (ფაქტობრივი ადგილსამყოფელი) |

| | | 93 36 25 | | |
|---|---|---|---|---|
| ალტერნატიული მისამართი | ტელ: სამსახურის | ტელ: სახლის | მობილური | კალექტრონული ფოსტის მისამართი |

| | 98 56 41 | |
|---|---|---|
| სამუშაო ადგილი და სამუშაო ადგილის ფაქტობრივი მისამართი | ფაქსი | უწყების მისაბარებლად |
| | | დელოვანი ოპრაელური ქრი |

---

**მოსარჩელის წარმომადგენელი (თუ სარჩელს შეაქვს წარმომადგენელი):**

| ქეთევან ქვარცხავა | თბილისი, 0105 გუდიაშვილის მოედანი №4 |
|---|---|
| სახელი, გვარი (სახელწოდება) | ძირითადი მისამართი (ფაქტობრივი ადგილსამყოფელი) |

| 932503; 920086; 922491. | 96 00 20 | 899 510 109 | ketti@blc.ge |
|---|---|---|---|
| ალტერნატიული მისამართი | ტელ: სამსახურის | ტელ: სახლის | მობილური | კალექტრონული ფოსტის მისამართი |

| | 934526 | 10:00-18:00 |
|---|---|---|
| სამუშაო ადგილი და სამუშაო ადგილის ფაქტობრივი მისამართი | ფაქსი | უწყების მისაბარებლად |
| | | დელოვანი ოპრაელური ქრი |

---

**მოპასუხე:**

| ინა გუდავაძე | თბილისი, კოჯრის გზატკეცილი V, VI კილომეტრი. |
|---|---|
| სახელი, გვარი (სახელწოდება) | ძირითადი მისამართი (ფაქტობრივი ადგილსამყოფელი) |

| თბილისი, გლდანი, მე-3 მ/რ, კორპუსი 10, ბინა 88 | | | | |
|---|---|---|---|---|
| ალტერნატიული მისამართი | ტელ: სამსახურის | ტელ: სახლის | მობილური | კალექტრონული ფოსტის მისამართი |

| | | |
|---|---|---|
| სამუშაო ადგილი და სამუშაო ადგილის ფაქტობრივი მისამართი | ფაქსი | უწყების მისაბარებლად |
| | | დელოვანი ოპრაელური ქრი |

---

**საკონტაქტო პირის მონაცემები:**

| ქეთევან ქვარცხავა | 932503; 920086; 922491. | 96 00 20 | 899 510 109 | 934526 | ketti@blc.ge |
|---|---|---|---|---|---|
| სახელი, გვარი (სახელწოდება) | ტელ: სამსახურის | ტელ: სახლის | მობილური | ფაქსი | კალექტრონული ფოსტის მისამართი |





შეესელით, ასარჩელურ დამატებით ფურცელი

სასამართლოში დასაბარებელ პირთა სია

I. ----------------------- საწით:

დასაბარებელი პირის სტატუსი

სახელი, გვარი (სახელწოდება)                          მირითადი მისამართი (ფაქტობრივი ადგილსამყოფელი)

ალტერნატიული მისამართი          ტელ: სამსახურის    ტელ: სახლის    მობილური    ელექტრონული ფოსტის მისამართი

საბუთში აღნიშ და საბუთში აღგილის ფაქტობრივი მისამართი          დაკ                უწყების ჩასაბარებლად
                                                                            ფაქი              ვალდებულ ოპტიმალური დრო

II. ----------------------- საწით:

დასაბარებელი პირის სტატუსი

სახელი, გვარი (სახელწოდება)                          მირითადი მისამართი (ფაქტობრივი ადგილსამყოფელი)

ალტერნატიული მისამართი          ტელ: სამსახურის    ტელ: სახლის    მობილური    ელექტრონული ფოსტის მისამართი

საბუთში აღნიშ და საბუთში აღგილის ფაქტობრივი მისამართი          დაკ                უწყების ჩასაბარებლად
                                                                            ფაქი              ვალდებულ ოპტიმალური დრო

III. ----------------------- საწით:

დასაბარებელი პირის სტატუსი

სახელი, გვარი (სახელწოდება)                          მირითადი მისამართი (ფაქტობრივი ადგილსამყოფელი)

ალტერნატიული მისამართი          ტელ: სამსახურის    ტელ: სახლის    მობილური    ელექტრონული ფოსტის მისამართი

საბუთში აღნიშ და საბუთში აღგილის ფაქტობრივი მისამართი          დაკ                უწყების ჩასაბარებლად
                                                                            ფაქი              ვალდებულ ოპტიმალური დრო

IV. ----------------------- საწით:

დასაბარებელი პირის სტატუსი

სახელი, გვარი (სახელწოდება)                          პირთადი მისამართი (ფაქტობრივი ადგილსამყოფელი)

ალტერნატიული მისამართი          ტელ: სამსახურის    ტელ: სახლის    მობილური    ელექტრონული ფოსტის მისამართი

საბუთში აღნიშ და საბუთში აღგილის ფაქტობრივი მისამართი          დაკ                უწყების ჩასაბარებლად
                                                                            ფაქი              ვალდებულ ოპტიმალური დრო

შეივსება, ისარგებლოს დამატებითი ფურცლით

**დავის საგანი**

მოსარჩელეს ალიარება გარდაცვლილი არკადი (ბადრი) პატარკაციშვილის სამკვიდროს მმართველად. უფლების არსებობა-არარსებობის დადგენა.

**იურიდიული ინტერესი, თუ აჭარულია ალიარებითი სარჩელი**



გარდაცვლილი არკადი (ბადრი) პატარკაციშვილის უკანასკნელი ნების შესრულება, რისი მიღწევაც შეუძლებელია იქნება  წინამდებარე ალიარებითი სარჩელის განხილვის გარეშე, ვინაიდან საქმე ეგიჭება კონებასთან, რომელიც არ არის კონცენტრირებული ერთ ადგიდალს ან ერთი პირის ან საწარმოს ხელში, ხოლო მათი სისტემატიზაციის გარეშე მართოვით მემკვიდრეთა ინტერესები დაზიანდებოდა. შესაბამისად წინამდებარე ალიარებითი სარჩელის ერთ-ერთი იურიდიული ინტერია ასევე მემკვიდრეთა ინტერესების დაცვა.



**დავის არსის მოკლე ვიმოხილვა**

გარდაცვალებამდე 2008 წლის 14 ნოემბერს შედგენილი "აქტის, კონების ალმისრულებელი მმართველის დანიშვნის შესახებ" ჯოზეფ კეი დანიშნულია არკადი ბადრი პატარკაციშვილის მიერ მისი სამკვიდროს მმართველად (იხ. დანართი 2). ალნიშნული აქტის თანახმად მოსარჩელეს და მის კომპანიას (JWL Entertainment Group, Inc.) უნდა განეხორციელებინა ბადრი პატარკაციშვილის პირდაპირ და არაპირდაპირ მფლობელობასა და საკუთრებაში არსებული კონების მართვა, ფლობა და განკარგვა ხოლო მისი გარდაცვალების შემოსვეგუში – კონების გაყიდვა  კერძო განკარგვის ან აუქციონის გზით. ამავე დროს, კომპანიას ყველა ვალის, გადასახადის და ხარჯების გადახდით შემდეგ უნდა გაენაწილებინა ამგვარი კონების ბადრი პატარკაციშვილის  კონფიდენციალური მითითებების შესაბამისად. გარდაცვალებული უკანასკნელი ნების განხორციელებაში მოსარჩელეს ხელს უშლის მოპასუხე, რომელიც მოსარჩელეს ედავება მისი უფლების განხორციელებებაში. ალნიშნული დავის გამო, კერძოდ, აშშ-ს სასამართლოში შეტანილი სარჩელის გამო, 2008 წლის 30 აპრილს დაიდი უზრუნველყოფასთან დაკავშირებული შეთანხმება, რომლის თანახმად ჯოზეფ კეიმ აილო ვალდებულება არ ემოქმედა არკადი (ბადრი) პატარკაციშვილის სამკვიდროს თაობაზე, ვიდრე შესაბამისი იურისდიქციის მქონე სასამართლო არ დაამგკიცცებდა საწინააღმდეგოს (იხ. დანართი 2).

მოსარჩელე არ წარმოადგენს ბადრი პატარკაციშვილის მემკვიდრეს და მისი მიზანი არ არის სამკვიდროს ნაწილის ან რაიმე სარგეგბელის მიღება, არამედ მიზანია გარდაცვლილის უკანასკნელი ნების შესრულება დავალდების შინაარსიდან გამომდინარე და სამკვიდროს დაცვა.

გამომდინარე საქმის სპეციფიკურობიდან და ვინაიდან საქმე ეხება აქტიივს, რომელიც დაყოვნების გამო შესაძლოა საერთოდ დაიკარგოს, გასხვისდეს ან განანდგურდეს, თუ მას არ გამოუჩნდა მმართველი, გადავწყვიტეთ წინამდებარე სარჩელით მივმართოთ სასამართლოს.



კონკრეტული ფაქტები და გარემოებები, რომლებზეც მოსარჩელე ამყარებს თავის მოთხოვნებს. მტკიცებულებები, რომლებიც ადასტურებენ მოსარჩელის მიერ მითითებულ გარემოებებს



I. მოგახსენებთ, რომ მოსარჩელე ჯოზეფ კეი გახლავთ 2008 წლის 13 თებერვალს გარდაცვლილი ბიზნესმენის ბადრი პატარკაციშვილის ნათესავი (დეიდაშვილი).

II. არკადი ბადრი პატარკაციშვილის მიერ გარდაცვალებამდე, 2008 წლის 14 ნოემბერს შედგენილი "ნების გამოთქმის წერილის" თანახმად მოსარჩელეს და მის კომპანიას (JWL Entertainment Group, Inc.) უნდა განეხორციელებინა ბადრი პატარკაციშვილის პირდაპირ და არაპირდაპირ მფლობელობასა და საკუთრებაში არსებული ქონების მართვა, ფლობა და განკარგვა ხოლო მისი გარდაცვალების შემთხვევაში – ქონების გაცემისა კერძო განკარგვის ან აუქციონის გზით. ამავე დროს, კომპანიას ყველა ვალის, გადასახადის და ხარჯების გადახდის შემდეგ უნდა გაენაწილებინა ამბგარი ქონება ბადრი პატარკაციშვილის კონფიდენციალური მითითებების შესაბამისად (იხ. დანართი 1).

III. ასევე გარდაცვალებამდე 2008 წლის 14 ნოემბერს შედგენილი "აქტის, ქონების აღმსრულებელი მმართველის დანიშვნის შესახებ" ჯოზეფ კეი დანიშნულია არკადი ბადრი პატარკაციშვილის მიერ მისი სამკვიდროს მმართველად და ანდერძის აღმასრულებელად(იხ. დანართი 2).

IV. ბადრი პატარკაციშვილის გარდაცვალების შემდეგ მოსარჩელე ეწვია მოასუუზე ინა გუდავაძეს და აცნობა გარდაცვალილის სურვილის შესახებ, ხოლო ადვოკატმა ემანუელ ზელცერმა გააცნო ოჯახს ბადრი პატარკაციშვილის უკანასკნელი ნება.

V. მოასუუზე ინა გუდავაძე წარმოადგენს ბადრი პატარკაციშვილის ერთ-ერთ მემკვიდრეს.

VI. გარდაცვალილი არკადი (ბადრი) პატარკაციშვილი წარმოადგენს საქართველოს მოქალაქეს, რომლის ოფიციალური საცხოვრებელი ადგილი იყო საქართველოში, ისევე, როგორც ჩვეულებრივი ადგილსამყოფელი უკანასკნელი, დაახლოებით 6 წლის მანძილზე.

VII. ბადრი პატარკაციშვილის სამკვიდრო შედგება ქონებისაგან, რომელიც წარმოადგენს წილებს მსოფლიოს სხვადასხვა ქვეყანაში არსებულ საწარმოებში და ურძღა ქონებას, რომელთაგან ნაწილი მართივს უფლებით, ტრასტების ან სხვა გზით არის გადაცემული სხვა პირებისთვის. ურძავი და მოძრავი ქონების დიდი ნაწილი იმყოფება საქართველოში. სამკვიდროს მმართველს უნდა შეეკრიბა აღნიშნული ქონება, თუ საჭირო ჩათლილიდა მთლიანად ან მისი ნაწილი გაეყიდა პირდაპირი მიყიდვით ან საჯარო აუქციონის გზით, ხოლო

დარჩენილი თანხა გაესაჯლებინა მემკვიდრეებისთვის. აღნიშნული დაყალება გამართლებულია სამკვიდროს ხასიათიდან გამომდინარეც, ვინაიდან საქმე გვაქვს ქონებასთან, რომელიც არ არის კონცენტრირებული ერთ ადგილას ან ერთი პირის ან საწარმოს ხელში, ხოლო მათი სისტემატიზაციის გარეშე, მემკვიდრეთა ინტერესები დაზიანდებოდა.

**VIII.** მოპასუხე მოსარჩელეს ედავება მისი უფლების განხორციელების კანონიერებაზე. აღნიშნული დავის გამო, კერძოდ, აშშ-ს სასამართლოში შეტანილი სარჩელის გამო, 2008 წლის 30 აპრილს დაიდო უზრუნველყოფასთან დაკავშირებული შეთანხმება, რომლის თანახმად ჯლოზეუ კემ ბილო ვალდებულელება არ ემოქმედა არკადი (ბადრი) პატარკაციშვილის სამკვიდროს თაობაზე, ვიდრე შესაბამისი იურისდიქციის მქონე სასამართლო არ დაამტკიცებს საწინააღმდეგოს (იხ. დანართი 2). ამავე შეთანხმების თანახმად ჯლოზეუ კი ინარჩუნებს უფლებას მიმართოს კომპეტენტურ სასამართლოს ან ადმინისტრაციულ ორგანოს სამკვიდროს მართვასთან დაკავშირებით ნებისმიერი საკითხის გადასაწყვეტად.

**IX.** მოსარჩელე აცხადებს, რომ იგი არ წარმოადგენს ბადრი პატარკაციუშებელის მემკვიდრეს და მისი მიზანი არ არის სამკვიდროს ნაწილის ან რაიმე სარგებლის მიღება, არამედ მიზანია გარდაცვლილის უკანასკნელი ნების შესრულება დაყალების შინაარსიდან გამომდინარე და სამკვიდროს დაცვა.

**X.** გამომდინარე საქმის სპეციფიკურობიდან და ვინაიდან საქმე ეხება აქტივებს, რომლებიც დაყოფილების გამო შეასაძლოა საერთოდ დაიკარგოს, გასხვისდეს ან განადგურდეს, თუ მას არ გამოუწ
ნენ მმართველი, გადავწყვიტეთ წინამდებარე სარჩელით მივმართოთ სასამართლოს.

## განსჯადობის შესახებ

**I.** წინამდებარე სარჩელში მითითებული მოსარჩელის მუდმივი საცხოვრებელი ადგილი არის საქართველო, ჩვენს ხელთ არსებული ინფორმაციით მოპასუხეე ინა გუდავაძის მუდმივი საცხოვრებელი ადგილი არის საქართველო (მისამართი მითითებულია სარჩელის დასაწყისში).

**II.** საქართველოს კანონის – საერთაშორისო კერძო სამართლის შესახებ მე-8 მუხლის თანახმად: "*საქართველოს სასამართლოებს აქვთ საერთაშორისო კომპეტენცია, თუ მოპასუხეს საქართველოში აქვს საცხოვრებელი ადგილი, რეზიდენცია ან ჩვეულებრივი ადგილსამყოფელი.*" როგორც ზემოთ აღინიშნა, თუმცა ჩვენთვის უცნობია მოპასუხის მოქალაქეობა, მისი ჩვეულებრივი ადგილსამყოფელი საქართველოშია.

**III.** წინამდებარე აღიარებითი სარჩელის მიზანია სამკვიდრო ქონებასთან დაკავშირებული ურთიერთობების გარკვევა და მოსარჩელის აღიარება სამკვიდროს მმართველად, აღსრულებად, იხი როგორც აღნიშნული აღწერილია გარდაცვლილის ნების გამოლების წერილში. შესაბამისად, განსჯადობისას გამოიყენება საერთაშორისო კერძო სამართლის შესახებ კანონის მე-9 მუხლის "გ" ქვეპუნქტი, რომლის თანახმად საქართველოს სასამართლოს საერთაშორისო კომპეტენცია გააჩნია თუ: "სარჩელი საგანია სამემკვიდრეო უფლების დადგენა, სამკვიდრო ქონების გაცემა და მამკვიდრებელს

გარდაცვალებისას საცხოვრებელი ადგილი, ჩვეულებრივი ადგილსამყოფელი ან
სამკვიდრო ქონება საქართველოში ჰქონდა." დადგენილია და დავას არ იწვევს,
რომ სამკვიდრო ქონების დიდი ნაწილი იმყოფება საქართველოში, ასევე არ
არის სადავო, რომ გარდაცვლილი არკადი (ბადრი) პატარკაციშვილი იყო
საქართველოს მოქალაქე და გარდაცვალებისას ჩვეულებრივი ადგილსამყოფელი
საქართველოში ჰქონდა. ანალოგიური შინაარსისაა საქართველოს სამოქალაქო
საპროცესო კოდექსის მე-16 მუხლის მე-4 პუნქტი.

IV.    გამომდინარე ზემოაღნიშნულიდან, წინამდებარე სარჩელის განხილვისას
სწორედ საქართველოს სასამართლოა კომპეტენტური.

**Exhibit B**



**GEOTEXT**
Translations, Inc.

STATE OF NEW YORK    )
                     )    ss
COUNTY OF NEW YORK   )

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from Georgian into English of the attached Application to Secure the Suit

by Plaintiff Joseph Kay.

Evan Finch, Project Manager
Geotext Translations, Inc.

Sworn to and subscribed before me

this _10th_ day of _June_, 20 _08_.

KRISTEN D. PLONKA
Notary Public, State of New York
No. 01PL6121852
Qualified in Queens County
Commission Expires January 31, 20 _09_

New York  259 West 30th Street, 17th Floor, New York, NY 10001, U.S.A. tel 212.631.7432 fax 212.631.7778
San Francisco  220 Montgomery Street, 3rd Floor, San Francisco, CA 94104, U.S.A. tel 415.576.9500 fax 415.520.0525
London  107-111 Fleet Street, London EC4A 2AB, United Kingdom tel +44.(0)20.7936.9002 fax +44.(0)20.7990.9909
Hong Kong  20th Floor, Central Tower, 28 Queen's Road, Central, Hong Kong tel +852.2159.9143 fax +852.3010.0082
translations@geotext.com  I  www.geotext.com

To: Civil Case Board of Tbilisi City Court

Plaintiff: Joseph Kay
Residing at: 5 Chanturia Street, Tbilisi
Contact Information: Tel: 93 36 25;
Fax: 98 56 41

Representative: Ketevan Kvartskhava
Address: 4 Gudiashvili Square, Tbilisi, 0105
Contact Information: 922491; 932503; 920086;
Fax: 934526; Cell: 899510109; Email: ketti@blc.ge

Application to Secure the Suit

1. Basis for Application

Be advised that on May 7, 2008 we filed an application to the Civil Case Board of Tbilisi
City Court where we request:

"1. To acknowledge Plaintiff Joseph Kay as a Manager of deceased Arkadi (Badri)
Patarkatsishvili's heritage property.
2. To prohibit Defendants hindering Plaintiff while fulfilling its rights and obligations.
3. Assigning Defendants to pay court costs to Plaintiff."

The basis for above application is hindering the exercising of rights vested in and
fulfilling the responsibilities assigned to Plaintiff by Arkadi (Badri) Patarkatsishvili –
namely in management of the estate and execution of the will.

We are going to secure the suit, which shall also involve following Defendants: Ia
Patarkatsishvili, Liana Zhmotova, and Olga Safonova. The suit against Inna Gudavadze,
Ia Patarkatsishvili, and Liana Zhmotova is intended to prohibit these Defendants from
hindering Plaintiff while fulfilling its rights and obligations, while Defendant Olga
Safonova will be involved in the part of acknowledging suit.

According to the information available to us, Defendant Inna Gudavadze directly
and by using her daughters Ia Patarkatsishvili and Liana Zhmotova is trying to gain
control over and property right of Arkadi (Badri) Patarkatsishvili's estate without
application of any rights of other heirs and the will of estate manager and executor of the
will.

1

### 2. <u>Claim</u>

Based on the aforementioned and on the facts given below we request:

1. To assign Defendants Inna Gudavadze, Ia Patarkatsishvili, and Liana Zhmotova not to perform any legal or/and factual acts to gain property, possession or other right to the estate or to transfer it to any other person;

2. To authorize Plaintiff Joseph Kay to perform any action that he may think necessary to gather and maintain Arkadi (Badri) Patarkatsishvili's estate as well as to sell it or any part thereof, if such sale deemed necessary within the material interests of the heirs, and to put the estate sales proceeds on the court's deposit account pending completion of the dispute (please provide us with the relevant deposit account details).

### 3. Factual Circumstances

1. Be advised that Plaintiff Joseph Kay is a relative (cousin on mother's side) of businessman Badri Patarkatsishvili, who passed away February 13, 2008.

2. According to the Letter of Will made on November 14, 2008 before Arkadi (Badri) Patarkatsishvili passed away, Plaintiff and his company (JWL Entertainment Group, Inc.) should have applied for the management, possession, and leadership of the property directly or indirectly held or owned by Badri Patarkatsishvili, and in the event of his death to sell it via private management or auction. At the same time, after payment of all debts, taxes and expenses, the company should have shared such property in accordance with Badri Patarkatsishvili's confidential instructions.

3. Besides, before his death, Arkadi Badri Patarkatsishvili appointed Joseph Kay as a manager of his heritage property under November 14, 2008 "Act on Appointment Property Executive Manager."

4. After Badri Patarkatsishvili passed away, Plaintiff visited Defendants and informed them about the will of Decedent, and lawyer Emmanuel Zeltzer notified the family of Badri Patarkatsishvili's final will.

5. Defendant Inna Gudavadze is one of the heirs of Badri Patarkatsishvili. Defendant Ia Patarkatsishvili is Badri Patarkatsishvili's daughter and one of the heirs. Defendant Liana Zhmotova is Badri Patarkatsishvili's daughter and one of the heirs.

6. Deceased Arkadi (Badri) Patarkatsishvili is a citizen of Georgia, who officially resided in Georgia as his usual place of residence for a period of approximately the past 6 years.

7. The heritage property of Badri Patarkatsishvili consists of the property with shares in industries throughout various countries in the world and real estate, the part of which has been transferred to other persons via management right, trust, or otherwise. A large part of movable property and real estate is located in Georgia. The estate manager had to gather the abovementioned property and if necessary to sell it partly or entirely through direct sale or public auction, and to share the rest of the sum with the heirs. Such assignment stands fair in terms of the estate character too, as we are faced with the property, which is not concentrated at one place or in possession of one person or an industry, and which if not managed in a systematized way, would humiliate the interests of heirs.

8. Plaintiff states that he is not Badri Patarkatsishvili's heir and his goal is not to have a part of heritage property and profit, but only to fulfill the final will and protect the heritage of Decedent under the content of his task.

3

4. <u>Circumstance that may hinder or make decision impossible to implement</u>

As mentioned above, Decedent appointed Plaintiff as an executor of his Will. Besides Defendants, there are other heirs too. For example, Decedent had a wife – Olga Safonova, citizen of the Russia Federation (Marriage Certificate issued September 5, 1997 is attached hereto). Decedent had one common child with her. The list of named heirs includes Decedent's children, sisters, and mother. Therefore, according to the will of Decedent, part of his heritage property belongs to his Russian spouse too.

Defendant Inna Gudavadze was wife of Decedent too. We obtained a document—the original copy of which is not available to us—namely: **Family Agreement**. This document, which is in the Russian language, bears four signatures, one of which is made by Decedent Badri Patarkatsishvili, one by Defendant Inna Gudavadze, and two by the witnesses. According to this document, which was made on March 12, 1994, the parties recognize their marriage as a formality that is not terminated for the sole purpose of not affecting their children adversely. According to Paragraph 5 of this document, Arkadi Patarkatsishvili and Inna Gudavadze are independently responsible for their obligations that they might undertake after the signature of the Agreement. Based on the substance of the document and taking into account the existence of the other official wife, we may presume that the above couple had been officially divorced by the time Decedent had passed away.

This presumption may be of decisive importance in dividing the heritage property, and while, during his lifetime, Badri Patarkatsishvili assigned Plaintiff to execute his will and manage, gather, or sell his estate and share it among the heirs, Defendants' receipt of any of Decedent's assets is devoid of legal basis.

Therefore, if Defendants take over any part of the heritage property or transfer it to any third person, it will expressly violate Decedent's will, encroach upon the rights of other heirs, and the executor of the will won't be able to fulfill his functions and duties even if the suit is granted.

4

## 5. Legal Grounds for Application of Measures to Secure the Suit

Article 198 of the Civil Code of Practice of Georgia sets forth the measures of securing the suit, one of which is prohibiting Defendant from performing certain actions (Subparagraph b of Paragraph 2 of Article 198). In addition to the reasonable cause contemplated by Article 191, the above legal basis is the legal motivation of the first claim in this application.

According to Article 198 of the Civil Code of Practice of Georgia, *"the court may employ other measures as well if it is necessary to secure the suit. If necessary, several methods of securing the suit may be allowed."* The second claim contemplated by our application arises from the specificity of the case. If the court dismisses the claim, it will be impossible to execute it even if the suit is granted, because the assets, which are assigned to different persons based on trust or commission, as well as any other property, the maintenance of which is related to certain expenses, will have either not existed by this period or will have been transferred or substantially devalued. Consequently, it would be impossible to execute Decedent's will.

Based on the abovementioned, we believe that our application is motivated and reasonable and must be granted pursuant to Articles 191, 194 and 198 of the Civil Code of Practice of Georgia.

Respectfully,

Joseph Kay

Represented by
Ketevan Kvartskhava

[signature]

Annex:
1. Marriage Certificate with Apostille issued on September 5, 1997;
2. Family Agreement made on March 12, 1994;
3. Fee Payment Confirmation Receipt;
4. Representative's power of attorney;
5. Copy of the action.

თბილისის საქალაქო სასამართლოს
სამოქალაქო საქმეთა კოლეგიას

მოსარჩელე: ჯოზეფ კეი
მცხოვრები:    ქ. თბილისი, ჯანდურიას ქ. №5
საკონტაქტო ინფორმაცია: ტელ: 93 36 25;
ფაქსი: 98 56 41

წარმომადგენელი ქეთევან ქვარცხავა
მისამართი: თბილისი, 0105 გუდიაშვილის მოედანი №4
საკონტაქტო ინფორმაცია 922491; 932503; 920086;
ფაქსი: 934526; მობ: 899510109; ელ.ფოსტა: ketti@blc.ge


გ ა ნ ც ხ ა დ ე ბ ა
სარჩელის უზრუნველყოფის შესახებ


1.    განცხადების საფუძველი

მოგახსენებთ, რომ 2008 წლის 7 მაისს თბილისის საქალაქო სასამართლოს
სამოქალაქო საქმეთა კოლეგიაში შემოტანილი გვაქვს სასარჩელო განცხადება,
რომლითაც ვითხოვთ:

"  1.    აღიაროთ მოსარჩელე ჯოზეფ კეი გარდაცვლილი არკადი (ბადრი)
        პატარკაციშვილის სამკვიდროს მმართველად.
    2.    აუკრძალოთ მოპასუხეებს ნებისმიერი ხელშემშლა მოსარჩელის მიერ
        მისი უფლება-ვალდებულებების შესრულებაში.
    3.    დააკავლოთ მოპასუხეებს აუნაზღაუროთ მოსარჩელეს სასამართლო
        ხარჯები."

აღნიშნული სასარჩელო განცხადების საფუძველია მოსარჩელესთვის
არკადი (ბადრი) პატარკაციშვილის მიერ მინიჭებული უფლებების და
დაკისრებული ვალდებულებების შესრულებაში – კერძოდ – სამკვიდროს
მართვასა და ანდერძის აღსრულებაში ხელშეშლა.

ჩვენ ვაპირებთ სარჩელის დაზუსტებას, სადაც მოპასუხეებად ჩართული
იქნებიან ასევე: ია პატარკაციშვილი, ლიანა ჟმოტოვა და ოლგა საფონოვა.
მოპასუხეების მიმართ ინა გუდავაძის, ია პატარკაციშვილის და ლიანა ჟმოტოვას
მიმართ სარჩელი გაითვალისწინებს მოსარჩელისთვის მისი უფლებების და
ვალდებულებების განხორციელებისას ხელშეშლის აკრძალვას, ხოლო მოპასუხეზე
ოლგა საფონოვას წარუდგება იქნება აღიარებითი სარჩელის ნაწილში.

ჩვენს ხელთ არსებული ინფორმაციით, მოპასუხე ინა გუდავაძე უშუალოდ
და მისი შვილების ია პატარკაციშვილის და ლიანა ჟმოტოვას გამოყცენებით
ცდილობს მოიპოვოს კონტროლი და საკუთრების უფლება არკადი (ბადრი)
პატარკაციშვილის სამკვიდრო ქონებაზე, ისე, რომ ხხვა მემკვიდრეთა უფლებები
და სამკვიდროს მმართველის და ანდერძის აღსრულებლის ნება არ არის
გათვალისწინებული.

                                                                                    1

## 2. გადაწყვეტა

გამომდინარე აღნიშნულიდან და ქეგმოთ მოცემული ფაქტებიდან, გთხოვთ:

1. დაავალოთ მოპასუხეებს ინა გუდავაძეს, ია პატარკაციშვილს და ლიანა ემუტროვას არ განახორციელონ არანაირი იურიდიული ან/და ფაქტობრივი მოქმედება სამკვიდროს ან მისი ნაწილის საკუთრების, მფლობელობის ან სხვა უფლებით მიღებასთან ან ნებისმიერი სხვა პირისთვის გადაცემასთან დაკავშირებით;

2. მიანიჭოთ მოსარჩელე ჯოზეფ კეის უფლება – განახორციელოს ნებისმიერი მოქმედება, რასაც აუცილებლად ჩათვლის არკადი (ბადრი) პატარკაციშვილის სამკვიდროს შეგროვების და მოვლისათვის, იქვე როგორც მისი ან მისი ნაწილის რეალიზაციისთვის, თუ ასეთი რეალიზაცია აუცილებლად ჩაითვლება მეჯიკიდრეთა მატერიალური ინტერესებიდან გამომდინარე, ხოლო მისი რეალიზაციით ამონაგები თანხები მოათავსოს სასამართლოს სადეპოზიტო ანგარიშზე დავის დასრულებამდე (გთხოვთ მიგვეთითოთ შესაბამისი სადეპოზიტო ანგარიშის დეტალები).

2

3.    **ფაქტობრივი გარემოებები**

1.    მოგახსენებთ, რომ მოსარჩელე ჯოზეფ კეი გახლავთ 2008 წლის 13 თებერვალს გარდაცვლილი ბიზნესმენის ბადრი პატარკაციშვილის ნათესავი (დეიდაშვილი).

2.    არცადა ბადრი პატარკაციშვილის მიერ გარდაცვალებამდე, 2008 წლის 14 ნოემბერს შელდგენილი "ნების გამო.ვლენის წერილით" თანახმად მოსარჩელეს და მის კომპანიას (JWL Entertainment Group, Inc.)  უნდა განეხორციელებინა ბადრი პატარკაციშვილის პიირდაპირ და არაპიირდაპირ მფლობელობასა და საკუთრებაში არსებული ქონების მართვა, ფლობა და განკარგვა ხოლო მისი გარდაცვალების შემთხვევაში — ქონების გაყიდვა კერძო განკარგვის ან აუქციონის გზით. ამავე დროს, კომპანიას ყველა ვალის, გადასახადის და ხარჯების გადახდის შემდეგ უნდა გაენაწილებინა ამგვარი ქონება ბადრი პატარკაციშვილის კონფიდენციალურუ მითითებების შესაბამისად.

3.    ასევე გარდაცვალებამდე 2008 წლის 14 ნოემბერს შელდგენილი "აქტის, ქონების აღმასრულებელი მმართველის დანიშვნის შესახებ" ჯოზეფ კეი დანიშნულია არცადა ბადრი პატარკაციშვილის მიერ მისი სამკვიდროს მმართველად.

4.    ბადრი პატარკაციშვილის გარდაცვალების შემდეგ მოსარჩელე ეჭვია მოპასუხეებს და ავანრძა გარდავერლილის სურვილის შესახებ, ხოლო ადვოკატმა ემანუელ ზელცერმა გააცნო ოჯახს ბადრი პატარკაციშვილის უკანასკნელი ნება.

5.    მოპასუხე ინა გუდავაძე წარმოადგენს ბადრი პატარკაციშვილის ერთ-ერთ მემკვიდრეს. მოპასუხე ია პატარკაციშვილი წარმოადგენს ბადრი პატარკაციშვილის შვილს და ერთ-ერთ მემკვიდრეს. მოპასუხე ლიანა ეფთოვა წარმოადგენს ბადრი პატარკაციშვილის შვილს და ერთ-ერთ მემკვიდრეს.

6.    გარდაცვალებული არცადა (ბადრი) პატარკაციშვილი წარმოადგენს საქართველოს მოქალაქეს, რომელიც ოფიციალური საცხოვრებლის ადგილი იყო საქართველოში, ისევე, როგორც ჩვეულებრივი ადგილსამყოფელი უკანასკნელი, დაახლოებით 6 წლის მანძილზე.

7.    ბადრი პატარკაციშვილის სამკვიდრო შედგება ქონებისაგან, რომელიც წარმოადგენს წიდებს მსოფლიოის სხვადასხვა ქვეყანაში არსებულ საწარმოებში და ურცა ქონებას, რომელთაგან ნაწილი მართვის უფ.ლებით, ტრასტის ან სხვა გზით არის გადაცემულია სხვა პიირებისთვის. ურცავი და მოძრავი ქონების დიდი ნაწილი იმყოფება საქართველოში. სამკვიდროს მმართველს უნდა შეეკრიბა აღნიშნული ქონება, თუ საჭიროდ ჩათვლიდა მიელიანდა ან მისი ნაწილი გაეყიდა პიირდაპირი მოყიდვით ან საჯარო აუქციონის გზით, ხოლო დარჩენილი თანხა გაენაწილებინა მემკვიდრეებისთვის. აღნიშნული დავალება გამართლებულია სამკვიდრო ხასიათიდან გამომდინარეც, ვინაიდან საქმე გვაქვს ქონებასთან, რომელიც არ არის კონცენტრირებული ერთ ადგილას ან ერთი პიირის ან საწარმოს ხელში, ხოლო მათი სისტემატიზაცის გარეშე, მემკვიდრეთა ინტერესები დაზიანდებიან.

8.    მოსარჩელე აცხადებს, რომ იგი არ წარმოადგენს ბადრი პატარკაციშვილის მემკვიდრეს და მისი მიზანი არ არის სამკვიდროს ნაწილის ან რაიმე სარგებელის მიღება, არამედ მიზანია გარდაცვლილის უკანასკნელი ნების შესრულება დავალების შინაარსიდან გამომდინარე და სამკვიდროს დაცვა.

#### 4.   გარემოებები, რომლებიც გაართულებს
#### ან შეუძლებელს გახდის გადაჭყვეტილების აღსრულებას

როგორც ზემოთ აღინიშნა, მოსარჩელე გარდაცვლილი პირის მიერ დანიშნულია ანდერძის აღმსრულებლად. მემკვიდრეებს შორის არიან მოპასუხეებიც გარდა სხვა პირებიც. მაგალითად, გარდაცვლილს ჰყავდა მეუღლე რუსეთის ფედერაციის მოქალაქე საფონია ოლღა (დართული ქორწინების მოწმობა გაცემული 1997 წლის 5 სექტემბერს), რომელთანაც ჰყავს საერთო შვილი, მემკვიდრეებად ასევე დასახელებულია ცალკე მამკვიდრებლის შვილები, დები და დედა. შესაბამისად, გარდაცვლილი ნების თანახმად, მისი სამკვიდროს წილი ასევე მის რუ მეუღლეს ეკუთვნის.

მოპასუხეც ინა გუდავაძე ასევე იყო გარდაცვლილის მეუღლე. ჩვენს ხელთ აღმოჩნდა დოკუმენტი, რომლის დედანიც ჩვენთან არ იმყოფება, კერძოდ: შეთანხმება ოჯახის ინტერესებიდან გამომდინარე. რუსულ ენაზე შედგენილ აღნიშნულ დოკუმენტზე აღნიშნულია ოთხი ხელმოწერა, აქედან ერთი ეკუთვნის გარდაცვლელ ბაღრი პატარკაციშეილს, ერთი მოპასუხეს (ინა გუდავაძეს), ხოლო ორი მოწმეებს. აღნიშნულ დოკუმენტის თანახმად, რომელიც 1994 წლის 12 მარტს შედგა, მხარეები მათ ქორწინებას ფორმალობას აღიარებენ, რომელიც მხოლოდ იმ მიზნით არ წყდება, რათა შვილებზე განქორწინებამ არ მოახდინოს ნეგატიური გავლენა. აღნიშნული დოკუმენტის მე-5 პუნქტის თანახმად არცადი პატარკაციშეილი და ინა გუდავაძი დამოუკიდებლად აგებენ პასუხს თავის ვალდებულებებზე, რომელსაც ხელშეკრულებაზე ხელმოწერის შემდეგ იისრებენ. გამომდინარა ამ დოკუმენტის შინაარსიდან და ასევე სხვა, ოფიციალური მეუღლის არსებობის ფაქტიდან საჯარაუდოა, რომ შესაძლია აღნიშნული წყვეტილი მამკვიდრებლის გარდაცვალების მომენტისთვის ოფიციალურად იყო განქორწინებული.

აღნიშნულ ვარაუდს გაამყ_ვებს მნიშვენლობა შესაძლია ჰკონდეს სამკვიდროს გაყოფისას, ხოლო ვიდაიდად სიცოცხლეში ბაღრი პატარკაციშეილმა სწორად მოსარჩელეს დააავალა ანდერძის აღმსრულებლობა და მისი სამკვიდროს მოვლა, შეკრება, რეალიზაცია და მემკვიდრეებს შორის გაყოფა, მოპასუხეების მიერ ნებისმიერი მამკვიდრებლის აქტივის მიღება მოკლებულია კანონიერ საფუძვლს.

შესაბამისად, თუკი მოპასუხეები მიიღებენ თავად ან გადააცალმენ ნებისმიერ მესამე პირს სამკვიდრო ქონების ნაწილს, მამკვიდრებლის ნება ამით ცალსახად დაირღვევა, სხვა მემკვიდრეების უფლებები შეილახება, ხოლო ანდერძის აღსრულებლებს, საჩელთან დამპყოფილების შემოხვევაში კი ვერ შეძლებს მისი ფუნქციის და დავალების შესრულებას.

## 5. სარჩელის უზრუნველყოფის ღონისძიების გამოყენების სამართლებრივი საფუძველი

საქართველოს სამოქალაქო საპროცესო კოდექსის 198 მუხლი ჩამოთვლის სარჩელის უზრუნველყოფის ღონისძიებებს, რომელთა შორის არის მოპასუხისათვის გარკვეული მოქმედების შესრულების აკრძალვა (მუხლი 198, პუნქტი 2, ქვეპუნქტი "ვ"). სწორედ აღნიშნული საკანონმდებლო საფუძველი, გარდა 191 მუხლით გათვალისწინებული საფუძვლიანი ვარაუდის წარმოადგენს წინამდებარე განცხადებით გათვალისწინებული პირველი მოთხოვნის სამართლებრივი მოტივაციას.

საქართველოს სამოქალაქო საპროცესო კოდექსის 198 მუხლის თანახმად: *"სასამართლოს შეუძლია გამოიყენოს სხვა ღონისძიებებიც, თუ ეს აუცილებელია სარჩელის უზრუნველყოფისათვის. აუცილებლობის შემთხვევაში შეიძლება დაშვებულ იქნეს სარჩელის უზრუნველყოფის რამდენიმე სახე."* ჩვენი განცხადების გათვალისწინებული მეორე მოთხოვნა გამომდინარეობს საქმის სპეციფიურობიდან. იმ შემთხვევაში, თუკი სასამართლო ვარს გაუზიარებს აღნიშნული მოთხოვნის დაკმაყოფილებაზე, სარჩელის დაკმაყოფილების შემთხვევაში კი მისი აღსრულების შეუძლებელი გახდება, ვინაიდან ქონება, რომელიც სხვა პირებისთვის არის მიბარებული ტრასტის ან დავალების სახით, ისევე როგორც ნებისმიერი სხვა ქონება, რომლის მოცვაც გარკვეულ სახსრებს საჭიროებს, ამ პერიოდისთვის ან არ იარსებებს, ან გასხვისდება ან მნიშვნელოვნად გაუფასურდება. შესაბამისად შეუძლებელი გახდება მამკვიდრებლის ნების განხორციელება.

გამომდინარე ზემოთ აღნიშნულიდან, მიგვაჩნია, რომ ჩვენი განცხადება მოტივირებულია და საფუძვლიანია და უნდა დაკმაყოფილდეს სამოქალაქო საპროცესო კოდექსის 191, 194 და 198 მუხლების შესაბამისად.

პატივისცემით,

ჯოზეფ კეი

წარმოდგენილი წარმომადგენლის
ქეთევან ქვარცხავა მიერ

დანართი:
1. ქორწინების მოწმობა აპოსტილით, გაცემული 1997 წლის 5 სექტემბერს;
2. შეთანხმება ოჯახის ინტერესებიდან გამომდინარე, დადებული 1994 წლის 12 მარტს.
3. ბაჯის გადახდის დამადასტურებელი ქვითარი;
4. წარმომადგენლის რწმუნება;
5. სარჩელის ასლი.

5

**Exhibit C**



**GEOTEXT**
Translations, Inc.

STATE OF NEW YORK        )
                         )    ss
COUNTY OF NEW YORK       )

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from Georgian into English of the attached Court Decision for Case No.

2/1597-08, dated May 14, 2008.


*Valbona Burda*

Valbona Burda, Project Manager
Geotext Translations, Inc.


Sworn to and subscribed before me

this 21 day of May, 2008.


*C. Lianides*

CORIN LIANIDES
NOTARY PUBLIC-STATE OF NEW YORK
No. 01LI6167936
Qualified in Kings County
My Commission Expires June 04, 2011

New York  259 West 30th Street, 17th Floor, New York, NY 10001, U.S.A. tel 212.631.7432 fax 212.631.7778
San Francisco  220 Montgomery Street, 3rd Floor, San Francisco, CA 94104, U.S.A. tel 415.676.9500 fax 415.520.0525
London  107-111 Fleet Street, London EC4A 2AB, United Kingdom tel +44.(0)20.7936.9002 fax +44.(0)20.7990.9909
Hong Kong  20th Floor, Central Tower, 28 Queen's Road, Central, Hong Kong tel +852.2159.9143 fax +852.3010.0082
translations@geotext.com  |  www.geotext.com

Case No. 2/1597-08                    [emblem]

# Court Decision

### Georgia

**Tbilisi**                                               **May 14, 2008**

Civil Case Board, Tbilisi City Court

### Judge: Diana Berekashvili

**Petitioner:** Joseph Kay;
**Representative:** Ketevan Kvartskhava;

**Respondents:** Ina Gudavadze; Ia Patarkatsishvili; Liana Zhmotova

**Complaint:** Pre-Award Relief

The statement of Joseph Kay on pre-award relief has been discussed without an **oral hearing.**

## DECISION:

On May 7, 2008, Joseph Kay presented a complaint to the Civil Case Board, Tbilisi City Court, against defendant Ina Gudavadze, who was seeking to be appointed as a wealth manager.

On May 14, 2008 Ketevan Kvaratskhava, who is representing Joseph Kay, presented a statement to the Tbilisi City Court Civil Case Board about her decision to clarify the pre-award relief where the successors Ia Patarkatsishvili, Liana Zhmotova and Olga Saponova will be presented as defendants. The pre-award relief will enable the defendants to exercise their rights and obligations. Defendant Olga Saponova will be a part of the claim for declaratory judgment.

According to the petitioner, defendant I. Gudavadze is trying to gain control and the right to Arkadi Patarkatsishvili's wealth by using their children, ignoring the rights of other successors, the wealth manager and the executor of a will. Before Arkadi Patarkatsishvili's death, according to the "will" drafted on November 14, 2008, the

[stamp:] Tbilisi City Court, Council on Civil Cases

plaintiff and his company were designated to manage, possess and execute all of Badri Patarkatsishvili's wealth regardless of whether it was in direct or indirect ownership and possession. In case of death, the wealth was to be sold by private management or auction. At the same time, after the company paid all debts, fees and expenses, the wealth had to be divided in accordance with Badri Patarkatsishvili's confidential instructions. According to the "Act of appointing" drafted on November 14, 2008, Joseph Kay is designated as the wealth manager by Arkadi Badri Patarkatsishvili to manage his wealth. The plaintiff has informed the defendants regarding the wishes of the deceased and the lawyer Emanuel Aeltser has notified the family about Badri Patarkatsishvili's last will.

The Plaintiff notes that Badri Patarkatsishvili's heritage is comprised of wealth including industrial shares in different countries of the world as well as real estate, part which is shared with other individuals with the right to manage, trust, etc. The wealth manager had to gather all of the above mentioned wealth and, if deemed necessary, sell fully or partially by direct sale or public auction, and then distribute the remaining sum among the successors. The plaintiff is not Badri Patarkatsishvili's successor and his goal is not to profit or receive any part of the heritage. He would simply like to fulfill the last will of the deceased and to protect the heritage under the given will.

According to the petitioner on March 12, 1994, there was an agreement between B. Patarkatsishvili and Ina Gudavadze, under which the parties recognize their marriage as formal. According to paragraph 5 of the above mentioned document, Arkadi Patarkatsishvili and Ina Gudavadze independently take responsibility for their duties mentioned in the agreement. According to the document, the plaintiff assumes that at the moment of the testator's death, the couple may have been legally divorced and that can play a significant role when dividing the wealth. If the defendants receive or give part of the heritage to any third party, the will of the testator will be partially violated and other successors' rights will be violated and the will executor will not be able to fulfill his functions and tasks even if the petition is granted.

**According to the above the petitioner asks:**
1.  Defendants Ina Gudavadze, Ia Patarkatsishvili and Liana Zhmotova be ordered not to conduct legal and/or factual actions regarding receiving or giving another individual full or partial ownership of the heritage.

[stamp:] Tbilisi City Court, Council on Civil Cases

2.  To give the Petitioner Joseph Kay the right to accomplish any tasks that he deems necessary in order to collect and care for the heritage of Arkadi (Badri) Patarkatsishvili, as well as sell part of the heritage if this action is deemed necessary for the successors' materialistic interests, then to deposit the profits of the sale to the court's bank account before the end of the suit.

**Under Articles 191 and 199 of Georgia's Civil procedural code, the court has reviewed the presented statement and decided that the pre-award relief petition has substantial arguments and should be granted because of the following grounds:**

The goal of granting the petition is fulfilling the court decision. This goal is clearly explained in article 191 of Georgian Civil procedural code, according to which the petition can be granted if it helps facilitate the fulfillment of the decision. Therefore, the petition granting involves avoiding possible obstacles by limiting the defendant's certain rights and its goal is to enable the subject of the complaint to facilitate the future decision. Therefore, the petition granting does not mean making the advance decision on the petition and granting it before its review date.

Under Article 192 of the civil procedural code in case of emergency, the plaintiff can apply to the court for granting a petition before the pre-award relief. The statement should include the reasons which will make it difficult or impossible to make a decision in case of securing the action. It is the petitioner's responsibility to provide the reasons that confirm the necessity of pre-award relief. In the end, the issue on the type of pre-award relief to be used is decided by the court according to the nature of request. The petitioner is obligated to specify in the pre-award relief claim not only what type of pre-award relief is requested but also why it is necessary to conduct the specific pre-award relief. The petitioner should also clearly and openly state those claim requests that are going to be filed against

[stamp:] Tbilisi City Court, Council on Civil Cases

the defendant so the court can decide whether to grant or not grant the pre-award relief in accordance to the nature and contents of the request.

According to the part I of Article 198, Georgian Civil Procedural Code, the issue of what kind of pre-award relief should be used is decided by the court. There is a list of different pre-award relief types listed in part II of the same article. The law does not state what type of action the court should use. This issue should be decided by the court according to the nature and contents of the suit claim. In the given case, the plaintiff has opened the claim for declaratory judgment and the subject of the claim is for the plaintiff to be recognized as a wealth manager and for the suppression of hindrance from the defendants. The court considers that if the claim for declaratory judgment takes place, it is possible to utilize the pre-award relief because in a possessive suit in case of claim for declaratory judgment, the individual rights take over and the party then asks for their rights to be defended in order to avoid violations in the future. Even during the petition for appointing the wealth manager, if the claim for declaratory judgment is granted, the party gets the right to perform certain actions and the court considers that the party has an honorable reason to ask the court to grant them rights for accomplishing future actions.

The request by the plaintiff is to be recognized as a wealth manager and to suppress hindrances from the defendants. The defendant requests that: "The defendants Ina Gudavadze, Ia Patarkatsishvili and Liana Zhmotova be ordered not to perform any legal and/or factual action in order to win, manage or receive the heritage in any other way or give it to another individual. 2. Plaintiff Joseph Kay be granted the right to fulfill any action that he will deem necessary in order to collect and take care of Arkadi (Badri) Patarkatsishvili's heritage, as well as sell it partly or fully if it is deemed necessary in accordance to the materialistic interests of the successors and to transfer the profit to the court's account before the end of the suit." The court considers that in this case there are similarities between claim requirements and guarantee, therefore the court explains the following: granting the suit is a temporary action and serves the protection of material and legal rights in a quick and effective manner and also serves to fulfill the rights

[stamp:] Tbilisi City Court, Council on Civil Cases

adopted under the court pre-award relief. If there is any evidence that not having the pre-award relief will make it difficult or impossible to make a decision, the court can use the pre-award relief even in the case when the subject of the claim and guarantee are the same.

According to part III of Article 198, Georgian Civil Procedural Code, the court has a right to use other actions if it is necessary for granting the claim. In the event of necessity, there can be several ways of granting a claim. The plaintiff states that in the case of granting the claim, fulfillment of the decision will be impossible since the wealth that needs to be managed will not exist for that time-frame or will be sold or depreciate. Considering the above mentioned event, the court has to take an action because in the case of non-existence of wealth, it will be impossible to declare a wealth manager or if the plaintiff is not granted a claim when the court decision becomes legal, the decision will turn into an unfulfilled decision. The court deems that in case the claim is granted, it means that J. Kay will be declared as a manager but because of the nature of the complaint, the hindrance for making a decision should not only be declaring J. Kay as a wealth manager but the protection of the wealth should also come into play so that in the case of granting a claim, there should be the possibility of accomplishing future actions—the heritage to be managed. Besides, the necessity of managing wealth is not only done for the need of the heritage protection (to protect the wealth from expenditure, loss, damage and other similar reasons). The main reason for the necessity of wealth management is continuous legal relations to protect the legal interests and rights of third parties and participating contracting agencies. The wealth manager has a right to change the testator which is one of the main aspects of the heritage institution directed to immediately replace the individual who is not able to participate in legal transactions due to death.

According to the pre-award relief, plaintiff J. Kay is obligated to transfer the amount received for managing the wealth to the court's bank account: Georgian Ministry of Justice, Supreme Council of General Courts Department. JSC "Bank Republic," account number 33050001, MFO—220101757; bank code 204856263.

**Resolution part:**
**The court applied articles 191, 199, 284 and 285 of Georgian Civil Procedural Code and made the following**

[stamp:] Tbilisi City Court, Council on Civil Cases

## DECISION:

1. To grant the petition of Joseph Kay's representative Ketevan Kvartskhava on a pre-award relief;

2. To forbid defendants: Ina Gudavadze, Ia Patarkatsishvili and Liana Zhmotova to take any legal or/and factual actions against ownership, possession or giving the heritage to another individual fully or partially;

3. To grant the plaintiff Joseph Kay the right to provide any actions that he will deem necessary to collect and take care of Arkadi (Badri) Patarkatsishvili's heritage, as well as sell it partially or fully if it is deemed necessary for the material interests of successors and to place the profit gained from the sale in the bank account of the Ministry of Justice, Supreme Council of General Courts Department. JSC "Bank Republic," account number 33050001, MFO—220101757; bank code 204856263.

4. From the date of granting the decision, the petitioner will have 10 (ten) days to bring the suit to court against defendants Ia Patarkatsishvili and Liana Zhmotova;

5. The petitioner should be notified that if the pre-award relief is unsuccessful because the plaintiff was refused on a claim and the decision was legalized; or if the petitioner does not start a pre-award relief claim in the timeframe mandated by the court, the court will initiate the annulment of the claim or grant the claim according to the request of the opposing party. Then, according to part III of Article 199, Georgian Civil Procedural Code, he will be obligated to compensate the other party for damages due to the actions used for pre-award relief.

6. The fulfillment of this decision should happen immediately and the official decision should be issued;

7. The decision can be appealed within 5 days. This date cannot be extended and it is valid from the time the decision is granted.

**Judge**        [signature]        **/D. Berekashvili/**
*The copy corresponds to the original document*
*Assistant to the judge: T. Gavashelishvili*
[stamp:] Tbilisi City Court, Council on Civil Cases

[stamp:] Tbilisi City Court, Council on Civil Cases [illegible stamp]

Georgia

Registration No. [illegible] *4265*

Year *two thousand and eight* [illegible handwriting]

I, Notary Public of Tbilisi Notary Bureau Mariam Kvezereli-Davitashvili, confirm that this copy is identical to the original document. [illegible handwriting]

Fee: GEL *1.40*

Notary Public [signature]____ M. Kvezereli-Davitashvili

[stamp:] Notary Public [illegible]

საქმე №2/1597-08



# განჩინება

## საქართველოს სახელით

თბილისი                                                    14 მაისი 2008წ.

თბილისის საქალაქო სასამართლოს სამოქალაქო საქმეთა კოლეგია

მოსამართლე დიანა ბერეკაშვილი

განმცხადებელი: ჯოზეფ კეი;
წარმომადგენელი: ქეთევან ქვარცხავა;

მოწ. მხარეები: ინა გუდავაძე; ია პატარკაციშვილი; ლიანა ჭმუტოვა

დავის საგანი: სარჩელის უზრუნველყოფის ღონისძიება

ზემოირ მოსმენის გარეშე ერთპიროვნულად განიხილა ჯოზეფ კეის განცხადება
სარჩელის უზრუნველყოფის ღონისძიების გამოყენების თაობაზე.

### გ ა მ ო ა რ კ ვ ი ა :

2008 წლის 07 მაისს თბილისის საქალაქო სასამართლოს სამოქალაქო
საქმეთა კოლეგიას სარჩელით მიმართა ჯოზეფ კეიმ და მოპასუხე ინა გუდავაძის
მიმართ და მოითხოვა სამკვიდროს მმართველად აღიარება.

2008 წლის 14 მაისს ჯოზეფ კეის წარმომადგენელმა ქეთევან ქვარცხავამ
განცხადებით მიმართა თბილისის საქალაქო სასამართლოს სამოქალაქო საქმეთა
კოლეგიას და აღნიშნა, რომ აპირებს სარჩელის დაზუსტებას, სადაც
მოპასუხეებად ჩართული იქნებიან ასევე მემკვიდრეები ია პატარკაციშვილი, ლიანა
ჭმუტოვა და ოლგა საფონოვა, რომელიც გათვალისწინებს მოსარჩელისათვის
მისი უფლებების და ვალდებულებების განხორციელებისას ხელშეწყობის
აქრძალვას, ხოლო მოპასუხეზე ოლგა საფონოვა ჩართული იქნება აღიარებითი
სარჩელის ნაწილში.

განმცხადებლის განმარტებით, მოპასუხე ი. გუდავაძე შვედების
გამოყენებით ცდილობს მოიპოვოს კონტროლი და საკუთრების უფლება არკადი
პატარკაციშვილის სამკვიდრო ქონებაზე, ცდა რომ ხსაა მემკვიდრეთა უფლებები
და სამკვიდროს მმართველის და [illegible]სი[illegible]რცეულებს ნება არ არის
გათვალისწინებული. არკადი პატარკაცი[illegible]ის სიკ[illegible]ის გარდაცვალებასდე, 2008
წლის 14 ნოემბერს შედგენილი [illegible] ი[illegible] "წერილის" თანახმად
მოსარჩელს და მის კონ[illegible] [illegible]ნეორ[illegible]ცელდებინა ბადრი

პატარკაციშვილის პირდაპირ და არაპირდაპირ მფლობელობასა და საკუთრებაში არსებული კონტენის მართვა, ფლობა და განკარგვა, ხოლო მისი გარდაცვალების შემთხვევაში – კონტენის გაყოფდვა კერძო განკარგვის ან აუქციონის გზით. ამავე უნდა გავნაწილებინა აქტიური კონტენა ბალერი პატარკაციშვილის კონვენციონალური მითითებების შესაბამისად. 2008 წლის 14 ნოემბრის შედეგინიერი „აქტის კონტენის აღმსრულებელი მმართველი დანიშნის შესახებ" ჯოზეფ კეი დანიშნული არკადი ბადრი პატარკაციშვილის მიერ მისი სურვილების შესახებ, ხოლო ადვოკატმა ეჩანეულ ზელცერმა გააცნო ოჯახს ბადრი პატარკაციშვილის უკანასკნელი ნება.

მოსარჩელე აღნიშნავს, რომ ბადრი პატარკაციშვილის სამეუფო შეფცება კონტებისაგან, რომელიც წარმოადგენს წინდების მსიოფელით სხვადასხვა ქვეყანაში არსებული საწარმოებში და ურავც კონტება, რომელთაგან ნაწილი მართვის უფლებით, ტრასტის ან სხვა გზით არის გადაცემული სხვა პირებისათვის. სამეუფოს მმართველს უნდა შეექირა აღნიშნული კონტენა, თუ საჭიროდ ჩაითვლიდა მითითნად ან მისი ნაწილი გაუკიდა პირდაპირი მიფლდვა ან საჯარო აუქციონის გზით, ხოლო დაარჩენილი თანხა გაენაწილებია შემდგომრეგისთავის. მოსარჩელ არ წარმოადგენს ბადრი პატარკაციშვილის შემკეიდრს და მისი მიზანი არ არის სამეუფოს ნაწილის ან ხარებების მიღება, არამედ მხოლოდ გარდაცვლილის უკანასკნელი ნების შესრულება დადალების შინაარსიდან გამომდინარე და სამეუფოს დაცვა.

განმცხადებლის განმარტებით, 1994 წლის 12 მარტს შედგა შეთანხმება ბ. პატარკაციშვილს და ინა გუდავაძეს შორის, რომლითიც მხარები მათ თანახმაზე არკადი პატარკაციშვილი და ინა გუდავაძე დამოუკიდებლად აგებდნენ საქმეს. ამ დოკუმენტს შინაარსიდან გამომდინარე მოსარჩელ თვლის, რომ შესაძლოა მამკვიდრების გარდაცვალების აღნიშნულს, წყვლილ ოპცაიალურად იყო განკუთვნილი, რომელისა შესაძლოა გადამწყდე მინიშენებია შეიძლება ჯერიბეტ სამკვიდროს გაყოფატის. ტუ მოპასუხეები მიიღებენ ტიავის ან გადასცელდ ნებისმიერ მესამე პირს სამკვიდრო კონტენის ნაწილს, მამკვიდრების ნება ამით ცალსახას დაირღცევა, სხვა მემკვიდრეების უფლდება შეიზღუდა, ხოლო ანდერძის აღმსრულებლის, სარჩელის დაკმაფილების შემთხვევაში კი ვერ შეძლებს მისი ფუნქციის და დალების შესრულებას.

ზემოაღნიშნულიდან გამომდინარე განმცხადებელი ითხოვს:
1. დადალის მოპასუხებს: ინა გუდავაძეს, ია პატარკაციშვილს და ლიანა ემოტოვას არ განახორციელოს არანაირი [...] ანდა ფაქტობრივი მოქმედება სამკვიდროს ან მისი ნაწილის [...] მფლობელობის ან სხვა უფლების მიღებასთან ან ნებისმიერ [...] ქმედების გადაცემასთან დაკავშირებით.

2. მიენიჭოს მოსარჩელე ჯოზეფ კეის უფლება – განახორციელოს ნერისმიერი მოქმედება, რასაც აუცილებლად ჩათვლის არკადი (ბადრი) ან მისი ნაწილის რეალიზაციისათვის, ისევე როგორც მისი ჩათვლება მემკვიდრეთა მატერიალური ინტერესისათვის, თუ ასეთი რეალიზაცია აუცილებლად რეალიზაციით ამონაგები თანხები მოათავსოს სასამართლოს სადეპოზიტო ანგარიშში დავის დასრულებამდე.

სასამართლომ განიხილა რა წარმოდგენილი განცხადება საქართველოს სამოქალაქო საპროცესო კოდექსის 191-ე – 199-ე მუხლების შესაბამისად, მიიჩნია, რომ განცხადება სარჩელის უზრუნველყოფის ღონისძიების გამოყენების თაობაზე, სავფუძიანია და იგი უნდა დაკმაყოფილდეს შემდეგ გარემოებათა გამო:

სარჩელის უზრუნველყოფის მიზანია სასამართლო გადაწყვეტილების აღსრულების უზრუნველყოფა. ეს მიზანი ნათლადაა გამოკვეთილი საქართველოს სამოქალაქო საპროცესო კოდექსის 191-ე მუხლში, რომლის თანახმად სარჩელის უზრუნველყოფა დასაშვებია, თუ უზრუნველყოფის ღონისძიების გამოუყენებლობა გააძნელებს ან შეუძლებელს გახდის გადაწყვეტილების აღსრულებას. ამდენად, სარჩელის უზრუნველყოფა ესაა სასამართლო გადაწყვეტილების აღსრულება, აღსრულებისათვის მოსალოდნელი დაბრკოლების თავიდან აცილება მოპასუხისათვის გარკვეული უფლებების შეზღუდვის გზით და მისი მიზანია დაიცვას ცალკეული დავის საგნის მოძალ... გადაწყვეტილების აღსრულების უზრუნველყოფისათვის. აქედან გამომდინარე სარჩელის უზრუნველყოფის ღონისძიების გამოყენება არ გულისხმობს სარჩელის უზრუნველყოფის მის დაკმაყოფილებას არსებით განხილვამდე.

სა)მოქალაქო საპროცესო კოდექსის 192-ე მუხლის თანახმად მოსარჩელე შეუძლია გადაუდებელ შემთხვევაში მიმართოს სასამართლოს განცხადებით სარჩელის აღძვრამდე უზრუნველყოფის შესახებ. განცხადება უნდა შეიცავდეს მითითებას იმ გარემოებაზე, რომელიც გამო უზრუნველყოფის ღონისძიებათა მიუღებლობა გააძნელებს ან შეუძლებელს გახდის გადაწყვეტილების აღსრულებას. იმ ფაქტორივ გარემოებათა მითითებას რომელიც აღასტურებს ვარაუდს სარჩელის უზრუნველყოფის კონკრეტული ღონისძიების გატარების აუცილებლობის შესახებ გეითრება განმცხადებელს. უნდა იქნეს გამოვლენილი ჩვენს სასამართლო მოთხოვნის როდესაც ღონისძიება შეიცავს განცხადება უზრუნველყოფის ღონისძიების შესახებ გაითვალისწინება სასამართლო ... უზრუნველყოფის შესახებ განცხადებაში მითითო... არა მარტო იმას, თუ უზრუნველყოფა რომელიმე ღონისძიების გატარება ... რამდენიმე აუცილებელი მის მიერ მითითების ... განმცხადებელი ... და დასაგება განსაზღვრავს ... მოთხოვნებს, რომელ... აღძრ... სავინააღმდეგოდ, რათა სასამართლომ მიიჩ... შეინარჩოს და ხასიათდან გამომდინარე ... ოთი სარჩელი

უზრუნველყოფის კონკრეტული ღონისძიების გამოყენების ან გამოყენებაზე უარის თქმის შესახებ.

საქართველოს სამოქალაქო საპროცესო კოდექსის 198-ე მუხლის პირველი ნაწილის თანახმად, საკითხს იმის შესახებ, თუ სარჩელის უზრუნველყოფის რომელი ღონისძიება უნდა იქნეს გამოყენებული, წყვეტს სასამართლო. ამავე მუხლის მე-2 ნაწილში მოცემულია სარჩელის უზრუნველყოფის ღონისძიებათა სახეების ჩამონათვალი. კანონი არ აწესრიგებს, თუ რომელ კონკრეტულ შემთხვევაში რომელი ღონისძიება უნდა გამოიყენოს სასამართლომ. ეს საკითხი უნდა გადაწყვიტოს სასამართლომ იმის მიხედვით, თუ როგორია სასარჩელო მოთხოვნის ხასიათი და შინაარსი. მოცემულ შემთხვევაში, მოსარჩელის მიერ აღძრულია აღიარებითი სარჩელი და დავის საგანია მოსარჩელის სამეწარმეო მმართველად აღიარება და მოსახუ$ $$უ$ება მხრიდან ხელშეწყობის აკრძალვა. სასამართლოს მიაჩნია, რომ აღიარებითი სარჩელის შემთხვევაში შესაძლებელია უზრუნველყოფის ღონისძიების გამოიყენება, როგორც მიკუთვნებითი სარჩელის არსებობისას, რადგან აღიარებითი სარჩელის დროს სამართალურთიერთობის ცენტრი გადატანილია უფლებაზე და მხარე ითხოვს თავისი უფლების დაცვას, რათა მომავალში არ დაირღვეს ის. სასამართლოს მმართველად დანიშვნის თაობაზე დავის დროსაც აღიარებითი სარჩელის დაკმაყოფილების შემთხვევაში მხარე იძენს გარკვეულ მომენტებით გამორიცვევების შესაძლებლობას, ამდენად სასამართლოს მიაჩნია, რომ მას აქვს პატივსაცემი მიზეზი, რომ სასამართლოს მოსთხოვის სამომავლო მომედებების განხორციელების შესაძლებლობის უზრუნველყოფა.

მოსარჩელის მიერ აღძრული მოთხოვნა არის სამეწარმეო მმართველად აღიარება და მოპასუ$ $ $$თა$ მხრიდან ხელშეწყობის აკრძალვა. სარჩელის უზრუნველყოფის სახით კი მოსარჩელე მოითხოვს: "დავეკრას მოპასუხეებს: ინა გულაჯავას, სა პარტაკაცაშვილს და ლიანა ქმრიტოვას არ განახორციელონ არანაირი იურიდიული ანდა ფაქტობრივი მოქმედება სამეწარმეო ან მისი ნაწილის საკუთრების, მფლობელობის ან სხვა უფლებათა მიღებასთან ან ნებისმიერი სხვა პირისთვის გადაცემასთან დაკავშირებით. 2. მიეცოთ მოსარჩელეს ჯონ კ რას უფლება - განახორციელონ ნებისმიერი მოქმედება, რასაც აუცილებლად ჩათვლის არკადი (ბადრი) პატარკაცაშვილის სამეწარმეო რესურსაციისათვის, თუ ასეთი რესურსაცია აუცილებელად ჩაითვლება მეს $$$$$ო$ მატერიალური ინტერესებისაგან გამომდინარე, ხოლო მისი რესურსაციით ამონაგები თანხები მოთავსოს სასამართლოს სადეპოზიტო ანგარიშზე დავის დასრულებამდე." სასამართლოს მიაჩნია, რომ მოცემულ შემთხვევაში აქცუ აქვს სარჩელის უზრუნველყოფისა და სარჩელით აღძრული მოთხოვნთა თანხვედრასა და აღსრულებასთან დაკავშირებით განხორცტას შემდეგს: სარჩელით უზრუნველყოფა ისეთი დროებითი ღონისძიებაა, რომლითაც მატერიალურ-სამართლებრივი უფლებების მ$$$$ $$$$$ სტრატეგიის შესრულება და სასამართლოს მიერ სასამართლო სამართალწარმოების $$$$ დადგენილი უფლებების $$$ $ $ უ$ობს ხელს. თუ არსებობის დასაბუთებული ეჭვი, რომ $$$ $$$ ღონისძიებათა მიუღებლობა გააძნელებს ან გადაწყვეტილების

აღსრულებას სასამართლოს შეუძლია გამოიყენოს უზრუნველყოფის ღონისძიება იმ შემთხვევაშიც თუ უზრუნველყოფის საგანი და სარჩელის საგანი ემთხვევა ერთმანეთს.

საქართველოს სამოქალაქო საპროცესო კოდექსის 198-ე მუხლის მესამე ნაწილის თანახმად სასამართლოს შეუძლია გამოიყენოს ისხვა ღონისძიებებიც, თუ აუცილებელია სარჩელის უზრუნველსაყოფად. აუცილებლობის შემთხვევაში შესაძლება დაშვებულ იქნეს სარჩელის უზრუნველყოფის რამდენიმე სახე. მოსარჩელე აღნიშნავს, რომ სარჩელის დაკმაყოფილების შემთხვევაში გადაწყვეტილების აღსრულება შეუძლებელად გახდება, რადგან სამეკეთოს ქონება რომშემდეგ მართვის საქართში ამ პერიოდისათვის ან აღარ იარსებებს, ან გასხვისდება და გაუფასურდება, აღნიშნული გარემოებების გახილვის თვალსაზრისით, სასამართლოდ უნდა გამოიყენოს უზრუნველყოფის ღონისძიება, რაგდან სამეკეთო მასის არარსების შემთხვევაში სამეკეთოს ღონისძიება, დინ მ. ...

[text continues, heavily degraded]

სარეზოლუციო ნაწილი

სასამართლომ იხელმძღვანელა საქართველოს სამოქალაქო საპროცესო კოდექსის 191-ე -- 199-ე, 284-ე, 285-ე მუხლებით და

და ა დ გ ი ნ ა:

1. დააკმაყოფილდეს ჯოუზეფ კეის წარმომადგენლის ქეთევან ქვარცხავას განცხადება სარჩელის უზრუნველყოფის ღონისძიების გამოყენების შესახებ;

2. მოპასუხეებს: ინა გუდავაძეს, ია პატარკაციშვილს და ლიაინა ჭმოტოყუას აეკრძალოთ განნასორციელონ იურიდიული ან/და ფაქტობრივი მოქმედება სამკვიდროს ან მისი ნაწილის სიკუთრების, მფლობელობის ან სხვა უფლებით მიღებასთან ან ნებისმიერი სხვა პირისთვის გადაცემასთან დაკავშირებით;

3. მიენიჭოს მოსარჩელე ჯოუზეფ კეის უფლება - განახორციელოს ნებისმიერი მოქმედება, რასაც აუცილებლად ჩათვლის არკადი (ბადრი) პატარკაციშვილის სამკვიდროს შენარჩუნ და მოვლისათვის, ისევე როგორც მისი და მისი ნაწილის რეალიზაცი ისათვის, თუ ასეთი რეალიზაცია აუცილებლად ჩათვლება შემკვეთრეთა მატერიალური ინტერესებიდან გამომდინარე, ხოლო მისი რეალიზაციით ამონაგები თანხები მოათავსოს სასამართლოს სადეპოზიტო ანგარიშზე, საქ. უუსტიციის სამინისტროს უმაღლესი საბჭოს საერთო სასამართლოების დეპარტამენტის ანგარიშზე სს „ბანკი რესპუბლიკა“, ანგარიშის №33050001, მფო- 220101757; ბანკის კოდი 204856263.

4. განიცხადებულ მოპასუხეებს ია პატარკაციშვილს და ლიაინა ჭმოტოყუას მიმართ სასამართლოში სარჩელის ადმერისათვის მიეცეთ 10 (ათი) დღის ვადა განჩინების გადაცემის დღიდან;

5. განემარტოს განმცხადებელს, რომ თუ სარჩელის უზრუნველყოფის ღონისძიებები გაუმართლებელი გამოყოფა იმის გამო, რომ მოსარჩელს უარი ეთქვა სარჩელზე და გადაწყვეტილება შევიდა კანონიერ ძალაში, ანდა იმის გამო, რომ სასამართლოში მიერ დანიშნულ ვადაში სარჩელის უზრუნველყოფის შესახებ განცხადების შემდგომ პირი არ ადარცავს სარჩელს, სასამართლოი თავისი ინიციაციივით ან მოწინააღმდეგდა მხარის შუამდგომელობის საფუძცელზე გამოიტანს განჩინებას სარჩელის უზრუნველყოფაზე მის მიერ მიღებული ღონისძიებების გაუქმების შესახებ, მაშინ საქართველოს სამოქალაქო საპროცესო კოდექსის 199-ე მუხლის მე-3 ნაწილი თანახმად, იგი ვალდებულია იქნება უუნახლაურის მეორე მხარეს ზარალი, რომელიც მას მიადგა სარჩელის უზრუნველსაყოფად გამოყენებული ღონისძიებით შედეგად.

6. ამ განჩინების ასლსრულება მოხდეს დაუყონებლდ რისთისაც გაიცეს სააღსრულებლო ფურცელი.

7. განჩინებაზე შეიძლება საჩივრის შეტანა 5 დღის ვადაში. ამ ვადის გაგრძელება არ შეიძლება და მისი დენა იწყება უზრუნველყოფის შესახებ განჩინების მოპასუხისათვის გადაცემის მომენტიდან.

მოსამართლე:    /დ. ბერეკაშვილი/



**Exhibit D**

Civil Litigation Board
of the Tbilisi City Court
6 Agmashenebeli Highway, 12th km.
Tel: 54-10-63, ext: 240, 260
Received from *Ina Gudavadze et al*
Registration No. *23391*
Date: *May 27*, 2008
Number of pages: *19*
Number of copies: *2*
Signature of the receiving official: [signature]

To: Judge Diana Berekashvili,
Civil Litigation Board
of the Tbilisi City Court

<u>Defendants:</u>

Ina Gudavadze, residing at 12 Tverskaya St.,
bldg. 7, apt. 234, Moscow, Russian Federation

Iya Patarkatsishvili, residing at 12 Tverskaya St.,
bldg. 7, apt. 234, Moscow, Russian Federation

Liana Zhmotova, residing at 12 Tverskaya St.,
bldg. 7, apt., Moscow, Russian Federation

Attorney: Lasha Birkaya, residing at
50 Saakadze St., Tbilisi

Attorney: Koba Kvantaliani, residing at
22 Dadiani St., Tbilisi

## Complaint
## requesting revocation of provisional legal remedy ruling (case No.2/1597-08)
## dated May 14, 2008

As you may know, on May 14, 2008 you passed a ruling on provisional legal remedy which restricted the right of defendants (Ina Gudavadze, Iya Patarkatsishvili and Liana Zhmotova) to file any legal action and/or undertake any other practical steps in connection with the estate of Arkadi Patarkatsishvili who passed away earlier this year. According to the same ruling, American citizen Joseph Kay was granted the authority to sell, at his discretion, the inheritable estate and to deposit proceeds from the sale into the account of the Department of Unified Courts of the Supreme Council with the Ministry of Justice of Georgia, with the purpose of protection and fair distribution of the inheritable estate among the heirs.

The aforementioned ruling is void and groundless, and it should be revoked for the following reasons:

1. The provisional legal remedy per se, taking into account its legal nature, represents a possibility which contributes to the execution of future decision, and for this purpose, the claimant is obliged not only to indicate circumstances in support of the assumption that non-

1

application of provisional legal remedy may complicate or render impossible the execution of decision, but, given the general principles of procedural laws, he should prove the existence of such circumstances. In his motion for provisional legal remedy, the claimant indicated circumstances that, in his opinion, may complicate or render impossible the execution of decision. For this purpose, he said that the testator had a wife Olga Safonova, a citizen of the Russian Federation, with whom he had a child and who accordingly was entitled to a certain share of the decedent's estate. The claimant admitted that the defendant Ina Gudavadze was the decedent's spouse. The claimant also presented a document dated March 12, 1994 based on which it was assumed that the testator and defendant might have been officially divorced by the time of the testator's death, taking into account the fact that the testator had another lawful wife (Olga Safonova). Therefore, as the claimant argued, the aforementioned circumstances (i.e. if the defendant received the inheritable estate, the testator's will and other heirs' rights might be violated) would complicate the execution of the decision. At this stage, we will not focus on the aforesaid document but we would like to draw the court's attention to the fact that the claimant's argument about the defendant's official divorce has per se excluded the defendant's chance to inherit the estate insofar as under the current law, heirs may receive a certificate of inheritable property upon presentation of relevant documents in a notary office, i.e. based on a certificate of inheritable property issued by a notary public within 6 months. Therefore, in case of official divorce, the defendant would not be able to present a marriage certificate to the notary public and accordingly, she would not have the right to undertake any legal and/or other practical actions and to raise any obstacles to the claimant in the execution of the lawsuit. Moreover, the claimant had sufficient time to go to a relevant notary office before May 14, from the date when the inheritable estate was accessed (February 12, 2008), in order to present the available "documents" and thereby, to exercise his authority as an "administrator of the inheritable estate and testamentary executor." The claimant cannot clarify what he means by "the defendant's attempts to gain ownership of property by using her children," as well as what actions specifically were undertaken by the defendant for this purpose. The reasons for the

2

claimant's appeal to the court are also unclear, all the more so that he did not present to either the defendants or to the notary public any documents proving any violation of his rights. Therefore, it is unclear which violated rights became a subject-matter of dispute in the court.

Therefore, it is absolutely clear that in fact, there was no risk or threat to the execution of the decision. Pursuant to article 191 of the Civil Procedure Code of Georgia, the justification in the substantiation part of the May 14 ruling (let alone the fact that the court approved the claimant's motion) itself rules out the possibility of granting the motion on these grounds.

2. According to the May 14 ruling, provisional legal remedy was applied to the defendants Iya Patarkatsishvili and Liana Zhmotova prior to the filing of the complaint. The claimant requested that he should be recognized as an administrator of the inheritable estate and testamentary executor. Pursuant to article 192 of the Civil Code of Georgia, motion for securing a claim prior to its filing may be submitted to the court only in case of emergency. In this case, the court should have taken into consideration the fact that the purpose of provisional legal remedy was to protect substantive rights. Given the procedure of inheriting a property prescribed by the law, it is definitely clear that if the claimant had submitted to a notary office the documents evidencing his authority, he would have ensured protection of his rights and therefore, would have excluded any actions on the part of the defendants. Therefore, it is obvious that there was no case of emergency. Provisional legal remedy prior to the filing of complaint per se represents a possibility which contributes to the execution of future decision, and such provisional legal remedy might be applied only in case of emergency. For this purpose, the claimant is obliged not only to indicate circumstances in support of the assumption that non-application of provisional legal remedy may complicate or render impossible the execution of decision, but, given the general principles of procedural laws, he should prove the existence of such circumstances. Surprising as it may seem, there were no such justifications in either the claimant's motion or the court ruling.

3. As it comes to clause 3 of the May 14 ruling, I would like to inform you that under article 198 of the Civil Procedure Code of Georgia it is permitted to apply other measures in addition to the clearly defined ones. However, the primary principle of this institution is either to preserve the existing situation or to protect rights from possible violation, if such

3

violation may result in irreparable and irreversible damage. Given this case, even if the court made a substantiated justification about the possible violation of the claimant's rights, it should have first applied measures which would exclude the possibility of such violation, but the court, on the contrary, granted exclusive authority to the claimant. This purpose of provisional legal remedy is also indicated in article 198 according to which defendants shall be prohibited, restricted or otherwise limited from carrying out certain actions, and they shall not be granted any additional rights. Moreover, taking into account the fact that the court, as mentioned above, groundlessly prohibited the defendants to carry out any actions with respect to the inheritable property, this practically excluded the risk of any actions being taken by the defendants before the settlement of the dispute. In this case, it is unclear what caused the need to grant exclusive authority to the claimant. We consider groundless the justification of the ruling according to which **protection of the perpetuity of the testator's legal relations** is an emergency measure to ensure the execution of decision to be taken with respect to the aforesaid dispute. The court should define clearly what kind of decision might be adopted in the given case, i.e. even if the claim is approved under the final decision, the authorities granted by the court and the actions already taken by the claimant with respect to the alienation and disposal of the inheritable property will by no means ensure execution of the decision. In the part of the ruling related to the granting of authority to the claimant, the court was concerned about protection of third parties' interests and for some reason, it considered that the emergency measures for ensuring the execution of decision in this case would serve as a guarantee for the protection of third parties' legal interests and rights. In the part of the ruling related to the legal grounds for granting the motion, the court groundlessly accepted the claimant's argument that the property delegated to other persons on trust or mandate, would be either alienated or depreciated by the time the decision was executed. First of all, we would like to point out that the current law does not deprive heirs of the opportunity to take reasonable care of or protect the property, particularly, if such property is delegated under trust or mandate. It is not clear what made the claimant assume that the

property might be ruined or depreciated. The court exceeded the legal boundaries of the claimant's motion, and in the substantiation part of the decision it listed groundless justifications for protecting legal interests of certain "counteragents and third parties" that were not involved in the case.

We should also mention that the court, while protecting interests of claimant and "third parties," has absolutely neglected defendant's legal interests and failed to take into account the fact that as a result of the May 14 ruling, the claimant might take actions contrary to the interests of heirs and the damage might become irreparable due to the reason that the inheritable estate includes things that are of special value to the heirs, and their withdrawal from the inheritable property might cause irreversible damage. Moreover, the court appears to have decided on the outcome of the case in advance and hence, it ruled out any possibility of the dispute being resolved in favor of the defendants. Otherwise, how a decision in favor of defendants might be executed if the inheritable estate is alienated against their will? Or how might the damage caused by J. Kay's decisions and actions be recovered? Besides, taking into account the value of the inheritable estate, there is a real danger that as a result of wrongful actions and decisions on the part of J. Kay's (within the authorities granted him by the disputed ruling) the damage may far exceed his financial capacities.

The court created such a situation that if the dispute were settled in favor of the claimant, the rendered decision would have already been executed by the claimant, and there would be no legal interests for accepting the claimant's motion.

Given the fact that provisional legal remedy is primarily aimed at the protection of substantive rights, I would like to draw attention of the court to the documents that purportedly prove the claimant's authority. In an attempt to substantiate his claim, the claimant mainly refers to two documents that were allegedly issued by Arkadi (Badri) Patarkatsishvili. These documents are: 1) "Declaration of Will" and 2) "Letter of appointment of executive administrator of the estate." We should mention that the authenticity of the documents is quite questionable and there is a high probability that such documents do not exist at all. The ground for such argument is the fact that there is a civil

5

dispute between the parties in the U.S., and the claimant failed to present these documents as though it was requested in the court order. Moreover, in their letter to Ina Gudavadze's attorneys, J. Kay's lawyers confirmed that J. Kay did not have the originals of the aforesaid documents (see appendix No.3). The defendants have never seen the originals of the two documents, either. As it follows from the case, only translated copies of questionable origin were submitted to the court.

In connection with the aforesaid, we would like to draw your attention to the fact that pursuant to the laws of Georgia the claimant J. Kay may not be either an administrator of inheritable estate or testamentary executor based on the documents presented. These are two completely different and mutually exclusive institutes. It also leaves us to wonder which of the two functions is trusted upon J. Kay—administrator of inheritable estate or testamentary executor? Can the claimant explain why he assumed one or both of the functions?

Given the importance and specific nature of the case, we will not only emphasize the existence of purely procedural grounds for the annulment of the aforesaid ruling, but we will also touch upon substantive aspects of this civil dispute:

a) It is unclear to us what kind of claim was filed by the claimant (for declaratory or non-declaratory fact-finding judgment). For the legal interests of declaratory claims which represent a pre-condition for the admission and consideration of declaratory judgment, there should be a dispute about the rights or legal relations between the parties, i.e. a defendant should challenge claimant's rights (i.e. property rights, right of claim, etc.). According to the claimant, legal interest of the declaratory claim is protection of heirs' rights which is not his legal interest; all the more so that none of the heirs asked to protect their interests. In contradiction to this, I say that defendants are against Joseph Kay's disposal of the estate. We should also mention that prior to the adoption of the May 14, 2008 ruling, the heirs assumed ownership of the estate, and pursuant to article 1421 of the Civil Code of Georgia, the heirs have already accepted the inheritable estate. As far as the recognition of Olga Safonova as one of heirs is concerned, she did not ask Joseph Kay to protect her interests and she did not file any application through a notary public for the inheritable property. If she does so, this

issue will be resolved by the notary public according to the current laws of Georgia without the claimant's allegedly "disinterested" care and help.

b) In fact, the claim is specifically of non-declaratory nature; the claimant asks to appoint him as administrator of the inheritable estate and testamentary executor. In this regard, we would like to explain that this issue is not within the jurisdiction of the court because, under the current laws, it is the prerogative right of heirs to appoint an administrator of the estate through an appropriate notary office.

c) The claimant failed to present originals of evidence materials (as far as we know, there are no originals of the aforesaid documents). And even if there are originals of such documents, this is not the document required by the law for the appointment as testamentary executor. Pursuant to article 56 of the law of Georgia "On International Private Law," last will and testament is deemed to be duly executed if it corresponds to the law of the country: a) to which a testator belonged [sic] at the time of his death; b) where the testator resided at the time of his death; c) where the real estate listed in the last will and testament is located (in our case, it is the current law of Georgia).

d) The defendant Ina Gudavadze was the testator's official wife until the latter's death (which is confirmed by certificate No.01/100/12-3782 of March 18, 2008 issued by the Tbilisi Archives of the Civil Registration Agency of the Justice Ministry of Georgia), in connection with which only 50% of the spouse's estate was accessed. The ruling does not specify to what part of the property the prohibition of legal and factual ownership is applied to.

e) The claim and motion for the provisional legal remedy are identical and in fact, at the stage of provisional remedy, the court resolved the merits of the dispute for which reason the claimant is not interested in examination of the case on its merits. It is also unclear why proceeds from the sale of the inheritable property should be deposited into the account of the Department of Unified Courts of the Supreme Council with the Ministry of Justice of Georgia. This is by no means in the interests of the heirs whose "material interests" the claimant allegedly tries to protect.

f) Pursuant to article 191 of the Civil Procedure Code, there should be a <u>founded assumption</u> that non-application of legal provisional remedy may complicate or render impossible the execution of decision. In this case, the claimant's motion, to put it mildly, is unclear and illogical. The aforementioned assumption may not be justified by the argument that the inheritable estate is located at different places and therefore, it might be destructed or

depreciated, since risks of destruction or depreciation may by no means arise due to the location of property at different places. Claimant's assumption regarding the possible destruction of the property should be substantiated and supported by evidence, which, in fact, does not exist;

g) According to article 192 of the Civil Procedure Code of Georgia, motion for securing a claim prior to its filing may be submitted to the court only in case of emergency, which, however, was not subject of consideration in the ruling.

h) Provisional legal remedy means restriction of defendants' rights to dispose of certain property and monetary assets, but it in no way means granting property rights to a claimant, which is not regulated by article 198 of the Civil Procedure Code and by provisional legal remedy institute.

In addition, we would like to inform you that the aforementioned provisional legal remedy may cause serious material damage to the defendants. For this reason, we file an additional claim seeking to secure compensation of anticipated damage.

In view of the above-mentioned, we ask you to rescind the ruling of May 14, 2008 (case No.2/1597-08) issued by the Civil Litigation Board of the Tbilisi City Court as groundless and legally unfounded

Annex:

No. 1. Powers of Attorney, 3 pages
No. 2. Certificate issued by the Tbilisi Archives, 1 page
No. 3. Letter from Law Firm dated May 1, 2008
No. 4. Receipt certifying payment of state fees

Lasha Birkaia:                                    [signature]

Koba Kvantaliani:                                 [signature]

8

**Exhibit E**

Docket # 2/1597-08

[emblem]

**RULING**
**in the name of Georgia**
**concerning the transfer of the appeal to a higher court**

Tbilisi                                                                                    June 10, 2008


Civil Litigation Board of the Tbilisi City Court
Judge D. Berekashvili

Appealing party: Ina Gudavadze, Ia Patarkatsishvili, Liana Zhmotova
Councilors: Lasha Birkaia, Koba Kvantaliani

Party invited to the court session: Joseph Kay

The judge, having considered individually, without verbal hearing, Ina Gudavadze's, Ia Patarkatsishvili's and Liana Zhmotova's appeal against the May 14, 2008 ruling issued by the Civil Litigation Board of the Tbilisi City Court



**ESTABLISHED**:
According to the May 14, 2008 ruling issued by the Civil Litigation Board of the Tbilisi City Court: the motion for provisional legal remedy filed by Ketevan Kvarstkhava, Legal Counsel for Joseph Kay, shall be approved; defendants Inna Gudavadze, Iya Patarkatsishvili and Liana Zhmotova shall be prohibited to perform any legal and/or physical actions in connection with the transfer of all or part of the estate to another person with the right of ownership, possession or any other right; claimant Joseph Kay shall be authorized to carry out any type of action as needed with respect to consolidation and disposal of Arkady (Badri) Patarkatsishvili's estate, as well as sale of any or all of the estate, should this become necessary based on financial interests of the heirs; proceeds from the sale shall be deposited into the Court account and into account # 33050001 of Bank Republic, MFO [Routing No.] 220101757, Bank Code 204856263; beneficiary: Department of Unified Courts of the Supreme Council with the Ministry of Justice of Georgia.

[seal]

On May 27, 2008, Ina Gudavadze, Ia Patarkatsishvili, and Liana Zhmotova's councilors Lasha Birkaia and Koba Kvantaliani appealed to the Civil Litigation Board of the Tbilisi City Court seeking to have the aforesaid ruling overturned due to the following reasons: the appealing party asserts that the claimant is obliged to indicate not only circumstances in support of the assumption that non-application of provisional legal remedy may complicate or render impossible the execution of decision, but he should prove the existence of such circumstances. The appealing party says that the claimant assumes with regard to these circumstances that the testator and defendant might have been officially divorced by the time of the testator's death, and this assumption excluded the defendant's practical opportunity to inherit the estate. Besides, in case of official divorce, the defendant would not have been able to present a marriage certificate to the notary public and accordingly, she would not have had the right to carry out any actions. The defendant in the appeal could submit to the notary public the power of attorney for "administrator of the inheritable estate and testamentary executor."

According to the appealing party, the claimant cannot clarify what he means by the defendant's attempts to gain ownership of property by using her children, as well as what actions specifically were undertaken by the defendant for this purpose. Besides, the motion may be submitted to the court prior to the filing of the claim only in case of emergency which the claimant cannot prove. The court groundlessly prohibited the defendants to carry out any actions with respect to the succession, and it is not clear what the emergency for granting exclusive authority to the claimant was caused by. The court was concerned about protection of third parties' interests, and it believed that the emergency measures for ensuring the execution of decision would serve as a guarantee for the protection of third parties' legal interests and rights. The court failed to consider the likelihood of irreparable damage being caused to the defendants due to the fact that the succession includes things that are of special value to the successors.

The appealing party maintains that the documents presented by the claimant—"Declaration of Will" and "Deed of appointment as an executive administrator of the succession"—are of rather questionable origin, and there is a high probability that such documents might be fake, as in his letter the claimant himself confirmed that he did not have the originals of the documents.

In view of the above-mentioned, the appealing party requests that the ruling of the Civil Litigation Board of the Tbilisi City Court dated May 14, 2008 be overturned as groundless and legally invalid.

Upon review of the appeal and materials presented in the case, the court resolved that due to its groundlessness, the appeal and the materials of the case should be transferred to the Appellate Court in view of the following:

The purpose of provisional legal remedy is to ensure execution of judgment. This purpose is clearly stated in Article 191 of the Civil Procedure Court of Georgia according to which provisional legal remedy is allowed provided that non-application of provisional remedy will complicate or render impossible the execution of judgment. Provisional remedy is defined as a

[seal]

measure which helps to prevent expected impediment to the real execution of judgments by limiting certain rights of defendants, and its purpose is to protect the subject-matter of dispute in order to ensure execution of future decision. Therefore, application of provisional remedy does not imply preliminary resolution of the claim and its approval prior to the consideration of the case on its merits.

In this case, the claimant indicated such circumstances. Specifically, the claimant says that by using her children, the defendant I. Gudavadze tries to gain control and ownership of Arkady Patarkatsishvili's estate by ignoring other successors' rights and the will of estate administrator and testamentary executor. According to the Declaration of Will issued by Arkady Patarkatsishvili on November 14, 2008 [sic] prior to his death, the claimant and his company were authorized to own and dispose of property in direct or indirect ownership of Badri Patarkatsishvili, and in case of the latter's death—to sell the property at their own discretion or through the auction. Moreover, after repayment of all debts, taxes and expenses, this company was authorized to distribute the property in compliance with Badri Patarkatsishvili's confidential dispositions. According to the "Deed of appointment as an executive administrator," Joseph Kay was nominated by Arkady (Badri) Patarkatsishvili as an estate administrator.

Moreover, the court interprets provisional legal remedy as a measure which helps to prevent expected impediment to the real execution of judgments by limiting certain rights of defendants. Provisional measure applied by the court shall be directly aimed at legal protection of disputable property specified in the claim in order to ensure unhampered execution of decision to be taken with respect to the case in question. It is the responsibility of the claimant to indicate factual circumstances substantiating the need for provisional measure. This means that the claimant is responsible only for indicating circumstances but not for bearing the burden of proof, as requested by the appealing party.

The court disagrees with the appealing party's argument that the ruling did not specify what the emergency was caused by, and that the claim and motion for provisional remedy were identical, since the aforesaid issue was considered in the appealed ruling according to which the court might apply provisional remedy even if the subject of provisional remedy and the subject of claim were identical to each other, and this does not mean that the decision has been rendered.

As for the appealing party's argument regarding the authenticity of documents presented, the court holds that under Article 193 of the Civil Procedure Code of Georgia motion for provisional remedy shall be considered by the court in charge of the case within the period established from the time of submitting the motion, without notifying the defendants, and

[seal]

*stapled together, 2 (two) pages*
[seal]

therefore, the court could not consider the authenticity of the presented documents at the time of reviewing the motion for provisional remedy.

In view of the above-mentioned, the court believes that the appeal is without merit, and it should be transferred to the higher court together with the materials of the case.

### Operative part of the ruling:

**Pursuant to Articles 197[1], 194, 284, 285 and 417 of the Civil Procedure Code of Georgia, the court**

### RULED:

1.     In the absence of legal grounds, the appeal of Ina Gudavadze, Ia Patarkatsishvili, and Liana Zhmotova's councilors, Lasha Birkaia and Koba Kvantaliani, seeking to overturn the ruling of the Civil Litigation Board of the Tbilisi City Court dated May 14, 2008 shall be transferred to the Appellate Court of Tbilisi together with other materials of the case.

2.     No special appeal may be lodged against this ruling.

Judge: [signature] D. Berekashvili
[seal]

*The copy is identical to the original*
*T. Gavashelashvili,*
*Assistant to the Judge*

**Exhibit F**



**GEOTEXT**
Translations, Inc.

STATE OF NEW YORK        )
                         )        ss
COUNTY OF NEW YORK       )

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from Georgian into English of the attached claim.

Jeffrey Aaron Cureton, Senior Managing Editor
Geotext Translations, Inc.

Sworn to and subscribed before me

this _9_ day of _June_, 20 _08_ .

EVAN FINCH
NOTARY PUBLIC-STATE OF NEW YORK
No. 01FI6134600
Qualified in New York County
My Commission Expires October 09, 2009

New York  269 West 30th Street, 17th Floor, New York, NY 10001, U.S.A. tel 212.631.7432 fax 212.631.7778
San Francisco  220 Montgomery Street, 3rd Floor, San Francisco, CA 94104, U.S.A. tel 415.576.9600 fax 415.520.0625
London  107-111 Fleet Street, London EC4A 2AB, United Kingdom tel +44.(0)20.7936.9002 fax +44.(0)20.7900.9909
Hong Kong  20th Floor, Central Tower, 28 Queen's Road, Central, Hong Kong tel +852.2159.9143 fax +852.3010.0082
translations@geotext.com  I  www.geotext.com

Case NO *2/1597-08*
*May 30*, 2008

### Notice sent to the defendant
### with regards to the subject claim and the attached documents

Tbilisi City Court, Civil Affairs Board

Tbilisi, 6, D. Agmashenebeli Avenue, 12th km.

### Judge Diana Berekashvili

To the defendant        *Ina Gudavadze*_____

Address                 *Tbilisi, 5, Kojori Highway, VI km.*_____

Pursuant to the Georgian Civil Procedural Code, Articles 184 and 201, you are being sent copies of the claim (statement) and the attached documents (document consists of *13* pages)

of the plaintiff (person making a statement) *Joseph Kay*_____

As a rule you are obligated to draft a written, typed response, (counter claim) on the issues pointed out in the claim, as well as your thoughts about the documents attached to the claim and then present all the documents in court within *15* days after receipt of this notice. The counter claim shall be drafted according to the requirements established by the civil procedural code and the letter template approved by the Georgian Supreme Council of Justice.

In the written countersuit of the defendant there should be the following:

1.

a) The name of the court where the defendant is filing the counter claim.
b) The first name, last name (title), permanent address (actual residence), also alternative address if applicable, work address, phone number, cell phone number, e-mail address, fax number of the defendant and his/her council (if counter claim is filed by the council), the witness and other individuals called to the meeting; The defendant or his/her council can also provide with contact person's information;
c) Whether the defendant recognizes the claim and what parts of the claim is he/she acknowledges;
d) If the defendant does not recognize the claim, what facts and circumstances is the counter claim is based on;
e) Evidence that proves the circumstances indicated by the defendant;

f) [illegible] particularly if he/she is going to [illegible] counter claim/illegible/admit [illegible];

g) In case of its existence, respondent's mediators would:

g.a) Whether there will be cause for challenge against the court or the judge and so forth;

g.b) Who can be included in the case as the co-participator or a third person;

g.c) Which witness should be called in the court;

g.d) Other types of mediation;

e) The list of documents attached to the counter claim;

f) Defendant's opinion on conducting a case without an oral hearing.

2. The response (counter claim) shall include the document confirming the rights of the representative [council] if the representative files the counter claim.

3. The counter claim shall fully and consistently reflect defendant's views about each of the factual circumstance and evidence included in the claim. If the defendant does not agree with some of circumstances indicated in the claim, he/she is obligated to state the reason and prove it with the corresponding argumentation.

4. The defendant is obligated to attach all the evidence included in the counter claim when sending his/her response. If the defendant within legitimate reason is not able to provide the evidence along with his/her counter claim,, he/she is obligated to include that information in his/her response. Otherwise, the defendant will be seized of his/her right to present evidence in the future. The defendant is entitled to ask for a reasonable amount of time for presenting evidence.

5. If the defendant fails to present his/her response (counter claim) without legitimate reason within the time limit mandated by the court, the judge will make a decision regarding granting a claim without oral hearing. Also, the judge will grant a claim if the circumstances in the claim legally justify the request for the claim. Otherwise, the court schedules the main hearing date, of which the parties shall be notified. In case the hearing is scheduled, the evidence will not be obtained from the defendant and the court will only hear legal justifications from the defendant about the claim.

6. When filing the response (counter claim), the defendant has the right to state that he/she agrees to receiving written materials by e-mail. In this case, usually, the court will send the information to the defendant via e-mail.

7. The response (counter claim) shall be signed by the defendant or his/her the legal council.

8. The response (counter claim) and attached documents shall be presented to the court in the same amount of copies as the number of plaintiffs.

*The assistant to the judge:* [signature]                                    /T. Gavashelishvili/

### The Claim
(on a civil case)
Tbilisi City Court
Name of the court where the claim is filed

**The plaintiff:**
Joseph Kay
      First name (title)            #5 Chanturia St.Tbilisi
                                  permanent address (present location)

                      93 36 25

Alternative address       Work phone                  Home phone no                    Cell phone
no                      e-mail

                      98 56 41

Place of work and the work address       Fax number
                                        The optimal time for
                                      filing the claim

**The representative/legal council of the plaintiff (if the claim is submitted by the representative/legal council):**

Ketevan Kvartskhava       ; # 4, Gudiashvili Square Tbilisi, 0105
First name, last name (title)         permanent address (present location)
                     932503; 920086; 922491. 96 00 20 899 510 109 ketti@blc.ge
alternative address                             Phone: work             Phone: home cell
phone       e-mail address

Place of work and the work address               934526       10:00 – 18:00
                        Fax NO                           The optimal time for
                                        submitting the claim

**Defendant:**
Inna Gudavadze       Tbilisi, V Kojori Highway, V1 km.
First name, last name (title)         main address (present location)

      Tbilisi, Gldani, District 3, building 10, apt 88
Alternative address                Phone: work       Phone: home       cell phone e-mail address

Place of work and the work address           fax number           The optimal time for
                                      submitting the claim

**Defendant:**
Iya Patarkatsishvili       Tbilisi, V Kojori Highway, VI km
First name, last name (title)         Permanent address (present location)

Tbilisi, Gldani, District 3, building 10, apt 88
Alternative address                Phone: work       Phone: home       cell phone e-mail address

Place of work and the work address           Fax number
                                      The optimal time for
                                      submitting the claim

**Defendant:**
Liana Zhmotova       Tbilisi, V Kojori Highway, VI km
First name, last name (title)         Permanent address (present location)

Tbilisi, Gldani, District 3, Building 10, apt 88
Alternative address                Phone: work       Phone: home       cell phone e-mail address

Place of work and the work address           Fax number
                                        The optimal time for
                                      submitting the claim

**The information about the contact person:**
Ketevan Kvartskhava       932503; 920086; 922491. 96 00 20 899 510 109 934526 ketti@blc.ge

                                              | Stamp area |

*1*

... .          ......          .. .

## The list of individuals to be subpoenaed in court

The witnesses, experts, specialists and interpreters can be called to the court

I. -------------------------- As:
The status of the individual to be called to the court

| First name, last name (title) | | Permanent address (present location) | | | |
|---|---|---|---|---|---|
| Alternative address | Phone: work | Phone: home | Cell phone | | E-mail address |
| Place of employment and work address | | Fax | The optimal time for submitting the claim | | |

II. ----------------------- way:
The status of the individual to be called to the court

| First name, last name (title) | | Permanent address (present location) | | | |
|---|---|---|---|---|---|
| Alternative address | Phone: work | Phone: home | Cell phone | | E-mail address |
| Place of employment and work address | | Fax | The optimal time for submitting the claim | | |

III. ----------------------- way:
The status of the individual to be called to the court

| First name, last name (title) | | Permanent address (present location) | | | |
|---|---|---|---|---|---|
| Alternative address | Phone: work | Phone: home | Cell phone | | E-mail address |
| Place of employment and work address | | Fax | The optimal time for submitting the claim | | |

IV. ----------------------- way:
The status of the individual to be called to the court

| First name, last name (title) | | Permanent address (present location) | | | |
|---|---|---|---|---|---|
| Alternative address | Phone: work | Phone: home | Cell phone | | E-mail address |
| Place of employment and work address | | Fax | The optimal time for submitting the claim | | |

*Remark*: If you wish for court to call the certain individual as a witness, please consider the circumstances that you are obligated to mark in mediation area as to what information that individual can confirm pertaining to the case. *Plaintiff and his/her representative (if the claim is presented by the representative) is obligated to state the information about the witness and other individuals called to the court hearing.*

Additional pages can be used

2

[illegible] to recognize Arkady (Badry) Patarkatsishvili as a will executor and heritage manager.  To forbid the defendants' interference in plaintiff's rights execution.

**Legal interest if the pre-award relief is filed**

According to the presented evidence, deceased Arkady Badry Patarkatsishvili trusted his heritage management and will execution to the plaintiff.  Accordingly, the above-mentioned is the right as well as the responsibility of the plaintiff.  The defendants are not giving a chance to the plaintiff to execute the last wish of Arkady (Badry) Patarkatsishvili.  Therefore, the execution of the rights and responsibilities of the plaintiff will not be possible without granting the above-mentioned pre-award relief.  Since the heritage of the deceased consists of wealth that is not concentrated at one area or in the hands of one individual or institution, therefore, it is imperative to consolidate, systemize and manage it properly.  Otherwise, all of heritage or part of it will be lost, depreciated or be destroyed which will result in nonfulfillment of the testator's will and in the end the successors will not be able to receive the heritage or a large part of it.

---

## The overview of the nature of the dispute

Pursuant to "The act on appointment of heritage executor-manager" which was drafted on November 14, 2008, before Arkady (Badry) Patarkatsishvili's death, Joseph Kay was appointed as the heritage executor-manager.  According to the "letter of will" which was officially registered at the same day, the plaintiff and his company (JWL Entertainment Group, Inc) were obligated to govern and manage Badry Patarkatsishvili's wealth during his life and after his death.  Additionally, in case of death, appointee, as indicated in the document was obligated to consolidate the heritage, sell it directly or through public auction, pay off all the debts, taxes and expenses and divide the remaining amount between successors according to the confidential instructions of the testator.

The defendants/respondents are trying to prevent the execution of Badry Patarkatsishvili's last wish.  They together filed a claim in the US court and demanded to forbid Joseph Kay to manage the heritage.  According to the agreement, Joseph Kay took upon himself not to execute the functions of the executor before the competent court's decision has been issued.

The plaintiff is not Badry Patarkatsishvili's successor and his plan is not to profit from the heritage.  The plaintiff's goal is to execute the wish of the deceased according to his instructions and to protect the heritage.

Due to the particularity of the case and  since due to the nature of the assets that could be sold, destroyed or lost in case of possible delay or inconsolidation and mismanagement , therefore, filing of the subject claim in court has been decided.

*3*

**[illegible] and circumstances that the plaintiff is basing his requests on.**
**[illegible] that confirm the circumstances indicated by the plaintiff.**

1. We would like to point out that, the Plaintiff Joseph Kay is a relative (cousin) of the businessman Badry Patarkatsishvili who passed away on February 13,, 2008.

2. Prior to Arkady Badry Patarkatsishvili's death, according to the "letter of will" drafted on November 14, 2008, the plaintiff and his company (JWL Entertainment Group, Inc.) were supposed to manage, own and govern Badry Patarkatsishvili's heritage whether in direct or indirect ownership or property, and in case of death, sell the wealth by auction or private disposal. At the same time, after the company has paid all the debts, payments and expenses, the heritage had to be divided according to Badry Patarkatsishvili's confidential instructions (see attachment 1).

3. According to the "act regarding appointment of heritage/will executor-manager" drafted prior to [Badry Patarkatsishvili's] death on November 14, 2008, Joseph Kay had been appointed by Arkady Badry Patarkatsishvili as his heritage manager and will executor (see attachment 2).

4. Following Badry Patarkatsishvili's death, the plaintiff visited the defendant Inna Gudavadze and informed her about the wish of the deceased and the lawyer, Emmanuel Zeltser informed the family about Badry Patarkatsishvili's last wish.

5. Defendant Inna Gudavadze is one of Badry Patarkatsishvili's successors.

6. Defendant Iya Patarkatsishvili is Badry Patarkatsishvili's daughter.

7. Defendant Liana Zhmotova is Badry Patarkatsishvili's daughter.

8. Deceased Arkady (Badry) Patarkatsishvili was a Georgian citizen whose official residence was in Georgia as well as the domicile during the last six years.

9. Badry Patarkatsishvili's heritage consists of wealth comprised of shares in various industries and real estate located in different countries, part of which is given to other individuals by right to govern, trust or other rights. A large share of the real estate and private property is located in Georgia. The heritage manager was charged to consolidate the above-mentioned heritage and if deemed necessary, sell it entirely or partially through direct sale or public auction and

10. Badry Patarkatsishvili's heritage consists of wealth comprised of shares in industries and real estate located in different countries, part of which is given to other individuals by right to govern, trust or other rights. Large share of real estate and private property is located in Georgia. The heritage manager was charged to consolidate the above-mentioned wealth and if deemed necessary sell it entirely or partially through direct sale or public auction and divide the remaining amount among successors. Due to the nature of the heritage, the above-mentioned task sounded reasonable due to the fact that the subject heritage is not concentrated in one location or in hands of one individual or industry and without their systematization the interests of the successors could have been damaged.

11. The defendant argues with the plaintiff regarding the lawfulness of his/her rights and their execution. Due to the above-mentioned claim, the claim filed in the US court in particular, an agreement of guarantee was executed on April 30, 2008 according to which, Joseph Kay decided not to act upon Arkady (Badry) Patarkatsishvili's heritage until the court with the corresponding jurisdiction proved otherwise (see attachment 2). According to the same agreement, Joseph Kay reserves the right to address the competent court or administrative body shall he need to make a decision related to the heritage management.

12. The plaintiff declares that he is not Badry Patarkatsishvili's successor and his goal is not to receive part of the heritage or profit from it, but according to the instructions , fulfill the last wish of the deceased and to protect the heritage.

13. Due to the particularity of the case and since the nature of the case is related to the assets that could be lost fully or partially if the case is delayed, sold or destroyed if there is no manager, we therefore have decided to file a claim.

14. Among the successors, there are other individuals besides the defendants. For example, the deceased had a wife, citizen of the Russian Federation, Saponova Olga (the marriage certificate is presented together with the declaration to grant the claim), with whom he had a son.. Among the successors, the testator's children, sisters and mother are listed. Therefore, according to the wish of the deceased, part of his heritage also belongs to his Russian wife.

*4*

15.    The document presented by us (we don't have an original document), represents an agreement based on the family interests. There are four signatures placed in the Russian language document where one belongs to the deceased Badry Patarkatsishvili, another one belongs to the defendant (Inna Gudavadze) and two signatures belong to the witnesses. According to the above-mentioned document, which was drafted on March 12, 1994, the parties acknowledge their marriage as formal, which has not been dissolved only for the reason to protect children from any negative affects resulted from the divorce..   According to the Paragraph 5 of the above-mentioned document, Arkady Patarkatsishvili and Inna Gudavadze are independently responsible for their obligations and actions which they would assume upon the execution of the agreement.   According to the document and also based on the existence of another official wife, it is possible that the couple might have been officially divorced by the time of testator's death (this document is attached to our statement regarding pre-award relief).

**Regarding the judgment**

1.    According to the above complaint the permanent residence of the plaintiff is Georgia, according to our information, the permanent residence of defendant Inna Gudavadze, Iya Patarkatsishvili and Liana Zhmotova is Georgia (the address is stated in the first part of the complaint).

2.    Pursuant to Article 8, Georgian law - International Privacy Law: *"Georgian courts have an international competence/jurisdiction if the defendant owns a house, maintains residence or domicile in Georgia."*   As mentioned above, even though the defendants' citizenship is unknown to us, their residence is in Georgia.

3.    The purpose of the above-mentioned declaratory judgment claim is to resolve the issues related to the heritage and to recognize the plaintiff as a will executor and heritage manager as it is described in the letter of the will of the deceased. Pursuant to paragraph "f", Article 9 of the International Privacy Law, the Georgian court possesses international competence/jurisdiction if: "the subject of the complaint is to determine the heritage rights, division of heritage and if the testator had residence, domicile or wealth in Georgia at the time of his/her death." It has been determined and is not disputable that a vested share of the heritage is located in Georgia and it is also not disputable that the deceased Arkady (Badry) Patarkatsishvili was a Georgian citizen and at the time of death his domicile was in Georgia. Paragraph 4, Article 16 of the Georgian Civil Procedural Code has the same content. According to the above reference, during consideration of the subject complaint, Georgian court shall be recognized as a competent body.

## The Plaintiff's Request

Based on the subject complaint I request the following:
1. To recognize plaintiff Joseph Kay as the heritage manager and will executor of deceased Arkady (Badry) Patarkatsishvili.
2. To forbid defendants from any interference in plaintiff's rights and fulfillment of his responsibilities.
3. To charge the defendants to compensate court-related expenses to the plaintiff.

## The legal basis that the plaintiff is basing his request on

1.    The subject complaint is a declaratory judgment claim and its goal is to recognize Joseph Kay as a heritage manager of Arkady (Badry) Patarkatsishvili's estate. The legal interest of the plaintiff in this case is obvious since he was designated as a heritage manager by the deceased prior to the testator's death.  As a relative and a trusted person, the plaintiff considers his responsibility to consolidate the heritage, protect it and divide it among the successors according to the testator's instructions.  It is also clear and is confirmed with the presented documents that the defendants are preventing [the plaintiff] from executing his rights and subsequently the last wish of the deceased, which will be ceased [defendants' interference] upon the satisfaction of the claim.

2.    According to the evidence presented by us, entitlement letter had been drafted by Arkady (Badry) Patarkatsishvili himself, back when he was still physically present which confirms the rights and responsibilities of the plaintiff to carry out certain actions according to the directions of the testator (arrangement according to the Article 709 of the Civil Code).

3.    According to the content of the agreement it is evident that the instructions are directly and unequivocally connected to the heritage management in case of testator's death.

4.    Article 714 of the Civil Code mandates the executor not to disclose the facts known to him within the boundaries of his functions.  Thus, the subject of the statement for the claim is not a determination of the specific rights of the successors, but to confirm the rights of the trustee (executor).  Therefore, there are no specific instructions stated in the complaint that was issued by the testator.

5.    Article 721 of the Civil Code considers the results of the testator's death and directly states that *"the agreement does not terminate in case of testator's death or disability if other issues have not been agreed upon or have not been included in the content of power of attorney."*  As mentioned above, the content of the agreement fully regulates obligations of the trustee in case of the testator's death; Moreover, based on the subject of the document and since it was composed and approved by the Notary Public with the attendance of two witnesses, it also represents the order of a will where the plaintiff is designated as a will executor of Badry Patarkatsishvili.

6.    Pursuant to the Article 52 of the Civil Code *"During the explanation of the letter of will, the will has to be established based on a clear and reasonable judgment and not only by expressing the idea word by word."*  Thus, even though the documents drafted by the deceased and presented by us are not titled "a will," according to their content, for example according to the content of "the letter of will," it represents a will where the testator gives the individual chosen by him specific instructions which shall be carried out in case of his/her death.  The testator specifically points out who shall manage his/her wealth (heritage) and what should be a purpose and basis of his/her heritage management.  Therefore, in accordance with the presented documents, e.g. "act of the appointment of the executor", Joseph Kay, had been appointed as a will executor.  The two documents presented by us complement each other and clearly represent the will of the drafter—that Joseph Kay shall manage and coordinate the heritage, consolidate it, pay off possible financial debts and liabilities and pass the remaining amount to the successors according to the wish of Badry Patarkatsishvili. Therefore, terminologically, the title of Joseph Kay chosen by the testator does not play a big difference, — whether he calls him the executor, bailiff, trustee or any other name.

**Solicitations/Mediations of the plaintiff**

[illegible]

The additional page can be used

**Amount to be paid for the claim** ----------------------------------------------------------------**Lari**

Numerical amount and longhand

**The State tax paid for the complaint—GEL 3000**

Numerical amount and longhand

[illegible]

**Solicitations related to the court expenses**

[illegible]

Please, order the respondent to reimburse court expenses to the plaintiff.

We would like to inform you additionally that since the nature of the claim is not wealth-related, the State tax for such claim in the first instance/circuit court is GEL 100 (Article 39, Part 1, Sub Paragraph h of Georgian Civil Procedural Code). The tax in the amount of GEL 3000 was paid for the above-referenced claim according to the Article 39, Part 3, Sub Paragraph A, of the Georgian Civil Procedural Code. Therefore, the state tax paid by the plaintiff was GEL 2900 more than mandated by the statue. Based on the above-referenced information we petition that you discuss/hear this issue and refund the overpaid amount of the State tax to us.

The bank account information is as follows:

| | |
|---|---|
| **Beneficiary Bank:** | **JSC "Investbank," Tbilisi, Georgia** |
| **Bank Code:** | **220101710** |
| **Beneficiary:** | **Joseph Kay** |
| **Account No. of the Beneficiary:** | **36010100777** |

*8*

**The list of documents attached to the claim**

[illegible]

The documents and evidence is attached to our original claim.

The additional page can be used

**Do you agree if the court examines/hears the case without an oral hearing?**

[illegible]

YES ☐                          NO ☒

**Do you agree to receive documents via e-mail?**

[illegible]

YES ☐                          NO ☒

[illegible]

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -
The signature of the plaintiff

- - - - - - - - - - - [signature] - - - - - - - - - - - -
The signature of the representative of the plaintiff          May 7, 2008

*10*

[illegible]

[illegible]

To: Tbilisi City Court
Civil Affairs Board
Judge Diana Berekashvili

The Statement issued by the
representative of Joseph Kay,
Ketevan Kvartskhava
Address: Tbilisi, 4, Gudiashvili Square
Phone: 899 51 01 09, e-mail ketti@blc.ge

## Statement
### Fulfillment of May 14, 2008 court decision

According to the court decision No. 2/1597-08 issued on May 14, 2008 we were obligated to file a complaint against the defendants Iya Patarkatsishvili and Liana Zhmotova.

On May 7, 2008, Plaintiff Joseph Kay has filed a complaint in Tbilisi City Court, Civil Affairs Board against defendant Inna Gudavadze. The plaintiff requests to be recognized as a heritage manager and requests the prevention of any interference in fulfillment of his duties as a heritage manager. In response to your court decision, we have filed a detailed version of the same complaint on May 23, 2008 (the complaint, court registration number 23356), where the defendants Iya Patarkatsishvili and Liana Zhmotova have also been included. We request that you examine this complaint and take into consideration the attachments and evidence filed with the original complaint and consider the task stipulated in your court decision as fulfilled.

Sincerely,

Ketevan Kvartskhava
                    [signature]
May 28, 2008

[stamp:]
Tbilisi City Court
Civil Case Board
[illegible] _5/28/08_
[illegible] _____
[illegible] _23912_
[illegible] _13_

...ჩ..ა... აღ..ერა გარდაცვლილი არკადი (ბადრი) პატარკაციშვილის ანდერძის აღსრულებლად და სამკვიდროს მმართველად. მოპასუხეებისთვის მოსარჩელის უფლების განხორციელებისას ხელშეშლის აკრძალვა.

## იურიდიული ინტერესი, თუ აღძრულია აღიარებითი სარჩელი

Წარმოდგენილი მტკიცებულებებიდან გამომდინარე გარდაცვლილმა არკადი ბადრი პატარკაციშვილმა მისი სამკვიდროს მართვა და ანდერძის აღსრულება მიანდო მოსარჩელეს, შესაბამისად, აღნიშნული, მოსარჩელის როგორც უფლება ასევე მოვალეობაცაა. მოპასუხეები არ აძლევენ მოსარჩელეს გარდაცვლილი არკადი პატარკაციშვილის უკანასკნელი ნების შესრულების საშუალებას, შესაბამისად მოსარჩელის უფლების და ვალდებულების განხორციელება შეუძლებელი იქნება Წინამდებარე აღიარებითი სარჩელის დაკმაყოფილების გარეშე. ჷინაიდან გარდაცვლილის სამკვიდრო შედგება კონებისაგან, რომელიც არ არის კონცენტრირებული ერთ ადგილას ან ერთი პირის ან საწარმოს ხელში, შესაბამისად აუცილებელია მისი შეკრება, სისტემატიზაცია და მართვა. Წინაალდმდე შემთხვევაში სამკვიდრო კონება ან მისი ნაწილი დაიკარგება, გაუფასურდება ან განადგურდება, რაც გამოიჷევს გარდაცვლილის ნების შეუსრულებლობას და სასხოლო ჯამში მემკვიდრეები ვერ შეძლებენ მიიღონ სამკვიდრო ან მისი მნიშვნელოვანი ნაწილი.

## დავის არსის მოკლე ჷიმომხილვა

"კონების აღმსრულებელი მმართველი დანიშვნის შესახებ აქტი"-ს თანახმად, რომელიც 2008 Წლის 14 ნოემბერს, არკადი (ბადრი) პატარკაციშვილის გარდაცვალებამდე შედგა, ჯლოზე კეი დაანიშნა ბადრი პატარკაციშვილის სამკვიდროს აღმსრულებელ-მმართველად. "ნების გამომცენის Წერილი"-ს თანახმად, რომელიც იმავე დღეს გაფორმდა, მოსარჩელე და მისი კომპანია (JWL Enternaiment Group, Inc) ვალდებული იყო ემართოს და განაკარგა ბადრი პატარკაციშვილის კონება მისი სიცოცხლეშიც და მისი გარდაცვალების შემდეგ. დამატებით, გარდაცვალების შემთხვევაში, რჷმნებული (Appointee) როგორც იგი მოიხსენიება დოკუმენტში ვალდებული იყო შეექმნა კონება, გაეკეთა პირდაპირი Წესით ან საჯარო აუქციონის გზით, გადადებდა ყველა ვალები, გადასახადები და ხარჯები და დარჩენილი თანხა გაენაᲬილებინა მემკვიდრეებისთვის, მამკვიდრებლის კონფიდენციალური მითითებების შესაბამისად.

Მოპასუხეები ცდილობენ ხელი შეუშალონ ბადრი პატარკაციშვილის უკანასკნელი ნების განხორციელებას. მათ ერთობლივად მიმართია აშშ-ს სასამართლოს, ხოლო უზრუნველყოფის ზომის სახით მოითხოვეს ჯლოზე კეისთვის სამკვიდროს მართვის აკრძალვა, აღნიშნულ Წამოდგებას დაედებული შეთანხმებით ჯლოზეფ კეიმ თავად იცისრა – არ განეხორციელებინა აღმსრულებელის ფუნქციები, ვიდრე ამას არ გადაᲬყვედდა კომპეტენტური სასამართლო.

Მოსარჩელე არ არის ბადრი პატარკაციშვილის მემკვიდრე და მისი მიზანი არ არის რაიმე სარგებლის მიღება სამკვიდროსგან. მოსარჩელის მიზანია გარდაცვალილის ნების შესრულება მისივე მითითებების შესაბამისად და სამკვიდროს დაცვა.

Საქმის საექსფურთიოდან გამომდინარე, ჷინაიდან იგი ეხება ისეთ აქტივებს, რომლებიც შეკრების და მართვის გარეშე, დაყოვნების შედეგად შესაძლოა გაიყიდოს, განადგურდეს ან დაიკარგოს, გადაჷყვეტით Წინამდებარე სარჩელის მიეჶართოთ სასამართლოს.

3

საქმე № 2/1597·08

30 _მაისი_____ 2008 წელი

მოპასუხისადმი სარჩელისა და თანდართული
დოკუმენტების გაგზავნილი

თბილისის საქალაქო სასამართლოს სამოქალაქო საქმეთა კოლეგია

ქ. თბილისი, დ. აღმაშენებლის ხეივანი მე-12 კმ. №6

მოსამართლე დიანა ბერეკაშვილი

მოპასუხე ___ ინს ვიდოვიჩ_____

მისამართი _თბორინ, კიჯკინ ვუჯვ ჯ. V, VI ვმ.___

საქართველოს სამოქალაქო საპროცესო კოდექსის 184-ე და 201-ე მუხლების
შესაბამისად გეგზავნებათ

მოსარჩელე (განმცხადებელ) _____ ნობევ ვეი_ც_____

სარჩელის (განცხადების) და თანდართული დოკუმენტების ასლები (დანართი 13
ფურცლად)

თქვენ ვალდებული ხართ წერილობითი ფორმით, როგორც წესი, ნაბეჭდი სახით
შეადგინოთ პასუხი (შესაგებელი) სარჩელსა და მასში დასმულ საკითხებზე, აგრეთვე
თვენი მოსაზრებები სარჩელისათვის დართული დოკუმენტების შესახებ და
წარმოადგინოთ იგინი სასამართლოში გაგზავნილის ჩაბარებიდან ____15___ დღის
ვადაში. შესაგებელი უნდა უპასუხებდეს სამოქალაქო საპროცესო კოდექსით
დადგენილ მოთხოვნებს და საქართველოს იუსტიციის უმაღლესი საბჭოს მიერ მიერ
დამტკიცებული ფორმის ნიმუშს.

მოპასუხის წერილობით პასუხში (შესაგებელში) მითითებული უნდა იყოს:

1.

ა) სასამართლოს დასახელება, რომელშიც მოპასუხემ შეაქვს პასუხი (შესაგებელი).
ბ) მოპასუხის, მისი წარმომადგენლის (თუ პასუხი შეაქვს წარმომადგენელს), მოწმის,
სხდომაზე მოსაწვევი სხვა პირის სახელი, გვარი (სახელწოდება), ძირითადი
მისამართი (ფაქტობრივი ადგილსამყოფელი), აგრეთვე არსებობის შემთხვევაში
ალტერნატიული მისამართი, სამუშაო ადგილის მისამართი, ტელეფონი, მათ შორის,
მობილური, ელექტრონული ფოსტა, ფაქსი; პასუხში შესაძლოა მოპასუხემ ან მისმა
წარმომადგენელმა ასევე მიუთითოს საკონტაქტო პირის მონაცემები;
გ) ცნობს თუ არა მოპასუხე სარჩელს და რა ნაწილში;
დ) თუ მოპასუხე სარჩელს არ ცნობს, რა კონკრეტულ ფაქტებსა და გარემოებებს
ემყარება მისი შესაგებელი სარჩელის წინააღმდეგ;
ე) მტკიცებულებები, რომლებიც ადასტურებს მოპასუხის მიერ მითითებულ
გარემოებებს;

ზ) არსებობის შემთხვევაში, მოპასუხის შუამდგომლობები:

ზ.ა) ხომ არ ექნება აცილება სასამართლოს ან მოსამართლის მიმართ და ა.შ;

ზ.ბ) ვინ შეიძლება ჩაებას პროცესში თანამონაწილედ ან მესამე პირად;

ზ.გ) რომელი მოწმე უნდა იქნეს გამოძახებული სასამართლო სხდომაზე;

ზ.დ) სხვა სახის შუამდგომლობები;

თ) პასუხისათვის დართული დოკუმენტების ნუსხა;

ი) მოპასუხის მოსაზრება საქმის ზეპირი მოსმენის გარეშე განხილვის თაობაზე.

**2.** პასუხს (შესაგებელს) უნდა დაერთოს წარმომადგენლის უფლებამოსილების დამადასტურებელი დოკუმენტი, თუ პასუხი სასამართლოში შეაქვს წარმომადგენელს.

**3.** პასუხში სრულყოფილად და თანმიმდევრობით უნდა აისახოს მოპასუხის მოსაზრებები სარჩელში მითითებულ თითოეულ ფაქტობრივ გარემოებასა და მტკიცებულებებთან დაკავშირებით. თუ მოპასუხეე არ ეთანხმება სარჩელში მოყვანილ რომელიმე გარემოებას, იგი ვალდებულია მიუთითოს ამის მიზეზი და დაასაბუთოს შესაბამისი არგუმენტაციით.

**4.** მოპასუხე ვალდებულია, პასუხს დაურთოს მასში მითითებული ყველა მტკიცებულება. თუ მოპასუხეს საპატიო მიზეზით არ შეუძლია პასუხთან ერთად მტკიცებულებათა წარდგენა, იგი ვალდებულია, ამის შესახებ მიუთითოს პასუხში. წინააღმდეგ შემთხვევაში მოპასუხეს ერთმევა უფლება, შემდგომში წარადგინოს მტკიცებულებები. მოპასუხე უფლებამოსილია, მტკიცებულებათა წარდგენისათვის მოითხოვოს გონივრული ვადა.

**5.** სასამართლოს მიერ განსახდევრულ ვადაში პასუხის (შესაგებლის) არასაპატიო მიზეზით წარუდგენლობის შემთხვევაში, მოსამართლის ზეპირი მოსმენის გარეშე გამოაქვს დაუსწრებელი გადაწყვეტილება სარჩელის დაკმაყოფილების შესახებ. ამასთანავე, მოსამართლე დააკმაყოფილებს სარჩელს, თუ სარჩელში მითითებული გარემოებები იურიდიულად ამართლებს სასარჩელო მოთხოვნას. წინააღმდეგ შემთხვევაში სასამართლო ნიშნავს მთავარ სხდომას, რის შესახებაც ეცნობება მხარეებს. სხდომის ჩატარების შემთხვევაში მოპასუხისაგან მტკიცებულებათა მიღება არ ხდება და სასამართლო მოისმენს მოპასუხის მხოლოდ სამართლებრივ მოსაზრებებს სასარჩელო მოთხოვნასთან დაკავშირებით.

**6.** მოპასუხეს შეუძლია პასუხის (შესაგებლის) შეტყანისას განაცხადოს, რომ თანახმაა, წერილობითი მასალები მიიღოს ელექტრონული ფოსტით. ასეთ შემთხვევაში სასამართლო, როგორც წესი, მოპასუხეს მასალებს უგზავნის ელექტრონული ფოსტით.

**7.** პასუხს (შესაგებელს) ხელს აწერს მოპასუხე ან მისი უფლებამოსილი წარმომადგენელი.

**8.** პასუხი (შესაგებელი) და თანდართული დოკუმენტები სასამართლოს უნდა წარედგინოს იმდენი ასლით, რამდენიც მოსარჩელეა.

მოსამართლის თანაშემწე:                    /თ. გავაშელიშვილი/

საქართველოს დროშა სსდ
ქ. თბილისის საქალაქო სასამართლო
საქართველოს კონსტიტუცია, როგორ მუშავ სარჩელი

**მოსარჩელე:**

ჯოზეფ კეი

ქ. თბილისი, ჯანტურიას ქ. №5

სახელი, გვარი (საგელწოდება)                                    მორიგეობა მისამართი (ფაქტიურად ცხოვრასამართალი)

                                                                  93 36 25

ადვოკატიული მისამართი                    ტელ. სამსახურის    ტელ. სახლის    მობილური    ელექტრონული ფოსტის მისამართი

                                                                  98 56 41

ხაზუშო ადგილი და ხაზუშო ადგილის ფიქტურიერი მისამართი                                         ფაქსი        * უჩკის ნახარებუფებ მოცლების ოპმალურ დრო

**მოსარჩელის წარმოგადგენელი (ან სარჩელი შეაგს წარმოგადგენელი):**

ქეთევან ქვარცხავა

თბილისი, 0105 გუდიაშვილის მოედანი №4

სახელი, გვარი (საგელწოდება)                                    მორიგეობა მისამართი (ფაქტიურად ცხოვრასამართალი)

932503; 920086; 922491.    96 00 20    899 510 109    ketti@blc.ge

ადვოკატიული მისამართი                    ტელ. სამსახურის    ტელ. სახლის    მობილური    ელექტრონული ფოსტის მისამართი

                                       934526                                  10:00-18:00

ხაზუშო ადგილი და ხაზუშო ადგილის ფიქტურიერი მისამართი                                         ფაქსი        უჩკის ნახარებუფებ მოცლების ოპმალურ დრო

**მოვადებსა:**

ინა გუდავაძე

თბილისი, კოჯრის გზატკეცილი V, VI კილომეტრი.

სახელი, გვარი (საგელწოდება)                                    მორიგეობა მისამართი (ფაქტიურად ცხოვრასამართალი)

თბილისი, გლდანი, მე-3 მ/რ, კორპუსი 10, ბინა 88

ადვოკატიული მისამართი                    ტელ. სამსახურის    ტელ. სახლის    მობილური    ელექტრონული ფოსტის მისამართი

ხაზუშო ადგილი და ხაზუშო ადგილის ფიქტურიერი მისამართი                                         ფაქსი        უჩკის ნახარებუფებ მოცლების ოპმალურ დრო

**მოაასუხა:**

ია პატარკაციშვილი

თბილისი, კოჯრის გზატკეცილი V, VI კილომეტრი.

სახელი, გვარი (საგელწოდება)                                    მორიგეობა მისამართი (ფაქტიურად ცხოვრასამართალი)

თბილისი, გლდანი, მე-3 მ/რ, კორპუსი 10, ბინა 88

ადვოკატიული მისამართი                    ტელ. ხახსახურის    ტელ. სახლის    მობილური    ელექტრონული ფოსტის მისამართი

ხაზუშო ადგილი და ხაზუშო ადგილის ფიქტურიერი მისამართი                                         ფაქსი        უჩკის ნახარებუფებ მოცლების ოპმალურ დრო

**მოაასუხა:**

ლიანა ემოჩოევა

თბილისი, კოჯრის გზატკეცილი V, VI კილომეტრი.

სახელი, გვარი (საგელწოდება)                                    მორიგეობა მისამართი (ფაქტიურად ცხოვრასამართალი)

თბილისი, გლდანი, მე-3 მ/რ, კორპუსი 10, ბინა 88

ადვოკატიული მისამართი                    ტელ. ხახსახურის    ტელ. სახლის    მობილური    ელექტრონული ფოსტის მისამართი

ხაზუშო ადგილი და ხაზუშო ადგილის ფიქტურიერი მისამართი                                         ფაქსი        უჩკის ნახარებუფებ მოცლების ოპმალურ დრო

**საკონტაქტო პირის მონაცემები:**

ქეთევან ქვარცხავა    932503; 920086; 922491.  96 00 20    899 510 109  934526    ketti@blc.ge

სახელი, გვარი (საგელწოდება)                    ტელ. სამსახურის    ტელ. სახლის    მობილური    ფაქსი    ელექტრონული ფოსტის მისამართი



4

I. ------------------------------------------- სახით:

    დასახელებული პირის სტატუსი

---

    სახელი, გვარი (სახელწოდება)                           მართლადი მისამართი (ფაქტობრივი ადგილსამყოფელი)

---

    ალტერნატიული მისამართი             ტელ. სამსახურის    ტელ. სახლის    მობილური      ელექტრონული ფოსტის მისამართი

---

    სამუშაო ადგილი და სამუშაო ადგილის ფაქტობრივი მისამართი           ფაქსი     უწყების რასაართებად
                                                                  ჩაბარების ოქმისათვის დრო

---

II. ------------------------------------------- სახით:

    დასახელებული პირის სტატუსი

---

    სახელი, გვარი (სახელწოდება)                           მართლადი მისამართი (ფაქტობრივი ადგილსამყოფელი)

---

    ალტერნატიული მისამართი             ტელ. სამსახურის    ტელ. სახლის    მობილური      ელექტრონული ფოსტის მისამართი

---

    სამუშაო ადგილი და სამუშაო ადგილის ფაქტობრივი მისამართი           ფაქსი     უწყების ჩასაართებად
                                                                  ადგილდამ ოქმისათვის დრო

---

III. ------------------------------------------- სახით:

    დასახელებული პირის სტატუსი

---

    სახელი, გვარი (სახელწოდება)                           მართლადი მისამართი (ფაქტობრივი ადგილსამყოფელი)

---

    ალტერნატიული მისამართი             ტელ. სამსახურის    ტელ. სახლის    მობილური      ელექტრონული ფოსტის მისამართი,

---

    სამუშაო ადგილი და სამუშაო ადგილის ფაქტობრივი მისამართი           ფაქსი     უწყების ჩასაართებად
                                                                  ადგილდამ ოქმისათვის დრო

---

IV. ------------------------------------------- სახით:

    დასახელებული პირის სტატუსი

---

    სახელი, გვარი (სახელწოდება)                           მართლადი მისამართი (ფაქტობრივი ადგილსამყოფელი)

---

    ალტერნატიული მისამართი.             ტელ. სამსახურის    ტელ. სახლის    მობილური      ელექტრონული ფოსტის მისამართი.

---

    სამუშაო ადგილი და სამუშაო ადგილის ფაქტობრივი მისამართი           ფაქსი     უწყების მასაართებად
                                                                  ადგილდამ ოქმისათვის დრო

---

შეგახსენებთ, ისარგებლოთ დამატებითი ფურცლით

2

...მოგახსენებთ, რომ მოსარჩელე ჯილზე კეჯ გასცლავი 2008 წლის 13 თებერვალს გარდაცვალილი ბიძნესმენის ბადრი პატარკაციშვილის ქონებაზე .ნათესავია (დედამისზეცა).

2.არჩაილი ბადრი პატარკაციშვილის მიერ გარდაცვალებამდე, 2008 წლის 14 ნოემბერს შეგენილიაზ "ნების გამომვლენის წერილის" თანახმად მოსარჩელეს და მის კომპანიას (JWL Entertainment Group, Inc.) უნდა განეხორციელებინა ბადრი პატარკაციშვილის პირიქსის და არაპირდაპირ მფლობელობაში და საკუთრებაში არსებული ქონების მართვა, ფლობა და განკარგვა ხოლო მისი გარდაცვალების შემთხვევაში – ქონების გაყიდვა კერძო განკარგავის ან აუქციონის გზით. ამავე დროს, კომპანიას ყველა ელ.,ს, გადასახადით და ხარჯებით გადახდით შემდეგ უნდა გაენაწილებინა ამჟამინ ქონება ბადრი პატარკაციშვილის კონფიდენციალური მითითებების შესაბამისაც (იხ. დანართი 1).

3.ასევე გარდაცვალებამდეგ 2008 წლის 14 ნოემბერს შედგენილი "აქტის, ქონების აღმსრულებელი მმართველის დანიშნის შესახებ" ჯილზზე ,ცა ,ცს და ,ს დანიშნულა არჩაილი ბადრი პატარკაციშვილი მიერ მისი სამკვიდროს მმართველად და ანდერძის აღმასრულებელად(იხ, დანართი 2).

4.ბადირ პატარკაციშვილის გარდაცვალების შემდეგ მოასარჩელე ეჭვა მოპასუხედ ინა გუდავაძის და აცვნენა გარდაცვალების სურვთილების შესახებ, ხოლემ ადვკატები ემაზეჯუ ხელცეცირმა გააცნო ოჯახს ბადირ პატარკაციშვილის უკანასკნელი ნება.

5.მოპასუხეჩ ინა გუდავაძე წარმოადგენს ბადრი პატარკაცატის ერთ-ერთ მემკვიდრეს.

6.მოასარსუჩი ია პატარკაციშვილ არ არის ბადრის პატარკაციშვილის შვილი.

7.მოპასუხეჩ ლიანას ქ. ყოუქა არის ბადრი პატარკაციშვილის შვილი.

8.გარდაცვლელმა არჩაილ (ბადრი) პატარკაციშვილი წარმოადგენდა საქართველოს მოქალაქეს, რომელის ოფიციალური საცხოვრებელი ადგილი იყო საქართველოში, ისევე, როგორც ჩვეულებრივი ადგილსამყოფელი უკანასკელი, დაახლოებით 6 წლის განმავლდე.

9.ბადრი პატარკაციშვილის სამკვიდრო შედგება ქონებისგან, რომელიც წარმოადგენს წილების მსოფლიოს სხვადასხვა ქვეყანაში არსებულ საწარმოებში და უძრავ ქონებას, რომელთაგან ნაწილი მართის უფლებით, ტრანსფის ან სხვა გზით არის გადაცემული სხვა პირებისთვის. უქრავი და მოძრავი ქონების დიდდ ნაწილი იმყოფება საქართველოში. სამკვიდროს მმართველი უნდა შეუკირია აღნიშჩ ქონება, თუ საჯირიდ ჩათვლნდა მიზდიანიად ან მისი ნაწილი გაიყიდა პირდაპირი მიყიდცით ან საჯარო აუქციონის გზით, ხოლ...

10.  ბადრი პატარკაციშვილის სამკვიდრო შედგება ქონებისგან, რომელიც წარმოადგენს წილების მსოფლიოს სხვადასხვა ქვეყანანში არსებულ საწარმოებში და უქრავ ქონებას, რომელთდაგან ნაწილი მართის უფლებით, ტრანსფის ან სხვა გზით არის გადაცცემენ სხვა პირებისთვის. უქრავი და მოძრავი ქონების დიდი ნაწილი იმყოფება საქართველოში. სამკვიდროს მმართველი უნდა შეუკირია აღნიშჩ ქონება, თუ საჯირიდ ჩათვლედა მითლიანად ან მისი ნაწილი გაიყიდა პირდაპირი მიყიდცით ან საჯარო აუქციონის გზით, ხოლო დარჩენილი თანხა განანაწილებინა მემკვიდრეებისთვისაც. აღნიშჩ დადავალება გამარცმულვება სამკვიდროს ხასიათიდან გამომდინარცა, ვინაიდად საქა გვაჯს ქონებასთან, რომ არის კონცენტრირებული ერთ ადგილს. ,ს ერთი პირის ან საწარმოს ხელში, ხოლო მათი სისტემატიზაცია გაჯზე, მემკვიდრის ინტერესებით დაიხდდდდისეც.

11.  მოასარჩელე ედგება მისი უფლების განხორციეებს კანწინებაში. აღნიშჩლი დავით გამო, ,პრიდ, ,აჟ-ს ხასამართლოში შედგენილი ხარჯელს გამ, 2008 წლს 30 აპრილდ დაიდდ უზრუჩელუცოქადსა დადაშირღმელი შემახსთხა, რომცმეცი თაჩსახაც ჯილზუჯ კეჯ ალდ ,ც ჯალ,ცდდცც. ,ს ემოჩმეჯ არცა. ,სდ (ბაცდრი) პატარკაციშვილი სამკვიდროს თარჩხზც. ვიდრც შეისიაზი...

12.  მოსარჩელე ავხაცდებს, რომ იცც არ წარმოადდენს ბაცდრი პატარკაცს შვილი...

13.  გამომდინარც საქმის სპეცცფიცურობიდდ და ვინაიდდ საქმე ეხება აქტივებს...

14.  მემკვიდრეებს შორის არაც მოპასუხდ,ცცდდ...



15. ჩვენ მიერ წარმოდგენილია დოკუმენტი (რომლის დედანიც ჩვენთან არ იმყოფება), კერძოდ: შეთანხმება ოჯახის ინტეგრესებიდან გამომდინარე. რუსულ ენაზე შედგენილი აღნიშნულ დოკუმენტზე აღნიშნულია ისეთი ხელმოწერა, აქედან ერთი ეკუთვნის გარდაცვლილ ბადრი პატარკაციშვილს, ერთი მოასუხეს (ინა გუდავაძეს), ხოლო ორი მოწმეებს. აღნიშნული დოკუმენტის თანახმად, რომელიც 1994 წლის 12 მარტს შედგა, მხარეები მათ ქონ[ს]ინებას ... ასახებენ, რომელიც მხოლოდ იმ მიზნით არ ..., რათა ... გან... არ ... გავდება. აღნიშნული დოკუმენტის მე-5 ...

**განსჯადობის შესახებ**

1. წინამდებარე სარჩელში მითითებული მოსარჩელის მუდმივი საცხოვრებელი ადგილია არის საქართველო, ჩვენს ხელთ არსებული ინფორმაციით მოპასუხეების ინა გუდავაძის, და პატარკაციშვილის და ... მუდმივი საცხოვრებელი ადგილი არის საქართველო (მისამართი მითითებულია სარჩელის დასაწყისში),

2. საქართველოს კანონი – საერთაშორისო კერძო სამართლის შესახებ მე-8 მუხლის თანახმად: "საქართველოს სასამართლოებს აქვს საერთაშორისო კომპეტენცია, თუ მოპასუხეს საქართველოში აქვს საცხოვრებელი ადგილი, რეზიდენცია ან ჩვეულებრივი ადგილსამყოფელი." რამდენაც ზემოთ აღინიშნა, ორივე ჩვენთვის უცნობია მოპასუხეების მოქმედება, ხოლო მათი ჩვეულებრივი ადგილსამყოფელი საქართველოშია.

3. წინამდებარე ალიარებითი სარჩელის მოჰასნა სასკვიდრო კონბებთან დაკავშირებული ... გარკვევა და მოსარჩელის ... ანდ..ქმის აღსრულებადად და სამკვიდროს მმართველად, ისე, რომგონც აღნიშნულ ... გარდაცვლილის ნებას გამოცდილება წერილით, შესაბამისად, განსაგდობისას გამოიყენება საერთაშორისო კერძო სამართლის შესახებ კანონის მე-9 მუხლის "ჟ" ქვეუნქტი, რომლის თანახმად: საქართველო სასამართლოს საერთაშორისო კომპეტენცია გააჩნია თუ: "სარჩელი საგანია სამკვიდრო უფლების დაცვებს, სამკვიდრო კონბის გაყოფა და მამკვიდრებელს გარდაცვალებისას საცხოვრებელი ადგილი, ჩვეულებრივი ადგილსამყოფელი ან სამკვიდრო კონბის საქართველოში ქონდა." დადგენილია და დავას არ იწვევს, რომ სამკვიდრო კონბის დიდი ნაწილი იმყოფება საქართველოში, ასევე არ არის სადავო, რომ გარდაცვლილი არკადი (ბადრი) პატარკაციშვილი იყო საქართველოს მოქალაქე და გარდაცვალებისას ჩვეულებრივი ადგილსამყოფელი საქართველოში ქონდა. ანალოგიური შინაარსისას საქართველოს სამოქალაქო საპროცესო კოდექსის მე-16 მუხლის მე-4 ქუნქტი, გამომდინარე ზემოაღნიშნულიდან, წინამდებარე სარჩელის განხილვისას სწორდ საქართველოს სასამართლოსია კომპეტენტური.

## მოსარჩელის მოთხოვნა

წინამდებაარე სარჩელით გთხოვთ:

1. აღიაროთ მოსარჩელ გლოზეე კეი გარდაცვლილი არკადი (ბადრი) პატარკაციშვილის სამკვიდროს მმართველად და ანდერძის აღსრულებლად.

2. აუკრძალოთ მოპასუხეებს ნებისმიერი ხელ... მოსარჩელის მიერ მისი უფლება- ვალდებულებების შესრულებაში.

3. დააკალოთ მოპასუხეებს აუნაზღაურონ მოსარჩელეს სასამართლო ხარჯები.



ᲡᲐᲛᲐᲠᲗᲚᲔᲑᲠ�“ᲕᲘ ᲡᲐᲤᲣ�«ᲕᲚᲔᲑᲘ, ᲠᲝ�›�“ᲚᲔᲑᲡᲐᲪ �›ᲝᲡᲐᲠᲩᲔ‹Ი Ა�›ᲤᲐᲠᲔᲑᲡ ᲗᲐ�•ᲘᲡ �›ᲝᲗᲮᲝ•ᲜᲐᲡ

1. ᲬᲘᲜᲐ�›ᲓᲔᲑᲐᲠᲔ ᲡᲐᲠᲩᲔᲚᲘ Ა‹ᲘᲐᲠᲔᲑᲘᲗᲘᲐ ᲓᲐ �›ᲘᲡᲘ �›ᲘᲖᲐᲜᲘᲐ �›ᲝᲡᲐᲠᲩᲔᲚᲔᲑ Ა‹ᲘᲐᲠᲔᲑᲐ ᲐᲠ‹ᲐᲓᲝ (ᲑᲐ‹ᲠᲘ) ᲞᲐᲢᲐᲠ‹Ა‹ᲘᲨᲔᲒᲔᲚᲘ ᲡᲐ�›‹Ე‹ᲓᲠᲝᲡ �›ᲨᲐᲠᲗᲒᲔᲚᲐᲓ. �›ᲝᲡᲐᲠᲩᲔᲚᲘ ᲘᲣᲠᲘᲓᲘᲣᲚᲘ ᲘᲜᲢᲔᲠᲔᲡᲘ Ა�› ᲨᲔ�›ᲝᲮᲕᲔᲕᲐᲨᲘ ᲪᲮᲐᲓᲘᲐ, �5Ი‹ᲘᲐᲜᲐᲓ Ი5Ი ᲒᲐᲠᲓᲐᲪᲒᲚᲔᲚᲘ ᲞᲘᲠᲘᲡ �›Ი‹Რ, �›ᲘᲡ ᲒᲐᲠᲓᲐᲪᲒᲚᲔᲑᲐ�›ᲓᲔ ᲓᲐᲜᲘᲨᲜᲣᲚᲘ Ი‹Ო ᲡᲐ‹‹ᲔᲓᲠᲝᲡ �›ᲨᲐᲠᲗᲒᲔᲚᲐᲓ. ᲠᲝᲒᲝᲠᲪ ᲜᲐᲗᲔᲚᲡᲐ‹ ᲓᲐ ᲨᲔᲡᲐᲑᲐ�›ᲘᲡ Უ‹ᲤᲚᲔᲑᲘᲗ ᲐᲚᲥᲣᲠᲒᲔᲚᲘ ᲞᲘᲠᲘ, �›ᲝᲡᲐᲠᲩᲜᲔᲥᲡ �›ᲘᲡ ᲒᲐᲚᲓᲔᲑᲣᲚᲔᲑᲐᲓ �›ᲘᲐᲜᲔᲑᲐ ᲡᲐ‹‹ᲔᲓᲠᲝᲡ ᲡᲐᲛᲘᲐᲜᲒᲔ‹ ᲙᲝᲜᲔᲑᲘᲡ ᲨᲔ‹ᲠᲔᲑᲐ, ᲓᲐᲪᲕᲐ ᲓᲐ ᲛᲔᲥᲕᲔᲝ‹ᲠᲔ‹Ს ᲣᲨᲠᲘᲡ, ᲛᲐᲛᲥᲘᲓᲠᲔᲑᲔᲚᲘ ‹ᲘᲜᲡᲢ‹ᲣᲥᲪᲘᲘᲡ ᲨᲔᲡᲐᲑᲐᲛᲘᲡᲐᲓ ᲒᲐᲜᲐᲬᲚᲔᲑᲐ. ᲐᲡᲔᲕᲔ ᲪᲮᲐᲓᲘᲐ ᲓᲐ ᲬᲐᲠᲛᲝᲒᲔᲑ‹Ნ‹ᲚᲘ ᲓᲝ‹ᲣᲛᲔᲜᲢᲔᲑᲘᲗ ᲛᲢ‹ᲘᲪᲓᲔ‹Ა, ᲠᲝᲛ ᲛᲝᲡᲐᲘᲮᲣᲔᲑᲘ ᲮᲔᲚᲡ Უ‹‹ᲚᲘᲐᲜ ᲛᲐᲡ ᲗᲐᲕᲘᲡᲘ ᲣᲤᲚᲔᲑ‹Ს ᲒᲐᲜᲮᲝᲠᲪᲘᲔᲚᲔᲑᲐᲨᲘ ᲓᲐ ᲨᲔᲡᲐᲑᲐᲛᲘᲡᲐᲓ, ᲮᲔᲚᲡ Უ‹‹ᲚᲘᲐᲜ ᲒᲐᲠᲓᲐᲪᲒᲚᲔᲚᲘᲡ ᲣᲐᲠᲜᲐᲡ‹ᲜᲔᲚᲝ ᲜᲔᲑᲘᲡ ᲒᲐᲜᲮᲝᲠᲪᲘᲔᲚᲔᲑᲐᲡ, ᲠᲘᲡ‹ ᲐᲚ‹ᲐᲒᲝᲗᲐᲪ ᲛᲘᲮᲕᲓᲔᲑᲐ Წ‹ᲜᲐᲛ‹ᲓᲔᲑᲐᲠᲔ ᲡᲐᲠᲩᲔᲚᲘᲡ ᲓᲐ‹ᲛᲐ‹ᲝᲤᲘᲚᲔᲑᲘᲡ ᲨᲔᲛᲝᲮ‹ᲔᲕᲐᲨᲘ.

2. ᲠᲝᲒᲝᲠᲪ ᲩᲕᲔᲜᲡ ᲛᲘᲔᲠ ᲬᲐᲠᲛᲝᲒᲔ‹ᲜᲘᲚᲘ ᲛᲢ‹Ი‹Ე‹ᲣᲚᲔᲑ‹ᲓᲐᲜ ᲒᲐᲛᲝ�›ᲓᲘᲜᲐᲠᲔᲝᲑᲡ, ᲐᲠ‹ᲐᲓᲝ (ᲑᲐ‹ᲠᲘ) ᲞᲐᲢᲐᲠ‹Ა‹ᲘᲨᲔᲒᲘᲚᲘ ᲛᲘᲔᲠ ᲛᲘᲡᲘ‹‹Ა ᲡᲘ‹ᲘᲪᲮ‹ᲚᲔᲨᲘ ᲨᲔᲓ‹Ე‹ᲜᲘᲚᲘᲐ ᲓᲐ‹ᲐᲘ‹ᲣᲑᲐ, ᲠᲝᲛᲔᲚᲘ‹ ᲐᲓᲐᲡᲢᲣᲠᲔᲑᲡ ᲛᲝᲡᲐᲠᲩᲔᲚᲘᲡ ᲣᲤᲚᲔᲑᲐᲡ ᲓᲐ ᲒᲐᲚᲓᲔᲑᲣᲚᲔᲑᲐᲡ ᲒᲐᲜᲮᲝᲠᲪᲘᲔᲚᲔᲛ ᲒᲐᲠ‹ᲔᲕ‹ᲚᲘ ᲛᲝ‹ᲛᲥᲔᲓᲔᲑᲐ ᲛᲐᲠᲬ‹ᲣᲜᲔᲑᲚᲘᲡ ᲛᲘᲗᲝᲗᲔᲑ‹Ს ᲨᲔᲡᲐᲑᲐᲛᲘᲡᲐᲓ (ᲡᲐᲛᲝ‹ᲐᲚᲐ‹Ო ᲙᲝᲓᲔᲥᲡᲘᲡ 709 ᲛᲣᲮᲚᲘᲗᲐᲜ ᲒᲐᲗᲕᲐᲚᲘᲡᲬᲘᲜᲔᲑᲣᲚᲘ ᲒᲐᲠ‹ᲘᲒᲔᲑᲐ).

3. ᲓᲐ‹ᲐᲚᲓᲔᲑᲘᲡ ᲮᲔᲚᲨᲔ‹Რ‹ᲚᲔᲑᲘᲡ ᲨᲘᲜᲐᲐᲠᲡᲘᲓᲐᲜ ᲒᲐᲛᲝᲛ‹ᲘᲜᲐᲠᲔ ᲘᲠ‹Ე‹‹Ა, ᲠᲝᲛ ᲒᲐ‹ᲪᲔᲛᲣᲚᲘ ᲒᲐᲜᲙᲐᲠᲒᲣᲚᲔᲑ‹ ᲞᲘᲠ‹ᲐᲓ‹ᲘᲠ ᲓᲐ ᲐᲠᲐᲝᲠᲘᲐᲖᲠᲝᲕ‹ᲜᲐᲓ ᲨᲔ‹ᲠᲔᲑᲐ ᲛᲐᲠᲬ‹ᲣᲜᲔᲑᲚᲘᲡ ᲒᲐᲠᲓᲐᲪ‹ᲒᲚᲔᲑᲘᲡ ᲨᲔᲛᲝᲮ‹Ე‹ᲐᲨᲘ ᲛᲘᲡᲘ ᲙᲝᲜᲔᲑᲘᲡ ᲛᲐᲠ‹ᲕᲐᲚᲡ.

4. ᲡᲐᲛᲘᲥᲐᲚᲐ‹Ო ᲙᲝᲓᲔᲥᲡᲘᲡ 714 ᲛᲣᲮᲚᲘ ᲐᲕ‹ᲚᲓᲔ‹ᲣᲚᲔᲑᲡ Რ‹ᲛᲤᲜᲔᲑ‹ᲔᲚᲡ ᲐᲠ ᲒᲐᲐᲮ‹ᲘᲣᲠᲝᲡ ᲛᲘᲡᲘ ᲡᲐ‹ᲛᲘᲐ‹ᲜᲝᲑᲘ ‹ᲐᲠ‹ᲚᲔᲑᲐᲨᲘ ᲛᲘᲡᲘ‹ᲝᲔᲑ‹ ‹ᲜᲝᲑ‹ᲚᲘ ‹‹ᲐᲥ‹ᲔᲑᲘ, ᲨᲔᲡᲐᲑᲐᲛ‹ᲡᲐᲓ, ᲬᲘᲜᲐᲛᲓᲔᲑᲐᲠᲔ ᲡᲐᲡᲐᲠ‹ᲔᲚᲝ ᲒᲐᲜ‹ᲮᲐ‹ᲔᲑᲘᲡ ᲡᲐᲒ‹ᲜᲘ ᲐᲠ ᲐᲠ‹Ს ᲛᲔᲛ‹‹ᲔᲝᲑᲐ ᲙᲝᲜᲙᲠᲔ‹ᲣᲚᲘ ᲣᲤᲚᲔ‹ᲔᲑ‹Ს ᲓᲐ‹ᲒᲔᲜᲐ, ᲐᲠᲐᲛᲔ‹ ᲛᲘᲡᲘ Ს‹ᲒᲐᲜᲘᲐ Რ‹ᲛᲤᲜᲔᲑ‹ᲔᲚᲘᲡ (Ა‹ᲛᲘᲜᲘᲡᲢ‹ᲐᲢᲝᲠᲘᲡ) ‹ᲤᲚᲔᲑᲔᲑᲘᲡ ᲓᲐ‹‹Დ‹ᲢᲣᲠᲔᲑᲐ. ᲐᲛ‹ᲔᲜᲐᲓ, ᲡᲐᲠ‹ᲔᲚᲨᲘ ᲐᲠ ᲐᲠ‹Ს ᲛᲝ‹ᲛᲔᲑᲣᲚᲘ ᲘᲡ ᲙᲝᲜᲙᲠᲔ‹ᲣᲚᲘ ᲛᲘᲗᲘᲗᲔᲑᲔᲑᲘ, ᲠᲐ‹ ‹Ა‹ᲒᲔᲚᲡ Ი‹Ო ᲛᲐᲠᲬ‹ᲣᲜᲔᲑᲚ‹Ს ᲛᲘ‹Რ.

5. ᲡᲐᲛᲘᲥᲐᲚᲐ‹Ო ᲙᲝᲓᲔᲥᲡᲘᲡ 721 ᲛᲣᲮ‹Ო ᲘᲗ‹ᲐᲚᲘᲡ‹ᲘᲜᲔᲑ‹ ᲛᲐᲠ‹‹ᲣᲜᲔᲑᲚ‹Ს ᲒᲐᲠᲓᲐᲪᲒᲐᲚ‹ᲔᲑ‹Ს ᲨᲔᲓ‹ᲔᲒᲔ‹Ს ᲓᲐ ᲞᲘᲠ‹ᲓᲐᲞᲘᲠ ᲛᲘᲗᲝᲗᲔᲑ‹Ს, ᲠᲝᲛ “ᲓᲐᲕᲐᲚᲔᲑᲘᲡ ᲮᲔᲚᲨᲔ‹Რ‹ᲚᲔᲑᲐ ᲐᲠ ᲣᲥᲕᲔᲓᲐ ᲛᲐᲠᲬᲣᲜᲔᲑᲚᲘᲡ ᲒᲐᲠᲓᲐᲪ‹ᲒᲚᲔᲑᲘᲡ ᲐᲜ ‹‹ᲛᲓᲔᲣᲤᲜᲐᲠᲝ‹ᲘᲡ ᲒᲐᲛᲝ, ᲗᲣ Ს‹ᲒᲐ ᲠᲐᲛ ᲐᲠ ᲐᲠᲘᲡ ᲨᲔᲗᲐᲜᲮᲛᲔᲑᲣᲚᲘ ᲐᲜ Ს‹ᲒᲐ ᲠᲐᲛ ᲐᲠ ᲒᲐᲛᲝ�›ᲓᲘᲜᲐᲠᲔ‹ᲝᲑ‹ ᲛᲘᲜᲓᲝᲑᲘᲚᲝᲑᲘᲡ ᲨᲘᲜᲐᲐᲠᲡᲘᲓᲐᲜ”. ᲠᲝᲒᲝᲠᲪ ᲒᲐᲜᲮᲘᲚᲨᲜ ᲓᲐ‹ᲐᲚᲔᲑᲘᲡ ᲨᲘᲜᲐᲐᲠᲡᲘ ᲓᲐᲬᲠᲘᲚᲔᲑᲘᲗ ᲐᲠᲔ‹ᲣᲚᲘᲠᲔᲑᲡ ᲠᲐ‹ᲛᲤᲜᲔᲑᲚᲘᲡ ‹ᲐᲚᲓᲔᲑ‹ᲚᲔᲑ‹Ს ᲛᲐᲠᲬᲣᲜᲔᲑ‹Ს ᲒᲐᲠᲓᲐᲪᲒᲐᲚᲔᲑ‹Ს ᲨᲔᲛᲝᲮᲕᲔ‹ᲐᲨᲘ. ᲛᲔ‹ᲢᲘᲪ, ᲓᲝᲙᲣᲛᲔᲜᲢᲘᲡ ᲨᲘᲜᲐᲐᲠᲡᲘᲓᲐ‹ ᲒᲐᲛᲝᲛ‹ᲘᲜᲐᲠᲔ, ᲐᲡᲔᲕᲔ ‹ᲘᲜ‹‹ᲜᲐᲓ ᲘᲝ ᲨᲔ‹ᲐᲚᲘ‹ᲣᲚᲘ Ი‹Ო ᲜᲝ‹ᲐᲠᲘᲣᲡᲐᲓ, ᲘᲛ‹ᲘᲡ ᲛᲝᲥᲛᲔᲓ ᲗᲐᲜᲐᲚᲐᲡᲒ‹ᲠᲘᲗᲝᲛ, ᲘᲒᲘ ᲬᲐᲠᲛᲝᲐᲓᲒᲔᲜᲡ ᲡᲐᲐᲜᲒ‹ᲠᲘᲨᲝ ᲒᲐᲜ‹ᲐᲠ‹ᲣᲚᲔᲑᲐᲡᲐ‹, ᲠᲝᲛᲔᲚᲘ‹ ᲗᲐᲜᲐᲮᲛᲐ‹ ᲛᲝ‹ᲐᲠᲩᲔᲚᲘ ‹ᲐᲜᲘᲨᲜᲣᲚᲘᲐ ᲑᲐ‹ᲠᲘ ᲞᲐᲢᲐᲠ‹Ა‹ᲘᲨᲔᲒ‹ᲚᲘ ᲜᲔ‹ᲘᲡ ᲐᲚ‹ᲘᲚ‹ᲠᲥᲒᲔᲚᲐᲓ.

6. ᲡᲐᲛᲘᲥᲐᲚᲐ‹Ო ᲙᲝᲓᲔᲥᲡᲘᲡ 52 ᲛᲣᲮᲚᲘᲡ ᲗᲐᲜᲐᲮᲛᲐᲓ “ᲜᲔᲑᲘᲡ ᲒᲐᲛᲝ‹ᲚᲔᲜᲘᲡ ᲒᲐᲜᲛᲐᲠᲢᲔᲑᲘᲡᲐᲡ ᲜᲔ‹‹ ᲣᲜ‹Ა ᲓᲐ‹‹ᲘᲜᲓᲔᲡ ᲒᲝᲜᲘ‹ᲠᲣᲚ‹ ᲒᲐᲜᲡᲯᲘᲡ Უ‹ᲓᲒᲝᲛᲐᲓ, ᲓᲐ ᲐᲠ‹ ᲛᲐᲠᲢᲝᲝ‹ᲓᲜ ᲒᲐᲛᲝᲗ‹ᲛᲘᲡ ᲡᲘᲢ‹ᲒᲐᲡ‹ᲠᲥ‹ᲘᲗᲝ ᲐᲖᲠ�“‹ᲐᲜ”. ᲨᲔᲡᲐᲑᲐᲛᲘᲡᲐᲓ, ᲛᲘᲣᲮᲔᲓᲐᲕᲐ‹ ᲘᲛᲘᲡᲐ, ᲠᲝᲛ ᲩᲕᲔᲜᲡ ᲛᲘᲔᲠ ᲬᲐᲠᲛᲝᲒ‹ᲜᲘᲚᲘ, ᲒᲐᲠ‹Ა‹ᲒᲚᲔ‹ᲘᲡ ᲛᲘᲔᲠ ᲨᲔ‹ᲒᲔᲜ‹Დ ᲓᲝ‹ᲣᲛᲔᲜᲢᲘ ᲐᲠ ᲣᲚᲝᲓᲔᲑᲐ „ᲐᲜᲒ‹ᲠᲘ“, Მ‹Თ‹Ნ ᲨᲘᲜᲐᲐᲠᲡᲘᲓᲐᲜ ‹ᲐᲛᲝ‹ᲓᲘᲜᲐᲠᲔ, ᲛᲐ‹Ა‹ᲝᲗᲐ‹, “ᲜᲔ‹ᲘᲡ ᲒᲐᲛᲝ‹ᲚᲔᲑᲘᲡ ᲬᲔᲠ‹ᲚᲝᲑᲘ” ᲨᲘᲜ‹ᲐᲠᲡᲘᲓᲐ‹ ᲒᲐᲛᲝᲛ‹ᲘᲜᲐᲠᲔ ᲘᲒᲘ ᲡᲬᲝᲠᲔᲓ ᲐᲜ‹ᲐᲠᲘᲨᲘ ᲬᲐᲠᲛᲝᲐᲓᲒᲔᲜᲡ, ᲡᲐ‹‹Ა ᲛᲝ‹ᲜᲔ‹‹ᲠᲥᲔ ᲙᲝᲜᲙᲠᲔ‹ᲣᲚ ᲓᲐ‹ᲐᲚᲓᲔᲑ‹Ლ ᲐᲛᲝ‹ᲒᲔᲑ Მ‹Ს ᲛᲘᲔᲠ ᲨᲔᲠᲩᲔᲣᲚ ᲞᲘᲠᲡ, ᲠᲐᲪ ᲣᲜᲓᲐ ᲨᲔᲡ‹ᲠᲣᲚᲝᲡ ᲛᲘ‹Ი ᲒᲐᲠ‹ᲐᲪᲒ‹ᲚᲔ‹ᲘᲡ ᲨᲔᲛᲝᲮᲕᲔᲕᲐᲨᲘ. ᲛᲝ‹ᲐᲒᲔᲠ‹Ე ᲙᲝᲜᲙ‹Ე‹ᲣᲚᲐᲓ ᲛᲘᲣᲗ‹ᲗᲔᲑᲡ, ᲗᲣ ‹ᲘᲜ, ᲠᲐ ᲛᲝᲮᲜᲘᲗ ᲓᲐ ᲠᲐ ᲡᲐᲤᲣᲫᲕᲔᲚᲖᲔ ᲣᲜᲓᲐ ᲛᲐᲠᲗ‹ᲘᲡ ᲛᲘ‹Ი ᲙᲝᲜᲔ‹Ა (ᲡᲐᲛ‹ᲒᲘᲓᲠᲝ). ᲨᲔᲡᲐᲑ‹ᲛᲘᲡᲐᲓ, ‹ᲚᲝᲑᲖᲔᲒ ᲙᲔᲘ, ᲬᲐᲠᲛᲝᲒᲔᲒᲜᲘᲚ‹ ᲓᲝᲙᲣᲛᲔᲜ‹ᲔᲑ‹ᲓᲐᲜ, ᲛᲐᲒ. „ᲐᲚ‹Ს‹ᲠᲒᲔᲚ‹Ს Დ‹ᲜᲘᲨᲜᲘᲡ ᲐᲥᲢᲘᲡ“ ᲗᲐᲜᲐ‹ᲛᲐᲓ Დ‹ᲜᲘᲨᲜᲣᲚᲘᲐ ᲡᲬ‹ᲠᲔᲓ ᲐᲜᲒᲐᲠᲘᲨᲘᲡ Ა‹‹ᲘᲡ‹ᲠᲣᲚᲔᲑᲐᲓ. ᲩᲕᲔᲜᲡ ᲛᲘᲔᲠ ᲬᲐᲠᲛᲝ‹ᲒᲔᲜᲘᲚᲘ ᲝᲠᲘ ᲓᲝ‹ᲣᲨᲘ‹‹Ო ᲔᲠᲗᲛ‹ᲜᲔ‹Ს ᲐᲡ‹ᲓᲐ ᲓᲐ ᲜᲐᲗᲔᲚᲐᲓ ᲬᲐᲠᲝ‹ᲐᲓ‹ᲔᲜ‹ ᲛᲐᲗᲝ ᲨᲘᲜᲐᲐᲠᲡᲘᲡ ᲜᲔᲑᲐᲡ – ‹ᲚᲝᲑ‹Გ ᲙᲔᲘᲡ ᲛᲐᲠᲗᲝᲡ, ᲒᲐᲜ‹ᲐᲠ‹ᲝᲡ ᲡᲐ‹‹ᲘᲓᲠᲝ ᲙᲝᲜᲔᲑᲐ, ᲨᲔ‹ᲠᲘᲑ‹Ს ᲘᲒᲘ, ᲒᲐᲘ‹Ა‹ᲣᲛᲘᲠᲝᲡ ᲨᲔ‹Ა‹ᲔᲠᲔ ᲒᲐ‹‹ᲐᲚᲓᲔᲑᲣᲚᲔᲑᲔᲑᲘ ᲓᲐ ᲓᲐᲠ‹Ნ‹ᲜᲔᲗᲘ ᲐᲥᲢᲘᲗᲐ ᲒᲐ‹Ა‹ᲘᲒᲝ ᲛᲔ‹ᲥᲕᲔᲝ‹ᲠᲔᲑᲘᲡ ᲑᲐᲓᲠᲘ ᲞᲐᲢᲐᲠ‹Ა‹ᲘᲨᲔᲒ‹ᲚᲘ ᲜᲔ‹ᲘᲡ ᲨᲔᲡᲐᲑ‹ᲛᲘᲡᲐᲓ. ᲐᲛ‹ᲔᲜ‹Დ, ᲢᲔᲠᲛᲘᲜ‹ᲚᲝᲒᲘᲣᲠᲐᲓ ᲐᲠ ᲐᲥᲢ‹ ᲠᲘᲡᲘᲛᲔ‹‹ᲚᲔᲑᲘᲐ – ᲐᲚᲛ‹Ს‹ᲠᲣᲚᲔᲑ‹Ს, ᲨᲔᲛᲡᲠᲣᲚᲔᲑᲔᲚᲡ, Რ‹ᲛᲤᲜᲔᲑᲚᲡ ᲗᲣ ᲠᲐᲘᲛᲔ Ს‹Ხ‹Ა ᲣᲤᲚᲔᲑᲔᲑᲡ ᲛᲝᲜᲐᲓᲠᲥᲐᲓ ‹ᲚᲝᲑᲖᲔᲒ ᲙᲔᲘᲡ.

მოსარჩელის შუამდგომლობები



მეგობარო, ისტვანცვლი დამტკვნი დორცვლი

განჩხელის ფასი ------------------------------------------------------------------------ ლარი

*(ციფრებით და სიტყვიერად)*

## სასარჩელო მოთხოვნაზე გადახხდილი
## სახელმწიფო ბაჟის ოდენობა 3000 ლარი

*(ციფრებით და სიტყვიერად)*



## შუამდგომლობები სასამართლო ხარჯებთან დაკავშირებით

გთხოვთ, დააკმაყოთ მიიკასუხეს აუნაზღაუროს მოსარჩელეს სასამართლო ხარჯები.

ასევე გაცნობებთ, რომ ვინაიდან აღნიშნული სარჩელი არაქონებრივი ხასიათისაა, სახელმწიფო ბაჟის ოდენობა ასეთი სარჩელის განხილვისთვის პირველი ინსტანციის სასამართლომში შეადგენს 100 ლარს (საქართველოს სამოქალაქო საპროცესო კოდექსის 39-ე მუხლის პირველი ნაწილის თ) ქვეპუნქტი). წინამდებარე სარჩელზე კი ბაჟი გადახდილ იქნა საქართველოს სამოქალაქო საპროცესო კოდექსის 39-ე მუხლის მე-3 ნაწილის ა) ქვეპუნქტის შესაბამისად, რამაც შეადგინა 3000 ლარი. შესაბამისად სახელმწიფო ბაჟი მოსარჩელეს მიერ გადახდილ იქნა 2900 ლარით მეტი ოდენობით, ვიდრე ეს კანონმდებლობითაა დადგენილი. ყოველივე ზემოაღნიშნულიდან გამომდინარე ვშუამდგომლობთ, რათა იმსჯელოთ აღნიშნულ საკითხზე და უკან დაგვიბრუნოდ ზედმეტად გადახდილი სახელმწიფო ბაჟი.

საბანკო ანგარიშის რეკვიზიტები არის შემდეგი:

ბენეფიციარის ბანკი:              სს „ინვესტბანკი", თბილისი, საქართველო

ბანკის კოდი:                        220101710

ბენეფიციარი:                        ჯოზეფ ქეი

ბენეფიციარის ანგარიში №:        36010100777

## სარჩელისათვის თანდართული საბუთების ნუსხა

მასალები და მტკიცებულებები თან ერთვის წელ ოადდაპირულ სარჩელს.

მევიდლია, იანუკალო დანქანთ ფერლთა

...ᲝᲗ ᲗᲣ ᲐᲠᲐ ᲗᲐᲜᲐᲮᲛᲐ, ᲠᲝᲛ ᲡᲐᲡᲐᲛᲐᲠᲗᲚᲝᲛ ᲡᲐᲥᲛᲔ ᲒᲐᲜᲘᲮᲘᲚᲝᲡ ᲖᲔᲐᲘᲠᲘ
ᲛᲝᲡᲛᲔᲜᲘᲡ ᲒᲐᲠᲔᲨᲔ?

ᲓᲘᲐᲮ ☐                                         ᲐᲠᲐ  ☒

### ᲮᲐᲠᲗ ᲗᲣ ᲐᲠᲐ ᲗᲐᲜᲐᲮᲛᲐ, ᲠᲝᲛ ᲬᲔᲠᲘᲚᲝᲑᲘᲗᲘ ᲒᲐᲡᲐᲚᲔᲑᲘ ᲛᲘᲘᲦᲝᲗ ᲔᲚᲔᲥᲢᲠᲝᲜᲣᲚᲘ ᲤᲝᲡᲢᲘᲡ ᲛᲔᲨᲕᲔᲝᲑᲘᲗ?

ᲓᲘᲐᲮ ☐                                         ᲐᲠᲐ  ☒

„7" „ᲛᲐᲘᲡᲘ" 2008  წ.



თბილისის საქალაქო სასამართლოს
სამოქალაქო საქმეთა კოლეგიის მოსამართლეს,
ქ-ნ დიანა ბერექაშვილს

მოსარჩელე ჯოზეფ კეის
წარმომადგენლის ქეთევან ქვარცხავას
მისამართი: თბილისი, გუდიაშვილის მოედანი
№4 ტელ: 899 51 01 09, ელ-ფოსტა ketti@blc.ge

**განცხადება**
2008 წლის 14 მაისის განჩინების შესრულება

მოგახსენებთ, რომ თქვენს მიერ 2008 წლის 14 მაისის საქმეზე №2/1597-08 გამოტანილი განჩინების თანახმად დაგევევალა მოპასუხეების ია პატარკაციშვილის და ლიანა ჟმუტოვას მიმართ სასამართლოში სარჩელის აღძერა.

მოგეხსენებათ, ჩვენს მიერ 2008 წლის 7 მაისს მოსარჩელე ჯოზეფ კეის მიერ თბილისის საქალაქო სასამართლოს სამოქალაქო საქმეთა კოლეგიაში შემოტანილია სასარჩელო განცხადება მოპასუხე ინა გუდავაძის მიმართ, რომლითაც მოსარჩელე ითხოვს მის აღიარებას სამკვიდროს მმართველად და მისი მოვალეობების შესრულებისას ხელშეშლის აღკვეთას. თქვენ განჩინების პასუხად, 2008 წლის 23 მაისს შევიტანეთ იგივე სარჩელი დაზუსტებული სახით (სარჩელი, სასამართლოს სარეგისტრაციო ნომერი 23356), სადაც მოპასუხეებად ასევე ჩართულია ია პატარკაციშვილი და ლიანა ჟმუტოვა. გთხოვთ მიიღოთ აღნიშნული სარჩელი წარმოებაში, გაითვალისწინოთ, რომ პირველ სარჩელთან ერთად შემოტანილი დანართები და მტკიცებულებები ასევე ვრცელდება მოცემულ სარჩელზე და ჩათვალოთ თქვენი განჩინებით გათვალისწინებული დავალება შესრულებულად.

პატივისცემით,

ქეთევან ქვარცხავა

2008 წლის 28 მაისი

**Exhibit G**

<u>IN THE SUPREME COURT OF GIBRALTAR</u>
<u>CHANCERY JURISDICTION</u>

2008 M No

**IN THE MATTER** of the Civil Procedure Rules, Part 64, Section 1

and

**IN THE MATTER** of the Trustees Act

and

**IN THE MATTER** of the trusts known as The Valmore Trust and The Summit Trust

**BETWEEN**

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**

<u>Claimants</u>

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**

<u>Defendants</u>

---

FIRST WITNESS STATEMENT
OF ANDREW JOHN BAKER

---

I, Andrew John Baker of Runkelsstrasse 37, Triesen, FL-9495, Liechtenstein hereby state as follows:

1.  I am a Solicitor of the Supreme Court of England & Wales and managing director of Miselva Establishment of Josef Rheinberger Strasse 29, Vaduz, FL-9490, Liechtenstein ("Miselva"), a professional Liechtenstein trust company. I am also a principal in Nexus Treuhand AG of Zuercherstrasse 61, CH-7320 Sargans, Switzerland ("Nexus"), a professional Swiss trust company. I am responsible for the administration of all trusts of which Nexus acts as trustee.

2.  I make this Statement in support of the Applications by Miselva and Nexus to the Supreme Court of Gibraltar in the matters of the Valmore Trust and the Summit Trust respectively, both of which are governed by the laws of Gibraltar. As will become apparent, a further trust currently named the Nile Trust is of relevance to these Applications, as is a Liechtenstein establishment called Jorum Establishment ("Jorum").

3.  Attached hereto as Exhibit "AJB1" is a schedule containing a list of the individuals, companies and other entities referred to in this statement together with a chronology of events pertaining to the Valmore Trust, the Summit Trust, the Nile Trust and Jorum so far as relevant to this application. I am still in the midst of some of these events (e.g. corporate acquisitions and restructuring) which have not been completed due to the death of Arkady Patarkatsishvili (as described below).

4.  For the purposes of this statement I shall adopt the abbreviations used in Exhibit "AJB1".

5.  I arranged for the establishment of both the Valmore Trust and the Summit Trust upon the request and instruction of David Ashfield ("DA") (as is further described below). I believe DA to be the Chief Financial Officer of London International Bank Limited ("LIB") of 11 Grosvenor Place, London. I have known DA since 03.02.2006 when, upon the invitation and recommendation of Hypo I met him in Vaduz together with Ali Guidfar ("AG") the Chief Executive Officer of LIB. At that time, they requested me to arrange via Miselva for the incorporation of two Liechtenstein establishments

2

called Sada Establishment ("Sada") and Jorum, both ostensibly for and on behalf of Joseph Kay ("JK") whom, I was led to believe, was the man behind LIB and whom DA and AG were representing at our meeting. I recall asking the managing director of Hypo how JK made his money and being told that he had earned a sizeable commission in respect of a sale of shares in the Russian oil company Sibneft.

6.      I was informed by DA and AG at our first meeting that both Jorum and Sada would initially be owned formally by JK but that one of the Establishments would, in due course, be owned by or on behalf of JK's cousin Arkady Patarkatsishvili (who was also known as "Badri") a very prominent Georgian business tycoon. I recall asking DA about AP in view of the latter's status as a fugitive from Russia and I recall his response that he had obtained legal advice from a well-known London law firm to the effect that AP was in a very similar position to Boris Berezovsky whom the UK authorities had declined to extradite to Russia due to the political nature of the allegations against him. Like Berezovsky, AP had made most of his money out of selling his shares in Sibneft. In accordance with Liechtenstein's 'Due Diligence' law, AG acted as Miselva's contractual partner and signed Miselva's form F2 confirming that JK was the initial beneficial owner of Jorum and Sada. The Establishments were incorporated by Miselva on 06.02.2006. Pursuant to common practice, Miselva acted as founder of the two establishments and signed Deeds of Assignment of the founder's rights in blank. These were sent by courier to DA in London for safe-keeping. Copies of the F2 forms and the signed Deeds of Assignment are attached as Exhibit "AJB2".

7.      In February 2006 I learned from DA of the intention that four or five new UK holding companies should be incorporated as part of a restructuring of an existing group and that these UK companies should be held by a discretionary trust, the first intended beneficiary of which would be David Aim of 70 Walton Street, London. After certain discussions and correspondence with DA and with professionals in London and Luxembourg, I received instructions from DA on 01.03.2006 to proceed with the establishment of the trust, the chronology of which is as follows:

   a.  The Fisher Trust was formed by declaration of Trust on 01.03.2006 with Miselva as trustee and Fallon Invest & Trade Inc ("Fallon") acting as protector. It is discretionary in form giving the trustees wide dispositive powers in favour of a

3

class of "Beneficiaries" with a default trust in favour of charity. The Trustee has power (with the Protector's consent) to add and remove persons from the class of beneficiaries. Initially, the International Red Cross was the only named beneficiary.

b. On 02.03.2006 Miselva as trustee of the Fisher Trust, with the consent of the Protector, resolved to appoint an individual called David Aim as a beneficiary of the Fisher Trust and to accept as trust assets the shares in four empty UK shelf companies which were due to be transferred to it. The four companies were in the process of changing their names to Fisher Island Limited, LIB Holdings Limited, Georgian Steel Limited (whose name has now been changed to Thames Steel UK Ltd) and Grosvenor Trading House Limited respectively.

c. On 07.04.06 Miselva resolved to accept as a trust asset the shares of a UK company called Freshname no.350 Ltd (name subsequently changed to Chapel Street Construction Limited).

d. The share of LIB Holdings were not, ultimately, contributed to the Trust and this was duly recorded in a Trustee Minute dated 15.05.2006.

e. On 16.05.2006 the International Red Cross was removed as a beneficiary of the Fisher Trust.

f. On 01.10.2006 David Aim was removed as a beneficiary and Sada was appointed as a beneficiary of the Fisher Trust. On the same date, the name of the trust was changed to the Valmore Trust.

g. On 22.03.2007 Sada was removed as a beneficiary of the Valmore Trust and JK signed an assignment of the founder's rights pertaining to Sada in favour of Miselva, so that Miselva could take it 'onto the shelf' for possible re-sale to a future client. Sada's involvement in this matter thus came to an end. The result of this was that the Trust had no named Beneficiaries, although the Trustee's power to add Beneficiaries remained.

4

h. On 22.03.2007 JK signed a Letter of Wishes in relation to the Valmore Trust, specifying himself and his family as the intended beneficiaries.

i. On 18.03.2008 Fallon (as protector of the Valmore Trust) wrote to Miselva requesting it to resign as trustee and informing Miselva that it would be appointing MP, a New York attorney, as the new trustee. Miselva has not at this time resigned as trustee.

Copies of the Declaration of Trust and the other documents referred to in this paragraph are attached as Exhibit "AJB3".

8.   Until very recently, I believed and had no reason to believe otherwise that the Valmore Trust was intended to benefit JK and his family.

9.   The protector of the Valmore (previously Fisher) Trust has always been Fallon, a British Virgin Islands company which Miselva acquired off the shelf on the instructions of DA. The directors of Fallon are DA and AG although they have signed resignations in blank, the originals of which are held by or for JK. DA and AG have signed an undertaking to the effect that as directors of Fallon they will not exercise Fallon's powers as protector without JK's prior written consent. The shareholder of Fallon is Miselva but it has signed a share transfer in blank, the original of which is held by or for JK. Copies of documents pertaining to Fallon are herewith in a bundle as Exhibit "AJB4".

10.  In early December 2006 I was informed that ownership of the founder's rights in Jorum would pass to AP and I duly received from AG, as Miselva's contractual partner, a replacement 'Due Diligence' form F2 showing AP as the new beneficial owner of Jorum. Copies of the correspondence and the new form F2 are herewith as Exhibit "AJB5".

11.  The Summit Trust was established by Declaration of Trust dated 20th April 2007 by Nexus. I recall discussing with DA whether I could propose a solution whereby a trustee other than Miselva would be appointed but the administration of the trust and its underlying companies would still be within my control. I understood the reason for

this request to be a desire not to have all one's eggs in a single basket. I proposed using Nexus and this was agreed. I understood the purpose of a second trust to be a desire to keep certain underlying assets separate from others. The chronology of the Summit Trust is as follows:

a.  On 20.04.2007 the Trust was formed by Declaration of Trust by Nexus. Fallon was appointed as the Protector. It was in identical terms (mutatis mutandis) to Valmore Trust.  The directors of Fallon gave a similar undertaking to JK as referred to in paragraph 9 above in relation to the Valmore Trust.

b.  On 20.04.2007 JK signed a letter of wishes in relation to the Summit Trust, specifying himself and his family as the intended beneficiaries.

c.  On 20.04.2007 the trustee resolved to accept the shares of Talladega Invest. Corp (a BVI company) as a trust asset. During the course of the next few months the shares in Barbary Invest Ltd, Dagenham Properties Ltd, Shaftsbury Trading Limited, Allied Partners Investments Limited and Golden Palace Ltd were transferred from Finsbury Trust (Gibraltar) to Nexus as trustee of Summit Trust.

d.  On 07.06.2007 the International Red Cross was removed as a Beneficiary. The result of this was that the Trust had no named Beneficiaries although the Trustee's power to add Beneficiaries remained.

e.  On 18.03.2008 Fallon (as protector) wrote to Nexus requesting it to retire as trustee and informing Nexus that it would be appointing Moshe Popack ("MP") (who is an attorney in Florida and a nephew-in-law of JK) as the new trustee.

f.  On 26.03.2008 Fallon retracted its request to the trustee to resign. Nexus has not at this time resigned as Trustee.

Copies of the Declaration of Trust and the other documents referred to in this paragraph are herewith in a bundle as Exhibit "AJB6".

12.    Until very recently, I believed and had no reason to believe otherwise that the Summit Trust was intended to benefit JK and his family.

13.    At the request of LIB, on 1st July 2007 Miselva was appointed as trustee of the Nile Trust (originally known as the Octopus Settlement) which had originally been established in Gibraltar on 25.07.2000. AP is the sole named Beneficiary.

14.    I turn now to the role of LIB. Since LIB Holdings Ltd was excluded (on 15.05.2006) as an asset of the then Fisher and now Valmore Trust, I have believed that LIB has been owned directly or indirectly by JK. I also believe that JK is the non-executive chairman of LIB. AG is the CEO, DA the CFO and Daniel Lam ("DL") the financial controller. LIB appears to have two functions, first as an investment trader and second as a sort of family office for JK and for AP. I have been unable to check the complete records of the two trusts but my recollection is that all requests, guidance and instructions to Miselva and /or Nexus in relation to any and all trusts and companies that we have set up and/or administer for or on behalf of JK, AP or their respective families have come from or been conveyed to us by LIB. I believe that LIB has been keeping management accounts in relation to various companies whose shares are owned by the Valmore and Summit Trusts and the subsidiaries of those companies, although I have not received copies despite a number of recent requests in this regard. To my knowledge, whenever guidance was needed from JK or AP personally, one of the LIB personnel would contact someone in what was known to me as the "private office" (principally an individual called Natalia Shachkova). Sometimes, requests or instructions would be signed by JK or AP personally and at other times a company called Lakebrow Limited would make the request or give the instruction, with one or both of JK and AP signing. Together LIB and I have been arranging over the past two years  for the transfer to Miselva or Nexus of the ownership and administration of numerous companies from their existing administrators and for the appointment of myself as the sole director of such companies wherever possible. Most of these companies are owned by one of the Valmore, Summit or Nile Trusts, or by Jorum. It was my clear understanding that part of LIB's job was to look after not only JK's business but also AP's. To my knowledge this entailed keeping track of payments into and out of the bank accounts of myriad companies and preparing inter-company loan notes where necessary. Attached in a bundle as Exhibit "AJB7" are copies of certain

7

correspondence which goes to show how the cooperation between LIB and myself typically worked. The first ones, all dated 05.12.2006, relate to a loan that Montglimmer Overseas Ltd. (then owned by AP now owned by Jorum) was asked to make to Coalco International Limited. One can see that Natalia Shachkova from the 'private office' is first in touch with DA who then sends on the draft loan agreement to myself (as a director of the company concerned in the transaction), at the same time confirming the 'normal procedure' for funds transfer. DA then sends to me a transfer request signed by himself, followed by the same request signed by JK and a letter of authorization signed by AP. An e-mail to me from DL dated 20.06.2007 goes to show how LIB were involved in investments for JK and AP and that JK did sometimes 'front' investments on behalf of AP. Finally, there is a letter dated 22.01.2008 from JK to Mr. William Cid De La Paz at Finsbury Trust in Gibraltar in which JK requests and instructs them to cooperate with myself in transferring the administration of various companies to Miselva.

15.    In mid-December 2007 a proposal was made by Emanuel Zeltser ("EZ"), a lawyer acting for JK, to insert an American holding company between Miselva as trustee of the Valmore Trust and the then top layer of existing holding companies, being Fisher Island Ltd, Thames Steel UK Ltd, Grosvenor Trading House Ltd, Chapel Street Construction Ltd, Chester Street Enterprises Ltd and Paua Enterprises Ltd., all of these being UK companies. Pursuant to advice from EZ and at the request of JK, the proposal was implemented by lawyers Stevens & Bolton with advice from accountants PKF. Pursuant to these arrangements, the Sale and Purchase Agreements for the shares in the said UK companies were signed on 31.12.2007 between Miselva and the new US holding company JWL Entertainment Group Inc. ("JWL") with share transfers being signed by Miselva in respect of the six subsidiaries. It was my clear understanding that Miselva should be receiving 100% of JWL's shares but when I eventually received a copy of the JWL share certificate by e-mail, I saw that Miselva was apparently the registered holder of only 199 out of 200 authorised shares. I am uncertain whether there are only 199 issued shares and am currently trying to resolve this question. Copies of the Sale and Purchase Agreements and related share transfers are herewith as Exhibit "AJB8".

16. AP passed away on 12th February 2008. The following day DA called to say that I must come to London to see JK as soon as possible. Accordingly, I travelled to London in the early morning of 14th February. I saw JK only fleetingly for about 10 minutes and passed on my condolences. He told me that he was AP's executor and that he must immediately gain control of all AP's assets. We did not have time to discuss any matter in any detail. Shortly thereafter, I met EZ in person for the first time. He confirmed that JK was AP's duly appointed executor and a very dear and close friend of AP's family. We discussed Jorum Establishment and the Nile Trust. He spoke of a Will that AP had apparently signed in November 2007 in New York and assured me that I would receive a copy. I said that it would be necessary for JK to have his appointment officially confirmed by the relevant court before I would be able to act on his instructions in relation to Jorum. I also said that the assets of the Nile Trust would not fall within AP's estate. He informed me that JK must do all he could to protect and gain control of all AP's assets so as to avoid them falling into the wrong hands. I said that I would want to cooperate in order to try and ensure this too, but he must understand that things would have to be done properly. Having heard my comment about the trust assets not forming part of AP's estate, EZ said words to the effect that "we will have to forget about the trust then and concentrate on the company". As I recall, we also discussed the ownership of Jorum and he indicated that since there was an assignment of the founder's rights in blank, he or anyone could put their name in the certificate and thus be the owner. I said this was not so under Liechtenstein law and that AP would need to have specifically assigned the rights to a third party. EZ then left with JK to go and visit Inna Gudavadze ("IG"), the widow of AP, and that was the last I saw of them that day. I returned to Liechtenstein in the evening of the same day.

17. On 20.02.2008 I participated in a telephone conference call with DA and EZ in which EZ asked DA to read out to me a document which purported to appoint JK as AP's executor but nothing more. We again discussed the Nile Trust and again I said that it would not be part of AP's estate.

18. On 04.03.2008, I had a lengthy meeting in Vaduz with DA, EZ and EZ's lady companion Vladlena Funk. We tried to find a solution whereby JK could be appointed to assist the trustee of the Nile Trust and the director of Jorum to protect their

9

respective assets without acting improperly. EZ showed me on the screen of his laptop a document entitled "Letter of Wishes" which he said had been signed by AP on 14.11.2007 in New York in front of an independent notary and two independent witnesses. I insisted on receiving a copy of the document, which EZ then printed out and handed to me (attached as Exhibit "AJB9"). It is a most curious document consisting of 4 or so pages which do not appear to fit together properly. It refers to "confidential memoranda" which EZ declined to show me. I said that without knowing who were the intended beneficiaries said to be listed in one of the confidential memoranda and without seeing a properly certified copy of the document, EZ should not seriously expect me to act. At one stage, EZ suggested that he and I should have a moment alone. I declined. I sincerely believe that he was intending to offer me a bribe to buy my cooperation. The meeting ended when I refused to issue a general power of attorney to JK or to condone a transfer from the account of Courtvale Holdings Limited (a BVI company now owned by Jorum) of approximately USD 21 million to JK's personal account or, or alternatively, of USD 7.1 million to EZ's "escrow account" as he described it.

19.    Courtvale Holdings Limited had previously been owned by nominees for JK personally and he had been the sole director and sole signatory on its bank account at Hypo. On 29.01.2008, however, JK resigned as a director, appointed me as the sole director, and caused the Courtvale shares to be transferred to Miselva. On 03.03.2008 JK instructed Miselva to hold the Courtvale shares on trust for Jorum and accordingly a declaration of trust was executed on that date. On 13.02.2008 (just one day after AP's death) JK requested me to transfer to Courtvale's account all of the credit balances on the Hypo bank accounts of Jorum's subsidiaries. I complied with his request as I was satisfied that Courtvale would hold these funds as nominee for Jorum and AP's family. In order properly to protect Jorum's assets, I appointed myself as joint signatory on Courtvale's bank account on 18.02.08 and therefore my signature was needed in respect of any transfers after that date. I did counter-sign various transfer instructions from JK which related to payments that appeared to be for the benefit of AP's family members but I refused to counter-sign JK's instruction of 03.03.2008 for the transfer of USD 21,275,000 to his personal account and this contributed to a deterioration of our relationship. On 05.03.2008 LIB sent a letter to Hypo objecting to my refusal to counter-sign JK's instruction of 03.03.3008 and

requesting a payment from Courtvale's account of USD 23 million to LIB's account with KAS Bank at JP Morgan Chase. LIB had no standing in relation to Courtvale and had no right to give instructions to Courtvale's bankers. Hypo declined to follow the instruction. On 07.03.2008 I wrote to AG at LIB in an effort to find a solution to the situation but as time went on my concerns only increased (as to which see below) and on 19.03.2008, in my capacity as sole director of Courtvale, I removed JK as a signatory on Courtvale's bank account. On 20.03.2008 LIB withdrew its request to Hypo to make the USD 23 million transfer. Copies of corporate documentation pertaining to Courtvale and of the letters and other documents referred to in this paragraph are herewith as Exhibit "AJB10".

20.    On 10.03.2008 Miselva received a letter from CJZ Group Inc. ("CJZ"), of which JK is, I understand, the chairman, with which was enclosed a copy of the Deed of Assignment of the Jorum founder's rights with the name of CJZ inserted as the assignee. On 21.03.2008 I received a further e-mail and letter from CJZ in which it purported to replace me and Miselva as "trustee" of Jorum by MP. On 25.03.2008 I wrote to CJZ informing them that I was not in a position to accept their instructions to which they responded on 26.03.2008. Copies of the correspondence and documents referred to in this paragraph are herewith as Exhibit "AJB11".

21.    On 12.03.2008 EZ was apparently arrested in Minsk on charges of using forged documents as detailed in the Verified Complaint filed in New York by AP's family (referred to below).

22.    On 17.03.2008 I received from an Israeli lawyer called Zvika Barak ("Barak") an e-mail concerning Paua Enterprises Ltd ("Paua"), a UK company (referred to above) that, until 31.12.2007, had been owned as to 50% by Miselva as trustee of the Valmore Trust and as to the other 50% by Jorum and, after 31.12.2007, as to 50% by JWL and as to the other 50% by Jorum. Barak and I are the directors of Paua. Barak's email made me aware for the first time that he had committed Paua to an investment in the aggregate amount of USD 84 million in a joint venture project in Israel. He was aware of the death of AP and was asking me to make funds available so that Paua could fulfil its contractual obligations in respect of the project. He wrote that he had signed the contract in AP's name (through Paua) and that AP assured him in a personal meeting a

week before AP's death that the investment would go according to plan. I met with Barak on 20.03.2008 in London and conveyed to him my surprise and annoyance at his actions without my knowledge. I also told him that neither Jorum nor Valmore Trust had sufficient cash to make the sort of payments he was looking for. I suggested that he speak to JK to see if he could find sufficient cash elsewhere. Barak told me that JK was irrelevant. He (Barak) had dealt only with AP about this investment and AP alone had attended meetings with the relevant persons in connection with the project. I found this most surprising since I had thought that JK was indirectly involved (via Valmore) in the project to the extent of 50%. On 03.04.2008 I wrote to Barak giving him my views and then met with him together with Dr. Ralph Wanger of Batliner Wanger Batliner at their offices in Vaduz on 07.04.2008. At that meeting, Barak said he was representing JK with respect to Jorum, and claimed that both JK and AP had been involved in the project and, further, that Jorum belonged to JK in any event. I disputed this. Barak also said that he had actually come to Vaduz to commence proceedings against me in respect of Jorum for losses amounting to hundreds of millions of Dollars but, when pressed as to what these might be, declined to comment. Copies of the correspondence mentioned in this paragraph are herewith as Exhibit "AJB12".

23.    On 18.03.2008 I received letters from Fallon addressed to Miselva and Nexus in which Fallon as protector of the Valmore and Summit Trusts requested their resignation as trustees and the appointment of MP as the new trustee. Upon my enquiry to DA, I learned that MP is apparently an attorney at law admitted to practise in Florida and the nephew-in-law of JK. On 31.03.2008 I received a letter from Fallon dated 26.03.2008 addressed to Nexus in which it retracted its letter of 18.03.2008 and confirmed that Nexus should continue as trustee of the Summit Trust until further notice. This was because negotiations were well advanced between LJB, Nexus and various others for the granting of a loan by Barclays Marine Finance to Seasing Limited, a Jersey company that is owned by a BVI company, Allied Partners Investments Ltd, which, in turn is owned by Nexus as trustee of the Summit Trust. The security for the repayment of the loan was and is a marine mortgage over a ship owned by Seasing Limited named MY Electra's. It was my clear understanding that this vessel was always intended to be used exclusively by JK and family and his guests and not by AP and his family and guests. DA in particular had asked me and Nexus to remain involved in

the negotiations so as to bring the loan to a swift conclusion. DA told me the reason for the loan was to resolve an acute cashflow crisis within the groups of companies headed by the Valmore and Summit Trusts.

24.   On 27.03.2008, I met with DA, MP and an associate working with MP's law firm at which we discussed in general terms the procedure to be followed upon a change of trustees. I was informed that MP would not in fact be the new trustee and that he was in the process of having a new BVI company set up for the purpose. It was agreed that he would let me have the details of the new company as soon as possible. In the event, I received notification of the identity of the new company on 14.04.2008. At our meeting, I agreed to be responsible for the drafting of the Deeds of Removal and Appointment of Trustees which would inter alia contain suitable indemnities. It was quite clear to me during our said meeting that MP and his assistant, despite being perfectly affable young gentlemen, had little or no experience of acting as trustees. MP has continued to press the directors of Fallon and me for the change of trustees to take place

25.   On 14.03.08 PHB as English solicitors for Miselva wrote to Lord Goldsmith QC of Debevoise & Plimpton LLC ("D&P"), acting for members of AP's family in order to arrange a meeting regarding the Nile Trust. This meeting took place at PHB's offices on 20.03.08 attended by IG, the 2 daughters of AP and IG, Iya Patarkatsishvili ("IP") and Liana Zhmotova ("LZ") (and her husband Alex Zhmotov) representing AP's family, myself representing Miselva, Christopher Sly a partner at Payne Hicks Beach ("PHB") and Lord Goldsmith QC and an associate from D&P. From comments made at that meeting the family clearly were well aware of certain assets held under the Valmore Trust (such as the Fisher Island development) which would be unusual if AP had had no interest in them. By a subsequent email from D&P to PHB on 03.04.2008, to which I replied on the same day, I was put on notice that AP's family believed they had a claim over some or all of the assets which I knew to be contained within the Valmore Trust and that they may have a claim over some or all of the assets in the Summit Trust

26.   On 04.04.2008 I received a copy of a letter addressed to Christopher Sly at PHB from D&P, in which were set out certain claims of IG, IP and LZ in respect of certain assets

belonging to the Valmore Trust together with a general claim to the effect that any and all assets said to belong or be held for JK should in fact be held for or on behalf of AP's estate. A copy of this letter and the e-mails referred to in paragraph 25 above are contained in Exhibit "AJB13"

27.    On 08.04.2008 I received a copy of a Verified Complaint filed in New York on 04.04.2008 on behalf of IG, IP and LZ against JK and EZ. This is copied as Exhibit "AJB14"

28.    I am also aware of publicity in the Georgian media about the conflict between AP's family and JK. Examples obtained from the internet are attached as Exhibit "AJB15".

**Conclusion**

29.    In the circumstances, there appears to be a serious question as to the true beneficial ownership of all or some of the assets held under the Valmore Trust and the Summit Trust, there being a real possibility that they were owned by or ought to be held on trust for, AP and/or his family. The actions taken by JK and his associates since AP's death (in particular, attempts to move substantial sums of money to private accounts and the apparently false assertions of acting on behalf of AP's estate) serve only to heighten the concerns. As the person responsible for the administration of the Valmore Trust and the Summit Trust by Miselva and Nexus respectively, I have further concerns about their replacement as trustee by a new BVI company run by inexperienced persons where its director is the nephew-in-law of JK and JK directly controls the actions of the protector of both trusts. There is a serious risk that if the court does not intervene the present trustees will be removed to the detriment of persons who may be interested in the trusts.

30.    For the reasons set out above, the trustees consider that directions need to be sought from the Court in the terms set out in the Claim Form herein to resolve the dispute concerning the rival claims to the assets of the Valmore and Summit trusts being made by JK and AP's widow and daughters. The trustees wish to ensure that the rival claims which are being made can be properly advanced and resolved before this Honourable Court.

31.   Clauses 18.1 and 18.2 of each of the declarations of trust establishing The Valmore Trust and The Summit Trust provide as follows:

> "*18.1*   **THE** *proper law of this Settlement shall be that of Gibraltar and all rights under this Settlement and its construction and effect shall be subject to the jurisdiction of and construed according to the laws of Gibraltar.*
>
> *18.2*   *The courts of Gibraltar shall be the forum for the administration of these trusts.*"

32.   A Claim Form has been issued and will be served on the First, Third and Fourth Defendants who are domiciled in England.

33.   Given that the Second Defendant is claiming that he has a claim to the assets held by the said trusts (as an intended beneficiary), he is a proper and/or necessary party to these proceedings. As far as I am aware, the Second Defendant is domiciled in 6 Wright Drive, Dix Hills, New York, 11746, outside the jurisdiction of this Court. I also understand that the Second Defendant has a residential address in England as follows: 70 Walton Street, London, SW3 2HH, from which I understand that post is collected every day.

34.   Fallon is a company incorporated in the British Virgin Islands with registered office address Pasea Estate, Road Town, Tortola, British Virgin Islands, VG 1110 outside the jurisdiction of this Court. As stated in paragraph 9 above, JK has effective control of Fallon which has already requested the resignation of the trustees.    The trustees have not, however, been dismissed pursuant to the trust deeds. In the light of JK's conduct so far as set out above, the Claimants fear that Fallon might use its powers of dismissal to thwart the First, Third and Fourth Defendants' claims being properly advanced: see in particular an e-mail received from DA on Friday 18th April at 18:15 a copy of which is herewith as Exhibit "AJB 16".   An order is therefore sought suspending the Fifth Defendant's powers in respect of the Summit and Valmore Trusts under clauses 13.1 and 13.2 (to appoint new or additional trustees), clause 14 (to

remove trustees) and clause 16.2 (to nominate successor protectors).   This would enable that rival claims can be progressed fairly.   The Fifth Defendant is therefore a necessary and/or proper party to these proceedings.

35.     For the above reasons, I consider that there is between the Claimants and the First, Third and Fourth Defendants (as well as the other Defendants) a real issue which the Claimants can reasonably ask the Court to try.   Further, I am advised and believe that the Claimants have a proper basis upon which to seek the directions of the court and other relief sought in the claim form.

## STATEMENT OF TRUTH

I believe that the facts stated in this Witness Statement are true.

Dated 20th day of April 2008

Signed:     ........................................

Andrew John Baker

This Witness Statement is filed by Messrs Hassans of 57/63 Line Wall Road, Gibraltar, Solicitors for the Claimants.

1

**IN THE SUPREME COURT OF GIBRALTAR**
**CHANCERY JURISDICTION**

2008 M No

**IN THE MATTER** of the Civil Procedure Rules, Part 64, Section 1

and

**IN THE MATTER** of the Trustees Act

and

**IN THE MATTER** of the trusts known as The Valmore Trust and The Summit Trust

**BETWEEN**

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**

<u>Claimants</u>

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**

<u>Defendants</u>

EXHIBIT "AJB1"

This is the Exhibit "AJB1" referred to in the Witness Statement of ANDREW JOHN BAKER dated this 20ᵀʰ day of APRiL 2008

<u>IN THE SUPREME COURT OF GIBRALTAR</u>
<u>CHANCERY JURISDICTION</u>

2008 M No

**IN THE MATTER** of the Civil Procedure Rules, Part 64, Section I

and

**IN THE MATTER** of the Trustees Act

and

**IN THE MATTER** of the trusts known as The Valmore trust and The Summit Trust

**BETWEEN**

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**

<u>Claimants</u>

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**

<u>Defendants</u>

--------------------------

Chronology and dramatis personæ

--------------------------

Abbreviations:

| | | | |
|---|---|---|---|
| AB | = | Andrew Baker | Deponent, MD of Miselva |
| AG | = | Ali Guidfar | CEO of LIB |
| AP | = | Arkady Patarkatsishvili (now deceased) | |
| AZ | = | Alex Zhmotov | Son-in-law of AP |
| B? | = | Baruch ? | NY attorney, colleague of MP |
| Barak | = | Zvika Barak | Israeli lawyer, and a director of Paua Enterprises Ltd |
| DA | = | David Ashfield | CFO of LIB |
| DL | = | Daniel Lam | Financial comprtoller LIB |
| D&P | = | Debevoise & Plimpton LLC | Lawyers for IG, IP, LZ |
| EZ | = | Emanuel Zeltser | Lawyer for JK |
| Fallon | = | Fallon Invest & Trade Inc. | Protector of Valmore and Summit Trusts |
| Hypo | = | Hypo Investment Bank (Liechtenstein) AG | |

| | | | |
|---|---|---|---|
| IG | = | Inna Gudavadze | Widow of AP |
| IP | = | Iya Patarkatsishvili | Daughter of AP and IG |
| JK | = | Joseph Kay | Step-cousin of AP |
| LIB | = | London International Bank Ltd | |
| LZ | = | Liana Zhmotova | Daughter of AP and IG |
| Miselva | = | Miselva Etablissement | Trustee of Valmore and Nile Trusts |
| MP | = | Moshe Popack | NY attorney, nephew-in-law of JK |
| Nexus | = | Nexus Treuhand AG | Trustee of Summit Trust |
| PHB | = | Payne Hicks Beach | Lawyers for Miselva and Nexus |
| S&B | = | Stevens & Bolton | Corporate lawyers for LIB |
| STI | = | Simply Trading Inc. | A BVI company, former trustee of Nile Trust |

| | |
|---|---|
| 25.07.2000 | Nile Trust (originally Octopus Settlement) established. |
| 03.02.2006 | Meeting between AB, DA and AG at Hypo when instructions given to form Jorum Establishment and Sada Establishment |
| 06.02.2006 | Incorporation of Jorum Establishment |
| 06.02.2006 | Incorporation of Sada Establishment |
| 01.03.2006 | Valmore Trust (originally Fisher Trust) established, Miselva as trustee, Fallon as protector |
| 02.03.2006 | Miselva resolves to accept as assets of the Fisher Trust the shares of Fisher Island Ltd, LIB Holdings Ltd, Georgian Steel Ltd (name subsequently changed to Thames Steel UK Ltd) and Grosvenor Trading House Ltd, all UK companies |
| 07.04.2006 | Miselva resolves to accept as an asset of the Fisher Trust the shares of Freshname no. 350 Ltd (name subsequently changed to Chapel Street Construction Ltd), a UK company |
| 15.05.2006 | Miselva resolution, noting that LIB Holdings Ltd excluded from the companies whose shares were accepted as assets of the Fisher Trust |
| 16.05.2006 | The International Red Cross removed as a beneficiary of the Valmore (then Fisher) Trust |
| 01.10.2006 | David Aim excluded as a beneficiary and Sada Establishment added as a beneficiary of the Valmore (Fisher) Trust |
| 01.10.2006 | Name of Fisher Trust changed to Valmore Trust |
| 11.12.2006 | Ownership of Jorum Establishment founder's rights vested in AP |

2

| 22.03.2007 | Meeting in London between AB, DA, AG and JK at which Miselva requested and instructed to take over the trusteeship of the Nile Trust and the administration of the trust's subsidiaries |
|---|---|
| 22.03.2007 | Sada Establishment removed as a Beneficiary of the Valmore Trust; JK signs an assignment of Sada founder's rights to Miselva; JK signs a Letter of Wishes in relation to the Valmore Trust |
| 20.04.2007 | Summit Trust established, Nexus as trustee, Fallon as protector |
| 01.07.2007 | Miselva appointed as trustee of Nile Trust in place of STI |
| 31.08.2007 | Shares of first Summit Trust subsidiaries (Barbary Invest Ltd, Dagenham Properties Ltd, Golden Palace Ltd) transferred to Nexus from Finsbury Trust (Gibraltar) |
| 11.12.2007 | Telephone conference call between AB in Vaduz, DA and AG in London, and EZ in USA, discussing EZ's proposal to insert a US holding company between Valmore Trust and its subsidiaries |
| 18.12.2007 | Telephone conference call between AB in Vaduz, AG in London and JK and EZ in USA in which JK confirms that he wants a new US holding company of the Valmore group, so that he can know he is in practical control, regardless of the tax consequences |
| 31.12.2007 | Agreements signed between Miselva (as trustee of the Valmore Trust) and JWL Entertainment Group Inc. for the sale and purchase of all shares in Fisher Island Ltd, Thames Steel UK Ltd, Grosvenor Trading House Ltd, Chapel Street Construction Ltd, Chester Street Enterprises Ltd and Paua Enterprises Ltd in return for all of JWL's shares |
| 29.01.2008 | JK resigns as director of Courtvale, appoints AB as sole director and transfers all shares to Miselva. |
| 12.02.2008 | Death of AP |
| 13.02.2008 | DL requests AB to arrange for transfer to Courtvale Ltd's bank account at Hypo of all balances standing to the credit of Jorum subsidiaries at Hypo. Written request from JK follows by e-mail. Total of approx. USD 23 million transferred to Courtvale |
| 14.02.2008 | Meeting between AB and EZ at LIB at which EZ claims JK is AP's executor and at which AB explains that Nile Trust is not part of AP's Estate |
| 18.02.2008 | AB as director of Courtvale appoints himself as joint signatory with JK on Courtvale's bank account at Hypo, to protect assets |
| 20.02.2008 | Conference telephone call between AB in Vaduz and DA and EZ in Miami during which EZ asks DA to read out a document purporting to appoint JK as AP's executor, and AB re-iterates that the Nile Trust is outside AP's estate |

3

| 03.03.2008 | JK requests that the shares in Courtvale are in future held on trust for Jorum |
| 03.03.2008 | JK purports to instruct Hypo to transfer USD 21 million from Courtvale's account to his personal account at JSC Investbank in Tbilisi, Georgia; Hypo contacts AB as joint signatory; AB refuses to countersign the instruction |
| 04.03.2008 | Meeting in Vaduz between AB, DA, EZ and EZ's lady companion Vlada Funk during which EZ shows AB on the screen of EZ's laptop a copy of the document purporting to appoint JK as AP's executor and shows then prints out an incomplete and most odd-looking copy of the so-called Letter of Wishes; EZ also requests a transfer of USD 7.1 million from Courtvale to his "escrow" account; AB refuses |
| 05.03.2008 | LIB purports to instruct Hypo to transfer USD 23 million from Courtvale to LIB's account with KAS Bank at JP Morgan Chase; Hypo declines |
| 10.03.2008 | Miselva receives letter from CJZ Group Inc. enclosing a copy of the Jorum Deed of Assignment with CJZ's name inserted |
| 19.03.2008 | AB as director of Courtvale removes JK's signatory rights on Courtvale's bank account at Hypo |
| 12.03.2008 | EZ arrested in Minsk on charges of using forged documents |
| 17.03.2008 | Email received from Z Barak concerning Paua Enterprises Ltd |
| 18.03.2008 | Fallon sends letters to Miselva and Nexus requesting them to resign as trustees of Valmore and Summit Trusts respectively |
| 20.03.2008 | Meeting in London between AB, PHB, IG, IP, LZ, AZ, and D&P concerning the Nile Trust |
| 20.03.2008 | Meeting in London between AB Z Barak and PHB to discuss Paua Enterprises |
| 26.03.2008 | Fallon send letter to Nexus retracting letter of 18.03.2008 and confirming wish for Nexus to continue as trustee of Summit Trust |
| 27.03.2008 | Meeting in Vaduz between AB, DA, MP and B? to discuss procedure to be followed on retirement and appointment of trustees |
| 04.04.2008 | Letter received from D&P setting out the claims of IG, LP and IZ against JK and in respect of the UK companies (in Valmore) which had been transferred to JWL Enterprises and other assets JK might claim as his |
| 08.04.2008 | Receipt by PHB and Miselva of a copy of the Verified Complaint filed in New York on 04.04.2008 by IG, LZ and IP against JK and EZ |

4

2

2008 M No

**IN THE SUPREME COURT OF GIBRALTAR**
**CHANCERY JURISDICTION**

**IN THE MATTER** of the Civil Procedure Rules, Part 64, Section 1

and

**IN THE MATTER** of the Trustees Act

and

**IN THE MATTER** of the trusts known as The Valmore Trust and The Summit Trust

**BETWEEN**

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**

**Claimants**

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**

**Defendants**

**EXHIBIT "AJB2"**

This is the exhibit marked "AJB2" referred to in the Witness Statement of ANDREW JOHN BAKER dated        this        day of                2008

MISELVA ETABLISSEMENT
Josef Rheinbergerstrasse 29
9490  Vaduz

Request to form a Liechtenstein Establishment

I/we kindly ask you to create a Liechtenstein establishment company for me/us (in
your name but to my/our costs) as per my/our following instructions:

Name of establishment:      1ˢᵗ choice:    SADA  ESTABLISHMENT

                            2ⁿᵈ   choice:   JORUM  ESTABLISHMENT

Type of establishment:      ~~a) commercial~~
                            b) non-commercial

Domicile:                   a) Vaduz
                            ~~b) other~~

Objects:                    HOLDING VEHICLE

Capital:                    a) minimun CHF 30'000.
                            ~~b) other:~~

Agency agreement:           Principal:   NONE

Authorised to give
Instructions:               a) JOSEPH KAY
                            b)

                            individually /collectively

Founder:                    a) Miselva Etablissement
                            ~~b) other:~~

1

Member of the Board:     1) _ANDREW BAKER_____

                         2) _____

                         3) _____

Signature right:         a) individually
                         ~~b) collectively with two~~

Representative:          a) Miselva Etablissement
                         ~~b) other:~~

Fiscal year-end:         a) 31st December
                         ~~b) other:~~

Book-keeping:            ~~a) Miselva Etablissement~~
                         ~~b) other~~
                         c) none

Auditor:                 ~~a) Miselva Etablissement~~
                         ~~b) other~~
                         c) none

Language of              a) English
the statutes:            ~~b) other:~~

Deed of Assignment:      a)  IN BLANK
to be issued for:        b)

Deed of Assignment:      a) to be kept by Miselva Etablissement
                         ~~b) to be sent to:~~

No. Of document sets:    a) 3
                         ~~b) other:~~

Mailing address:         a) Miselva Etablissement
                         ~~b) Client~~
                         ~~c) other:~~

Fees:                    Formation:
AS PER ATTACHED
                         Administration: CHF

                         Domicile:     CHF

                         Due Diligence: CHF

2

-3-

Bank account(s):          Bank: HYPO INVESTMENT BANK (LIECHTENSTEIN)

Account type:             a)      Current account
                          b)      depot
                          c)      other:

authorised signatories:   a)      Members of the Board
                          b)      other: JOSEPH KAY

signature-right:          a)      individually
                          b)      collectively.

Bank post to be sent to:  a)      Miselva Etablissement
                          b)      Client
                          c)      Other: DAVID ASHFIELD, c/o LONDON INTERNATIONAL BANK

Duplicate:                yes/no

Instructions re invoice:  a)      to be settled direct from bank account
                          b)      to be sent to Client for approval
                          c)      other:        DAVID ASHFIELD

Notepaper:                yes / no        amount:
                          text:

Beneficial owner of the funds being contributed:
a)
b)      SEE DUE DILIGENCE FORMS
c)

Source of the funds to be contributed:
Amount:
Source:    SEE DUE DILIGENCE FORMS

N.B.: A certified copy of the passport of the contractual partner and the
beneficial owner(s) is/are attached.

Miscellaneous:

Vaduz, 3.2.2006

_____
Client (signature)

3

Due Diligence – Form F1

Identification of contractual partner

I.    Name of entity :    SADA ESTABLISHMENT

      Place and date of incorporation / establishment :    Vaduz, 6-2-2006

II.   Type of identification:

      X      new          ☐    repeat

      ☒      personal appearance. If yes, date and place:    Hypobank, Vaduz

      ☐      by correspondence. If yes, details :

III.  The contractual partner(s) is / are:

      ☒      a natural person / persons :    ☒ copy of current passport or i.d. card, attached
                                            (copy must made by Miselva or a duly appointed delegate)

                                            ☐ certified copy of a current passport or i.d. card, attached
                                            (if copy not made by Miselva or a duly appointed delegate)

      ☐      a corporate body / bodies :    ☐ original or a certified copy of a probative document not more than
                                            6 months old, attached

IV.   Particulars of contractual partner(s):

Surname / company name :    GUIDFAR

First name :    MOHAMMAD ALi

Profession:    COMPANY DIRECTOR

Date of birth / incorporation :    06 SEPTEMBER 1960

Nationality / Nationalities :    IRANIAN

Residential / registered office address :    2 GARSTON CRESCENT, WATFORD WD25 9LD

VADUZ, 3.2.2006
Place and date                                              Signature

4-

Due Diligence - Form F2

Determination of the beneficial owner(s)

Name of Entity:       Sada Establishment

Declaration of the Contractual Partner(s):

The undersigned hereby declare(s) :-

☐    that he / she / they is / are the ultimate beneficial owner(s) of the Entity's assets; or

☒    that the following person(s) is / are the ultimate beneficial owner(s) of the Entity's assets :-

Surname(s) :       KAY

First name(s) :       JOSEPH

Birth date(s) :       19 MAY 1958

Profession:       COMPANY DIRECTOR

Nationality / nationalities :       U.S.A.

Residential address(es) :       70 WALTON STREET, LONDON SW1

The contractual partner(s) hereby confirm(s) with his / her / their signature(s) the correctness and completeness of the above information. In case of any changes he / she / they will immediately inform Miselva Etablissement in writing accordingly.

Furthermore, the contractual partner(s) take(s) notice of and agree(s) to the fact, that in case of opening a bank or deposit account, the identity of the beneficial owner(s) may have to be disclosed to the bank.

VADUZ 3.2.2006

Place and date

Contractual Partner

5



# DEED OF ASSIGNMENT

The undersigned, Miselva Etablissement, Vaduz, Founder of the firm

## Sada Establishment
### Vaduz

hereby irrevocably assigns all the rights and obligations that it has as Founder pursuant to the law or the statutes of the said firm to:

And hereby waives all its rights to the said firm and explicitly declares that it will neither now nor in future make any claim to or in respect of such rights.

Vaduz, 6th February 2006

The Founder

**Miselva Etablissement**

Andrew J. Baker



Die Echtheit der Unterschrift von

Herrn Andrew J. Baker, geb. am 03.12.1960

wird amtlich beglaubigt.
Grundbuch- und Öffentlichkeitsregisteramt
Vaduz, den 08.02.2006

Rico Hassler

7

**MISELVA ETABLISSEMENT**
Josef Rheinbergerstrasse 29
9490 Vaduz

Request to form a Liechtenstein Establishment

I/we kindly ask you to create a Liechtenstein establishment company for me/us (in your name but to my/our costs) as per my/our following instructions:

Name of establishment:          1st choice:     IORUM ESTABLISHMENT

                                2nd  choice:     RODAVA  ESTABLISHMENT

Type of establishment:          a) commercial
                                b) non-commercial

Domicile:                       a) Vaduz
                                b) other

Objects:                        HOLDING VEHICLE


Capital:                        a) minimun CHF 30'000.—
                                b) other:

Agency agreement:               Principal:   NONE

Authorised to give
Instructions:                   a) JOSEPH KAY
                                b)

                                individually / collectively

Founder:                        a) Miselva Etablissement
                                b) other:

$8$

-2-

| | |
|---|---|
| Member of the Board: | 1) _ANDREW BAKER_____ |
| | 2) _____ |
| | 3) _____ |
| Signature right: | a) individually |
| | ~~b) collectively with two~~ |
| Representative: | a) Miselva Etablissement |
| | ~~b) other: ~~ |
| Fiscal year-end: | a) 31st December |
| | ~~b) other:~~ |
| Book-keeping: | ~~a) Miselva Etablissement~~ |
| | ~~b) other~~ |
| | c) none |
| Auditor: | ~~a) Miselva Etablissement~~ |
| | ~~b) other~~ |
| | c) none |
| Language of the statutes: | a) English |
| | ~~b) other:~~ |
| Deed of Assignment: to be issued for: | a) IN BLANK |
| | ~~b)~~ |
| Deed of Assignment: | a) to be kept by Miselva Etablissement |
| | ~~b) to be sent to: ~~ |
| No. Of document sets: | a) 3 |
| | ~~b) other~~ |
| Mailing address: | a) Miselva Etablissement |
| | ~~b) Client~~ |
| | ~~c) other:~~ |
| Fees: SEE ATTACHED SHEET | Formation: |
| | Administration: CHF |
| | Domicile:     CHF |
| | Due Diligence: CHF |

9

-3-

Bank account(s):          Bank: HYPO INVESTMENT BANK (LIECHTENSTEIN)

Account type:             a)      Current account
                          b)      depot
                          c)      other:

authorised signatories:   a)      Members of the Board
                          b)      other: JOSEPH KAY

signature-right:          a)      individually
                          b)      collectively

Bank post to be sent to:  a)      Miselva Etablissement
                          b)      Client
                          c)      Other: DAVID ASHFIELD, % HYPO INVESTMENT BANK

Duplicate:                yes/no

Instructions re invoice:  a)      to be settled direct from bank account
                          b)      to be sent to Client for approval
                          c)      other: DAVID ASHFIELD

Notepaper:                yes / no                amount:
                          text:

Beneficial owner of the funds being contributed:
a)
b)      SEE DUE DILIGENCE FORMS
c)

Source of the funds to be contributed:
Amount:
Source:   SEE DUE DILIGENCE FORMS

N.B.: A certified copy of the passport of the contractual partner and the beneficial owner(s) is/are attached.

Miscellaneous:

Vaduz, 3.2.2006

Client (signature)

10

Due Diligence - Form F1

Identification of contractual partner

I.  Name of entity :   Jorum Etablishment, Vaduz

Place and date of incorporation / establishment :   06.02.2006

II.  Type of identification:

X   new         ☐   repeat

☒   personal appearance. If yes, date and place: 3rd Feb. 2006, VADUZ

☐   by correspondence. If yes, details :

III.  The contractual partner(s) is / are:

☒   a natural person / persons :  ☒ copy of current passport or i.d. card, attached
                                    (copy must made by Miselva or a duly appointed delegate)

                                    ☐ certified copy of a current passport or i.d. card, attached
                                    (li copy not made by Miselva or a duly appointed delegate)

☐   a corporate body / bodies :  ☐ original or a certified copy of a probative document not more than
                                    6 months old, attached

IV.  Particulars of contractual partner(s):

Surname / company name :            GUIDFAR

First name :                        MOHAMMAD ALI

Profession:                         COMPANY DIRECTOR

Date of birth / incorporation :     06 SEPTEMBER 1960

Nationality / Nationalities :       IRANIAN

Residential / registered office address :   2 GARSTON CRESCENT, WATFORD, WD25 0LD

VADUZ, 3.2.2006
Place and date

_____ Signature

11

Due Diligence - Form F2

Determination of the beneficial owner(s)

Name of Entity:     *Jorum Establishemnt*

Declaration of the Contractual Partner(s):

The undersigned hereby declare(s) :-

☐     that he / she / they is / are the ultimate beneficial owner(s) of the Entity's assets; or

☒     that the following person(s) is / are the ultimate beneficial owner(s) of the Entity's assets :-

Surname(s) :     KAY

First name(s) :     JOSEPH

Birth date(s) :     19 MAY 1958

Profession:     COMPANY DIRECTOR

Nationality / nationalities :     U.S.A.

Residential address(es) :     70 WALTON STREET, LONDON SW1

The contractual partner(s) hereby confirm(s) with his / her / their signature(s) the correctness and completeness of the above information. In case of any changes he / she / they will immediately inform Miselva Etablissement in writing accordingly.

Furthermore, the contractual partner(s) take(s) notice of and agree(s) to the fact, that in case of opening a bank or deposit account, the identity of the beneficial owner(s) may have to be disclosed to the bank.

VADUZ, 03.02.2006

Place and date

Contractual Partner

*12*

6-08 - Original D Ashfield

# DEED OF ASSIGNMENT

The undersigned, Miselva Etablissement, Vaduz, Founder of the firm

## Jorum Establishment
### Vaduz

hereby irrevocably assigns all the rights and obligations that it has as
Founder pursuant to the law or the statutes of the said firm to:

And hereby waives all its rights to the said firm and explicitly declares
that it will neither now nor in future make any claim to or in respect of
such rights.

Vaduz, 6th February 2006

The Founder

## Miselva Etablissement

Andrew J. Baker

13

Die Echtheit der Unterschrift von

Herrn Andrew J. Baker, geb. am 03.12.1960



wird amtlich beglaubigt.
Grundbuch- und Öffentlichkeitsregisteramt
Vaduz, den 09.02.2006

Rico Hassler

14

**3**

2008 M No

**IN THE SUPREME COURT OF GIBRALTAR**
**CHANCERY JURISDICTION**

**IN THE MATTER** of the Civil Procedure Rules, Part 64, Section 1

and

**IN THE MATTER** of the Trustees Act

and

**IN THE MATTER** of the trusts known as The Valmore Trust and The Summit Trust

**BETWEEN**

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**

__Claimants__

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**

__Defendants__

---

**EXHIBIT "AJB3"**

---

This is the exhibit marked "AJB3" referred to in the Witness Statement of ANDREW JOHN BAKER dated        this      day of                    2008

# DECLARATION OF TRUST

# THE FISHER TRUST

*Miselva Etablissement*

TRUSTEES

Dated 1ST March, 2006

| Clause | | Page |
|---|---|---|
| 1. | Definitions | 3 |
| 2. | Trusts for Sale | 4 |
| 3. | Trusts of Added Property | 5 |
| 4. | Overriding Powers | 5 |
| 5. | Trusts in Default of Exercise of Overriding Powers | 6 |
| 6. | Ultimate Default Trusts | 6 |
| 7. | Trustees' Powers Immunities and Decision Making | 6 |
| 8. | Power of Advancement | 7 |
| 9. | Speculative Investments | 7 |
| 10. | Provision of Information | 7 |
| 11. | No Duty to Interfere in Underlying Business | 7 |
| 12. | Trustees' and Protector's Remuneration | 7 |
| 13. | Appointment of New or Additional Trustees | 8 |
| 14. | Removal of Trustees | 9 |
| 15. | Indemnity of Retiring Trustee and Protector | 9 |
| 16. | Appointment of New Protector | 10 |
| 17. | Powers of Trustees subject to Consent of Protector | 10 |
| 18. | Applicable Law and Jurisdiction | 11 |
| 19. | Power to Appoint Additional Beneficiaries | 11 |
| 20. | Power to Exclude Beneficiaries | 12 |
| 21. | Exclusion of Excluded Persons | 12 |
| 22. | Emergency Provisions | 13 |
| 23. | Power to amend | 14 |
| Schedule One - Administrative Powers | | 15 |
| Schedule Two - Initial Trust Fund | | 24 |

2

THIS DECLARATION OF TRUST is made on the ⟨FIRST⟩ day of March, 2006

BY

MISELVA ETABLISSEMENT of Josef Rheinberger Strasse 29, FL-9490 Vaduz, Liechtenstein

(the "Original Trustees")

WHEREAS:

(A)    The property specified in the Second Schedule has been transferred or delivered to the Original Trustees or otherwise placed under their control and from time to time further money investments or other property may be paid or transferred to the Trustees by way of addition

(B)    The trust created by this declaration shall be irrevocable

(C)    This trust created by this declaration shall be known as **The Fisher Trust**

NOW THIS DEED WITNESSES as follows

1.    Definitions

IN this Sentement where the context so admits

1.1    "Beneficiaries" means and includes

1.1.1    The International Red Cross of 17 Chemin des Crets, PO Box 372, Geneva, Switzerland

1.1.2    such other objects or persons as may be added under Clause 19

PROVIDED ALWAYS that the expression "the Beneficiaries" shall not mean or include any Gibraltar Resident

1.2    "the Emergency Trustee" means the person or corporation from time to time designated as such pursuant to the provisions of Clause 22

1.3    "Excluded Persons" means any Gibraltar Resident and any person constituted an Excluded Person pursuant to Clause 20

1.4    "Gibraltar Resident" means any person who is a resident of Gibraltar as defined in Section 2(1) of the Companies (Taxation and Concessions) Ordinance of Gibraltar or any modification or re-enactment thereof

1.5    "Protector" means Fallon Invest & Trade Inc. of Pasea Estate, Road Town, Tortola, British Virgin Islands, or such new Protector as may be appointed pursuant to Clause 16

1.6    "Sentement" means The Fisher Trust created by this Deed

1.7    "Speculative Investments" means property the ownership of which entails to the owner thereof a risk of substantial financial loss but which entails also a possibility of greater profit on the sale or conversion into money of such property than that which might reasonably be

3

expected to be realised on the sale or conversion into money of property not entailing to its owner a risk of substantial financial loss and for the purpose of this definition "a risk of substantial financial loss" includes a risk that the value of property will prior to any sale or conversion into money thereof be reduced to nothing

1.8  "Trustees" means the Original Trustees or other trustee or trustees for the time being of the Settlement hereby created

1.9  "Trust Fund" means

    1.9.1  the property specified in the Second Schedule and

    1.9.2  all moneys investments and property paid or transferred by any person or persons to and accepted by the Trustees as additions to the Trust Fund and

    1.9.3  all accumulations (if any) of income directed to be held as an accretion to capital and

    1.9.4  the money investments and property from time to time representing such money investments property additions and accumulations or any part or parts thereof

1.10  "Trust Period" means the period commencing on the date hereof and ending on the earlier of (i) the last day of the period of one hundred years from the date hereof which period (and no other) shall be the applicable perpetuity period or (ii) such earlier date as the Trustees shall by deed specify (not being a date earlier than the date of execution of such deed)

1.11  "Trust Property" means any property comprised in the Trust Fund

1.12  references to clauses and schedules are to be construed as references to clauses and the schedules of this Settlement unless otherwise stated

1.13  references to (or to any specified provision of) this Settlement or any other document shall be construed as references to this Settlement that provision or that document as from time to time amended and/or supplemented unless otherwise stated

1.14  words denoting the single shall include the plural and vice versa

1.15  words denoting any gender shall include both genders

1.16  references to a person shall be construed as references to an individual firm company corporation unincorporated body of persons or any state or any agency thereof

1.17  the tables of contents and clause heading are included for reference only and shall not affect the interpretation of this Deed

2.  Trusts for Sale

THE Trustees shall hold the Trust Fund upon trust in their discretion either to allow the same to remain in the state in which it is received or held for so long as they shall think fit or to sell or convert the same into money and may in their discretion invest such money in their names or under their control in any of the investments authorised by this Settlement or by law with power from time to time to vary or transpose any such investments for or into others so authorised.

4

3.    Trusts of Added Property

THE Trustees shall hold the Trust Fund upon with and subject to the trusts powers and provisions of this Settlement and the Trustees may at any time or times during the Trust Period accept such additional money investments or other property as may be paid or transferred to them upon these trusts by any person either personally or by testamentary act or disposition (including property of any onerous nature the acceptance of which the Trustees consider to be beneficial).

4    Overriding Powers

4.1    THE Trustees shall hold the capital and income of the Trust Fund upon trust for or for the benefit of the Beneficiaries at such times in such shares upon such trusts (which may include discretionary or protective powers or trusts) and in such manner generally as the Trustees shall in their discretion appoint and such appointment may include such powers and provisions for the maintenance education or other benefit of the Beneficiaries or for the accumulation of income and such administrative powers and provisions as the Trustees think fit

4.2    No exercise of the power conferred by Clause 4.1 shall invalidate any prior payment or application of all or any part of the capital or income of the Trust Fund under the trusts of this Settlement or made under any other power conferred by this Settlement or by law

4.3    Any trusts and powers created by an appointment under Clause 4.1 may be delegated to any extent to any person, whether or not including the Trustees or any of them

4.4    The exercise of the power of appointment conferred by Clause 4.1 shall

4.4.1    be subject to the application if any of the rule against perpetuities and the law concerning excessive accumulations of income

4.4.2    be by deed revocable during the Trust Period or irrevocable executed during the Trust Period

4.4.3    be subject to the written consent of the Protector (for so long as there is a Protector of this Settlement) which consent (if applicable) shall be endorsed on such deed or deeds

4.5    Notwithstanding paragraph 20 of the First Schedule the Trustees may not release or restrict the power of appointment conferred by Clause 4.1 without the Protector's written consent for so long as there is a Protector of this Settlement

4.6    Notwithstanding the trusts and provisions herein the Trustees may by any deed or deeds revocable during the Trust Period or irrevocable and executed during the Trust Period in their absolute discretion with the written consent of the Protector (for so long as there is a Protector of this Settlement) which consent (if applicable) shall be endorsed on such deed or deeds pay or transfer the whole or any part or parts of the capital or income of the Trust Fund to the trustees for the time being of any other trust wherever established or existing and whether governed by the law of Gibraltar or by the law of any other state or territory under which any one or more of the Beneficiaries are interested notwithstanding that such other trusts may also contain trusts powers and provisions (discretionary or otherwise) in favour of some other person or persons or objects if the Trustees shall in their absolute discretion consider such payment to be for the benefit of such one or more of the Beneficiaries

5    Trusts in Default of Exercise of Overriding Powers

SUBJECT to and in default of any appointment under Clause 4 and for so long as there is a Protector of this Settlement with the written consent of such Protector

5.1    The Trustees shall pay or apply the income of the Trust Fund to or for the benefit of such of the Beneficiaries as shall for the time being be in existence in such shares and in such manner generally as the Trustees shall in their discretion from time to time think fit

5.2    Notwithstanding the provisions of Clause 5.1 the Trustees may at any time in their discretion accumulate the income by investing it in any investments authorised by this Deed or by law and subject to Clause 5.3 shall hold such accumulations as an addition to capital

5.3    The Trustees may apply the whole or any part of the income accumulated under Clause 5.2 as if it were income arising in the then current year

5.4    Notwithstanding the provisions of Clauses 5.1 to 5.3 the Trustees may at any time during the Trust Period pay or apply the whole or any part of the capital of the Trust Fund to or for the benefit of all or such of the Beneficiaries in such shares and in such manner generally as the Trustees shall in their discretion think fit

6.    Ultimate Default Trusts

SUBJECT as above and if and so far as not wholly disposed of for any reason whatever by the above provisions the capital and income of the Trust Fund shall be held for such charitable purposes or objects as the Trustees may determine and for so long as there is a Protector of this Settlement any such determination shall be with the written consent of the Protector

7    Trustees' Powers, Immunities and Decision Making

7.1    THE Trustees shall in addition and without prejudice to all statutory powers have the powers and immunities set out in the First Schedule provided that the Trustees shall not exercise any of their powers so as to conflict with the beneficial provisions of this Settlement

7.2    Notwithstanding the Trustees' powers and immunities set out in the First Schedule the Trustees shall not take any action in any form or manner directly or indirectly which would require under this Settlement written consent of the Protector without obtaining such a written consent and where the provisions of this Settlement restrict or limit the powers of the Trustees such limitations and restrictions shall apply notwithstanding any of the provisions of the First Schedule

7.3    In the event that there shall be more than two Trustees in office from time to time every decision resolution or exercise of a power or discretion required to be or capable of being made by the Trustees shall be validly made if so made by a majority in number of the Trustees and any instrument executed in pursuance of any such decision resolution or exercise shall have binding legal effect (as if executed by all the Trustees) if it shall be executed by a majority in number of the Trustees but not so as to render any of the Trustees liable for any act or thing done or omitted without his consent by reason of the provisions of this paragraph or for any act in which he joins for conformity only

7.4    A resolution in writing signed by a majority of the Trustees shall be valid and effective as if it had been passed at a meeting of the Trustees duly convened and held and any such resolution may consist of one or more documents in similar form each signed by one or more of the Trustees

6

8.    Power of Advancement

THE Trustees may pay or apply the Trust Property for the advancement or benefit of any Beneficiary

9.    Speculative Investments

IT is expressly declared that one of the purposes of the trusts hereby created may be to invest all or part of the Trust Fund in Speculative Investments and accordingly the Trustees shall not be liable for any loss sustained to the value of the Trust Fund by reason only that it may comprise or have comprised (whether in whole or part) Speculative Investments and for the purposes of this clause "invest" shall be given its widest possible meaning

10.    Provision of Information

10.1    SUBJECT to Clause 10.2 the Trustees shall not be bound to furnish any information relating to the value state or amount of the Trust Fund or any assets comprising the Trust Fund to any Beneficiary unless and until a Beneficiary has a vested interest in all or any part of the Trust Fund and then only to the extent of that interest and in particular but without limiting the foregoing the Trustees shall not be bound to notify any Beneficiary that he is a beneficiary of this Settlement

10.2    The obligation of the Trustees to furnish information in relation to the Trust Fund in relation to any company an interest in which comprises part or all of the Trust Fund (each a company being in this subclause hereinafter called an "underlying company") shall be to furnish information only of the fact that the shares in an underlying company form part of the Trust Fund and the number and nominal value of the shares in an underlying company which form part of the Trust Fund and accordingly the Trustees shall not be obliged in relation to an underlying company to provide any Beneficiary with any information regarding the administration management or conduct of the business or affairs of that underlying company

11    No Duty to Interfere in Underlying Business

THE Trustees are under no duty to enquire into the conduct of a company in which they are interested unless they have knowledge of circumstances which call for enquiry

12.    Trustees' and Protector's Remuneration

12.1    ANY Trustee or Protector who is a solicitor accountant or other person engaged in any profession or business shall be entitled to charge and be paid all usual professional or other charges and to receive commission or other benefits for or in respect of business transacted time expended and acts done by him or any employee or partner of his in connection with these trusts including acts which a trustee or protector not being in any profession or business could have done personally

12.2    Any Trustee or Protector which is a trust corporation or company authorised to undertake trust business shall be entitled in addition to reimbursement of its proper expenses to remuneration for its services in accordance with its published terms and conditions for trust business in force from time to time and in the absence of such published terms and conditions in accordance with such terms and conditions as may from time to time be determined by such Trustee or Protector

7

12.3    Any Trustee or Protector shall be entitled to retain any brokerage or other commission which may be received personally or by such Trustee's or Protector's firm in respect of any transaction carried out on behalf of this Settlement for which such Trustee or Protector or Trustee's or Protector's firm is in the normal course of business allowed brokerage or other commission notwithstanding that the receipt of such brokerage or commission was procured by an exercise by such Trustee or Protector of powers over the Trust Fund

12.4    All costs, charges, liabilities and expenses incurred and payments made by the Trustee in the lawful exercise of the powers conferred upon it by these presents shall be payable or reimbursable out of the Trust Fund or income thereof.

12.5    The Trustee shall be indemnified out of the Trust Fund and/or income thereof (i) in respect of all liabilities sustained and costs and expenses properly incurred by it or by any delegate or sub-delegate appointed by it or to whom any duties, powers, trusts, authorities or discretions may be delegated by it in the proper execution or purported execution of the trusts, powers, authorities or discretions vested in it by, or the proper performance of obligations assumed by it under this Settlement, (ii) against all liabilities, actions, proceedings, costs and expenses, claims and demands in respect of any matter or thing properly done or omitted by it or any other person in any way relating to this Settlement except to the extent that any such are sustained or incurred as a result of the negligence, willful misconduct or fraud of the Trustee.

13.    Appointment of New or Additional Trustees

13.1    IF any Trustee whether original additional or substituted shall die or being a company shall be dissolved or shall give notice of a desire to withdraw and be discharged from these trusts or shall be unfit or unwilling to act or shall be removed by the Protector pursuant to Clause 14 then

13.1.1    the Protector or if there shall be no Protector or if the Protector shall be unable or unwilling to act

13.1.2    the Trustees or if there shall be no Trustee in existence or willing to act

13.1.3    the Supreme Court of Gibraltar or the court of such other place which shall then be the forum for the administration of these trusts in accordance with the terms of Clause 18 may by deed appoint one or more other persons or bodies corporate to be a trustee or trustees in place of the trustee so deceased dissolved desiring to withdraw becoming unfit or unwilling to act or so removed

13.2    The person or body for the time being having the power to appoint new trustees in accordance with Clause 13.1 shall also have power to appoint by deed one or more other persons or companies to be an additional trustee or trustees

13.3    Where new or additional trustees are appointed for the whole or any part or parts of the Trust Fund the appointor or appointors may appoint any person or persons as trustee or trustees notwithstanding the residence domicile place of business or (if any body corporate) place of incorporation of such person or persons and the receipt of such person or persons for the whole or such part or parts of the Trust Fund as may be paid or transferred to such person or persons pursuant to such appointment shall be a good discharge to any other trustee or trustees accordingly

13.4   Any corporate body may at any time be appointed either as a general trustee or as custodian trustee hereof on such terms or conditions as to remuneration (payable out of the income or capital of the Trust Fund) and otherwise in all respects as the appointor or appointors shall prescribe or approve

13.5   The power of appointing new trustees shall not be exercisable by reason only that a trustee remains out of Gibraltar (or if applicable out of the jurisdiction which is then the forum for the administration of these trusts in accordance with the terms of Clause 18) for more than twelve months

13.6   Acts and instruments done or executed for the proper vesting of the Trust Fund in new or additional trustees shall be done and executed by the continuing or retiring trustee or trustees at the expense of the income or capital of the Trust Fund PROVIDED THAT an outgoing trustee who is liable as a trustee or who may at the death of any person be liable as a trustee or on any other occasion be liable as a former trustee for any taxes wherever they may be imposed and of whatsoever nature shall not be bound to transfer the Trust Fund unless reasonable security is provided for indemnifying such outgoing trustee against such liability

13.7   The Supreme Court of Gibraltar or the court of such any other place which shall then be the forum for the administration shall have the power to vest the Trust Fund in the trustees appointed by such court

13.8   On every change in the trusteeship a memorandum shall be endorsed on or permanently annexed to this Deed stating the name of the Trustees for the time being and shall be signed by the persons so named and any person shall be entitled to rely upon such memorandum (or the latest of such memoranda if more than one) as sufficient evidence that the Trustees named in such memorandum are the duly constituted trustees of this Settlement for the time being

14.    Removal of Trustees

THE office of a trustee shall be determined and vacated if such trustee being an individual shall be found to be a lunatic or of unsound mind or shall become subject to any proceedings under the insolvency or bankruptcy laws applicable to such trustee or if such trustee being a company shall enter into liquidation whether compulsory or voluntary (not being merely a voluntary liquidation for the purpose of amalgamation or reconstruction) or if its ownership changes without prior written notification to the Protector or if the Protector (at any time when there is a Protector of this Settlement) removes such trustee by written notice

15.    Indemnity of Retiring Trustee and Protector

15.1   IF a Trustee ceases to be a trustee such Trustee shall be released from all claims demands actions proceedings and accounts of any kind on the part of any other person (whether in existence or not) actually or prospectively interested under this Settlement for or in respect of the capital and income of the Trust Fund or these trusts or an act or thing done or omitted in execution or purported execution of these trusts other than and except only actions

15.1.1   arising from any breach of trust to which such Trustee or (in the case of a corporate trustee) any of its officers or employees was a party or privy

9

15.1.2    to recover from such Trustee the whole or any part of the Trust Fund in the possession of such Trustee or previously received by such Trustee or (in the case of a corporate Trustee) any of its officers or employees and converted to the use of such trustee or officers or employees

15.2    If the Protector for the time being shall have died or retired as Protector then the Protector or the personal representatives of such Protector shall be entitled to a similar release as that specified above for a retiring trustee in respect of any act or thing done or omitted to be done

15.3    The Protector shall not owe any fiduciary duty towards and shall not be accountable to any person or persons from time to time interested hereunder or to the Trustees for any act of omission or commission of the Protector in relation to the powers given to the Protector by this Settlement to the intent that the Protector (in the absence of fraud or dishonesty) shall be free from any liability whatsoever in relation to such powers

15.4    The Protector shall be wholly indemnified and held harmless out of the Trust Fund from any losses damages or judgment debt arising out of any action or suit in a court of law based upon or in connection with the Protector's powers or duties under this Settlement

16.    Appointment of New Protector

16.1    THE Protector shall cease to be the Protector on death if an individual or on dissolution if a company or in either case on becoming unable or unfit to act or  in the case of the Protector being a company if there shall be a change of ownership and in the case of a company with bearer shares if there shall be a change in the identity of the person recorded by the Trustees as being the holder of the bearer share certificate(s)

16.2    The Protector may by deed revocable or irrevocable during protectorship nominate a person to become the Protector upon the person making the nomination ceasing to be the Protector and thereupon if the nomination remains unrevoked and the Trustees have been given written notice of the nomination and the person nominated consents in writing (which consent is endorsed on any such deed) such person shall immediately become the Protector PROVIDED THAT if the Protector shall be a company then any such deed as is referred to above shall first be approved by the company in general meeting before it is executed on behalf of the company by its board

16.3    If at any time there is no longer a Protector of this Settlement the Trustees may if they consider it desirable to do so appoint by deed a person to be the Protector of this Settlement provided always that such person consents in writing to such appointment which consent is endorsed on such deed

17.    Powers of Trustees Subject to Consent of Protector

NOTWITHSTANDING anything herein contained and in particular conferring an absolute or uncontrolled discretion on the Trustees all and every power and discretion vested in the Trustees by such provisions of this Settlement as are specified below shall for as long as there is a Protector of this Settlement and as stated in the relevant Clause or Clauses of this Deed be exercisable by the Trustees only with the prior or simultaneous written consent of the Protector:

| Clause 4: | Overriding Powers |
| Clause 5: | Trusts in default of exercise of overriding powers |
| Clause 6: | Ultimate Default Trusts |
| Clause 19: | Appointment of additional Beneficiaries |

Clause 20.1:        Exclusion of Beneficiaries
Clause 22:         Power to designate Emergency Trustee and revoke such designation

18.    Applicable Law and Jurisdiction

18.1    THE proper law of this Settlement shall be that of Gibraltar and all rights under this Settlement and its construction and effect shall be subject to the jurisdiction of and construed according to the laws of Gibraltar

18.2    The courts of Gibraltar shall be the forum for the administration of these trusts

18.3    Notwithstanding the provisions of Clauses 18.1 and 18.2

18.3.1    The Trustees shall have power (subject to the application (if any) of the rule against perpetuities) to carry on the general administration of these trusts in any jurisdiction in the world whether or not such jurisdiction is for the time being the proper law of this Settlement or the courts of such jurisdiction are for the time being the proper law of this Settlement or the courts of such jurisdiction are for the time being the forum for the administration of these trusts and whether or not the Trustees or any of them are for the time being resident in or otherwise connected with such jurisdiction

18.3.2    The Trustees may at any time declare in writing that from the date of such declaration the proper law of this Settlement shall be that of any specified jurisdiction (not being a jurisdiction under the law of which this Settlement would be capable of revocation) and that all rights under this Settlement and its construction and effect shall be subject to and construed according to the laws of that jurisdiction

18.3.3    The Trustees may at any time declare in writing that from the date of such declaration the forum for the administration of this Settlement shall be the courts of any specified jurisdiction

19    Power to Appoint Additional Beneficiaries

19.1    THE Trustees and for so long as there is a Protector of this Settlement with the written consent of such Protector shall have power at any time or times during the Trust Period to add to the class of Beneficiaries such one or more objects or persons (not being an Excluded Person or Gibraltar Resident) as the Trustees with such consent of the Protector (if applicable) shall in their absolute discretion determine

19.2    Any such addition shall be made by deed which shall be endorsed with the written consent of the Protector (if applicable) and which

19.2.1    shall name or describe the one or more objects or persons to be thereby added to the class of Beneficiaries and

19.2.2    shall specify the date (not being earlier than the date of the deed but during the Trust Period) from which such one or more objects or persons shall be so added and

19.2.3    shall specify the period during which such one or more objects or persons is to be included with the class of Beneficiaries

11

20    Power to Exclude Beneficiaries

20.1    THE Trustees (and for so long as there is a Protector of this Settlement with the written consent of such Protector may by deed made at any time or times during the Trust Period declare that the one or more objects or persons or the members of a class named or specified (whether or not ascertained) in such deed who are would or might but for this Clause be or become a Beneficiary or Beneficiaries or be or become otherwise able to benefit hereunder as the case may be

20.1.1    shall be wholly or partially excluded from future benefit hereunder or

20.1.2    shall cease to be a Beneficiary or Beneficiaries or

20.1.3    shall be an Excluded Person or Excluded Persons

and any such deed may be irrevocable or revocable during the Trust Period shall have effect from the date specified therein and shall be endorsed with the written consent of the Protector (if applicable) provided that this power shall not be capable of being exercised so as to derogate from any interest to which any Beneficiary has previously become indefeasibly entitled whether in possession or in reversion or otherwise

20.2    Any person of full age to whom or for whose benefit any capital or income of the Trust Fund may be liable whether directly or indirectly to be paid appointed transferred or applied in any manner whatsoever by or in consequence of an exercise of any trust power or discretion vested in the Trustees or in any other person may by deed to which the Trustees are party during the Trust Period either revocably (but revocable during the Trust Period only) or irrevocably

20.2.1    disclaim his interest as an object of such trust power or discretion either wholly or with respect to any specified part or share of such capital or income provided that any disclaimer by a Beneficiary of his whole interest shall be irrevocable or

20.2.2    declare that he shall cease to be a Beneficiary or

20.2.3    declare that he shall be an Excluded Person and such

deed shall have effect from the date thereof

21.    Exclusion of Excluded Persons

SUBJECT to Clause 12 and notwithstanding anything else contained or implied in this Settlement no Excluded Person shall be capable of taking any benefit of any kind by virtue or in consequence of this Settlement and in particular but without prejudice to the generality of the foregoing provisions of this Clause

21.1    The Trust Fund and the income thereof shall henceforth be possessed and enjoyed to the entire exclusion of any such Excluded Person and of any benefit to him by contract or otherwise

21.2    No part of the capital or income of the Trust Fund shall be paid or lent or applied for the benefit either directly or indirectly of any such Excluded Person in any manner or in any circumstances whatsoever and

21.3    No power or discretion hereby or by any appointment made hereunder or by law conferred upon the Trustees or any of them shall be capable of being exercised in such manner that any such Excluded Person will or may become entitled either directly or indirectly to any benefit in any manner or in any circumstances whatsoever

12

*12*

22    Emergency Provisions

22.1    ANY Trustee hereof shall automatically cease to be a Trustee hereof on the happening of any of the following events within the territory where such Trustee is incorporated (in the case of a corporate Trustee) or resident in the case of a natural person that is to say

22.1.1    the invasion of such territory by military forces

22.1.2    the enactment of any law or the taking of any action by or on the part of any governmental authority agency or officer of or within the said territory the aim or purpose or effect of which is or would be had such Trustee sole control of the assets comprising the Trust Fund

22.1.2.1    the acquisition expropriation or confiscation of any of the assets comprising the Trust Fund or any part thereof

22.1.2.2    to jeopardise or interfere with or hamper the exercise by any such Trustee of its administrative or executive functions in respect of the trusts thereof or the Trust Fund or its discretion in respect thereof

22.1.2.3    the restriction suspension abrogation withdrawal or cancellation or rescission of any exemption relief or contract in relation to the trusts hereby created or in relation to the Trust Fund or any part thereof whether in respect of exchange or currency control or any other matter

22.1.2.4    to levy any tax or duty on the capital of the Trust Fund in excess of five (5) per centum per annum thereof

22.1.2.5    to levy any tax or charge or fee on the income of the Trust Fund or any part thereof in excess of five (5) per centum per annum thereof

22.1.3    the nationalization or attempted nationalization of a controlling interest in the Trustee or the intervention in its affairs by a government official or a government body or agency in such a way that the Trustees are unable efficiently to carry out their duties and exercise their discretion in accordance with the terms of this Settlement

22.2    Forthwith upon any such Trustee ceasing to be a Trustee pursuant to this Clause any such Trustee shall be divested of title to the Trust Fund which shall automatically vest in the Emergency Trustee as if the Emergency Trustee had been the Original Trustee hereof and the forum for the administration of this Settlement shall forthwith be deemed to be the place of incorporation (or residence if a natural person) of the Emergency Trustee and the laws of such place shall become the proper law of this Settlement and the Courts of the said place of incorporation or residence shall have exclusive jurisdiction in respect of the trusts hereof and any matters relating hereto

22.3    The Trustees and for so long as there is a Protector of this Settlement with the written consent of such Protector have the power exercisable by deed (endorsed with such consent, if applicable) from time to time of designating the Emergency Trustee and also and for so long as there is a Protector of this Settlement with the written consent of such Protector have the power exercisable by deed (endorsed with such consent, if applicable) of revoking any such designation

13

23.     THE Trustees shall have power at any time or times during the Trust Period by deed or deeds to revoke or vary any of the administrative provisions of this Settlement or to add any further administrative provisions as the Trustees may consider expedient for the purposes of this Settlement and without prejudice to the generality of the above for ensuring that at all times there should be a trustee of this Settlement and that the Trust Fund shall be fully and effectively vested in or under the control of such trustee and that the trusts of this Settlement shall be enforceable by the Beneficiaries provided always that the power conferred by this clause shall only be exercisable if the Trustees shall be advised in writing by a lawyer of at least 10 years' standing qualified in the law of the jurisdiction which for the time being is the proper law of this Settlement that it would be expedient for the purposes of this Settlement that the administrative provisions be revoked varied or added to in the manner specified in such written advice and that such power shall be exercisable only by the Trustees executing a deed in a form appropriate to carry such advice into effect.


IN WITNESS whereof the Original Trustees have executed this Declaration of Trust on the day and year first hereinbefore written


[The First Schedule and the Second Schedule follow]

14

14

FIRST SCHEDULE

ADMINISTRATIVE POWERS

INDEX TO CLAUSES

| Clause | | Page |
|---|---|---|
| 1. | General | 16 |
| 2. | General powers as to properties and investments | 16 |
| 3. | Trustees' powers and discretions | 16 |
| 4. | Power to lend and to give guarantees | 16 |
| 5. | Power to borrow | 17 |
| 6. | Power to permit occupation of property and enjoyment of chattels | 17 |
| 7. | Powers in relation to real property | 17 |
| 8. | Powers in relation to chattels | 18 |
| 9. | Powers in relation to securities | 18 |
| 10. | Power to vote and to employ nominees and custodians | 19 |
| 11. | Power to promote companies | 19 |
| 12. | Power to delegate management of investments | 20 |
| 13. | Power to trade | 20 |
| 14. | Power to give indemnities | 20 |
| 15. | Exclusion of apportionment | 21 |
| 16. | Power to deal with insurance policies | 21 |
| 17. | Power to take out life policies | 21 |
| 18. | Power to insure property | 21 |
| 19. | Power to take counsel's opinion | 21 |
| 20. | Release of powers | 21 |
| 21. | Power of appropriation | 22 |
| 22. | Power to receive remuneration | 22 |
| 23. | Power to appoint agents | 22 |
| 24. | Power to pay duties and taxes | 22 |
| 25. | Power to permit self-dealing | 22 |
| 26. | Protection of Trustees | 22 |
| 27. | Delegation of powers | 22 |
| 28. | Power to pay parent or guardian | 23 |
| 29. | Power to assign pledge charge or mortgage the Trust Fund | 23 |

1.    General

THE Trustees shall have all the powers of investments sale alienation exchange partition mortgage charging pledging leasing insurance protection improvement equipment dealing disposition and management and all other powers of an absolute beneficial owner of the Trust Fund. Such power shall not be restricted by any principle of construction but shall operate according to the widest generality of which the foregoing words are capable notwithstanding that certain powers are more particularly set out in the following clauses

2.    General Powers as to Property and Investments

2.1    THE Trustees shall have power to allow the property or investments at any time subject to the trusts hereof to remain unsold or in the actual state of investment thereof for so long as the Trustees may think fit and at any time or times to sell call in or convert into money the said property or investments or any part or parts thereof and power at any time pending investment to place any moneys for so long as the Trustees think fit on any current or deposit account

2.2    The Trustees shall have power to change exchange or vary any property or investments for the time being subject to the trusts hereof for others hereby or by law authorised

2.3    The Trustees shall have power to invest any money requiring to be invested under the trusts hereof in the purchase of or at interest upon the security of such stocks funds shares securities land immovable or movable property of any tenure or chattels or in any trade (whether or not as partners or limited partners or others) or other investment or property of whatsoever nature and wheresoever situate and whether producing income or not whether involving liabilities or not or upon such personal credit with or without security as the Trustees shall in their absolute discretion think fit to the intent that the Trustees shall have the same power in all respects as if they were a sole beneficial absolute owner

2.4    In the investment of the Trust Fund the Trustees shall not be required to have regard to the diversification of investments and save for any provision to the contrary contained in Clause 26 of these provisions shall not be liable or responsible for any loss to the Trust Fund which may arise from the failure of the Trustees to diversify the investments comprised in the Trust Fund

2.5    The acquisition of any reversionary interest or any policy of insurance or assurance sinking fund policy or other policy of whatever nature or any annuity or securities or other investments not producing income or of a wasting nature or for any other reason not within the meaning of the word 'investment' strictly construed shall be deemed to be an authorised investment of trust moneys if the Trustees shall consider the same to be for the benefit of any one or more of the Beneficiaries

3.    Trustees' Powers and Discretions

EVERY power and discretion vested in the Trustees shall be exercisable in their absolute and uncontrolled discretion and the Trustees shall exercise such powers and discretions as they shall think most expedient for the benefit of all or any of the persons actually or prospectively interested under this Settlement and may exercise (or refrain from exercising) any power or discretion for the benefit of any one or more of them without being obliged to consider the interests of the others or other of them

16

4.    Power to Lend and to Give Guarantees

    4.1    THE Trustees shall have power to lend money or property to any one or more of the Beneficiaries either free of interest or on such terms as to payment of interest and generally as the Trustees shall in their absolute discretion think fit

    4.2    The Trustees shall have power to guarantee the payment of money and the performance of obligations in respect of any existing or future borrowings by any one or more of the Beneficiaries from third parties or guarantees indemnities or other commitments of like nature given to third parties by any one or more of the Beneficiaries including without prejudice to the generality of the above the power to pledge the whole or part of the assets comprising the Trust Fund in support of any such guarantee given as above by the Trustees and to enter into such indemnities as they shall in their absolute discretion think fit in connection with any such guarantee

5.    Power to Borrow

    THE Trustees shall have power to borrow and raise money for any purpose (including the investment of the moneys so raised as part of the Trust Fund) whether upon the security of the whole or any part of the Trust Fund or upon personal security only and to mortgage charge or pledge any part of the Trust Fund as security for any moneys so raised and to guarantee the payment of money and the performance of obligations in respect of borrowings by any company fully or partly owned by the Trustees and in connection with such guarantees to enter into such indemnities as the Trustees shall in their absolute discretion think fit

6.    Power to Permit Occupation of Property and Enjoyment of Chattels

    THE Trustees shall have power to permit any one or more of the Beneficiaries to occupy or reside in or upon any dwelling house building or land or to have the enjoyment and use of chattels or other movable property for the time being held upon these trusts on such terms as to payment of rent rates taxes and other expenses and outgoings and as to insurance repair and decoration and generally upon such terms as the Trustees shall in their absolute discretion think fit

7.    Powers in Relation to Real Property

    WHERE the Trust Fund for the time being includes any real or immovable property (in this clause referred to as "the land") the Trustees shall have power to sell exchange convey lease mortgage charge agree to let license and otherwise conduct the management of the land as if the Trustees were the sole beneficial owner thereof and

    7.1    The Trustees may lease all or any part of the land for any purpose and whether involving waste or not and for any term and either wholly or partly in consideration of a rent (whether fixed or variable or fine or premium or the erection improvement or repair or any agreement to erect improve or repair buildings or other structures on the land and may accept (with or without consideration) surrender of any lease of all or any part of the land

    7.2    The Trustees may in executing any trust or power of sale sell all or any part of the land either wholly or partly in consideration of an annual sum payable either in perpetuity or for any term (whether definite or indefinite) and being either reserved out of the land sold or secured in such other manner as the Trustees shall in their absolute discretion think fit

    7.3    The Trustees may in executing any trust or power of sale or leasing

        7.3.1    sell or lease all or any part of the land whether the division is horizontal or vertical or

17

made in any other way

7.3.2    sell or lease or reserve any easement or right or privilege over all or any part of the land

7.3.3    sell or lease or except or reserve any timber or mines or minerals on or in or under all or any part of the land together with any easements rights or privileges or cutting or working and carrying away the same or otherwise incidental to or connected with forestry or mining purposes

7.3.4    impose and make binding for the benefit of all or any part of the land sold or leased any restrictions or stipulations as to user or otherwise affecting any part of the land retained

7.3.5    accept in exchange for all or any part of the land to be sold or leased (either with or without any money paid or received for equality of exchange) any other real or immovable property or any lease

7.3.6    enter into any contract or grant any option for the sale or leasing of all or any part of the land or otherwise for the exercise by the Trustees of any of their above powers

7.4    The Trustees shall not be bound to see nor be liable or accountable for omitting or neglecting to see to the repair or insurance of any buildings or other structures on the land or to the payment of any outgoings or otherwise as to the maintenance of the land or any buildings or other structures on the land but may maintain repair or insure the same in such manner and to such extent as they shall in their absolute discretion think fit

7.5    The Trustees may from time to time expend moneys (whether capital or otherwise) in making any repairs whether of a permanent nature or not and any improvements whether sanctioned by statute or not or in enlarging improving decorating redecorating equipping furnishing or altering the land or any buildings or other structures on the land (including erecting demolishing or rebuilding the same) to such extent and in such manner as they shall in their absolute discretion think fit and any certificate in writing of any architect or surveyor employed by the Trustees to the effect that any work specified in such certificate is or includes an alteration or an improvement to the land or any such building or other structure shall be conclusive as between the Trustees and the Beneficiaries that any money expended on such work was properly expended in exercise of this power

8.    <u>Powers in Relation to Chattels</u>

WHERE the Trust Fund for the time being includes any chattels (in this clause referred to as "the chattels")

8.1    The Trustees may sell lease hire deposit store or otherwise deal with the chattels upon such terms as they shall in their absolute discretion think fit

8.2    The Trustees shall not be bound to see nor be liable or accountable for omitting or neglecting to see to the repair or insurance of the chattels but may repair and insure the chattels in such manner and to such extent as they shall in their absolute discretion think fit

9.    <u>Powers in Relation to Securities</u>

9.1    THE Trustees shall be entitled to retain all or any shares stock debenture stock or other securities in any public or private company which may be transferred to them from time to time or to purchase subscribe or apply for or otherwise acquire any further or additional

18'

shares or other securities in any such company (hereinafter called "the Shares") and may retain all or any of the Shares for so long as they shall in their absolute discretion consider it beneficial to do so

9.2    The Trustees may exercise all the powers given to them by the ownership of the Shares for the purposes of carrying on or causing to be carried on the business of such company or companies as if they were beneficially entitled thereto

9.3    The Trustees may at any time as they shall in their absolute discretion think fit wind up or concur in winding up such company or companies whether for the purposes of any reconstruction amalgamation or other arrangements concerning the company or companies or may promote or agree to any such reconstruction amalgamation or other arrangement or scheme including the formation of a new company or companies to take over the business of such company or companies

9.4    The Trustees shall not be liable or responsible for any loss to the Trust Fund arising from a depreciation in value of the Shares or in any otherwise resulting from the retention of the Shares by the Trustees as aforesaid

9.5    The Trustees shall have power to obtain or join with others in obtaining from any Stock Exchange permission to deal in the Alternative Investment Market in the United Kingdom (or any such similar or replacement market) or to obtain from any Stock Exchange a quotation for or permission to deal in any securities which or some of which are comprised in the Trust Fund and shall have power to sell or join with any other person or persons in selling or disposing of any securities with a view to creating a market in such securities whether or not a sale or disposition would on any other ground be desirable or expedient

10.    Power to Vote and to Employ Nominees and Custodians

IN respect of any property comprised in the Trust Fund the Trustees shall have power

10.1    To vote upon or in respect of any shares securities bonds notes or other evidence of interest in or obligation of any corporation trust association or concern whether or not affecting the security or the apparent security of the Trust Fund or the purchase or sale or lease of the assets of any such corporation trust association or concern

10.2    To deposit any such shares securities or property in any voting trust or with any depositary designated under such a voting trust

10.3    To give proxies or powers of attorney with or without power of substitution for voting or acting on behalf of the Trustees as the owners of any such property

10.4    To hold any or all securities or other property in bearer form or in the names of the Trustees or any one or more of them or in the name of some other person or partnership or in the name or names of nominees without disclosing the fiduciary relationship created by this Settlement and to deposit the said securities and any title deeds or other documents belonging or relating to the Trust Fund in any part of the world with any bank firm trust company or other company that undertakes the safe custody of securities as part of its business without being responsible for the default of such bank firm trust company or other company or for any consequent loss

11.    Power to Promote Companies

THE Trustees may (without prejudice to the generality of their powers of investment) promote or join with any other person or persons in promoting or incorporating any company in any part of the world or

19

19

subscribe for or acquire any of the shares or stock or debentures or debenture stock or loan capital of any company with a view to or in consideration of

    11.1   the establishment and carrying on by such company of a business of any kind which the Trustees are for the time being authorised to carry on themselves and the acquisition of any of the assets comprised in the Trust Fund which may be required for the purposes of such business

    11.2   the acquisition of the assets and undertaking of any business being carried on by the Trustees under the above power

    11.3   the acquisition of all or any of the assets comprised in the Trust Fund to be held as investments of the company acquiring the same

12.    Power to Delegate Management of Investments

    12.1   THE Trustees shall have power to engage the services of such investment adviser or advisers as the Trustees may from time to time think fit ("the investment adviser") to advise the Trustees in respect of the investment and reinvestment of the Trust Fund with power for the Trustees without being liable for any consequent loss to delegate to the investment adviser discretion to manage all or any part of the Trust Fund within the limits and for the period stipulated by the Trustees and the Trustees shall settle the terms and conditions for the remuneration of the investment adviser and the reimbursement of the investment adviser's expenses as the Trustees shall in their absolute discretion think fit and such remuneration and expenses shall be paid by the Trustees from the Trust Fund

    12.2   The Trustees shall not be bound to enquire into nor be in any manner responsible for any changes in the legal status of the investment adviser

    12.3   The Trustees shall incur no liability for any action taken pursuant to or for otherwise following the advice of the investment adviser however communicated

13.    Power to Trade

    13.1   THE Trustees shall have power to trade or take part in any venture in the nature of trade whether solely or jointly with any other person and whether or not by way of partnership (limited or general) and for these purposes make such arrangements as they shall in their absolute discretion think fit and may delegate any exercise of this power to any one or more of their number or to a company or partnership formed for this purpose

    13.2   Any power vested in the Trustees under this Settlement shall (where applicable) extend to any arrangements in connection with any such trade or venture and in particular but without prejudice to the generality of the above the Trustees' powers of borrowing and charging shall extend to any borrowing arrangements made in connection with such trade or venture and whether made severally or jointly with others or with unequal liability and the Trustees shall be entitled to be fully indemnified out of the Trust Fund against all personal liability to which they may become in any manner subject in connection with any such trade or venture

14.    Power to Give Indemnities

    14.1   THE Trustees shall have power to enter into any indemnity in favour of any former trustee or any other person in respect of any fiscal imposition or other liability of any nature prospectively payable in respect of the Trust Fund or otherwise in connection with this Settlement and to charge or deposit the whole or any part of the Trust Fund as security for any

such indemnity in such manner in all respects as they shall in their absolute discretion think fit

14.2    The Trustees shall have power to give or enter into any indemnity warranty guarantee undertaking or covenant or enter into any type of agreement that they shall in their absolute discretion think fit relating to the transfer or sale of a business or private company shareholding held or owned for the time being by the Trustees whether relating to the business or company itself its assets liabilities shares or employees or any other aspect of the business or company in favour of any transferee purchaser or other relevant party and including any limitation or restriction on value or otherwise as the Trustees shall in their absolute discretion think fit

15.    Exclusion of Apportionment

NO statutory or equitable rules of apportionment shall apply to this Settlement and the Trustees shall be permitted to treat all dividends and other payments in the nature of income received by them as income at the date of receipt irrespective of the period for which the dividend or other income is payable

16.    Power to Deal with Insurance Policies

THE Trustees shall in addition and without prejudice to all statutory and other powers conferred upon them have the following powers in relation to any insurance policy ("the policy") from time to time comprised in the Trust Fund

16.1    To borrow on the security of the policy for any purpose

16.2    To convert the policy into a fully paid-up policy for a reduced sum assured free from payment of future premiums

16.3    To surrender the policy wholly or any part or any bonus attaching to the policy for its cash surrender value

16.4    To sell the policy or any substituted policy on such terms as the Trustees shall in their absolute discretion think fit

16.5    To exercise any of the powers conferred by the policy or with the consent of the insurer to alter the amount or occasion of the payment of the sum assured or to increase or decrease the amount of the periodic premiums (if any) payable under the policy or to alter the period during which the premiums are payable and to do any of these things notwithstanding that the sum assured may be reduced subject always to production of evidence of insurability satisfactory to the insurer

17.    Power to Take Out Life Policies

THE Trustees shall have power to effect and maintain out of the capital or income of the Trust Fund any policy of insurance or assurance upon the life of any person or under which the death of any person is one of the events under which moneys may be payable

18.    Power to Insure Property

THE Trustees shall have power to insure against any loss or damage from any peril any property for the time being comprised in the Trust Fund for any amount and to pay the premiums out of the Trust Fund

21

19.    Power to take Counsel's Opinion

THE Trustees shall have power to take the opinion of legal counsel locally or where necessary or appropriate elsewhere concerning any difference arising under the Settlement or any matter in any way relating to this Settlement or to their duties in connection with these trusts and in all matters to act in accordance with the opinion of such counsel.

20.    Release of Powers

THE Trustees may by deed or deeds and so as to bind their successors as trustees release or restrict the future exercise of all or any of the powers by this Settlement or by law conferred on them either wholly or to the extent specified in any such deed or deeds notwithstanding the fiduciary nature of any such power

21.    Power of Appropriation

THE Trustees shall have power in their absolute discretion to appropriate any part of the Trust Fund in its then actual condition or state of investment in or towards satisfaction of any interest or share in the Trust Fund as may in all the circumstances appear to them to be just and reasonable and for the above purposes from time to time to place such value on any or all investments or other property as they shall in their absolute discretion think fit

22.    Power to Receive Remuneration

NO Trustee shall be liable to account for any remuneration or other profit received by such Trustee in consequence of such Trustee acting as or being appointed to be a director officer or employee of any company notwithstanding that such appointment was procured by an exercise by such Trustee or by the Trustees of voting rights attached to securities comprised in the Trust Fund

23.    Power to Appoint Agents

THE Trustees shall have power instead of acting personally to employ and pay at the expense of the Trust Fund any agent in any part of the world whether attorneys solicitors accountants brokers banks trust companies or other agents without being responsible for the default of any agent if employed in good faith to transact any business or act as nominee or do any act in the execution of these trusts including without prejudice to the generality of the above the receipt and payment of moneys and the execution of documents

24.    Power to Pay Duties and Taxes

IN the event of any tax duty or fiscal imposition whatsoever becoming payable in Gibraltar or elsewhere in respect of the Trust Fund or any part thereof in any circumstances whatsoever the Trustees shall have power to pay all such taxes duties or fiscal impositions out of the Trust Fund or income thereof and shall have entire discretion as to the time and manner in which the said taxes duties or fiscal impositions shall be paid and the Trustees may pay such taxes duties or fiscal impositions notwithstanding that the same shall not be recoverable from the Trustees or the Beneficiaries or other persons entitled hereunder or that the payment shall not be to the advantage of any Beneficiary or other person entitled hereunder

25.    Power to Permit Self-Dealing

THE Trustees shall have power to enter into any transaction concerning the Trust Fund notwithstanding that one or more of the Trustees may be interested in the transaction other than as one of the Trustees

26.  Protection of Trustees

IN the execution of these trusts no Trustee shall be liable for any loss to the Trust Fund arising by reason of any improper investment made in good faith or for the negligence or fraud of any agent employed by such Trustee or by any of the Trustees although the employment of such agent was not strictly necessary or expedient or by reason of any mistake or omission made in good faith by such Trustee or by any of the Trustees or by reason of any matter or thing except wilful and individual fraud or dishonesty on the part of the Trustee who is sought to be made liable

27.  Delegation of Powers

27.1  THE Trustees may delegate to any one or more of their number the operation of any bank account in their names

27.2  Any Trustee shall have power at any time (notwithstanding any rule of law to the contrary) by deed or deeds revocable during the Trust Period or irrevocable and executed during the Trust Period to delegate to any person or to any corporate trustee (including in cases where there is more than one Trustee to any other or others of the Trustees) the exercise of all or any powers and discretions conferred on such Trustee notwithstanding the fiduciary nature of such power or powers

28.  Power to Pay Parent or Guardian

THE Trustees may pay to the parent or either parent or guardian of any minor any sum of income to be applied for the maintenance education or benefit of that minor or any sum of capital intended to be applied for the advancement or benefit of that minor so that the receipt of such parent or parents or guardian shall be a complete discharge to the Trustees and the Trustees shall not be required to enquire into the application of such sums

29.  Power to assign pledge charge or mortgage the Trust Fund

THE Trustees shall have power to assign pledge charge or mortgage the whole or any part of the Trust Fund by way of security for any borrowing guarantee or other obligation made given or indemnified by the Trustees or any debts or obligations of any Beneficiary or any liability incurred by them as Trustees

23

SECOND SCHEDULE


US$ 1,000  (ONE THOUSAND U.S. DOLLARS)


Duly executed for and on behalf of          )
**MISELVA ETABLISSEMENT**          )

Director

24

24

## The Fisher Trust

Written resolutions of Miselva Etablissement as trustee of the Fisher Trust duly passed and recorded on this 2nd day of March 2006

1.     Appointment of beneficiary

IT IS HEREBY RESOLVED pursuant to clause 19 of the Declaration of Trust dated 1st March 2006 establishing the Fisher Trust with the written consent of the Protector to add David Aim of 70 Walton Street, London SW3 2HH to the class of Beneficiaries with immediate effect and until removal by trustee resolution with the consent of the Protector.

2.     Acceptance of trust assets

IT IS HEREBY RESOLVED pursuant to clause 1 of the Declaration of Trust dated 1st March 2006 establishing the Fisher Trust to accept as additions to the Trust Fund the 100% shareholdings in the four UK companies that are currently changing their names to the following :

Fisher Island Limited
LIB Holdings Limited
Georgian Steel Limited
Grosvenor Trading House Limited

Michael Repolski, Director

We, Fallon Invest & Trade Inc. as Protector of the Fisher Trust hereby agree to the addition to the class of Beneficiaries as set out above :

Andrew Baker, Director

25

# The Fisher Trust

Written resolution of Minerva Etablissement as trustee of the Fisher Trust duly passed and recorded on this 7th day of April 2006

Acceptance of trust assets

IT IS HEREBY RESOLVED pursuant to clause 1 of the Declaration of Trust dated 1st March 2006 establishing the Fisher Trust to accept as an addition to the Trust Fund the legal and beneficial ownership of 100% of the company:

Freshdante No. 338 Limited (of which it is intended to change name to Chapel Street Contractors Limited), a UK company with registration number 5717163



And / or Baker, Director

26

IN WITNESS WHEREOF, Assignor and Assignee have caused this instrument to be duly executed in quadruplicate as of and as of the date first above written.

ASSIGNOR:

DAVID SMITH

ASSIGNEE:

FISHER TRUST

By: _____
Name: ROBERT BAKER
Title: Authorized Signatory

27

IN WITNESS WHEREOF, Assignor and Assignee have caused this instrument to be duly executed under seal as of the day and the date first above written.

ASSIGNOR:

DAVID AIM

ASSIGNEE:

FISHER TRUST

By:
Name:
Title:   Authorized Signatory

28

IN WITNESS WHEREOF, Assignor and Assignee have caused this instrument to be duly executed under seal as of the date first above written.

ASSIGNOR:

DAVIDAIM

ASSIGNEE:

FISHER TRUST

By: _____
Name: INGRAM PARK, JR
Title: Authorized Signatory

29

IN WITNESS WHEREOF, Assignor and Assignee have caused this instrument to be executed under seal as of and on the date first above written.

ASSIGNOR:

DAVID AIM

ASSIGNEE:

FISHER TRUST

By:
Name:  DAMIAN KASSER
Title:  Authorized Signatory

# The Fisher Trust

A this resolution of Massive Entitlement as Trustee of the Fisher Trust duly passed and executed on this 1st day of May 2006

I. this passes

WHEREAS by resolution dated 3rd March 2006 the Trustee resolved to accept as an addition to the Trust Fund inter alia the shares in the UK company known as HB Holdings Ltd.

AND WHEREAS the Trustee has been informed that the said shares have not and for the time being will not in fact be settled on the trusts of the Fisher Trust

NOW HEREBY RESOLVED that the resolution of the Trustee of the Fisher Trust dated 3rd March 2006 be and the same is hereby amended so as to exclude the 100% shareholding in the UK company known as HB Holdings Ltd and the said resolution be and the same is hereby otherwise confirmed as passed

_____ _____ Baker, Director

31

# The Fisher Trust

## Deed of Removal of Beneficiary

This Deed is made the 1 May 2000

By Minerva Etablissement as Trustee of the Fisher Trust

And by Dalton Invest & Trade Inc as Protector of the Fisher Trust

WHEREAS pursuant to clause 20 of the Declaration of Trust dated 17 March 1999 bringing the Fisher Trust into existence the Trustee has power with the consent of the Protector to remove objects or persons as Beneficiaries of the Trust

AND WHEREAS a request has been received by the Trustee to remove the International Red Cross as a Beneficiary so as to make clear that the sole intended Beneficiary of the Fisher Trust is David Fisher of 79 Walton Street, London

AND WHEREAS the Trustee is agreeable to effecting such removal

AND WHEREAS the Protector is willing to give its consent to such removal

NOW THIS DEED WITNESSES as follows

- The Trustee hereby declares that with immediate effect the International Red Cross of 17 Chemin des Crets, Geneva, Switzerland be and the same is hereby removed as a Beneficiary of the Fisher Trust

- The Protector hereby consents to the removal of the International Red Cross of 17 Chemin des Crets, Geneva, Switzerland as a Beneficiary of the Fisher Trust

IN WITNESS WHEREOF this Deed has been duly executed by the parties on the day and year first before written

Executed by Minerva Etablissement          )
in accordance with the Constitution and     )
the laws of its place of incorporation       )

Executed by Dalton Invest & Trade Inc        )
in accordance with the Constitution and      )
the laws of its place of incorporation       )

32

# The Fisher Trust

Written resolutions of Nisciva Etablissement as trustee of the Fisher Trust duly passed and recorded on this 26th day of OCTOBER 2006

### 1.    Appointment of beneficiary

IT IS HEREBY RESOLVED pursuant to clause 19 of the Declaration of Trust dated 1st March 2006 establishing the Fisher Trust with the written consent of the Protector to add Sala Establishment of Josef Rheinberger Strasse 29, FL-9490 Vaduz, Liechtenstein to the class of Beneficiaries with immediate effect and until removal by trustee resolution with the consent of the Protector.

### 2.    Removal of beneficiary

IT IS HEREBY RESOLVED pursuant to clause 20 of the Declaration of Trust dated 1st March 2006 establishing the Fisher Trust with the written consent of the Protector to exclude David Aaronson of 70 Warren Street, London SW2 2HH from the class of Beneficiaries with immediate effect.

Andrew Braun, Director

We, Fallan Invest & Trade Inc. as Protector of the Fisher Trust hereby agree to the addition to and the exclusion from the class of Beneficiaries as set out above :

David Aaronson    VT Gladius, Directors

33

# The Fisher Trust

William resort on a Meeting Endorsement as Trustee of the Fisher Trust duly passed and recorded on this            day of                    2006

Name of Trust

WHEREAS in the Declaration of Trust constituting the Fisher Trust dated 1st March 2006 the name of the trust is stated to be "The Fisher Trust"

AND WHEREAS the Trustee has been informed that in order to prevent confusion it would be preferred to change the name of the Trust to "The Valmore Trust"

AND WHEREAS the Trustee believes that such name change would be advantageous and will not be a potential disadvantage

AND WHEREAS the Protector of the Trust is agreeable to the said name change

IT IS HEREBY RESOLVED pursuant to the powers vested in the Trustee by the Declaration of Trust and subject to the laws governing the Trust that the name of the Trust be and the same is hereby changed with immediate effect from "The Fisher Trust" to "The Valmore Trust"

Andrew Baker, Director

We hereby approve of and consent to the said name change of the Trust

Duly authorised for and on behalf of Fallon Invest & Trade Inc., Protector

34

# The Valmore Trust

### Deed of Removal of Beneficiary

Made This twenty-second day of March 2007

By Missive Etablissement as Trustee of the Valmore Trust

And by Dafion Invest & Trade Inc. as Protector of the Valmore Trust

WHEREAS pursuant to clause 20 of the Declaration of Trust dated 1st March 2006 bringing the Valmore Trust (formerly named the Fisher Trust) into existence the Trustee has power with the consent of the Protector to remove objects or persons as Beneficiaries of the Trust

AND WHEREAS a request has been received by the Trustee to remove Sada Establishment as a Beneficiary so as to leave no named intended Beneficiaries for the time being

AND WHEREAS the Trustee is agreeable to effecting such removal

AND WHEREAS the Protector is willing to give its consent to such removal

NOW THIS DEED WITNESSES as follows:

1. The Trustee hereby irrevocably declares that with immediate effect Sada Establishment of Josef Rheinberger Strasse 39, FL-9490 Vaduz, Liechtenstein be and the same is hereby removed as a Beneficiary of the Valmore Trust

2. The Protector hereby irrevocably consents to the removal of Sada Establishment as a Beneficiary of the Valmore Trust

IN WITNESS WHEREOF this Deed has been duly executed by the parties on the day and year first before written

Executed by Missive Etablissement          )
in accordance with its constitution and    )
the laws of its place of incorporation     )


Executed by Dafion Invest & Trade Inc.     )
in accordance with its constitution and    )
the laws of its place of incorporation     )

35

# DEED OF ASSIGNMENT

The undersigned, Miselva Etablissement, Vaduz, Founder of the firm

## Sada Establishment
Vaduz

hereby irrevocably assigns all the rights and obligations that it has as Founder pursuant to the law or the statutes of the said firm to,

*Joseph Loup*

And hereby waives all its rights to the said firm and explicitly declares that it will neither now nor in future make any claim to or in respect of such rights.

Vaduz, 6th February 2006

The Founder

## Miselva Etablissement

*[signature]*

Andrew J. Baker

36

Die Echtheit der Unterschrift von

Herrn Andrew J. Baker, geb. am 03.12.1960



wird amtlich beglaubigt.
Grundbuch- und Öffentlichkeitsregisteramt
Vaduz, den 08.02.2006

Rico Hassler

I , JOSEPH KAY , HEREBY ASSIGN ALL THE RIGHTS AND
OBLIGATIONS THAT I HAVE AS HOLDER OF THE FOUNDER'S
RIGHTS OF SABA ESTABLISHMENT

TO :    MISELVA ETABLISSEMENT

DATED :  22ⁿᵈ MARCH 2007

JOSEPH KAY

37

# THE VALMORE TRUST

## LETTER OF WISHES

To the Trustees of the Valmore Trust                          Date : 12th March 2007

Dear Sirs,

I refer to the Valmore Trust (the "Trust") created by Declaration of Trust dated 1st March 2006 by yourselves. As you are aware and have acknowledged, I am the undisclosed effective settlor of the Trust. As such, I am writing to set out and let you know my present wishes with respect to the Trust and the way in which its assets may be distributed in due course. I acknowledge and appreciate that you have absolute discretion pursuant to the trust deed as to whom or what you choose to benefit and as to the extent of benefit and as to the timing of any distribution out of the Trust Fund. Nevertheless, I feel that this letter – which contains only my wishes that are not intended to bind you or limit your discretion in any way – may be of assistance to you in your deliberations from time to time.

1.      It is my wish that, during my lifetime, I be treated as the principal and sole beneficiary of the Trust both with respect to the income and the capital of the Trust, although I may from time to time ask you to consider making one or more distributions to one or more members of my extended family.

2.      It is my wish that, after my death, my parents or the survivor of them should be treated as beneficiaries / beneficiary of the Trust and should be taken care of financially until their death. My current thinking is that a sum of USD 20,000 per month per person should suffice, but the actual amounts are up to you as trustees having first consulted the Protector.

3.      Subject to paragraph 2 above, it is my wish that, after my death, my wife (or any whom the lady I had been living with at the time of my death) be treated as a beneficiary of the Trust to the extent of 10% and that she be consulted on a regular basis with respect to her financial needs and as to the timing of distributions from the Trust Fund (whether capital or income).



38

4.    Subject to paragraph 2. above, it is my wish that, after my death, my child / children be treated as beneficiary / beneficiaries of the Trust in equal shares per stirpes to the extent of 90%, in aggregate with the capital share of each such child being distributed to them, absolutely upon their reaching the age of 30 years.

5.    It is my wish that, after my death and before my said child or children reach(es) the age of 30 years, you may utilise some or all of their intended share for their education, maintenance and benefit with a view to maintaining their standard of living to that to which they were accustomed during my lifetime.

6.    As you are aware, the Trust Fund consists primarily of holdings in subsidiary companies. It is my wish that, after my death, none of the intended beneficiaries mentioned above should seek to cause the said group of subsidiary companies to be broken up and/or liquidated in an untimely fashion. On the contrary, it is my wish that you take great care in managing such subsidiaries with advice from the Protector and such experts as you may elect fit. It is essential that the production of cash for distribution to intended beneficiaries is undertaken subject to careful consideration of the commercial feasibility thereof.

Please note that my wishes may change and, if they do, I shall write to you again. In the event of my death, these wishes shall be treated as irrevocable. In the meantime, please acknowledge receipt hereof by signing and returning to me the enclosed copy.

Yours faithfully,

_[signature]_

Receipt Acknowledged

_[signature]_

... sole member of _Mauna Development_
_Protector of the Vicmore Trust_

39

# Fallon Invest & Trade Inc.
## Pasea Estate, Road Town, Tortola, British Virgin Islands

Andrew Baker
Miselva Etablissement
Josef Rheinberger
Strasse 29
Vaduz FL-9490
Liechtenstein

18 March 2008

Dear Andrew,

We are writing to you in our capacity as Directors of the Protector for the Valmore Trust to request your resignation as Trustee with immediate effect pursuant to Clause 14 of the Declaration of Trust dated 1st March 2006.

We will be appointing the following as the new Trustee for both Trusts:

Mr. Moshe L. Popack, esq., M.B.A.
The Law office of Moshe Popack, PC
188-12 Union Turnpike
Fresh Meadows, NY 11366
P: 516-521-5110
F: 718-228-7935

It would be useful to meet in the very near future to arrange for the transfer of all documentation. Please confirm your acceptance of this request.

Regards,

David Ashfield                    Ali Guidfar

C/o Morgan & Morgan Trust Corporation limited,
PO BOX 958, Pasea Estate, Road Town, Tortola, British Virgin Islands VG 1110,
Tel: +284 49 42011, Fax: +284 49 42015, Registered in the British Virgin Islands, No. 1008536

40

**4**

**2008 M No**

<u>IN THE SUPREME COURT OF GIBRALTAR</u>
<u>CHANCERY JURISDICTION</u>

**IN THE MATTER** of the Civil Procedure Rules, Part 64, Section 1

and

**IN THE MATTER** of the Trustees Act

and

**IN THE MATTER** of the trusts known as The Valmore Trust and The Summit Trust

**BETWEEN**

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**

<u>Claimants</u>

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**

<u>Defendants</u>

**EXHIBIT "AJB4"**

This is the exhibit marked "AJB4" referred to in the Witness Statement of ANDREW JOHN BAKER dated          this      day of              2008

TERRITORY OF THE BRITISH VIRGIN ISLANDS
BVI BUSINESS COMPANIES ACT 2004

CERTIFICATE OF INCORPORATION (SECTION 7)

The Registrar of Corporate Affairs of the British Virgin Islands
HEREBY CERTIFIES, that pursuant to the BVI Business Companies Act 2004, all the
requirements of the Act in respect of incorporation having been complied with,

FALLON INVEST & TRADE INC.

BVI COMPANY NUMBER: 1008536

is incorporated in the BRITISH VIRGIN ISLANDS as a BVI BUSINESS COMPANY, this
1st day of February, 2006.

REGISTRAR OF CORPORATE AFFAIRS
1st day of February, 2006

BBC001I

# CERTIFICATE OF INCUMBENCY

Territory of the British Virgin Islands (BVI)
The Registered Agent
(Sect. 107 of the Business Companies Act, 2004)

of

## FALLON INVEST & TRADE INC.

("the Company")

upon examination of the corporate documents maintained at the Registered Office

## CERTIFIES:

1. That the Company has been validly incorporated under the laws of the BVI on February 1, 2006 as BC No. 1008536

2. That the Board of Directors of the Company and their signature right to date hereof are:
   - MOHAMMAD ALI GUIDFAR                individually
   - DAVID ASHFIELD                      individually

3. That the Board of Directors can execute all powers of the Company

4. That the Company is authorized to issue a maximum of 10,000.00 non par value shares

5. That the Registered Office and Agent of the Company is:
   MORGAN & MORGAN Trust Corporation Limited
   P.O. Box 958, Pasea Estate, Road Town, Tortola, BVI

6. That so far as evidenced by the documents filed with the Registrar of BC's, this Company is in good legal standing.

Dated this 27th day of December 2006

MORGAN & MORGAN TRUST CORPORATION LIMITED
Kay-Linda Richardson, Authorized Signatory

CERTIFIED TO BE A
TRUE COPY OF THE
ORIGINAL

ANDREW J. BAKER
Solicitor of the Supreme Court
of England and Wales

2

# R E S I G N A T I O N

The undersigned,

### David Ashfield

of Bramblebank, The Avenue, Farnham Common, Buckinghamshire, England SL2 3JS

hereby resigns with immediate effect as a Director of :

## FALLON INVEST & TRADE INC.

of Pasea Estate, Road Town, Tortola, British Virgin Islands, incorporated on 1st February 2006 with registered number 1008536

Place and Date

Signature

3

# R E S I G N A T I O N

The undersigned,

Mohammad Ali Guidfar

of 2 Garston Crescent, Watford, WD25 ØLD

hereby resigns with immediate effect as a Director of :

## FALLON INVEST & TRADE INC.

of Pasea Estate, Road Town, Tortola, British Virgin Islands, incorporated on 1st February 2006 with registered number 1008536

Place and Date

Signature

4

Certificate No. ONE

*SHARES CERTIFICATE*

For 10'000 share(s)

## FALLON INVEST & TRADE INC.

("the Company")

Incorporated under
the BVI Business Companies Act, 2004
of the Territory of the British Virgin Islands

Authorized Shares: 10'000 (TEN THOUSAND) non par value shares

*This is to certify that MISELVA ETABLISSEMENT, VADUZ is the registered holder
of 10'000 (TEN THOUSAND) non par value shares in the above-named Company,
subject to the Memorandum and Articles of Association of the said Company.*

*GIVEN* under the Common Seal of the Company this 3ʳᵈ day of March, 2006.

Sole Director

We,

## Miselva Etablissement, Vaduz

herewith transfer all our rights, title and interest in and to the 10'000 non par value shares in

FALLON INVEST & TRADE INC. as comprised in Certificate No. ONE issued on the 3rd day of March 2006:

in favour of:



Vaduz, 3rd March 2006

_____          _____
                                  Andrew J. Baker, DIRECTOR

6

# Fallon Invest & Trade Inc.
## Pasea Estate, Road Town, Tortola, British Virgin Islands

Joseph Kay, Esq.
By hand

13th March 2006

Dear Joseph,

As directors of Fallon Invest & Trade Inc. ("Fallon") we are writing to confirm to you and undertake with you as follows :

1. Fallon is the current protector of the Fisher Trust and, as such, has certain powers via à vis the trustee of the Trust as set out in the declaration of trust establishing the Trust.

2. We are the current directors of Fallon with power to sign [jointly / alone] on behalf of the company.

3. In exercising the powers vested in Fallon as protector and in sending written notices, etc. from Fallon to the trustee of the Trust, we will ensure that a copy of any such notice, etc. is first counter-signed by you before it is transmitted to the trustee.

4. This arrangement will continue in force until such time as you agree in writing to change it.

With kind regards.

Yours sincerely,

_____          _____
David Ashfield                           Ali Guidfar

7

# Fallon Invest & Trade Inc.

Pasea Estate, Road Town, Tortola, British Virgin Islands

Joseph Kay, Esq.
By hand

2 / April 2007

Dear Joseph,

As directors of Fallon Invest & Trade Inc. ("Fallon") we are writing to confirm to you and undertake with you as follows :

1.  Fallon is the current protector of the Summit Trust and, as such, has certain powers via à vis the trustee of the Trust as set out in the declaration of trust establishing the Trust.

2.  We are the current directors of Fallon with power to sign jointly on behalf of the company.

3.  In exercising the powers vested in Fallon as protector and in sending written notices, etc. from Fallon to the trustee of the Trust, we will ensure that a copy of any such notice, etc. is first counter-signed by you before it is transmitted to the trustee.

4.  This arrangement will continue in force until such time as you agree in writing to change it.

With kind regards.

Yours sincerely,

_____            _____
David Ashfield                      Ali Guidfar

**5**

2008 M No

**IN THE SUPREME COURT OF GIBRALTAR**
**CHANCERY JURISDICTION**

IN THE MATTER of the Civil Procedure Rules, Part 64, Section 1

and

IN THE MATTER of the Trustees Act

and

IN THE MATTER of the trusts known as The Valmore Trust and The Summit Trust

BETWEEN

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**

**Claimants**

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**

**Defendants**

EXHIBIT "AJB5"

This is the exhibit marked "AJB5" referred to in the Witness Statement of ANDREW JOHN BAKER dated        this        day of                2008

**Andrew Baker**

| | |
|---|---|
| Von: | Daniel Lam [d.lam@londonintbank.com] |
| Gesendet: | Donnerstag, 7. Dezember 2006 18:11 |
| An: | andrew.baker@miselva.li |
| Betreff: | RE: Jorum / Ucam |

Dear Andrew,

Please be advised that the original Deed of Assignment (Jorum) is actually in our safe in London.

I confirm that Jorum is now to be beneficially owned by AP. I have filled in the form F2 and will have it signed by Ali next week MONDAY. I will then have it couriered to you.

I can also confirm that UCAM should be held for Jorum and not AP. Please can you draft a letter to satisfy this requirement. In addition please can you go ahead with the new declaration of Trust in favour of Jorum.

Kind regards,

Daniel

Financial Controller
London International Bank
11 Grosvenor Place
London SW1X 7HH
Tel: +44 207 170 5592
Fax: +44 207 170 5510
Blackberry: +44 (0) 7738 135764
Email: d.lam@londonintbank.com

-----Original Message-----
From: Andrew Baker [mailto:andrew.baker@miselva.li]
Sent: 06 December 2006 15:24
To: Daniel Lam
Subject: Jorum / Ucam

Daniel,

With reference to our telephone conversation, I confirm that at present we
are still showing JK as the beneficial owner of Jorum, on the strength of
the Due Diligence From F2 signed at the outset by Ali. The original of the
Deed of Assignment (sort of like a bearer share certificate) was sent to
David some while ago and is, I believe, in the safe opened for the purpose
at Hypo by JK.

If Jorum is now to be beneficially owned by AP, then the Deed should be
placed under his control, i.e. in his bank safe. Alternatively, we can keep
it in our bank safe with a note that we ae holding it for him. At least then
we will know for sure where the Deed is!

In addition, we need to replace the current Form F2. I attach a blank Form
which should be completed with AP's name, signed by Ali and then please
returned to me.

Secondly, if UCAM is be held for Jorum and not for AP, then AP needs to
instruct us (Miselva) accordingly with a brief letter saying that as
current

1

beneficial owner, he hereby instructs us to hold the shares from now on for:
Jorum and not for him. We will then do a new declaration of trust in favour
of Jorum and send a copy to you for your file.

Kind regards

Andrew

2

Due Diligence – Form F1

Identification of contractual partner

I.    Name of entity:  Jorum Establishment, Vaduz

       Place and date of incorporation:          Vaduz, 06.02.2006

II.   Type of identification:

       new          X        repeat

       X      personal appearance.  If yes, date and place: several meetings in Vaduz and London

       ☐      by correspondence.  If yes, details : _____

III.  The contractual partner(s) is / are:

☒     a natural person / persons :  ☒ copy of current passport or i.d. card, attached
                                                     (copy must made by Miselva or a duly appointed delegate)

                                           ☐ certified copy of a current passport or i.d. card, attached
                                                     (if copy not made by Miselva or a duly appointed delegate)

☐     a corporate body / bodies :  ☐ original or a certified copy of a probative document not more than
                                                     6 months old, attached

IV.   Particulars of contractual partner(s):

Surname name :                      Guidfar

First name :                            Mohammad Ali

Profession:                             Company Director

Date of birth:                          06.09.1960

Nationality :                            Iranian

Residential address :               2 Garston Crescent, Watford, WDF25 o LD


Vaduz, 21.12.2006
_____                          _____
       Place and date                                          Signature

3

Due Diligence - Form F2

Determination of the beneficial owner(s)

Name of Entity:    **Jorum Establishment**

Declaration of the Contractual Partner(s):

The undersigned hereby declare(s) :-

☐    that he / she / they is / are the ultimate beneficial owner(s) of the Entity's assets; or

☑    that the following person(s) is / are the ultimate beneficial owner(s) of the Entity's assets :-

Surname(s) :    _PATARKATSISHVILI_

First name(s) :    _ARKADI_

Birth date(s) :    _31/10/55_

Profession:    _BUSINESSMAN_

Nationality / nationalities :    _GEORGIAN_

Residential address(es) :    _3 MICROQUARTER   BLOCK 10_
_APARTMENT 88   TBILISI_
_ELDANI, GEORGIA_

The contractual partner(s) hereby confirm(s) with his / her / their signature(s) the correctness and completeness of the above information. In case of any changes he / she / they will immediately inform Miselva Etablissement in writing accordingly.

Furthermore, the contractual partner(s) take(s) notice of and agree(s) to the fact, that in case of opening a bank or deposit account, the identity of the beneficial owner(s) may have to be disclosed to the bank.

_LONDON   11/12/06_

Place and date

Contractual Partner

4

**6**

<u>IN THE SUPREME COURT OF GIBRALTAR</u>                                2008 M No
<u>CHANCERY JURISDICTION</u>

**IN THE MATTER** of the Civil Procedure Rules, Part 64, Section 1

and

**IN THE MATTER** of the Trustees Act

and

**IN THE MATTER** of the trusts known as The Valmore Trust and The Summit Trust

**BETWEEN**

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**
                                                                **Claimants**

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**
                                                                **Defendants**

---

**EXHIBIT "AJB6"**

---

This is the exhibit marked "AJB6" referred to in the Witness Statement of ANDREW JOHN
BAKER dated          this      day of              2008

DECLARATION OF TRUST

# THE SUMMIT TRUST

*Nexus Treuhand Aktiengesellschaft*

TRUSTEES

Dated : 20th April, 2007

| Clause | | Page |
|---|---|---|
| 1. | Definitions | 3 |
| 2. | Trusts for Sale | 4 |
| 3. | Trusts of Added Property | 5 |
| 4. | Overriding Powers | 5 |
| 5. | Trusts in Default of Exercise of Overriding Powers | 6 |
| 6. | Ultimate Default Trusts | 6 |
| 7. | Trustees' Powers Immunities and Decision Making | 6 |
| 8. | Power of Advancement | 7 |
| 9. | Speculative Investments | 7 |
| 10. | Provision of Information | 7 |
| 11. | No Duty to Interfere in Underlying Business | 7 |
| 12. | Trustees' and Protector's Remuneration | 7 |
| 13. | Appointment of New or Additional Trustees | 8 |
| 14. | Removal of Trustees | 9 |
| 15. | Indemnity of Retiring Trustee and Protector | 9 |
| 16. | Appointment of New Protector | 10 |
| 17. | Powers of Trustees subject to Consent of Protector | 10 |
| 18. | Applicable Law and Jurisdiction | 11 |
| 19. | Power to Appoint Additional Beneficiaries | 11 |
| 20. | Power to Exclude Beneficiaries | 12 |
| 21. | Exclusion of Excluded Persons | 12 |
| 22. | Emergency Provisions | 13 |
| 23. | Power to amend | 14 |
| Schedule One - Administrative Powers | | 15 |
| Schedule Two - Initial Trust Fund | | 24 |

2

**THIS DECLARATION OF TRUST** is made on the Twentieth day of April, 2007

BY:

**NEXUS TREUHAND AKTIENGESELLSCHAFT** of Zuercherstrasse 61, CH-7320 Sargans, Switzerland (the "Original Trustees")

**WHEREAS:**

(A)    The property specified in the Second Schedule has been transferred or delivered to the Original Trustees or otherwise placed under their control and from time to time further money investments or other property may be paid or transferred to the Trustees by way of addition

(B)    The trust created by this declaration shall be irrevocable

(C)    This trust created by this declaration shall be known as **The Summit Trust**

**NOW THIS DEED WITNESSES** as follows

1.    Definitions

IN this Settlement where the context so admits

1.1    "Beneficiaries" means and includes

1.1.1    The International Red Cross of 17 Chemin des Crets, PO Box 372, Geneva, Switzerland

1.1.2    such other objects or persons as may be added under Clause 19

**PROVIDED ALWAYS** that the expression "the Beneficiaries" shall not mean or include any Gibraltar Resident

1.2    "the Emergency Trustee" means the person or corporation from time to time designated as such pursuant to the provisions of Clause 22

1.3    "Excluded Persons" means any Gibraltar Resident and any person constituted an Excluded Person pursuant to Clause 20

1.4    "Gibraltar Resident" means any person who is a resident of Gibraltar as defined in Section 2(1) of the Companies (Taxation and Concessions) Ordinance of Gibraltar or any modification or re-enactment thereof

1.5    "Protector" means Fallon Invest & Trade Inc. of Pasea Estate, Road Town, Tortola, British Virgin Islands, or such new Protector as may be appointed pursuant to Clause 16

1.6    "Settlement" means The [Summit] Trust created by this Deed

1.7    "Speculative Investments" means property the ownership of which entails to the owner thereof a risk of substantial financial loss but which entails also a possibility of greater profit on the sale or conversion into money of such property than that which might reasonably be expected to be realised on the sale or conversion into money of property not entailing to its

3

owner a risk of substantial financial loss and for the purpose of this definition "a risk of substantial financial loss" includes a risk that the value of property will prior to any sale or conversion into money thereof be reduced to nothing

1.8  "Trustees" means the Original Trustees or other trustee or trustees for the time being of the Settlement hereby created

1.9  "Trust Fund" means

    1.9.1  the property specified in the Second Schedule and

    1.9.2  all moneys investments and property paid or transferred by any person or persons to and accepted by the Trustees as additions to the Trust Fund and

    1.9.3  all accumulations (if any) of income directed to be held as an accretion to capital and

    1.9.4  the money investments and property from time to time representing such money investments property additions and accumulations or any part or parts thereof

1.10  "Trust Period" means the period commencing on the date hereof and ending on the earlier of (i) the last day of the period of one hundred years from the date hereof which period (and no other) shall be the applicable perpetuity period or (ii) such earlier date as the Trustees shall by deed specify (not being a date earlier than the date of execution of such deed)

1.11  "Trust Property" means any property comprised in the Trust Fund

1.12  references to clauses and schedules are to be construed as references to clauses and the schedules of this Settlement unless otherwise stated

1.13  references to (or to any specified provision of) this Settlement or any other document shall be construed as references to this Settlement, that provision or that document as from time to time amended and/or supplemented unless otherwise stated

1.14  words denoting the single shall include the plural and vice versa

1.15  words denoting any gender shall include both genders

1.16  references to a person shall be construed as references to an individual firm company corporation unincorporated body of persons or any state or any agency thereof

1.17  the tables of contents and clause heading are included for reference only and shall not affect the interpretation of this Deed

2.  <u>Trusts for Sale</u>

THE Trustees shall hold the Trust Fund upon trust in their discretion either to allow the same to remain in the state in which it is received or held for so long as they shall think fit or to sell or convert the same into money and may in their discretion invest such money in their names or under their control in any of the investments authorised by this Settlement or by law with power from time to time to vary or transpose any such investments for or into others so authorised.

3.    Trusts of Added Property

THE Trustees shall hold the Trust Fund upon with and subject to the trusts powers and provisions of this Settlement and the Trustees may at any time or times during the Trust Period accept such additional money investments or other property as may be paid or transferred to them upon these trusts by any person either personally or by testamentary act or disposition (including property of any onerous nature the acceptance of which the Trustees consider to be beneficial).

4.    Overriding Powers

4.1     THE Trustees shall hold the capital and income of the Trust Fund upon trust for or for the benefit of the Beneficiaries at such times in such shares upon such trusts (which may include discretionary or protective powers or trusts) and in such manner generally as the Trustees shall in their discretion appoint and such appointment may include such powers and provisions for the maintenance education or other benefit of the Beneficiaries or for the accumulation of income and such administrative powers and provisions as the Trustees think fit

4.2     No exercise of the power conferred by Clause 4.1 shall invalidate any prior payment or application of all or any part of the capital or income of the Trust Fund under the trusts of this Settlement or made under any other power conferred by this Settlement or by law

4.3     Any trusts and powers created by an appointment under Clause 4.1 may be delegated to any extent to any person, whether or not including the Trustees or any of them

4.4     The exercise of the power of appointment conferred by Clause 4.1 shall

4.4.1     be subject to the application if any of the rule against perpetuities and the law concerning excessive accumulations of income

4.4.2     be by deed revocable during the Trust Period or irrevocable executed during the Trust Period

4.4.3     be subject to the written consent of the Protector (for so long as there is a Protector of this Settlement) which consent (if applicable) shall be endorsed on such deed or deeds

4.5     Notwithstanding paragraph 20 of the First Schedule the Trustees may not release or restrict the power of appointment conferred by Clause 4.1 without the Protector's written consent for so long as there is a Protector of this Settlement

4.6     Notwithstanding the trusts and provisions herein the Trustees may by any deed or deeds revocable during the Trust Period or irrevocable and executed during the Trust Period in their absolute discretion with the written consent of the Protector (for so long as there is a Protector of this Settlement) which consent (if applicable) shall be endorsed on such deed or deeds pay or transfer the whole or any part or parts of the capital or income of the Trust Fund to the trustees for the time being of any other trust wherever established or existing and whether governed by the law of Gibraltar or by the law of any other state or territory under which any one or more of the Beneficiaries are interested notwithstanding that such other trusts may also contain trusts powers and provisions (discretionary or otherwise) in favour of some other person or persons or objects if the Trustees shall in their absolute discretion consider such payment to be for the benefit of such one or more of the Beneficiaries

5

5.    Trusts in Default of Exercise of Overriding Powers

SUBJECT to and in default of any appointment under Clause 4 and for so long as there is a Protector of this Settlement with the written consent of such Protector

5.1    The Trustees shall pay or apply the income of the Trust Fund to or for the benefit of such of the Beneficiaries as shall for the time being be in existence in such shares and in such manner generally as the Trustees shall in their discretion from time to time think fit

5.2    Notwithstanding the provisions of Clause 5.1 the Trustees may at any time in their discretion accumulate the income by investing it in any investments authorised by this Deed or by law and subject to Clause 5.3 shall hold such accumulations as an addition to capital

5.3    The Trustees may apply the whole or any part of the income accumulated under Clause 5.2 as if it were income arising in the then current year

5.4    Notwithstanding the provisions of Clauses 5.1 to 5.3 the Trustees may at any time during the Trust Period pay or apply the whole or any part of the capital of the Trust Fund to or for the benefit of all or such of the Beneficiaries in such shares and in such manner generally as the Trustees shall in their discretion think fit

6.    Ultimate Default Trusts

SUBJECT as above and if and so far as not wholly disposed of for any reason whatever by the above provisions the capital and income of the Trust Fund shall be held for such charitable purposes or objects as the Trustees may determine and for so long as there is a Protector of this Settlement any such determination shall be with the written consent of the Protector

7.    Trustees' Powers, Immunities and Decision Making

7.1    THE Trustees shall in addition and without prejudice to all statutory powers have the powers and immunities set out in the First Schedule provided that the Trustees shall not exercise any of their powers so as to conflict with the beneficial provisions of this Settlement

7.2    Notwithstanding the Trustees' powers and immunities set out in the First Schedule the Trustees shall not take any action in any form or manner directly or indirectly which would require under this Settlement written consent of the Protector without obtaining such a written consent and where the provisions of this Settlement restrict or limit the powers of the Trustees such limitations and restrictions shall apply notwithstanding any of the provisions of the First Schedule

7.3    In the event that there shall be more than two Trustees in office from time to time every decision resolution or exercise of a power or discretion required to be or capable of being made by the Trustees shall be validly made if so made by a majority in number of the Trustees and any instrument executed in pursuance of any such decision resolution or exercise shall have binding legal effect (as if executed by all the Trustees) if it shall be executed by a majority in number of the Trustees but not so as to render any of the Trustees liable for any act or thing done or omitted without his consent by reason of the provisions of this paragraph or for any act in which he joins for conformity only

7.4    A resolution in writing signed by a majority of the Trustees shall be valid and effective as if it had been passed at a meeting of the Trustees duly convened and held and any such resolution may consist of one or more documents in similar form each signed by one or more of the Trustees

6



8.    Power of Advancement

THE Trustees may pay or apply the Trust Property for the advancement or benefit of any Beneficiary

9.    Speculative Investments

IT is expressly declared that one of the purposes of the trusts hereby created may be to invest all or part of the Trust Fund in Speculative Investments and accordingly the Trustees shall not be liable for any loss sustained to the value of the Trust Fund by reason only that it may comprise or have comprised (whether in whole or part) Speculative Investments and for the purposes of this clause "invest" shall be given its widest possible meaning

10.    Provision of Information

10.1    SUBJECT to Clause 10.2 the Trustees shall not be bound to furnish any information relating to the value state or amount of the Trust Fund or any assets comprising the Trust Fund to any Beneficiary unless and until a Beneficiary has a vested interest in all or any part of the Trust Fund and then only to the extent of that interest and in particular but without limiting the foregoing the Trustees shall not be bound to notify any Beneficiary that he is a beneficiary of this Settlement

10.2    The obligation of the Trustees to furnish information in relation to the Trust Fund in relation to any company an interest in which comprises part or all of the Trust Fund (such a company being in this subclause hereinafter called an "underlying company") shall be to furnish information only of the fact that the shares in an underlying company form part of the Trust Fund and the number and nominal value of the shares in an underlying company which form part of the Trust Fund and accordingly the Trustees shall not be obliged in relation to an underlying company to provide any Beneficiary with any information regarding the administration management or conduct of the business or affairs of that underlying company

11.    No Duty to Interfere in Underlying Business

THE Trustees are under no duty to enquire into the conduct of a company in which they are interested unless they have knowledge of circumstances which call for enquiry

12.    Trustees' and Protector's Remuneration

12.1    ANY Trustee or Protector who is a solicitor accountant or other person engaged in any profession or business shall be entitled to charge and be paid all usual professional or other charges and to receive commission or other benefits for or in respect of business transacted time expended and acts done by him or any employee or partner of his in connection with these trusts including acts which a trustee or protector not being in any profession or business could have done personally

12.2    Any Trustee or Protector which is a trust corporation or company authorised to undertake trust business shall be entitled in addition to reimbursement of its proper expenses to remuneration for its services in accordance with its published terms and conditions for trust business in force from time to time and in the absence of such published terms and conditions in accordance with such terms and conditions as may from time to time be determined by such Trustee or Protector

7

12.3     Any Trustee or Protector shall be entitled to retain any brokerage or other commission which may be received personally or by such Trustee's or Protector's firm in respect of any transaction carried out on behalf of this Settlement for which such Trustee or Protector or Trustee's or Protector's firm is in the normal course of business allowed brokerage or other commission notwithstanding that the receipt of such brokerage or commission was procured by an exercise by such Trustee or Protector of powers over the Trust Fund

12.4     All costs, charges, liabilities and expenses incurred and payments made by the Trustee in the lawful exercise of the powers conferred upon it by these presents shall be payable or reimbursable out of the Trust Fund or income thereof.

12.5     The Trustee shall be indemnified out of the Trust Fund and/or income thereof (i) in respect of all liabilities sustained and costs and expenses properly incurred by it or by any delegate or sub-delegate appointed by it or to whom any duties, powers, trusts, authorities or discretions may be delegated by it in the proper execution or purported execution of the trusts, powers, authorities or discretions vested in it by, or the proper performance of obligations assumed by it under the Settlement, (ii) against all liabilities, actions, proceedings, costs and expenses, claims and demands in respect of any matter or thing properly done or omitted by it or any other person in any way relating to this Settlement except to the extent that any such are sustained or incurred as a result of the negligence, willful misconduct or fraud of the Trustee.

13.     Appointment of New or Additional Trustees

13.1     IF any Trustee whether original additional or substituted shall die or being a company shall be dissolved or shall give notice of a desire to withdraw and be discharged from these trusts or shall be unfit or unwilling to act or shall be removed by the Protector pursuant to Clause 14 then

      13.1.1     the Protector or if there shall be no Protector or if the Protector shall be unable or unwilling to act

      13.1.2     the Trustees or if there shall be no Trustee in existence or willing to act

      13.1.3     the Supreme Court of Gibraltar or the court of such other place which shall then be the forum for the administration of these trusts in accordance with the terms of Clause 18 may by deed appoint one or more other persons or bodies corporate to be a trustee or trustees in place of the trustee so deceased dissolved desiring to withdraw becoming unfit or unwilling to act or so removed

13.2     The person or body for the time being having the power to appoint new trustees in accordance with Clause 13.1 shall also have power to appoint by deed one or more other persons or companies to be an additional trustee or trustees

13.3     Where new or additional trustees are appointed for the whole or any part or parts of the Trust Fund the appointor or appointors may appoint any person or persons as trustee or trustees notwithstanding the residence domicile place of business or (if any body corporate) place of incorporation of such person or persons and the receipt of such person or persons for the whole or such part or parts of the Trust Fund as may be paid or transferred to such person or persons pursuant to such appointment shall be a good discharge to any other trustee or trustees accordingly

8

13.4    Any corporate body may at any time be appointed either as a general trustee or as custodian trustee hereof on such terms or conditions as to remuneration (payable out of the income or capital of the Trust Fund) and otherwise in all respects as the appointor or appointors shall prescribe or approve

13.5    The power of appointing new trustees shall not be exercisable by reason only that a trustee remains out of Gibraltar (or if applicable out of the jurisdiction which is then the forum for the administration of these trusts in accordance with the terms of Clause 18) for more than twelve months

13.6    Acts and instruments done or executed for the proper vesting of the Trust Fund in new or additional trustees shall be done and executed by the continuing or retiring trustee or trustees at the expense of the income or capital of the Trust Fund PROVIDED THAT an outgoing trustee who is liable as a trustee or who may at the death of any person be liable as a trustee or on any other occasion be liable as a former trustee for any taxes wherever they may be imposed and of whatsoever nature shall not be bound to transfer the Trust Fund unless reasonable security is provided for indemnifying such outgoing trustee against such liability

13.7    The Supreme Court of Gibraltar or the court of such any other place which shall then be the forum for the administration shall have the power to vest the Trust Fund in the trustees appointed by such court

13.8    On every change in the trusteeship a memorandum shall be endorsed on or permanently annexed to this Deed stating the name of the Trustees for the time being and shall be signed by the persons so named and any person shall be entitled to rely upon such memorandum (or the latest of such memoranda if more than one) as sufficient evidence that the Trustees named in such memorandum are the duly constituted trustees of this Settlement for the time being

14.    Removal of Trustees

THE office of a trustee shall be determined and vacated if such trustee being an individual shall be found to be a lunatic or of unsound mind or shall become subject to any proceedings under the insolvency or bankruptcy laws applicable to such trustee or if such trustee being a company shall enter into liquidation whether compulsory or voluntary (not being merely a voluntary liquidation for the purpose of amalgamation or reconstruction) or if its ownership changes without prior written notification to the Protector or if the Protector (at any time when there is a Protector of this Settlement) removes such trustee by written notice

15.    Indemnity of Retiring Trustee and Protector

15.1    IF a Trustee ceases to be a trustee such Trustee shall be released from all claims demands actions proceedings and accounts of any kind on the part of any other person (whether in existence or not) actually or prospectively interested under this Settlement for or in respect of the capital and income of the Trust Fund or these trusts or an act or thing done or omitted in execution or purported execution of these trusts other than and except only actions

15.1.1    arising from any breach of trust to which such Trustee or (in the case of a corporate trustee) any of its officers or employees was a party or privy

9

15.1.2    to recover from such Trustee the whole or any part of the Trust Fund in the possession of such Trustee or previously received by such Trustee or (in the case of a corporate Trustee) any of its officers or employees and converted to the use of such trustee or officers or employees

15.2    If the Protector for the time being shall have died or retired as Protector then the Protector or the personal representatives of such Protector shall be entitled to a similar release as that specified above for a retiring trustee in respect of any act or thing done or omitted to be done

15.3    The Protector shall not owe any fiduciary duty towards and shall not be accountable to any person or persons from time to time interested hereunder or to the Trustees for any act of omission or commission of the Protector in relation to the powers given to the Protector by this Settlement to the intent that the Protector (in the absence of fraud or dishonesty) shall be free from any liability whatsoever in relation to such powers

15.4    The Protector shall be wholly indemnified and held harmless out of the Trust Fund from any losses damages or judgment debt arising out of any action or suit in a court of law based upon or in connection with the Protector's powers or duties under this Settlement

16.    Appointment of New Protector

16.1    THE Protector shall cease to be the Protector on death if an individual or on dissolution if a company or in either case on becoming unable or unfit to act or  in the case of the Protector being a company if there shall be a change of ownership and in the case of a company with bearer shares if there shall be a change in the identity of the person recorded by the Trustees as being the holder of the bearer share certificate(s)

16.2    The Protector may by deed revocable or irrevocable during protectorship nominate a person to become the Protector upon the person making the nomination ceasing to be the Protector and thereupon if the nomination remains unrevoked and the Trustees have been given written notice of the nomination and the person nominated consents in writing (which consent is endorsed on any such deed) such person shall immediately become the Protector PROVIDED THAT if the Protector shall be a company then any such deed as is referred to above shall first be approved by the company in general meeting before it is executed on behalf of the company by its board

16.3    If at any time there is no longer a Protector of this Settlement the Trustees may if they consider it desirable to do so appoint by deed a person to be the Protector of this Settlement provided always that such person consents in writing to such appointment which consent is endorsed on such deed

17.    Powers of Trustees Subject to Consent of Protector

NOTWITHSTANDING anything herein contained and in particular conferring an absolute or uncontrolled discretion on the Trustees all and every power and discretion vested in the Trustees by such provisions of this Settlement as are specified below shall for as long as there is a Protector of this Settlement and as stated in the relevant Clause or Clauses of this Deed be exercisable by the Trustees only with the prior or simultaneous written consent of the Protector:

Clause 4:        Overriding Powers
Clause 5:        Trusts in default of exercise of overriding powers
Clause 6:        Ultimate Default Trusts
Clause 19:       Appointment of additional Beneficiaries

10

Clause 20.1:    Exclusion of Beneficiaries

Clause 22:    Power to designate Emergency Trustee and revoke such designation

18.    Applicable Law and Jurisdiction

18.1    THE proper law of this Settlement shall be that of Gibraltar and all rights under this Settlement and its construction and effect shall be subject to the jurisdiction of and construed according to the laws of Gibraltar

18.2    The courts of Gibraltar shall be the forum for the administration of these trusts

18.3    Notwithstanding the provisions of Clauses 18.1 and 18.2

18.3.1    The Trustees shall have power (subject to the application (if any) of the rule against perpetuities) to carry on the general administration of these trusts in any jurisdiction in the world whether or not such jurisdiction is for the time being the proper law of this Settlement or the courts of such jurisdiction are for the time being the proper law of this Settlement or the courts of such jurisdiction are for the time being the forum for the administration of these trusts and whether or not the Trustees or any of them are for the time being resident in or otherwise connected with such jurisdiction

18.3.2    The Trustees may at any time declare in writing that from the date of such declaration the proper law of this Settlement shall be that of any specified jurisdiction (not being a jurisdiction under the law of which this Settlement would be capable of revocation) and that all rights under this Settlement and its construction and effect shall be subject to and construed according to the laws of that jurisdiction

18.3.3    The Trustees may at any time declare in writing that from the date of such declaration the forum for the administration of this Settlement shall be the courts of any specified jurisdiction

19.    Power to Appoint Additional Beneficiaries

19.1    THE Trustees and for so long as there is a Protector of this Settlement with the written consent of such Protector shall have power at any time or times during the Trust Period to add to the class of Beneficiaries such one or more objects or persons (not being an Excluded Person or Gibraltar Resident) as the Trustees with such consent of the Protector (if applicable) shall in their absolute discretion determine

19.2    Any such addition shall be made by deed which shall be endorsed with the written consent of the Protector (if applicable) and which

19.2.1    shall name or describe the one or more objects or persons to be thereby added to the class of Beneficiaries and

19.2.2    shall specify the date (not being earlier than the date of the deed but during the Trust Period) from which such one or more objects or persons shall be so added and

19.2.3    shall specify the period during which such one or more objects or persons is to be included with the class of Beneficiaries

20.  Power to Exclude Beneficiaries

20.1  THE Trustees and for so long as there is a Protector of this Settlement with the written consent of such Protector may by deed made at any time or times during the Trust Period declare that the one or more objects or persons or the members of a class named or specified (whether or not ascertained) in such deed who are would or might but for this Clause be or become a Beneficiary or Beneficiaries or be or become otherwise able to benefit hereunder as the case may be

20.1.1  shall be wholly or partially excluded from future benefit hereunder or

20.1.2  shall cease to be a Beneficiary or Beneficiaries or

20.1.3  shall be an Excluded Person or Excluded Persons

and any such deed may be irrevocable or revocable during the Trust Period shall have effect from the date specified therein and shall be endorsed with the written consent of the Protector (if applicable) provided that this power shall not be capable of being exercised so as to derogate from any interest to which any Beneficiary has previously become indefeasibly entitled whether in possession or in reversion or otherwise

20.2  Any person of full age to whom or for whose benefit any capital or income of the Trust Fund may be liable whether directly or indirectly to be paid appointed transferred or applied in any manner whatsoever by or in consequence of an exercise of any trust power or discretion vested in the Trustees or in any other person may by deed to which the Trustees are party during the Trust Period either revocably (but revocable during the Trust Period only) or irrevocably

20.2.1  disclaim his interest as an object of such trust power or discretion either wholly or with respect to any specified part or share of such capital or income provided that any disclaimer by a Beneficiary of his whole interest shall be irrevocable or

20.2.2  declare that he shall cease to be a Beneficiary or

20.2.3  declare that he shall be an Excluded Person and such

deed shall have effect from the date thereof

21.  Exclusion of Excluded Persons

SUBJECT to Clause 12 and notwithstanding anything else contained or implied in this Settlement no Excluded Person shall be capable of taking any benefit of any kind by virtue or in consequence of this Settlement and in particular but without prejudice to the generality of the foregoing provisions of this Clause

21.1  The Trust Fund and the income thereof shall henceforth be possessed and enjoyed to the entire exclusion of any such Excluded Person and of any benefit to him by contract or otherwise

21.2  No part of the capital or income of the Trust Fund shall be paid or lent or applied for the benefit either directly or indirectly of any such Excluded Person in any manner or in any circumstances whatsoever and

21.3  No power or discretion hereby or by any appointment made hereunder or by law conferred upon the Trustees or any of them shall be capable of being exercised in such manner that any such Excluded Person will or may become entitled either directly or indirectly to any benefit in any manner or in any circumstances whatsoever.

12

12

22    Emergency Provisions

22.1    ANY Trustee hereof shall automatically cease to be a Trustee hereof on the happening of any of the following events within the territory where such Trustee is incorporated (in the case of a corporate Trustee) or resident in the case of a natural person that is to say

22.1.1    the invasion of such territory by military forces

22.1.2    the enactment of any law or the taking of any action by or on the part of any governmental authority agency or officer of or within the said territory the aim or purpose or effect of which is or would be had such Trustee sole control of the assets comprising the Trust Fund

22.1.2.1    the acquisition expropriation or confiscation of any of the assets comprising the Trust Fund or any part thereof

22.1.2.2    to jeopardise or interfere with or hamper the exercise by any such Trustee of its administrative or executive functions in respect of the trusts thereof or the Trust Fund or its discretion in respect thereof

22.1.2.3    the restriction suspension abrogation withdrawal or cancellation or rescission of any exemption relief or contract in relation to the trusts hereby created or in relation to the Trust Fund or any part thereof whether in respect of exchange or currency control or any other matter

22.1.2.4    to levy any tax or duty on the capital of the Trust Fund in excess of five (5) per centum per annum thereof

22.1.2.5    to levy any tax or charge or fee on the income of the Trust Fund or any part thereof in excess of five (5) per centum per annum thereof

22.1.3    the nationalization or attempted nationalization of a controlling interest in the Trustee or the intervention in its affairs by a government official or a government body or agency in such a way that the Trustees are unable efficiently to carry out their duties and exercise their discretion in accordance with the terms of this Settlement

22.2    Forthwith upon any such Trustee ceasing to be a Trustee pursuant to this Clause any such Trustee shall be divested of title to the Trust Fund which shall automatically vest in the Emergency Trustee as if the Emergency Trustee had been the Original Trustee hereof and the forum for the administration of this Settlement shall forthwith be deemed to be the place of incorporation (or residence if a natural person) of the Emergency Trustee and the laws of such place shall become the proper law of this Settlement and the Courts of the said place of incorporation or residence shall have exclusive jurisdiction in respect of the trusts hereof and any matters relating hereto

22.3    The Trustees and for so long as there is a Protector of this Settlement with the written consent of such Protector have the power exercisable by deed (endorsed with such consent, if applicable) from time to time of designating the Emergency Trustee and also and for so long as there is a Protector of this Settlement with the written consent of such Protector have the power exercisable by deed (endorsed with such consent, if applicable) of revoking any such designation

13

23.    THE Trustees shall have power at any time or times during the Trust Period by deed or deeds to revoke or vary any of the administrative provisions of this Settlement or to add any further administrative provisions as the Trustees may consider expedient for the purposes of this Settlement and without prejudice to the generality of the above for ensuring that at all times there should be a trustee of this Settlement and that the Trust Fund shall be fully and effectively vested in or under the control of such trustee and that the trusts of this Settlement shall be enforceable by the Beneficiaries provided always that the power conferred by this clause shall only be exercisable if the Trustees shall be advised in writing by a lawyer of at least 10 years' standing qualified in the law of the jurisdiction which for the time being is the proper law of this Settlement that it would be expedient for the purposes of this Settlement that the administrative provisions be revoked varied or added to in the manner specified in such written advice and that such power shall be exercisable only by the Trustees executing a deed in a form appropriate to carry such advice into effect.

IN WITNESS whereof the Original Trustees have executed this Declaration of Trust on the day and year first hereinbefore written

[The First Schedule and the Second Schedule follow]

14

14

FIRST SCHEDULE

ADMINISTRATIVE POWERS

INDEX TO CLAUSES

| Clause | | Page |
|---|---|---|
| 1. | General | 16 |
| 2. | General powers as to properties and investments | 16 |
| 3. | Trustees' powers and discretions | 16 |
| 4. | Power to lend and to give guarantees | 16 |
| 5. | Power to borrow | 17 |
| 6. | Power to permit occupation of property and enjoyment of chattels | 17 |
| 7. | Powers in relation to real property | 17 |
| 8. | Powers in relation to chattels | 18 |
| 9. | Powers in relation to securities | 18 |
| 10. | Power to vote and to employ nominees and custodians | 19 |
| 11. | Power to promote companies | 19 |
| 12. | Power to delegate management of investments | 20 |
| 13. | Power to trade | 20 |
| 14. | Power to give indemnities | 20 |
| 15. | Exclusion of apportionment | 21 |
| 16. | Power to deal with insurance policies | 21 |
| 17. | Power to take out life policies | 21 |
| 18. | Power to insure property | 21 |
| 19. | Power to take counsel's opinion | 21 |
| 20. | Release of powers | 21 |
| 21. | Power of appropriation | 22 |
| 22. | Power to receive remuneration | 22 |
| 23. | Power to appoint agents | 22 |
| 24. | Power to pay duties and taxes | 22 |
| 25. | Power to permit self-dealing | 22 |
| 26. | Protection of Trustees | 22 |
| 27. | Delegation of powers | 22 |
| 28. | Power to pay parent or guardian | 23 |
| 29. | Power to assign pledge charge or mortgage the Trust Fund | 23 |

1.    General

THE Trustees shall have all the powers of investments sale alienation exchange partition mortgage charging pledging leasing insurance protection improvement equipment dealing disposition and management and all other powers of an absolute beneficial owner of the Trust Fund. Such power shall not be restricted by any principle of construction but shall operate according to the widest generality of which the foregoing words are capable notwithstanding that certain powers are more particularly set out in the following clauses

2.    General Powers as to Property and Investments

2.1    THE Trustees shall have power to allow the property or investments at any time subject to the trusts hereof to remain unsold or in the actual state of investment thereof for so long as the Trustees may think fit and at any time or times to sell call in or convert into money the said property or investments or any part or parts thereof and power at any time pending investment to place any moneys for so long as the Trustees think fit on any current or deposit account

2.2    The Trustees shall have power to change exchange or vary any property or investments for the time being subject to the trusts hereof for others hereby or by law authorised

2.3    The Trustees shall have power to invest any money requiring to be invested under the trusts hereof in the purchase of or at interest upon the security of such stocks funds shares securities land immovable or movable property of any tenure or chattels or in any trade (whether or not as partners or limited partners or others) or other investment or property of whatsoever nature and wheresoever situate and whether producing income or not whether involving liabilities or not or upon such personal credit with or without security as the Trustees shall in their absolute discretion think fit to the intent that the Trustees shall have the same power in all respects as if they were a sole beneficial absolute owner

2.4    In the investment of the Trust Fund the Trustees shall not be required to have regard to the diversification of investments and save for any provision to the contrary contained in Clause 26 of these provisions shall not be liable or responsible for any loss to the Trust Fund which may arise from the failure of the Trustees to diversify the investments comprised in the Trust Fund

2.5    The acquisition of any reversionary interest or any policy of insurance or assurance sinking fund policy or other policy of whatever nature or any annuity or securities or other investments not producing income or of a wasting nature or for any other reason not within the meaning of the word 'investment' strictly construed shall be deemed to be an authorised investment of trust moneys if the Trustees shall consider the same to be for the benefit of any one or more of the Beneficiaries

3.    Trustees' Powers and Discretions

EVERY power and discretion vested in the Trustees shall be exercisable in their absolute and uncontrolled discretion and the Trustees shall exercise such powers and discretions as they shall think most expedient for the benefit of all or any of the persons actually or prospectively interested under this Settlement and may exercise (or refrain from exercising) any power or discretion for the benefit of any one or more of them without being obliged to consider the interests of the others or other of them

4.   Power to Lend and to Give Guarantees

    4.1   THE Trustees shall have power to lend money or property to any one or more of the Beneficiaries either free of interest or on such terms as to payment of interest and generally as the Trustees shall in their absolute discretion think fit

    4.2   The Trustees shall have power to guarantee the payment of money and the performance of obligations in respect of any existing or future borrowings by any one or more of the Beneficiaries from third parties or guarantees indemnities or other commitments of like nature given to third parties by any one or more of the Beneficiaries including without prejudice to the generality of the above the power to pledge the whole or part of the assets comprising the Trust Fund in support of any such guarantee given as above by the Trustees and to enter into such indemnities as they shall in their absolute discretion think fit in connection with any such guarantee

5.   Power to Borrow

THE Trustees shall have power to borrow and raise money for any purpose (including the investment of the moneys so raised as part of the Trust Fund) whether upon the security of the whole or any part of the Trust Fund or upon personal security only and to mortgage charge or pledge any part of the Trust Fund as security for any moneys so raised and to guarantee the payment of money and the performance of obligations in respect of borrowings by any company fully or partly owned by the Trustees and in connection with such guarantees to enter into such indemnities as the Trustees shall in their absolute discretion think fit

6.   Power to Permit Occupation of Property and Enjoyment of Chattels

THE Trustees shall have power to permit any one or more of the Beneficiaries to occupy or reside in or upon any dwelling house building or land or to have the enjoyment and use of chattels or other movable property for the time being held upon these trusts on such terms as to payment of rent rates taxes and other expenses and outgoings and as to insurance repair and decoration and generally upon such terms as the Trustees shall in their absolute discretion think fit

7.   Powers in Relation to Real Property

WHERE the Trust Fund for the time being includes any real or immovable property (in this clause referred to as "the land") the Trustees shall have power to sell exchange convey lease mortgage charge agree to let license and otherwise conduct the management of the land as if the Trustees were the sole beneficial owner thereof and

    7.1   The Trustees may lease all or any part of the land for any purpose and whether involving waste or not and for any term and either wholly or partly in consideration of a rent (whether fixed or variable) or fine or premium or the erection improvement or repair or any agreement to erect improve or repair buildings or other structures on the land and may accept (with or without consideration) surrender of any lease of all or any part of the land

    7.2   The Trustees may in executing any trust or power of sale sell all or any part of the land either wholly or partly in consideration of an annual sum payable either in perpetuity or for any term (whether definite or indefinite) and being either reserved out of the land sold or secured in such other manner as the Trustees shall in their absolute discretion think fit

    7.3   The Trustees may in executing any trust or power of sale or leasing

        7.3.1   sell or lease all or any part of the land whether the division is horizontal or vertical or


17

made in any other way

7.3.2    sell or lease or reserve any easement or right or privilege over all or any part of the land

7.3.3    sell or lease or except or reserve any timber or mines or minerals on or in or under all or any part of the land together with any easements rights or privileges or cutting or working and carrying away the same or otherwise incidental to or connected with forestry or mining purposes

7.3.4    impose and make binding for the benefit of all or any part of the land sold or leased any restrictions or stipulations as to user or otherwise affecting any part of the land retained

7.3.5    accept in exchange for all or any part of the land to be sold or leased (either with or without any money paid or received for equality of exchange) any other real or immovable property or any lease

7.3.6    enter into any contract or grant any option for the sale or leasing of all or any part of the land or otherwise for the exercise by the Trustees of any of their above powers

7.4    The Trustees shall not be bound to see nor be liable or accountable for omitting or neglecting to see to the repair or insurance of any buildings or other structures on the land or to the payment of any outgoings or otherwise as to the maintenance of the land or any buildings or other structures on the land but may maintain repair or insure the same in such manner and to such extent as they shall in their absolute discretion think fit

7.5    The Trustees may from time to time expend moneys (whether capital or otherwise) in making any repairs whether of a permanent nature or not and any improvements whether sanctioned by statute or not or in enlarging improving decorating redecorating equipping furnishing or altering the land or any buildings or other structures on the land (including erecting demolishing or rebuilding the same) to such extent and in such manner as they shall in their absolute discretion think fit and any certificate in writing of any architect or surveyor employed by the Trustees to the effect that any work specified in such certificate is or includes an alteration or an improvement to the land or any such building or other structure shall be conclusive as between the Trustees and the Beneficiaries that any money expended on such work was properly expended in exercise of this power

8.    <u>Powers in Relation to Chattels</u>

**WHERE** the Trust Fund for the time being includes any chattels (in this clause referred to as "the chattels")

8.1    The Trustees may sell lease hire deposit store or otherwise deal with the chattels upon such terms as they shall in their absolute discretion think fit

8.2    The Trustees shall not be bound to see nor be liable or accountable for omitting or neglecting to see to the repair or insurance of the chattels but may repair and insure the chattels in such manner and to such extent as they shall in their absolute discretion think fit

9.    <u>Powers in Relation to Securities</u>

9.1    **THE** Trustees shall be entitled to retain all or any shares stock debenture stock or other securities in any public or private company which may be transferred to them from time to time or to purchase subscribe or apply for or otherwise acquire any further or additional

18



shares or other securities in any such company (hereinafter called "the Shares") and may retain all or any of the Shares for so long as they shall in their absolute discretion consider it beneficial to do so

9.2    The Trustees may exercise all the powers given to them by the ownership of the Shares for the purposes of carrying on or causing to be carried on the business of such company or companies as if they were beneficially entitled thereto

9.3    The Trustees may at any time as they shall in their absolute discretion think fit wind up or concur in winding up such company or companies whether for the purposes of any reconstruction amalgamation or other arrangements concerning the company or companies or may promote or agree to any such reconstruction amalgamation or other arrangement or scheme including the formation of a new company or companies to take over the business of such company or companies

9.4    The Trustees shall not be liable or responsible for any loss to the Trust Fund arising from a depreciation in value of the Shares or in any otherwise resulting from the retention of the Shares by the Trustees as aforesaid

9.5    The Trustees shall have power to obtain or join with others in obtaining from any Stock Exchange permission to deal in the Alternative Investment Market in the United Kingdom (or any such similar or replacement market) or to obtain from any Stock Exchange a quotation for or permission to deal in any securities which or some of which are comprised in the Trust Fund and shall have power to sell or join with any other person or persons in selling or disposing of any securities with a view to creating a market in such securities whether or not a sale or disposition would on any other ground be desirable or expedient

10.    <u>Power to Vote and to Employ Nominees and Custodians</u>

IN respect of any property comprised in the Trust Fund the Trustees shall have power

10.1    To vote upon or in respect of any shares securities bonds notes or other evidence of interest in or obligation of any corporation trust association or concern whether or not affecting the security or the apparent security of the Trust Fund or the purchase or sale or lease of the assets of any such corporation trust association or concern

10.2    To deposit any such shares securities or property in any voting trust or with any depositary designated under such a voting trust

10.3    To give proxies or powers of attorney with or without power of substitution for voting or acting on behalf of the Trustees as the owners of any such property

10.4    To hold any or all securities or other property in bearer form or in the names of the Trustees or any one or more of them or in the name of some other person or partnership or in the name or names of nominees without disclosing the fiduciary relationship created by this Settlement and to deposit the said securities and any title deeds or other documents belonging or relating to the Trust Fund in any part of the world with any bank firm trust company or other company that undertakes the safe custody of securities as part of its business without being responsible for the default of such bank firm trust company or other company or for any consequent loss

11.    <u>Power to Promote Companies</u>

THE Trustees may (without prejudice to the generality of their powers of investment) promote or join with any other person or persons in promoting or incorporating any company in any part of the world or

19

subscribe for or acquire any of the shares or stock or debentures or debenture stock or loan capital of any company with a view to or in consideration of

11.1 the establishment and carrying on by such company of a business of any kind which the Trustees are for the time being authorised to carry on themselves and the acquisition of any of the assets comprised in the Trust Fund which may be required for the purposes of such business

11.2 the acquisition of the assets and undertaking of any business being carried on by the Trustees under the above power

11.3 the acquisition of all or any of the assets comprised in the Trust Fund to be held as investments of the company acquiring the same

12. Power to Delegate Management of Investments

12.1 THE Trustees shall have power to engage the services of such investment adviser or advisers as the Trustees may from time to time think fit ("the investment adviser") to advise the Trustees in respect of the investment and reinvestment of the Trust Fund with power for the Trustees without being liable for any consequent loss to delegate to the investment adviser discretion to manage all or any part of the Trust Fund within the limits and for the period stipulated by the Trustees and the Trustees shall settle the terms and conditions for the remuneration of the investment adviser and the reimbursement of the investment adviser's expenses as the Trustees shall in their absolute discretion think fit and such remuneration and expenses shall be paid by the Trustees from the Trust Fund

12.2 The Trustees shall not be bound to enquire into nor be in any manner responsible for any changes in the legal status of the investment adviser

12.3 The Trustees shall incur no liability for any action taken pursuant to or for otherwise following the advice of the investment adviser however communicated

13. Power to Trade

13.1 THE Trustees shall have power to trade or take part in any venture in the nature of trade whether solely or jointly with any other person and whether or not by way of partnership (limited or general) and for these purposes make such arrangements as they shall in their absolute discretion think fit and may delegate any exercise of this power to any one or more of their number or to a company or partnership formed for this purpose

13.2 Any power vested in the Trustees under this Settlement shall (where applicable) extend to any arrangements in connection with any such trade or venture and in particular but without prejudice to the generality of the above the Trustees' powers of borrowing and charging shall extend to any borrowing arrangements made in connection with such trade or venture and whether made severally or jointly with others or with unequal liability and the Trustees shall be entitled to be fully indemnified out of the Trust Fund against all personal liability to which they may become in any manner subject in connection with any such trade or venture

14. Power to Give Indemnities

14.1 THE Trustees shall have power to enter into any indemnity in favour of any former trustee or any other person in respect of any fiscal imposition or other liability of any nature prospectively payable in respect of the Trust Fund or otherwise in connection with this Settlement and to charge or deposit the whole or any part of the Trust Fund as security for any

20



such indemnity in such manner in all respects as they shall in their absolute discretion think fit

14.2   The Trustees shall have power to give or enter into any indemnity warranty guarantee undertaking or covenant or enter into any type of agreement that they shall in their absolute discretion think fit relating to the transfer or sale of a business or private company shareholding held or owned for the time being by the Trustees whether relating to the business or company itself its assets liabilities shares or employees or any other aspect of the business or company in favour of any transferee purchaser or other relevant party and including any limitation or restriction on value or otherwise as the Trustees shall in their absolute discretion think fit

15.   Exclusion of Apportionment

NO statutory or equitable rules of apportionment shall apply to this Settlement and the Trustees shall be permitted to treat all dividends and other payments in the nature of income received by them as income at the date of receipt irrespective of the period for which the dividend or other income is payable

16.   Power to Deal with Insurance Policies

THE Trustees shall in addition and without prejudice to all statutory and other powers conferred upon them have the following powers in relation to any insurance policy ("the policy") from time to time comprised in the Trust Fund

16.1   To borrow on the security of the policy for any purpose

16.2   To convert the policy into a fully paid-up policy for a reduced sum assured free from payment of future premiums

16.3   To surrender the policy wholly or any part or any bonus attaching to the policy for its cash surrender value

16.4   To sell the policy or any substituted policy on such terms as the Trustees shall in their absolute discretion think fit

16.5   To exercise any of the powers conferred by the policy or with the consent of the insurer to alter the amount or occasion of the payment of the sum assured or to increase or decrease the amount of the periodic premiums (if any) payable under the policy or to alter the period during which the premiums are payable and to do any of these things notwithstanding that the sum assured may be reduced subject always to production of evidence of insurability satisfactory to the insurer

17.   Power to Take Out Life Policies

THE Trustees shall have power to effect and maintain out of the capital or income of the Trust Fund any policy of insurance or assurance upon the life of any person or under which the death of any person is one of the events under which moneys may be payable

18.   Power to Insure Property

THE Trustees shall have power to insure against any loss or damage from any peril any property for the time being comprised in the Trust Fund for any amount and to pay the premiums out of the Trust Fund

21

19.    Power to take Counsel's Opinion

THE Trustees shall have power to take the opinion of legal counsel locally or where necessary or appropriate elsewhere concerning any difference arising under the Settlement or any matter in any way relating to this Settlement or to their duties in connection with these trusts and in all matters to act in accordance with the opinion of such counsel.

20.    Release of Powers

THE Trustees may by deed or deeds and so as to bind their successors as trustees release or restrict the future exercise of all or any of the powers by this Settlement or by law conferred on them either wholly or to the extent specified in any such deed or deeds notwithstanding the fiduciary nature of any such power

21.    Power of Appropriation

THE Trustees shall have power in their absolute discretion to appropriate any part of the Trust Fund in its then actual condition or state of investment in or towards satisfaction of any interest or share in the Trust Fund as may in all the circumstances appear to them to be just and reasonable and for the above purposes from time to time to place such value on any or all investments or other property as they shall in their absolute discretion think fit

22.    Power to Receive Remuneration

NO Trustee shall be liable to account for any remuneration or other profit received by such Trustee in consequence of such Trustee acting as or being appointed to be a director officer or employee of any company notwithstanding that such appointment was procured by an exercise by such Trustee or by the Trustees of voting rights attached to securities comprised in the Trust Fund

23.    Power to Appoint Agents

THE Trustees shall have power instead of acting personally to employ and pay at the expense of the Trust Fund any agent in any part of the world whether attorneys solicitors accountants brokers banks trust companies or other agents without being responsible for the default of any agent if employed in good faith to transact any business or act as nominee or do any act in the execution of these trusts including without prejudice to the generality of the above the receipt and payment of moneys and the execution of documents

24.    Power to Pay Duties and Taxes

IN the event of any tax duty or fiscal imposition whatsoever becoming payable in Gibraltar or elsewhere in respect of the Trust Fund or any part thereof in any circumstances whatsoever the Trustees shall have power to pay all such taxes duties or fiscal impositions out of the Trust Fund or income thereof and shall have entire discretion as to the time and manner in which the said taxes duties or fiscal impositions shall be paid and the Trustees may pay such taxes duties or fiscal impositions notwithstanding that the same shall not be recoverable from the Trustees or the Beneficiaries or other persons entitled hereunder or that the payment shall not be to the advantage of any Beneficiary or other person entitled hereunder

25.    Power to Permit Self-Dealing

THE Trustees shall have power to enter into any transaction concerning the Trust Fund notwithstanding that one or more of the Trustees may be interested in the transaction other than as one of the Trustees

26.   Protection of Trustees

IN the execution of these trusts no Trustee shall be liable for any loss to the Trust Fund arising by reason of any improper investment made in good faith or for the negligence or fraud of any agent employed by such Trustee or by any of the Trustees although the employment of such agent was not strictly necessary or expedient or by reason of any mistake or omission made in good faith by such Trustee or by any of the Trustees or by reason of any matter or thing except wilful and individual fraud or dishonesty on the part of the Trustee who is sought to be made liable

27.   Delegation of Powers

27.1    THE Trustees may delegate to any one or more of their number the operation of any bank account in their names

27.2    Any Trustee shall have power at any time (notwithstanding any rule of law to the contrary) by deed or deeds revocable during the Trust Period or irrevocable and executed during the Trust Period to delegate to any person or to any corporate trustee (including in cases where there is more than one Trustee to any other or others of the Trustees) the exercise of all or any powers and discretions conferred on such Trustee notwithstanding the fiduciary nature of such power or powers

28.   Power to Pay Parent or Guardian

THE Trustees may pay to the parent or either parent or guardian of any minor any sum of income to be applied for the maintenance education or benefit of that minor or any sum of capital intended to be applied for the advancement or benefit of that minor so that the receipt of such parent or parents or guardian shall be a complete discharge to the Trustees and the Trustees shall not be required to enquire into the application of such sums

29.   Power to assign pledge charge or mortgage the Trust Fund

THE Trustees shall have power to assign pledge charge or mortgage the whole or any part of the Trust Fund by way of security for any borrowing guarantee or other obligation made given or indemnified by the Trustees or any debts or obligations of any Beneficiary or any liability incurred by them as Trustees

23

SECOND SCHEDULE

CHF 1,000  (ONE THOUSAND SWISS FRANCS)

Duly executed for and on behalf of        )
**NEXUS TREUHAND AG**                      )

Director

24

THE SUMMIT TRUST

LETTER OF WISHES

To the Trustees of the Summit Trust                    Date : 20 April 2007

Dear Sirs,

I refer to the Summit Trust (the "Trust") created by Declaration of Trust dated 20 April / March 2007 by yourselves. As you are aware and have acknowledged, I am the undisclosed effective settlor of the Trust. As such, I am writing to set out and let you know my present wishes with respect to the Trust and the way in which its assets may be distributed in due course. I acknowledge and appreciate that you have absolute discretion pursuant to the trust deed as to whom or what you choose to benefit and as to the extent of benefit and as to the timing of any distributions out of the Trust Fund. Nevertheless, I feel that this letter - which contains only my wishes that are not intended to bind you or limit your discretion in any way – may be of assistance to you in your deliberations from time to time.

1.    It is my wish that, during my lifetime, I be treated as the principal and sole beneficiary of the Trust both with respect to the income and the capital of the Trust, although I may from time to time ask you to consider making one or more distributions to one or more members of my extended family.

2.    It is my wish that, after my death, my wife failing whom the lady I had been living with at the time of my death be treated as a beneficiary of the Trust to the extent of 10% and that she be consulted on a regular basis with respect to her financial needs and as to the timing of distributions from the Trust Fund (whether capital or income).

3.    It is my wish that, after my death, my child / children be treated as beneficiary / beneficiaries of the Trust in equal shares per stirpes to the extent of 90% in aggregate with the capital share of each such child being distributed to them absolutely upon their reaching the age of 30 years.

25

4.      It is my wish that, after my death and before my said child or children reach(es) the age of 30 years, you may utilise some or all of their intended share for their education, maintenance and benefit with a view to maintaining their standard of living to that to which they were accustomed during my lifetime.

5.      As you are aware, the Trust Fund consists primarily of holdings in subsidiary companies. It is my wish that, after my death, none of the intended beneficiaries mentioned above should seek to cause the said group of subsidiary companies to be broken up and/or liquidated in an untimely fashion. On the contrary, it is my wish that you take great care in managing such subsidiaries with advice from the Protector and such experts as you may deem fit. It is essential that the production of cash for distribution to intended beneficiaries is undertaken subject to careful consideration of the commercial feasibility thereof.

Please note that my wishes may change and, if they do, I shall write to you again. In the event of my death these wishes shall be treated as irrevocable. In the meantime, please acknowledge receipt hereof by signing and returning to me the enclosed copy.

Yours faithfully,

26

## The Summit Trust

Written resolution of Nexus Treuhand AG as trustee of the Summit Trust duly passed and recorded on this 20th day of April 2007

Acceptance of trust assets

IT IS HEREBY RESOLVED pursuant to clause 1 of the Declaration of Trust dated 20th April 2007 establishing the Summit Trust to accept as an addition to the Trust Fund the beneficial ownership of 100% of the company:

Talladega Invest Corp, a British Virgin Island company with registration number 1051761

R.A. Vedat Erduran

27

# The Summit Trust

### Deed of Removal of Beneficiary

Made this seventh day of June 2007

By Nexus Treuhand AG as Trustee of the Summit Trust

And by Fallon Invest & Trade Inc. as Protector of the Summit Trust

WHEREAS pursuant to clause 20 of the Declaration of Trust dated 20th April 2007 bringing the Summit Trust into existence the Trustee has power with the consent of the Protector to remove objects or persons as Beneficiaries of the Trust

AND WHEREAS a request has been received by the Trustee to remove The International Red Cross as a Beneficiary so as to leave no named intended Beneficiaries for the time being

AND WHEREAS the Trustee is agreeable to effecting such removal

AND WHEREAS the Protector is willing to give its consent to such removal

WITNESSETH as follows :

1.     The Trustee hereby irrevocably declares that with immediate effect The International Red Cross of 17 Chemin des Crets, P. O. Box 372, Geneva, Switzerland be and the same is hereby removed as a Beneficiary of the Summit Trust

2.     The Protector hereby irrevocably consents to the removal of The International red Cross as a Beneficiary of the Summit Trust

IN WITNESS WHEREOF this Deed has been duly executed by the parties on the day and year first before written

Executed by Nexus Treuhand AG          )
in accordance with its constitution and      )
the laws of its place of incorporation        )

Executed by Fallon Invest & Trade Inc.   )   MR AN JUNIPER
in accordance with its constitution and      )
the laws of its place of incorporation        )   MR DAVID RAFFIELD

28

# Fallon Invest & Trade Inc.

## Pasea Estate, Road Town, Tortola, British Virgin Islands

R.A. Vedat Erduran
Nexus Treuhand AG
Zurcherstrasse 61
CH-7320 Sargans
Switzerland

18 March 2008

Dear Mr Erduran,

We are writing to you in our capacity as Directors of the Protector for the Summit Trust to request your resignation as Trustee with immediate effect pursuant to Clause 14 of the Declaration of Trust dated 20th April 2007.

We will be appointing the following as the new Trustee:

Mr. Moshe L. Popack, esq., M.B.A.
The Law office of Moshe Popack, PC
185-12 Union Turnpike
Fresh Meadows, NY 11366
P: 516-521-5110
F: 718-228-7935

It would be useful to meet in the very near future to arrange for the transfer of all documentation. Please confirm your acceptance of this request.

Regards,

David Ashfield                    Ali Gaidfar

C/o Morgan & Morgan Trust Corporation limited,
PO BOX 958, Pasea Estate, Road Town, Tortola, British Virgin Islands VG 1110,
Tel: +284 49 42011, Fax: +284 49 42015, Registered in the British Virgin Islands, No. 1008536

29

# Fallon Invest & Trade Inc.

### Pasea Estate, Road Town, Tortola, British Virgin Islands

Nexus Treuhand AG
Zurcherstrasse 61
CH-7320 Sargans
Switzerland

For the attention of Vedat Erduran, Esq.

26th March 2008

Dear Sirs,

We write with reference to our letter of 18th March 2008 in which we (as Protector of the Summit Trust) requested you to resign as trustee of the Summit Trust.

We hereby unconditionally retract our said letter and our request for you to resign and hereby confirm that we wish you to continue as trustee of the Summit Trust until further notice.

Yours faithfully

Fallon Invest & Trade Inc.
Per:

_____          _____
Ali Guidfar                                      David Ashfield

30

**7**

IN THE SUPREME COURT OF GIBRALTAR                    2008 M No
CHANCERY JURISDICTION

IN THE MATTER of the Civil Procedure Rules, Part 64, Section 1

and

IN THE MATTER of the Trustees Act

and

IN THE MATTER of the trusts known as The Valmore Trust and The Summit Trust

BETWEEN

MISELVA ETABLISSEMENT (1)
NEXUS TREUHAND AG (2)

Claimants

and

INNA GUDAVADZE (1)
JOSEPH KAY (2)
IYA PATARKATSISHVILI (3)
LIANA ZHMOTOVA (4)
FALLON INVEST & TRADE INC. (5)

Defendants

EXHIBIT "AJB7"

This is the exhibit marked "AJB7" referred to in the Witness Statement of ANDREW JOHN
BAKER dated        this    day of              2008

Fw: URGENT

## Andrew Baker

| | |
|---|---|
| **Von:** | David Ashfield [d.ashfield@londonintbank.com] |
| **Gesendet:** | Dienstag, 5. Dezember 2006 10:45 |
| **An:** | andrew.baker@miselva.li |
| **Cc:** | n.shachknova@btconnect.com |
| **Betreff:** | Fw: URGENT |

Andrew, please find attached the draft of the loan agreement. There is one obvious error on the signature page where the borrower and lender have been transposed. I would be grateful if you could complete withe the Montglimmer details and correct the error and any others that you pick up. The value date will be 6th December so I imagine we should change that? I will get for you also the signature of myself and Joseph as per our normal procedure for funds transfer. I also need to draft a letter of instructions to yourself from the UBO (BP?) Aithorising the transaction. We do need to instruct today. It may also be worth entering into an FRA given the USD performance but I will look into that. Regards,

David Ashfield

London International Bank Ltd
11 Grosvenor Place, SW1X 7HH
Mobile: +44 7887897329
Blackberry: +44 7921881027
Tel: +44 2071705591
Fax: +44 2071705510

-----Original Message-----
From: Natalia Shachkova
To: David Ashfield
Sent: Tue Dec 05 09:31:51 2006
Subject: URGENT

Go <<Loan_final.doc>> od morning David,

This is the last version of the Loan agreement.

Regards,

Natalia

Dear Natalya,
This is the final version of a Loan Agreement checked by the external counsel for compliance with Swiss and Liechtenstein law.
Please, put Lender's details and send it back to us.
Waiting for your reply and information about bank transfer. Our bankk is informed already and is ready to credit money on Coalco Int. account.

Thanks.
Ekaterina Mavrenkova.

17.04.2008

## Andrew Baker

| | |
|---|---|
| **Von:** | David Ashfield [d.ashfield@londonintbank.com] |
| **Gesendet:** | Dienstag, 5. Dezember 2006 11:54 |
| **An:** | andrew.baker@miselva.li |
| **Betreff:** | Montglimmer |

Andrew, attached is the transfer instruction we normally use along with our internal authorisation signed by me, I will get Joseph's signature later this afternoon as he is five hours behind us in Miami. BP's signature will come later. Regards,

**David Ashfield**

**London International Bank Ltd**
11 Grosvenor Place, SW1X 7HH
Mobile: +44 7887897329
Blackberry: +44 7921861027
Tel: +44 2071705591
Fax. +44 2071705510

2

 London International Bank Ltd

## TRANSFER REQUEST

| | |
|---|---|
| **TRANSFER REQUIRED BY** | |
| Joseph Kay | |

**DETAILS OF TRANSFER**
Loan to Coalco International Limited from Montglimmer Overseas Limited.

**AMOUNT TO TRANSFER**

| CURRENCY<br>( $, EURO, £ ) | USD $46,000,000 (From Euro Account) |
|---|---|

**BANK DETAILS:**

| FROM: | Company: Montglimmer Overseas Limited<br>Account Name: Montglimmer Overseas Limited<br>Account No: 308130 |
|---|---|
| TO: | Bank: UBS AG, (Head Office), Zurich<br>Clearing #230<br>Account No: 230-354.094.641<br>Swift Code: UBSWCHZH80A<br>In Favour of: Coalco International Ltd.<br>IBAN: CH09 0023 0230 3540 9464 J<br>Ref: Loan |

AUTHORISED BY: Lord J. Kay/David Ashfield

DATE: 05/12/06

EXECUTED BY: Daniel Lam

CASH BOOK LOGGED:

*3*

**Andrew Baker**

| | |
|---|---|
| **Von:** | David Ashfield [d.ashfield@londonintbank.com] |
| **Gesendet:** | Dienstag, 5. Dezember 2006 18:00 |
| **An:** | Andrew Baker |
| **Cc:** | Daniel Lam |
| **Betreff:** | Montglimmer Loan |

Andrew, attached are the authorisations that you needed for the Coalco loan. Daniel, please ensure that
these are filed on the file of Montglimmer and are fully reflected in their financial statements. Regards,

David Ashfield

**London International Bank Ltd**
11 Grosvenor Place, SW1X 7HH
Mobile: +44 7887897329
Blackberry: +44 7921881027
Tel: +44 2071705591
Fax: +44 2071705510

4



# London International Bank Ltd

| TRANSFER REQUEST | |
|---|---|
| **TRANSFER REQUIRED BY** | |
| Joseph Kay | |
| **DETAILS OF TRANSFER** | |
| Loan to Coalco International Limited from Montglimmer Overseas Limited. | |
| **AMOUNT TO TRANSFER** | |
| **CURRENCY** ( $, EURO, £ ) | USD $46,000,000 (From Euro Account) |

**BANK DETAILS:**

| | |
|---|---|
| **FROM:** | Company: Montglimmer Overseas Limited<br>Account Name: Montglimmer Overseas Limited<br>Account No: 308130 |
| **TO:** | Bank: UBS AG, (Head Office), Zurich<br>Clearing #230<br>Account No: 230-354.094.64J<br>Swift Code: UBSWCH2H80A<br>In Favour of: Coalco International Ltd.<br>IBAN: CH09 0023 0230 3540 9464 J<br>Ref: Loan |

**AUTHORISED BY:** Lord J. Kay/David Ashfield

**DATE:** 05/12/06

**EXECUTED BY:** Daniel Lam

**CASH BOOK LOGGED:**

05-DEC-2006 16:20  DE :MEDICABLE S.A      +21222334333      A :00442072358085      P.2/2
05 Dec 06 18:44    Lakehaw Ltd                                00442072358085      p.2

Miselva Establishment
Att. Mr Andrew Baker
PO Box 635
Josef Rheinberger Strasse 29
Vaduz
FL-9490 Liechtenstein

5th December 2006

Dear Mr Baker,

Montglimmer Overseas Limited

This is to authorise you in your position as Director of Montglimmer Overseas
Limited to enter into the loan agreement of 5th December 2006 with Coalco Ltd for a
total of $46,000,000 for a period of one year at an interest rate of 10%.

Yours sincerely,

Mr Arkadi Patarkatsishvili

Seite 1 von 1

## Andrew Baker

**Von:**      Daniel Lam [d.lam@londonintbank.com]
**Gesendet:** Mittwoch, 20. Juni 2007 11:51
**An:**       andrew_baker@miselva.li
**Betreff:**  Georgian Deal

Hi Andrew,

As per our conversation we are currently trying to arrange a deal in Georgia whereby we will be purchasing land and building cottages on them.

The present scheme is that a Georgian Company (Belair) will purchase the land. There is apparently a trust agreement signed by Belair in favour of AP.
This structure will somewhat change as I have been instructed to set up a Luxembourg company to hold Belair, which I am currently working on. AP's name should not really be mentioned anywhere hence the new Lux Co. will be wholly owned by JK. The project however is 50% JK and 50% AP hence I would be grateful if you could recommend the best way for AP to hold his share.

Finally Natalia will be sending you documents in relation to the purchase of the land (be it quite a lot of pages) and I would kindly ask you to review them from a legal perspective to see if there is anything in them that may cause us concern. I will need feedback on this ASAP as the transfer of funds and the signing of the agreements will be done in the next few hours.

Sorry for the lack of advance warning but yet again I was only just told that this deal has to be completed by today.

Please also note that the funds will need to come out of Montglimmer's account in Hypo so I will also need your signature for the transfer request. I will shortly send you these transfers for signing (that is upon your approval of course).

Kind regards,

Daniel

Financial Controller
London International Bank
11 Grosvenor Place
London SW1X 7HH
Tel: +44 207 170 5592
Fax: +44 207 170 5510
Blackberry: +44 (0) 7738 135764
Email: d.lam@londonintbank.com

Registered in England, No 3256543 32
Authorised and Regulated by the Financial Services Authority
This e-mail, together with any attachments, is confidential between the sender and addressee, if you are not the intended recipient(s) of this e-mail you should not copy or use it for any purpose nor disclose its contents to any person to do so may be unlawful. If you have received this e-mail by mistake please notify the sender immediately and delete this e-mail and any attachments from your IT system. To the maximum extent permitted by law London International Bank Ltd accepts no liability for any loss or damage resulting from unauthorised use of this email or any attachments by telecommunication and our e-mail can not be guaranteed to be virus free.

20.06.2007

Mr Joseph Kay
70 Walton Street
London SW3 2HH
UK

Mr William Cid De La Paz
Finsbury Trust
Suites 7B & 8B
50 Town Range
Gibraltar

22 January 2008

RE: TRANSFER OF DIRECTORSHIP AND SHAREHOLDING

Dear Mr. Cid De La Paz

Please accept this letter as my request and instruction to disclose all information pertaining to the below-mentioned companies to Mr. Andrew J. Baker at Miselva Etablissement, Vaduz and to co-operate with Mr. Baker and Miselva in (i) transferring the shares of the company, (ii) transferring the administration of the company to Miselva and (iii) appointing new directors and officers as Mr. Baker may direct.

1.  Ascension Bay Limited
2.  Linerpool Limited
3.  Numina Securities Limited
4.  Juliett Incorporated

I acknowledge that these provisions will be charged as per your administrative costs.

With thanks for your assistance.

Yours faithfully,

Mr. Joseph Kay

8

**8**

<u>IN THE SUPREME COURT OF GIBRALTAR</u>                    **2008 M No**
<u>CHANCERY JURISDICTION</u>

**IN THE MATTER** of the Civil Procedure Rules, Part 64, Section I

and

**IN THE MATTER** of the Trustees Act

and

**IN THE MATTER** of the trusts known as The Valmore Trust and The Summit Trust

**BETWEEN**

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**
                                                          <u>Claimants</u>

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**
                                                          <u>Defendants</u>

_____

**EXHIBIT "AJB8"**

_____

This is the exhibit marked "AJB8" referred to in the Witness Statement of ANDREW JOHN
BAKER dated        this        day of            2008

DATED ....... 21 December 2007

(1) MISELVA ETABLISSEMENT AS TRUSTEE OF THE VALMORE TRUST

(2) JWL ENTERTAINMENT GROUP INC

AGREEMENT

for the sale and purchase of
the entire issued share capital of

CHAPEL STREET CONSTRUCTION LIMITED

Stevens & Bolton LLP
The Billings
GUILDFORD
GU1 4YD

Ref JRP.KRILL.01053.1

## CONTENTS

|    |                                   | Page No. |
|----|-----------------------------------|----------|
| 1  | INTERPRETATION                    | 1        |
| 2  | SALE AND PURCHASE                 | 2        |
| 3  | CONSIDERATION                     | 2        |
| 4  | COMPLETION                        | 3        |
| 5  | WARRANTIES                        | 3        |
| 6  | FURTHER ASSURANCE                 | 3        |
| 7  | ASSIGNMENT                        | 4        |
| 8  | WHOLE AGREEMENT                   | 4        |
| 9  | VARIATION AND WAIVER              | 4        |
| 10 | SEVERANCE                         | 4        |
| 11 | THIRD PARTY RIGHTS                | 5        |
| 12 | COUNTERPARTS                      | 5        |
| 13 | GOVERNING LAW AND JURISDICTION    | 5        |

2

THIS AGREEMENT is dated 31 December 2007

## PARTIES

(1)     MISELVA ETABLISSEMENT as trustee of the Valmore Trust, a private company
incorporated and registered in Liechtenstein whose registered office is at Josef
Rheinberger Strasse 29, P.O. Box 635, FL-9490 Vaduz, Liechtenstein ("Seller")

(2)     JWL ENTERTAINMENT GROUP INC, a private company incorporated and
registered in the State of Delaware with EIN number 20-2569110 whose address is at
Blumbergexcelsior Corporate Services Inc, 3500 South DuPont Highway, Dover, DE
19901, County of KENT in the State of Delaware, United States of America
("Buyer").

## BACKGROUND

(A)     The Seller has agreed to sell and the Buyer has agreed to buy the Sale Shares subject
to and on the terms and conditions of this agreement.

(B)     The Seller is the registered holder of the Sale Shares of the Company at the date
hereof and holds these Sale Shares as trustee of the Valmore Trust.

(C)     The Seller is willing to sell and the Buyer is willing to buy the Sale Shares with all
rights attaching to them from the Effective Date for the Consideration and upon the
terms set out in this agreement

## AGREED TERMS

1       INTERPRETATION

1.1     The definitions and rules of interpretation in this clause apply in this agreement.

| | |
|---|---|
| Buyer's Shares | one (1) share of no par value in the capital of the Buyer; |
| Company | Chapel Street Construction Limited, a private company limited by shares incorporated and registered in England and Wales with company number 05717163 whose registered office is at 3rd Floor, 11 Grosvenor Place, London, SW1X 7HH with an issued share capital of one (1) ordinary share of £1; |
| Completion | completion of the sale and purchase of the Sale Shares in accordance with this agreement; |
| Completion Date | the date of this agreement; |
| Consideration | the consideration for the sale and purchase of the Sale Shares set out in clause 3; |
| Encumbrance | any interest or equity of any person including any right to acquire, option or |

1



3

| | right of pre-emption) or any mortgage, charge, pledge, lien, assignment, hypothecation, security, interest, title, retention or any other security agreement or arrangement; |
| Effective Date | 31 December 2007; |
| Sale Shares | the one (1) ordinary share of £1 in the Company, comprising the whole of the allotted and issued share capital of the Company. |
| Warranties | the statements set out in clause 5. |

1.2    Clause and schedule headings do not affect the interpretation of this agreement.

1.3    A reference to a clause or a schedule is a reference to a clause of, or schedule to, this agreement. A reference to a paragraph is to a paragraph of the relevant schedule, and a reference to an appendix is to the relevant appendix to this agreement.

1.4    A person includes a corporate or unincorporated body.

1.5    Words in the singular include the plural and in the plural include the singular.

1.6    A reference to one gender includes a reference to the other gender.

1.7    A reference to a statute, statutory provision or any subordinate legislation made under a statute is to such statute, provision or subordinate legislation as amended or re-enacted from time to time whether before or after the date of this agreement and, in the case of a statute, includes any subordinate legislation made under that statute whether before or after the date of this agreement.

1.8    Writing or written includes faxes but not e-mail.

1.9    Documents in agreed form are documents in the form agreed by the parties or on their behalf and initialled by them or on their behalf for identification.

1.10    Where the words include(s), including or in particular are used in this agreement, they are deemed to have the words "without limitation" following them.

1.11    References to this agreement include this agreement as amended or varied in accordance with its terms.

## 2    SALE AND PURCHASE

The Seller shall sell with full title guarantee subject to all Encumbrances existing at the Effective Date and the Buyer shall buy the Sale Shares, together with all rights that attach (or may in the future attach) to them on or after the Effective Date, including, in particular, the right to receive all dividends and distributions declared, made or paid thereon.

## 3    CONSIDERATION

The Consideration for the sale of the Sale Shares shall be the issue and allotment on Completion to the Seller of the Buyer's Shares credited as fully paid.

2

4.      COMPLETION

4.1     Completion shall take place on the Completion Date.

4.2     At Completion the Seller shall deliver or cause to be delivered:

    4.2.1   transfers of the Sale Shares executed by the registered holders in favour of the Buyer;

    4.2.2   the share certificates for the Sale Shares in the names of the registered holders or an indemnity in the agreed form for any lost certificates; and

    4.2.3   the statutory register and minute books of the Company (written up to the time of Completion), the common seal, certificate of incorporation and any certificates of incorporation on change of name,

4.3     On the Completion Date the Seller shall procure that the directors of the Company shall hold a board meeting at which the transfer of the Sale Shares (subject to stamping) to the Buyer shall be approved for registration in the Company's statutory register.

4.4     At Completion the Buyer shall

    4.4.1   procure the transfer of the Buyer's Shares in satisfaction of the Consideration and deliver as soon as reasonably practicable following Completion definitive share certificates in respect of such Buyer's Shares (in the name of the Seller) to the Seller, and

    4.4.2   enter the Seller's name in the register of members of the Buyer in respect of the number of Buyer's Shares held by the Seller.

4.5     As soon as possible after Completion the Seller shall deliver to the Buyer all documents of title, records, correspondence, documents, files, memoranda and other papers relating to the Company, not required to be delivered at Completion which are in its possession.

5.      WARRANTIES

5.1     The Seller warrants and represents to the Buyer that each of the Warranties set out in this clause 5 is true and accurate and not misleading at the date of this agreement:

    5.1.1   the Sale Shares constitute the whole of the allotted and issued share capital of the Company and are fully paid; and

    5.1.2   the Seller is the sole legal owner of the Sale Shares as trustee of the Valmore Trust.

6.      FURTHER ASSURANCE

Each party shall (at its own expense) promptly execute and deliver all such documents, and do all such things, or procure the execution of documents and doing of such things as are required to give full effect to this agreement and the transaction intended to be effected pursuant to it.

3



ASSIGNMENT

Neither party may assign or transfer any of its rights, benefits or obligations under this agreement. Each party confirms that it is acting on its own behalf and on no-one else's.

8    WHOLE AGREEMENT

8.1    This agreement constitutes the whole agreement and understanding of the parties and supersedes any previous arrangements, understanding or agreement between the parties relating to the subject matter of this agreement. Save as expressly provided, and to the maximum extent they may be excluded by contract, this agreement excludes any warranty, covenant, condition or undertaking which may be implied by law. The Buyer acknowledges that it has not been induced to enter into this agreement by, and so far as permitted by law and except in the case of fraud, hereby waives any remedy in respect of, any warranties, representations, undertakings, promises or assurances not incorporated expressly into this agreement.

8.2    Nothing in this clause shall operate to limit or exclude any liability for fraud

9    VARIATION AND WAIVER

9.1    Any variation of this agreement must be in writing and signed by or on behalf of the parties.

9.2    Any waiver of any right under this agreement is only effective if it is in writing and it applies only to the party to whom the waiver is addressed and to the circumstances for which it is given.

9.3    No failure to exercise or delay in exercising any right or remedy provided under this agreement or by law constitutes a waiver of such right or remedy nor shall it prevent any future exercise or enforcement thereof.

9.4    No single or partial exercise of any right or remedy under this agreement shall preclude or restrict the further exercise of any such right or remedy or other rights or remedies

10    SEVERANCE

10.1    If any provision of this agreement (or part of a provision) is found by any court or administrative body of competent jurisdiction to be invalid, unenforceable or illegal, that provision shall be ineffective to the extent of such illegality, invalidity or unenforceability but the other provisions shall remain in force.

10.2    If any invalid, unenforceable or illegal provision would be valid, enforceable or legal if some part of it were deleted, the provision shall apply with the minimum modification necessary to make it legal, valid and unenforceable



4



11    THIRD PARTY RIGHTS

No term of this agreement shall be enforceable under the Contracts (Rights of Third Parties) Act 1999 by a person who is not a party to this agreement, but this does not affect any right or remedy of a third party which exists or is available apart from under that Act.

12    COUNTERPARTS

This agreement may be executed in any number of counterparts, each of which when executed and delivered constitutes an original of this agreement but all the counterparts shall together constitute the same agreement.

13    GOVERNING LAW AND JURISDICTION

13.1    This agreement and any disputes or claims arising out of or in connection with its subject matter are governed by and construed in accordance with the law of New York.

13.2    The parties irrevocably agree that the courts of New York have exclusive jurisdiction to settle any dispute or claim that arises out of or in connection with this agreement.

This agreement has been entered into on the date stated at the beginning of it.

Signed by ANDREW BAKER for and    )
on    behalf    of    MISELVA    )
ETABLISSEMENT as trustee of the    )
VALMORE TRUST.    )

Signed by a director for and on behalf of    )
JWL ENTERTAINMENT GROUP    )
INC.    )

5

7

STOCK
TRANSFER
FORM

(Above this line for Registrars only)

Certificate lodged with the Registrar

(For completion by the Registrar/Stock Exchange)

SPARD CREDIT CORPORATION LIMITED

ORDINARY SHARES OF £1 EACH

| Words | | Figures |
| --- | --- | --- |
| ONE | | |

In the name(s) of

EUROPA ETABLISSEMENT AS TRUSTEE OF THE VALMORE TRUST
3 MIT HELISBURGER STRASSE 34
POSTFACH 63M
FTI 9490 VADUZ
LIECHTENSTEIN.

I/We hereby transfer the above security out of the name(s) aforesaid to the person(s) named below

Stamp of Selling Broker(s) or, for transactions which are not stock exchange transactions of Agent(s), if any, acting for the Transferor(s)

PAT INVESTMENTS GROUP INC
RICHMOND HOUSE CORPORATE SERVICES INC.
12TH NORTH CORST HIGHWAY
NEVIS
NEVIS
COUNTY OF NEVIS
STATE OF NEVIS
UNITED STATES OF AMERICA

I/We request that such entries be made in the register as are necessary to give effect to this transfer

Stevens & Bolton LLP
The Billings, Guildford, Surrey, GU1 4YT

DX75 Guildford 1
01483204364

## FORM OF CERTIFICATE REQUIRED FOR EXEMPTION FROM STAMP DUTY

## FORM OF CERTIFICATE REQUIRED WHERE THE TRANSFER IS NOT EXEMPT BUT IS NOT LIABLE TO AD VALOREM STAMP DUTY

DATED ........ 31 December 2007

(1) MISELVA ETABLISSEMENT AS TRUSTEE OF THE VALMORE TRUST

(2) JWL ENTERTAINMENT GROUP INC

AGREEMENT

for the sale and purchase of
the entire issued share capital of

CHESTER STREET ENTERPRISES LIMITED

Stevens & Bolton LLP
The Billings
GUILDFORD
GU1 4YD

Ref: JRP.KRI.LO1053.1

10

CONTENTS

|     |                                      | Page No. |
|-----|--------------------------------------|----------|
| 1   | INTERPRETATION                       | 1        |
| 2   | SALE AND PURCHASE                    | 2        |
| 3   | CONSIDERATION                        | 2        |
| 4   | COMPLETION                           | 3        |
| 5   | WARRANTIES                           | 3        |
| 6   | FURTHER ASSURANCE                    | 3        |
| 7   | ASSIGNMENT                           | 4        |
| 8   | WHOLE AGREEMENT                      | 4        |
| 9   | VARIATION AND WAIVER                 | 4        |
| 10  | SEVERANCE                            | 4        |
| 11  | THIRD PARTY RIGHTS                   | 5        |
| 12  | COUNTERPARTS                         | 5        |
| 13  | GOVERNING LAW AND JURISDICTION       | 5        |

THIS AGREEMENT is dated 31 December 2007

PARTIES

(1)  MISELVA ETABLISSEMENT as trustee of the Valmore Trust, a private company incorporated and registered in Liechtenstein whose registered office is at Josef Rheinberger Strasse 29, P.O. Box 635, FL-9490 Vaduz, Liechtenstein ("Seller").

(2)  JWL ENTERTAINMENT GROUP INC, a private company incorporated and registered in the State of Delaware with EIN number 20-2569110 whose address is at Blumbergexcelsior Corporate Services Inc, 3500 South DuPont Highway, Dover, DE 19901, County of KENT in the State of Delaware, United States of America ("Buyer").

BACKGROUND

(A)  The Seller has agreed to sell and the Buyer has agreed to buy the Sale Shares subject to and on the terms and conditions of this agreement

(B)  The Seller is the registered holder of the Sale Shares of the Company at the date hereof and holds these Sale Shares as trustee of the Valmore Trust.

(C)  The Seller is willing to sell and the Buyer is willing to buy the Sale Shares with all rights attaching to them from the Effective Date for the Consideration and upon the terms set out in this agreement.

AGREED TERMS

1    INTERPRETATION

1.1  The definitions and rules of interpretation in this clause apply in this agreement.

| | |
|---|---|
| Buyer's Shares | one (1) share of no par value in the capital of the Buyer; |
| Company | Chester Street Enterprises Limited, a private company limited by shares incorporated and registered in England and Wales with company number 06241160 whose registered office is at Bridge House, 25 Fiddlebridge Lane, Hatfield, Hertfordshire, AL10 0SP with an issued share capital of one (1) ordinary share of £1; |
| Completion | completion of the sale and purchase of the Sale Shares in accordance with this agreement; |
| Completion Date | the date of this agreement; |
| Consideration | the consideration for the sale and purchase of the Sale Shares set out in clause 3; |
| Encumbrance | any interest or equity of any person (including any right to acquire, option or |

12

|  | right of pre-emption) or any mortgage, charge, pledge, lien, assignment, hypothecation, security, interest, title, retention or any other security agreement or arrangement; |
| Effective Date | 31 December 2007; |
| Sale Shares | the one (1) ordinary share of £1 in the Company, comprising the whole of the allotted and issued share capital of the Company; |
| Warranties | the statements set out in clause 5. |

1.2 Clause and schedule headings do not affect the interpretation of this agreement.

1.3 A reference to a clause or a schedule is a reference to a clause of, or schedule to, this agreement. A reference to a paragraph is to a paragraph of the relevant schedule, and a reference to an appendix is to the relevant appendix to this agreement.

1.4 A person includes a corporate or unincorporated body.

1.5 Words in the singular include the plural and in the plural include the singular.

1.6 A reference to one gender includes a reference to the other gender.

1.7 A reference to a statute, statutory provision or any subordinate legislation made under a statute is to such statute, provision or subordinate legislation as amended or re-enacted from time to time whether before or after the date of this agreement and, in the case of a statute, includes any subordinate legislation made under that statute whether before or after the date of this agreement.

1.8 Writing or written includes faxes but not e-mail.

1.9 Documents in agreed form are documents in the form agreed by the parties or on their behalf and initialled by them or on their behalf for identification.

1.10 Where the words include(s), including or in particular are used in this agreement, they are deemed to have the words "without limitation" following them.

1.11 References to this agreement include this agreement as amended or varied in accordance with its terms.

2    SALE AND PURCHASE

The Seller shall sell with full title guarantee subject to all Encumbrances existing at the Effective Date and the Buyer shall buy the Sale Shares, together with all rights that attach (or may in the future attach) to them on or after the Effective Date, including, in particular, the right to receive all dividends and distributions declared, made or paid thereon.

3    CONSIDERATION

The Consideration for the sale of the Sale Shares shall be the issue and allotment on Completion to the Seller of the Buyer's Shares credited as fully paid.



2

13

4       COMPLETION

4.1     Completion shall take place on the Completion Date.

4.2     At Completion the Seller shall deliver or cause to be delivered:

        4.2.1   transfers of the Sale Shares executed by the registered holders in favour of
                the Buyer;

        4.2.2   the share certificates for the Sale Shares in the names of the registered
                holders or an indemnity in the agreed form for any lost certificates; and

        4.2.3   the statutory register and minute books of the Company (written up to the
                time of Completion), the common seal, certificate of incorporation and any
                certificates of incorporation on change of name;

4.3     On the Completion Date the Seller shall procure that the directors of the Company
        shall hold a board meeting at which the transfer of the Sale Shares (subject to
        stamping) to the Buyer shall be approved for registration in the Company's statutory
        register.

4.4     At Completion the Buyer shall

        4.4.1   procure the transfer of the Buyer's Shares in satisfaction of the Consideration
                and deliver as soon as reasonably practicable following Completion definitive
                share certificates in respect of such Buyer's Shares (in the name of the Seller)
                to the Seller; and

        4.4.2   enter the Seller's name in the register of members of the Buyer in respect of
                the number of Buyer's Shares held by the Seller.

4.5     As soon as possible after Completion the Seller shall deliver to the Buyer all
        documents of title, records, correspondence, documents, files, memoranda and other
        papers relating to the Company not required to be delivered at Completion which are
        in its possession.

5       WARRANTIES

5.1     The Seller warrants and represents to the Buyer that each of the Warranties set out in
        this clause 5 is true and accurate and not misleading at the date of this agreement:

        5.1.1   the Sale Shares constitute the whole of the allotted and issued share capital of
                the Company and are fully paid; and

        5.1.2   the Seller is the sole legal owner of the Sale Shares as trustee of the Valmore
                Trust.

6       FURTHER ASSURANCE

        Each party shall (at its own expense) promptly execute and deliver all such
        documents, and do all such things, or procure the execution of documents and doing
        of such things as are required to give full effect to this agreement and the transaction
        intended to be effected pursuant to it.



3

14.

7     ASSIGNMENT

Neither party may assign or transfer any of its rights, benefits or obligations under this agreement. Each party confirms that it is acting on its own behalf and on no-one else's.

8     WHOLE AGREEMENT

8.1     This agreement constitutes the whole agreement and understanding of the parties and supersedes any previous arrangements, understanding or agreement between the parties relating to the subject matter of this agreement. Save as expressly provided, and to the maximum extent they may be excluded by contract, this agreement excludes any warranty, covenant, condition or undertaking which may be implied by law. The Buyer acknowledges that it has not been induced to enter into this agreement by, and so far as permitted by law and except in the case of fraud, hereby waives any remedy in respect of, any warranties, representations, undertakings, promises or assurances not incorporated expressly into this agreement.

8.2     Nothing in this clause shall operate to limit or exclude any liability for fraud.

9     VARIATION AND WAIVER

9.1     Any variation of this agreement must be in writing and signed by or on behalf of the parties.

9.2     Any waiver of any right under this agreement is only effective if it is in writing and it applies only to the party to whom the waiver is addressed and to the circumstances for which it is given.

9.3     No failure to exercise or delay in exercising any right or remedy provided under this agreement or by law constitutes a waiver of such right or remedy nor shall it prevent any future exercise or enforcement thereof.

9.4     No single or partial exercise of any right or remedy under this agreement shall preclude or restrict the further exercise of any such right or remedy or other rights or remedies.

10     SEVERANCE

10.1     If any provision of this agreement (or part of a provision) is found by any court or administrative body of competent jurisdiction to be invalid, unenforceable or illegal, that provision shall be ineffective to the extent of such illegality, invalidity or unenforceability but the other provisions shall remain in force.

10.2     If any invalid, unenforceable or illegal provision would be valid, enforceable or legal if some part of it were deleted, the provision shall apply with the minimum modification necessary to make it legal, valid and unenforceable.



4

15

11    THIRD PARTY RIGHTS

No term of this agreement shall be enforceable under the Contracts (Rights of Third Parties) Act 1999 by a person who is not a party to this agreement, but this does not affect any right or remedy of a third party which exists or is available apart from under that Act.

12    COUNTERPARTS

This agreement may be executed in any number of counterparts, each of which when executed and delivered constitutes an original of this agreement but all the counterparts shall together constitute the same agreement.

13    GOVERNING LAW AND JURISDICTION

13.1    This agreement and any disputes or claims arising out of or in connection with its subject matter are governed by and construed in accordance with the law of New York.

13.2    The parties irrevocably agree that the courts of New York have exclusive jurisdiction to settle any dispute or claim that arises out of or in connection with this agreement.

This agreement has been entered into on the date stated at the beginning of it.

Signed by ANDREW BAKER for and    )
on    behalf    of    MISELVA    )
ETABLISSEMENT as trustee of the    )
VALMORE TRUST    )

Signed by a director for and on behalf of    )
JWL ENTERTAINMENT GROUP    )
INC.    )

5

16

STOCK
TRANSFER
FORM

(Above this line for Registrars only)

ONE PENNY AT £1 PAR VALUE IN THE
CAPITAL OF THE ENTERTAINMENT GROUP
INC.

Certificate lodged with the Registrar

Consideration Money £ _____     (For completion by the Registrar/Stock Exchange)

Name of Security        CULLEN STREET ENTERPRISES LIMITED

Description             ORDINARY SHARES OF £1 EACH

                        Words                              Figures
                        One                                _____ _____ _____ shares of £ _____

In the name(s) of

MIKLOVA ETABLISSEMENT AS TRUSTEE OF THE VALMORE TRUST
JOSEF BLUENDIGER STRASSE 24
LI-9490 VADUZ
LIECHTENSTEIN

I/We hereby transfer the above security out of the name(s) aforesaid to the person(s)
named below

Signature(s) of transferor(s)

Stamp of Selling Broker(s) or, for transactions
which are not stock exchange transactions of
Agent(s), if any, acting for the Transferor(s).

Date 31 12 2007

Full name(s) and full postal address (including
County or, if applicable, Postal District number)
of the person(s) to whom the security is
transferred.

                    THE ENTERTAINMENT GROUP INC.
                    c/o GENESIS REGISTRATION CORPORATE SERVICES INC.
                    1000 NORTH DUPONT HIGHWAY
                    DOVER
                    DE 19901
                    COUNTY OF KENT
                    UNITED STATES OF AMERICA

I/We request that such entries be made in the register as are necessary to give effect to this transfer

Stamp or name and address of person lodging this form
(if other than the Buying Broker(s) or Agent(s))

Stevens & Bolton LLP
The Billings, Guildford, Surrey, GU1 4YD

DX148 Guildford
01483 734784

Reference to the Registrar in this form means the court of registration agent if the undertaking and the Registrar of Companies at Companies House.

17

## FORM OF CERTIFICATE REQUIRED FOR EXEMPTION FROM STAMP DUTY

## FORM OF CERTIFICATE REQUIRED WHERE THE TRANSFER IS NOT EXEMPT BUT IS NOT LIABLE TO AD VALOREM STAMP DUTY

18

Company No. 06241160

## CHESTER STREET ENTERPRISES LIMITED

("Company")

Minutes of a meeting of the board of directors of the Company held at Josef Rheinberger Strasse 29, Vaduz, Liechtenstein on 31 December 2007

Present:          Andrew Baxer

In attendance:    Silvia Matt

1     Quorum

Andrew Baxer agreed to chair the meeting and Silvia Matt agreed to take the minutes. The chairman declared the meeting open, there being a quorum present.

2     Transfer of the entire issued share capital of the Company

2.1   There was produced to the meeting a transfer of shares in the capital of the Company as follows:

| Transferor | No. of ordinary shares of £1 each | Transferee |
|---|---|---|
| Miselva Etablissement as trustee of the Valmore Trust | 1 | JWL Entertainment Group Inc |

2.2   It was resolved that the transfer be approved and, subject to the same being duly stamped, registered and that, subject as aforesaid, the relative share certificate be executed and issued to the transferee accordingly.

3     Any other business

There being no further business the meeting was closed.

Chairman                                        Secretary

1

19

DATED _____ 31 December 2002

(1) MISELVA ETABLISSEMENT AS TRUSTEE OF THE VALMORE TRUST

(2) JWL ENTERTAINMENT GROUP INC

AGREEMENT

for the sale and purchase of
the entire issued share capital of

FISHER ISLAND LIMITED

Stevens & Bolton LLP
The Billings
GUILDFORD
GU1 4YD

Ref: JRP.KRH.LO1953.1

20

## CONTENTS

| | | Page No. |
|---|---|---|
| 1 | INTERPRETATION | 1 |
| 2 | SALE AND PURCHASE | 2 |
| 3 | CONSIDERATION | 2 |
| 4 | COMPLETION | 3 |
| 5 | WARRANTIES | 3 |
| 6 | FURTHER ASSURANCE | 3 |
| 7 | ASSIGNMENT | 4 |
| 8 | WHOLE AGREEMENT | 4 |
| 9 | VARIATION AND WAIVER | 4 |
| 10 | SEVERANCE | 4 |
| 11 | THIRD PARTY RIGHTS | 4 |
| 12 | COUNTERPARTS | 5 |
| 13 | GOVERNING LAW AND JURISDICTION | 5 |

21

THIS AGREEMENT is dated 31 December 2007

PARTIES

(1)    MISELVA ETABLISSEMENT as trustee of the Valmore Trust, a private company incorporated and registered in Liechtenstein whose registered office is at Josef Rheinberger Strasse 29, P.O. Box 635, FL-9490 Vaduz, Liechtenstein ("Seller").

(2)    JWL ENTERTAINMENT GROUP INC, a private company incorporated and registered in the State of Delaware with EIN number 20-2569110 whose address is at Blumbergexcelsior Corporate Services Inc, 3500 South DuPont Highway, Dover, DE 19901, County of KENT in the State of Delaware, United States of America ("Buyer").

BACKGROUND

(A)    The Seller has agreed to sell and the Buyer has agreed to buy the Sale Shares subject to and on the terms and conditions of this agreement.

(B)    The Seller is the registered holder of the Sale Shares of the Company at the date hereof and holds these Sale Shares as trustee of the Valmore Trust.

(C)    The Seller is willing to sell and the Buyer is willing to buy the Sale Shares with all rights attaching to them from the Effective Date for the Consideration and upon the terms set out in this agreement

AGREED TERMS

1      INTERPRETATION

1.1    The definitions and rules of interpretation in this clause apply in this agreement.

| | |
|---|---|
| Buyer's Shares | one hundred and twenty-one (121) shares each of no par value in the capital of the Buyer; |
| Company | Fisher Island Limited, a private company limited by shares incorporated and registered in England and Wales with company number 0572 1222 whose registered office is at 3rd Floor, 11 Grosvenor Place, London, SW1X 7HH with an issued share capital of 43,347,001 (forty three million, three hundred and forty seven thousand and one) ordinary shares of £1 each; |
| Completion | completion of the sale and purchase of the Sale Shares in accordance with this agreement; |
| Completion Date | the date of this agreement; |
| Consideration | the consideration for the sale and purchase of the Sale Shares set out in clause 3; |

1

| | |
|---|---|
| Encumbrance | any interest or equity of any person (including any right to acquire, option or right of pre-emption) or any mortgage, charge, pledge, lien, assignment, hypothecation, security, interest, title, retention or any other security agreement or arrangement; |
| Effective Date | 31 December 2007; |
| Sale Shares | the 43,347,001 (forty three million, three hundred and forty seven thousand and one) ordinary shares of £1 each comprising the whole of the allotted and issued share capital of the Company; |
| Warranties | the statements set out in clause 5. |

1.2    Clause and schedule headings do not affect the interpretation of this agreement.

1.3    A reference to a clause or a schedule is a reference to a clause of, or schedule to, this agreement. A reference to a paragraph is to a paragraph of the relevant schedule and a reference to an appendix is to the relevant appendix to this agreement.

1.4    A person includes a corporate or unincorporated body.

1.5    Words in the singular include the plural and in the plural include the singular.

1.6    A reference to one gender includes a reference to the other gender.

1.7    A reference to a statute, statutory provision or any subordinate legislation made under a statute is to such statute, provision or subordinate legislation as amended or re-enacted from time to time whether before or after the date of this agreement and, in the case of a statute, includes any subordinate legislation made under that statute whether before or after the date of this agreement.

1.8    Writing or written includes faxes but not e-mail.

1.9    Documents in agreed form are documents in the form agreed by the parties or on their behalf and initialled by them or on their behalf for identification.

1.10    Where the words include(s), including or in particular are used in this agreement, they are deemed to have the words "without limitation" following them.

1.11    References to this agreement include this agreement as amended or varied in accordance with its terms.

2    SALE AND PURCHASE

The Seller shall sell with full title guarantee subject to all Encumbrances existing at the Effective Date and the Buyer shall buy the Sale Shares, together with all rights that attach (or may in the future attach) to them on or after the Effective Date, including, in particular, the right to receive all dividends and distributions declared, made or paid thereon.

3    CONSIDERATION

The Consideration for the sale of the Sale Shares shall be the issue and allotment on Completion to the Seller of the Buyer's Shares credited as fully paid.

2

23

4        COMPLETION

4.1      Completion shall take place on the Completion Date.

4.2      At Completion the Seller shall deliver or cause to be delivered:

    4.2.1    transfers of the Sale Shares executed by the registered holders in favour of the Buyer;

    4.2.2    the share certificates for the Sale Shares in the names of the registered holders or an indemnity in the agreed form for any lost certificates; and

    4.2.3    the statutory register and minute books of the Company (written up to the time of Completion), the common seal, certificate of incorporation and any certificates of incorporation on change of name;

4.3      On the Completion Date the Seller shall procure that the directors of the Company shall hold a board meeting at which the transfer of the Sale Shares (subject to stamping) to the Buyer shall be approved for registration in the Company's statutory register.

4.4      At Completion the Buyer shall:

    4.4.1    procure the transfer of the Buyer's Shares in satisfaction of the Consideration and deliver as soon as reasonably practicable following Completion definitive share certificates in respect of such Buyer's Shares (in the name of the Seller) to the Seller; and

    4.4.2    enter the Seller's name in the register of members of the Buyer in respect of the number of Buyer's Shares held by the Seller.

4.5      As soon as possible after Completion the Seller shall deliver to the Buyer all documents of title, records, correspondence, documents, files, memoranda and other papers relating to the Company not required to be delivered at Completion which are in its possession.

5        WARRANTIES

5.1      The Seller warrants and represents to the Buyer that each of the Warranties set out in this clause 5 is true and accurate and not misleading at the date of this agreement:

    5.1.1    the Sale Shares constitute the whole of the allotted and issued share capital of the Company and are fully paid; and

    5.1.2    the Seller is the sole legal owner of the Sale Shares as trustee of the Valmore Trust.

6        FURTHER ASSURANCE

Each party shall (at its own expense) promptly execute and deliver all such documents, and do all such things, or procure the execution of documents and doing of such things as are required to give full effect to this agreement and the transaction intended to be effected pursuant to it





7    ASSIGNMENT

Neither party may assign or transfer any of its rights, benefits or obligations under this agreement. Each party confirms that it is acting on its own behalf and on no-one else's.

8    WHOLE AGREEMENT

8.1    This agreement constitutes the whole agreement and understanding of the parties and supersedes any previous arrangements, understanding or agreement between the parties relating to the subject matter of this agreement. Save as expressly provided, and to the maximum extent they may be excluded by contract, this agreement excludes any warranty, covenant, condition or undertaking which may be implied by law. The Buyer acknowledges that it has not been induced to enter into this agreement by, and so far as permitted by law and except in the case of fraud, hereby waives any remedy in respect of, any warranties, representations, undertakings, promises or assurances not incorporated expressly into this agreement.

8.2    Nothing in this clause shall operate to limit or exclude any liability for fraud.

9    VARIATION AND WAIVER

9.1    Any variation of this agreement must be in writing and signed by or on behalf of the parties.

9.2    Any waiver of any right under this agreement is only effective if it is in writing and it applies only to the party to whom the waiver is addressed and to the circumstances for which it is given.

9.3    No failure to exercise or delay in exercising any right or remedy provided under this agreement or by law constitutes a waiver of such right or remedy nor shall it prevent any future exercise or enforcement thereof.

9.4    No single or partial exercise of any right or remedy under this agreement shall preclude or restrict the further exercise of any such right or remedy or other rights or remedies.

10    SEVERANCE

10.1    If any provision of this agreement (or part of a provision) is found by any court or administrative body of competent jurisdiction to be invalid, unenforceable or illegal, that provision shall be ineffective to the extent of such illegality, invalidity or unenforceability but the other provisions shall remain in force.

10.2    If any invalid, unenforceable or illegal provision would be valid, enforceable or legal if some part of it were deleted, the provision shall apply with the minimum modification necessary to make it legal, valid and unenforceable.

11    THIRD PARTY RIGHTS

No term of this agreement shall be enforceable under the Contracts (Rights of Third Parties) Act 1999 by a person who is not a party to this agreement, but this does not

25

affect any right or remedy of a third party which exists or is available apart from under that Act.

12    COUNTERPARTS

This agreement may be executed in any number of counterparts, each of which when executed and delivered constitutes an original of this agreement but all the counterparts shall together constitute the same agreement.

13    GOVERNING LAW AND JURISDICTION

13.1    This agreement and any disputes or claims arising out of or in connection with its subject matter are governed by and construed in accordance with the law of New York.

13.2    The parties irrevocably agree that the courts of New York have exclusive jurisdiction to settle any dispute or claim that arises out of or in connection with this agreement.

This agreement has been entered into on the date stated at the beginning of it.

Signed by ANDREW BAKER for and    )
on    behalf    of    MISELVA    )
ETABLISSEMENT as trustee of the    )
VALMORE TRUST    )

Signed by a director for and on behalf of    )
JWL ENTERTAINMENT GROUP    )
INC.    )

5

26

STOCK
TRANSFER
FORM

(Above this line for Registrars only)

ONE HUNDRED AND TWENTY ONE SHARES
WITH A NOMINAL VALUE IN THE CAPITAL
OF THE INTERRA GROUP LTD INC.

Certificate lodged with the Registrar

Consideration Money £

(For completion by the Registrar Stock Exchange)

Name of Undertaking                 INTERRA GROUP LTD INC.

Description of Security              ORDINARY SHARES OF £1 EACH

Number or amount of Shares,         Words                                    Figures
Stock or other security and, in     FORTY-THREE MILLION THREE HUNDRED AND
figures column only, number and     FORTY SEVEN THOUSAND AND ONE            (43347001 units of
denomination of units, if any.

In the name(s) of

H. SILVA ESTABLISHMENT AS TRUSTEE OF THE VINDOBON TRUST
C/O RHEINBERGER STRASSE 6
P.O. BOX 385
FL9 490 VADUZ
LIECHTENSTEIN

I/We hereby transfer the above security out of the name(s) aforesaid to the person(s)
named below

Stamp of Selling Broker(s) or, for transactions
which are not stock exchange transactions, of
Agent(s), if any, acting for the Transferor(s)

[signature]

Date  31.12.2007

Full name(s) and full postal                 THE INDEPENDENT HOLD INC
address (including County or                 C/O DELAWARE AICH CORPORATE SERVICES INC.
Postal District) of the person(s)            1201 NORTH DUPONT HIGHWAY
to whom the security is                       DOVER
transferred.                                  DE 19901
                                              COUNTY OF KENT
                                              STATE OF DELAWARE
                                              UNITED STATES OF AMERICA

I/We request that such entries be made in the register as are necessary to give effect to this transfer

Stamp or name and address of person lodging this form
(if other than the Buying Broker(s))

Stevens & Bolton LLP

The Billings, Guildford, Surrey, GU1 4YD

Ref:  Guildford 1

JC683DUT04

Reference to the Registrar in this form means the person doing the registration of the undertaking, not the Registrar of Companies at Companies House

27

## FORM OF CERTIFICATE REQUIRED FOR EXEMPTION FROM STAMP DUTY

## FORM OF CERTIFICATE REQUIRED WHERE THE TRANSFER IS NOT EXEMPT BUT IS NOT LIABLE TO AD VALOREM STAMP DUTY

28

DATED _____ 31 December 2007

(1) MISELVA ETABLISSEMENT AS TRUSTEE OF THE VALMORE TRUST

(2) JWL ENTERTAINMENT GROUP INC

AGREEMENT

for the sale and purchase of
the entire issued share capital of

GROSVENOR TRADING HOUSE LIMITED

Stevens & Bolton LLP
The Billings
GUILDFORD
GU1 4YD

Ref: JRP.KRILLO1053 1

29

CONTENTS

|  |  | Page No. |
|---|---|---|
| 1 | INTERPRETATION | 1 |
| 2 | SALE AND PURCHASE | 2 |
| 3 | CONSIDERATION | 2 |
| 4 | COMPLETION | 2 |
| 5 | WARRANTIES | 3 |
| 6 | FURTHER ASSURANCE | 3 |
| 7 | ASSIGNMENT | 3 |
| 8 | WHOLE AGREEMENT | 4 |
| 9 | VARIATION AND WAIVER | 4 |
| 10 | SEVERANCE | 4 |
| 11 | THIRD PARTY RIGHTS | 4 |
| 12 | COUNTERPARTS | 5 |
| 13 | GOVERNING LAW AND JURISDICTION | 5 |

30

THIS AGREEMENT is dated 3 December 2007

PARTIES

(1)    MISELVA ETABLISSEMENT as trustee of the Valmore Trust, a private company, incorporated and registered in Liechtenstein whose registered office is at Josef Rheinberger Strasse 29, P.O. Box 635, FL-9490 Vaduz, Liechtenstein ("Seller").

(2)    JWL ENTERTAINMENT GROUP INC, a private company incorporated and registered in the State of Delaware with EIN number 20-2369130 whose address is at Blumbergexcelsor Corporate Services Inc, 3500 South DuPont Highway, Dover, DE 19901, County of KENT in the State of Delaware, United States of America ("Buyer").

BACKGROUND

(A)    The Seller has agreed to sell and the Buyer has agreed to buy the Sale Shares subject to and on the terms and conditions of this agreement.

(B)    The Seller is the registered holder of the Sale Shares of the Company at the date hereof and holds these Sale Shares as trustee of the Valmore Trust.

(C)    The Seller is willing to sell and the Buyer is willing to buy the Sale Shares with all rights attaching to them from the Effective Date for the Consideration and upon the terms set out in this agreement.

AGREED TERMS

1    INTERPRETATION

1.1    The definitions and rules of interpretation in this clause apply in this agreement.

| | |
|---|---|
| Buyer's Shares | one (1) share of no par value in the capital of the Buyer; |
| Company | Grosvenor Trading House Limited, a private company limited by shares incorporated and registered in England and Wales with company number 05724430 whose registered office is at 3rd Floor, 11 Grosvenor Place, London, SW1X 7HH with an issued share capital of one (1) ordinary share of £1; |
| Completion | completion of the sale and purchase of the Sale Shares in accordance with this agreement; |
| Completion Date | the date of this agreement; |
| Consideration | the consideration for the sale and purchase of the Sale Shares set out in clause 3; |
| Encumbrance | any interest or equity of any person (including any right to acquire, option or right of pre-emption) or any mortgage, |

1

31

|  | charge, pledge, lien, assignment, hypothecation, security, interest, title, retention or any other security agreement or arrangement; |
|---|---|
| Effective Date | 31 December 2007; |
| Sale Shares | the one ordinary share of £1 comprising the whole of the allotted and issued share capital of the Company; |
| Warranties | the statements set out in clause 5. |

1.2    Clause and schedule headings do not affect the interpretation of this agreement.

1.3    A reference to a clause or a schedule is a reference to a clause of, or schedule to, this agreement. A reference to a paragraph is to a paragraph of the relevant schedule, and a reference to an appendix is to the relevant appendix to this agreement.

1.4    A person includes a corporate or unincorporated body.

1.5    Words in the singular include the plural and in the plural include the singular.

1.6    A reference to one gender includes a reference to the other gender.

1.7    A reference to a statute, statutory provision or any subordinate legislation made under a statute is to such statute, provision or subordinate legislation as amended or re-enacted from time to time whether before or after the date of this agreement and, in the case of a statute, includes any subordinate legislation made under that statute whether before or after the date of this agreement.

1.8    Writing or written includes faxes but not e-mail.

1.9    Documents in agreed form are documents in the form agreed by the parties or on their behalf and initialled by them or on their behalf for identification.

1.10    Where the words include(s), including or in particular are used in this agreement, they are deemed to have the words 'without limitation' following them.

1.11    References to this agreement include this agreement as amended or varied in accordance with its terms.

2    SALE AND PURCHASE

The Seller shall sell with full title guarantee subject to all Encumbrances existing at the Effective Date and the Buyer shall buy the Sale Shares, together with all rights that attach (or may in the future attach) to them on or after the Effective Date, including, in particular, the right to receive all dividends and distributions declared, made or paid thereon.

3    CONSIDERATION

The Consideration for the sale of the Sale Shares shall be the issue and allotment on Completion to the Seller of the Buyer's Shares credited as fully paid

4    COMPLETION

4.1    Completion shall take place on the Completion Date.

4.2    At Completion the Seller shall deliver or cause to be delivered:

2



32

4.2.1 transfers of the Sale Shares executed by the registered holders in favour of the Buyer;

4.2.2 the share certificates for the Sale Shares in the names of the registered holders or an indemnity in the agreed form for any lost certificates; and

4.2.3 the statutory register and minute books of the Company (written up to the date of Completion), the common seal, certificate of incorporation and any certificates of incorporation on change of name.

4.3 On the Completion Date the Seller shall procure that the directors of the Company shall hold a board meeting at which the transfer of the Sale Shares (subject to stamping) to the Buyer shall be approved for registration in the Company's statutory register.

4.4 At Completion the Buyer shall:

4.4.1 procure the transfer of the Buyer's Shares in satisfaction of the Consideration and deliver as soon as reasonably practicable following Completion definitive share certificates in respect of such Buyer's Shares (in the name of the Seller) to the Seller; and

4.4.2 enter the Seller's name in the register of members of the Buyer in respect of the number of Buyer's Shares held by the Seller.

4.5 As soon as possible after Completion the Seller shall deliver to the Buyer all documents of title, records, correspondence, documents, files, memoranda and other papers relating to the Company not required to be delivered at Completion which are in its possession.

5    WARRANTIES

5.1 The Seller warrants and represents to the Buyer that each of the Warranties set out in this clause 5 is true and accurate and not misleading at the date of this agreement:

5.1.1 the Sale Shares constitute the whole of the allotted and issued share capital of the Company and are fully paid; and

5.1.2 the Seller is the sole legal owner of the Sale Shares as trustee of the Valmore Trust.

6    FURTHER ASSURANCE

Each party shall (at its own expense) promptly execute and deliver all such documents, and do all such things, or procure the execution of documents and doing of such things as are required to give full effect to this agreement and the transaction intended to be effected pursuant to it.

7    ASSIGNMENT

Neither party may assign or transfer any of its rights, benefits or obligations under this agreement. Each party confirms that it is acting on its own behalf and on no-one else's.



33

8.    WHOLE AGREEMENT

8.1    This agreement constitutes the whole agreement and understanding of the parties and supersedes any previous arrangements, understanding or agreement between the parties relating to the subject matter of this agreement. Save as expressly provided, and to the maximum extent they may be excluded by contract, this agreement excludes any warranty, covenant, condition or undertaking which may be implied by law. The Buyer acknowledges that it has not been induced to enter into this agreement by, and so far as permitted by law and except in the case of fraud, hereby waives any remedy in respect of, any warranties, representations, undertakings, promises or assurances not incorporated expressly into this agreement.

8.2    Nothing in this clause shall operate to limit or exclude any liability for fraud

9.    VARIATION AND WAIVER

9.1    Any variation of this agreement must be in writing and signed by or on behalf of the parties.

9.2    Any waiver of any right under this agreement is only effective if it is in writing and it applies only to the party to whom the waiver is addressed and to the circumstances for which it is given.

9.3    No failure to exercise or delay in exercising any right or remedy provided under this agreement or by law constitutes a waiver of such right or remedy nor shall it prevent any future exercise or enforcement thereof.

9.4    No single or partial exercise of any right or remedy under this agreement shall preclude or restrict the further exercise of any such right or remedy or other rights or remedies

10.    SEVERANCE

10.1    If any provision of this agreement (or part of a provision) is found by any court or administrative body of competent jurisdiction to be invalid, unenforceable or illegal, that provision shall be ineffective to the extent of such illegality, invalidity or unenforceability but the other provisions shall remain in force.

10.2    If any invalid, unenforceable or illegal provision would be valid, enforceable or legal if some part of it were deleted, the provision shall apply with the minimum modification necessary to make it legal, valid and unenforceable.

11.    THIRD PARTY RIGHTS

No term of this agreement shall be enforceable under the Contracts (Rights of Third Parties) Act 1999 by a person who is not a party to this agreement, but this does not affect any right or remedy of a third party which exists or is available apart from under that Act



4

34

12    COUNTERPARTS

This agreement may be executed in any number of counterparts, each of which when executed and delivered constitutes an original of this agreement but all the counterparts shall together constitute the same agreement.

13    GOVERNING LAW AND JURISDICTION

13.1    This agreement and any disputes or claims arising out of or in connection with its subject matter are governed by and construed in accordance with the law of New York.

13.2    The parties irrevocably agree that the courts of New York have exclusive jurisdiction to settle any dispute or claim that arises out of or in connection with this agreement.

This agreement has been entered into on the date stated at the beginning of it.

Signed by ANDREW BAKER for and          )
on    behalf    of    MISELVA    )
ETABLISSEMENT as trustee of the    )
VALMORE TRUST    )

Signed by a director for and on behalf of    )
JWL ENTERTAINMENT GROUP    )
INC.    )

5

35

STOCK
TRANSFER
FORM

(Above this line for Registrars only)

THE ABOVE NAMED TO THE
CAPITAL OF THE ABOVE-NAMED COMPANY

Consideration Money £

(For completion by the Registrar Stock Exchange)

Full name of Undertaking          GLENWOOD TRADING HOUSE LIMITED

Full description of Security       ORDINARY SHARES OF £1 EACH

Words                              Figures

In the name(s) of

METRA ESTABLISHMENT AS TRUSTEE OF THE VALBERG TRUST
c/o HEILIGKREUZ STRASSE 19
POST BOX 435
FL-9490 VADUZ
LIECHTENSTEIN

I/We hereby transfer the above security out of the name(s) aforesaid to the person(s)
named below

Stamp of Selling Broker(s) or, for transactions
which are not Stock Exchange transactions, of
Agent(s) if any, acting for the Transferor(s)

Signature(s) of transferor(s)

Date  31. 12. 2004

Full name(s) and full postal address
(including County or, if applicable,
Postal District number) of the
person(s) to whom the security is
transferred.

BIL IN ESTABLISHMENT GROUP INC
RAWSON TRANSFEROR CORPORATE SERVICES INC.
THE SQUARE STREET BELFRY
OVER
DE LANE
COUNTY OF KENT
STATE OF DELAWARE
UNITED STATES OF AMERICA

I/We request that such entries be made in the register as are necessary to give effect to this transfer

Stamp of or name and address of person lodging this form
(if other than the Buying Broker(s))

Stevens & Bolton LLP

The Billings, Guildford, Surrey, GU1 4YP

GU23   Guildford 1
0145470104

## FORM OF CERTIFICATE REQUIRED FOR EXEMPTION FROM STAMP DUTY

Instruments of transfer executed on or after 1 May 1987 are exempt from stamp duty where the transaction falls within one of the following categories and will not need to be sent to stamp offices provided they are certified in accordance with the Stamp Duty (Exempt Instruments) Regulations 1987.

A. The vesting of property in respect of a trust in the trustees of the trust on the appointment of a new trustee, or on the continuing trustees on the retirement of a trustee.

B. The conveyance or transfer of property the subject of a specific devise or legacy to the beneficiary named in the will (or his nominee).

C. The conveyance or transfer of property which forms part of an intestate's estate to the person entitled on intestacy (or his nominee).

D. The appropriation of property within section 84(4) of the Finance Act 1985 (death: appropriation in satisfaction of a general legacy of money) or section 84(5) or (7) (that is death: appropriation in satisfaction of any interest of surviving spouse and in partition and on the division of the estate of deceased).

E. The conveyance or transfer of property which forms part of the residuary estate of a testator to a beneficiary (or his nominee) entitled solely by virtue of his entitlement under the will.

F. The conveyance or transfer of property out of a settlement in or towards satisfaction of a beneficiary's interest, not being an interest acquired for money or money's worth, being a conveyance or transfer constituting a distribution of property in accordance with the provisions of the settlement.

G. The conveyance or transfer of property on and in consideration only of marriage to a party to the marriage (or his nominee) or to trustees to be held on the terms of a settlement made in consideration of the marriage.

H. The conveyance or transfer of property within section 83(1) of the Finance Act 1985 (transfers in connection with divorce etc.).

I. The conveyance or transfer by the liquidator of property which formed part of the assets of the company in liquidation to a shareholder of the company in satisfaction of his rights on a winding up.

J. The grant in fee simple of an easement in or over land for no consideration in money or money's worth.

K. The grant of a servitude for no consideration in money or money's worth.

L. The conveyance or transfer of property operating as a voluntary disposition inter vivos for no consideration in money or money's worth nor any consideration referred to in section 57 (the Stamp Act 1891 (conveyance in consideration of a debt etc.)).

M. The conveyance or transfer of property by an instrument within section 84(1) of the Finance Act 1985 (death: varying dispositions).

I/We hereby certify that the instrument falls within category ___ in the Schedule to the Stamp Duty (Exempt Instruments) Regulations 1987 set out above.

I/We are being the transferor ___ to the transferee named herein, state that I/we are authorised to sign this certificate, and that I/we give this certificate from our own knowledge of the facts stated in it.

Executed the ___ day of ___

Signed by ___ (in the case of a body corporate, signature of a person acting in an official capacity)

## FORM OF CERTIFICATE REQUIRED WHERE THE TRANSFER IS NOT EXEMPT BUT IS NOT LIABLE TO AD VALOREM STAMP DUTY

(1) Transfer by way of security for a loan or a re-transfer to the original transferor on repayment of a loan.

(2) Transfer, not on sale and not of a stamp duty where no beneficial interest in the property passes.

I/We hereby certify that the transaction in respect of which this transfer is made is one which falls within the category ___ above. I/We confirm that I/we have been duly authorised by the transferor to sign this certificate and that the facts of the transaction are within my/our knowledge.

Signature ___

NOTE: ___

DATED _____ 31 December 2007 _____

(1) MISELVA ETABLISSEMENT AS TRUSTEE OF THE VALMORE TRUST

(2) JWL ENTERTAINMENT GROUP INC

AGREEMENT

for the sale and purchase of
part of the issued share capital of

PAUA ENTERPRISES LIMITED

Stevens & Bolton LLP
The Billings
GUILDFORD
GU1 4YD

Ref: JRP.KRELLO1053.2

38

# CONTENTS

| | | Page No. |
|---|---|---|
| 1 | INTERPRETATION | 1 |
| 2 | SALE AND PURCHASE | 2 |
| 3 | CONSIDERATION | 2 |
| 4 | COMPLETION | 2 |
| 5 | WARRANTIES | 3 |
| 6 | FURTHER ASSURANCE | 3 |
| 7 | ASSIGNMENT | 3 |
| 8 | WHOLE AGREEMENT | 4 |
| 9 | VARIATION AND WAIVER | 4 |
| 10 | SEVERANCE | 4 |
| 11 | THIRD PARTY RIGHTS | 4 |
| 12 | COUNTERPARTS | 4 |
| 13 | GOVERNING LAW AND JURISDICTION | 5 |

39

THIS AGREEMENT is dated 31 December 2007

PARTIES

(1)    MISELVA ETABLISSEMENT as trustee of the Valmore Trust, a private company
       incorporated and registered in Liechtenstein whose registered office is at Josef
       Rheinberger Strasse 29, P.O. Box 635, FL-9490 Vaduz, Liechtenstein ("Seller").

(2)    JWL ENTERTAINMENT GROUP INC, a private company incorporated and
       registered in the State of Delaware with EIN number 20-2569110 whose address is
       at Blumbergexcelsion Corporate Services Inc, 3500 South DuPont Highway, Dover,
       DE 19901, County of KENT in the State of Delaware, United States of America
       ("Buyer").

BACKGROUND

(A)    The Seller has agreed to sell and the Buyer has agreed to buy the Sale Share subject
       to and on the terms and conditions of this agreement

(B)    The Seller is the registered holder of the Sale Share at the date hereof and holds the
       Sale Share as trustee of the Valmore Trust.

(C)    The Seller is willing to sell and the Buyer is willing to buy the Sale Share with all
       rights attaching to it from the Effective Date for the Consideration and upon the terms
       set out in this agreement

AGREED TERMS

1    INTERPRETATION

1.1    The definitions and rules of interpretation in this clause apply in this agreement.

| | |
|---|---|
| Buyer's Share | one (1) share of no par value in the capital of the Buyer; |
| Company | Paua Enterprises Limited, a private company limited by shares incorporated and registered in England and Wales with company number 06235529 whose registered office is at Bridge House, 25 Fiddlebridge Lane, Hatfield, Hertfordshire, AL10 0SP with an issued share capital of two (2) ordinary shares of £1 each; |
| Completion | completion of the sale and purchase of the Sale Share in accordance with this agreement; |
| Completion Date | the date of this agreement; |
| Consideration | the consideration for the sale and purchase of the Sale Share set out in clause 3; |
| Encumbrance | any interest or equity of any person (including any right to acquire, option or |

1

|  | right of pre-emption) or any mortgage, charge, pledge, lien, assignment, hypothecation, security, interest, title, retention or any other security agreement or arrangement; |
|---|---|
| Effective Date | 31 December 2007; |
| Sale Share | the one (1) ordinary share of £1 in the Company registered in the name of the Seller, comprising fifty percent (50%) of the allotted and issued share capital of the Company; |
| Warranties | the statements set out in clause 5. |

1.2    Clause and schedule headings do not affect the interpretation of this agreement.

1.3    A reference to a clause or a schedule is a reference to a clause of, or schedule to, this agreement. A reference to a paragraph is to a paragraph of the relevant schedule, and a reference to an appendix is to the relevant appendix to this agreement.

1.4    A person includes a corporate or unincorporated body.

1.5    Words in the singular include the plural and in the plural include the singular.

1.6    A reference to one gender includes a reference to the other gender.

1.7    A reference to a statute, statutory provision or any subordinate legislation made under a statute is to such statute, provision or subordinate legislation as amended or re-enacted from time to time whether before or after the date of this agreement and, in the case of a statute, includes any subordinate legislation made under that statute whether before or after the date of this agreement.

1.8    Writing or written includes faxes but not e-mail.

1.9    Documents in agreed form are documents in the form agreed by the parties or on their behalf and initialled by them or on their behalf for identification.

1.10    Where the words include(s), including or in particular are used in this agreement, they are deemed to have the words "without limitation" following them.

1.11    References to this agreement include this agreement as amended or varied in accordance with its terms.

2    SALE AND PURCHASE

The Seller shall sell with full title guarantee subject to all Encumbrances existing at the Effective Date and the Buyer shall buy the Sale Share, together with all rights that attach (or may in the future attach) to it on or after the Effective Date, including, in particular, the right to receive all dividends and distributions declared, made or paid thereon.

3    CONSIDERATION

The Consideration for the sale of the Sale Share shall be the issue and allotment on Completion to the Seller of the Buyer's Share credited as fully paid.



2

41

4    COMPLETION

4.1    Completion shall take place on the Completion Date.

4.2    At Completion the Seller shall deliver or cause to be delivered:

    4.2.1    a transfer of the Sale Share executed by the registered holder in favour of the Buyer;

    4.2.2    the share certificate for the Sale Share in the name of the registered holder or an indemnity in the agreed form for any lost certificate; and

    4.2.3    the statutory register and minute books of the Company (written up to the time of Completion), the common seal, certificate of incorporation and any certificate of incorporation on change of name;

4.3    On the Completion Date the Seller shall procure that the directors of the Company shall hold a board meeting at which the transfer of the Sale Share (subject to stamping) to the Buyer shall be approved for registration in the Company's statutory register.

4.4    At Completion the Buyer shall

    4.4.1    procure the transfer of the Buyer's Share in satisfaction of the Consideration and deliver as soon as reasonably practicable following Completion definitive share certificates in respect of the Buyer's Share (in the name of the Seller) to the Seller; and

    4.4.2    enter the Seller's name in the register of members of the Buyer in respect of the Buyer's Share held by the Seller.

4.5    As soon as possible after Completion the Seller shall deliver to the Buyer all documents of title, records, correspondence, documents, files, memoranda and other papers relating to the Company not required to be delivered at Completion which are in its possession

5    WARRANTIES

5.1    The Seller warrants and represents to the Buyer that each of the Warranties set out in this clause 5 is true and accurate and not misleading at the date of this agreement:

    5.1.1    the Sale Share constitutes fifty percent (50%) of the allotted and issued share capital of the Company and are fully paid; and

    5.1.2    the Seller is the sole legal owner of the Sale Share as trustee of the Valmore Trust

6    FURTHER ASSURANCE

Each party shall (at its own expense) promptly execute and deliver all such documents, and do all such things, or procure the execution of documents and doing of such things as are required to give full effect to this agreement and the transaction intended to be effected pursuant to it.



3

42

7    ASSIGNMENT

Neither party may assign or transfer any of its rights, benefits or obligations under this agreement. Each party confirms that it is acting on its own behalf and on no-one else's.

8    WHOLE AGREEMENT

8.1    This agreement constitutes the whole agreement and understanding of the parties and supersedes any previous arrangements, understanding or agreement between the parties relating to the subject matter of this agreement. Save as expressly provided, and to the maximum extent they may be excluded by contract, this agreement excludes any warranty, covenant, condition or undertaking which may be implied by law. The Buyer acknowledges that it has not been induced to enter into this agreement by, and so far as permitted by law and except in the case of fraud, hereby waives any remedy in respect of, any warranties, representations, undertakings, promises or assurances not incorporated expressly into this agreement.

8.2    Nothing in this clause shall operate to limit or exclude any liability for fraud.

9    VARIATION AND WAIVER

9.1    Any variation of this agreement must be in writing and signed by or on behalf of the parties.

9.2    Any waiver of any right under this agreement is only effective if it is in writing and it applies only to the party to whom the waiver is addressed and to the circumstances for which it is given.

9.3    No failure to exercise or delay in exercising any right or remedy provided under this agreement or by law constitutes a waiver of such right or remedy nor shall it prevent any future exercise or enforcement thereof.

9.4    No single or partial exercise of any right or remedy under this agreement shall preclude or restrict the further exercise of any such right or remedy or other rights or remedies.

10    SEVERANCE

10.1    If any provision of this agreement (or part of a provision) is found by any court or administrative body of competent jurisdiction to be invalid, unenforceable or illegal, that provision shall be ineffective to the extent of such illegality, invalidity or unenforceability but the other provisions shall remain in force.

10.2    If any invalid, unenforceable or illegal provision would be valid, enforceable or legal if some part of it were deleted, the provision shall apply with the minimum modification necessary to make it legal, valid and enforceable.

11    THIRD PARTY RIGHTS

No term of this agreement shall be enforceable under the Contracts (Rights of Third Parties) Act 1999 by a person who is not a party to this agreement, but this does not

4

affect any right or remedy of a third party which exists or is available apart from under that Act.

12    COUNTERPARTS

This agreement may be executed in any number of counterparts, each of which when executed and delivered constitutes an original of this agreement but all the counterparts shall together constitute the same agreement.

13    GOVERNING LAW AND JURISDICTION

13.1    This agreement and any disputes or claims arising out of or in connection with its subject matter are governed by and construed in accordance with the law of New York

13.2    The parties irrevocably agree that the courts of New York have exclusive jurisdiction to settle any dispute or claim that arises out of or in connection with this agreement

This agreement has been entered into on the date stated at the beginning of it.

Signed by ANDREW BAKER for and    )
on    behalf    of    MISELVA    )
ETABLISSEMENT as trustee of the    )
VALMORE TRUST.    )

Signed by a director for and on behalf of    )
JWL ENTERTAINMENT GROUP    )
INC.    )

5

44

STOCK
TRANSFER
FORM

(Above this line for Registrars only)

ONE SHARE AT NO PAR VALUE IN THE
CAPITAL OF JML ENTERTAINMENT GROUP
INC.

Certificate lodged with the Registrar

(For completion by the Registrar/Stock Exchange)

Consideration Money

PAUA ENTERPRISES LIMITED

ORDINARY SHARES OF £1 EACH

Words        Figures
ONE.

In the name(s) of
MIRELVA ETABLISSEMENT AG TRUSTEE OF THE VALMORE TRUST
JOSEF RHEINBERGER STRASSE 29
P.O. BOX 695
FL1 9491 VADUZ
LIECHTENSTEIN

Date 31. 12. 2004

JML ENTERTAINMENT GROUP INC
FLUMBERG/EXCELSIOR CORPORATE SERVICES INC
3500 SOUTH DUPONT HIGHWAY
DOVER
FT 19901.
COUNTY OF KENT
STATE OF DELAWARE
UNITED STATES OF AMERICA

We request that such entries be made in the register as are necessary to give effect to this transfer.

Stevens & Bolton LLP
The Billings, Guildford, Surrey, GU 4YP

0423  Guildford
01483802284

45

## FORM OF CERTIFICATE REQUIRED FOR EXEMPTION FROM STAMP DUTY

Instruments of transfer executed on or after 1 May 1987 are exempt from stamp duty where the transaction falls within one of the following categories and will not need to be sent to stamp offices provided they are certified as below in accordance with the Stamp Duty (Exempt Instruments) Regulations 1987

A.  The vesting of property subject to a trust in the trustees of the trust on the appointment of a new trustee, or in the continuing trustees on the retirement of a trustee

B.  The conveyance or transfer of property the subject of a specific devise or legacy to the beneficiary named in the will (or his nominee)

C.  The conveyance or transfer of property which forms part of an intestate's estate to the person entitled on intestacy (or his nominee)

D.  The appropriation of property within section 84(4) of the Finance Act 1985 (death: appropriation in satisfaction of a general legacy of money) or section 84(5) or (7) of that Act (death: appropriation in satisfaction of any interest of surviving spouse or civil partner and in Scotland also of any interest of issue)

E.  The conveyance or transfer of property which forms part of the residuary estate of a testator to a beneficiary (or his nominee) entitled solely by virtue of his entitlement under the will

F.  The conveyance or transfer of property out of a settlement in or towards satisfaction of a beneficiary's interest, not being an interest acquired for money or money's worth, being a conveyance or transfer constituting a distribution of property in accordance with the provisions of the settlement

G.  The conveyance or transfer of property on and in consideration only of marriage or a party to the marriage (or his nominee) or to trustees to be held on the terms of a settlement made in consideration of the marriage

Gᴬ.  The conveyance or transfer of property on and in consideration only of the formation of a civil partnership to a party to the civil partnership (or his nominee) or to trustees to be held on the terms of a settlement made in consideration only of the said partnership

H.  The conveyance or transfer of property within section 83(1) or (1A) of the Finance Act 1985 (transfers in connection with divorce or dissolution of civil partnership etc.)

I.  The conveyance or transfer by the liquidator of property which formed part of the assets of the company in liquidation to a shareholder of that company in or towards satisfaction of the shareholder's rights on a winding-up

J.  The grant in fee simple of an easement in or over land for no consideration in money or money's worth

K.  The grant of a servitude for no consideration in money or money's worth

L.  The conveyance or transfer of property operating as a voluntary disposition inter vivos for no consideration in money or money's worth

M.  The conveyance or transfer of property by an instrument within a section 84(1) of the Finance Act 1985 (death: varying dispositions)

(1)  I/We hereby certify that this instrument falls within category ( )  in the Schedule to the Stamp Duty (Exempt Instruments) Regulations 1987

(2)  I/We, being the transferor, grantee, of the transferee(s) thereof, hereby state that I/we are authorised to sign this certificate and that I/we give this certificate from my/our own knowledge of the facts stated in it

Date ..............................     Day of ..............................

(3)  .......................     The transferor or agent of his signature

## FORM OF CERTIFICATE REQUIRED WHERE THE TRANSFER IS NOT EXEMPT BUT IS LIABLE TO AD VALOREM STAMP DUTY

Instruments of transfer liable to a fixed duty of £5 should be certified where the transaction falls within one of the following categories and needs to be forwarded to the Stamp Office

1.  Transfer on sale of securities for a consideration referred to in the original instrument or repayment of a loan

2.  Transfer of securities sold and transferring under any contract of sale and where no beneficial interest in the property passes (e.g. to a person who is a bare trustee of such a person, or only to the interest the first is a bare trustee who has at all times held the property on behalf of the transferor, or from a bare trustee to another instance of the stock beneficial owner where the first nominee has at all times held the property on behalf of that beneficial owner) Note: This category does not include a transfer made as part of the following circumstances. Sale of stock, etc., otherwise the point of acquisition to purchase the stock, to the person entitled to the option or his nominee; the instrument is executed from the creation to the sale of the stock, etc., that stock is to be entered into only from the nominee, or a vendor that has only sold the interest under it, etc. trust, mortgage, setting or held stock, etc., in trust for a purchaser, to such purchaser

I/We hereby certify that the instrument in respect of which this transfer is made is one which falls within the category
......... above. I/We confirm that I/we have been duly authorised by the transferor to sign this certificate and that the facts of the transaction are within my/our knowledge

Signature .....................     Set capacity "Transferor", "Grantee", etc.

Date .............................

*(3) If none of the above declarations can be given the transfer should be submitted to the Stamp Office and usually will attract ad valorem Stamp Duty

Company No: 06235529

## PAGA ENTERPRISES LIMITED

("Company")

Minutes of a meeting of the board of directors of the Company held at Josef Rheinberger Strasse 29, Vaduz, Liechtenstein on 31 December 2007.

| Present: | Andrew Baker |
| | Zvi Barak |

| In attendance: | Silvia Matt |

1    Quorum

Andrew Baker agreed to chair the meeting and Silvia Matt agreed to take the minutes. The chairman declared the meeting open, there being a quorum present.

2    Transfer of part of the issued share capital of the Company

2.1    There was produced to the meeting a transfer of shares in the capital of the Company as follows:

| Transferor | No. of ordinary shares of £1 each | Transferee |
| Miselva Etablissement as trustee of the Valmore Trust | 1 | JWL Entertainment Group Inc. |

2.2    It was resolved that the transfer be approved and, subject to the same being duly stamped, registered and that, subject as aforesaid, the relative share certificate be executed and issued to the transferee accordingly.

3    Any other business

There being no further business the meeting was closed.

_____          _____
Chairman                                          Secretary

1

47

DATED     31 December 2007


(1) MISELVA ETABLISSEMENT AS TRUSTEE OF THE VALMORE TRUST

(2) JWL ENTERTAINMENT GROUP INC


AGREEMENT

for the sale and purchase of
the entire issued share capital of

THAMES STEEL UK LIMITED


Stevens & Bolton LLP
The Billings
GUILDFORD
GU1 4YD

Ref: JRP.KRI.LO1053 1

48

# CONTENTS

| | | Page No. |
|---|---|---|
| 1 | INTERPRETATION | 1 |
| 2 | SALE AND PURCHASE | 2 |
| 3 | CONSIDERATION | 2 |
| 4 | COMPLETION | 3 |
| 5 | WARRANTIES | 3 |
| 6 | FURTHER ASSURANCE | 3 |
| 7 | ASSIGNMENT | 4 |
| 8 | WHOLE AGREEMENT | 4 |
| 9 | VARIATION AND WAIVER | 4 |
| 10 | SEVERANCE | 4 |
| 11 | THIRD PARTY RIGHTS | 4 |
| 12 | COUNTERPARTS | 5 |
| 13 | GOVERNING LAW AND JURISDICTION | 5 |

49

THIS AGREEMENT is dated 31 December 2007

PARTIES

(1)     MISELVA ETABLISSEMENT as trustee of the Valmore Trust, a private company incorporated and registered in Liechtenstein whose registered office is at Josef Rheinberger Strasse 29, P.O. Box 633, FIL-9490 Vaduz, Liechtenstein ("Seller")

(2)     JWL ENTERTAINMENT GROUP INC. a private company incorporated and registered in the State of Delaware with EIN number 20-2569110 whose address is at Blumbergexcelsior Corporate Services Inc, 3500 South DuPont Highway, Dover, DE 19901, County of KENT in the State of Delaware, United States of America ("Buyer").

BACKGROUND

(A)     The Seller has agreed to sell and the Buyer has agreed to buy the Sale Shares subject to and on the terms and conditions of this agreement.

(B)     The Seller is the registered holder of the Sale Shares of the Company at the date hereof and holds these Sale Shares as trustee of the Valmore Trust

(C)     The Seller is willing to sell and the Buyer is willing to buy the Sale Shares with all rights attaching to them from the Effective Date for the Consideration and upon the terms set out in this agreement

AGREED TERMS

1       INTERPRETATION

1.1     The definitions and rules of interpretation in this clause apply in this agreement.

| | |
|---|---|
| Buyer's Shares | seventy-four (74) shares each of no par value in the capital of the Buyer; |
| Company | Thames Steel UK Limited, a private company limited by shares incorporated and registered in England and Wales with company number 05724450 whose registered office is at 3rd Floor, 11 Grosvenor Place, London, SW1X 7HH with an issued share capital of twenty-six million six hundred and ninety thousand five hundred and eighty six (26,690,586) ordinary shares of £1; |
| Completion | completion of the sale and purchase of the Sale Shares in accordance with this agreement; |
| Completion Date | the date of this agreement; |
| Consideration | the consideration for the sale and purchase of the Sale Shares set out in clause 3; |

1

50

| | |
|---|---|
| Encumbrance | any interest or equity of any person (including any right to acquire, option or right of pre-emption) or any mortgage, charge, pledge, lien, assignment, hypothecation, security, interest, title, retention or any other security agreement or arrangement; |
| Effective Date | 31 December 2007; |
| Sale Shares | twenty-six million six hundred and ninety thousand five hundred and eighty six (26,690,586) ordinary shares of £1 comprising the whole of the allotted and issued share capital of the Company; |
| Warranties | the statements set out in clause 5. |

1.2    Clause and schedule headings do not affect the interpretation of this agreement.

1.3    A reference to a clause or a schedule is a reference to a clause of, or schedule to, this agreement. A reference to a paragraph is to a paragraph of the relevant schedule, and a reference to an appendix is to the relevant appendix to this agreement.

1.4    A person includes a corporate or unincorporated body.

1.5    Words in the singular include the plural and in the plural include the singular.

1.6    A reference to one gender includes a reference to the other gender.

1.7    A reference to a statute, statutory provision or any subordinate legislation made under a statute is to such statute, provision or subordinate legislation as amended or re-enacted from time to time whether before or after the date of this agreement and, in the case of a statute, includes any subordinate legislation made under that statute whether before or after the date of this agreement.

1.8    Writing or written includes faxes but not e-mail.

1.9    Documents in agreed form are documents in the form agreed by the parties or on their behalf and initialled by them or on their behalf for identification.

1.10   Where the words include(s), including or in particular are used in this agreement, they are deemed to have the words "without limitation" following them.

1.11   References to this agreement include this agreement as amended or varied in accordance with its terms.

2    SALE AND PURCHASE

The Seller shall sell with full title guarantee subject to all Encumbrances existing at the Effective Date and the Buyer shall buy the Sale Shares, together with all rights that attach (or may in the future attach) to them on or after the Effective Date, including, in particular, the right to receive all dividends and distributions declared, made or paid thereon

3    CONSIDERATION

The Consideration for the sale of the Sale Shares shall be the issue and allotment on Completion to the Seller of the Buyer's Shares credited as fully paid.



51

4       COMPLETION

4.1     Completion shall take place on the Completion Date.

4.2     At Completion the Seller shall deliver or cause to be delivered:

      4.2.1     transfers of the Sale Shares executed by the registered holders in favour of the Buyer;

      4.2.2     the share certificates for the Sale Shares in the names of the registered holders or an indemnity in the agreed form for any lost certificates; and

      4.2.3     the statutory register and minute books of the Company (written up to the time of Completion), the common seal, certificate of incorporation and any certificates of incorporation on change of name;

4.3     On the Completion Date the Seller shall procure that the directors of the Company shall hold a board meeting at which the transfer of the Sale Shares (subject to stamping) to the Buyer shall be approved for registration in the Company's statutory register.

4.4     At Completion the Buyer shall:

      4.4.1     Procure the transfer of the Buyer's Shares in satisfaction of the Consideration and deliver as soon as reasonably practicable following Completion definitive share certificates in respect of such Buyer's Shares (in the name of the Seller) to the Seller; and

      4.4.2     enter the Seller's name in the register of members of the Buyer in respect of the number of Buyer's Shares held by the Seller.

4.5     As soon as possible after Completion the Seller shall deliver to the Buyer all documents of title, records, correspondence, documents, files, memoranda and other papers relating to the Company not required to be delivered at Completion which are in its possession.

5       WARRANTIES

5.1     The Seller warrants and represents to the Buyer that each of the Warranties set out in this clause 5 is true and accurate and not misleading at the date of this agreement:

      5.1.1     the Sale Shares constitute the whole of the allotted and issued share capital of the Company and are fully paid; and

      5.1.2     the Seller is the sole legal owner of the Sale Shares as trustee of the Valmore Trust.

6       FURTHER ASSURANCE

Each party shall (at its own expense) promptly execute and deliver all such documents, and do all such things, or procure the execution of documents and doing of such things as are required to give full effect to this agreement and the transaction intended to be effected pursuant to it.



52

7    ASSIGNMENT

Neither party may assign or transfer any of its rights, benefits or obligations under this agreement. Each party confirms that it is acting on its own behalf and on no-one else's.

8    WHOLE AGREEMENT

8.1    This agreement constitutes the whole agreement and understanding of the parties and supersedes any previous arrangements, understanding or agreement between the parties relating to the subject matter of this agreement. Save as expressly provided, and to the maximum extent they may be excluded by contract, this agreement excludes any warranty, covenant, condition or undertaking which may be implied by law. The Buyer acknowledges that it has not been induced to enter into this agreement by, and so far as permitted by law and except in the case of fraud, hereby waives any remedy in respect of, any warranties, representations, undertakings, promises or assurances not incorporated expressly into this agreement.

8.2    Nothing in this clause shall operate to limit or exclude any liability for fraud.

9    VARIATION AND WAIVER

9.1    Any variation of this agreement must be in writing and signed by or on behalf of the parties.

9.2    Any waiver of any right under this agreement is only effective if it is in writing and it applies only to the party to whom the waiver is addressed and to the circumstances for which it is given.

9.3    No failure to exercise or delay in exercising any right or remedy provided under this agreement or by law constitutes a waiver of such right or remedy nor shall it prevent any future exercise or enforcement thereof.

9.4    No single or partial exercise of any right or remedy under this agreement shall preclude or restrict the further exercise of any such right or remedy or other rights or remedies.

10    SEVERANCE

10.1    If any provision of this agreement (or part of a provision) is found by any court or administrative body of competent jurisdiction to be invalid, unenforceable or illegal that provision shall be ineffective to the extent of such illegality, invalidity or unenforceability but the other provisions shall remain in force.

10.2    If any invalid, unenforceable or illegal provision would be valid, enforceable or legal if some part of it were deleted, the provision shall apply with the minimum modification necessary to make it legal, valid and unenforceable.

11    THIRD PARTY RIGHTS

No term of this agreement shall be enforceable under the Contracts (Rights of Third Parties) Act 1999 by a person who is not a party to this agreement; but this does not

4



53

affect any right or remedy of a third party which exists or is available apart from under that Act.

12    COUNTERPARTS

This agreement may be executed in any number of counterparts, each of which when executed and delivered constitutes an original of this agreement but all the counterparts shall together constitute the same agreement.

13    GOVERNING LAW AND JURISDICTION

13.1    This agreement and any disputes or claims arising out of or in connection with its subject matter are governed by and construed in accordance with the law of New York.

13.2    The parties irrevocably agree that the courts of New York have exclusive jurisdiction to settle any dispute or claim that arises out of or in connection with this agreement.

This agreement has been entered into on the date stated at the beginning of it.

Signed by ANDREW BAKER for and    )
on    behalf    of    MISELVA    )
ETABLISSEMENT as trustee of the    )
VALMORE TRUST.    )

Signed by a director for and on behalf of    )
JWL ENTERTAINMENT GROUP    )
INC.    )

5

54

**STOCK TRANSFER FORM**

(Above this line for Registrars only)

SEVENTY FOUR SHARES EACH AT NO PAR
VALUE IN THE CAPITAL OF PBL
ENTERTAINMENT GROUP INC.

Certificate lodged with the Registrar

Consideration Money £                                    (For completion by the Registrar/Stock Exchange)

Name of Undertaking          PBL ENTERTAINMENT GROUP LIMITED

Description of Security       ORDINARY SHARES OF £1 EACH

| | Words | Figures |
|---|---|---|
| | TWENTY SIX MILLION SIX HUNDRED AND FIFTY THREE THOUSAND FIVE HUNDRED AND EIGHTY SIX | (26640586 shares of £1) |

In the name(s) of

MISELVA ETABLISSEMENT AS TRUSTEE OF THE VALMORE TRUST
JOSEF RHEINBERGER STRASSE 25
P.O. BOX 635
FL1-949  VADUZ
LIECHTENSTEIN

Signature(s) of transferor(s)

Date  31.12.2007

PBL ENTERTAINMENT GROUP INC
BLUMBERG EXCELSIOR CORPORATE SERVICES INC.
DOVER
COUNTY OF KENT
STATE OF DELAWARE
UNITED STATES OF AMERICA

I/We request that such entries be made in the register as are necessary to give effect to this transfer.

Stevens & Bolton LLP
The Billings, Guildford, Surrey, GU1 4YD

Guildford
01483 302264

55

## FORM OF CERTIFICATE REQUIRED FOR EXEMPTION FROM STAMP DUTY

Instruments of transfer executed on or after 1 May 1987 are exempt from stamp duty when the transaction falls within one of the following categories and will not need to be sent as stamp offices provided they are certified as below in accordance with the Stamp Duty (Exempt Instruments) Regulations 1987

*(The detailed clauses a. through M. are too faded to transcribe accurately)*

FORM OF CERTIFICATE REQUIRED WHERE THE TRANSFER IS NOT EXEMPT BUT IS NOT LIABLE TO AD VALOREM STAMP DUTY

Instruments of transfer are liable to a fixed duty of £5 unless the transaction falls within one of the following categories and needs to be forwarded to the Stamp Office

*(Text too faded to transcribe accurately)*



**9**

<u>IN THE SUPREME COURT OF GIBRALTAR</u>                          2008 M No
<u>CHANCERY JURISDICTION</u>

IN THE MATTER of the Civil Procedure Rules, Part 64, Section 1

and

IN THE MATTER of the Trustees Act

and

IN THE MATTER of the trusts known as The Valmore Trust and The Summit Trust

BETWEEN

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**

<u>Claimants</u>

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**

<u>Defendants</u>

EXHIBIT "AJB9"

This is the exhibit marked "AJB9" referred to in the Witness Statement of ANDREW JOHN
BAKER dated         this      day of               2008

# Apostille



(Convention de La Haye du 5 Octobre 1961)

1.  Country:     **United States of America**

    This public document

2.  has been signed by **Norman Goodman**

3.  acting in the capacity of **County Clerk**

4.  bears the seal/stamp of the county of **New York**

## Certified

5.  At New York, New York     6.   the 25th day of February 2008

7.  by Special Deputy Secretary of State, State of New York

8.  No. NYC-10572458A

9.  Seal/Stamp          10.   Signature



_James Bizzarri_

James Bizzarri
Special Deputy Secretary of State

04103565 RSL ( REV  2/2008)

STRICTLY PRIVATE AND CONFIDENTIAL

# LETTER OF WISHES
## of Arkadi Badri Patarkatsishvili

TO:        All Trustees, Protectors, Directors and Custodians of my property.

FROM:     Arkadi Badri Patarkatsishvili (hereinafter, the "APPOINTOR")

Dear Sirs:

This letter represents my wishes, requests and instructions to all Trustees, Protectors, Directors, Managers and Custodians of all of my real, personal and business holdings who now hold, or may in the future but before my death, hold, manage or administer any of my real, personal and business property, wherever in the World situated (hereinafter, collectively referred to as the "ADMINISTRATORS"), including specifically, not by way of any limitations, those properties and possessions enumerated in the Confidential Addendum A; and those Settlements enumerated in the Confidential Addendum B.

IT IS MY WISH THAT this Letter of Wishes be deemed my sole and irrevocable instrument expressly superceding, revoking and rendering invalid any and all Wills, Codicils, Letters of Wishes and other similar documents purporting to devise or distribute any of my property executed by me or at my behest prior to the date hereof.

IT IS MY WISH that this Letter of Wishes be held in escrow by my personal lawyer since 1996, Emanuel Zeltser, Esq. (hereinafter, the "LAWYER") and be unsealed to the Administrators, within thirty (30) days after my death and burial of my body.

2

STRICTLY PRIVATE AND CONFIDENTIAL

IT IS MY WISH that all those to whom this Letter of Wishes may come, hold it be held in strict confidence and release to no one, including, without limitations, to my beneficiaries, except for the purposes of ensuring that my wishes herein stated are carried out after my death.

I am making this Letter of Wishes at this time because I believe that my political ambitions may have brought me to the point of being placed in the jeopardy of being physically eliminated either by my political opponents, if I succeed, or by my own allies, if I should fail to attain my goal of ridding my beloved country of Georgia of the dictatorial regime and henceforth become a liability to my friends and supporters. If the latter should occur, I WISH IT TO BE KNOWN that I accept my fate with no bitterness or remorse and with understanding that I did what I did with open eyes and seek no revenge against or prosecution of anyone. I WISH IT TO BE KNOWN that no member of my family shared my political aspirations and my struggle was solely and exclusively my own chosen mission and that I take full responsibility for my actions alone.

IT IS MY WISH that upon my death and burial of my body, all of my real, personal and business properties and holdings, wherever in the world situated be held and managed by an American corporation, **JWL Entertainment Group, Inc.**, headed by my cousin and business partner, **Joseph Kay** of 6 Wright Drive, Dix Hills, New York 11746, USA (hereinafter referred to as the "APPOINTEE"), at Appointee's sole and uncontrolled discretion, as I myself did, could or might do if I were personally present.

IT IS MY WISH that upon presentment of this Letter of Wishes

3

STRICTLY PRIVATE AND CONFIDENTIAL

to any of the Administrators or any other person, regardless of the title of such person, who is vested or possessed with any of my real, personal or business holdings and possessions, for my and/or my family benefit, *de juro* or *de facto*, or any Settlement in which I appear as a Trustor or Beneficiary, *de juro* or *de facto*, appoint forthwith my Appointee, and/or such person as may be designated by the Appointee as the sole legal representative of the Administrators and to issue to Appointee General Irrevocable Power of Attorney to act for the Settlements or for any other entities in which I de facto hold controlling interest in each and every way as the Administrator or Trustee could or might act if personally present with respect to any and all matters concerning my real, personal and business property, with no limitations whatsoever, in order to authorize and empower the Appointee to gather all of my real, personal and business assets and subsequently, sell or otherwise dispose of such assets, at private sale or public auction, at Appointee's discretion, and after paying all debts, taxes and final expenses, to distribute such assets to my beneficiaries at such time, as the Appointee may deem appropriate and in accordance with my confidential instructions, which have been conveyed to the Appointee and reflected in the Confidential Addendum C.

IT IS MY WISH that the powers conveyed upon the Appointee herein be construed in the broadest possible sense so as to empower the Appointee to perform any and all acts in his own sole and unhampered discretion.

4

STRICTLY PRIVATE AND CONFIDENTIAL

I specifically provide that any and all addendums to this Letter of Wishes are annexed for convenience purposes only in order to help my Appointee and/or my current Administrators to identify and gather my property and not for the purposes of limiting the powers vested in my Appointee in any way.

IN WITNESS WHEREOF, I the undersigned Appointor have set my hand on the date set forth below and caused this Letter of Wishes to be executed before the Notary and before two witnesses, whose names and signatures appear below.

_____
Arkadi Badri Patarkatsishvili
Appointor

_____
Witness № 1

_____
Witness № 2

ALEXANDER FISHKIN
Notary Public, State of New York
No. 31-5000163
Qualified in New York County
Commission Expires August 10, 20//

On this 14th day of November in the year 2007, before me, Alexander Fishkin, a Notary Public of the State of New York, County of New York, personally came Arkadi Badri Patarkatsishvili, a citizen of Georgia, born on October 31, 1955, in Tbilisi, resident of the City of Tbilisi, Gldani bldg. 10, Apt. 88, passport # 1508037, personal # 65002001339, issued by the Ministry of Justice of Georgia, personally known to me to be the Appointor named in the within Letter of Wishes. I have been satisfied that the Appointor is of sound mind and has full understanding of the instrument, which he is executing herein and that he does so being of sound and disposing mind and memory and over the age of eighteen (18) years of age and not being actuated by any duress, menace, fraud, mistake, or undue influence, Thereafter Arkadi (Badri) Patarkatsishvili executed the within Letter of Wishes under his own hand in my presence and in the presence of the witnesses appearing herein and in the presence of one another.

_____

**10**

<u>IN THE SUPREME COURT OF GIBRALTAR</u>
<u>CHANCERY JURISDICTION</u>

2008 M No

**IN THE MATTER** of the Civil Procedure Rules, Part 64, Section 1

and

**IN THE MATTER** of the Trustees Act

and

**IN THE MATTER** of the trusts known as The Valmore Trust and The Summit Trust

**BETWEEN**

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**

<u>Claimants</u>

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IVA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**

<u>Defendants</u>

_____

**EXHIBIT "AJB10"**

_____

This is the exhibit marked "AJB10" referred to in the Witness Statement of ANDREW JOHN BAKER dated            this      day of              2008



CRTI001Y

# TERRITORY OF THE BRITISH VIRGIN ISLANDS

## THE INTERNATIONAL BUSINESS COMPANIES ACT
(CAP. 291)

### CERTIFICATE OF INCORPORATION    (SECTIONS 14 AND 15)

No. 640519

The Registrar of Corporate Affairs of the British Virgin Islands HEREBY CERTIFIES

pursuant to the International Business Companies Act, Cap. 291 that all

the requirements of the Act in respect of incorporation having been satisfied,

## COURIVALE HOLDINGS LIMITED

is incorporated in the British Virgin Islands as an International Business

Company this 3rd day of Februrary, 2005.

Given under my hand and seal at

Road Town, in the Territory of the

British Virgin Islands



REGISTRAR OF CORPORATE AFFAIRS



Tat Tang                                           *Courtvale*

Von:        Daniel Lam [d.lam@londonintbank.com]
Gesendet:   Mittwoch, 23. Januar 2008 11:09
An:         William Cid De La Paz
Cc:         andrew.baker@miselva.li; Bianca Daniell; Sean Federico; Bhavini Pithava; Tat Tang
Betreff:    RE: Courtvale Holdings Limited

Dear William,

I hereby confirm that Courtvale is to be also transferred to Miselva Etablissement.

I will provide you shortly with a letter from JK authorizing this transfer.

Kind regards,

Daniel

Financial Controller
London International Bank
11 Grosvenor Place
London SW1X 7HH
Tel. +44 207 170 5592
Fax +44 207 170 5510
Blackberry +44 (0) 7738 135764
Email: d.lam@londonintbank.com


From: William Cid De La Paz [mailto:WCidDeLaPaz@finsburytrust.com]
Sent: 22 January 2008 10:24
To: Daniel Lam
Cc: andrew.baker@miselva.li; Bianca Daniell; Sean Federico
Subject: Courtvale Holdings Limited

Dear Daniel

I have just realised that there is another BVI company that is still with us, Courtvale Holdings Limited.

Please confirm whether this company also needs to be transferred to Miselva Etablissement.

Best regards


William

William Cid de la Paz TEP
Trust Manager

Finsbury Trust Company Limited
email: wciddelapaz@finsburytrust.com
Tel +350 40000
Fax +350 40404

=PRIVATE AND CONFIDENTIAL=================
This email and any attached files are confidential and may be legally privileged. If you are not the addressee,
any disclosure, reproduction, copying, distribution or other dissemination or use of this communication is
strictly prohibited. If you have received this transmission in error, please notify the sender immediately and
then delete this email. Email transmission cannot be guaranteed to be secure or error free as information
could be intercepted, corrupted, lost, destroyed, arrive late or incomplete or contain viruses. The sender

23.01.2008                                                           2

Mr Joseph Kay
70 Walton Street
London SW3 2HH
UK

Mr William Cid De La Paz
Finsbury Trust
Suites 7B & 8B
50 Town Range
Gibraltar

28 January 2008

RE: TRANSFER OF DIRECTORSHIP AND SHAREHOLDING

Dear Mr. Cid De La Paz

Please accept this letter as my request and instruction to disclose all information pertaining to the below-mentioned company to Mr. Andrew J. Baker at Miselva Etablissement, Vaduz and to co-operate with Mr. Baker and Miselva in (i) transferring the shares of the company, (ii) transferring the administration of the company to Miselva and (iii) appointing new directors and officers as Mr. Baker may direct.

1. Courtvale Holdings limited

I acknowledge that these provisions will be charged as per your administrative costs.

With thanks for your assistance.

Yours faithfully,

Mr. Joseph Kay

3

Courtvale Holdings Limited

(Company number 640519)
(Incorporated in British Virgin Islands)

Pursuant to the Company's Articles of Association we the undersigned, being all the Directors of the Company for the time being, hereby:

Share Transfers

The following (stamped) instruments of transfer was/were tabled:

| Transferor | Transferee | No. of Shares |
|---|---|---|
| Valmet Nominees Limited | Miselva Etablissement | 25,000 |
| Finsbury Nominees Limited | Miselva Etablissement | 25,000 |

NOTE THAT there had been obtained from the relevant subscribers a waiver of rights of pre-emption.

RESOLVE THAT (subject to stamping) the aforesaid transfer of shares be and it is hereby approved and THAT the relevant share certificates be signed sealed and issued.

Cancellation of Share Certificates

RESOLVE THAT share certificate number 1 issued in favour of Valmet Nominees Limited in the sum of 25,000 ordinary shares of USD 1.00 each be cancelled.
RESOLVE THAT share certificate number 2 issued in favour of Finsbury Nominees Limited in the sum of 25,000 ordinary shares of USD 1.00 each be cancelled.

Issuance of Share Certificate

RESOLVE THAT share certificate number 3 be issued in favour of Miselva Etablissement in the sum of 50,000 ordinary shares of USD 1.00 each be issued.

Resignation of Director

RESOLVE THAT the resignation of Joseph Kay as Director be accepted with effect from the close of this Meeting.

Appointment of Director

RESOLVE THAT Andrew John Baker be appointed as Director of the Company with effect from the close of this Meeting.

Resignation of Company Secretary

RESOLVE THAT the resignation of Finsbury Secretaries Limited as Secretary of the Company be accepted with effect from the close of this Meeting.

Appointment of Company Secretary

RESOLVE THAT Michael Ferdinand Repolusk be appointed as Secretary of the Company with effect from the close of this Meeting.

#VPF:FRM49360#

Change of Registered office & Registered agent

RESOLVE THAT the registered office and registered agent be transferred from Messrs. Trident Trust Company (B.V.I) Limited to Morgan & Morgan.

Dated this the 29th day of January, 2008

Mr. Joseph Kay – Sole Director

## STOCK TRANSFER FORM

WE                Valmet Nominees Limited
                  Suites 7B & 8B
                  50 Town Range
                  Gibraltar

herinafter called the "Transferor"

In consideration of the Sum of USD 1.00

paid to us by     Miselva Etablissement
                  Josef Rheinberger Strasse 29
                  FL-9490 Vaduz
                  Liechtenstein

hereinafter called the "Transferee"

Do hereby transfer to the Transferee 25,000 fully paid up shares of USD 1 each in the undertaking called Courtvale Holdings Limited

To hold unto the Transferee SUBJECT to Several Conditions on which we the Transferee DO HEREBY agree to take the said share(s) SUBJECT to the conditions aforesaid.

**In Witness** whereas the parties hereto have executed this Transfer under the hand/seal this 29th day of January, 2008

EXECUTED by the within        )      DIRECTOR

Name TRANSFEROR under         )

Hand/seal in the presence of: )

                              )      Finsbury Secretaries Limited
                              )         Secretaries
                              )      Valmet Nominees Limited


EXECUTED by the within        )

Name TRANSFEREE under         )

Hand in the presence of:      )

                              )
                              )      Miselva Etablissement


#VPF:FRM49363#

Certificate number : 1

of Suites 7b & 8b, 50 Town Range, Gibraltar

**Courtvale Holdings Limited**

Certificate Number

1

for 25000 Shares issued Valmet Nominees Limited to

Dated 15 February 2005

Number of Shares

25000

*Incorporated under the Laws of the Territory of the British Virgin Islands*

## COURTVALE HOLDINGS LIMITED

Valmet Nominees Limited

is/are the Registered

*This is to certify that*

of Suites 7b & 8b, 50 Town Range, Gibraltar

Proprietor of 25000 Ordinary Shares of USD1.00 each

in the above-named Company, subject to the Memorandum and Articles of Association of the Company.

Given under the Common Seal of the Company on this 15th day of February, 2005.

FINSBURY COMPANY LIMITED DIRECTOR

Finsbury Secretaries Limited Secretary

Directors

Secretary

No transfer of the Shares comprised in this certificate (or any part thereof) can be registered until this Certificate has been lodged with the Company

7

## STOCK TRANSFER FORM

WE        Finsbury Nominees Limited
Suites 7B & 8B
50 Town Range
Gibraltar

herinafter called the "Transferor"

In consideration of the Sum of USD 1.00

paid to us by      Miselva Etablissement
Josef Rheinberger Strasse 29
FL-9490 Vaduz
Liechtenstein

hereinafter called the "Transferee"

Do hereby transfer to the Transferee 25,000 fully paid up shares of USD 1 each in the undertaking called **Courtvale Holdings Limited**

To hold unto the Transferee SUBJECT to Several Conditions on which we the Transferee DO HEREBY agree to take the said share(s) SUBJECT to the conditions aforesaid.

In Witness whereas the parties hereto have executed this Transfer under the hand/seal this 29th day of January, 2008

EXECUTED by the within      )
Name TRANSFEROR under      )
Hand/seal in the presence of:      )

       DIRECTOR

       Finsbury Secretaries Limited
       Secretaries

)      Finsbury Nominees Limited

EXECUTED by the within      )
Name TRANSFEREE under      )
Hand in the presence of:      )

)      Miselva Etablissement

#VPF:FRM49383#

Certificate number    2    for    25000    Shares    issued    Finsbury Nominees Limited

of    Suites 7b & 8b, 50 Town Range, Gibraltar    to

Courtvale Holdings Limited

Dated    15 February 2005

Certificate Number    2

Number of Shares    25000

*Incorporated under the Laws of the Territory of the British Virgin Islands*

## COURTVALE HOLDINGS LIMITED

**This is to certify that**

Finsbury Nominees Limited

of    Suites 7b & 8b, 50 Town Range, Gibraltar

**Proprietor of**    25000    **Ordinary Shares of**    USD1.00    each

is/are the Registered

in the above-named Company, subject to the Memorandum and Articles of Association of the Company.

Given under the Common Seal of the Company on this    15th day of February, 2005

Directors

Secretary

Finsbury Secretaries Limited Secretaries

No transfer of the Shares comprised in this certificate (or any part thereof) can be registered until this Certificate has been lodged with the Company

No. of Certificate

3

No. of Shares

50000

# SHARE CERTIFICATE
## of
## COURTVALE HOLDINGS LIMITED

Incorporated under the International Business Companies Act, CAP. 291

THIS IS TO CERTIFY that

of  Josef Riehberger Strasse 29, FL-9490 Vaduz, Liechtenstein

Misetva Etablissement

is/are the Registered

Proprietor of  50000   Ordinary Shares of   USD1.00   each

in the above named Company, subject to the Memorandum and Articles of Association of the Company.

GIVEN under the Common Seal of the said Company,

the   29th day of January, 2002

_____
Director

_____
Director/Secretary

FINSBURY SECRETARIES LIMITED
SECRETARIES

10

Date:    29 January 2008

The Board of Directors
Courtvale Holdings Limited
Trident Chambers
P.O. Box 146
Wickhams Cay
Road Town Tortola
British Virgin Islands

Dear Sirs

### Re: Resignation as Director

Please take this letter as my notice of resignation as Director of the Company with effect from 29th day of January, 2008.

Yours faithfully

Mr. Joseph Kay

#VPF:FRM49357#

Courtvale Holdings Ltd                                                          Seite 1 von 1

## Andrew Baker

Von:        David Ashfield [d.ashfield@londonintbank.com]
Gesendet:   Montag, 3. März 2008 14:08
An:         tat.tang@miselva.li
Cc:         andrew.baker@miselva.li; Daniel Lam
Betreff:    Courtvale Holdings Ltd

Tat, further to your e mails of 12th February and 3rd March, please put the shares under the Valmore Trust. Please send me the resolution accepting the shares as part of the Trust immediately. Sorry for the urgency. I also need the declaration of trust for Moncayo to Jorum. Regards,

David Ashfield

London International Bank Ltd
11 Grosvenor Place, SW1X 7HH
Mobile: +44 7887897329
Blackberry: +44 7921881027
Tel: +44 2071705591
Fax: +44 2071705510

Registered in England, No 3250571-2
Authorised and Regulated by the Financial Services Authority

This e-mail, together with any attachments, is confidential between the sender and addressee(s). If you are not the intended recipient(s) of this e-mail you should not copy it or use it for any purpose nor disclose its contents to any person; to do so may be unlawful. If you have received this e-mail by mistake please notify the sender immediately by e-mail and delete this e mail and any attachments from your system. To the maximum extent permitted by law, London International Bank Ltd accepts no liability for any loss or damage resulting from unauthorised use of this email or any attachment or from unauthorised use of any information contained or implied in the email or attachments.

03.03.2008

12

Re: Courtvale Holdings Ltd

Seite 1 von 1

## Tat Tang

| | |
|---|---|
| **Von:** | David Ashfield [d.ashfield@londonintbank.com] |
| **Gesendet:** | Montag, 3. März 2008 14:56 |
| **An:** | tat.tang@miselva.li |
| **Cc:** | andrew.baker@miselva.li; Daniel Lam |
| **Betreff:** | Re: Courtvale Holdings Ltd |

Tat, following our call with Andrew please do the declaration of trust in favour of Jorum. I will get a written confirmation from JK later. In the meantime please send the DoT. Regards,

David Ashfield

London International Bank Ltd
11 Grosvenor Place, SW1X 7HH
Mobile: +44 7887897329
Blackberry: +44 7921881027
Tel: +44 2071705591
Fax: +44 2071705510

-----Original Message-----
From: David Ashfield
To: 'tat.tang@miselva.li'
CC: 'andrew.baker@miselva.li'; Daniel Lam
Sent: Mon Mar 03 13:08:02 2008
Subject: Courtvale Holdings Ltd

Tat, further to your e mails of 12th February and 3rd March, please put the shares under the Valmore Trust. Please send me the resolution accepting the shares as part of the Trust immediately. Sorry for the urgency. I also need the declaration of trust for Moncayo to Jorum. Regards,

David Ashfield

London International Bank Ltd
11 Grosvenor Place, SW1X 7HH
Mobile: +44 7887897329
Blackberry: +44 7921881037
Tel: +44 2071705591
Fax: +44 2071705510

Registered in England, No 325957-2
Authorised and Regulated by the Financial Services Authority

This e-mail, together with any attachments, is confidential between the sender and addressee(s). If you are not the intended recipient(s) of this e-mail you should not copy it or use it for any purpose nor disclose its contents to any person: to do so may be unlawful. If you have received this e-mail by mistake please notify the sender immediately by e-mail and delete this e-mail and any attachments from your system. To the maximum extent permitted by law, London International Bank Ltd accepts no liability for any loss or damage resulting from unauthorised use of this email or any attachment or from unauthorised use of any information contained or implied in the email or attachments.

03.03.2008

13

03 Mar 2008 9:07AM    CARLBROW LTD    MAR. 03 2008 10:25    CTM

020772358085    P. 1

Misolva Etablissement
Att. Mr Andrew Baker
Josef Rheinberger Strasse 29
FL 9490
Vaduz
Liechtenstein

3rd March 2008

Dear Andrew,

Courtvale Holdings Ltd

I would be grateful if you would make a declaration of trust in favour of Jorum
Establishment with regard to your nominee holding of my share in Courtvale Holdings
Ltd

Yours sincerely,

Joseph Kay

14

# DECLARATION OF TRUST

To:

## JORUM Establishment, Josef Rheinberger Strasse 29, FL-9490 Vaduz

We, Miselva Etablissement of Josef Rheinberger Strasse 29, Postfach 635, 9490 Vaduz, Liechtenstein hereby declare that we hold ten thousand (10'000) shares in

## COURTVALE HOLDINGS LIMITED

Registered in the British Virgin Islands under Company number 1063187
Registered office at Pasea Estate, Road Town, Tortola, British Virgin Islands

and that we hold these shares on trust for your use and benefit absolutely. We undertake not to dispose of these shares without your express consent and we will not seek to mortgage them or to place any form of charge, pledge or security over them or to do or knowingly suffer to be done anything in any way what ever that is inconsistent with or that could prejudice your use and benefit of the said ten thousand shares.

Vaduz, 3rd March 2008

Miselva Etablissement

Andrew J. Baker
Director

15

FILE NOTE

COURTVALE HOLDINGS LTD ("Courtvale")

I have today had various discussions with David Ashfield ("DA") of LIB concerning inter alia the ownership of Courtvale.

Recently, I was appointed as the sole director of Courtvale and Miselva became the shareholder of record. Until now, there has been some uncertainty for whom or for which holding vehicle Miselva has been holding the shares, although it had been my impression that Courtvale was a "JK" company.

At the end of today's discussions, DA finally requested that Miselva should hold the shares on trust for Jorum Establishment ("Jorum"). I suggested that DA ask JK to sign a confirmation to this effect. We have now received an e-mail from DA and a signed request from JK.

Since monies in Courtvale originated from "AP" companies, and since Jorum is beneficially owned by AP's Estate, this request appears to make sense to me and to be in order.

In the circumstances, I am prepared to accede to the request and issue a Declaration of Trust in favour of Jorum - on condition, however, that Jorum is and remains part of AP's Estate.

If it transpires that for whatever reason Jorum does not form part of AP's Estate, then the pre-condition for the Declaration of Trust will not have been fulfilled and the shares in Courtvale will no longer be held on trust for Jorum.

03.03.08

16

**Andrew Baker**

**Von:**      Daniel Lam [d lam@londonintbank.com]
**Gesendet:** Mittwoch, 13. Februar 2008 16:12
**An:**       Andrew Baker
**Betreff:**  FW: Attached Image

Dear Andrew,

As discussed earlier please find attached a letter from Joseph addressed to you requesting transfer of funds. Please can you arrange for the transfers as soon as possible. If you have any queries regarding these transfers please do not hesitate to contact me.

Kind regards,

Daniel

Financial Controller
London International Bank
11 Grosvenor Place
London SW1X 7HH
Tel: +44 207 170 5592
Fax: +44 207 170 5510
Blackberry: +44 (0) 7738 135764
Email: d lam@londonintbank.com

Registered in England, No 3250573 2
Authorised and Regulated by the Financial Services Authority

This e mail, together with any attachments, is confidential between the sender and addressee(s). If you are not the intended recipient none of this e mail you should not copy it or use it for any purpose nor disclose its contents to any person. To do so may be unlawful. If you have received this e mail by mistake please notify the sender immediately by e mail and delete this e mail and any attachment from your system. To the maximum extent permitted by law, London International Bank Ltd accepts no liability for any loss or damage resulting from unauthorised use of this e mail or any attachment or from any statement based on any information contained or implied in the e mail or attachments.

17-

70 Walton Street,
London,
SW3 2HH,
United Kingdom.

Miselva Etablissement,
Josef Rheinberger Strasse 29,
Vaduz, FL-9490,
Liechtenstein.

13th February 2008

Dear Mr. Baker,

Please can you arrange for all funds held at Hypo Investment Bank Liechtenstein for the following companies Montglimmer Overseas Limited, Ucam Estate Inc., Shenton Park Company Inc., Moncayo Management Inc. and Jorum Establishment to be transferred to Courtvale Holdings Limited's Hypo Investment Bank account, account number 10.304155_0.

The amounts to be transferred are as follows:

Montglimmer Oversea Ltd: $6,970,211.78 and €1,971.40
Ucam Estates Inc.: $594,979.31 and €23.85 and £4,388,166.90
Shenton Park Company Inc.: $1,436,446.72
Moncayo Management Inc.: £2,976,828.59
Jorum Establishment: $489.96 and €11,146.30

Please can you ensure that these transfers are made with value as of today's date.

Thank you for your assistance in this matter.

Yours sincerely,

Lord J. Kay

18

**Andrew Baker**

*Courtvale*

| | |
|---|---|
| **Von:** | Andrew Baker [andrew.baker@miselva.li] |
| **Gesendet:** | Mittwoch, 13. Februar 2008 16:31 |
| **An:** | Daniel Lam |
| **Betreff:** | AW: Attached Image |

Daniel,

I will do as instructed.

However, can you please let me know what is the basis of these transfers? Short-term loans?

Also, can you find out and let me know what is the thinking behind these urgent transfers?

Finally, it is my clear understanding that funds in Courtvale have always been and will in future be used to pay expenses incurred by or in connection with or for the exclusive benefit of AP and his personal affairs. If this is not the case, then we may have a problem with respect to these transfers now being carried out. Can you obtain some confirmation to this effect from JK?

Thanks and kind regards.

Andrew

-----Ursprüngliche Nachricht-----
**Von:** Daniel Lam [mailto:d.lam@londonintbank.com]
**Gesendet:** Mittwoch, 13. Februar 2008 16:12
**An:** andrew.baker@miselva.li
**Betreff:** FW: Attached Image

Dear Andrew,

As discussed earlier please find attached a letter from Joseph addressed to you requesting transfer of funds. Please can you arrange for the transfers as soon as possible. If you have any queries regarding these transfers please do not hesitate to contact me.

Kind regards,

Daniel

Financial Controller
London International Bank
11 Grosvenor Place
London SW1X 7HH
Tel: +44 207 170 5592
Fax: +44 207 170 5510
Blackberry: +44 (0) 7738 135764
Email: d.lam@londonintbank.com

Registered in England, No 325057× 2
Authorised and Regulated by the Financial Services Authority

This e-mail, together with any attachments, is confidential between the sender and addressee(s). If you are not the intended recipient(s) of this e-mail you should not copy it or use it or for any purpose nor disclose its contents to any person; to do so may be un- lawful. If you have received this e-mail by mistake please notify the sender immediately by e-mail and delete this e-mail and any attachments from your system. To the maximum extent permitted by law, London International Bank Ltd accepts no liability for any loss or damage resulting from unauthorised use of this email or any attachment or from unauthorised use of any information is contained or implied in the email or attachments.

13.02.2008

*19*

**Andrew Baker**

| | |
|---|---|
| Von: | Andrew Baker [andrew.baker@miselva.li] |
| Gesendet: | Montag, 25. Februar 2008 14:10 |
| An: | Anastasija Blinova |
| Betreff: | Courtvale |
| | |
| Wichtigkeit: | Hoch |

Dear Anastasija,

As the director of Courtvale, I have asked Hypo to make me a joint signatory on the account with Joseph and to send me copies of all correspondence.

I am about to counter-sign the payment instructions for the four transfers requested earlier today.

Can you please send to me copies of the invoices referred to and, if there is no invoice, then provide an explanation as to what exactly the payment is for?

With thanks and kind regards.

Andrew

1

20

**Andrew Baker**

| | |
|---|---|
| Von: | Anastasija Blinova [a.blinova@londonintbank.com] |
| Gesendet: | Dienstag, 26. Februar 2008 13:02 |
| An: | andrew.baker@miselva.li |
| Betreff: | RE: Courtvale |



20080226115005.p
df

Dear Andrew,

Please find attached details of the invoices as requested.

If it's confusing that the invoices are addressed to JK and Mr
Samuelson, please be advised that we hardly ever received any invoices
on AP's name.

Regards,
*nastasija

-----Original Message-----
From: Andrew Baker [mailto:andrew.baker@miselva.li]
Sent: 25 February 2008 15:17
To: Anastasija Blinova
Subject: AW: Courtvale

Anastasija,

Many thanks.

I do have a further question in relation to the payment to Degaulle
Fleurance & Associés. There are two invoices addressed to Joseph and to
Christopher Samuelson respectively. Can you please give me further
details
as to what these invoices relate?

Kind regards

Andrew


Registered in England, No 3250572
Authorised and Regulated by the Financia=
l Services Authority

--
This e-mail, together with any attachments, is con=
fidential between the
sender and Addressee(s). If you are not the intended r=
ecipient(s) of this
e-mail you should not copy it or use it for any purpose =
nor disclose its
contents to any person: to do so may be unlawful. If you ha=
ve received this
e-mail by mistake please notify the sender immediately by e=
-mail and delete
this e-mail and any attachments from your system. To the ma=
ximum extent
permitted by law, London International Bank Ltd accepts no liab=
ility for any
loss or damage resulting from unauthorised use of this email o=
r any
attachment or from unauthorised use of any information contained or im=

1

21

plied
in the email or attachments.

2

22

**DE GAULLE**
**FLEURANCE**
**& ASSOCIÉS**

SOCIÉTÉ D'AVOCATS

January 30, 2008

Mr. Joseph Kay
London International Bank
11 Grosvenor Place
London SW1X 7HH
UK

Dear Joseph,

Please find enclosed our statement of fees for professional services rendered during period from March 26, 2007 to January 24, 2008 in the "MP" matter.

Please do not hesitate to contact us should you have any questions concerning this statement.

We would be grateful if you could ensure the payment upon receipt.

Kind regards

Didier Bruère-Dawson

*Encl.*

Agreed with N,
GKeene 14/2/8

11, RUE PORTALIS 75008 PARIS
TEL +33 1 56 64 00 00 – FAX +33 1 56 64 00 01
SELAS AU CAPITAL DE 40.000 euros – RCS PARIS 439 534 835 – 00722C 8.05
www.dgfla.com

125308v1

23

January 30th, 2008

---

**MEMORANDUM DESCRIBING PROFESSIONAL SERVICES
RENDERED TO MR KAY**

---

1.    DESCRIPTION

Advice and assistance rendered from 26 March 2007 to 24 January 2008 with respect to the "MP" matters (criminal law)

In particular :

- Follow up of the case with the Isle of Man attorney and Mr Samuelson (numerous calls and emails);

- Various discussions and emails and one meeting in New York City with Mr Zeitzner relating to the Pechiney matter (followed by O'Kane - De Pardieu - Zeitzner);

- Follow up in emergency of Chris' interview (Antibes matter) with his attorneys (meeting on 16 January 2008 in Paris and 17 January 2008 in London), tremendous discussions and emails, setting of a file to be provided;

2.    LAWYERS WORKING ON THE FILE

Didier Bruère-Dawson (DBD)

3.    AMOUNT OF THE FEES

| Lawyer | Rate per Hour | Hours spent | Subtotal |
|--------|---------------|-------------|----------|
| DBD | 330,00 € | 27:15 | 8 992,50 € |
| Total | | | 8 992,50 € |

Disbursements: 5 611, 87€ (Plane tickets for London, cabs, translation in emergency for the file to be provided to authorities)

24

# DE GAULLE
# FLEURANCE
# & ASSOCIÉS

SOCIÉTÉ D'AVOCATS

Joseph Kay
C/O Fisher Island Holdings LLC
1 Fisher Island Drive
Fisher Island Fl. 33109
U.S.A

INVOICE 240/20023623

January 30, 2008

Our statement for professional services rendered
during the period from March 26, 2007 to January
24, 2008 in the "MP" matter

| | | EUR | 8 992.50 |
| *Disbursements* | | *EUR* | *5 611.87* |
| **TOTAL** | | EUR | 14 604.37 |

*14,604~37*
*5,362~50*
*19,966~87*

Payment requested upon receipt

Bank Transfers should be addressed to : BNP Paribas
Agence Paris Place Dauphine, 20, rue de Harlay, 75001 Paris
(Bank code : 30004 ; Branch code : 01960 ; Account n° 00010104228 55)
IBAN: FR76 3000 4019 6000 0101 0422 855 -- BIC: BNPAFRPPPOP
VAT number : FR 00 439534835

11, RUE PORTALIS 75008 PARIS
TEL. +33 1 56 64 00 00 - FAX +33 1 56 64 00 01
SELAS AU CAPITAL DE 40.000 euros - RCS PARIS 437 534 835 - TOQUE K 35
www.dgfla.com

2S

**DE GAULLE
FLEURANCE
& ASSOCIÉS**

SOCIÉTÉ D'AVOCATS

January 30th, 2008

Mrs. Natalia Shachkova
Mr. Joseph Kay
Mrs. Galina Keene
C/O LAKEBROW LTD
11 Grosvenor Place
London SW1X 7HH
UK

Dear all,

Please find enclosed our statement of fees for professional services rendered during the period from July 26th 2007 to January 25th, 2008 relating to "HIATUS".

Please do not hesitate to contact us should you have any questions concerning this statement.

We would be grateful if you could ensure the payment upon receipt.

Kind regards,

Didier Bruére-Dawson

Encl.

11, RUE PORTALIS 75008 PARIS
TEL +33 1 56 64 00 00 · FAX +33 1 56 64 00 01
SELAS AU CAPITAL DE 40.800 euros · RCS PARIS 432 534 835 · TOQUE K 35
www.dgfla.com

26

January 30th, 2008

## MEMORANDUM DESCRIBING PROFESSIONAL SERVICES RENDERED TO HIATUS

1.  DESCRIPTION

Advice and assistance rendered from July 26th, 2007 to January 25th, 2008.

In particular :

- Tremendous calls and emails in order to collect back remaining funds (116K€ on 20 November 2007, 150K€ still to be collected) ;

- Settlement of wealth tax issue for 2006;

- Numerous calls with Antibes Tax Administration and PWC in order to try to settle the 600K€ claim and an additional tax claim (see my email dated 16 November 2007);

- Reading the writs filed by the Tax Administration at Court,

- Researches, drafting and then filing at Court of new writs in order to challenge the Administration's position in order to try to settle the matter.

2.  LAWYERS WORKING ON THE FILE

Didier Bruère-Dawson (DBD)
Vincent Schmitt (VS)

3.  AMOUNT OF THE FEES

| Lawyer | Rate per Hour | Hours spent | Subtotal |
|--------|---------------|-------------|----------|
| DBD | 330.00 € | 8:30 | 2 805.00 € |
| VS | 330.00 € | 7:45 | 2 557.50 € |
| Total | | | 5 362.50 € |

195021v1

27

# DE GAULLE
# FLEURANCE
# & ASSOCIÉS

SOCIÉTÉ D'AVOCATS

Mr Christopher Samuelson
C/o Joseph Kay
24 Avenue Paul-Cérésole
1800 Vevey
Switzerland

INVOICE 666/20023622

January 30, 2008

Our statement for professional services rendered
during the period from July 26th 2007 to January
25th, 2008

|  |  | EUR | 5 362.50 |
|---|---|---|---|
| TOTAL |  | EUR | 5 362.50 |

Payment requested upon receipt

Bank Transfers should be addressed to : BNP Paribas
Agence Paris Place Dauphine, 20, rue de Harlay, 75001 Paris
(Bank code : 30004 ; Branch code : 01960 ; Account n° 00010104228 55)
IBAN: FR76 3000 4019 6000 0101 0422 855 – BIC: BNPAFRPPPOP
VAT number : FR 00 439534835

11, RUE PORTALIS 75008 PARIS
TEL. +33 1 56 64 00 00 - FAX. +33 1 56 64 00 01
SELAS AU CAPITAL DE 40.000 euros - RCS PARIS 439 534 835 - TOQUE K 35
www.dgfla.com

28

**Andrew Baker**

| | |
|---|---|
| **Von:** | Andrew Baker [andrew.baker@miselva.li] |
| **Gesendet:** | Dienstag, 26. Februar 2008 17:27 |
| **An:** | Peter Bader |
| **Betreff:** | Courtvale |
| **Wichtigkeit:** | Hoch |

Courtvale - Tfrs
26.02.08.pdf

Peter,

5 Zahlungsaufträge anbei, von mir unterschrieben.

Gruss

Andrew

1

29

26/02/2008  15:42    08423-265-56-66                                    S.    31/86
       26/02 2008 TUE 11:50  FAX 0207130X510 London Int' Bank Ltd       ☒001/300

Ot:                              HOMER TERESOUA:           FEB. 26 2008 14:32  CTR2
     26 Feb 2008 9:05AM         LAKEBROW LTD              020728350005        P.1

Ms Kutoglu
Hypo Investment Bank
Aktiengesellschaft
Austrasse 59
Vaduz 9490
Liechtenstein


26 February 2008


Fax: +423 (265) 5666


Dear Filiz,


Please transfer from the account of Courtvale Holdings the amount of EUR 89,500-
(Eighty Nine Thousand Five Hundred Euros Exactly) to the following account:

Beneficiary:        Global Jet
Bank:               UBS 9A 1260 Nyon - Switzerland
SWIFT:              UBSWCHZH12T
IBAN:               CH33 0024 3243 3274 0861 R
Reference:          Invoices E08-17318 and E08-17319

Charges:            From payer's a/c


Yours sincerely,


Lord J. Kay


30

26/02/2008  15:42    08023-265-56-66                                                    S.    02/05
26/02 2008 TUE 11:50  FAX 00071705510 London Int' Bank Ltd                              @002/005

OT:                        HOMEP ТЕЛЕCONA:                 ФЕВ. 26 2008 14:32  CTP3
26 Feb 2008 5:05PM    LAKEBROW LTD              020772358085                  P.2

Ms Kurtoglu
Hypo Investment Bank
Aktiengesellschaft
Austrasse 59
Vaduz 9490
Liechtenstein

26 February 2008

Fax: +423 (265) 5666

Dear Filiz,

Please transfer from Courtvale Holdings Ltd account the amount of Euro 774.53
(Seven Hundred and Seventy Four Euros and Fifty Three Centimes Only) to the
following account:

Beneficiary:      Finanzamt Baden-Baden
Bank:             Bundesbank Karlsruhe
IBAN:             DE 35660000000066001516
BIC:              MARKDEF1660

Reference:        Steuer-Nr. 36 059 06008 / Tolkmitt, February

Please could you ensure that the value date of the above transfer is today.

All charges to be paid by Courtvale Holdings Ltd.

Yours sincerely,

Lord J. Kay

31

26/02/2008  15:42    80423-265-56-66                                    S.    03/05
   26/02 2008 TUE 11:50  FAX 00011905810 London Int' Bank Ltd              Ø003/005

OT:                    НОМЕР ТЕЛЕФОНА:              СБ. 26 2008 14:33  СТР4
     26 Feb 2008 5:05AM   LAKEBROW LTD          020772358085          p.3

Ms Kurtoglu
Hypo Investment Bank
Aktiengesellschaft
Austrasse 59
Vaduz 9490
Liechtenstein

26 February 2008


Fax: +423 (265) 5666


Dear Sirs,


Please transfer from Courtvale Holdings Ltd account the amount of Euro 2,013.69
(Two Thousand and Thirteen Euros and Sixty Nine Centimes Only) to the following
account:

Beneficiary:      AOK Bayern
Bank:             Deutsche Bank Munchen
IBAN:             DE51700700100152172360
BIC:              DEUTDEMM

Reference:        Beitr.Kto 144 824 61/Tolkmitt, February

Please could you ensure that the value date of the above transfer is today.

All charges to be paid by Courtvale Holdings Ltd.


Yours sincerely,

Lord J. Kay

32

26/02/2008  15:42    03423-265-56-66

26/02 2008 TUE 11:50  FAX 02071905510 London Int' Bank Ltd                                    S.   04/05
                                                                                              ☒004/005

OT:                         MUYER TELEGRAM:                    DEB. 26 2008 14:33  CTMS

      26 Feb 2008 5:05AM     LAKEBROW LTD             02077235808S                  p.4

Ms Kurtoglu
Hypo Investment Bank
Aktiengesellschaft
Austrasse 59
Vaduz 9490
Liechtenstein

26 February 2008

Fax: +423 (265) 5666

Dear Eliz,

Please transfer from Courtvale Holdings Ltd account the amount of Euro 4,189.21
(Four Thousand One Hundred and Eighty Nine Euros and Twenty One Centimes
Only) to the following account:

Beneficiary:        Mrs Anett Tolkmitt
Bank:               Dresdner Bank
IBAN:               DE72370800400427770300
BIC:                DRESDEFF

Reference:          February salary & quarter expenses

Please could you ensure that the value date of the above transfer is today.

All charges to be paid by Courtvale Holdings Ltd.

Yours sincerely,

Lord J. Kay

33

26/02/2008   15:42   00423-265-56-66                                          S.    05/05
     26/02 2008 TUE 11:59   FAX 02071705510 London Int' Bank Ltd                    @005/005

CI:                          HOMER YENEGRAR:              FEB. 26 2008 14:33   CMG
     26 Feb 2008 5:06PM      LAKEBREW LTD              02077235B085              p.5

Ms Kurtoglu
Hypo Investment Bank
Aktiengesellschaft
Austrasse 59
Vaduz 9490
Liechtenstein

26 February 2008

Fax: +423 (365) 5666

Dear Piliz,

Please transfer from Courtvale Holdings Ltd account the amount of Euro 1,335.41
(One Thousand Three Hundred and Thirty Five Euros and Forty One Centimos Only)
to the following account:

Beneficiary:      Mr. Rico Tolkmitt
Bank:             Hypovereinsbank Aschaffenburg
IBAN:             DB39795200703820429795
BIC:              HYVEDEMM405

Reference:        February salary

Please could you ensure that the value date of the above transfer is today.

All charges to be paid by Courtvale Holdings Ltd.

Yours sincerely,

Lord J. Ksy

34

**Andrew Baker**

| | |
|---|---|
| Von: | Andrew Baker [andrew.baker@miselva.li] |
| Gesendet: | Mittwoch, 27. Februar 2008 08:31 |
| An: | Anastasija Blinova |
| Betreff: | AW: Courtvale |

Anastasija,

Thank you.

With respect to yesterday's transfers, can you please let me know who were the passengers on the flights from Moscow to Tbilisi on 14th February and Tbilisi to London on 17th February?

Also, all the other payments relate to the property in Baden Baden which is owned by Xavia Holdings BV. Surely these expenses relating to the property should be paid by Xavia? Xavia is a Dutch company that must prepare and file annual accounts and it would make tax-sense, I believe, to be charging the property running costs to Xavia.

Kind regards

Andrew

-----Ursprüngliche Nachricht-----
Von: Anastasija Blinova [mailto:a.blinova@londonintbank.com]
Gesendet: Dienstag, 26. Februar 2008 18:20
An: andrew.baker@miselva.li
Betreff: RE: Courtvale

Dear Andrew,
I was not informed about the new requirements.
However, from now on I will provide you with the instructions and back ups as requested.
Please find attached payments made today.
Have a good evening.
Regards,
Anastasija

-----Original Message-----
From: Andrew Baker [mailto:andrew.baker@miselva.li]
Sent: 26 February 2008 17:02
To: Anastasija Blinova
Subject: Courtvale
Importance: High

Dear Anastasija,

I am sorry to be a bore but can you please now as a matter of course send to
me copies of the relevant invoices that relate to each payment instruction
that is being sent to Hypo?

The very best thing would be for you to send the signed payment instructions plus invoices and supporting details to me, and I will counter-sign them and send them on to Hypo, with a copy back to you for your
file and so that you know they have gone to the bank.

The purpose of this is to ensure (and be seen to be ensuring) that all payments are to cover the expenses of AP's intended beneficiaries only.

Thanks and kind regards

Andrew

1

35

Registered in England, No 3250872
Authorised and Regulated by the Financia-
l Services Authority

--
This e-mail, together with any attachments, is con-
fidential between the
sender and addressee(s). If you are not the intended re-
cipient(s) of this
e-mail you should not copy it or use it for any purpose o-
nor disclose its
contents to any person: to do so may be unlawful. If you ha-
ve received this
e-mail by mistake please notify the sender immediately by e-
-mail and delete
this e-mail and any attachments from your system. To the ma-
ximum extent
permitted by law, London International Bank Ltd accepts no liab-
ility for any
loss or damage resulting from unauthorised use of this email o-
r any
attachment or from unauthorised use of any information contained or im-
plied
in the email or attachments.

36

**Tat Tang**

| | |
|---|---|
| Von: | Andrew Baker [andrew.baker@miselva.li] |
| Gesendet: | Mittwoch, 27. Februar 2008 17:22 |
| An: | Tat Tang |
| Betreff: | WG: Courtvale & API KAS payment |
| | |
| Anlagen: | 20080227141410.pdf; 20080227141442.pdf; Transfer API KAS to SARL Rodolfe 27.02.08.doc |

  

2008022714  2008022714  Transfer API
10.pdf (103 K442.pdf (1 MB  to SARL Rod

-----Ursprüngliche Nachricht-----
Von: Anastasija Blinova [mailto:a.blinova@londonintbank.com]
Gesendet: Mittwoch, 27. Februar 2008 15:59
An: andrew.baker@miselva.li
Betreff: Courtvale & API KAS payment

Andrew,

In regards to the Global Jet flight, I confirmed with the private office that
passengers on the plane were family members and close friends of AP.
Hope that answers your question.

As for Xavia invoices from now on the payments will be made from Xavia a/c, not
Courtvale.

Moreover, please find attached 2 payments:

1. Courtvale to Carre Aviation; this is AP's monthly private plane expenses (JK never
uses it). I haven't sent it to Hypo yet and would appreciate some clarification on how
you would like to run the payments now.

2. API KAS payment for your signature and JK's authorization.

Regards,
Anastasia

-----Original Message-----
From: Andrew Baker [mailto:andrew.baker@miselva.li]
Sent: 27 February 2008 07:31
To: Anastasija Blinova
Subject: AW: Courtvale

Anastasija,

Thank you.

With respect to yesterday's transfers, can you please let me know who were the
passengers on the flights from Moscow to Tbilisi on 14th February and Tbilisi to
London on 17th February?

Also, all the other payments relate to the property in Baden Baden which is owned by
Xavia Holdings BV. Surely these expenses relating to the property should be paid by
Xavia? Xavia is a Dutch company that must prepare and file annual accounts and it
would make tax-sense, I believe, to be charging the property running costs to Xavia.

Kind regards

1

37

Andrew

Registered in England, No 3296572
Authorised and Regulated by the Financial Services Authority

--

This e-mail, together with any attachments, is con= fidential between the sender and
addressee(s). If you are not the intended r=
ecipient(s) of this
e-mail you should not copy it or use it for any purpose = nor disclose its contents to
any person: to do so may be unlawful. If you ha= ve received this e-mail by mistake
please notify the sender immediately by e= -mail and delete this e-mail and any
attachments from your system. To the ma= ximum extent permitted by law, London
International Bank Ltd accepts no liab= ility for any loss or damage resulting from
unauthorised use of this email o= r any attachment or from unauthorised use of any
information contained or im= plied in the email or attachments.

38

Ms. Filiz Kurtoglu
Hypo Investment Bank
Aktiengesellschaft
Austrasse 59
Vaduz 9490
Liechtenstein


27 February 2008


Fax: +423 (265) 5666


Dear Filiz,

Please could you kindly arrange for a transfer from Courtvale Holdings Limited
account the amount of EUR 432,701.04 (Four Hundred and Thirty Two Thousand,
Seven Hundred and One Euros and Four Centimes Only) to the following account:

Name:
Bank:                      Carre Aviation Limited
Account.                   Hypo Investment Bank Liechtenstein
IBAN:                      309.265
Reference:                 LI47 0880 3103 0926 5000 0
                           Invoice 2008/010


Please could you ensure that the value date of the above transfer is today.


Yours sincerely,

Lord J. Kay

03/03 2008 MON 11:33  FAX 02071705510 London Int' Bank Ltd                    ☒001/002

Ms Kurtoglu
Hypo Investment Bank
Aktiengesellschaft
Austrasse 59
Vaduz 9490
Liechtenstein

3rd March 2008

Fax: +423 (265) 5666

Dear Filiz,


Please transfer from Courtvale Holdings Ltd account the amount of USD $21,275,000.- (Twenty One Million, Two Hundred and Seventy Five Thousand US Dollars Exactly) to the following account:

Beneficiary:          Joseph Kay
Beneficiary's a/c:    36110100777

Beneficiary's Bank:  JSC Investbank, Tbilisi, Georgia
SWIFT:                LISMGE22

Intermediary Bank:   Commerzbank AG, Frankfurt, Germany
SWIFT:                COBADEFF
A/c USD/EUR:          400886582600


Reference:           Courtvale


Please could you ensure that the value date of the above transfer is today.
All charges to be paid by Courtvale Holdings Ltd.


Yours sincerely,


Lord J. Kay

40

03/03 2008 MON 11:33  FAX 02071705610 London Int' Bank Ltd                    ☒002/002

Ms. F Kurtoglu
Hypo Investment Bank
Aktiengesellschaft
Austrasse 59
Vaduz 9490
Liechtenstein

3rd March 2008

Fax: +423 (265) 5698

Dear Filiz,

Please transfer from Connvale Holdings Ltd account the amount of GBP £100,000-
(One Hundred Thousand Pounds Only) to the following account:

Account:       Lakebrow Ltd

Bank:          The Royal Bank of Scotland
               London Victoria Branch
               London SW1E 6RA

Sort Code:     16 01 09
Account:       00230902

Yours sincerely,

Lord J. Kay

41

FILE NOTE - 2

COURTVALE HOLDINGS LTD ("Courtvale")

It had until recently been my impression that Courtvale was a company beneficially owned by Joseph Kay ("JK"). Upon AP's death, JK requested me to make certain transfers from "AP" companies to Courtvale. When I questioned the propriety of this, I was told that Courtvale had only ever been used to make payments to cover the expenses of AP and his family. I made the transfers as requested but had myself put onto the bank account as a joint signatory, for safety's sake.

Today, I received from JK two transfer requests to make payments out of Courtvale's bank account, one of which is for a very substantial amount of money to JK's personal account. I have declined to countersign the instructions pending a meeting tomorrow with David Ashfield and Emanuel Zeltser.

In my view, it is essential to ensure so far as possible that transfers of funds which originated from "AP" companies are only used for the benefit of AP's heirs (Jorum Establishment) or intended beneficiaries (Nile Trust).

03.03.08

42



London International Bank Ltd

Hypo Investment bank AG
Austrasse 59
Postfach 231
FL-9490
Vaduz
Liechtenstein

March 5, 2008

RE: Courtvale Holdings, Ltd.

===================================

Dear Andreas,

We understand that a wire transfer requested by Mr. Joseph Kay on March 3, 2008, has not been executed by the Bank apparently because of an objection or a refusal to comply with instructions of the principals by Mr. Andrew Baker, a nominal director of Courtvale, whom you initially recommended to our organization as a nominee-trustee and nominee director. (Since that time, we have become Mr. Baker's single largest client accounting for approximately half a million Swiss Francs per annum income.)

As you know, Courtvale has been a client of both Hypo Bank and LIB for many years. The failure to effect the transfer has caused and continues to cause Courtvale and its actual principals significant damages and is a source of embarrassment for LIB. As you also know, Courtvale for years has been under the control and management of Mr. Kay. In January we appointed Mr. Baker a nominal director of the company. Naturally, the *de facto* control has always been and continues to be vested in the principals of Courtvale represented solely and exclusively by Mr. Kay. Following this incident and other issues our clients have had with Mr. Baker and having secured the advice of attorneys, the actual owners and directors of Courtvale have made a decision to remove Mr. Baker as a nominee and vest the entire control over Courtvale in Mr. Kay for the time being.

You are well aware that Mr. Baker's position as Courtvale's director has always been purely nominal and he has neither interest in nor control over the account or its assets. Accordingly, on behalf of the actual owners of Courtvale, we request that Mr. Baker's signature be removed forthwith. We further request that the transfer of US$23,000,000.00 be effected in favor of the London International Bank, Ltd., at JPMorgan Chase Bank, New York BIC CHASUS33 Account name KAS Bank (KASANL2A) Account 544-732920 FFC 22.83.06.728.

In the event Hypo may have any concerns respecting this transfer, please accept our assurances that LIB is prepared to take full and unequivocal responsibility for same in every respect.

11 Grosvenor Place, London SW1X 7HH
Tel. +44 20 7170 5500   Fax:+44 20 7170 5510
Email contact@londonintbank.com
www.londonintbank.com
Registered in England and Wales No 4280572   Authorised and Regulated by the Financial Services Authority

43

We appreciate your cooperation in this regrettable incident with Mr. Baker and rest assured that we, as always, value the long-standing relationship between our two institutions and your kind assistance in this and other matters. Should you have any questions, please feel free to contact Mr. Kay directly.

Yours sincerely

Ali Guidfar
Chief Executive Officer

Cc: Joseph Kay, Chairman
David Ashfield, CEO
Courtvale Holdings, Ltd
Emanuel Zeltser, Esq.

11 Grosvenor Place, London SW1X 7HH
Tel. +44 20 7176 5500    Fax: +44 20 7176 5510
Email: contact@londonintbank.com
www.londonintbank.com
Registered in England and Wales No. 5250522   Authorised and Regulated by the Financial Services Authority

44

miselva

Ali Guldfar, Esq.
London International Bank Limited
11 Grosvenor Place
London SW1X 7HH

7th March 2008

By e-mail, original following by post

Dear Ali,

As requested repeatedly by yourself and David, I have been trying to find a solution that will allow us to continue our relationship whilst allowing Joseph Kay ("Joseph") to maintain his efforts in Georgia to protect the assets of the Nile Trust ("Nile") and of Jorum Establishment ("Jorum") for the benefit of Nile and Jorum respectively.

As a preliminary matter, please note that Miselva and I have instructed the London law firm of Payne Hicks Beach and the Vaduz law firm of Batliner Wanger Batliner to provide independent advice to us. I suggest that Joseph also appoints recognized firms of lawyers in London and Vaduz to represent him. Without any intended disrespect to Mr. Emanuel Zeltser, I sincerely believe that much more progress will be made this way. The bizarre 'cloak and dagger' approach to date whereby documents have been referred to or read out but not supplied in copy or delivered incomplete and in a shambolic state has been most unhelpful and is responsible to a large degree for the current situation.

In order to make positive progress, I will need you first to rescind in writing your letter of 5th March to Dr. Andreas Insam at Hypo Investment Bank (Liechtenstein) AG ("Hypo") in which it is alleged that I am acting improperly and which purports to remove me as a director of Courtvale Holdings Limited ("Courtvale") and as a signatory on that company's bank account at Hypo. Second, I will require Joseph to rescind in writing his verbal allegations to Hypo that I or persons under my control have forged Joseph's signature with respect to the change of director and authorized signatory of Courtvale. This is a very serious matter and will result in Hypo involving the criminal prosecutor's office unless resolved by 19th March, as set out in Dr. Insam's e-mail response of 5th March to your said letter. As you know, there is absolutely no doubt that Joseph signed the necessary paperwork accepting his resignation as director of Courtvale and appointing me as sole director, as well as moving Courtvale under Jorum's ownership. We have placed the original, signed documents in our bank safe.

Further, subject to the lawyers' confirmation, I believe it is clear that the founder's rights in respect of Jorum form part of the late Arkadi Patarkatsishvili's ("AP") Estate. This needs to be acknowledged by Joseph in writing as Zeltser was attempting to argue otherwise at our meeting on 4th March.

...../2

45

- 2 -

Assuming we can achieve the above, we can then address the future.

Joseph needs clearly to understand what I have told him, yourself, David and Zeltser on numerous occasions that even though he may sincerely believe himself to be AP's intended Executor and/or personal representative he must first be officially appointed as such before I or anyone else for that matter can take instructions from him. However, since this is purely a matter of Liechtenstein law with respect to the founder's rights of Jorum I repeat my advice that Joseph should instruct lawyers here without delay.

In the meantime, in view of the apparent urgency, it may be possible to accept at face value the document(s) purporting to appoint Joseph as Executor / personal representative but these MUST first be properly produced to and examined by our lawyers. Subject to our lawyers' advice, I would have thought that they will appoint a New York firm to go and inspect the original documents which I understand are held at the offices of Sternik and Zeltser and make copies which they will then certify as true and correct. The same applies to the document(s) purporting to give Joseph absolute power over Nile, including the most unusual "Letter of Wishes" produced for the first time by Mr. Zeltser on 4th March, of which an incomplete copy was left with me at that time. This procedure need not take long; indeed, if Mr. Zeltser had produced proper copies at an earlier date, this process would in all probability have been completed by now. His failure to do so can only engender suspicion that he has something to hide.

Whilst these matters may take some time to be satisfactorily resolved, I understand that various urgent payments may need to be made in order to protect the assets of Jorum and Nile. I am quite prepared in principle to sanction and comply with requests for such payments provided that these are made in writing in a cogent and coherent fashion with as much supporting evidence as possible to back them up. Requests such as the one I received from Joseph on 3rd March to transfer USD 21,000,000 to his personal account (without giving any reason therefor) and another (verbally) on 4th March from Zeltser for a transfer of USD 7.1 million to his "escrow" account (whatever that may be) in order to "pay salaries in Georgia" are quite simply unacceptable for obvious reasons as I am sure you will understand. The payments must of course be for the protection of the Nile and Jorum assets. We are under an obligation to ensure that funds are disbursed for proper purposes only.

I am aware of Joseph's desire to receive an unlimited general power of attorney to represent Jorum and Miselva (as trustee of Nile). I regret that I am not prepared to issue these. Subject to the foregoing, however, I am willing to issue some limited form of authorization that will enable him to assist us in protecting the Jorum and Nile assets and I will ask our lawyers to produce suitable documents, as a matter of urgency, if Joseph agrees.

..... / 3

46

# COURTVALE HOLDINGS LIMITED
### Pasea Estate, Road Town, Tortola,
### British Virgin Islands

## ADOPTION OF A WRITTEN RESOLUTION BY THE SOLE DIRECTOR
### this 19th day of March 2008

I, the undersigned, Andrew Baker, sole director of Courtvale Holdings Limited ("the Company"), a company duly registered, incorporated and existing under the laws of the British Virgin Islands, company registration 640519, with its registered office at Pasea Estate, Road Town, Tortola, British Virgin Islands, HEREBY RESOLVE AS FOLLOWS:

THAT Mr. Joseph Kay be and the same is hereby removed with immediate effect as a signatory on each of the Company's bank accounts with Hypo Investment Bank (Liechtenstein) AG to the intent that Andrew Baker be the sole remaining signatory on the said bank account(s)

Andrew Baker

48



**London International Bank Ltd**

Hypo Investment Bank AG
Austrasse 59
Postfach 231
FL-9490
Vaduz
Liechtenstein

March 20, 2008

RE: Courtvale Holdings, Ltd.
==============================

Dear Andreas,

I write further to my letter of 5 March 2008 in which a request was made for the transfer of funds from the account of Courtvale Ltd to an account of London International Bank. I now wish to withdraw that request as it was based on a misunderstanding of the situation and instruction that has now been clarified.

Yours sincerely,

Ali Guldfar
Chief Executive Officer

11 Grosvenor Place, London SW1X 7HH
Tel. +44 20 7179 5500   Fax +44 20 7179 5510
E-mail contact@londonintbank.com
www.londonintbank.com
Registered in England and Wales No. 3250572   Authorised and Regulated by the Financial Services Authority

49

**11**

<u>IN THE SUPREME COURT OF GIBRALTAR</u>                                    **2008 M No**
<u>CHANCERY JURISDICTION</u>

**IN THE MATTER** of the Civil Procedure Rules, Part 64, Section 1

and

**IN THE MATTER** of the Trustees Act

and

**IN THE MATTER** of the trusts known as The Valmore Trust and The Summit Trust

**BETWEEN**

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**

<u>Claimants</u>

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**

<u>Defendants</u>

**EXHIBIT "AJB11"**

This is the exhibit marked "AJB11" referred to in the Witness Statement of ANDREW JOHN
BAKER dated         this      day of              2008

**Andrew Baker**

| | |
|---|---|
| **Von:** | CJZ Group [cjzgroup@bk.ru] |
| **Gesendet:** | Montag, 10. März 2008 05:04 |
| **An:** | andrew.baker@miselva.li |
| **Cc:** | a.guidfar@londonintbank.com; lawmail@rambler.ru; alexfishkin2000@mail.ru |
| **Betreff:** | Courtvale Holdings, Ltd./ please see attached correspondence |

untitled.pdf

1

# CJZ GROUP, INC.

*Information of Real Estate Investments*



Tel/Fax: +1.440.339.1789
Email: CJZGroup@bk.ru

ELECTRONIC TRANSMISSION

| FROM: | Zlata Tszyan, Secretary-Treasurer | TO: | Mr. Andrew Baker |
|---|---|---|---|
| RE: | Jorum and Courtvale | FAX: | |
| DATE: | March 10, 2008 | EMAIL: | andrew.baker@miselva.li |

Dear Mr. Baker,

I write to you as a Director of CJZ Group, Inc. ("CJZ") in an "eleventh hour" effort to avert a full-blown controversy which is looming on the horizon. As you probably are aware, CJZ is a US corporation which owns 100% of Jorum Establishment, pursuant to the deed of assignment signed by yourself on February 6, 2006 (copy is attached as Annex 1). As you also know, Courtvale Holdings, Ltd. ("Courtvale") is a 100% subsidiary of Jorum, as evidenced by the Declaration of Trust confirming to us that your company, Miselva Etablisement, holds 10,000 shares (100%) in Courtvale "on trust for [Jorum's] use and benefit absolutely", signed by yourself on March 3, 2008 (attached, as Annex 2).

We are aware that various written and verbal exchanges have been had amongst yourself, Hypo Bank and our UK bankers, London International Bank ("LIB"), who were kind enough to use their good offices in an attempt to mediate this conflict, prompted by the blocking of our account with Hypo, because of your failure to comply with our principals' transfer instructions - - all apparently without much progress thus far. In the meantime, our inability to access the funds of our subsidiary is causing us significant financial harm. LIB was kind enough to provide us with your recent email to Mr. Ali Guidfar. We certainly agree that once the lawyers get involved, we are ALL in their hands. This is why the CJZ Board of Directors instructed me to write to you in order to make one more attempt to resolve the situation in an amicable fashion before the lawyers commence filing complaints with US and European authorities - - in addition to legal actions in various jurisdictions. Thus, we are asking you to help us and help yourself. As a preliminary matter, permit me to address some points raised in your written and verbal communications with LIB officers.

FIRST. We are aware that both you and Hypo Bank are much concerned regarding certain statements made by our Chairman, Mr. Joseph Kay, and suggested that a letter from Mr. Kay retracting same may remove the impediment to the rapid resolution of this matter. We are confident that once Hypo confirms that our funds would be released immediately upon their receipt of such correspondence, we will be able to impress upon Mr. Kay to forward same to Hypo. Given your intimate and long-standing relationship with Hypo, obviously you are in the best position to facilitate such confirmation.

SECOND. Regrettably, we cannot recant the statement that you had been replaced as Courtvale director because this is a true and accurate statement. CJZ, being the 100% owner of Jorum, upon due deliberation of the Board has determined that it is in the best interest of our Organization to appoint new Boards of Directors of Jorum and Courtvale. Lawful resolution of the Board to that effect has been duly and properly adopted and will not be re-visited. Needless to say, our first duty is to our shareholders and, as you surely know, any holding company is within its right

2.

to replace the directors of its subsidiaries at will, if it deems such action in shareholders' best interest.

THIRD. As to your concerns regarding Jorum and/or Courtvale somehow being a part of Mr. Patarkatsishvili's estate, our US and European lawyers advise us that this is simply not so. Courtvale is a wholly owned subsidiary of Jorum, according to your own written confirmation. (Annex 2). Jorum in turn is a wholly owned subsidiary of CJZ (Annex 1), a company entirely unrelated to Mr. Patarkatsishvili. Hence, neither Courtvale nor Jorum could possibly constitute a part of Mr. Patarkatsishvili's estate. Therefore the issue of JK's executorship is not even relevant under the circumstances and you have no responsibility whatsoever as regards Courtvale's and Jorum's actions, as such have been properly and lawfully approved by the Board of their US parent company.

FOURTH. We understand that in one conversation with LIB officers you intimated that you were "considering" notifying Mr. Patarkatsishvili's family. As noted, Mr. Patarkatsishvili or his family has nothing to do with Jorum, Courtvale or CJZ. That being said, we certainly are not concerned with any challenges to our ownership of Jorum or Courtvale, which is evidenced beyond doubt, *inter alia*, by the documents executed by yourself. In addition of course, the funds in the account clearly came from the sources, which are wholly unrelated to Mr. Patarkatsishvili and notably after his departure. Still further, multiple witnesses stand ready to testify under oath as to the facts and circumstances evidencing propriety of CJZ's acquisition of Jorum and its subsidiaries.[1] Above notwithstanding, our lawyers advise us that divulging confidential client information by a person who holds himself out to be a "trustee" and "fiduciary" is a grave infraction (in addition to being certain to cause further confusion and pain to Badri's loved ones unnecessarily.) Hence, we do suggest that you consider that factor before imparting our confidences to any third party.

FIFTH. You indicated that you wanted your attorneys to meet with Mr. Patarkatsishvili's former lawyers in New York and review the documents relating to Mr. Patarkatsishvili's last wishes. Even though, as noted, Courtvale is wholly unrelated to Mr. Patarkatsishvili, we understand that Mr. Patarkatsishvili's attorneys agreed to such a meeting in the interest of avoiding an ugly controversy. But this must br done immediately, if at all, because the time is not on our side. We seek no controversy with you or Hypo but we simply cannot afford any further damages to be caused by our inability to use our funds.

Dear sir, we can still resolve this mess without long-lasting legal consequences if we move fast. LIB wants to continue working with you and you may appreciate that Jorum is not its only client. But, as you surely know, once the lawyers get into an adversarial mode, this matter will not be capable of stopping until hundreds of thousands in legal honorariums are expended. We cannot believe that

---

[1]    We are not certain which "family" you are referring to, as Mr. Patarkatsishvili had more than one family, making Mr. Kay's appointment as the sole executor a tedious and extremely delicate task. This was one of the reasons why Mr. Patarkatsishvili picked Mr. Kay to perform this challenging chore, and instructed all trustees (yourself included) and custodians of his property to turn all assets having to do with Mr. Patarkatsishvili to Mr. Kay, as the documents provided to you clearly establish. In any event, all of Mr. Patarkatsishvili's family members are very dear to us, as Badri himself was (Badri was a very dear friend of our Organization, Mr. Kay and my personal dear friend as well). We currently are assisting all of Badri's family members in gathering the assets, which indeed belonged to him (Jorum and Courtvale not being part of such) and mediating occasional conflicts amongst them, so as to ensure that Badri's wishes are carried out.

Andrew Baker    March 10, 2008    Page 3

you want lay out your hard-earned money for the next three years to defend against the allegations of gross misconduct, and we do not want to suffer any further damages due to our inability to access our funds, which the Organization has allocated for particular immediate expenditures. Nor does Hypo or LIB want to be embarrassed by their insistent recommendations and endorsement of yourself - - the sole reason for our subsidiaries' decision to retain your services - - especially now that the news media all over the world is portraying (perhaps unfairly) Liechtenstein and people in your profession in the most derogatory light.

We have no doubt that the US and European courts, after reviewing the documentary and testimonial evidence, will justly direct Hypo to release our funds. Regrettably, the time, the expense and the damages caused by this unnecessary quarrel will take a significant toll on us, yourself and Hypo.

We are confident that given your very special relationship with Hypo (which, according to the investigators retained by our European counsel, we will have no difficulty demonstrating) you may easily resolve this without further harm to everyone. Please, speak to Hypo, get them to confirm that our account is solely within our control and we will get Mr. Kay to write the letter clearing your name and we will forget about this incident. Assuming that your expressed concerns are genuine, we are even prepared to offer to you and Hypo an extra level of comfort by having the funds wired to our Courtvale's or Jorum's account in the US, so that this would be merely an inter-company transaction.

The time is running awfully short. Our US and European lawyers have advised that they are prepared to file complaints with appropriate authorities and commence actions in proper forums by mid-week. We truly do not want to go that route. Please, make it unnecessary. Please feel free to contact the undersigned directly at any time. Awaiting your news with much interest.

Yours, truly,

*Zlata Tszyan*
Zlata Tszyan
Secretary of the Board

cc:    Peters & Peters, Esqs.
       Sternik & Zeltser, Esqs.
       Norton Rose, Esqs.
       Alexander Fishkin, Esq.
       Alexander Cherny, Esq.
       De Pardieu Brocas Maffei, Esqs.
       London International Bank
       Mr. Joseph Kay

4

**ANNEX 1**

# DEED OF ASSIGNMENT

The undersigned, Miselva Etablissement, Vaduz, Founder of the firm

### Jorum Establishment
#### Vaduz

hereby irrevocably assigns all the rights and obligations that it has as Founder pursuant to the law or the statutes of the said firm to:

# CJZ Group, Inc.

And hereby waives all its rights to the said firm and explicitly declares that it will neither now nor in future make any claim to or in respect of such rights.

Vaduz, 6ᵗʰ February 2006

The Founder

**Miselva Etablissement**

Andrew J. Baker

5

Die Echtheit der Unterschrift von

Herrn Andrew J. Baker, geb. am 03.12.1960



wird amtlich beglaubigt.
Grundbuch- und Öffentlichkeitsregisteramt
Vaduz, den 06.02.2006

Rico Hassler

6

**ANNEX 2**

# DECLARATION OF TRUST

To:

**JORUM Establishment, Josef Rheinberger Strasse 29, FL-9490 Vaduz**

We, Miselva Etablissement of Josef Rheinberger Strasse 29, Postfach 635, 9490 Vaduz, Liechtenstein hereby declare that we hold ten thousand (10'000) shares in

## COURTVALE HOLDINGS LIMITED

Registered in the British Virgin Islands under Company number 1063187
Registered office at Pasea Estate, Road Town, Tortola, British Virgin Islands

and that we hold these shares on trust for your use and benefit absolutely. We undertake not to dispose of these shares without your express consent and we will not seek to mortgage them or to place any form of charge, pledge or security over them or to do or knowingly suffer to be done anything in any way what ever that is inconsistent with or that could prejudice your use and benefit of the said ten thousand shares.

Vaduz, 3rd March 2008

Miselva Etablissement

Andrew J. Baker
Director

7

**12**

<u>IN THE SUPREME COURT OF GIBRALTAR</u>                    **2008 M No**
<u>CHANCERY JURISDICTION</u>

**IN THE MATTER** of the Civil Procedure Rules, Part 64, Section 1

and

**IN THE MATTER** of the Trustees Act

and

**IN THE MATTER** of the trusts known as The Valmore Trust and The Summit Trust

**BETWEEN**

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**

                                                  **<u>Claimants</u>**

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**

                                                  **<u>Defendants</u>**

---

**EXHIBIT "AJB12"**

---

This is the exhibit marked "AJB12" referred to in the Witness Statement of ANDREW JOHN
BAKER dated            this        day of                    2008

**Andrew Baker**

Von:    Andrew Baker [andrew.baker@miselva.li]

Gesendet: Donnerstag, 3. April 2008 18:50

An:    Adv. Zvi Barak

Betreff:    AW: Pearls of Wisdom - Investment contract dated December 3rd 2007

Dear Mr. Barak,

I am writing to confirm an appointment with you on Monday 7th April 2008 at 10:00 a.m. the offices of our lawyers, Messrs Batliner Wanger Batliner at Am Schraegen Weg 2 in Vaduz.

Whilst writing, I wish to address a number of issues arising from your e-mail message below:

1.  Far from being "well aware" that Paua Enterprises Limited ("Paua") had signed an investment contract in the sum of USD 84 million, I was NOT aware of this AT ALL.

2.  Although you and I are the directors of Paua, I was not asked to consider and/or to approve a resolution authorizing Paua to enter into the said contract (entitled "Founders Agreement"). You made this decision entirely by yourself and without any involvement whatsoever on my part.

3.  I fail to understand how you can have made the representation and warranty in clause 4 of the Founders Agreement without my knowledge or approval of the Founders Agreement or the investment itself.

4.  I would certainly not have approved of Paua entering into any agreement by which it might incur (potential) financial liability unless I had been sure of being able to secure the necessary financing.

5.  To the best of my knowledge, Paua does not have access to sufficient funds to meet its commitments under the Founders Agreement.

6.  As I read the terms of the Founders Agreement, in particular cl. 8.4., the consequence of non-payment of the Capital Contribution (sic) is dilution of Paua's interest in the joint venture.

7.  In the circumstances, it seems to me at this stage as if Paua has no alternative but to be diluted.

Yours sincerely,

Andrew Baker

-----Ursprüngliche Nachricht-----
Von: Adv. Zvi Barak [mailto:advbarak@zahav.net.il]
Gesendet: Montag, 17. März 2008 13:20
An: Andrew Baker
Cc: Ali Guidfar; Joseph Kay; 'Natalia Shachkova'
Betreff: Pearls of Wisdom - Investment contract dated December 3rd 2007
Wichtigkeit: Hoch

Dear Mr. Baker,

I was advised to approach you after the tragic death of Badri Patarkatsishvili.

As you are well aware, I signed in his name (through Paua Enterprises Limited, the British company registered under no. 06225529 ) an investment contract in the sum of 84 million US dollars with an Israeli corporation "The Pearls of Wisdom Research & Development Ltd.", on December 3rd 2007. (Contract sent in the attchment - total 16 pages).

The scheduled payment of Paua Enterprises Limited in the fiscal year 2008 is 2 million dollars for each month, starting with March 1st 2008.
All the business plan of this important company is based on the schedule of these payments.

I would be very appreciative if you will allow to this investment to go according to the plan, as I was assured by Mr. Badri (reconfirmed by him in our last meeting in London a week before his death).

I am at your service to answer any question that you might have regarding this commitment.

With best regards,
Zvika Barak, Adv.

Zvika Barak - Advocates & Solicitors
Gibor Sport Building, 7 Menachem Begin St.
Ramat-Gan, Israel  52521
Tel: + 972 - 3 - 6114485   Fax. + 972 - 3 - 6114486
email: advbarak@zahav.net.il

This e-mail message and its attachments are confidential, intended only for the addressee(s) named above and may contain information that is proprietary, privileged, attorney work product or otherwise exempt from disclosure. If you receive this message in error please notify us at advbarak@zahav.net.il and immediately delete this message and its attachments from your system.

18.04.2008

2

**13**

IN THE SUPREME COURT OF GIBRALTAR
CHANCERY JURISDICTION

2008 M No

IN THE MATTER of the Civil Procedure Rules, Part 64, Section 1

and

IN THE MATTER of the Trustees Act

and

IN THE MATTER of the trusts known as The Valmore Trust and The Summit Trust

BETWEEN

MISELVA ETABLISSEMENT (1)
NEXUS TREUHAND AG (2)

Claimants

and

INNA GUDAVADZE (1)
JOSEPH KAY (2)
IYA PATARKATSISHVILI (3)
LIANA ZHMOTOVA (4)
FALLON INVEST & TRADE INC. (5)

Defendants

---

EXHIBIT "AJB13"

---

This is the Exhibit "AJB13" referred to in the Witness Statement of ANDREW JOHN BAKER dated this 20th day of April 2008

**Andrew Baker**

| | |
|---|---|
| **Von:** | Andrew Baker [andrew.baker@miselva.li] |
| **Gesendet:** | Donnerstag, 3. April 2008 19:50 |
| **An:** | CHRIS SLY |
| **Betreff:** | AW. Broadlands, Bagshot Road, Ascot |

Chris,

I have read the contents of Lord Goldsmith's e-mail below and regret to advise that Miselva is not in a position to disclose any information about the companies mentioned in his message.

To the best of our knowledge and belief, these companies do not form part of the assets of the Nile Trust or of Jorum Establishment nor do we have any specific evidence to suggest that any of Lord Goldsmith's clients have any proprietary or beneficial interest in such companies.

Could you please pass our response to this effect to Lord Goldsmith?

Thanks and kind regards

Drew


-----Ursprüngliche Nachricht-----
**Von:** CHRIS SLY [mailto:CSLY@phb.co.uk]
**Gesendet:** Donnerstag, 3. April 2008 18:45
**An:** andrew.baker@miselva.li
**Betreff:** FW: Broadlands, Bagshot Road, Ascot
**Wichtigkeit:** Hoch

Drew

Can you call me urgently about this?

Chris


**Christopher Sly**
**Partner**
**Payne Hicks Beach**
**Direct Dial +44 (0)20 7465 4383**
**Mobile +44 (0)7802 579296**


**From:** Goldsmith, Peter H. [mailto:phgoldsmith@debevoise.com]
**Sent:** 03 April 2008 17:42
**To:** CHRIS SLY
**Cc:** McLarty, Karis; Byrne, Louise
**Subject:** Re: Broadlands, Bagshot Road, Ascot

Dear Christopher

I have not yet opened the attachments but in the meantime have an urgent issue which has come up which I would like to raise with you and Andrew Baker

We, together with The Risk Advisory Group, have been taking steps to try to discover the nature and location of the late Arkady (Badri) Patarkatsishvili's assets. Part of our investigation has focused on assets held by English companies called Fisher Island Ltd., Grosvenor Trading House Ltd., Thames Steel UK Ltd. and and Chapel St Construction Ltd. Our understanding was that these entities were held by Miselva Etablissement.

However, it has emerged during the course of further searches made today that ownership of these companies (and perhaps others, of whose existence we are to date unaware) has been transferred from Miselva to JWL Entertainment Group Inc, a company registered in Delaware. Available records for the latter company show that its representative is a person known to be affiliated with Joseph Kay.

Available records show that the transfers of these companies apparently took place on 31 December 2007 but that the transfers were not registered with Companies House in England until very recently.

We would like to speak to you urgently about this matter, as, understandably, it is of great concern to our client. Please let me know whether you are available for a call later today or, if not, when you would be?

Many thanks

2

# DEBEVOISE & PLIMPTON LLP

Tower 42
Old Broad Street
London EC2N 1HQ
Tel +44 20 7786 9000
Fax +44 20 7588 4180
www.debevoise.com

The Rt Hon Lord Goldsmith QC
European Chair of Litigation
Tel +44 20 7786 3007
plhgoldsmith@debevoise.com

April 4, 2008

Christopher Sly, Esq
Payne Hicks Beach
10 New Square
Lincolns Inn
London WC2A 3QG

Dear Christophe

We refer to our previous correspondence and meeting. As you are aware, we act for Inna Gudavadze and other members of the family of the late Arkadi (Badri) Patarkatsishvili.

Yesterday, we asked you for information from Andrew Baker in relation to transfers of four English companies by Miselva Etablissement. The reply from you enclosing the email of Andrew Baker of Miselva yesterday has caused us very significant concern.

That reply indicates that Miselva is not in a position to disclose any information about these transfers. The messages goes on to say that these companies do not form part of the assets of the Nile Trust or of Jorum Etablissement nor "do we have any specific evidence to suggest that any of Lord Goldsmith's clients have any proprietary or beneficial interest in such companies". Our concern is that this implies to us that Miselva believes that our clients do not have any interest or claim in these companies or the assets held by them. That in turn would imply that Miselva does not believe, or has no evidence that these assets were assets ultimately beneficially held for the benefit of Mr. Patarkatsishvili.

We have evidence to believe that such a belief would simply be not correct. For example, Fisher Island Limited we understand to have been a company which ultimately owned Fisher Island, a US resort. Mr. Patarkatsishvili had on many occasions told family and business associates that he had bought the island. On one occasion, for example, at the beginning of 2006, his widow and his daughter Iya and her husband Zhenya came to Mr. Kay's office in London for a meeting, where, together with Mr. Patarkatsishvili, Mr. Kay showed them booklets and video presentations of development in Fisher Island. Mr. Patarkatsishvili showed them architectural plans and explained the project for building apartment buildings and villas there. The family understood that Mr. Kay was to manage the project. Mr. Patarkatsishvili also told him that he had similar projects in Spain and Marrakech.

Debevoise & Plimpton LLP is a registered limited liability partnership established under the laws of the State of New York.
A list of the partners' names and their professional qualifications is open to inspection at the above address.
The partners are either solicitors or registered foreign lawyers  The firm is regulated by the Solicitors Regulation Authority

3

Christopher Sly, Esq                    2                           April 4, 2008

We believe these to be other investments held by Fisher Island Limited through intermediate companies. Later that year the daughter Iya and her husband went on a cruise to the US. They passed through Florida and Mr. Kay showed them around Fisher Island, introducing it as Mr Patarkatsishvili's project which he managed for him.

In the light of this and other evidence we have as to the way Mr. Patarkatsishvili did business we believe that the most probable explanation for Miselva's belief is that Mr. Kay may have represented that the assets were his whereas in fact they had been entrusted to him by Mr. Patarkatsishvili on the basis that they were ultimately for the benefit of Mr. Patarkatsishvili. As we expect you know, the Delaware Corporation to which the companies mentioned above were transferred appears to be connected with Mr. Kay.

We have evidence, for example, from the Chief Operating Officer of fund managers who managed very substantial sums for Mr. Patarkatsishvili over a substantial period of time and who knew him very well that he met Mr. Kay on several occasions through his work with Mr. Patarkatsishvili and that his understanding was that Mr. Kay was an employee and associate of Mr. Patarkatsishvili who at times dealt with some of the mechanics, including funding, necessary to implement certain of Mr. Patarkatsishvili's investments. He further says that in all of his dealings with Mr. Kay it was apparent that he was administering Mr. Patarkatsishvili's money, not his own, and that he was merely executing Mr. Patarkatsishvili's orders. It appeared to him, therefore, that the ultimate beneficiary of the investments that Mr. Kay was handling was always Mr. Patarkatsishvili himself.

We wonder if Andrew Baker through his involvement in Miselva or other trusts and companies with which he is associated may already be in possession of information that would support that this, for example, of other assets which Miselva understood were held ultimately for Joseph Kay but which he subsequently acknowledged were held for the benefit of Mr. Patarkatsishvili or his family.

You will also be aware from the meeting that took place at your offices of our grave concerns about the conduct of Joseph Kay and we will imminently be filing proceedings in New York against Kay and his lawyer Emanuel Zeltzer, currently held in custody in Belarus charged, as we understand it, with attempting to use forged documents to obtain assets which truly should fall into the estate of Mr. Patarkatsishvili or be applied for the benefit of his heirs and beneficiaries.

For these reasons it would appear that Miselva is acting under a mistaken assumption in considering that these assets were held for the ultimate beneficial ownership of somebody else and in particular Joseph Kay.

The position goes further still. We appreciate that these particular companies may have been transferred by Miselva at the end of last year even though the transfers were not registered until very recently. However it is perfectly possible, it appears to

4

Christopher Sly, Esq                3                          April 4, 2008

us, that if this misunderstanding applies to those assets it may well apply to other assets still held by Miselva as trustee which it may presently think are not for the benefit of Mr Patarkatsishvili or his estate or his heirs and beneficiaries but for a third party, particularly Joseph Kay.

We accept that Miselva, given its position as trustee, may require further evidence of these matters. We are in the process of producing that evidence and will write to you again

The purpose of this letter, however, is to put you on notice that, in the light of this exchange of correspondence, Miselva may wrongly believe that assets are not connected with Mr. Patarkatsishvili when in truth they are, to require Miselva to make further enquiries to establish the true position and to agree not to take any steps at the moment which may prejudice the interests of the beneficiaries and heirs or others properly entitled to the estate of Mr. Patarkatsishvili until these matters are resolved or a proper determination is made by a Court of Competent Jurisdiction. In particular, we would be very concerned were Miselva to deal with assets where at the moment Miselva may believe Mr. Kay to be the sole beneficiary and it should view any attempt to move these assets at this sensitive time with extreme caution.

In the latter connection, you will understand that one of our grave concerns is that people have been asserting, in particular Joseph Kay and his lawyer, that they are entitled to deal with assets of or for the benefit of Mr. Patarkatsishvili without ever having obtained any form of order from a Court of their entitlement.

Should Miselva fail to act in this way and should it take any step which may ultimately prejudice the interests of our clients or the estate more generally of Mr. Patarkatsishvili you will understand that we will look to make good any losses from Miselva and its officers.

Given the urgency of the situation we look forward to hearing from you and, of course, remain ready to discuss this matter.

Lord Goldsmith QC

50252044v2

**14**

2008 M No

<u>IN THE SUPREME COURT OF GIBRALTAR</u>
<u>CHANCERY JURISDICTION</u>

IN THE MATTER of the Civil Procedure Rules, Part 64, Section 1

and

IN THE MATTER of the Trustees Act

and

IN THE MATTER of the trusts known as The Valmore Trust and The Summit Trust

BETWEEN

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**

<u>Claimants</u>

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**

<u>Defendants</u>

_____

**EXHIBIT "AJB14"**

_____

This is the exhibit marked "AJB14" referred to in the Witness Statement of ANDREW JOHN BAKER dated          this      day of                 2008

Christopher K. Tahbaz
Jennifer R. Cowan
Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
Tel. (212) 909-6000
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- x

INNA GUDAVADZE, LIANA ZHMOTOVA and IYA
PATARKATSISHVILI,

                         Plaintiffs,

     v.

JOSEPH KAY (A/K/A JOSEPH KAKALASHVILI, A/K/A
JOSEPH KEJ, A/K/A IOSEB KAKALASHVILI, A/K/A
IOSEB KAKIASHVILI) AND EMANUEL ZELTSER,

                         Defendants.

-------------------------------------------------- x

08-civ-_____

VERIFIED
COMPLAINT

        Plaintiffs Inna Gudavadze, Liana Zhmotova and Iya Patarkatsishvili (collectively

"Plaintiffs"), by their attorneys Debevoise & Plimpton LLP, for their Complaint against

Defendants Joseph Kay (a/k/a Joseph Kakalashvili, a/k/a Joseph Kej, a/k/a Ioseb

Kakalashvili, a/k/a Ioseb Kakiashvili) and Emanuel Zeltser, allege as follows:

## NATURE OF THE ACTION

       1.     Plaintiffs are the widow and daughters of Arkady (Badri) Patarkatsishvili,

who died unexpectedly on February 12, 2008. They are among the primary beneficiaries

of Mr. Patarkatsishvili's estate, and they are currently in the process of applying for

*1*

letters of administration for the estate in the United Kingdom, where they reside and where a portion of Mr. Patarkatsishvili's assets are found.

2.    By this action, Plaintiffs seek to prevent Defendants, citizens and residents of New York, from interfering with Plaintiffs' efforts to ensure the lawful distribution of Mr. Patarkatsishvili's assets and the orderly administration of Mr. Patarkatsishvili's estate under the supervision of a court of competent jurisdiction. Defendants have engaged in such interference by, among other things, misrepresenting their authority to speak or act on behalf of Mr. Patarkatsishvili and his estate and using invalid or fraudulent documents to assert control over assets that Mr. Patarkatsishvili owned or in which he otherwise had an interest. Defendants' misconduct began within days of Mr. Patarkatsishvili's death, intended, upon information and belief, to take advantage of the period of time preceding judicial appointment of an administrator and Plaintiffs' grief and shock at suddenly losing their husband and father.

3.    Mr. Patarkatsishvili was the beneficial owner of substantial assets throughout the world. Although Plaintiffs are still in the process of inventorying and valuing Mr. Patarkatsishvili's estate, upon information and belief it is worth well over $1 billion.

4.    Defendant Kay was Mr. Patarkatsishvili's half-cousin, and upon information and belief, he managed certain of Mr. Patarkatsishvili's assets during Mr. Patarkatsishvili's life. Defendant Zeltser has claimed that he acted as Mr. Patarkatsishvili's attorney and that he represents Mr. Patarkatsishvili's estate. He also recently advised Plaintiffs that he represents Defendant Kay. Both Defendants are

2

citizens and residents of New York State, and, according to official New York State records, Defendant Zeltser is a lawyer licensed by New York State with his place of business in Manhattan.

5.    Upon information and belief, since Mr. Patarkatsishvili's untimely death, Defendants have exploited his demise by, among other things, approaching his business associates throughout the world and, relying on invalid and fraudulent documents allegedly executed in New York, demanding information about and control over Mr. Patarkatsishvili's assets.

6.    Indeed, upon information and belief, working in concert with Defendant Zeltser, Defendant Kay has already succeeded in gaining control over Imedi Television ("Imedi TV"), a broadcast television station located in the country of Georgia and a valuable asset in which Mr. Patarkatsishvili beneficially owned the majority interest at the time of his death.  Upon information and belief, Defendant Kay gained control of Imedi TV by misrepresenting his legal authority to act on behalf of Mr. Patarkatsishvili and his estate and by relying on documents which he obtained from Defendant Zeltser and which both Defendants knew to be fraudulent and invalid.

7.    Defendant Kay has represented himself as the executor of Mr. Patarkatsishvili's estate even though, upon information and belief, he has not filed for letters of administration, probate of any will, letters testamentary or a similar grant of authority in any court.

3

8.    Defendants have also refused to provide Plaintiffs or their attorneys with copies of the documents that they claim authorize them to act as representatives of Mr. Patarkatsishvili and his estate.

9.    To prevent the Defendants, who are citizens and residents of New York State, from further interfering with the orderly administration of Mr. Patarkatsishvili's estate, and to prevent Defendants from misappropriating any assets that rightly should pass to Mr. Patarkatsishvili's heirs, by this action Plaintiffs seek the following:

a)    a declaratory judgment that neither Defendant is authorized to act or speak on behalf of Plaintiffs or as a representative of Mr. Patarkatsishvili or his estate, unless and until a court of competent jurisdiction finds to the contrary;

b)    a declaratory judgment that neither the "Deed of Appointment of Executor" nor the "Letter of Wishes," nor any other document that Defendants have been using in an attempt to gain control over Mr. Patarkatsishvili's assets, empowers Defendant Kay to act as the executor of Mr. Patarkatsishvili's estate or in any other representative capacity unless and until a court of competent of jurisdiction finds to the contrary;

c)    a declaratory judgment that, as a matter of law, the "Power of Attorney" that Defendant Zeltser has used in an attempt to assert control over Mr. Patarkatsishvili's assets became invalid at the time of Mr. Patarkatsishvili's death (regardless of whether it was valid during his life);

4

d)      an order compelling Defendants to produce to Plaintiffs, for inspection, the original, signed versions of all documents that they claim provide them with authority to control assets in which Mr. Patarkatsishvili had an interest and/or to serve as representatives of Mr. Patarkatsishvili's estate;

e)      an order compelling Defendants to hold in constructive trust any assets in which Mr. Patarkatsishvili held a beneficial interest and over which Defendants, or either of them, exercises control or dominion, as well as any income that they may have received from such assets and any proceeds that they may have realized from any sale of such assets;

f)      an order compelling Defendants to account to Plaintiffs for any assets in which Mr. Patarkatsishvili held a beneficial interest and over which Defendants, or either of them, exercises control or dominion, as well as any income that they may have received from such assets and any proceeds that they may have realized from any sale of such assets; and

g)      damages for any harm caused by Defendants' conduct, as well as costs, expenses and attorneys' fees incurred in prosecuting this action.

## PARTIES

10.    Inna Gudavadze is a citizen of the Russian Federation currently resident in England and Wales. She is the widow of Mr. Patarkatsishvili.

11.     Liana Zhmotova and Iya Patarkatsishvili are both citizens of the Russian Federation currently resident in England and Wales. They are the daughters of Mr. Patarkatsishvili and Mrs. Gudavadze.

12.     Upon information and belief, Defendant Kay is a United States citizen residing at 6 Wright Drive, Dix Hills, New York 11746. Kay was a half-cousin and a business associate of Mr. Patarkatsishvili.

13.     Upon information and belief, Defendant Zeltser is a United States citizen residing at 235 W. 76th Street, New York, New York 10023. According to the New York State Office of Court Administration attorney registration database, Mr. Zeltser is an attorney licensed to practice in New York State; his business address is 119 West 72nd Street, #229, New York, New York 10023.

14.     Badri Patarkatsishvili was a citizen of the country of Georgia domiciled in the country of Georgia at the time of his death. Upon information and belief, Mr. Patarkatsishvili did not leave a will or other valid direction to govern the disposition of his assets.

15.     Because Mr. Patarkatsishvili was a citizen of and domiciled in Georgia, and because he died without a will, under the law of England and Wales (where Plaintiffs will soon be applying for letters of administration), Georgian law determines the devolution of all moveable assets in Mr. Patarkatsishvili's estate, devolution of immovable assets being governed by the law of the situs of those assets. Under Georgian law, the surviving spouse has a pre-existing community property ownership interest in half of the assets acquired during the marriage (which do not pass through the estate), and

the first degree heirs (the spouse, children and parents) of an individual who dies intestate are the beneficiaries of the estate.

16.    Under Georgian law, therefore, Mrs. Gudavadze is entitled to 50% of the assets acquired since the date of her marriage to Mr. Patarkatsishvili in 1979 (excluding assets obtained by Mr. Patarkatsishvili as an inheritance or a gift) as the surviving co-owner of those assets. In addition, under Georgian law, Plaintiffs collectively are entitled to another 30% of the assets acquired during the marriage and 60% of all other assets in Mr. Patarkatsishvili's estate. As heirs and beneficiaries of his estate (and, in the case of Mrs. Gudavadze, as the surviving co-owner of property in which she had a common interest with Mr. Patarkatsishvili), Plaintiffs are being harmed by the misconduct of Defendants. (Hereinafter the word "heirs" is defined to encompass Mrs. Gudavadze as a surviving co-owner of community property as well as an heir.)

## JURISDICTION AND VENUE

17.    This action arises under the laws of the State of New York.

18.    Because Plaintiffs are citizens of the Russian Federation, who all currently are resident in England and Wales, and Defendants are citizens of New York, and the value in controversy exceeds $75,000, this Court has jurisdiction under 28 U.S.C. § 1332(a)(2). Personal jurisdiction is proper by virtue of Defendants' residences in New York and by virtue of Defendant Zeltser conducting business in New York.

19.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(1) and (a)(2).

7

20.    The Court may enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## FACTUAL BACKGROUND

<u>Mr. Patarkatsishvili's Global Business Interests</u>

21.    Mr. Patarkatsishvili was a businessman and investor with business interests throughout the world, including interests in a number of assets located in Georgia.

22.    Upon information and belief, Mr. Patarkatsishvili was the beneficial owner of assets managed or held by Defendant Kay.  In addition, upon information and belief, Mr. Patarkatsishvili may have jointly owned certain assets with Defendant Kay.

<u>Mr. Patarkatsishvili's Untimely Death</u>

23.    On February 12, 2008, Mr. Patarkatsishvili suffered a heart attack and died unexpectedly outside of London, where he and his family had been staying.

<u>The Unlawful Conduct Of Defendants</u>

24.    Within days of Mr. Patarkatsishvili's death, Defendants began to assert to Plaintiffs and others that they had exclusive authority to act on behalf of Mr. Patarkatsishvili's estate, and that Defendant Zeltser had a will and other documents through which Mr. Patarkatsishvili allegedly had expressed his wishes for the administration of his estate and distribution of his assets.  Upon information and belief, Defendants made these assertions knowing that they were untrue and without basis, and

8



knowing that the documents on which they were relying were fraudulent or otherwise invalid.

      25.    On or about February 14, 2008 – two days after Mr. Patarkatsishvili's death – Defendants visited Plaintiffs at their home outside of London. Defendant Zeltser told Mrs. Gudavadze that he had acted as her husband's attorney, and that he had possession of her husband's will. He also told Mrs. Gudavadze that her husband had appointed Defendant Kay as the executor of his estate.

      26.    Upon information and belief, Defendant Zeltser made these assertions knowing that they were untrue and without basis, and knowing that the documents on which he was relying were fraudulent or otherwise invalid.

      27.    On or about February 15, 2008, Defendants visited the London offices of Salford Capital Partners Inc. ("Salford"), a private equity firm that managed some of Mr. Patarkatsishvili's investments. During this visit, Defendant Kay told Salford representatives that, in the wake of Mr. Patarkatsishvili's death, he effectively stood in Mr. Patarkatsishvili's shoes and that Salford should treat him accordingly, and he demanded information about Mr. Patarkatsishvili's accounts. Upon information and belief, Defendant Kay made these assertions knowing that they were untrue and without basis.

      28.    When Salford representatives demanded to see proof of Defendants' authority to act on behalf of Mr. Patarkatsishvili, Defendant Zeltser showed the Salford representatives a document titled General Durable Power of Attorney, attached hereto as Exhibit A (hereinafter "Power of Attorney").

9

29.    Upon information and belief, Defendant Zeltser did this knowing that the "Power of Attorney" was fraudulent, expired upon Mr. Patarkatsishvili's death, or was otherwise invalid.

30.    Defendant Zeltser did not at this time provide the Salford representatives with a copy of the "Power of Attorney." Instead, Defendant Zeltser only allowed the Salford representatives to view the document on the screen of his laptop computer.

31.    Also on or about February 15, 2008, Defendant Zeltser spoke with Nicholas Keeling, a director of Mainstay Trust Limited in Gibraltar, an entity through which Mr. Patarkatsishvili, among others, had made investments managed by Salford. Defendant Zeltser made to Mr. Keeling the same demand for information that Defendant Kay had previously made to the Salford representatives.

32.    Mr. Keeling and his solicitor also refused to provide any information to Defendants unless they could provide satisfactory evidence of their authority to act on behalf of Mr. Patarkatsishvili. Upon information and belief, in response, Defendant Zeltser later emailed Mr. Keeling and his solicitor the "Power of Attorney."

33.    On or about February 17, 2008, Defendant Zeltser wrote to Mr. Keeling. A copy of that letter is attached hereto as Exhibit B. Defendant Zeltser identified himself as counsel for Mr. Patarkatsishvili and for his estate. He requested:

> any and all information, documents and records in your custody or within your control or power to obtain concerning Mr. Patarkatsishvili and any of his financial and business interests, whether held in his own name or through or in conjunction with any third party or parties, directly or indirectly, overtly or covertly or through any nominee (legal entity or physical person), in which you know or have a reason to believe Mr.

10

Patarkatsishvili had interest or business or other involvement, no matter how small, or was a shadow director or a principal *de facto*.

34.    Upon information and belief, Defendant Zeltser fraudulently misrepresented that the requested information was needed so that Defendant Zeltser could assist law enforcement authorities in their investigation of Mr. Patarkatsishvili's death.

35.    Upon information and belief, Defendant Zeltser made these assertions knowing that they were untrue and without basis, and, upon information and belief, knowing that the "Power of Attorney" on which he was relying was fraudulent or otherwise invalid.

36.    Mr. Keeling's solicitor, Michael Lindley, advised Defendant Zeltser that Mainstay could not release information to Defendants based on the "Power of Attorney." As Mr. Lindley stated in an email to Defendant Zeltser on February 19, 2008, "I have been advised that, as a matter of New York Law, the Power of Attorney on which you purport to rely is not, and may never have been, valid. In the circumstances it is clearly not appropriate for either my client or me, or indeed any other party, to provide you with any information or documents which may in any way relate to Mr. Patarkatsishvili's affairs." This email, as well as related emails with Defendant Zeltser, is attached hereto as Exhibit C.

37.    Upon information and belief, Salford similarly declined to provide information to Defendants based on the "Power of Attorney."

11

38.    The "Power of Attorney" appears to have been acknowledged before a New York-licensed notary public, and the geographical authority of a New York notary is limited to New York State. If the signature is authentic, it appears to have been executed in New York State. The language of the "Power of Attorney" also appears to be a modification of the New York statutory language for a durable general power of attorney in N.Y. General Obligation Law § 5-1501. Therefore, if authentic, the "Power of Attorney" is subject to interpretation pursuant to New York State law.

39.    Under New York law, the "Power of Attorney" terminated upon the death of the principal, Badri Patarkatsishvili. This is so despite the fact that the "Power of Attorney" claims on its face that "This Power of Attorney . . . shall not be affected by my subsequent death, disability or incompetence." (emphasis in the original).

40.    On or about February 20, 2008, Defendant Kay met with Mrs. Gudavadze, Michelle Duncan, a lawyer with Cadwalader, Wickersham & Taft LLP in London who then represented Mrs. Gudavadze, and others at Mrs. Gudavadze's home outside London. Ms. Duncan asked Defendant Kay questions about the documents related to Mr. Patarkatsishvili's estate. Defendant Kay said that he did not know where the will was but agreed that it should be produced. When Ms. Duncan asked him about his relationship with Mr. Zeltser, he became confrontational and would not answer her questions.

41.    Ms. Duncan asked Defendant Kay to put her in contact with Defendant Zeltser and asked him for assistance in obtaining from Defendant Zeltser copies of Mr. Patarkatsishvili's will and other documents. Defendant Kay said he could only ask

12

Defendant Zeltser to meet with Ms. Duncan, and that he could not ask him to provide copies of the documents.

42. Mrs. Gudavadze asked Defendant Kay for assistance in identifying Mr. Patarkatsishvili's assets and explained that she was making similar requests of many business associates of her husband. Defendant Kay agreed to assist and said he would call Ms. Duncan either late that day or the next day to set up a meeting.

43. On or about February 20, 2008, Defendant Zeltser telephoned Ms. Duncan. She told him that the "Power of Attorney" had become ineffective at the time of Mr. Patarkatsishvili's death. Upon information and belief, Defendant Zeltser disagreed and maintained that the "Power of Attorney" remained valid but that regardless, he was also acting pursuant to many other documents in his possession, including a will of Mr. Patarkatsishvili dated November 14, 2007, which named Defendant Kay as executor with broad powers.

44. Upon information and belief, Defendant Zeltser knew these assertions to be untrue and without basis and that the referenced documents were fraudulent or otherwise invalid.

45. During that conversation, Ms. Duncan requested that Defendant Zeltser provide her with copies of any documents in his possession related to Mr. Patarkatsishvili's estate. Defendant Zeltser refused.

46. Ms. Duncan and Defendant Zeltser agreed to meet on February 22, 2008 in New York. At Defendant Zeltser's subsequent request, the meeting was moved to February 24, 2008.

13

13

47.     On or about February 22, 2008, Ms. Duncan telephoned Defendant Kay to schedule a meeting so that Defendant Kay could help identify assets to which Mr. Patarkatsishvili was connected, as had been agreed at the February 20 meeting.

48.     Upon information and belief, Defendant Kay told Ms. Duncan that she should communicate with him only through his personal attorney, Defendant Zeltser.

49.     On or about February 24, 2008, Ms. Duncan, Defendant Zeltser and others met at the Buddha Bar, 25 Little West 12th Street, New York, New York.

50.     During that meeting, Defendant Zeltser showed Ms. Duncan, on his computer screen, images of documents related to Mr. Patarkatsishvili including a "Letter of Wishes," which was several pages long, and a one-page "Deed of Appointment of Executor." Both of these documents were purportedly signed by Mr. Patarkatsishvili in New York on November 14, 2007.

51.     Upon information and belief, although Mr. Patarkatsishvili was in New York City on November 14, 2007, he arrived in the late evening and then had dinner with friends and business associates until early in the morning of November 15. Upon information and belief, he did not meet with Defendant Zeltser on that day nor did he sign any documents in Defendant Zeltser's presence on that day.

52.     During her February 24, 2008 meeting with Defendant Zeltser, Ms. Duncan asked him for copies of the documents displayed on his computer screen. Upon information and belief, he said he would send them later that evening or the following day.

14

14

53.    Defendant Zeltser failed to send copies of the documents as promised. Ms. Duncan repeated her request for these documents in writing on or about February 25 and February 27, 2008. Defendant Zeltser failed again to provide her with copies of these documents.

54.    On or about March 5, 2008, Defendant Zeltser met with Mrs. Gudavadze, Ms. Duncan and others at the Four Seasons Hotel in London. Ms. Duncan and Mrs. Gudavadze again raised with Defendant Zeltser questions about the documents related to Mr. Patarkatsishvili's estate and asked Defendant Zeltser to provide them with copies of the documents. Defendant Zeltser avoided answering the questions and made various excuses about why he would not produce the documents.

55.    On or about March 7, 2008, Plaintiffs and other members of their family met with Defendant Kay in Tbilisi, Georgia and asked him for copies of the documents that supported his claims of being the executor of Mr. Patarkatsishvili's estate and having authority to speak and act on behalf of Mr. Patarkatsishvili and the estate. Defendant Kay refused to provide the documents, and he claimed that Defendant Zeltser had the documents.

56.    On March 10, 2008, Peter Goldsmith of Debevoise & Plimpton LLP in London, who had been engaged recently to act as counsel to Mrs. Gudavadze, wrote to Defendant Zeltser (in Defendant Zeltser's capacity as counsel for Defendant Kay) and requested copies of the relevant documents: "[I]f Mr. Kay believes he has documentation establishing that he in fact has authority to speak on behalf of Mr. Patarkatsishvili in any

15

capacity, notwithstanding our belief to the contrary, we would request that you provide us with copies of that documentation as soon as possible."

57.    On March 10, 2008, Defendant Zeltser responded by email and refused to provide copies of the documents: "The documents expressing Badri's wishes, vested in us as his counsel, are being disclosed in due course to proper bodies in such jurisdictions as are appropriate and in strict accordance with our client's final instructions." Upon information and belief, Defendant Zeltser made this assertion knowing that the documents to which he referred were fraudulent or otherwise invalid.

Defendants' Misappropriation of Imedi TV

58.    Although, as described above, Defendants failed to obtain information about Mr. Patarkatsishvili's investments from Salford or Mainstay, Defendants had better luck obtaining control over Imedi TV.

59.    Upon information and belief, Mr. Patarkatsishvili owned a controlling interest in Imedi TV through beneficial ownership of shares in a parent company, JSC JMG Consulting Ltd.  Also upon information and belief, most of Mr. Patarkatsishvili's shares in JSC JMG Consulting Ltd. were held for his benefit by Giorgi Jaoshvili, a business associate in Georgia.

60.    Upon information and belief, Defendants together agreed to effect the improper transfer of shares of JSC JMG Consulting Ltd. from the estate of Mr. Patarkatsishvili to Defendant Kay.  Upon information and belief, Defendants knew that

16

16

this transfer would harm Mr. Patarkatsishvili's heirs and beneficiaries, including Plaintiffs.

61.    Upon information and belief, on or about February 19, 2008 – just one week after Mr. Patarkatsishvili's unexpected death – Defendant Kay approached Mr. Jaoshvili and, relying on documents including one described as a power of attorney, directed him to transfer the shares in JSC JMG Consulting Ltd. which Mr. Jaoshvili held beneficially for Mr. Patarkatsishvili. Also upon information and belief, Mr. Jaoshvili complied with this direction.

62.    Upon information and belief, Defendant Kay effected this transfer by relying on documents which he obtained from Defendant Zeltser and which both Defendants knew to be fraudulent or otherwise invalid.

63.    Plaintiffs have demanded that Defendant Kay transfer to them the shares in JSC JMG Consulting Ltd., because they do not belong to Mr. Kay; half belong to Mrs. Gudavadze (being matrimonial property) and Mr. Patarkatsishvili's half devolve to his heirs. Defendant Kay has refused to do that.

64.    Instead, Defendant Kay has proclaimed in public statements reported by the media that he purchased his shares in JSC JMG Consulting Ltd. for an undisclosed price. For example, according to the Russian newspaper Kommersant on March 27, 2008, Defendant Kay claimed in an interview that he purchased the shares "legally" but that the amount he paid was "a commercial secret."

65.    As a result of Defendants' misconduct, Defendant Kay appears to control Imedi TV, rather than Mr. Patarkatsishvili's heirs or his estate. This occurred even

17

though Defendant Kay has produced no documentation to Plaintiffs or to any authorized representative of Mr. Patarkatsishvili's estate demonstrating that this was Mr. Patarkatsishvili's desire.

The Arrest of Defendant Zeltser

66.     On March 3, 2008, Ms. Duncan (who was then still acting as Mrs. Gudavadze's counsel) wrote to the Prosecutor General of Belarus to notify him that Mr. Patarkatsishvili might have had substantial assets in Belarus, and that Defendants and certain associates might improperly attempt to gain control over those assets.

67.     Upon information and belief, on or about March 12, 2008, Defendant Zeltser was arrested in Minsk, Belarus on a charge of attempting to use fraudulent documents to obtain control over assets in which Mr. Patarkatsishvili had an interest.

68.     Upon information and belief, on or about March 28, 2008, Defendant Zeltser was charged by prosecutors in Belarus with attempting to defraud Mr. Patarkatsishvili's estate through the use of forged documents.

Harm To Plaintiffs

69.     Because of Defendants' misconduct, Defendant Kay – and not Mr. Patarkatsishvili's heirs or estate – appears currently to have control of Imedi TV.

70.     In addition, Defendants' misrepresentations and illegitimate demands to Mr. Patarkatsishvili's business associates have complicated Plaintiffs' efforts to inventory Mr. Patarkatsishvili's assets and begin administration of Mr. Patarkatsishvili's estate.

71.    Plaintiffs continue to be injured by Defendants' ongoing misrepresentations and will be irreparably harmed if Defendants continue fraudulently to represent that they are authorized to speak and act on behalf of Plaintiffs or the estate of Mr. Patarkatsishvili.

72.    Because the relevant assets are located throughout the world, it will be difficult, if not impossible, to value the harm caused by Defendants and to obtain monetary damages to remedy that harm.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment)

73.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 72 of the Complaint as if fully set forth herein.

74.    Plaintiffs request that the Court issue a declaratory judgment determining that:

(a)    Neither Defendant is authorized to act or speak on behalf of Plaintiffs or as a representative of Mr. Patarkatsishvili or his estate, unless and until a court of competent jurisdiction finds to the contrary;

(b)    Neither the "Deed of Appointment of Executor" nor the "Letter of Wishes," nor any other document that Defendants have been using in an attempt to gain control over Mr. Patarkatsishvili's assets, empowers Defendant Kay to act as the executor of Mr. Patarkatsishvili's estate or in any other representative capacity unless and until a court of competent of jurisdiction finds to the contrary; and

(c)    As a matter of law, the "Power of Attorney" that Defendant Zeltser has used in an attempt to assert control over Mr. Patarkatsishvili's assets became invalid at the time of Mr. Patarkatsishvili's death (regardless of whether it was valid during his life).

19

19

### SECOND CAUSE OF ACTION
#### (Fraud Against Defendant Kay)

75.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 74 of the Complaint as if fully set forth herein.

76.    Upon information and belief, Defendant Kay gained control of a controlling interest in Imedi TV, which had been beneficially owned by Mr. Patarkatsishvili, by working in concert with Defendant Zeltser. Upon information and belief, Defendant Kay intentionally misrepresented his legal authority to act on behalf of Mr. Patarkatsishvili and his estate, in part by relying on documents that Defendant Kay obtained from Defendant Zeltser that both Defendants knew to be fraudulent or invalid. On information and belief, Defendant Kay engaged in these misrepresentations with the intent that Giorgi Jaoshvili would rely upon them.

77.    Upon information and belief, in transferring the shares in JSC JMG Consulting Ltd. that Mr. Jaoshvili held beneficially for Mr. Patarkatsishvili, Mr. Jaoshvili relied on Defendant Kay's misrepresentations and the fraudulent or invalid documents that Defendant Kay obtained from Defendant Zeltser.

78.    Plaintiffs have been and continue to be damaged as a result of Defendant Kay's fraud.

### THIRD CAUSE OF ACTION
#### (Conspiracy To Defraud)

79.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 78 of the Complaint as if fully set forth herein.

20

80.     Upon information and belief, Defendants together agreed to effect the improper transfer of shares of JSC JMG Consulting Ltd., a parent company of Imedi TV, from the estate of Mr. Patarkatsishvili to Defendant Kay.

81.     Upon information and belief, Defendants knew that this transfer would harm Mr. Patarkatsishvili's heirs and beneficiaries, including Plaintiffs.

82.     Upon information and belief, Defendant Kay gained control of the shares of JSC JMG Consulting Ltd., which had been beneficially owned by Mr. Patarkatsishvili, by intentionally misrepresenting his legal authority to act on behalf of Mr. Patarkatsishvili and his estate, in part by relying on documents that Defendant Kay obtained from Defendant Zeltser that both Defendants knew to be fraudulent or invalid. On information and belief, Defendants engaged in this misconduct with the intent that Giorgi Jaoshvili would rely upon it, and Mr. Jaoshvili did so rely in transferring the shares.

83.     Plaintiffs have been harmed by Defendants' conspiracy to defraud.

## FOURTH CAUSE OF ACTION
### (Constructive Trust)

84.     Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 83 of the Complaint as if fully set forth herein.

85.     Defendant Kay's business relationship with Mr. Patarkatsishvili was a relationship of trust and confidence and as a result, Defendant Kay owed a fiduciary duty to Mr. Patarkatsishvili.

21

86.    In connection with that relationship, upon information and belief, Mr. Patarkatsishvili entrusted money and/or property to Defendant Kay.

87.    Defendant Kay has unjustly enriched himself by gaining control over most of the interest in Imedi TV beneficially owned by Mr. Patarkatsishvili, by working in concert with Defendant Zeltser to intentionally misrepresent Defendant Kay's legal authority to act on behalf of Mr. Patarkatsishvili and his estate, and by relying on documents that Defendant Kay obtained from Defendant Zeltser that both Defendants knew to be fraudulent or invalid.

88.    Defendants have attempted to unjustly enrich themselves by exercising dominion and control over assets which they or others held for the benefit of Mr. Patarkatsishvili.

89.    Imposition of a constructive trust is needed to ensure that assets in which Mr. Patarkatsishvili had an interest are properly included within his estate and distributed to his heirs and beneficiaries including Plaintiffs.

### FIFTH CAUSE OF ACTION
### (Accounting)

90.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 89 of the Complaint as if fully set forth herein.

91.    Defendant Kay's business relationship with Mr. Patarkatsishvili was a relationship of trust and confidence and as a result, Defendant Kay owed a fiduciary duty to Mr. Patarkatsishvili.

22

92.    In connection with that relationship, upon information and belief, Mr. Patarkatsishvili entrusted money and/or property to Defendant Kay.

93.    Working together, and knowingly misrepresenting their authority to act on behalf of Mr. Patarkatsishvili or his estate and relying on fraudulent or invalid documents, Defendants have obtained property which belonged to Mr. Patarkatsishvili and attempted to obtain control over other property which should properly belong to his heirs and beneficiaries.

94.    An accounting is necessary to ascertain what money and/or property within the control or dominion of Defendants was being held by them for the benefit of Mr. Patarkatsishvili or was obtained as a result of Defendants' misconduct.

95.    Due to the ownership structure and locations of Mr. Patarkatsishvili's assets, monetary damages will not be a sufficient remedy and an accounting is needed.

### JURY DEMAND

96.    Plaintiffs elect a trial by jury for each and every count in this Complaint triable by a jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(i)    Issue a declaratory judgment determining that:

    (a)    Neither Defendant is authorized to act or speak on behalf of Plaintiffs or as a representative of Mr. Patarkatsishvili or his estate, unless and until a court of competent jurisdiction finds to the contrary;

23

23.

(b)    Neither the "Deed of Appointment of Executor," nor the "Letter of Wishes," nor any other document that Defendants have been using in an attempt to gain control over Mr. Patarkatsishvili's assets, empowers Defendant Kay to act as the executor of Mr. Patarkatsishvili's estate or in any other representative capacity unless and until a court of competent of jurisdiction finds to the contrary; and

(c)    As a matter of law, the "Power of Attorney" attached hereto as Exhibit A became invalid at the time of Mr. Patarkatsishvili's death (regardless of whether it was valid during his life);

(ii)    Preliminarily and permanently enjoin Defendants from claiming that:

(a)    either Defendant is authorized to act or speak on behalf of Plaintiffs or the estate of Mr. Patarkatsishvili, unless and until a court of competent jurisdiction finds to the contrary;

(b)    the "Deed of Appointment of Executor," the "Letter of Wishes" or any other document that Defendants have been using in an attempt to gain control over Mr. Patarkatsishvili's assets, empower Defendant Kay to act as the executor of Mr. Patarkatsishvili's estate or in any other representative capacity unless and until a court of competent of jurisdiction finds to the contrary; or

(c)    the "Power of Attorney" attached hereto as Exhibit A is valid notwithstanding Mr. Patarkatsishvili's death and permits Defendant Zeltser to act or speak on behalf of Mr. Patarkatsishvili or his estate;

(iii)    Order Defendants to produce to Plaintiffs, for inspection, the original, signed versions of all documents that they claim provide them with authority to control Mr. Patarkatsishvili's assets and/or to serve as representatives of Mr. Patarkatsishvili's estate;

(iv)    Impose on Defendants a constructive trust for the benefit of Mr. Patarkatsishvili's estate and heirs over any assets in which Mr. Patarkatsishvili held a beneficial interest and over which Defendants, or either of them, exercises control or

dominion, as well as any income they may have received from such assets and any proceeds that they may have realized from any sale of such assets;

(v)    Order Defendants to account to Plaintiffs for any assets in which Mr. Patarkatsishvili held a beneficial interest and over which Defendants, or either of them, exercises control or dominion, as well as any income that they may have received from such assets and any proceeds that they may have realized from any sale of such assets;

(vi)    Award damages for any harm caused by Defendants' conduct, as well as costs, expenses and attorneys' fees incurred in prosecuting this action; and

(vii)    Grant such other and further relief as the Court may deem appropriate.

Dated: New York, New York
        April 4, 2008

Respectfully Submitted,

DEBEVOISE & PLIMPTON LLP

By: _____
        Christopher K. Tahbaz
        Jennifer R. Cowan
        919 Third Avenue
        New York, New York  10022
        Tel. (212) 909-6000
        *Attorneys for Plaintiffs*

25

25

<u>**VERIFICATION**</u>

I, Inna Gudavadze, am one of the plaintiffs herein. I have read the foregoing Complaint and know its contents. The Complaint is true to the best of my own knowledge, except as to the matters alleged on information and belief. As to those matters, I believe them to be true.

Pursuant to 28 U.S.C. § 1746, I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Tblisi, Georgia, on April 3, 2008.

INNA GUDAVADZE

26

**15**

<u>IN THE SUPREME COURT OF GIBRALTAR</u>                    2008 M No
<u>CHANCERY JURISDICTION</u>

**IN THE MATTER** of the Civil Procedure Rules, Part 64, Section 1

and

**IN THE MATTER** of the Trustees Act

and

**IN THE MATTER** of the trusts known as The Valmore Trust and The Summit Trust

**BETWEEN**

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**

<u>Claimants</u>

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**

<u>Defendants</u>

---

**EXHIBIT "AJB15"**

---

This is the exhibit marked "AJB15" referred to in the Witness Statement of ANDREW JOHN
BAKER dated        this        day of              2008

Media.ge | News                                                        Seite 1 von 1

 edia.ge

## Category: News

[2008-02-25 | 15:27:18]
### The Fate of Imedi will be Decided by Badri Patarkatsishvili Family

The family of a businessman Badri Patarkatsishvili will resolve the issue of Imedi independently – it is said in the announcement of the businessman's family, spread by civil.ge web-site.

"First of all, the family will continue the activities of Badri Patarkatsishvili's charity foundation and will resolve the fate of Imedi independently. These two projects indeed were the most important in Badri's life" – it is said in the announcement.
The businessman's sister Nana Patarkatsishvili declared in the interview with Mteli Kvira newspaper that Ina Gudavadze, Patarkatsishvili's spouse will manage Imedi. According to her, the businessman's family doesn't intend to sell Imedi.

After Patarkatsishvili's decease, people close to him were declaring that the businessman was going to sell Imedi to News Corp and was holding negotiations for this purpose. The TV channel ceased broadcasting last year, in December.

Director-general of the TV Company Bidzina Baratashvili in the interview with Rezonansi newspaper presumes that the television company will air in March.
Baratashvili also added that Imedi's license expires in February; hence the management of the television channel intends to apply to National Communications Commission in order to automatically prolong the license.

All Rights Reserved to Internews Georgia.
When using this information media.ge must be mentioned.

Find this article at:
http://www.media.ge/eng/page.php?m=news_detailed&id_numb=2933

Media.ge | News                                         Seite 1 von 2



Category: News

[2008-03-19 | 15:40:28]
**Imedi TV seized from Patarkatsishvili's family due to government's attempt –
Georgian Press Reports**

The Georgian press reports on the Imedi TV sale in the secret from the recently deceased business
tycoon Badri Patarkatsishvili's family.

In its front-page article titled "Imedi seized from the Patarkatsishvills" the Georgian daily Alia (March 18
edition) reported that the shares into Imedi TV were formally registered on Badri Patarkatsishvili's friend
in Tbilisi someone named Gogi Jaoshvili. The latter, however, according to the reports, transferred
shares to Joseph Kay, the relative of the deceased, around a week ahead of Patarkatsishvili's funeral in
Tbilisi. Reportedly Joseph Kay himself has handed the shares over to someone for a 5-year term.

The newspaper got in touch with Badri Patarkatsishvili's sister Nana having confirmed the spread
information. According to Nana Patarkatsishvilithe the court trial was held at midnight, against the court
ruling Imedi assets were unfrozen and legalized on Joseph Kay on the same night.

Another Georgian newspaper Rezonansi responded to Imedi issue as well. Reporting in his interview
with the newspaper Goga Khaindrava, one of the leaders of the opposition coalition, said that the
government is trying its best to silence Imedi.

During his recent trip to London Khaindrava had a talk with Badri Patarkatsishvili's spouse Ina
Gudavadze over the faith of the TV company. Patarkatsishvili's business partner Boris Berezovsky
attended their conversation. In accordance with Khaindrava Patarkatsishvili's spouse will make a special
statement on the plans regarding Imedi TV following March 23. A protest rally under the slogan "Give Us
Imedi Back" will be held in front of the Parliament building on March 24, Khaindrava informed.

Pursuant to the Georgian newspapers the authorities are now conducting talks with Joseph Kay
regarding Imedi issue. The governmentfrom its side strongly denies any kind of involvement in the
misappropriation of Imedi TV.

"As far as I know, it is an internal family dispute and it should be settled by lawyers. Nobody can seize
anything from them [the Patarkatsishvili family]. This is not a company, which is related only to Georgia.
You know, that very serious foreign companies and lawyers are involved in this case and it should be
arranged within the family. We have nothing to do with it," Nino Burjanadze, the Parliamentary
Chairperson pointed out.

The Georgian newspaper Versia too covered Imedi TV issue in its March 19 edition. According to the
paper the new possessor of Imedi TV Joseph Kay, the owner of Rustavi Metallurgical Plant, has
transferred Imedi shares to his old acquaintance, current PM Lado Gurgenidze for a 5-year term.

Pursuant to the newspaper Versia Joseph Kay is the citizen of America and formerly used to take part in
Badri Patarkatsishvili's commercial projects.
Versia does not exclude the possibility that Joseph Kay agreed on the "cynical plan" of Imedi registration
on his name in order to avoid the seizure of the plant.

Imedi TV went off the air on December 26, 2007. The term of inactivity expires on March 26. Unless the
company resumes broadcasts until that time the company will get the third warning, as a result the
license will be automatically revoked.



Media.ge | News

All Rights Reserved to Internews Georgia.
When using this information media.ge must be mentioned.

**Find this article at:**

http://www.media.ge/eng/page.php?m=news_detailed&id_numb=3016



Category: News

[2008-03-19 | 16:44:05]
## Badri Patarkatsishvili's Widow Addressed Georgian Population with Open Letter

Badri Patarkatsishvili's widow Ina Gudavadze addressed the Georgian population with an open letter.
The address reads as follows:
"The imposters, having claimed ownership over Imedi, tried to sell it to the Government but they enjoy no
such right since my family and I are the rightful owners of Imedi. We will struggle, through courts, against
any attempt to misappropriate Imedi."

Since my family and I have no desire and intentions to go into politics I did not want to worsen already
tense political situation in the country and throughout the recent period I have been trying to reach
compromise and therefore negotiated with the high officials including the chairperson of the Parliament
[Nino Burjanadze]. But I still do not have the answer.

I am full of courage and determination to put Imedi back on air. An international independent media
company and joint management of the board of trustees will be the guarantee for objective information.

As Badri said Imedi is the achievement of the Georgian people and it belongs to people as a mouthpiece
of free speech.
I feel myself obliged to implement the will of my deceased husband. The freedom of speech is protected
under the Constitution of Georgia. Each citizen enjoys a right to free expression, and an independent TV
channel is the best mean to secure free speech.

I request all of you to support me with my campaign to get Imedi back on air. We have lost Badri. We
have no right to lose Imedi," reads the letter.

On March 24 the opposition coalition plans to hold a protest rally under the slogan "Give Us Imedi Back"
in front of the Parliament building.

All Rights Reserved to Internews Georgia.
When using this information media.ge must be mentioned.

Find this article at:
http://www.media.ge/eng/page.php?m=news_detailed&id_numb=3017

 edia.ge

## Category: News

[2008-03-28 | 13:42:01]

### Joseph Kay is Confident of Proving his Right to Manage Patarkatsishvili's Assets

The new owner of Imedi TV Joseph Kay, being accused of misappropriating, through falsification of documents, his recently deceased cousin Badri Patarakatsishvili's assets, including Imedi TV, made a special statement over the issue.

Kay's statement published on March 26 clarifies that "In November 2007 Badri Patarkatsishvili truly drew up a will clearly defining his wishes and wills. A part of the documentation had been handed over to Patarkatsishvili's American lawyer Emanuel Zeltser."

"It's deplorable that Zeltser has been jailed by Belarus law enforcer. He was arrested just after exiting the plane belonging to Boris Berezovsky. It is indisputable that the arrest of Zeltser and his assistant is another provocation staged by Berezovsky who aims at undisclosing recently deceased Badri Patarkatsishvili's genuine will," Kay pointed out.

Taking into account the question marks raised in regard to the management of Badri's assets and property, I look forward to the completion of all necessary legal and court procedures that will eventually ratify my, Joseph Kay's, power of attorney to manage Patarkatsishvili's assets," Imedi owner said.

The Georgian newspaper Kvela Siakhle (all news) has published an exclusive interview with Joseph Kay, trying to dispel doubts relating to Badri Patarkatsishvili's assets, including the management of Imedi TV and Radio company, and the doubts regarding his rights.
The article can be viewed at: http://www.media.ge/eng/page.php?m=media_discussions_news_detailed&id_numb=52

All Rights Reserved to Internews Georgia.
When using this information media.ge must be mentioned.

Find this article at:
http://www.media.ge/eng/page.php?m=news_detailed&id_numb=3053

 edia.ge

Category: Media Discussions

[2008-03-28 | 13:39:19]
## Kvela Siakhle Newspaper Exclusive Interview with Scandalously Famous Joseph Kay, Alias Soso Kakiashvili

**They say you declared that you are the manager of Badri Patarkatsishvili property. Why you and not his family?**

First of all, I'd like to say that this statement shall be reinforced with certain documentation. I haven't yet declared that I am the manager of Badri Patarkatsishvili's property. My lawyers informed me on this and as it caused a lot of commotion, I asked my lawyer to reinforce this through means of court; as soon as court confirms it, I will probably come out and say that I'm the manager of his property.

**Could to concretize which lawyer informed you on this matter?**

Lawyer Zeltser

**How did officially registering Gogi Jaoshvili's Imedi shares in your name happen? They say that the agreement was signed at midnight in Tskneti and you brought the notary there.**

The agreement wasn't signed in Tskneti, let alone at midnight. As you know, Giorgi Jaoshvili was Badri Patarkatsishvili's friend. Badri Patarkatsishvili's decision to drop a boundary between the television and politics was caused by your colleagues' actions. I remember Imedi journalist's announcement on leaving the company – they declared that they left only because Badri Patarkatsishvili got involved in politics; as a result the company got closed down. Hence, Badri made a decision that the TV company shall in no case become politicized. He had conversations with me too regarding the matter. I offered to him, if he wished I could buy Imedi TV Company and become its owner. I could have the right to act as a private businessman, not as Patarkatsishvili's brother, who was acting only under a warrant. Badri Patarkatsishvili talked to Mr. Jaoshvili on this matter. Probably Gogi himself isn't denying the fact. Unfortunately the purchase of Imedi took place after Badri's decease, although the process started in his lifetime. As for the process of officially registering the ownership, it didn't happen at night, or in a hurry. I met Mr. Jaoshvili and asked him whether he was prepared to transfer the television into my ownership and he said that he was perfectly ready.

**If it's not a secret, how much did you pay for Imedi?**

I can't answer to your question, as it can be said that the sum exceeds, or is at the utmost limit of the amount linked with the shares.

**Do you know whether the amount you paid for Imedi shares was transferred to Patarkatsishvili's family?**

Unfortunately, I don't have this kind of information.

**We had an opportunity to familiarize with Gogi Jaoshvili's testimony he gave to the investigation. In it he declares: I am the owner of Imedi on papers only; the actual owner of everything is Badri Patarkatsishvili. Hence, the money you paid should have probably been given to the family.**

I answer like you asked – allegedly.
**Mr. Kakiashvili, you said that talks on selling Imedi started yet in Badri Patarkatsishvili's lifetime. How can you explain then the fact that his family is against the sale-purchase, didn't they know you were to buy the television?**



Badri had a peculiar character and he didn't let his family meddle in his business. Hence, I assume the family wasn't informed on the matter. I have no right not to believe them, as I always look for the truth in people, not the lie.

**You will probably have to fight in courts for Imedi, as Patarkatsishvili's family members declare, that they won't give up Imedi and will fight till the end. You referred to Badri as your brother. How hard will it be for you to argue in court with the family members?**

I am not going to make our family problems public. If it come down to the point when we'll have to appeal to court and it will be a legitimate instance where the decision will be made, I don't care how this all will end.

**In the previous issue of Kvela Siakhle an interview with Mzia Tortladze was published, where she notes that she had a very difficult conversation with you regarding Imedi...**

The only issue I had conversation about with the family was their claims – they asked why I didn't confer with them before taking the step and I gave an adequate answer to the question. I am not going to repeat my answer publicly! I don't have any moral or financial obligations to this family. I had an obligation to Badri Patarkatsishvili, who is my brother and I will fully fulfill this obligation.

**Why did you dismiss News Corp from Imedi management?**

News Corp management means that the channel will be controlled by Boris Berezovsky, which is absolutely unacceptable to me.
**Does Boris Berezovsky stand behind News Corp?**

Yes, indeed. Solely Boris Berezovsky is standing behind News Corp.

**Do you insinuate that Imedi used to be controlled by Berezovsky?**

I consider that Badri was controlled by Berezovsky. Due to him Badri made a mistake and owing to him Badri decided he wanted to be a president. He never had such a desire before. Berezovsky wanted this.

**Boris Berezovsky claims that you seized Imedi by swindling and the fact that Badri's family is confirming his statement raised certain questions.**

Unfortunately Berezovsky could control not only Badri, but after his decease he is managing his family as well. The family can not see this, but I hope that some day they will realize it. I can say one thing only -- after Badri's decease the family's attitude towards Berezovsky changed. If they used to say: Berezovsky shall move away from our son, husband, brother, father; he won't do any good to Badri, now, somehow, they have changed their opinion and I'm much concerned about it. I consider Berezovsky to be a real evil. He possesses all the means to dictate his own will to anybody and make them do what he wants. Conforming to his ideas won't do any good to the family.

**You said that you are defending Patarkatsishvili's family from Berezovsky and sooner or later they will realize this.**

If Badri named me the rightful manager of his property it was only due to the fact that he didn't trust Berezovsky. What's more, he was afraid of him and saw a danger in him. Once Badri told me: Joseph, if I don't realize my political ambitions, my supporters will take reprisals for it. He probably meant Berezovsky and nobody else, as it was Berezovsy only who was pushing him into politics.

**We'll get back to Patarkatsishvilis' relationship with Berezovsky later. Before that, I'd like to ask about you working at ORT; Berezovsky declared that you were fired. How much work experience in media do you have and how are you planning to run Imedi?**

It is true that I was working at ORT with Badri, but no one has fired me. My other business activities didn't give me a chance to work at the television too, so I left the place willfully; although, for certain period I maintained relationship with ORT Video. As for Imedi management, I consider that the channel



has a professional staff headed by Bidzina Baratashvili. I'm not interested in day to day or micro management of the channel; I don't have time for this. I think that Imedi shall be the way journalists want it to be; the journalists who created the rating it had before Badri got involved in politics.

**You mentioned Patarkatsishvili's relationships with Berezovsky several times. They say that they were having arguments regarding business allotment. After Badri's death Russian internet sites were reporting that Boris Berezovsky got rid of him.**

As for Badri's relationship with Bereaovski, as far as I remember, several years ago Patarkatsishvili declared that their ways in business had parted. He withered his shares from all common businesses. To tell you the truth, initially I thought that Badri did this due to the political pressure. Several times we had conversation regarding the issue. At last Badri told me quite rudely – Why you don't get it? This is the third time you are asking me about this matter. Our ways in business have parted. I paid him the money. This was no "media trick" or a step taken for hushing up anything. I paid the part of the some, I still have to pay another part, but this is my problem and I don't want you to ask me anything about it. I assessed this as a fact.
When Badri passed away and the lawyer declared that according to his will I was the rightful manager of his property, Berezovsky was very displeased. He took me aside and told me: Joseph, you do understand that 50% of all shares in Badri's business belong to me, don't you? I explained to him that if I was to be appointed as the manager of Badri's property I would act lawfully. It is the manager's duty to manage in accordance to the will. I explained that if there were appropriate documents proving that he owned those shares, he wouldn't lose anything. If this wasn't the case, he would have to talk to Badri's family on this issue. He answered – Okay, this is fine; I'll talk to the women myself. Afterwards he took me aside and whispered in my ear, I guess he was afraid that I was recording our conversation, he told me: Joseph, you should know that if someone will be in debt to me or to the "group", I will organize an exemplary murder so that others will come running and hand me my shares.
**Who may be the victim of "exemplary murder"?**

He didn't say directly, but I assessed this as a threat. I even informed Federal Bureau on this matter.

**As for the reason of death, according to one version Boris Berezovsky got rid of Mr. Patarkatsishvili; according to another, Georgian authority is the one to blame in his death.**

By the way, I told the same to Mrs. Ina Gudavadze and asked her, whether she knew that Berezovsky owned half of the shares in Badri's business. Yes, Boria told me about it – Ina answered. I told her I didn't believe that and asked her again, whether Badri had ever mentioned that Berezovsky owned fifty percent of all the shares. She answered, that Badri had never told her anything like that. Then why do you think that Boria is telling the truth? - You know, they were partners and all expanses came out of one pocket, controlled by Berezovsky. - Why don't you suppose that this was put aside money that was spent? It doesn't mean that they had all businesses in common. They split businesses and put aside the money to be spent. Ina agreed with me but also told me she didn't want to have such a dangerous enemy as Berezovsky was. Then I told her: Ina, if you allow me I will stand up to Berezovsky, as I'm not afraid of him. As we all see today, Ina couldn't to make the decision.

**Your story somehow confirms the version that Berezovsky took interest in getting rid of Patarkatsishvili...**

I don't remember where I heard it, but as I know the day Badri passed away he had a very strained conversation with Berezovsky. They may have had an argument on any issue and I don't count out that the argument was linked to the fact that Badri didn't like to lose, particularly in politics. Badri lost not only his presidential campaign, but also his authority and he was worrying about it a lot. To my opinion, Badri informed Berezovsky that he was no longer planning to continue with politics, as he wanted to have a peaceful life and to do what he wished. It seems a strained conversation followed afterwards. I consider there is only one person to be morally blamed in Badri's death – Boris Berezovsky; although, I can not say that he used any chemical substance to get rid of him. It can be said, that all of us are to blame in Badri's death, as we didn't stop him, so that he wouldn't engage in politics or conform to Boria's ideas. There is one more thing that worries me. I constantly ponder over the reason such a detailed examination of the body was necessary – it was Berezovsky's obsession. I guess, his pants were on fire.

**Some, including Berezovsky blame Georgian authority in Badri's death...**



Unfortunately, Berezovsky managed to persuade the family that it is true. I had a serious confrontation with the family regarding this issue. I told all of them directly that Berezovsky is the one to blame in Badri's death, not Georgian authority.

**They say that you are friends with Georgian Prime-Minister Lado Gurgenidze and they also don't count out that Georgian authority stands behind you...**

Unfortunately I can't yet boast that Lado and I are friends. I haven't even shaken hands with that man, as I am not acquainted with him; hopefully, I will.

**Do you remember when the last time you met Patarkatsishvili and whether you spoke about Imedi issue?**

Five days before his decease.

**Which date are the documents making you the manager of Badri's property dated?**

As far as I know, the document was drawn up last year, in December, but it doesn't yet have a judicial power, as it needs to be confirmed by any of the courts.

**I'd like to ask about the arrest of your lawyer, Zeltser – The Patarkatsishvilis' lawyers appealed both to Georgian and Belarusian authorities with a written statement; as a result, Zeltser was arrested in Belarus, charged with document forging and swindling...**

I'd like to say, that I haven't seen those letters with my own eyes. As for The Patarkatsishvilis' lawyers, I'd like to note that all of them are Berezovsky's lawyers. I have a single comment regarding those letters -- the accused shall be tried in a civilized state instead of a dictatorial state such as Belarus. What's more, as far as I know the documents are drawn up in English, not in Georgian or Russian. I don't know why Mr. Berezovsky decided to give Zeltser his private pane and send him in Belarus with his assistant, who he had planted on Badri's side.

**Are you talking about Mitkin?**

Yes, I am. He was Berezovsky's man, planted on Badri'ss side. As I know there was Zeltser, his assistant and Mitkin aboard. Let's take several steps back and I'll explain in details everything. Why was Boria so interested in the will? As soon as he found out that there was a will, his lawyers started pestering with Ina and meticulously exploring the issue. They went to New York to visit Mr. Zeltser and as far as I know, they saw those documents. Afterwards, they got back to London and took advantage of the complicated situation and the fact that Ina was displeased that there was a will in which... I don't want to talk in details, as it is a family affair.

**Let's go back to Zeltser's arrest...**

Right after his lawyers met Zeltser in NY Berezovsky called him and informed him that he was going to take Ina to London. He asked him to leave for London and take documents with him. He wanted to show those documents to Ina, so that she wouldn't have been against the will execution. Mr. Zeltser informed me about this matter and I told him that it wasn't a bad idea to show the papers to Ina. Before that, after Badri's decease it was Zeltser who explained to Ina that there was Badri's second family. Afterwards Ina questioned me, she was talking quite emotionally.
Having talked to Berezovsky Zeltser left for London and he would certainly have taken all the documents with him in order to show them to Mrs. Ina Gudavadze. I knew that Ina was in London too. I thought that the meeting would have taken place, but when Zeltser left, Berezovsky told him: Ina can wait. You should leave for Belarus instead. There we've bought an oil-refining factory, officially registered in Badri's name. We paid USD 148 million in it and we need to pay two more millions. I'll pay the sum, although you need to leave immediately, as the factory may be auctioned again and we'll lose both the money and the factory. This should have been done a week ago, but I hope it's not too late. We have an appointment at 11:00 am tomorrow. I'll book you the plane and you'll leave immediately.
When Zeltser called me, I told him that it was a suspicious situation -- the documents aren't yet confirmed judicially and why is it necessary for you to go there? What's more, Berezovsky also wanted

me to go to Belarus. He said: the manager shall be there, he shall sign the papers and declare -- I am the manager of Patarkatsishvili's family. As I've noted, I thought the situation was quite suspicious and I warned Zeltser: Berezovsky is very cunning, be careful and don't let him trick you into something. He explained that he had to go; otherwise it would have harmed the business. As he was so determined to go, I didn't stop him. Berezovsky told Zeltser: I possess information about Badri's assets that you may never be able to find. If you make a deal with me and let me have shares, I'll share the information with you. I warned Zeltser not to agree with Berezovsky on anything. This was our last talk. Afterwards he flew to Belarus and everyone knows what happened there. Why was it necessary to send him to Minks? If the papers were forged, couldn't Berezovsky have him arrested in London or in New York? Isn't there enough justice in those countries?

**Can Zeltser prove his innocence?**

I am sure that in a normal country, where there are laws there, Zeltser will prove his innocence but this is not the case in Belarus. This man who is diabetic is denied to have access to medication. It seems that this is they way they try to make him sign their favorable testimony. He may not even be alive. A document may appear tomorrow, having his signature on it and stating that the papers are forged.

**Were you summoned as a witness?**

No, not yet. Even if I will be, I don't intend to go to Belarus.

**They say that you are friends with Andrei Lugavoi...**

I know him well, as we worked together at ORT. He was the head of our security office, although I am no friend of his. Actually to tell you the truth, I have few friends, as I've been betrayed many times.

**What kind of relationship did Badri Ptarkatsishvili have with Lugavoi lately?**

As far as I know, pretty normal; Lugavoi had strained relationships with Berezovsky instead, as both were blaming each other in Litvinenko's death.

**And one more question regarding Imedi -- when did you officially register television shares in your name? Was it 3-4 days after Badri's death, when you arrived in Georgia?**

I don't remember the exact date...

**They say that you are the owner of Agaris Shakari (Agarian Sugar) and Rustavi Metallurgical Plant shares too.**

I have a lot of business interests in Georgia, including Agaris Shakari and Rustavi Metallurgical Plant.

**Is it true that Badri Patarkatsishvili helped you purchase the plant, while former Prime-Minister Zurab Zhvania was lobbying the arrangement?**

I don't remember when I bought the plant. I didn't know Zyrab Zhvania personally. I can't say that Badri helped me with anything. We didn't have common business; he had common businesses with Berezovsky instead, who was constantly trying to provoke Badri's political ambitions. Badri was Boria's victim and no one knows who will be the next one. It can be me, as Boria threatened me openly, but I am not afraid of him.

**When will Imedi air? As we know, its broadcasting license has expired...**

I hope that the issue will be resolved justly and we won't have any problems regarding the license. Imedi will air in the nearest future.

**The political opposition won't bee too happy about this. They declare they are going to hold manifestations in front of the television.**



Having taken Imedi's way of broadcasting into consideration, I think that Imedi can be regarded as people's television. The TV channel will be the same as it used to be before it got involved in political turmoil. Badri's greatest concern was the incidents regarding Imedi.

All Rights Reserved to Internews Georgia
When using this information media.ge must be mentioned

**Find this article at:**
http://www.media.ge/eng/page.php?m=media_discussions_news_detailed&id_numb=52

 edia.ge

## Category: News

**[2008-03-31 | 16:37:59]**

### News Corp to Carry on Struggle for Imedi TV with or without Patarkatsishvili's Family

The controversy between the Imedi TV new owner Joseph Kay and a transnational company News Corp is still on. The latter had been conducting the management of the company ahead of Joseph Kay's appearance.

"The transnational company News Corp does not recognize Joseph Kay's right to ownership and pledges to carry on the struggle for Imedi TV with or without Patarkatsishvili's family," Daisy Dunlop of News Corp outlined in her statement sent to Tbilisi from London. The statement has been disseminated by Georgian media outlets.

Joseph Kay became the manager of the channel consequent to the decease of his cousin Imedi TV founder Badri Patarkatsishvili. Joseph Kay refused to proceed with the cooperation with News Corp, since according to him a Russian oligarch Boris Berezovsky is standing behind the company.

The new owner of the television, pursuant to News Corp, was unable to present any documentation proving his legitimate ownership over Imedi media holding.

In accordance with the statement Joseph Kay's decision on the cessation of News Corp's authority over the management of Imedi TV has no legal power, therefore the legal services of Imedi media holding and News Corp are examining the issue related to ownership of the company.

News Corp management, the statements outline, had a verbal agreement regarding a 100% stake transfer to News Corp, with the founder of the company, Badri Patarkatsishvili, having expired on February 12, 2007. The process of the agreement was witnessed by many people.

"Patarkatsishvil's family confirmed the transfer of the 100% stake to News Corp. The transnational corporation is well aware that Patarkatsishvili's family leveled some accusations against Joseph Kay. We preserve a right either to join Patarkatsishvili's family's legal struggle for Imedi TV, or independently put the case on trial against Joseph Kay," News Corp's statement reads.

In response to the accusations Kay disseminated a paper stating that News Corp had been handed over I-Media's 100% stake in the Imedi Ltd. The legal basis of the transfer is a partial proxy issued by I-Media director. The proxy has been legally annulled by the current director of I-Media. In this regard the legislation does not envisage any kind of consent or permission from News Corp.

As regards to the dispute regarding the ownership of the TV company initiated by Patarkatsishvili's family and News Corp, we would like to point out that under the circumstances we are unaware of any specific complaints against us and we haven't been notified which legal action they take for the topic of debates. The discussions will be possible to hold consequent to the written documented lawsuit submitted by the opponent," Joseph Kay's statement reads.

All Rights Reserved to Internews Georgia.
When using this information media.ge must be mentioned.

**Find this article at:**
http://www.media.ge/eng/page.php?m=news_detailed&id_numb=3057

 edia.ge

Category: News

[2008-04-01 | 15:53:47]

### Joseph Kay Presented Legal Document - Bidzina Baratashvili

Joseph Kay has a power of attorney and the document proving that he is the chair of Imedi TV Board of Trustees, this is to say he is holding the position that used to be maintained by Badri Patarkatsishvili, Director General of Imedi TV Bidzina Baratashvili stated reporting to the Georgian weekly Asaval-Dasavali.

According to the TV director general "it's a legal certified document."

"The members of our Board of Trustees are elected and appointed by I-Media holding. Joseph Kay presented the document certified by Paata Siradze, current director of I-Media," Baratashvili said. Siradze was appointed to the position following Badri Patarkatsishvili's decease, Baratashvili noted in his interview. In addition, Imedi TV director general pointed out that he isn't acquainted with Siradze and hence is unable to say anything about his personality.

"The director was appointed by the new board. Consequently the changes took place in the composition of Imedi TV Board of Trustes chaired by Joseph Kay. It has nothing to do with the ownership issue and management either. As regards Imedi ownership, the top interesting topic for the society, the court will find out everything," Imedi TV Director General underlined.

In accordance with Baratashvili, against the document Kay has been elected for the position of a Chairman of the Board of Trustees for a 5-year term.

"Joseph Kay enjoys a right to appoint the director general of the channel and run the staff policy. At this stage the documentation is legal. Inna Gudavadze [the spouse of a recently deceased Imedi TV founder Badri Patarkatsishvili -- Media.ge] and most likely News Corp too are going to appeal this decision," Baratashvili said.

Moreover, Imedi TV director general said, News Corp had been appointed to run the TV management against the official document issued by Shota Shavleishvili, a former director of the media holding, the validity of the document expires on October 31, 2008, but the paper was declared nullified by the new director Paata Siradze. "Any type of illegality in this case shall be found by the court."

All Rights Reserved to Internews Georgia.
When using this information media.ge must be mentioned.

Find this article at:
http://www.media.ge/eng/page.php?m=news_detailed&id_numb=3063

 edia.ge

Category: News

[2008-04-02 | 17:50:12]

### Badri Patarkatsishvili's Family Flatly Refuses to Recognize Joseph Kay's Power of Attorney to Manage Late Business Tycoon's Assets

Badri Patarkatsishvili's family flatly refuses to recognize Joseph Kay's and his allies' power of attorney to manage the late tycoon's assets.

"We do not believe that Kay and his associates act in line with Badri's will. Despite numerous requests by the family we have not seen any written document proving his [Kay's] power of attorney," the family said in the statement presented to the journalists April 2 by the deceased business tycoon's sister MP Mzia Totladze.

"We are Badri Patarkatsishvili's widow, mother, daughters and sisters," reads the statement.

Patarkatsishvili's family is willing to settle all disputes and conflicts in a legal way.

"Our foreign lawyers are thoroughly studying the issue and we will appeal Joseph Kay's power of attorney. We don't consider Joseph Kay as a member of our family. We are unanimous in this decision," reads the statement.

"Their actions are contradictory to the law, moral and common sense. They are capable to fail to prove that Inna is not Badri's spouse. But we, our family, know that Inna is his legal spouse. Intrigues, provocations and falsehood inflict harm on the virtue of our family. We covet peace, respect, kindness and justice. It is our duty towards Badri," the authors of the statement stressed.

All Rights Reserved to Internews Georgia.
When using this information media.ge must be mentioned

Find this article at:
http://www.media.ge/eng/page.php?m=news_detailed&id_numb=3071

 edia.ge

Category: News

[2008-04-03 | 15:13:28]

### Joseph Kay Denies being Successor to Badri Patarkatsishvili's Property

Joseph Kay, chairman of Imedi TV Board of Trustees lays no claims to the late business tycoon Badri Patarkatsishvili's property.

Joseph Kay granted InterPressNews information agency an interview commenting the statement made by Patarkatsishvili's family on April 2.

"I am not and have never been the successor to my cousin's [Badri Patarkatsishvili] property, and hence I have no right to lay any claims," Kay said.

"In case the court ratifies the legitimacy of Badri Patarkatsishvili's will I will make a decision whether to implement his will on managing his assets and not a successor as many assert," Joseph Kay stressed.

"If these people, including so called politicians, fail to see the difference between the power of attorney and being a successor, it's nothing else but the revelation of their lack of knowledge," Kay pointed out.

All Rights Reserved to Internews Georgia
When using this information media.ge must be mentioned.

Find this article at:
http://www.media.ge/eng/page.php?m=news_detailed&id_numb=3072

Seite 1 von 2

 edia.ge

Category: News

[2008-04-08 | 18:14:37]

## Badri Patarkatsishvili's Widow Sued Joseph Kay at Manhattan Federal Court

Inna Gudavadze, the widow and two daughters of late business tycoon, Imedi TV founder Badri Patarkatsishvili filed a lawsuit at Manhattan Federal Court against Patarkatsishvili's stepcousin Joseph Kay, 49, and Patarkatsishvili's American lawyer Emanuel Zeltser, 54.
Patarkatsishvili's family accuses Kay and Zeltser of applying false documents – the proxy and the will, BBC informs.

Joseph Kay is also known alias Joseph Kakalashvili, Ioseb Kakalashvili and Ioseb Kakiashvili, reads the lawsuit.

Debevoise&Plimpton LLP represents the plaintiff. It is yet unknown who is going to advocate the defendants.

Zeltser was arrested on March 12 in Minsk, together with his secretary, Vladlena Funk. Zeltser and Funk, charged with the falsification of the documents are awaiting the trial in the Belarus KGB isolator.

Last Wednesday a protest meeting was held in front of Consulate General of the Republic of Belarus. The protesters were demanding Zeltser's release from detention.

On Monday the Washington Press National Club hosted the press conference headed by Emanuel Zeltser's elder brother Mark, Oxana Adler and doctor Peter Shecker. According to their statement, Emanuel Zeltser, carrying a serious disease, is not given proper medicine, including the painkiller.

Joseph Kay, being abroad at the moment, was ready to respond all questions through the video phone, but the conversation was not held and the press conference came to an end in 10 minutes.

Inna Gudavadze and Patarkatsishvili's daughters Liana Zhmotova and Ia Patarkatsishvili have underlined in the lawsuit that they reside in Great Britain and simultaneously addressed the local court to issue the document on granting the right to inherit the property.

According to the complainants the stock-taking and evaluation of Patarkatsishvili's property around the world is under way. Pursuant to the initial data the value of the property exceeds USD one billion."

On February 12, Patarkatsishvili's family members said, right on the decease of the billionaire "the defendants got in touch with Patarkatsishvili's business partners around the world and through invalid false documents, quasi drawn up and signed in New York, required the information on Patarkatsishvili's property, and control over it."

Thus Joseph Kay, according to the plaintiffs, managed to misappropriate Imedi TV through having presented the forged papers received from the defendant Zeltser, both defendants were well aware of the falsity and invalidity of the documents.

Pursuant to the lawsuit on February 15, three days off of Patarkatsishvili's decease, Kay and Zeltser visited Salford Capital Partners Inc office in London, the company managing part of Patarkatsishvili's assets.
Joseph Kay having presented himself as an executor of late Patarkatsishvili's will requested the information on the businessmen's assets. In response to the staff's requirement on authority Zeltser turned his notebook on and showed the document titled Proxy on the screen. Kay and Zeltser refused to provide the copy of the paper. As a result they were denied access to the requested information. On the same day, the lawsuit reads, Zeltser kept trying, in vain though, to obtain information from Nicholas

Killing, director of Mainstay Trust Limited on the investments made through this company by Patarkatsishvili.

The defendants underline that the proxy, even in case of its authenticity is considered, against the New York laws, as invalid upon the decease of the issuer of the will.

On February 24 at Manhattan Buddha bar Zeltser met Inna Gudavadze's lawyer at that time, Michelle Duncan and showed the latter, through the laptop screen, the documents quasi signed by Patarkatsishvili on November 14, 2007 in New York.

On November 14 Badri Patarkatsishvili was truly visiting New York but, in accordance with the plaintiffs, he arrived in New York late in the evening and had a dinner with his friends and colleagues until midnight. Pursuant to the lawsuit Patarkatsishvili did not meet Zeltser on that day, let alone signing any papers in his presence. Duncan requested the copies of the papers, but the lawyer got just a promise instead.

Under the lawsuit the aforementioned proxy and other papers, the copies of which Patarkatsishvili's widow and daughters never received, impressed Badri's business partner Giorgi Jaoshvili.
The latter registered the JSC JMG Consulting Ltd shares owned by Badri Patarkatsishvili on Joseph Kay. Imedi TV was JSC JMG Consulting Ltd subsidiary company.

The lawyers of the plaintiffs, according to the lawsuit, do not believe that Kay has bought the shares, as of reported to the Russian daily Kommersant. The defendants request the court to outlaw Kay's imposture and demand the defendants to present the originals of the signed documents that grant them a right to manage Patarkatsishvili's assets.

All Rights Reserved to Internews Georgia.
When using this information media.ge must be mentioned.

Find this article at:
http://www.media.ge/eng/page.php?m=news_detailed&id_numb=3084

# Civil.Ge
**UNAG online Magazine**

Government Wants to Seize Imedi –
Patarkatsishvili's Widow                                    **News**

/ Civil Georgia, Tbilisi / 2008-03-19 13:58:51



The Georgian government is trying to take over Imedi TV station with the help of
"imposters," Badri Patarkatsishvili's widow, Inna Gudavadze, said on March 19.

"Imposters have claimed ownership of Imedi and tried to sell it to the Government," she said
in an open letter addressed to "the Georgian People." "But they can not [do that] because I
and my family are the rightful owners of Imedi. In order not to make the [already] tense
political situation worse, during all this time I have tried to negotiate with the Government,
including the chair[person] of Parliament [Nino Burjanadze]. But I still do not have an
answer."

"Imedi is not on air because the Georgian government does not want to allow it,"
Gudavadze said.

The Georgian newspapers *Alia* and *Rezonansi* reported on March 18 that Imedi TV shares
had been formally registered under the name of Patarkatsishvili's friend, Gogi Jaoshvili. The
latter, however, according to the reports, transferred the shares to Joseph Kay, alias Joseph
Kakalashvili, who, according to the *Alia*, is a stepson of Patarkatsishvili's aunt. *The Alia*
claimed that the Georgian authorities were negotiating with Kay.

In an interview with the *Rezonansi* on March 19, Bidzina Baratashvili, director general of
Imedi TV, said that he had "heard" that 70% of the shares had been transferred to Kay. He
said, however, that he had not seen any documentary evidence.

"My family owns Imedi and we will challenge in the courts any attempt to steal Imedi",
Gudavadze said.

She also said that she was "determined to put Imedi back on air." She said her family had no
intention of going into politics and she wanted Imedi TV to be managed by "an international
independent media company" and to have a board of trustees "representing the people of
Georgia to ensure balance."

"I ask you all to support me in my campaign to get Imedi back on air," Gudavadze writes.
"We have lost Badri. We must not lose Imedi."

Nino Burjanadze, the parliamentary chairperson, strongly denied any official interference or
involvement in matters related with Imedi TV.

"As far as I know, this is an internal family dispute and it should be resolved by the
lawyers," she told journalist on March 18. "Nobody can seize anything from them [the
Patarkatsishvili family]. This is not only a Georgian company. You know that very serious
foreign companies and lawyers are involved in this case and it should be settled within the
family. We have nothing to do with it."

Giorgi Khaindrava, an individual member of the eight-party opposition coalition, said that the opposition planned a protest rally on March 24 to protest against, what he called, the authorities' attempts to seize Imedi TV.

**Related Stories:**
Opposition Figure Discusses Imedi TV with Patarkatsishvili Family
Patarkatsishvili Family to Decide on Imedi TV
Patarkatsishvili Poison Test Results in Eight Weeks
Patarkatsishvili's Assets, Including Imedi TV, Frozen
Imedi TV Suspends Broadcasts



© 2004 UNA-Georgia

# Civil.Ge
**UNAG online Magazine**

New Imedi Owner Claims Right to Manage
Patarkatsishvili's Assets
/ Civil Georgia, Tbilisi / 2008-03-27 12:53:17

**News**





Joseph Kay, who claims to be the new owner of Imedi
TV, said Boris Berezovsky had been engaged in a plot
to seize Badri Patarkatsishvili's assets.

In an interview with the Russian daily *Kommersant*,
Kay, alias Kakalashvili, who is Patarkatsishvili's step
cousin, claimed that he had power of attorney to manage
Patarkatsishvili's assets in accordance with the late
tycoon's will. Patarkatsishvili's widow, Inna
Gudavadze, however, has accused Kay of an attempt to
seize Patarkatsishvili's assets through "falsification of

*Joseph Kay has promised not to interfere in Imedi TV's editorial policy. Photo: InterPressNews*

documents." Berezovsky made similar accusations in an interview with the Georgian
television station, Rustavi 2.

Kay said that Berezovsky – "whom I prefer to call the Devil" – wanted him to travel to
Belarus to get rid of him by having him jailed there. Kay said that his lawyer, Emanuel
Zeltser, went to Belarus where he was arrested just after exiting a plane on the request of
Berezovsky.

"Emanuel Zeltser was Badri Patarkatsishvili's lawyer for about 13 or 14 years," Kay said.
"A day or two after Badri's death, Mr. Zeltser came to me and told me about Badri
Patarkatsishvili's will. He [Patarkatsishvili] wrote the will in New York at Zeltser's office. I
do not know the exact date, but it was last November… Mr. Zeltser came to me [after
Patarkatsishvili's death in February] and showed me the will, which grants me the power of
attorney, giving me the authority to manage all of his [Patarkatsishvili's] property. The will
mandates me to collect all of Badri's assets and properties and to then distribute them in
accordance with the will."

Kay said the will dictated that Patarkatsishvili's assets be distributed among his close
relatives, but he did not give details, saying that "the courts should first confirm my power
of attorney." He, however, said he did not know which court his lawyer, Zeltser, had
appealed to.

Kay also claimed that Zeltser went to Belarus because Berezovsky had told him to clarify
the situation with an oil refinery there which was owned by Patarkatsishvili. "Berezovsky
told Zeltser that I should go to Belarus. So he wanted me to be arrested there. But eventually
Zeltser went there. There were three people on the plane: Zeltser, [Zeltser's secretary
Vladlena] Funk and an Israeli citizen, Berezovsky's associate Anatoly Motkin, who was in
charge of Badri Patarkatsishvili's election campaign [in Georgia's January 5 presidential
election]. Motkin was not arrested. So I want to ask: if those papers about my power of
attorney were forged, why didn't this Devil have my people arrested in London or New
York?"

In the interview with *the Kommersant*, Kay said he did not want to speak much about his deal involving Imedi TV, but said he bought the shares "legally." He, however, declined to disclose the sum, saying it was "a commercial secret."

**Related Stories:**
Opposition Rallies to Protect Imedi
Imedi TV May Resume Broadcasts in April
Imedi's New Owner Delays Reopening - Source
Patarkatsishvili Family: 'Do not Politicize Imedi TV Dispute'
Imedi TV 'New Owner' Plans to Restore 'Old Imedi'
Government Wants to Seize Imedi - Patarkatsishvili's Widow
Berezovsky on his Plans, Georgian Opposition, Authorities
Imedi TV 'New Owner' Denies Talks with Government
Okruashvili Calls for Focusing on Imedi TV
Burjanadze Confirms Meeting with Patarkatsishvili Widow

© 2004 UNA-Georgia

# Civil.Ge
**UNAG online Magazine**

Imedi TV Tests Signal    **News**

/ Civil Georgia, Tbilisi / 2008-04-01 21:30:42



Imedi TV's logo appeared on TV screens on April 1 as the station prepares to resume partial broadcasts.

Imedi radio accompanied the logo.

Bidzina Baratashvili, the executive director of Imedi TV, said on March 26 he expected the television station to resume partial broadcasts from April 1 and its normal programming, particularly news, no later than April 10.

The Imedi TV ownership issue, meanwhile, remains disputed between Joseph Kay, a relative of late tycoon Badri Patarkatsishvili, and Patarkatsishvili's widow, Inna Gudavadze, who claims that Kay is just a frontman for the authorities, who are using him to gain control of the station.

**Related Stories:**
Imedi TV Suspends Broadcasts
Imedi TV Resumes Broadcasts
New Imedi Owner Claims Right to Manage Patarkatsishvili's Assets



© 2004 UNA-Georgia

# Civil.Ge
**UNAG online Magazine**

Patarkatsishvili Family in Row over Assets                    **News**
/ Civil Georgia, Tbilisi - 2008-04-02 17:54:24



Badri Patarkatsishvili's family has reiterated it does not recognize Joseph Kay's claims that he has the power of attorney to manage the late tycoon's assets.

"Dishonorable people have taken advantage of the hardest times for our family (involving the widow, mother, daughters and sisters) and started seizing Badri's assets against the will of his family; we are being deprived of what he had bequeathed," the family said in a statement issued on April 2.

Kay, who is Patarkatsishvili's step cousin, claims that he has the power of attorney to manage Patarkatsishvili's assets in accordance with the late tycoon's will. Kay also claims that the will mandates him to collect all of Patarkatsishvili's assets and properties and to then distribute them in accordance with the will among family members, including Patarkatsishvili's first wife. Kay also claims to be the owner of Imedi TV and radio stations.

"We do not believe that Kay and his associates act in accordance with Badri's will," the Patarkatsishvili family said in the statement. "Despite numerous requests by the family we have not seen any document proving his [Kay's] power of attorney… Our foreign lawyers are thoroughly studying the issue and we will appeal to the courts."

Lord Goldsmith, a former UK Attorney General and now head of the New York-based law firm Debevoise & Plimpton's European litigations, is, among others, acting on the family's behalf.

**Related Stories:**
New Imedi Owner Claims Right to Manage Patarkatsishvili's Assets



© 2004 UNA-Georgia



**16**

<u>IN THE SUPREME COURT OF GIBRALTAR</u>
<u>CHANCERY JURISDICTION</u>

**2008 M No**

**IN THE MATTER** of the Civil Procedure Rules, Part 64, Section 1

and

**IN THE MATTER** of the Trustees Act

and

**IN THE MATTER** of the trusts known as The Valmore Trust and The Summit Trust

**BETWEEN**

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**

<u>Claimants</u>

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**

<u>Defendants</u>

---

EXHIBIT "AJB16"

---

This is the Exhibit "AJB16" referred to in the Witness Statement of ANDREW JOHN BAKER dated this 20ᵗʰ day of April 2008

## Andrew Baker

| | |
|---|---|
| **Von:** | David Ashfield [d.ashfield@londonintbank.com] |
| **Gesendet:** | Freitag, 18. April 2008 18:15 |
| **An:** | Daniel Fielding; Andrew Baker |
| **Cc:** | Jonathan Porteous; mpop10@hotmail.com; Ali Guidfar |
| **Betreff:** | RE: JWL and Charleswood [SB-LIVE.FID69201] |

      

JWL EIN (Tax) ID Number (786 ...  1 - ByLaws.pdf  1 - Cert of Incorporation.pdf  Board of Directors 31.12.7.pdf...  Resolution to transfer shares ...  Register of Shares.pdf  9 - Cert 1 CANCELLED.pdf

     

9 - Cert 2 for Miselva, 199 sh...  Excerpt 28.3.8.pdf  Chapel.pdf  Thames.pdf  Chester.pdf  Fisher.pdf  Grosvenor.pdf

Paua.pdf

Dear all, these are all the records for the JWL transfer. I believe that one share was transferred to Zlata at the 31st December but that this was immediately cancelled as it would have led to a large stamp duty liability in the UK. I believe therefore that 199 (i.e. 100% of the issued share capital has been issue to Miselva); incidentally the reason for the cancellation of the first stock certificate is that it had the wrong name on it (JWL Entertainment Inc instead of JWL Entertainment Group Inc.). We obviously need to get the original of the stock certificate. Then we need to register the transfers at the stamp office. The next step then should be to transfer the stock to Charleswood on their appointment as trustees for the Valmore Trust. We will need to agree the retirement deed of Miselva and then set about deciding whether we continue with JWL or if not, I assume, wind it up and revert to each of the holding companies being held directly by the trustee? Can everyone confirm that they are happy to this course of action? With regard to the Summit this complication of JWL does not exist so I assume that we need to send the removal notice to Nexus and start with the process of assigning the shares held in trust by Nexus to Charleswood and appointing new directors to each of the subsidiaries. I think that we had agreed that Andrew would handle each of these stock transfers and resignations and appointments as he knew each of the agents and jurisdictions. Again could everyone please conform that this is their understanding of the way forward? Regards

David Ashfield
Director
Fisher Island Ltd
11 Grosvenor Place, SW1X 7HH

Blackberry: +44 7921881027
Tel: +44 2071705591
Fax: +44 2071705510

-----Original Message-----
From: Daniel Fielding [mailto:dan.fielding@stevens-bolton.co.uk]
Sent: 16 April 2008 21:23
To: Andrew Baker
Cc: David Ashfield; Jonathan Porteous; mpop10@hotmail.com; Kate Schmit; Jaime Topp
Subject: RE: JWL and Charleswood [SB-LIVE.FID69201]

Dear All

Further to Andrew's email below, we are looking into legal arguments whereby we could unpick the transaction. To form a view on this we need to know exactly what JWL signed and what they actually did in terms of any registrations and/or their company accounts produced. David - would it be possible to provide these details or provide us with a contact that we can follow this up with? Even if JWL did not actually issue the shares it is not cut and dried that we can unpick the transaction.

1

We are also considering a transfer from JWL to Charleswood PTC and are investigating if there is any way of doing this without incurring a stamp duty charge. Moshe - would there be any adverse US tax consequences in doing this?  Consideration also needs to be given to what the adverse tax effect is on the group of acknowledging the transfer to JWL at the start of year.

Annual returns have recently been filed with the Registrar of Companies in the UK for Chapel Street, Fisher Island, Grosvenor Trading and Thames Steel. The 'share transfers' have been reflected in these annual returns.  However, legal title to shares does not pass until the stock transfer forms have been stamped and the record of a private company's shares that should be checked for details of share ownership is the company's register of members, which should be updated once the legal title to the shares has transferred. The stock transfer forms for each of these four companies have not yet been stamped. Therefore the annual returns should not state that JWL currently owns the shares. If necessary, an amended annual return could be filed at Companies House, but the annual returns currently filed could not be removed from the filing history of each company without a court order.

I believe that there was some confusion over whether the company secretary, Z Stepanenko, owned one share in the company. I have reviewed a certified copy of the share register of JWL as at 31 December 2007 and also the copy of the JWL share certificate that we have on file. The share register shows that Miselva owns the entire issued share capital of JWL (being 199 shares) and the share certificate states that Miselva owns 199 shares (although the Company is authorised to issue 200 shares in total). Andrew - could you please let me know if you think there may be an issue or further investigation is required.


Daniel Fielding

DDI: 01483 401264
Email: daniel.fielding@stevens-bolton.co.uk

Stevens & Bolton LLP, The Billings, Guildford GU1 4YD
Tel: +44 (0)1483 302264  Fax: +44 (0)1483 302254   DX 2423 Guildford 1
www.stevens-bolton.co.uk

Corporate Law Firm of the Year
Insider South East Dealmakers Awards 2007 and 2008

Stevens & Bolton LLP is a limited liability partnership registered in England (registered number OC306955) and is regulated by the Solicitors Regulation Authority. A list of members' names is open to inspection at the above address.

IMPORTANT NOTICE:
This message may contain confidential or legally privileged information.  If you are not the addressee of this e-mail please reply to the sender immediately by e-mail and do not disclose, store or make use of this information.
Communicating by e-mail carries certain risks which include delay, corruption of data, non-delivery, wrongful interception, amendment and other dangers.  Please refer to our internet site http://www.stevens-bolton.co.uk/email if you would like more information on this issue.  However if you communicate with us by e-mail we will take it that you have assumed the risks involved in using such a medium.



-----Original Message-----
From: Andrew Baker [mailto:andrew.baker@miselva.li]
Sent: Tuesday, April 15, 2008 11:42 AM
To: Daniel Fielding
Cc: d.ashfield@londonintbank.com; Jonathan Porteous; mpop10@hotmail.com
Subject: AW: JWL and Charleswood [SB-LIVE.FID69201]

Dear Daniel,

Thinking about this overnight, I am beginning to wonder whether and, if so, how this transaction can really be unpicked, given that legal agreements were executed by Miselva (although I never saw the agreements signed by JWL Entertainment Group Inc)

and the share transfers registered (presumably) at the UK Companies Registry?

**Perhaps** this is what PKF are pondering upon, but I thought I should pass on my concerns as early as possible.

Also, as I recall the deal was that Miselva would transfer 100% of the shares in its 6 subsidiaries in return for 100% of the shares of JWL Entertainment Group Inc. Having compared the 6 Sale & Purchase Agreements with the copy share certificate in JWL which was sent to us by e-mail in early January, I noticed that Miselva had in fact received only 199 out of 200 shares. I think I asked David at the time what had happened to the 1 share, but I cannot remember what his response was. Can you shed any light on the matter?

Kind regards

Andrew

-----Ursprüngliche Nachricht-----
Von: Daniel Fielding [mailto:dan.fielding@stevens-bolton.co.uk]
Gesendet: Montag, 14. April 2008 19:03
An: Andrew Baker
Cc: d.ashfield@londonintbank.com; Jonathan Porteous; mpop10@hotmail.com
Betreff: JWL and Charleswood [SB-LIVE.FID69201]


Dear Andrew

Jonathan asked me to email you to let you know that we should be able to prepare the stock transfer forms for the transfer of the shares to Charleswood PTC as soon as possible on the basis that the JWL transaction was never fulfilled, but (as Jonathan mentioned) we need to first speak to PKF in relation to this matter and seek their advice on proceeding in this way. We are due to speak to PKF tomorrow.

We assume that the drafting of the stock transfer forms is all that you require from us and that, subject to Miselva confirming what happened with JWL and that the proposed transactions with JWL did not go ahead, you will prepare all of the other required documentation.

Kind regards


Daniel Fielding


DDI: 01483 401264
Email: daniel.fielding@stevens-bolton.co.uk


Stevens & Bolton LLP, The Billings, Guildford GU1 4YD
Tel: +44 (0)1483 302264  Fax: +44 (0)1483 302254  DX 2423 Guildford 1
www.stevens-bolton.co.uk
Corporate Law Firm of the Year
Insider South East Dealmakers Awards 2007 and 2008

Stevens & Bolton LLP is a limited liability partnership registered in England (registered number OC306955) and is regulated by the Solicitors Regulation Authority. A list of members' names is open to inspection at the above address.
IMPORTANT NOTICE:
This message may contain confidential or legally privileged information. If you are not the addressee of this e-mail please reply to the sender immediately by e-mail and do not disclose, store or make use of this information.
Communicating by e-mail carries certain risks which include delay, corruption of data, non-delivery, wrongful interception, amendment and other dangers. Please refer to our internet site http://www.stevens-bolton.co.uk/email if you would like more information on this issue. However if you communicate with us by e-mail we will take it that you have assumed the risks involved in using such a medium.

3

**Exhibit H**

<u>IN THE SUPREME COURT OF GIBRALTAR</u>
<u>CHANCERY JURISDICTION</u>

2008 M No. 70

IN THE MATTER of the Civil Procedure Rules, Part 64, Section 1

and

IN THE MATTER of the Trustees Act

and

IN THE MATTER of the trusts known as The Valmore Trust and The Summit Trust

BETWEEN

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**

<u>Claimants</u>

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**

<u>Defendants</u>

---

SECOND WITNESS STATEMENT
OF ANDREW JOHN BAKER

---

1

I, Andrew John Baker of Runkelsstrasse 37, Triesen, FL-9495, Liechtenstein hereby state as follows:

1.      I am the same Andrew John Baker who made a Witness Statement in this claim on 20 April 2008 and make this statement for the Hearing today at 10:30 a.m. of an Application by the Second Defendant Joseph Kay ("JK") and in response to a witness statement of Mohammad Ali Guidfar ("MAG"), a draft of which was supplied to me yesterday evening.   The Claimants have been given less than 24 hours notice of this application and this Witness Statement has had to be prepared hastily.

2.      It is my belief that the statements of MAG lack real credibility. He speaks of "potential" problems and of a "potentially de-stabilising effect" if the change in management of JWL Entertainment Group Inc. ("JWL") becomes public but there is no convincing evidence given that this will really happen. Curiously, it the first time that any detail has been provided by the Second Defendant or his representatives regarding these allegations.

3.      MAG describes JK as the "driving force" behind the Valmore Trust. This is simply untrue. The trustee has only rarely had contact with JK and he has rarely, if at all, been involved in the decision-making concerning the trust or its assets. London International Bank Limited ("LIB"), on the other hand, and in particular its Chief Financial Officer David Ashfield ("DA"), has been the trustee's principal point of contact with respect to the Valmore Trust and its underlying assets. Indeed, it is true to say that in the past the trustees of the Valmore Trust and of the Summit Trust have placed great reliance on the ability and efficiency of DA and the LIB team in administering the trusts' assets.

4.      To my knowledge it has been DA and LIB who have been running the corporate structures under the Valmore and Summit Trusts and who have been negotiating various loans with various financiers. I do not believe that JK has much, if any, involvement in these negotiations. JK is involved or not. It is therefore misleading to portray JK as the mainstay of the Valmore group without whose involvement on the board of JWL the group is going to collapse. I bring to the Honourable Court's attention that JWL was only inserted as the top holding company of the Valmore

2

group in December 2007 (if indeed it has been properly inserted at all, as to which see below) and that prior thereto JK had not been a director of the holding companies at all.

5.    With respect to JWL it is significant that DA has recently been making a considerable effort to have the insertion of JWL as the top holding company reversed or 'unpicked'. Copies of relevant correspondence are attached as Exhibit "2-AJB-1". It is evident from the correspondence that there was slight uncertainty as to whether the insertion of JWL in December 2007 as the top holding company has been properly completed. Further it goes to show that it is not at all important for the continuing well-being of the corporate group if JWL is the holding company. On the contrary, it is my belief that DA and LIB will be relieved if they no longer have to enter negotiations with potential financiers showing a holding company with the somewhat unhappily named "JWL Entertainment Group, Inc.".

6.    Since this Honourable Court made its order on 21.04.2008, the trustees have been attempting to: (1) obtain information as to the present state affairs of the various companies underlying the 2 trusts; and (2) secure proper control of the corporate structure underlying each trust but without jeopardising the commercial interests of the underlying companies. As part of these efforts, the trustees have engaged a number of professional firms to assist. Upon advice received, the trustee of the Valmore Trust decided to take control of JWL so as to ensure that the Second Defendant could not dispose of or encumber any of the underlying assets. It was not and, as things currently stand, is not the intention of the trustees to remove the directors of the holding companies at the next level (for the most part DA and/or MAG).

7.    On behalf of the trustees I have been trying to arrange an urgent meeting with DA, MAG and LIB with a view to making progress on gaining proper control and proper status reports as to the trust assets. My efforts have been thwarted however and my concerns are growing that LIB may be deliberately putting me off. Copies of relevant correspondence are attached as Exhibit "2-AJB-2". Subject to further advice from the trustees lawyers, in light of the foregoing the trustees may appoint a representative to the boards of directors of the second-level holding companies just to ensure that they (the trustees) are kept properly informed.

3

8.    I reiterate that there is no intention on the part of the trustees to interfere in the day to day running of the operating companies within the relevant corporate groups. The trustees do not see this as their role. However, the trustees feel strongly that proper ownership, control and monitoring of the trust assets is essential. In view of the recent actions of JK, the trustees feel that he is not the appropriate person to be in charge of any of the holding companies.

## STATEMENT OF TRUTH

I believe that the facts stated in this Witness Statement are true.

Dated  1ˢᵗ day of May 2008

Signed:    .......................................................

Andrew John Baker

This Witness Statement is filed by Messrs Hassans of 57/63 Line Wall Road, Gibraltar, Solicitors for the Claimants.

**1**

## Andrew Baker

**Von:** David Ashfield [d.ashfield@londonintbank.com]

**Gesendet:** Montag, 21. April 2008 12:58

**An:** jonathan.porteous@stevens-bolton.co.uk; dan.fielding@stevens-bolton.co.uk; Andrew Baker

**Cc:** mpop10@hotmail.com; Ali Guidfar; kate.schmit@stevens-bolton.co.uk

**Betreff:** Re: JWL and Charleswood [SB-LIVE.FID69201]

Dear all further to discussions over the weekend with Moshe it seems that the shares in JWL may never have been issued therefore the transfers of each of the six holding companies may never have been fulfilled. It is now our preference to cancel these six transactions and file amended annual returns. Jonathan what do we need to do to make this happen? The next step is then to transfer the six holding company shares to Charleswood. Jonathan, can you please advise? Regards,

David Ashfield

London International Bank Ltd
11 Grosvenor Place, SW1X 7HH
Mobile: +44 7887897529
Blackberry: +44 7921881027
Tel: +44 2071705591
Fax: +44 2071705510

-----Original Message-----
From: Jonathan Porteous
To: David Ashfield; Daniel Fielding; Andrew Baker
CC: mpop10@hotmail.com; Ali Guidfar; Kate Schmit
Sent: Mon Apr 21 11:39:42 2008
Subject: RE: JWL and Charleswood [SB-LIVE.FID69201]

Many thanks David. We are happy with this course of action. To confirm, we see ourselves as dealing with the UK stamp duty applications of the initial transaction and future transactions to unwind or vary the structure, and to prepare stock transfer forms for the UK companies as required to implement whatever transactions are effected. We are not otherwise dealing with the paperwork to effect the change of trustee, though please let us know if you need us to assist.

My tax colleague Kate Schmit has prepared a note on the stamp duty position following her conversation with US tax attorney David Horowitz on Friday, and we will be circulating that to you all and to David shortly.

Kind regards
Jonathan

DDI +44 (0) 1483 401233
jonathan.porteous@stevens-bolton.co.uk

Stevens & Bolton LLP, The Billings, Guildford GU1 4YD
Tel: +44 (0)1483 302264  Fax: +44 (0)1483 302254  DX 2423 Guildford 1
www.stevens-bolton.co.uk

Corporate Law Firm of the Year
Insider South East Dealmakers Awards 2007 and 2008

Stevens & Bolton LLP is a limited liability partnership registered in England (registered number OC306955) and is regulated by the Solicitors Regulation Authority.
A list of members' names is open to inspection at the above address.

IMPORTANT NOTICE:
This message may contain confidential or legally privileged information. If you are not the addressee of this e-mail please reply to the sender immediately by e-mail and do not disclose, store or make use of this information.

01.05.2008

Communicating by e-mail carries certain risks which include delay, corruption of data, non-delivery, wrongful interception, amendment and other dangers. Please refer to our internet site http://www.stevens-bolton.co.uk/email if you would like more information on this issue. However if you communicate with us by e-mail we will take it that you have assumed the risks involved in using such a medium.

-----Original Message-----
From: David Ashfield [mailto:d.ashfield@londonintbank.com]
Sent: Friday, April 18, 2008 5:15 PM
To: Daniel Fielding; Andrew Baker
Cc: Jonathan Porteous; mpop10@hotmail.com; Ali Guidfar
Subject: RE: JWL and Charleswood [SB-LIVE.FID69201]

Dear all, these are all the records for the JWL transfer. I believe that one share was transferred to Zlata at the 31st December but that this was immediately cancelled as it would have led to a large stamp duty liability in the UK. I believe therefore that 199 (i.e. 100% of the issued share capital has been issue to Miselva); incidentally the reason for the cancellation of the first stock certificate is that it had the wrong name on it (JWL Entertainment Inc instead of JWL Entertainment Group Inc.). We obviously need to get the original of the stock certificate. Then we need to register the transfers at the stamp office. The next step then should be to transfer the stock to Charleswood on their appointment as trustees for the Valmore Trust. We will need to agree the retirement deed of Miselva and then set about deciding whether we continue with JWL, or if not, I assume, wind it up and revert to each of the holding companies being held directly by the trustee? Can everyone confirm that they are happy to this course of action? With regard to the Summit this complication of JWL does not exist so I assume that we need to send the removal notice to Nexus and start with the process of assigning the shares held in trust by Nexus to Charleswood and appointing new directors to each of the subsidiaries. I think that we had agreed that Andrew would handle each of these stock transfers and resignations and appointments as he knew each of the agents and jurisdictions. Again could everyone please conform that this is their understanding of the way forward? Regards

David Ashfield
Director
Fisher Island Ltd
11 Grosvenor Place, SW1X 7HH

Blackberry: +44 7921881027
Tel: +44 2071705591
Fax: +44 2071705510

-----Original Message-----
From: Daniel Fielding [mailto:dan.fielding@stevens-bolton.co.uk]
Sent: 16 April 2008 21:23
To: Andrew Baker
Cc: David Ashfield; Jonathan Porteous; mpop10@hotmail.com; Kate Schmit; Jaime Hopp
Subject: RE: JWL and Charleswood [SB-LIVE.FID69201]

Dear All

Further to Andrew's email below, we are looking into legal arguments whereby we could unpick the transaction. To form a view on this we need to know exactly what JWL signed and what they actually did in terms of any registrations and/or their company accounts produced. David - would it be possible to provide these details or provide us with a contact that we can follow this up with? Even if JWL did not actually issue the shares it is not cut and dried that we can unpick the transaction.

We are also considering a transfer from JWL to Charleswood PTC and are investigating if there is any way of doing this without incurring a stamp duty charge. Moshe - would there be any adverse US tax consequences in doing this? Consideration also needs to be given to what the adverse tax effect is on the group of acknowledging the transfer to JWL at the start of year.

Annual returns have recently been filed with the Registrar of Companies in the UK for Chapel Street, Fisher Island, Grosvenor Trading and Thames Steel. The 'share transfers' have been reflected in terms of any annual returns. However, legal title to shares does not pass until the stock transfer forms have been stamped and the record of a private company's shares that should be checked for details of share ownership is the company's register of members, which should be updated once the legal title to the shares has transferred. The stock transfer forms for each of these four companies have not yet been stamped. Therefore the annual returns should not state that JWL currently owns the shares. If necessary, an

01.05.2008

amended annual return could be filed at Companies House, but the annual returns currently filed could not be removed from the filing history of each company without a court order.

I believe that there was some confusion over whether the company secretary, Z Stepanenko, owned one share in the company. I have reviewed a certified copy of the share register of JWL as at 31 December 2007 and also the copy of the JWL share certificate that we have on file. The share register shows that Miselva owns the entire issued share capital of JWL (being 199 shares) and the share certificate states that Miselva owns 199 shares (although the Company is authorised to issue 200 shares in total). Andrew - could you please let me know if you think there may be an issue or further investigation is required.


Daniel Fielding

DDI: 01483 401264
Email: daniel.fielding@stevens-bolton.co.uk

Stevens & Bolton LLP, The Billings, Guildford GU1 4YD
Tel: +44 (0)1483 302264  Fax: +44 (0)1483 302254  DX 2423 Guildford 1 www.stevens-bolton.co.uk

Corporate Law Firm of the Year
Insider South East Dealmakers Awards 2007 and 2008

Stevens & Bolton LLP is a limited liability partnership registered in England (registered number OC306955) and is regulated by the Solicitors Regulation Authority.
A list of members' names is open to inspection at the above address.

IMPORTANT NOTICE:
This message may contain confidential or legally privileged information. If you are not the addressee of this e-mail please reply to the sender immediately by e-mail and do not disclose, store or make use of this information. Communicating by e-mail carries certain risks which include delay, corruption of data, non-delivery, wrongful interception, amendment and other dangers. Please refer to our internet site http://www.stevens-bolton.co.uk/email if you would like more information on this issue. However if you communicate with us by e-mail we will take it that you have assumed the risks involved in using such a medium.



-----Original Message-----
From: Andrew Baker [mailto:andrew.baker@miselva.li]
Sent: Tuesday, April 15, 2008 11:42 AM
To: Daniel Fielding
Cc: d.ashfield@londonintbank.com; Jonathan Porteous; mpop10@hotmail.com
Subject: AW: JWL and Charleswood [SB-LIVE.FID69201]

Dear Daniel,

Thinking about this overnight, I am beginning to wonder whether and, if so, how this transaction can really be unpicked, given that legal agreements were executed by Miselva (although I never saw the agreements signed by JWL Entertainment Group Inc) and the share transfers registered (presumably) at the UK Companies Registry?

Perhaps this is what PKF are pondering upon, but I thought I should pass on my concerns as early as possible.

Also, as I recall the deal was that Miselva would transfer 100% of the shares in its 6 subsidiaries in return for 100% of the shares of JWL Entertainment Group Inc. Having compared the 6 Sale & Purchase Agreements with the copy share certificate in JWL which was sent to us by e-mail in early January, I noticed that Miselva had in fact received only 199 out of 200 shares. I think I asked David at the time what had happened to the 1 share, but I cannot remember what his response was. Can you shed any light on the matter?

Kind regards

Andrew

-----Ursprüngliche Nachricht-----
Von: Daniel Fielding [mailto:dan.fielding@stevens-bolton.co.uk]
Gesendet: Montag, 14. April 2008 19:03


01.05.2008

An: Andrew Baker
Cc: d.ashfield@londonintbank.com; Jonathan Porteous; mpop10@hotmail.com
Betreff: JWL and Charleswood [SB-LIVE.FID69201]

Dear Andrew

Jonathan asked me to email you to let you know that we should be able to prepare the stock transfer forms for the transfer of the shares to Charleswood PTC as soon as possible on the basis that the JWL transaction was never fulfilled, but (as Jonathan mentioned) we need to first speak to PKF in relation to this matter and seek their advice on proceeding in this way. We are due to speak to PKF tomorrow.

We assume that the drafting of the stock transfer forms is all that you require from us and that, subject to Miselva confirming what happened with JWL and that the proposed transactions with JWL did not go ahead, you will prepare all of the other required documentation.

Kind regards

Daniel Fielding

DDI: 01483 401264
Email: daniel.fielding@stevens-bolton.co.uk

Stevens & Bolton LLP, The Billings, Guildford GU1 4YD
Tel: +44 (0)1483 302264  Fax: +44 (0)1483 302254  DX 2423 Guildford 1 www.stevens-bolton.co.uk Corporate Law Firm of the Year Insider South East Dealmakers Awards 2007 and 2008

Stevens & Bolton LLP is a limited liability partnership registered in England (registered number OC306955) and is regulated by the Solicitors Regulation Authority.
A list of members' names is open to inspection at the above address.
IMPORTANT NOTICE:
This message may contain confidential or legally privileged information. If you are not the addressee of this e-mail please reply to the sender immediately by e-mail and do not disclose, store or make use of this information. Communicating by e-mail carries certain risks which include delay, corruption of data, non-delivery, wrongful interception, amendment and other dangers. Please refer to our internet site http://www.stevens-bolton.co.uk/email if you would like more information on this issue. However if you communicate with us by e-mail we will take it that you have assumed the risks involved in using such a medium.

Registered in England, No 3250572
Authorised and Regulated by the Financial Services Authority

--
This e-mail, together with any attachments, is confidential between the sender and addressee(s). If you are not the intended r=
ecipient(s) of this
e-mail you should not copy it or use it for any purpose = nor disclose its contents to any person, to do so may be unlawful. If you ha= ve received this e-mail by mistake please notify the sender immediately by e= -mail and delete this e-mail and any attachments from your system. To the ma= ximum extent permitted by law, London International Bank Ltd accepts no liab= ility for any loss or damage resulting from unauthorised use of this email o= r any attachment or from unauthorised use of any information contained or im= plied in the email or attachments.

Registered in England, No 3250572
Authorised and Regulated by the Financial Services Authority
-

This e-mail, together with any attachments, is confidential between the sender and addressee(s). If you are not the intended r= ecipient(s), of this e-mail you should not copy it or use it= for any purpose nor disclose its contents to any person, to

01.05.2008

Re: JWL and Charleswood [SB-LIVE.FID69201]

or so may be unlawful. If you have received this e-mail by mistake please notify the sender immediately by e-mail and delete this e-mail and any attachments from your system. To the maximum extent permitted by law, London International Bank Ltd. accepts no liability for any loss or damage resulting from unauthorised use of this email or any attachment or both, or authorised use of any information contained or implied in the email or attachments.

**2**

Case 1:08-cv-03363-RJS    Document 36-6    Filed 06/18/2008    Page 71 of 122
Re: AW: AW: Proposed meeting tomorrow
Seite 1 von 4

Andrew Baker

| | |
|---|---|
| **Von:** | David Ashfield [d.ashfield@londonintbank.com] |
| **Gesendet:** | Mittwoch, 30. April 2008 20:01 |
| **An:** | Andrew Baker |
| **Cc:** | Ali Guidfar |
| **Betreff:** | RE: AW: AW: Proposed meeting tomorrow |

Andrew, I have been advised by our lawyer Timothy Eppel of McFadden's that some of the items on your agenda may be dealt with in court in Gibraltar tomorrow and consequently they would suggest that we meet at 14.00 here in our offices on Friday 2nd May. Best Regards,

**David Ashfield**
Director
**Fisher Island Ltd**
11 Grosvenor Place, SW1X 7HH

Blackberry. +44 7921881027
Tel: +44 2071705591
Fax: +44 2071705510

**From:** Andrew Baker [mailto:andrew.baker@miselva.li]
**Sent:** 30 April 2008 16:08
**To:** David Ashfield
**Cc:** Ali Guidfar
**Subject:** AW: AW: AW: Proposed meeting tomorrow

Dear David, dear Ali,

Further to your e-mails yesterday I now understand why you were not keen to meet with me yesterday in any event.

In the current circumstances, is your invitation to meet together with our respective lawyers tomorrow at 11:00 a.m. still open? There would be no point in my making another special journey to London if you were not going to be able to provide me / us with the detailed information I need as mentioned in our previous exchanges.

Best regards

Andrew

-----Ursprüngliche Nachricht-----
**Von:** David Ashfield [mailto:d.ashfield@londonintbank.com]
**Gesendet:** Dienstag, 29. April 2008 12:12
**An:** Andrew Baker
**Cc:** Ali Guidfar
**Betreff:** Re: AW: AW: Proposed meeting tomorrow

Andrew specifically can we say 11.00 on Thursday? Regards,

David Ashfield

01.05.2008

Case 1:08-cv-03363-RJS   Document 36-6   Filed 06/18/2008   Page 72 of 122
Re: AW: AW: Proposed meeting tomorrow
Seite 2 von 4

London International Bank Ltd
11 Grosvenor Place, SW1X 7HH
Mobile: +44 7887897329
Blackberry: +44 7921881027
Tel: +44 2071705591
Fax: +44 2071705510

-----Original Message-----
From: David Ashfield
To: 'andrew.baker@miselva.li'
CC: Ali Guidfar
Sent: Tue Apr 29 11:10:33 2008
Subject: Re: AW: AW: Proposed meeting tomorrow

Andrew, I am afraid that we cannot meet today can we please meet on Thuirsday if possible? Sorry about this late notice. Regards,

David Ashfield

London International Bank Ltd
11 Grosvenor Place, SW1X 7HH
Mobile: +44 7887897329
Blackberry: +44 7921881027
Tel: +44 2071705591
Fax: +44 2071705510

-----Original Message-----
From: Andrew Baker
To: David Ashfield
Sent: Tue Apr 29 07:57:58 2008
Subject: AW: AW: Proposed meeting tomorrow

Dear David

In view of the urgency and importance of protecting the various assets, I will come to your offices without lawyers at about 12 neon today.

Kind regards

Silvia on behalf of Andrew
-----Ursprüngliche Nachricht-----
Von: David Ashfield [mailto:d.ashfield@londonintbank.com]
Gesendet: Montag, 28. April 2008 20:55
An: Andrew Baker; Ali Guidfar
Cc: esly@paynehicksbeach.co.uk
Betreff: Re: AW: Proposed meeting tomorrow


You will understand that Ali and I do not feel comfortable in meeting with you and your lawyer without having representation ourselves. If you want to come along on your own tomorrow we would be happy to have a constructive discussion about matters of mutual concern and interest but if you insist on having a solicitor with you then I would prefer that we wait until we can properly brief someone ourselves, which would probably mean meeting early next week. We are sure you will appreciate our position. Regards,

David Ashfield

London International Bank Ltd
11 Grosvenor Place, SW1X 7HH
Mobile: +44 7887897329
Blackberry: +44 7921881027
Tel: +44 2071705591

01.05.2008

Re: AW: AW: Proposed meeting tomorrow

Fax: +44 2071705510

-----Original Message-----
From: Andrew Baker
To: David Ashfield; Ali Guidfar
CC: Chris Sly (E-Mail)
Sent: Mon Apr 28 18:44:39 2008
Subject: AW: Proposed meeting tomorrow

Dear David and Ali,

Many thanks - I understand your position but this should not be a problem. We do no intend to discuss any of the points in issue in the Gibraltar proceedings or relating to the role or powers of Fallon.

The principal purpose of the meeting is to brief me on the present state of affairs in the various companies under Valmore, Summit, Jorum and Nile in which you and Ali are concerned or for which LIB provides services.

This is simply part of the trustees' and administrators' duties in relation to which I am not aware of any issue concerning Fallon.

It will be a great help to us if we can make a start, tomorrow, as planned and I would appreciate your confirmation as soon as possible that we can still meet as arranged.

Kind regards,

Andrew

-----Ursprüngliche Nachricht-----
Von: David Ashfield [ mailto:d.ashfield@londonintbank.com]
Gesendet: Montag, 28. April 2008 18:12
An: Andrew Baker
Cc: Ali Guidfar
Betreff: Proposed meeting tomorrow


Andrew, thank you for your agenda. It seems to me and to Ali that these are matters that relate to the procedings that have been brought in Gibraltar and we would like to have in attendance a lawyer for Fallon. As this will take a few days for a lawyer to be briefed in Gibraltar, can we arrange our meeting for next Tuesday. We would prefer Monday but it is a bank holiday here on that day. Regards,


David Ashfield

London International Bank Ltd
11 Grosvenor Place, SW1X 7HH
Mobile: +44 7887897329
Blackberry: +44 7921881027
Tel: +44 2071705591
Fax: +44 2071705510


Registered in England. No 325057= 2
Authorised and Regulated by the Financial Services Authority
=
This e-mail, together with any att= tachments, is confidential between the sender and addressee(s). If you are n= ot the intended recipient(s) of this e-mail you should not copy it or use it= for any purpose r or disclose its contents to any person: to do so may be un= lawful. If you have received this e-mail by mistake please notify the sender= immediately by e-mail and delete this e-mail and any attachments from your = system. To the maximum extent permitted by law, London International Bank Lt= d accepts no liability for any loss or damage resulting from unauthorised us= e of this email or any attachment or from unauthorised use of any informatio= n contained or implied in the email or attachments.


01.05.2008

Registered in England, No 325057= 2
Authorised and Regulated by the Financial Services Authority

This e-mail, together with any at= tachments, is confidential between the sender and addressee(s). If you are n= ot the intended recipient(s) of this e-mail you should not copy it or use it= for any purpose r or disclose its contents to any person: to do so may be un= lawful. If you have received this e-mail by mistake please notify the sender= immediately by e-mail and delete this e-mail and any attachments from your = system. To the maximum extent permitted by law, London International Bank Lt= d accepts no liability for any loss or damage resulting from unauthorised us= e of this email or any attachment or from unauthorised use of any informatio= n contained or implied in the email or attachments.

Registered in England, No 325057= 2
Authorised and Regulated by the Financial Services Authority

This e-mail, together with any at= tachments, is confidential between the sender and addressee(s). If you are n= ot the intended recipient(s) of this e-mail you should not copy it or use it= for any purpose r or disclose its contents to any person: to do so may be un= lawful. If you have received this e-mail by mistake please notify the sender= immediately by e-mail and delete this e-mail and any attachments from your = system. To the maximum extent permitted by law, London International Bank Lt= d accepts no liability for any loss or damage resulting from unauthorised us= e of this email or any attachment or from unauthorised use of any informatio= n contained or implied in the email or attachments.

Registered in England, No 3250572
Authorised and Regulated by the Financia=
l Services Authority

--
This e-mail, together with any attachments, is con=
fidential between the
sender and addressee(s). If you are not the intended r=
ecipient(s) of this
e-mail you should not copy it or use it for any purpose =
nor disclose its
contents to any person: to do so may be unlawful. If you ha=
ve received this
e-mail by mistake please notify the sender immediately by e=
-mail and delete
this e-mail and any attachments from your system. To the ma=
ximum extent
permitted by law, London International Bank Ltd accepts no liab=
ility for any
loss or damage resulting from unauthorised use of this email o=
r any
attachment or from unauthorised use of any information contained or im=
plied
in the email or attachments.

**Exhibit I**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
MOTOROLA CREDIT CORPORATION and      :
NOKIA CORPORATION,                    :
                                      :
                Plaintiffs,           :
                                      :            02 Civ. 666 (JSR)
                -v-                   :
                                      :            <u>MEMORANDUM ORDER</u>
                                      :
KEMAL UZAN, et al.,                   :
                                      :
                Defendants.           :
-----------------------------------------X



JED S. RAKOFF, U.S.D.J.

     Pursuant to Rule 65, Fed. R. Civ. P., and also to the All

Writs Act, plaintiffs Motorola Credit Corporation and Nokia

Corporation move to enjoin the defendants and those acting in

concert with them from proceeding with a newly-filed Turkish

injunction action and a previously-filed Turkish attachment

action.  Full familiarity with all prior proceedings in this case

is here presumed.

     The facts pertinent to the instant motion are as follows.

Following the initiation of this suit in New York, Telsim

Telekominkasyon Hizmetleri Anonim Sirketi ("Telsim") and Rumeli

Telefon Sistemleri A.S. ("Rumeli Telefon"), which are non-parties

to the lawsuit but controlled by the defendants here, filed

(between them) demands for three arbitrations in Switzerland and

one in France that with the exception of the latter threatened to

interfere with this litigation.  In connection with one of the

Swiss demands, Telism obtained an order from the Turkish Civil

Court of First Instance for the District of Kucukcekmece

attaching the property of Motorola Komunikasyon Ticaret ve Servis
Ltd. Sti. ("Motorola Turkey") and Motorola Ltd., both of which
are affiliates of plaintiff Motorola Credit Corporation. See
Declaration of Allison G. Kort, dated December 30, 2002, Exhibit
1, at 6.

Thereafter, following considerable delay, defendants in this
action belatedly moved in this Court to compel arbitration, and
plaintiffs cross-moved to enjoin defendants and those acting in
concert with them (such as Telsim and Rumeli Telfon) from
pursuing the arbitrations. The Court, by Orders dated September
30, 2002 and October 15, 2002, denied defendants' motion and
granted plaintiffs' motion (except as to the French arbitration),
finding, <u>inter alia</u>, that the Swiss arbitrations had been
"commenced in an effort to undercut the prior orders of, and
proceedings before, this Court." Memorandum Order, dated October
15, 2002, at 7.

At no time prior to the issuance of these orders did the
defendants seek to stay this lawsuit, or any ancillary
proceedings, pending issuance of the Court's decision on the
arbitration issue and any appeal therefrom. Nevertheless, on
October 21, 2002, over nine months after the initiation of the
suit, defendants filed a motion to stay the entire lawsuit
pending their appeal of the Court's September 30 and October 15
Orders. While recognizing that defendants may well have waived

2

any right to the relief they so belatedly sought, the Court, by Order dated October 28, 2002, denied defendants' stay motion on the merits, concluding that "a stay would only serve to advance the very machinations for which defendants [had] previously been found in contempt of court." Memorandum Order, dated October 28, 2002, at 2.

Unable to secure their desired relief in this Court, the defendants and their proxies returned to the court in Kucukcekmece. On November 27, 2002, in plain contravention of this Court's September 30 and October 15 Orders, the individual Uzan defendants (Kemal Uzan, Cem Cengiz Uzan, Murat Hakan Uzan, Melahat Uzan, Aysegul Akay, and Antonio Luna Betancourt) and the defendant-controlled company Telsim, filed an <u>ex parte</u> petition in the Turkish Civil Court of Kucukcekmece against plaintiffs and Motorola, Inc. seeking to stay the instant action, and to vacate the injunction and attachment decisions issued in connection thereto, as well as to stay the ancillary proceedings in England, Germany, France, Bermuda, and Channel Island Guernsey. See Affidavit of Samir Varma, dated December 20, 2002, Exhibit A (Civil Court of Kucukcekmece, Turkey, preliminary injunction Order, dated November 27, 2002). In response, the Turkish Court, that very day, issued an order granting the relief requested.[1]

_____

[1] The order issued by the Turkish Court purports on its face to enjoin, not the plaintiffs, but this Court itself (as well as various foreign courts), a power no foreign court possesses. This

3

Plaintiffs now seek an order from this Court enjoining defendants from further pursuing this Turkish action and, instead, requiring them to terminate the action and dissolve the earlier-issued attachment. While "it is well-settled that a federal court has the power to enjoin a party before it from pursuing litigation before a foreign tribunal," U.S. v. Davis, 767 F.2d 1025, 1038 (2d Cir. 1985), considerations of comity counsel that such injunctions be "used sparingly." Id. As a preliminary matter, two threshold requirements for issuance of such an anti-foreign suit injunction must be met, to wit (1) the parties must be the same in both matters, and (2) resolution of the case before the enjoining court must be dispositive of the action to be enjoined. See China Trade & Dev. Corp. v. M.V. Choong Yong, 837 F.2d 33, 35 (2d Cir. 1987).

Here, both these threshold requirements are satisfied. With regard to the Turkish injunction action filed on November 27, 2002, although Telsim and Motorola, Inc. are parties to the Turkish, but not to the U.S. action, and although Unikom Iletism Hizmetleri Pazarlama A.S. ("Unikom"), Standart Pazarlama A.S. ("Standart P."), and Standart Telekomunkikasyon Bilgisayar

---

Court can only assume that something has been lost in translation and that the Turkish Court in fact meant to enjoin the plaintiffs from prosecuting these actions, as whatever the jurisdiction of the Turkish court over Motorola Credit Corporation, Motorola, Inc, and Nokia Corporation, the Turkish court has no jurisdiction over the courts of foreign sovereigns.

4

Hizmetleri A.S. ("Standart T.") are parties to the U.S., but not to the Turkish, action, the real parties in interest are the same in both matters.   Indeed, the Court has previously found that Telsim is owned and controlled by, and is in the respects here relevant a mere proxy for, defendants.   See also Nagoya Venture Ltd. v. Souza, 1998 U.S. Dist. Lexis 8580, at *19 (S.D.N.Y. June 11, 1998).   As to Motorola, Inc., Unikom, Standart P. and Standart T., these entities were not necessary to the Turkish action, since the purpose of the action was to stay suits brought by Motorola Credit Corporation and Nokia Corporation (not Motorola, Inc.), and the individual Uzan defendants and Telsim obtained this relief despite the non-joinder of the other corporate entities.   See MasterCard Int'l, Inc. v. Argencard Sociedad Anonima, 2002 U.S. Dist. Lexis 4625, at *30-31 (S.D.N.Y. March 20, 2002) (holding that the identity of party requirement was satisfied despite the intervention of an additional party in the foreign proceeding since this party was not a necessary party to the action).   In addition, the only issue to be decided by the Turkish court is whether this and other actions should be dismissed in favor of arbitration, a question that this Court has already resolved in plaintiffs' favor. See China Trade, 837 F.2d at 35.

With regard to the Turkish attachment action filed on June 19, 2002, the relevant parties are Telsim, a proxy for defendants

5

in all respects here relevant, as well as Motorola Turkey and
Motorola, Ltd., affiliates of plaintiff Motorola Credit
Corporation.  Again, the sole question before the Turkish court
in the attachment action concerns the propriety of the Swiss
arbitration, a matter that this Court has now resolved.

Once the threshold requirements are met, the issue becomes
one of informed discretion.  Here, the Court finds that with
regard to both Turkish suits numerous supplemental factors
support the issuance of an anti-foreign suit injunction against
the defendants: (1) the Turkish actions threaten this Court's
jurisdiction (indeed, the Turkish injunction suit has purported
to stay proceedings in, and to nullify preliminary orders issued
by, this Court); (2) the Turkish actions frustrate the United
States' stated interest in prosecution of civil RICO claims; and
(3) the Turkish actions were initiated by defendants in
contravention of and in a tactical effort to evade the prior
orders of this Court. See id. at 36-37; Mastercard Int'l, 2002
U.S. Dist Lexis 4625, at *31-32. These factors more than
overbalance any countervailing considerations of comity or
otherwise.

Accordingly, the Court pursuant to Rule 65, Fed. R. Civ.
P., hereby directs defendants, their proxies, and all others in

---

' Finding that the Court's power pursuant to Rule 65 is
sufficient to grant the requested relief, the Court need not
reach the question of whether the remedy could also issue under

concert with them, to take all steps necessary to withdraw and cause to be dissolved the Turkish injunction granted on November 27, 2002 and the action on which it is premised, and enjoins defendants from initiating any similar proceeding; and further, bars them from effectuating the attachment entered on June 19, 2002 against Motorola Turkey and Motorola Ltd. in connection with the Swiss arbitration and, instead, requires them to seek its immediate dissolution.

SO ORDERED.

_____
JED S. RAKOFF, U.S.D.J.

Dated:     New York, New York
           January 6, 2003

_____

the All Writs Act, 28 U.S.C. § 1651.

7

**Exhibit J**

Case 1:08-cv-00362-RJS    Document 36-6    Filed 06/18/2008    Page 94 of 122

# U.S. DEPARTMENT *of* STATE

## Georgia

Country Reports on Human Rights Practices - 2007
Released by the Bureau of Democracy, Human Rights, and Labor
March 11, 2008

The constitution of the Georgian republic provides for an executive branch that reports to the president, a unicameral Parliament, and an independent judiciary. The country has a population of approximately 4.4 million. In 2003 former president Shevardnadze resigned during what became known as the Rose Revolution. Mikheil Saakashvili won the presidency in 2004 with over 90 percent of the vote, and his National Movement Party won a majority of seats in the Parliament. International observers determined that the 2004 presidential and parliamentary elections represented significant progress over previous elections and brought the country closer to meeting international standards, although several irregularities were noted. Following a series of protests throughout the country in the fall, President Saakashvili officially resigned on November 25, calling for a snap presidential election to be held on January 5, 2008, cutting his term of office short by one year. Civilian authorities generally maintained effective control of the security forces.

While the government's human rights record improved in some areas during the year, its record worsened in other areas, especially during the fall, and serious problems remained. There was at least one reported death due to excessive use of force by law enforcement officers, cases of torture and mistreatment of detainees, abuse of prisoners, excessive use of force to disperse demonstrations, poor conditions in prisons and pretrial detention facilities, impunity of police officers, continued overuse of pretrial detention for less serious offenses, lack of access for average citizens to defense attorneys, lack of due process in some cases, and reports of government pressure on the judiciary. Respect for freedom of speech, the press, assembly and political participation worsened, especially during the fall crisis. Other problems included reports of government pressure on the judiciary and the media, restrictions on freedom of assembly and freedom of speech, and corruption among senior-level officials. Despite government efforts, trafficking-in-persons continued to occur.

Prior to the fall political crisis, the government took some significant steps to improve the human rights situation. For example, Parliament adopted legislation that prohibited communication between judges and parties about cases outside the courtroom, adopted a Code of Ethics for Judges, and the government opened the High School of Justice to train judges as part of the continued broad reform of the judiciary. The Permanent Interagency Coordination Council approved a mechanism to reintegrate trafficking victims into society, significantly increased the budget to assist victims, and opened the first shelter for them in Tbilisi.

De facto authorities in the separatist regions of Abkhazia and South Ossetia remained outside the control of the central government; ceasefires were in effect in both areas, although incidents of violence, including deaths, occurred in both areas. In both Abkhazia and South Ossetia, deprivation of life, arbitrary arrest, and detention continued to be serious problems. The de facto authorities in Abkhazia continued to restrict the rights of citizens to vote and to participate in the political process through a "citizenship" law that forced ethnic Georgians to give up their Georgian citizenship in order to vote in local elections. A 2006 property law prevented internally displaced persons living in other parts of the country from reclaiming homes they fled in Abkhazia in 1992/1993. Authorities did not permit instruction in the Georgian language in the predominantly ethnic Georgian Gali district schools in Abkhazia.

**RESPECT FOR HUMAN RIGHTS**

Section 1 Respect for the Integrity of the Person, Including Freedom from:

a. Arbitrary or Unlawful Deprivation of Life

The government or its agents did not commit any politically motivated killings.

On April 15, the Ministry of Internal Affairs opened an investigation against four officers of the Vake-Sabutarlo District Unit--L. Gelbakhiani, M. Chaduneli, G. Kokolishvili, and G. Sakhamberidze--on allegations that they exceeded the limits of official authority and inflicted grave injury on A. Khositashvili, which resulted in his death. On December 11, the officers were convicted of torture and fraud and given sentences that ranged from 11 years' imprisonment to three years probation and a fine of $3,125(5,000 lari)

According to the Prosecutor General's Office, it opened an investigation in June 2006 to determine if the actions of law enforcement agents were in accordance with the law during the prison riot at Tbilisi Prison No. 5 in March 2006. The Department of Prisons alleged that the "thieves in law" criminal group was organizing mass disturbances at a prison hospital, and prison authorities had planned to move disruptive prisoners to another facility to resolve the issue. The head of the Department of Prisons, along with

officers from the Investigative Department of the Ministry of Justice, arrived at the prison on March 27. Six prisoners resisted being moved from the hospital and incited others to riot during the attempted transfer. Four prisoners were taken away, but the disturbances reached Tbilisi prisons no. 5 and no. 1.

In Prison No.5 cell doors and bars were broken and a fire was started, endangering the lives of inmates. In order to regain control of Prison No.5, a Special Task Force of the Department of Prisons was ordered to free the Prison No. 5 entrance blocked by inmates. After the blocked entrance of the building had been cleared, the Director of Prison No. 5 and several Special Task Force officers entered the building and called for order. The inmates began to move toward the officers, throwing stones and pieces of metal and wood at them. In response, the Special Task Force officers fired rubber bullets, to which, prisoners responded with gunfire. The Special Operations Task Force opened fire only after prisoners initiated gunfire. As a result of these events, two of the Special Operation Task Force officers were wounded, seven prisoners died and 22 prisoners were injured. All 24 of the injured were medically examined.

The Public Defender's 2006 Human Rights Report stated that the Penal Department's Administration provoked the riot in Tbilisi Prison No. 5 and during the suppression of the riot, special forces armed with machine guns used disproportionate force to quell the violence. Inmates specifically alleged that Bacho Akhalaia, Chief of the Penitentiary Service, verbally and physically assaulted several inmates and violently tortured three others. The report stated also that the public defender confirmed that six inmates were tortured, but no medical forensic examinations of the injured inmates took place.

In the course of the criminal investigation, 190 inmates were questioned. The forensic examination confirmed the cause of death for the seven inmates was a bullet wound. Upon the recommendation of the public defender, the OSCE's Chairman-in-Office, and Human Rights Watch (HRW), in September 2006 the government opened seven separate investigations to ascertain if officers exceeded the limits of their authority. As of year's end, these investigations were ongoing.

In July 2006 four Ministry of Internal Affairs officers were convicted in the January beating death of Sandro Girgvliani and sentenced to prison terms of from seven to eight years. The officers appealed to the Supreme Court after the trial court's decision was upheld by the court of appeal. In July the Supreme Court removed six months from the final sentences for all four defendants, based on changes to the law regarding destruction of property, one of the charges against the officers. Many observers believed that senior ministry officials ordered his beating. Both HRW and the International Crisis Group's (ICG) December reports on Georgia stated that, while the fall charges and arrest of former Defense Minister Okruashvili galvanized the opposition protests in October and November, the perceived lack of full accountability in the Girgvliani case was an additional factor in mobilizing the opposition.

The Prosecutor General's Office investigated five of 12 deaths in 2006 cited by NGOs as evidence of police use of excessive force. In the case of the deaths of Aleksandre Khubulovi and Zurab Vazagashvili, the office concluded that the actions of the police officers were lawful, and on April 20 the investigation was terminated. An appeal of this decision continued at year's end.

Following an investigation into the charge that police had used excessive force in the deaths of Murman Movsesiani, Gela Gaidenini, and Levan Darsadze, the Kutaisi unit of the Ministry of Internal Affairs concluded that the police had only fired when the suspects fired on them and that the police officers did not exceed the limits of their authority. On February 15, the investigation was terminated.

Two police officers were suspended pending an investigation of the December 2006 death in Kutaisi of Valeri Pkhakadze, who was allegedly shot and beaten by police investigating a break-in. One of the officers, I. Kapadze, was charged with murder for exceeding the limits necessary for the apprehension of a suspect and placed in pretrial detention. Other patrol officers at the scene were charged with negligence of duty, and were fined $1,250(2,000 lari). On February 5, the criminal case was submitted to the Kutaisi City Court and was ongoing at year's end.

In July 2006 the judgment of the Tbilisi City Court was appealed by the prosecutor in the 2004 conviction of Roland Minadze, a police officer who was found guilty of falsification and fabrication of evidence in connection with the beating of Khvicha Kvirikashvili and sentenced to four years' imprisonment. The Tbilisi Appellate Court upheld the judgment. Roland Minadze went into hiding and was at large at year's end.

The criminal case into alleged fabrication of evidence against Akaki Bartaia, Kakhaber Azariashvili, and Giorgi Kurdadze in the 2004 death of Amiran Robakidze was ongoing at year's end.

There were reports of arbitrary and unlawful killings in the separatist areas of South Ossetia and Abkhazia, areas not under government control. Arbitrary violence continued in Abkhazia and South Ossetia. In Abkhazia, one businessman from Sukhumi working in Gali was killed.

There was one report of a child's death due to landmines in Abkhazia. No deaths due to landmines were reported in South Ossetia during the year.

b. Disappearance

There were no reports of politically motivated disappearances perpetrated by the government. However, conflict-related disappearances and kidnappings were frequent during the year in the separatist regions of Abkhazia and South Ossetia. Since January, nine kidnappings and two attempted kidnappings occurred in Abkhazia.

Other parts of this report contain information related to this section; see section 1.g.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The constitution and law prohibit such practices; however, there were reports that government officials continued to employ them.

According to the public defender's office and human rights monitors, abuse in police stations remained low due to ongoing unannounced and random monitoring of stations, while incidents of police abuse during arrest persisted, but declined. According to the public defender's office, instances of abuse at isolators of temporary detention had been practically eliminated by year's end, but some cases of physical abuse were reported directly to the police stations.

Following a spring visit to the country, the Council of Europe's Committee for the Prevention of Torture (CPT) reported receiving "numerous and consistent allegations of prisoners being beaten upon admission as well as in other contexts" at the Rustavi Prison 6. The CPT reported that it did not receive any allegations of recent physical mistreatment of prisoners at four other prisons that it visited.

During the year the public defender's office visited 303 prisons and pretrial detainment facilities. Overall, there were six cases of suspected torture but only one of these cases was confirmed. In the other instances, the perpetrators were not charged specifically with torture, but with lesser offenses. The public defender's office regularly monitored Ministry of Internal Affairs police precincts during year, making 1,142 visits. The office found 308 cases in which detainees were arrested with physical injuries; however, only 26 detainees alleged that they received their injuries from police. The office did not report that victims feared police retribution, but there was a perception that victims still feared police retribution for filing complaints. The Prosecutor's Office opened investigations in 20 of these cases. Of the 20 cases, six investigations were closed due to lack of evidence and 14 cases were ongoing at year's end. In 2006 there were 262 detainees arrested with injuries, out of which 32 reported cases of physical abuse by police.

During the year the Human Rights Protection Unit of the Prosecutor General's Office took steps to address torture and mistreatment by random monitoring of pretrial and prison facilities. The office reported 89 instances during the year of detainees entering pretrial detention with injuries. In response, it launched 20 investigations, which were ongoing at year's end. During the year 23 Ministry of Internal Affairs officers were sentenced in seven criminal cases of torture and mistreatment, compared to seven persons convicted on four criminal cases in 2006.

On March 14, the Poti City Court convicted transport police officers T. Shurghulaia, K. Lataria, P. Jghamadze, A. Sikhuashvili, G. Kharchilava, R. Kachavava, and T. Sajaia of involvement in the false arrest, torture, and death of T. Mikia, who was subjected to torture and who fell to his death from the second floor of the police station under unclear circumstances. The officers received sentences ranging from three years' imprisonment and a fine of $9,375(15,000 lari) for exceeding the legal limits on police authority to 13 years' imprisonment for deliberately inflicting grave injury and exceeding the legal limits on police authority.

On April 10, Rustavi Prison 2 officers David Shubitidze, Kakha Sharumashvili, and Davit Jighauri were convicted of having exceeded the limits of their authority by physically abusing inmate Robert Makharashvili on February 18. They were sentenced to one year in prison.

On April 29, officers B. Khvhistani, K. Sopromadze, and

J. Jankhoteli were found guilty of physically and morally insulting arrestees K. Chrelashvili, G. Bregadze, L. Beruchuashvili, V. Muraviov, and G. Jibladze. Their sentences ranged from seven to eight-and-a-half years' imprisonment.

On May 9, in the Zugdidi District Court, Badri Sordia of the Special Operational Department of the Ministry of Internal Affairs was sentenced to 11 years in prison for inflicting bodily injuries on Zaal Akobia and Vakhtang Guchua in 2005.

Officers G. Bitiashvili, R. Chitishvili, and K. Kesauri were charged with exceeding the limits of their authority against Merab Burdiashvili; on May 14, the Court of Appeal sentenced Kesauri to five years' imprisonment in absentia. On March 16, Chitishvili and Bitiashvili were sentenced to seven years imprisonment and prohibited from holding a government position, including law enforcement work, for a period of two years.

On November 20, the Mstkheta District court sentenced officers Bondo Tatunashvili and Besik Orkodashvili to two years of probation, a fine in the amount of $3,125(5,000 lari), and suspension from work for three years. They had been charged in August 2006 with exceeding the limits of official authority through torture and violence against pupils at Akhalgori Secondary school.

On December 11. Vake-Sabutarlo District Unit officers L. Gelbakhiani, M. Chaduneli, G. Kokolishvili, and G. Sakhamberidze were convicted of torture and fraud and given sentences that ranged from 11 years' imprisonment to three years probation and a fine of $3,125(5,000 lari).

There were significant obstacles to bringing cases of police torture and mistreatment to light. NGOs reported victims often did not report abuse, fearing police retribution against them or their families.

NGOs continued to claim that close ties between the Prosecutor General's Office and police hindered their ability to substantiate

police misconduct. NGOS alleged also that a lack of professionalism and independence of the judiciary made it unresponsive to torture allegations. As a result, despite implementation of positive reforms, NGOs claimed law enforcement officials could still resort to torture or mistreatment with limited risk of exposure or punishment. NGOs also believed a lack of adequate training for law enforcement officers, as well as low public awareness of the protections afforded citizens, impeded improvements.

According to Ministry of Internal Affairs statistics, during the year 4,328 of the 24,680 detainees held by authorities were registered with injuries. Of these, 186 claimed to have been beaten by police. The general inspector's office of the ministry referred 145 of the cases to the prosecutor general's office for further investigation. Of these, 108 investigations were on-going at year's end; police were acquitted of wrongdoing in 23 cases. The public defender's office noted that monitoring groups found no instances where police officers had incorrectly registered a detainee upon arrival at the police station, which previously had been a means for police officers to conceal abuse.

All law enforcement officers and representatives of the prosecutor's office, except for officers of the special police unit, were required to wear identity badges during meetings with detainees and prisoners. Special police units were exempted to protect members' anonymity. NGOs believed this prevented accountability for any abuse by the units.

In January 2006 Mikheil Chkheidze alleged police officers mistreated him in the Bagdati region when he and a friend were stopped for questioning. During the trial, Chkheidze said that his previous testimony was aimed at avoiding criminal responsibility, and in May 2006 the criminal investigation was closed on the basis of lack of evidence of a crime.

In February 2006 Batumi police patrol officer Mamuka Jincharadze reportedly beat severely Jemal Baramidze of Batumi with his pistol after stopping him for speeding, causing serious injury. In August 2006 the Kehlvachauri District Court convicted Jincharadze of exceeding police authority and sentenced him to three years' imprisonment. During his appeal at the Kutaisi Court of Appeals, Jincharadze pled guilty, and the court sentenced him to two years' imprisonment, followed by probation for one year.

In May 2006 Eduard Jaogli alleged police officers mistreated him in the Isani-Samgori police station, resulting in injuries. Investigators in the case concluded that, during his arrest, Jaogli resisted and proportionate force was used to apprehend him. Upon being charged, Jaogli suffered an epileptic shock, lost consciousness, and fell to the floor. He was taken by ambulance to a Tbilisi clinic. According to medical records, Jaogli had knee injuries. These injuries contradicted Joagli's statements that police officers had beaten him in the face and on the body. A witness present at Jaogli's arrest stated that no visible injuries were evident. Based on these facts, it was ruled that Joagli had not been subjected to mistreatment, and the investigation was terminated on April 27.

In September 2006 Gia Razmadze alleged mistreatment by police officers in the Kvemo Kartli region. A forensic expert examined x-rays taken of Razmadze on the day of his arrest and determined that the injuries at issue did not indicate any criminal offense on the part of police, and the case was closed on October 24.

Avtandil Khvinchiashvili alleged he sustained injuries as a result of excessive use of force by police during questioning in November 2006 in the Gldani-Nadzaladevi district. Police officers testified that Khvinchiasvhili resisted arrest and proportionate force was used to apprehend him. A forensic report indicated that Khvinchiasvhili suffered light injuries. A witness, a local business owner, testified that Khvinchiashvili and another man were drunk and not conducting themselves appropriately, so he called the police. The witness corroborated the police testimony, and it was established that the police officers were acting within the limits of the law. On April 30, the investigation was terminated.

The investigation continued at year's end into the alleged 2005 beating of inmate Eldar Konenishvili in Prison No. 1 and later at Gurdzhani police station. As part of its investigation, the special commission interrogated prisoners, officials and medical personnel in Prison No. 1, escorting officers, and law enforcement officers and other witnesses at Gurdzhani police station. The commission also reviewed results of a 2005 medical examination of Konenishvili, which included a computer-assisted tomography scan, magnetic resonance imaging, and x-rays. In June 2006 a prosecutor who was involved in the case left the prosecution service, reportedly of his own volition.

An investigation by the Prosecutor General's Office continued into former chief of the State Audit Agency Sulkhan Molashvili's allegation that he was tortured while in pretrial detention in 2004. Molashvili's attorneys appealed his case to the European Court of Human Rights in 2006, and at year's end Molashvili was being held in the prison hospital. According to the Prosecutor General's Office, Molashvili continued to refuse to identify the alleged perpetrators who tortured him.

Other sections of this report contain information related to this section; see sections 1.d., Role of the Police and Security Apparatus and 2.b.

Prison and Detention Center Conditions

During the year the number of deaths in the penitentiary system increased. According to the Ministry of Justice, 100 prisoners died during the year, compared with 92 in 2006. Most deaths were related to poor medical care and health issues. However, although the total overall number of prisoner deaths increased over the last six years as the overall number of prisoners rose, the mortality rate of deaths decreased. Of the 100 deaths, at least five were reported as suicides on the Justice Ministry's Web site. The public defender's office reported that it frequently petitioned prison officials to obtain necessary medical treatment for inmates.

Attempted suicides and self-mutilation occurred in prisons as protests against declining prison conditions and human rights violations. There were also sporadic hunger strikes by prisoners to protest poor conditions, visitor limitations, and the perceived arbitrary parole policy of the government.

Conditions in many prison and pretrial facilities generally remained poor and did not meet international standards. The public defender's office, the Organization for Security and Cooperation in Europe (OSCE), the CPT, and many NGOs, including HRW, continued to report inhuman and life-threatening conditions, including poor facilities, overcrowding, and inadequate nutrition and health care. Most prison and pretrial detention facilities lacked adequate sanitary facilities. In his December bi-annual report, the public defender recommended the Ministry of Justice work to improve the hygienic conditions, by improving shower facilities and laundries in the prisons and creating proper air ventilation to ameliorate conditions.

In March 2006, after the public defender's office called for an investigation, the Prosecutor General's Office opened an investigation into the beating of Iago Tsikvadze in Tbilisi Prison No. 1. According to a statement Tsikvadze gave to the public defender's office, he was beaten severely by prison officials, including the head of the prison, Temur Tabaghua. Tsikvadze stated also that prison officials denied his requests to see a doctor. Investigators in the case questioned Tabaghua and other inmates. All of them denied that Tsikvadze was beaten. The case was closed on March 31 after the investigation concluded that there was no evidence of a crime.

In September Shalva Ramishvili of independent TV 202 reportedly submitted a case to the European Court of Human Rights in connection with his January 2006 temporary move by prison officials from his regular cell to a carcer, a small disciplinary solitary confinement cell, which Ramishvili alleged lacked necessary ventilation and sanitary facilities.

Five prisons out of 17 institutions and pretrial detention facilities were overcrowded severely, sometimes at double their capacity, due to the increase in the prison population as the government cracked down on crime since 2004. According to government statistics, at the beginning of the year, an estimated 21.7 percent of inmates were detainees awaiting trial. While this was an improvement over previous years, the high figure continued to indicate a backlog of court cases.

Tbilisi Prison No. 5 continued to be used as a pretrial detention facility. As of December 21, 2,661 prisoners remained in Tbilisi Prison No. 5, exceeding the official capacity of 1,881 by 41 percent.

The investigative service of the Department of Prisons conducted investigations into alleged misconduct by prison officials. During the year the service opened investigations into allegations that prison officials brought prohibited items such as illegal narcotics onto prison grounds. For example, in October 2006 Ramaz Gabisonia, an official in the women's prison, was detained on charges of bribery and possession of prohibited items on prison grounds. On March 12, Gabisonia was convicted for commission of bribery and passing prohibited objects to a prisoner and was sentenced to two years of imprisonment.

With the exception of the new prisons in Kutaisi, Rustavi, and Gldani, prisons severely lacked medical facilities, including equipment and medicines. In the autumn, the Department of Prisons announced an open tender for purchasing medical insurance service for prisoners for three years. The tender was won by the insurance company Aldagi-BCI and after contracting with Department of Prisons, they became responsible for medical treatment of prisoners. In accordance with contract terms, the insurance company must provide all prison institutions with medicine, fill medical staff positions, and train staff. All medical staff that worked in the penitentiary system as of the implementation of the contract became employees of Aldagi-BCI and no longer were staff members of the penitentiary system. The penitentiary system no longer had any authority in their selection, promotion or dismissal.

The Ministry of Justice, which includes the Department of Prisons, continued its comprehensive effort to reform all aspects of the penitentiary system. During the year the total budget for the penitentiary system increased approximately 132 percent in comparison to the budget in 2006, which was itself 63.5 percent higher than in 2005. According to the Ministry of Justice figures for 2006 and 2007 the overall inmate population grew from 15,423 to 18,310. Of the 18,310 inmates in the system, 2,963, or 16.2 percent, were in pretrial confinement. In December a presidential pardon and amnesty was granted to 914 prisoners, who were released before the end of the year. According to the Council of Europe's Committee for the Prevention of Torture, the country's prison population more than doubled between 2004 and 2007. The increase in the prison population was linked to the government's fight against crime, which resulted in a decrease in crime across the country, including in the capital of Tbilisi.

In cooperation with NGOs, the Justice Ministry adopted a code of ethics for prison system employees on December 13 that set standards for employee conduct and the use of force, modeled after European practices. In August the Working Control Unit of the Headquarters of Department of Prisons was created. According to this unit, during the year there were 36 cases of disciplinary violations by penitentiary officers in various penitentiary establishments. Out of the 36, six were dismissed from their posts, 11 received strict rebukes, 18 received a rebuke, and one was reprimanded. Salaries for prison guards were increased and paid regularly; the average salary of a prison employee was 79 percent higher than in 2006.

The justice ministry was in the middle of a multiyear program to build and renovate prisons in order to meet international physical standards. During the year the government increased the budget for capital expenditures on prisons by 555 percent compared to 2006. In January a justice ministry decree created a new juvenile department in two prisons for women, which meant that juvenile female inmates would be confined separately from adults, as was the case for males. The renovated Khoni Prison No. 9 was reopened in February, and in May an additional wing was opened at Rustavi Prison No. 2. In December Gldani prison was opened officially, and 2,478 prisoners were transferred from Tbilisi Prison No. 5, easing the overcrowding. In December a psycho-rehabilitation center, Atlantis, was opened in Rustavi No. 6 prison to treat inmates on a voluntary basis with drug or alcohol dependencies.

The government increased spending for prisoners' food and nutrition by 227 percent compared with 2006 and reported that it required prisons to ensure that relatives were allowed to deliver packages of food to prisoners, something that prisoners relied on in the past. A sundry shop opened in Kutaisi Prison No. 2 in April as part of an effort to reduce reliance on packages from outside sources, which had been a conduit for smuggling contraband into the prison.

In June the government and the International Committee of the Red Cross (ICRC) extended for two years a prison tuberculosis control program.

As of December 1, local monitoring councils operated in 11 penitentiary establishments. The councils monitored penitentiary establishments, developed appropriate recommendations, and delivered reports every three months. Members who belong to the councils were approved by the Minister of Justice and selected on the basis of their desire to work, qualifications, and reputation. The latter was defined as general assessment of character, education and work experience, ability and desire to work as a member of the Council, and reliability. It excluded candidates who were previously convicted or charged for illegal acts. Ideally, members were to reside within 30 kilometers from the institution in which they monitored.

The ICRC had full access to detention facilities in the country, as well as to those in the regions of Abkhazia and South Ossetia, to monitor conditions of detention and treatment of all detainees. The ICRC followed up on persons detained in connection with the conflicts in Abkhazia and South Ossetia. Prison conditions in the two regions were chronically substandard, although overcrowding reportedly was not a problem.

d. Arbitrary Arrest or Detention

The constitution and law prohibit arbitrary arrest and detention; however, the government did not always observe these prohibitions.

Role of the Police and Security Apparatus

The Ministry of Internal Affairs has primary responsibility for law enforcement. During times of internal disorder, the government may call on the ministry or the military. The ministry controls the police, which are divided into functional departments as well as a separate, independently funded police protection department that provides security and protection to private businesses.

There was a low incidence of police corruption at the patrol police level. As a result of recent reforms, the relatively high salaries for police officers provided an incentive for them to refrain from using their positions to extort money from citizens and from mistreatment or abuse of detainees.

In October the UN Human Rights Committee expressed its regret about the persistence of reports involving police abuse, in particular during the arrest of suspects, and deaths allegedly resulting from the use of excessive force by police.

The number of incidents of police misconduct, such as the fabrication or planting of evidence, reportedly did not decrease, with allegations persisting that authorities continued to use threats to plant or fabricate evidence against suspects or their families. A number of cases in which police were charged with planting evidence, using excessive force, inhuman and degrading treatment, abuse of official authority, and exceeding the limits of official authority, carried over from 2006.

According to the Prosecutor General's Office, there were 205 criminal proceedings initiated against police during the year, resulting in 271 convictions, compared with 239 initiated criminal proceedings and 228 convictions in 2006.

The public defender reported that on February 19, the Ministry of Internal Affairs arrested Lasha Khorguiani, Gocha Mildiani, and Khvicha Mildiani, planted drugs on them, unlawfully detained them, tortured Khorguiani, and abused official authority. The arrests were made allegedly because Irakli Kodua, the head of the ministry's Special Operations Department, was angry that a person using Khorguiani's cell phone had accidentally dialed a friend of Kodua's at a late hour. Gocha and Khvicha Mildiani were released on February 20, but authorities continued to hold Khorguiani, seeking the identity of the person who made the early morning call. Khorguiani was released after two months detention and a $3,200 fine (5,000 lari). No charges were brought against Ministry of Internal Affairs officials.

Authorities arrested or administratively disciplined police officers in some high-profile cases of physical abuse or deaths in custody. The Human Rights Protection Unit in the Office of the Prosecutor General issued regular updates on the status of cases, trials, and investigations of human rights violations. However, NGOs maintained that the incidence of abuse was higher than the number of cases investigated by the prosecutor general and that this failure to conduct systematic investigations and pursue convictions of all alleged abusers continued to foster a long-standing culture of impunity. Human rights NGOs also asserted that many instances of abuse went unreported by victims due to fear of reprisals or lack of confidence in the judicial system.

The Prosecutor General's Office was in charge of all criminal investigations into allegations of torture and mistreatment. Prosecutors were required to investigate police use of force when a detainee with injuries sustained during arrest was registered. The law required the office to open an investigation when it received information about a possible violation even if from an anonymous source. If prosecutors concluded after investigation that charges were not warranted, the decision could be appealed to a higher level of the office. Any person subjected to abuse was able to pursue a civil action against the abuser.

NGOs reported that the Prosecutor General's Office opened investigations but often continued them indefinitely without issuing any

findings or, if concluded, usually substantiated the reasonable use of force by police. During the year the office conducted investigations into allegations of torture or abuse and inhumane treatment by police and concluded that the police had committed some violations.

A 2006 police code of ethics obliges police officers to uphold the human rights of all persons and to use force only when strictly necessary for the performance of their duty; the Ministry of Internal Affairs and prosecutor general's office are responsible for implementing the code. The General Inspection service of the Ministry of Internal Affairs investigates cases of suspected duty infractions of police officers, receiving complaints from citizens who call in on the ministry hot line, from the Public Defender, or from the Main Unit of the Human Rights and Monitoring Department of the ministry. Infractions may be addressed to the policeman's supervisor who can also initiate an inquiry. Disciplinary measures may be one of seven types: reproach, condemnation, severe condemnation, deprivation of the ministry badge, demotion, demotion by one grade, dismissal. If there is suspicion that a police officer committed a criminal act, the policeman is suspended from his post, and if the allegations are confirmed, the inquiry materials are transferred to the Prosecutor General's office where the case becomes a criminal investigation.

During the year 413 officers received administrative sanctions; 271 were dismissed and 37 were arrested on criminal charges.

During the year the Police Academy included training on human rights in the basic course for patrol police and conducted additional specialized training on human rights in cooperation with international partners such as the Council of Europe.

Other parts of this report contain information related to this subsection; see section 1.c.

Arrest and Detention

Police, investigators, and prosecutors may arrest a person upon suspicion and without a warrant, but the law stipulates that detainees must be brought before a magistrate judge within 72 hours. Those not charged within this period must be released. During the year, there were no reported cases of detainees kept longer than 72 hours without being charged.

NGOs stated that reports of police planting drugs or weapons in order to make an arrest continued. The prosecutor general's office is the only body authorized to engage directly with the courts. During the year the Public Defender and NGOs working on human rights issues reported a number of cases in which law enforcement officers planted drugs or weapons in order to charge individuals in criminal cases.

On May 23, the law was amended to lower the minimum age at which children may be held criminally responsible for certain violent crimes, such as first degree murder and rape, from 14 to 12. HRW and some European countries criticized the change.

Under the law the release of detainees on bail is preferred over pretrial detention. Since October 2006 the government released on bail approximately 50 percent of those arrested. Citing the 2006 example of police officer Grigol Bashaleishvili, who was released on bail despite admitting his guilt in the shooting death of Amiran Robakidze, the public defender and NGOs questioned the fairness of the granting of bail in some cases

A detainee has the right to request immediate access to a lawyer and the right to refuse to make a statement in the absence of counsel. An indigent defendant has the right to counsel provided at public expense. Such counsel is appointed upon the defendant's request by the agency that is in charge of the proceedings. If a defendant requests an attorney after arrest, the investigator or prosecutor who is handling the case is responsible for contacting and engaging the attorney. In June legislation was passed to provide attorneys free of charge to all persons charged in criminal cases.

On September 25, former defense minister Irakli Okruashvili gave a televised press conference in which he declared his opposition to the government and accused President Saakashvili of several sensational crimes, including ordering him to kill prominent businessman Badri Patarkatsishvili. Okruashvili provided no corroboration for his charges, which in some cases were based on alleged private conversations between him and Saakashvili. Police arrested Okruashvili on September 27 and charged him with corruption. According to the ICG, while Okruashvili's record was tainted, "he aired questions which have long preoccupied the opposition and civil society." At the time of his arrest he had just established a new opposition party and was considered by pundits a potential challenger to President Saakashvili in the next election. The arrest triggered large opposition protests, including the largest demonstration at that point since the Rose Revolution. Other opposition leaders expressed concern that Okruashvili's arrest was politically motivated, an attempt to intimidate all of the political opposition, and part of a series of attacks on human rights by the government. He was released on bail October 8 after he made a videotaped confession to some of the charges against him and retracted his charges against Saakashvili. Okruashvili left the country on November 1 and, in subsequent interviews from abroad, stated that his confession, retraction, and departure from the country had been forced. On November 25, Okruashvili was arrested in Germany. At year's end, Okruashvili remained in pretrial detention in Germany, where he had asked for asylum.

Defense counsel has the right to meet persons accused of a crime without hindrance, supervision, or undue restriction; however, some attorneys alleged that audio and video equipment in police stations, which was intended to record interrogations of suspects by law enforcement or investigators, was sometimes used improperly to monitor privileged attorney/client conversations.

Officers must notify detainees' families of their location within five hours of their arrest and note the circumstances of the notification in the case record. Monitoring boards regularly reviewed these records during their visits to police stations.

Police are required to inform detainees orally of their rights and to provide detainees with a copy of the arrest and search form, signed by police and detainees, to acknowledge that detainees have been fully informed of their rights. The public defender's office and NGOs reported that police often failed to inform completely detainees of their rights and that, if informed of their rights, detainees often did not understand them.

In December 2006 law enforcement officers arrested Pridon Chakaberia, head of the administration of the Kvemo Bargebi village in Abkhazia's Gali region, while he was in Zugdidi, and charged him with drug trafficking. The Zugdidi court found Chakaberia guilty and sentenced him to 10 years in prison on February 16. Abkhaz de facto authorities condemned the arrest as an attempt to intimidate the local population and demanded his release. Some observers believed that the Georgian police planted drugs on him and arrested Chakaberia because of his cooperation with the Abkhaz authorities. A court in the western Georgian city of Kutaisi released Chakaberia on April 23.

According to 2005 amendments to the Code of Criminal Procedure, pretrial measures of restraint include detention, release on bail, and personal guarantee. The amendments eliminated alternatives such as house arrest and police supervision. Since January 1, the judiciary sought to use bail rather than pretrial detention. NGOs noted that due to economic hardship, some defendants were not able to pay bail even when it was granted, ending up in pretrial detention. According to Supreme Court statistics, there were 21,170 persons convicted in criminal cases during the year, 9,788 sentenced to imprisonment, or 46.2 percent, 9,585 released on probation, or 45.3 percent, figures analogous to 2006. The number of those tried receiving probation increased by 3.9 percent. The remainder of those found guilty received either fines or correctional labor as punishments. Of those charged in criminal cases, 11,241 were released on bail. In 2006 approximately 50 percent were released on bail.

Under the law and in practice, the overall maximum time period for trial and exhaustion of appeals is 12 months. A person who is arrested must be charged within 72 hours or released. They can be held for a maximum of 9 months before the court of the first instance renders a verdict. Once the verdict is rendered, the start of the prison sentence begins immediately, despite any appeal process underway. There is a maximum three month appeal process for the Appellate court and a maximum of six months for the Cassation Court in the Supreme Court. If all appeals are exhausted, a prisoner could be held for a maximum of 18 months. There are no time constraints once the trial begins for the first instance court to render a verdict.

e. Denial of Fair Public Trial

The law provides for an independent judiciary. However, reports persisted that the executive branch and powerful outside interests continued to pressure judicial authorities. Many NGOs complained that judicial authorities continued to act as a rubber stamp for prosecutors' decisions and that the executive branch exerted undue influence. NGOs also expressed concern that recent judicial appointees lacked experience and training to act independently. The high number of vacancies at the trial court level resulted in long delays scheduling trials. The number of people in pretrial detention decreased significantly, as the backlog of cases was reduced and the use of bail increased.

Following 2006 constitutional amendments, the High Council of Justice, the body that disciplines judges, operated throughout the year as an independent institution with a majority of its members from the judiciary. In June Parliament passed further changes reorganizing the High Council of Justice and removing the minister of justice as a member, the last such executive branch official. Eight judicial members elected by the Conference of Judges and the chairman of the Supreme Court constitute the majority of the High Council of Justice. Two members of the council are appointed by the President and three members are elected by Parliament. The head of the Legal Committee of Parliament-currently a member of the ruling party-is an ex-officio member of the High Council of Justice.

In December 2006 the authority to appoint or dismiss judges was moved from the president to the High Council of Justice in order to increase the transparency of the judicial appointment process. Despite the use of objective written examinations to create a pool of potential qualified appointees and publication of the names of all the potential candidates for public comment, the judicial appointment process was not sufficiently transparent. Oral interviews of appointees were held behind closed doors with no public knowledge of what criteria were used for selection.

In July Parliament passed legislation on ex parte communications, prohibiting prosecutors, defendants, investigators, and any interested third parties from contacting judges outside the courtroom during cases to sway their judgments. The legislation--which went into effect in August--also repealed Soviet-era laws that punished judges, both criminally and administratively, for making "incorrect rulings," provisions that many observers believed the government could use to limit judicial independence. The law requires judges to report in writing to the secretary of the High Council of Justice any ex parte communication within one month. The secretary then forwards the report to the appropriate regulatory body--the prosecutor general for prosecutors, the Georgian Bar Association for defense attorneys, or the relevant agency heads for investigators--for disciplinary action. If these bodies do not act, the High Council of Justice may take action on its own initiative. The council can impose a $60 (100 lari) fine on unregulated entities (defendants, accused, third parties, legal representatives, or other interested persons) who violate the ban on ex parte communications. According to the High Council of Justice Disciplinary commission, no disciplinary action was taken on ex parte communications since the law's adoption.

The Code of Ethics for Prosecutors was approved in June 2006. Violations of the ethics code results in disciplinary action by the Prosecutor's Office. The General Inspection of the Office of the Prosecutor General conducts an inquiry into such facts and presents this information to the Prosecutor General with a recommendation for disciplinary action. The code was actively implemented during the year, with 17 prosecutors receiving disciplinary actions from reprimand, to sharp reprimand, to dismissal from the job.

Defendants must confirm in court any statement they gave while in pretrial detention before it can be accepted as evidence. NGOs reported that this provision had little impact, either because detainees feared reprisal if their statement was not ratified in court, they were not aware of the protection, or they feared the penalty if they did not retract it.

In 2005 Irakli Sioridze, a court officer of the justice ministry, was detained on charges of exceeding authority. During an hour-long interrogation, several law enforcement officers including Chief of the interior ministry's Department of Constitutional Security Data Akhalaia reportedly beat and kicked him severely in order to force him to give incriminating evidence against lawyer Giorgi Usupashvili, the brother of opposition Republican Party leader Davit Usupashvili. According to Sioridze, the officers wanted him to sign a statement saying that Usupashvili misappropriated $111,000 (200,000 lari). Government investigators concluded that Sioridze's claim of injury was to achieve mitigation of a possible criminal liability in another case in which he was charged. As a result, in September 2006 officials terminated the criminal proceedings against the police.

The law provides penalties of up to five years in prison for witnesses who change or retract their original statements to police. NGOs contended that the provision made witnesses more vulnerable to prosecutorial pressure because it discouraged them from recanting incriminating statements given to the prosecutor during pretrial investigations. Prosecutors supported the provision on the ground that it discouraged witnesses from changing their testimony due to pressure from the defendant or his or her associates. Both torture and the extortion of evidence represent criminal offences under the Criminal Code. Article 30 of the Criminal Procedural Code sets aside a general rule, based on which the persons having suffered property damage, physical, or moral injuries have the right to file a civil claim and demand compensation. The compensation for physical injuries covers the costs of burials, medical treatment, prosthetic device and medicine, insurance, the compensation of financial aid and pension. Compensation for moral injuries can be monetary. The general rule of seeking compensation and redress for the injuries received as a result of crime through civil action equally applies to all crimes, including torture and extortion of testimony.

The High Council of Justice administered a three-tiered court system composed of regional (city) courts, appellate courts, and the Supreme Court. Regional (city) courts hear routine criminal, civil, and administrative law cases. Appellate courts serve a purely appellate function. The Supreme Court acts as the court of final appeal. According to Supreme Court data, during the first quarter of the year, the Supreme Court's Chamber for Administrative and Other Cases issued judgments in favor of the government in 93 cases and in favor of private individuals or companies in 87 cases. The government continued setting up a system of magistrates to hear specific cases, such as misdemeanors; when completed, the system will have 18 enlarged district (city) courts with 48 magistrate judges specialized to hear cases in civil, criminal, and administrative categories. By year's end six magistrate judges had been appointed and were working in the district (city) courts.

In June in cooperation with the Council of Europe, the High School of Justice established curriculum for training judges. The school began training judges, many of whom will serve as magistrate judges, in December. During the year the salaries of judges at all levels were raised $60 (100 lari) a month to reduce the incentive for corruption.

In November the Council of Judges adopted a Code of Ethics for Judges. The code defines rules of judicial ethics to strengthen independence, impartiality, and integrity of the judiciary.

The Constitutional Court arbitrates disputes between branches of government and rules on individual human rights violation claims; it generally demonstrated judicial independence. The power of constitutional review is vested solely in the Constitutional Court. The court generally interpreted its role in human rights cases narrowly, agreeing to rule only on cases in which human rights were violated as a result of specific articles of law.

Trial Procedures

Defendants have the right to a public trial, except where national security, privacy or protection or a juvenile are involved. While the 2005 criminal procedure code does not provide for a jury trial, there were other amendments that expanded defendants' rights in criminal procedures. For example, in January Parliament approved adding an article to the Criminal Procedure Code that allows a person to appeal an arrest as unlawful, even if he or she had been released within a short time following the arrest without charges.

Defendants have the right to be present at their trial and to consult an attorney; however, access to defense attorneys for indigent defendants was limited in practice. The majority of criminal defendants went to trial without benefit of counsel. In June Parliament established a system to provide persons accused of crimes with free legal assistance in the first 48 hours, regardless of their financial status. The budget was increased more than $800,000 (1,280,000 lari) to begin the two-year process of implementing the new law.

Defendants may question and confront witnesses against them and present witnesses and evidence on their own behalf at trial. By law, defendants and their attorneys have access to the prosecution's evidence relevant to their cases at any point during the investigation and may make copies at their own expense. By law, defendants are presumed innocent and have the right to appeal.

The law provides that, within five days following the conclusion of the court hearing or trial the record must be prepared and signed by the secretary and the presiding judge of the hearing. Only after these court officials have signed the document can it be introduced to the parties. Comments from the parties regarding the wording of the transcript may be submitted to the court.

The law provides that criminally charged defendants could be tried in absentia. During the year Parliament amended the law to permit a person convicted in absentia to appeal their conviction, which guarantees a new trial.

Defense counsel and the defendant have the right to participate in pretrial hearings; however, their presence is not mandatory. Failure of defense counsel to appear at a hearing does not constitute grounds for postponing a hearing. A judge may also rule on an appeal of a pretrial preventative measure without a hearing.

By law a court must certify that a plea bargaining agreement was reached without resort to violence, intimidation, deception, or illegal promise and that the accused had the opportunity to obtain legal assistance. Although the prosecutor general's office reported that the majority of plea bargaining cases supported ongoing investigations into drug trafficking, NGOs criticized plea bargaining. There were widespread reports that such agreements (some on issues much wider than drug trafficking) required a person to pay money but the agreement was not used to obtain information on other criminal activity. Some plea bargaining agreements reportedly included a tacit understanding that the person accused would not pursue complaints of abuse or mistreatment against law enforcement authorities and would support their version of events in order to avoid negative publicity.

Political Prisoners and Detainees

Many individuals, including several high-ranking officials from the previous government, considered themselves to be political prisoners. Local human rights organizations varied on estimates of the number of political prisoners, reporting from one prisoner of conscience to 60 political prisoners. The parliamentary Human Rights Committee and Public Defender claimed that there were no political prisoners in the country.

During the year there were verdicts in the following two high-profile cases involving charges of treason; at year's end, both verdicts had been appealed.

On May 23, the Tbilisi City Court found the head of the opposition party Forward Georgia, former member of Parliament and minister of state security Irakli Batiashvili, guilty of treason allegedly for providing intellectual support and encouragement to rebels in the Kodori valley in July 2006. The court sentenced Batiashvili to seven years in prison. Batiashvili, who claimed the evidence was fabricated, filed an appeal. Some observers asserted that the evidence in the case did not substantiate the charge against Batiashvili and raised due process concerns, including the court's alleged acceptance of an inaccurate copy of the transcript of a telephone conversation as evidence and failure to provide the defendant with all of the relevant case material as required by law. Opposition parties and some NGOs therefore considered him a political prisoner. The release of Batiashvili was one of the demands made by the opposition during a series of demonstrations in November. On December 13, Nino Burjanadze, the acting president during the presidential election campaign, reportedly announced that he would be released on the day after the inauguration of the newly elected president in January 2008.

On August 24, the Tbilisi City Court found 14 individuals guilty of treason in a conspiracy to take over the government by violence. Most of the defendants reportedly were members of opposition parties affiliated with the Justice Party, headed by former state security minister Igor Giorgadze, who was accused of the 2005 attempted assassination of then president Shevardnadze. The defendants included Giorgadze's niece Maia Topuria, Teimuraz Zhorzholiani, Kakhaber Kantaria, Ramaz Samnidze, Giorgi Metreveli, Guram Papukashvili, Varlam Galdava, Revaz Bulia, Giorgi Akhobadze, Maia Nikoleishvili, Iakob Kvinikadze, Zaza Davitaia and Vakhtang Talakhadze. Critics maintained that the evidence in the case did not substantiate the charge and raised a number of due process concerns, such as the alleged destruction of potentially exculpatory evidence and admission into evidence of written statements from witnesses with similar language and narrative structure, including 16 word-for-word identical sentences, and closing of the courtroom. The Prosecutor's office noted that the witnesses' testimony was consistent with regard to the significant elements regarding the conspiracy. The prosecution further contended that the witnesses' recollections of the participation of different people in various meetings indicated that law enforcement authorities did not coach the statements.

On October 17, the opposition published a manifesto containing several demands, including the release of unspecified political prisoners.

The government permitted international human rights and domestic organizations to visit those claiming to be political prisoners, and some organizations did so during the year.

==Civil Judicial Procedures and Remedies==

The constitution provides for an independent and impartial judiciary in civil matters, however, there were concerns about professionalism of judges and transparency in adjudication. The constitution and law provide that a person who suffers damages resulting from arbitrary detention or other unlawful or arbitrary act is entitled to bring a civil action.

In Abkhazia, the de facto parliament in May 2006 adopted a decree banning de facto courts from considering any property claims filed by ethnic Georgians who left Abkhazia before, during, or after the 1992-93 war, thereby effectively depriving internally displaced persons (IDPs) of their property in Abkhazia. According to the decree, any previous judgments or pending procedures related to ethnic Georgians' property were nullified. De facto courts in Abkhazia reportedly did not make efforts to establish facts or administer justice but acted at the direction of prosecutors and law enforcement. Criminals paid bribes to police, prosecutors, and judges to avoid prosecution.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The law prohibits such actions without court approval or legal necessity and also prohibits police from searching a residence or

conducting undercover or monitoring operations without a warrant. Charges against some opposition leaders after video and/or audio surveillance raised concerns among some NGOS and international observers about this practice. In its December report, the ICG contended that civil society activists complained phone taps had become widespread and used to implicate opposition or public figures and business men.

NGOs continued to report that in practice police conducted searches and occasionally monitored private telephone conversations without first obtaining court orders; police often obtained the necessary warrant after the fact. NGOs reported that most people were unaware of their right to postpone a search of their home by one hour in order to summon two objective third-party witnesses for the search. The government stated that security police and tax authorities entered homes and workplaces without prior legal sanction.

There were concerns about the lack of due process and respect for the rule of law in a number of developments related to property rights. A law passed in June required old leases to be reregistered with the government. The law also gave the government the right to evict illegal tenants with five days notice. There were protests over the law and widespread concern among citizens over its ramifications. As a result, a resolution passed in November restricted the government from attaching title to property after August 1 unless it reserved its rights before that date. Various ministries and cities gave notice affecting 1,950 different properties before the deadline. The government said that cases would be reviewed and not all the properties would be divested from their owners. After passage of the June law, residents alleged that the government tore down booths, stalls, and other structures giving only a few days verbal notice, thus precluding the possibility for owners to appeal to the courts. Residents reported the justification offered by the officials for tearing down the structures was the city's appearance or that owners did not have proper documentation.

In April, according to HRW, restaurant owners in Tbilisi and a neighboring town complained that officials had pressured them into handing over their property by threatening them with criminal charges for purchasing their property through corrupt business transactions during the Shevardnadze era. The government contended that these instances were cases of property with expired or ambiguous leases or obtained through fraudulent transactions or bribery linked to corruption, which caused domestic and international observers to raise concerns that the government had not sufficiently respected due process and the rule of law. The Public Defender was investigating ten such cases at year's end, although there were reportedly more.

g. Use of Excessive Force and Other Abuses in Internal Conflicts

Separatist conflicts in the regions of Abkhazia and South Ossetia remained unresolved, although ceasefires were in effect. Commonwealth of Independent States peacekeeping forces (in effect Russian peacekeepers) were present in Abkhazia. Russian, Ossetian, and Georgian forces participated in a joint peacekeeping force in South Ossetia. Incidents of violence occurred in Abkhazia, particularly in the predominantly ethnic Georgian Gali region, and in South Ossetia. The government had no effective control over most of Abkhazia and South Ossetia. The government maintained effective control over the upper Kodori valley in Abkhazia and several Georgian enclaves in South Ossetia. In May the government established a Temporary Administrative Unit in South Ossetia and delegated authority to the administration of Dmitry Sanakoyev, an ethnic Ossetian who won an unofficial "alternative election" in November 2006. A commission including government officials and South Ossetian representatives began work to define a broad autonomy for the region. In practice Sanakoyev's administration exercised authority only in the Georgian enclaves.

There was little information on the human rights situation in Abkhazia and South Ossetia due to limited access to these regions. Abkhaz de facto authorities in March agreed to permit a UN human rights officer's presence and the deployment of three UN civilian police in the Gali Sector headquarters.

The situation in the Gali region of Abkhazia, where many ethnic Georgians live, remained tense as a result of kidnapping, arbitrary arrest, and deaths in custody. Systemic problems in the criminal justice system of the de facto authorities, in particular the failure to conduct impartial investigations and to bring alleged perpetrators to trial, sustained a climate of impunity. Abuse by de facto law enforcement authorities included arbitrary arrests and detention as well as routine mistreatment of detainees. De facto law enforcement authorities rarely wore uniforms or carried badges or credentials, allowing them to act with impunity.

Killings

There were no reports of deliberate or indiscriminate killings related to the conflict during the year.

Abductions

In February unknown persons abducted David Sigua, an ethnic Georgian serving as de facto election commission chair in the Abkhaz-controlled Gali district. The Georgian government denied Abkhaz accusations of involvement in the disappearance, and both sides agreed to a joint investigation, which was being conducted by the UN at year's end. Sigua's whereabouts remained unknown.

Government and Abkhaz commissions on missing persons reported that nearly 2,000 Georgians and Abkhaz remained missing as a result of the 1992-93 war in Abkhazia. The ICRC assisted both commissions in efforts to provide information to the families of the missing persons. However, most of the missing persons went unaccounted for in the region of Abkhazia. According to the ICRC, no repatriation of mortal remains occurred during the year.

Child Soldiers

In Abkhazia, teenage boys were frequently taken from their homes for forced conscription in the Abkhaz militia. Some parents claimed that their sons were younger than 18 and under the required age for military service. While the number of ethnic Georgians conscripted into the Abkhaz military was reportedly small, the threat of conscription remained a political tool used by the de facto authorities to control the ethnic Georgian population and to prevent young Georgian men from returning to or staying in the ethnic Georgian Gali district.


Other Conflict-related Abuses


A 2006 Abkhaz law on citizenship, which excludes the possibility of dual Abkhaz-Georgian citizenship but allows dual Abkhaz-Russian citizenship, limited the rights of the ethnic Georgian population in Abkhazia to participate in the electoral process and to have representation in the de facto parliament, as well as in local de facto bodies.


Section 2 Respect for Civil Liberties, Including:


a. Freedom of Speech and Press


The constitution and law provide for freedom of speech and of the press. The government restricted freedom of speech and the press in connection with the fall political crisis. Throughout the year, there were accusations by NGOs, independent analysts, and journalists that high-ranking government officials and opposition politicians exercised some influence over editorial and programming decisions through their personal connections with news directors and media executives. There were scattered reported incidents of actual or incited physical abuse of journalists by local government officials and by opposition politicians.


Some individuals claimed to western monitors that they were afraid to criticize the government publicly or by telephone for fear of reprisal.


There were approximately 200 independent newspapers in Georgia, although most were local and with extremely limited circulation or influence. During the year print media frequently criticized senior government officials. However, few editorially independent newspapers were commercially viable. In addition lack of financial resources further limited their circulation. Patrons in politics and business typically subsidized newspapers, which were subject to their influence.


Most people received news from broadcast media. There were eight independent or privately owned television stations in Tbilisi and one public station, Channel 1. Four of the Tbilisi-based stations, Channel 1, Rustavi-2, Imedi, Mze claimed nationwide coverage. Imedi was the most viewed station and frequently carried criticism of the government. A fifth channel, Batumi-based Adjara Television, broadcast nationwide. Observers believed that some members of the government directed progovernment television stations, notably Rustavi-2 and Mze, to provide positive coverage of the government. During the pre-election period, the Organization for Security and Cooperation in Europe (OSCE) reported that Channel 1's coverage of the campaign improved and became more balanced. Some observers felt that as monitors reported on media coverage in the presidential campaign the balance of reporting improved. An international NGO estimated that there were more than 45 regional television stations outside of Tbilisi, 17 of which offered locally oriented daily news.


The Committee to Protect Journalists reported that, on


January 17, two unknown men briefly abducted *Giya Boklomi* journalist Ilya Chachibaya and warned him to stop his journalistic work in Zugdidi. At year's end local police closed the investigation into the alleged incident of threats of physical violence and the threat to close his newspaper by local authorities, without finding evidence to support Chachibaya's claims. Chachibaya planned to appeal the decision in the Kutaisi Court of Appeals.


In March, Elisio Janashia, editor of *Tavisupali Sitkhva* (Free Word), claimed that she was verbally abused and threatened by the spokesman for the governor of Samegrelo-Upper Saventi after she published an article about harassment of a journalist from another newspaper. On March 15, the Public Defender requested that the Zugdidi Internal Affairs investigate the allegations. The investigation was still ongoing at year's end.


At the end of July, the president signed legislation prohibiting video and photo cameras in courtrooms but allowing journalists to be present. A number of journalists and NGOs opposed the camera ban, arguing that publicity in courtrooms helped ensure fair trials.


On November 7, after using excessive force to disband opposition protesters, the government instituted a State of Emergency which, according to the constitution, suspended all broadcast press activities, except those of Public Television. As a result, operations were suspended completely at three television stations during this period (*Imedi, Kavkasiya*, and Channel 25) and *Imedi* was raided by Special Forces from the Ministry of the Interior. According to *Imedi* management, no official order authorizing the police raid was presented and police held the staff at gunpoint. Media sources and HRW reported that police violently dispersed departing staff and its supporters outside with teargas, rubber bullets, and truncheons. In the late evening, the prime minister read a statement declaring that a State Emergency was in effect and only public television would be allowed to broadcast, as permitted by the Constitution. Print media was not affected by the state of emergency. The ban was lifted on November 18, and all broadcast media except for *Imedi* television resumed their news broadcasts.


*Imedi* television stayed off the air following the suspension of its license by the Georgia National Communications Commission but resumed broadcasts on December 12. The government said that these actions were taken in response to the statement broadcast

by *Imedi*, which allegedly called for the violent overthrow of the government—a charge that the broadcaster's management denied. According to the OSCE/ODIHR's first report on the pre-presidential election period, "similar statements apparently broadcast by other channels did not have the same legal consequences." When personnel were permitted to return several weeks later to the station, although the stationed had been cleaned, they found extensive damage to the equipment, looting of station property, vandalism, and theft of staff members' personal property and automobiles.

*Imedi* resumed broadcast on December 12, but closed again on December 26 after the resignations of several key journalists concerned that the owner, Badri Patarkatsishvili, a presidential candidate, had been accused by the government on December 24 of plotting a coup. The allegation was based on audio and video-recordings made public of a Patarkatsishvili representative attempting to bribe a Ministry of Interior official into thwarting the election, triggering mass unrest in Tbilisi and the entire country, and assassinating the minister of internal affairs.

The Georgian Media Council (a self-governing body of journalists and academics set up at the European Commission suggestion in 2006) monitored presidential campaign coverage to evaluate the coverage each candidate received. Adam Michnik, a noted Polish journalist and politician was asked by the EU to monitor the media. He set up a board of prominent local journalists and academics that monitored the ethical tone of the media coverage.

OSCE/ODIHR media monitoring results indicated a lack of balance in the news coverage of most monitored television stations during the presidential campaign through the end of the year, with the incumbent generally receiving the most coverage. *Imedi* TV appeared to be more critical of the incumbent than other monitored broadcasts.

In November, Ramaza Samkhradze, the director of independent radio station *Hereti*, a small regional radio station, alleged that during the election campaign in November-December, an attempt was made by a progovernment businessman to pressure Radio *Hereti* to stop antigovernment reporting. The Public Defender requested an investigation by the prosecutor's office.

In a November 15 report, the UN Human Rights Committee expressed concern over the lack of proper investigation of acts of harassment against journalists and called on the government to respect freedom of speech and of the media.

Throughout the year, self-censorship remained a concern among journalists, often tied to the fact that most journalists worked without contracts. In December, six high profile television journalists from *Imedi* and *Rustavi2* resigned. *Rustavi2* journalists said that they felt pressured to conform to a pro-government policy; *Imedi* journalists said they resigned due to increased pressure to conform to an antigovernment editorial policy.

Prior to the fall political crisis, NGOs, media analysts and individual journalists cited improvement in access to public information, less indirect and covert pressure on journalists, and better financial resources. While the law provides for the National Commission on Communications to adopt a code of ethics for broadcasters, the commission postponed issuing a code in 2006 to allow for public comment after journalists criticized the draft version, originally proposed by the European Commission, as an attempt to control broadcast media. At year's end the commission had not adopted such a code of ethics.

The Ministry of Defense and the Ministry of Internal Affairs made considerable improvement in providing access to journalists and information. During the year the defense ministry permitted journalists to visit the Krtsanisi Training Annex and other facilities that had been closed. Media in the separatist regions of South Ossetia and Abkhazia remained tightly restricted by the de facto authorities.

Other parts of this report contain information related to this section; see section 2.b., Freedom of Assembly and section 3.

Internet Freedom

There were no government restrictions on access to the Internet or reports that the government monitored e-mail or Internet chat rooms. Individuals and groups could engage in the peaceful expression of views via the Internet, including by electronic mail. The Internet was available to 7 percent of the population.

Academic Freedom and Cultural Events

There were no government restrictions on academic freedom or cultural events.

b. Freedom of Peaceful Assembly and Association

Freedom of Assembly

The constitution and law provide for freedom of assembly; however, the government restricted this right in November, and the police on occasion used force to disperse peaceful protests.

The law requires political parties and other organizations to give prior notice and obtain permission from local authorities to assemble on a public thoroughfare. Permits for assemblies were granted routinely.

Different political parties were galvanized by the September arrest of former Defense Minister Irakli Okruashvili and joined to form the United Opposition Council (UNC). The UNC began protests in October in Zugdidi, Kutaisi, and other regions, culminating in a series of November protests in Tbilisi:

On October 28, seven men physically assaulted MP Bezhan Gunava, MP Bidzina Gujabidze, and Laska Chkhartishvii from the Equality Institute, at an opposition rally in Zugdidi. On October 29, the Kutaisi court sentenced two of the seven men to 20 days administrative detention and fined five others. On October 30, the Public Defender recommended that the government criminally prosecute the seven individuals, all of whom were ruling party members for dispersing the October 28 demonstration. He criticized the court for imposing administrative sentences on defendants who used violence against MPs. The Public Defender called for the criminal prosecution of all persons, including police officers, who did not prevent the beatings of the MPs. No police were charged for failing to execute their duty of maintaining law and order.

Activists attempted to drive from western regions of the country to participate in a November 2 protest in the capital but were unable to do so. The government allegedly seized cars, keys and car registration papers from drivers, blocked motorways, and slashed car tires. Some drivers reportedly were assaulted and roads were blocked coming into Tbilisi.

The Tbilisi protests began on November 2 and continued peacefully until November 7, when demonstrators were dispersed with force that HRW, the ICG, and others described as excessive. Early on November 7, police cleared approximately 70 protesters and hunger strikers from the vicinity of Parliament. HRW reported that police physically assaulted several protesters. Later that morning, in response, a larger number of protesters broke through police lines, and confrontations began with police. After mid-day, police, using a loud speaker, demanded that protesters clear the streets several times, and riot vehicles subsequently used water cannons on the crowds. In several confrontations during the day, riot police fired tear gas and rubber bullets at those protesters who did not disperse when ordered by police. HRW reported that "many of those beaten were peaceful protesters, protestors attempting to disperse, or individuals merely observing the events or coming to the aid of victims of police violent." A number of fist fights between protesters and police also took place, and some groups of protestors attacked police or law enforcement agents who had become separated, particularly later in the day. Government spokesmen asserted that the authorities were in their rights to disperse the demonstrators and that it was a legally based decision.

Local area hospitals admitted 587 persons with either injuries or side effects from the tear gas. Three of those admitted required surgery. Thirty-four policemen were injured, two seriously. Included in the number of injured were the Public Defender and political party activists. Koba Datiashvili, leader of the opposition People's Party, was kidnapped, beaten, and taken to Gori military hospital before he was released. Early on November 8, the government declared a state of emergency, but citizens were unclear whether this restriction was country wide or only confined to Tbilisi due to contradicting statements from officials. According to one NGO, this confusion affected protestors in Batumi and Telavi who gathered seemingly not knowing about the ban on November 8, but were forcibly dispersed by police.

The Public Defender called for an investigation into the use of excessive force by police and the events of November 7. On November 10, Old Tbilisi District Prosecution Office initiated a preliminary investigation into the bodily injuries sustained by individuals on November 7. The investigation was subsequently transferred to the Investigation Unit of the Tbilisi Prosecutor's Office. In addition to evidence gathered, the Prosecutor's Office accepted materials sent from the Public Defender with regards to 12 individuals who were affected. Information from the prosecutor's office indicated that 19 persons received injuries, varying in degree of seriousness. All 19 were examined by medical authorities. At year's end the investigation was underway and no one had been charged.

The Ministry of Internal Affairs dismissed 11 police officers for violating the ministry's instructions during the November 7 disorders not to cause conflict with citizens which would further escalate the situation.

In his December report, the Public Defender recommended that the Ministry of Internal Affairs provide a special re-training program for patrol police inspectors to familiarize them with current legislation about freedom of assembly and how to differentiate between the exercise of this freedom and disorderly behavior.

Freedom of Association

The constitution and law provide for freedom of association, and the government generally respected this right in practice. Authorities granted permits for registration of associations without arbitrary restriction or discrimination.

However, there were a number of reports that opposition activists continued to be harassed after the November demonstrations. For example, the OSCE's December 20 interim report on the January 2008 presidential election reported allegations of "political intimidation, pressure and violence" against opposition activists including the New Rights Party during the campaign.

In addition some opposition MPs were physically assaulted during the year. Opposition MP Gia Tsagareishvili asked the prosecutor general's office to prosecute ruling party MPs Koba Dvalishvili and Vakhtang Balavadze for beating him on September 18 after he made a public statement that they found offensive. Tsagareishvili was affiliated with former defense minister Okruashvili's planned opposition party. The Public Defender's report stated that there were grounds for arrest on criminal conduct charges for threatening a public official. The prosecutor's office looked into the above allegations, but concluded there were no signs of criminal conduct and no investigation was initiated.

c. Freedom of Religion

The constitution provides for freedom of religion and the government generally respected this right in practice.

The constitution recognizes the special role of the Orthodox Church in the country's history but stipulates the separation of church and state. A constitutional agreement (concordat) signed by the president and the Orthodox patriarch in 2005 gives the church legal status. The concordat contained several controversial provisions that give the patriarch legal immunity, grant the church the exclusive right to staff the military chaplaincy, exempt church clergymen from military service, and give the church a unique consultative role in government, particularly in the area of education. However, the Parliament has not adopted legislation needed for many of these provisions to enter into force. The tax code exempts the Orthodox Church from paying value added tax (VAT) for the importation of some religious items (crosses, candles, icons, books, and calendars used exclusively for religious purposes) but requires other religious groups to pay VAT and file for reimbursement.

Any religious group may register as a local association or foundation and receive tax exempt status. An association is based on membership (a minimum of five members is required), while a foundation involves one or more founders establishing a fund for furtherance of a certain cause for the benefit of the group or the general public. In both cases registration is a function of the Ministry of Justice, which must grant or deny registration within 15 days of application; a refusal may be appealed in court.

Some religious communities expressed dissatisfaction with the status that registration provided. The Roman Catholic Church and the Armenian Apostolic Church opposed registering as civil organizations. However, many other religious groups registered under the legislation, which does not discriminate against any religious activity.

During the year attacks on religious minorities, including violence, verbal harassment, and disruption of services and meetings, continued to decrease, with the Ombudsman's Office reporting that incidents of abuse declined to nearly half the number of cases the previous year. Police were quick to respond to incidents of abuse but were slower in their follow up to crimes they viewed as minor "hooliganism," defined as actions that violate public order or demonstrate open contempt towards society committed by using violence or threats of violence.

A 2005 law separating state schools and religious teaching narrowed the interpretation of the government concordat with the Orthodox Church regarding reaching Orthodoxy as an elective part of the school curriculum. The law stated that such Orthodox teaching may only take place after school hours and cannot be controlled by the school or teachers. Also outsiders, including clergy, cannot regularly attend or direct student extracurricular activities, student clubs, or their meetings. Such classes were taught by lay theologians, rather than priests. Religious minorities broadly welcomed the change to school religious education although they observed along with NGOs that practice did not always keep pace with the law. During the year there continued to be flaws in the implementation of the law, which mainly pertained to carrying out religious rituals and displaying religious objects.

Public schools offered students the opportunity to take as an elective a course on religion in society, which covered the history of major religions. Parents complained teachers focused solely on the Orthodox Church, as did the primary textbook. At midyear the Ministry of Education suspended work on a new curriculum that was to have addressed the public complaints. The curriculum was abandoned principally because the group could not agree on a curriculum and there were not enough incentives offered to teachers who would have to teach the course.

Unlike in 2006, representatives from the Armenian church reported they no longer had problems importing religious literature. The Armenian Church had stopped importing candles because of customs problems.

Members of Jehovah's Witnesses no longer felt the need to hold their services in private homes for security reasons. Delays in obtaining permits to build Kingdom Halls required congregations to continue meeting in private homes. The prosecutor general's office investigated cases in which the members of Jehovah's Witnesses were denied the use of privately owned facilities to hold religious conventions for large groups in 2005-06 but could not identify the specific individuals responsible. In May the European Court of Human Rights (ECHR) ruled against the government for failing to protect the group from violent harassment in 1999. At year's end the group had four cases pending before the ECHR, filed during the administration of previous governments. One of these cases contested a 2001 Supreme Court ruling that revoked the group's registration. However, during the year the organization was registered under the new registration law. This status allowed them to import materials, rent venues, and conduct other transactions as a legal entity.

The Roman Catholic Church and the Armenian Apostolic Church were unable to secure the return of churches closed or given to the Georgian Orthodox Church during the Soviet period. By midyear the justice ministry had adopted plans to rely on disinterested expert opinion for assessment of future ownership disputes, instead of a now inactive commission that had included a Georgian Orthodox Church participant.

Societal Abuses and Discrimination

Judaism is practiced in a number of communities throughout the country, particularly in the largest cities, Tbilisi and Kutaisi. There were approximately 14,000 Jews in the country. There were no reports of anti-Semitic acts.

Despite a general tolerance toward minority religious groups "traditional" to the country, including Catholics, Armenian Apostolic Christians, Jews, and Muslims, citizens remained apprehensive towards "nontraditional" religions, which were perceived as taking advantage of the populace's economic hardships by gaining members through economic assistance. Some members of the Orthodox Church and the public viewed non-Orthodox religious groups, particularly nontraditional groups or sects, as a threat to the national church and the country's cultural values and asserted that foreign Christian missionaries should confine their activities to

non-Christian areas.

During the year the government investigated several cases of interference, threats, intimidation, or violence. The prosecutor general's office elected to exercise prosecutorial discretion to emphasize cases arising after 2003, given its limited investigative and prosecutorial resources. Investigations prior to 2003 were scheduled to continue where feasible, but priority was given to new cases. Religious minority groups pointed out that this could lead to the eventual elimination of cases that could be investigated under law predating 2003.

On January 29, in Chkhorotska, the prosecutor general's office opened a criminal investigation against Vladimir Sukinara for inflicting verbal and physical abuse against two members of Jehovah's Witnesses. On February 21, the Jehovah Witnesses Eter Charkviani and Inga Izoria, the victims on the case, withdrew their complaint stating that they had reconciled with Sichinava. The case was closed as a result.

On June 12, there were two instances of violence directed against members of the Jehovah's Witnesses. In Tbilisi, undetermined persons threw rocks at the building of the Jehovah witnesses and on the same day, threw a bottle at Marina Kinkladze, Jehovah Witness, when the latter was cleaning the entrance of the building. On the same day, a criminal case was on the grounds of damage to the Jehovah witness property. The investigation was ongoing at year's end.

On May 29, unidentified individuals insulted and physically abused Jehovah Witnesses Davit Shermadini and David Karamiani in Gldani. The instigators forcibly took the Jehovah Witnesses' literature and promptly destroyed it at the scene. At year's end the investigation was still underway.

In June a court sentenced Khaber Ninikuri, Giorgi Alasania, Nikoloz Tsikhelashvili, and Shalva Mosiashvili to seven years' imprisonment for a November 2006 attack on the office of Jehovah Witnesses in Rustavi.

De facto authorities in the separatist Abkhazia and South Ossetia regions remained outside the control of the central government, and reliable information from those regions was difficult to obtain. Although the Russian Orthodox Church recognizes the country's territorial integrity, the Georgian Orthodox Church patriarchate claimed that the Russian church was sending in priests loyal to the church patriarchate in Moscow under the pretext of setting up indigenous Abkhaz churches.

A 1995 decree issued by the de facto leader of Abkhazia prohibiting Jehovah's Witnesses in the region remained in effect but was not enforced. During the year members of Jehovah's Witnesses reported no problems in Abkhazia, where the group has approximately 1,500 members. Although Baptists, Lutherans, and Roman Catholics also reported they were allowed to operate in the region, the Georgian Orthodox Church reported that it was unable to do so.

In South Ossetia, Orthodox believers were not able to conduct services in Georgian Orthodox churches located near the villages of Nuli, Eredvi, Monasteri, and Gera because these areas were under the control of Ossetian de facto authorities.

For a more detailed discussion, see the *2007 International Religious Freedom Report.*

d. Freedom of Movement, Internally Displaced Persons, Protection of Refugees, and Stateless Persons

The law provides for freedom of movement within the country, foreign travel, emigration, and repatriation, and the government generally respected them in practice.

Freedom of movement was restricted by the de facto authorities in the separatist regions of Abkhazia and South Ossetia. Checkpoints operated by de facto militia often obstructed citizens' internal movement in these regions and from these regions to areas controlled by the Georgian government. In December 2006, Abkhaz de facto authorities closed the cease-fire line to all civilian vehicular traffic. Abkhaz de facto authorities reduced the number of legal official crossing points to six by the end of the year, with only one being open for vehicular traffic. There were some case by case exceptions made due to medical emergencies and funerals at other checkpoints. South Ossetian authorities closed the Transcaucasian Highway through a string of Georgian-administered villages to the north of Tskhinvali throughout much of the year.

An Abkhaz citizenship law allows dual Russian-Abkhaz citizenship but not dual Georgian-Abkhaz citizenship. As a result, ethnic Georgians had to relinquish their Georgian passports and obtain Russian passports to travel abroad.

Abkhaz de facto militia conducted searches of local populations and erected arbitrary checkpoints. Money and valuables were extorted from ethnic Georgians on the pretext that they violated identity document requirements.

The law prohibits forced exile, and the government did not employ it.

In July Parliament passed a law authorizing the government to begin accepting applications in 2008 for repatriation of Meskhetian Turks beginning in 2011, based on documents that attest to their deportation.

Internally Displaced Persons (IDPs)

Approximately 240,000 ethnic Georgians, 227,000 from Abkhazia and 13,000 from South Ossetia, remained displaced as a result of the conflicts in Abkhazia and South Ossetia. During the year the government, in conjunction with international organizations and NGOs, developed an action plan for its first national strategy on IDPs.

Approximately 105,000 IDPs occupied collective centers in hotels, hospitals, and other civil buildings throughout the country, particularly concentrated in Tbilisi, Zugdidi, Kutaisi, Kobuleti, and Gori. The remaining 135,000 lived in private homes with relatives or friends. The Office of the UN High Commissioner for Refugees (UNHCR) reported that collective centers were not well adapted to serve as homes, and a foreign government continued its housing voucher program for vulnerable IDPs living in collective centers in Kutaisi.

During 2006 the government began a project called "My House," which allowed over 50,000 IDPs to register property owned in Abkhazia before the war. Abkhaz de facto authorities continued to prevent repatriation of the approximately 227,000 IDPs previously driven from the region, despite their 1994 agreement with Georgia, Russia, and the UNHCR that provided for the safe, secure, and voluntary return of IDPs who left during the war. Approximately 50,000 IDPs, mostly seasonal workers, returned to the Gali region of Abkhazia.

In 2006 Abkhaz de facto authorities instituted a law that prevented internally displaced Georgians from reclaiming homes they fled in Abkhazia in 1992/1993.

In South Ossetia, de facto authorities continued to obstruct repatriation of approximately 13,000 ethnic Georgians to the region.

Protection of Refugees

The law provides for the granting of asylum and refugee status in accordance with the 1951 UN Convention relating to the Status of Refugees and its 1967 protocol, and the government has established a system for providing protection to refugees. In practice, the government provided some protection against refoulement, the return of persons to a country where there is reason to believe they feared persecution. However, in its November report, the UN Human Rights Committee expressed concern that current legislation did not fully ensure respect for nonrefoulement and recommended additional legislation and procedural safeguards, training for border guards, and a mechanism to speed referral of asylum seekers. The government granted refugee status or asylum.

The government cooperated with the UNHCR and other humanitarian organizations in assisting refugees and asylum seekers.

There were approximately 1,300 registered refugees from Chechnya settled in the Pankisi valley in the eastern part of the country. International humanitarian organizations' assistance to refugees in the Pankisi valley was sporadic. In June the government began issuing refugees temporary residence permits, allowing them to move freely about the country, open bank accounts, and purchase homes. During the year there were no instances of refoulement.

The majority of the Chechen refugees lived with the local Kist population; only 15 percent were sheltered in communal centers.

Stateless Persons

According to UNHCR, in 2006 there were 1,273 registered stateless persons in the country. Of these, 60 percent resided in Tbilisi and others were scattered throughout the country. Among those registered as "stateless," documentation was poor. The number of registered stateless persons may include Chechens who volunteered for repatriation to Russia but were denied because they had never been registered in Russia and did not have documented Georgian citizenship. This confusion was compounded by persons who lived in the unrecognized, separatist regions.

The law allows for acquisition of citizenship by birth, including for children of stateless individuals born on Georgian territory. For persons born on foreign territory, the law allows for the acquisition of citizenship through a naturalization process that requires 10 years of continuous residence in the country, demonstrated command of Georgian or Abkhaz language and Georgian history, and demonstrated permanent employment or possession of real property.

There were no clear estimates of the size of the Roma population. When the country became independent in 1991, many Roma left the country, although several thousand reportedly remained. Large numbers of Roma came from Abkhazia, from where they had migrated to Zugdidi and Tbilisi, while additional Muslim Roma arrived from Armenia and Azerbaijan. Internal seasonal migration was noted during the summer to the Black Sea Coast. Romani IDPs from Abkhazia were not entitled to IDP social assistance as they had no documentation to prove their status.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

The law provides citizens with the right to change their government peacefully, and citizens exercised this right through periodic elections, held on the basis of universal suffrage.

Controversial 2004 constitutional amendments remained in force during the year that strengthened the powers of the president, by giving him/her the ability to dismiss Parliament in two circumstances: if the Parliament does not approve the President's Cabinet nominations after three attempts, then the President can dismiss the Parliament and appoint the Prime Minister and Cabinet

himself; if the Parliament does not pass the budget on time, the President can approve the budget by decree. In both instances newly elected parliaments could neither vote on the Cabinet nor the budget.

An Abkhaz citizenship law did not allow dual Georgian-Abkhaz citizenship. As a result ethnic Georgians in the separatist region had to relinquish their Georgian citizenship in order to vote or participate in the political process.

Elections and Political Participation

The most recent presidential and parliamentary elections were held in 2004. The OSCE reported that the presidential election demonstrated notable progress, although time constraints limited administrative improvements since previous elections. The OSCE noted a continued lack of separation between state administration and political party structures and the tendency to misuse state administration resources. The voter register also continued to be incomplete and sometimes inaccurate. All of these problems continued to be noted during the November-December presidential election campaign. While the OSCE reported the voting process itself was excellent in the majority of regions, there were significant irregularities in Kvemo Kartli, and the worst irregularities were recorded in Ajara, where no pre-election registration was conducted and little or no campaigning occurred.

International observers in 2004 deemed the parliamentary elections the most democratic since independence, with voter registration procedures further improved, including the addition of a consolidated computerized database; however, there continued to be a lack of political balance and independence in election commissions. During the election international observers noticed a number of irregularities, including high voter turnout in certain regions, an unusually high percentage of invalid votes, and campaign material on display in several polling stations. Significant voting irregularities again took place in Kvemo Kartli.

In October 2006 the OSCE, the Council of Europe, and respected NGOs concluded that the local elections generally respected fundamental freedoms. OSCE and NGOS noted, however, that the ruling National Movement party abused its incumbency status through actions such as employing identical slogans, designs, and images in government public service announcements and in campaign materials, thereby improperly blurring the distinction between the National Movement and the government. OSCE, NGOs, and opposition parties also criticized the composition of the Central Election Commission, which was dominated by members of the ruling party. OSCE also noted that election legislation, voter registration, vote counting, and election grievance processes needed improvement.

International organizations, including the UN and the OSCE, as well as the government, did not recognize the February 11 local and March 4 and 18 "parliamentary " elections in Abkhazia, just as they did not recognize previous elections in the separatist regions.

Following opposition protests in November, the government agreed to change the composition of the Central Election Commission to include six members appointed by opposition parties. One member was appointed by the ruling National Movement and the other six were appointed by the President and Parliament under the previously existing procedure. The opposition also appointed members to all Precinct Election Commissions at this time; however, the mid-level District Election Commissions remained without opposition representation. Subsequent votes on major issues that came before the CEC split on party lines. Prior to this reform, the President and Parliament appointed a new chairman of the CEC, but opposition parties alleged that the appointee was selected in advance by the President and therefore was not consistent with the transparent procedure provided for in the electoral code. In their interim election reports, the OSCE reported flaws in the conduct of election commissions.

OSCE noted in their election interim reports that in November and December, the presidential election campaign was conducted in a highly polarized political environment. Opposition candidates expressed deep distrust in the election administration and alleged that they were unable to compete equally with the incumbent. They also alleged widespread pressure on voters, in particular, on state employees. The authorities, for their part, suggested that the opposition was not willing to respect the outcome of the election.

There were no government restrictions on political party formation beyond registration requirements; according to the justice ministry's Registration and Licensing Department, there were 189 registered political parties, of which 179 were active. However, some members of the political opposition were subjected to political violence. There were reports that politically active persons who were not members of the ruling party experienced problems such as selective prosecution for corruption.

At year's end the government had not determined the identity and the whereabouts of the offenders who in 2005 severely beat Valeri Gelashvili, then an opposition MP.

There were 23 women in the 235-seat Parliament. The speaker of Parliament, Nino Burjanadze, who served as Acting President during the presidential campaign, was a woman. The majority head of Parliament was also a woman, and women held important committee chairs.

There were eight members of minority groups (five Armenians and three Azeris) in the Parliament. As a result of 2006 local government reforms, the number of seats held by ethnic minorities in municipal councils was commensurate with their percentage of the population in each region of the country.

Government Corruption and Transparency

The law provides criminal penalties for official corruption; while the government implemented these laws effectively against low-level corruption, which decreased as a result of high profile reforms led by the president, senior level officials reportedly engaged in

corruption with impunity. The World Bank's worldwide governance indicators reflected that corruption was a serious problem.

According to a September Transparency International Report, the positive improvements to fight corruption were implemented in the following areas: university entrance exams, state licensing and permissions, state revenue collection, and accuracy of the public registry. Problems remained with the lack of transparency in the government's policy making process, lack of research-based fight against bribery and corruption, lack of and stable and effective mechanism for interaction between government and civil society, inconsistency related to protection of legal requirements during arrests, and difficulties in accessing public information, especially in the regions.

On June 19, Freedom House's 2007 Nations in Transit report - which covered 2006 - noted the country had made significant progress in implementing anti-corruption measures, where the government's tough reforms for the public sector were having a sustained positive effect. The report noted that corruption remained a serious concern. In a subsequent report for 2007 Freedom in the World 2008, Freedom House reported that despite progress in combating lower- and mid-level corruption, corruption at elite levels apparently continued.

A number of politically active defendants in corruption cases, including former Defense Minister Okruashvili and his associates, alleged that they were victims of selective prosecution. Other opposition leaders also stated that Okruashvili was a victim of selective prosecution. Critics alleged that the government only brought up on corruption charges high level officials when it was politically expedient to do so. Government authorities pointed out that, particularly in the case of Okruashvili, the investigation had been underway for quite some time, and Okruashvili only came forward with his allegations to attempt to preempt his arrest. During the year members of the government and ruling party members were investigated for corruption.

On September 23, Mikheil Kareli, the former mayor of Shida Karli region, was arrested and charged with bribery and illegal business practices. Earlier, according to press accounts, several officials from the local administration, including Vasil Makharashvili, the governor of Gori, Nugza Papunashvili, the deputy chairman of the City Council, and Gaioz Dzanadia, the governor of Kareli district were arrested on corruption charges. At year's end the investigation continued.

In December 2006 the Ministry of Internal Affairs opened a criminal case that involved the company Colizeum Ltd. and Kutaisi public officials. The ministry charged the deputy mayor of Kutaisi, the acting head of the Service of Territorial administration, and fifteen members of the Kutaisi mayor's office with neglect of official duty and exceeding the limits of official authority. All were accused of forging documents that paid Colizeum Ltd. more than $331,372 (553,392 lari) over the actual amount of work completed on re-roofing damaged houses in the city.

The Deputy Mayor of Kutaisi, Omar Kikvidze was found guilty of neglect of official duty and the Acting Head of the Service of Territorial Administration of the Mayor's Office, Mukhran Kokhredize was found guilty of exceeding official authority. Both were sentenced to three years probation, fined $3,125 (5,000 lari), and deprivation of the right to hold a position in the public sector for three years.

Zviad Mandaria, a member of the Kutaisi Municipality and Iralki Goglichidze, the Deputy Head of the City Service of Economic Development at the Mayor's office were found guilty of exceeding their authority and sentenced to two years probation, fined $6,250 (10,000 lari), and deprived of the right to hold a position in the public sector for three years.

Thirteen employees of the same organization were found guilty of similar crimes regarding this case and sentenced to two years probation, fined $3,125 (5000 lari) and deprived of the right to hold a position in the public sector for three years.

On April 25 the Revenue Service opened a criminal case against the company Gorgia Ltd. for bringing in construction materials from Turkey without paying proper customs duties. Five Batumi Customs agents were implicated and charged with abusing their official power for the purpose of gaining profit or privilege from Gorgia Ltd. The five officials were accused of intentionally undervaluing the materials, thereby permitting the company to pay significantly reduced customs fees. Zaza Ochkhikidze, Zurab Gugava, Shadiman Tsakadze and Lasha Jaiani were sentenced to three years probation and fined $1,250 (2,000 lari). Kakhaber Zarandia was sentenced to six months probation and fined $ 1,875 (3,000 lari). All five were required to make reparation to the state of funds lost.

On May 2, David Kekua, deputy head of the General Inspection Department of the Ministry of Internal Affairs, was charged with planting evidence during a high-profile murder investigation and held in pre-trail detention. On October 25, he was found dead in his cell in Tbilisi Prison No. 7. An investigation was ongoing at year's end.

In October 2006 the Parliament stripped the immunity of two ruling party parliamentarians, Gia Nutsubidze and Giorgi Kenchaidze implicated in a corruption scandal in 2004. Nutsubidze was sentenced to imprisonment for three years on January 14 and in September 2004, Kenchaidze found guilty of extortion and sentenced to two years in prison.

On February 14 Davit Ingorokva, the director general of the state-owned Georgian Oil and Gas Company was found guilty of filing a false public corporate declaration and sentenced to probation for 5 years, and a fine of $31,250 (50,000 lari). In the course of the investigation it was discovered that the total value of the funds stolen from the company was $3,978,434 (6,365,495 lari). Ingorovka and his accomplices, who were also convicted in the criminal case, partially reimbursed the victim, which was in this instance, Georgian Oil and Gas Company.

During the fall, the public defender reportedly criticized the head of the Ministry of Interior's Special Operations Department for attempting to illegally seize cars he liked. As of year's end government authorities had not investigated this accusation.

The law provides for public access to government meetings and documents; however, the government sometimes did not provide access. Although the law states that a public agency shall release public information immediately or no later than 10 days from request, the release of requested information could be delayed indefinitely, and requests were sometimes ignored in practice.

Other parts of this report contain information related to this subsection; see section 1.d.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigations of Alleged Violations of Human Rights

A variety of domestic and international human rights groups generally operated without government restriction, investigating and publishing their findings on human rights cases. However, while some NGOs enjoyed close cooperation with the government and officials were cooperative and responsive to their views, others complained of discrimination from government members.

The major human rights issues that caused tensions between the government and NGOs were the ill treatment of prisoners, lowering of the minimum age of criminal responsibility, inconsistency of the bail system, intimidation and use of administrative resources during the presidential campaign, violations of rights to property, and use of excessive force on November 7.

The UNHCR and the OSCE monitored only sporadically in the separatist conflict areas due to poor security conditions but provided periodic findings, reports, and recommendations. NGOs viewed the office of the Public Defender as the most objective of the government's human rights bodies. The constitutionally mandated office monitored human rights conditions and investigated allegations of abuses. The public defender's office generally operated without government interference and was considered effective, with some exceptions.

On November 2, Public Defender Office staff member Giorgi Getsadze visited the Geguti prison to verify allegations that prison guards were accepting money to be transferred to inmates, prohibited by law. When prison guards denied that such a practice existed, Getsadze called a colleague, Giorgi Mshvenieradze, to discuss the situation. On November 5, Bacho Akhalaia, Head of the Penitentiary Department released an audio tape of the Getdadze-Msheviardze telephone conversation, alleging that Getsadze was attempting to bribe the guards. On December 10, Getsadze was found guilty of the charge, fined $3,125 (5,000 lari) and sentenced to one year probation, during which he may not serve in a public sector job.

The public defender's office attributed Getsadze's arrest to his role in revealing the plight of naked inmates in the Rustavi Prison No.6 in October 2006, which caused a strong negative public reaction. According to the office, Getsadze was convicted of attempting to bribe prison staff members into passing money to prisoners, and recording the process by a hidden camera to implicate officers.

Public Defender Sozar Subauri stated in his report on the events of November 7 that he was physically abused on that date by representatives from the special operations department under the Ministry of Internal Affairs on Rustaveli Avenue. The Public Defender stood between the demonstrators and the special operation unit members and tried to prevent a provocation between the sides. Even though the Public Defender identified himself to both sides, he was physically beaten by law enforcement officers. On November 15, a criminal investigation was launched to investigate Subauri's allegations. On November 24, Subauri was questioned and examined by forensic medical experts to determine the extent of his injuries. The investigation was ongoing at year's end.

The public defender stated that, while his office continued to receive government funding, earmarked increases from the state budget were not provided to the office. The public defender's authority does not include the power to initiate prosecutions or other legal actions. The public defender objected to justice ministry regulations prohibiting the use of cameras and recorders in the penitentiary system as an obstacle to substantiating claims of prison abuse.

As required by law, the public defender issued biannual reports to Parliament. Some members of Parliament were critical of the public defender's findings and recommendations calling for equal recognition under the law of all religions. For example, the members stated that the historical position of the Orthodox Church justified its privileged position. The public defender's report is delivered in front of Parliament and is available upon request for public dissemination; the spring report to Parliament was conveyed to an almost empty hall, and received a reserved assessment from Parliament.

The parliamentary Committee on Human Rights and Civil Integration, the interior ministry's Human Rights Division, and the National Security Council's human rights advisor also had mandates to investigate claims of abuse. By law the prosecutor general is charged with protection of human rights and fundamental freedoms; the prosecutor general's human rights protection unit is the reporting and monitoring arm of the legal department and has no independent investigative powers. The human rights unit focused on curbing abuses by law enforcement officials.

The UNHROAG office in Sukhumi continued to monitor respect for human rights in Abkhazia and to visit detention facilities in the region. In March Abkhaz de facto authorities agreed to permit a UN human rights officer's presence and the deployment of three UN civilian police in the Gali Sector headquarters and these deployments subsequently occurred.

Other parts of this report contain information related to this section; see section 2.b., Freedom of Assembly.

Section 5 Discrimination, Societal Abuse, and Trafficking in Persons

The law prohibits discrimination based on race, gender, religion, disability, language, or social status; however, the government did not always enforce these provisions effectively.

Women

Rape is illegal. Criminal cases of rape generally can only be initiated following a complaint by the victim. Spousal rape is not specifically addressed by criminal law. A first time offender may be imprisoned for up to seven years; a repeat offender or perpetrator against multiple victims may receive up to 10 years. If the victim was pregnant, contracted HIV/AIDS, or was subjected to extreme violence, the sentence may be increased to 15 years and, if the victim was a minor, up to 20 years. In 2006 the Ministry of Internal Affairs reported 156 cases of rape and attempted rape, compared to 167 cases in 2005. Observers believed many instances of rape went unreported due to the social stigma for victims. Police did not always investigate reports of rape.

Violence against women was a problem. The government acknowledged that domestic violence was a problem. Women victimized by domestic violence, however, rarely reported it because of social taboos, and police rarely arrested or punished perpetrators. According to Ministry of Internal Affairs statistics, during the year the police responded to 2,056 cases of family conflicts, in which 545 involved reports of domestic violence where restrictive orders were issued. The number of such conflicts registered in 2006 was 3,665, but there is no information available on restrictive orders, as the law did not go into effect until September 2006, and statistics were not required to be gathered until January 2007. UN and NGO studies have found that in 2006 approximately 5 percent of women reported being physically abused. A November UN Human Rights Committee report recommended that the government institute a mechanism to compile information on domestic violence and to make it publicly available. A local NGO operated a hot line and a shelter for abused women, although services at the shelter were limited due to a lack of funding and facilities. The same UN report recommended that the government take measures necessary to protect victims from domestic violence by establishing a sufficient number of shelters across the country.

The law on domestic violence, which came into effect in June 2006, defines domestic violence as a violation of the constitutional rights and liberties of one member of a family by another by means of physical, psychological, economic, or sexual violence or coercion; however, domestic violence is not specifically criminalized. Perpetrators of domestic violence are prosecuted under existing criminal provisions against, for example, battery or rape.

The law allows victims to file immediate protective orders against abusers and police to issue temporary restrictive orders against persons suspected of abusing a family member. The temporary order is then approved by a court within 24 hours and becomes a protective order that prohibits the abuser from coming within 100 meters of the victim and using common property, such as a residence or vehicle, for six months. The victim may ask authorities to extend the protective order indefinitely. In September 2006, the Ministry of Internal Affairs developed a form required by law for police to issue as restrictive orders, but training for police in this area was lacking outside of Tbilisi. In his biannual report, the public defender recommended amendments to the law that would imply administrative liability for nonexecution of a restraining order, create social and labor guarantees for victims, and establish rehabilitation for aggressors. In July the government approved the Action Plan on Measures to Prevent and Combat Domestic Violence mandated by law.

The kidnapping of women for marriage continued to occur, particularly in rural areas. Such kidnappings often were arranged elopements; however, at times kidnappings occurred against the will of the intended bride and involved rape. Police rarely took action in these cases, even though the law criminalizes kidnapping. A local NGO in the Samtskhe-Javakheti region maintained a hot line and shelter to assist victims of attempted kidnappings, who were often rejected by their families after escaping from the kidnapper.

Prostitution is illegal but was widespread, particularly in Tbilisi. Several NGOs claimed that prostitution remained common due to continuing poor economic conditions.

Sexual harassment and violence against women in the workplace was a problem. The law prohibits sexual harassment; however, the government did not effectively enforce the law, and complaints were rarely investigated.

The law provides for the equality of men and women; however, in practice this was not enforced. NGOs stated that discrimination against women in the workplace existed but instances were never reported. The speaker of Parliament continued to chair a Gender Equity Advisory Council, which included members of Parliament as well as representatives from the executive branch, the public defender's office, and NGOs. The State Commission on Gender Equity was chaired at the deputy state minister level and prepares recommendations on the implementation of international agreements and conventions on gender equity. Within the public defender's office, there is a special group dedicated to women's and children's issues.

Women's access to the labor market improved; however, women remained primarily confined to low-paying and low-skilled positions, regardless of their professional and academic qualifications, and salaries for women lagged behind those for men. As a result, many women sought employment abroad. According to the UN Development Program, employers frequently withheld benefits connected to pregnancy and childbirth.

Children

The law provides for the protection of children's rights and welfare, but the government provided limited services. Children are protected under the antidomestic violence law, which became effective in June 2006. In his December biannual report, the Public Defender recommended the Ministry of Education and Science promote public awareness and education to protect children from domestic and any other forms of violence.

Primary and basic education is compulsory from age six or seven to age 14, and provided up to age 16 (a total of 11 years). The UN Children's Fund (UNICEF) estimated primary school enrollment at 95 percent in 2005, the most recent year for which data was available; secondary school enrollment for the same period was 81 percent. Education was officially free through high school, but in practice a lack of resources inhibited schools' functioning and affected the quality of education in some areas, including and especially in the separatist regions of Abkhazia and South Ossetia.

During the year the government rehabilitated schools, but in some areas school facilities were inadequate and lacked heating, libraries, and blackboards. Most parents were obliged to pay some form of "tuition" to support the schools. Many parents were unable to afford books and school supplies, and in some cases students were forced to drop out due to an inability or unwillingness to pay tuition.

There were some reports of child abuse, particularly of street children, although there was no societal pattern of such abuse. Incidents of sexual exploitation of children, particularly girls, were reported. Commercial sexual exploitation of children and pornography are punishable by up to three years' imprisonment. The Ministry of Internal Affairs sponsored a center for the rehabilitation of minors, which regularly provided medical and psychological assistance to child and adolescent victims before returning them to their guardians. Street children and children living in orphanages were reportedly particularly vulnerable to trafficking.

Difficult economic conditions broke up some families and contributed to the number of street children. In September the NGO Save the Children estimated that there were approximately 823 street children in four major cities, 435 of whom were in Tbilisi, due to the inability of orphanages and the government to provide support. The private voluntary organization Child and Environment and the Ministry of Education each operated a shelter in Tbilisi; however, the two shelters could accommodate only a small number of street children. The government took little other action to assist street children. According to a UN-sponsored report prepared by the Minnesota Advocates for Human Rights, the education ministry views street children as a local issue which should be addressed by the municipalities, not the ministry.

There were unconfirmed reports of police violence against street children, but the patrol police routinely transferred street children to a 24-hour care center or orphanage. The center, however, lacked resources for treatment and rehabilitation of the children, many of whom were substance abusers or suffered from mental disorders.

Orphanages were unable to provide adequate food, clothing, education, and medical care; facilities lacked heat, water, and electricity. Staff wages were paid on a regular basis. Due to reported mismanagement of resources, staff members often diverted money and supplies provided to orphanages for personal use.

Roma children were usually born at home and their births were not registered by their parents with the government.

Ongoing conflicts in Abkhazia and South Ossetia displaced thousands of children. In these regions, UNICEF reported that health services were scant, immunization rates were lower than elsewhere in the country, schools were deteriorating, and malnutrition was a serious problem.

Trafficking in Persons

The law prohibits trafficking in persons; however, there were reports that women and girls were trafficked to, from, and within the country for commercial sexual exploitation and labor and men were trafficked from the country for labor.

The country was a country of transit and origin, and very rarely a destination for trafficked persons. Women were trafficked from the country to Turkey, Greece, the United Arab Emirates, North America, and Western Europe to work in hotels, bars, restaurants, or as domestic help. Many were exploited in the adult entertainment sector or forced into prostitution. Victims most frequently came directly from Tbilisi or the impoverished former industrial centers of Poti, Kutaisi, and Rustavi. Local NGOs reported that men were trafficked to Russia, Greece, Spain, Portugal, and other destinations to work in construction, agriculture, and other manual labor. There also was evidence women from other countries of the former Soviet Union were trafficked through the country to Turkey, sometimes using fraudulently obtained passports.

Children were seldom trafficking victims, although street children and children living in orphanages were particularly vulnerable. Some reports indicated that IDPs were a particular target for traffickers. Conditions for trafficked laborers and women trafficked into prostitution were extremely poor.

Traffickers were largely freelance domestic operators with connections outside the country as well as some small international operations. They often used offers of employment from friends and families or offers of overseas jobs from tourism or employment agencies to lure potential victims.

In 2006 the country incorporated into its domestic law the Protocol to Prevent, Suppress, and Punish Trafficking in Persons,

Especially Women and Children, supplementing the UN Convention against Transnational Organized Crime, and the Council of Europe Convention on Action against Trafficking in Human Beings.

The criminal code prohibits trafficking in persons, including minors, for sexual, labor, and other forms of exploitation. Trafficking in adults is punishable by seven to 20 years in prison. Trafficking in minors is punishable by a prison sentence of eight years to life, under aggravated circumstances. Minors are defined as anyone below the age of 18. The code prohibits internal and external forms of trafficking, although transborder trafficking is an aggravated form of the crime.

The code of civil procedure provides for confiscation of assets of convicted traffickers, members of their families, their close relatives, and persons related to traffickers if these assets were acquired through trafficking in persons. Such assets are to be used to satisfy the needs of the trafficking victim, with any remaining assets go to the state. A victim can also claim civil damages from the trafficker during the criminal proceedings.

On May 8, Parliament amended the criminal code to criminalize the use of services of a (statutory) trafficking victim, which is punishable by three to 15 years' imprisonment.

A trafficker was convicted in April and sentenced to 26 years in prison after two victims trafficked contacted the hot line in the fall of 2006. One victim was a minor.

As of year's end the courts had opened 24 new criminal investigations, one involving a minor. During the year the courts rendered 13 judgments against 16 perpetrators; the sentences of those convicted ranged from eight to 26 years in prison. None involved government officials or international organization employers.

As a result of active cooperation between the prosecutor general's office, the Ministry of Foreign Affairs, and the International Organization for Migration, a third-country national was safely repatriated in January after her trafficker was convicted and sentenced to 11 years in prison.

An interagency antitrafficking coordination council serves as the overall coordinator for antitrafficking measures undertaken by state agencies. National NGOs and international organizations were actively involved in the work of the council, which met quarterly. On July 19, the council approved a strategy for rehabilitating and reintegrating trafficking victims into society. The strategy is the final document in a series providing the framework for assistance to, and protection of, trafficking victims. The prosecutor general's office, the State Fund, and international organizations and local NGOS were designated to implement the strategy, which called for individual victims to receive a specific rehabilitation plan according to their needs.

During the year the government allocated approximately $180,000 (300,000 lari) to protect and aid trafficking victims and an additional $29,000 (51,000 lari) to rehabilitate and open a second shelter in the country -- the first in Tbilisi -- before the end of the year. A hot line for trafficking victims and inquiries was fully operational in the largest cities, and a trafficking victim shelter functioned in Batumi.

The country has a system for protecting and providing rehabilitation opportunities for trafficking victims, integrating them back into society. This system is fully operational.

A robust public information campaign ensures that information about trafficking is widely available through law enforcement agency Web sites, public service announcements, antitrafficking television programming, and brochures at the country's main ports of entry.

Persons with Disabilities

The law prohibits discrimination against persons with disabilities, although in practice the problem was a low priority for the government. Discrimination against persons with disabilities in employment, education, access to health care, and in the provision of other state services was a problem, and societal discrimination against persons with disabilities existed. The administrative code mandates access to buildings for persons with disabilities and stipulates fines for noncompliance. However, very few, if any, public facilities or buildings were accessible.

According to official data for the year, the country has 11,024, children with disabilities, although the actual number is thought to be higher.

National/Racial/Ethnic Minorities

The law requires that all government officials speak Georgian, which some minorities claimed excludes them from participating in government. Some government materials distributed to the public were only available in the Georgian language.

Ethnic Georgians living in the Gali region of Abkhazia had no legal access to education in the Georgian language. As a practical matter, however, teachers who did not speak Abkhaz instructed students in Georgian. However, those who did so were often subject to harassment and prosecution by de facto Abkhaz authorities.

During the year there were no significant incidents of ethnic/criminal violence in the Tsalka region. The ethnic Greeks residing there

were predominantly elderly and often reported economic difficulties (low pensions). The improvement of the social situation in the district was largely due to upgrades in the water supply, roads, and electricity, renovated schools, and appearance of local NGOs where community members are actively involved.

In the ethnic-Armenian dominated region of Akhalkalaki, many ethnic Armenians asserted that the government should allow Armenian to have "provincial language" status, as very few persons there spoke Georgian and were unable to conduct daily affairs in Georgian. They also complained that the government did not provide Georgian language instruction. Ethnic Azeris had similar complaints in the ethnic-Azeri dominated region of Kvemo Kartli.

While the law stipulates that Georgian is the state language, ethnic Armenians, Azeris, Greeks, Abkhaz, Ossetians, and Russians usually communicated in their native languages or in Russian in the areas where they are the dominant ethnic group. The law requires that ethnic minority students learn Georgian as a second language, and the government funded over 200 primary and secondary Russian, Azeri, and Armenian language schools throughout the country for persons whose first language is not Georgian. In Tbilisi a large majority of ethnic minority groups communicate in Georgian in their daily affairs.

The government took several steps to better integrate ethnic minority communities through Georgian language instruction, education, involving minorities in political dialogue, and increasing their overall access to information. The government increased its efforts to provide Georgian language instruction to members of ethnic minorities serving in the armed forces and law enforcement. In his annual report, the public defender recommended that the Ministry of Education send qualified Georgian language teachers who speak the relevant national minority languages to these regions.

In July Parliament approved a law on the repatriation of the Meskhetian Turks, a national minority group of the Muslim faith deported by Stalin in 1944. The legislation honored commitments made by the country to the Council of Europe in 1999 to provide for the resettlement of the Meskhetians by 2011. Passage of the law allowed the government to begin accepting applications on January 1, 2008 for repatriation from Meskhetians based on documents which attest to their deportation. Passage of the law came under heavy criticism from opposition MPs and the media, which pointed to the delicate ethnic and demographic balance in areas once inhabited by Meskhetians but which have become populated by a sizeable ethnic Armenian community.

Other Societal Abuses and Discrimination

While there are no laws that criminalize homosexual behavior, it was not widely accepted in society.

The law expressly prohibits discrimination on the basis of HIV/AIDS status; however, there is no penalty for violating this prohibition. NGOs reported that societal stigma resulted in individuals avoiding testing or obtaining treatment for fear of discrimination. Some health care providers, particularly dentists, often refused to provide services to HIV-positive persons. Individuals often concealed their HIV-positive status from employers for fear of losing their jobs. The Ministry of Internal Affairs conducted mandatory HIV testing on all job applicants in 2006.

Section 6 Worker Rights

a. The Right of Association

The law allows all workers, including government employees, to form and join unions of their choice, and they did so in practice. However, the law restricts the right of employees of law enforcement agencies and the prosecutor general's office to form and join unions. Labor unions stated that provisions of the labor code limit the mechanisms available for them to exercise their rights. Labor unions' most frequent demand was for the creation of an eight-hour workday, with double pay for overtime. The labor code stipulates an eight-hour day unless the employee and employer agree to other arrangements. Critics asserted that this gave too much power to employers, since there was a shortage of jobs in the country.

The principal association of unions is the Georgian Trade Union Confederation (GTUC), which represented unions in 25 sectors with over 252,000 unionized workers. The Educators and Scientists Free Trade Union of Georgia (ESFTUG) represented over 100,000 members. The ESEFTUG merged with GTUC by the end of the year. There were a few small unions for civil servants, cultural workers, and art workers, but they did not participate in GTUC. Although many employees in large-scale enterprises were unionized, their power was not commensurate with their large membership. Only a minority of the members were active in the labor movement. Critics believed that this gave management a free hand.

The law prohibits discrimination by employers against union members or union organizing activities, and employers may be prosecuted for violations and forced to reinstate employees and pay back wages. Despite this law, the GTUA and its national unions continued to report some cases of management warning staff not to organize trade unions.

During the year GTUC alleged several instances in which union members were threatened with dismissal by their employers for union activity. In December union members were fired from their jobs in Poti for union activity and their office sealed. After negotiations between the port authorities and the union, most all workers were reinstated and the union office was reopened. There were continuing reports that some workers, including teachers, employees of various mining, pipeline and port facilities, and the Tbilisi municipal government, complained of being intimidated or threatened by employers--including public sector employers--for union organizing activity. There were a few cases of employers failing to transfer compulsory union dues, deducted from wages, to union bank accounts, but the disputes were resolved after discussions between the unions and employers.

b. The Right to Organize and Bargain Collectively

The law allows unions to conduct their activities without interference. Collective bargaining is recognized by law, and the law provides punishments for those who refuse to take part in negotiations; however, the government did not always protect this right in practice. The ombudsman's office listed not requiring employers to provide notice to employees in the event of termination of the labor relationship as one of the major deficiencies of the labor code. The practice of collective bargaining was not widespread. The GTUC administered approximately 1,600 collective bargaining agreements. Poor management and leadership, plus a general unfamiliarity with the collective bargaining process, limited the scope of collective bargaining.

The law provides for the right to strike; however, the law limits the maximum length of strikes to 90 days. In general workers exercised their right to strike in accordance with the labor code; strikes must be sanctioned by the employer based on written notification provided three days in advance and a one-hour warning strike. In practice, strikes were rare.

There are no export processing zones.

c. Prohibition of Forced or Compulsory Labor

The law prohibits forced or compulsory labor; however, there were reports that women and children were trafficked for commercial sexual exploitation and men were trafficked for labor.

NGOs and trade unions have objected to a provision in the labor code that permits compulsory labor in instances of emergency and natural disaster but does not require remuneration to persons who are conscripted. Also, the labor code provides that an employer may change hours of work by 90 minutes in either direction without renegotiating the terms of any labor contact. NGOs stated that this provision would effectively require employees to work overtime without compensation in violation of the prohibition against compulsory labor in the constitution.

d. Prohibition of Child Labor and Minimum Age for Employment

There are laws and policies to protect children from exploitation in the workplace; however, there were reports that children were sometimes trafficked for commercial sexual exploitation. A least one minor was trafficked during the year for sexual exploitation.

The public defender's office listed not giving enough attention to the rights of minors as one of the major deficiencies of the labor code. With high unemployment resulting in a large pool of adult workers willing to work for low wages, child labor was uncommon in the country. The Ministry of Health, Labor, and Social Affairs is responsible for enforcing laws regulating child labor. Although official data was not available, child labor was not generally considered a serious problem. Approximately 77.4 percent of working children were employed on family farms while 18.4 percent worked in family enterprises.

The minimum legal age for employment of children is 16. In exceptional cases, children may work with parental consent at ages 14 and 15. Children under age 18 may not engage in unhealthy or underground work, and children ages 16 to 18 are subject to reduced working hours and are prohibited from working at night. Inspections are performed by the Labor Department of the Ministry of Labor, Health, and Social Affairs, which employed six labor inspectors nationwide.

e. Acceptable Conditions of Work

Neither the minimum wage for public employees, approximately $67 (115 lari) a month, nor the statutory minimum wage for private sector workers, approximately $12 (20 lari) a month, provided a decent standard of living for a worker and family. The minimum wage was below the average 2006 monthly wage in both private enterprise and the government sector. The official minimum subsistence levels were approximately $72 (121.40 lari) for a single person and $126 (215.10 lari) for a family of four. Unreported trade activities, assistance from family and friends, and the sale of homegrown agricultural products often supplemented salaries. The Ministry of Labor, Health, and Social Affairs is responsible for enforcing the minimum wage. The GTUA had its own inspector to monitor compliance.

The labor code provides for a 41-hour work week and for a weekly 24-hour rest period, unless otherwise provided by a labor contract. The public defender's office listed not giving enough attention to the rights of pregnant women as one of the major deficiencies of the labor code. The code does not protect pregnant women from being dismissed from work while they are on maternity leave. The labor code provides that, unless otherwise addressed by an employment agreement, the duration of the business day is determined by the employer, but should not exceed 41 hours a week. Break and leave is not included in the work time. Duration of leave between work days (shifts) should not be less than 12 hours. The Labor Code provides that employees must work overtime labor without compensation to avoid natural disasters or prevent industrial accidents or to resolve of the consequences of either event. Pregnant women or women who have recently given birth are prohibited from working overtime without their consent. Overtime is defined as work that exceeds the work hours addressed in the employment agreement. If the employment agreement does not specify business hours then overtime is considered to be performance exceeding 41 work hours per week. Terms of overtime labor are defined by the parties.

The government set occupational health and safety standards. The Ministry of Labor, Health and Social Affairs is charged with monitoring implementation of health and safety standards and had six inspectors assigned to the task. However, the public defender's office listed failure to ensure safe conditions for workers as one of the major deficiencies of the labor code. During the

year the government allocated approximately $33,000 (55,000 lari) for a program for formation of workplace safety rules. The law permits higher wages for hazardous work and provides workers the right to remove themselves from situations that endanger health or safety without jeopardizing their continued employment. In practice employees rarely, if ever, took advantage of these protections.

 BACK TO TOP

Published by the U.S. Department of State Website at http://www.state.gov maintained by the Bureau of Public Affairs.

**© Crown Copyright 2006**

The text in this document may be reproduced free of charge in any format or media without requiring specific permission. This is subject to the material not being used in a derogatory manner or in a misleading context. The source of the material must be acknowledged as Crown Copyright and the title of the document must be included when being reproduced as part of another publication or service,

Any enquiries relating to the copyright in this document should be addressed to HMSO,
The Copyright Unit,
St Clements House,
2–16 Colegate,
Norwich NR3 1BQ.
Fax 01603–723000 or
e.mail: copyright@hmso.gov.uk

2

**Exhibit K**



**United Kingdom** | **Foreign & Commonwealth Office**

# H U M A N   R I G H T S

**Annual Report 2006**

Presented to Parliament

by the Secretary of State for Foreign and Commonwealth Affairs

by Command of Her Majesty October 2006

Cm 6916  £32.00

the rule of law, good governance, respect for human rights and the principles of market economy and sustainable development. Each country is involved in developing an action plan which sets out priorities that promote the interests of both parties. The priorities will also reflect the state of the EU's relationship with the country and take into account the country's needs and capacities.

The implementation of each action plan is regularly monitored by the joint bodies set up by the association or partnership and co-operation agreements each country signs with the EU. To date, Armenia, Azerbaijan, Egypt, Georgia, Israel, Jordan, Lebanon, Moldova, Morocco, the Palestinian Authority, Tunisia and Ukraine have completed action plans. The EU will consider developing an action plan with Belarus as soon as the Belarusian authorities demonstrate a sincere willingness to respect human rights, the rule of law and democratic values. The European Commission will compile a report in 2006 with a view to negotiating an action plan with Algeria.

We will now look in closer detail at the human rights situation in some of the EU's near neighbours. See Chapter 2 for information on the human rights situation in Belarus, Israel and the Occupied Territories and Syria, and Chapter 9 for information on democratisation and reform in Middle Eastern and north African countries, including those that fall under the ENP.

### Eastern neighbours

*Armenia*
The EU and Armenia signed a Partnership and Co-operation Agreement in April 1996, which came into force in July 1999. Armenia became a full member of the Council of Europe in January 2001.

The constitution was amended by a referendum in November 2005. The amendments aimed to bring legislation into line with the commitments Armenia made on joining the Council of Europe and to restrict the power of the president, particularly to appoint and dismiss members of the judiciary. As a result, power is now more evenly balanced between the president and parliament. The majority of the international community viewed the changes as positive, but they were rejected by most opposition parties as not going far enough. The opposition also questioned the legitimacy of the government, who they claim "stole" the previous election, and called for a boycott of the vote. The amendments were approved by an improbably high margin amid widespread allegations of fraud and ballot stuffing.

A new electoral code drafted with the assistance of the

Venice Commission and the ODIHR was introduced in 2005. However, it is widely perceived to be flawed and there are moves to change it again in advance of the 2007 general election.

In 2003, the government adopted an anti-corruption strategy. The prime minister chairs an anti-corruption council, and NGOs have been included in an anti-corruption monitoring commission. However, this process is now defunct and there is no evidence of any real political will to tackle corruption. Civil society groups are now calling for a new, more robust anti-corruption strategy to be drawn up.

The UK supports human rights in Armenia in a number of ways. We have supported a number of small NGOs in their work on tackling corruption in the traffic police, promoting greater transparency of judgments in the judicial system and freedom of information. We have helped translate important manuals on the workings of the ECHR. *ECHR practice,* funded by the British Embassy, is the first monthly periodical in Armenia to provide up-to-date information on developments in the court, which is currently considering 24 Armenian cases.

The embassy works closely with reformist elements of the judiciary to help them in their efforts to modernise and reform the system. We have also helped investigative journalists to cover human rights violation cases in the regions.

Young people in Armenia are often excluded from the political process, and have become cynical about their leaders. Two recent embassy-funded concerts – "Rock the referendum" (promoting participation in elections) and "It's possible" (promoting the idea that young people can drive change) – have been major successes, attracting more than 2,000 young people.

*Azerbaijan*
A partnership and co-operation agreement between the EU and Azerbaijan came into force in 1998. Azerbaijan joined the Council of Europe in 2001 and signed the ECHR and its associated protocols. The government has made some progress on human rights, abolishing the death penalty in 1998 and establishing an ombudsman's office and a constitutional court in 2002. We welcome the continued co-operation between the Council of Europe and the government on the issue of political prisoners.

Despite these steps, Azerbaijan's human rights record remains poor. The judiciary does not function independently of the executive and is widely perceived to be inefficient and corrupt.

During the parliamentary elections in November 2005, the UK made one of the largest contributions to the OSCE Election Observer Mission. This included 50 short-term and three long-term observers; and two secondees to the core team of the Mission. Their final report concluded that the elections failed to meet international standards. The UK, along with EU and OSCE partners, continues to press the Azerbaijani government and the Central Election Commission to build on the OSCE's report, and to amend procedures and laws to ensure that future elections are conducted according to international democratic norms.

The OSCE and the Council of Europe noted that some progress had been made during parliamentary by-elections held in May 2006, but that more needed to be done to ensure that future elections were free and fair. We share the OSCE's concern that Azerbaijan has made little progress in implementing the recommendations set out in the OSCE's final report. The justice ministry continues to deny registration to many NGOs, hampering the development of civil society. Although the government abolished censorship in 1998, it still exerts strong control over the broadcast and electronic media. The City of Baku authorities have failed to approve any application to hold demonstrations since November 2005.

We were deeply concerned at the murder on 2 March 2005 of the journalist Elmar Huseynov (see also page 279), who had made a significant contribution to the development of a free media, democracy and pluralism in Azerbaijan. On behalf of EU heads of mission in Baku, the British embassy issued a press release paying tribute to the contribution made by Elmar Huseynov to the development of a free media, democracy and pluralism in Azerbaijan. The British ambassador attended his funeral and events marking the anniversary of his death. The ambassador has expressed concern to the Azerbaijani authorities at senior levels at the lack of progress in identifying and bringing to justice those responsible for the murder.

We supported the OSCE statement, which concluded the trial of three youth activists from the Yeni Fikir ("New Thought") youth movement, who were arrested on charges of treason prior to the parliamentary elections in November 2005, fell short of international standards in upholding the rule of law commensurate with international obligations.

The UK closely monitored the activities of the media in Azerbaijan in the run-up to the November 2005 elections. According to the OSCE, state-funded television did not provide equal or equitable coverage to the main political parties and blocs. The state media must develop a neutral, objective and informative editorial line and ensure that its reporting is balanced at all times. The establishment of a public TV channel in Azerbaijan in August 2005 was a welcome step forward, but the government will need to ensure it meets the standards laid down by the Council of Europe.

*Georgia*
President Saakashvili has set an ambitious reform programme aimed at promoting and establishing democracy, good governance and the rule of law in line with Georgia's NATO and EU accession aspirations. Despite considerable progress in some areas, though, Georgia's human rights record remains uneven. The local elections, scheduled for 2006, will be the litmus test for Georgian democracy. We continue to be concerned about the freedom and independence of the media. There have been allegations that, through indirect control, government influence has led certain sections of the media to become less critical. Media outlets that have spoken out against the actions of the government claim to have been subjected to political pressure. Despite this, the right to demonstrate still exists and has been frequently exercised in 2006. Civil society has become more outspoken, and extra-parliamentary opposition activities have increased. While 2005 saw a decrease in the number of reported attacks on non-orthodox religious groups, the legal framework to clarify the situation of non-orthodox religious groups in Georgia is not yet in place.

Although the government has taken several important steps to prevent torture and mistreatment by the police and other security agencies, incidences of torture continue to be reported and remain a serious concern. The lack of professionalism and independence of the judiciary makes

**A woman walks past candidates' posters ahead of Azerbaijan's parliamentary elections in November 2005. The** OSCE's final report concluded that the elections failed to meet international standards.





**Inmates at a prison in Tbilisi. Georgia's prison population has doubled since 2004, leading to overcrowding and unsanitary conditions.**

prosecution difficult, as does the apparent culture of impunity among the security services. Police officials routinely use firearms against suspects with the explicit support of both President Saakashvili and the Ministry of the Interior. Several suspects have died in the course of violent arrests.

As a result of the police's zero tolerance approach, pre-trial detention facilities and prisons are increasingly overcrowded. The prison population has almost doubled since 2004, a fact the government views as a positive achievement. Sanitary and health conditions do not meet international standards. Several deaths in custody have been reported. Most detainees' cases have reportedly been investigated, but follow-up has been hindered by a lack of judiciary staff. In recent months there have been several clashes between detainees and authorities. On 27 March 2006, at least seven prison inmates were killed in circumstances which remain unclear. There is a growing belief among human rights activists that the government needs to end the apparent

culture of impunity that exists within the security agencies. The judiciary is also under pressure from the government. In the drive to tackle corruption and establish a new and independent judiciary, judges have been pressured to resign and/or dismissed in arbitrary procedures directly influenced by the executive branch.

Through Penal Reform International(PRI), the UK has supported two projects aimed at improving the independent monitoring of prisons. We have also supported the writing and publication of a new *Parliamentarians' guide to human rights* for MPs and researchers, which should help ensure that human rights issues are given proper consideration in future legislation. The embassy has also used devolved funding to support a range of other projects, including training support for public broadcasting, training the police to handle domestic violence and providing free legal advice to vulnerable groups through the parliament's Committee on Human Rights and Civic Integration.

*Moldova*
Although Moldova has made some progress on human rights and democracy since gaining independence in 1991, serious reform in key areas is still needed. The government decriminalised libel in 2005, and has promised to implement the key political reforms set out in its ENP action plan. However, the UN Committees on Human Rights, Racial Discrimination and the Rights of the Child have all expressed concern at Moldova's human rights record. There are also continuing allegations of ill-treatment and torture of suspects and prisoners by Moldovan police officers and concern at levels of corruption within the Moldovan police force and in other areas of public life, including the judiciary.

Independent observers have reported that some detentions could be regarded as politically motivated. The authorities detained Mihail Formuzal, a leading opposition figure in the autonomous region of Gagauzia, on charges of abuse of office and misuse of funds. Former defence minister Valeriu Pasat – who had openly criticised the government on several occasions – was arrested in early 2005 and sentenced to 10 years in prison for fraud. The EU has expressed its concern to the Moldovan authorities over the lack of transparency in the trial process.  Mr Pasat's lawyers announced on 30 June 2006 that they intend to appeal to the ECtHR on the grounds that the Moldovan authorities have violated the rights of their client.

Moldova also needs to undertake serious reforms in order to meet European standards for a free and pluralistic media. Teleradio-Moldova (the state broadcaster) is not a genuine public broadcaster and continues to support the government.

**Exhibit L**

Distr.
GENERAL

CCPR/C/GEO/CO/3/CRP.1
19 October 2007

Original:  ENGLISH

**Human Rights Committee**
**Ninety-first session**
**Geneva, 15 October to 2 November 2007**

## CONSIDERATION OF REPORTS SUBMITTED BY STATES PARTIES UNDER ARTICLE 40 OF THE COVENANT

### Concluding observations of the Human Rights Committee

### Unedited version

### Georgia

1.   The Committee considered the third periodic report submitted by Georgia (CCPR/C/GEO/3) at its 2483rd and 2484th meetings (CCPR/C/SR.2483 and 2484), held on 15 and 16 October 2007, and adopted the following concluding observations at its 2500 meeting (CCPR/C/SR.2500), held on 26 October 2007.

### Introduction

2.   The Committee welcomes the timely submission of the State Party's third periodic report, which contains useful and detailed information on developments since the consideration of the second periodic report, in light of certain previous concluding observations. The Committee appreciates the attendance of a delegation composed of experts competent in various fields relevant to the Covenant, as well as its oral and written replies to the questions raised and concerns expressed by the Committee during the examination of the State Party's report.

### B.    Positive aspects

3.   The Committee welcomes the significant and wide-ranging legislative and institutional changes that have been introduced in the State party during the years covered by the report, with

a view to consolidating the rule of law, and in light of certain recommendations made by the Committee in 2002.

4.    The Committee welcomes the accession by Georgia, in 2006, to the Optional Protocol to the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, which should ensure better observance of Article 7 of the Covenant.

5.    The Committee welcomes the adoption of the Law on Restitution of Property adopted on 29 December 2006, and encourages the State party to take all necessary measures to promptly implement it.

### Principal subjects of concern and recommendations

6.    While taking note of the difficulties expressed by the State Party in implementing the Covenant in the Abkhazia and Tskhinvali Region/South Ossetia, and acknowledging positive steps taken to ensure protection of the rights under the Covenant of persons living in territories presently not under its control, including encouraging United Nations Special Procedures mechanisms invited to Georgia to visit such territories and engage in dialogue with de facto authorities, the Committee is concerned that the populations concerned do not fully enjoy the Covenant provisions. (Articles 1 and 2).

> **The State party should continue to take all possible measures, without discrimination, to enhance protection under the Covenant for the population of these regions by the Abkhazia and Tskhinvali Region/South Ossetia de facto authorities. The State Party should ensure that international agencies are able to operate without obstacles.**

7.    The Committee acknowledges: a) the April 2007 amendments to *Law on Refugees Issues*, which grant the refugees registered in Georgia temporary residence; and b) the new procedure to appeal against deportation decisions of the Prosecutor General. However, the Committee remains concerned that the current legislation does not fully ensure respect for the principle of *non-refoulement*. (Articles 2, 6 and 7)

> **The State Party should:**
>
> a) **adopt effective legislative and procedural safeguards to ensure that nobody is returned to a country where there are substantial grounds to believe that they are at risk of being arbitrarily deprived of their life or being tortured or subjected to other cruel, inhuman or degrading treatment or punishment;**
>
> b) **provide training to border guards on the rights of asylum seekers, and institute a mechanism to speed up referral of asylum seekers from the border guards to the asylum authority.**

8.    While acknowledging the *Law on Combating Domestic Violence, Prevention of and Support to its Victims*, adopted in May 2006, the Committee remains concerned by the still substantial number of women in Georgia who are subject to violence, in particular to domestic violence, as well as at the insufficient measures and services to protect victims. The Committee

notes with regret that the State Party considers that Non-governmental organisations are mainly responsible for setting out and managing shelters for victims of domestic violence, without assuring to them appropriate financing. (Articles 3, 23 and 26)

**The State Party should take prompt measures to implement the 2006 Law, including:**

a) **institute a mechanism to compile disaggregated data on incidents of domestic violence, including sex, age and family relationship of victims and perpetrators, as well as investigations and prosecutions carried out.  This information should be made public;**

b) **promptly investigate complaints related to domestic violence and other acts of violence against women, as bride-kidnapping and rape; and institute criminal proceedings against perpetrators; and**

c) **take all the necessary measures to protect victims of domestic violence, including by establishing a sufficient number of appropriate shelters across the country.**

9.   The Committee is concerned about allegations of deaths caused by use of excessive force by police and prison officials. The Committee is particularly concerned at the Tbilisi prison No. 5 disturbance, in March 2006, in which at least seven inmates allegedly died. (Article 6)

**The State Party should take firm measures to eradicate all forms of excessive use of force by the law enforcement officials. It should in particular:**

a) **ensure prompt and impartial investigation of complaints concerning actions of law enforcement officials, and make public the results of such investigations, including with respect to the 2006 disturbance at Tbisili prison No.5;**

b) **initiate criminal proceedings against alleged perpetrators;**

c) **provide training to law enforcement officers with regard to the criminal nature of the excessive use of force, as well as on the principle of proportionality when using force. In this regard, the Committee draws to the attention of the State Party the 1990 UN Basic Principles on the Use of Force and Firearms by Law Enforcement Officials;**

d) **provide compensation to the victims and/or their families.**

10.  While acknowledging the positive legislative, judicial and monitoring measures taken by the State Party to strengthen safeguards against torture and other ill-treatment, as well as significant reduction in allegations of such treatment of persons in custody, the Committee regrets the persistence of reports of acts of ill-treatment by the police, especially during the arrest of suspects. (art. 2, 7 and 9)

**The State party should:**

a) **ensure prompt and impartial investigation of complaints concerning allegations of torture or other ill-treatment, and initiate criminal proceedings against alleged perpetrators;**

b) **ensure proper reparation for victims;**

    c)    **establish independent and competent national mechanisms for the prevention of torture, in accordance with the Optional Protocol to the Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment, such as the present Office of the Public Defender.**

    d)    **continue to have a comprehensive action plan against torture and other ill-treatment for the future years, taking into consideration the recommendations made by the UN Special Rapporteur on torture and other cruel, inhuman or degrading treatment of punishment following his visit to Georgia in 2005.**

11.  While noting the measures taken by the State Party to improve the treatment of prisoners, such as the construction of the new prison in Gldani District (Tbilisi), the Committee remains concerned about the persistence of adverse conditions in a number of prisons in the State Party, namely gross overcrowding, poor rations and quality of food, inadequate access to natural light and fresh air, insufficient personal hygiene conditions, and about the large number of deaths of prisoners allegedly due to the prison conditions that amount to ill-treatment in some detentions facilities. (Article 10)

> **The State Party should take immediate, firm, positive and coordinated measures to improve the conditions of all persons deprived of their liberty before trial and after conviction, fulfilling all requirements outlined in the UN Standard Minimum Rules for the Treatment of Prisoners. In particular, the gross overcrowding should be ended at once. In addition, the State Party should implement alternatives to imprisonment.**

12.  While acknowledging the adoption of the State Party's strategy aimed at allowing internally displaced persons (IDPs) to lead a normal life while, at the same time, retaining their right to return,, its efforts to prepare a plan of action in this regard, as well as measures taken to create conditions for their voluntary return to their permanent places of residence, the Committee regrets the reported cases of forced eviction from collective centres in Tbilisi, Kutaisi and Adjara regions, without a court decision or agreement of the persons concerned, and without proper compensation and support by governmental agencies. (Article 12 and 26)

> **The State Party should ensure that the privatization of collective centres is properly regulated and take all the necessary measures to prevent cases of forced evictions of IDP in the future. The State party should also ensure that the plan of action for IDPs is fully in line with the Covenant, in particular with principles of voluntariness of return and non-discrimination.**

13.  While taking note of recent efforts undertaken by the State Party to reform the judiciary and increase its efficiency, the Committee remains concerned at interference with the independence of the judiciary and the problem of judicial corruption. (Article 14)

> **The State Party should take steps to ensure the independence of the judiciary. It should in particular take measures to eradicate all forms of interference with the Judiciary, and ensure prompt, thorough, independent and impartial investigations into all allegations of interference, including**

**by way of corruption; and prosecute and punish perpetrators, including judges who may be complicit.**

14. The Committee regrets the absence of adequate education of judges, and the fact that they are not generally trained in international human rights law, with the result that in practice there is very little direct enforcement of the rights recognized under the Covenant.

**The State party should intensify its efforts to educate judges in order to ensure adequate administration of justice. The State party should in particular provide training on the Covenant and its implications for interpretation of the Constitution and domestic legislation, so as to ensure that all actions of the judiciary will be in accordance with its obligations under the Covenant.**

15. The Committee notes that, as explained by the State Party, the status of legal public entity was granted exclusively to the Georgian Orthodox Church on the grounds of historical and social factors. The Committee, however, is concerned by the fact that the different status of other religious groups could lead to discrimination. The Committee regrets that problems related to the restitution of places of worship and related properties of religious minorities, confiscated during the Communist era, have not been solved (Article 18).

**The State party should take steps to ensure equal enjoyment of the right of freedom of religion or belief and ensure that its legislation and practices conform fully with article 18 of the Covenant. The State Party should address the problems related to the confiscation of places of worship and related properties of religious minorities.**

16. The Committee expresses concern that acts of harassment against journalists in Georgia have not been properly investigated by the State Party. (Article 19)

**The State Party should guarantee freedom of speech and of the press and other media, ensure that complaints in this regard are promptly investigated, and perpetrators are prosecuted and punished.**

17. The Committee remains concerned at the obstacles faced by minorities in the enjoyment of their cultural rights, as well as at the low level of political representation of minorities. While acknowledging that there is no prohibition of the use of minority languages in the private sphere, and minority languages are taught in schools, the Committee is concerned that lack of knowledge of the Georgian language could lead to marginalization and underrepresentation of minorities in different public and private spheres (Articles 25 and 26).

**The State party should:**

a) **Consider the possibility of allowing minorities to use their own language at the level of local government and administration;**

b) **Take all appropriate measures to ensure adequate political representation and participation of minorities, in particular Armenian and Azeri communities, as well**

**as to improve their knowledge of the Georgian language. The State Party should take steps to eliminate language-based discriminatory practices;**

c) **promote the integration of minorities in the Georgian society. To this purpose, the State Party should engage in a dialogue with the concerned groups and civil society working with minorities issues;**

d) **adopt indicators and benchmarks to determine whether relevant anti-discrimination goals have been reached.**

18.   The Committee sets 1 November 2011 as the date for the submission of the fourth periodic report of Georgia. It requests that the State Party's third periodic report and the present concluding observations be disseminated to the general public as well as to the judicial, legislative and administrative authorities. Hard copies of those documents should be distributed to universities, public libraries, the Parliamentary library, and all other relevant places. It also requests that the fourth periodic report and these concluding observations be distributed to civil society and to non-governmental organizations operating in the country. It would be desirable to distribute a summary of the report and the Concluding Observations to minorities in their own languages.

19.   In accordance with rule 71, paragraph 5, of the Committee's rules of procedure, the State Party should submit within one year information on the follow-up given to the Committee's recommendations in paragraphs 8, 9 and 11 above. The Committee requests the State Party to include in its next periodic report information on its remaining recommendations and on the implementation of the Covenant as a whole.

———————

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
INNA GUDAVADZE, LIANA ZHMOTOVA and IYA       :
PATARKATSISHVILI,                             :
                                              :
                              Plaintiffs,     :
                                              :
              v.                              :   08-Civ-3363 (RJS)
                                              :
JOSEPH KAY (A/K/A JOSEPH KAKALASHVILI,        :
A/K/A JOSEPH KEJ, A/K/A IOSEB KAKALASHVILI,   :
A/K/A IOSEB KAKIASHVILI) AND EMANUEL          :
ZELTSER,                                      :
                              Defendants      x
------------------------------------------------------------------------

## CERTIFICATE OF SERVICE

I, Jennifer R. Cowan, am a member of the bar of the State of New York and of

this Court and counsel in the New York office of the law firm of Debevoise & Plimpton

LLP, attorneys for Plaintiffs Inna Gudavadze, Liana Zhmotova and Iya Patarkatsishvili.

I am over eighteen (18) years of age.  On June 17, 2008, per the Order to Show

Cause issued by Judge Sullivan on June 17, 2008, I caused to be served copies of the

within:

     i)     Memorandum Of Law In Support Of Plaintiffs' Application For An Order

           To Show Cause;

     ii)    Declaration Of Jennifer R. Cowan, Esq. In Support Of Application For

           Temporary Restraining Order And An Order To Show Cause For

           Preliminary Injunction

iii)    [Proposed] Temporary Restraining Order And Order To Show Cause For

Preliminary Injunction; and

iv)    Plaintiffs' Verified Complaint of April 4, 2008

by hand delivery upon Scott M. Himes, Esq., counsel for Defendant Joseph Kay,

at the following address:

> Scott M. Himes, Esq.
> Stillman, Friedman & Shechtman, P.C.
> 425 Park Avenue
> New York, NY 10022

I also served copies by overnight courier on Harold M. Hoffman, Esq., counsel

for Defendant Emanuel Zeltser at the following address, per the request of Mr. Hoffman:

> Mr. Harold M. Hoffman, Esq.
> 75 Grand Avenue
> Englewood, NJ  07631

I also sent an electronic copy of the Order to Show Cause as issued by Judge

Sullivan on June 17, 2008 via email to Mr. Hoffman's business email address and to Mr.

Himes' business email address.

Pursuant to 28 U.S.C. § 1746, I certify under the penalty of perjury that the

foregoing is true and correct.

Executed on June 18, 2008

/s/ Jennifer R. Cowan
Jennifer R. Cowan, Esq.

2