ELECTRONICALLY FILED

Christopher K. Tahbaz
Jennifer R. Cowan
Natalie L. Reid
Debevoise & Plimpton LLP
919 Third Avenue
New York, New York  10022
Tel. (212) 909-6000
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

INNA GUDAVADZE, LIANA ZHMOTOVA, AND IYA
PATARKATSISHVILI,

                                  Plaintiffs,

v.

JOSEPH KAY (A/K/A JOSEPH KAKALASHVILI, A/K/A
JOSEPH KEJ, A/K/A IOSEB KAKALASHVILI, A/K/A
IOSEB KAKIASHVILI) AND EMANUEL ZELTSER,

                                    Defendants.

:    No. 08 Civ. 3363 (RJS)

:    AMENDED
:    COMPLAINT

------------------------------------------------------------------- x

      Plaintiffs Inna Gudavadze, Liana Zhmotova, Iya Patarkatsishvili, and Natela

Patarkatsishvili (collectively "Plaintiffs"), by their attorneys Debevoise & Plimpton LLP,

for their Amended Complaint against Defendants Joseph Kay (a/k/a Joseph Kakalashvili,

a/k/a Joseph Kej, a/k/a Ioseb Kakalashvili, a/k/a Ioseb Kakiashvili), Emanuel Zeltser,

Alexander Fishkin, and CJZ Group, Inc. allege as follows:

# NATURE OF THE ACTION

1.      Arkady (Badri) Patarkatsishvili, a wealthy Georgian businessman with investments and business interests located in a number of countries, died unexpectedly outside of London on February 12, 2008.  Upon information and belief, Mr. Patarkatsishvili's assets are worth billions of dollars.

2.      Plaintiffs are the widow, daughters and mother of Mr. Patarkatsishvili.  By this action, Plaintiffs seek to prevent Defendants from fraudulently asserting control over assets held directly or indirectly by Mr. Patarkatsishvili, and to which Plaintiffs, and Mr. Patarkatsishvili's son David, are now rightfully entitled.  Defendants have engaged in such misconduct through a variety of tactics.  Most notably, Defendants have used invalid testamentary documents apparently created by a New York licensed attorney and notarized by a New York notary public in support of a worldwide conspiracy, one that has as its goal the establishment of Defendant Kay as executor of Mr. Patarkatsishvili's estate and as the individual with power to control Mr. Patarkatsishvili's assets falling outside of his estate.

3.      Plaintiffs are among the primary beneficiaries of Mr. Patarkatsishvili's estate.  On April 7, 2008 , Plaintiffs Inna Gudavadze, Liana Zhmotova, and Iya Patarkatsishvili applied for letters of administration for Mr. Patarkatsishvili's estate in the United Kingdom, where they reside and where a portion of Mr. Patarkatsishvili's assets are found.  That application is pending.  On May 14, 2008, in Georgia (where Mr. Patarkatsishvili owned substantial assets), all of the Plaintiffs began the notarial process of confirmation of their rights to inherit Mr. Patarkatsishvili's assets.

4.     Plaintiff Inna Gudavadze owns a community property interest in fifty percent of the assets acquired by Mr. Patarkatsishvili during the course of their marriage.

5.     Plaintiffs, as well as Mr. Patarkatsishvili's son David, are the beneficiaries or intended beneficiaries of trusts Mr. Patarkatsishvili created during his lifetime.

6.     Defendant Kay is a citizen and resident of New York.  He was Mr. Patarkatsishvili's half-cousin, and upon information and belief, during Mr. Patarkatsishvili's lifetime and at his direction, Defendant Kay assisted in the acquisition of assets by Mr. Patarkatsishvili, managed certain of Mr. Patarkatsishvili's assets, and held assets as a nominee or agent for the benefit of Mr. Patarkatsishvili.

7.     Defendant Zeltser is a citizen and resident of New York and, according to official New York State records, he is an attorney licensed by New York State with his place of business in Manhattan.  He has claimed that he acted as Mr. Patarkatsishvili's attorney and that he represents Mr. Patarkatsishvili's estate.  Shortly after Mr. Patarkatsishvili's death, Defendant Zeltser advised Plaintiffs that he represents Defendant Kay.

8.     Upon information and belief, Defendant Fishkin is a citizen of the United States, and, according to official New York State records, an attorney licensed by New York State with his place of business in Manhattan.  The three invalid documents Defendants have used to improperly assert control over Mr. Patarkatsishvili's assets purport to have been notarized by Defendant Fishkin.  He also participated in at least one meeting with Defendant Zeltser through which Defendant Zeltser attempted to obtain control of assets belonging to Mr. Patarkatsishvili, and he has acted as the attorney for at

least one of the companies through which Defendants have attempted to take control of Mr. Patarkatsishvili's assets, Defendant CJZ Group, Inc.

9.      Since Mr. Patarkatsishvili's untimely death, Defendants have exploited his demise by, among other things, approaching his business associates throughout the world and, relying on invalid and fraudulent documents allegedly executed in New York and/or claiming direct ownership of Mr. Patarkatsishvili's assets, demanding information about and control over those assets.  Defendants have also claimed that Defendant Kay is the ultimate owner of assets which he was merely managing for Mr. Patarkatsishvili. Defendants' misconduct began within days of Mr. Patarkatsishvili's death, intended, upon information and belief, to take advantage of Plaintiffs' grief and shock at suddenly losing their husband, father and son.

10.      In particular, Defendants have relied on three documents. Two of those documents, a "Letter of Wishes" and a "Deed of Appointment of Executor," appear to be forgeries based on eyewitness statements that Mr. Patarkatsishvili could not have signed these documents on the dates on which they purport to have been signed by him and notarized by Defendant Fishkin.  Even if authentic, the third document, a "Power of Attorney," which purports to run from Mr. Patarkatsishvili to Defendant Zeltser, and was notarized by Defendant Fishkin, did not remain valid after Mr. Patarkatsishvili's death. Indeed, although Defendants have advanced these documents in support of Defendant Kay's authority to serve as the executor of Mr. Patarkatsishvili's estate and to control Mr. Patarkatsishvili's other assets, upon information and belief, Defendants have never shown

complete copies or original versions of these documents to Plaintiffs, anyone affiliated with Plaintiffs, or any court of competent jurisdiction.

11.    Defendants have already managed to assert control over certain of Mr. Patarkatsishvili's interests, despite their having no valid legal basis for doing so.  For example, working in concert with the other Defendants, Defendant Kay has succeeded in improperly gaining control over Imedi Television ("Imedi TV"), a broadcast television station located in the country of Georgia and a valuable asset in which Mr. Patarkatsishvili beneficially owned the majority interest at the time of his death.  Upon information and belief, Defendant Kay gained control of Imedi TV by misrepresenting his legal authority to act on behalf of Mr. Patarkatsishvili and his estate, and by relying on documents which he obtained from Defendant Zeltser, which were notarized by Defendant Fishkin, and which Defendants Kay, Zeltser and Fishkin knew to be fraudulent and/or invalid.  Defendant Kay has also claimed that he is the settlor of trusts established for the benefit of Mr. Patarkatsishvili and his family.  Defendant Kay claims that he and his family are the sole beneficiaries of those trusts.

12.    On May 14, 2008, Defendant Kay obtained from a Georgian court an order granting him on an interim basis wide-ranging powers that are *de facto* equal to the powers of an executor.  However, he has never formally been declared an executor, even on a provisional basis.

13.    Defendant Kay made his *ex parte* application for this order based on incomplete photocopies – not originals – of the "Letter of Wishes" and "Deed of Appointment of Executor" described above, without providing any explanation about

5

why he was not presenting originals to the court. Further, when he made his application, he failed to notify the Georgian court of this action or to present to the Georgian court evidence he had in his possession calling into question the authenticity of the testamentary documents upon which he relied.

14.    Defendant CJZ Group, Inc. is a Delaware corporation with its principal place of business in New York; Defendant Kay is CJZ Group's President. CJZ Group has participated in Defendants' conspiracy to fraudulently obtain control over Mr. Patarkatsishvili's assets, described in more detail herein.

15.    To prevent the Defendants, who are citizens and residents of New York State and/or attorneys licensed to practice in New York State, from further exerting improper control over any assets that are rightfully the property of Plaintiffs or should rightly should pass to Mr. Patarkatsishvili's heirs, by this action Plaintiffs seek the following relief:

(i)    An order that Defendants produce to Plaintiffs, for inspection, the original, signed versions of all documents that they claim provide them with authority to control Mr. Patarkatsishvili's assets and/or to serve as representatives of Mr. Patarkatsishvili's estate;

(ii)    A declaratory judgment that:

(a)    the "Deed of Appointment of Executor" and the "Letter of Wishes" are legally invalid; and

(b)    as a matter of law, the "Power of Attorney" that Defendant Zeltser used in an attempt to assert control over Mr. Patarkatsishvili's assets became invalid at the time of Mr. Patarkatsishvili's death (regardless of whether it was valid during his life);

6

(iii)    A preliminary and permanent injunction enjoining Defendants Kay and Zeltser from relying on the "Deed of Appointment of Executor", the "Letter of Wishes" and/or the "Power of Attorney" to claim any authority to control Mr. Patarkatsishvili's assets or to act or speak on behalf of Mr. Patarkatsishvili or his estate;

(iv)    A constructive trust imposed on Defendants for the benefit of Mrs. Gudavadze, with respect to her community property ownership interest, and for the benefit of Mr. Patarkatsishvili's estate and heirs (including Mrs. Gudavadze), over any assets in which Mr. Patarkatsishvili held a beneficial interest or which Defendant Kay was otherwise holding for him and over which Defendants, or any of them, exercise control or dominion, as well as any income they may have received from such assets and any proceeds that they may have realized from any sale of such assets;

(v)    An order that Defendants account to Plaintiffs for any assets in which Mr. Patarkatsishvili held a beneficial interest and over which Defendants, or any of them, exercises control or dominion, as well as any income that they may have received from such assets and any proceeds that they may have realized from any sale of such assets;

(vi)    An award of damages in an amount to be determined at trial, for any harm caused by Defendants' conduct, as well as costs, expenses and attorneys' fees incurred in prosecuting this action; and

(vii)    Such other and further relief as the Court may deem appropriate.

## PARTIES

16.    Inna Gudavadze is a citizen of the Russian Federation currently resident in England and Wales.  She and Mr. Patarkatsishvili married in 1979 and never divorced.  She is the widow of Mr. Patarkatsishvili.

17.    Liana Zhmotova and Iya Patarkatsishvili are both citizens of the Russian Federation currently resident in the United Kingdom.  They are the daughters of Mr. Patarkatsishvili and Mrs. Gudavadze.

18.    Natela Patarkatsishvili is a citizen of the country of Georgia currently resident in Georgia.  She is the mother of Mr. Patarkatsishvili.

19.    Upon information and belief, Defendant Kay is a United States citizen residing at 6 Wright Drive, Dix Hills, New York 11746.  Kay was a half-cousin and a business associate of Mr. Patarkatsishvili.

20.    Upon information and belief, Defendant Zeltser is a United States citizen residing at 235 W. 76th Street, New York, New York 10023.  According to the New York State Office of Court Administration attorney registration database, Defendant Zeltser is an attorney licensed to practice in New York State and his business address is 119 West 72nd Street, #229, New York, New York 10023.

21.    Upon information and belief, Defendant Alexander Fishkin is a United States citizen.  According to the New York State Office of Court Administration attorney registration database, Defendant Fishkin is an attorney licensed to practice in New York State; his business address is 366 Amsterdam Ave, Suite 176, New York, New York 10024.  He is also identified as having a business address of 250 W. 57th Street, Suite

916, New York, New York 10107.  Defendant Fishkin is also a notary public licensed by the State of New York.

22.    Defendant CJZ Group, Inc. is a Delaware corporation with its principal place of business at the law offices of Defendant Fishkin, 366 Amsterdam Ave, # 176, New York, New York 10024.  Defendant Kay is the President of Defendant CJZ Group, Inc.

23.    Badri Patarkatsishvili was a citizen of the country of Georgia domiciled in the country of Georgia at the time of his death.  Upon information and belief, Mr. Patarkatsishvili did not leave a will or other valid direction to govern the disposition of his assets.

24.    Because Mr. Patarkatsishvili was a citizen of and domiciled in Georgia, and because he died without a will, under the law of England and Wales (where three of the Plaintiffs have applied for letters of administration), Georgian law determines the devolution of all moveable assets in Mr. Patarkatsishvili's estate, devolution of immovable assets being governed by the law of the situs of those assets.

25.    The Plaintiffs and Defendant Kay have separately begun the process to have the estate administered in Georgia.  Upon information and belief, because Mr. Patarkatsishvili was a citizen of and domiciled in Georgia, Georgian law will be applied by a Georgian court supervising the distribution of Mr. Patarkatsishvili's estate.

26.    Under Georgian law, regardless of whether there is a valid will, the surviving spouse has a pre-existing community property ownership interest in half of the assets acquired during the marriage (which does not pass through the estate).  In the

absence of a valid will, the first degree heirs (the spouse, children and parents) of an individual who dies intestate are the beneficiaries of the estate.

27.    Under Georgian law, therefore, Mrs. Gudavadze and Mr. Patarkatsishvili were equal co-owners of all assets that either of them acquired during their marriage (excluding assets obtained as an inheritance or a gift).  Since Mrs. Gudavadze and Mr. Patarkatsishvili were married in 1979, at a time before Mr. Patarkatsishvili commenced his business activities, for practical purposes Mrs. Gudavadze holds a fifty percent ownership interest in all assets owned by Mr. Patarkatsishvili.  The other fifty percent constitutes Mr. Patarkatsishvili's estate.  Under Georgian law, in the absence of a valid will, as first degree beneficiaries, Plaintiffs collectively are entitled to 80% of Mr. Patarkatsishvili's estate.  Combining Mrs. Gudavadze's ownership interest and the rights of Plaintiffs as first degrees beneficiaries, Plaintiffs are entitled to 90% of Mr. Patarkatsishvili's assets.   As Plaintiffs have acknowledged, the other 10% is due to Mr. Patarkatsishvili's son, David Patarkatsishvili.

28.    Mrs. Gudavadze, as owner of 50% of the assets held by Mr. Patarkatsishvili at the time of his death, and all four Plaintiffs as beneficiaries of trusts established by Mr. Patarkatsishvili, and as heirs and beneficiaries of his estate, are being harmed by the misconduct of Defendants.

## JURISDICTION AND VENUE

29.    This action arises under the laws of the State of New York.

30.    Because Plaintiffs are citizens of the Russian Federation or Georgia, who all currently are resident in the United Kingdom or in Georgia, and Defendants are citizens of New York or another state, and the amount in controversy exceeds $75,000, this Court has jurisdiction under 28 U.S.C. § 1332(a)(2). Personal jurisdiction is proper by virtue of the residence of all Defendants in New York and by virtue of Defendant Zeltser, Defendant Fishkin, and Defendant CJZ Group conducting business in New York.

31.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(1) and (a)(2).

32.    The Court may enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## FACTUAL BACKGROUND

**A.    Mr. Patarkatsishvili's Global Business Interests**

33.    Mr. Patarkatsishvili was a businessman and investor with business interests throughout the world, including interests in a number of assets located in Georgia.

34.    In the mid-1990s, Mr. Patarkatsishvili brought Defendant Kay into his business as a subordinate, and Defendant Kay eventually began to manage certain of Mr. Patarkatsishvili's investments.

35.     Mr. Patarkatsishvili was the disclosed (or in some cases, undisclosed) principal in those investments.  He decided whether to invest and on what terms.  He usually negotiated the principal terms of such investments directly with the relevant counterparties, with no substantive involvement in those negotiations by Defendant Kay.  He was also the source of funding for those investments.

36.     Once Mr. Patarkatsishvili decided to make an investment, his typical practice was to instruct Defendant Kay to establish a holding structure for the investment and to arrange for financing (often from other companies owned directly or indirectly by Mr. Patarkatsishvili).

37.     With respect to certain investments, Mr. Patarkatsishvili instructed Defendant Kay to manage the investment after the transaction was complete.

38.     Defendant Kay sometimes acted as treasurer, executor of the financial terms or nominee to Mr. Patarkatsishvili, but upon information and belief, he was supposed to act at the direction of Mr. Patarkatsishvili.

39.     In addition, upon information and belief, Mr. Patarkatsishvili may have on occasion given Defendant Kay some form of partial ownership interest in some of those investments.

**1.      The Structure Of Mr. Patarkatsishvili's Global Holdings**

40.     A number of business assets and companies that Mr. Patarkatsishvili acquired were held, either directly or indirectly, by trusts established by or on behalf of Mr. Patarkatsishvili during his lifetime.  Upon information and belief, these trusts were

established for the ultimate benefit of Mr. Patarkatsishvili and members of his immediate family.

41.    Three of those trusts are now known as the Valmore Trust, the Summit Trust, and the Nile Trust (the "Trusts"). A Liechtenstein trust company, Miselva Establishment ("Miselva"), established the Valmore Trust and is the trustee of the Valmore and Nile Trusts. Andrew John Baker is managing director of Miselva.

42.    Mr. Baker is also a principal in Nexus Treuhand AG, a professional Swiss trust company that established the Summit Trust and which acts as its trustee.

43.    The named beneficiaries of the Trusts have changed over time. They have included the International Red Cross and David Aim, who was an official at London International Bank ("LIB"). There are presently no named beneficiaries of the Valmore and Summit trusts. Upon information and belief, Plaintiffs are among the intended beneficiaries of the Trusts.

44.    Miselva also founded two relevant Liechtenstein establishments, Jorum Establishment ("Jorum") and Sada Establishment ("Sada"). Although these were formally beneficially owned by Defendant Kay, at the time they were created, Mr. Baker was told that one of them was for the benefit of Mr. Patarkatsishvili. Although he was not initially named as the beneficial owner of Jorum, in December 2006, ownership of the founder's rights in Jorum passed to Mr. Patarkatsishvili who thus became its ultimate beneficial owner.

45.    The companies held by the Trusts have changed over time. Among the assets held by the Trusts are the Rustavi metallurgical facility in Georgia; the Fisher

Island development company and homes in Miami, Florida; the Buddha Bar in New York City; the Benahavis development in Marbella, Spain; and certain properties in the Palmeraie outside Marrakech, Morocco.

46.    Upon information and belief, LIB acted as a private bank for Mr. Patarkatsishvili and companies he owned or in which he otherwise had a beneficial interest.  LIB also held some management accounts of the companies in the Trusts, facilitated deposits and withdrawals from company bank accounts and facilitated financing for those companies, often in the form of inter-company loans.  Most of the directions to the trustee of the Trusts came from LIB.  Upon information and belief, LIB has been managing most, if not all, of the companies owned by the Trusts, and LIB officials are directors of many companies held under the trust structures.

47.    By operation of law, if the trusts were successfully settled, then (subject to any claim Plaintiff Inna Gudavadze may have pursuant to her 50% matrimonial ownership interest referred to in paragraph 26 above), assets in the Trusts are held for the benefit of the Trusts' beneficiaries and are not part of Mr. Patarkatsishvili's estate.  Upon information and belief, Plaintiffs are among the beneficiaries of the Trusts.

48.    Defendant Kay has claimed that he and his family members are beneficiaries of the Valmore and Summit Trusts.

49.    On April 21, 2008, Miselva and Nexus initiated an action captioned *Miselva Establishment and Nexus Treuhand AG v. Gudavadze et al,* 2008 M No. 70 in the Chancery Division of the Supreme Court of Gibraltar.  That action seeks to clarify who settled the Trusts, and for whom the assets are held, which in turn will likely

determine whether Plaintiffs, Defendant Kay and his family or other individuals are the beneficiaries of the Trusts. Plaintiffs Inna Gudavadze, Liana Zhmotova, and Iya Patarkatsishvili and Defendant Kay are defendants in that action. In that action, Defendant Kay has claimed that he is the settlor of the Valmore and Summit trusts and accordingly, that he and his family should be the beneficiaries of the trusts.

50.     Material submitted in that action is deemed confidential unless permission to disclose it is granted by the person who submitted it or the court. As defendants in the Gibraltar proceeding, Plaintiffs sought and received permission from the Gibraltar court to disclose the witness statements of Mr. Baker in this proceeding. Mr. Baker's first witness statement, dated April 20, 2008, is attached hereto as Exhibit A; Mr. Baker's second witness statement, dated May 1, 2008, is attached hereto as Exhibit B.

**2.      Assets Held Beneficially For Mr. Patarkatsishvili**

51.     Upon information and belief, as a regular practice, individuals and companies held assets as nominees or as agents for Mr. Patarkatsishvili, who was the beneficial owner of those assets.

52.     Defendant Kay was among the people who held assets as a nominee or agent for Mr. Patarkatsishvili or otherwise for the benefit of Mr. Patarkatsishvili.

53.     Defendant Kay was sometimes granted authority with respect to assets owned beneficially by Mr. Patarkatsishvili, including signing authority for bank accounts, so that Defendant Kay could effectively execute Mr. Patarkatsishvili's instructions concerning those assets.

54.     Upon information and belief, in some instances, Defendant Kay also had some partial form of ownership interest in assets which he held beneficially for Mr. Patarkatsishvili.

55.     For example, in June 2007, LIB worked with Mr. Baker to create a Luxembourg company of which Defendant Kay would be the sole nominal owner with the understanding that Mr. Patarkatsishvili held a 50% interest in the company.

**B.     Mr. Patarkatsishvili's Untimely Death**

56.     On February 12, 2008, Mr. Patarkatsishvili suffered a heart attack and died unexpectedly outside of London, where he and his family had been staying.

**C.     The Unlawful Conduct Of Defendants**

57.     Within days of Mr. Patarkatsishvili's death, Defendants Kay and Zeltser began to assert to Plaintiffs and others that Defendants Kay and Zeltser had exclusive authority to act on behalf of Mr. Patarkatsishvili's estate and that Defendant Zeltser had a will and other documents through which Mr. Patarkatsishvili allegedly had expressed his wishes for the administration of his estate and distribution of his assets.  Defendant Kay is also now claiming to be the settlor of trusts belonging to Mr. Patarkatsishvili and his family.  Upon information and belief, Defendants Kay and Zeltser made these assertions knowing that they were untrue and without basis, and knowing that the documents on which they were relying, which were notarized by Defendant Fishkin, were fraudulent or otherwise invalid.

1.      **Defendants' Interactions With Plaintiffs**

58.      On or about February 14, 2008 – two days after Mr. Patarkatsishvili's death – Defendants Kay and Zeltser visited Plaintiffs Inna Gudavadze, Liana Zhmotova, and Iya Patarkatsishvili at their home outside of London.  Defendant Zeltser told Mrs. Gudavadze that he had acted as her husband's attorney, and that he had possession of her husband's will.  He also told Mrs. Gudavadze that her husband had appointed Defendant Kay as the executor of his estate.

59.      Upon information and belief, Defendant Zeltser made these assertions knowing that they were untrue and without basis, and knowing that the documents on which he was relying were fraudulent or otherwise invalid.

60.      During that meeting, Defendant Zeltser also told Mrs. Gudavadze and others that Mr. Patarkatsishvili had a fourteen-year-old son named David Patarkatsishvili with a woman named Olga Safonova.  Before Mr. Zeltser made this disclosure to Mrs. Gudavadze, two days after Mr. Patarkatsishvili died, Mrs. Gudavadze had no knowledge of Ms. Safonova or her son.

61.      Defendant Kay and others have subsequently claimed that Ms. Safonova was Mr. Patarkatsishvili's wife at the time of his death.  However, Mrs. Gudavadze and Mr. Patarkatsishvili were married in 1979 and never divorced.  Accordingly, even if Mr. Patarkatsishvili purported to "marry" Ms. Safonova at some point after 1979, that marriage would not be legally valid.

62.      On or about March 7, 2008, Plaintiffs and other members of their family met with Defendant Kay in Tbilisi, Georgia and asked him for copies of the documents

17

that supported his claims of being the executor of Mr. Patarkatsishvili's estate and having authority to speak and act on behalf of Mr. Patarkatsishvili and the estate. Defendant Kay refused to provide the documents, and he claimed that Defendant Zeltser had the documents.

### 2.    Defendants' Interactions With Salford Capital Partners Inc.

63.    On or about February 15, 2008, Defendants Kay and Zeltser visited the London offices of Salford Capital Partners Inc. ("Salford"), a private equity firm that managed some of Mr. Patarkatsishvili's investments. During this visit, Defendant Kay told Salford representatives that, in the wake of Mr. Patarkatsishvili's death, he effectively stood in Mr. Patarkatsishvili's shoes and that Salford should treat him accordingly, and he demanded information about Mr. Patarkatsishvili's accounts. Upon information and belief, Defendant Kay made these assertions knowing that they were untrue and without basis.

64.    When Salford representatives demanded to see proof of Defendants' authority to act on behalf of Mr. Patarkatsishvili, Defendant Zeltser showed the Salford representatives a document titled General Durable Power of Attorney, notarized by Defendant Fishkin, attached hereto as Exhibit C (hereinafter "Power of Attorney").

65.    Upon information and belief, Defendant Zeltser did this knowing that the "Power of Attorney" expired upon Mr. Patarkatsishvili's death or was otherwise invalid.

66.    Defendant Zeltser did not at this time provide the Salford representatives with a copy of the "Power of Attorney." Instead, Defendant Zeltser only allowed the Salford representatives to view the document on the screen of his laptop computer.

67.     Also on or about February 15, 2008, Defendant Zeltser spoke with Nicholas Keeling, a director of Mainstay Trust Limited in Gibraltar, an entity through which Mr. Patarkatsishvili, among others, had made investments managed by Salford. Defendant Zeltser made to Mr. Keeling the same demand for information that Defendant Kay had previously made to the Salford representatives.

68.     Mr. Keeling and his solicitor also refused to provide any information to Defendants unless they could provide satisfactory evidence of their authority to act on behalf of Mr. Patarkatsishvili.  Upon information and belief, in response, Defendant Zeltser later emailed Mr. Keeling and his solicitor a copy of the "Power of Attorney."

69.     On or about February 17, 2008, Defendant Zeltser wrote to Mr. Keeling. A copy of that letter is attached hereto as Exhibit D.   Defendant Zeltser identified himself as counsel for Mr. Patarkatsishvili and for his estate.  He requested:

> any and all information, documents and records in your custody or within your control or power to obtain concerning Mr. Patarkatsishvili and any of his financial and business interests, whether held in his own name or through or in conjunction with any third party or parties, directly or indirectly, overtly or covertly or through any nominee (legal entity or physical person), in which you know or have a reason to believe Mr. Patarkatsishvili had interest or business or other involvement, no matter how small, or was a shadow director or a principal *de facto.*

70.     Upon information and belief, Defendant Zeltser fraudulently misrepresented that the requested information was needed so that Defendant Zeltser could assist law enforcement authorities in their investigation of Mr. Patarkatsishvili's death.

71.     Upon information and belief, Defendant Zeltser made these assertions knowing that they were untrue and without basis, and, upon information and belief, knowing that the "Power of Attorney" on which he was relying was fraudulent or otherwise invalid.

72.     Mr. Keeling's solicitor, Michael Lindley, advised Defendant Zeltser that Mainstay could not release information to Defendants based on the "Power of Attorney." As Mr. Lindley stated in an email to Defendant Zeltser on February 19, 2008, "I have been advised that, as a matter of New York Law, the Power of Attorney on which you purport to rely is not, and may never have been, valid.  In the circumstances it is clearly not appropriate for either my client or me, or indeed any other party, to provide you with any information or documents which may in any way relate to Mr. Patarkatsishvili's affairs."  This email, as well as related emails with Defendant Zeltser, is attached hereto as Exhibit E.  Defendant Fishkin is copied on the email from Defendant Zeltser to Mr. Lindley.

73.     Upon information and belief, Salford similarly declined to provide information to Defendants based on the "Power of Attorney."

74.     The "Power of Attorney" appears to have been acknowledged before Defendant Fishkin, a New York-licensed notary public, and the geographical authority of a New York notary is limited to New York State.  If the signature is authentic, it appears to have been executed in New York State.  The language of the "Power of Attorney" also appears to be a modification of the New York statutory language for a durable general

power of attorney in N.Y. General Obligation Law § 5-1501.  Therefore, if authentic, the "Power of Attorney" is subject to interpretation pursuant to New York State law.

75.    Under New York law, the "Power of Attorney" terminated upon the death of the principal, Badri Patarkatsishvili.  This is so despite the fact that the "Power of Attorney" claims on its face that "This Power of Attorney . . . shall not be affected by my subsequent death, disability or incompetence." (Emphasis in the original).

### 3.    Defendants' Interactions With Plaintiffs' Counsel

76.    On or about February 20, 2008, Defendant Kay met with Mrs. Gudavadze, Michelle Duncan, a lawyer with Cadwalader, Wickersham & Taft LLP in London who then represented Mrs. Gudavadze, and others at Mrs. Gudavadze's home outside London.  Ms. Duncan asked Defendant Kay questions about the documents related to Mr. Patarkatsishvili's estate.  Defendant Kay said that he did not know where the will was but agreed that it should be produced.  When Ms. Duncan asked him about his relationship with Mr. Zeltser, he became confrontational and would not answer her questions.

77.     Ms. Duncan asked Defendant Kay to put her in contact with Defendant Zeltser and asked for assistance in obtaining from Defendant Zeltser copies of Mr. Patarkatsishvili's will and other documents.  Defendant Kay said he could only ask Defendant Zeltser to meet with Ms. Duncan, and that he could not ask him to provide copies of the documents.

78.    Mrs. Gudavadze asked Defendant Kay for assistance in identifying Mr. Patarkatsishvili's assets and explained that she was making similar requests of many

business associates of her husband.  Defendant Kay agreed to assist and said he would call Ms. Duncan either late that day or the next day to set up a meeting.

79.    On or about February 20, 2008, Defendant Zeltser telephoned Ms. Duncan.  She stated that the "Power of Attorney" had become ineffective at the time of Mr. Patarkatsishvili's death.  Upon information and belief, Defendant Zeltser disagreed and maintained that the "Power of Attorney" remained valid but that regardless, he was also acting pursuant to many other documents in his possession, including a will of Mr. Patarkatsishvili dated November 14, 2007, which named Defendant Kay as executor with broad powers.

80.    Upon information and belief, Defendant Zeltser knew these assertions to be untrue and without basis and that the referenced documents were fraudulent or otherwise invalid.

81.    During that conversation, Ms. Duncan requested that Defendant Zeltser provide her with copies of any documents in his possession related to Mr. Patarkatsishvili's estate.  Defendant Zeltser refused.

82.    Ms. Duncan and Defendant Zeltser agreed to meet on February 22, 2008 in New York.  At Defendant Zeltser's subsequent request, the meeting was moved to February 24, 2008.

83.    On or about February 22, 2008, Ms. Duncan telephoned Defendant Kay to schedule a meeting so that Defendant Kay could help identify assets to which Mr. Patarkatsishvili was connected, as had been agreed at the February 20 meeting.

84.    Upon information and belief, Defendant Kay told Ms. Duncan that she should communicate with him only through his personal attorney, Defendant Zeltser.

85.    On or about February 24, 2008, Ms. Duncan, Defendant Zeltser and others, including Defendant Fishkin, met at the Buddha Bar, 25 Little West 12th Street, New York, New York.

86.    During that meeting, Defendant Zeltser showed Ms. Duncan, on his computer screen, images of documents related to Mr. Patarkatsishvili including a "Letter of Wishes," which was several pages long, and a one-page "Deed of Appointment of Executor."  A copy of the Letter of Wishes is attached hereto as Exhibit AJB-9 to Mr. Baker's First Witness Statement (Exhibit A); and a copy of the Deed of Appointment of Executor is attached hereto as Exhibit F.  Both of these documents purported to have been signed by Mr. Patarkatsishvili in New York on November 14, 2007.

87.    Although Mr. Patarkatsishvili was in New York City on November 14, 2007, he arrived in the late evening and then had dinner with friends and business associates until early in the morning of November 15.  He did not meet with Defendant Zeltser on that day nor did he sign any documents in the presence of Defendant Zeltser or Fishkin on that day.

88.    During her February 24, 2008 meeting with Defendant Zeltser, Ms. Duncan asked him for copies of the documents displayed on his computer screen.  Upon information and belief, he said he would send them later that evening or the following day.

89.     Defendant Zeltser failed to send copies of the documents as promised. Ms. Duncan repeated her request for these documents in writing on or about February 25 and February 27, 2008.  Defendant Zeltser again failed to provide her with copies of these documents.

90.     On or about March 5, 2008, Defendant Zeltser met with Mrs. Gudavadze, Ms. Duncan and others at the Four Seasons Hotel in London.  Ms. Duncan and Mrs. Gudavadze again raised with Defendant Zeltser questions about the documents related to Mr. Patarkatsishvili's estate and asked Defendant Zeltser to provide them with copies of the documents.  Defendant Zeltser avoided answering the questions and made various excuses about why he would not produce the documents.

91.     On March 10, 2008, Debevoise & Plimpton LLP, which had shortly before been engaged to act as counsel to Mrs. Gudavadze, wrote to Defendant Zeltser (in Defendant Zeltser's capacity as counsel for Defendant Kay) and requested copies of the relevant documents: "[I]f Mr. Kay believes he has documentation establishing that he in fact has authority to speak on behalf of Mr. Patarkatsishvili in any capacity, notwithstanding our belief to the contrary, we would request that you provide us with copies of that documentation as soon as possible."

92.     On March 10, 2008, Defendant Zeltser responded by email (and copied Defendant Fishkin) and refused to provide copies of the documents: "The documents expressing Badri's wishes, vested in us as his counsel, are being disclosed in due course to proper bodies in such jurisdictions as are appropriate and in strict accordance with our client's final instructions."  Upon information and belief, Defendant Zeltser made this

assertion knowing that the documents to which he referred were fraudulent or otherwise invalid.

**4.    Defendants' Interactions With Andrew Baker of Miselva**

93.    On or about February 13, 2008 (one day after Mr. Patarkatsishvili's death), Defendant Kay asked Mr. Baker to transfer the credit balances of all of the bank accounts of Jorum subsidiaries at Hypo Bank in Liechtenstein to the bank account of Courtvale Holdings Limited ("Courtvale"), a BVI company which, beginning in January 2008, was held by Miselva for the benefit of Jorum.  Prior to that date, Courtvale had been held by nominees for Defendant Kay.

94.    Mr. Baker complied with that request on February 18, 2008, and at the same time, Mr. Baker also appointed himself as a joint signatory on Courtvale's bank account so that no transfers could be made without his approval.  Prior to February 13, 2008, Defendant Kay had been the sole signatory on the account.  Mr. Baker subsequently approved transfers from the account that appeared to be for the benefit of Mr. Patarkatsishvili's family.

95.    On or about February 14, 2008, at the request of David Ashfield, the CFO of LIB, Mr. Baker traveled to London to meet with Defendant Kay.  During their brief meeting, Defendant Kay told Mr. Baker that he was Mr. Patarkatsishvili's executor, and that he must immediately obtain control over all of Mr. Patarkatsishvili's assets.

96.    Upon information and belief, Defendant Kay made this representation knowing that it was false and without basis.

25

97.     Later on February 14, 2008, Mr. Baker met Defendant Zeltser for the first time.  During this meeting, Defendant Zeltser claimed that Defendant Kay was Mr. Patarkatsishvili's duly appointed executor.  In support of this claim, Defendant Zeltser referred to a will purportedly signed by Mr. Patarkatsishvili in November 2007 in New York.  Defendant Zeltser told Mr. Baker that Defendant Kay had to do everything possible to gain control over Mr. Patarkatsishvili's assets, purportedly to prevent them from falling into the wrong hands.

98.     Upon information and belief, Defendant Zeltser made these assertions knowing that they were false and without basis and knowing that the documents to which he referred were fraudulent or otherwise invalid.

99.     During that meeting, Defendant Zeltser inquired of Mr. Baker about the Nile Trust and Jorum.  When Mr. Baker told Defendant Zeltser that the Nile Trust would not be part of Mr. Patarkatsishvili's estate, Defendant Zeltser responded to the effect that he would then focus on Jorum.

100.    Defendant Zeltser told Mr. Baker that because Mr. Baker had signed a blank assignment of the founder's rights in Jorum, Defendant Zeltser or anyone else could claim ownership of Jorum by inserting their name into the assignment.  Mr. Baker disagreed and said that under Liechtenstein law, such a transfer would be valid only if Mr. Patarkatsishvili had assigned the founder's rights.

101.    On or about February 20, 2008, Mr. Baker, David Ashfield of LIB, and Defendant Zeltser participated in a teleconference.  At Defendant Zeltser's instruction, Mr. Ashfield read to Mr. Baker a document allegedly appointing Defendant Kay as Mr.

Patarkatsishvili's executor. The parties then discussed the rights to the Nile Trust and Mr. Baker again asserted that it was not part of Mr. Patarkatsishvili's estate.

102. Upon information and belief, Defendant Zeltser had Mr. Ashfield read the document described above to Mr. Baker knowing that it was fraudulent and/or invalid, and he did so in an attempt to obtain control over the Nile Trust.

103. On or about March 3, 2008, Mr. Baker refused Defendant Kay's request to transfer more than $21 million from Courtvale to Defendant Kay's personal account.

104. On or about March 4, 2008, Defendant Zeltser, his assistant Vladlena Funk, Mr. Baker, and Mr. Ashfield met in Vaduz, Liechtenstein. During this meeting, Defendant Zeltser again discussed with Mr. Baker how Defendant Kay could gain some degree of control over the Nile Trust and Jorum.

105. During that meeting, Defendant Zeltser showed Mr. Baker a document titled "Letter of Wishes" on the screen of his laptop computer. That document was notarized by Defendant Fishkin. At Mr. Baker's request, Defendant Zeltser printed a copy of the Letter of Wishes for Mr. Baker but declined to show him the "confidential memoranda" referenced in the document. Mr. Baker declined to act on the basis of the "Letter of Wishes" without seeing a properly certified copy of the document and the confidential memoranda referenced in it which purported to list the beneficiaries.

106. Defendant Zeltser demanded that Mr. Baker issue a general power of attorney to Defendant Kay, or either approve the transfer of approximately $21 million from the account of Courtvale to Defendant Kay's personal account or approve the

transfer of $7.1 million to Defendant Zeltser's self-described "escrow account." When Mr. Baker declined, the meeting ended.

107.    On March 5, 2008, LIB sent a request to Hypo Bank objecting to Mr. Baker's refusal to countersign Defendant Kay's March 3 instruction to transfer funds from Courtvale to Defendant Kay's personal account and requesting a transfer of $23 million from Courtvale to an LIB account at JP Morgan Chase. Hypo declined to follow that instruction because LIB had no authority with respect to Courtvale.

108.    On or about March 19, 2008, Mr. Baker removed Defendant Kay as a signatory to Courtvale's account.

109.    On or about March 17, 2008, Mr. Baker received an email from Zvika Barak, an Israeli lawyer. Mr. Baker and Mr. Barak are directors of a UK company, Paua Enterprises Ltd., which is owned in equal parts by Jorum and by Miselva as trustee for the Valmore Trust. In that email and subsequent discussions, Mr. Barak told Mr. Baker that, in working on projects for Paua, Mr. Barak had worked solely with Mr. Patarkatsishvili, and he was therefore looking to Jorum and the Valmore Trust to fund projects that Mr. Patarkatsishvili had orally approved prior to his death.

110.    Mr. Barak rejected Mr. Baker's suggestion that he seek funding for the projects from Defendant Kay, because, according to Mr. Barak, Defendant Kay was not involved in any way with Paua.

111.    However, when Mr. Barak met with Mr. Baker in early April 2008, Mr. Barak then claimed that Defendant Kay owned Jorum and had been involved with Paua's projects.

112.    Upon information and belief, between mid-March and early April, Defendant Kay improperly exercised control over Paua.

113.    Upon information and belief, since the death of Mr. Patarkatsishvili, Defendant Kay, working in concert with other Defendants and improperly using his authority with respect to assets in the Trusts, including the signing authority for bank accounts, has encumbered and taken steps to dispose of assets in the Trusts.

### 5.    Defendants' Efforts To Remove Miselva As Trustee

114.    Defendants have attempted to remove Miselva (and therefore Mr. Baker) as trustee of the Trusts and replace it with Moshe Popack.  Mr. Popack is Defendant Kay's nephew and upon information and belief, has no experience relevant to serving as trustee of hundreds of millions of dollars in assets.  Miselva was purportedly requested to resign as trustee so that Mr. Popack could be appointed as trustee, but Miselva has not yet done that.  Mr. Baker subsequently learned, at a meeting with Defendant Popack and others, that Mr. Popack was not going to act as a trustee himself but was setting up a new company in the British Virgin Islands for that purpose.

115.    Defendants have also attempted to remove Mr. Baker as director of Courtvale.  Upon information and belief, Defendants attempted to do this in order to gain control over the more than $21 million that they had previously failed to induce Mr. Baker to transfer to them.

116.    On or about March 10, 2008, Mr. Baker received a letter from Defendant CJZ Group Inc.  The letter reported that the founder's rights in Jorum had been assigned to CJZ Group and that Mr. Baker had been removed as director of Courtvale.  A copy of

that letter is attached as Exhibit AJB-11 to Mr. Baker's First Witness Statement (Exhibit A).

117.    Among other things, the letter asserts that Jorum and Courtvale are not part of Mr. Patarkatsishvili's estate.  It also states that Mr. Patarkatsishvili had "instructed all trustees (yourself included) and custodians of his property to turn all assets having to do with Mr. Patarkatsishvili to Mr. Kay."  The three other Defendants are copied on that letter.

118.    Upon information and belief, Defendant CJZ Group made these representations knowing that they were false and without basis.  Defendants have sought through these representations improperly to transfer the founder's rights in Jorum to CJZ Group as a way to misappropriate the assets held by Jorum for the benefit of its beneficiaries which include some or all of the Plaintiffs.

**6.    Defendant Zeltser's Interactions with Boris Berezovsky**

119.    Boris Berezovsky is a former business partner and friend of Mr. Patarkatsishvili.  He currently resides in London.

120.    Based on his prior business relationship with Mr. Patarkatsishvili, Mr. Berezovsky has at various times since Mr. Patarkatsishvili's death claimed that he is entitled to 50 percent of certain of Mr. Patarkatsishvili's assets.  (Plaintiffs deny Mr. Berezovsky's claims.)

121.    Upon information and belief, on March 6 and 7, 2008, Mr. Zeltser and Mr. Berezovsky met to discuss Mr. Patarkatsishvili's assets.

122.    Following those discussions, on March 8, 2008, Mr. Zeltser provided to Mr. Berezovsky and his solicitor Michelle Duncan a draft agreement entitled "Confidential Letter of Understanding" (the "Zeltser Proposal").

123.    Although the Zeltser Proposal recites that it is "made in the interest of the Beneficiaries of [Mr. Patarkatsishvili's] Assets," it proposes that the "Beneficiaries" – who include Plaintiffs herein – receive a total of only 15 percent of Mr. Patarkatsishvili's assets between them.  The Zeltser Proposal recites that, of the remaining assets, 47.6 percent would be controlled by the "BB Group" and 37.4 percent would be controlled by the "EZ Group."

124.    The Zeltser Proposal also states that "it is in the best interest of the Beneficiaries" that the document "be kept in strict confidence and disclosed to no one," including Plaintiffs herein.  The requirement that the Zeltser Proposal will not be disclosed to non-parties – including Plaintiffs herein - is repeated throughout the document.

125.    Upon information and belief, Defendant Zeltser created and put forward the Zeltser Proposal in an attempt for Defendants to further exercise improper control over Mr. Patarkatsishvili's assets and to deprive Plaintiffs herein and others of their lawful entitlement to those assets.

126.    Upon information and belief, on March 11, 2008, Mr. Berezovsky, through his counsel, informed Mr. Zeltser that Mr. Berezovsky could not accept the Zeltser Proposal, and the Zeltser Proposal was never finalized.

7.    **Defendants' Misappropriation of Imedi TV**

127.    In addition to seeking control over assets and funds as described above, Defendants were able to obtain control over at least one asset, Imedi TV, which was held by another individual for the benefit of Mr. Patarkatsishvili.

128.    Upon information and belief, Mr. Patarkatsishvili owned a controlling interest in Imedi TV through beneficial ownership of shares in a parent company, JSC JMG Consulting Ltd.  Also upon information and belief, most of Mr. Patarkatsishvili's shares in JSC JMG Consulting Ltd. were held for his benefit by Giorgi Jaoshvili, a business associate in Georgia.

129.    Upon information and belief, Defendants together agreed to solicit under false pretenses the transfer of shares of JSC JMG Consulting Ltd. from Mrs. Gudavadze and the estate of Mr. Patarkatsishvili to Defendant Kay.  Upon information and belief, Defendants knew that this transfer would harm Mrs. Gudavadze and Mr. Patarkatsishvili's heirs and beneficiaries, including Plaintiffs.

130.    On or about February 19, 2008 – just one week after Mr. Patarkatsishvili's unexpected death – Defendant Kay approached Mr. Jaoshvili and, relying on documents including one described as a power of attorney, directed him to transfer the shares in JSC JMG Consulting Ltd. which Mr. Jaoshvili held beneficially for Mr. Patarkatsishvili.  Mr. Jaoshvili complied with this direction.

131.    Upon information and belief, Defendant Kay effected this transfer by relying on at least one document notarized by Defendant Fishkin which he obtained from

Defendant Zeltser, and which all three of those Defendants knew to be fraudulent or otherwise invalid.

132.    Plaintiffs have demanded that Defendant Kay transfer to them the shares in JSC JMG Consulting Ltd., because they do not belong to Defendant Kay; half belong to Mrs. Gudavadze (being matrimonial property) and Mr. Patarkatsishvili's half devolve to his heirs.  Defendant Kay has refused to do that.

133.    Instead, Defendant Kay has proclaimed in at least one public statement reported by the media that he purchased his shares in JSC JMG Consulting Ltd. for an undisclosed price.  For example, according to the Russian newspaper Kommersant on March 27, 2008, Defendant Kay claimed in an interview that he purchased the shares "legally" but that the amount he paid was "a commercial secret."

134.    Defendant Kay subsequently claimed in at least one media interview that the shares were purchased pursuant to an agreement he reached with Mr. Patarkatsishvili prior to Mr. Patarkatsishvili's death.

135.    As a result of Defendants' misconduct, Defendant Kay controls Imedi TV, rather than Mrs. Gudavadze and Mr. Patarkatsishvili's heirs or his estate.

**D.    The Arrest of Defendant Zeltser**

136.    On March 3, 2008, Ms. Duncan (who was then still acting as Mrs. Gudavadze's counsel) wrote to the Prosecutor General of Belarus to notify him that Mr. Patarkatsishvili might have had substantial assets in Belarus, and that Defendants Kay

and Zeltser and certain associates might improperly attempt to gain control over those assets.

137.    Upon information and belief, on or about March 12, 2008, Defendant Zeltser was arrested in Minsk, Belarus on a charge of attempting to use fraudulent documents to obtain control over assets in which Mr. Patarkatsishvili had an interest.

138.    Upon information and belief, on or about March 28, 2008, Defendant Zeltser was charged by prosecutors in Belarus with attempting to defraud Mr. Patarkatsishvili's estate through the use of forged documents.

**E.    Defendant Kay's Improper Effort To Obtain Probate In Georgia**

139.    On May 7, 2008, Defendant Kay filed *ex parte* a complaint against Plaintiff Inna Gudavadze with the Civil Case Board of Tbilisi City Court (the "Georgia Court"), in which he sought a judgment appointing him as the sole authorized executor of Mr. Patarkatsishvili's estate and an injunction against Mrs. Gudavadze barring her from undertaking any action in connection with the estate.

140.    Defendant Kay did not submit original signed testamentary documents in that action or explain his failure to do so.  Instead, he relied on photocopies that were incomplete on their face, lacking addenda referenced in the documents themselves.

141.    Defendant Kay has stated in at least one media interview that he has seen only copies of the documents, not the original versions.  His counsel has stated that Defendant Kay does not have the original documents.  Defendant Kay did not disclose that to the Georgia Court, nor did he disclose the sworn witness statements submitted in

this action stating that Mr. Patarkatsishvili could not have executed the testamentary documents on the date indicated on the documents.

142.    On May 14, 2008, in response to a separate *ex parte* request from Defendant Kay for preliminary relief against three of the Plaintiffs in this action (Inna Gudavadze, Liana Zhmotova, and Iya Patarkatsishvili), the Georgia Court issued an order granting Defendant Kay's request for provisional relief, and ruled as follows, in relevant part:

> [The Court decides]
>
> 2.   To forbid defendants:  Ina Gudavadze, Ia Patarkatsishvili and Liana Zhmotova to take any legal or/and factual actions against ownership, possession or giving the heritage [the estate] to another individual fully or partially;
>
> 3.   To grant the plaintiff Joseph Kay the right to provide any actions that he will deem necessary to collect and take care of Arkadi (Badri) Patarkatsishvili's heritage [i.e., estate], as well as sell it partially or fully if it is deemed necessary for the material interests of successors and to place the profit gained from the sale in the bank account of the Ministry of Justice, Supreme Council of General Courts Department. JSC "Bank Republic," account number 33050001, MFO—220101757; bank code 204856263.
>
> 4.   From the date of granting the decision, the petitioner will have 10 (ten) days to bring the suit to court against defendants Ia Patarkatsishvili and Liana Zhmotova;
>
> …
>
> 6.   The fulfillment of this decision should happen immediately and the official decision should be issued; [and]

> 7.  The decision can be appealed within 5 days. This date
> cannot be extended and it is valid from the time the
> decision is granted.

143.    On May 27, 2008, Plaintiffs moved the court to vacate the May 14 Order and argued, *inter alia,* that Defendant Kay had failed to provide any evidence to support his claims nor did he demonstrate any urgency to justify granting an injunction with respect to future actions not yet commenced.  In addition, Plaintiffs argued that the order improperly granted Defendant Kay powers that may adversely affect the assets of the estate, which would frustrate and nullify any eventual judgment adverse to Defendant Kay.

144.    On June 10, 2008 the Georgia Court rejected the motion, finding that "the court could not consider the authenticity of the presented documents at the time of reviewing the motion for provisional remedy."

145.    Under Georgian civil procedure, the court's decision was automatically reviewed by the Civil Litigation Board of the Tbilisi Appellate Court.  On June 19, 2008, the Civil Litigation Board affirmed the issuance of the May 14 Order.  This was done without an oral hearing despite a request to the Court to permit one.

146.    On May 28, 2008, Defendant Kay filed an amended Claim with the Georgia Court in which he added Iya Patarkatsishvili and Liana Zhmotova as defendants and advanced some new legal arguments.

147.    The defendants in that action have moved to dismiss Defendant Kay's complaint on a number of grounds, including violation of proper probate procedure by Defendant Kay and lack of jurisdiction by the Georgia Court to adjudicate the action.

148.    Mr. Barak, acting as attorney for Defendant Kay, has sent letters to business associates of Mr. Patarkatsishvili asserting that Defendant Kay is the executor of Mr. Patarkatsishvili's estate and demanding information about Mr. Patarkatsishvili's assets.  As counsel for Plaintiffs, Debevoise & Plimpton LLP sent a letter to Mr. Barak on June 23, 2008, requesting production of the original versions of the testamentary documents and inquiring about the basis for Mr. Barak's assertions that Defendant Kay is the executor if he cannot produce the original documents.

149.    Upon information and belief, Defendant Kay has improperly instituted a probate action in Georgia and obtained injunctive relief against three of the Plaintiffs in furtherance of Defendants' efforts to misappropriate funds and assets which are properly part of Mr. Patarkatsishvili's estate.

**F.     Harm To Plaintiffs**

150.    Because of Defendants' misconduct, Defendant Kay – and not Mrs. Gudavadze, Mr. Patarkatsishvili's heirs or his estate –currently controls Imedi TV.

151.    Defendants' misconduct has obstructed the ability of Plaintiffs and David Patarkatsishvili to benefit from the Valmore and Summit trusts and Jorum Establishment and, upon information and belief, the value of the assets in the Trusts may have been diminished in an amount to be established through discovery in this action.

152.    In addition, Defendants' misrepresentations and illegitimate demands to Mr. Patarkatsishvili's business associates have complicated Plaintiffs' efforts to inventory

Mr. Patarkatsishvili's assets and Mrs. Gudavadze's ability to claim her ownership interest in those assets.

153.    Plaintiffs continue to be injured by Defendant Kay's misrepresentations and ongoing use of documents which are fraudulent and/or invalid to assert his control over Mr. Patarkashvili's assets.

154.    Because the relevant assets are located throughout the world, it will be difficult, if not impossible, to value the harm caused by Defendants and to obtain monetary damages to remedy that harm.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment)

155.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 154 of the Amended Complaint as if fully set forth herein.

156.    Plaintiffs request that the Court issue a declaratory judgment determining that:

> (a)    the "Deed of Appointment of Executor" and the "Letter of Wishes" are legally invalid; and

> (b)    as a matter of law, the "Power of Attorney" that Defendant Zeltser used in an attempt to assert control over Mr. Patarkatsishvili's assets became invalid at the time of Mr. Patarkatsishvili's death (regardless of whether it was valid during his life).

## SECOND CAUSE OF ACTION
### (Fraud Against Defendant Kay)

157.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 156 of the Amended Complaint as if fully set forth herein.

158.    Upon information and belief, Defendant Kay gained control of a controlling interest in Imedi TV, which had been beneficially owned by Mr. Patarkatsishvili, by working in concert with Defendant Zeltser and Defendant Fishkin. Upon information and belief, Defendant Kay intentionally misrepresented his legal authority to act on behalf of Mr. Patarkatsishvili and his estate, in part by relying on documents that Defendant Kay obtained from Defendant Zeltser, which were notarized by Defendant Fishkin and which all three of those Defendants knew to be fraudulent or invalid. Upon information and belief, Defendant Kay engaged in these misrepresentations with the intent that Giorgi Jaoshvili would rely upon them.

159.    Upon information and belief, in transferring the shares in JSC JMG Consulting Ltd. that Mr. Jaoshvili held beneficially for Mr. Patarkatsishvili, Mr. Jaoshvili relied on Defendant Kay's misrepresentations and the fraudulent or invalid documents that Defendant Kay obtained from Defendant Zeltser and which were notarized by Defendant Fishkin.

160.    Upon information and belief, since the death of Mr. Patarkatsishvili, Defendant Kay, working in concert with other Defendants and improperly using his authority with respect to assets in the Trusts, including the signing authority for bank accounts, has encumbered and taken steps to dispose of assets in the Trusts.

161.    Plaintiffs have been and continue to be damaged as a result of Defendant Kay's fraud.

## THIRD CAUSE OF ACTION
### (Conspiracy To Defraud)

162.     Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 161 of the Amended Complaint as if fully set forth herein.

163.     Upon information and belief, Defendants Kay, Zeltser and Fishkin together agreed to effect the improper transfer of shares of JSC JMG Consulting Ltd., a parent company of Imedi TV, from the estate of Mr. Patarkatsishvili to Defendant Kay.

164.     Upon information and belief, Defendants knew that this transfer would harm Mrs. Gudavadze as owner of 50% of those shares as well as harm Mr. Patarkatsishvili's heirs and beneficiaries, including Plaintiffs.

165.     Upon information and belief, Defendant Kay gained control of the shares of JSC JMG Consulting Ltd., which had been beneficially owned by Mr. Patarkatsishvili, by intentionally misrepresenting his legal authority to act on behalf of Mr. Patarkatsishvili and his estate, in part by relying on documents that Defendant Kay obtained from Defendant Zeltser that were notarized by Defendant Fishkin, and which all three Defendants knew to be fraudulent or invalid.  Upon information and belief, Defendants engaged in this misconduct with the intent that Giorgi Jaoshvili would rely upon it, and Mr. Jaoshvili did so rely in transferring the shares.

166.     Upon information and belief, since the death of Mr. Patarkatsishvili, all of the Defendants have worked in concert with Defendant Kay so that he could improperly use his authority with respect to assets in the Trusts, including the signing authority for bank accounts, to encumber and take steps to dispose of assets in the Trusts.

167.     Plaintiffs have been harmed by Defendants' conspiracy to defraud.

## FOURTH CAUSE OF ACTION
### (Aiding And Abetting Fraud)

168.     Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 167 of the Amended Complaint as if fully set forth herein.

169.     Upon information and belief, Defendant Kay effected the improper transfer of shares of JSC JMG Consulting Ltd., a parent company of Imedi TV, from the estate of Mr. Patarkatsishvili to Defendant Kay by relying on documents that he knew to be fraudulent or invalid.

170.     Upon information and belief, Defendant Zeltser knowingly provided substantial assistance to Defendant Kay by providing him with the documents that Defendant Zeltser knew to be fraudulent or invalid, for the purpose of improperly obtaining control over assets in Mr. Patarkatsishvili's estate.

171.    Upon information and belief, Defendant Fishkin knowingly provided substantial assistance to Defendant Kay by notarizing the fraudulent or invalid documents, for the purpose of improperly obtaining control over assets in Mr. Patarkatsishvili's estate.

172.    Plaintiffs have been harmed by Defendants' aiding and abetting Defendant Kay's fraud.

## FIFTH CAUSE OF ACTION
### (Conversion Against Defendant Kay)

173.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 172 of the Amended Complaint as if fully set forth herein.

174.    Mrs. Gudavadze is the 50% owner of all assets acquired by Mr. Patarkatsishvili during their marriage, with an immediate right to exercise possession of those assets.

175.    Plaintiffs are among the beneficiaries of trusts established by Mr. Patarkatsishvili which are not part of his estate.

176.    Defendant Kay has exercised unauthorized dominion and ownership over assets, including funds and interests in companies, which belong to Plaintiffs and have thereby excluded Plaintiffs from their rightful ownership.

177.    Plaintiffs have been harmed by Defendant Kay's conversion of their assets.

## SIXTH CAUSE OF ACTION
### (Breach of Fiduciary Duty Against Defendant Kay)

178.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 177 of the Amended Complaint as if fully set forth herein.

179.    Defendant Kay holds signing authority for bank accounts and other forms of control with respect to assets owned directly or indirectly by Mr. Patarkatsishvili.

180.    Defendant Kay held assets as the nominee or agent of Mr. Patarkatsishvili.

181.    Because of the trust and authority granted to him with respect to the those assets, Defendant Kay has fiduciary duties to Mrs. Gudavadze has 50% owner of those assets.

182.    Defendant Kay has violated his fiduciary duties by acting in his own interest and/or improperly encumbering and taking steps to dispose of assets and by exercising improper control over assets.

183.    Plaintiffs have been harmed by Defendant Kay's breaches of his fiduciary duties.

## SEVENTH CAUSE OF ACTION
### (Constructive Trust)

184.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 183 of the Amended Complaint as if fully set forth herein.

185.    Defendant Kay's business relationship with Mr. Patarkatsishvili was a relationship of trust and confidence and as a result, Defendant Kay owed a fiduciary duty to Mr. Patarkatsishvili.

186.    In connection with that relationship, upon information and belief, Mr. Patarkatsishvili entrusted money and/or property to Defendant Kay.

187.    Defendant Kay has unjustly enriched himself by gaining control over assets, including most of the interest in Imedi TV beneficially owned by Mr. Patarkatsishvili.  He has done this by working in concert with the other Defendants to assert control over the Trusts and to assert his authority, for which he has no legal basis, to act on behalf of Mr. Patarkatsishvili's estate.

188.    Defendants have attempted to unjustly enrich themselves by exercising dominion and control over assets which they or others held for the benefit of Mr. Patarkatsishvili or held for Mrs. Gudavadze pursuant to her stand-alone right to 50% of all property acquired during her marriage to Mr. Patarkatsishvili.

189.    Imposition of a constructive trust is needed to ensure that Mrs. Gudavadze has control over her share of the assets in which Mr. Patarkatsishvili had an interest and the other 50% is properly included within his estate or otherwise properly distributed to his heirs and beneficiaries, which include Plaintiffs.

### EIGHTH CAUSE OF ACTION
#### (Accounting)

190.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 189 of the Amended Complaint as if fully set forth herein.

191.    Defendant Kay's business relationship with Mr. Patarkatsishvili was a relationship of trust and confidence and as a result, Defendant Kay owed a fiduciary duty to Mr. Patarkatsishvili.

192.    In connection with that relationship, upon information and belief, Mr. Patarkatsishvili entrusted money and/or property to Defendant Kay.

193.    Defendant Kay has obtained property which belonged to Mr. Patarkatsishvili and attempted to obtain control over other property which should properly belong to Mrs. Gudavadze and Mr. Patarkatsishvili's heirs and beneficiaries. Defendant Kay has done this by working in concert with the other Defendants to assert control over the Trusts and to assert his authority, for which he has no legal basis, to act on behalf of Mr. Patarkatsishvili's estate.

194.    An accounting is necessary to ascertain what money and/or property within the control or dominion of Defendants was being held by them for the benefit of Mr. Patarkatsishvili or was obtained as a result of Defendants' misconduct.

195.    Due to the ownership structure and locations of Mr. Patarkatsishvili's assets, monetary damages will not be a sufficient remedy and an accounting is needed.

**JURY DEMAND**

196.    Plaintiffs elect a trial by jury for each and every count in this Amended Complaint triable by a jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

(i)    Order Defendants to produce to Plaintiffs, for inspection, the original, signed versions of all documents that they claim provide them with authority to control

Mr. Patarkatsishvili's assets and/or to serve as representatives of Mr. Patarkatsishvili's estate;

   (ii)    Issue a declaratory judgment that:

      (a)    the "Deed of Appointment of Executor" and the "Letter of Wishes" are legally invalid; and

      (b)    as a matter of law, the "Power of Attorney" that Defendant Zeltser used in an attempt to assert control over Mr. Patarkatsishvili's assets became invalid at the time of Mr. Patarkatsishvili's death (regardless of whether it was valid during his life);

   (iii)    Preliminarily and permanently enjoin Defendants from relying on the "Deed of Appointment of Executor," the "Letter of Wishes" and/or the "Power of Attorney" to claim any authority to control Mr. Patarkatsishvili's assets or to act or speak on behalf of Mr. Patarkatsishvili or his estate;

   (iv)    Impose on Defendants a constructive trust for the benefit of Mrs. Gudavadze, in respect of her community property ownership interest, and Mr. Patarkatsishvili's estate and heirs (including Mrs. Gudavadze), over any assets in which Mr. Patarkatsishvili held a beneficial interest and over which Defendants, or any of them, exercises control or dominion, as well as any income they may have received from such assets and any proceeds that they may have realized from any sale of such assets;

   (v)    Order Defendants to account to Plaintiffs for any assets in which Mr. Patarkatsishvili held a beneficial interest and over which Defendants, or any of them, exercises control or dominion, as well as any income that they may have received from such assets and any proceeds that they may have realized from any sale of such assets;

(vi)    Award damages, in an amount to be determined at trial, for any harm

caused by Defendants' conduct, as well as costs, expenses and attorneys' fees incurred in

prosecuting this action; and

(vii)    Grant such other and further relief as the Court may deem appropriate.


Dated: New York, New York
        June 27, 2008

Respectfully Submitted,

DEBEVOISE & PLIMPTON LLP


By: /S/ Christopher K. Tahbaz
     Christopher K. Tahbaz
     Jennifer R. Cowan
     Natalie L. Reid
     919 Third Avenue
     New York, New York  10022
     Tel. (212) 909-6000
     *Attorneys for Plaintiffs*

Christopher K. Tahbaz
Jennifer R. Cowan
Natalie L. Reid
Debevoise & Plimpton LLP
919 Third Avenue
New York, New York  10022
Tel. (212) 909-6000
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

INNA GUDAVADZE, LIANA ZHMOTOVA, and IYA      :
PATARKATSISHVILI,      :
     :
               Plaintiffs,      :
     :
               v.      :    08-Civ-3363 (RJS)
     :
JOSEPH KAY (A/K/A JOSEPH KAKALASHVILI,      :
A/K/A JOSEPH KEJ, A/K/A IOSEB KAKALASHVILI,      :
A/K/A IOSEB KAKIASHVILI) and EMANUEL      :
ZELTSER,      :
               Defendants.      :

-----------------------------------------------------------------------x

# EXHIBITS TO AMENDED COMPLAINT

**Exhibit A**

<u>IN THE SUPREME COURT OF GIBRALTAR</u>
<u>CHANCERY JURISDICTION</u>

2008 M No

**IN THE MATTER** of the Civil Procedure Rules, Part 64, Section 1

and

**IN THE MATTER** of the Trustees Act

and

**IN THE MATTER** of the trusts known as The Valmore Trust and The Summit Trust

**BETWEEN**

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**

<u>Claimants</u>

<u>Defendants</u>

---

**FIRST WITNESS STATEMENT**
**OF ANDREW JOHN BAKER**

---

I, Andrew John Baker of Runkelsstrasse 37, Triesen, FL-9495, Liechtenstein hereby state as follows:

1.   I am a Solicitor of the Supreme Court of England & Wales and managing director of Miselva Establishment of Josef Rheinberger Strasse 29, Vaduz, FL-9490, Liechtenstein ("Miselva"), a professional Liechtenstein trust company. I am also a principal in Nexus Treuhand AG of Zuercherstrasse 61, CH-7320 Sargans, Switzerland ("Nexus"), a professional Swiss trust company. I am responsible for the administration of all trusts of which Nexus acts as trustee.

2.   I make this Statement in support of the Applications by Miselva and Nexus to the Supreme Court of Gibraltar in the matters of the Valmore Trust and the Summit Trust respectively, both of which are governed by the laws of Gibraltar. As will become apparent, a further trust currently named the Nile Trust is of relevance to these Applications, as is a Liechtenstein establishment called Jorum Establishment ("Jorum").

3.   Attached hereto as Exhibit "AJB1" is a schedule containing a list of the individuals, companies and other entities referred to in this statement together with a chronology of events pertaining to the Valmore Trust, the Summit Trust, the Nile Trust and Jorum so far as relevant to this application. I am still in the midst of some of these events (e.g. corporate acquisitions and restructuring) which have not been completed due to the death of Arkady Patarkatsishvili (as described below).

4.   For the purposes of this statement I shall adopt the abbreviations used in Exhibit "AJB1".

5.   I arranged for the establishment of both the Valmore Trust and the Summit Trust upon the request and instruction of David Ashfield ("DA") (as is further described below). I believe DA to be the Chief Financial Officer of London International Bank Limited ("LIB") of 11 Grosvenor Place, London. I have known DA since 03.02.2006 when, upon the invitation and recommendation of Hypo I met him in Vaduz together with Ali Guidfar ("AG") the Chief Executive Officer of LIB. At that time, they requested me to arrange via Miselva for the incorporation of two Liechtenstein establishments

2

called Sada Establishment ("Sada") and Jorum, both ostensibly for and on behalf of Joseph Kay ("JK") whom, I was led to believe, was the man behind LIB and whom DA and AG were representing at our meeting. I recall asking the managing director of Hypo how JK made his money and being told that he had earned a sizeable commission in respect of a sale of shares in the Russian oil company Sibneft.

6.    I was informed by DA and AG at our first meeting that both Jorum and Sada would initially be owned formally by JK but that one of the Establishments would, in due course, be owned by or on behalf of JK's cousin Arkady Patarkatsishvili (who was also known as "Badri") a very prominent Georgian business tycoon. I recall asking DA about AP in view of the latter's status as a fugitive from Russia and I recall his response that he had obtained legal advice from a well-known London law firm to the effect that AP was in a very similar position to Boris Berezovsky whom the UK authorities had declined to extradite to Russia due to the political nature of the allegations against him. Like Berezovsky, AP had made most of his money out of selling his shares in Sibneft. In accordance with Liechtenstein's 'Due Diligence' law, AG acted as Miselva's contractual partner and signed Miselva's form F2 confirming that JK was the initial beneficial owner of Jorum and Sada. The Establishments were incorporated by Miselva on 06.02.2006. Pursuant to common practice, Miselva acted as founder of the two establishments and signed Deeds of Assignment of the founder's rights in blank. These were sent by courier to DA in London for safe-keeping. Copies of the F2 forms and the signed Deeds of Assignment are attached as Exhibit "AJB2".

7.    In February 2006 I learned from DA of the intention that four or five new UK holding companies should be incorporated as part of a restructuring of an existing group and that these UK companies should be held by a discretionary trust, the first intended beneficiary of which would be David Aim of 70 Walton Street, London. After certain discussions and correspondence with DA and with professionals in London and Luxembourg, I received instructions from DA on 01.03.2006 to proceed with the establishment of the trust, the chronology of which is as follows:

a. The Fisher Trust was formed by declaration of Trust on 01.03.2006 with Miselva as trustee and Fallon Invest & Trade Inc ("Fallon") acting as protector. It is discretionary in form giving the trustees wide dispositive powers in favour of a

3

class of "Beneficiaries" with a default trust in favour of charity. The Trustee has power (with the Protector's consent) to add and remove persons from the class of beneficiaries. Initially, the International Red Cross was the only named beneficiary.

b. On 02.03.2006 Miselva as trustee of the Fisher Trust, with the consent of the Protector, resolved to appoint an individual called David Aim as a beneficiary of the Fisher Trust and to accept as trust assets the shares in four empty UK shelf companies which were due to be transferred to it. The four companies were in the process of changing their names to Fisher Island Limited, LIB Holdings Limited, Georgian Steel Limited (whose name has now been changed to Thames Steel UK Ltd) and Grosvenor Trading House Limited respectively.

c. On 07.04.06 Miselva resolved to accept as a trust asset the shares of a UK company called Freshname no.350 Ltd (name subsequently changed to Chapel Street Construction Limited).

d. The share of LIB Holdings were not, ultimately, contributed to the Trust and this was duly recorded in a Trustee Minute dated 15.05.2006.

e. On 16.05.2006 the International Red Cross was removed as a beneficiary of the Fisher Trust.

f. On 01.10.2006 David Aim was removed as a beneficiary and Sada was appointed as a beneficiary of the Fisher Trust. On the same date, the name of the trust was changed to the Valmore Trust.

g. On 22.03.2007 Sada was removed as a beneficiary of the Valmore Trust and JK signed an assignment of the founder's rights pertaining to Sada in favour of Miselva, so that Miselva could take it 'onto the shelf' for possible re-sale to a future client. Sada's involvement in this matter thus came to an end. The result of this was that the Trust had no named Beneficiaries, although the Trustee's power to add Beneficiaries remained.

h. On 22.03.2007 JK signed a Letter of Wishes in relation to the Valmore Trust, specifying himself and his family as the intended beneficiaries.

i. On 18.03.2008 Fallon (as protector of the Valmore Trust) wrote to Miselva requesting it to resign as trustee and informing Miselva that it would be appointing MP, a New York attorney, as the new trustee. Miselva has not at this time resigned as trustee.

Copies of the Declaration of Trust and the other documents referred to in this paragraph are attached as Exhibit "AJB3".

8.    Until very recently, I believed and had no reason to believe otherwise that the Valmore Trust was intended to benefit JK and his family.

9.    The protector of the Valmore (previously Fisher) Trust has always been Fallon, a British Virgin Islands company which Miselva acquired off the shelf on the instructions of DA. The directors of Fallon are DA and AG although they have signed resignations in blank, the originals of which are held by or for JK. DA and AG have signed an undertaking to the effect that as directors of Fallon they will not exercise Fallon's powers as protector without JK's prior written consent. The shareholder of Fallon is Miselva but it has signed a share transfer in blank, the original of which is held by or for JK. Copies of documents pertaining to Fallon are herewith in a bundle as Exhibit "AJB4".

10.    In early December 2006 I was informed that ownership of the founder's rights in Jorum would pass to AP and I duly received from AG, as Miselva's contractual partner, a replacement 'Due Diligence' form F2 showing AP as the new beneficial owner of Jorum. Copies of the correspondence and the new form F2 are herewith as Exhibit "AJB5".

11.    The Summit Trust was established by Declaration of Trust dated 20th April 2007 by Nexus. I recall discussing with DA whether I could propose a solution whereby a trustee other than Miselva would be appointed but the administration of the trust and its underlying companies would still be within my control. I understood the reason for

this request to be a desire not to have all one's eggs in a single basket. I proposed using Nexus and this was agreed. I understood the purpose of a second trust to be a desire to keep certain underlying assets separate from others. The chronology of the Summit Trust is as follows:

a.  On 20.04.2007 the Trust was formed by Declaration of Trust by Nexus. Fallon was appointed as the Protector. It was in identical terms (mutatis mutandis) to Valmore Trust. The directors of Fallon gave a similar undertaking to JK as referred to in paragraph 9 above in relation to the Valmore Trust.

b.  On 20.04.2007 JK signed a letter of wishes in relation to the Summit Trust, specifying himself and his family as the intended beneficiaries.

c.  On 20.04.2007 the trustee resolved to accept the shares of Talladega Invest. Corp (a BVI company) as a trust asset. During the course of the next few months the shares in Barbary Invest Ltd, Dagenham Properties Ltd, Shaftsbury Trading Limited, Allied Partners Investments Limited and Golden Palace Ltd were transferred from Finsbury Trust (Gibraltar) to Nexus as trustee of Summit Trust.

d.  On 07.06.2007 the International Red Cross was removed as a Beneficiary. The result of this was that the Trust had no named Beneficiaries although the Trustee's power to add Beneficiaries remained.

e.  On 18.03.2008 Fallon (as protector) wrote to Nexus requesting it to retire as trustee and informing Nexus that it would be appointing Moshe Popack ("MP") (who is an attorney in Florida and a nephew-in-law of JK) as the new trustee.

f.  On 26.03.2008 Fallon retracted its request to the trustee to resign. Nexus has not at this time resigned as Trustee.

Copies of the Declaration of Trust and the other documents referred to in this paragraph are herewith in a bundle as Exhibit "AJB6".

12.    Until very recently, I believed and had no reason to believe otherwise that the Summit Trust was intended to benefit JK and his family.

13.    At the request of LIB, on 1st July 2007 Miselva was appointed as trustee of the Nile Trust (originally known as the Octopus Settlement) which had originally been established in Gibraltar on 25.07.2000. AP is the sole named Beneficiary.

14.    I turn now to the role of LIB. Since LIB Holdings Ltd was excluded (on 15.05.2006) as an asset of the then Fisher and now Valmore Trust, I have believed that LIB has been owned directly or indirectly by JK. I also believe that JK is the non-executive chairman of LIB. AG is the CEO, DA the CFO and Daniel Lam ("DL") the financial controller. LIB appears to have two functions, first as an investment trader and second as a sort of family office for JK and for AP. I have been unable to check the complete records of the two trusts but my recollection is that all requests, guidance and instructions to Miselva and /or Nexus in relation to any and all trusts and companies that we have set up and/or administer for or on behalf of JK, AP or their respective families have come from or been conveyed to us by LIB. I believe that LIB has been keeping management accounts in relation to various companies whose shares are owned by the Valmore and Summit Trusts and the subsidiaries of those companies, although I have not received copies despite a number of recent requests in this regard. To my knowledge, whenever guidance was needed from JK or AP personally, one of the LIB personnel would contact someone in what was known to me as the "private office" (principally an individual called Natalia Shachkova). Sometimes, requests or instructions would be signed by JK or AP personally and at other times a company called Lakebrow Limited would make the request or give the instruction, with one or both of JK and AP signing. Together LIB and I have been arranging over the past two years  for the transfer to Miselva or Nexus of the ownership and administration of numerous companies from their existing administrators and for the appointment of myself as the sole director of such companies wherever possible. Most of these companies are owned by one of the Valmore, Summit or Nile Trusts, or by Jorum. It was my clear understanding that part of LIB's job was to look after not only JK's business but also AP's. To my knowledge this entailed keeping track of payments into and out of the bank accounts of myriad companies and preparing inter-company loan notes where necessary. Attached in a bundle as Exhibit "AJB7" are copies of certain

7

correspondence which goes to show how the cooperation between LIB and myself typically worked. The first ones, all dated 05.12.2006, relate to a loan that Montglimmer Overseas Ltd. (then owned by AP now owned by Jorum) was asked to make to Coalco International Limited. One can see that Natalia Shachkova from the 'private office' is first in touch with DA who then sends on the draft loan agreement to myself (as a director of the company concerned in the transaction), at the same time confirming the 'normal procedure' for funds transfer. DA then sends to me a transfer request signed by himself, followed by the same request signed by JK and a letter of authorization signed by AP. An e-mail to me from DL dated 20.06.2007 goes to show how LIB were involved in investments for JK and AP and that JK did sometimes 'front' investments on behalf of AP. Finally, there is a letter dated 22.01.2008 from JK to Mr. William Cid De La Paz at Finsbury Trust in Gibraltar in which JK requests and instructs them to cooperate with myself in transferring the administration of various companies to Miselva.

15.    In mid-December 2007 a proposal was made by Emanuel Zeltser ("EZ"), a lawyer acting for JK, to insert an American holding company between Miselva as trustee of the Valmore Trust and the then top layer of existing holding companies, being Fisher Island Ltd, Thames Steel UK Ltd, Grosvenor Trading House Ltd, Chapel Street Construction Ltd, Chester Street Enterprises Ltd and Paua Enterprises Ltd., all of these being UK companies. Pursuant to advice from EZ and at the request of JK, the proposal was implemented by lawyers Stevens & Bolton with advice from accountants PKF. Pursuant to these arrangements, the Sale and Purchase Agreements for the shares in the said UK companies were signed on 31.12.2007 between Miselva and the new US holding company JWL Entertainment Group Inc. ("JWL") with share transfers being signed by Miselva in respect of the six subsidiaries. It was my clear understanding that Miselva should be receiving 100% of JWL's shares but when I eventually received a copy of the JWL share certificate by e-mail, I saw that Miselva was apparently the registered holder of only 199 out of 200 authorised shares. I am uncertain whether there are only 199 issued shares and am currently trying to resolve this question. Copies of the Sale and Purchase Agreements and related share transfers are herewith as Exhibit "AJB8".

16.   AP passed away on 12th February 2008. The following day DA called to say that I must come to London to see JK as soon as possible. Accordingly, I travelled to London in the early morning of 14th February. I saw JK only fleetingly for about 10 minutes and passed on my condolences. He told me that he was AP's executor and that he must immediately gain control of all AP's assets. We did not have time to discuss any matter in any detail. Shortly thereafter, I met EZ in person for the first time. He confirmed that JK was AP's duly appointed executor and a very dear and close friend of AP's family. We discussed Jorum Establishment and the Nile Trust. He spoke of a Will that AP had apparently signed in November 2007 in New York and assured me that I would receive a copy. I said that it would be necessary for JK to have his appointment officially confirmed by the relevant court before I would be able to act on his instructions in relation to Jorum. I also said that the assets of the Nile Trust would not fall within AP's estate. He informed me that JK must do all he could to protect and gain control of all AP's assets so as to avoid them falling into the wrong hands. I said that I would want to cooperate in order to try and ensure this too, but he must understand that things would have to be done properly. Having heard my comment about the trust assets not forming part of AP's estate, EZ said words to the effect that "we will have to forget about the trust then and concentrate on the company". As I recall, we also discussed the ownership of Jorum and he indicated that since there was an assignment of the founder's rights in blank, he or anyone could put their name in the certificate and thus be the owner. I said this was not so under Liechtenstein law and that AP would need to have specifically assigned the rights to a third party. EZ then left with JK to go and visit Inna Gudavadze ("IG"), the widow of AP, and that was the last I saw of them that day. I returned to Liechtenstein in the evening of the same day.

17.   On 20.02.2008 I participated in a telephone conference call with DA and EZ in which EZ asked DA to read out to me a document which purported to appoint JK as AP's executor but nothing more. We again discussed the Nile Trust and again I said that it would not be part of AP's estate.

18.   On 04.03.2008, I had a lengthy meeting in Vaduz with DA, EZ and EZ's lady companion Vladlena Funk. We tried to find a solution whereby JK could be appointed to assist the trustee of the Nile Trust and the director of Jorum to protect their

respective assets without acting improperly. EZ showed me on the screen of his laptop a document entitled "Letter of Wishes" which he said had been signed by AP on 14.11.2007 in New York in front of an independent notary and two independent witnesses. I insisted on receiving a copy of the document, which EZ then printed out and handed to me (attached as Exhibit "AJB9"). It is a most curious document consisting of 4 or so pages which do not appear to fit together properly. It refers to "confidential memoranda" which EZ declined to show me. I said that without knowing who were the intended beneficiaries said to be listed in one of the confidential memoranda and without seeing a properly certified copy of the document, EZ should not seriously expect me to act. At one stage, EZ suggested that he and I should have a moment alone. I declined. I sincerely believe that he was intending to offer me a bribe to buy my cooperation. The meeting ended when I refused to issue a general power of attorney to JK or to condone a transfer from the account of Courtvale Holdings Limited (a BVI company now owned by Jorum) of approximately USD 21 million to JK's personal account or, or alternatively, of USD 7.1 million to EZ's "escrow account" as he described it.

19.    Courtvale Holdings Limited had previously been owned by nominees for JK personally and he had been the sole director and sole signatory on its bank account at Hypo. On 29.01.2008, however, JK resigned as a director, appointed me as the sole director, and caused the Courtvale shares to be transferred to Miselva. On 03.03.2008 JK instructed Miselva to hold the Courtvale shares on trust for Jorum and accordingly a declaration of trust was executed on that date. On 13.02.2008 (just one day after AP's death) JK requested me to transfer to Courtvale's account all of the credit balances on the Hypo bank accounts of Jorum's subsidiaries. I complied with his request as I was satisfied that Courtvale would hold these funds as nominee for Jorum and AP's family. In order properly to protect Jorum's assets, I appointed myself as joint signatory on Courtvale's bank account on 18.02.08 and therefore my signature was needed in respect of any transfers after that date. I did counter-sign various transfer instructions from JK which related to payments that appeared to be for the benefit of AP's family members but I refused to counter-sign JK's instruction of 03.03.2008 for the transfer of USD 21,275,000 to his personal account and this contributed to a deterioration of our relationship. On 05.03.2008 LIB sent a letter to Hypo objecting to my refusal to counter-sign JK's instruction of 03.03.3008 and

requesting a payment from Courtvale's account of USD 23 million to LIB's account with KAS Bank at JP Morgan Chase. LIB had no standing in relation to Courtvale and had no right to give instructions to Courtvale's bankers.  Hypo declined to follow the instruction. On 07.03.2008 I wrote to AG at LIB in an effort to find a solution to the situation but as time went on my concerns only increased (as to which see below) and on 19.03.2008, in my capacity as sole director of Courtvale, I removed JK as a signatory on Courtvale's bank account. On 20.03.2008 LIB withdrew its request to Hypo to make the USD 23 million transfer. Copies of corporate documentation pertaining to Courtvale and of the letters and other documents referred to in this paragraph are herewith as Exhibit "AJB10".

20.    On 10.03.2008 Miselva received a letter from CJZ Group Inc. ("CJZ"), of which JK is, I understand, the chairman, with which was enclosed a copy of the Deed of Assignment of the Jorum founder's rights with the name of CJZ inserted as the assignee. On 21.03.2008 I received a further e-mail and letter from CJZ in which it purported to replace me and Miselva as "trustee" of Jorum by MP. On 25.03.2008 I wrote to CJZ informing them that I was not in a position to accept their instructions to which they responded on 26.03.2008.  Copies of the correspondence and documents referred to in this paragraph are herewith as Exhibit "AJB11".

21.    On 12.03.2008 EZ was apparently arrested in Minsk on charges of using forged documents as detailed in the Verified Complaint filed in New York by AP's family (referred to below).

22.    On 17.03.2008 I received from an Israeli lawyer called Zvika Barak ("Barak") an e-mail concerning Paua Enterprises Ltd ("Paua"), a UK company (referred to above) that, until 31.12.2007, had been owned as to 50% by Miselva as trustee of the Valmore Trust and as to the other 50% by Jorum and, after 31.12.2007, as to 50% by JWL and as to the other 50% by Jorum. Barak and I are the directors of Paua. Barak's email made me aware for the first time that he had committed Paua to an investment in the aggregate amount of USD 84 million in a joint venture project in Israel. He was aware of the death of AP and was asking me to make funds available so that Paua could fulfil its contractual obligations in respect of the project. He wrote that he had signed the contract in AP's name (through Paua) and that AP assured him in a personal meeting a

week before AP's death that the investment would go according to plan. I met with Barak on 20.03.2008 in London and conveyed to him my surprise and annoyance at his actions without my knowledge. I also told him that neither Jorum nor Valmore Trust had sufficient cash to make the sort of payments he was looking for. I suggested that he speak to JK to see if he could find sufficient cash elsewhere. Barak told me that JK was irrelevant. He (Barak) had dealt only with AP about this investment and AP alone had attended meetings with the relevant persons in connection with the project. I found this most surprising since I had thought that JK was indirectly involved (via Valmore) in the project to the extent of 50%. On 03.04.2008 I wrote to Barak giving him my views and then met with him together with Dr. Ralph Wanger of Batliner Wanger Batliner at their offices in Vaduz on 07.04.2008. At that meeting, Barak said he was representing JK with respect to Jorum, and claimed that both JK and AP had been involved in the project and, further, that Jorum belonged to JK in any event. I disputed this. Barak also said that he had actually come to Vaduz to commence proceedings against me in respect of Jorum for losses amounting to hundreds of millions of Dollars but, when pressed as to what these might be, declined to comment. Copies of the correspondence mentioned in this paragraph are herewith as Exhibit "AJB12".

23.    On 18.03.2008 I received letters from Fallon addressed to Miselva and Nexus in which Fallon as protector of the Valmore and Summit Trusts requested their resignation as trustees and the appointment of MP as the new trustee. Upon my enquiry to DA, I learned that MP is apparently an attorney at law admitted to practise in Florida and the nephew-in-law of JK. On 31.03.2008 I received a letter from Fallon dated 26.03.2008 addressed to Nexus in which it retracted its letter of 18.03.2008 and confirmed that Nexus should continue as trustee of the Summit Trust until further notice. This was because negotiations were well advanced between LJB, Nexus and various others for the granting of a loan by Barclays Marine Finance to Seasing Limited, a Jersey company that is owned by a BVI company, Allied Partners Investments Ltd, which, in turn is owned by Nexus as trustee of the Summit Trust. The security for the repayment of the loan was and is a marine mortgage over a ship owned by Seasing Limited named MY Electra's. It was my clear understanding that this vessel was always intended to be used exclusively by JK and family and his guests and not by AP and his family and guests. DA in particular had asked me and Nexus to remain involved in

the negotiations so as to bring the loan to a swift conclusion. DA told me the reason for the loan was to resolve an acute cashflow crisis within the groups of companies headed by the Valmore and Summit Trusts.

24.    On 27.03.2008, I met with DA, MP and an associate working with MP's law firm at which we discussed in general terms the procedure to be followed upon a change of trustees. I was informed that MP would not in fact be the new trustee and that he was in the process of having a new BVI company set up for the purpose. It was agreed that he would let me have the details of the new company as soon as possible. In the event, I received notification of the identity of the new company on 14.04.2008. At our meeting, I agreed to be responsible for the drafting of the Deeds of Removal and Appointment of Trustees which would inter alia contain suitable indemnities. It was quite clear to me during our said meeting that MP and his assistant, despite being perfectly affable young gentlemen, had little or no experience of acting as trustees. MP has continued to press the directors of Fallon and me for the change of trustees to take place

25.    On 14.03.08 PHB as English solicitors for Miselva wrote to Lord Goldsmith QC of Debevoise & Plimpton LLC ("D&P"), acting for members of AP's family in order to arrange a meeting regarding the Nile Trust. This meeting took place at PHB's offices on 20.03.08 attended by IG, the 2 daughters of AP and IG, Iya Patarkatsishvili ("IP") and Liana Zhmotova ("LZ") (and her husband Alex Zhmotov) representing AP's family, myself representing Miselva, Christopher Sly a partner at Payne Hicks Beach ("PHB") and Lord Goldsmith QC and an associate from D&P. From comments made at that meeting the family clearly were well aware of certain assets held under the Valmore Trust (such as the Fisher Island development) which would be unusual if AP had had no interest in them. By a subsequent email from D&P to PHB on 03.04.2008, to which I replied on the same day, I was put on notice that AP's family believed they had a claim over some or all of the assets which I knew to be contained within the Valmore Trust and that they may have a claim over some or all of the assets in the Summit Trust

26.    On 04.04.2008 I received a copy of a letter addressed to Christopher Sly at PHB from D&P, in which were set out certain claims of IG, IP and LZ in respect of certain assets

belonging to the Valmore Trust together with a general claim to the effect that any and all assets said to belong or be held for JK should in fact be held for or on behalf of AP's estate. A copy of this letter and the e-mails referred to in paragraph 25 above are contained in Exhibit "AJB13"

27.     On 08.04.2008 I received a copy of a Verified Complaint filed in New York on 04.04.2008 on behalf of IG, IP and LZ against JK and EZ. This is copied as Exhibit "AJB14"

28.     I am also aware of publicity in the Georgian media about the conflict between AP's family and JK. Examples obtained from the internet are attached as Exhibit "AJB15".

**Conclusion**

29.     In the circumstances, there appears to be a serious question as to the true beneficial ownership of all or some of the assets held under the Valmore Trust and the Summit Trust, there being a real possibility that they were owned by or ought to be held on trust for, AP and/or his family. The actions taken by JK and his associates since AP's death (in particular, attempts to move substantial sums of money to private accounts and the apparently false assertions of acting on behalf of AP's estate) serve only to heighten the concerns.  As the person responsible for the administration of the Valmore Trust and the Summit Trust by Miselva and Nexus respectively, I have further concerns about their replacement as trustee by a new BVI company run by inexperienced persons where its director is the nephew-in-law of JK and JK directly controls the actions of the protector of both trusts. There is a serious risk that if the court does not intervene the present trustees will be removed to the detriment of persons who may be interested in the trusts.

30.     For the reasons set out above, the trustees consider that directions need to be sought from the Court in the terms set out in the Claim Form herein to resolve the dispute concerning the rival claims to the assets of the Valmore and Summit trusts being made by JK and AP's widow and daughters.  The trustees wish to ensure that the rival claims which are being made can be properly advanced and resolved before this Honourable Court.

31.  Clauses 18.1 and 18.2 of each of the declarations of trust establishing The Valmore Trust and The Summit Trust provide as follows:

> "*18.1*     *THE proper law of this Settlement shall be that of Gibraltar and all rights under this Settlement and its construction and effect shall be subject to the jurisdiction of and construed according to the laws of Gibraltar.*
>
> *18.2*     *The courts of Gibraltar shall be the forum for the administration of these trusts.*"

32.  A Claim Form has been issued and will be served on the First, Third and Fourth Defendants who are domiciled in England.

33.  Given that the Second Defendant is claiming that he has a claim to the assets held by the said trusts (as an intended beneficiary), he is a proper and/or necessary party to these proceedings. As far as I am aware, the Second Defendant is domiciled in 6 Wright Drive, Dix Hills, New York, 11746, outside the jurisdiction of this Court. I also understand that the Second Defendant has a residential address in England as follows: 70 Walton Street, London, SW3 2HH, from which I understand that post is collected every day.

34.  Fallon is a company incorporated in the British Virgin Islands with registered office address Pasea Estate, Road Town, Tortola, British Virgin Islands, VG 1110 outside the jurisdiction of this Court. As stated in paragraph 9 above, JK has effective control of Fallon which has already requested the resignation of the trustees. The trustees have not, however, been dismissed pursuant to the trust deeds. In the light of JK's conduct so far as set out above, the Claimants fear that Fallon might use its powers of dismissal to thwart the First, Third and Fourth Defendants' claims being properly advanced: see in particular an e-mail received from DA on Friday 18th April at 18:15 a copy of which is herewith as Exhibit "AJB 16". An order is therefore sought suspending the Fifth Defendant's powers in respect of the Summit and Valmore Trusts under clauses 13.1 and 13.2 (to appoint new or additional trustees), clause 14 (to

remove trustees) and clause 16.2 (to nominate successor protectors). This would enable that rival claims can be progressed fairly. The Fifth Defendant is therefore a necessary and/or proper party to these proceedings.

35. For the above reasons, I consider that there is between the Claimants and the First, Third and Fourth Defendants (as well as the other Defendants) a real issue which the Claimants can reasonably ask the Court to try. Further, I am advised and believe that the Claimants have a proper basis upon which to seek the directions of the court and other relief sought in the claim form.

## STATEMENT OF TRUTH

I believe that the facts stated in this Witness Statement are true.

Dated 20th day of April 2008

Signed: ...................................................

Andrew John Baker

This Witness Statement is filed by Messrs Hassans of 57/63 Line Wall Road, Gibraltar, Solicitors for the Claimants.

**AJB-1**

<u>IN THE SUPREME COURT OF GIBRALTAR</u>
<u>CHANCERY JURISDICTION</u>

2008 M No

**IN THE MATTER** of the Civil Procedure Rules, Part 64, Section 1

and

**IN THE MATTER** of the Trustees Act

and

**IN THE MATTER** of the trusts known as The Valmore Trust and The Summit Trust

**BETWEEN**

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**

<u>Claimants</u>

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**

<u>Defendants</u>

_____

EXHIBIT "AJB1"

_____

This is the Exhibit "AJB1" referred to in the Witness Statement of ANDREW JOHN BAKER
dated this 20ᵀʰ day of April 2008

<u>IN THE SUPREME COURT OF GIBRALTAR</u>
<u>CHANCERY JURISDICTION</u>

2008 M No

**IN THE MATTER** of the Civil Procedure Rules, Part 64, Section I

and

**IN THE MATTER** of the Trustees Act

and

**IN THE MATTER** of the trusts known as The Valmore trust and The Summit Trust

**BETWEEN**

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**

<u>Claimants</u>

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**

<u>Defendants</u>

---

Chronology and dramatis personæ

---

Abbreviations:

| | | | |
|---|---|---|---|
| AB | = | Andrew Baker | Deponent, MD of Miselva |
| AG | = | Ali Guidfar | CEO of LIB |
| AP | = | Arkady Patarkatsishvili (now deceased) | |
| AZ | = | Alex Zhmotov | Son-in-law of AP |
| B? | = | Baruch ? | NY attorney, colleague of MP |
| Barak | = | Zvika Barak | Israeli lawyer, and a director of Paua Enterprises Ltd |
| DA | = | David Ashfield | CFO of LIB |
| DL | = | Daniel Lam | Financial comprtoller LIB |
| D&P | = | Debevoise & Plimpton LLC | Lawyers for IG, IP, LZ |
| EZ | = | Emanuel Zeltser | Lawyer for JK |
| Fallon | = | Fallon Invest & Trade Inc. | Protector of Valmore and Summit Trusts |
| Hypo | = | Hypo Investment Bank (Liechtenstein) AG | |

| | | | |
|---|---|---|---|
| IG | = | Inna Gudavadze | Widow of AP |
| IP | = | Iya Patarkatsishvili | Daughter of AP and IG |
| JK | = | Joseph Kay | Step-cousin of AP |
| LIB | = | London International Bank Ltd | |
| LZ | = | Liana Zhmotova | Daughter of AP and IG |
| Miselva | = | Miselva Etablissement | Trustee of Valmore and Nile Trusts |
| MP | = | Moshe Popack | NY attorney, nephew-in-law of JK |
| Nexus | = | Nexus Treuhand AG | Trustee of Summit Trust |
| PHB | = | Payne Hicks Beach | Lawyers for Miselva and Nexus |
| S&B | = | Stevens & Bolton | Corporate lawyers for LIB |
| STI | = | Simply Trading Inc. | A BVI company, former trustee of Nile Trust |

| | |
|---|---|
| 25.07.2000 | Nile Trust (originally Octopus Settlement) established. |
| 03.02.2006 | Meeting between AB, DA and AG at Hypo when instructions given to form Jorum Establishment and Sada Establishment |
| 06.02.2006 | Incorporation of Jorum Establishment |
| 06.02.2006 | Incorporation of Sada Establishment |
| 01.03.2006 | Valmore Trust (originally Fisher Trust) established, Miselva as trustee, Fallon as protector |
| 02.03.2006 | Miselva resolves to accept as assets of the Fisher Trust the shares of Fisher Island Ltd, LIB Holdings Ltd, Georgian Steel Ltd (name subsequently changed to Thames Steel UK Ltd) and Grosvenor Trading House Ltd, all UK companies |
| 07.04.2006 | Miselva resolves to accept as an asset of the Fisher Trust the shares of Freshname no. 350 Ltd (name subsequently changed to Chapel Street Construction Ltd), a UK company |
| 15.05.2006 | Miselva resolution, noting that LIB Holdings Ltd excluded from the companies whose shares were accepted as assets of the Fisher Trust |
| 16.05.2006 | The International Red Cross removed as a beneficiary of the Valmore (then Fisher) Trust |
| 01.10.2006 | David Aim excluded as a beneficiary and Sada Establishment added as a beneficiary of the Valmore (Fisher) Trust |
| 01.10.2006 | Name of Fisher Trust changed to Valmore Trust |
| 11.12.2006 | Ownership of Jorum Establishment founder's rights vested in AP |

2

22.03.2007    Meeting in London between AB, DA, AG and JK at which Miselva requested and instructed to take over the trusteeship of the Nile Trust and the administration of the trust's subsidiaries

22.03.2007    Sada Establishment removed as a Beneficiary of the Valmore Trust; JK signs an assignment of Sada founder's rights to Miselva; JK signs a Letter of Wishes in relation to the Valmore Trust

20.04.2007    Summit Trust established, Nexus as trustee, Fallon as protector

01.07.2007    Miselva appointed as trustee of Nile Trust in place of STI

31.08.2007    Shares of first Summit Trust subsidiaries (Barbary Invest Ltd, Dagenham Properties Ltd, Golden Palace Ltd) transferred to Nexus from Finsbury Trust (Gibraltar)

11.12.2007    Telephone conference call between AB in Vaduz, DA and AG in London, and EZ in USA, discussing EZ's proposal to insert a US holding company between Valmore Trust and its subsidiaries

18.12.2007    Telephone conference call between AB in Vaduz, AG in London and JK and EZ in USA in which JK confirms that he wants a new US holding company of the Valmore group, so that he can know he is in practical control, regardless of the tax consequences

31.12.2007    Agreements signed between Miselva (as trustee of the Valmore Trust) and JWL Entertainment Group Inc. for the sale and purchase of all shares in Fisher Island Ltd, Thames Steel UK Ltd, Grosvenor Trading House Ltd, Chapel Street Construction Ltd, Chester Street Enterprises Ltd and Paua Enterprises Ltd in return for all of JWL's shares

29.01.2008    JK resigns as director of Courtvale, appoints AB as sole director and transfers all shares to Miselva.

12.02.2008    Death of AP

13.02.2008    DL requests AB to arrange for transfer to Courtvale Ltd's bank account at Hypo of all balances standing to the credit of Jorum subsidiaries at Hypo. Written request from JK follows by e-mail. Total of approx. USD 23 million transferred to Courtvale

14.02.2008    Meeting between AB and EZ at LIB at which EZ claims JK is AP's executor and at which AB explains that Nile Trust is not part of AP's Estate

18.02.2008    AB as director of Courtvale appoints himself as joint signatory with JK on Courtvale's bank account at Hypo, to protect assets

20.02.2008    Conference telephone call between AB in Vaduz and DA and EZ in Miami during which EZ asks DA to read out a document purporting to appoint JK as AP's executor, and AB re-iterates that the Nile Trust is outside AP's estate

3

| | |
|---|---|
| 03.03.2008 | JK requests that the shares in Courtvale are in future held on trust for Jorum |
| 03.03.2008 | JK purports to instruct Hypo to transfer USD 21 million from Courtvale's account to his personal account at JSC Investbank in Tbilisi, Georgia; Hypo contacts AB as joint signatory; AB refuses to countersign the instruction |
| 04.03.2008 | Meeting in Vaduz between AB, DA, EZ and EZ's lady companion Vlada Funk during which EZ shows AB on the screen of EZ's laptop a copy of the document purporting to appoint JK as AP's executor and shows then prints out an incomplete and most odd-looking copy of the so-called Letter of Wishes; EZ also requests a transfer of USD 7.1 million from Courtvale to his "escrow" account; AB refuses |
| 05.03.2008 | LIB purports to instruct Hypo to transfer USD 23 million from Courtvale to LIB's account with KAS Bank at JP Morgan Chase; Hypo declines |
| 10.03.2008 | Miselva receives letter from CJZ Group Inc. enclosing a copy of the Jorum Deed of Assignment with CJZ's name inserted |
| 19.03.2008 | AB as director of Courtvale removes JK's signatory rights on Courtvale's bank account at Hypo |
| 12.03.2008 | EZ arrested in Minsk on charges of using forged documents |
| 17.03.2008 | Email received from Z Barak concerning Paua Enterprises Ltd |
| 18.03.2008 | Fallon sends letters to Miselva and Nexus requesting them to resign as trustees of Valmore and Summit Trusts respectively |
| 20.03.2008 | Meeting in London between AB, PHB, IG, IP, LZ, AZ, and D&P concerning the Nile Trust |
| 20.03.2008 | Meeting in London between AB Z Barak and PHB to discuss Paua Enterprises |
| 26.03.2008 | Fallon send letter to Nexus retracting letter of 18.03.2008 and confirming wish for Nexus to continue as trustee of Summit Trust |
| 27.03.2008 | Meeting in Vaduz between AB, DA, MP and B? to discuss procedure to be followed on retirement and appointment of trustees |
| 04.04.2008 | Letter received from D&P setting out the claims of IG, LP and IZ against JK and in respect of the UK companies (in Valmore) which had been transferred to JWL Enterprises and other assets JK might claim as his |
| 08.04.2008 | Receipt by PHB and Miselva of a copy of the Verified Complaint filed in New York on 04.04.2008 by IG, LZ and IP against JK and EZ |

4

**AJB-2**

2008 M No

<u>IN THE SUPREME COURT OF GIBRALTAR</u>
<u>CHANCERY JURISDICTION</u>

**IN THE MATTER** of the Civil Procedure Rules, Part 64, Section 1

and

**IN THE MATTER** of the Trustees Act

and

**IN THE MATTER** of the trusts known as The Valmore Trust and The Summit Trust

**BETWEEN**

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**

**Claimants**

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**

**Defendants**

**EXHIBIT "AJB2"**

This is the exhibit marked "AJB2" referred to in the Witness Statement of ANDREW JOHN
BAKER dated          this     day of              2008

MISELVA ETABLISSEMENT
Josef Rheinbergerstrasse 29
9490  Vaduz

Request to form a Liechtenstein Establishment

I/we kindly ask you to create a Liechtenstein establishment company for me/us (in your name but to my/our costs) as per my/our following instructions:

Name of establishment:    1st choice:    SADA  ESTABLISHMENT

                          2nd  choice:   JORUM  ESTABLISHMENT

Type of establishment:    a) commercial
                          b) non-commercial

Domicile:                 a) Vaduz
                          b) other

Objects:                  HOLDING VEHICLE

Capital:                  a) minimun CHF 30'000.
                          b) other:

Agency agreement:         Principal:  NONE.

Authorised to give
Instructions:             a) JOSEPH KAY
                          b)

                          individually /collectively

Founder:                  a) Miselva Etablissement
                          b) other:

1

Member of the Board:      1) _ANDREW BAKER_____

                          2) _____

                          3) _____

Signature right:          a) individually
                          ~~b) collectively with two~~

Representative:           a) Miselva Etablissement
                          ~~b) other:~~

Fiscal year-end:          a) 31st December
                          ~~b) other:~~

Book-keeping:             ~~a) Miselva Etablissement~~
                          ~~b) other~~
                          c) none

Auditor:                  ~~a) Miselva Etablissement~~
                          ~~b) other~~
                          c) none

Language of               a) English
the statutes:             ~~b) other:~~

Deed of Assignment:       a) _IN BLANK_
to be issued for:         b)

Deed of Assignment:       a) to be kept by Miselva Etablissement
                          ~~b) to be sent to:~~

No. Of document sets:     a) 3
                          ~~b) other~~

Mailing address:          a) Miselva Etablissement
                          ~~b) Client~~
                          ~~c) other:~~

Fees:                     Formation:
AS PER ATTACHED
                          Administration: CHF

                          Domicile:      CHF

                          Due Diligence: CHF

2

-3-

Bank account(s):          Bank: HYPO INVESTMENT BANK (LIECHTENSTEIN)

Account type:             a)      Current account
                          b)      depot
                          c)      other:

authorised signatories:   a)      Members of the Board
                          b)      other: JOSEPH KAY

signature-right:          a)      individually
                          b)      collectively.

Bank post to be sent to:  a)      Miselva Etablissement
                          b)      Client
                          c)      Other: DAVID ASHFIELD, C/O LONDON INTERNATIONAL BANK

Duplicate:                yes/no

Instructions re invoice:  a)      to be settled direct from bank account
                          b)      to be sent to Client for approval
                          c)      other:      DAVID ASHFIELD

Notepaper:                yes / no        amount:
                          text:

Beneficial owner of the funds being contributed:
a)
b)      SEE DUE DILIGENCE FORMS
c)

Source of the funds to be contributed:
Amount:
Source:      SEE DUE DILIGENCE FORMS

N.B.: A certified copy of the passport of the contractual partner and the
beneficial owner(s) is/are attached.

Miscellaneous:

Vaduz, 3.2.2006

                                    Client (signature)

3

Due Diligence – Form F1

## Identification of contractual partner

I.    Name of entity :    SADA ESTABLISHMENT

Place and date of incorporation / establishment :    Vaduz, 6-2-2006

II.   Type of identification:

X    new    ☐    repeat

☒    personal appearance. If yes, date and place: Hypobank, Vaduz

☐    by correspondence. If yes, details :

III.  The contractual partner(s) is / are:

☒    a natural person / persons ·    ☒ copy of current passport or i.d. card, attached
(copy must made by Miselva or a duly appointed delegate)

☐ certified copy of a current passport or i.d. card, attached
(if copy not made by Miselva or a duly appointed delegate)

☐    a corporate body / bodies :    ☐ original or a certified copy of a probative document not more than
6 months old, attached

IV.   Particulars of contractual partner(s):

Surname / company name :    GUIDFAR

First name :    MOHAMMAD ALI

Profession:    COMPANY DIRECTOR

Date of birth / incorporation :    06 SEPTEMBER 1960

Nationality / Nationalities :    IRANIAN

Residential / registered office address :    2 GARSTON CRESCENT, WATFORD WD25 9LD

VADUZ 3.2.2006
Place and date

Signature

4

Due Diligence - Form F2

Determination of the beneficial owner(s)

Name of Entity:     Sada Establishment

Declaration of the Contractual Partner(s):

The undersigned hereby declare(s) :-

☐    that he / she / they is / are the ultimate beneficial owner(s) of the Entity's assets; or

☒    that the following person(s) is / are the ultimate beneficial owner(s) of the Entity's assets :-

Surname(s) :     KAY

First name(s) :     JOSEPH

Birth date(s) :     19 MAY 1958

Profession:     COMPANY DIRECTOR

Nationality / nationalities :     U.S.A.

Residential address(es) :     70 WALTON STREET, LONDON SW1

The contractual partner(s) hereby confirm(s) with his / her / their signature(s) the correctness and completeness of the above information. In case of any changes he / she / they will immediately inform Miselva Etablissement in writing accordingly.

Furthermore, the contractual partner(s) take(s) notice of and agree(s) to the fact, that in case of opening a bank or deposit account, the identity of the beneficial owner(s) may have to be disclosed to the bank.

VADUZ, 3.2. 2006
_____
Place and date

_____
Contractual Partner

5



# DEED OF ASSIGNMENT

The undersigned, Miselva Etablissement, Vaduz, Founder of the firm

## Sada Establishment
Vaduz

hereby irrevocably assigns all the rights and obligations that it has as Founder pursuant to the law or the statutes of the said firm to:

And hereby waives all its rights to the said firm and explicitly declares that it will neither now nor in future make any claim to or in respect of such rights.

Vaduz, 6th February 2006

The Founder

## Miselva Etablissement

Andrew J. Baker

Die Echtheit der Unterschrift von

Herrn Andrew J. Baker, geb. am 03.12.1960



wird amtlich beglaubigt.
Grundbuch- und Öffentlichkeitsregisteramt
Vaduz, den 08.02.2005

Rico Hassler

7

**MISELVA ETABLISSEMENT**
Josef Rheinbergerstrasse 29
9490 Vaduz

## Request to form a Liechtenstein Establishment

I/we kindly ask you to create a Liechtenstein establishment company for me/us (in your name but to my/our costs) as per my/our following instructions:

| | | |
|---|---|---|
| Name of establishment: | 1ˢᵗ choice: | IDRUM ESTABLISHMENT |
| | 2ⁿᵈ choice: | RODAVA ESTABLISHMENT |

Type of establishment:
  a) commercial
  b) non-commercial

Domicile:
  a) Vaduz
  b) other

Objects:  HOLDING VEHICLE

Capital:
  a) minimun CHF 30'000.—
  b) other:

Agency agreement:  Principal:  NONE

Authorised to give
Instructions:
  a) JOSEPH KAY
  b)

  individually /collectively

Founder:
  a) Miselva Etablissement
  b) other:

8

-2-

| | |
|---|---|
| Member of the Board: | 1) _ANDREW BAKER_ |
| | 2) _____ |
| | 3) _____ |

Signature right:  a) individually
                  ~~b) collectively with two~~

Representative:  a) Miselva Etablissement
                 ~~b) other:~~

Fiscal year-end:  a) 31st December
                  ~~b) other:~~

Book-keeping:  ~~a) Miselva Etablissement~~
               ~~b) other~~
               c) none

Auditor:  ~~a) Miselva Etablissement~~
          ~~b) other~~
          c) none

Language of
the statutes:  a) English
               ~~b) other:~~

Deed of Assignment:
to be issued for:  a) IN BLANK
                   ~~b)~~

Deed of Assignment:  a) to be kept by Miselva Etablissement
                     ~~b) to be sent to:~~

No. Of document sets:  a) 3
                       ~~b) other~~

Mailing address:  a) Miselva Etablissement
                  ~~b) Client~~
                  ~~c) other:~~

Fees:
SEE ATTACHED SHEET   Formation:

                     Administration: CHF

                     Domicile:     CHF

                     Due Diligence: CHF

9

-3-

Bank account(s):                  Bank: HYPO INVESTMENT BANK (LIECHTENSTEIN)

Account type:              a)      Current account
                           b)      depot
                           c)      other:

authorised signatories:    a)      Members of the Board
                           b)      other: Joseph KAY

signature-right:           a)      individually
                           b)      collectively

Bank post to be sent to:   a)      Miselva Etablissement
                           b)      Client
                           c)      Other: DAVID ASHFIELD, % HYPO INVESTMENT
                                          BANK

Duplicate:                 yes/no

Instructions re invoice:   a)      to be settled direct from bank account
                           b)      to be sent to Client for approval
                           c)      other:   DAVID ASHFIELD

Notepaper:                 yes / no        amount:
                           text:

Beneficial owner of the funds being contributed:
a)
b)      SEE DUE DILIGENCE FORMS
c)

Source of the funds to be contributed:
Amount:
Source:   SEE DUE DILIGENCE FORMS

N.B.: A certified copy of the passport of the contractual partner and the
beneficial owner(s) is/are attached.

Miscellaneous:

Vaduz, 3.2.2006

                                                Client (signature)

10

Due Diligence - Form F1

Identification of contractual partner

I.    Name of entity :    *Jorum Etablishment, Vaduz*

Place and date of incorporation / establishment :    06.02.2006

II.   Type of identification:

X    new        ☐    repeat

☒    personal appearance. If yes, date and place: 3rd Feb. 2006, VADUZ

☐    by correspondence. If yes, details :

III.  The contractual partner(s) is / are:

☒    a natural person / persons :  ☒ copy of current passport or i.d. card, attached
                                    (copy must made by Miselva or a duly appointed delegate)

                                    ☐ certified copy of a current passport or i.d. card, attached
                                    (Ii copy not made by Miselva or a duly appointed delegate)

☐    a corporate body / bodies :  ☐ original or a certified copy of a probative document not more than
                                    6 months old, attached

IV.   Particulars of contractual partner(s):

Surname / company name :    GUIDFAR

First name :    MOHAMMAD ALI

Profession:    COMPANY DIRECTOR

Date of birth / incorporation :    06 SEPTEMBER 1960

Nationality / Nationalities :    IRANIAN

Residential / registered office address :    2 GARSTON CRESCENT, WATFORD, WD25 0LD

VADUZ, 3.2.2006
Place and date

Signature

11

Due Diligence - Form F2

Determination of the beneficial owner(s)

Name of Entity:    *Jorum Establishemnt*

Declaration of the Contractual Partner(s):

The undersigned hereby declare(s) :-

☐    that he / she / they is / are the ultimate beneficial owner(s) of the Entity's assets; or

☒    that the following person(s) is / are the ultimate beneficial owner(s) of the Entity's assets :-

Surname(s) :    KAY

First name(s) :    JOSEPH

Birth date(s) :    19 MAY 1958

Profession:    COMPANY DIRECTOR

Nationality / nationalities :    U.S.A.

Residential address(es) :    70 WALTON STREET  LONDON SW1

The contractual partner(s) hereby confirm(s) with his / her / their signature(s) the correctness and completeness of the above information. In case of any changes he / she / they will immediately inform Miselva Etablissement in writing accordingly.

Furthermore, the contractual partner(s) take(s) notice of and agree(s) to the fact, that in case of opening a bank or deposit account, the identity of the beneficial owner(s) may have to be disclosed to the bank.

VADUZ , 03.02.2006

Place and date

Contractual Partner

12

*6 4 06 - Original D Ashfield*

# DEED OF ASSIGNMENT

The undersigned, Miselva Etablissement, Vaduz, Founder of the firm

## Jorum Establishment
### Vaduz

hereby irrevocably assigns all the rights and obligations that it has as Founder pursuant to the law or the statutes of the said firm to:

And hereby waives all its rights to the said firm and explicitly declares that it will neither now nor in future make any claim to or in respect of such rights.

Vaduz, 6th February 2006

The Founder

### Miselva Etablissement

Andrew J. Baker

*13*



Die Echtheit der Unterschrift von

Herrn Andrew J. Baker, geb. am 03.12.1960

wird amtlich beglaubigt.
Grundbuch- und Öffentlichkeitsregisteramt
Vaduz, den 09.02.2006

Rico Hassler

14

**AJB-3**

2008 M No

<u>IN THE SUPREME COURT OF GIBRALTAR</u>
<u>CHANCERY JURISDICTION</u>

IN THE MATTER of the Civil Procedure Rules, Part 64, Section 1

and

IN THE MATTER of the Trustees Act

and

IN THE MATTER of the trusts known as The Valmore Trust and The Summit Trust

BETWEEN

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**

<u>Claimants</u>

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**

<u>Defendants</u>

---

**EXHIBIT "AJB3"**

---

This is the exhibit marked "AJB3" referred to in the Witness Statement of ANDREW JOHN BAKER dated          this          day of                    2008

# DECLARATION OF TRUST

## THE FISHER TRUST

Miselva Etablissement

TRUSTEES

Dated 1ST March, 2006

| Clause | | Page |
|---|---|---|
| 1. | Definitions | 3 |
| 2. | Trusts for Sale | 4 |
| 3. | Trusts of Added Property | 5 |
| 4. | Overriding Powers | 5 |
| 5. | Trusts in Default of Exercise of Overriding Powers | 6 |
| 6. | Ultimate Default Trusts | 6 |
| 7. | Trustees' Powers Immunities and Decision Making | 6 |
| 8. | Power of Advancement | 7 |
| 9. | Speculative Investments | 7 |
| 10. | Provision of Information | 7 |
| 11. | No Duty to Interfere in Underlying Business | 7 |
| 12. | Trustees' and Protector's Remuneration | 7 |
| 13. | Appointment of New or Additional Trustees | 8 |
| 14. | Removal of Trustees | 9 |
| 15. | Indemnity of Retiring Trustee and Protector | 9 |
| 16. | Appointment of New Protector | 10 |
| 17. | Powers of Trustees subject to Consent of Protector | 10 |
| 18. | Applicable Law and Jurisdiction | 11 |
| 19. | Power to Appoint Additional Beneficiaries | 11 |
| 20. | Power to Exclude Beneficiaries | 12 |
| 21. | Exclusion of Excluded Persons | 12 |
| 22. | Emergency Provisions | 13 |
| 23. | Power to amend | 14 |
| Schedule One - Administrative Powers | | 15 |
| Schedule Two - Initial Trust Fund | | 24 |

2

THIS DECLARATION OF TRUST is made on the F I R S T    day of March, 2006

BY

**MISELVA ETABLISSEMENT** of Josef Rheinberger Strasse 29, FL-9490 Vaduz, Liechtenstein

(the "Original Trustees")

WHEREAS:

(A)    The property specified in the Second Schedule has been transferred or delivered to the Original Trustees or otherwise placed under their control and from time to time further money investments or other property may be paid or transferred to the Trustees by way of addition

(B)    The trust created by this declaration shall be irrevocable

(C)    This trust created by this declaration shall be known as **The Fisher Trust**

NOW THIS DEED WITNESSES as follows

1.    Definitions

IN this Settlement where the context so admits

1.1    "Beneficiaries" means and includes

1.1.1    The International Red Cross of 17 Chemin des Crets, PO Box 372, Geneva, Switzerland

1.1.2    such other objects or persons as may be added under Clause 19

PROVIDED ALWAYS that the expression "the Beneficiaries" shall not mean or include any Gibraltar Resident

1.2    "the Emergency Trustee" means the person or corporation from time to time designated as such pursuant to the provisions of Clause 22

1.3    "Excluded Persons" means any Gibraltar Resident and any person constituted an Excluded Person pursuant to Clause 20

1.4    "Gibraltar Resident" means any person who is a resident of Gibraltar as defined in Section 2(1) of the Companies (Taxation and Concessions) Ordinance of Gibraltar or any modification or re-enactment thereof

1.5    "Protector" means Fallon Invest & Trade Inc. of Pasea Estate, Road Town, Tortola, British Virgin Islands, or such new Protector as may be appointed pursuant to Clause 16

1.6    "Settlement" means The Fisher Trust created by this Deed

1.7    "Speculative Investments" means property the ownership of which entails to the owner thereof a risk of substantial financial loss but which entails also a possibility of greater profit on the sale or conversion into money of such property than that which might reasonably be

3

*3*

expected to be realised on the sale or conversion into money of property not entailing to its owner a risk of substantial financial loss and for the purpose of this definition "a risk of substantial financial loss" includes a risk that the value of property will prior to any sale or conversion into money thereof be reduced to nothing

1.8    "Trustees" means the Original Trustees or other trustee or trustees for the time being of the Settlement hereby created

1.9    "Trust Fund" means

1.9.1    the property specified in the Second Schedule and

1.9.2    all moneys investments and property paid or transferred by any person or persons to and accepted by the Trustees as additions to the Trust Fund and

1.9.3    all accumulations (if any) of income directed to be held as an accretion to capital and

1.9.4    the money investments and property from time to time representing such money investments property additions and accumulations or any part or parts thereof

1.10    "Trust Period" means the period commencing on the date hereof and ending on the earlier of (i) the last day of the period of one hundred years from the date hereof which period (and no other) shall be the applicable perpetuity period or (ii) such earlier date as the Trustees shall by deed specify (not being a date earlier than the date of execution of such deed)

1.11    "Trust Property" means any property comprised in the Trust Fund

1.12    references to clauses and schedules are to be construed as references to clauses and the schedules of this Settlement unless otherwise stated

1.13    references to (or to any specified provision of) this Settlement or any other document shall be construed as references to this Settlement that provision or that document as from time to time amended and/or supplemented unless otherwise stated

1.14    words denoting the single shall include the plural and vice versa

1.15    words denoting any gender shall include both genders

1.16    references to a person shall be construed as references to an individual firm company corporation unincorporated body of persons or any state or any agency thereof

1.17    the tables of contents and clause heading are included for reference only and shall not affect the interpretation of this Deed

2.    Trusts for Sale

THE Trustees shall hold the Trust Fund upon trust in their discretion either to allow the same to remain in the state in which it is received or held for so long as they shall think fit or to sell or convert the same into money and may in their discretion invest such money in their names or under their control in any of the investments authorised by this Settlement or by law with power from time to time to vary or transpose any such investments for or into others so authorised.

3.     Trusts of Added Property

THE Trustees shall hold the Trust Fund upon with and subject to the trusts powers and provisions of this Settlement and the Trustees may at any time or times during the Trust Period accept such additional money investments or other property as may be paid or transferred to them upon these trusts by any person either personally or by testamentary act or disposition (including property of any onerous nature the acceptance of which the Trustees consider to be beneficial).

4.     Overriding Powers

4.1     THE Trustees shall hold the capital and income of the Trust Fund upon trust for or for the benefit of the Beneficiaries at such times in such shares upon such trusts (which may include discretionary or protective powers or trusts) and in such manner generally as the Trustees shall in their discretion appoint and such appointment may include such powers and provisions for the maintenance education or other benefit of the Beneficiaries or for the accumulation of income and such administrative powers and provisions as the Trustees think fit

4.2     No exercise of the power conferred by Clause 4.1 shall invalidate any prior payment or application of all or any part of the capital or income of the Trust Fund under the trusts of this Settlement or made under any other power conferred by this Settlement or by law

4.3     Any trusts and powers created by an appointment under Clause 4.1 may be delegated to any extent to any person, whether or not including the Trustees or any of them

4.4     The exercise of the power of appointment conferred by Clause 4.1 shall

4.4.1     be subject to the application if any of the rule against perpetuities and the law concerning excessive accumulations of income

4.4.2     be by deed revocable during the Trust Period or irrevocable executed during the Trust Period

4.4.3     be subject to the written consent of the Protector (for so long as there is a Protector of this Settlement) which consent (if applicable) shall be endorsed on such deed or deeds

4.5     Notwithstanding paragraph 20 of the First Schedule the Trustees may not release or restrict the power of appointment conferred by Clause 4.1 without the Protector's written consent for so long as there is a Protector of this Settlement

4.6     Notwithstanding the trusts and provisions herein the Trustees may by any deed or deeds revocable during the Trust Period or irrevocable and executed during the Trust Period in their absolute discretion with the written consent of the Protector (for so long as there is a Protector of this Settlement) which consent (if applicable) shall be endorsed on such deed or deeds pay or transfer the whole or any part or parts of the capital or income of the Trust Fund to the trustees for the time being of any other trust wherever established or existing and whether governed by the law of Gibraltar or by the law of any other state or territory under which any one or more of the Beneficiaries are interested notwithstanding that such other trusts may also contain trusts powers and provisions (discretionary or otherwise) in favour of some other person or persons or objects if the Trustees shall in their absolute discretion consider such payment to be for the benefit of such one or more of the Beneficiaries

5

5.    Trusts in Default of Exercise of Overriding Powers

SUBJECT to and in default of any appointment under Clause 4 and for so long as there is a Protector of this Settlement with the written consent of such Protector

5.1    The Trustees shall pay or apply the income of the Trust Fund to or for the benefit of such of the Beneficiaries as shall for the time being be in existence in such shares and in such manner generally as the Trustees shall in their discretion from time to time think fit

5.2    Notwithstanding the provisions of Clause 5.1 the Trustees may at any time in their discretion accumulate the income by investing it in any investments authorised by this Deed or by law and subject to Clause 5.3 shall hold such accumulations as an addition to capital

5.3    The Trustees may apply the whole or any part of the income accumulated under Clause 5.2 as if it were income arising in the then current year

5.4    Notwithstanding the provisions of Clauses 5.1 to 5.3 the Trustees may at any time during the Trust Period pay or apply the whole or any part of the capital of the Trust Fund to or for the benefit of all or such of the Beneficiaries in such shares and in such manner generally as the Trustees shall in their discretion think fit

6.    Ultimate Default Trusts

SUBJECT as above and if and so far as not wholly disposed of for any reason whatever by the above provisions the capital and income of the Trust Fund shall be held for such charitable purposes or objects as the Trustees may determine and for so long as there is a Protector of this Settlement any such determination shall be with the written consent of the Protector

7.    Trustees' Powers, Immunities and Decision Making

7.1    THE Trustees shall in addition and without prejudice to all statutory powers have the powers and immunities set out in the First Schedule provided that the Trustees shall not exercise any of their powers so as to conflict with the beneficial provisions of this Settlement

7.2    Notwithstanding the Trustees' powers and immunities set out in the First Schedule the Trustees shall not take any action in any form or manner directly or indirectly which would require under this Settlement written consent of the Protector without obtaining such a written consent and where the provisions of this Settlement restrict or limit the powers of the Trustees such limitations and restrictions shall apply notwithstanding any of the provisions of the First Schedule

7.3    In the event that there shall be more than two Trustees in office from time to time every decision resolution or exercise of a power or discretion required to be or capable of being made by the Trustees shall be validly made if so made by a majority in number of the Trustees and any instrument executed in pursuance of any such decision resolution or exercise shall have binding legal effect (as if executed by all the Trustees) if it shall be executed by a majority in number of the Trustees but not so as to render any of the Trustees liable for any act or thing done or omitted without his consent by reason of the provisions of this paragraph or for any act in which he joins for conformity only

7.4    A resolution in writing signed by a majority of the Trustees shall be valid and effective as if it had been passed at a meeting of the Trustees duly convened and held and any such resolution may consist of one or more documents in similar form each signed by one or more of the Trustees

6

8.    Power of Advancement

THE Trustees may pay or apply the Trust Property for the advancement or benefit of any Beneficiary

9.    Speculative Investments

IT is expressly declared that one of the purposes of the trusts hereby created may be to invest all or part of the Trust Fund in Speculative Investments and accordingly the Trustees shall not be liable for any loss sustained to the value of the Trust Fund by reason only that it may comprise or have comprised (whether in whole or part) Speculative Investments and for the purposes of this clause "invest" shall be given its widest possible meaning

10.   Provision of Information

10.1    SUBJECT to Clause 10.2 the Trustees shall not be bound to furnish any information relating to the value state or amount of the Trust Fund or any assets comprising the Trust Fund to any Beneficiary unless and until a Beneficiary has a vested interest in all or any part of the Trust Fund and then only to the extent of that interest and in particular but without limiting the foregoing the Trustees shall not be bound to notify any Beneficiary that he is a beneficiary of this Settlement

10.2    The obligation of the Trustees to furnish information in relation to the Trust Fund in relation to any company an interest in which comprises part or all of the Trust Fund (such a company being in this subclause hereinafter called an "underlying company") shall be to furnish information only of the fact that the shares in an underlying company form part of the Trust Fund and the number and nominal value of the shares in an underlying company which form part of the Trust Fund and accordingly the Trustees shall not be obliged in relation to an underlying company to provide any Beneficiary with any information regarding the administration management or conduct of the business or affairs of that underlying company

11.   No Duty to Interfere in Underlying Business

THE Trustees are under no duty to enquire into the conduct of a company in which they are interested unless they have knowledge of circumstances which call for enquiry

12.   Trustees' and Protector's Remuneration

12.1    ANY Trustee or Protector who is a solicitor accountant or other person engaged in any profession or business shall be entitled to charge and be paid all usual professional or other charges and to receive commission or other benefits for or in respect of business transacted time expended and acts done by him or any employee or partner of his in connection with these trusts including acts which a trustee or protector not being in any profession or business could have done personally

12.2    Any Trustee or Protector which is a trust corporation or company authorised to undertake trust business shall be entitled in addition to reimbursement of its proper expenses to remuneration for its services in accordance with its published terms and conditions for trust business in force from time to time and in the absence of such published terms and conditions in accordance with such terms and conditions as may from time to time be determined by such Trustee or Protector

7

12.3    Any Trustee or Protector shall be entitled to retain any brokerage or other commission which may be received personally or by such Trustee's or Protector's firm in respect of any transaction carried out on behalf of this Settlement for which such Trustee or Protector or Trustee's or Protector's firm is in the normal course of business allowed brokerage or other commission notwithstanding that the receipt of such brokerage or commission was procured by an exercise by such Trustee or Protector of powers over the Trust Fund

12.4    All costs, charges, liabilities and expenses incurred and payments made by the Trustee in the lawful exercise of the powers conferred upon it by these presents shall be payable or reimbursable out of the Trust Fund or income thereof.

12.5    The Trustee shall be indemnified out of the Trust Fund and/or income thereof (i) in respect of all liabilities sustained and costs and expenses properly incurred by it or by any delegate or sub-delegate appointed by it or to whom any duties, powers, trusts, authorities or discretions may be delegated by it in the proper execution or purported execution of the trusts, powers, authorities or discretions vested in it by, or the proper performance of obligations assumed by it under the Settlement, (ii) against all liabilities, actions, proceedings, costs and expenses, claims and demands in respect of any matter or thing properly done or omitted by it or any other person in any way relating to this Settlement except to the extent that any such are sustained or incurred as a result of the negligence, willful misconduct or fraud of the Trustee.

13.    Appointment of New or Additional Trustees

13.1    If any Trustee whether original additional or substituted shall die or being a company shall be dissolved or shall give notice of a desire to withdraw and be discharged from these trusts or shall be unfit or unwilling to act or shall be removed by the Protector pursuant to Clause 14 then

13.1.1    the Protector or if there shall be no Protector or if the Protector shall be unable or unwilling to act

13.1.2    the Trustees or if there shall be no Trustee in existence or willing to act

13.1.3    the Supreme Court of Gibraltar or the court of such other place which shall then be the forum for the administration of these trusts in accordance with the terms of Clause 18 may by deed appoint one or more other persons or bodies corporate to be a trustee or trustees in place of the trustee so deceased dissolved desiring to withdraw becoming unfit or unwilling to act or so removed

13.2    The person or body for the time being having the power to appoint new trustees in accordance with Clause 13.1 shall also have power to appoint by deed one or more other persons or companies to be an additional trustee or trustees

13.3    Where new or additional trustees are appointed for the whole or any part or parts of the Trust Fund the appointor or appointors may appoint any person or persons as trustee or trustees notwithstanding the residence domicile place of business or (if any body corporate) place of incorporation of such person or persons and the receipt of such person or persons for the whole or such part or parts of the Trust Fund as may be paid or transferred to such person or persons pursuant to such appointment shall be a good discharge to any other trustee or trustees accordingly

8

13.4    Any corporate body may at any time be appointed either as a general trustee or as custodian trustee hereof on such terms or conditions as to remuneration (payable out of the income or capital of the Trust Fund) and otherwise in all respects as the appointor or appointors shall prescribe or approve

13.5    The power of appointing new trustees shall not be exercisable by reason only that a trustee remains out of Gibraltar (or if applicable out of the jurisdiction which is then the forum for the administration of these trusts in accordance with the terms of Clause 18) for more than twelve months

13.6    Acts and instruments done or executed for the proper vesting of the Trust Fund in new or additional trustees shall be done and executed by the continuing or retiring trustee or trustees at the expense of the income or capital of the Trust Fund PROVIDED THAT an outgoing trustee who is liable as a trustee or who may at the death of any person be liable as a trustee or on any other occasion be liable as a former trustee for any taxes wherever they may be imposed and of whatsoever nature shall not be bound to transfer the Trust Fund unless reasonable security is provided for indemnifying such outgoing trustee against such liability

13.7    The Supreme Court of Gibraltar or the court of such any other place which shall then be the forum for the administration shall have the power to vest the Trust Fund in the trustees appointed by such court

13.8    On every change in the trusteeship a memorandum shall be endorsed on or permanently annexed to this Deed stating the name of the Trustees for the time being and shall be signed by the persons so named and any person shall be entitled to rely upon such memorandum (or the latest of such memoranda if more than one) as sufficient evidence that the Trustees named in such memorandum are the duly constituted trustees of this Settlement for the time being

14.    Removal of Trustees

THE office of a trustee shall be determined and vacated if such trustee being an individual shall be found to be a lunatic or of unsound mind or shall become subject to any proceedings under the insolvency or bankruptcy laws applicable to such trustee or if such trustee being a company shall enter into liquidation whether compulsory or voluntary (not being merely a voluntary liquidation for the purpose of amalgamation or reconstruction) or if its ownership changes without prior written notification to the Protector or if the Protector (at any time when there is a Protector of this Settlement) removes such trustee by written notice

15.    Indemnity of Retiring Trustee and Protector

15.1    IF a Trustee ceases to be a trustee such Trustee shall be released from all claims demands actions proceedings and accounts of any kind on the part of any other person (whether in existence or not) actually or prospectively interested under this Settlement for or in respect of the capital and income of the Trust Fund or these trusts or an act or thing done or omitted in execution or purported execution of these trusts other than and except only actions

15.1.1    arising from any breach of trust to which such Trustee or (in the case of a corporate trustee) any of its officers or employees was a party or privy

9

15.1.2   to recover from such Trustee the whole or any part of the Trust Fund in the possession of such Trustee or previously received by such Trustee or (in the case of a corporate Trustee) any of its officers or employees and converted to the use of such trustee or officers or employees

15.2   If the Protector for the time being shall have died or retired as Protector then the Protector or the personal representatives of such Protector shall be entitled to a similar release as that specified above for a retiring trustee in respect of any act or thing done or omitted to be done

15.3   The Protector shall not owe any fiduciary duty towards and shall not be accountable to any person or persons from time to time interested hereunder or to the Trustees for any act of omission or commission of the Protector in relation to the powers given to the Protector by this Settlement to the intent that the Protector (in the absence of fraud or dishonesty) shall be free from any liability whatsoever in relation to such powers

15.4   The Protector shall be wholly indemnified and held harmless out of the Trust Fund from any losses damages or judgment debt arising out of any action or suit in a court of law based upon or in connection with the Protector's powers or duties under this Settlement

16.   Appointment of New Protector

16.1   THE Protector shall cease to be the Protector on death if an individual or on dissolution if a company or in either case on becoming unable or unfit to act or in the case of the Protector being a company if there shall be a change of ownership and in the case of a company with bearer shares if there shall be a change in the identity of the person recorded by the Trustees as being the holder of the bearer share certificate(s)

16.2   The Protector may by deed revocable or irrevocable during protectorship nominate a person to become the Protector upon the person making the nomination ceasing to be the Protector and thereupon if the nomination remains unrevoked and the Trustees have been given written notice of the nomination and the person nominated consents in writing (which consent is endorsed on any such deed) such person shall immediately become the Protector PROVIDED THAT if the Protector shall be a company then any such deed as is referred to above shall first be approved by the company in general meeting before it is executed on behalf of the company by its board

16.3   If at any time there is no longer a Protector of this Settlement the Trustees may if they consider it desirable to do so appoint by deed a person to be the Protector of this Settlement provided always that such person consents in writing to such appointment which consent is endorsed on such deed

17.   Powers of Trustees Subject to Consent of Protector

NOTWITHSTANDING anything herein contained and in particular conferring an absolute or uncontrolled discretion on the Trustees all and every power and discretion vested in the Trustees by such provisions of this Settlement as are specified below shall for as long as there is a Protector of this Settlement and as stated in the relevant Clause or Clauses of this Deed be exercisable by the Trustees only with the prior or simultaneous written consent of the Protector:

Clause 4:      Overriding Powers
Clause 5:      Trusts in default of exercise of overriding powers
Clause 6:      Ultimate Default Trusts
Clause 19:     Appointment of additional Beneficiaries

*10*

Clause 20.1:        Exclusion of Beneficiaries
Clause 22:          Power to designate Emergency Trustee and revoke such designation

18.    Applicable Law and Jurisdiction

    18.1    THE proper law of this Settlement shall be that of Gibraltar and all rights under this Settlement and its construction and effect shall be subject to the jurisdiction of and construed according to the laws of Gibraltar

    18.2    The courts of Gibraltar shall be the forum for the administration of these trusts

    18.3    Notwithstanding the provisions of Clauses 18.1 and 18.2

        18.3.1    The Trustees shall have power (subject to the application (if any) of the rule against perpetuities) to carry on the general administration of these trusts in any jurisdiction in the world whether or not such jurisdiction is for the time being the proper law of this Settlement or the courts of such jurisdiction are for the time being the proper law of this Settlement or the courts of such jurisdiction are for the time being the forum for the administration of these trusts and whether or not the Trustees or any of them are for the time being resident in or otherwise connected with such jurisdiction

        18.3.2    The Trustees may at any time declare in writing that from the date of such declaration the proper law of this Settlement shall be that of any specified jurisdiction (not being a jurisdiction under the law of which this Settlement would be capable of revocation) and that all rights under this Settlement and its construction and effect shall be subject to and construed according to the laws of that jurisdiction

        18.3.3    The Trustees may at any time declare in writing that from the date of such declaration the forum for the administration of this Settlement shall be the courts of any specified jurisdiction

19.    Power to Appoint Additional Beneficiaries

    19.1    THE Trustees and for so long as there is a Protector of this Settlement with the written consent of such Protector shall have power at any time or times during the Trust Period to add to the class of Beneficiaries such one or more objects or persons (not being an Excluded Person or Gibraltar Resident) as the Trustees with such consent of the Protector (if applicable) shall in their absolute discretion determine

    19.2    Any such addition shall be made by deed which shall be endorsed with the written consent of the Protector (if applicable) and which

        19.2.1    shall name or describe the one or more objects or persons to be thereby added to the class of Beneficiaries and

        19.2.2    shall specify the date (not being earlier than the date of the deed but during the Trust Period) from which such one or more objects or persons shall be so added and

        19.2.3    shall specify the period during which such one or more objects or persons is to be included with the class of Beneficiaries

11

*11*

20.    Power to Exclude Beneficiaries

20.1    THE Trustees and for so long as there is a Protector of this Settlement with the written consent of such Protector may by deed made at any time or times during the Trust Period declare that the one or more objects or persons or the members of a class named or specified (whether or not ascertained) in such deed who are would or might but for this Clause be or become a Beneficiary or Beneficiaries or be or become otherwise able to benefit hereunder as the case may be

20.1.1    shall be wholly or partially excluded from future benefit hereunder or

20.1.2    shall cease to be a Beneficiary or Beneficiaries or

20.1.3    shall be an Excluded Person or Excluded Persons

and any such deed may be irrevocable or revocable during the Trust Period shall have effect from the date specified therein and shall be endorsed with the written consent of the Protector (if applicable) provided that this power shall not be capable of being exercised so as to derogate from any interest to which any Beneficiary has previously become indefeasibly entitled whether in possession or in reversion or otherwise

20.2    Any person of full age to whom or for whose benefit any capital or income of the Trust Fund may be liable whether directly or indirectly to be paid appointed transferred or applied in any manner whatsoever by or in consequence of an exercise of any trust power or discretion vested in the Trustees or in any other person may by deed to which the Trustees are party during the Trust Period either revocably (but revocable during the Trust Period only) or irrevocably

20.2.1    disclaim his interest as an object of such trust power or discretion either wholly or with respect to any specified part or share of such capital or income provided that any disclaimer by a Beneficiary of his whole interest shall be irrevocable or

20.2.2    declare that he shall cease to be a Beneficiary or

20.2.3    declare that he shall be an Excluded Person and such

deed shall have effect from the date thereof

21.    Exclusion of Excluded Persons

SUBJECT to Clause 12 and notwithstanding anything else contained or implied in this Settlement no Excluded Person shall be capable of taking any benefit of any kind by virtue or in consequence of this Settlement and in particular but without prejudice to the generality of the foregoing provisions of this Clause

21.1    The Trust Fund and the income thereof shall henceforth be possessed and enjoyed to the entire exclusion of any such Excluded Person and of any benefit to him by contract or otherwise

21.2    No part of the capital or income of the Trust Fund shall be paid or lent or applied for the benefit either directly or indirectly of any such Excluded Person in any manner or in any circumstances whatsoever and

21.3    No power or discretion hereby or by any appointment made hereunder or by law conferred upon the Trustees or any of them shall be capable of being exercised in such manner that any such Excluded Person will or may become entitled either directly or indirectly to any benefit in any manner or in any circumstances whatsoever.

12

*12*

22    Emergency Provisions

22.1    ANY Trustee hereof shall automatically cease to be a Trustee hereof on the happening of any of the following events within the territory where such Trustee is incorporated (in the case of a corporate Trustee) or resident in the case of a natural person that is to say

22.1.1    the invasion of such territory by military forces

22.1.2    the enactment of any law or the taking of any action by or on the part of any governmental authority agency or officer of or within the said territory the aim or purpose or effect of which is or would be had such Trustee sole control of the assets comprising the Trust Fund

22.1.2.1    the acquisition expropriation or confiscation of any of the assets comprising the Trust Fund or any part thereof

22.1.2.2    to jeopardise or interfere with or hamper the exercise by any such Trustee of its administrative or executive functions in respect of the trusts thereof or the Trust Fund or its discretion in respect thereof

22.1.2.3    the restriction suspension abrogation withdrawal or cancellation or rescission of any exemption relief or contract in relation to the trusts hereby created or in relation to the Trust Fund or any part thereof whether in respect of exchange or currency control or any other matter

22.1.2.4    to levy any tax or duty on the capital of the Trust Fund in excess of five (5) per centum per annum thereof

22.1.2.5    to levy any tax or charge or fee on the income of the Trust Fund or any part thereof in excess of five (5) per centum per annum thereof

22.1.3    the nationalization or attempted nationalization of a controlling interest in the Trustee or the intervention in its affairs by a government official or a government body or agency in such a way that the Trustees are unable efficiently to carry out their duties and exercise their discretion in accordance with the terms of this Settlement

22.2    Forthwith upon any such Trustee ceasing to be a Trustee pursuant to this Clause any such Trustee shall be divested of title to the Trust Fund which shall automatically vest in the Emergency Trustee as if the Emergency Trustee had been the Original Trustee hereof and the forum for the administration of this Settlement shall forthwith be deemed to be the place of incorporation (or residence if a natural person) of the Emergency Trustee and the laws of such place shall become the proper law of this Settlement and the Courts of the said place of incorporation or residence shall have exclusive jurisdiction in respect of the trusts hereof and any matters relating hereto

22.3    The Trustees and for so long as there is a Protector of this Settlement with the written consent of such Protector have the power exercisable by deed (endorsed with such consent, if applicable) from time to time of designating the Emergency Trustee and also and for so long as there is a Protector of this Settlement with the written consent of such Protector have the power exercisable by deed (endorsed with such consent, if applicable) of revoking any such designation

13

23.    THE Trustees shall have power at any time or times during the Trust Period by deed or deeds to revoke or vary any of the administrative provisions of this Settlement or to add any further administrative provisions as the Trustees may consider expedient for the purposes of this Settlement and without prejudice to the generality of the above for ensuring that at all times there should be a trustee of this Settlement and that the Trust Fund shall be fully and effectively vested in or under the control of such trustee and that the trusts of this Settlement shall be enforceable by the Beneficiaries provided always that the power conferred by this clause shall only be exercisable if the Trustees shall be advised in writing by a lawyer of at least 10 years' standing qualified in the law of the jurisdiction which for the time being is the proper law of this Settlement that it would be expedient for the purposes of this Settlement that the administrative provisions be revoked varied or added to in the manner specified in such written advice and that such power shall be exercisable only by the Trustees executing a deed in a form appropriate to carry such advice into effect.

IN WITNESS whereof the Original Trustees have executed this Declaration of Trust on the day and year first hereinbefore written

[The First Schedule and the Second Schedule follow]

14

FIRST SCHEDULE

ADMINISTRATIVE POWERS

INDEX TO CLAUSES

| Clause | | Page |
|---|---|---|
| 1. | General | 16 |
| 2. | General powers as to properties and investments | 16 |
| 3. | Trustees' powers and discretions | 16 |
| 4. | Power to lend and to give guarantees | 16 |
| 5. | Power to borrow | 17 |
| 6. | Power to permit occupation of property and enjoyment of chattels | 17 |
| 7. | Powers in relation to real property | 17 |
| 8. | Powers in relation to chattels | 18 |
| 9. | Powers in relation to securities | 18 |
| 10. | Power to vote and to employ nominees and custodians | 19 |
| 11. | Power to promote companies | 19 |
| 12. | Power to delegate management of investments | 20 |
| 13. | Power to trade | 20 |
| 14. | Power to give indemnities | 20 |
| 15. | Exclusion of apportionment | 21 |
| 16. | Power to deal with insurance policies | 21 |
| 17. | Power to take out life policies | 21 |
| 18. | Power to insure property | 21 |
| 19. | Power to take counsel's opinion | 21 |
| 20. | Release of powers | 21 |
| 21. | Power of appropriation | 22 |
| 22. | Power to receive remuneration | 22 |
| 23. | Power to appoint agents | 22 |
| 24. | Power to pay duties and taxes | 22 |
| 25. | Power to permit self-dealing | 22 |
| 26. | Protection of Trustees | 22 |
| 27. | Delegation of powers | 22 |
| 28. | Power to pay parent or guardian | 23 |
| 29. | Power to assign pledge charge or mortgage the Trust Fund | 23 |

1.    General

THE Trustees shall have all the powers of investments sale alienation exchange partition mortgage charging pledging leasing insurance protection improvement equipment dealing disposition and management and all other powers of an absolute beneficial owner of the Trust Fund. Such power shall not be restricted by any principle of construction but shall operate according to the widest generality of which the foregoing words are capable notwithstanding that certain powers are more particularly set out in the following clauses

2.    General Powers as to Property and Investments

2.1    THE Trustees shall have power to allow the property or investments at any time subject to the trusts hereof to remain unsold or in the actual state of investment thereof for so long as the Trustees may think fit and at any time or times to sell call in or convert into money the said property or investments or any part or parts thereof and power at any time pending investment to place any moneys for so long as the Trustees think fit on any current or deposit account

2.2    The Trustees shall have power to change exchange or vary any property or investments for the time being subject to the trusts hereof for others hereby or by law authorised

2.3    The Trustees shall have power to invest any money requiring to be invested under the trusts hereof in the purchase of or at interest upon the security of such stocks funds shares securities land immovable or movable property of any nature or chattels or in any trade (whether or not as partners or limited partners or others) or other investment or property of whatsoever nature and wheresoever situate and whether producing income or not whether involving liabilities or not or upon such personal credit with or without security as the Trustees shall in their absolute discretion think fit to the intent that the Trustees shall have the same power in all respects as if they were a sole beneficial absolute owner

2.4    In the investment of the Trust Fund the Trustees shall not be required to have regard to the diversification of investments and save for any provision to the contrary contained in Clause 26 of these provisions shall not be liable or responsible for any loss to the Trust Fund which may arise from the failure of the Trustees to diversify the investments comprised in the Trust Fund

2.5    The acquisition of any reversionary interest or any policy of insurance or assurance sinking fund policy or other policy of whatever nature or any annuity or securities or other investments not producing income or of a wasting nature or for any other reason not within the meaning of the word 'investment' strictly construed shall be deemed to be an authorised investment of trust moneys if the Trustees shall consider the same to be for the benefit of any one or more of the Beneficiaries

3.    Trustees' Powers and Discretions

EVERY power and discretion vested in the Trustees shall be exercisable in their absolute and uncontrolled discretion and the Trustees shall exercise such powers and discretions as they shall think most expedient for the benefit of all or any of the persons actually or prospectively interested under this Settlement and may exercise (or refrain from exercising) any power or discretion for the benefit of any one or more of them without being obliged to consider the interests of the others or other of them

16

4.      Power to Lend and to Give Guarantees

    4.1      THE Trustees shall have power to lend money or property to any one or more of the Beneficiaries either free of interest or on such terms as to payment of interest and generally as the Trustees shall in their absolute discretion think fit

    4.2      The Trustees shall have power to guarantee the payment of money and the performance of obligations in respect of any existing or future borrowings by any one or more of the Beneficiaries from third parties or guarantees indemnities or other commitments of like nature given to third parties by any one or more of the Beneficiaries including without prejudice to the generality of the above the power to pledge the whole or part of the assets comprising the Trust Fund in support of any such guarantee given as above by the Trustees and to enter into such indemnities as they shall in their absolute discretion think fit in connection with any such guarantee

5.      Power to Borrow

    THE Trustees shall have power to borrow and raise money for any purpose (including the investment of the moneys so raised as part of the Trust Fund) whether upon the security of the whole or any part of the Trust Fund or upon personal security only and to mortgage charge or pledge any part of the Trust Fund as security for any moneys so raised and to guarantee the payment of money and the performance of obligations in respect of borrowings by any company fully or partly owned by the Trustees and in connection with such guarantees to enter into such indemnities as the Trustees shall in their absolute discretion think fit

6.      Power to Permit Occupation of Property and Enjoyment of Chattels

    THE Trustees shall have power to permit any one or more of the Beneficiaries to occupy or reside in or upon any dwelling house building or land or to have the enjoyment and use of chattels or other movable property for the time being held upon these trusts on such terms as to payment of rent rates taxes and other expenses and outgoings and as to insurance repair and decoration and generally upon such terms as the Trustees shall in their absolute discretion think fit

7.      Powers in Relation to Real Property

    WHERE the Trust Fund for the time being includes any real or immovable property (in this clause referred to as "the land") the Trustees shall have power to sell exchange convey lease mortgage charge agree to let license and otherwise conduct the management of the land as if the Trustees were the sole beneficial owner thereof and

    7.1      The Trustees may lease all or any part of the land for any purpose and whether involving waste or not and for any term and either wholly or partly in consideration of a rent (whether fixed or variable) or fine or premium or the erection improvement or repair or any agreement to erect improve or repair buildings or other structures on the land and may accept (with or without consideration) surrender of any lease of all or any part of the land

    7.2      The Trustees may in executing any trust or power of sale sell all or any part of the land either wholly or partly in consideration of an annual sum payable either in perpetuity or for any term (whether definite or indefinite) and being either reserved out of the land sold or secured in such other manner as the Trustees shall in their absolute discretion think fit

    7.3      The Trustees may in executing any trust or power of sale or leasing

        7.3.1      sell or lease all or any part of the land whether the division is horizontal or vertical or

made in any other way

7.3.2   sell or lease or reserve any easement or right or privilege over all or any part of the land

7.3.3   sell or lease or except or reserve any timber or mines or minerals on or in or under all or any part of the land together with any easements rights or privileges or cutting or working and carrying away the same or otherwise incidental to or connected with forestry or mining purposes

7.3.4   impose and make binding for the benefit of all or any part of the land sold or leased any restrictions or stipulations as to user or otherwise affecting any part of the land retained

7.3.5   accept in exchange for all or any part of the land to be sold or leased (either with or without any money paid or received for equality of exchange) any other real or immovable property or any lease

7.3.6   enter into any contract or grant any option for the sale or leasing of all or any part of the land or otherwise for the exercise by the Trustees of any of their above powers

7.4   The Trustees shall not be bound to see nor be liable or accountable for omitting or neglecting to see to the repair or insurance of any buildings or other structures on the land or to the payment of any outgoings or otherwise as to the maintenance of the land or any buildings or other structures on the land but may maintain repair or insure the same in such manner and to such extent as they shall in their absolute discretion think fit

7.5   The Trustees may from time to time expend moneys (whether capital or otherwise) in making any repairs whether of a permanent nature or not and any improvements whether sanctioned by statute or not or in enlarging improving decorating redecorating equipping furnishing or altering the land or any buildings or other structures on the land (including erecting demolishing or rebuilding the same) to such extent and in such manner as they shall in their absolute discretion think fit and any certificate in writing of any architect or surveyor employed by the Trustees to the effect that any work specified in such certificate is or includes an alteration or an improvement to the land or any such building or other structure shall be conclusive as between the Trustees and the Beneficiaries that any money expended on such work was properly expended in exercise of this power

8.   Powers in Relation to Chattels

WHERE the Trust Fund for the time being includes any chattels (in this clause referred to as "the chattels")

8.1   The Trustees may sell lease hire deposit store or otherwise deal with the chattels upon such terms as they shall in their absolute discretion think fit

8.2   The Trustees shall not be bound to see nor be liable or accountable for omitting or neglecting to see to the repair or insurance of the chattels but may repair and insure the chattels in such manner and to such extent as they shall in their absolute discretion think fit

9.   Powers in Relation to Securities

9.1   THE Trustees shall be entitled to retain all or any shares stock debenture stock or other securities in any public or private company which may be transferred to them from time to time or to purchase subscribe or apply for or otherwise acquire any further or additional

18

shares or other securities in any such company (hereinafter called "the Shares") and may retain all or any of the Shares for so long as they shall in their absolute discretion consider it beneficial to do so

9.2     The Trustees may exercise all the powers given to them by the ownership of the Shares for the purposes of carrying on or causing to be carried on the business of such company or companies as if they were beneficially entitled thereto

9.3     The Trustees may at any time as they shall in their absolute discretion think fit wind up or concur in winding up such company or companies whether for the purposes of any reconstruction amalgamation or other arrangements concerning the company or companies or may promote or agree to any such reconstruction amalgamation or other arrangement or scheme including the formation of a new company or companies to take over the business of such company or companies

9.4     The Trustees shall not be liable or responsible for any loss to the Trust Fund arising from a depreciation in value of the Shares or in any otherwise resulting from the retention of the Shares by the Trustees as aforesaid

9.5     The Trustees shall have power to obtain or join with others in obtaining from any Stock Exchange permission to deal in the Alternative Investment Market in the United Kingdom (or any such similar or replacement market) or to obtain from any Stock Exchange a quotation for or permission to deal in any securities which or some of which are comprised in the Trust Fund and shall have power to sell or join with any other person or persons in selling or disposing of any securities with a view to creating a market in such securities whether or not a sale or disposition would on any other ground be desirable or expedient

10.    <u>Power to Vote and to Employ Nominees and Custodians</u>

IN respect of any property comprised in the Trust Fund the Trustees shall have power

10.1    To vote upon or in respect of any shares securities bonds notes or other evidence of interest in or obligation of any corporation trust association or concern whether or not affecting the security or the apparent security of the Trust Fund or the purchase or sale or lease of the assets of any such corporation trust association or concern

10.2    To deposit any such shares securities or property in any voting trust or with any depositary designated under such a voting trust

10.3    To give proxies or powers of attorney with or without power of substitution for voting or acting on behalf of the Trustees as the owners of any such property

10.4    To hold any or all securities or other property in bearer form or in the names of the Trustees or any one or more of them or in the name of some other person or partnership or in the name or names of nominees without disclosing the fiduciary relationship created by this Settlement and to deposit the said securities and any title deeds or other documents belonging or relating to the Trust Fund in any part of the world with any bank firm trust company or other company that undertakes the safe custody of securities as part of its business without being responsible for the default of such bank firm trust company or other company or for any consequent loss

11.    <u>Power to Promote Companies</u>

THE Trustees may (without prejudice to the generality of their powers of investment) promote or join with any other person or persons in promoting or incorporating any company in any part of the world or

19

subscribe for or acquire any of the shares or stock or debentures or debenture stock or loan capital of any company with a view to or in consideration of

11.1    the establishment and carrying on by such company of a business of any kind which the Trustees are for the time being authorised to carry on themselves and the acquisition of any of the assets comprised in the Trust Fund which may be required for the purposes of such business

11.2    the acquisition of the assets and undertaking of any business being carried on by the Trustees under the above power

11.3    the acquisition of all or any of the assets comprised in the Trust Fund to be held as investments of the company acquiring the same

12.    **Power to Delegate Management of Investments**

12.1    THE Trustees shall have power to engage the services of such investment adviser or advisers as the Trustees may from time to time think fit ("the investment adviser") to advise the Trustees in respect of the investment and reinvestment of the Trust Fund with power for the Trustees without being liable for any consequent loss to delegate to the investment adviser discretion to manage all or any part of the Trust Fund within the limits and for the period stipulated by the Trustees and the Trustees shall settle the terms and conditions for the remuneration of the investment adviser and the reimbursement of the investment adviser's expenses as the Trustees shall in their absolute discretion think fit and such remuneration and expenses shall be paid by the Trustees from the Trust Fund

12.2    The Trustees shall not be bound to enquire into nor be in any manner responsible for any changes in the legal status of the investment adviser

12.3    The Trustees shall incur no liability for any action taken pursuant to or for otherwise following the advice of the investment adviser however communicated

13.    **Power to Trade**

13.1    THE Trustees shall have power to trade or take part in any venture in the nature of trade whether solely or jointly with any other person and whether or not by way or partnership (limited or general) and for these purposes make such arrangements as they shall in their absolute discretion think fit and may delegate any exercise of this power to any one or more of their number or to a company or partnership formed for this purpose

13.2    Any power vested in the Trustees under this Settlement shall (where applicable) extend to any arrangements in connection with any such trade or venture and in particular but without prejudice to the generality of the above the Trustees' powers of borrowing and charging shall extend to any borrowing arrangements made in connection with such trade or venture and whether made severally or jointly with others or with unequal liability and the Trustees shall be entitled to be fully indemnified out of the Trust Fund against all personal liability to which they may become in any manner subject in connection with any such trade or venture

14.    **Power to Give Indemnities**

14.1    THE Trustees shall have power to enter into any indemnity in favour of any former trustee or any other person in respect of any fiscal imposition or other liability of any nature prospectively payable in respect of the Trust Fund or otherwise in connection with this Settlement and to charge or deposit the whole or any part of the Trust Fund as security for any

20

such indemnity in such manner in all respects as they shall in their absolute discretion think fit

14.2    The Trustees shall have power to give or enter into any indemnity warranty guarantee undertaking or covenant or enter into any type of agreement that they shall in their absolute discretion think fit relating to the transfer or sale of a business or private company shareholding held or owned for the time being by the Trustees whether relating to the business or company itself its assets liabilities shares or employees or any other aspect of the business or company in favour of any transferee purchaser or other relevant party and including any limitation or restriction on value or otherwise as the Trustees shall in their absolute discretion think fit

15.    Exclusion of Apportionment

NO statutory or equitable rules of apportionment shall apply to this Settlement and the Trustees shall be permitted to treat all dividends and other payments in the nature of income received by them as income at the date of receipt irrespective of the period for which the dividend or other income is payable

16.    Power to Deal with Insurance Policies

THE Trustees shall in addition and without prejudice to all statutory and other powers conferred upon them have the following powers in relation to any insurance policy ("the policy") from time to time comprised in the Trust Fund

16.1    To borrow on the security of the policy for any purpose

16.2    To convert the policy into a fully paid-up policy for a reduced sum assured free from payment of future premiums

16.3    To surrender the policy wholly or any part or any bonus attaching to the policy for its cash surrender value

16.4    To sell the policy or any substituted policy on such terms as the Trustees shall in their absolute discretion think fit

16.5    To exercise any of the powers conferred by the policy or with the consent of the insurer to alter the amount or occasion of the payment of the sum assured or to increase or decrease the amount of the periodic premiums (if any) payable under the policy or to alter the period during which the premiums are payable and to do any of these things notwithstanding that the sum assured may be reduced subject always to production of evidence of insurability satisfactory to the insurer

17.    Power to Take Out Life Policies

THE Trustees shall have power to effect and maintain out of the capital or income of the Trust Fund any policy of insurance or assurance upon the life of any person or under which the death of any person is one of the events under which moneys may be payable

18.    Power to Insure Property

THE Trustees shall have power to insure against any loss or damage from any peril any property for the time being comprised in the Trust Fund for any amount and to pay the premiums out of the Trust Fund

21

21

19.   Power to take Counsel's Opinion

THE Trustees shall have power to take the opinion of legal counsel locally or where necessary or appropriate elsewhere concerning any difference arising under the Settlement or any matter in any way relating to this Settlement or to their duties in connection with these trusts and in all matters to act in accordance with the opinion of such counsel.

20.   Release of Powers

THE Trustees may by deed or deeds and so as to bind their successors as trustees release or restrict the future exercise of all or any of the powers by this Settlement or by law conferred on them either wholly or to the extent specified in any such deed or deeds notwithstanding the fiduciary nature of any such power

21.   Power of Appropriation

THE Trustees shall have power in their absolute discretion to appropriate any part of the Trust Fund in its then actual condition or state of investment in or towards satisfaction of any interest or share in the Trust Fund as may in all the circumstances appear to them to be just and reasonable and for the above purposes from time to time to place such value on any or all investments or other property as they shall in their absolute discretion think fit

22.   Power to Receive Remuneration

NO Trustee shall be liable to account for any remuneration or other profit received by such Trustee in consequence of such Trustee acting as or being appointed to be a director officer or employee of any company notwithstanding that such appointment was procured by an exercise by such Trustee or by the Trustees of voting rights attached to securities comprised in the Trust Fund

23.   Power to Appoint Agents

THE Trustees shall have power instead of acting personally to employ and pay at the expense of the Trust Fund any agent in any part of the world whether attorneys solicitors accountants brokers banks trust companies or other agents without being responsible for the default of any agent if employed in good faith to transact any business or act as nominee or do any act in the execution of these trusts including without prejudice to the generality of the above the receipt and payment of moneys and the execution of documents

24.   Power to Pay Duties and Taxes

IN the event of any tax duty or fiscal imposition whatsoever becoming payable in Gibraltar or elsewhere in respect of the Trust Fund or any part thereof in any circumstances whatsoever the Trustees shall have power to pay all such taxes duties or fiscal impositions out of the Trust Fund or income thereof and shall have entire discretion as to the time and manner in which the said taxes duties or fiscal impositions shall be paid and the Trustees may pay such taxes duties or fiscal impositions notwithstanding that the same shall not be recoverable from the Trustees or the Beneficiaries or other persons entitled hereunder or that the payment shall not be to the advantage of any Beneficiary or other person entitled hereunder

25.   Power to Permit Self-Dealing

THE Trustees shall have power to enter into any transaction concerning the Trust Fund notwithstanding that one or more of the Trustees may be interested in the transaction other than as one of the Trustees

26.    Protection of Trustees

IN the execution of these trusts no Trustee shall be liable for any loss to the Trust Fund arising by reason of any improper investment made in good faith or for the negligence or fraud of any agent employed by such Trustee or by any of the Trustees although the employment of such agent was not strictly necessary or expedient or by reason of any mistake or omission made in good faith by such Trustee or by any of the Trustees or by reason of any matter or thing except wilful and individual fraud or dishonesty on the part of the Trustee who is sought to be made liable

27.    Delegation of Powers

27.1    THE Trustees may delegate to any one or more of their number the operation of any bank account in their names

27.2    Any Trustee shall have power at any time (notwithstanding any rule of law to the contrary) by deed or deeds revocable during the Trust Period or irrevocable and executed during the Trust Period to delegate to any person or to any corporate trustee (including in cases where there is more than one Trustee to any other or others of the Trustees) the exercise of all or any powers and discretions conferred on such Trustee notwithstanding the fiduciary nature of such power or powers

28.    Power to Pay Parent or Guardian

THE Trustees may pay to the parent or either parent or guardian of any minor any sum of income to be applied for the maintenance education or benefit of that minor or any sum of capital intended to be applied for the advancement or benefit of that minor so that the receipt of such parent or parents or guardian shall be a complete discharge to the Trustees and the Trustees shall not be required to enquire into the application of such sums

29.    Power to assign pledge charge or mortgage the Trust Fund

THE Trustees shall have power to assign pledge charge or mortgage the whole or any part of the Trust Fund by way of security for any borrowing guarantee or other obligation made given or indemnified by the Trustees or any debts or obligations of any Beneficiary or any liability incurred by them as Trustees

23

SECOND SCHEDULE

US$ 1,000  (ONE THOUSAND U.S. DOLLARS)

Duly executed for and on behalf of          )
MISELVA ETABLISSEMENT                    )

Director

24

24

# The Fisher Trust

Written resolutions of Miselva Etablissement as trustee of the Fisher Trust duly passed and recorded on this 2nd day of March 2006

1.    **Appointment of beneficiary**

IT IS HEREBY RESOLVED pursuant to clause 19 of the Declaration of Trust dated 1st March 2006 establishing the Fisher Trust with the written consent of the Protector to add David Aim of 70 Walton Street, London SW3 2HH to the class of Beneficiaries with immediate effect and until removal by trustee resolution with the consent of the Protector.

2.    **Acceptance of trust assets**

IT IS HEREBY RESOLVED pursuant to clause 1 of the Declaration of Trust dated 1st March 2006 establishing the Fisher Trust to accept as additions to the Trust Fund the 100% shareholdings in the four UK companies that are currently changing their names to the following :

Fisher Island Limited
LIB Holdings Limited
Georgian Steel Limited
Grosvenor Trading House Limited

Michael Repholsk, Director

We, Fallon Invest & Trade Inc, as Protector of the Fisher Trust hereby agree to the addition to the class of Beneficiaries as set out above :

Andrew Baker, Director

25

# The Fisher Trust

Written resolution of Miselva Etablissement as trustee of the Fisher Trust duly passed and recorded on this 7th day of April 2006

### Acceptance of trust assets

IT IS HEREBY RESOLVED pursuant to clause 1 of the Declaration of Trust dated 1st March 2006 establishing the Fisher Trust to accept as an addition to the Trust Fund the legal and beneficial ownership of 100% of the company:

Freshname No. 350 Limited (of which it is intended to change name to Chapel Street Contraction Limited), a UK company with registration number 5717363



...................................
Andrew Baker, Director

26

IN WITNESS WHEREOF, Assignor and Assignee have caused this instrument to be duly executed under seal as of and on the date first above written.

ASSIGNOR:

DAVID AMY

ASSIGNEE:

FISHER TRUST

By: _____
Name: ANDREW BAKER
Title:  Authorized Signatory



27

IN WITNESS WHEREOF, Assignor and Assignee have caused this instrument to be duly executed under seal as of and on the date first above written.

ASSIGNOR:

DAVID AMY

ASSIGNEE:

FISHER TRUST

By: _____
Name: Andrew Baker
Title: Authorized Signatory

28

IN WITNESS WHEREOF, Assignor and Assignee have caused this instrument to be first executed in duplicate and as of and on the date first above written.

ASSIGNOR:

DAVID AIM

ASSIGNEE:

FISHER TRUST

By
Name: ANDREW BARKER
Title: Authorized Signatory

29

IN WITNESS WHEREOF, Assignor and Assignee have caused this instrument to be duly executed under seal as of and on the date first above written.

ASSIGNOR:

DAVID AIM

ASSIGNEE:

FISHER TRUST

By
Name: ANDREW BAKER
Title:   Authorized Signatory

The Fisher Trust

Written resolution of Miseiva Etablissement as Trustee of the Fisher Trust duly passed and recorded on this 15th day of May 2006

Trust assets

WHEREAS by resolution dated 2nd March 2006 the Trustee resolved to accept as an addition to the Trust Fund inter alia shares in the UK company known as LIB Holdings Ltd

AND WHEREAS the Trustee has been informed that the said shares have not and for the time being will not in fact be settled on the trusts of the Fisher Trust

IT IS HEREBY RESOLVED that the resolution of the trustee of the Fisher Trust dated 2nd March 2006 be and the same is hereby amended so as to exclude the 100% shareholding in the UK company known as LIB Holdings Ltd and the said resolution be and the same is hereby otherwise confirmed as passed



Andrew Baker, Director

31

# The Fisher Trust

### Deed of Removal of Beneficiary

Made the        day of May 2006

By Miselva Etablissement as Trustee of the Fisher Trust

And by Falton Invest & Trade Inc. as Protector of the Fisher Trust

WHEREAS pursuant to clause 20 of the Declaration of Trust dated 1st March 2006 bringing the Fisher Trust into existence the Trustee has power with the consent of the Protector to remove objects or persons as Beneficiaries of the Trust

AND WHEREAS a request has been received by the Trustee to remove the International red Cross as a Beneficiary so as to make clear that the sole intended Beneficiary of the Fisher Trust is David Vins of 70 Walton Street, London

AND WHEREAS the Trustee is agreeable to effecting such removal

AND WHEREAS the Protector is willing to give its consent to such removal

WITNESSETH as follows :

1      The Trustee hereby declares that with immediate effect the International Red Cross of 17 Chemin des Crets, Geneva, Switzerland be and the same is hereby removed as a Beneficiary of the Fisher Trust

2      The Protector hereby consents to the removal of the International Red Cross of 17 Chemin des Crets, Geneva, Switzerland as a Beneficiary of the Fisher Trust

IN WITNESS WHEREOF this Deed has been duly executed by the parties on the day and year first before written

Executed by Miselva Etablissement          )
in accordance with its construction and     )
the laws of its place of incorporation      )



Executed by Falton Invest & Trade Inc.      )
in accordance with its construction and     )
the laws of its place of incorporation      )

32

# The Fisher Trust

Written resolutions of Miselva Etablissement as trustee of the Fisher Trust duly passed and recorded on this FIRST     day of OCTOBER 2006

1.    Appointment of beneficiary

IT IS HEREBY RESOLVED pursuant to clause 19 of the Declaration of Trust dated 1st March 2006 establishing the Fisher Trust with the written consent of the Protector to add Sada Establishment of Josef Rheinberger Strasse 29, FL-9490 Vaduz, Liechtenstein to the class of Beneficiaries with immediate effect and until removal by trustee resolution with the consent of the Protector.

2.    Removal of beneficiary

IT IS HEREBY RESOLVED pursuant to clause 20 of the Declaration of Trust dated 1st March 2006 establishing the Fisher Trust with the written consent of the Protector to exclude David Ana of 70 Walton Street, London SW2 2HH from the class of Beneficiaries with immediate effect.

Andrew Baker, Director

We, Fallon Invest & Trade Inc. as Protector of the Fisher Trust hereby agree to the addition to and the exclusion from the class of Beneficiaries as set out above :

David Ashfield - Ali Guidfar, Directors

33

# The Fisher Trust

Written resolution of Maelva Etablissement as Trustee of the Fisher Trust duly passed and recorded on this          day of          2006

Name of Trust

WHEREAS in the Declaration of Trust constituting the Fisher Trust dated 1ˢᵗ March 2006 the name of the Trust is stated to be "The Fisher Trust"

AND WHEREAS the Trustee has been informed that in order to prevent confusion it would be prudent to change the name of the Trust to "The Valmore Trust"

AND WHEREAS the Trustee believes that such name change would be advantageous and without any potential disadvantage

AND WHEREAS the Protector of the Trust is agreeable to the said name change

IT IS HEREBY RESOLVED pursuant to the powers vested in the Trustee by the Declaration of Trust and subject to the laws governing the Trust that the name of the Trust be and the same is hereby changed with immediate effect from "The Fisher Trust" to "The Valmore Trust"

Andrew Baker, Director

We hereby approve of and consent to the said name change of the Trust

Duly authorised for and on behalf of Fallon Invest & Trade Inc., Protector

34

# The Valmore Trust

### Deed of Removal of Beneficiary

Made this twenty-second day of March 2007

By Miseiva Etablissement as Trustee of the Valmore Trust

And by Fallon Invest & Trade Inc. as Protector of the Valmore Trust

WHEREAS pursuant to clause 20 of the Declaration of Trust dated 1st March 2006 bringing the Valmore Trust (formerly named the Fisher Trust) into existence the Trustee has power with the consent of the Protector to remove objects or persons as Beneficiaries of the Trust

AND WHEREAS a request has been received by the Trustee to remove Sada Establishment as a Beneficiary so as to leave no named intended Beneficiaries for the time being

AND WHEREAS the Trustee is agreeable to effecting such removal

AND WHEREAS the Protector is willing to give its consent to such removal

WITNESSETH as follows :

1.   The Trustee hereby irrevocably declares that with immediate effect Sada Establishment of Josef Rheinberger Strasse 29, FL-9490 Vaduz, Liechtenstein be and the same is hereby removed as a Beneficiary of the Valmore Trust

2.   The Protector hereby irrevocably consents to the removal of Sada Establishment as a Beneficiary of the Valmore Trust

IN WITNESS WHEREOF this Deed has been duly executed by the parties on the day and year first before written

Executed by Miseiva Etablissement      )
in accordance with its constitution and  )
the laws of its place of incorporation    )


Executed by Fallon Invest & Trade Inc.  )
in accordance with its constitution and  )
the laws of its place of incorporation    )

35

# DEED OF ASSIGNMENT

The undersigned, Miselva Etablissement, Vaduz, Founder of the firm

## Sada Establishment
### Vaduz

hereby irrevocably assigns all the rights and obligations that it has as Founder pursuant to the law or the statutes of the said firm to:

*Joseph King*

And hereby waives all its rights to the said firm and explicitly declares that it will neither now nor in future make any claim to or in respect of such rights.

Vaduz, 6th February 2006

The Founder

**Miselva Etablissement**

Andrew J. Baker

36

Die Echtheit der Unterschrift von

Herrn Andrew J. Baker, geb. am 03.12.1960



wird amtlich beglaubigt.
Grundbuch- und Öffentlichkeitsregisteramt
Vaduz, den 08.02.2006

Rico Hassler

I, JOSEPH KAY, HEREBY ASSIGN ALL THE RIGHTS AND
OBLIGATIONS THAT I HAVE AS HOLDER OF THE FOUNDER'S
RIGHTS OF SADA ESTABLISHMENT

TO : MISELVA ETABLISSEMENT

DATED : 22ND MARCH 2007

JOSEPH KAY

37

# THE VALMORE TRUST

## LETTER OF WISHES

To the Trustees of the Valmore Trust                    Date : 22nd March 2007

Dear Sirs,

I refer to the Valmore Trust (the "Trust") created by Declaration of Trust dated 1st March 2006 by yourselves. As you are aware and have acknowledged, I am the undisclosed effective settlor of the Trust. As such, I am writing to set out and let you know my present wishes with respect to the Trust and the way in which its assets may be distributed in due course. I acknowledge and appreciate that you have absolute discretion pursuant to the trust deed as to whom or what you choose to benefit and as to the extent of benefit and as to the timing of any distributions out of the Trust Fund. Nevertheless, I feel that this letter - which contains only my wishes that are not intended to bind you or limit your discretion in any way -- may be of assistance to you in your deliberations from time to time.

1.    It is my wish that, during my lifetime, I be treated as the principal and sole beneficiary of the Trust both with respect to the income and the capital of the Trust, although I may from time to time ask you to consider making one or more distributions to one or more members of my extended family.

2.    It is my wish that, after my death, my parents or the survivor of them should be treated as beneficiaries / beneficiary of the Trust and should be taken care of financially until their death. My current thinking is that a sum of USD 20,000 per month per person should suffice but the actual amounts are up to you as trustees having first consulted the Protector.

3.    Subject to paragraph 2. above, it is my wish that, after my death, my wife failing whom the lady I had been living with at the time of my death be treated as a beneficiary of the Trust to the extent of 10% and that she be consulted on a regular basis with respect to her financial needs and as to the timing of distributions from the Trust Fund (whether capital or income).





38

4.   Subject to paragraph 2. above, it is my wish that, after my death, my child / children be treated as beneficiary / beneficiaries of the Trust in equal shares per stirpes to the extent of 90% in aggregate with the capital share of each such child being distributed to them absolutely upon their reaching the age of 30 years.

5.   It is my wish that, after my death and before my said child or children reaches the age of 30 years, you may utilise some or all of their intended share for their education, maintenance and benefit with a view to maintaining their standard of living to that to which they were accustomed during my lifetime.

6.   As you are aware, the Trust Fund consists primarily of holdings in subsidiary companies. It is my wish that, after my death, none of the intended beneficiaries mentioned above should seek to cause the said group of subsidiary companies to be broken up and/or liquidated in an untimely fashion. On the contrary, it is my wish that you take great care in managing such subsidiaries with advice from the Protector and such experts as you may deem fit. It is essential that the production of cash for distribution to intended beneficiaries is undertaken subject to careful consideration of the commercial feasibility thereof.

Please note that my wishes may change and, if they do, I shall write to you again. In the event of my death these wishes shall be treated as irrevocable. In the meantime, please acknowledge receipt hereof by signing and returning to me the enclosed copy.

Yours faithfully,

ACCEPT ACKNOWLEDGED

FOR & ON BEHALF OF HASELWA ESTABLISHMENT
AS TRUSTEE OF THE VACMORE TRUST

39

# Fallon Invest & Trade Inc.
## Pasea Estate, Road Town, Tortola, British Virgin Islands

Andrew Baker
Miselva Etablissement
Josef Rheinberger
Strasse 29
Vaduz FL-9490
Liechtenstein

18 March 2008

Dear Andrew,

We are writing to you in our capacity as Directors of the Protector for the Valmore Trust to request your resignation as Trustee with immediate effect pursuant to Clause 14 of the Declaration of Trust dated 1st March 2006.

We will be appointing the following as the new Trustee for both Trusts:

Mr. Moshe L. Popack, esq., M.B.A.
The Law office of Moshe Popack, PC
185-12 Union Turnpike
Fresh Meadows, NY 11366
P: 516-521-5110
F: 718-228-7935

It would be useful to meet in the very near future to arrange for the transfer of all documentation. Please confirm your acceptance of this request.

Regards,

David Ashfield                    Ali Guidfar

C/o Morgan & Morgan Trust Corporation limited,
PO BOX 958, Pasea Estate, Road Town, Tortola, British Virgin Islands VG 1110,
Tel: +284 49 42011, Fax: +284 49 43015, Registered in the British Virgin Islands, No. 1008536

40

**AJB-4**

2008 M No

<u>IN THE SUPREME COURT OF GIBRALTAR</u>
<u>CHANCERY JURISDICTION</u>

IN THE MATTER of the Civil Procedure Rules, Part 64, Section 1

and

IN THE MATTER of the Trustees Act

and

IN THE MATTER of the trusts known as The Valmore Trust and The Summit Trust

BETWEEN

MISELVA ETABLISSEMENT (1)
NEXUS TREUHAND AG (2)

Claimants

and

INNA GUDAVADZE (1)
JOSEPH KAY (2)
IYA PATARKATSISHVILI (3)
LIANA ZHMOTOVA (4)
FALLON INVEST & TRADE INC. (5)

Defendants

---

EXHIBIT "AJB4"

---

This is the exhibit marked "AJB4" referred to in the Witness Statement of ANDREW JOHN
BAKER dated          this          day of                    2008

# TERRITORY OF THE BRITISH VIRGIN ISLANDS
## BVI BUSINESS COMPANIES ACT, 2004

### CERTIFICATE OF INCORPORATION (SECTION 7)

The Registrar of Corporate Affairs, of the British Virgin Islands HEREBY CERTIFIES, that pursuant to the BVI Business Companies Act, 2004, all the requirements of the Act in respect of incorporation having been complied with,

**FALLON INVEST & TRADE INC.**

**BVI COMPANY NUMBER: 1008536**

is incorporated in the BRITISH VIRGIN ISLANDS as a BVI BUSINESS COMPANY, this 1st day of February, 2006.

REGISTRAR OF CORPORATE AFFAIRS
1st day of February, 2006

BBC001I

# CERTIFICATE OF INCUMBENCY

Territory of the British Virgin Islands (BVI)
The Registered Agent
(Sect. 107 of the Business Companies Act, 2004)

of

## FALLON INVEST & TRADE INC.

("the Company")

upon examination of the corporate documents maintained at the Registered Office

## CERTIFIES:

1. That the Company has been validly incorporated under the laws of the BVI on February 1, 2006 as BC No. 1008536

2. That the Board of Directors of the Company and their signature right to date hereof are:
   - MOHAMMAD ALI GUIDFAR      individually
   - DAVID ASHFIELD      individually

3. That the Board of Directors can execute all powers of the Company

4. That the Company is authorized to issue a maximum of 10,000.00 non par value shares

5. That the Registered Office and Agent of the Company is:
   MORGAN & MORGAN Trust Corporation Limited
   P.O. Box 958, Pasea Estate, Road Town, Tortola, BVI

6. That so far as evidenced by the documents filed with the Registrar of BC's, this Company is in good legal standing.

Dated this 27th day of December 2006

MORGAN & MORGAN TRUST CORPORATION LIMITED
Kay-Linda Richardson, Authorized Signatory

CERTIFIED TO BE A
TRUE COPY OF THE
ORIGINAL

ANDREW J. BAKER
Solicitor of the Supreme Court
of England and Wales

2

# R E S I G N A T I O N

The undersigned,

### David Ashfield

of Bramblebank, The Avenue, Farnham Common, Buckinghamshire, England SL2 3JS

hereby resigns with immediate effect as a Director of :

## FALLON INVEST & TRADE INC.

of Pasea Estate, Road Town, Tortola, British Virgin Islands, incorporated on 1st February 2006 with registered number 1008536

_____
Place and Date

_____
Signature

3

# R E S I G N A T I O N

The undersigned,

Mohammad Ali Guidfar

of 2 Garston Crescent, Watford, WD25 ØLD

hereby resigns with immediate effect as a Director of :

## FALLON INVEST & TRADE INC.

of Pasea Estate, Road Town, Tortola, British Virgin Islands, incorporated on 1st
February 2006 with registered number 1008536

Place and Date

Signature

4

Certificate No. ONE

*SHARES CERTIFICATE*

For 10'000 share(s)

## FALLON INVEST & TRADE INC.

("the Company")

Incorporated under
the BVI Business Companies Act, 2004
of the Territory of the British Virgin Islands

Authorized Shares: 10'000 (TEN THOUSAND) non par value shares

*This is to certify that MISELVA ETABLISSEMENT, VADUZ is the registered holder
of 10'000 (TEN THOUSAND) non par value shares in the above-named Company,
subject to the Memorandum and Articles of Association of the said Company.*

*GIVEN* under the Common Seal of the Company this 3ʳᵈ day of March 2006.

No transfer of the share mentioned hereof will be registered until the certificate has been deposited at the Office of the Company

Sole Director

We,

# Miselva Etablissement, Vaduz

herewith transfer all our rights, title and interest in and to the 10'000 non par value shares in

FALLON INVEST & TRADE INC. as comprised in Certificate No. ONE issued on the 3rd day of March 2006:

in favour of:



Vaduz, 3rd March 2006

Andrew J. Baker , DIRECTOR

6

# Fallon Invest & Trade Inc.
## Pasea Estate, Road Town, Tortola, British Virgin Islands

Joseph Kay, Esq.
By hand

13th March 2006

Dear Joseph,

As directors of Fallon Invest & Trade Inc. ("Fallon") we are writing to confirm to you and undertake with you as follows :

1.  Fallon is the current protector of the Fisher Trust and, as such, has certain powers via à vis the trustee of the Trust as set out in the declaration of trust establishing the Trust.

2.  We are the current directors of Fallon with power to sign [jointly / alone] on behalf of the company.

3.  In exercising the powers vested in Fallon as protector and in sending written notices, etc. from Fallon to the trustee of the Trust, we will ensure that a copy of any such notice, etc. is first counter-signed by you before it is transmitted to the trustee.

4.  This arrangement will continue in force until such time as you agree in writing to change it.

With kind regards.

Yours sincerely,

_____          _____
David Ashfield                                 Ali Guidfar

7

# Fallon Invest & Trade Inc.

### Pasea Estate, Road Town, Tortola, British Virgin Islands

Joseph Kay, Esq.
By hand

April 2007

Dear Joseph,

As directors of Fallon Invest & Trade Inc. ("Fallon") we are writing to confirm to you and undertake with you as follows :

1.    Fallon is the current protector of the Summit Trust and, as such, has certain powers via à vis the trustee of the Trust as set out in the declaration of trust establishing the Trust.

2.    We are the current directors of Fallon with power to sign jointly on behalf of the company.

3.    In exercising the powers vested in Fallon as protector and in sending written notices, etc. from Fallon to the trustee of the Trust, we will ensure that a copy of any such notice, etc. is first counter-signed by you before it is transmitted to the trustee.

4.    This arrangement will continue in force until such time as you agree in writing to change it.

With kind regards,

Yours sincerely,

David Ashfield                          Ali Guidfar

**AJB-5**

2008 M No

**IN THE SUPREME COURT OF GIBRALTAR**
**CHANCERY JURISDICTION**

IN THE MATTER of the Civil Procedure Rules, Part 64, Section 1

and

**IN THE MATTER** of the Trustees Act

and

**IN THE MATTER** of the trusts known as The Valmore Trust and The Summit Trust

BETWEEN

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**

**Claimants**

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**

**Defendants**

---

**EXHIBIT "AJB5"**

---

This is the exhibit marked "AJB5" referred to in the Witness Statement of ANDREW JOHN BAKER dated          this     day of               2008

**Andrew Baker**

| | |
|---|---|
| Von: | Daniel Lam [d.lam@londonintbank.com] |
| Gesendet: | Donnerstag, 7. Dezember 2006 18:11 |
| An: | andrew.baker@miselva.li |
| Betreff: | RE: Jorum / Ucam |

Dear Andrew,

Please be advised that the original Deed of Assignment (Jorum) is actually in our safe in London.

I confirm that Jorum is now to be beneficially owned by AP. I have filled in the form F2 and will have it signed by Ali next week MONDAY. I will then have it couriered to you.

I can also confirm that UCAM should be held for Jorum and not AP. Please can you draft a letter to satisfy this requirement. In addition please can you go ahead with the new declaration of Trust in favour of Jorum.

Kind regards,

Daniel

Financial Controller
London International Bank
11 Grosvenor Place
London SW1X 7HN
Tel: +44 207 170 5592
Fax: +44 207 170 5510
Blackberry: +44 (0) 7738 135764
Email: d.lam@londonintbank.com


-----Original Message-----
From: Andrew Baker [mailto:andrew.baker@miselva.li]
Sent: 06 December 2006 15:24
To: Daniel Lam
Subject: Jorum / Ucam

Daniel,

With reference to our telephone conversation, I confirm that at present we
are still showing JK as the beneficial owner of Jorum, on the strength of
the Due Diligence From F2 signed at the outset by Ali. The original of the
Deed of Assignment (sort of like a bearer share certificate) was sent to
David some while ago and is, I believe, in the safe opened for the purpose
at Hypo by JK.

If Jorum is now to be beneficially owned by AP, then the Deed should be
placed under his control, i.e. in his bank safe. Alternatively, we can keep
it in our bank safe with a note that we ae holding it for him. At least then
we will know for sure where the Deed is!

In addition, we need to replace the current Form F2. I attach a blank Form
which should be completed with AP's name, signed by Ali and then please
returned to me.

Secondly, if UCAM is be held for Joru and not for AP, then AP needs to
instruct us (Miselva) accordingly with a brief letter saying that as
current

1

beneficial owner, he hereby instructs us to hold the shares from now on for
Jorum and not for him. We will then do a new declaration of trust in favour
of Jorum and send a copy to you for your file.

Kind regards

Andrew

Due Diligence – Form F1

Identification of contractual partner

I.    Name of entity:  Jorum Establishment, Vaduz

      Place and date of incorporation:          Vaduz, 06.02.2006

II.   Type of identification:

      new          X     repeat

      X     personal appearance. If yes, date and place: several meetings in Vaduz and London

      ☐     by correspondence. If yes, details :    _____

III.  The contractual partner(s) is / are:

☒    a natural person / persons :  ☒ copy of current passport or i.d. card, attached
                                    (copy must made by Miselva or a duly appointed delegate)

                                  ☐ certified copy of a current passport or i.d. card, attached
                                    (if copy not made by Miselva or a duly appointed delegate)

☐    a corporate body / bodies :  ☐ original or a certified copy of a probative document not more than
                                    6 months old, attached

IV.   Particulars of contractual partner(s):

Surname name :                    Guidfar

First name :                      Mohammad Ali

Profession:                       Company Director

Date of birth:                    06.09.1960

Nationality :                     Iranian

Residential address :             2 Garston Crescent, Watford, WDF25 o LD

Vaduz, 21.12.2006
_____                    _____
      Place and date                              Signature

3

Due Diligence - Form F2

Determination of the beneficial owner(s)

Name of Entity:              **Jorum Establishment**

Declaration of the Contractual Partner(s):

The undersigned hereby declare(s) :-

☐    that he / she / they is / are the ultimate beneficial owner(s) of the Entity's assets; or

☑    that the following person(s) is / are the ultimate beneficial owner(s) of the Entity's assets :-

Surname(s) :        PATARKATSISHVILI

First name(s) :      ARKADI

Birth date(s) :      31/10/55

Profession:          BUSINESSMAN

Nationality / nationalities :    GEORGIAN

Residential address(es) :    3 MICROQUARTER, BLOCK 10
APARTMENT 88, TBILISI
ELDANI, GEORGIA

The contractual partner(s) hereby confirm(s) with his / her / their signature(s) the correctness and completeness of the above information. In case of any changes he / she / they will immediately inform Miselva Etablissement in writing accordingly.

Furthermore, the contractual partner(s) take(s) notice of and agree(s) to the fact, that in case of opening a bank or deposit account, the identity of the beneficial owner(s) may have to be disclosed to the bank.

LONDON  11/12/06

Place and date

Contractual Partner

4

**AJB-6**

2008 M No

<u>IN THE SUPREME COURT OF GIBRALTAR</u>
<u>CHANCERY JURISDICTION</u>

**IN THE MATTER** of the Civil Procedure Rules, Part 64, Section 1

and

**IN THE MATTER** of the Trustees Act

and

**IN THE MATTER** of the trusts known as The Valmore Trust and The Summit Trust

BETWEEN

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**

<u>Claimants</u>

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**

<u>Defendants</u>

---

**EXHIBIT "AJB6"**

---

This is the exhibit marked "AJB6" referred to in the Witness Statement of ANDREW JOHN
BAKER dated        this      day of            2008

DECLARATION OF TRUST

# THE SUMMIT TRUST

*Nexus Treuhand Aktiengesellschaft*

TRUSTEES

Dated : 20th April, 2007

| Clause | | Page |
|---|---|---|
| 1. | Definitions | 3 |
| 2. | Trusts for Sale | 4 |
| 3. | Trusts of Added Property | 5 |
| 4. | Overriding Powers | 5 |
| 5. | Trusts in Default of Exercise of Overriding Powers | 6 |
| 6. | Ultimate Default Trusts | 6 |
| 7. | Trustees' Powers Immunities and Decision Making | 6 |
| 8. | Power of Advancement | 7 |
| 9. | Speculative Investments | 7 |
| 10. | Provision of Information | 7 |
| 11. | No Duty to Interfere in Underlying Business | 7 |
| 12. | Trustees' and Protector's Remuneration | 7 |
| 13. | Appointment of New or Additional Trustees | 8 |
| 14. | Removal of Trustees | 9 |
| 15. | Indemnity of Retiring Trustee and Protector | 9 |
| 16. | Appointment of New Protector | 10 |
| 17. | Powers of Trustees subject to Consent of Protector | 10 |
| 18. | Applicable Law and Jurisdiction | 11 |
| 19. | Power to Appoint Additional Beneficiaries | 11 |
| 20. | Power to Exclude Beneficiaries | 12 |
| 21. | Exclusion of Excluded Persons | 12 |
| 22. | Emergency Provisions | 13 |
| 23. | Power to amend | 14 |
| Schedule One - Administrative Powers | | 15 |
| Schedule Two - Initial Trust Fund | | 24 |

2

THIS DECLARATION OF TRUST is made on the Twentieth day of April, 2007

BY:

**NEXUS TREUHAND AKTIENGESELLSCHAFT** of Zuercherstrasse 61, CH-7320 Sargans, Switzerland (the "Original Trustees")

WHEREAS:

(A)    The property specified in the Second Schedule has been transferred or delivered to the Original Trustees or otherwise placed under their control and from time to time further money investments or other property may be paid or transferred to the Trustees by way of addition

(B)    The trust created by this declaration shall be irrevocable

(C)    This trust created by this declaration shall be known as **The Summit Trust**

NOW THIS DEED WITNESSES as follows

1.    Definitions

     IN this Settlement where the context so admits

     1.1    "Beneficiaries" means and includes

          1.1.1    The International Red Cross of 17 Chemin des Crets, PO Box 372, Geneva, Switzerland

          1.1.2    such other objects or persons as may be added under Clause 19

          **PROVIDED ALWAYS** that the expression "the Beneficiaries" shall not mean or include any Gibraltar Resident

     1.2    "the Emergency Trustee" means the person or corporation from time to time designated as such pursuant to the provisions of Clause 22

     1.3    "Excluded Persons" means any Gibraltar Resident and any person constituted an Excluded Person pursuant to Clause 20

     1.4    "Gibraltar Resident" means any person who is a resident of Gibraltar as defined in Section 2(1) of the Companies (Taxation and Concessions) Ordinance of Gibraltar or any modification or re-enactment thereof

     1.5    "Protector" means Fallon Invest & Trade Inc. of Pasea Estate, Road Town, Tortola, British Virgin Islands, or such new Protector as may be appointed pursuant to Clause 16

     1.6    "Settlement" means The [Summit] Trust created by this Deed

     1.7    "Speculative Investments" means property the ownership of which entails to the owner thereof a risk of substantial financial loss but which entails also a possibility of greater profit on the sale or conversion into money of such property than that which might reasonably be expected to be realised on the sale or conversion into money of property not entailing to its

3

owner a risk of substantial financial loss and for the purpose of this definition "a risk of substantial financial loss" includes a risk that the value of property will prior to any sale or conversion into money thereof be reduced to nothing

1.8 "Trustees" means the Original Trustees or other trustee or trustees for the time being of the Settlement hereby created

1.9 "Trust Fund" means

1.9.1 the property specified in the Second Schedule and

1.9.2 all moneys investments and property paid or transferred by any person or persons to and accepted by the Trustees as additions to the Trust Fund and

1.9.3 all accumulations (if any) of income directed to be held as an accretion to capital and

1.9.4 the money investments and property from time to time representing such money investments property additions and accumulations or any part or parts thereof

1.10 "Trust Period" means the period commencing on the date hereof and ending on the earlier of (i) the last day of the period of one hundred years from the date hereof which period (and no other) shall be the applicable perpetuity period or (ii) such earlier date as the Trustees shall by deed specify (not being a date earlier than the date of execution of such deed)

1.11 "Trust Property" means any property comprised in the Trust Fund

1.12 references to clauses and schedules are to be construed as references to clauses and the schedules of this Settlement unless otherwise stated

1.13 references to (or to any specified provision of) this Settlement or any other document shall be construed as references to this Settlement, that provision or that document as from time to time amended and/or supplemented unless otherwise stated

1.14 words denoting the single shall include the plural and vice versa

1.15 words denoting any gender shall include both genders

1.16 references to a person shall be construed as references to an individual firm company corporation unincorporated body of persons or any state or any agency thereof

1.17 the tables of contents and clause heading are included for reference only and shall not affect the interpretation of this Deed

2. Trusts for Sale

THE Trustees shall hold the Trust Fund upon trust in their discretion either to allow the same to remain in the state in which it is received or held for so long as they shall think fit or to sell or convert the same into money and may in their discretion invest such money in their names or under their control in any of the investments authorised by this Settlement or by law with power from time to time to vary or transpose any such investments for or into others so authorised.

4

3.     <u>Trusts of Added Property</u>

      **THE** Trustees shall hold the Trust Fund upon with and subject to the trusts powers and provisions of this Settlement and the Trustees may at any time or times during the Trust Period accept such additional money investments or other property as may be paid or transferred to them upon these trusts by any person either personally or by testamentary act or disposition (including property of any onerous nature the acceptance of which the Trustees consider to be beneficial).

4.     <u>Overriding Powers</u>

      4.1     **THE** Trustees shall hold the capital and income of the Trust Fund upon trust for or for the benefit of the Beneficiaries at such times in such shares upon such trusts (which may include discretionary or protective powers or trusts) and in such manner generally as the Trustees shall in their discretion appoint and such appointment may include such powers and provisions for the maintenance education or other benefit of the Beneficiaries or for the accumulation of income and such administrative powers and provisions as the Trustees think fit

      4.2     No exercise of the power conferred by Clause 4.1 shall invalidate any prior payment or application of all or any part of the capital or income of the Trust Fund under the trusts of this Settlement or made under any other power conferred by this Settlement or by law

      4.3     Any trusts and powers created by an appointment under Clause 4.1 may be delegated to any extent to any person, whether or not including the Trustees or any of them

      4.4     The exercise of the power of appointment conferred by Clause 4.1 shall

           4.4.1     be subject to the application if any of the rule against perpetuities and the law concerning excessive accumulations of income

           4.4.2     be by deed revocable during the Trust Period or irrevocable executed during the Trust Period

           4.4.3     be subject to the written consent of the Protector (for so long as there is a Protector of this Settlement) which consent (if applicable) shall be endorsed on such deed or deeds

      4.5     Notwithstanding paragraph 20 of the First Schedule the Trustees may not release or restrict the power of appointment conferred by Clause 4.1 without the Protector's written consent for so long as there is a Protector of this Settlement

      4.6     Notwithstanding the trusts and provisions herein the Trustees may by any deed or deeds revocable during the Trust Period or irrevocable and executed during the Trust Period in their absolute discretion with the written consent of the Protector (for so long as there is a Protector of this Settlement) which consent (if applicable) shall be endorsed on such deed or deeds pay or transfer the whole or any part or parts of the capital or income of the Trust Fund to the trustees for the time being of any other trust wherever established or existing and whether governed by the law of Gibraltar or by the law of any other state or territory under which any one or more of the Beneficiaries are interested notwithstanding that such other trusts may also contain trusts powers and provisions (discretionary or otherwise) in favour of some other person or persons or objects if the Trustees shall in their absolute discretion consider such payment to be for the benefit of such one or more of the Beneficiaries

5



5.    Trusts in Default of Exercise of Overriding Powers

SUBJECT to and in default of any appointment under Clause 4 and for so long as there is a Protector of this Settlement with the written consent of such Protector

5.1    The Trustees shall pay or apply the income of the Trust Fund to or for the benefit of such of the Beneficiaries as shall for the time being be in existence in such shares and in such manner generally as the Trustees shall in their discretion from time to time think fit

5.2    Notwithstanding the provisions of Clause 5.1 the Trustees may at any time in their discretion accumulate the income by investing it in any investments authorised by this Deed or by law and subject to Clause 5.3 shall hold such accumulations as an addition to capital

5.3    The Trustees may apply the whole or any part of the income accumulated under Clause 5.2 as if it were income arising in the then current year

5.4    Notwithstanding the provisions of Clauses 5.1 to 5.3 the Trustees may at any time during the Trust Period pay or apply the whole or any part of the capital of the Trust Fund to or for the benefit of all or such of the Beneficiaries in such shares and in such manner generally as the Trustees shall in their discretion think fit

6.    Ultimate Default Trusts

SUBJECT as above and if and so far as not wholly disposed of for any reason whatever by the above provisions the capital and income of the Trust Fund shall be held for such charitable purposes or objects as the Trustees may determine and for so long as there is a Protector of this Settlement any such determination shall be with the written consent of the Protector

7.    Trustees' Powers, Immunities and Decision Making

7.1    THE Trustees shall in addition and without prejudice to all statutory powers have the powers and immunities set out in the First Schedule provided that the Trustees shall not exercise any of their powers so as to conflict with the beneficial provisions of this Settlement

7.2    Notwithstanding the Trustees' powers and immunities set out in the First Schedule the Trustees shall not take any action in any form or manner directly or indirectly which would require under this Settlement written consent of the Protector without obtaining such a written consent and where the provisions of this Settlement restrict or limit the powers of the Trustees such limitations and restrictions shall apply notwithstanding any of the provisions of the First Schedule

7.3    In the event that there shall be more than two Trustees in office from time to time every decision resolution or exercise of a power or discretion required to be or capable of being made by the Trustees shall be validly made if so made by a majority in number of the Trustees and any instrument executed in pursuance of any such decision resolution or exercise shall have binding legal effect (as if executed by all the Trustees) if it shall be executed by a majority in number of the Trustees but not so as to render any of the Trustees liable for any act or thing done or omitted without his consent by reason of the provisions of this paragraph or for any act in which he joins for conformity only

7.4    A resolution in writing signed by a majority of the Trustees shall be valid and effective as if it had been passed at a meeting of the Trustees duly convened and held and any such resolution may consist of one or more documents in similar form each signed by one or more of the Trustees

6



8.    Power of Advancement

THE Trustees may pay or apply the Trust Property for the advancement or benefit of any Beneficiary

9.    Speculative Investments

IT is expressly declared that one of the purposes of the trusts hereby created may be to invest all or part of the Trust Fund in Speculative Investments and accordingly the Trustees shall not be liable for any loss sustained to the value of the Trust Fund by reason only that it may comprise or have comprised (whether in whole or part) Speculative Investments and for the purposes of this clause "invest" shall be given its widest possible meaning

10.    Provision of Information

10.1    SUBJECT to Clause 10.2 the Trustees shall not be bound to furnish any information relating to the value state or amount of the Trust Fund or any assets comprising the Trust Fund to any Beneficiary unless and until a Beneficiary has a vested interest in all or any part of the Trust Fund and then only to the extent of that interest and in particular but without limiting the foregoing the Trustees shall not be bound to notify any Beneficiary that he is a beneficiary of this Settlement

10.2    The obligation of the Trustees to furnish information in relation to the Trust Fund in relation to any company an interest in which comprises part or all of the Trust Fund (such a company being in this subclause hereinafter called an "underlying company") shall be to furnish information only of the fact that the shares in an underlying company form part of the Trust Fund and the number and nominal value of the shares in an underlying company which form part of the Trust Fund and accordingly the Trustees shall not be obliged in relation to an underlying company to provide any Beneficiary with any information regarding the administration management or conduct of the business or affairs of that underlying company

11.    No Duty to Interfere in Underlying Business

THE Trustees are under no duty to enquire into the conduct of a company in which they are interested unless they have knowledge of circumstances which call for enquiry

12.    Trustees' and Protector's Remuneration

12.1    ANY Trustee or Protector who is a solicitor accountant or other person engaged in any profession or business shall be entitled to charge and be paid all usual professional or other charges and to receive commission or other benefits for or in respect of business transacted time expended and acts done by him or any employee or partner of his in connection with these trusts including acts which a trustee or protector not being in any profession or business could have done personally

12.2    Any Trustee or Protector which is a trust corporation or company authorised to undertake trust business shall be entitled in addition to reimbursement of its proper expenses to remuneration for its services in accordance with its published terms and conditions for trust business in force from time to time and in the absence of such published terms and conditions in accordance with such terms and conditions as may from time to time be determined by such Trustee or Protector

12.3 Any Trustee or Protector shall be entitled to retain any brokerage or other commission which may be received personally or by such Trustee's or Protector's firm in respect of any transaction earned out on behalf of this Settlement for which such Trustee or Protector or Trustee's or Protector's firm is in the normal course of business allowed brokerage or other commission notwithstanding that the receipt of such brokerage or commission was procured by an exercise by such Trustee or Protector of powers over the Trust Fund

12.4 All costs, charges, liabilities and expenses incurred and payments made by the Trustee in the lawful exercise of the powers conferred upon it by these presents shall be payable or reimbursable out of the Trust Fund or income thereof.

12.5 The Trustee shall be indemnified out of the Trust Fund and/or income thereof (i) in respect of all liabilities sustained and costs and expenses properly incurred by it or by any delegate or sub-delegate appointed by it or to whom any duties, powers, trusts, authorities or discretions may be delegated by it in the proper execution or purported execution of the trusts, powers, authorities or discretions vested in it by, or the proper performance of obligations assumed by it under the Settlement, (ii) against all liabilities, actions, proceedings, costs and expenses, claims and demands in respect of any matter or thing properly done or omitted by it or any other person in any way relating to this Settlement except to the extent that any such are sustained or incurred as a result of the negligence, willful misconduct or fraud of the Trustee.

13. <u>Appointment of New or Additional Trustees</u>

13.1 IF any Trustee whether original additional or substituted shall die or being a company shall be dissolved or shall give notice of a desire to withdraw and be discharged from these trusts or shall be unfit or unwilling to act or shall be removed by the Protector pursuant to Clause 14 then

13.1.1 the Protector or if there shall be no Protector or if the Protector shall be unable or unwilling to act

13.1.2 the Trustees or if there shall be no Trustee in existence or willing to act

13.1.3 the Supreme Court of Gibraltar or the court of such other place which shall then be the forum for the administration of these trusts in accordance with the terms of Clause 18 may by deed appoint one or more other persons or bodies corporate to be a trustee or trustees in place of the trustee so deceased dissolved desiring to withdraw becoming unfit or unwilling to act or so removed

13.2 The person or body for the time being having the power to appoint new trustees in accordance with Clause 13.1 shall also have power to appoint by deed one or more other persons or companies to be an additional trustee or trustees

13.3 Where new or additional trustees are appointed for the whole or any part or parts of the Trust Fund the appointor or appointors may appoint any person or persons as trustee or trustees notwithstanding the residence domicile place of business or (if any body corporate) place of incorporation of such person or persons and the receipt of such person or persons for the whole or such part or parts of the Trust Fund as may be paid or transferred to such person or persons pursuant to such appointment shall be a good discharge to any other trustee or trustees accordingly

8



13.4   Any corporate body may at any time be appointed either as a general trustee or as custodian trustee hereof on such terms or conditions as to remuneration (payable out of the income or capital of the Trust Fund) and otherwise in all respects as the appointor or appointors shall prescribe or approve

13.5   The power of appointing new trustees shall not be exercisable by reason only that a trustee remains out of Gibraltar (or if applicable out of the jurisdiction which is then the forum for the administration of these trusts in accordance with the terms of Clause 18) for more than twelve months

13.6   Acts and instruments done or executed for the proper vesting of the Trust Fund in new or additional trustees shall be done and executed by the continuing or retiring trustee or trustees at the expense of the income or capital of the Trust Fund PROVIDED THAT an outgoing trustee who is liable as a trustee or who may at the death of any person be liable as a trustee or on any other occasion be liable as a former trustee for any taxes wherever they may be imposed and of whatsoever nature shall not be bound to transfer the Trust Fund unless reasonable security is provided for indemnifying such outgoing trustee against such liability

13.7   The Supreme Court of Gibraltar or the court of such any other place which shall then be the forum for the administration shall have the power to vest the Trust Fund in the trustees appointed by such court

13.8   On every change in the trusteeship a memorandum shall be endorsed on or permanently annexed to this Deed stating the name of the Trustees for the time being and shall be signed by the persons so named and any person shall be entitled to rely upon such memorandum (or the latest of such memoranda if more than one) as sufficient evidence that the Trustees named in such memorandum are the duly constituted trustees of this Settlement for the time being

14.   Removal of Trustees

THE office of a trustee shall be determined and vacated if such trustee being an individual shall be found to be a lunatic or of unsound mind or shall become subject to any proceedings under the insolvency or bankruptcy laws applicable to such trustee or if such trustee being a company shall enter into liquidation whether compulsory or voluntary (not being merely a voluntary liquidation for the purpose of amalgamation or reconstruction) or if its ownership changes without prior written notification to the Protector or if the Protector (at any time when there is a Protector of this Settlement) removes such trustee by written notice

15.   Indemnity of Retiring Trustee and Protector

15.1   IF a Trustee ceases to be a trustee such Trustee shall be released from all claims demands actions proceedings and accounts of any kind on the part of any other person (whether in existence or not) actually or prospectively interested under this Settlement for or in respect of the capital and income of the Trust Fund or these trusts or an act or thing done or omitted in execution or purported execution of these trusts other than and except only actions

15.1.1   arising from any breach of trust to which such Trustee or (in the case of a corporate trustee) any of its officers or employees was a party or privy

9

9

15.1.2    to recover from such Trustee the whole or any part of the Trust Fund in the possession of such Trustee or previously received by such Trustee or (in the case of a corporate Trustee) any of its officers or employees and converted to the use of such trustee or officers or employees

15.2    If the Protector for the time being shall have died or retired as Protector then the Protector or the personal representatives of such Protector shall be entitled to a similar release as that specified above for a retiring trustee in respect of any act or thing done or omitted to be done

15.3    The Protector shall not owe any fiduciary duty towards and shall not be accountable to any person or persons from time to time interested hereunder or to the Trustees for any act of omission or commission of the Protector in relation to the powers given to the Protector by this Settlement to the intent that the Protector (in the absence of fraud or dishonesty) shall be free from any liability whatsoever in relation to such powers

15.4    The Protector shall be wholly indemnified and held harmless out of the Trust Fund from any losses damages or judgment debt arising out of any action or suit in a court of law based upon or in connection with the Protector's powers or duties under this Settlement

16.    Appointment of New Protector

16.1    THE Protector shall cease to be the Protector on death if an individual or on dissolution if a company or in either case on becoming unable or unfit to act or in the case of the Protector being a company if there shall be a change of ownership and in the case of a company with bearer shares if there shall be a change in the identity of the person recorded by the Trustees as being the holder of the bearer share certificate(s)

16.2    The Protector may by deed revocable or irrevocable during protectorship nominate a person to become the Protector upon the person making the nomination ceasing to be the Protector and thereupon if the nomination remains unrevoked and the Trustees have been given written notice of the nomination and the person nominated consents in writing (which consent is endorsed on any such deed) such person shall immediately become the Protector PROVIDED THAT if the Protector shall be a company then any such deed as is referred to above shall first be approved by the company in general meeting before it is executed on behalf of the company by its board

16.3    If at any time there is no longer a Protector of this Settlement the Trustees may if they consider it desirable to do so appoint by deed a person to be the Protector of this Settlement provided always that such person consents in writing to such appointment which consent is endorsed on such deed

17.    Powers of Trustees Subject to Consent of Protector

NOTWITHSTANDING anything herein contained and in particular conferring an absolute or uncontrolled discretion on the Trustees all and every power and discretion vested in the Trustees by such provisions of this Settlement as are specified below shall for as long as there is a Protector of this Settlement and as stated in the relevant Clause or Clauses of this Deed be exercisable by the Trustees only with the prior or simultaneous written consent of the Protector:

| | |
|---|---|
| Clause 4: | Overriding Powers |
| Clause 5: | Trusts in default of exercise of overriding powers |
| Clause 6: | Ultimate Default Trusts |
| Clause 19: | Appointment of additional Beneficiaries |

10

Clause 20.1:      Exclusion of Beneficiaries
Clause 22:        Power to designate Emergency Trustee and revoke such designation

18.    Applicable Law and Jurisdiction

18.1    THE proper law of this Settlement shall be that of Gibraltar and all rights under this Settlement and its construction and effect shall be subject to the jurisdiction of and construed according to the laws of Gibraltar

18.2    The courts of Gibraltar shall be the forum for the administration of these trusts

18.3    Notwithstanding the provisions of Clauses 18.1 and 18.2

18.3.1    The Trustees shall have power (subject to the application (if any) of the rule against perpetuities) to carry on the general administration of these trusts in any jurisdiction in the world whether or not such jurisdiction is for the time being the proper law of this Settlement or the courts of such jurisdiction are for the time being the proper law of this Settlement or the courts of such jurisdiction are for the time being the forum for the administration of these trusts and whether or not the Trustees or any of them are for the time being resident in or otherwise connected with such jurisdiction

18.3.2    The Trustees may at any time declare in writing that from the date of such declaration the proper law of this Settlement shall be that of any specified jurisdiction (not being a jurisdiction under the law of which this Settlement would be capable of revocation) and that all rights under this Settlement and its construction and effect shall be subject to and construed according to the laws of that jurisdiction

18.3.3    The Trustees may at any time declare in writing that from the date of such declaration the forum for the administration of this Settlement shall be the courts of any specified jurisdiction

19.    Power to Appoint Additional Beneficiaries

19.1    THE Trustees and for so long as there is a Protector of this Settlement with the written consent of such Protector shall have power at any time or times during the Trust Period to add to the class of Beneficiaries such one or more objects or persons (not being an Excluded Person or Gibraltar Resident) as the Trustees with such consent of the Protector (if applicable) shall in their absolute discretion determine

19.2    Any such addition shall be made by deed which shall be endorsed with the written consent of the Protector (if applicable) and which

19.2.1    shall name or describe the one or more objects or persons to be thereby added to the class of Beneficiaries and

19.2.2    shall specify the date (not being earlier than the date of the deed but during the Trust Period) from which such one or more objects or persons shall be so added and

19.2.3    shall specify the period during which such one or more objects or persons is to be included with the class of Beneficiaries

20.   Power to Exclude Beneficiaries

20.1   THE Trustees and for so long as there is a Protector of this Settlement with the written consent of such Protector may by deed made at any time or times during the Trust Period declare that the one or more objects or persons or the members of a class named or specified (whether or not ascertained) in such deed who are would or might but for this Clause be or become a Beneficiary or Beneficiaries or be or become otherwise able to benefit hereunder as the case may be

20.1.1   shall be wholly or partially excluded from future benefit hereunder or

20.1.2   shall cease to be a Beneficiary or Beneficiaries or

20.1.3   shall be an Excluded Person or Excluded Persons

and any such deed may be irrevocable or revocable during the Trust Period shall have effect from the date specified therein and shall be endorsed with the written consent of the Protector (if applicable) provided that this power shall not be capable of being exercised so as to derogate from any interest to which any Beneficiary has previously become indefeasibly entitled whether in possession or in reversion or otherwise

20.2   Any person of full age to whom or for whose benefit any capital or income of the Trust Fund may be liable whether directly or indirectly to be paid appointed transferred or applied in any manner whatsoever by or in consequence of an exercise of any trust power or discretion vested in the Trustees or in any other person may by deed to which the Trustees are party during the Trust Period either revocably (but revocable during the Trust Period only) or irrevocably

20.2.1   disclaim his interest as an object of such trust power or discretion either wholly or with respect to any specified part or share of such capital or income provided that any disclaimer by a Beneficiary of his whole interest shall be irrevocable or

20.2.2   declare that he shall cease to be a Beneficiary or

20.2.3   declare that he shall be an Excluded Person and such

deed shall have effect from the date thereof

21.   Exclusion of Excluded Persons

SUBJECT to Clause 12 and notwithstanding anything else contained or implied in this Settlement no Excluded Person shall be capable of taking any benefit of any kind by virtue or in consequence of this Settlement and in particular but without prejudice to the generality of the foregoing provisions of this Clause

21.1   The Trust Fund and the income thereof shall henceforth be possessed and enjoyed to the entire exclusion of any such Excluded Person and of any benefit to him by contract or otherwise

21.2   No part of the capital or income of the Trust Fund shall be paid or lent or applied for the benefit either directly or indirectly of any such Excluded Person in any manner or in any circumstances whatsoever and

21.3   No power or discretion hereby or by any appointment made hereunder or by law conferred upon the Trustees or any of them shall be capable of being exercised in such manner that any such Excluded Person will or may become entitled either directly or indirectly to any benefit in any manner or in any circumstances whatsoever.

12

12

22      Emergency Provisions

22.1    **ANY** Trustee hereof shall automatically cease to be a Trustee hereof on the happening of any of the following events within the territory where such Trustee is incorporated (in the case of a corporate Trustee) or resident in the case of a natural person that is to say

22.1.1   the invasion of such territory by military forces

22.1.2   the enactment of any law or the taking of any action by or on the part of any governmental authority agency or officer of or within the said territory the aim or purpose or effect of which is or would be had such Trustee sole control of the assets comprising the Trust Fund

22.1.2.1   the acquisition expropriation or confiscation of any of the assets comprising the Trust Fund or any part thereof

22.1.2.2   to jeopardise or interfere with or hamper the exercise by any such Trustee of its administrative or executive functions in respect of the trusts thereof or the Trust Fund or its discretion in respect thereof

22.1.2.3   the restriction suspension abrogation withdrawal or cancellation or rescission of any exemption relief or contract in relation to the trusts hereby created or in relation to the Trust Fund or any part thereof whether in respect of exchange or currency control or any other matter

22.1.2.4   to levy any tax or duty on the capital of the Trust Fund in excess of five (5) per centum per annum thereof

22.1.2.5   to levy any tax or charge or fee on the income of the Trust Fund or any part thereof in excess of five (5) per centum per annum thereof

22.1.3   the nationalization or attempted nationalization of a controlling interest in the Trustee or the intervention in its affairs by a government official or a government body or agency in such a way that the Trustees are unable efficiently to carry out their duties and exercise their discretion in accordance with the terms of this Settlement

22.2    Forthwith upon any such Trustee ceasing to be a Trustee pursuant to this Clause any such Trustee shall be divested of title to the Trust Fund which shall automatically vest in the Emergency Trustee as if the Emergency Trustee had been the Original Trustee hereof and the forum for the administration of this Settlement shall forthwith be deemed to be the place of incorporation (or residence if a natural person) of the Emergency Trustee and the laws of such place shall become the proper law of this Settlement and the Courts of the said place of incorporation or residence shall have exclusive jurisdiction in respect of the trusts hereof and any matters relating hereto

22.3    The Trustees and for so long as there is a Protector of this Settlement with the written consent of such Protector have the power exercisable by deed (endorsed with such consent, if applicable) from time to time of designating the Emergency Trustee and also and for so long as there is a Protector of this Settlement with the written consent of such Protector have the power exercisable by deed (endorsed with such consent, if applicable) of revoking any such designation

13

23.    THE Trustees shall have power at any time or times during the Trust Period by deed or deeds to revoke or vary any of the administrative provisions of this Settlement or to add any further administrative provisions as the Trustees may consider expedient for the purposes of this Settlement and without prejudice to the generality of the above for ensuring that at all times there should be a trustee of this Settlement and that the Trust Fund shall be fully and effectively vested in or under the control of such trustee and that the trusts of this Settlement shall be enforceable by the Beneficiaries provided always that the power conferred by this clause shall only be exercisable if the Trustees shall be advised in writing by a lawyer of at least 10 years' standing qualified in the law of the jurisdiction which for the time being is the proper law of this Settlement that it would be expedient for the purposes of this Settlement that the administrative provisions be revoked varied or added to in the manner specified in such written advice and that such power shall be exercisable only by the Trustees executing a deed in a form appropriate to carry such advice into effect.

**IN WITNESS** whereof the Original Trustees have executed this Declaration of Trust on the day and year first hereinbefore written

[The First Schedule and the Second Schedule follow]

14

FIRST SCHEDULE

ADMINISTRATIVE POWERS

INDEX TO CLAUSES

| Clause | | Page |
|---|---|---|
| 1. | General | 16 |
| 2. | General powers as to properties and investments | 16 |
| 3. | Trustees' powers and discretions | 16 |
| 4. | Power to lend and to give guarantees | 16 |
| 5. | Power to borrow | 17 |
| 6. | Power to permit occupation of property and enjoyment of chattels | 17 |
| 7. | Powers in relation to real property | 17 |
| 8. | Powers in relation to chattels | 18 |
| 9. | Powers in relation to securities | 18 |
| 10. | Power to vote and to employ nominees and custodians | 19 |
| 11. | Power to promote companies | 19 |
| 12. | Power to delegate management of investments | 20 |
| 13. | Power to trade | 20 |
| 14. | Power to give indemnities | 20 |
| 15. | Exclusion of apportionment | 21 |
| 16. | Power to deal with insurance policies | 21 |
| 17. | Power to take out life policies | 21 |
| 18. | Power to insure property | 21 |
| 19. | Power to take counsel's opinion | 21 |
| 20. | Release of powers | 21 |
| 21. | Power of appropriation | 22 |
| 22. | Power to receive remuneration | 22 |
| 23. | Power to appoint agents | 22 |
| 24. | Power to pay duties and taxes | 22 |
| 25. | Power to permit self-dealing | 22 |
| 26. | Protection of Trustees | 22 |
| 27. | Delegation of powers | 22 |
| 28. | Power to pay parent or guardian | 23 |
| 29. | Power to assign pledge charge or mortgage the Trust Fund | 23 |

1.    General

THE Trustees shall have all the powers of investments sale alienation exchange partition mortgage charging pledging leasing insurance protection improvement equipment dealing disposition and management and all other powers of an absolute beneficial owner of the Trust Fund. Such power shall not be restricted by any principle of construction but shall operate according to the widest generality of which the foregoing words are capable notwithstanding that certain powers are more particularly set out in the following clauses

2.    General Powers as to Property and Investments

2.1    THE Trustees shall have power to allow the property or investments at any time subject to the trusts hereof to remain unsold or in the actual state of investment thereof for so long as the Trustees may think fit and at any time or times to sell call in or convert into money the said property or investments or any part or parts thereof and power at any time pending investment to place any moneys for so long as the Trustees think fit on any current or deposit account

2.2    The Trustees shall have power to change exchange or vary any property or investments for the time being subject to the trusts hereof for others hereby or by law authorised

2.3    The Trustees shall have power to invest any money requiring to be invested under the trusts hereof in the purchase of or at interest upon the security of such stocks funds shares securities land immovable or movable property of any tenure or chattels or in any trade (whether or not as partners or limited partners or others) or other investment or property of whatsoever nature and wheresoever situate and whether producing income or not whether involving liabilities or not or upon such personal credit with or without security as the Trustees shall in their absolute discretion think fit to the intent that the Trustees shall have the same power in all respects as if they were a sole beneficial absolute owner

2.4    In the investment of the Trust Fund the Trustees shall not be required to have regard to the diversification of investments and save for any provision to the contrary contained in Clause 26 of these provisions shall not be liable or responsible for any loss to the Trust Fund which may arise from the failure of the Trustees to diversify the investments comprised in the Trust Fund

2.5    The acquisition of any reversionary interest or any policy of insurance or assurance sinking fund policy or other policy of whatever nature or any annuity or securities or other investments not producing income or of a wasting nature or for any other reason not within the meaning of the word 'investment' strictly construed shall be deemed to be an authorised investment of trust moneys if the Trustees shall consider the same to be for the benefit of any one or more of the Beneficiaries

3.    Trustees' Powers and Discretions

EVERY power and discretion vested in the Trustees shall be exercisable in their absolute and uncontrolled discretion and the Trustees shall exercise such powers and discretions as they shall think most expedient for the benefit of all or any of the persons actually or prospectively interested under this Settlement and may exercise (or refrain from exercising) any power or discretion for the benefit of any one or more of them without being obliged to consider the interests of the others or other of them

16

4.    Power to Lend and to Give Guarantees

    4.1    THE Trustees shall have power to lend money or property to any one or more of the Beneficiaries either free of interest or on such terms as to payment of interest and generally as the Trustees shall in their absolute discretion think fit

    4.2    The Trustees shall have power to guarantee the payment of money and the performance of obligations in respect of any existing or future borrowings by any one or more of the Beneficiaries from third parties or guarantees indemnities or other commitments of like nature given to third parties by any one or more of the Beneficiaries including without prejudice to the generality of the above the power to pledge the whole or part of the assets comprising the Trust Fund in support of any such guarantee given as above by the Trustees and to enter into such indemnities as they shall in their absolute discretion think fit in connection with any such guarantee

5.    Power to Borrow

    THE Trustees shall have power to borrow and raise money for any purpose (including the investment of the moneys so raised as part of the Trust Fund) whether upon the security of the whole or any part of the Trust Fund or upon personal security only and to mortgage charge or pledge any part of the Trust Fund as security for any moneys so raised and to guarantee the payment of money and the performance of obligations in respect of borrowings by any company fully or partly owned by the Trustees and in connection with such guarantees to enter into such indemnities as the Trustees shall in their absolute discretion think fit

6.    Power to Permit Occupation of Property and Enjoyment of Chattels

    THE Trustees shall have power to permit any one or more of the Beneficiaries to occupy or reside in or upon any dwelling house building or land or to have the enjoyment and use of chattels or other movable property for the time being held upon these trusts on such terms as to payment of rent rates taxes and other expenses and outgoings and as to insurance repair and decoration and generally upon such terms as the Trustees shall in their absolute discretion think fit

7.    Powers in Relation to Real Property

    WHERE the Trust Fund for the time being includes any real or immovable property (in this clause referred to as "the land") the Trustees shall have power to sell exchange convey lease mortgage charge agree to let license and otherwise conduct the management of the land as if the Trustees were the sole beneficial owner thereof and

    7.1    The Trustees may lease all or any part of the land for any purpose and whether involving waste or not and for any term and either wholly or partly in consideration of a rent (whether fixed or variable) or fine or premium or the erection improvement or repair or any agreement to erect improve or repair buildings or other structures on the land and may accept (with or without consideration) surrender of any lease of all or any part of the land

    7.2    The Trustees may in executing any trust or power of sale sell all or any part of the land either wholly or partly in consideration of an annual sum payable either in perpetuity or for any term (whether definite or indefinite) and being either reserved out of the land sold or secured in such other manner as the Trustees shall in their absolute discretion think fit

    7.3    The Trustees may in executing any trust or power of sale or leasing

        7.3.1    sell or lease all or any part of the land whether the division is horizontal or vertical or

17



made in any other way

7.3.2    sell or lease or reserve any easement or right or privilege over all or any part of the land

7.3.3    sell or lease or except or reserve any timber or mines or minerals on or in or under all or any part of the land together with any easements rights or privileges or cutting or working and carrying away the same or otherwise incidental to or connected with forestry or mining purposes

7.3.4    impose and make binding for the benefit of all or any part of the land sold or leased any restrictions or stipulations as to user or otherwise affecting any part of the land retained

7.3.5    accept in exchange for all or any part of the land to be sold or leased (either with or without any money paid or received for equality of exchange) any other real or immovable property or any lease

7.3.6    enter into any contract or grant any option for the sale or leasing of all or any part of the land or otherwise for the exercise by the Trustees of any of their above powers

7.4    The Trustees shall not be bound to see nor be liable or accountable for omitting or neglecting to see to the repair or insurance of any buildings or other structures on the land or to the payment of any outgoings or otherwise as to the maintenance of the land or any buildings or other structures on the land but may maintain repair or insure the same in such manner and to such extent as they shall in their absolute discretion think fit

7.5    The Trustees may from time to time expend moneys (whether capital or otherwise) in making any repairs whether of a permanent nature or not and any improvements whether sanctioned by statute or not or in enlarging improving decorating redecorating equipping furnishing or altering the land or any buildings or other structures on the land (including erecting demolishing or rebuilding the same) to such extent and in such manner as they shall in their absolute discretion think fit and any certificate in writing of any architect or surveyor employed by the Trustees to the effect that any work specified in such certificate is or includes an alteration or an improvement to the land or any such building or other structure shall be conclusive as between the Trustees and the Beneficiaries that any money expended on such work was properly expended in exercise of this power

8.    Powers in Relation to Chattels

WHERE the Trust Fund for the time being includes any chattels (in this clause referred to as "the chattels")

8.1    The Trustees may sell lease hire deposit store or otherwise deal with the chattels upon such terms as they shall in their absolute discretion think fit

8.2    The Trustees shall not be bound to see nor be liable or accountable for omitting or neglecting to see to the repair or insurance of the chattels but may repair and insure the chattels in such manner and to such extent as they shall in their absolute discretion think fit

9.    Powers in Relation to Securities

9.1    THE Trustees shall be entitled to retain all or any shares stock debenture stock or other securities in any public or private company which may be transferred to them from time to time or to purchase subscribe or apply for or otherwise acquire any further or additional

18


18

shares or other securities in any such company (hereinafter called "the Shares") and may retain all or any of the Shares for so long as they shall in their absolute discretion consider it beneficial to do so

9.2    The Trustees may exercise all the powers given to them by the ownership of the Shares for the purposes of carrying on or causing to be carried on the business of such company or companies as if they were beneficially entitled thereto

9.3    The Trustees may at any time as they shall in their absolute discretion think fit wind up or concur in winding up such company or companies whether for the purposes of any reconstruction amalgamation or other arrangements concerning the company or companies or may promote or agree to any such reconstruction amalgamation or other arrangement or scheme including the formation of a new company or companies to take over the business of such company or companies

9.4    The Trustees shall not be liable or responsible for any loss to the Trust Fund arising from a depreciation in value of the Shares or in any otherwise resulting from the retention of the Shares by the Trustees as aforesaid

9.5    The Trustees shall have power to obtain or join with others in obtaining from any Stock Exchange permission to deal in the Alternative Investment Market in the United Kingdom (or any such similar or replacement market) or to obtain from any Stock Exchange a quotation for or permission to deal in any securities which or some of which are comprised in the Trust Fund and shall have power to sell or join with any other person or persons in selling or disposing of any securities with a view to creating a market in such securities whether or not a sale or disposition would on any other ground be desirable or expedient

10.    <u>Power to Vote and to Employ Nominees and Custodians</u>

IN respect of any property comprised in the Trust Fund the Trustees shall have power

10.1    To vote upon or in respect of any shares securities bonds notes or other evidence of interest in or obligation of any corporation trust association or concern whether or not affecting the security or the apparent security of the Trust Fund or the purchase or sale or lease of the assets of any such corporation trust association or concern

10.2    To deposit any such shares securities or property in any voting trust or with any depositary designated under such a voting trust

10.3    To give proxies or powers of attorney with or without power of substitution for voting or acting on behalf of the Trustees as the owners of any such property

10.4    To hold any or all securities or other property in bearer form or in the names of the Trustees or any one or more of them or in the name of some other person or partnership or in the name or names of nominees without disclosing the fiduciary relationship created by this Settlement and to deposit the said securities and any title deeds or other documents belonging or relating to the Trust Fund in any part of the world with any bank firm trust company or other company that undertakes the safe custody of securities as part of its business without being responsible for the default of such bank firm trust company or other company or for any consequent loss

11.    <u>Power to Promote Companies</u>

**THE** Trustees may (without prejudice to the generality of their powers of investment) promote or join with any other person or persons in promoting or incorporating any company in any part of the world or

19

19

subscribe for or acquire any of the shares or stock or debentures or debenture stock or loan capital of any company with a view to or in consideration of

11.1    the establishment and carrying on by such company of a business of any kind which the Trustees are for the time being authorised to carry on themselves and the acquisition of any of the assets comprised in the Trust Fund which may be required for the purposes of such business

11.2    the acquisition of the assets and undertaking of any business being carried on by the Trustees under the above power

11.3    the acquisition of all or any of the assets comprised in the Trust Fund to be held as investments of the company acquiring the same

12.    Power to Delegate Management of Investments

12.1    THE Trustees shall have power to engage the services of such investment adviser or advisers as the Trustees may from time to time think fit ("the investment adviser") to advise the Trustees in respect of the investment and reinvestment of the Trust Fund with power for the Trustees without being liable for any consequent loss to delegate to the investment adviser discretion to manage all or any part of the Trust Fund within the limits and for the period stipulated by the Trustees and the Trustees shall settle the terms and conditions for the remuneration of the investment adviser and the reimbursement of the investment adviser's expenses as the Trustees shall in their absolute discretion think fit and such remuneration and expenses shall be paid by the Trustees from the Trust Fund

12.2    The Trustees shall not be bound to enquire into nor be in any manner responsible for any changes in the legal status of the investment adviser

12.3    The Trustees shall incur no liability for any action taken pursuant to or for otherwise following the advice of the investment adviser however communicated

13.    Power to Trade

13.1    THE Trustees shall have power to trade or take part in any venture in the nature of trade whether solely or jointly with any other person and whether or not by way of partnership (limited or general) and for these purposes make such arrangements as they shall in their absolute discretion think fit and may delegate any exercise of this power to any one or more of their number or to a company or partnership formed for this purpose

13.2    Any power vested in the Trustees under this Settlement shall (where applicable) extend to any arrangements in connection with any such trade or venture and in particular but without prejudice to the generality of the above the Trustees' powers of borrowing and charging shall extend to any borrowing arrangements made in connection with such trade or venture and whether made severally or jointly with others or with unequal liability and the Trustees shall be entitled to be fully indemnified out of the Trust Fund against all personal liability to which they may become in any manner subject in connection with any such trade or venture

14.    Power to Give Indemnities

14.1    THE Trustees shall have power to enter into any indemnity in favour of any former trustee or any other person in respect of any fiscal imposition or other liability of any nature prospectively payable in respect of the Trust Fund or otherwise in connection with this Settlement and to charge or deposit the whole or any part of the Trust Fund as security for any

20



such indemnity in such manner in all respects as they shall in their absolute discretion think fit

14.2    The Trustees shall have power to give or enter into any indemnity warranty guarantee undertaking or covenant or enter into any type of agreement that they shall in their absolute discretion think fit relating to the transfer or sale of a business or private company shareholding held or owned for the time being by the Trustees whether relating to the business or company itself its assets liabilities shares or employees or any other aspect of the business or company in favour of any transferee purchaser or other relevant party and including any limitation or restriction on value or otherwise as the Trustees shall in their absolute discretion think fit

15.    Exclusion of Apportionment

NO statutory or equitable rules of apportionment shall apply to this Settlement and the Trustees shall be permitted to treat all dividends and other payments in the nature of income received by them as income at the date of receipt irrespective of the period for which the dividend or other income is payable

16.    Power to Deal with Insurance Policies

THE Trustees shall in addition and without prejudice to all statutory and other powers conferred upon them have the following powers in relation to any insurance policy ("the policy") from time to time comprised in the Trust Fund

16.1    To borrow on the security of the policy for any purpose

16.2    To convert the policy into a fully paid-up policy for a reduced sum assured free from payment of future premiums

16.3    To surrender the policy wholly or any part or any bonus attaching to the policy for its cash surrender value

16.4    To sell the policy or any substituted policy on such terms as the Trustees shall in their absolute discretion think fit

16.5    To exercise any of the powers conferred by the policy or with the consent of the insurer to alter the amount or occasion of the payment of the sum assured or to increase or decrease the amount of the periodic premiums (if any) payable under the policy or to alter the period during which the premiums are payable and to do any of these things notwithstanding that the sum assured may be reduced subject always to production of evidence of insurability satisfactory to the insurer

17.    Power to Take Out Life Policies

THE Trustees shall have power to effect and maintain out of the capital or income of the Trust Fund any policy of insurance or assurance upon the life of any person or under which the death of any person is one of the events under which moneys may be payable

18.    Power to Insure Property

THE Trustees shall have power to insure against any loss or damage from any peril any property for the time being comprised in the Trust Fund for any amount and to pay the premiums out of the Trust Fund

21

19.   Power to take Counsel's Opinion

THE Trustees shall have power to take the opinion of legal counsel locally or where necessary or appropriate elsewhere concerning any difference arising under the Settlement or any matter in any way relating to this Settlement or to their duties in connection with these trusts and in all matters to act in accordance with the opinion of such counsel.

20.   Release of Powers

THE Trustees may by deed or deeds and so as to bind their successors as trustees release or restrict the future exercise of all or any of the powers by this Settlement or by law conferred on them either wholly or to the extent specified in any such deed or deeds notwithstanding the fiduciary nature of any such power

21.   Power of Appropriation

THE Trustees shall have power in their absolute discretion to appropriate any part of the Trust Fund in its then actual condition or state of investment in or towards satisfaction of any interest or share in the Trust Fund as may in all the circumstances appear to them to be just and reasonable and for the above purposes from time to time to place such value on any or all investments or other property as they shall in their absolute discretion think fit

22.   Power to Receive Remuneration

NO Trustee shall be liable to account for any remuneration or other profit received by such Trustee in consequence of such Trustee acting as or being appointed to be a director officer or employee of any company notwithstanding that such appointment was procured by an exercise by such Trustee or by the Trustees of voting rights attached to securities comprised in the Trust Fund

23.   Power to Appoint Agents

THE Trustees shall have power instead of acting personally to employ and pay at the expense of the Trust Fund any agent in any part of the world whether attorneys solicitors accountants brokers banks trust companies or other agents without being responsible for the default of any agent if employed in good faith to transact any business or act as nominee or do any act in the execution of these trusts including without prejudice to the generality of the above the receipt and payment of moneys and the execution of documents

24.   Power to Pay Duties and Taxes

IN the event of any tax duty or fiscal imposition whatsoever becoming payable in Gibraltar or elsewhere in respect of the Trust Fund or any part thereof in any circumstances whatsoever the Trustees shall have power to pay all such taxes duties or fiscal impositions out of the Trust Fund or income thereof and shall have entire discretion as to the time and manner in which the said taxes duties or fiscal impositions shall be paid and the Trustees may pay such taxes duties or fiscal impositions notwithstanding that the same shall not be recoverable from the Trustees or the Beneficiaries or other persons entitled hereunder or that the payment shall not be to the advantage of any Beneficiary or other person entitled hereunder

25.   Power to Permit Self-Dealing

THE Trustees shall have power to enter into any transaction concerning the Trust Fund notwithstanding that one or more of the Trustees may be interested in the transaction other than as one of the Trustees

22



26.    Protection of Trustees

IN the execution of these trusts no Trustee shall be liable for any loss to the Trust Fund arising by reason of any improper investment made in good faith or for the negligence or fraud of any agent employed by such Trustee or by any of the Trustees although the employment of such agent was not strictly necessary or expedient or by reason of any mistake or omission made in good faith by such Trustee or by any of the Trustees or by reason of any matter or thing except wilful and individual fraud or dishonesty on the part of the Trustee who is sought to be made liable

27.    Delegation of Powers

27.1    THE Trustees may delegate to any one or more of their number the operation of any bank account in their names

27.2    Any Trustee shall have power at any time (notwithstanding any rule of law to the contrary) by deed or deeds revocable during the Trust Period or irrevocable and executed during the Trust Period to delegate to any person or to any corporate trustee (including in cases where there is more than one Trustee to any other or others of the Trustees) the exercise of all or any powers and discretions conferred on such Trustee notwithstanding the fiduciary nature of such power or powers

28.    Power to Pay Parent or Guardian

THE Trustees may pay to the parent or either parent or guardian of any minor any sum of income to be applied for the maintenance education or benefit of that minor or any sum of capital intended to be applied for the advancement or benefit of that minor so that the receipt of such parent or parents or guardian shall be a complete discharge to the Trustees and the Trustees shall not be required to enquire into the application of such sums

29.    Power to assign pledge charge or mortgage the Trust Fund

THE Trustees shall have power to assign pledge charge or mortgage the whole or any part of the Trust Fund by way of security for any borrowing guarantee or other obligation made given or indemnified by the Trustees or any debts or obligations of any Beneficiary or any liability incurred by them as Trustees


23

SECOND SCHEDULE

CHF 1,000   (ONE THOUSAND SWISS FRANCS)

Duly executed for and on behalf of        )
**NEXUS TREUHAND AG**                      )

Director

24

24

THE SUMMIT TRUST

LETTER OF WISHES

To the Trustees of the Summit Trust                    Date    April 2007

Dear Sirs,

I refer to the Summit Trust (the "Trust") created by Declaration of Trust dated 26 April / March 2007 by yourselves. As you are aware and have acknowledged, I am the undisclosed effective settlor of the Trust. As such, I am writing to set out and let you know my present wishes with respect to the Trust and the way in which its assets may be distributed in due course. I acknowledge and appreciate that you have absolute discretion pursuant to the trust deed as to whom or what you choose to benefit and as to the extent of benefit and as to the timing of any distributions out of the Trust Fund. Nevertheless, I feel that this letter – which contains only my wishes that are not intended to bind you or limit your discretion in any way – may be of assistance to you in your deliberations from time to time.

1.      It is my wish that, during my lifetime, I be treated as the principal and sole beneficiary of the Trust both with respect to the income and the capital of the Trust, although I may from time to time ask you to consider making one or more distributions to one or more members of my extended family.

2.      It is my wish that, after my death, my wife failing whom the lady I had been living with at the time of my death be treated as a beneficiary of the Trust to the extent of 10% and that she be consulted on a regular basis with respect to her financial needs and as to the timing of distributions from the Trust Fund (whether capital or income).

3.      It is my wish that, after my death, my child / children be treated as beneficiary / beneficiaries of the Trust in equal shares per stirpes to the extent of 90% in aggregate with the capital share of each such child being distributed to them absolutely upon their reaching the age of 30 years.

25

4.    It is my wish that, after my death and before my said child or children reach(es) the age of 30 years, you may utilise some or all of their intended share for their education, maintenance and benefit with a view to maintaining their standard of living to that to which they were accustomed during my lifetime.

5.    As you are aware, the Trust Fund consists primarily of holdings in subsidiary companies. It is my wish that, after my death, none of the intended beneficiaries mentioned above should seek to cause the said group of subsidiary companies to be broken up and/or liquidated in an untimely fashion. On the contrary, it is my wish that you take great care in managing such subsidiaries with advice from the Protector and such experts as you may deem fit. It is essential that the production of cash for distribution to intended beneficiaries is undertaken subject to careful consideration of the commercial feasibility thereof.

Please note that my wishes may change and, if they do, I shall write to you again. In the event of my death these wishes shall be treated as irrevocable. In the meantime, please acknowledge receipt hereof by signing and returning to me the enclosed copy.

Yours faithfully,



# The Summit Trust

Written resolution of Nexus Treuhand AG as trustee of the Summit Trust duly passed and recorded on this 20th day of April 2007

*Acceptance of trust assets*

IT IS HEREBY RESOLVED pursuant to clause 1 of the Declaration of Trust dated 20th April 2007 establishing the Summit Trust to accept as an addition to the Trust Fund the beneficial ownership of 100% of the company:

Talladega Invest Corp, a British Virgin Island company with registration number 1051761

RA Vedat Erduran

27

# The Summit Trust

### Deed of Removal of Beneficiary

Made this seventh day of June 2007

By Nexus Treuhand AG as Trustee of the Summit Trust

And by Fallon Invest & Trade Inc. as Protector of the Summit Trust

WHEREAS pursuant to clause 20 of the Declaration of Trust dated 20th April 2007 bringing the Summit Trust into existence the Trustee has power with the consent of the Protector to remove objects or persons as Beneficiaries of the Trust

AND WHEREAS a request has been received by the Trustee to remove The International Red Cross as a Beneficiary so as to leave no named intended Beneficiaries for the time being

AND WHEREAS the Trustee is agreeable to effecting such removal

AND WHEREAS the Protector is willing to give its consent to such removal

WITNESSETH as follows :

1.    The Trustee hereby irrevocably declares that with immediate effect The International Red Cross of 17 Chemin des Crets, P. O. Box 372, Geneva, Switzerland be and the same is hereby removed as a Beneficiary of the Summit Trust

2.    The Protector hereby irrevocably consents to the removal of The International red Cross as a Beneficiary of the Summit Trust

IN WITNESS WHEREOF this Deed has been duly executed by the parties on the day and year first before written

Executed by Nexus Treuhand AG            )
in accordance with its constitution and   )
the laws of its place of incorporation     )

Executed by Fallon Invest & Trade Inc.   )    MR AL GINOTRE
in accordance with its constitution and   )
the laws of its place of incorporation     )    MR DAVID MUFIELD

28

# Fallon Invest & Trade Inc.
## Pasea Estate, Road Town, Tortola, British Virgin Islands

R.A. Vedat Erduran
Nexus Treuhand AG
Zurcherstrasse 61
CH-7320 Sargans
Switzerland

18 March 2008

Dear Mr Erduran,

We are writing to you in our capacity as Directors of the Protector for the Summit Trust to request your resignation as Trustee with immediate effect pursuant to Clause 14 of the Declaration of Trust dated 20th April 2007.

We will be appointing the following as the new Trustee:

Mr. Moshe L. Popack, esq., M.B.A.
The Law office of Moshe Popack, PC
185-12 Union Turnpike
Fresh Meadows, NY 11366
P: 516-521-5110
F: 718-228-7935

It would be useful to meet in the very near future to arrange for the transfer of all documentation. Please confirm your acceptance of this request.

Regards,

David Ashfield                         Ali Gaidfar

C/o Morgan & Morgan Trust Corporation limited,
PO BOX 958, Pasea Estate, Road Town, Tortola, British Virgin Islands VG 1110,
Tel: +284 49 42011, Fax: +284 49 42015, Registered in the British Virgin Islands, No. 1008536

29

# Fallon Invest & Trade Inc.
## Pasea Estate, Road Town, Tortola, British Virgin Islands

Nexus Treuhand AG
Zurcherstrasse 61
CH-7320 Sargans
Switzerland

For the attention of Vedat Erduran, Esq.

26th March 2008

Dear Sirs,

We write with reference to our letter of 18th March 2008 in which we (as Protector of the Summit Trust) requested you to resign as trustee of the Summit Trust.

We hereby unconditionally retract our said letter and our request for you to resign and hereby confirm that we wish you to continue as trustee of the Summit Trust until further notice.

Yours faithfully

Fallon Invest & Trade Inc.
Per:

Ali Guidfar                              David Ashfield

30

**AJB-7**

2008 M No

**IN THE SUPREME COURT OF GIBRALTAR**
**CHANCERY JURISDICTION**

**IN THE MATTER** of the Civil Procedure Rules, Part 64, Section 1

and

**IN THE MATTER** of the Trustees Act

and

**IN THE MATTER** of the trusts known as The Valmore Trust and The Summit Trust

**BETWEEN**

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**

**Claimants**

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**

**Defendants**

---

**EXHIBIT "AJB7"**

---

This is the exhibit marked "AJB7" referred to in the Witness Statement of ANDREW JOHN
BAKER dated          this     day of              2008

Fw: URGENT

**Andrew Baker**

| | |
|---|---|
| **Von:** | David Ashfield [d.ashfield@londonintbank.com] |
| **Gesendet:** | Dienstag, 5. Dezember 2006 10:45 |
| **An:** | andrew.baker@miselva.li |
| **Cc:** | n.shachknova@btconnect.com |
| **Betreff:** | Fw: URGENT |

Andrew, please find attached the draft of the loan agreement. There is one obvious error on the signature page where the borrower and lender have been transposed. I would be grateful if you could complete withe the Montglimmer details and correct the error and any others that you pick up. The value date will be 6th December so I imagine we shoulkd change that? I will get for you also the signature of myself and Joseph as per our normal procedure for funds transfer. I also need to draft a letter of instructions to yourself from the UBO (BP?) Aithorising the transaction. We do need to instruct today. It may also be worth entering into an FRA given the USD performance but I will look into that. Regards,

David Ashfield

London International Bank Ltd
11 Grosvenor Place, SW1X 7HH
Mobile: +44 7887897329
Blackberry: +44 7921881027
Tel: +44 2071705591
Fax: +44 2071705510

-----Original Message-----
From: Natalin Shachkova
To: David Ashfield
Sent: Tue Dec 05 09:31:51 2006
Subject: URGENT

Go <<Loan_final.doc>> od morning David,

This is the last version of the Loan agreement.

Regards,

Natalia

Dear Natalya,
This is the final version of a Loan Agreement checked by the external counsel for compliance with Swiss and Liechtenstein law.
Please, put Lender's details and send it back to us.
Waiting for your reply and information about bank transfer. Our bankk is informed already and is ready to credit money on Coalco Int. account.

Thanks.
Ekaterina Mavrenkova.

17.04.2008

Seite 1 von 1

## Andrew Baker

**Von:**       David Ashfield [d.ashfield@londonintbank.com]

**Gesendet:** Dienstag, 5. Dezember 2006 11:54

**An:**        andrew.baker@miselva.li

**Betreff:**   Montglimmer

Andrew, attached is the transfer instruction we normally use along with our internal authorisation signed by me. I will get Joseph's signature later this afternoon as he is five hours behind us in Miami. BP's signature will come later. Regards,

David Ashfield

London International Bank Ltd
11 Grosvenor Place, SW1X 7HH
Mobile: +44 7887897329
Blackberry: +44 7921861027
Tel: +44 2071705591
Fax: +44 2071705510

2

 **London International Bank Ltd**

## TRANSFER REQUEST

TRANSFER REQUIRED BY
Joseph Kay

DETAILS OF TRANSFER
Loan to Coalco International Limited from Montglimmer Overseas Limited.

AMOUNT TO TRANSFER

| CURRENCY | USD $46,000,000 (From Euro Account) |
|---|---|
| (US Dollar, £) | |

BANK DETAILS:

| FROM: | Company: Montglimmer Overseas Limited<br>Account Name: Montglimmer Overseas Limited<br>Account No: 308150 |
|---|---|
| TO: | Bank: UBS AG, (Head Office), Zurich<br>Clearing #230<br>Account No: 230-354.094.64J<br>Swift Code: UBSWCHZH80A<br>In Favour of: Coalco International Ltd.<br>IBAN: CH09 0023 0230 3540 9464 J<br>Ref: Loan |

AUTHORISED BY: Lord J. Kay/David Ashfield

DATE: 05/12/06

EXECUTED BY: Daniel Lam

CASH BOOK LOGGED:

3

**Andrew Baker**

| | |
|---|---|
| **Von:** | David Ashfield [d.ashfield@londonintbank.com] |
| **Gesendet:** | Dienstag, 5. Dezember 2006 18:00 |
| **An:** | Andrew Baker |
| **Cc:** | Daniel Lam |
| **Betreff:** | Montglimmer Loan |

Andrew, attached are the authorisations that you needed for the Coalco loan. Daniel, please ensure that these are filed on the file of Montglimmer and are fully reflected in their financial statements. Regards,

**David Ashfield**

**London International Bank Ltd**
11 Grosvenor Place, SW1X 7HH
Mobile: +44 7887897329
Blackberry: +44 7921881027
Tel: +44 2071705591
Fax: +44 2071705510

4

 **London International Bank Ltd**

## TRANSFER REQUEST

| TRANSFER REQUIRED BY | |
| --- | --- |
| Joseph Kay | |

**DETAILS OF TRANSFER**

Loan to Coalco International Limited from Montglimmer Overseas Limited.

**AMOUNT TO TRANSFER**

| CURRENCY ( $, EURO, £ ) | USD $46,000,000 (From Euro Account) |
| --- | --- |

**BANK DETAILS:**

| FROM: | Company: Montglimmer Overseas Limited Account Name: Montglimmer Overseas Limited Account No: 308130 |
| --- | --- |
| TO: | Bank: UBS AG, (Head Office), Zurich Clearing #230 Account No: 230-354.094.64J Swift Code: UBSWCHZH80A In Favour of: Coalco International Ltd. IBAN: CH09 0023 0230 3540 9464 J Ref: Loan |

AUTHORISED BY: Lord J. Kay/David Ashfield

DATE: 05/12/06

EXECUTED BY: Daniel Lam

CASH BOOK LOGGED:

05-DEC-2006 16:20 DE :MEDICABLE S.A     +21222334333     A :00442072358085     P.2/2
05 DOC 06 16.44   Lakabrow Ltd                           00442072358085          p.2

Miselva Establishment
Att. Mr Andrew Baker
PO Box 635
Josef Rheinberger Strasse 29
Vaduz
FL-9490 Liechtenstein

5th December 2006

Dear Mr Baker,

Montglimmer Overseas Limited

This is to authorise you in your position as Director of Montglimmer Overseas
Limited to enter into the loan agreement of 5th December 2006 with Coalco Ltd for a
total of $46,000,000 for a period of one year at an interest rate of 10%.

Yours sincerely,

Mr Arkadi Patarkatsishvili



Seite 1 von 1

## Andrew Baker

**Von:**      Daniel Lam [d.lam@londonintbank.com]

**Gesendet:** Mittwoch, 20. Juni 2007 11:51

**An:**       andrew.baker@miselva.li

**Betreff:**  Georgian Deal

Hi Andrew,

As per our conversation we are currently trying to arrange a deal in Georgia whereby we will be purchasing land and building cottages on them.

The present scheme is that a Georgian Company (Belair) will purchase the land. There is apparently a trust agreement signed by Belair in favour of AP.

This structure will somewhat change as I have been instructed to set up a Luxembourg company to hold Belair, which I am currently working on. AP's name should not really be mentioned anywhere hence the new Lux Co. will be wholly owned by JK. The project however is 50% JK and 50% AP hence I would be grateful if you could recommend the best way for AP to hold his share.

Finally Natalia will be sending you documents in relation to the purchase of the land (be it quite a lot of pages) and I would kindly ask you to review them from a legal perspective to see if there is anything in them that may cause us concern. I will need feedback on this ASAP as the transfer of funds and the signing of the agreements will be done in the next few hours.

Sorry for the lack of advance warning but yet again I was only just told that this deal has to be completed by today.

Please also note that the funds will need to come out of Montglimmer's account in Hypo so I will also need your signature for the transfer request. I will shortly send you these transfers for signing (that is upon your approval of course).

Kind regards,

Daniel

Financial Controller
London International Bank
11 Grosvenor Place
London SW1X 7HH
Tel: +44 207 170 5592
Fax: +44 207 170 5510
Blackberry: +44 (0) 7738 135764
Email: d.lam@londonintbank.com

Registered in England, no. 5606242
Authorised and regulated by the Financial Services Authority

20.06.2007

7

Mr Joseph Kay
70 Walton Street
London SW3 2HH
UK

Mr William Cid De La Paz
Finsbury Trust
Suites 7B & 8B
50 Town Range
Gibraltar

22 January 2008

<u>RE: TRANSFER OF DIRECTORSHIP AND SHAREHOLDING</u>

Dear Mr. Cid De La Paz

Please accept this letter as my request and instruction to disclose all information pertaining to the below-mentioned companies to Mr. Andrew J. Baker at Miselva Etablissement, Vaduz and to co-operate with Mr. Baker and Miselva in (i) transferring the shares of the company, (ii) transferring the administration of the company to Miselva and (iii) appointing new directors and officers as Mr. Baker may direct.

1. Ascension Bay Limited
2. Liverpool Limited
3. Numina Securities Limited
4. Juliett Incorporated

I acknowledge that these provisions will be charged as per your administrative costs.

With thanks for your assistance.

Yours faithfully,

Mr. Joseph Kay

8

**AJB-8**

IN THE SUPREME COURT OF GIBRALTAR                    2008 M No
CHANCERY JURISDICTION

IN THE MATTER of the Civil Procedure Rules, Part 64, Section 1

and

IN THE MATTER of the Trustees Act

and

IN THE MATTER of the trusts known as The Valmore Trust and The Summit Trust

BETWEEN

MISELVA ETABLISSEMENT (1)
NEXUS TREUHAND AG (2)

Claimants

and

INNA GUDAVADZE (1)
JOSEPH KAY (2)
IYA PATARKATSISHVILI (3)
LIANA ZHMOTOVA (4)
FALLON INVEST & TRADE INC. (5)

Defendants

_____

EXHIBIT "AJB8"

_____

This is the exhibit marked "AJB8" referred to in the Witness Statement of ANDREW JOHN
BAKER dated        this        day of            2008

DATED _____ 31 December 2007 _____

(1) MISELVA ETABLISSEMENT AS TRUSTEE OF THE VALMORE TRUST

(2) JWL ENTERTAINMENT GROUP INC

AGREEMENT

for the sale and purchase of
the entire issued share capital of

CHAPEL STREET CONSTRUCTION LIMITED

Stevens & Bolton LLP
The Billings
GUILDFORD
GU1 4YD

Ref: JRP.KRH.LO1053.1

## CONTENTS

| | | Page No. |
|---|---|---|
| 1 | INTERPRETATION | 1 |
| 2 | SALE AND PURCHASE | 2 |
| 3 | CONSIDERATION | 2 |
| 4 | COMPLETION | 3 |
| 5 | WARRANTIES | 3 |
| 6 | FURTHER ASSURANCE | 3 |
| 7 | ASSIGNMENT | 4 |
| 8 | WHOLE AGREEMENT | 4 |
| 9 | VARIATION AND WAIVER | 4 |
| 10 | SEVERANCE | 4 |
| 11 | THIRD PARTY RIGHTS | 5 |
| 12 | COUNTERPARTS | 5 |
| 13 | GOVERNING LAW AND JURISDICTION | 5 |

2

THIS AGREEMENT is dated 31 December 2007

PARTIES

(1)    MISELVA ETABLISSEMENT as trustee of the Valmore Trust, a private company incorporated and registered in Liechtenstein whose registered office is at Josef Rheinberger Strasse 29, P.O. Box 635, FIL-9490 Vaduz, Liechtenstein ("Seller").

(2)    JWL ENTERTAINMENT GROUP INC, a private company incorporated and registered in the State of Delaware with EIN number 20-2569110 whose address is at Blumbergexcelsior Corporate Services Inc, 3500 South DuPont Highway, Dover, DE 19901, County of KENT in the State of Delaware, United States of America ("Buyer").

BACKGROUND

(A)    The Seller has agreed to sell and the Buyer has agreed to buy the Sale Shares subject to and on the terms and conditions of this agreement.

(B)    The Seller is the registered holder of the Sale Shares of the Company at the date hereof and holds these Sale Shares as trustee of the Valmore Trust.

(C)    The Seller is willing to sell and the Buyer is willing to buy the Sale Shares with all rights attaching to them from the Effective Date for the Consideration and upon the terms set out in this agreement

AGREED TERMS

1    INTERPRETATION

1.1    The definitions and rules of interpretation in this clause apply in this agreement.

| | |
|---|---|
| Buyer's Shares | one (1) share of no par value in the capital of the Buyer; |
| Company | Chapel Street Construction Limited, a private company limited by shares incorporated and registered in England and Wales with company number 05717163 whose registered office is at 3rd Floor, 11 Grosvenor Place, London, SW1X 7HH with an issued share capital of one (1) ordinary share of £1; |
| Completion | completion of the sale and purchase of the Sale Shares in accordance with this agreement; |
| Completion Date | the date of this agreement; |
| Consideration | the consideration for the sale and purchase of the Sale Shares set out in clause 3; |
| Encumbrance | any interest or equity of any person (including any right to acquire, option or |

1

3

|  |  | right of pre-emption) or any mortgage, charge, pledge, lien, assignment, hypothecation, security, interest, title, retention or any other security agreement or arrangement; |
|--|--|--|
|  | Effective Date | 31 December 2007; |
|  | Sale Shares | the one (1) ordinary share of £1 in the Company, comprising the whole of the allotted and issued share capital of the Company; |
|  | Warranties | the statements set out in clause 5. |

1.2    Clause and schedule headings do not affect the interpretation of this agreement.

1.3    A reference to a clause or a schedule is a reference to a clause of, or schedule to, this agreement. A reference to a paragraph is to a paragraph of the relevant schedule, and a reference to an appendix is to the relevant appendix to this agreement.

1.4    A person includes a corporate or unincorporated body.

1.5    Words in the singular include the plural and in the plural include the singular.

1.6    A reference to one gender includes a reference to the other gender.

1.7    A reference to a statute, statutory provision or any subordinate legislation made under a statute is to such statute, provision or subordinate legislation as amended or re-enacted from time to time whether before or after the date of this agreement and, in the case of a statute, includes any subordinate legislation made under that statute whether before or after the date of this agreement.

1.8    Writing or written includes faxes but not e-mail.

1.9    Documents in agreed form are documents in the form agreed by the parties or on their behalf and initialled by them or on their behalf for identification.

1.10   Where the words include(s), including or in particular are used in this agreement, they are deemed to have the words "without limitation" following them.

1.11   References to this agreement include this agreement as amended or varied in accordance with its terms.


2      SALE AND PURCHASE

The Seller shall sell with full title guarantee subject to all Encumbrances existing at the Effective Date and the Buyer shall buy the Sale Shares, together with all rights that attach (or may in the future attach) to them on or after the Effective Date, including, in particular, the right to receive all dividends and distributions declared, made or paid thereon.


3      CONSIDERATION

The Consideration for the sale of the Sale Shares shall be the issue and allotment on Completion to the Seller of the Buyer's Shares credited as fully paid.

2

4      COMPLETION

4.1    Completion shall take place on the Completion Date.

4.2    At Completion the Seller shall deliver or cause to be delivered:

      4.2.1   transfers of the Sale Shares executed by the registered holders in favour of the Buyer;

      4.2.2   the share certificates for the Sale Shares in the names of the registered holders or an indemnity in the agreed form for any lost certificates; and

      4.2.3   the statutory register and minute books of the Company (written up to the time of Completion), the common seal, certificate of incorporation and any certificates of incorporation on change of name;

4.3    On the Completion Date the Seller shall procure that the directors of the Company shall hold a board meeting at which the transfer of the Sale Shares (subject to stamping) to the Buyer shall be approved for registration in the Company's statutory register.

4.4    At Completion the Buyer shall

      4.4.1   procure the transfer of the Buyer's Shares in satisfaction of the Consideration and deliver as soon as reasonably practicable following Completion definitive share certificates in respect of such Buyer's Shares (in the name of the Seller) to the Seller; and

      4.4.2   enter the Seller's name in the register of members of the Buyer in respect of the number of Buyer's Shares held by the Seller.

4.5    As soon as possible after Completion the Seller shall deliver to the Buyer all documents of title, records, correspondence, documents, files, memoranda and other papers relating to the Company, not required to be delivered at Completion which are in its possession

5      WARRANTIES

5.1    The Seller warrants and represents to the Buyer that each of the Warranties set out in this clause 5 is true and accurate and not misleading at the date of this agreement:

      5.1.1   the Sale Shares constitute the whole of the allotted and issued share capital of the Company and are fully paid; and

      5.1.2   the Seller is the sole legal owner of the Sale Shares as trustee of the Valmore Trust.

6      FURTHER ASSURANCE

Each party shall (at its own expense) promptly execute and deliver all such documents, and do all such things, or procure the execution of documents and doing of such things as are required to give full effect to this agreement and the transaction intended to be effected pursuant to it.

7    ASSIGNMENT

Neither party may assign or transfer any of its rights, benefits or obligations under this agreement. Each party confirms that it is acting on its own behalf and on no-one else's.

8    WHOLE AGREEMENT

8.1    This agreement constitutes the whole agreement and understanding of the parties and supersedes any previous arrangements, understanding or agreement between the parties relating to the subject matter of this agreement. Save as expressly provided, and to the maximum extent they may be excluded by contract, this agreement excludes any warranty, covenant, condition or undertaking which may be implied by law. The Buyer acknowledges that it has not been induced to enter into this agreement by, and so far as permitted by law and except in the case of fraud, hereby waives any remedy in respect of, any warranties, representations, undertakings, promises or assurances not incorporated expressly into this agreement.

8.2    Nothing in this clause shall operate to limit or exclude any liability for fraud.

9    VARIATION AND WAIVER

9.1    Any variation of this agreement must be in writing and signed by or on behalf of the parties.

9.2    Any waiver of any right under this agreement is only effective if it is in writing and it applies only to the party to whom the waiver is addressed and to the circumstances for which it is given.

9.3    No failure to exercise or delay in exercising any right or remedy provided under this agreement or by law constitutes a waiver of such right or remedy nor shall it prevent any future exercise or enforcement thereof.

9.4    No single or partial exercise of any right or remedy under this agreement shall preclude or restrict the further exercise of any such right or remedy or other rights or remedies.

10    SEVERANCE

10.1    If any provision of this agreement (or part of a provision) is found by any court or administrative body of competent jurisdiction to be invalid, unenforceable or illegal, that provision shall be ineffective to the extent of such illegality, invalidity or unenforceability but the other provisions shall remain in force.

10.2    If any invalid, unenforceable or illegal provision would be valid, enforceable or legal if some part of it were deleted, the provision shall apply with the minimum modification necessary to make it legal, valid and unenforceable.





11    THIRD PARTY RIGHTS

No term of this agreement shall be enforceable under the Contracts (Rights of Third Parties) Act 1999 by a person who is not a party to this agreement, but this does not affect any right or remedy of a third party which exists or is available apart from under that Act.

12    COUNTERPARTS

This agreement may be executed in any number of counterparts, each of which when executed and delivered constitutes an original of this agreement but all the counterparts shall together constitute the same agreement.

13    GOVERNING LAW AND JURISDICTION

13.1    This agreement and any disputes or claims arising out of or in connection with its subject matter are governed by and construed in accordance with the law of New York.

13.2    The parties irrevocably agree that the courts of New York have exclusive jurisdiction to settle any dispute or claim that arises out of or in connection with this agreement.

This agreement has been entered into on the date stated at the beginning of it.

Signed by ANDREW BAKER for and      )
on      behalf      of      MISELVA      )
ETABLISSEMENT as trustee of the      )
VALMORE TRUST.                        )

Signed by a director for and on behalf of      )
JWL ENTERTAINMENT GROUP      )
INC.                        )

5

7

STOCK
TRANSFER
FORM

(Above this line for Registrars only)

Certificate lodged with the Registrar

Consideration Money £ ___ (For completion by the Registrar/Stock Exchange)

Name of Undertaking | SHAPED STREET CONSTRUCTION LIMITED

Description of Security | ORDINARY SHARES OF £1 EACH

| | Words | | Figures |
| | ONE | | ( ) units of £1 ( ) |

In the name(s) of

BIRALVA ETABLISSEMENT AS TRUSTEE OF THE VALMORS TRUST
JETZT RHEINBERGER STRASSE 29
P.O. BOX 635
FIL 9491 VADUZ
LIECHTENSTEIN

I/We hereby transfer the above security out of the name(s) aforesaid to the person(s) named below

Signature(s) of transferor(s)

Stamp of Selling Banker(s) or, for transactions which are not stock exchange transactions, of Agent(s), if any, acting for the Transferor(s)

Date 31.12.2007

BCL FIDUCIARY GROUP INC
BELINDERGUNDERSTOP CORPORATE SERVICES INC.
1304 SOUTH DUPONT HIGHWAY
DOVER
DE 1990?
COUNTY OF KENT
STATE OF DELAWARE
UNITED STATES OF AMERICA

I/We request that such entries be made in the register as are necessary to give effect to this transfer

Stamp or name and address of person lodging this form (if other than the buying broker(s))

Stevens & Bolton LLP
The Billings, Guildford, Surrey, GU1 4YD

2423   Guildford J
01483302384

Reference to the Registrar in this form means, the registrar or registration agent of the undertaking, not the Registrar of Companies at Companies House.

## FORM OF CERTIFICATE REQUIRED FOR EXEMPTION FROM STAMP DUTY

Instruments of transfer executed on or after 1 May 1987 are exempt from stamp duty when the transaction falls within one of the following categories and will not need to be sent to stamp offices provided they are certified as below in accordance with the Stamp Duty (Exempt Instruments) Regulations 1987.

|     |     |
| --- | --- |
| A. | The vesting of property vested in a trustee of the trustees of the trust on the appointment of a new trustee, or in the continuing trustees on the retirement of a trustee. |
| B. | The conveyance or transfer of property the subject act of a specific devise or legacy to the beneficiary named in the will (or his nominee). |
| C. | The conveyance or transfer of property which forms part of an intestate's estate to the person entitled on intestacy (or his nominee). |
| D. | The appropriation of property within section 84(4) of the Finance Act 1985 (death: appropriation in satisfaction of a general legacy of money) or section 84(5) or (7) (death: appropriation in satisfaction of any interest of surviving spouse in civil partner and in Scotland also of any interest of issue). |
| E. | The conveyance or transfer of property which forms part of the residuary estate of a testator to a beneficiary (or his nominee) entitled solely by virtue of his entitlement under the will. |
| F. | The conveyance or transfer of property out of a settlement in or towards satisfaction of a beneficiary's interest, not being an interest acquired for money or money's worth, being a conveyance or transfer constituting a distribution of property in accordance with the provisions of the settlement. |
| G. | The conveyance or transfer of property on and in consideration only of marriage to a party to the marriage (or his nominee) or to trustees to be held on the terms of a settlement made in consideration only of the marriage. |
| GA. | The conveyance or transfer of property on and in consideration only of the formation of a civil partnership to a party to the civil partnership (or his nominee) or to trustees to be held on the terms of a settlement made in consideration only of the civil partnership. |
| H. | The conveyance or transfer of property within section 83(1) of the Finance Act 1985 (transfers in connection with divorce or dissolution of civil partnership etc.). |
| I. | The conveyance or transfer by the liquidator of property which formed part of the assets of the company in liquidation to a shareholder of the company in his capacity as such towards distribution of the shareholder's rights on a winding up. |
| J. | The grant in fee simple of an easement in or over land for no consideration in money or money's worth. |
| K. | The grant of a servitude for no consideration in money or money's worth. |
| L. | The conveyance or transfer of property operating as a voluntary disposition inter vivos for no consideration in money or money's worth nor any consideration referred to in section 57 (the Stamp Act 1891 (conveyance in consideration of a debt etc.). |
| M. | The conveyance or transfer of property by an instrument within section 84(1) of the Finance Act 1985 (death: varying dispositions). |

| Insert "A to M" as appropriate | (1) | I/We hereby certify that this instrument falls within category [ ]  in the Schedule to the Stamp Duty (Exempt Instruments) Regulations 1987 set out above. |
| Delete this paragraph if not applicable | (2) | I/We, not being the transferee/grantee, in the statement hereby state that I/we are authorised to sign this certificate and that I/we know the details of, and acts relative to the knowledge of the facts stated in it. |
| In the case of a transferor or transferee or their solicitor or duly authorised agent | (3) | Date [ ]    Case [ ] |
| | (4) | Signature    Description or capacity of signatory |
| Where signed by a personal representative, trustee, grantor or solicitor, other particulars should be stated | | |

## FORM OF CERTIFICATE REQUIRED WHERE THE TRANSFER IS NOT EXEMPT BUT IS NOT LIABLE TO AD VALOREM STAMP DUTY

Instruments of transfer are liable to a fixed duty of £5 or when the transaction falls within one of the following categories and needs to be forwarded to the Stamp office.

|     |     |
| --- | --- |
| (1) | Transfer by way of security for a loan or retransfer to the original transferor on repayment of a loan. |
| (2) | Transfer not on sale and not on any indebtedness of sale and where no beneficial interest in the property passes. (a) to a person who is a mere nominee of, and is in trust only solely by, the transferor; (b) from a mere nominee who has at all times held the property on behalf of the transferor; (c) from one nominee to another nominee of the same beneficial owner where the first nominee has at all times held the property on behalf of that beneficial owner. (N.B.: This category does not include a transfer made in any of the following circumstances: (i) by a holder of stock, etc., following the grant of an option to purchase the stock, to the person entitled to the option or his nominee; (ii) to a nominee in contemplation of a contract for the sale of the stock, etc., then about to be entered into; (iii) from the nominee of a vendor, who has instructed the nominee to hold on sale or by some unnamed writing to hold stock, etc., in trust for a purchaser, to such purchaser.) |

| Insert (1) or (2) | | I/We hereby certify that the transaction in respect of which this transfer is made is one which falls within the category [ ]  above. I/We and/or that I/we have been duly authorised by the transferor to sign this certificate and that the facts of the transaction are within my own knowledge. |

| The signatory should give his description, e.g. "transferor", "transferee's solicitor" as appropriate | | Signature    Description "transferor", "solicitor", etc. |

N.B. If none of the above declarations can be given then the transfer should be submitted to the Stamp Office and usually will attract ad valorem Stamp Duty.

9

DATED     31 December 2007

(1) MISELVA ETABLISSEMENT AS TRUSTEE OF THE VALMORE TRUST

(2) JWL ENTERTAINMENT GROUP INC

AGREEMENT

for the sale and purchase of
the entire issued share capital of

CHESTER STREET ENTERPRISES LIMITED

Stevens & Bolton LLP
The Billings
GUILDFORD
GU1 4YD

Ref: JRP.KRH.LO1053.1

*10*

# CONTENTS

| | | Page No. |
|---|---|---|
| 1 | INTERPRETATION | 1 |
| 2 | SALE AND PURCHASE | 2 |
| 3 | CONSIDERATION | 2 |
| 4 | COMPLETION | 3 |
| 5 | WARRANTIES | 3 |
| 6 | FURTHER ASSURANCE | 3 |
| 7 | ASSIGNMENT | 4 |
| 8 | WHOLE AGREEMENT | 4 |
| 9 | VARIATION AND WAIVER | 4 |
| 10 | SEVERANCE | 4 |
| 11 | THIRD PARTY RIGHTS | 5 |
| 12 | COUNTERPARTS | 5 |
| 13 | GOVERNING LAW AND JURISDICTION | 5 |

THIS AGREEMENT is dated 31 December 2007

PARTIES

(1)  MISELVA ETABLISSEMENT as trustee of the Valmore Trust, a private company
     incorporated and registered in Liechtenstein whose registered office is at Josef
     Rheinberger Strasse 29, P.O. Box 635, FL-9490 Vaduz, Liechtenstein ("Seller").

(2)  JWL ENTERTAINMENT GROUP INC, a private company incorporated and
     registered in the State of Delaware with EIN number 20-2569110 whose address is
     at Blumbergexcelsior Corporate Services Inc. 3500 South DuPont Highway, Dover,
     DE 19901, County of KENT in the State of Delaware, United States of America
     ("Buyer").

BACKGROUND

(A)  The Seller has agreed to sell and the Buyer has agreed to buy the Sale Shares subject
     to and on the terms and conditions of this agreement

(B)  The Seller is the registered holder of the Sale Shares of the Company at the date
     hereof and holds these Sale Shares as trustee of the Valmore Trust.

(C)  The Seller is willing to sell and the Buyer is willing to buy the Sale Shares with all
     rights attaching to them from the Effective Date for the Consideration and upon the
     terms set out in this agreement.

AGREED TERMS

1    INTERPRETATION

1.1  The definitions and rules of interpretation in this clause apply in this agreement.

| | |
|---|---|
| Buyer's Shares | one (1) share of no par value in the capital of the Buyer; |
| Company | Chester Street Enterprises Limited, a private company limited by shares incorporated and registered in England and Wales with company number 06241160 whose registered office is at Bridge House, 25 Fiddlebridge Lane, Hatfield, Hertfordshire, AL10 0SP with an issued share capital of one (1) ordinary share of £1; |
| Completion | completion of the sale and purchase of the Sale Shares in accordance with this agreement; |
| Completion Date | the date of this agreement; |
| Consideration | the consideration for the sale and purchase of the Sale Shares set out in clause 3; |
| Encumbrance | any interest or equity of any person (including any right to acquire, option or |

1

12

|  | right of pre-emption) or any mortgage, charge, pledge, lien, assignment, hypothecation, security, interest, title, retention or any other security agreement or arrangement; |
| Effective Date | 31 December 2007; |
| Sale Shares | the one (1) ordinary share of £1 in the Company, comprising the whole of the allotted and issued share capital of the Company; |
| Warranties | the statements set out in clause 5. |

1.2  Clause and schedule headings do not affect the interpretation of this agreement.

1.3  A reference to a clause or a schedule is a reference to a clause of, or schedule to, this agreement. A reference to a paragraph is to a paragraph of the relevant schedule, and a reference to an appendix is to the relevant appendix to this agreement.

1.4  A person includes a corporate or unincorporated body.

1.5  Words in the singular include the plural and in the plural include the singular.

1.6  A reference to one gender includes a reference to the other gender.

1.7  A reference to a statute, statutory provision or any subordinate legislation made under a statute is to such statute, provision or subordinate legislation as amended or re-enacted from time to time whether before or after the date of this agreement and, in the case of a statute, includes any subordinate legislation made under that statute whether before or after the date of this agreement.

1.8  Writing or written includes faxes but not e-mail.

1.9  Documents in agreed form are documents in the form agreed by the parties or on their behalf and initialled by them or on their behalf for identification.

1.10  Where the words include(s), including or in particular are used in this agreement, they are deemed to have the words "without limitation" following them.

1.11  References to this agreement include this agreement as amended or varied in accordance with its terms.

2    SALE AND PURCHASE

The Seller shall sell with full title guarantee subject to all Encumbrances existing at the Effective Date and the Buyer shall buy the Sale Shares, together with all rights that attach (or may in the future attach) to them on or after the Effective Date, including, in particular, the right to receive all dividends and distributions declared, made or paid thereon.

3    CONSIDERATION

The Consideration for the sale of the Sale Shares shall be the issue and allotment on Completion to the Seller of the Buyer's Shares credited as fully paid.

13

4    COMPLETION

4.1    Completion shall take place on the Completion Date.

4.2    At Completion the Seller shall deliver or cause to be delivered:

4.2.1    transfers of the Sale Shares executed by the registered holders in favour of the Buyer;

4.2.2    the share certificates for the Sale Shares in the names of the registered holders or an indemnity in the agreed form for any lost certificates; and

4.2.3    the statutory register and minute books of the Company (written up to the time of Completion), the common seal, certificate of incorporation and any certificate of incorporation on change of name;

4.3    On the Completion Date the Seller shall procure that the directors of the Company shall hold a board meeting at which the transfer of the Sale Shares (subject to stamping) to the Buyer shall be approved for registration in the Company's statutory register.

4.4    At Completion the Buyer shall:

4.4.1    procure the transfer of the Buyer's Shares in satisfaction of the Consideration and deliver as soon as reasonably practicable following Completion definitive share certificates in respect of such Buyer's Shares (in the name of the Seller) to the Seller; and

4.4.2    enter the Seller's name in the register of members of the Buyer in respect of the number of Buyer's Shares held by the Seller.

4.5    As soon as possible after Completion the Seller shall deliver to the Buyer all documents of title, records, correspondence, documents, files, memoranda and other papers relating to the Company not required to be delivered at Completion which are in its possession.

5    WARRANTIES

5.1    The Seller warrants and represents to the Buyer that each of the Warranties set out in this clause 5 is true and accurate and not misleading at the date of this agreement:

5.1.1    the Sale Shares constitute the whole of the allotted and issued share capital of the Company and are fully paid; and

5.1.2    the Seller is the sole legal owner of the Sale Shares as trustee of the Valmore Trust.

6    FURTHER ASSURANCE

Each party shall (at its own expense) promptly execute and deliver all such documents, and do all such things, or procure the execution of documents and doing of such things as are required to give full effect to this agreement and the transaction intended to be effected pursuant to it.



3

14

7    ASSIGNMENT

Neither party may assign or transfer any of its rights, benefits or obligations under this agreement. Each party confirms that it is acting on its own behalf and on no-one else's.

8    WHOLE AGREEMENT

8.1    This agreement constitutes the whole agreement and understanding of the parties and supersedes any previous arrangements, understanding or agreement between the parties relating to the subject matter of this agreement. Save as expressly provided, and to the maximum extent they may be excluded by contract, this agreement excludes any warranty, covenant, condition or undertaking which may be implied by law. The Buyer acknowledges that it has not been induced to enter into this agreement by, and so far as permitted by law and except in the case of fraud, hereby waives any remedy in respect of, any warranties, representations, undertakings, promises or assurances not incorporated expressly into this agreement.

8.2    Nothing in this clause shall operate to limit or exclude any liability for fraud.

9    VARIATION AND WAIVER

9.1    Any variation of this agreement must be in writing and signed by or on behalf of the parties.

9.2    Any waiver of any right under this agreement is only effective if it is in writing and it applies only to the party to whom the waiver is addressed and to the circumstances for which it is given.

9.3    No failure to exercise or delay in exercising any right or remedy provided under this agreement or by law constitutes a waiver of such right or remedy nor shall it prevent any future exercise or enforcement thereof.

9.4    No single or partial exercise of any right or remedy under this agreement shall preclude or restrict the further exercise of any such right or remedy or other rights or remedies.

10    SEVERANCE

10.1    If any provision of this agreement (or part of a provision) is found by any court or administrative body of competent jurisdiction to be invalid, unenforceable or illegal, that provision shall be ineffective to the extent of such illegality, invalidity or unenforceability but the other provisions shall remain in force.

10.2    If any invalid, unenforceable or illegal provision would be valid, enforceable or legal if some part of it were deleted, the provision shall apply with the minimum modification necessary to make it legal, valid and unenforceable.



4

15

11    THIRD PARTY RIGHTS

No term of this agreement shall be enforceable under the Contracts (Rights of Third Parties) Act 1999 by a person who is not a party to this agreement, but this does not affect any right or remedy of a third party which exists or is available apart from under that Act.

12    COUNTERPARTS

This agreement may be executed in any number of counterparts, each of which when executed and delivered constitutes an original of this agreement but all the counterparts shall together constitute the same agreement.

13    GOVERNING LAW AND JURISDICTION

13.1    This agreement and any disputes or claims arising out of or in connection with its subject matter are governed by and construed in accordance with the law of New York.

13.2    The parties irrevocably agree that the courts of New York have exclusive jurisdiction to settle any dispute or claim that arises out of or in connection with this agreement.

This agreement has been entered into on the date stated at the beginning of it.

Signed by ANDREW BAKER for and    )
on    behalf    of    MISELVA    )
ETABLISSEMENT as trustee of the    )
VALMORE TRUST.    )

Signed by a director for and on behalf of    )
JWL ENTERTAINMENT GROUP    )
INC.    )

5

16

STOCK
TRANSFER
FORM

(Above this line for Registrars only)

| ONE SHARE AT NO PAR VALUE IN THE CAPITAL OF THE ENTERTAINMENT GROUP INC. | Certificate lodged with the Registrar |

Consideration Money £ _____    (For completion by the Registrar Stock Exchange)

Name of Undertaking    CINEMA SPEED ENTERPRISES LIMITED

Description of Security    ORDINARY SHARES OF £1 EACH

| Number or amount of Shares, Stock or other security and, in figures column only, number and denomination of units, if any. | Words | Figures |
|---|---|---|
| | ONE | ___ ___ units of £___ ) |

In the name(s) of

MICELVA ETABLISSEMENT AS TRUSTEE OF THE VALMORE TRUST
JOSEF NEUENBERGER STRASSE 29
P.O. BOX 635
FL 9490 VADUZ
LIECHTENSTEIN

I/We hereby transfer the above security out of the name(s) aforesaid to the person(s) named below

Signature(s) of transferor(s)

[signature]

Stamp of Selling Broker(s) or, for transactions which are not stock exchange transactions, of Agent(s), if any, acting for the Transferor(s)

Date  31. 12. 2007

A body corporate should execute this transfer under its common seal or otherwise in accordance with applicable statutory requirements.

| Full name(s) and full postal address(es) (including County or, if applicable, Postal District number) of the person(s) to whom the security is transferred | IHC ENTERTAINMENT GROUP INC. SLUMBERSACK TELSTOF CORPORATE SERVICES INC. 1105 NORTH DUPONT HIGHWAY DOVER DE 1946 COUNTY OF KENT STATE OF DELAWARE UNITED STATE OF AMERICA |

I/We request that such entries be made in the register as are necessary to give effect to this transfer.

| Stamp of name and address of person lodging this form (if other than the buying broker(s)) |
|---|
| Stevens & Bolton LLP The Billings, Guildford, Surrey, GU1 4YD 2623  Guildford 01483382264 |

Reference to the Registrar in this form means the registrar or registration agent of the undertaking, not the Registrar of Companies at Companies House

17

## FORM OF CERTIFICATE REQUIRED FOR EXEMPTION FROM STAMP DUTY

Instruments of transfer executed on or after 1 May 1987 are exempt from stamp duty when the transaction falls within one of the following categories and will not have to be given a stamp office produced they are certified as being in accordance with the Stamp Duty (Exempt Instruments) Regulations 1987

A.    The vesting of property subject to a trust in the Trustee of the trust on the appointment of a new trustee, or in the continuing trustee on the retirement of a trustee.

B.    The conveyance or transfer of property the subject of a specific devise or legacy to the beneficiary named in the will (or his nominee)

C.    The conveyance or transfer of property which forms part of an intestate's estate to the person entitled on intestacy (or his nominee)

D.    The appropriation of property within section 84(4) of the Finance Act 1985 (death: appropriation in satisfaction of a general legacy of money) or in section 84(5) or (7) of that Act (death: appropriation in satisfaction of any interest of surviving spouse or civil partner and in Scotland also of any interest of issue.)

E.    The conveyance or transfer of property which forms part of the residuary estate of a testator to a beneficiary (or his nominee) entitled solely by virtue of his entitlement under the will

F.    The conveyance or transfer of property out of a settlement in or towards satisfaction of a beneficiary's interest, not being an interest acquired for money or money's worth, being a conveyance or transfer constituting a distribution of property in accordance with the provisions of the settlement

G.    The conveyance or transfer of property on and in consideration only of marriage to a party to the marriage (or his nominee) or to the trustees to be held on terms of a settlement made in consideration only of the marriage.

(G1)  The conveyance or transfer of property on and in consideration only of the formation of a civil partnership to a party to the civil partnership (or his nominee) or to the trustees to be held on the terms of a settlement made in consideration only of the civil partnership.

H.    The conveyance or transfer of property within section 83(1) or 83A of the Finance Act 1985 (transfers in connection with divorce or dissolution of civil partnership etc.)

I.    The conveyance or transfer by the liquidator of property which formed part of the assets of the company in liquidation to a shareholder of the company from his share entitlement by way of distribution of the shareholder's interest or in a winding up

J.    The grant in fee simple of an easement in or over land for no consideration in money or money's worth

K.    The grant of a servitude for no consideration in money or money's worth

L.    The conveyance or transfer of property operating as a voluntary disposition inter vivos for no consideration in money or money's worth nor any consideration referred to in section 57 of the Stamp Act 1891 (conveyance in consideration of a debt etc.)

M.    The conveyance or transfer of property by an instrument within section 84(1) of the Finance Act 1985 (death: varying dispositions)

1     Insert A to H as appropriate category

I/We hereby certify that this instrument falls within category (1) ... in the Schedule to the Stamp Duty (Exempt Instruments) Regulations 1987 set out above

2a   Delete this paragraph if not applicable

(2a)  I/We, not being the transferor ... nominee, of the undersigned hereof, state that I/we are authorised to sign this certificate and that I/we have this certificate been never seen knowledge of the facts stated in it

3b   To be signed by ... transferor or nominee or by a partner in sole proprietor duly authorised agent

(3)   Dated this .......... day of ..........

4b   Where signed by a nominee, solicitor, accountant or bank or other duly authorised agent

(b)   Signatories ..........    (b)  Description or capacity of signatory ..........

## FORM OF CERTIFICATE REQUIRED WHERE THE TRANSFER IS NOT EXEMPT BUT IS NOT LIABLE TO AD VALOREM STAMP DUTY

Instruments of transfer are liable to a fixed duty of £5 per share when the transaction falls within one of the following categories and needs to be forwarded to the Stamp Office.

(1)   Transfer to a bare nominee or transfer back from such nominee or the original transferor on repayment of a loan.

(2)   Transfer ... on sale and not at/on a gift of any contract of sale where no beneficial interest in the property passes (a) to a person who is a mere nominee of, and is no entitled and who by the transferor, (b) from a mere nominee who has of all interest held the property on behalf of the transferor, or (c) from one nominee to another nominee of the same beneficial owner where the first nominee has it all times held the property on behalf of that beneficial owner (d) This category does not include a transfer made in any of the following circumstances: (i) by a holder of stock etc... following the grant of an option to purchase the stock, to the person entitled to the option in his nominee, or to a person in consideration of a contract for the sale of the stock, etc. (here about to be entered into) (iii) from the issuance of a vendor, who has executed the document oral or by some unstamped writing to hold stock, etc. in trust for a purchaser, to such purchaser.

2     Insert category

I/We hereby certify that the transaction in respect of which this transfer is made is one which falls within the category ... above. I/We confirm that I/we have been duly authorised by the transferor to sign this certificate and that the facts of the transaction are within my our knowledge.

3     Here give a grounds for the facts giving rise to the certificate if certified by other than transferor or assignor

Signatories ..........    Description "Transferor", "Indenture", etc...

Date ..........

4     If none of the above certifications can be given in on the transfer should be submitted to the Stamp Office and stamp with affixed ad valorem Stamp Duty

18

Company No. 962-41160

## CHESTER STREET ENTERPRISES LIMITED

("Company")

Minutes of a meeting of the board of directors of the Company held at Josef Rheinberger Strasse 29, Vaduz, Liechtenstein on 31 December 2007

---

Present:         Andrew Baker

In attendance:   Silvia Matt

---

1    Quorum

Andrew Baker agreed to chair the meeting and Silvia Matt agreed to take the minutes. The chairman declared the meeting open, there being a quorum present.

2    Transfer of the entire issued share capital of the Company

2.1   There was produced to the meeting a transfer of shares in the capital of the Company as follows:

| Transferor | No. of ordinary shares of £1 each | Transferee |
|---|---|---|
| Miselva Etablissement as trustee of the Valmore Trust | 1 | JWL Entertainment Group Inc |

2.2   It was resolved that the transfer be approved and, subject to the same being duly stamped, registered and that, subject as aforesaid, the relative share certificate be executed and issued to the transferee accordingly.

3    Any other business

There being no further business the meeting was closed.

---

Chairman                              Secretary

1

19

DATED _____ 31 December 2007 _____


(1) MISELVA ETABLISSEMENT AS TRUSTEE OF THE VALMORE TRUST

(2) JWL ENTERTAINMENT GROUP INC


AGREEMENT

for the sale and purchase of
the entire issued share capital of

FISHER ISLAND LIMITED


Stevens & Bolton LLP
The Billings
GUILDFORD
GU1 4YD

Ref: JRP.KRH.LO1053.1

20

CONTENTS

|    |                                   | Page No. |
|----|-----------------------------------|----------|
| 1  | INTERPRETATION                    | 1        |
| 2  | SALE AND PURCHASE                 | 2        |
| 3  | CONSIDERATION                     | 2        |
| 4  | COMPLETION                        | 3        |
| 5  | WARRANTIES                        | 3        |
| 6  | FURTHER ASSURANCE                 | 3        |
| 7  | ASSIGNMENT                        | 4        |
| 8  | WHOLE AGREEMENT                   | 4        |
| 9  | VARIATION AND WAIVER              | 4        |
| 10 | SEVERANCE                         | 4        |
| 11 | THIRD PARTY RIGHTS                | 4        |
| 12 | COUNTERPARTS                      | 5        |
| 13 | GOVERNING LAW AND JURISDICTION    | 5        |

21

THIS AGREEMENT is dated 31 December 2007

PARTIES

(1)    MISELVA ETABLISSEMENT as trustee of the Valmore Trust, a private company incorporated and registered in Liechtenstein whose registered office is at Josef Rheinberger Strasse 29, P.O. Box 635, FIL-9490 Vaduz, Liechtenstein ("Seller").

(2)    JWL ENTERTAINMENT GROUP INC, a private company incorporated and registered in the State of Delaware with EIN number 20-2569110 whose address is at Blumbergexcelsior Corporate Services Inc, 3500 South DuPont Highway, Dover, DE 19901, County of KENT in the State of Delaware, United States of America ("Buyer").

BACKGROUND

(A)    The Seller has agreed to sell and the Buyer has agreed to buy the Sale Shares subject to and on the terms and conditions of this agreement.

(B)    The Seller is the registered holder of the Sale Shares of the Company at the date hereof and holds these Sale Shares as trustee of the Valmore Trust.

(C)    The Seller is willing to sell and the Buyer is willing to buy the Sale Shares with all rights attaching to them from the Effective Date for the Consideration and upon the terms set out in this agreement

AGREED TERMS

1    INTERPRETATION

1.1    The definitions and rules of interpretation in this clause apply in this agreement.

| | |
|---|---|
| Buyer's Shares | one hundred and twenty-one (121) shares each of no par value in the capital of the Buyer; |
| Company | Fisher Island Limited, a private company limited by shares incorporated and registered in England and Wales with company number 05724222 whose registered office is at 3rd Floor, 11 Grosvenor Place, London, SW1X 7HH with an issued share capital of 43,347,001 (forty three million, three hundred and forty seven thousand and one) ordinary shares of £1 each; |
| Completion | completion of the sale and purchase of the Sale Shares in accordance with this agreement; |
| Completion Date | the date of this agreement; |
| Consideration | the consideration for the sale and purchase of the Sale Shares set out in clause 3: |

1

22

| | |
|---|---|
| Encumbrance | any interest or equity of any person (including any right to acquire, option or right of pre-emption) or any mortgage, charge, pledge, lien, assignment, hypothecation, security, interest, title, retention or any other security agreement or arrangement; |
| Effective Date | 31 December 2007; |
| Sale Shares | the 43,347,001 (forty three million, three hundred and forty seven thousand and one) ordinary shares of £1 each comprising the whole of the allotted and issued share capital of the Company; |
| Warranties | the statements set out in clause 5. |

1.2   Clause and schedule headings do not affect the interpretation of this agreement.

1.3   A reference to a clause or a schedule is a reference to a clause of, or schedule to, this agreement. A reference to a paragraph is to a paragraph of the relevant schedule, and a reference to an appendix is to the relevant appendix to this agreement.

1.4   A person includes a corporate or unincorporated body.

1.5   Words in the singular include the plural and in the plural include the singular.

1.6   A reference to one gender includes a reference to the other gender.

1.7   A reference to a statute, statutory provision or any subordinate legislation made under a statute is to such statute, provision or subordinate legislation as amended or re-enacted from time to time whether before or after the date of this agreement and, in the case of a statute, includes any subordinate legislation made under that statute whether before or after the date of this agreement.

1.8   Writing or written includes faxes but not e-mail.

1.9   Documents in agreed form are documents in the form agreed by the parties or on their behalf and initialled by them or on their behalf for identification.

1.10  Where the words include(s), including or in particular are used in this agreement, they are deemed to have the words "without limitation" following them.

1.11  References to this agreement include this agreement as amended or varied in accordance with its terms.

2     SALE AND PURCHASE

The Seller shall sell with full title guarantee subject to all Encumbrances existing at the Effective Date and the Buyer shall buy the Sale Shares, together with all rights that attach (or may in the future attach) to them on or after the Effective Date, including, in particular, the right to receive all dividends and distributions declared, made or paid thereon.

3     CONSIDERATION

The Consideration for the sale of the Sale Shares shall be the issue and allotment on Completion to the Seller of the Buyer's Shares credited as fully paid.

2



23

4    COMPLETION

4.1    Completion shall take place on the Completion Date.

4.2    At Completion the Seller shall deliver or cause to be delivered:

    4.2.1    transfers of the Sale Shares executed by the registered holders in favour of the Buyer;

    4.2.2    the share certificates for the Sale Shares in the names of the registered holders or an indemnity in the agreed form for any lost certificates; and

    4.2.3    the statutory register and minute books of the Company (written up to the time of Completion), the common seal, certificate of incorporation and any certificates of incorporation on change of name;

4.3    On the Completion Date the Seller shall procure that the directors of the Company shall hold a board meeting at which the transfer of the Sale Shares (subject to stamping) to the Buyer shall be approved for registration in the Company's statutory register.

4.4    At Completion the Buyer shall:

    4.4.1    procure the transfer of the Buyer's Shares in satisfaction of the Consideration and deliver as soon as reasonably practicable following Completion definitive share certificates in respect of such Buyer's Shares (in the name of the Seller) to the Seller; and

    4.4.2    enter the Seller's name in the register of members of the Buyer in respect of the number of Buyer's Shares held by the Seller.

4.5    As soon as possible after Completion the Seller shall deliver to the Buyer all documents of title, records, correspondence, documents, files, memoranda and other papers relating to the Company not required to be delivered at Completion which are in its possession.

5    WARRANTIES

5.1    The Seller warrants and represents to the Buyer that each of the Warranties set out in this clause 5 is true and accurate and not misleading at the date of this agreement:

    5.1.1    the Sale Shares constitute the whole of the allotted and issued share capital of the Company and are fully paid; and

    5.1.2    the Seller is the sole legal owner of the Sale Shares as trustee of the Valmore Trust.

6    FURTHER ASSURANCE

Each party shall (at its own expense) promptly execute and deliver all such documents, and do all such things, or procure the execution of documents and doing of such things as are required to give full effect to this agreement and the transaction intended to be effected pursuant to it.

3

7       ASSIGNMENT

Neither party may assign or transfer any of its rights, benefits or obligations under this agreement. Each party confirms that it is acting on its own behalf and on no-one else's.

8       WHOLE AGREEMENT

8.1     This agreement constitutes the whole agreement and understanding of the parties and supersedes any previous arrangements, understanding or agreement between the parties relating to the subject matter of this agreement. Save as expressly provided, and to the maximum extent they may be excluded by contract, this agreement excludes any warranty, covenant, condition or undertaking which may be implied by law. The Buyer acknowledges that it has not been induced to enter into this agreement by, and so far as permitted by law and except in the case of fraud, hereby waives any remedy in respect of, any warranties, representations, undertakings, promises or assurances not incorporated expressly into this agreement.

8.2     Nothing in this clause shall operate to limit or exclude any liability for fraud.

9       VARIATION AND WAIVER

9.1     Any variation of this agreement must be in writing and signed by or on behalf of the parties.

9.2     Any waiver of any right under this agreement is only effective if it is in writing and it applies only to the party to whom the waiver is addressed and to the circumstances for which it is given.

9.3     No failure to exercise or delay in exercising any right or remedy provided under this agreement or by law constitutes a waiver of such right or remedy nor shall it prevent any future exercise or enforcement thereof.

9.4     No single or partial exercise of any right or remedy under this agreement shall preclude or restrict the further exercise of any such right or remedy or other rights or remedies.

10      SEVERANCE

10.1    If any provision of this agreement (or part of a provision) is found by any court or administrative body of competent jurisdiction to be invalid, unenforceable or illegal, that provision shall be ineffective to the extent of such illegality, invalidity or unenforceability but the other provisions shall remain in force.

10.2    If any invalid, unenforceable or illegal provision would be valid, enforceable or legal if some part of it were deleted, the provision shall apply with the minimum modification necessary to make it legal, valid and unenforceable.

11      THIRD PARTY RIGHTS

No term of this agreement shall be enforceable under the Contracts (Rights of Third Parties) Act 1999 by a person who is not a party to this agreement, but this does not

4

affect any right or remedy of a third party which exists or is available apart from under that Act.

12      COUNTERPARTS

This agreement may be executed in any number of counterparts, each of which when executed and delivered constitutes an original of this agreement but all the counterparts shall together constitute the same agreement.

13      GOVERNING LAW AND JURISDICTION

13.1    This agreement and any disputes or claims arising out of or in connection with its subject matter are governed by and construed in accordance with the law of New York.

13.2    The parties irrevocably agree that the courts of New York have exclusive jurisdiction to settle any dispute or claim that arises out of or in connection with this agreement.

This agreement has been entered into on the date stated at the beginning of it.

Signed by ANDREW BAKER for and    )
on      behalf      of      MISELVA    )
ETABLISSEMENT as trustee of the    )
VALMORE TRUST    )

Signed by a director for and on behalf of    )
JWL ENTERTAINMENT GROUP    )
INC.    )

5

26

STOCK
TRANSFER
FORM

(Above this line for Registrars only)

ONE HUNDRED AND TWENTY FIVE SHARES
EACH AT NO PAR VALUE IN THE CAPITAL
OF THE ENTERTAINMENT GROUP INC.

Certificate lodged with the Registrar

Consideration Money    £    (For completion by the Registrar/Stock Exchange)

Name of Undertaking    FISHER ISLAND LIMITED

Description of Security    ORDINARY SHARES OF £1 EACH

| Number of Shares or Amount of Stock, &c. | Words | Figures |
| FORTY-THREE MILLION THREE HUNDRED AND FORTY SEVEN THOUSAND AND ONE | 43347001 units of £1 |

In the name(s) of

DR. HANS ERNST WISSMENT AS TRUSTEE OF THE WALMORE TRUST
JOSEF RHEINBERGER STRASSE 76
P.O. BOX 635
FL1 9494 VADUZ
LIECHTENSTEIN

I/We hereby transfer the above security out of the name(s) aforesaid to the person(s) named below

Signature(s) of transferor(s)

1

2

3

4

Date  31.12.2007

BHL ENTERTAINMENT GROUP INC
BLUMBERG EXCELSIOR CORPORATE SERVICES INC.
4550 SOUTH DUPONT HIGHWAY
DOVER
DE 19901
COUNTY OF KENT
STATE OF DELAWARE
UNITED STATES OF AMERICA

I/We request that such entries be made in the register as are necessary to give effect to this transfer

Stevens & Bolton LLP
The Billings, Guildford, Surrey, GU1 4YD

5423  Guildford _
01483204284

27

## FORM OF CERTIFICATE REQUIRED FOR EXEMPTION FROM STAMP DUTY

Instruments of transfer executed on or after 1 May 1987 are exempt from stamp duty when the transaction falls within one of the following categories and will not be liable to be seen stamped will be provided they are certified as below as in accordance with the Stamp Duty (Exempt Instruments) Regulations 1987.

A.    The vesting of property subject to a trust in the trustees of the trust on the appointment of a new trustee, or on the retirement of a trustee.

B.    The conveyance or transfer of property the subject of a specific devise or legacy to the beneficiary named in the will (or his nominee).

C.    The conveyance or transfer of property which forms part of an intestate estate to the person entitled on intestacy (or his nominee).

D.    The appropriation of property within section 84(4) of the Finance Act (specific appropriation in satisfaction of a general legacy of money) or section 84(5) or (7) of that Act (death appropriation in satisfaction of any interest of surviving spouse or civil partner and in satisfaction of any interest of child).

E.    The conveyance or transfer of property which forms part of the residuary estate of a testator to a beneficiary (or his nominee) entitled solely by virtue of his entitlement under the will.

F.    The conveyance or transfer of property out of a settlement in or towards satisfaction of a beneficiary's interest, not being an interest acquired for money or money's worth, being a conveyance or transfer constituting a distribution of property in accordance with the provisions of the settlement.

G.    The conveyance or transfer of property on and in consideration only of marriage to a party to the marriage (or his nominee) or to trustees to be held on the terms of a settlement made in consideration only of the marriage.

G1.   The conveyance or transfer of property on and in consideration only of the formation of a civil partnership to a party to the civil partnership (or his nominee) or to trustees to be held on the terms of a settlement made in consideration only of the civil partnership.

H.    The conveyance or transfer of property within section 83(1) or (3) of the Finance Act 1985 (transfers in connection with divorce or dissolution of civil partnership etc.)

I.    The conveyance or transfer by the liquidator of property which formed part of the assets of the company in liquidation to a shareholder of that company (or his nominee) in or towards satisfaction of the shareholder's rights on a winding up.

J.    The grant in fee simple of an easement in or over land for no consideration in money or money's worth.

K.    The grant of a servitude for no consideration in money or money's worth.

L.    The conveyance or transfer of property operating as a voluntary disposition inter vivos for no consideration in money or money's worth or any consideration referred to in section 57 of the Stamp Act 1891 (conveyance in consideration of a debt etc.)

M.    The conveyance or transfer of property by an instrument within section 84(1) of the Finance Act 1985 (death: varying dispositions).

(1)  I/We hereby certify that this instrument falls within category (1)       in the Schedule to the Stamp Duty (Exempt Instruments) Regulations 1987 set out above.

(2)  I/We, not being the transferor grantor, or the beneficiary thereof, hereby state that I/we are authorised to sign this certificate and that I/we gave this certificate only on our own knowledge of the facts stated in it.

(3)  Signature                        (4)  Description or capacity of signatory

## FORM OF CERTIFICATE REQUIRED WHERE THE TRANSFER IS NOT EXEMPT BUT IS NOT LIABLE TO AD VALOREM STAMP DUTY

Instruments of transfer are liable to a fixed duty of £5.00 when the transaction falls within one of the following categories and needs to be forwarded to the Stamp Office —

(1)  Transfer by way of security for a loan or re-transfer to the original transferor on repayment of a loan.

(2)  Transfer not on sale and not giving order any consideration in sale and where no beneficial interest in the property passes; (i) to a person who is a mere trustee and, and is nominated solely by, the transferor; (ii) from a mere nominee who has at all times held the property on behalf of the transferee; (iii) from one nominee to another nominee of the same beneficial owner where the first nominee has at all times held the property on behalf of that beneficial owner (Note) — This category does not include a transfer made in any of the following circumstances; (a) by a holder of stock, etc., following the grant of an option to purchase the stock, to the person entitled to the option, or (b) to a nominee, (iv) to a person entitled for a contract to buy sell the stock, etc., then placed by his nominee into (iii) from the nominee of a vendor, who has instructed the nominee to sell, to any sub-buyer nothing to hold stock, etc., in trust for a purchaser (to mere purchasers)

I/We hereby certify that the transaction in respect of which this transfer is made is one which falls within the category (1) above. I/We state further that I/we have been duly authorised by the transferee to sign this certificate and that the facts of the transaction are within our own knowledge.

Signature                        Description 'Transferor', 'Solicitor', etc.

(4)

N.B. If none of the above certificates can be appropriately given, then the transfer should be submitted to the Stamp Office and its duty will attract ad valorem Stamp Duty.

28

DATED _____ 31 December 2007 _____

(1) MISELVA ETABLISSEMENT AS TRUSTEE OF THE VALMORE TRUST

(2) JWL ENTERTAINMENT GROUP INC

AGREEMENT

for the sale and purchase of
the entire issued share capital of

GROSVENOR TRADING HOUSE LIMITED

Stevens & Bolton LLP
The Billings
GUILDFORD
GU1 4YD

Ref: JRP.KRH.LO1053.1

29

## CONTENTS

|  |  | Page No. |
|---|---|---|
| 1 | INTERPRETATION | 1 |
| 2 | SALE AND PURCHASE | 2 |
| 3 | CONSIDERATION | 2 |
| 4 | COMPLETION | 2 |
| 5 | WARRANTIES | 3 |
| 6 | FURTHER ASSURANCE | 3 |
| 7 | ASSIGNMENT | 3 |
| 8 | WHOLE AGREEMENT | 4 |
| 9 | VARIATION AND WAIVER | 4 |
| 10 | SEVERANCE | 4 |
| 11 | THIRD PARTY RIGHTS | 4 |
| 12 | COUNTERPARTS | 5 |
| 13 | GOVERNING LAW AND JURISDICTION | 5 |

30

THIS AGREEMENT is dated 31 December 2007

PARTIES

(1)     MISELVA ETABLISSEMENT as trustee of the Valmore Trust, a private company incorporated and registered in Liechtenstein whose registered office is at Josef Rheinberger Strasse 29, P.O. Box 635, FL-9490 Vaduz, Liechtenstein ("Seller").

(2)     JWL ENTERTAINMENT GROUP INC, a private company incorporated and registered in the State of Delaware with EIN number 20-2569110 whose address is at Blumbergexcelsior Corporate Services Inc, 3500 South DuPont Highway, Dover, DE 19901, County of KENT in the State of Delaware, United States of America ("Buyer").

BACKGROUND

(A)     The Seller has agreed to sell and the Buyer has agreed to buy the Sale Shares subject to and on the terms and conditions of this agreement.

(B)     The Seller is the registered holder of the Sale Shares of the Company at the date hereof and holds these Sale Shares as trustee of the Valmore Trust.

(C)     The Seller is willing to sell and the Buyer is willing to buy the Sale Shares with all rights attaching to them from the Effective Date for the Consideration and upon the terms set out in this agreement

AGREED TERMS

1     INTERPRETATION

1.1     The definitions and rules of interpretation in this clause apply in this agreement.

| | |
|---|---|
| Buyer's Shares | one (1) share of no par value in the capital of the Buyer; |
| Company | Grosvenor Trading House Limited, a private company limited by shares incorporated and registered in England and Wales with company number 05724470 whose registered office is at 3rd Floor, 11 Grosvenor Place, London, SW1X 7HH with an issued share capital of one (1) ordinary share of £1; |
| Completion | completion of the sale and purchase of the Sale Shares in accordance with this agreement; |
| Completion Date | the date of this agreement; |
| Consideration | the consideration for the sale and purchase of the Sale Shares set out in clause 3; |
| Encumbrance | any interest or equity of any person (including any right to acquire, option or right of pre-emption) or any mortgage, |

1

31

|  |  | charge, pledge, lien, assignment, hypothecation, security, interest, title, retention or any other security agreement or arrangement; |
| --- | --- | --- |
|  | Effective Date | 31 December 2007; |
|  | Sale Shares | the one ordinary share of £1 comprising the whole of the allotted and issued share capital of the Company; |
|  | Warranties | the statements set out in clause 5. |

1.2 Clause and schedule headings do not affect the interpretation of this agreement.

1.3 A reference to a clause or a schedule is a reference to a clause of, or schedule to, this agreement. A reference to a paragraph is to a paragraph of the relevant schedule, and a reference to an appendix is to the relevant appendix to this agreement.

1.4 A person includes a corporate or unincorporated body.

1.5 Words in the singular include the plural and in the plural include the singular.

1.6 A reference to one gender includes a reference to the other gender.

1.7 A reference to a statute, statutory provision or any subordinate legislation made under a statute is to such statute, provision or subordinate legislation as amended or re-enacted from time to time whether before or after the date of this agreement and, in the case of a statute, includes any subordinate legislation made under that statute whether before or after the date of this agreement.

1.8 Writing or written includes faxes but not e-mail.

1.9 Documents in agreed form are documents in the form agreed by the parties or on their behalf and initialled by them or on their behalf for identification.

1.10 Where the words include(s), including or in particular are used in this agreement, they are deemed to have the words "without limitation" following them.

1.11 References to this agreement include this agreement as amended or varied in accordance with its terms.

2    SALE AND PURCHASE

The Seller shall sell with full title guarantee subject to all Encumbrances existing at the Effective Date and the Buyer shall buy the Sale Shares, together with all rights that attach (or may in the future attach) to them on or after the Effective Date, including, in particular, the right to receive all dividends and distributions declared, made or paid thereon.

3    CONSIDERATION

The Consideration for the sale of the Sale Shares shall be the issue and allotment on Completion to the Seller of the Buyer's Shares credited as fully paid.

4    COMPLETION

4.1 Completion shall take place on the Completion Date.

4.2 At Completion the Seller shall deliver or cause to be delivered:

32

4.2.1   transfers of the Sale Shares executed by the registered holders in favour of the Buyer;

4.2.2   the share certificates for the Sale Shares in the names of the registered holders or an indemnity in the agreed form for any lost certificates; and

4.2.3   the statutory register and minute books of the Company (written up to the time of Completion), the common seal, certificate of incorporation and any certificates of incorporation on change of name;

4.3   On the Completion Date the Seller shall procure that the directors of the Company shall hold a board meeting at which the transfer of the Sale Shares (subject to stamping) to the Buyer shall be approved for registration in the Company's statutory register

4.4   At Completion the Buyer shall

4.4.1   procure the transfer of the Buyer's Shares in satisfaction of the Consideration and deliver as soon as reasonably practicable following Completion definitive share certificates in respect of such Buyer's Shares (in the name of the Seller) to the Seller; and

4.4.2   enter the Seller's name in the register of members of the Buyer in respect of the number of Buyer's Shares held by the Seller.

4.5   As soon as possible after Completion the Seller shall deliver to the Buyer all documents of title, records, correspondence, documents, files, memoranda and other papers relating to the Company not required to be delivered at Completion which are in its possession.

## 5   WARRANTIES

5.1   The Seller warrants and represents to the Buyer that each of the Warranties set out in this clause 5 is true and accurate and not misleading at the date of this agreement:

5.1.1   the Sale Shares constitute the whole of the allotted and issued share capital of the Company and are fully paid; and

5.1.2   the Seller is the sole legal owner of the Sale Shares as trustee of the Valmore Trust.

## 6   FURTHER ASSURANCE

Each party shall (at its own expense) promptly execute and deliver all such documents, and do all such things, or procure the execution of documents and doing of such things as are required to give full effect to this agreement and the transaction intended to be effected pursuant to it.

## 7   ASSIGNMENT

Neither party may assign or transfer any of its rights, benefits or obligations under this agreement. Each party confirms that it is acting on its own behalf and on no-one else's.

33

8    WHOLE AGREEMENT

8.1    This agreement constitutes the whole agreement and understanding of the parties and supersedes any previous arrangements, understanding or agreement between the parties relating to the subject matter of this agreement. Save as expressly provided, and to the maximum extent they may be excluded by contract, this agreement excludes any warranty, covenant, condition or undertaking which may be implied by law. The Buyer acknowledges that it has not been induced to enter into this agreement by, and so far as permitted by law and except in the case of fraud, hereby waives any remedy in respect of, any warranties, representations, undertakings, promises or assurances not incorporated expressly into this agreement.

8.2    Nothing in this clause shall operate to limit or exclude any liability for fraud.

9    VARIATION AND WAIVER

9.1    Any variation of this agreement must be in writing and signed by or on behalf of the parties.

9.2    Any waiver of any right under this agreement is only effective if it is in writing and it applies only to the party to whom the waiver is addressed and to the circumstances for which it is given.

9.3    No failure to exercise or delay in exercising any right or remedy provided under this agreement or by law constitutes a waiver of such right or remedy nor shall it prevent any future exercise or enforcement thereof.

9.4    No single or partial exercise of any right or remedy under this agreement shall preclude or restrict the further exercise of any such right or remedy or other rights or remedies.

10    SEVERANCE

10.1    If any provision of this agreement (or part of a provision) is found by any court or administrative body of competent jurisdiction to be invalid, unenforceable or illegal, that provision shall be ineffective to the extent of such illegality, invalidity or unenforceability but the other provisions shall remain in force.

10.2    If any invalid, unenforceable or illegal provision would be valid, enforceable or legal if some part of it were deleted, the provision shall apply with the minimum modification necessary to make it legal, valid and unenforceable.

11    THIRD PARTY RIGHTS

No term of this agreement shall be enforceable under the Contracts (Rights of Third Parties) Act 1999 by a person who is not a party to this agreement, but this does not affect any right or remedy of a third party which exists or is available apart from under that Act.



4

34

12    COUNTERPARTS

This agreement may be executed in any number of counterparts, each of which when executed and delivered constitutes an original of this agreement but all the counterparts shall together constitute the same agreement.

13    GOVERNING LAW AND JURISDICTION

13.1  This agreement and any disputes or claims arising out of or in connection with its subject matter are governed by and construed in accordance with the law of New York.

13.2  The parties irrevocably agree that the courts of New York have exclusive jurisdiction to settle any dispute or claim that arises out of or in connection with this agreement.

This agreement has been entered into on the date stated at the beginning of it.

Signed by ANDREW BAKER for and        )
on       behalf   of      MISELVA       )
ETABLISSEMENT as trustee of the        )
VALMORE TRUST.                         )

Signed by a director for and on behalf of  )
JWL ENTERTAINMENT GROUP              )
INC.                                   )

5

35

STOCK
TRANSFER
FORM

(Above this line for Registrars only)

THE SHARE AL NO PAR VALUE IN THE
CAPITAL OF IXL ENTERTAINMENT GROUP
INC.

Certificate lodged with the Registrar

Consideration Money £                    (For completion by the Registrar Stock Exchange)

Full name of Undertaking                 GROSVENOR TRADING HOUSE LIMITED

Description of Security                   ORDINARY SHARES OF £1 EACH

Number or amount of Shares, Stock or other security and, in figures column only, number and denomination of units, if any.

| Words | Figures |
|-------|---------|
| ONE | ( 1 units of £1 ) |

Name(s) of registered holder(s) should be given in full; the address should be given where there is only one holder.

In the name(s) of

If the transfer is not made by the registered holder(s) insert also the name(s) and capacity (e.g. Executor(s)) of the person(s) making the transfer.

MONALVA ETABLISSEMENT AS TRUSTEE OF THE VALMORE TRUST
JOSEF RHEINBERGER STRASSE 29
P.O. BOX 835
FL-9490 VADUZ
LIECHTENSTEIN

I/We hereby transfer the above security out of the name(s) aforesaid to the person(s) named below.

Signature(s) of transferor(s)

[signature]

Stamp of Selling Broker(s) (if any) for transactions which are not stock exchange transactions, or Agent(s), if any, acting for the Transferor(s).

Date 31.12.2007

I/We request that the Company will register the transferee(s) named below in respect of the above security.

Full name(s) and full postal address(es) (including County or, if applicable, Postal District number) of the person(s) to whom the security is transferred.

Please state title, if any, or whether Mr., Mrs. or Miss.

IXL ENTERTAINMENT GROUP INC
HARVESTER/CUSTODIAN CORPORATE SERVICES INC.
1500 SOUTH DUPONT HIGHWAY
DOVER
DE 19901
COUNTY OF KENT
STATE OF DELAWARE
UNITED STATES OF AMERICA

Please complete in typewriting or in Block Capitals.

I/We request that such entries be made in the register as are necessary to give effect to this transfer.

Name and address of person lodging this form (if other than the Buying Broker(s))

Stamp of person or address of person lodging this form (if other than the Buying Broker(s))

Stevens & Bolton LLP
The Billings, Guildford, Surrey, GU1 4YD

2423   Guildford 1
01483702264

Reference to the Registrar in this form means the registrar or registration agent of the undertaking, not the Registrar of Companies at Companies House.

36

## FORM OF CERTIFICATE REQUIRED FOR EXEMPTION FROM STAMP DUTY

Instruments of transfer executed on or after 1 May 1987 are exempt from stamp duty when the transaction falls within one of the following categories and will not need to be seen at stamp offices provided they are certified as below in accordance with the Stamp Duty (Exempt Instruments) Regulations 1987.

A. The vesting of property subject to a trust in the trustees of the trust on the appointment of a new trustee, or on the retirement of a trustee.

B. The conveyance or transfer of property the subject of a specific devise or legacy to the beneficiary named in the will (or his nominee).

C. The conveyance or transfer of property which forms part of an intestate estate to the person entitled on intestacy (or his nominee).

D. The appropriation of property within section 84(4) of the Finance Act 1985 (death: appropriation in satisfaction of a general legacy of money) or section 84(5) or (7) of that Act (death: appropriation in satisfaction of any interest of surviving spouse or civil partner and in Scotland also of any interest of issue).

E. The conveyance or transfer of property which forms part of the residuary estate of a testator to a beneficiary (or his nominee) entitled solely by virtue of his entitlement under the will.

F. The conveyance or transfer of property out of a settlement in or towards satisfaction of a beneficiary's interest, not being an interest acquired for money or money's worth, being a conveyance or transfer constituting a distribution of property in accordance with the provisions of the settlement.

G. The conveyance or transfer of property on and in consideration only of marriage to a party to the marriage (or his nominee) or to trustees to be held on the terms of a settlement made in consideration only of the marriage.

H. The conveyance or transfer of property on and in consideration only of the formation of a civil partnership to a party to the civil partnership (or his nominee) or to trustees to be held on the terms of a settlement made in consideration only of the civil partnership.

I. The conveyance or transfer of property within section 83(1) or (1A) of the Finance Act 1985 (transfers in connection with divorce or dissolution of civil partnership etc.).

J. The conveyance or transfer by the liquidator of property which formed part of the assets of the company in liquidation to a shareholder of the company (or his nominee) in or towards satisfaction of the shareholder's rights on a winding up.

K. The grant in fee simple of an easement in or over land for no consideration in money or money's worth.

L. The grant of a servitude for no consideration in money or money's worth.

M. The conveyance or transfer of property operating as a voluntary disposition inter vivos for no consideration in money or money's worth (see section 57 of the Stamp Act 1891 (conveyance in consideration of a debt etc.)).

N. The conveyance or transfer of property by a liquidator within section 84(1) of the Finance Act 1985 (death: varying dispositions).

I/We hereby certify that this instrument falls within category (1) ........ in the Schedule to the Stamp Duty (Exempt Instruments) Regulations 1987 set out above.

(3) I/We, the being the persons ........ or the solicitor(s) thereof, hereby state that I/we are authorised to sign this certificate and that I/we give this certificate from actual/our knowledge of the facts stated in it.

Dated the .......... day of ..........

(3) Signature .......... (4) .......... Description or capacity of signatory

## FORM OF CERTIFICATE REQUIRED WHERE THE TRANSFER IS NOT EXEMPT BUT IS NOT LIABLE TO AD VALOREM STAMP DUTY

Such instruments of transfer are liable to a fixed duty of £5 and these documents must be forwarded to the Stamp Office.

(1) Transfers by way of security for a loan or re-transfer to the original transferor on repayment of a loan.

(2) Transfer, and re-sale and re-issuing under any contract of sale, and where no beneficial interest in the property passes (a) to a person who is a mere nominee of, and is nominated only by, the transferor, (b) from a mere nominee who has at all times held the property on behalf of the transferor, (c) from one nominee to another nominee of the same beneficial owner where the first nominee has at all times held the property on behalf of that beneficial owner (NB. This category does not include a transfer made in any of the following circumstances: (i) by a holder of stock, etc. following the grant of an option to purchase the stock, to the person entitled to the option to the nominee who following a nomination or contract for the sale of the stock, etc., (ii) a transfer to a nominee(s) from the nominee of a vendor, who has nominated the nominee under a contract for sale and is named in that contract, or (iii) a purchaser to sub-purchaser.)

I/We hereby certify that the transaction in respect of which this transfer is made is one which falls within the category .......... above. I/We confirm that I/we have been duly authorised by the transferor to sign this certificate and that the facts of the transaction are within my/our knowledge.

.......... Signature .......... Description "Transferor", "Solicitor", etc.

N.B. If none of the above certificates can be given then the transfer should be submitted to the Stamp Office and usually will attract ad valorem Stamp Duty.

37

DATED        31 December 2007


(1) MISELVA ETABLISSEMENT AS TRUSTEE OF THE VALMORE TRUST

(2) JWL ENTERTAINMENT GROUP INC


AGREEMENT

for the sale and purchase of
part of the issued share capital of

PAUA ENTERPRISES LIMITED


Stevens & Bolton LLP
The Billings
GUILDFORD
GU1 4YD

Ref: JRP.KRH.LO1053.1

38

# CONTENTS

| | | Page No. |
|---|---|---|
| 1 | INTERPRETATION | 1 |
| 2 | SALE AND PURCHASE | 2 |
| 3 | CONSIDERATION | 2 |
| 4 | COMPLETION | 2 |
| 5 | WARRANTIES | 3 |
| 6 | FURTHER ASSURANCE | 3 |
| 7 | ASSIGNMENT | 3 |
| 8 | WHOLE AGREEMENT | 4 |
| 9 | VARIATION AND WAIVER | 4 |
| 10 | SEVERANCE | 4 |
| 11 | THIRD PARTY RIGHTS | 4 |
| 12 | COUNTERPARTS | 4 |
| 13 | GOVERNING LAW AND JURISDICTION | 5 |

39

THIS AGREEMENT is dated 31 December 2007

PARTIES

(1)    MISELVA ETABLISSEMENT as trustee of the Valmore Trust, a private company
       incorporated and registered in Liechtenstein whose registered office is at Josef
       Rheinberger Strasse 29, P.O. Box 635, FBL-9490 Vaduz, Liechtenstein ("Seller").

(2)    JWL ENTERTAINMENT GROUP INC, a private company incorporated and
       registered in the State of Delaware with EIN number 20-2569110 whose address is
       at Blumbergexcelsior Corporate Services Inc, 3500 South DuPont Highway, Dover,
       DE 19901, County of KENT in the State of Delaware, United States of America
       ("Buyer").

BACKGROUND

(A)    The Seller has agreed to sell and the Buyer has agreed to buy the Sale Share subject
       to and on the terms and conditions of this agreement.

(B)    The Seller is the registered holder of the Sale Share at the date hereof and holds the
       Sale Share as trustee of the Valmore Trust.

(C)    The Seller is willing to sell and the Buyer is willing to buy the Sale Share with all
       rights attaching to it from the Effective Date for the Consideration and upon the terms
       set out in this agreement.

AGREED TERMS

1      INTERPRETATION

1.1    The definitions and rules of interpretation in this clause apply in this agreement.

| | |
|---|---|
| Buyer's Share | one (1) share of no par value in the capital of the Buyer; |
| Company | Paua Enterprises Limited, a private company limited by shares incorporated and registered in England and Wales with company number 06225529 whose registered office is at Bridge House, 25 Fiddlebridge Lane, Hatfield, Hertfordshire, AL10 0SP with an issued share capital of two (2) ordinary shares of £1 each; |
| Completion | completion of the sale and purchase of the Sale Share in accordance with this agreement; |
| Completion Date | the date of this agreement; |
| Consideration | the consideration for the sale and purchase of the Sale Share set out in clause 3; |
| Encumbrance | any interest or equity of any person (including any right to acquire, option or |

1

|  |  |
|---|---|
|  | right of pre-emption) or any mortgage, charge, pledge, lien, assignment, hypothecation, security, interest, title, retention or any other security agreement or arrangement; |
| Effective Date | 31 December 2007; |
| Sale Share | the one (1) ordinary share of £1 in the Company registered in the name of the Seller, comprising fifty percent (50%) of the allotted and issued share capital of the Company; |
| Warranties | the statements set out in clause 5. |

1.2    Clause and schedule headings do not affect the interpretation of this agreement.

1.3    A reference to a clause or a schedule is a reference to a clause of, or schedule to, this agreement. A reference to a paragraph is to a paragraph of the relevant schedule, and a reference to an appendix is to the relevant appendix to this agreement.

1.4    A person includes a corporate or unincorporated body.

1.5    Words in the singular include the plural and in the plural include the singular.

1.6    A reference to one gender includes a reference to the other gender

1.7    A reference to a statute, statutory provision or any subordinate legislation made under a statute is to such statute, provision or subordinate legislation as amended or re-enacted from time to time whether before or after the date of this agreement and, in the case of a statute, includes any subordinate legislation made under that statute whether before or after the date of this agreement.

1.8    Writing or written includes faxes but not e-mail.

1.9    Documents in agreed form are documents in the form agreed by the parties or on their behalf and initialled by them or on their behalf for identification.

1.10   Where the words include(s), including or in particular are used in this agreement, they are deemed to have the words "without limitation" following them.

1.11   References to this agreement include this agreement as amended or varied in accordance with its terms.

2.     SALE AND PURCHASE

The Seller shall sell with full title guarantee subject to all Encumbrances existing at the Effective Date and the Buyer shall buy the Sale Share, together with all rights that attach (or may in the future attach) to it on or after the Effective Date, including, in particular, the right to receive all dividends and distributions declared, made or paid thereon.

3.     CONSIDERATION

The Consideration for the sale of the Sale Share shall be the issue and allotment on Completion to the Seller of the Buyer's Share credited as fully paid.

2

4    COMPLETION

4.1    Completion shall take place on the Completion Date.

4.2    At Completion the Seller shall deliver or cause to be delivered:

    4.2.1    a transfer of the Sale Share executed by the registered holder in favour of the Buyer;

    4.2.2    the share certificate for the Sale Share in the name of the registered holder or an indemnity in the agreed form for any lost certificate; and

    4.2.3    the statutory register and minute books of the Company (written up to the time of Completion), the common seal, certificate of incorporation and any certificates of incorporation on change of name;

4.3    On the Completion Date the Seller shall procure that the directors of the Company shall hold a board meeting at which the transfer of the Sale Share (subject to stamping) to the Buyer shall be approved for registration in the Company's statutory register.

4.4    At Completion the Buyer shall

    4.4.1    procure the transfer of the Buyer's Share in satisfaction of the Consideration and deliver as soon as reasonably practicable following Completion definitive share certificates in respect of the Buyer's Share (in the name of the Seller) to the Seller; and

    4.4.2    enter the Seller's name in the register of members of the Buyer in respect of the Buyer's Share held by the Seller.

4.5    As soon as possible after Completion the Seller shall deliver to the Buyer all documents of title, records, correspondence, documents, files, memoranda and other papers relating to the Company not required to be delivered at Completion which are in its possession

5    WARRANTIES

5.1    The Seller warrants and represents to the Buyer that each of the Warranties set out in this clause 5 is true and accurate and not misleading at the date of this agreement:

    5.1.1    the Sale Share constitutes fifty percent (50%) of the allotted and issued share capital of the Company and are fully paid; and

    5.1.2    the Seller is the sole legal owner of the Sale Share as trustee of the Valmore Trust.

6    FURTHER ASSURANCE

    Each party shall (at its own expense) promptly execute and deliver all such documents, and do all such things, or procure the execution of documents and doing of such things as are required to give full effect to this agreement and the transaction intended to be effected pursuant to it.

3

7    ASSIGNMENT

Neither party may assign or transfer any of its rights, benefits or obligations under this agreement. Each party confirms that it is acting on its own behalf and on no-one else's.

8    WHOLE AGREEMENT

8.1    This agreement constitutes the whole agreement and understanding of the parties and supersedes any previous arrangements, understanding or agreement between the parties relating to the subject matter of this agreement. Save as expressly provided, and to the maximum extent they may be excluded by contract, this agreement excludes any warranty, covenant, condition or undertaking which may be implied by law. The Buyer acknowledges that it has not been induced to enter into this agreement by, and so far as permitted by law and except in the case of fraud, hereby waives any remedy in respect of, any warranties, representations, undertakings, promises or assurances not incorporated expressly into this agreement.

8.2    Nothing in this clause shall operate to limit or exclude any liability for fraud.

9    VARIATION AND WAIVER

9.1    Any variation of this agreement must be in writing and signed by or on behalf of the parties.

9.2    Any waiver of any right under this agreement is only effective if it is in writing and it applies only to the party to whom the waiver is addressed and to the circumstances for which it is given.

9.3    No failure to exercise or delay in exercising any right or remedy provided under this agreement or by law constitutes a waiver of such right or remedy nor shall it prevent any future exercise or enforcement thereof.

9.4    No single or partial exercise of any right or remedy under this agreement shall preclude or restrict the further exercise of any such right or remedy or other rights or remedies.

10    SEVERANCE

10.1    If any provision of this agreement (or part of a provision) is found by any court or administrative body of competent jurisdiction to be invalid, unenforceable or illegal, that provision shall be ineffective to the extent of such illegality, invalidity or unenforceability but the other provisions shall remain in force.

10.2    If any invalid, unenforceable or illegal provision would be valid, enforceable or legal if some part of it were deleted, the provision shall apply with the minimum modification necessary to make it legal, valid and unenforceable.

11    THIRD PARTY RIGHTS

No term of this agreement shall be enforceable under the Contracts (Rights of Third Parties) Act 1999 by a person who is not a party to this agreement, but this does not

4

43

affect any right or remedy of a third party which exists or is available apart from under that Act.

12    COUNTERPARTS

This agreement may be executed in any number of counterparts, each of which when executed and delivered constitutes an original of this agreement but all the counterparts shall together constitute the same agreement.

13    GOVERNING LAW AND JURISDICTION

13.1    This agreement and any disputes or claims arising out of or in connection with its subject matter are governed by and construed in accordance with the law of New York.

13.2    The parties irrevocably agree that the courts of New York have exclusive jurisdiction to settle any dispute or claim that arises out of or in connection with this agreement.

This agreement has been entered into on the date stated at the beginning of it.

Signed by ANDREW BAKER for and    )
on    behalf    of    MISELVA    )
ETABLISSEMENT as trustee of the    )
VALMORE TRUST.    )

Signed by a director for and on behalf of    )
JWL ENTERTAINMENT GROUP    )
INC.    )

5

44

STOCK
TRANSFER
FORM

(Above this line for Registrars only)

ONE SHARE AT NO PAR VALUE IN THE
CAPITAL OF JWL ENTERTAINMENT GROUP
INC.

Certificate lodged with the Registrar

Consideration Money  £ . . . . . . . . . .

(For completion by the Registrar/Stock Exchange)

Name of Undertaking          PAVA ENTERPRISES LIMITED

Description of Security        ORDINARY SHARES OF £1 EACH

| Number or amount of Shares, Stock or other security and, in figures column only, number and denomination of units, if any. | Words | Figures |
|---|---|---|
| | ONE | £   1   units of   £1 |

In the name(s) of

MISELVA ETABLISSEMENT AS TRUSTEE OF THE VALMORE TRUST
JOSEF RHEINBERGER STRASSE 29
P.O. BOX 635
FLL 9490 VADUZ
LIECHTENSTEIN

I/We hereby transfer the above security out of the name(s) aforesaid to the person(s)
named below

Signature(s) of transferor(s)

Stamp of Selling Broker(s) or, for transactions
which are not stock exchange transactions, of
Agent(s), if any, acting for the Transferor(s)

Date  31. 12. 2007

4.

A body corporate should execute this transfer under its common seal or otherwise in accordance with
applicable statutory requirements

Full name(s) and full postal
address(es) (including County or,
if applicable, Postal
District number) of the
person(s) to whom the
security is transferred

JWL ENTERTAINMENT GROUP INC
BLUMBERGEXCELSIOR CORPORATE SERVICES INC
1201 NORTH DUPONT HIGHWAY
DOVER,
DE 1990.
COUNTY OF KENT
STATE OF DELAWARE
UNITED STATES OF AMERICA

Please complete in type
or in Block Capitals.

I/We request that such entries be made in the register as are necessary to give effect to this transfer.

| Stamp of lodging agent (if any) | Name and address of person lodging this form (if other than the Buying Broker(s)) |
|---|---|
| | Stevens & Bolton LLP |
| | The Billings, Guildford, Surrey, GU1 4YD |
| | 2423   Guildford 4 |
| | 01483302264 |

Reference to the Registrar in this Form means the registrar or registration agent of the undertaking, not the Registrar of Companies at Companies House.   15420

45

## FORM OF CERTIFICATE REQUIRED FOR EXEMPTION FROM STAMP DUTY

Instruments of transfer executed on or after 1 May 1987 are exempt from stamp duty, when the transaction falls within one of the following categories and will not need to be seen by stamp officers provided they are certified in accordance with the Stamp Duty (Exempt Instruments) Regulations 1987

| | |
|---|---|
| A | The vesting of property subject to a trust in the trustees of the trust on the appointment of a new trustee, or on the continuing trustees on the retirement of a trustee. |
| B | The conveyance or transfer of property the subject of a specific devise or legacy to the beneficiary named in the will (or his nominee) |
| C | The conveyance or transfer of property which forms part of an intestate's estate to the person entitled on intestacy (or his nominee) |
| D | The appropriation of property within section 84(4) of the Finance Act 1985 (death: appropriation in satisfaction of a general legacy of money) or section 84(5) or (7) of that Act (death: appropriation in satisfaction of any interest of surviving spouse or civil partner and in Scotland also of any interest of issue) |
| E | The conveyance or transfer of property which forms part of the residuary estate of a testator to a beneficiary (or his nominee) entitled solely by virtue of his entitlement under the will |
| F | The conveyance or transfer of property out of a settlement in or towards satisfaction of a beneficiary's interest, not being an interest acquired for money or money's worth, being a conveyance or transfer constituting a distribution of property in accordance with the provisions of the settlement |
| G | The conveyance or transfer of property on and in consideration only of marriage to a party to the marriage (or his nominee) or to trustees to be held on terms of a settlement made in consideration or only of the marriage |
| Gaa | The conveyance or transfer of property on and in consideration only of the formation of a civil partnership to a party to the civil partnership (or his nominee) or to trustees to be held on the terms of a settlement made in consideration only of the civil partnership |
| H | The conveyance or transfer of property within section 83(1) or (1A) of the Finance Act 1985 (transfers in connection with divorce etc.) |
| I | The conveyance or transfer by the liquidator of property which formed part of the assets of the company in liquidation to a shareholder of that company (or his nominee) in or towards satisfaction of the shareholder's rights on a winding up |
| J | The grant in fee simple of an easement in or over land for no consideration in money or money's worth |
| K | The grant of a servitude for no consideration in money or money's worth |
| L | The conveyance or transfer of property operating as a voluntary disposition inter vivos for no consideration in money or money's worth nor any consideration referred to in section 57 of the Stamp Act 1891 (conveyance in consideration of a debt etc.) |
| M | The conveyance or transfer of property by an instrument within section 84(1) of the Finance Act 1985 (death: varying dispositions) |

Note: Add B, G page, Gaa section.

(1)  I/We hereby certify that the instrument falls within category (1) ............... in the Schedule to the Stamp Duty (Exempt Instruments) Regulations 1987 as set above.

(2)  I/We, not being the transferor, grantee, of the interest(s) thereof, hereby state that I/we are authorised to sign the certificate and that I/we give the certificate from my/our own knowledge of the facts stated in it.

Dated the .......... day of ...........................

(3)  Sign date .......................    (4)  Description or signature of signatories ...........

## FORM OF CERTIFICATE REQUIRED WHERE THE TRANSFER IS NOT EXEMPT BUT IS NOT LIABLE TO AD VALOREM STAMP DUTY

Instruments of transfer are liable to a fixed duty of £5.00 when the transaction falls within one of the following categories and needs to be forwarded to the Stamp Office -

(1)  Transfer by way of security of a loan or re-transfer to the original transferor on repayment of a loan

(2)  Transfer not on sale and not arising under any contract of sale and where no beneficial interest in the property passes: (a) to a person who is a nominee of and is nominated only by, the transferor, (b) from a mere nominee who has at all times held the property on behalf of the transferor, to a beneficial owner or to another nominee of the same beneficial owner where the first nominee has at all times held the property on behalf of that beneficial owner (NB - This category does not include a transfer made in any of the following circumstances: (a) by a holder of stock, etc., following the grant of an option to purchase the stock, to the person entitled to the option in his nominee, (b) to a nominee in contemplation of a contract for the sale of the stock, etc., then about to be entered into (c) from the nominee of a vendor, who has instructed the nominee to hold or to some arrangement, nothing to hold stock, etc., in trust for a purchaser, to such purchaser)

I/We hereby certify that the transaction in respect of which this transfer is made is one which falls within the category .......... above. I/We confirm that I/we have been duly authorised by the transferor to sign this certificate and that the facts of the transactions are within my/our knowledge.

Signature ...........................    Description 'Transferor', 'Solicitor', etc.

Note ...........................

N.B. If none of the above declarations can be given then the transfer should be submitted to the Stamp Office and usually will attract ad valorem Stamp Duty.

46

Company No: 06225529

PAGA ENTERPRISES LIMITED

("Company")

Minutes of a meeting of the board of directors of the Company held at Josef Rheinberger
Strasse 29, Vaduz, Liechtenstein on 31 December 2007.

Present:        Andrew Baker
                Zvi Barak

In attendance:  Silvia Matt

1    Quorum

     Andrew Baker agreed to chair the meeting and Silvia Matt agreed to take the minutes.
     The chairman declared the meeting open, there being a quorum present.

2    Transfer of part of the issued share capital of the Company

2.1  There was produced to the meeting a transfer of shares in the capital of the Company
     as follows:

     | Transferor | No. of ordinary shares of £1 each | Transferee |
     |------------|-----------------------------------|------------|
     | Misolva Etablissement as trustee of the Valmore Trust | 1 | JWL Entertainment Group Inc |

2.2  It was resolved that the transfer be approved and, subject to the same being duly
     stamped, registered and that, subject as aforesaid, the relative share certificate be
     executed and issued to the transferee accordingly.

3    Any other business

     There being no further business the meeting was closed.

_____                        _____
Chairman                                        Secretary

1

47

DATED    31 December 2007

(1) MISELVA ETABLISSEMENT AS TRUSTEE OF THE VALMORE TRUST

(2) JWL ENTERTAINMENT GROUP INC

AGREEMENT

for the sale and purchase of
the entire issued share capital of

THAMES STEEL UK LIMITED

Stevens & Bolton LLP
The Billings
GUILDFORD
GU1 4YD

Ref: JRP.KRH.LO1053.1

48

# CONTENTS

|     |                              | Page No. |
|-----|------------------------------|----------|
| 1   | INTERPRETATION               | 1        |
| 2   | SALE AND PURCHASE            | 2        |
| 3   | CONSIDERATION                | 2        |
| 4   | COMPLETION                   | 3        |
| 5   | WARRANTIES                   | 3        |
| 6   | FURTHER ASSURANCE            | 3        |
| 7   | ASSIGNMENT                   | 4        |
| 8   | WHOLE AGREEMENT              | 4        |
| 9   | VARIATION AND WAIVER         | 4        |
| 10  | SEVERANCE                    | 4        |
| 11  | THIRD PARTY RIGHTS           | 4        |
| 12  | COUNTERPARTS                 | 5        |
| 13  | GOVERNING LAW AND JURISDICTION | 5      |

49

THIS AGREEMENT is dated 31 December 2007

PARTIES

(1)     MISELVA ETABLISSEMENT as trustee of the Valmore Trust, a private company incorporated and registered in Liechtenstein whose registered office is at Josef Rheinberger Strasse 29, P.O. Box 635, FH-9490 Vaduz, Liechtenstein ("Seller").

(2)     JWL ENTERTAINMENT GROUP INC. a private company incorporated and registered in the State of Delaware with EIN number 20-2569110 whose address is at Blumbergexcelsior Corporate Services Inc, 3500 South DuPont Highway, Dover, DE 19901, County of KENT in the State of Delaware, United States of America ("Buyer").

BACKGROUND

(A)     The Seller has agreed to sell and the Buyer has agreed to buy the Sale Shares subject to and on the terms and conditions of this agreement.

(B)     The Seller is the registered holder of the Sale Shares of the Company at the date hereof and holds these Sale Shares as trustee of the Valmore Trust

(C)     The Seller is willing to sell and the Buyer is willing to buy the Sale Shares with all rights attaching to them from the Effective Date for the Consideration and upon the terms set out in this agreement

AGREED TERMS

1       INTERPRETATION

1.1     The definitions and rules of interpretation in this clause apply in this agreement.

| | |
|---|---|
| Buyer's Shares | seventy-four (74) shares each of no par value in the capital of the Buyer; |
| Company | Thames Steel UK Limited, a private company limited by shares incorporated and registered in England and Wales with company number 05724450 whose registered office is at 3rd Floor, 11 Grosvenor Place, London, SW1X 7HH with an issued share capital of twenty-six million six hundred and ninety thousand five hundred and eighty six (26,690,586) ordinary shares of £1; |
| Completion | completion of the sale and purchase of the Sale Shares in accordance with this agreement; |
| Completion Date | the date of this agreement; |
| Consideration | the consideration for the sale and purchase of the Sale Shares set out in clause 3; |

1

50

| | |
|---|---|
| Encumbrance | any interest or equity of any person (including any right to acquire, option or right of pre-emption) or any mortgage, charge, pledge, lien, assignment, hypothecation, security, interest, title, retention or any other security agreement or arrangement; |
| Effective Date | 31 December 2007; |
| Sale Shares | twenty-six million six hundred and ninety thousand five hundred and eighty six (26,690,586) ordinary shares of £1 comprising the whole of the allotted and issued share capital of the Company; |
| Warranties | the statements set out in clause 5. |

1.2    Clause and schedule headings do not affect the interpretation of this agreement.

1.3    A reference to a clause or a schedule is a reference to a clause of, or schedule to, this agreement. A reference to a paragraph is to a paragraph of the relevant schedule, and a reference to an appendix is to the relevant appendix to this agreement.

1.4    A person includes a corporate or unincorporated body.

1.5    Words in the singular include the plural and in the plural include the singular.

1.6    A reference to one gender includes a reference to the other gender.

1.7    A reference to a statute, statutory provision or any subordinate legislation made under a statute is to such statute, provision or subordinate legislation as amended or re-enacted from time to time whether before or after the date of this agreement and, in the case of a statute, includes any subordinate legislation made under that statute whether before or after the date of this agreement.

1.8    Writing or written includes faxes but not e-mail.

1.9    Documents in agreed form are documents in the form agreed by the parties or on their behalf and initialled by them or on their behalf for identification.

1.10    Where the words include(s), including or in particular are used in this agreement, they are deemed to have the words "without limitation" following them.

1.11    References to this agreement include this agreement as amended or varied in accordance with its terms.

2    SALE AND PURCHASE

The Seller shall sell with full title guarantee subject to all Encumbrances existing at the Effective Date and the Buyer shall buy the Sale Shares, together with all rights that attach (or may in the future attach) to them on or after the Effective Date, including, in particular, the right to receive all dividends and distributions declared, made or paid thereon.

3    CONSIDERATION

The Consideration for the sale of the Sale Shares shall be the issue and allotment on Completion to the Seller of the Buyer's Shares credited as fully paid.

51

4    COMPLETION

4.1    Completion shall take place on the Completion Date.

4.2    At Completion the Seller shall deliver or cause to be delivered:

4.2.1    transfers of the Sale Shares executed by the registered holders in favour of the Buyer;

4.2.2    the share certificates for the Sale Shares in the names of the registered holders or an indemnity in the agreed form for any lost certificates; and

4.2.3    the statutory register and minute books of the Company (written up to the time of Completion), the common seal, certificate of incorporation and any certificates of incorporation on change of name;

4.3    On the Completion Date the Seller shall procure that the directors of the Company shall hold a board meeting at which the transfer of the Sale Shares (subject to stamping) to the Buyer shall be approved for registration in the Company's statutory register.

4.4    At Completion the Buyer shall.

4.4.1    Procure the transfer of the Buyer's Shares in satisfaction of the Consideration and deliver as soon as reasonably practicable following Completion definitive share certificates in respect of such Buyer's Shares (in the name of the Seller) to the Seller; and

4.4.2    enter the Seller's name in the register of members of the Buyer in respect of the number of Buyer's Shares held by the Seller.

4.5    As soon as possible after Completion the Seller shall deliver to the Buyer all documents of title, records, correspondence, documents, files, memoranda and other papers relating to the Company not required to be delivered at Completion which are in its possession.

5    WARRANTIES

5.1    The Seller warrants and represents to the Buyer that each of the Warranties set out in this clause 5 is true and accurate and not misleading at the date of this agreement:

5.1.1    the Sale Shares constitute the whole of the allotted and issued share capital of the Company and are fully paid; and

5.1.2    the Seller is the sole legal owner of the Sale Shares as trustee of the Valmore Trust.

6    FURTHER ASSURANCE

Each party shall (at its own expense) promptly execute and deliver all such documents, and do all such things, or procure the execution of documents and doing of such things as are required to give full effect to this agreement and the transaction intended to be effected pursuant to it.



3

52

7    ASSIGNMENT

Neither party may assign or transfer any of its rights, benefits or obligations under this agreement. Each party confirms that it is acting on its own behalf and on no-one else's.

8    WHOLE AGREEMENT

8.1    This agreement constitutes the whole agreement and understanding of the parties and supersedes any previous arrangements, understanding or agreement between the parties relating to the subject matter of this agreement. Save as expressly provided, and to the maximum extent they may be excluded by contract, this agreement excludes any warranty, covenant, condition or undertaking which may be implied by law. The Buyer acknowledges that it has not been induced to enter into this agreement by, and so far as permitted by law and except in the case of fraud, hereby waives any remedy in respect of, any warranties, representations, undertakings, promises or assurances not incorporated expressly into this agreement.

8.2    Nothing in this clause shall operate to limit or exclude any liability for fraud.

9    VARIATION AND WAIVER

9.1    Any variation of this agreement must be in writing and signed by or on behalf of the parties.

9.2    Any waiver of any right under this agreement is only effective if it is in writing and it applies only to the party to whom the waiver is addressed and to the circumstances for which it is given.

9.3    No failure to exercise or delay in exercising any right or remedy provided under this agreement or by law constitutes a waiver of such right or remedy nor shall it prevent any future exercise or enforcement thereof.

9.4    No single or partial exercise of any right or remedy under this agreement shall preclude or restrict the further exercise of any such right or remedy or other rights or remedies.

10    SEVERANCE

10.1    If any provision of this agreement (or part of a provision) is found by any court or administrative body of competent jurisdiction to be invalid, unenforceable or illegal, that provision shall be ineffective to the extent of such illegality, invalidity or unenforceability but the other provisions shall remain in force.

10.2    If any invalid, unenforceable or illegal provision would be valid, enforceable or legal if some part of it were deleted, the provision shall apply with the minimum modification necessary to make it legal, valid and unenforceable.

11    THIRD PARTY RIGHTS

No term of this agreement shall be enforceable under the Contracts (Rights of Third Parties) Act 1999 by a person who is not a party to this agreement, but this does not

53

affect any right or remedy of a third party which exists or is available apart from under that Act.

12    COUNTERPARTS

This agreement may be executed in any number of counterparts, each of which when executed and delivered constitutes an original of this agreement but all the counterparts shall together constitute the same agreement.

13    GOVERNING LAW AND JURISDICTION

13.1    This agreement and any disputes or claims arising out of or in connection with its subject matter are governed by and construed in accordance with the law of New York.

13.2    The parties irrevocably agree that the courts of New York have exclusive jurisdiction to settle any dispute or claim that arises out of or in connection with this agreement.

This agreement has been entered into on the date stated at the beginning of it.

Signed by ANDREW BAKER for and    )
on    behalf    of    MISELVA    )
ETABLISSEMENT as trustee of the    )
VALMORE TRUST.    )

Signed by a director for and on behalf of    )
JWL ENTERTAINMENT GROUP    )
INC.    )

5

54

STOCK
TRANSFER
FORM

*(Above this line for Registrars only)*

SEVENTY FOUR SHARES EACH AT NO PAR
VALUE IN THE CAPITAL OF JWL
ENTERTAINMENT GROUP INC.

Certificate lodged with the Registrar

Consideration Money £ ............................    *(for completion by the Registrar/Stock Exchange)*

| Name of Undertaking | THAMES STEEL UK LIMITED |
|---|---|
| Description of Security | ORDINARY SHARES OF £1 EACH |

| Number or amount of Shares, Stock or other Security and, in figures column only, number and denomination of units, if any. | Words<br>TWENTY SIX MILLION SIX HUNDRED AND<br>NINETY THOUSAND FIVE HUNDRED AND EIGHTY<br>SIX | Figures<br>(26690586 units of    £1 ) |
|---|---|---|

| Name(s) of registered holder(s) should be given in full; the address should be given where there is only one holder.<br><br>If the transfer is not made by the registered holder(s) insert also the name(s) and capacity (e.g. Executor(s)) of the person(s) making the transfer. | In the name(s) of<br>MISELVA ETABLISSEMENT AS TRUSTEE OF THE VALMORE TRUST<br>JOSEF RHEINBERGER STRASSE 29<br>P.O. BOX 835<br>FTL-9494 VADUZ<br>LIECHTENSTEIN |
|---|---|

I/We hereby transfer the above security out of the name(s) aforesaid to the person(s) named below

Signature(s) of transferor(s)

1. *[signature]*

2.

3.

4.

A body corporate should execute this transfer under its common seal or otherwise in accordance with applicable statutory requirements.

Stamp of Selling Broker(s) or, for transactions which are not stock exchange transactions of Agent(s), if any, acting for the Transferor(s).

Date 31.12.2007

| Full name(s), full postal address(es) (including County or, if applicable, Postal District number) of the person(s) to whom the security is transferred.<br><br>Please state title, if any, or whether Mr, Mrs or Miss. | JWL ENTERTAINMENT GROUP INC<br>BLUMBERG/EXCELSIOR CORPORATE SERVICES INC.<br>1105 SOUTH DUPONT HIGHWAY<br>DOVER<br>DE 19901<br>COUNTY OF KENT<br>STATE OF DELAWARE<br>UNITED STATES OF AMERICA |
|---|---|

Please complete in type or in block capitals.

I/We request that such entries be made in the register as are necessary to give effect to this transfer.

Stamp or name and address of person lodging this form *(if other than the Buying Broker(s))*

Stevens & Bolton LLP
The Billings, Guildford, Surrey, GU1 4YD

; 2423    Guildford ;
01483302264

Reference to the Registrar in this form means the registrar or registration agent of the undertaking, not the Registrar of Companies at Companies House.    (230A)

55

## FORM OF CERTIFICATE REQUIRED FOR EXEMPTION FROM STAMP DUTY

Instruments of transfer executed on or after 1 May 1987 are exempt from stamp duty when the transaction falls within one of the following categories and will not need to be sent to stamp offices provided they are certified as below in accordance with the Stamp Duty (Exempt Instruments) Regulations 1987.

A. The vesting of property subject to a trust in the trustees of the trust on the appointment of a new trustee, or in the continuing trustees on the retirement of a trustee.

B. The conveyance or transfer of property the subject of a specific devise or legacy to the beneficiary named in the will (or his nominee).

C. The conveyance or transfer of property which forms part of an intestate's estate to the person entitled on intestacy (or his nominee).

D. The appropriation of property within section 84(4) of the Finance Act 1985 (death: appropriation in satisfaction of a general legacy of money) or section 84(5), (7) (death: appropriation in satisfaction of any interest of surviving spouse or civil partner and in the case of any interest of issue).

E. The conveyance or transfer of property which forms part of the residuary estate of a testator to a beneficiary (or his nominee) entitled solely by virtue of his entitlement under the will.

F. The conveyance or transfer of property out of a settlement in or towards satisfaction of a beneficiary's interest, not being an interest acquired for money or money's worth, being a conveyance or transfer constituting a distribution of property in accordance with the provisions of the settlement.

G. The conveyance or transfer of property on and in consideration only of marriage to a party to the marriage (or his nominee) or to trustees to be held on terms of a settlement made in consideration only of the marriage.

H. The conveyance or transfer of property on and in consideration only of the formation of a civil partnership to a party to the civil partnership (or his nominee) or to trustees to be held on the terms of a settlement made in consideration only of the civil partnership.

I. The conveyance or transfer of property within section 83(1) of the Finance Act 1985 (transfers in connection with divorce or dissolution of civil partnership etc.)

J. The conveyance or transfer by the liquidator of property which formed part of the assets of the company in liquidation to a shareholder of that company (or his nominee) in or towards satisfaction of the shareholder's rights on a winding up.

K. The grant in fee simple of an easement in or over land for no consideration in money or money's worth.

L. The grant of a servitude for no consideration in money or money's worth.

M. The conveyance or transfer of property operating as a voluntary disposition inter vivos for no consideration in money or money's worth nor any consideration referred to in section 57 of the Stamp Act 1891 (conveyance in consideration of a debt etc.)

N. The conveyance or transfer of property by an instrument within section 84(1) of the Finance Act 1985 (death: varying disposition).

(1) Insert A or B as appropriate category

I/We hereby certify that this instrument falls within category (1)                  in the Schedule to the Stamp Duty (Exempt Instruments) Regulations 1987 set out above.

(2) Delete this paragraph if not applicable

I/We not being the transferor, grantee, or the transferee(s) thereof, hereby state that I/we are authorised to sign this certificate and that I/we give this certificate from actual or near knowledge of the facts stated in it.

(3) To be signed by transferor or grantor or the barrister or duly authorised agent

Dated this          day of

(4) Where any other person other than the transferor, grantor or a solicitor, state capacity in which signed

(2)          Signature                         Description or signature of signatory

## FORM OF CERTIFICATE REQUIRED WHERE THE TRANSFER IS NOT EXEMPT BUT IS NOT LIABLE TO AD VALOREM STAMP DUTY

Instruments of transfer are liable to a fixed duty of £5 surwhere the transaction falls within one of the following categories and needs to be forwarded to the Stamp Office

(1) Transfer by way of security for a loan or re-transfer to the original transferor on repayment of a loan

(2) Transfer, not on sale and not arising under any contract of sale and where no beneficial interest in the property passes: (a) to a person who is a mere nominee of, and is nominated only by, the transferor, the transferee who has at all times held the property on behalf of the transferor (b) from a mere nominee of, and who has at all times held the property on behalf of the transferor; (c) from one nominee to another nominee of the same beneficial owner where the first nominee has at all times held the property on behalf of that beneficial owner (N.B. This category does not include a transfer made on any of the following circumstances: (i) to a holder or stock, etc. following the grant of an option to purchase the stock, to the person entitled to the option of his nominee; (ii) to a nominee or sub-nominee of the person entitled under a contract for the sale of the stock, etc. then about to be entered into; (iii) from the nominee of a vendor, who has contracted to sell the stock, etc. to or under direction of the purchaser, to such purchaser.)

I/We hereby certify that the transaction in respect of which this transfer is made is one which falls within the category  above. I/We confirm that I/we have been duly authorised by the transferor to sign this certificate and that the facts of the transaction are within my/our knowledge

Have solvent reasons for the facts explaining the transaction (full particulars are requested)

Signature(s)                                     Description "Transferor" "Solicitor" etc.

Date

N.B. If none of the above declarations can be given then the transfer should be submitted to the Stamp Office and usually will attract ad valorem Stamp Duty.



56

**AJB-9**

**2008 M No**

<u>IN THE SUPREME COURT OF GIBRALTAR</u>
<u>CHANCERY JURISDICTION</u>

**IN THE MATTER** of the Civil Procedure Rules, Part 64, Section 1

and

**IN THE MATTER** of the Trustees Act

and

**IN THE MATTER** of the trusts known as The Valmore Trust and The Summit Trust

**BETWEEN**

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**

<u>Claimants</u>

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**

<u>Defendants</u>

---

**EXHIBIT "AJB9"**

---

This is the exhibit marked "AJB9" referred to in the Witness Statement of ANDREW JOHN BAKER dated          this          day of                    2008

# Apostille



(Convention de La Haye du 5 Octobre 1961)

1.  Country:     **United States of America**

    This public document

2.  has been signed by **Norman Goodman**

3.  acting in the capacity of **County Clerk**

4.  bears the seal/stamp of the county of **New York**

# Certified

5.  At New York, New York     6.    the 25th day of February 2008

7.  by Special Deputy Secretary of State, State of New York

8.  No. NYC-10572458A

9.  Seal/Stamp                  10.   Signature



James Bizzarri
Special Deputy Secretary of State

STRICTLY PRIVATE AND CONFIDENTIAL

# LETTER OF WISHES
### of Arkadi Badri Patarkatsishvili

TO:     All Trustees, Protectors, Directors and Custodians of my property.

FROM:   Arkadi Badri Patarkatsishvili (hereinafter, the "APPOINTOR")

Dear Sirs:

This letter represents my wishes, requests and instructions to all Trustees, Protectors, Directors, Managers and Custodians of all of my real, personal and business holdings who now hold, or may in the future but before my death, hold, manage or administer any of my real, personal and business property, wherever in the World situated (hereinafter, collectively referred to as the "ADMINISTRATORS"), including specifically, not by way of any limitations, those properties and possessions enumerated in the Confidential Addendum A; and those Settlements enumerated in the Confidential Addendum B.

IT IS MY WISH THAT this Letter of Wishes be deemed my sole and irrevocable instrument expressly superceding, revoking and rendering invalid any and all Wills, Codicils, Letters of Wishes and other similar documents purporting to devise or distribute any of my property executed by me or at my behest prior to the date hereof.

IT IS MY WISH that this Letter of Wishes be held in escrow by my personal lawyer since 1996, Emanuel Zeltser, Esq. (hereinafter, the "LAWYER") and be unsealed to the Administrators, within thirty (30) days after my death and burial of my body.

2

STRICTLY PRIVATE AND CONFIDENTIAL

IT IS MY WISH that all those to whom this Letter of Wishes may come, hold it be held in strict confidence and release to no one, including, without limitations, to my beneficiaries, except for the purposes of ensuring that my wishes herein stated are carried out after my death.

I am making this Letter of Wishes at this time because I believe that my political ambitions may have brought me to the point of being placed in the jeopardy of being physically eliminated either by my political opponents, if I succeed, or by my own allies, if I should fail to attain my goal of ridding my beloved country of Georgia of the dictatorial regime and henceforth become a liability to my friends and supporters. If the latter should occur, I WISH IT TO BE KNOWN that I accept my fate with no bitterness or remorse and with understanding that I did what I did with open eyes and seek no revenge against or prosecution of anyone. I WISH IT TO BE KNOWN that no member of my family shared my political aspirations and my struggle was solely and exclusively my own chosen mission and that I take full responsibility for my actions alone.

IT IS MY WISH that upon my death and burial of my body, all of my real, personal and business properties and holdings, wherever in the world situated be held and managed by an American corporation, **JWL Entertainment Group, Inc.**, headed by my cousin and business partner, **Joseph Kay** of 6 Wright Drive, Dix Hills, New York 11746, USA (hereinafter referred to as the "APPOINTEE"), at Appointee's sole and uncontrolled discretion, as I myself did, could or might do if I were personally present.

IT IS MY WISH that upon presentment of this Letter of Wishes

3

STRICTLY PRIVATE AND CONFIDENTIAL

to any of the Administrators or any other person, regardless of the title of such person, who is vested or possessed with any of my real, personal or business holdings and possessions, for my and/or my family benefit, *de juro* or *de facto*, or any Settlement in which I appear as a Trustor or Beneficiary, *de juro* or *de facto*, appoint forthwith my Appointee, and/or such person as may be designated by the Appointee as the sole legal representative of the Administrators and to issue to Appointee General Irrevocable Power of Attorney to act for the Settlements or for any other entities in which I de facto hold controlling interest in each and every way as the Administrator or Trustee could or might act if personally present with respect to any and all matters concerning my real, personal and business property, with no limitations whatsoever, in order to authorize and empower the Appointee to gather all of my real, personal and business assets and subsequently, sell or otherwise dispose of such assets, at private sale or public auction, at Appointee's discretion, and after paying all debts, taxes and final expenses, to distribute such assets to my beneficiaries at such time, as the Appointee may deem appropriate and in accordance with my confidential instructions, which have been conveyed to the Appointee and reflected in the Confidential Addendum C.

IT IS MY WISH that the powers conveyed upon the Appointee herein be construed in the broadest possible sense so as to empower the Appointee to perform any and all acts in his own sole and unhampered discretion.

STRICTLY PRIVATE AND CONFIDENTIAL

I specifically provide that any and all addendums to this Letter of Wishes are annexed for convenience purposes only in order to help my Appointee and/or my current Administrators to identify and gather my property and not for the purposes of limiting the powers vested in my Appointee in any way.

IN WITNESS WHEREOF, I the undersigned Appointor have set my hand on the date set forth below and caused this Letter of Wishes to be executed before the Notary and before two witnesses, whose names and signatures appear below.

_____
Arkadi Badri Patarkatsishvili
Appointor

_____
Witness № 1

_____
Witness № 2

ALEXANDER FISHKIN
Notary Public, State of New York
No. 31-5000163
Qualified in New York County
Commission Expires August 10, 20___

*On this 14th day of November in the year 2007, before me, Alexander Fishkin, a Notary Public of the State of New York, County of New York, personally came Arkadi Badri Patarkatsishvili, a citizen of Georgia, born on October 31, 1955, in Tbilisi, resident of the City of Tbilisi, Gldani bldg. 10, Apt. 88, passport # 1508037, personal # 65002001339, issued by the Ministry of Justice of Georgia, personally known to me to be the Appointor named in the within Letter of Wishes. I have been satisfied that the Appointor is of sound mind and has full understanding of the instrument, which he is executing herein and that he does so being of sound and disposing mind and memory and over the age of eighteen (18) years of age and not being actuated by any duress, menace, fraud, mistake, or undue influence, Thereafter Arkadi (Badri) Patarkatsishvili executed the within Letter of Wishes under his own hand in my presence and in the presence of the witnesses appearing herein and in the presence of one another.*

**AJB-10**

2008 M No

<u>IN THE SUPREME COURT OF GIBRALTAR</u>
<u>CHANCERY JURISDICTION</u>

IN THE MATTER of the Civil Procedure Rules, Part 64, Section 1

and

IN THE MATTER of the Trustees Act

and

IN THE MATTER of the trusts known as The Valmore Trust and The Summit Trust

BETWEEN

MISELVA ETABLISSEMENT (1)
NEXUS TREUHAND AG (2)

<span style="float:right;"><u>Claimants</u></span>

and

INNA GUDAVADZE (1)
JOSEPH KAY (2)
IVA PATARKATSISHVILI (3)
LIANA ZHMOTOVA (4)
FALLON INVEST & TRADE INC. (5)

<span style="float:right;"><u>Defendants</u></span>

EXHIBIT "AJB10"

This is the exhibit marked "AJB10" referred to in the Witness Statement of ANDREW JOHN BAKER dated         this      day of          2008



TERRITORY OF THE BRITISH VIRGIN ISLANDS

THE INTERNATIONAL BUSINESS COMPANIES ACT
(CAP. 291)

CERTIFICATE OF INCORPORATION    (SECTIONS 14 AND 15)

No. 640519

The Registrar of Corporate Affairs of the British Virgin Islands HEREBY CERTIFIES pursuant to the International Business Companies Act, Cap. 291 that all the requirements of the Act in respect of incorporation having been satisfied,

**COURIVALE HOLDINGS LIMITED**

is incorporated in the British Virgin Islands as an International Business Company this 3rd day of February, 2005.

Given under my hand and seal at
Road Town, in the Territory of the
British Virgin Islands

*REGISTRAR OF CORPORATE AFFAIRS*

CERT001Y



Tat Tang                                        *Courtvale*

**Von:**       Daniel Lam [d.lam@londonintbank.com]
**Gesendet:** Mittwoch, 23. Januar 2008 11:09
**An:**        William Cid De La Paz
**Cc:**        andrew.baker@miselva.li; Bianca Daniell; Sean Federico; Bhavini Prthava; Tat Tang
**Betreff:**   RE: Courtvale Holdings Limited

Dear William,

I hereby confirm that Courtvale is to be also transferred to Miselva Etablissement.

I will provide you shortly with a letter from JK authorizing this transfer

Kind regards

Daniel

Financial Controller
London International Bank
11 Grosvenor Place
London SW1X 7HH
Tel +44 207 170 5592
Fax +44 207 170 5610
Blackberry +44 (0) 7738 135764
Email: d.lam@londonintbank.com

**From:** William Cid De La Paz [mailto:WCidDeLaPaz@finsburytrust.com]
**Sent:** 22 January 2008 10:24
**To:** Daniel Lam
**Cc:** andrew.baker@miselva.li; Bianca Daniell; Sean Federico
**Subject:** Courtvale Holdings Limited

Dear Daniel

I have just realised that there is another BVI company that is still with us, Courtvale Holdings Limited.

Please confirm whether this company also needs to be transferred to Miselva Etablissement

Best regards

William

William Cid de la Paz TEP
Trust Manager

Finsbury Trust Company Limited
email: wciddelapaz@finsburytrust.com
Tel +350 40000
Fax +350 40404

=PRIVATE AND CONFIDENTIAL====================
This email and any attached files are confidential and may be legally privileged. If you are not the addressee,
any disclosure, reproduction, copying, distribution or other dissemination or use of this communication is
strictly prohibited. If you have received this transmission in error, please notify the sender immediately and
then delete this email. Email transmission cannot be guaranteed to be secure or error free as information
could be intercepted, corrupted, lost, destroyed, arrive late or incomplete or contain viruses. The sender

23.01.2008                                                                    2

Mr Joseph Kay
70 Walton Street
London SW3 2HH
UK

Mr William Cid De La Paz
Finsbury Trust
Suites 7B & 8B
50 Town Range
Gibraltar

28 January 2008

<u>**RE: TRANSFER OF DIRECTORSHIP AND SHAREHOLDING**</u>

Dear Mr. Cid De La Paz

Please accept this letter as my request and instruction to disclose all information pertaining to the below-mentioned company to Mr. Andrew J. Baker at Miselva Etablissement, Vaduz and to co-operate with Mr. Baker and Miselva in (i) transferring the shares of the company, (ii) transferring the administration of the company to Miselva and (iii) appointing new directors and officers as Mr. Baker may direct.

1. Courtvale Holdings limited

I acknowledge that these provisions will be charged as per your administrative costs.

With thanks for your assistance.

Yours faithfully,

Mr. Joseph Kay

3

## Courtvale Holdings Limited

(Company number 640519)
(Incorporated in British Virgin Islands)

Pursuant to the Company's Articles of Association we the undersigned, being all the Directors of the Company for the time being, hereby:

**Share Transfers**

The following (stamped) instruments of transfer was/were tabled:

| Transferor | Transferee | No. of Shares |
|---|---|---|
| Valmet Nominees Limited | Miselva Etablissement | 25,000 |
| Finsbury Nominees Limited | Miselva Etablissement | 25,000 |

NOTE THAT there had been obtained from the relevant subscribers a waiver of rights of pre-emption.

RESOLVE THAT (subject to stamping) the aforesaid transfer of shares be and it is hereby approved and THAT the relevant share certificates be signed sealed and issued.

**Cancellation of Share Certificates**

RESOLVE THAT share certificate number 1 issued in favour of Valmet Nominees Limited in the sum of 25,000 ordinary shares of USD 1.00 each be cancelled.
RESOLVE THAT share certificate number 2 issued in favour of Finsbury Nominees Limited in the sum of 25,000 ordinary shares of USD 1.00 each be cancelled.

**Issuance of Share Certificate**

RESOLVE THAT share certificate number 3 be issued in favour of Miselva Etablissement in the sum of 50,000 ordinary shares of USD 1.00 each be issued.

**Resignation of Director**

RESOLVE THAT the resignation of Joseph Kay as Director be accepted with effect from the close of this Meeting.

**Appointment of Director**

RESOLVE THAT Andrew John Baker be appointed as Director of the Company with effect from the close of this Meeting.

**Resignation of Company Secretary**

RESOLVE THAT the resignation of Finsbury Secretaries Limited as Secretary of the Company be accepted with effect from the close of this Meeting.

**Appointment of Company Secretary**

RESOLVE THAT Michael Ferdinand Repolusk be appointed as Secretary of the Company with effect from the close of this Meeting.

#VPF:FRM49360# ,

4

Change of Registered office & Registered agent

RESOLVE THAT the registered office and registered agent be transferred from Messrs. Trident Trust Company (B.V.I) Limited to Morgan & Morgan.

Dated this the 29th day of January, 2008

_____
Mr. Joseph Kay -- Sole Director

5

## STOCK TRANSFER FORM

WE          Valmet Nominees Limited
            Suites 7B & 8B
            50 Town Range
            Gibraltar

herinafter called the "Transferor"

In consideration of the Sum of USD 1.00

paid to us by    Miselva Etablissement
                 Josef Rheinberger Strasse 29
                 FL-9490 Vaduz
                 Liechtenstein

hereinafter called the "Transferee"

Do hereby transfer to the Transferee 25,000 fully paid up shares of USD 1 each in the undertaking called Courtvale Holdings Limited

To hold unto the Transferee SUBJECT to Several Conditions on which we the Transferee DO HEREBY agree to take the said share(s) SUBJECT to the conditions aforesaid.

**In Witness** whereas the parties hereto have executed this Transfer under the hand/seal this 29th day of January, 2008

EXECUTED by the within        )        DIRECTOR

Name TRANSFEROR under         )

Hand/seal in the presence of: )

                              )        Finsbury Secretaries Limited
                              )                Secretaries
                              )        Valmet Nominees Limited

EXECUTED by the within        )

Name TRANSFEREE under         )

Hand in the presence of:      )

                              )
                              )
                              )        Miselva Etablissement

#VPF:FRM49363#

Certificate number

Shares issued    Valnet Nominees Limited

for    25000    to

of    Suites 7b & 8b, 50 Town Range, Gibraltar

Courtvale Holdings Limited

Certificate Number

1

Number of Shares

25000

Dated    15 February 2005

**COURTVALE HOLDINGS LIMITED**

Incorporated under the Laws of the Territory of the British Virgin Islands

This is to certify that    Valnet Nominees Limited

of    Suites 7b & 8b, 50 Town Range, Gibraltar

is/are the Registered

Proprietor of    25000    Ordinary Shares of    USD1.00    each

in the above named Company, subject to the Memorandum and Articles of Association of the Company.

Given under the Common Seal of the Company on this    15th day of February 2005

FINSBURY COMPANY NOMINEES LIMITED    Director

Finsbury Secretaries Limited    Secretary

Directors

No transfer of the Shares comprised in this certificate (or any part thereof) can be registered until this Certificate has been lodged with the Company

CANCELLED

7

## STOCK TRANSFER FORM

WE       Finsbury Nominees Limited
Suites 7B & 8B
50 Town Range
Gibraltar

herinafter called the "Transferor"

In consideration of the Sum of USD 1.00

paid to us by     Miselva Etablissement
Josef Rheinberger Strasse 29
FL.-9490 Vaduz
Liechtenstein

hereinafter called the "Transferee"

Do hereby transfer to the Transferee 25,000 fully paid up shares of USD 1 each in the undertaking called Courtvale Holdings Limited

To hold unto the Transferee SUBJECT to Several Conditions on which we the Transferee DO HEREBY agree to take the said share(s) SUBJECT to the conditions aforesaid.

**In Witness** whereas the parties hereto have executed this Transfer under the hand/seal this 29th day of January, 2008

EXECUTED by the within       )

Name TRANSFEROR under       )

Hand/seal in the presence of:       )

DIRECTOR

      )

Finsbury Secretaries Limited
Secretaries

      )

      )     Finsbury Nominees Limited

EXECUTED by the within       )

Name TRANSFEREE under       )

Hand in the presence of:       )

      )

      )

      )     Miselva Etablissement

#VPF:FRM49363#



Certificate number    2    for    25000    Shares    issued    Finsbury Nominees Limited

of    Suites 7b & 8b, 50 Town Range, Gibraltar    to

Courtvale Holdings Limited

Dated    15 February 2005

Certificate Number

2

Number of Shares

25000

*Incorporated under the Laws of the Territory of the British Virgin Islands*

# COURTVALE HOLDINGS LIMITED

*This is to certify that*    Finsbury Nominees Limited

of    Suites 7b & 8b, 50 Town Range, Gibraltar

*is/are the Registered*

*Proprietor of*    25000    Ordinary Shares of    USD1.00    each

in the above-named *Company*, subject to the *Memorandum* and *Articles of Association* of the *Company*.

*Given under the Common Seal of the Company on this*    15th day of February, 2005

FINSBURY SECRETARIES LIMITED

Finsbury Secretaries Limited
Secretaries

Directors

Secretary

No transfer of the Shares comprised in this certificate (or any part thereof) can be registered until this Certificate has been lodged with the Company

CANCELLED

9

No. of Certificate

3

No. of Shares

50000

# SHARE CERTIFICATE
## of
# COURTVALE HOLDINGS LIMITED

Incorporated under the International Business Companies Act, CAP. 291

THIS IS TO CERTIFY that    Miselva Etablissement

of    Josef Rheinberger Strasse 29, FL-9490 Vaduz, Liechtenstein

is/are the Registered

Proprietor of    50000    Ordinary Shares of    USD1.00    each

in the above named Company, subject to the Memorandum and Articles of Association of the Company.

GIVEN under the Common Seal of the said Company.

the    29th day of January, 2008

Director

Director/Secretary

FINSBURY SECRETARIES LIMITED
SECRETARIES

Date:    29 January 2008

The Board of Directors
Courtvale Holdings Limited
Trident Chambers
P.O. Box 146
Wickhams Cay
Road Town Tortola
British Virgin Islands

Dear Sirs

### Re: Resignation as Director

Please take this letter as my notice of resignation as Director of the Company with effect from 29th day of January, 2008.

Yours faithfully

_____
Mr. Joseph Kay

#VPF:FRM49367#

11

Courtvale Holdings Ltd

Seite 1 von 1

**Andrew Baker**

Von:        David Ashfield [d.ashfield@londonintbank.com]

Gesendet: Montag, 3. März 2008 14 08

An:         tat.tang@miselva.li

Cc:         andrew.baker@miselva.li; Daniel Lam

Betreff:    Courtvale Holdings Ltd

Tat, further to your e mails of 12th February and 3rd March, please put the shares under the Valmore Trust. Please send me the resolution accepting the shares as part of the Trust immediately. Sorry for the urgency. I also need the declaration of trust for Moncayo to Jorum. Regards,

David Ashfield

London International Bank Ltd
11 Grosvenor Place, SW1X 7HH
Mobile: +44 7887897329
Blackberry: +44 7921881027
Tel: +44 2071705591
Fax: +44 2071705510

Registered in England, No 3250521 2
Authorised and Regulated by the Financial Services Authority

This e mail, together with any attachments, is confidential between the sender and addressee(s). If you are not the intended recipient(s) of this e-mail you should not copy it or use it for any purpose nor disclose its contents to any person; to do so may be unlawful. If you have received this e-mail by mistake please notify the senders immediately by e-mail and delete this e mail and any attachments from your system. To the maximum extent permitted by law, London International Bank Ltd accepts no liability for any loss or damage resulting from unauthorised use of this email or any attachment or from unauthorised use of any information contained or implied in the email or attachments.

Re: Courtvale Holdings Ltd

Seite 1 von 1

## Tat Tang

Von:        David Ashfield [d.ashfield@londonintbank.com]

Gesendet:  Montag, 3. März 2008 14:56

An:         tat.tang@miselva.li

Cc:         andrew.baker@miselva.li; Daniel Lam

Betreff:    Re: Courtvale Holdings Ltd

Tat, following our call with Andrew please do the declaration of trust in favour of Jorum. I will get a written confirmation from JK later. In the meantime please send the DoT. Regards,

David Ashfield

London International Bank Ltd
11 Grosvenor Place, SW1X 7HH
Mobile: +44 7887897329
Blackberry: +44 7921881027
Tel: +44 2071705591
Fax: +44 2071705510

-----Original Message-----
From: David Ashfield
To: 'tat.tang@miselva.li'
CC: 'andrew.baker@miselva.li'; Daniel Lam
Sent: Mon Mar 03 13:08:02 2008
Subject: Courtvale Holdings Ltd

Tat, further to your e-mails of 12th February and 3rd March, please put the shares under the Valmore Trust. Please send me the resolution accepting the shares as part of the Trust immediately. Sorry for the urgency. I also need the declaration of trust for Moncayo to Jorum. Regards,

David Ashfield

London International Bank Ltd
11 Grosvenor Place, SW1X 7HH
Mobile: +44 7887897329
Blackberry: +44 7921881027
Tel: +44 2071705591
Fax: +44 2071705510

Registered in England, No 325657= 2
Authorised and Regulated by the Financial Services Authority

This e-mail, together with any attachments, is confidential between the sender and addressee(s). If you are not the intended recipient(s) of this e-mail you should not copy it or use it= for any purpose nor disclose its contents to any person; to do so may be unlawful. If you have received this e-mail by mistake please notify the sender= immediately by e-mail and delete this e-mail and any attachments from your = system. To the maximum extent permitted by law, London International Bank Ltd accepts no liability for any loss or damage resulting from unauthorised use = of this email or any attachment or from unauthorised use of any information = contained or implied in the email or attachments.

03.03.2008

13

03 Mar 2008 9:07AM     LAKEBROW LTD     MAR. 03 2008 10:25     CTP:

020772358085     P.1

Missiva Etablissement
Att. Mr Andrew Baker
Josef Rheinberger Strasse 29
FL 9490
Vaduz
Liechtenstein

3rd March 2008

Dear Andrew,

Courtvale Holdings Ltd

I would be grateful if you would make a declaration of trust in favour of Jorum Establishment with regard to your nominee holding of my share in Courtvale Holdings Ltd

Yours sincerely,

Joseph Kay

14

# DECLARATION OF TRUST

To:

## JORUM Establishment, Josef Rheinberger Strasse 29, FL-9490 Vaduz

We, Miselva Etablissement of Josef Rheinberger Strasse 29, Postfach 635, 9490 Vaduz, Liechtenstein hereby declare that we hold ten thousand (10'000) shares in

## COURTVALE HOLDINGS LIMITED

Registered in the British Virgin Islands under Company number 1063187
Registered office at Pasea Estate, Road Town, Tortola, British Virgin Islands

and that we hold these shares on trust for your use and benefit absolutely. We undertake not to dispose of these shares without your express consent and we will not seek to mortgage them or to place any form of charge, pledge or security over them or to do or knowingly suffer to be done anything in any way what ever that is inconsistent with or that could prejudice your use and benefit of the said ten thousand shares.

Vaduz, 3rd March 2008

Miselva Etablissement

Andrew J. Baker
Director

15

FILE NOTE

COURTVALE HOLDINGS LTD ("Courtvale")

I have today had various discussions with David Ashfield ("DA") of LIB concerning inter alia the ownership of Courtvale.

Recently, I was appointed as the sole director of Courtvale and Miselva became the shareholder of record. Until now, there has been some uncertainty for whom or for which holding vehicle Miselva has been holding the shares, although it had been my impression that Courtvale was a "JK" company.

At the end of today's discussions, DA finally requested that Miselva should hold the shares on trust for Jorum Establishment ("Jorum"). I suggested that DA ask JK to sign a confirmation to this effect. We have now received an e-mail from DA and a signed request from JK.

Since monies in Courtvale originated from "AP" companies, and since Jorum is beneficially owned by AP's Estate, this request appears to make sense to me and to be in order.

In the circumstances, I am prepared to accede to the request and issue a Declaration of Trust in favour of Jorum - on condition, however, that Jorum is and remains part of AP's Estate.

If it transpires that for whatever reason Jorum does not form part of AP's Estate, then the pre-condition for the Declaration of Trust will not have been fulfilled and the shares in Courtvale will no longer be held on trust for Jorum.

03.03.08

16

**Andrew Baker**

| | |
|---|---|
| **Von:** | Daniel Lam [d.lam@londonintbank.com] |
| **Gesendet:** | Mittwoch, 13. Februar 2008 16:12 |
| **An:** | Andrew Baker |
| **Betreff:** | FW: Attached Image |

Dear Andrew,

As discussed earlier please find attached a letter from Joseph addressed to you requesting transfer of funds. Please can you arrange for the transfers as soon as possible. If you have any queries regarding these transfers please do not hesitate to contact me.

Kind regards,

Daniel

Financial Controller
London International Bank
11 Grosvenor Place
London SW1X 7HH
Tel: +44 207 170 5592
Fax: +44 207 170 5510
Blackberry: +44 (0) 7738 135764
Email: d.lam@londonintbank.com

Registered in England, No 3250578 7
Authorised and Regulated by the Financial Services Authority

This e-mail (together with any attachments) is confidential between the sender and addressee(s). If you are not the intended recipient you are strictly prohibited from copying it or using it for any purpose and/or disclosing its contents to any person, to do so may be unlawful. If you have received this e-mail by mistake please notify the sender immediately by e-mail and delete this e-mail and any attachments from your computer system. To the maximum extent permitted by law, London International Bank accepts no liability for any loss or damage resulting from unauthorised use of this e-mail or any attachment or for any unauthorised use of any information contained or implied in the e-mail or attachments.

17

70 Walton Street,
London,
SW3 2HH,
United Kingdom.

Miselva Etablissement,
Josef Rheinberger Strasse 29,
Vaduz, FL-9490,
Liechtenstein.

13th February 2008

Dear Mr. Baker,

Please can you arrange for all funds held at Hypo Investment Bank Liechtenstein for the following companies Montglimmer Overseas Limited, Ucam Estate Inc., Shenton Park Company Inc., Moncayo Management Inc. and Jorum Establishment to be transferred to Courtvale Holdings Limited's Hypo Investment Bank account, account number 10.304155_0.

The amounts to be transferred are as follows:

Montglimmer Oversea Ltd: $6,970,211.78 and €1,971.40
Ucam Estates Inc.: $594,979.31 and €23.85 and £4,388,166.90
Shenton Park Company Inc.: $1,436,446.72
Moncayo Management Inc.: £2,976,828.59
Jorum Establishment: $489.96 and €11,146.30

Please can you ensure that these transfers are made with value as of today's date.

Thank you for your assistance in this matter.

Yours sincerely,

Lord J Kay

18

**Andrew Baker**

*Courtvle*

| | |
|---|---|
| **Von:** | Andrew Baker [andrew.baker@miselva.li] |
| **Gesendet:** | Mittwoch, 13. Februar 2008 16:31 |
| **An:** | Daniel Lam |
| **Betreff:** | AW: Attached Image |

Daniel,

I will do as instructed.

However, can you please let me know what is the basis of these transfers? Short-term loans?

Also, can you find out and let me know what is the thinking behind these urgent transfers?

Finally, it is my clear understanding that funds in Courtvale have always been and will in future be used to pay expenses incurred by or in connection with or for the exclusive benefit of AP and his personal affairs. If this is not the case, then we may have a problem with respect to these transfers now being carried out. Can you obtain some confirmation to this effect from JK?

Thanks and kind regards,

Andrew

-----Ursprüngliche Nachricht-----
**Von:** Daniel Lam [mailto:d.lam@londonintbank.com]
**Gesendet:** Mittwoch, 13. Februar 2008 16:12
**An:** andrew.baker@miselva.li
**Betreff:** FW: Attached Image

Dear Andrew,

As discussed earlier please find attached a letter from Joseph addressed to you requesting transfer of funds. Please can you arrange for the transfers as soon as possible. If you have any queries regarding these transfers please do not hesitate to contact me.

Kind regards,

Daniel

Financial Controller
London International Bank
11 Grosvenor Place
London SW1X 7HH
Tel: +44 207 170 5592
Fax: +44 207 170 5510
Blackberry: +44 (0) 7738 135764
Email: d.lam@londonintbank.com

Registered in England, No 525057= 2
Authorised and Regulated by the Financial Services Authority

This e-mail, together with any attachments, is confidential between the sender and addressee(s). If you are not the intended recipient(s) of this e-mail you should not copy it or use it for any purpose nor disclose its contents to any person, to do so may be unlawful. If you have received this e-mail by mistake please notify the sender immediately by e-mail and delete this e-mail and any attachments from your system. To the maximum extent permitted by law, London International Bank Ltd accepts no liability for any loss or damage resulting from unauthorised use of this email or any attachment or from unauthorised use of any information contained or implied in the email or attachments.

13.02.2008

*19*

## Andrew Baker

| | |
|---|---|
| Von: | Andrew Baker [andrew.baker@miselva.li] |
| Gesendet: | Montag, 25. Februar 2008 14:10 |
| An: | Anastasija Blinova |
| Betreff: | Courtvale |
| | |
| Wichtigkeit: | Hoch |

Dear Anastasija,

As the director of Courtvale, I have asked Hypo to make me a joint signatory on the account with Joseph and to send me copies of all correspondence.

I am about to counter-sign the payment instructions for the four transfers requested earlier today.

Can you please send to me copies of the invoices referred to and, if there is no invoice, then provide an explanation as to what exactly the payment is for?

With thanks and kind regards.

.ndrew

1

20

**Andrew Baker**

| | |
|---|---|
| Von: | Anastasija Blinova [a.blinova@londonintbank.com] |
| Gesendet: | Dienstag, 26. Februar 2008 13:02 |
| An: | andrew.baker@miselva.li |
| Betreff: | RE: Courtvale |



20080226115005.p
df

Dear Andrew,

Please find attached details of the invoices as requested.

If it's confusing that the invoices are addressed to JK and Mr
Samuelson, please be advised that we hardly ever received any invoices
on AB's name.

Regards,
Anastasija


-----Original Message-----
From: Andrew Baker [mailto:andrew.baker@miselva.li]
Sent: 25 February 2008 15:17
To: Anastasija Blinova
Subject: AW: Courtvale

Anastasija,

Many thanks.

I do have a further question in relation to the payment to Degaulle
Fleurance & Associes. There are two invoices addressed to Joseph and to
Christopher Samuelson respectively. Can you please give me further
details
as to what these invoices relate?

Kind regards

Andrew



Registered in England, No 3250572
Authorised and Regulated by the Financia=
l Services Authority

--
This e-mail, together with any attachments, is con=
fidential between the
sender and addressee(s). If you are not the intended r=
ecipient(s) of this
e-mail you should not copy it or use it for any purpose =
nor disclose its
contents to any person: to do so may be unlawful. If you ha=
ve received this
e-mail by mistake please notify the sender immediately by e=
-mail and delete
this e-mail and any attachments from your system. To the ma=
ximum extent
permitted by law, London International Bank Ltd accepts no liab=
ility for any
loss or damage resulting from unauthorised use of this email o=
r any
attachment or from unauthorised use of any information contained or im=

1

21

plied
in the email or attachments.

22

**DE GAULLE
FLEURANCE
& ASSOCIÉS**

SOCIÉTÉ D'AVOCATS

January 30, 2008

Mr. Joseph Kay
London International Bank
11 Grosvenor Place
London SW1X 7HH
UK

Dear Joseph,

Please find enclosed our statement of fees for professional services rendered during period from March 26, 2007 to January 24, 2008 in the "MP" matter.

Please do not hesitate to contact us should you have any questions concerning this statement.

We would be grateful if you could ensure the payment upon receipt.

Kind regards

Didier Bruère-Dawson

Encl.

Agreed with N,
GKeene 14/2/8

11, RUE PORTALIS 75008 PARIS
TEL. +33 1 56 64 00 00 - FAX. +33 1 56 64 00 01
SELAS AU CAPITAL DE 40.000 euros - RCS PARIS 439 984 835 - TOGUE K 35
www.dgfla.com

129308v1

23

January 30th, 2008

> **MEMORANDUM DESCRIBING PROFESSIONAL SERVICES**
> **RENDERED TO MR KAY**

1.  DESCRIPTION

    Advice and assistance rendered from 26 March 2007 to 24 January 2008 with respect to the
    "MP" matters (criminal law).

    In particular :

    - Follow up of the case with the Isle of Man attorney and Mr Samuelson
      (numerous calls and emails);

    - Various discussions and emails and one meeting in New York City with Mr
      Zeltzner relating to the Pechiney matter (followed by O'Kane - De Pardieu -
      Zeltzner);

    - Follow up in emergency of Chris' interview (Antibes matter) with his attorneys
      (meeting on 16 January 2008 in Paris and 17 January 2008 in London),
      tremendous discussions and emails, setting of a file to be provided;

2.  LAWYERS WORKING ON THE FILE

    Didier Bruère-Dawson (DBD)

3.  AMOUNT OF THE FEES

    | Lawyer | Rate per Hour | Hours spent | Subtotal |
    |--------|--------------|-------------|----------|
    | DBD | 330,00 € | 27:15 | 8 992,50 € |
    | Total | | | 8 992,50 € |

    Disbursements: 5 611, 87€ (Plane tickets for London, cabs, translation in emergency for the file
    to be provided to authorities)

198940v1

24

# DE GAULLE
# FLEURANCE
# & ASSOCIÉS

SOCIÉTÉ D'AVOCATS

Joseph Kay
C/O Fisher Island Holdings LLC
1 Fisher Island Drive
Fisher Island FL 33109
U.S.A

INVOICE 240/20023623

January 30, 2008

Our statement for professional services rendered
during the period from March 26, 2007 to January
24, 2008 in the "MP" matter

|  |  | EUR | 8 992.50 |
|---|---|---|---|
| *Disbursements* |  | *EUR* | *5 611.87* |
|  | TOTAL | EUR | 14 604.37 |

Payment requested upon receipt

*14,604-37*
*5,362-50*
*19,966-87*

Bank Transfers should be addressed to : BNP Paribas
Agence Paris Place Dauphine, 20, rue de Harlay, 75001 Paris
(Bank code : 30004 ; Branch code : 01960 ; Account n° 00010104228 55)
IBAN: FR76 3000 4019 6000 0101 0422 855 – BIC: BNPAFRPPPOP
VAT number : FR 00 439534635

11, RUE PORTALIS 75008 PARIS

TEL +33 1 56 64 00 00 · FAX +33 1 56 64 00 01

SELAS AU CAPITAL DE 40.000 euros · RCS PARIS 439 534 835 · TOGUE R 35

www.dgfla.com

*25*

# DE GAULLE
# FLEURANCE
# &ASSOCIÉS

SOCIÉTÉ D'AVOCATS

January 30th, 2008

Mrs. Natalia Shachkova
Mr. Joseph Kay
Mrs. Galina Keene
C/O LAKEBROW LTD
11 Grosvenor Place
London SW1X 7HH
UK

Dear all,

Please find enclosed our statement of fees for professional services rendered during the period from July 26th 2007 to January 25th, 2008 relating to "HIATUS".

Please do not hesitate to contact us should you have any questions concerning this statement.

We would be grateful if you could ensure the payment upon receipt.

Kind regards,

Didier Bruère-Dawson

*Encl.*

11, RUE PORTALIS 75008 PARIS
TEL +33 1 56 64 00 00 · FAX +33 1 56 64 00 01
SELAS AU CAPITAL DE 40 000 euros · RCS PARIS 439 534 865 · TOQUE K 35
www.dgfla.com

26

January 30th, 2008

+----------------------------------------------+
|   MEMORANDUM DESCRIBING PROFESSIONAL SERVICES |
|            RENDERED TO HIATUS                  |
+----------------------------------------------+

1.    DESCRIPTION

Advice and assistance rendered from July 26th, 2007 to January 25th, 2008.

In particular :

-    Tremendous calls and emails in order to collect back remaining funds (116K€ on 20 November 2007, 150K€ still to be collected) ;

-    Settlement of wealth tax issue for 2006;

-    Numerous calls with Antibes Tax Administration and PWC in order to try to settle the 600K€ claim and an additional tax claim (see my email dated 16 November 2007);

-    Reading the writs filed by the Tax Administration at Court;

-    Researches, drafting and then filing at Court of new writs in order to challenge the Administration's position in order to try to settle the matter.

2.    LAWYERS WORKING ON THE FILE

Didier Bruère-Dawson (DBD)
Vincent Schmitt (VS)

3.    AMOUNT OF THE FEES

| Lawyer | Rate per Hour | Hours spent | Subtotal |
|--------|---------------|-------------|----------|
| DBD    | 330.00 €      | 8:30        | 2 805.00 € |
| VS     | 330.00 €      | 7:45        | 2 557.50 € |
| Total  |               |             | 5 362.50 € |

199021v1

27

# DE GAULLE
# FLEURANCE
# & ASSOCIÉS

SOCIÉTÉ D'AVOCATS

Mr Christopher Samuelson
C/o Joseph Kay
24 Avenue Paul-Cérésole
1800 Vevey
Switzerland

INVOICE 666/20023622

January 30, 2008

Our statement for professional services rendered
during the period from July 26th 2007 to January
25th, 2008

| | | EUR | 5 362.50 |
|---|---|---|---|
| | TOTAL | EUR | 5 362.50 |

Payment requested upon receipt

Bank Transfers should be addressed to : BNP Paribas
Agence Paris Place Dauphine, 20, rue de Harlay, 75001 Paris
(Bank code : 30004 ; Branch code : 01960 ; Account n° 00010104228 55)
IBAN: FR76 3000 4019 6000 0101 0422 855 – BIC: BNPAFRPPPOP
VAT number : FR 00 439534835

11, RUE PORTALIS 75008 PARIS
TEL. +33 1 56 64 00 00 - FAX. +33 1 56 64 00 01
SELAS AU CAPITAL DE 40.000 euros - RCS PARIS 439 534 835 - TOQUE K 35
www.dgfla.com

28

**Andrew Baker**

**Von:**              Andrew Baker [andrew.baker@miselva.li]
**Gesendet:**      Dienstag, 26. Februar 2008 17:27
**An:**                Peter Bader
**Betreff:**          Courtvale

**Wichtigkeit:**     Hoch



Courtvale - Tfrs
26.02.08.pdf

Peter,

5 Zahlungsaufträge anbei, von mir unterschrieben.

Gruss

Andrew

1

29

26/02/2008  15:42    00423-265-56-66                                                S.  31/05
76/02 2008 208 11:50  FAX 0267170510 London Int' Bank Ltd                        [4001/005

OT:                          KÖREF TEREXEKGE:                  FEB. 26 2008 14:32  CTP2
        26 Feb 2008 8:05AM  LAKEBROW LTD                    020772350095          P. 1

Ms Kuttoglu
Hypo Investment Bank
Aktiengesellschaft
Aeulestrasse 59
Vaduz 9490
Liechtenstein

26 February 2008

Fax: +423 (265) 5666

Dear Filiz,

Please transfer from the account of Courtvale Holdings the amount of EUR 89,500-
(Eighty Nine Thousand Five Hundred Euros Exactly) to the following account:

| | |
|---|---|
| Beneficiary: | Global Jet |
| Bank: | UBS 9A 1260 Nyon - Switzerland |
| SWIFT: | UBSWCHZH12T |
| IBAN: | CH33 0024 3243 3274 0861 R |
| Reference: | Invoices E08-17318 and E08-17319 |
| Charges: | From payer's a/c |

Yours sincerely,

Lord J. Kay

30

26/02/2008  15:42   00423-265-56-66                                    S.    02/05
   26/02 2008 TUE 11:50  FAX 02071705510 London Int' Bank Ltd                ☑002/003

   OT:              HOMEP TEJECOPA:              FEB. 26 2008 14:32  CTP3
      26 Feb 2008 5:05PM   LAKEBROW LTD         020772358085         P.2

Ms Kurtoglu
Hypo Investment Bank
Aktiengesellschaft
Austrasse 59
Vaduz 9450
Liechtenstein

26 February 2008

Fax: +423 (265) 5666

Dear Filiz,

Please transfer from Courtvale Holdings Ltd account the amount of Euro 774.53 (Seven Hundred and Seventy Four Euros and Fifty Three Centimes Only) to the following account:

Beneficiary:   Finanzamt Baden-Baden
Bank:          Bundesbank Karlsruhe
IBAN:          DE 35660000000066001516
BIC:           MARKDEF1660

Reference:     Steuer-Nr. 36 059 06008 / Tolkmitt, February

Please could you ensure that the value date of the above transfer is today.

All charges to be paid by Courtvale Holdings Ltd.

Yours sincerely,

Lord J. Kay

31

01:                       HOMEP TEЛEФOHA:            GЕП. 25 2008 14:33  CTP4
    26 Feb 2008 5:05AM   LAKEBROW LTD        020772358085           p.3

Ms Kurtoglu
Hypo Investment Bank
Aktiengesellschaft
Austrasse 59
Vaduz 9490
Liechtenstein

26 February 2008


Fax: +423 (265) 5666


Dear Filiz,


Please transfer from Courtvale Holdings Ltd account the amount of Euro 2,013.69
(Two Thousand and Thirteen Euros and Sixty Nine Centimes Only) to the following
account:

Beneficiary:      AOK Bayern
Bank:             Deutsche Bank Munchen
IBAN:             DE51700700100152172360
BIC:              DEUTDEMM

Reference:        Beitr.Kto 144 824 61/Tolkmitt, February

Please could you ensure that the value date of the above transfer is today.

All charges to be paid by Courtvale Holdings Ltd.


Yours sincerely,

Lord J. Kay

32

26/02/2008  15:42    03423-265-56-66                                    S.   04/05
  26/02 2008 TUE 11:50  FAX 02071705510 London Int' Bank Ltd           ⊠004/005

OY:                        UEUEP TE/EGOPA:         SER. 26 2008 14:33  CTP5
    26 Feb 2008 5:05AM    LAKEBROW LTD         020772388085          P.4

Mrs Kurtoglu
Hypo Investment Bank
Aktiengesellschaft
Austrasse 59
Vaduz 9490
Liechtenstein

26 February 2008

Fax: +423 (265) 5666

Dear Eliz,

Please transfer from Courtvale Holdings Ltd account the amount of Euro 4,189.21
(Four Thousand One Hundred and Eighty Nine Euros and Twenty One Centimes
Only) to the following account:

Beneficiary:      Mrs Anett Tolkmit
Bank:             Dresdner Bank
IBAN:             DE72370800400427770300
BIC:              DRESDEFF

Reference:        February salary & quarter expenses

Please could you ensure that the value date of the above transfer is today.

All charges to be paid by Courtvale Holdings Ltd.

Yours sincerely,

Lord J. Kay

33

26/02/2008  15:42  00423-265-56-66                                        S.  05/05
    26/02 2008 TUE 11:50  FAX 02071705510 London Int' Bank Ltd           ☒005/005

C1:                    POMEP TELEGOCHA:              GEN. 26 2008 14:33  C1P6
    26 Feb 2008 5:06PM    LAKEBROW LTD           02077235S085          p.5

Ms Kurtoglu
Hypo Investment Bank
Aktiengesellschaft
Austrasse 59
Vaduz 9490
Liechtenstein

26 February 2008

Fax: +423 (265) 5666

Dear Biliz,

Please transfer from Courtvale Holdings Ltd account the amount of Euro 1,335.41
(One Thousand Three Hundred and Thirty Five Euros and Forty One Centimes Only)
to the following account:

Beneficiary:      Mr. Rico Tolkmit
Bank:             Hypovereinsbank Aschaffenburg
IBAN:             DE39795200703820429295
BIC:              HYVEDEMM407

Reference:        February salary

Please could you ensure that the value date of the above transfer is today.

All charges to be paid by Courtvale Holdings Ltd.

Yours sincerely,

Lord J. Kay

**Andrew Baker**

| | |
|---|---|
| Von: | Andrew Baker [andrew.baker@miselva.li] |
| Gesendet: | Mittwoch, 27. Februar 2008 08:31 |
| An: | Anastasija Blinova |
| Betreff: | AW: Courtvale |

Anastasija,

Thank you.

With respect to yesterday's transfers, can you please let me know who were the passengers on the flights from Moscow to Tbilisi on 14th February and Tbilisi to London on 17th February?

Also, all the other payments relate to the property in Baden Baden which is owned by Xavia Holdings BV. Surely these expenses relating to the property should be paid by Xavia? Xavia is a Dutch company that must prepare and file annual accounts and it would make tax-sense, I believe, to be charging the property running costs to Xavia.

Kind regards

Andrew

-----Ursprüngliche Nachricht-----
Von: Anastasija Blinova [mailto:a.blinova@londonintbank.com]
Gesendet: Dienstag, 26. Februar 2008 18:20
An: andrew.baker@miselva.li
Betreff: RE: Courtvale

Dear Andrew,
I was not informed about the new requirements.
However, from now on I will provide you with the instructions and back ups as requested.
Please find attached payments made today.
Have a good evening.
Regards,
Anastasija

-----Original Message-----
From: Andrew Baker [mailto:andrew.baker@miselva.li]
Sent: 26 February 2008 17:02
To: Anastasija Blinova
Subject: Courtvale
Importance: High

Dear Anastasija,

I am sorry to be a bore but can you please now as a matter of course send to
me copies of the relevant invoices that relate to each payment instruction
that is being sent to Hypo?

The very best thing would be for you to send the signed payment instructions plus invoices and supporting details to me, and I will counter-sign them and send them on to Hypo, with a copy back to you for your
file and so that you know they have gone to the bank.

The purpose of this is to ensure (and be seen to be ensuring) that all payments are to cover the expenses of AP's intended beneficiaries only.

Thanks and kind regards

Andrew

35

Registered in England, No 3250972
Authorised and Regulated by the Financia-
l Services Authority

--
This e-mail, together with any attachments, is con-
fidential between the
sender and addressee(s). If you are not the intended r-
ecipient(s) of this
e-mail you should not copy it or use it for any purpose -
nor disclose its
contents to any person; to do so may be unlawful. If you ha-
ve received this
e-mail by mistake please notify the sender immediately by e-
-mail and delete
this e-mail and any attachments from your system. To the ma-
ximum extent
permitted by law, London International Bank Ltd accepts no liab-
ility for any
loss or damage resulting from unauthorised use of this email o-
r any
attachment or from unauthorised use of any information contained or im-
plied
in the email or attachments.

36

**Tat Tang**

| | |
|---|---|
| Von: | Andrew Baker [andrew.baker@miselva.li] |
| Gesendet: | Mittwoch, 27. Februar 2008 17:22 |
| An: | Tat Tang |
| Betreff: | WG: Courtvale & API KAS payment |
| | |
| Anlagen: | 20080227141410.pdf; 20080227141442.pdf; Transfer API KAS to SARL Rodolfe 27.02.08.doc |

  

2008022714    2008022714    Transfer API
10.pdf (103 K442.pdf (1 MB to SARL Rod...

-----Ursprüngliche Nachricht-----
Von: Anastasija Blinova [mailto:a.blinova@londonintbank.com]
Gesendet: Mittwoch, 27. Februar 2008 15:59
An: andrew.baker@miselva.li
Betreff: Courtvale & API KAS payment


Andrew,

In regards to the Global Jet flight, I confirmed with the private office that
passengers on the plane were family members and close friends of AP.
Hope that answers your question.

As for Xavia invoices from now on the payments will be made from Xavia a/c, not
Courtvale.

Moreover, please find attached 2 payments:

1. Courtvale to Carre Aviation; this is AP's monthly private plane expenses (JK never
uses it). I haven't sent it to Hypo yet and would appreciate some clarification on how
you would like to run the payments now.

2. API KAS payment for your signature and JK's authorization.

Regards,
Anastasia




-----Original Message-----
From: Andrew Baker [mailto:andrew.baker@miselva.li]
Sent: 27 February 2008 07:31
To: Anastasija Blinova
Subject: AW: Courtvale

Anastasija,

Thank you.

With respect to yesterday's transfers, can you please let me know who were the
passengers on the flights from Moscow to Tbilisi on 14th February and Tbilisi to
London on 17th February?

Also, all the other payments relate to the property in Baden Baden which is owned by
Xavia Holdings BV. Surely these expenses relating to the property should be paid by
Xavia? Xavia is a Dutch company that must prepare and file annual accounts and it
would make tax-sense, I believe, to be charging the property running costs to Xavia.

Kind regards

1

37

Andrew

Registered in England, No 3250572
Authorised and Regulated by the Financial Services Authority

--
This e-mail, together with any attachments, is confidential between the sender and
addressee(s). If you are not the intended recipient(s) of this
e-mail you should not copy it or use it for any purpose nor disclose its contents to
any person; to do so may be unlawful. If you have received this e-mail by mistake
please notify the sender immediately by e-mail and delete this e-mail and any
attachments from your system. To the maximum extent permitted by law, London
International Bank Ltd accepts no liability for any loss or damage resulting from
unauthorised use of this email or any attachment or from unauthorised use of any
information contained or implied in the email or attachments.

2

38

OT:                          HOMEP TEIEΦOHR:           FEB. 27 2008 18:17   C1P1
27 FEB 2008 7:07AM    LAKEBROW LTD
                                                       020772358085
                                                                    P.2


Ms. Filiz Kurtoglu
Hypo Investment Bank
Aktiengesellschaft
Austrasse 59
Vaduz 9490
Liechtenstein


27 February 2008


Fax: +423 (265) 5866


Dear Filiz,

Please could you kindly arrange for a transfer from Courtvale Holdings Limited
account the amount of EUR 432,701.04 (Four Hundred and Thirty Two Thousand,
Seven Hundred and One Euros and Four Centimes Only) to the following account:

| | |
|---|---|
| Name: | Carre Aviation Limited |
| Bank: | Hypo Investment Bank Liechtenstein |
| Account: | 309,265 |
| IBAN: | LI47 0880 3103 0926 5000 0 |
| Reference: | Invoice 2008/010 |


Please could you ensure that the value date of the above transfer is today.


Yours sincerely,



Lord J. Kay


39

03/03 2008 MON 11:33   FAX 02071705510 London Int' Bank Ltd                    ☑001/002

Ms Kurtoglu
Hypo Investment Bank
Aktiengesellschaft
Austrasse 59
Vaduz 9490
Liechtenstein

3ʳᵈ March 2008

Fax: +423 (265) 5666

Dear Filiz,

Please transfer from Courtvale Holdings Ltd account the amount of USD
$21,275,000.- (Twenty One Million, Two Hundred and Seventy Five Thousand US
Dollars Exactly) to the following account:

Beneficiary:          Joseph Kay
Beneficiary's a/c:    36110100777

Beneficiary's Bank:   JSC Investbank, Tbilisi, Georgia
SWIFT:                USMGE22

Intermediary Bank:    Commerzbank AG, Frankfurt, Germany
SWIFT:                COBADEFF
A/c USD/EUR:          400886582600

Reference:            Courtvale

Please could you ensure that the value date of the above transfer is today.
All charges to be paid by Courtvale Holdings Ltd.

Yours sincerely,

Lord J. Kay

40

03/03 2008 MON 11:33  FAX 02071705510 London Int' Bank Ltd

@002/002

Ms. F Kurtoglu
Hypo Investment Bank
Aktiengesellschaft
Austrasse 59
Vaduz 9490
Liechtenstein

3rd March 2008

Fax: +423 (265) 5698

Dear Filiz,

Please transfer from Courtvale Holdings Ltd account the amount of GBP £100,000-
(One Hundred Thousand Pounds Only) to the following account:

Account:      Lakebrow Ltd

Bank:         The Royal Bank of Scotland
              London Victoria Branch
              London SW1E 6RA

Sort Code:    16 01 09
Account:      00230902

Yours sincerely,

Lord J. Kay

4-1

FILE NOTE - 2

COURTVALE HOLDINGS LTD ("Courtvale")

It had until recently been my impression that Courtvale was a company beneficially owned by Joseph Kay ("JK"). Upon AP's death, JK requested me to make certain transfers from "AP" companies to Courtvale. When I questioned the propriety of this, I was told that Courtvale had only ever been used to make payments to cover the expenses of AP and his family. I made the transfers as requested but had myself put onto the bank account as a joint signatory, for safety's sake.

Today, I received from JK two transfer requests to make payments out of Courtvale's bank account, one of which is for a very substantial amount of money to JK's personal account. I have declined to countersign the instructions pending a meeting tomorrow with David Ashfield and Emanuel Zeltser.

In my view, it is essential to ensure so far as possible that transfers of funds which originated from "AP" companies are only used for the benefit of AP's heirs (Jorum Establishment) or intended beneficiaries (Nile Trust).

03.03.08

42



London International Bank Ltd

Hypo Investment bank AG
Austrasse 59
Postfach 231
FL-9490
Vaduz
Liechtenstein

March 5, 2008

RE: Courtvale Holdings, Ltd.

========================

Dear Andreas,

We understand that a wire transfer requested by Mr. Joseph Kay on March 3, 2008, has not been executed by the Bank apparently because of an objection or a refusal to comply with instructions of the principals by Mr. Andrew Baker, a nominal director of Courtvale, whom you initially recommended to our organization as a nominee-trustee and nominee director. (Since that time, we have become Mr. Baker's single largest client accounting for approximately half a million Swiss Francs per annum income.)

As you know, Courtvale has been a client of both Hypo Bank and LIB for many years. The failure to effect the transfer has caused and continues to cause Courtvale and its actual principals significant damages and is a source of embarrassment for LIB. As you also know, Courtvale for years has been under the control and management of Mr. Kay. In January we appointed Mr. Baker a nominal director of the company. Naturally, the *de facto* control has always been and continues to be vested in the principals of Courtvale represented solely and exclusively by Mr. Kay. Following this incident and other issues our clients have had with Mr. Baker and having secured the advice of attorneys, the actual owners and directors of Courtvale have made a decision to remove Mr. Baker as a nominee and vest the entire control over Courtvale in Mr. Kay for the time being.

You are well aware that Mr. Baker's position as Courtvale's director has always been purely nominal and he has neither interest in nor control over the account or its assets. Accordingly, on behalf of the actual owners of Courtvale, we request that Mr. Baker's signature be removed forthwith. We further request that the transfer of US$23,000,000.00 be effected in favor of the London International Bank, Ltd., at JPMorgan Chase Bank, New York BIC CHASUS33 Account name KAS Bank (KASANL2A) Account 544-732920 FFC 22.83.06.728.

In the event Hypo may have any concerns respecting this transfer, please accept our assurances that LIB is prepared to take full and unequivocal responsibility for same in every respect.

11 Grosvenor Place London SW1X 7HH
Tel +44 20 7170 4500  Fax +44 20 7170 4510
Email contact@londoninbank.com
www.londoninbank.com
Registered in England and Wales No 5250572  Authorised and Regulated by the Financial Services Authority

43



We appreciate your cooperation in this regrettable incident with Mr. Baker and rest assured that we, as always, value the long-standing relationship between our two institutions and your kind assistance in this and other matters. Should you have any questions, please feel free to contact Mr. Kay directly.

Yours sincerely

Ali Guidfar
Chief Executive Officer

Cc: Joseph Kay, Chairman
David Ashfield, CEO
Courtvale Holdings, Ltd
Emanuel Zeltser, Esq.

13 Grosvenor Place, London SW1X 7HH
Tel. +44 20 7170 5500    Fax. +44 20 7170 5510
Email: contact@londinimbank.com
www.londinimbank.com
Registered in England and Wales No. 3250572   Authorised and Regulated by the Financial Services Authority

44

miselva

Ali Guidfar, Esq.
London International Bank Limited
11 Grosvenor Place
London SW1X 7HH

7th March 2008

By e-mail, original following by post

Dear Ali,

As requested repeatedly by yourself and David, I have been trying to find a solution that will allow us to continue our relationship whilst allowing Joseph Kay ("Joseph") to maintain his efforts in Georgia to protect the assets of the Nile Trust ("Nile") and of Jorum Establishment ("Jorum") for the benefit of Nile and Jorum respectively.

As a preliminary matter, please note that Miselva and I have instructed the London law firm of Payne Hicks Beach and the Vaduz law firm of Batliner Wanger Batliner to provide independent advice to us. I suggest that Joseph also appoints recognized firms of lawyers in London and Vaduz to represent him. Without any intended disrespect to Mr. Emanuel Zeltser, I sincerely believe that much more progress will be made this way. The bizarre 'cloak and dagger' approach to date whereby documents have been referred to or read out but not supplied in copy or delivered incomplete and in a shambolic state has been most unhelpful and is responsible to a large degree for the current situation.

In order to make positive progress, I will need you first to rescind in writing your letter of 5th March to Dr. Andreas Insam at Hypo Investment Bank (Liechtenstein) AG ("Hypo") in which it is alleged that I am acting improperly and which purports to remove me as a director of Courtvale Holdings Limited ("Courtvale") and as a signatory on that company's bank account at Hypo. Second, I will require Joseph to rescind in writing his verbal allegations to Hypo that I or persons under my control have forged Joseph's signature with respect to the change of director and authorized signatory of Courtvale. This is a very serious matter and will result in Hypo involving the criminal prosecutor's office unless resolved by 19th March, as set out in Dr. Insam's e-mail response of 5th March to your said letter. As you know, there is absolutely no doubt that Joseph signed the necessary paperwork accepting his resignation as director of Courtvale and appointing me as sole director, as well as moving Courtvale under Jorum's ownership. We have placed the original, signed documents in our bank safe.

Further, subject to the lawyers' confirmation, I believe it is clear that the founder's rights in respect of Jorum form part of the late Arkadi Patarkatsishvili's ("AP") Estate. This needs to be acknowledged by Joseph in writing as Zeltser was attempting to argue otherwise at our meeting on 4th March.

...../2

- 2 -

Assuming we can achieve the above, we can then address the future.

Joseph needs clearly to understand what I have told him, yourself, David and Zeltser on numerous occasions that even though he may sincerely believe himself to be AP's intended Executor and/or personal representative he must first be officially appointed as such before I or anyone else for that matter can take instructions from him. However, since this is purely a matter of Liechtenstein law with respect to the founder's rights of Jorum I repeat my advice that Joseph should instruct lawyers here without delay.

In the meantime, in view of the apparent urgency, it may be possible to accept at face value the document(s) purporting to appoint Joseph as Executor / personal representative but these MUST first be properly produced to and examined by our lawyers. Subject to our lawyers' advice, I would have thought that they will appoint a New York firm to go and inspect the original documents which I understand are held at the offices of Sternik and Zeltser and make copies which they will then certify as true and correct. The same applies to the document(s) purporting to give Joseph absolute power over Nile, including the most unusual "Letter of Wishes" produced for the first time by Mr. Zeltser on 4th March, of which an incomplete copy was left with me at that time. This procedure need not take long: indeed, if Mr. Zeltser had produced proper copies at an earlier date, this process would in all probability have been completed by now. His failure to do so can only engender suspicion that he has something to hide.

Whilst these matters may take some time to be satisfactorily resolved, I understand that various urgent payments may need to be made in order to protect the assets of Jorum and Nile. I am quite prepared in principle to sanction and comply with requests for such payments provided that these are made in writing in a cogent and coherent fashion with as much supporting evidence as possible to back them up. Requests such as the one I received from Joseph on 3rd March to transfer USD 21,000,000 to his personal account (without giving any reason therefor) and another (verbally) on 4th March from Zeltser for a transfer of USD 7.1 million to his "escrow" account (whatever that may be) in order to "pay salaries in Georgia" are quite simply unacceptable for obvious reasons as I am sure you will understand. The payments must of course be for the protection of the Nile and Jorum assets. We are under an obligation to ensure that funds are disbursed for proper purposes only.

I am aware of Joseph's desire to receive an unlimited general power of attorney to represent Jorum and Miselva (as trustee of Nile). I regret that I am not prepared to issue these. Subject to the foregoing, however, I am willing to issue some limited form of authorization that will enable him to assist us in protecting the Jorum and Nile assets and I will ask our lawyers to produce suitable documents, as a matter of urgency, if Joseph agrees.

..... / 3

- 3 -

Finally, I wish to address an issue that has been causing me some anxiety. As you know, at your request I drafted and sent to you by e-mail on 15th February (subsequent to our meeting on 14th February in London) a draft letter to be sent to me from Joseph in which he recounts a meeting with AP on 12th January and requests me to issue an instruction as director of Montglimmer Overseas Limited to LIB to use funds standing to the credit of its account with LIB to cover trading losses on various LIB accounts including its own. I did receive such a letter by fax on 21st February but have not acted on it and no such instruction from Montglimmer has been given. On reflection, I think it would be improper for me and thus Montglimmer to give such an instruction. I sincerely apologize for perhaps conveying the impression that I might be prepared to do so. Further, since Montglimmer is a trust asset, I feel it is no longer appropriate (post AP's death) for trust cash assets to be involved in what I now perceive to be high-risk investments. Accordingly, please accept this letter as my instruction as director of Montglimmer to close out its trading positions (if any) and to remit all funds to its account with Hypo.

I look forward to hearing from Joseph and yourself once you have had a chance to digest the contents of this letter. Let me assure you that I am quite prepared to work with Joseph and yourselves provided that everything is done properly and transparently.

With kind regards.

Yours sincerely,

MISELVA ETABLISSEMENT

Andrew J. Baker

47

# COURTVALE HOLDINGS LIMITED
### Pasea Estate, Road Town, Tortola,
### British Virgin Islands

### ADOPTION OF A WRITTEN RESOLUTION BY THE SOLE DIRECTOR
### this 19th day of March 2008

I, the undersigned, Andrew Baker, sole director of Courtvale Holdings Limited ("the Company"), a company duly registered, incorporated and existing under the laws of the British Virgin Islands, company registration 640519, with its registered office at Pasea Estate, Road Town, Tortola, British Virgin Islands, HEREBY RESOLVE AS FOLLOWS:

THAT Mr. Joseph Kay be and the same is hereby removed with immediate effect as a signatory on each of the Company's bank accounts with Hypo Investment Bank (Liechtenstein) AG to the intent that Andrew Baker be the sole remaining signatory on the said bank account(s)

Andrew Baker

48



London International Bank Ltd

Hypo Investment Bank AG
Austrasse 59
Postfach 231
FL-9490
Vaduz
Liechtenstein

March 20, 2008

RE: Courtvale Holdings, Ltd.
============================

Dear Andreas,

I write further to my letter of 5 March 2008 in which a request was made for the transfer of funds from the account of Courtvale Ltd to an account of London International Bank. I now wish to withdraw that request as it was based on a misunderstanding of the situation and instruction that has now been clarified.

Yours sincerely

Ali Guldfar
Chief Executive Officer

11 Grosvenor Place, London SW1X 7HH
Tel. +44 20 7170 5500   Fax +44 20 7170 5510
E mail contact@londonintbank.com
www.londonintbank.com
Registered in England and Wales No. 3286574  Authorised and Regulated by the Financial Services Authority

49

**AJB-11**

2008 M No

**IN THE SUPREME COURT OF GIBRALTAR**
**CHANCERY JURISDICTION**

IN THE MATTER of the Civil Procedure Rules, Part 64, Section 1

and

IN THE MATTER of the Trustees Act

and

IN THE MATTER of the trusts known as The Valmore Trust and The Summit Trust

BETWEEN

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**

<u>Claimants</u>

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**

<u>Defendants</u>

---

**EXHIBIT "AJB11"**

---

This is the exhibit marked "AJB11" referred to in the Witness Statement of ANDREW JOHN BAKER dated        this      day of                2008

**Andrew Baker**

| | |
|---|---|
| **Von:** | CJZ Group [cjzgroup@bk.ru] |
| **Gesendet:** | Montag, 10. März 2008 05:04 |
| **An:** | andrew.baker@miselva.li |
| **Cc:** | a.guidfar@londonintbank.com; lawmail@rambler.ru; alexfishkin2000@mail.ru |
| **Betreff:** | Courtvale Holdings, Ltd./ please see attached correspondence |



untitled.pdf

1

/



# CJZ GROUP, INC.
## International Real Estate Investments

Tel/ Fax: +1.440.332.1789
Email: CJZGroup@bk.ru

ELECTRONIC TRANSMISSION

| FROM: | Zlata Tszyan, Secretary-Treasurer | TO: | Mr. Andrew Baker |
|-------|-----------------------------------|------|------------------|
| RE: | Jorum and Courtvale | FAX: | |
| DATE: | March 10, 2008 | EMAIL: | andrew.baker@miselva.li |

Dear Mr. Baker,

I write to you as a Director of CJZ Group, Inc. ("CJZ") in an "eleventh hour" effort to avert a full-blown controversy which is looming on the horizon. As you probably are aware, CJZ is a US corporation which owns 100% of Jorum Establishment, pursuant to the deed of assignment signed by yourself on February 6, 2006 (copy is attached as Annex 1). As you also know, Courtvale Holdings, Ltd. ("Courtvale") is a 100% subsidiary of Jorum, as evidenced by the Declaration of Trust confirming to us that your company, Miselva Etablisement, holds 10,000 shares (100%) in Courtvale "on trust for [Jorum's] use and benefit absolutely", signed by yourself on March 3, 2008 (attached, as Annex 2).

We are aware that various written and verbal exchanges have been had amongst yourself, Hypo Bank and our UK bankers, London International Bank ("LIB"), who were kind enough to use their good offices in an attempt to mediate this conflict, prompted by the blocking of our account with Hypo, because of your failure to comply with our principals' transfer instructions - - all apparently without much progress thus far. In the meantime, our inability to access the funds of our subsidiary is causing us significant financial harm. LIB was kind enough to provide us with your recent email to Mr. Ali Guidfar. We certainly agree that once the lawyers get involved, we are ALL in their hands. This is why the CJZ Board of Directors instructed me to write to you in order to make one more attempt to resolve the situation in an amicable fashion before the lawyers commence filing complaints with US and European authorities - - in addition to legal actions in various jurisdictions. Thus, we are asking you to help us and help yourself. As a preliminary matter, permit me to address some points raised in your written and verbal communications with LIB officers.

FIRST. We are aware that both you and Hypo Bank are much concerned regarding certain statements made by our Chairman, Mr. Joseph Kay, and suggested that a letter from Mr. Kay retracting same may remove the impediment to the rapid resolution of this matter. We are confident that once Hypo confirms that our funds would be released immediately upon their receipt of such correspondence, we will be able to impress upon Mr. Kay to forward same to Hypo. Given your intimate and long-standing relationship with Hypo, obviously you are in the best position to facilitate such confirmation.

SECOND. Regrettably, we cannot recant the statement that you had been replaced as Courtvale director because this is a true and accurate statement. CJZ, being the 100% owner of Jorum, upon due deliberation of the Board has determined that it is in the best interest of our Organization to appoint new Boards of Directors of Jorum and Courtvale. Lawful resolution of the Board to that effect has been duly and properly adopted and will not be re-visited. Needless to say, our first duty is to our shareholders and, as you surely know, any holding company is within its right

2.

to replace the directors of its subsidiaries at will, if it deems such action in shareholders' best interest.

THIRD. As to your concerns regarding Jorum and/or Courtvale somehow being a part of Mr. Patarkatsishvili's estate, our US and European lawyers advise us that this is simply not so. Courtvale is a wholly owned subsidiary of Jorum, according to your own written confirmation. (Annex 2). Jorum in turn is a wholly owned subsidiary of CJZ (Annex 1), a company entirely unrelated to Mr. Patarkatsishvili. Hence, neither Courtvale nor Jorum could possibly constitute a part of Mr. Patarkatsishvili's estate. Therefore the issue of JK's executorship is not even relevant under the circumstances and you have no responsibility whatsoever as regards Courtvale's and Jorum's actions, as such have been properly and lawfully approved by the Board of their US parent company.

FOURTH. We understand that in one conversation with LIB officers you intimated that you were "considering" notifying Mr. Patarkatsishvili's family. As noted, Mr. Patarkatsishvili or his family has nothing to do with Jorum, Courtvale or CJZ. That being said, we certainly are not concerned with any challenges to our ownership of Jorum or Courtvale, which is evidenced beyond doubt, *inter alia*, by the documents executed by yourself. In addition of course, the funds in the account clearly came from the sources, which are wholly unrelated to Mr. Patarkatsishvili and notably after his departure. Still further, multiple witnesses stand ready to testify under oath as to the facts and circumstances evidencing propriety of CJZ's acquisition of Jorum and its subsidiaries.[1] Above notwithstanding, our lawyers advise us that divulging confidential client information by a person who holds himself out to be a "trustee" and "fiduciary" is a grave infraction (in addition to being certain to cause further confusion and pain to Badri's loved ones unnecessarily.) Hence, we do suggest that you consider that factor before imparting our confidences to any third party.

FIFTH. You indicated that you wanted your attorneys to meet with Mr. Patarkatsishvili's former lawyers in New York and review the documents relating to Mr. Patarkatsishvili's last wishes. Even though, as noted, Courtvale is wholly unrelated to Mr. Patarkatsishvili, we understand that Mr. Patarkatsishvili's attorneys agreed to such a meeting in the interest of avoiding an ugly controversy. But this must br done immediately, if at all, because the time is not on our side. We seek no controversy with you or Hypo but we simply cannot afford any further damages to be caused by our inability to use our funds.

Dear sir, we can still resolve this mess without long-lasting legal consequences if we move fast. LIB wants to continue working with you and you may appreciate that Jorum is not its only client. But, as you surely know, once the lawyers get into an adversarial mode, this matter will not be capable of stopping until hundreds of thousands in legal honorariums are expended. We cannot believe that

---

[1] We are not certain which "family" you are referring to, as Mr. Patarkatsishvili had more than one family, making Mr. Kay's appointment as the sole executor a tedious and extremely delicate task. This was one of the reasons why Mr. Patarkatsishvili picked Mr. Kay to perform this challenging chore, and instructed all trustees (yourself included) and custodians of his property to turn all assets having to do with Mr. Patarkatsishvili to Mr. Kay, as the documents provided to you clearly establish. In any event, all of Mr. Patarkatsishvili's family members are very dear to us, as Badri himself was (Badri was a very dear friend of our Organization, Mr. Kay and my personal dear friend as well). We currently are assisting all of Badri's family members in gathering the assets, which indeed belonged to him (Jorum and Courtvale not being part of such) and mediating occasional conflicts amongst them, so as to ensure that Badri's wishes are carried out.

3

Andrew Baker    March 10, 2008    Page 3

you want lay out your hard-earned money for the next three years to defend against the allegations of gross misconduct, and we do not want to suffer any further damages due to our inability to access our funds, which the Organization has allocated for particular immediate expenditures. Nor does Hypo or LIB want to be embarrassed by their insistent recommendations and endorsement of yourself - - the sole reason for our subsidiaries' decision to retain your services - - especially now that the news media all over the world is portraying (perhaps unfairly) Liechtenstein and people in your profession in the most derogatory light.

We have no doubt that the US and European courts, after reviewing the documentary and testimonial evidence, will justly direct Hypo to release our funds. Regrettably, the time, the expense and the damages caused by this unnecessary quarrel will take a significant toll on us, yourself and Hypo.

We are confident that given your very special relationship with Hypo (which, according to the investigators retained by our European counsel, we will have no difficulty demonstrating) you may easily resolve this without further harm to everyone. Please, speak to Hypo, get them to confirm that our account is solely within our control and we will get Mr. Kay to write the letter clearing your name and we will forget about this incident. Assuming that your expressed concerns are genuine, we are even prepared to offer to you and Hypo an extra level of comfort by having the funds wired to our Courtvale's or Jorum's account in the US, so that this would be merely an inter-company transaction.

The time is running awfully short. Our US and European lawyers have advised that they are prepared to file complaints with appropriate authorities and commence actions in proper forums by mid-week. We truly do not want to go that route. Please, make it unnecessary. Please feel free to contact the undersigned directly at any time. Awaiting your news with much interest.

Yours, truly,

*Zlata Tszyan*

Zlata Tszyan
Secretary of the Board

cc:    Peters & Peters, Esqs.
       Sternik & Zeltser, Esqs.
       Norton Rose, Esqs.
       Alexander Fishkin, Esq.
       Alexander Cherny, Esq.
       De Pardieu Brocas Maffei, Esqs.
       London International Bank
       Mr. Joseph Kay

4

**ANNEX 1**

## DEED OF ASSIGNMENT

The undersigned, Miselva Etablissement, Vaduz, Founder of the firm

### Jorum Establishment
#### Vaduz

hereby irrevocably assigns all the rights and obligations that it has as Founder pursuant to the law or the statutes of the said firm to:

# CJZ Group, Inc.

And hereby waives all its rights to the said firm and explicitly declares that it will neither now nor in future make any claim to or in respect of such rights.

Vaduz, 6th February 2006

The Founder

Miselva Etablissement

Andrew J. Baker

5

Die Echtheit der Unterschrift von

Herrn Andrew J. Baker, geb. am 03.12.1960



wird amtlich beglaubigt.
Grundbuch- und Öffentlichkeitsregisteramt
Vaduz, den 06.02.2006

Rino Hassler

**ANNEX 2**

# DECLARATION OF TRUST

To:

### JORUM Establishment, Josef Rheinberger Strasse 29, FL-9490 Vaduz

We, Miselva Etablissement of Josef Rheinberger Strasse 29, Postfach 635, 9490 Vaduz, Liechtenstein hereby declare that we hold ten thousand (10'000) shares in

## COURTVALE HOLDINGS LIMITED

### Registered in the British Virgin Islands under Company number 1063187
### Registered office at Pasea Estate, Road Town, Tortola, British Virgin Islands

and that we hold these shares on trust for your use and benefit absolutely. We undertake not to dispose of these shares without your express consent and we will not seek to mortgage them or to place any form of charge, pledge or security over them or to do or knowingly suffer to be done anything in any way what ever that is inconsistent with or that could prejudice your use and benefit of the said ten thousand shares.

Vaduz, 3rd March 2008

Miselva Etablissement

Andrew J. Baker
Director

7

**AJB-12**

**2008 M No**

<u>IN THE SUPREME COURT OF GIBRALTAR</u>
<u>CHANCERY JURISDICTION</u>

**IN THE MATTER** of the Civil Procedure Rules, Part 64, Section 1

and

**IN THE MATTER** of the Trustees Act

and

**IN THE MATTER** of the trusts known as The Valmore Trust and The Summit Trust

**BETWEEN**

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**

<u>Claimants</u>

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**

<u>Defendants</u>

---

**EXHIBIT "AJB12"**

---

This is the exhibit marked "AJB12" referred to in the Witness Statement of ANDREW JOHN BAKER dated          this    day of              2008

## Andrew Baker

**Von:**      Andrew Baker [andrew.baker@miselva.il]
**Gesendet:** Donnerstag, 3. April 2008 18:50
**An:**       Adv. Zvi Barak
**Betreff:**  AW: Pearls of Wisdom - Investment contract dated December 3rd 2007


Dear Mr. Barak,

I am writing to confirm an appointment with you on Monday 7th April 2008 at 10:00 a.m. the offices of our lawyers, Messrs Batliner Wanger Batliner at Am Schraegen Weg 2 in Vaduz.

Whilst writing, I wish to address a number of issues arising from your e-mail message below:

1.   Far from being "well aware" that Paua Enterprises Limited ("Paua") had signed an investment contract in the sum of USD 84 million, I was NOT aware of this AT ALL.

2.   Although you and I are the directors of Paua, I was not asked to consider and/or to approve a resolution authorizing Paua to enter into the said contract (entitled "Founders Agreement"). You made this decision entirely by yourself and without any involvement whatsoever on my part.

3.   I fail to understand how you can have made the representation and warranty in clause 4 of the Founders Agreement without my knowledge or approval of the Founders Agreement or the investment itself.

4.   I would certainly not have approved of Paua entering into any agreement by which it might incur (potential) financial liability unless I had been sure of being able to secure the necessary financing.

5.   To the best of my knowledge, Paua does not have access to sufficient funds to meet its commitments under the Founders Agreement.

6.   As I read the terms of the Founders Agreement, in particular cl. 8.4., the consequence of non-payment of the Capital Contribution (sic) is dilution of Paua's interest in the joint venture.

7.   In the circumstances, it seems to me at this stage as if Paua has no alternative but to be diluted.

Yours sincerely,

Andrew Baker


-----Ursprüngliche Nachricht-----
**Von:** Adv. Zvi Barak [mailto:advbarak@zahav.net.il]
**Gesendet:** Montag, 17. März 2008 13:20
**An:** Andrew Baker
**Cc:** Ali Guidfar; Joseph Kay; 'Natalia Shachkova'
**Betreff:** Pearls of Wisdom - Investment contract dated December 3rd 2007
**Wichtigkeit:** Hoch

Dear Mr. Baker,

I was advised to approach you after the tragic death of Badri Patarkatsishvili.

As you are well aware, I signed in his name (through Paua Enterprises Limited,  the British company registered under no.  06225529 ) an investment contract in the sum of 84 million US dollars with an Israeli corporation "The Peals of Wisdom Research & Development Ltd.", on  December 3rd 2007. (Contract sent in the attchment - total 16 pages).

The scheduled payment of Paua Enterprises Limited in the fiscal year 2008 is 2 million dollars for each month, starting with March 1st 2008.
All the business plan of this important company is based on the schedule of these payments.

I would be very appreciative if you will allow to this investment to go according to the plan, as I was assured by Mr. Badri (reconfirmed by him in our last meeting in London a week before his death).

I am at your service to answer any question that you might have regarding this commitment.

With best regards,
Zvika Barak, Adv.

Zvika Barak - Advocates & Solicitors
Gibor Sport Building, 7 Menachem Begin St.
Ramat-Gan, Israel 52521
Tel: + 972 - 3 - 6114485   Fax + 972 - 3 - 6114486
email: advbarak@zahav.net.il

This e-mail message and its attachments are confidential, intended only for the addressee(s) named above and may contain information that is proprietary, privileged, attorney work product or otherwise exempt from disclosure. If you receive this message in error please notify us at advbarak@zahav.net.il and immediately delete this message and its attachments from your system.

18.04.2008

2

**AJB-13**

**IN THE SUPREME COURT OF GIBRALTAR**
**CHANCERY JURISDICTION**

2008 M No

**IN THE MATTER** of the Civil Procedure Rules, Part 64, Section 1

and

**IN THE MATTER** of the Trustees Act

and

**IN THE MATTER** of the trusts known as The Valmore Trust and The Summit Trust

**BETWEEN**

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**

Claimants

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**

Defendants

EXHIBIT "AJB13"

This is the Exhibit "AJB13" referred to in the Witness Statement of ANDREW JOHN BAKER dated this 20ᵀʰ day of April 2008

**Andrew Baker**

| | |
|---|---|
| **Von:** | Andrew Baker [andrew.baker@miselva.li] |
| **Gesendet:** | Donnerstag, 3. April 2008 19:50 |
| **An:** | CHRIS SLY |
| **Betreff:** | AW: Broadlands, Bagshot Road, Ascot |

Chris,

I have read the contents of Lord Goldsmith's e-mail below and regret to advise that Miselva is not in a position to disclose any information about the companies mentioned in his message.

To the best of our knowledge and belief, these companies do not form part of the assets of the Nile Trust or of Jorum Establishment nor do we have any specific evidence to suggest that any of Lord Goldsmith's clients have any proprietary or beneficial interest in such companies.

Could you please pass our response to this effect to Lord Goldsmith?

Thanks and kind regards

Drew

-----Ursprüngliche Nachricht-----
**Von:** CHRIS SLY [mailto:CSLY@phb.co.uk]
**Gesendet:** Donnerstag, 3. April 2008 18:45
**An:** andrew.baker@miselva.li
**Betreff:** FW: Broadlands, Bagshot Road, Ascot
**Wichtigkeit:** Hoch

Drew

Can you call me urgently about this?

Chris

**Christopher Sly**
**Partner**
**Payne Hicks Beach**
**Direct Dial +44 (0)20 7465 4383**
**Mobile +44 (0)7802 579296**

**From:** Goldsmith, Peter H. [mailto:phgoldsmith@debevoise.com]
**Sent:** 03 April 2008 17:42
**To:** CHRIS SLY
**Cc:** McLarty, Karis; Byrne, Louise
**Subject:** Re: Broadlands, Bagshot Road, Ascot

Dear Christopher

I have not yet opened the attachments but in the meantime have an urgent issue which has come up which I would like to raise with you and Andrew Baker

We, together with The Risk Advisory Group, have been taking steps to try to discover the nature and location of the late Arkady (Badri) Patarkatsishvili's assets. Part of our investigation has focused on assets held by English companies called Fisher Island Ltd., Grosvenor Trading House Ltd., Thames Steel UK Ltd. and and Chapel St Construction Ltd. Our understanding was that these entities were held by Miselva Etablissement.

However, it has emerged during the course of further searches made today that ownership of these companies (and perhaps others, of whose existence we are to date unaware) has been transferred from Miselva to JWL Entertainment Group Inc, a company registered in Delaware. Available records for the latter company show that its representative is a person known to be affiliated with Joseph Kay.

Available records show that the transfers of these companies apparently took place on 31 December 2007 but that the transfers were not registered with Companies House in England until very recently.

We would like to speak to you urgently about this matter, as, understandably, it is of great concern to our client. Please let me know whether you are available for a call later today or, if not, when you would be?


Many thanks

2

# DEBEVOISE & PLIMPTON LLP

Tower 42
Old Broad Street
London EC2N 1HQ
Tel +44 20 7786 9000
Fax +44 20 7588 4180
www.debevoise.com

The Rt Hon Lord Goldsmith QC
European Chair of Litigation
Tel +44 20 7786 3007
phgoldsmith@debevoise.com

April 4, 2008

Christopher Sly, Esq
Payne Hicks Beach
10 New Square
Lincolns Inn
London WC2A 3QG

*Dear Christopher*

We refer to our previous correspondence and meeting. As you are aware, we act for Inna Gudavadze and other members of the family of the late Arkadi (Badri) Patarkatsishvili.

Yesterday, we asked you for information from Andrew Baker in relation to transfers of four English companies by Miselva Etablissement. The reply from you enclosing the email of Andrew Baker of Miselva yesterday has caused us very significant concern.

That reply indicates that Miselva is not in a position to disclose any information about these transfers. The messages goes on to say that these companies do not form part of the assets of the Nile Trust or of Jorum Etablissement nor "do we have any specific evidence to suggest that any of Lord Goldsmith's clients have any proprietary or beneficial interest in such companies". Our concern is that this implies to us that Miselva believes that our clients do not have any interest or claim in these companies or the assets held by them. That in turn would imply that Miselva does not believe, or has no evidence that these assets were assets ultimately beneficially held for the benefit of Mr. Patarkatsishvili.

We have evidence to believe that such a belief would simply be not correct. For example, Fisher Island Limited we understand to have been a company which ultimately owned Fisher Island, a US resort. Mr. Patarkatsishvili had on many occasions told family and business associates that he had bought the island. On one occasion, for example, at the beginning of 2006, his widow and his daughter Iya and her husband Zhenya came to Mr. Kay's office in London for a meeting, where, together with Mr. Patarkatsishvili, Mr. Kay showed them booklets and video presentations of development in Fisher Island. Mr. Patarkatsishvili showed them architectural plans and explained the project for building apartment buildings and villas there. The family understood that Mr. Kay was to manage the project. Mr. Patarkatsishvili also told him that he had similar projects in Spain and Marrakech.

---

Debevoise & Plimpton LLP is a registered limited liability partnership established under the laws of the State of New York.
A list of the partners' names and their professional qualifications is open to inspection at the above address.
The partners are either solicitors or registered foreign lawyers  The firm is regulated by the Solicitors Regulation Authority

New York • Washington, D C • London • Paris • Frankfurt • Moscow • Hong Kong • Shanghai

3

Christopher Siy, Esq                      2                        April 4, 2008

We believe these to be other investments held by Fisher Island Limited through intermediate companies. Later that year the daughter Iya and her husband went on a cruise to the US. They passed through Florida and Mr. Kay showed them around Fisher Island, introducing it as Mr. Patarkatsishvili's project which he managed for him.

In the light of this and other evidence we have as to the way Mr. Patarkatsishvili did business we believe that the most probable explanation for Miselva's belief is that Mr. Kay may have represented that the assets were his whereas in fact they had been entrusted to him by Mr. Patarkatsishvili on the basis that they were ultimately for the benefit of Mr. Patarkatsishvili. As we expect you know, the Delaware Corporation to which the companies mentioned above were transferred appears to be connected with Mr. Kay.

We have evidence, for example, from the Chief Operating Officer of fund managers who managed very substantial sums for Mr. Patarkatsishvili over a substantial period of time and who knew him very well that he met Mr. Kay on several occasions through his work with Mr. Patarkatsishvili and that his understanding was that Mr. Kay was an employee and associate of Mr. Patarkatsishvili who at times dealt with some of the mechanics, including funding, necessary to implement certain of Mr. Patarkatsishvili's investments. He further says that in all of his dealings with Mr. Kay it was apparent that he was administering Mr. Patarkatsishvili's money, not his own, and that he was merely executing Mr. Patarkatsishvili's orders. It appeared to him, therefore, that the ultimate beneficiary of the investments that Mr. Kay was handling was always Mr. Patarkatsishvili himself.

We wonder if Andrew Baker through his involvement in Miselva or other trusts and companies with which he is associated may already be in possession of information that would support that this, for example, of other assets which Miselva understood were held ultimately for Joseph Kay but which he subsequently acknowledged were held for the benefit of Mr. Patarkatsishvili or his family.

You will also be aware from the meeting that took place at your offices of our grave concerns about the conduct of Joseph Kay and we will imminently be filing proceedings in New York against Kay and his lawyer Emanuel Zeltzer, currently held in custody in Belarus charged, as we understand it, with attempting to use forged documents to obtain assets which truly should fall into the estate of Mr. Patarkatsishvili or be applied for the benefit of his heirs and beneficiaries.

For these reasons it would appear that Miselva is acting under a mistaken assumption in considering that these assets were held for the ultimate beneficial ownership of somebody else and in particular Joseph Kay.

The position goes further still. We appreciate that these particular companies may have been transferred by Miselva at the end of last year even though the transfers were not registered until very recently. However it is perfectly possible, it appears to

50252044v2

Christopher Sly, Esq                    3                    April 4, 2008

us, that if this misunderstanding applies to those assets it may well apply to other assets still held by Miselva as trustee which it may presently think are not for the benefit of Mr Patarkatsishvili or his estate or his heirs and beneficiaries but for a third party, particularly Joseph Kay.

We accept that Miselva, given its position as trustee, may require further evidence of these matters. We are in the process of producing that evidence and will write to you again

The purpose of this letter, however, is to put you on notice that, in the light of this exchange of correspondence, Miselva may wrongly believe that assets are not connected with Mr. Patarkatsishvili when in truth they are, to require Miselva to make further enquiries to establish the true position and to agree not to take any steps at the moment which may prejudice the interests of the beneficiaries and heirs or others properly entitled to the estate of Mr. Patarkatsishvili until these matters are resolved or a proper determination is made by a Court of Competent Jurisdiction. In particular, we would be very concerned were Miselva to deal with assets where at the moment Miselva may believe Mr Kay to be the sole beneficiary and it should view any attempt to move these assets at this sensitive time with extreme caution.

In the latter connection, you will understand that one of our grave concerns is that people have been asserting, in particular Joseph Kay and his lawyer, that they are entitled to deal with assets of or for the benefit of Mr. Patarkatsishvili without ever having obtained any form of order from a Court of their entitlement.

Should Miselva fail to act in this way and should it take any step which may ultimately prejudice the interests of our clients or the estate more generally of Mr. Patarkatsishvili you will understand that we will look to make good any losses from Miselva and its officers.

Given the urgency of the situation we look forward to hearing from you and, of course, remain ready to discuss this matter.

Yours sincerely

Lord Goldsmith QC

5

**AJB-14**

2008 M No

<u>IN THE SUPREME COURT OF GIBRALTAR</u>
<u>CHANCERY JURISDICTION</u>

IN THE MATTER of the Civil Procedure Rules, Part 64, Section 1

and

IN THE MATTER of the Trustees Act

and

IN THE MATTER of the trusts known as The Valmore Trust and The Summit Trust

BETWEEN

MISELVA ETABLISSEMENT (1)
NEXUS TREUHAND AG (2)

Claimants

and

INNA GUDAVADZE (1)
JOSEPH KAY (2)
IYA PATARKATSISHVILI (3)
LIANA ZHMOTOVA (4)
FALLON INVEST & TRADE INC. (5)

Defendants

_____

EXHIBIT "AJB14"

_____

This is the exhibit marked "AJB14" referred to in the Witness Statement of ANDREW JOHN BAKER dated          this      day of                2008

Christopher K. Tahbaz
Jennifer R. Cowan
Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
Tel. (212) 909-6000
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x
INNA GUDAVADZE, LIANA ZHMOTOVA and IYA     :
PATARKATSISHVILI,

                        Plaintiffs,     :

                                   :

v.     :     08-civ-_____

                                   :

JOSEPH KAY (A/K/A JOSEPH KAKALASHVILI, A/K/A     :     VERIFIED
JOSEPH KEJ, A/K/A IOSEB KAKALASHVILI, A/K/A     :     COMPLAINT
IOSEB KAKIASHVILI) AND EMANUEL ZELTSER,

                          Defendants.     :

-------------------------------------------------------------- x

        Plaintiffs Inna Gudavadze, Liana Zhmotova and Iya Patarkatsishvili (collectively

"Plaintiffs"), by their attorneys Debevoise & Plimpton LLP, for their Complaint against

Defendants Joseph Kay (a/k/a Joseph Kakalashvili, a/k/a Joseph Kej, a/k/a Ioseb

Kakalashvili, a/k/a Ioseb Kakiashvili) and Emanuel Zeltser, allege as follows:

## NATURE OF THE ACTION

        1.      Plaintiffs are the widow and daughters of Arkady (Badri) Patarkatsishvili,

who died unexpectedly on February 12, 2008. They are among the primary beneficiaries

of Mr. Patarkatsishvili's estate, and they are currently in the process of applying for

letters of administration for the estate in the United Kingdom, where they reside and where a portion of Mr. Patarkatsishvili's assets are found.

2.      By this action, Plaintiffs seek to prevent Defendants, citizens and residents of New York, from interfering with Plaintiffs' efforts to ensure the lawful distribution of Mr. Patarkatsishvili's assets and the orderly administration of Mr. Patarkatsishvili's estate under the supervision of a court of competent jurisdiction. Defendants have engaged in such interference by, among other things, misrepresenting their authority to speak or act on behalf of Mr. Patarkatsishvili and his estate and using invalid or fraudulent documents to assert control over assets that Mr. Patarkatsishvili owned or in which he otherwise had an interest. Defendants' misconduct began within days of Mr. Patarkatsishvili's death, intended, upon information and belief, to take advantage of the period of time preceding judicial appointment of an administrator and Plaintiffs' grief and shock at suddenly losing their husband and father.

3.      Mr. Patarkatsishvili was the beneficial owner of substantial assets throughout the world. Although Plaintiffs are still in the process of inventorying and valuing Mr. Patarkatsishvili's estate, upon information and belief it is worth well over $1 billion.

4.      Defendant Kay was Mr. Patarkatsishvili's half-cousin, and upon information and belief, he managed certain of Mr. Patarkatsishvili's assets during Mr. Patarkatsishvili's life. Defendant Zeltser has claimed that he acted as Mr. Patarkatsishvili's attorney and that he represents Mr. Patarkatsishvili's estate. He also recently advised Plaintiffs that he represents Defendant Kay. Both Defendants are

2

citizens and residents of New York State, and, according to official New York State records, Defendant Zeltser is a lawyer licensed by New York State with his place of business in Manhattan.

5.     Upon information and belief, since Mr. Patarkatsishvili's untimely death, Defendants have exploited his demise by, among other things, approaching his business associates throughout the world and, relying on invalid and fraudulent documents allegedly executed in New York, demanding information about and control over Mr. Patarkatsishvili's assets.

6.     Indeed, upon information and belief, working in concert with Defendant Zeltser, Defendant Kay has already succeeded in gaining control over Imedi Television ("Imedi TV"), a broadcast television station located in the country of Georgia and a valuable asset in which Mr. Patarkatsishvili beneficially owned the majority interest at the time of his death.  Upon information and belief, Defendant Kay gained control of Imedi TV by misrepresenting his legal authority to act on behalf of Mr. Patarkatsishvili and his estate and by relying on documents which he obtained from Defendant Zeltser and which both Defendants knew to be fraudulent and invalid.

7.     Defendant Kay has represented himself as the executor of Mr. Patarkatsishvili's estate even though, upon information and belief, he has not filed for letters of administration, probate of any will, letters testamentary or a similar grant of authority in any court.

3

*3*

8.    Defendants have also refused to provide Plaintiffs or their attorneys with copies of the documents that they claim authorize them to act as representatives of Mr. Patarkatsishvili and his estate.

9.    To prevent the Defendants, who are citizens and residents of New York State, from further interfering with the orderly administration of Mr. Patarkatsishvili's estate, and to prevent Defendants from misappropriating any assets that rightly should pass to Mr. Patarkatsishvili's heirs, by this action Plaintiffs seek the following:

a)    a declaratory judgment that neither Defendant is authorized to act or speak on behalf of Plaintiffs or as a representative of Mr. Patarkatsishvili or his estate, unless and until a court of competent jurisdiction finds to the contrary;

b)    a declaratory judgment that neither the "Deed of Appointment of Executor" nor the "Letter of Wishes," nor any other document that Defendants have been using in an attempt to gain control over Mr. Patarkatsishvili's assets, empowers Defendant Kay to act as the executor of Mr. Patarkatsishvili's estate or in any other representative capacity unless and until a court of competent of jurisdiction finds to the contrary;

c)    a declaratory judgment that, as a matter of law, the "Power of Attorney" that Defendant Zeltser has used in an attempt to assert control over Mr. Patarkatsishvili's assets became invalid at the time of Mr. Patarkatsishvili's death (regardless of whether it was valid during his life);

4

d)    an order compelling Defendants to produce to Plaintiffs, for inspection, the original, signed versions of all documents that they claim provide them with authority to control assets in which Mr. Patarkatsishvili had an interest and/or to serve as representatives of Mr. Patarkatsishvili's estate;

e)    an order compelling Defendants to hold in constructive trust any assets in which Mr. Patarkatsishvili held a beneficial interest and over which Defendants, or either of them, exercises control or dominion, as well as any income that they may have received from such assets and any proceeds that they may have realized from any sale of such assets;

f)    an order compelling Defendants to account to Plaintiffs for any assets in which Mr. Patarkatsishvili held a beneficial interest and over which Defendants, or either of them, exercises control or dominion, as well as any income that they may have received from such assets and any proceeds that they may have realized from any sale of such assets; and

g)    damages for any harm caused by Defendants' conduct, as well as costs, expenses and attorneys' fees incurred in prosecuting this action.

## PARTIES

10.    Inna Gudavadze is a citizen of the Russian Federation currently resident in England and Wales. She is the widow of Mr. Patarkatsishvili.

5

11.     Liana Zhmotova and Iya Patarkatsishvili are both citizens of the Russian Federation currently resident in England and Wales. They are the daughters of Mr. Patarkatsishvili and Mrs. Gudavadze.

12.     Upon information and belief, Defendant Kay is a United States citizen residing at 6 Wright Drive, Dix Hills, New York 11746. Kay was a half-cousin and a business associate of Mr. Patarkatsishvili.

13.     Upon information and belief, Defendant Zeltser is a United States citizen residing at 235 W. 76th Street, New York, New York 10023. According to the New York State Office of Court Administration attorney registration database, Mr. Zeltser is an attorney licensed to practice in New York State; his business address is 119 West 72nd Street, #229, New York, New York 10023.

14.     Badri Patarkatsishvili was a citizen of the country of Georgia domiciled in the country of Georgia at the time of his death. Upon information and belief, Mr. Patarkatsishvili did not leave a will or other valid direction to govern the disposition of his assets.

15.     Because Mr. Patarkatsishvili was a citizen of and domiciled in Georgia, and because he died without a will, under the law of England and Wales (where Plaintiffs will soon be applying for letters of administration), Georgian law determines the devolution of all moveable assets in Mr. Patarkatsishvili's estate, devolution of immovable assets being governed by the law of the situs of those assets. Under Georgian law, the surviving spouse has a pre-existing community property ownership interest in half of the assets acquired during the marriage (which do not pass through the estate), and

6

the first degree heirs (the spouse, children and parents) of an individual who dies intestate are the beneficiaries of the estate.

16.     Under Georgian law, therefore, Mrs. Gudavadze is entitled to 50% of the assets acquired since the date of her marriage to Mr. Patarkatsishvili in 1979 (excluding assets obtained by Mr. Patarkatsishvili as an inheritance or a gift) as the surviving co-owner of those assets.  In addition, under Georgian law, Plaintiffs collectively are entitled to another 30% of the assets acquired during the marriage and 60% of all other assets in Mr. Patarkatsishvili's estate.  As heirs and beneficiaries of his estate (and, in the case of Mrs. Gudavadze, as the surviving co-owner of property in which she had a common interest with Mr. Patarkatsishvili), Plaintiffs are being harmed by the misconduct of Defendants. (Hereinafter the word "heirs" is defined to encompass Mrs. Gudavadze as a surviving co-owner of community property as well as an heir.)

## JURISDICTION AND VENUE

17.     This action arises under the laws of the State of New York.

18.     Because Plaintiffs are citizens of the Russian Federation, who all currently are resident in England and Wales, and Defendants are citizens of New York, and the value in controversy exceeds $75,000, this Court has jurisdiction under 28 U.S.C. § 1332(a)(2). Personal jurisdiction is proper by virtue of Defendants' residences in New York and by virtue of Defendant Zeltser conducting business in New York.

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(1) and (a)(2).

20.     The Court may enter a declaratory judgment pursuant to 28 U.S.C.

§§ 2201 and 2202.

## FACTUAL BACKGROUND

Mr. Patarkatsishvili's Global Business Interests

21.     Mr. Patarkatsishvili was a businessman and investor with business

interests throughout the world, including interests in a number of assets located in

Georgia.

22.     Upon information and belief, Mr. Patarkatsishvili was the beneficial

owner of assets managed or held by Defendant Kay.  In addition, upon information and

belief, Mr. Patarkatsishvili may have jointly owned certain assets with Defendant Kay.

Mr. Patarkatsishvili's Untimely Death

23.     On February 12, 2008, Mr. Patarkatsishvili suffered a heart attack and died

unexpectedly outside of London, where he and his family had been staying.

The Unlawful Conduct Of Defendants

24.     Within days of Mr. Patarkatsishvili's death, Defendants began to assert to

Plaintiffs and others that they had exclusive authority to act on behalf of Mr.

Patarkatsishvili's estate, and that Defendant Zeltser had a will and other documents

through which Mr. Patarkatsishvili allegedly had expressed his wishes for the

administration of his estate and distribution of his assets.  Upon information and belief,

Defendants made these assertions knowing that they were untrue and without basis, and

8



knowing that the documents on which they were relying were fraudulent or otherwise invalid.

25.    On or about February 14, 2008 -- two days after Mr. Patarkatsishvili's death -- Defendants visited Plaintiffs at their home outside of London.  Defendant Zeltser told Mrs. Gudavadze that he had acted as her husband's attorney, and that he had possession of her husband's will.  He also told Mrs. Gudavadze that her husband had appointed Defendant Kay as the executor of his estate.

26.    Upon information and belief, Defendant Zeltser made these assertions knowing that they were untrue and without basis, and knowing that the documents on which he was relying were fraudulent or otherwise invalid.

27.    On or about February 15, 2008, Defendants visited the London offices of Salford Capital Partners Inc. ("Salford"), a private equity firm that managed some of Mr. Patarkatsishvili's investments.  During this visit, Defendant Kay told Salford representatives that, in the wake of Mr. Patarkatsishvili's death, he effectively stood in Mr. Patarkatsishvili's shoes and that Salford should treat him accordingly, and he demanded information about Mr. Patarkatsishvili's accounts.  Upon information and belief, Defendant Kay made these assertions knowing that they were untrue and without basis.

28.    When Salford representatives demanded to see proof of Defendants' authority to act on behalf of Mr. Patarkatsishvili, Defendant Zeltser showed the Salford representatives a document titled General Durable Power of Attorney, attached hereto as Exhibit A (hereinafter "Power of Attorney").

9

29.    Upon information and belief, Defendant Zeltser did this knowing that the "Power of Attorney" was fraudulent, expired upon Mr. Patarkatsishvili's death, or was otherwise invalid.

30.    Defendant Zeltser did not at this time provide the Salford representatives with a copy of the "Power of Attorney." Instead, Defendant Zeltser only allowed the Salford representatives to view the document on the screen of his laptop computer.

31.    Also on or about February 15, 2008, Defendant Zeltser spoke with Nicholas Keeling, a director of Mainstay Trust Limited in Gibraltar, an entity through which Mr. Patarkatsishvili, among others, had made investments managed by Salford. Defendant Zeltser made to Mr. Keeling the same demand for information that Defendant Kay had previously made to the Salford representatives.

32.    Mr. Keeling and his solicitor also refused to provide any information to Defendants unless they could provide satisfactory evidence of their authority to act on behalf of Mr. Patarkatsishvili. Upon information and belief, in response, Defendant Zeltser later emailed Mr. Keeling and his solicitor the "Power of Attorney."

33.    On or about February 17, 2008, Defendant Zeltser wrote to Mr. Keeling. A copy of that letter is attached hereto as Exhibit B. Defendant Zeltser identified himself as counsel for Mr. Patarkatsishvili and for his estate. He requested:

> any and all information, documents and records in your custody or within your control or power to obtain concerning Mr. Patarkatsishvili and any of his financial and business interests, whether held in his own name or through or in conjunction with any third party or parties, directly or indirectly, overtly or covertly or through any nominee (legal entity or physical person), in which you know or have a reason to believe Mr.

10

Patarkatsishvili had interest or business or other involvement, no matter how small, or was a shadow director or a principal *de facto*.

34.     Upon information and belief, Defendant Zeltser fraudulently misrepresented that the requested information was needed so that Defendant Zeltser could assist law enforcement authorities in their investigation of Mr. Patarkatsishvili's death.

35.     Upon information and belief, Defendant Zeltser made these assertions knowing that they were untrue and without basis, and, upon information and belief, knowing that the "Power of Attorney" on which he was relying was fraudulent or otherwise invalid.

36.     Mr. Keeling's solicitor, Michael Lindley, advised Defendant Zeltser that Mainstay could not release information to Defendants based on the "Power of Attorney." As Mr. Lindley stated in an email to Defendant Zeltser on February 19, 2008, "I have been advised that, as a matter of New York Law, the Power of Attorney on which you purport to rely is not, and may never have been, valid. In the circumstances it is clearly not appropriate for either my client or me, or indeed any other party, to provide you with any information or documents which may in any way relate to Mr. Patarkatsishvili's affairs." This email, as well as related emails with Defendant Zeltser, is attached hereto as Exhibit C.

37.     Upon information and belief, Salford similarly declined to provide information to Defendants based on the "Power of Attorney."

11

38.    The "Power of Attorney" appears to have been acknowledged before a New York-licensed notary public, and the geographical authority of a New York notary is limited to New York State. If the signature is authentic, it appears to have been executed in New York State. The language of the "Power of Attorney" also appears to be a modification of the New York statutory language for a durable general power of attorney in N.Y. General Obligation Law § 5-1501. Therefore, if authentic, the "Power of Attorney" is subject to interpretation pursuant to New York State law.

39.    Under New York law, the "Power of Attorney" terminated upon the death of the principal, Badri Patarkatsishvili. This is so despite the fact that the "Power of Attorney" claims on its face that "This Power of Attorney . . . shall not be affected by my subsequent death, disability or incompetence." (emphasis in the original).

40.    On or about February 20, 2008, Defendant Kay met with Mrs. Gudavadze, Michelle Duncan, a lawyer with Cadwalader, Wickersham & Taft LLP in London who then represented Mrs. Gudavadze, and others at Mrs. Gudavadze's home outside London. Ms. Duncan asked Defendant Kay questions about the documents related to Mr. Patarkatsishvili's estate. Defendant Kay said that he did not know where the will was but agreed that it should be produced. When Ms. Duncan asked him about his relationship with Mr. Zeltser, he became confrontational and would not answer her questions.

41.    Ms. Duncan asked Defendant Kay to put her in contact with Defendant Zeltser and asked him for assistance in obtaining from Defendant Zeltser copies of Mr. Patarkatsishvili's will and other documents. Defendant Kay said he could only ask

12

Defendant Zeltser to meet with Ms. Duncan, and that he could not ask him to provide copies of the documents.

42.    Mrs. Gudavadze asked Defendant Kay for assistance in identifying Mr. Patarkatsishvili's assets and explained that she was making similar requests of many business associates of her husband. Defendant Kay agreed to assist and said he would call Ms. Duncan either late that day or the next day to set up a meeting.

43.    On or about February 20, 2008, Defendant Zeltser telephoned Ms. Duncan. She told him that the "Power of Attorney" had become ineffective at the time of Mr. Patarkatsishvili's death. Upon information and belief, Defendant Zeltser disagreed and maintained that the "Power of Attorney" remained valid but that regardless, he was also acting pursuant to many other documents in his possession, including a will of Mr. Patarkatsishvili dated November 14, 2007, which named Defendant Kay as executor with broad powers.

44.    Upon information and belief, Defendant Zeltser knew these assertions to be untrue and without basis and that the referenced documents were fraudulent or otherwise invalid.

45.    During that conversation, Ms. Duncan requested that Defendant Zeltser provide her with copies of any documents in his possession related to Mr. Patarkatsishvili's estate. Defendant Zeltser refused.

46.    Ms. Duncan and Defendant Zeltser agreed to meet on February 22, 2008 in New York. At Defendant Zeltser's subsequent request, the meeting was moved to February 24, 2008.

13

47.    On or about February 22, 2008, Ms. Duncan telephoned Defendant Kay to schedule a meeting so that Defendant Kay could help identify assets to which Mr. Patarkatsishvili was connected, as had been agreed at the February 20 meeting.

48.    Upon information and belief, Defendant Kay told Ms. Duncan that she should communicate with him only through his personal attorney, Defendant Zeltser.

49.    On or about February 24, 2008, Ms. Duncan, Defendant Zeltser and others met at the Buddha Bar, 25 Little West 12th Street, New York, New York.

50.    During that meeting, Defendant Zeltser showed Ms. Duncan, on his computer screen, images of documents related to Mr. Patarkatsishvili including a "Letter of Wishes," which was several pages long, and a one-page "Deed of Appointment of Executor." Both of these documents were purportedly signed by Mr. Patarkatsishvili in New York on November 14, 2007.

51.    Upon information and belief, although Mr. Patarkatsishvili was in New York City on November 14, 2007, he arrived in the late evening and then had dinner with friends and business associates until early in the morning of November 15. Upon information and belief, he did not meet with Defendant Zeltser on that day nor did he sign any documents in Defendant Zeltser's presence on that day.

52.    During her February 24, 2008 meeting with Defendant Zeltser, Ms. Duncan asked him for copies of the documents displayed on his computer screen. Upon information and belief, he said he would send them later that evening or the following day.

53.    Defendant Zeltser failed to send copies of the documents as promised. Ms. Duncan repeated her request for these documents in writing on or about February 25 and February 27, 2008. Defendant Zeltser failed again to provide her with copies of these documents.

54.    On or about March 5, 2008, Defendant Zeltser met with Mrs. Gudavadze, Ms. Duncan and others at the Four Seasons Hotel in London. Ms. Duncan and Mrs. Gudavadze again raised with Defendant Zeltser questions about the documents related to Mr. Patarkatsishvili's estate and asked Defendant Zeltser to provide them with copies of the documents. Defendant Zeltser avoided answering the questions and made various excuses about why he would not produce the documents.

55.    On or about March 7, 2008, Plaintiffs and other members of their family met with Defendant Kay in Tbilisi, Georgia and asked him for copies of the documents that supported his claims of being the executor of Mr. Patarkatsishvili's estate and having authority to speak and act on behalf of Mr. Patarkatsishvili and the estate. Defendant Kay refused to provide the documents, and he claimed that Defendant Zeltser had the documents.

56.    On March 10, 2008, Peter Goldsmith of Debevoise & Plimpton LLP in London, who had been engaged recently to act as counsel to Mrs. Gudavadze, wrote to Defendant Zeltser (in Defendant Zeltser's capacity as counsel for Defendant Kay) and requested copies of the relevant documents: "[I]f Mr. Kay believes he has documentation establishing that he in fact has authority to speak on behalf of Mr. Patarkatsishvili in any

15

capacity, notwithstanding our belief to the contrary, we would request that you provide us with copies of that documentation as soon as possible."

57.    On March 10, 2008, Defendant Zeltser responded by email and refused to provide copies of the documents: "The documents expressing Badri's wishes, vested in us as his counsel, are being disclosed in due course to proper bodies in such jurisdictions as are appropriate and in strict accordance with our client's final instructions." Upon information and belief, Defendant Zeltser made this assertion knowing that the documents to which he referred were fraudulent or otherwise invalid.

Defendants' Misappropriation of Imedi TV

58.    Although, as described above, Defendants failed to obtain information about Mr. Patarkatsishvili's investments from Salford or Mainstay, Defendants had better luck obtaining control over Imedi TV.

59.    Upon information and belief, Mr. Patarkatsishvili owned a controlling interest in Imedi TV through beneficial ownership of shares in a parent company, JSC JMG Consulting Ltd. Also upon information and belief, most of Mr. Patarkatsishvili's shares in JSC JMG Consulting Ltd. were held for his benefit by Giorgi Jaoshvili, a business associate in Georgia.

60.    Upon information and belief, Defendants together agreed to effect the improper transfer of shares of JSC JMG Consulting Ltd. from the estate of Mr. Patarkatsishvili to Defendant Kay. Upon information and belief, Defendants knew that



this transfer would harm Mr. Patarkatsishvili's heirs and beneficiaries, including Plaintiffs.

61.    Upon information and belief, on or about February 19, 2008 – just one week after Mr. Patarkatsishvili's unexpected death – Defendant Kay approached Mr. Jaoshvili and, relying on documents including one described as a power of attorney, directed him to transfer the shares in JSC JMG Consulting Ltd. which Mr. Jaoshvili held beneficially for Mr. Patarkatsishvili. Also upon information and belief, Mr. Jaoshvili complied with this direction.

62.    Upon information and belief, Defendant Kay effected this transfer by relying on documents which he obtained from Defendant Zeltser and which both Defendants knew to be fraudulent or otherwise invalid.

63.    Plaintiffs have demanded that Defendant Kay transfer to them the shares in JSC JMG Consulting Ltd., because they do not belong to Mr. Kay; half belong to Mrs. Gudavadze (being matrimonial property) and Mr. Patarkatsishvili's half devolve to his heirs. Defendant Kay has refused to do that.

64.    Instead, Defendant Kay has proclaimed in public statements reported by the media that he purchased his shares in JSC JMG Consulting Ltd. for an undisclosed price. For example, according to the Russian newspaper Kommersant on March 27, 2008, Defendant Kay claimed in an interview that he purchased the shares "legally" but that the amount he paid was "a commercial secret."

65.    As a result of Defendants' misconduct, Defendant Kay appears to control Imedi TV, rather than Mr. Patarkatsishvili's heirs or his estate. This occurred even

17

though Defendant Kay has produced no documentation to Plaintiffs or to any authorized representative of Mr. Patarkatsishvili's estate demonstrating that this was Mr. Patarkatsishvili's desire.

The Arrest of Defendant Zeltser

66.    On March 3, 2008, Ms. Duncan (who was then still acting as Mrs. Gudavadze's counsel) wrote to the Prosecutor General of Belarus to notify him that Mr. Patarkatsishvili might have had substantial assets in Belarus, and that Defendants and certain associates might improperly attempt to gain control over those assets.

67.    Upon information and belief, on or about March 12, 2008, Defendant Zeltser was arrested in Minsk, Belarus on a charge of attempting to use fraudulent documents to obtain control over assets in which Mr. Patarkatsishvili had an interest.

68.    Upon information and belief, on or about March 28, 2008, Defendant Zeltser was charged by prosecutors in Belarus with attempting to defraud Mr. Patarkatsishvili's estate through the use of forged documents.

Harm To Plaintiffs

69.    Because of Defendants' misconduct, Defendant Kay – and not Mr. Patarkatsishvili's heirs or estate – appears currently to have control of Imedi TV.

70.    In addition, Defendants' misrepresentations and illegitimate demands to Mr. Patarkatsishvili's business associates have complicated Plaintiffs' efforts to inventory Mr. Patarkatsishvili's assets and begin administration of Mr. Patarkatsishvili's estate.

18

18

71.    Plaintiffs continue to be injured by Defendants' ongoing misrepresentations and will be irreparably harmed if Defendants continue fraudulently to represent that they are authorized to speak and act on behalf of Plaintiffs or the estate of Mr. Patarkatsishvili.

72.    Because the relevant assets are located throughout the world, it will be difficult, if not impossible, to value the harm caused by Defendants and to obtain monetary damages to remedy that harm.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment)

73.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 72 of the Complaint as if fully set forth herein.

74.    Plaintiffs request that the Court issue a declaratory judgment determining that:

(a)    Neither Defendant is authorized to act or speak on behalf of Plaintiffs or as a representative of Mr. Patarkatsishvili or his estate, unless and until a court of competent jurisdiction finds to the contrary;

(b)    Neither the "Deed of Appointment of Executor" nor the "Letter of Wishes," nor any other document that Defendants have been using in an attempt to gain control over Mr. Patarkatsishvili's assets, empowers Defendant Kay to act as the executor of Mr. Patarkatsishvili's estate or in any other representative capacity unless and until a court of competent of jurisdiction finds to the contrary; and

(c)    As a matter of law, the "Power of Attorney" that Defendant Zeltser has used in an attempt to assert control over Mr. Patarkatsishvili's assets became invalid at the time of Mr. Patarkatsishvili's death (regardless of whether it was valid during his life).

19

## SECOND CAUSE OF ACTION
### (Fraud Against Defendant Kay)

75.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 74 of the Complaint as if fully set forth herein.

76    Upon information and belief, Defendant Kay gained control of a controlling interest in Imedi TV, which had been beneficially owned by Mr. Patarkatsishvili, by working in concert with Defendant Zeltser. Upon information and belief, Defendant Kay intentionally misrepresented his legal authority to act on behalf of Mr. Patarkatsishvili and his estate, in part by relying on documents that Defendant Kay obtained from Defendant Zeltser that both Defendants knew to be fraudulent or invalid. On information and belief, Defendant Kay engaged in these misrepresentations with the intent that Giorgi Jaoshvili would rely upon them.

77.    Upon information and belief, in transferring the shares in JSC JMG Consulting Ltd. that Mr. Jaoshvili held beneficially for Mr. Patarkatsishvili, Mr. Jaoshvili relied on Defendant Kay's misrepresentations and the fraudulent or invalid documents that Defendant Kay obtained from Defendant Zeltser.

78.    Plaintiffs have been and continue to be damaged as a result of Defendant Kay's fraud.

## THIRD CAUSE OF ACTION
### (Conspiracy To Defraud)

79.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 78 of the Complaint as if fully set forth herein.

20

80.    Upon information and belief, Defendants together agreed to effect the improper transfer of shares of JSC JMG Consulting Ltd., a parent company of Imedi TV, from the estate of Mr. Patarkatsishvili to Defendant Kay.

81.    Upon information and belief, Defendants knew that this transfer would harm Mr. Patarkatsishvili's heirs and beneficiaries, including Plaintiffs.

82.    Upon information and belief, Defendant Kay gained control of the shares of JSC JMG Consulting Ltd., which had been beneficially owned by Mr. Patarkatsishvili, by intentionally misrepresenting his legal authority to act on behalf of Mr. Patarkatsishvili and his estate, in part by relying on documents that Defendant Kay obtained from Defendant Zeltser that both Defendants knew to be fraudulent or invalid. On information and belief, Defendants engaged in this misconduct with the intent that Giorgi Jaoshvili would rely upon it, and Mr. Jaoshvili did so rely in transferring the shares.

83.    Plaintiffs have been harmed by Defendants' conspiracy to defraud.

### FOURTH CAUSE OF ACTION
### (Constructive Trust)

84.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 83 of the Complaint as if fully set forth herein.

85.    Defendant Kay's business relationship with Mr. Patarkatsishvili was a relationship of trust and confidence and as a result, Defendant Kay owed a fiduciary duty to Mr. Patarkatsishvili.

21

86.    In connection with that relationship, upon information and belief, Mr. Patarkatsishvili entrusted money and/or property to Defendant Kay.

87.    Defendant Kay has unjustly enriched himself by gaining control over most of the interest in Imedi TV beneficially owned by Mr. Patarkatsishvili, by working in concert with Defendant Zeltser to intentionally misrepresent Defendant Kay's legal authority to act on behalf of Mr. Patarkatsishvili and his estate, and by relying on documents that Defendant Kay obtained from Defendant Zeltser that both Defendants knew to be fraudulent or invalid.

88.    Defendants have attempted to unjustly enrich themselves by exercising dominion and control over assets which they or others held for the benefit of Mr. Patarkatsishvili.

89.    Imposition of a constructive trust is needed to ensure that assets in which Mr. Patarkatsishvili had an interest are properly included within his estate and distributed to his heirs and beneficiaries including Plaintiffs.

### FIFTH CAUSE OF ACTION
### (Accounting)

90.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 89 of the Complaint as if fully set forth herein.

91.    Defendant Kay's business relationship with Mr. Patarkatsishvili was a relationship of trust and confidence and as a result, Defendant Kay owed a fiduciary duty to Mr. Patarkatsishvili.

22

22

92.    In connection with that relationship, upon information and belief, Mr. Patarkatsishvili entrusted money and/or property to Defendant Kay.

93.    Working together, and knowingly misrepresenting their authority to act on behalf of Mr. Patarkatsishvili or his estate and relying on fraudulent or invalid documents, Defendants have obtained property which belonged to Mr. Patarkatsishvili and attempted to obtain control over other property which should properly belong to his heirs and beneficiaries.

94.    An accounting is necessary to ascertain what money and/or property within the control or dominion of Defendants was being held by them for the benefit of Mr. Patarkatsishvili or was obtained as a result of Defendants' misconduct.

95.    Due to the ownership structure and locations of Mr. Patarkatsishvili's assets, monetary damages will not be a sufficient remedy and an accounting is needed.

### JURY DEMAND

96.    Plaintiffs elect a trial by jury for each and every count in this Complaint triable by a jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(i)    Issue a declaratory judgment determining that:

(a)    Neither Defendant is authorized to act or speak on behalf of Plaintiffs or as a representative of Mr. Patarkatsishvili or his estate, unless and until a court of competent jurisdiction finds to the contrary;

23

23

(b)     Neither the "Deed of Appointment of Executor," nor the "Letter of Wishes," nor any other document that Defendants have been using in an attempt to gain control over Mr. Patarkatsishvili's assets, empowers Defendant Kay to act as the executor of Mr. Patarkatsishvili's estate or in any other representative capacity unless and until a court of competent of jurisdiction finds to the contrary; and

(c)     As a matter of law, the "Power of Attorney" attached hereto as Exhibit A became invalid at the time of Mr. Patarkatsishvili's death (regardless of whether it was valid during his life);

(ii)     Preliminarily and permanently enjoin Defendants from claiming that:

(a)     either Defendant is authorized to act or speak on behalf of Plaintiffs or the estate of Mr. Patarkatsishvili, unless and until a court of competent jurisdiction finds to the contrary;

(b)     the "Deed of Appointment of Executor," the "Letter of Wishes" or any other document that Defendants have been using in an attempt to gain control over Mr. Patarkatsishvili's assets, empower Defendant Kay to act as the executor of Mr. Patarkatsishvili's estate or in any other representative capacity unless and until a court of competent of jurisdiction finds to the contrary; or

(c)     the "Power of Attorney" attached hereto as Exhibit A is valid notwithstanding Mr. Patarkatsishvili's death and permits Defendant Zeltser to act or speak on behalf of Mr. Patarkatsishvili or his estate;

(iii)     Order Defendants to produce to Plaintiffs, for inspection, the original, signed versions of all documents that they claim provide them with authority to control Mr. Patarkatsishvili's assets and/or to serve as representatives of Mr. Patarkatsishvili's estate;

(iv)     Impose on Defendants a constructive trust for the benefit of Mr. Patarkatsishvili's estate and heirs over any assets in which Mr. Patarkatsishvili held a beneficial interest and over which Defendants, or either of them, exercises control or

24

24

dominion, as well as any income they may have received from such assets and any proceeds that they may have realized from any sale of such assets;

(v)    Order Defendants to account to Plaintiffs for any assets in which Mr. Patarkatsishvili held a beneficial interest and over which Defendants, or either of them, exercises control or dominion, as well as any income that they may have received from such assets and any proceeds that they may have realized from any sale of such assets;

(vi)    Award damages for any harm caused by Defendants' conduct, as well as costs, expenses and attorneys' fees incurred in prosecuting this action; and

(vii)    Grant such other and further relief as the Court may deem appropriate.

Dated: New York, New York
       April 4, 2008

Respectfully Submitted,

DEBEVOISE & PLIMPTON LLP

By: _____
     Christopher K. Tahbaz
     Jennifer R. Cowan
     919 Third Avenue
     New York, New York  10022
     Tel. (212) 909-6000
     *Attorneys for Plaintiffs*

25

25

## VERIFICATION

I, Inna Gudavadze, am one of the plaintiffs herein. I have read the foregoing Complaint and know its contents. The Complaint is true to the best of my own knowledge, except as to the matters alleged on information and belief. As to those matters, I believe them to be true.

Pursuant to 28 U.S.C. § 1746, I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Tblisi, Georgia, on April 3, 2008.

INNA GUDAVADZE

26

**AJB-15**

2008 M No

### IN THE SUPREME COURT OF GIBRALTAR
### CHANCERY JURISDICTION

**IN THE MATTER** of the Civil Procedure Rules, Part 64, Section 1

and

**IN THE MATTER** of the Trustees Act

and

**IN THE MATTER** of the trusts known as The Valmore Trust and The Summit Trust

**BETWEEN**

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**

Claimants

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**

Defendants

---

### EXHIBIT "AJB15"

---

This is the exhibit marked "AJB15" referred to in the Witness Statement of ANDREW JOHN BAKER dated          this      day of                    2008

 edia.ge

Category: News

[2008-02-25 | 15:27:18]
### The Fate of Imedi will be Decided by Badri Patarkatsishvili Family

The family of a businessman Badri Patarkatsishvili will resolve the issue of Imedi independently – it is said in the announcement of the businessman's family, spread by civil.ge web-site.

"First of all, the family will continue the activities of Badri Patarkatsishvili's charity foundation and will resolve the fate of Imedi independently. These two projects indeed were the most important in Badri's life" – it is said in the announcement.
The businessman's sister Nana Patarkatsishvili declared in the interview with Mteli Kvira newspaper that Ina Gudavadze, Patarkatsishvili's spouse will manage Imedi. According to her, the businessman's family doesn't intend to sell Imedi.

After Patarkatsishvili's decease, people close to him were declaring that the businessman was going to sell Imedi to News Corp and was holding negotiations for this purpose. The TV channel ceased broadcasting last year, in December.

Director-general of the TV Company Bidzina Baratashvili in the interview with Rezonansi newspaper presumes that the television company will air in March.
Baratashvili also added that Imedi's license expires in February; hence the management of the television channel intends to apply to National Communications Commission in order to automatically prolong the license.

All Rights Reserved to Internews Georgia.
When using this information media.ge must be mentioned.

**Find this article at:**
http://www.media.ge/eng/page.php?m=news_detailed&id_numb=2933

 edia.ge

Category: News

[2008-03-19 | 15:40:28]

### Imedi TV seized from Patarkatsishvili's family due to government's attempt – Georgian Press Reports

The Georgian press reports on the Imedi TV sale in the secret from the recently deceased business tycoon Badri Patarkatsishvili's family.

In its front-page article titled "Imedi seized from the Patarkatsishvilis" the Georgian daily Alia (March 18 edition) reported that the shares into Imedi TV were formally registered on Badri Patarkatsishvili's friend in Tbilisi someone named Gogi Jaoshvili. The latter, however, according to the reports, transferred shares to Joseph Kay, the relative of the deceased, around a week ahead of Patarkatsishvili's funeral in Tbilisi. Reportedly Joseph Kay himself has handed the shares over to someone for a 5-year term.

The newspaper got in touch with Badri Patarkatsishvili's sister Nana having confirmed the spread information. According to Nana Patarkatsishvilithe the court trial was held at midnight, against the court ruling Imedi assets were unfrozen and legalized on Joseph Kay on the same night.

Another Georgian newspaper Rezonansl responded to Imedi issue as well. Reporting in his interview with the newspaper Goga Khaindrava, one of the leaders of the opposition coalition, said that the government is trying its best to silence Imedi.

During his recent trip to London Khaindrava had a talk with Badri Patarkatsishvili's spouse Ina Gudavadze over the faith of the TV company. Patarkatsishvili's business partner Boris Berezovsky attended their conversation. In accordance with Khaindrava Patarkatsisvili's spouse will make a special statement on the plans regarding Imedi TV following March 23. A protest rally under the slogan "Give Us Imedi Back" will be held in front of the Parliament building on March 24, Khaindrava informed.

Pursuant to the Georgian newspapers the authorities are now conducting talks with Joseph Kay regarding Imedi issue. The governmentfrom its side strongly denies any kind of involvement in the misappropriation of Imedi TV.

"As far as I know, it is an internal family dispute and it should be settled by lawyers. Nobody can seize anything from them [the Patarkatsishvili family]. This is not a company, which is related only to Georgia. You know, that very serious foreign companies and lawyers are involved in this case and it should be arranged within the family. We have nothing to do with it," Nino Burjanadze, the Parliamentary Chairperson pointed out.

The Georgian newspaper Versia too covered Imedi TV issue in its March 19 edition. According to the paper the new possessor of Imedi TV Joseph Kay, the owner of Rustavi Metallurgical Plant, has transferred Imedi shares to his old acquaintance, current PM Lado Gurgenidze for a 5-year term.

Pursuant to the newspaper Versia Joseph Kay is the citizen of America and formerly used to take part in Badri Patarkatsishvili's commercial projects.
Versia does not exclude the possibility that Joseph Kay agreed on the "cynical plan" of Imedi registration on his name in order to avoid the seizure of the plant.

Imedi TV went off the air on December 26, 2007. The term of inactivity expires on March 26. Unless the company resumes broadcasts until that time the company will get the third warning, as a result the license will be automatically revoked.

All Rights Reserved to Internews Georgia.
When using this information media.ge must be mentioned.

**Find this article at:**

http://www.media.ge/eng/page.php?m=news_detailed&id_numb=3016

 edia.ge

## Category: News

[2008-03-19 | 15:44:05]

### Badri Patarkatsishvili's Widow Addressed Georgian Population with Open Letter

Badri Patarkatsishvili's widow Ina Gudavadze addressed the Georgian population with an open letter. The address reads as follows:
"The imposters, having claimed ownership over Imedi, tried to sell it to the Government but they enjoy no such right since my family and I are the rightful owners of Imedi. We will struggle, through courts, against any attempt to misappropriate Imedi."

Since my family and I have no desire and intentions to go into politics I did not want to worsen already tense political situation in the country and throughout the recent period I have been trying to reach compromise and therefore negotiated with the high officials including the chairperson of the Parliament [Nino Burjanadze]. But I still do not have the answer.

I am full of courage and determination to put Imedi back on air. An international independent media company and joint management of the board of trustees will be the guarantee for objective information.

As Badri said Imedi is the achievement of the Georgian people and it belongs to people as a mouthpiece of free speech.
I feel myself obliged to implement the will of my deceased husband. The freedom of speech is protected under the Constitution of Georgia. Each citizen enjoys a right to free expression, and an independent TV channel is the best mean to secure free speech.

I request all of you to support me with my campaign to get Imedi back on air. We have lost Badri. We have no right to lose Imedi," reads the letter.

On March 24 the opposition coalition plans to hold a protest rally under the slogan "Give Us Imedi Back" in front of the Parliament building.

All Rights Reserved to Internews Georgia.
When using this information media.ge must be mentioned.

Find this article at:
http://www.media.ge/eng/page.php?m=news_detailed&id_numb=3017



 edia.ge

Category: News

[2008-03-28 | 13:42:01]

### Joseph Kay is Confident of Proving his Right to Manage Patarkatsishvili's Assets

The new owner of Imedi TV Joseph Kay, being accused of misappropriating, through falsification of documents, his recently deceased cousin Badri Patarakatsishvili's assets, including Imedi TV, made a special statement over the issue.

Kay's statement published on March 26 clarifies that "In November 2007 Badri Patarkatsishvili truly drew up a will clearly defining his wishes and wills. A part of the documentation had been handed over to Patarkatsishvili's American lawyer Emanuel Zeltser."

"It's deplorable that Zeltser has been jailed by Belarus law enforcer. He was arrested just after exiting the plane belonging to Boris Berezovsky. It is indisputable that the arrest of Zeltser and his assistant is another provocation staged by Berezovsky who aims at undisclosing recently deceased Badri Patarkatsishvili's genuine will," Kay pointed out.

Taking into account the question marks raised in regard to the management of Badri's assets and property, I look forward to the completion of all necessary legal and court procedures that will eventually ratify my, Joseph Kay's, power of attorney to manage Patarkatsishvili's assets," Imedi owner said.

The Georgian newspaper Kvela Siakhle (all news) has published an exclusive interview with Joseph Kay, trying to dispel doubts relating to Badri Patarkatsishvili's assets, including the management of Imedi TV and Radio company, and the doubts regarding his rights.
The article can be viewed at: http://www.media.ge/eng/page.php?
m=media_discussions_news_detailed&id_numb=52

All Rights Reserved to Internews Georgia
When using this information media.ge must be mentioned.

Find this article at:
http://www.media.ge/eng/page.php?m=news_detailed&id_numb=3053

 edia.ge

Category: Media Discussions

[2008-03-28 | 13:39:19]

**Kvela Siakhle Newspaper Exclusive Interview with Scandalously Famous Joseph Kay, Alias Soso Kakiashvili**

**They say you declared that you are the manager of Badri Patarkatsishvili property. Why you and not his family?**

First of all, I'd like to say that this statement shall be reinforced with certain documentation. I haven't yet declared that I am the manager of Badri Patarkatsishvili's property. My lawyers informed me on this and as it caused a lot of commotion, I asked my lawyer to reinforce this through means of court; as soon as court confirms it, I will probably come out and say that I'm the manager of his property.

**Could to concretize which lawyer informed you on this matter?**

Lawyer Zeltser

**How did officially registering Gogi Jaoshvili's Imedi shares in your name happen? They say that the agreement was signed at midnight in Tskneti and you brought the notary there.**

The agreement wasn't signed in Tskneti, let alone at midnight. As you know, Giorgi Jaoshvili was Badri Patarkatsishvili's friend. Badri Patarkatsishvili's decision to drop a boundary between the television and politics was caused by your colleagues' actions. I remember Imedi journalist's announcement on leaving the company – they declared that they left only because Badri Patarkatsishvili got involved in politics; as a result the company got closed down. Hence, Badri made a decision that the TV company shall in no case become politicized. He had conversations with me too regarding the matter. I offered to him, if he wished I could buy Imedi TV Company and become its owner. I could have the right to act as a private businessman, not as Patarkatsishvili's brother, who was acting only under a warrant. Badri Patarkatsishvili talked to Mr. Jaoshvili on this matter. Probably Gogi himself isn't denying the fact. Unfortunately the purchase of Imedi took place after Badri's decease, although the process started in his lifetime. As for the process of officially registering the ownership, it didn't happen at night, or in a hurry. I met Mr. Jaoshvili and asked him whether he was prepared to transfer the television into my ownership and he said that he was perfectly ready.

**If it's not a secret, how much did you pay for Imedi?**

I can't answer to your question, as it can be said that the sum exceeds, or is at the utmost limit of the amount linked with the shares.

**Do you know whether the amount you paid for Imedi shares was transferred to Patarkatsishvili's family?**

Unfortunately, I don't have this kind of information.

**We had an opportunity to familiarize with Gogi Jaoshvili's testimony he gave to the investigation. In it he declares: I am the owner of Imedi on papers only; the actual owner of everything is Badri Patarkatsishvili. Hence, the money you paid should have probably been given to the family.**

I answer like you asked – allegedly.
**Mr. Kakiashvili, you said that talks on selling Imedi started yet in Badri Patarkatsishvili's lifetime. How can you explain then the fact that his family is against the sale-purchase, didn't they know you were to buy the television?**



Badri had a peculiar character and he didn't let his family meddle in his business. Hence, I assume the family wasn't informed on the matter. I have no right not to believe them, as I always look for the truth in people, not the lie.

**You will probably have to fight in courts for Imedi, as Patarkatsishvili's family members declare, that they won't give up Imedi and will fight till the end. You referred to Badri as your brother. How hard will it be for you to argue in court with the family members?**

I am not going to make our family problems public. If it come down to the point when we'll have to appeal to court and it will be a legitimate instance where the decision will be made, I don't care how this all will end.

**In the previous issue of Kvela Siakhle an interview with Mzia Tortladze was published, where she notes that she had a very difficult conversation with you regarding Imedi...**

The only issue I had conversation about with the family was their claims -- they asked why I didn't confer with them before taking the step and I gave an adequate answer to the question. I am not going to repeat my answer publicly! I don't have any moral or financial obligations to this family. I had an obligation to Badri Patarkatsishvili, who is my brother and I will fully fulfill this obligation.

**Why did you dismiss News Corp from Imedi management?**

News Corp management means that the channel will be controlled by Boris Berezovsky, which is absolutely unacceptable to me.
**Does Boris Berezovsky stand behind News Corp?**

Yes, indeed. Solely Boris Berezovsky is standing behind News Corp.

**Do you insinuate that Imedi used to be controlled by Berezovsky?**

I consider that Badri was controlled by Berezovsky. Due to him Badri made a mistake and owing to him Badri decided he wanted to be a president. He never had such a desire before. Berezovsky wanted this.

**Boris Berezovsky claims that you seized Imedi by swindling and the fact that Badri's family is confirming his statement raised certain questions.**

Unfortunately Berezovsky could control not only Badri, but after his decease he is managing his family as well. The family can not see this, but I hope that some day they will realize it. I can say one thing only -- after Badri's decease the family's attitude towards Berezovsky changed. If they used to say: Berezovsky shall move away from our son, husband, brother, father; he won't do any good to Badri, now, somehow, they have changed their opinion and I'm much concerned about it. I consider Berezovsky to be a real evil. He possesses all the means to dictate his own will to anybody and make them do what he wants. Conforming to his ideas won't do any good to the family.

**You said that you are defending Patarkatsishvili's family from Berezovsky and sooner or later they will realize this.**

If Badri named me the rightful manager of his property it was only due to the fact that he didn't trust Berezovsky. What's more, he was afraid of him and saw a danger in him. Once Badri told me: Joseph, if I don't realize my political ambitions, my supporters will take reprisals for it. He probably meant Berezovsky and nobody else, as it was Berezovsy only who was pushing him into politics.

**We'll get back to Patarkatsishvilis' relationship with Berezovsky later. Before that, I'd like to ask about you working at ORT; Berezovsky declared that you were fired. How much work experience in media do you have and how are you planning to run Imedi?**

It is true that I was working at ORT with Badri, but no one has fired me. My other business activities didn't give me a chance to work at the television too, so I left the place willfully; although, for certain period I maintained relationship with ORT Video. As for Imedi management, I consider that the channel



has a professional staff headed by Bidzina Baratashvili. I'm not interested in day to day or micro management of the channel; I don't have time for this. I think that Imedi shall be the way journalists want it to be; the journalists who created the rating it had before Badri got involved in politics.

**You mentioned Patarkatsishvili's relationships with Berezovsky several times. They say that they were having arguments regarding business allotment. After Badri's death Russian internet sites were reporting that Boris Berezovsky got rid of him.**

As for Badri's relationship with Bereaovski, as far as I remember, several years ago Patarkatsishvili declared that their ways in business had parted. He withered his shares from all common businesses. To tell you the truth, initially I thought that Badri did this due to the political pressure. Several times we had conversation regarding the issue. At last Badri told me quite rudely – Why you don't get it? This is the third time you are asking me about this matter. Our ways in business have parted. I paid him the money. This was no "media trick" or a step taken for hushing up anything. I paid the part of the some, I still have to pay another part, but this is my problem and I don't want you to ask me anything about it. I assessed this as a fact.

When Badri passed away and the lawyer declared that according to his will I was the rightful manager of his property, Berezovsky was very displeased. He took me aside and told me: Joseph, you do understand that 50% of all shares in Badri's business belong to me, don't you? I explained to him that if I was to be appointed as the manager of Badri's property I would act lawfully. It is the manager's duty to manage in accordance to the will. I explained that if there were appropriate documents proving that he owned those shares, he wouldn't lose anything. If this wasn't the case, he would have to talk to Badri's family on this issue. He answered – Okay, this is fine; I'll talk to the women myself. Afterwards he took me aside and whispered in my ear, I guess he was afraid that I was recording our conversation, he told me: Joseph, you should know that if someone will be in debt to me or to the "group", I will organize an exemplary murder so that others will come running and hand me my shares.

**Who may be the victim of "exemplary murder"?**

He didn't say directly, but I assessed this as a threat. I even informed Federal Bureau on this matter.

**As for the reason of death, according to one version Boris Berezovsky got rid of Mr. Patarkatsishvili; according to another, Georgian authority is the one to blame in his death.**

By the way, I told the same to Mrs. Ina Gudavadze and asked her, whether she knew that Berezovsky owned half of the shares in Badri's business. Yes, Boria told me about it – Ina answered. I told her I didn't believe that and asked her again, whether Badri had ever mentioned that Berezovsky owned fifty percent of all the shares. She answered, that Badri had never told her anything like that. Then why do you think that Boria is telling the truth? – You know, they were partners and all expanses came out of one pocket, controlled by Berezovsky. – Why don't you suppose that this was put aside money that was spent? It doesn't mean that they had all businesses in common. They split businesses and put aside the money to be spent. Ina agreed with me but also told me she didn't want to have such a dangerous enemy as Berezovsky was. Then I told her: Ina, if you allow me I will stand up to Berezovsky, as I'm not afraid of him. As we all see today, Ina couldn't to make the decision.

**Your story somehow confirms the version that Berezovsky took interest in getting rid of Patarkatsishvili...**

I don't remember where I heard it, but as I know the day Badri passed away he had a very strained conversation with Berezovsky. They may have had an argument on any issue and I don't count out that the argument was linked to the fact that Badri didn't like to lose, particularly in politics. Badri lost not only his presidential campaign, but also his authority and he was worrying about it a lot. To my opinion, Badri informed Berezovsky that he was no longer planning to continue with politics, as he wanted to have a peaceful life and to do what he wished. It seems a strained conversation followed afterwards. I consider there is only one person to be morally blamed in Badri's death – Boris Berezovsky; although, I can not say that he used any chemical substance to get rid of him. It can be said, that all of us are to blame in Badri's death, as we didn't stop him, so that he wouldn't engage in politics or conform to Boria's ideas. There is one more thing that worries me. I constantly ponder over the reason such a detailed examination of the body was necessary – it was Berezovsky's obsession, I guess, his pants were on fire.

**Some, including Berezovsky blame Georgian authority in Badri's death...**



Unfortunately, Berezovsky managed to persuade the family that it is true. I had a serious confrontation with the family regarding this issue. I told all of them directly that Berezovsky is the one to blame in Badri's death, not Georgian authority.

**They say that you are friends with Georgian Prime-Minister Lado Gurgenidze and they also don't count out that Georgian authority stands behind you...**

Unfortunately I can't yet boast that Lado and I are friends. I haven't even shaken hands with that man, as I am not acquainted with him; hopefully, I will.

**Do you remember when the last time you met Patarkatsishvili was and whether you spoke about Imedi issue?**

Five days before his decease.

**Which date are the documents making you the manager of Badri's property dated?**

As far as I know, the document was drawn up last year, in December, but it doesn't yet have a judicial power, as it needs to be confirmed by any of the courts.

**I'd like to ask about the arrest of your lawyer, Zeltser – The Patarkatsishvilis' lawyers appealed both to Georgian and Belarusian authorities with a written statement; as a result, Zeltser was arrested in Belarus, charged with document forging and swindling...**

I'd like to say, that I haven't seen those letters with my own eyes. As for The Patarkatsishvilis' lawyers, I'd like to note that all of them are Berezovsky's lawyers. I have a single comment regarding those letters – the accused shall be tried in a civilized state instead of a dictatorial state such as Belarus. What's more, as far as I know the documents are drawn up in English, not in Georgian or Russian. I don't know why Mr. Berezovsky decided to give Zeltser his private pane and send him in Belarus with his assistant, who he had planted on Badri's side.

**Are you talking about Mitkin?**

Yes, I am. He was Berezovsky's man, planted on Badri'ss side. As I know there was Zeltser, his assistant and Mitkin aboard. Let's take several steps back and I'll explain in details everything. Why was Boria so interested in the will? As soon as he found out that there was a will, his lawyers started pestering with Ina and meticulously exploring the issue. They went to New York to visit Mr. Zeltser and as far as I know, they saw those documents. Afterwards, they got back to London and took advantage of the complicated situation and the fact that Ina was displeased that there was a will in which... I don't want to talk in details, as it is a family affair.

**Let's go back to Zeltser's arrest...**

Right after his lawyers met Zeltser in NY Berezovsky called him and informed him that he was going to take Ina to London. He asked him to leave for London and take to documents with him. He wanted to show those documents to Ina, so that she wouldn't have been against the will execution. Mr. Zeltser informed me about this matter and I told him that it wasn't a bad idea to show the papers to Ina. Before that, after Badri's decease it was Zeltser who explained to Ina that there was Badri's second family. Afterwards Ina questioned me, she was talking quite emotionally.
Having talked to Berezovsky Zeltser left for London and he would certainly have taken all the documents with him in order to show them to Mrs. Ina Gudavadze. I knew that Ina was in London too. I thought that the meeting would have taken place, but when Zeltser left, Berezovsky told him: Ina can wait. You should leave for Belarus instead. There we've bought an oil-refining factory, officially registered in Badri's name. We paid USD 148 million in it and we need to pay two more millions. I'll pay the sum, although you need to leave immediately, as the factory may be auctioned again and we'll lose both the money and the factory. This should have been done a week ago, but I hope it's not too late. We have an appointment at 11:00 am tomorrow. I'll book you the plane and you'll leave immediately.
When Zeltser called me, I told him that it was a suspicious situation – the documents aren't yet confirmed judicially and why is it necessary for you to go there? What's more, Berezovsky also wanted



me to go to Belarus. He said: the manager shall be there, he shall sign the papers and declare -- I am the manager of Patarkatsishvili's family. As I've noted, I thought the situation was quite suspicious and I warned Zelter: Berezovsky is very cunning, be careful and don't let him trick you into something. He explained that he had to go; otherwise it would have harmed the business. As he was so determined to go, I didn't stop him. Berezovsky told Zeltser: I possess information about Badri's assets that you may never be able to find. If you make a deal with me and let me have shares, I'll share the information with you. I warned Zeltser not to agree with Berezovsky on anything. This was our last talk. Afterwards he flew to Belarus and everyone knows what happened there. Why was it necessary to send him to Minks? If the papers were forged, couldn't Berezovsky have him arrested in London or in New York? Isn't there enough justice in those countries?

**Can Zeltser prove his innocence?**

I am sure that in a normal country, where there are laws there, Zeltser will prove his innocence but this is not the case in Belarus. This man who is diabetic is denied to have access to medication. It seems that this is they way they try to make him sign their favorable testimony. He may not even be alive. A document may appear tomorrow, having his signature on it and stating that the papers are forged.

**Were you summoned as a witness?**

No, not yet. Even if I will be, I don't intend to go to Belarus.

**They say that you are friends with Andrei Lugavoi...**

I know him well, as we worked together at ORT. He was the head of our security office, although I am no friend of his. Actually to tell you the truth, I have few friends, as I've been betrayed many times.

**What kind of relationship did Badri Ptarkatsishvili have with Lugavoi lately?**

As far as I know, pretty normal; Lugavoi had strained relationships with Berezovsky instead, as both were blaming each other in Litvinenko's death.

**And one more question regarding Imedi -- when did you officially register television shares in your name? Was it 3-4 days after Badri's death, when you arrived in Georgia?**

I don't remember the exact date...

**They say that you are the owner of Agaris Shakari (Agarian Sugar) and Rustavi Metallurgical Plant shares too.**

I have a lot of business interests in Georgia, including Agaris Shakari and Rustavi Metallurgical Plant.

**Is it true that Badri Patarkatsishvili helped you purchase the plant, while former Prime-Minister Zurab Zhvania was lobbying the arrangement?**

I don't remember when I bought the plant. I didn't know Zyrab Zhvania personally. I can't say that Badri helped me with anything. We didn't have common business; he had common businesses with Berezovsky instead, who was constantly trying to provoke Badri's political ambitions. Badri was Boria's victim and no one knows who will be the next one. It can be me, as Boria threatened me openly, but I am not afraid of him.

**When will Imedi air? As we know, its broadcasting license has expired...**

I hope that the issue will be resolved justly and we won't have any problems regarding the license. Imedi will air in the nearest future.

**The political opposition won't bee too happy about this. They declare they are going to hold manifestations in front of the television.**



Having taken Imedi's way of broadcasting into consideration, I think that Imedi can be regarded as people's television. The TV channel will be the same as it used to be before it got involved in political turmoil. Badri's greatest concern was the incidents regarding Imedi.

All Rights Reserved to Internews Georgia
When using this information media.ge must be mentioned

**Find this article at:**
http://www.media.ge/eng/page.php?m=media_discussions_news_detailed&id_numb=52

 edia.ge

## Category: News

[2008-03-31 | 15:37:59]
### News Corp to Carry on Struggle for Imedi TV with or without Patarkatsishvili's Family

The controversy between the Imedi TV new owner Joseph Kay and a transnational company News Corp is still on. The latter had been conducting the management of the company ahead of Joseph Kay's appearance.

"The transnational company News Corp does not recognize Joseph Kay's right to ownership and pledges to carry on the struggle for Imedi TV with or without Patarkatsishvili's family," Daisy Dunlop of News Corp outlined in her statement sent to Tbilisi from London. The statement has been disseminated by Georgian media outlets.

Joseph Kay became the manager of the channel consequent to the decease of his cousin Imedi TV founder Badri Patarkatsishvili. Joseph Kay refused to proceed with the cooperation with News Corp, since according to him a Russian oligarch Boris Berezovsky is standing behind the company.

The new owner of the television, pursuant to News Corp, was unable to present any documentation proving his legitimate ownership over Imedi media holding.

In accordance with the statement Joseph Kay's decision on the cessation of News Corp's authority over the management of Imedi TV has no legal power, therefore the legal services of Imedi media holding and News Corp are examining the issue related to ownership of the company.

News Corp management, the statements outline, had a verbal agreement regarding a 100% stake transfer to News Corp, with the founder of the company, Badri Patarkatsishvili, having expired on February 12, 2007. The process of the agreement was witnessed by many people.

"Patarkatsishvili's family confirmed the transfer of the 100% stake to News Corp. The transnational corporation is well aware that Patarkatsishvili's family leveled some accusations against Joseph Kay. We preserve a right either to join Patarkatsishvili's family's legal struggle for Imedi TV, or independently put the case on trial against Joseph Kay," News Corp's statement reads.

In response to the accusations Kay disseminated a paper stating that News Corp had been handed over I-Media's 100% stake in the Imedi Ltd. The legal basis of the transfer is a partial proxy issued by I-Media director. The proxy has been legally annulled by the current director of I-Media. In this regard the legislation does not envisage any kind of consent or permission from News Corp.

As regards to the dispute regarding the ownership of the TV company initiated by Patarkatsishvili's family and News Corp, we would like to point out that under the circumstances we are unaware of any specific complaints against us and we haven't been notified which legal action they take for the topic of debates. The discussions will be possible to hold consequent to the written documented lawsuit submitted by the opponent," Joseph Kay's statement reads.

All Rights Reserved to Internews Georgia.
When using this information media.ge must be mentioned.

Find this article at:
http://www.media.ge/eng/page.php?m=news_detailed&id_numb=3057

 edia.ge

## Category: News

[2008-04-01 | 16:53:47]
### Joseph Kay Presented Legal Document - Bidzina Baratashvili

Joseph Kay has a power of attorney and the document proving that he is the chair of Imedi TV Board of Trustees, this is to say he is holding the position that used to be maintained by Badri Patarkatsishvli, Director General of Imedi TV Bidzina Baratashvili stated reporting to the Georgian weekly Asaval-Dasavali.

According to the TV director general "it's a legal certified document."

"The members of our Board of Trustees are elected and appointed by I-Media holding. Joseph Kay presented the document certified by Paata Siradze, current director of I-Media," Baratashvili said. Siradze was appointed to the position following Badri Patarkatsishvili's decease, Baratashvili noted in his interview. In addition, Imedi TV director general pointed out that he isn't acquainted with Siradze and hence is unable to say anything about his personality.

"The director was appointed by the new board. Consequently the changes took place in the composition of Imedi TV Board of Trustes chaired by Joseph Kay. It has nothing to do with the ownership issue and management either. As regards Imedi ownership, the top interesting topic for the society, the court will find out everything," Imedi TV Director General underlined.

In accordance with Baratashvili, against the document Kay has been elected for the position of a Chairman of the Board of Trustees for a 5-year term.

"Joseph Kay enjoys a right to appoint the director general of the channel and run the staff policy. At this stage the documentation is legal. Inna Gudavadze [the spouse of a recently deceased Imedi TV founder Badri Patarkatsishvili -- Media.ge] and most likely News Corp too are going to appeal this decision," Baratashvili said.

Moreover, Imedi TV director general said, News Corp had been appointed to run the TV management against the official document issued by Shota Shavleishvili, a former director of the media holding, the validity of the document expires on October 31, 2008, but the paper was declared nullified by the new director Paata Siradze. "Any type of illegality in this case shall be found by the court."

All Rights Reserved to Internews Georgia.
When using this information media.ge must be mentioned.

Find this article at:
http://www.media.ge/eng/page.php?m=news_detailed&id_numb=3063



Category: News

[2008-04-02 | 17:50:12]

## Badri Patarkatsishvili's Family Flatly Refuses to Recognize Joseph Kay's Power of Attorney to Manage Late Business Tycoon's Assets

Badri Patarkatsishvili's family flatly refuses to recognize Joseph Kay's and his allies' power of attorney to manage the late tycoon's assets.

"We do not believe that Kay and his associates act in line with Badri's will. Despite numerous requests by the family we have not seen any written document proving his [Kay's] power of attorney," the family said in the statement presented to the journalists April 2 by the deceased business tycoon's sister MP Mzia Totladze.

"We are Badri Patarkatsishvili's widow, mother, daughters and sisters," reads the statement.

Patarkatsishvili's family is willing to settle all disputes and conflicts in a legal way.

"Our foreign lawyers are thoroughly studying the issue and we will appeal Joseph Kay's power of attorney. We don't consider Joseph Kay as a member of our family. We are unanimous in this decision," reads the statement.

"Their actions are contradictory to the law, moral and common sense. They are capable to fall to prove that Inna is not Badri's spouse. But we, our family, know that Inna is his legal spouse. Intrigues, provocations and falsehood inflict harm on the virtue of our family. We covet peace, respect, kindness and justice. It is our duty towards Badri," the authors of the statement stressed.

All Rights Reserved to Internews Georgia.
When using this information media.ge must be mentioned

Find this article at:
http://www.media.ge/eng/page.php?m=news_detailed&id_numb=3071

Media.ge | News                                                                  Seite 1 von 1

 edia.ge

## Category: News

[2008-04-03 | 15:13:28]
### Joseph Kay Denies being Successor to Badri Patarkatsishvili's Property

Joseph Kay, chairman of Imedi TV Board of Trustees lays no claims to the late business tycoon Badri Patarkatsishvili's property.

Joseph Kay granted InterPressNews information agency an interview commenting the statement made by Patarkatsishvili's family on April 2.

"I am not and have never been the successor to my cousin's [Badri Patarkatsishvili] property, and hence I have no right to lay any claims," Kay said.

"In case the court ratifies the legitimacy of Badri Patarkatsishvili's will I will make a decision whether to implement his will on managing his assets and not a successor as many assert," Joseph Kay stressed.

"If these people, including so called politicians, fail to see the difference between the power of attorney and being a successor, it's nothing else but the revelation of their lack of knowledge," Kay pointed out.

All Rights Reserved to Internews Georgia
When using this information media.ge must be mentioned

Find this article at:
http://www.media.ge/eng/page.php?m=news_detailed&id_numb=3072



Category: News

[2008-04-08 | 18:14:37]

## Badri Patarkatsishvili's Widow Sued Joseph Kay at Manhattan Federal Court

Inna Gudavadze, the widow and two daughters of late business tycoon, Imedi TV founder Badri
Patarkatsishvili filed a lawsuit at Manhattan Federal Court against Patarkatsishvili's stepcousin Joseph
Kay, 49, and Patarkatsishvili's American lawyer Emanuel Zeltser, 54.
Patarkatsshvili's family accuses Kay and Zeltser of applying false documents – the proxy and the will,
BBC informs.

Joseph Kay is also known alias Joseph Kakalashvili, Ioseb Kakalashvili and Ioseb Kakiashvili, reads the
lawsuit.

Debevoise&Plimpton LLP represents the plaintiff. It is yet unknown who is going to advocate the
defendants.

Zeltser was arrested on March 12 in Minsk, together with his secretary, Vladlena Funk. Zeltser and Funk,
charged with the falsification of the documents are awaiting the trial in the Belarus KGB isolator.

Last Wednesday a protest meeting was held in front of Consulate General of the Republic of Belarus.
The protesters were demanding Zeltser's release from detention.

On Monday the Washington Press National Club hosted the press conference headed by Emanuel
Zeltser's elder brother Mark, Oxana Adler and doctor Peter Shecker. According to their statement,
Emanuel Zeltser, carrying a serious disease, is not given proper medicine, including the painkiller.

Joseph Kay, being abroad at the moment, was ready to respond all questions through the video phone,
but the conversation was not held and the press conference came to an end in 10 minutes.

Inna Gudavadze and Patarkatsishvili's daughters Liana Zhmotova and Ia Patarkatsishvili have
underlined in the lawsuit that they reside in Great Britain and simultaneously addressed the local court to
issue the document on granting the right to inherit the property.

According to the complainants the stock-taking and evaluation of Patarkatsishvili's property around the
world is under way. Pursuant to the initial data the value of the property exceeds USD one billion."

On February 12, Patarkatsishvili's family members said, right on the decease of the billionaire "the
defendants got in touch with Patarkatsishvili's business partners around the world and through invalid
false documents, quasi drawn up and signed in New York, required the information on Patarkatsishvili's
property, and control over it."

Thus Joseph Kay, according to the plaintiffs, managed to misappropriate Imedi TV through having
presented the forged papers received from the defendant Zeltser, both defendants were well aware of
the falsity and invalidity of the documents.

Pursuant to the lawsuit on February 15, three days off of Patarkatsishvili's decease, Kay and Zeltser
visited Salford Capital Partners Inc office in London, the company managing part of Patarkatsishvili's
assets.
Joseph Kay having presented himself as an executor of late Patarkatsishvili's will requested the
information on the businessmen's assets. In response to the staff's requirement on authority Zeltser
turned his notebook on and showed the document titled Proxy on the screen. Kay and Zeltser refused to
provide the copy of the paper. As a result they were denied access to the requested information. On the
same day, the lawsuit reads, Zeltser kept trying, in vain though, to obtain information from Nicholas

Killing, director of Mainstay Trust Limited on the investments made through this company by Patarkatsishvili.

The defendants underline that the proxy, even in case of its authenticity is considered, against the New York laws, as invalid upon the decease of the issuer of the will.

On February 24 at Manhattan Buddha bar Zeltser met Inna Gudavadze's lawyer at that time, Michelle Duncan and showed the latter, through the laptop screen, the documents quasi signed by Patarkatsishvili on November 14, 2007 in New York.

On November 14 Badri Patarkatsishvili was truly visiting New York but, in accordance with the plaintiffs, he arrived in New York late in the evening and had a dinner with his friends and colleagues until midnight. Pursuant to the lawsuit Patarkatsishvili did not meet Zeltser on that day, let alone signing any papers in his presence. Duncan requested the copies of the papers, but the lawyer got just a promise instead.

Under the lawsuit the aforementioned proxy and other papers, the copies of which Patarkatsishvili's widow and daughters never received, impressed Badri's business partner Giorgi Jaoshvili.
The latter registered the JSC JMG Consulting Ltd shares owned by Badri Patarkatsishvili on Joseph Kay. Imedi TV was JSC JMG Consulting Ltd subsidiary company.

The lawyers of the plaintiffs, according to the lawsuit, do not believe that Kay has bought the shares, as of reported to the Russian daily Kommersant. The defendants request the court to outlaw Kay's imposture and demand the defendants to present the originals of the signed documents that grant them a right to manage Patarkatsishvili's assets.

All Rights Reserved to Internews Georgia.
When using this information media.ge must be mentioned.

**Find this article at:**
http://www.media.ge/eng/page.php?m=news_detailed&id_numb=3084

# Civil.Ge
**UNAG online Magazine**

Government Wants to Seize Imedi –
Patarkatsishvili's Widow

**News**

/ Civil Georgia, Tbilisi / 2008-03-19 13:58:51



The Georgian government is trying to take over Imedi TV station with the help of "imposters," Badri Patarkatsishvili's widow, Inna Gudavadze, said on March 19.

"Imposters have claimed ownership of Imedi and tried to sell it to the Government," she said in an open letter addressed to "the Georgian People." "But they can not [do that] because I and my family are the rightful owners of Imedi. In order not to make the [already] tense political situation worse, during all this time I have tried to negotiate with the Government, including the chair[person] of Parliament [Nino Burjanadze]. But I still do not have an answer."

"Imedi is not on air because the Georgian government does not want to allow it," Gudavadze said.

The Georgian newspapers *Alia* and *Rezonansi* reported on March 18 that Imedi TV shares had been formally registered under the name of Patarkatsishvili's friend, Gogi Jaoshvili. The latter, however, according to the reports, transferred the shares to Joseph Kay, alias Joseph Kakalashvili, who, according to the *Alia*, is a stepson of Patarkatsishvili's aunt. *The Alia* claimed that the Georgian authorities were negotiating with Kay.

In an interview with the *Rezonansi* on March 19, Bidzina Baratashvili, director general of Imedi TV, said that he had "heard" that 70% of the shares had been transferred to Kay. He said, however, that he had not seen any documentary evidence.

"My family owns Imedi and we will challenge in the courts any attempt to steal Imedi", Gudavadze said.

She also said that she was "determined to put Imedi back on air." She said her family had no intention of going into politics and she wanted Imedi TV to be managed by "an international independent media company" and to have a board of trustees "representing the people of Georgia to ensure balance."

"I ask you all to support me in my campaign to get Imedi back on air," Gudavadze writes. "We have lost Badri. We must not lose Imedi."

Nino Burjanadze, the parliamentary chairperson, strongly denied any official interference or involvement in matters related with Imedi TV.

"As far as I know, this is an internal family dispute and it should be resolved by the lawyers," she told journalist on March 18. "Nobody can seize anything from them [the Patarkatsishvili family]. This is not only a Georgian company. You know that very serious foreign companies and lawyers are involved in this case and it should be settled within the family. We have nothing to do with it."

Giorgi Khaindrava, an individual member of the eight-party opposition coalition, said that the opposition planned a protest rally on March 24 to protest against, what he called, the authorities' attempts to seize Imedi TV.

**Related Stories:**
Opposition Figure Discusses Imedi TV with Patarkatsishvili Family
Patarkatsishvili Family to Decide on Imedi TV
Patarkatsishvili Poison Test Results in Eight Weeks
Patarkatsishvili's Assets, Including Imedi TV, Frozen
Imedi TV Suspends Broadcasts



© 2004 UNA-Georgia

# Civil.Ge
**UNAG online Magazine**

New Imedi Owner Claims Right to Manage
Patarkatsishvili's Assets

**News**

Civil Georgia, Tbilisi / 2008-03-27 12:53:17





Joseph Kay has promised not to interfere in Imedi TV's

editorial policy. Photo: InterPressNews

Joseph Kay, who claims to be the new owner of Imedi TV, said Boris Berezovsky had been engaged in a plot to seize Badri Patarkatsishvili's assets.

In an interview with the Russian daily *Kommersant*, Kay, alias Kakalashvili, who is Patarkatsishvili's step cousin, claimed that he had power of attorney to manage Patarkatsishvili's assets in accordance with the late tycoon's will. Patarkatsishvili's widow, Inna Gudavadze, however, has accused Kay of an attempt to seize Patarkatsishvili's assets through "falsification of documents." Berezovsky made similar accusations in an interview with the Georgian television station, Rustavi 2.

Kay said that Berezovsky – "whom I prefer to call the Devil" – wanted him to travel to Belarus to get rid of him by having him jailed there. Kay said that his lawyer, Emanuel Zeltser, went to Belarus where he was arrested just after exiting a plane on the request of Berezovsky.

"Emanuel Zeltser was Badri Patarkatsishvili's lawyer for about 13 or 14 years," Kay said. "A day or two after Badri's death, Mr. Zeltser came to me and told me about Badri Patarkatsishvili's will. He [Patarkatsishvili] wrote the will in New York at Zeltser's office. I do not know the exact date, but it was last November… Mr. Zeltser came to me [after Patarkatsishvili's death in February] and showed me the will, which grants me the power of attorney, giving me the authority to manage all of his [Patarkatsishvili's] property. The will mandates me to collect all of Badri's assets and properties and to then distribute them in accordance with the will."

Kay said the will dictated that Patarkatsishvili's assets be distributed among his close relatives, but he did not give details, saying that "the courts should first confirm my power of attorney." He, however, said he did not know which court his lawyer, Zeltser, had appealed to.

Kay also claimed that Zeltser went to Belarus because Berezovsky had told him to clarify the situation with an oil refinery there which was owned by Patarkatsishvili. "Berezovsky told Zeltser that I should go to Belarus. So he wanted me to be arrested there. But eventually Zeltser went there. There were three people on the plane: Zeltser, [Zeltser's secretary Vladlena] Funk and an Israeli citizen, Berezovsky's associate Anatoly Motkin, who was in charge of Badri Patarkatsishvili's election campaign [in Georgia's January 5 presidential election]. Motkin was not arrested. So I want to ask: if those papers about my power of attorney were forged, why didn't this Devil have my people arrested in London or New York?"

20

In the interview with *the Kommersant*, Kay said he did not want to speak much about his deal involving Imedi TV, but said he bought the shares "legally." He, however, declined to disclose the sum, saying it was "a commercial secret."

**Related Stories:**
Opposition Rallies 'to Protect Imedi'
Imedi TV May Resume Broadcasts in April
Imedi's New Owner Delays Reopening – Source
Patarkatsishvili Family: 'Do not Politicize Imedi TV Dispute'
Imedi TV 'New Owner' Plans to Restore 'Old Imedi'
Government Wants to Seize Imedi – Patarkatsishvili's Widow
Berezovsky on his Plans, Georgian Opposition, Authorities
Imedi TV 'New Owner' Denies Talks with Government
Okruashvili Calls for Focusing on Imedi TV
Burjanadze Confirms Meeting with Patarkatsishvili Widow

© 2004 UNA-Georgia

# Civil.Ge
**UNAG online Magazine**

Imedi TV Tests Signal                                                    **News**

- Civil Georgia, Tbilisi / 2008-04-01 21:30:42




Imedi TV's logo appeared on TV screens on April 1 as the station prepares to resume partial broadcasts.

Imedi radio accompanied the logo.

Bidzina Baratashvili, the executive director of Imedi TV, said on March 26 he expected the television station to resume partial broadcasts from April 1 and its normal programming, particularly news, no later than April 10.

The Imedi TV ownership issue, meanwhile, remains disputed between Joseph Kay, a relative of late tycoon Badri Patarkatsishvili, and Patarkatsishvili's widow, Inna Gudavadze, who claims that Kay is just a frontman for the authorities, who are using him to gain control of the station.

**Related Stories:**
Imedi TV Suspends Broadcasts
Imedi TV Resumes Broadcasts
New Imedi Owner Claims Right to Manage Patarkatsishvili's Assets



© 2004 UNA-Georgia

# Civil.Ge
**UNAG online Magazine**

Patarkatsishvili Family in Row over Assets                                    **News**

/ Civil Georgia, Tbilisi / 2008 04-02 17:54:24



Badri Patarkatsishvili's family has reiterated it does not recognize Joseph Kay's claims that he has the power of attorney to manage the late tycoon's assets.

"Dishonorable people have taken advantage of the hardest times for our family (involving the widow, mother, daughters and sisters) and started seizing Badri's assets against the will of his family; we are being deprived of what he had bequeathed," the family said in a statement issued on April 2.

Kay, who is Patarkatsishvili's step cousin, claims that he has the power of attorney to manage Patarkatsishvili's assets in accordance with the late tycoon's will. Kay also claims that the will mandates him to collect all of Patarkatsishvili's assets and properties and to then distribute them in accordance with the will among family members, including Patarkatsishvili's first wife. Kay also claims to be the owner of Imedi TV and radio stations.

"We do not believe that Kay and his associates act in accordance with Badri's will," the Patarkatsishvili family said in the statement. "Despite numerous requests by the family we have not seen any document proving his [Kay's] power of attorney... Our foreign lawyers are thoroughly studying the issue and we will appeal to the courts."

Lord Goldsmith, a former UK Attorney General and now head of the New York-based law firm Debevoise & Plimpton's European litigations, is, among others, acting on the family's behalf.

**Related Stories:**
New Imedi Owner Claims Right to Manage Patarkatsishvili's Assets



© 2004 UNA-Georgia

**AJB-16**

**IN THE SUPREME COURT OF GIBRALTAR**
**CHANCERY JURISDICTION**

2008 M No

**IN THE MATTER** of the Civil Procedure Rules, Part 64, Section 1

and

**IN THE MATTER** of the Trustees Act

and

**IN THE MATTER** of the trusts known as The Valmore Trust and The Summit Trust

**BETWEEN**

**MISELVA ETABLISSEMENT (1)**
**NEXUS TREUHAND AG (2)**

Claimants

and

**INNA GUDAVADZE (1)**
**JOSEPH KAY (2)**
**IYA PATARKATSISHVILI (3)**
**LIANA ZHMOTOVA (4)**
**FALLON INVEST & TRADE INC. (5)**

Defendants

EXHIBIT "AJB16"

This is the Exhibit "AJB16" referred to in the Witness Statement of ANDREW JOHN BAKER dated this 20th day of APRiL 2008

**Andrew Baker**

**Von:** David Ashfield [d.ashfield@londonintbank.com]
**Gesendet:** Freitag, 18. April 2008 18:15
**An:** Daniel Fielding; Andrew Baker
**Cc:** Jonathan Porteous; mpop10@hotmail.com; Ali Guidfar
**Betreff:** RE: JWL and Charleswood [SB-LIVE.FID69201]

      

JWL EIN (Tax) ID   1 - ByLaws.pdf   1 - Cert of   Board of Directors   Resolution to   Register of   9 - Cert 1
Number (786 ...                     Incorporation.pdf   31.12.7.pdf...   transfer shares ...   Shares.pdf   CANCELLED.pdf

      

9 - Cert 2 for   Excerpt 28.3.8.pdf   Chapel.pdf   Thames.pdf   Chester.pdf   Fisher.pdf   Grosvenor.pdf
Miselva, 199 sh...



Paua.pdf

        Dear all, these are all the records for the JWL transfer. I believe that
one share was transferred to Zlata at the 31st December but that this was immediately
cancelled as it would have led to a large stamp duty liability in the UK. I believe
therefore that 199 (i.e. 100% of the issued share capital has been issue to Miselva);
incidentally the reason for the cancellation of the first stock certificate is that it
had the wrong name on it (JWL Entertainment Inc instead of JWL Entertainment Group
Inc.). We obviously need to get the original of the stock certificate. Then we need to
register the transfers at the stamp office. The next step then should be to transfer
the stock to Charleswood on their appointment as trustees for the Valmore Trust. We
will need to agree the retirement deed of Miselva and then set about deciding whether
we continue with JWL or if not, I assume, wind it up and revert to each of the holding
companies being held directly by the trustee? Can everyone confirm that they are happy
to this course of action? With regard to the Summit this complication of JWL does not
exist so I assume that we need to send the removal notice to Nexus and start with the
process of assigning the shares held in trust by Nexus to Charleswood and appointing
new directors to each of the subsidiaries. I think that we had agreed that Andrew
would handle each of these stock transfers and resignations and appointments as he
knew each of the agents and jurisdictions. Again could everyone please conform that
this is their understanding of the way forward? Regards

David Ashfield
Director
Fisher Island Ltd
11 Grosvenor Place, SW1X 7HH

Blackberry: +44 7921881027
Tel: +44 2071705591
Fax: +44 2071705510

-----Original Message-----
From: Daniel Fielding [mailto:dan.fielding@stevens-bolton.co.uk]
Sent: 16 April 2008 21:23
To: Andrew Baker
Cc: David Ashfield; Jonathan Porteous; mpop10@hotmail.com; Kate Schmit; Jaime Topp
Subject: RE: JWL and Charleswood [SB-LIVE.FID69201]

Dear All

Further to Andrew's email below, we are looking into legal arguments whereby we could
unpick the transaction. To form a view on this we need to know exactly what JWL signed
and what they actually did in terms of any registrations and/or their company accounts
produced. David - would it be possible to provide these details or provide us with a
contact that we can follow this up with? Even if JWL did not actually issue the shares
it is not cut and dried that we can unpick the transaction.

We are also considering a transfer from JWL to Charleswood PTC and are investigating if there is any way of doing this without incurring a stamp duty charge. Moshe - would there be any adverse US tax consequences in doing this? Consideration also needs to be given to what the adverse tax effect is on the group of acknowledging the transfer to JWL at the start of year.

Annual returns have recently been filed with the Registrar of Companies in the UK for Chapel Street, Fisher Island, Grosvenor Trading and Thames Steel. The 'share transfers' have been reflected in these annual returns. However, legal title to shares does not pass until the stock transfer forms have been stamped and the record of a private company's shares that should be checked for details of share ownership is the company's register of members, which should be updated once the legal title to the shares has transferred. The stock transfer forms for each of these four companies have not yet been stamped. Therefore the annual returns should not state that JWL currently owns the shares. If necessary, an amended annual return could be filed at Companies House, but the annual returns currently filed could not be removed from the filing history of each company without a court order.

I believe that there was some confusion over whether the company secretary, Z Stepanenko, owned one share in the company. I have reviewed a certified copy of the share register of JWL as at 31 December 2007 and also the copy of the JWL share certificate that we have on file. The share register shows that Miselva owns the entire issued share capital of JWL (being 199 shares) and the share certificate states that Miselva owns 199 shares (although the Company is authorised to issue 200 shares in total). Andrew - could you please let me know if you think there may be an issue or further investigation is required.


Daniel Fielding

DDI: 01483 401264
Email: daniel.fielding@stevens-bolton.co.uk

Stevens & Bolton LLP, The Billings, Guildford GU1 4YD
Tel: +44 (0)1483 302264  Fax: +44 (0)1483 302254  DX 2423 Guildford 1
www.stevens-bolton.co.uk

Corporate Law Firm of the Year
Insider South East Dealmakers Awards 2007 and 2008

Stevens & Bolton LLP is a limited liability partnership registered in England (registered number OC306955) and is regulated by the Solicitors Regulation Authority. A list of members' names is open to inspection at the above address.

IMPORTANT NOTICE:
This message may contain confidential or legally privileged information. If you are not the addressee of this e-mail please reply to the sender immediately by e-mail and do not disclose, store or make use of this information.
Communicating by e-mail carries certain risks which include delay, corruption of data, non-delivery, wrongful interception, amendment and other dangers. Please refer to our internet site http://www.stevens-bolton.co.uk/email if you would like more information on this issue. However if you communicate with us by e-mail we will take it that you have assumed the risks involved in using such a medium.


-----Original Message-----
From: Andrew Baker [mailto:andrew.baker@miselva.li]
Sent: Tuesday, April 15, 2008 11:42 AM
To: Daniel Fielding
Cc: d.ashfield@londonintbank.com; Jonathan Porteous; mpop10@hotmail.com
Subject: AW: JWL and Charleswood [SB-LIVE.FID69201]

Dear Daniel,

Thinking about this overnight, I am beginning to wonder whether and, if so, how this transaction can really be unpicked, given that legal agreements were executed by Miselva (although I never saw the agreements signed by JWL Entertainment Group Inc)

and the share transfers registered (presumably) at the UK Companies Registry?

Perhaps this is what PKF are pondering upon, but I thought I should pass on my concerns as early as possible.

Also, as I recall the deal was that Miselva would transfer 100% of the shares in its 6 subsidiaries in return for 100% of the shares of JWL Entertainment Group Inc. Having compared the 6 Sale & Purchase Agreements with the copy share certificate in JWL which was sent to us by e-mail in early January, I noticed that Miselva had in fact received only 199 out of 200 shares. I think I asked David at the time what had happened to the 1 share, but I cannot remember what his response was. Can you shed any light on the matter?

Kind regards

Andrew

-----Ursprüngliche Nachricht-----
Von: Daniel Fielding [mailto:dan.fielding@stevens-bolton.co.uk]
Gesendet: Montag, 14. April 2008 19:03
An: Andrew Baker
Cc: d.ashfield@londonintbank.com; Jonathan Porteous; mpop10@hotmail.com
Betreff: JWL and Charleswood [SB-LIVE.FID69201]

Dear Andrew

Jonathan asked me to email you to let you know that we should be able to prepare the stock transfer forms for the transfer of the shares to Charleswood PTC as soon as possible on the basis that the JWL transaction was never fulfilled, but (as Jonathan mentioned) we need to first speak to PKF in relation to this matter and seek their advice on proceeding in this way. We are due to speak to PKF tomorrow.

We assume that the drafting of the stock transfer forms is all that you require from us and that, subject to Miselva confirming what happened with JWL and that the proposed transactions with JWL did not go ahead, you will prepare all of the other required documentation.

Kind regards


Daniel Fielding


DDI: 01483 401264
Email: daniel.fielding@stevens-bolton.co.uk


Stevens & Bolton LLP, The Billings, Guildford GU1 4YD
Tel: +44 (0)1483 302264  Fax: +44 (0)1483 302254  DX 2423 Guildford 1
www.stevens-bolton.co.uk
Corporate Law Firm of the Year
Insider South East Dealmakers Awards 2007 and 2008

Stevens & Bolton LLP is a limited liability partnership registered in England (registered number OC306955) and is regulated by the Solicitors Regulation Authority. A list of members' names is open to inspection at the above address.
IMPORTANT NOTICE:
This message may contain confidential or legally privileged information.  If you are not the addressee of this e-mail please reply to the sender immediately by e-mail and do not disclose, store or make use of this information.
Communicating by e-mail carries certain risks which include delay, corruption of data, non-delivery, wrongful interception, amendment and other dangers.  Please refer to our internet site http://www.stevens-bolton.co.uk/email if you would like more information on this issue.  However if you communicate with us by e-mail we will take it that you have assumed the risks involved in using such a medium.

3

**Exhibit B**

IN THE SUPREME COURT OF GIBRALTAR
CHANCERY JURISDICTION

2008 M No. 70

IN THE MATTER of the Civil Procedure Rules, Part 64, Section 1

and

IN THE MATTER of the Trustees Act

and

IN THE MATTER of the trusts known as The Valmore Trust and The Summit Trust

BETWEEN

MISELVA ETABLISSEMENT (1)
NEXUS TREUHAND AG (2)

Claimants

and

INNA GUDAVADZE (1)
JOSEPH KAY (2)
IYA PATARKATSISHVILI (3)
LIANA ZHMOTOVA (4)
FALLON INVEST & TRADE INC. (5)

Defendants

_____

SECOND WITNESS STATEMENT
OF ANDREW JOHN BAKER

_____

1

I, Andrew John Baker of Runkelsstrasse 37, Triesen, FL-9495, Liechtenstein hereby state as follows:

1.  I am the same Andrew John Baker who made a Witness Statement in this claim on 20 April 2008 and make this statement for the Hearing today at 10:30 a.m. of an Application by the Second Defendant Joseph Kay ("JK") and in response to a witness statement of Mohammad Ali Guidfar ("MAG"), a draft of which was supplied to me yesterday evening. The Claimants have been given less than 24 hours notice of this application and this Witness Statement has had to be prepared hastily.

2.  It is my belief that the statements of MAG lack real credibility. He speaks of "potential" problems and of a "potentially de-stabilising effect" if the change in management of JWL Entertainment Group Inc. ("JWL") becomes public but there is no convincing evidence given that this will really happen. Curiously, it the first time that any detail has been provided by the Second Defendant or his representatives regarding these allegations.

3.  MAG describes JK as the "driving force" behind the Valmore Trust. This is simply untrue. The trustee has only rarely had contact with JK and he has rarely, if at all, been involved in the decision-making concerning the trust or its assets. London International Bank Limited ("LIB"), on the other hand, and in particular its Chief Financial Officer David Ashfield ("DA"), has been the trustee's principal point of contact with respect to the Valmore Trust and its underlying assets. Indeed, it is true to say that in the past the trustees of the Valmore Trust and of the Summit Trust have placed great reliance on the ability and efficiency of DA and the LIB team in administering the trusts' assets.

4.  To my knowledge it has been DA and LIB who have been running the corporate structures under the Valmore and Summit Trusts and who have been negotiating various loans with various financiers. I do not believe that JK has much, if any, involvement in these negotiations. JK is involved or not. It is therefore misleading to portray JK as the mainstay of the Valmore group without whose involvement on the board of JWL the group is going to collapse. I bring to the Honourable Court's attention that JWL was only inserted as the top holding company of the Valmore

group in December 2007 (if indeed it has been properly inserted at all, as to which see below) and that prior thereto JK had not been a director of the holding companies at all.

5.    With respect to JWL it is significant that DA has recently been making a considerable effort to have the insertion of JWL as the top holding company reversed or 'unpicked'. Copies of relevant correspondence are attached as Exhibit "2-AJB-1". It is evident from the correspondence that there was slight uncertainty as to whether the insertion of JWL in December 2007 as the top holding company has been properly completed. Further it goes to show that it is not at all important for the continuing well-being of the corporate group if JWL is the holding company. On the contrary, it is my belief that DA and LIB will be relieved if they no longer have to enter negotiations with potential financiers showing a holding company with the somewhat unhappily named "JWL Entertainment Group, Inc.".

6.    Since this Honourable Court made its order on 21.04.2008, the trustees have been attempting to: (1) obtain information as to the present state affairs of the various companies underlying the 2 trusts; and (2) secure proper control of the corporate structure underlying each trust but without jeopardising the commercial interests of the underlying companies. As part of these efforts, the trustees have engaged a number of professional firms to assist. Upon advice received, the trustee of the Valmore Trust decided to take control of JWL so as to ensure that the Second Defendant could not dispose of or encumber any of the underlying assets. It was not and, as things currently stand, is not the intention of the trustees to remove the directors of the holding companies at the next level (for the most part DA and/or MAG).

7.    On behalf of the trustees I have been trying to arrange an urgent meeting with DA, MAG and LIB with a view to making progress on gaining proper control and proper status reports as to the trust assets. My efforts have been thwarted however and my concerns are growing that LIB may be deliberately putting me off. Copies of relevant correspondence are attached as Exhibit "2-AJB-2". Subject to further advice from the trustees lawyers, in light of the foregoing the trustees may appoint a representative to the boards of directors of the second-level holding companies just to ensure that they (the trustees) are kept properly informed.

3

8.  I reiterate that there is no intention on the part of the trustees to interfere in the day to day running of the operating companies within the relevant corporate groups. The trustees do not see this as their role. However, the trustees feel strongly that proper ownership, control and monitoring of the trust assets is essential. In view of the recent actions of JK, the trustees feel that he is not the appropriate person to be in charge of any of the holding companies.

## STATEMENT OF TRUTH

I believe that the facts stated in this Witness Statement are true.

Dated 1st day of May 2008

Signed: ...................................................

Andrew John Baker

This Witness Statement is filed by Messrs Hassans of 57/63 Line Wall Road, Gibraltar, Solicitors for the Claimants.

4

**2-AJB-1**

**Andrew Baker**

**Von:**       David Ashfield [d.ashfield@londonintbank.com]

**Gesendet:** Montag, 21. April 2008 12:58

**An:**        jonathan.porteous@stevens-bolton.co.uk; dan.fielding@stevens-bolton.co.uk; Andrew Baker

**Cc:**        mpop10@hotmail.com; Ali Guidfar; kate.schmit@stevens-bolton.co.uk

**Betreff:**   Re: JWL and Charleswood [SB-LIVE.FID69201]

Dear all further to discussions over the weekend with Moshe it seems that the shares in JWL may never have been issued therefore the transfers of each of the six holding companies may never have been fulfilled. It is now our preference to cancel these six transactions and file amended annual returns. Jonathan what do we need to do to make this happen? The next step is then to transfer the six holding company shares to Charleswood. Jonathan, can you please advise? Regards,


David Ashfield

London International Bank Ltd
11 Grosvenor Place, SW1X 7HH
Mobile: +44 7887897329
Blackberry: +44 7921881027
Tel: +44 2071705591
Fax: +44 2071705510


-----Original Message-----
From: Jonathan Porteous
To: David Ashfield; Daniel Fielding; Andrew Baker
CC: mpop10@hotmail.com; Ali Guidfar; Kate Schmit
Sent: Mon Apr 21 11:39:42 2008
Subject: RE: JWL and Charleswood [SB-LIVE.FID69201]

Many thanks David. We are happy with this course of action. To confirm, we see ourselves as dealing with the UK stamp duty applications of the initial transaction and future transactions to unwind or vary the structure, and to prepare stock transfer forms for the UK companies as required to implement whatever transactions are effected. We are not otherwise dealing with the paperwork to effect the change of trustee, though please let us know if you need us to assist.

My tax colleague Kate Schmit has prepared a note on the stamp duty position following her conversation with US tax attorney David Horowitz on Friday, and we will be circulating that to you all and to David shortly.

Kind regards
Jonathan



DDI - 44 (0) 1483 401233
jonathan.porteous@stevens-bolton.co.uk

Stevens & Bolton LLP, The Billings, Guildford GU1 4YD
Tel: +44 (0)1483 302264  Fax: +44 (0)1483 302254  DX 2423 Guildford 1
www.stevens-bolton.co.uk

Corporate Law Firm of the Year
Insider South East Dealmakers Awards 2007 and 2008

Stevens & Bolton LLP is a limited liability partnership registered in England (registered number OC306955) and is regulated by the Solicitors Regulation Authority.
A list of members' names is open to inspection at the above address.

IMPORTANT NOTICE:
This message may contain confidential or legally privileged information. If you are not the addressee of this e-mail please reply to the sender immediately by e-mail and do not disclose, store or make use of this information.


01.05.2008

Communicating by e-mail carries certain risks which include delay, corruption of data, non-delivery, wrongful interception, amendment and other dangers. Please refer to our internet site http://www.stevens-bolton.co.uk/email if you would like more information on this issue. However if you communicate with us by e-mail we will take it that you have assumed the risks involved in using such a medium.


-----Original Message-----
From: David Ashfield [mailto:d.ashfield@londonintbank.com]
Sent: Friday, April 18, 2008 5:15 PM
To: Daniel Fielding; Andrew Baker
Cc: Jonathan Porteous; mpop10@hotmail.com; Ali Guidfar
Subject: RE: JWL and Charleswood [SB-LIVE.FID69201]

Dear all, these are all the records for the JWL transfer. I believe that one share was transferred to Zlata at the 31st December but that this was immediately cancelled as it would have led to a large stamp duty liability in the UK. I believe therefore that 199 (i.e. 100% of the issued share capital has been issue to Miselva); incidentally the reason for the cancellation of the first stock certificate is that it had the wrong name on it (JWL Entertainment Inc instead of JWL Entertainment Group Inc.). We obviously need to get the original of the stock certificate. Then we need to register the transfers at the stamp office. The next step then should be to transfer the stock to Charleswood on their appointment as trustees for the Valmore Trust. We will need to agree the retirement deed of Miselva and then set about deciding whether we continue with JWL or if not, I assume, wind it up and revert to each of the holding companies being held directly by the trustee? Can everyone confirm that they are happy to this course of action? With regard to the Summit this complication of JWL does not exist so I assume that we need to send the removal notice to Nexus and start with the process of assigning the shares held in trust by Nexus to Charleswood and appointing new directors to each of the subsidiaries. I think that we had agreed that Andrew would handle each of these stock transfers and resignations and appointments as he knew each of the agents and jurisdictions. Again could everyone please conform that this is their understanding of the way forward? Regards


David Ashfield
Director
Fisher Island Ltd
11 Grosvenor Place, SW1X 7HH

Blackberry: +44 7921881027
Tel: +44 2071705591
Fax: +44 2071705510

-----Original Message-----
From: Daniel Fielding [mailto:dan.fielding@stevens-bolton.co.uk]
Sent: 16 April 2008 21:23
To: Andrew Baker
Cc: David Ashfield; Jonathan Porteous; mpop10@hotmail.com; Kate Schmit; Jaime Topp
Subject: RE: JWL and Charleswood [SB-LIVE.FID69201]

Dear All

Further to Andrew's email below, we are looking into legal arguments whereby we could unpick the transaction. To form a view on this we need to know exactly what JWL signed and what they actually did in terms of any registrations and/or their company accounts produced. David - would it be possible to provide these details or provide us with a contact that we can follow this up with? Even if JWL did not actually issue the shares it is not cut and dried that we can unpick the transaction.

We are also considering a transfer from JWL to Charleswood PTC and are investigating if there is any way of doing this without incurring a stamp duty charge. Moshe - would there be any adverse US tax consequences in doing this? Consideration also needs to be given to what the adverse tax effect is on the group of acknowledging the transfer to JWL at the start of year.

Annual returns have recently been filed with the Registrar of Companies in the UK for Chapel Street, Fisher Island, Grosvenor Trading and Thames Steel. The 'share transfers' have been reflected in these annual returns. However, legal title to shares does not pass until the stock transfer forms have been stamped and the record of a private company's shares that should be checked for details of share ownership is the company's register of members, which should be updated once the legal title to the shares has transferred. The stock transfer forms for each of these four companies have not yet been stamped. Therefore the annual returns should not state that JWL currently owns the shares. If necessary, an

01.05.2008

amended annual return could be filed at Companies House, but the annual returns currently filed could not be removed from the filing history of each company without a court order.

I believe that there was some confusion over whether the company secretary, Z Stepanenko, owned one share in the company. I have reviewed a certified copy of the share register of JWL as at 31 December 2007 and also the copy of the JWL share certificate that we have on file. The share register shows that Miselva owns the entire issued share capital of JWL (being 199 shares) and the share certificate states that Miselva owns 199 shares (although the Company is authorised to issue 200 shares in total). Andrew - could you please let me know if you think there may be an issue or further investigation is required.


Daniel Fielding

DDI: 01483 401264
Email: daniel.fielding@stevens-bolton.co.uk

Stevens & Bolton LLP, The Billings, Guildford GU1 4YD
Tel: +44 (0)1483 302264  Fax: +44 (0)1483 302254  DX 2423 Guildford 1 www.stevens-bolton.co.uk

Corporate Law Firm of the Year
Insider South East Dealmakers Awards 2007 and 2008

Stevens & Bolton LLP is a limited liability partnership registered in England (registered number OC306955) and is regulated by the Solicitors Regulation Authority.
A list of members' names is open to inspection at the above address.

IMPORTANT NOTICE:
This message may contain confidential or legally privileged information.  If you are not the addressee of this e-mail please reply to the sender immediately by e-mail and do not disclose, store or make use of this information. Communicating by e-mail carries certain risks which include delay, corruption of data, non-delivery, wrongful interception, amendment and other dangers.  Please refer to our internet site http://www.stevens-bolton.co.uk/email if you would like more information on this issue.  However if you communicate with us by e-mail we will take it that you have assumed the risks involved in using such a medium.



-----Original Message-----
From: Andrew Baker [mailto:andrew.baker@miselva.li]
Sent: Tuesday, April 15, 2008 11:42 AM
To: Daniel Fielding
Cc: d.ashfield@londonintbank.com; Jonathan Porteous; mpop10@hotmail.com
Subject: AW: JWL and Charleswood [SB-LIVE.FID69201]

Dear Daniel,

Thinking about this overnight, I am beginning to wonder whether and, if so, how this transaction can really be unpicked, given that legal agreements were executed by Miselva (although I never saw the agreements signed by JWL Entertainment Group Inc) and the share transfers registered (presumably) at the UK Companies Registry?

Perhaps this is what PKF are pondering upon, but I thought I should pass on my concerns as early as possible.

Also, as I recall the deal was that Miselva would transfer 100% of the shares in its 6 subsidiaries in return for 100% of the shares of JWL Entertainment Group Inc. Having compared the 6 Sale & Purchase Agreements with the copy share certificate in JWL which was sent to us by e-mail in early January, I noticed that Miselva had in fact received only 199 out of 200 shares. I think I asked David at the time what had happened to the 1 share, but I cannot remember what his response was. Can you shed any light on the matter?

Kind regards

Andrew

-----Ursprüngliche Nachricht-----
Von: Daniel Fielding [mailto:dan.fielding@stevens-bolton.co.uk]
Gesendet: Montag, 14. April 2008 19:03


01.05.2008

An: Andrew Baker
Cc: d.ashfield@londonintbank.com; Jonathan Porteous; mpop10@hotmail.com
Betreff: JWL and Charleswood [SB-LIVE.FID69201]

Dear Andrew

Jonathan asked me to email you to let you know that we should be able to prepare the stock transfer forms for the transfer of the shares to Charleswood PTC as soon as possible on the basis that the JWL transaction was never fulfilled, but (as Jonathan mentioned) we need to first speak to PKF in relation to this matter and seek their advice on proceeding in this way. We are due to speak to PKF tomorrow.

We assume that the drafting of the stock transfer forms is all that you require from us and that, subject to Miselva confirming what happened with JWL and that the proposed transactions with JWL di i not go ahead, you will prepare all of the other required documentation.

Kind regards

Daniel Fielding

DDI: 01483 401264
Email: daniel.fielding@stevens-bolton.co.uk

Stevens & Bolton LLP, The Billings, Guildford GU1 4YD
Tel: +44 (0)1483 302264  Fax: +44 (0)1483 302254  DX 2423 Guildford 1 www.stevens-bolton.co.uk Corporate Law Firm of the Year Insider South East Dealmakers Awards 2007 and 2008

Stevens & Bolton LLP is a limited liability partnership registered in England (registered number OC306955) and is regulated by the Solicitors Regulation Authority.
A list of members' names is open to inspection at the above address.
IMPORTANT NOTICE:
This message may contain confidential or legally privileged information. If you are not the addressee of this e-mail please reply to the sender immediately by e-mail and do not disclose, store or make use of this information. Communicating by e-mail carries certain risks which include delay, corruption of data, non-delivery, wrongful interception, amendment and other dangers. Please refer to our internet site http://www.stevens-bolton.co.uk/email if you would like more information on this issue. However if you communicate with us by e-mail we will take it that you have assumed the risks involved in using such a medium.

Registered in England, No 3250572
Authorised and Regulated by the Financial Services Authority

--
This e-mail, together with any attachments, is confidential between the sender and addressee(s). If you are not the intended r~
ecipient(s) of this
e-mail you should not copy it or use it for any purpose = nor disclose its contents to any person: to do so may be unlawful. If you have received this e-mail by mistake please notify the sender immediately by e- mail and delete this e-mail and any attachments from your system. To the maximum extent permitted by law, London International Bank Ltd accepts no liability for any loss or damage resulting from unauthorised use of this email or r any attachment or from unauthorised use of any information contained or implied in the email or attachments.

Registered in England, No 3250572
Authorised and Regulated by the Financial Services Authority

This e-mail, together with any attachments, is confidential between the sender and addressee(s). If you are not the intended recipient(s) of this e-mail you should not copy it or use it for any purpose nor disclose its contents to any person: to

01.05.2008

Re: JWL and Charleswood [SB-LIVE.FID69201]                                    Seite 5 von 5

do so may be unlawful. If you have received this e-mail by mistake please notify the senders immediately by e-mail and delete the e-mail and any attachments from your system. To the maximum extent permitted by law, London International Bank Ltd disclaims liability for any loss or damage resulting from unauthorised use of this email or any attachment or from unauthorised use of any information contained or implied in the email or attachments.

01.05.2008

**2-AJB-2**

**Andrew Baker**

**Von:**      David Ashfield [d.ashfield@londonintbank.com]

**Gesendet:** Mittwoch, 30. April 2008 20:01

**An:**      Andrew Baker

**Cc:**      Ali Guidfar

**Betreff:**    RE: AW: AW: Proposed meeting tomorrow

Andrew, I have been advised by our lawyer Timothy Eppel of McFadden's that some of the items on your agenda may be dealt with in court in Gibraltar tomorrow and consequently they would suggest that we meet at 14.00 here in our offices on Friday 2nd May. Best Regards,

**David Ashfield**
Director
**Fisher Island Ltd**
11 Grosvenor Place, SW1X 7HH

Blackberry: +44 7921881027
Tel: +44 2071705591
Fax: +44 2071705510

**From:** Andrew Baker [mailto:andrew.baker@miselva.li]
**Sent:** 30 April 2008 16:08
**To:** David Ashfield
**Cc:** Ali Guidfar
**Subject:** AW: AW: AW: Proposed meeting tomorrow

Dear David, dear Ali,

Further to your e-mails yesterday, I now understand why you were not keen to meet with me yesterday in any event.

In the current circumstances, is your invitation to meet together with our respective lawyers tomorrow at 11:00 a.m. still open? There would be no point in my making another special journey to London if you were not going to be able to provide me / us with the detailed information I need as mentioned in our previous exchanges.

Best regards

Andrew

-----Ursprüngliche Nachricht-----
**Von:** David Ashfield [mailto:d.ashfield@londonintbank.com]
**Gesendet:** Dienstag, 29. April 2008 12:12
**An:** Andrew Baker
**Cc:** Ali Guidfar
**Betreff:** Re: AW: AW: Proposed meeting tomorrow

Andrew specifically can we say 11.00 on Thursday? Regards,

David Ashfield

01.05.2008

London International Bank Ltd
11 Grosvenor Place, SW1X 7HH
Mobile: +44 7887897329
Blackberry: +44 7921881027
Tel: +44 2071705591
Fax: +44 2071705510


-----Original Message-----
From: David Ashfield
To: 'andrew.baker@miselva.li'
CC: Ali Guidfar
Sent: Tue Apr 29 11:10:33 2008
Subject: Re: AW: AW: Proposed meeting tomorrow

Andrew, I am afraid that we cannot meet today can we please meet on Thuirsday if possible? Sorry about this late notice.
Regards,


David Ashfield

London International Bank Ltd
11 Grosvenor Place, SW1X 7HH
Mobile: +44 7887897329
Blackberry: +44 7921881027
Tel: +44 2071705591
Fax: +44 2071705510


-----Original Message-----
From: Andrew Baker
To: David Ashfield
Sent: Tue Apr 29 07:57:58 2008
Subject: AW: AW: Proposed meeting tomorrow

Dear David

In view of the urgency and importance of protecting the various assets, I will come to your offices without lawyers at about 12 noon today.

Kind regards

Silvia on behalf of Andrew
-----Ursprüngliche Nachricht-----
Von: David Ashfield [mailto:d.ashfield@londonintbank.com]
Gesendet: Montag, 28. April 2008 20:55
An: Andrew Baker; Ali Guidfar
Cc: csly@paynehicksbeach.co.uk
Betreff: Re: AW: Proposed meeting tomorrow


You will understand that Ali and I do not feel comfortable in meeting with you and your lawyer without having representation ourselves. If you want to come along on your own tomorrow we would be happy to have a constructive discussion about matters of mutual concern and interest but if you insist on having a solicitor with you then I would prefer that we wait until we can properly brief someone ourselves, which would probably mean meeting early next week. We are sure you will appreciate our position. Regards,


David Ashfield

London International Bank Ltd
11 Grosvenor Place, SW1X 7HH
Mobile: +44 7887897329
Blackberry: +44 7921881027
Tel: +44 2071705591


01.05.2008

Fax: +44 2071705510

-----Original Message-----
From: Andrew Baker
To: David Ashfield; Ali Guidfar
CC: Chris Sly (E-Mail)
Sent: Mon Apr 28 18:44:39 2008
Subject: AW: Proposed meeting tomorrow

Dear David and Ali,

Many thanks - I understand your position but this should not be a problem. We do no intend to discuss any of the points in issue in the Gibraltar proceedings or relating to the role or powers of Fallon.

The principal purpose of the meeting is to brief me on the present state of affairs in the various companies under Valmore, Summit, Jorum and Nile in which you and Ali are concerned or for which LIB provides services.

This is simply part of the trustees' and administrators' duties in relation to which I am not aware of any issue concerning Fallon.

It will be a great help to us if we can make a start. tomorrow, as planned and I would appreciate your confirmation as soon as possible that we can still meet as arranged.

Kind regards,

Andrew

-----Ursprüngliche Nachricht-----
Von: David Ashfield [ mailto:d.ashfield@londonintbank.com]
Gesendet: Montag, 28. April 2008 18:12
An: Andrew Baker
Cc: Ali Guidfar
Betreff: Proposed meeting tomorrow


Andrew, thank you for your agenda. It seems to me and to Ali that these are matters that relate to the procedings that have been brought in Gibraltar and we would like to have in attendance a lawyer for Fallon. As this will take a few days for a lawyer to be briefed in Gibraltar, can we arrange our meeting for next Tuesday. We would prefer Monday but it is a bank holiday here on that day. Regards,


David Ashfield

London International Bank Ltd
11 Grosvenor Place, SW1X 7HH
Mobile: +44 7887897329
Blackberry: +44 7921881027
Tel: +44 2071705591
Fax: +44 2071705510


Registered in England, No 325057 2
Authorised and Regulated by the Financial Services Authority

This e-mail, together with any attachments, is confidential between the sender and addressee(s). If you are not the intended recipient(s) of this e-mail you should not copy it or use it for any purpose r or disclose its contents to any person: to do so may be unlawful. If you have received this e-mail by mistake please notify the sender immediately by e-mail and delete this e-mail and any attachments from your system. To the maximum extent permitted by law, London International Bank Ltd accepts no liability for any loss or damage resulting from unauthorised use of this email or any attachment or from unauthorised use of any information contained or implied in the email or attachments.


01.05.2008

Registered in England, No 325057= 2
Authorised and Regulated by the Financial Services Authority

This e-mail, together with any at= tachments, is confidential between the sender and addressee(s). If you are n= ot the intended recipient(s) of this e-mail you should not copy it or use it= for any purpose r or disclose its contents to any person: to do so may be un= lawful. If you have received this e-mail by mistake please notify the sender= immediately by e-mail and delete this e-mail and any attachments from your = system. To the maximum extent permitted by law, London International Bank Lt= d accepts no liability for any loss or damage resulting from unauthorised us= e of this email or any attachment or from unauthorised use of any informatio= n contained or implied in the email or attachments.

Registered in England, No 325057= 2
Authorised and Regulated by the Financial Services Authority

This e-mail, together with any at= tachments, is confidential between the sender and addressee(s). If you are n= ot the intended recipient(s) of this e-mail you should not copy it or use it= for any purpose or disclose its contents to any person: to do so may be un= lawful. If you have received this e-mail by mistake please notify the sender= immediately by e-mail and delete this e-mail and any attachments from your = system. To the maximum extent permitted by law, London International Bank Lt= d accepts no liability for any loss or damage resulting from unauthorised us= e of this email or any attachment or from unauthorised use of any informatio= n contained or implied in the email or attachments.

Registered in England, No 3250572
Authorised and Regulated by the Financia=
l Services Authority

--

This e-mail, together with any attachments, is con=
fidential between the
sender and addressee(s). If you are not the intended r=
ecipient(s) of this
e-mail you should not copy it or use it for any purpose =
nor disclose its
contents to any person: to do so may be unlawful. If you ha=
ve received this
e-mail by mistake please notify the sender immediately by e=
-mail and delete
this e-mail and any attachments from your system. To the ma=
ximum extent
permitted by law, London International Bank Ltd accepts no liab=
ility for any
loss or damage resulting from unauthorised use of this email o=
r any
attachment or from unauthorised use of any information contained or im=
plied
in the email or attachments.

01.05.2008

**Exhibit C**

# General Durable Power of Attorney

*TO ALL WHOM THIS MAY COME, BE IT KNOWN THAT:* I, ARKADI (BADRI) PATARKATSISHVILI, a citizen of Georgia, born on October 31, 1955, in Tbilisi, resident of the City of Tbilisi, Gldani bldg. 10, Apt. 88, passport # 1503037, personal # 65002001339, issued by the Ministry of Justice of the Republic of Georgia on December 17, 2005 (PRINCIPAL) do hereby appoint my personal lawyer, EMANUEL ZELTSER, Esq. (AGENT) my true agent and attorney-in-fact to do and to act in my name, place and stead with respect to ANY AND ALL MATTERS, as I myself could or might do if I were personally present, to the extent that I may be permitted by law to act through an agent, including without limitations, effecting any and all transactions with respect to my personal and business property, wherever situated, banking, real estate, chattel, securities, commodities and investments transactions; business operating and insurance transactions; estate, last wills and testament administration; claims and litigations; and all other matters of whatsoever nature. It is the intention of the Principal that this General Durable Power of Attorney be construed in the broadest manner, so as to give the Agent each and every power to act for the Principal in his own unhampered discretion.

This Power of Attorney is given with full and unqualified authority to delegate any and all of the foregoing powers to any person or persons whom my Agent shall select in his discretion.

Hereby ratifying and confirming all that said Agent or substitute may do or may cause to be done.

This Power of Attorney is durable and irrevocable and is granted for valuable consideration, sufficiency of which is hereby acknowledged and shall not be affected by my subsequent death, disability or incompetence.

Photostatic copy of this Power of Attorney shall have the same force and effect as the original.

## HOLD HARMLESS

I, the undersigned Principal, request that all third parties to whom this Power of Attorney may come, rely upon and honor this Power of Attorney and as an inducement thereof, I agree and pledge to indemnify and hold harmless any third party acting in reliance thereupon and his/her/its agents, employees, successors and assigns from any and all claims or damages arising out of such third party's reliance upon and honoring this Power of Attorney.

ARKADI (BADRI) PATARKATSISHVILI

*On this 14th day of December in the year 2006, before me, Alexander Fishkin, a Notary Public and Constitutional Officer of the State of New York, County of New York, personally came Arkadi (Badri) Patarkatsishvili personally known to me to be the Principal named in the within General Durable Power of Attorney. I have been satisfied that Mr. Patarkatsishvili is of sound mind and has full understanding of the document, which he is executing herein and that he does so on his own free will and as his own considered free deed. Thereafter Arkadi (Badri) Patarkatsishvili executed the within General Durable Power of Attorney in favor of the Agent, under his own hand in my presence.*



ALEXANDER FISHKIN, ESQ.
Notary Public • State of New York
Qualified in New York County
No. 31-5000163
Commission exp. Aug. 10, 2010

**Exhibit D**

STERNIK & ZELTSER
ATTORNEYS AT LAW
* * *
119 West 72nd Street # 229
New York NY, 10023 USA
tel/fax: +1-212-656-1810
email: lawmail@rambler.ru

EMANUEL E. ZELTSER
Admitted in New York and R.F.
Writer's direct line: +1-917-916-7613

MEMBER: AMERICAN RUSSIAN LAW INSTITUTE
www.russianlaw.org
www.russianlaw.org/directors_ex.htm

February 17, 2008

Nick P. Keeling, Esq
Mainstay Trust Limited
Suite 975 Europort
P.O. Box 714
Gibraltar
via email: npk@mainstay.gi

PRIVILEGED and CONFIDENTIAL

RE:    Badri Patarkatsishvili

Dear Mr. Keeling,

It was a pleasure speaking with you on February 15, 2007, and I gratefully appreciate your kind assistance.

As discussed, we were counsel for Mr. Patarkatsishvili and remain counsel for his estate. A copy of the durable power of attorney is annexed herewith as per your request.

Pursuant to our discussion, we request that you provide us any and all information, documents and records in your custody or within your control or power to obtain concerning Mr. Patarkatsishvili and any of his financial and business interests, whether held in his own name or through or in conjunction with any third party or parties, directly or indirectly, overtly or covertly or through any nominee (legal entity or physical person), in which you know or have a reason to believe Mr. Patarkatsishvili had interest or business or other involvement, no matter how small, or was a shadow director or a principal de facto

For example, we understand that Mr. Patarkatsishvili was in true and in fact an undisclosed principal of Salford Capital Partners ("Salford") and/or of multiple entities managed or controlled by or affiliated with Salford in the UK, Georgia and other jurisdictions. Accordingly, without limiting the generality of this request, we hereby request that you produce, inter alia, any and all information and records concerning Salford and companies owned or controlled or affiliated with Salford.

As you may be aware, on February 13, 2008, London Police referred the investigation into the circumstances of Mr. Patarkatsishvili's death to a major crimes investigation team. We understand

Nick Keeling, Esq.   February 17, 2008   Page 2

that authorities of other countries also conduct probes into this matter. We are committed to cooperating with and assisting law enforcement authorities in their enquiries. Accordingly, we would be grateful if the requested information and materials be provided at your earliest opportunity. We also request that any information concerning our client, including this request and any communications related thereto, be treated as strictly confidential.

We thank you in advance for your prompt attention to this matter. Should you have any questions related thereto, please feel free to contact the undersigned directly.

Grateful for your cooperation and courtesy, we remain,

Yours truly,

*Sternik & Zeltser*

by:   *Emanuel Zeltser*

cc:   Michael Lindley, Esq.
      Streathers Solicitors, LLP
      (via email: mlindley@streathers.com)

# General Durable Power of Attorney

*TO ALL WHOM THIS MAY COME, BE IT KNOWN THAT:* I, ARKADI (BADRI) PATARKATSISHVILI, a citizen of Georgia, born on October 31, 1955, in Tbilisi, resident of the City of Tbilisi, Gldani bldg. 10, Apt. 88, passport # 1503037, personal # 65002001339, issued by the Ministry of Justice of the Republic of Georgia on December 17, 2005 (PRINCIPAL) do hereby appoint my personal lawyer, EMANUEL ZELTSER, Esq. (AGENT) my true agent and attorney-in-fact to do and to act in my name, place and stead with respect to ANY AND ALL MATTERS, as I myself could or might do if I were personally present, to the extent that I may be permitted by law to act through an agent, including without limitations, effecting any and all transactions with respect to my personal and business property, wherever situated, banking, real estate, chattel, securities, commodities and investments transactions; business operating and insurance transactions; estate, last wills and testament administration; claims and litigations; and all other matters of whatsoever nature. It is the intention of the Principal that this General Durable Power of Attorney be construed in the broadest manner, so as to give the Agent each and every power to act for the Principal in his own unhampered discretion.

This Power of Attorney is given with full and unqualified authority to delegate any and all of the foregoing powers to any person or persons whom my Agent shall select in his discretion.

Hereby ratifying and confirming all that said Agent or substitute may do or may cause to be done.

This Power of Attorney is durable and irrevocable and is granted for valuable consideration, sufficiency of which is hereby acknowledged and shall not be affected by my subsequent death, disability or incompetence.

Photostatic copy of this Power of Attorney shall have the same force and effect as the original.

### HOLD HARMLESS

I, the undersigned Principal, request that all third parties to whom this Power of Attorney may come, rely upon and honor this Power of Attorney and as an inducement thereof, I agree and pledge to indemnify and hold harmless any third party acting in reliance thereupon and his/her/its agents, employees, successors and assigns from any and all claims or damages arising out of such third party's reliance upon and honoring this Power of Attorney.

ARKADI (BADRI) PATARKATSISHVILI

On this 14th day of December in the year 2006, before me, Alexander Fishkin, a Notary Public and Constitutional Officer of the State of New York, County of New York, personally came Arkadi (Badri) Patarkatsishvili personally known to me to be the Principal named in the within General Durable Power of Attorney. I have been satisfied that Mr. Patarkatsishvili is of sound mind and has full understanding of the document, which he is executing herein and that he does so on his own free will and as his own considered free deed. Thereafter Arkadi (Badri) Patarkatsishvili executed the within General Durable Power of Attorney in favor of the Agent, under his own hand in my presence.



ALEXANDER FISHKIN, ESQ.
Notary Public * State of New York
Qualified in New York County
No. 31-5000163
Commission exp. Aug. 10, 2010

**Exhibit E**

-----Original Message-----
From: "Sternik & Zeltser" <lawmail@rambler ru>

Date: Wed, 20 Feb 2008 00:49:49
To:"Michael Lindley" <mlindley@streathers co uk>,"Keeling, Nick" <npk@mainstay gi>
Cc:"Margaret Kirov@SternikLawyersMoscow" <law@russianlaw org>,<alexfishkin2000
@mail ru>,"Margaret Kirov" <lawyers@inbox ru>
Subject: Re: Badri Patarkatsishvili

□

Dear Mr Lindley,
We thank you for expressing your position  Respectfully, we seriously doubt that a New
York attorney would give you an advice as absurd as the one expressed in your previous
email. However if you wish to provide us with the name and contact information of the
purported New York attorney our attorneys will be happy to communicate with him/her. In
the interim, we are under the duty to pursue all lawful avenues in order to ensure that
our legal responsibilities are fulfilled. Given the expressed and respectfully erroneous
posture you have taken, we now have little choice but to instruct our counsel in
Gibraltar, UK, Georgia, RF and other jurisdictions to connect with proper authorities and
commence appropriate actions, inter alia, in the US, in order to protect the interests
vested in us  At the risk of stating the obvious, we expect that you will take all
appropriate steps to ensure that pending the investigations and rulings by appropriate
judicial forums you ensure that the assets within your and/or your clients custody or
control are not dissipated.
Of course, our door remains open to constructive dialogue, should you, at some point deem
such advised
Yours truly,

  <http://russianlaw org/directors_ez htm> Emanuel Zeltser
http://www russianlaworg/directors_ez htm <http://www russianlaw org/directors_ez htm>
STERNIK & ZELTSER
Counselors at Law
119 West 72nd Street ₦ 229
New York, NY 10023
tel/fax: 212 656 1810
If this e-mail is not addressed to you, please inform us and delete the e-mail. * Si vous
n'êtes pas le destinataire de cet e-mail, nous vous prions de nous en informer et de
l'effacer  * Ist diese E-Mail nicht an Sie adressiert, bitten wir Sie, uns zu informieren
und die E-Mail zu löschen. * Если это сообщение адресовано не Вам, пожалуйста,  удалите
его и сообщите нам. * This message may be confidential and privileged and prohibited from
disclosure under the laws of US, UK and other countries.  Reproduction or dissemination
is strictly prohibited. IRS Circular 230 Disclosure: unless otherwise expressly

1

indicated, any federal tax advice contained in this communication, including attachments and enclosures, is not intended or written to be used, and may not be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein

-----Original Message-----
From: Michael Lindley <mailto:mlindley@streathers.co.uk>
To: Sternik &amp; Zeltser <mailto:lawmail@rambler.ru>
Cc: Keeling, Nick <mailto:npk@mainstay.gi>
Sent: Tuesday, February 19, 2008 5:46 PM
Subject: RE: Badri Patarkatsishvili

Dear Mr Zeltser,
I refer to your email of today  Given that the purported Power of Attorney is governed by New York law, I have taken advice from our New York lawyers  I have been advised that, as a matter of New York law, the Power of Attorney on which you purport to rely is not, and may never have been, valid  In the circumstances it is clearly not appropriate for either my client or me, or indeed any other party, to provide you with any information or documents which may in any way relate to Mr Patarkatsishvili's affairs
Yours sincerely

Michael Lindley

Direct dial: 020 7034 4207


-----------------
From: Sternik & Zeltser [mailto:lawmail@rambler.ru]
Sent: 19 February 2008 13:30
To: Michael Lindley
Cc: Keeling, Nick
Subject: Re: Badri Patarkatsishvili


Gentlemen,

Thank you for your message


As discussed, it was our client's wish that the will and ancillary documents remain confidential and be disclosed only to specific beneficiaries and to the extent of their interest at an appropriate time, I am sure you are familiar with these instruments. More importantly, as discussed, our present request is based upon our General Durable Power of Attorney  (previously provided at your request) not necessarily related to the issues of estate or powers of the executor  As expressly stated in the POA, provided to you, we have been appointed by Mr. Patarkatsishvili: "to do and to act in [his] name, place and stead with respect to ANY AND ALL MATTERS, as [he himself] could or might do if [he] were personally present"  ... including without limitations, effecting any and all transactions with respect to [his]personal and business property, wherever situated and all other matters of whatsoever nature "
POA further provides: "It is the intention of the Principal that this General Durable Power of Attorney be construed in the broadest manner, so as to give the Agent each and every power to act for the Principal in his own unhampered discretion", and still further states: "This Power of Attorney is durable ...  and shall not be affected by my subsequent death, disability or incompetence " [Emphasis in the original]
Hence, our authority, vested upon us by Mr  Patarkatsishvili, himself, to demand and to receive the information, set forth in our request, as Mr  Patarkatsishvili could do himself, may not be in dispute
Accordingly, we reiterate our request to produce the information and records without

2

further delay  Kindly, let me know at your earliest opportunity whether it is your intention to comply with our client's wishes  Should you have any further questions, please feel free to call me.
Many thanks, yours, Emanuel

‚

<http://russianlaw org/directors_ez htm> Emanuel Zeltser
STERNIK & ZELTSER
Counselors at Law
119 West 72nd Street # 229
New York, NY 10023
tel/fax: 212 656 1810

If this e-mail is not addressed to you, please inform us and delete the e-mail * Si vous n'êtes pas le destinataire de cet e-mail, nous vous prions de nous en informer et de l'effacer * Ist diese E-Mail nicht an Sie adressiert, bitten wir Sie, uns zu informieren und die E-Mail zu löschen * Если это сообщение адресовано не Вам, пожалуйста, удалите его и сообщите нам. * This message may be confidential and privileged and prohibited from disclosure under the laws of US, UK and other countries. Reproduction or dissemination is strictly prohibited. IRS Circular 230 Disclosure: unless otherwise expressly indicated, any federal tax advice contained in this communication, including attachments and enclosures, is not intended or written to be used, and may not be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein

----- Original Message -----
From: Michael Lindley <mailto:mlindley@streathers co uk>
To: Sternik &amp; Zeltser <mailto:lawmail@rambler ru>
Sent: Monday, February 18, 2008 2:24 PM
Subject: RE: Badri Patarkatsishvili

☐
Dear Mr Zeltser,

It was a pleasure to talk to you on Friday.

So that we can move forward can you please send me:

a    Letter of authority signed by the executor;
b    Copy of the Will of the deceased (or at least the extract showing appointment of the executor and the signature clause of the Will)

Kind regards

Michael Lindley

Direct dial: 020 7034 4207


-------------
From: Sternik & Zeltser [mailto:lawmail@rambler ru]
Sent: 18 February 2008 03:42
To: Keeling, Nick
Cc: Michael Lindley
Subject: Badri Patarkatsishvili



Dear Nick,

3

Sorry, forgot to attach the POA  Now attached
Thanks, yours, Emanuel

<http://russianlaw.org/directors_ez.htm> Emanuel Zeltser
STERNIK & ZELTSER
Counselors at Law
119 West 72nd Street # 229
New York, NY 10023
tel/fax: 212 656 1810

If this e-mail is not addressed to you, please inform us and delete the e-mail. * Si vous
n'êtes pas le destinataire de cet e-mail, nous vous prions de nous en informer et de
l'effacer  * Ist diese E-Mail nicht an Sie adressiert, bitten wir Sie, uns zu informieren
und die E Mail zu löschen  * Если это сообщение адресовано не Вам, пожалуйста,  удалите
его и сообщите нам  * This message may be confidential and privileged and prohibited from
disclosure under the laws of US, UK and other countries . Reproduction or dissemination
is strictly prohibited  IRS Circular 230 Disclosure: unless otherwise expressly
indicated, any federal tax advice contained in this communication, including attachments
and enclosures, is not intended or written to be used, and may not be used, for the
purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or (ii)
promoting, marketing or recommending to another party any tax-related matters addressed
herein

----- Original Message -----
From: Sternik &amp; Zeltser <mailto:sternik@russianlaw org>
To: Keeling, Nick <mailto:npk@mainstay.gi>
Cc: Lindley, Michael <mailto:mlindley@streathers co uk>
Sent: Sunday, February 17, 2008 5:00 PM
Subject: Badri Patarkatsishvili

STREATHERS SOLICITORS LLP
128 Wigmore Street London W1U 3SA
TEL: 020 7034 4200 - FAX: 020 7034 4303 - DX: 9050 West End
IMPORTANT NOTICE
Streathers Solicitors LLP is a Limited Liability Partnership registered in England and
Wales under number OC323349.
This LLP is regulated by the Solicitors Regulation Authority.  A list of the names of the
members and consultants is available for inspection at the above office.
This e-mail is confidential and may contain legally privileged information.  If you are
not named above as an addressee it may be unlawful for you to read, copy, distribute,
disclose or otherwise use the information in this e-mail.  If you are not the intended
recipient of this e-mail, please telephone us on 020 7034 4200.
E-mails are susceptible to data corruption, interception, falsification, delay,
unauthorised amendment and viruses.  You should therefore carry out such virus and other
checks as you consider appropriate.  Streathers do not accept liability for any such
events or any consequences thereof in respect of e-mails sent or received.  If the
content of this transmission is important, you should not rely on its integrity without
verifying it by telephone or facsimile

STREATHERS SOLICITORS LLP
128 Wigmore Street London W1U 3SA
TEL: 020 7034 4200 - FAX: 020 7034 4303 - DX: 9050 West End
IMPORTANT NOTICE
Streathers Solicitors LLP is a Limited Liability Partnership registered in England and
Wales under number OC323349
This LLP is regulated by the Solicitors Regulation Authority.  A list of the names of the
members and consultants is available for inspection at the above office
This e-mail is confidential and may contain legally privileged information.  If you are
not named above as an addressee it may be unlawful for you to read, copy, distribute,
disclose or otherwise use the information in this e-mail.  If you are not the intended

4

recipient of this e-mail, please telephone us on 020 7014 4200
E-mails are susceptible to data corruption, interception, falsification, delay,
unauthorised amendment and viruses  You should therefore carry out such virus and other
checks as you consider appropriate  Streathers do not accept liability for any such
events or any consequences thereof in respect of e-mails sent or received  If the
content of this transmission is important, you should not rely on its integrity without
verifying it by telephone or facsimile

**Exhibit F**

# Apostille

(Convention de La Haye du 5 Octobre 1961)

1.  Country:     **United States of America**

    This public document

2.  has been signed by Norman Goodman

3.  acting in the capacity of County Clerk

4.  bears the seal/stamp of the county of New York

## Certified

5.  At New York, New York      6.  the 25th day of February 2008

7.  by Special Deputy Secretary of State, State of New York

8.  No. NYC-19572458A

9.  Seal/Stamp                 10.  Signature



James Bizzarri
Special Deputy Secretary of State

# Certification

Pursuant to C.P.L.R. 2105, of the State of New York, the undersigned Attorney and Counselor at Law duly admitted before the Supreme Court of the State of New York certifies that the within copy of the Deed of Appointment of Administrator duly notarized on November 14, 2007, has been compared with the original and is the true and complete copy thereof.

Emanuel Zeltser

COUNTY
OFFICE
State of New York
) ss:
County of New York )

Subscribed and sworn to before me on this 23rd day of February of 2003

NOTARY PUBLIC

ALEXANDER FISHKIN
Notary Public, State of New York
No. 01FI6124703
Qualified in Kings County
Commission Expires August 10, 20 10

# Deed of Appointment of Executor of the Estate

*KNOW ALL MEN BY THESE PRESENTS*

ARKADY BADRI PATARKATSISHVILI of Downside Manor, Downs Lane, Leatherhead, Surrey KT22 2JW United Kingdom (hereinafter called the "Appointor") by this Deed appoints JOSEPH KAY of 6 Wright Drive, Dix Hills, New York 11746 (hereinafter called the "Executor") the sole executor of his entire estate and powers, howsoever in the world situated, AND the sole administrator of any and all of the Appointor's last wills and testaments, or if Appointor shall die intestate, of Appointor's any and all properties and possessions, wherever in the world situated AND grants to and vests upon the Executor all powers to administer Appointor's estate as Executor's sole and uncontrolled discretion for the benefit of Appointor's beneficiaries.

It is the Appointor's wish and intent that the powers of the Executor named herein be construed as broadly as possible and that Executor's discretion in administering Appointor's estate and carrying out Appointor's wishes, as such have been conveyed by Appointor to Executor and known by the Executor, be unhampered in any way shape or form.

Signed sealed and delivered etc.

_____
Arkady Badri Patarkatsishvili
as Appointor

_____
Witness # 1

_____
Witness # 2

On this 14th day of November in the year 2007, before me personally came Arkady Badri Patarkatsishvili personally known to me and executed this instrument as his own free will and deed.

_____
NOTARY PUBLIC