WILLIAM E. BUTLER DECLARATION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

INNA GUDAVADZE, *et al.*,

        Plaintiffs,

v.

JOSEPH KAY, *et al.*,

        Defendants.

------------------------------------X

08-Civ-3363 (RJS)

**REPLY DECLARATION OF
WILLIAM ELLIOTT BUTLER**

I, WILLIAM E. BUTLER, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

**Introduction**

1. I am the same William E. Butler who filed a Declaration in the present case on October 3, 2008.

2. I have been requested to comment upon the Declaration of Dr. Douwe Korff dated November 21, 2008, submitted in the present case on behalf of the Plaintiffs and partially in response to my Declaration of October 3, 2008.

**Preliminary Matters**

3. I am asked to indicate my publications. I have more than 3,500 publications in this field, a bibliography of which was published as *International and Comparative Law: A Bibliography with Annotations and Notes of the Published Writings and Reports of William E. Butler* (London, Wildy, Simmonds & Hill Publishing, 2005). The publication is in print and can be obtained from the Publisher. My principal publications on Georgia are enumerated in my CV, which was attached to my first Report. I also cited in that Report my translation of the Georgian Constitution. My analysis of the Georgian law of treaties and translations of relevant Georgian legislation appear in W. E. Butler, *The Law of Treaties in Russia and the Commonwealth of Independent States* (Cambridge, Cambridge University Press, 2002), and my analysis of Georgian foreign investment legislation and relevant texts appears in W. E. Butler, *Foreign Investment Law in the Commonwealth of Independent States* (2002).

4. I have in addition acted as an external evaluator of law student written dissertations at Georgian universities and been involved in other matters concerning Georgian inheritance law. I maintain links with Georgian legal colleagues and have access to Georgian legal data bases in the Russian language. I have been requested to act by law firms representing the Government of Georgia as an arbitrator in international commercial arbitrations, but so far been unable to accept because of conflicts involved. I have been to Georgia on a number of occasions, but not recently.

5. I have been extensively involved in law reform activities throughout the CIS since 1988 in the fields of public and private law, including the drafting of legislation on pledge, company law, civil law generally, labor law, foreign investment, oil and gas, judicial reform, criminal law, and others. I have chaired or co-chaired CIS-based drafting committees which actually produced joint drafts in the Russian language for consideration by relevant State agencies and parliamentary committees. I was a member of the European Union Task Force on Law Reform in the Independent States of the Former Soviet Union, and a co-author of the Report prepared by that Task Force and published by the European Union. For the past several years I have been a legal adviser to the United Nations Office on Drugs and Crime in Moscow advising on legal aspects of criminal and criminal procedure law with particular reference to narcotics. I am a Russian jurist (LL.M., 1997) and have been licensed to practice in the Russian Federation (1995) and Uzbekistan (1995) as a jurisconsult.

6. I do not maintain a list of other cases in which I have testified as an expert at trial or by deposition. Insofar as my views or publications have been cited by the courts or arbitral tribunals concerned, they are readily accessible through the usual databases. To the best of my recollection, in the United States I have testified and/or been deposed in cases during the past four years before federal courts of the United States where I have acted as an expert witness for the United States Department of Justice with respect to the law of Russia and Azerbaidzhan (Southern District of New York) and Ukraine (Federal District Court in San Francisco); for Deutsche Bank in respect of Russian law in the Yukos bankruptcy proceedings (Federal District Court, Bankruptcy Division, Houston, Texas); and for Marriott in respect of Russian law in the District of Columbia (by deposition only).

7. My fees in the present case are my standard rate of £300 per hour, plus actual outgoings. I am a co-founder of a law firm with an office in Moscow, Russian Federation.

**Qualifications of Douwe Korff**

8. Mr. Korff, judging from his CV reproduced in Exhibit 1 of his Declaration, is an experienced human rights lawyer who has offered selfless assistance to the Georgian legal community. Nothing in his background suggests that he is experienced in CIS law generally, the Soviet legal heritage, or the law of Georgia in particular. He does not claim any knowledge of the Russian language (which is the second language of Georgian jurists); he does not have a law degree from any CIS legal institution. His experience in

Georgia is addressed almost entirely to the field of criminal procedure, which is irrelevant to the issues of the present case.

9. Mr. Korff is inclined to deprecate my evidence and that of an experienced Georgian advocate, Ms Ketevan Kvartskhava, as a "summary of aspects of the law on paper, without any reference to how the law is applied, or how the courts operate, in practice" (para. 23, fn. 15, Korff Declaration). A number of observations are in order on Mr. Korff's characterization. First, a Georgian court or any foreign court applying Georgian law needs to know precisely what the law is, and for that we turn to the published legislation of Georgia. Judicial practice of relevance constitutes the decrees or guiding explanations of the highest Georgian courts. It does not constitute the decisions or behaviour of individual Georgian courts in individual cases, for these are not sources of law in Georgia. Mr. Korff cites no relevant judicial practice of Georgia.

10. Second, Mr. Korff does not see the law in action in Georgia on a routine basis. As a human rights specialist and a proceduralist, he sees the legal system at its most dysfunctional, at the nexus where, particularly in public and criminal law relations, he hears the (often legitimate) complaints about weaknesses of the system, or arbitrary application of legislation, or other shortcomings, of which Georgia is not the only country in the world to experience. Since he is not proficient in either the Georgian or Russian languages, he hears these complaints through an interpreter whose abilities to cope with CIS legal concepts in English are unknown to us. This anecdotal material forms the foundation of the various reports issued by NGOs and foreign governments who monitor human rights. And he hears the complaints of those who lose cases, rather than those who win them.

11. Third, in deprecating my evidence and that of my Georgian colleague, Mr. Korff does not, so far as I can ascertain, criticize the Georgian law of inheritance or the procedures connected with deciding issues by a Georgian court or notary in matters related to inheritance – if indeed he is aware of the substantive law on the subject. He wants to argue that the record of outside intervention in matters before Georgian courts, as he understands it, or the possible risk of such intervention, is so pervasive as to contaminate the Georgian legal system in any proceeding or, at least, this proceeding. That is entirely an *ad hominem* position, and there is nothing in any of the sources or evidence which he cites that would sustain such a position.

12. Further, the sources on which he relies are almost entirely concerned with human rights issues, that is, the often sensitive nexus between individual political and economic rights as embedded in the constitutions, and not with the humdrum of legal life to which courts direct most of their attention. In Georgia every single death of a natural person opens an estate in connection with the law of inheritance. Notaries and relevant courts deal with these matters literally every working day. No human rights report known to me impugns the quality of the Georgian legal system from this standpoint. To imply, as Mr. Korff does, that the public image, political activeness, and great wealth of the deceased in this case imparts a special risk to the disposition of his estate does not follow either from the evidence or the characterizations of Georgian legal life; if there is a threat to the

private property comprising the estate, such as confiscation (which is a very narrow term in CIS legal systems and normally applicable only in connection with criminal law as a supplementary punishment), it is almost certain to come from other legal considerations than the law of inheritance and the legal rules governing evidence connected with establishing the authenticity of documents. Mr. Korff's apprehensions on this point are speculative in the extreme, and I am not aware of any evidence in the case which would support such an apprehension.

**Interference with courts**

13. I have no doubt that instances may arise in Georgia, as elsewhere in the CIS, of attempted or successful interference with the courts from outside sources, whether they be officials with an interest in the outcome of a proceeding or one of the parties to a case. This has been a regrettable feature of legal life in the CIS since the days of the Russian Empire, and is acknowledged by senior officials in the judicial systems of all CIS countries.

14. But to say a problem of this nature exists is not to discredit the outcome in all cases before the courts of the countries concerned. Problems of this nature are not unknown to the American judicial system. But Mr. Korff indulges in the most tendentious characterizations to express his concern on this matter: "There is no history of judicial independence in Georgia". (para. 2). That is plainly false, for the Georgian constitutions of 1937 and 1978 both made provision for judicial independence. Korff continues: "In Soviet times, the courts, like all State institutions, were under the complete control of the Communist Party, and merely a tool of the regime" (para. 2). Also false, and no reputable Soviet law specialist would accept a generalization so sweeping because it implies that all judicial decisions were Party decisions or Party-dictated, and we have absolutely no empirical evidence to support, or even believe, this was the practice. "'Telephone justice' – where the judges are called by the Party or the Executive and told how to decide in a particular case – was rife" (para. 2). There is a mythology concerning "telephone justice", but no hard data to demonstrate its frequency, where such may have occurred. But Mr. Korff offers no considered view on this – he engages in wild and unsupported sweeping characterizations that even the most severe critics of CIS systems know to be exaggerated.

15. This approach taints Mr. Korff's Declaration throughout. His views on the politics of Georgia amount to punditry, interesting as they are. This kind of exercise can be indulged in with respect to any legal system, and is in my view irrelevant to the issues that confront us in the present case. Similarly, the reports on Georgia by the international community are not evidence of Georgian law; they are outside commentaries, often of considerable interest, but nothing more. So far as I can determine, none of these reports contains a detailed analysis of the subject-matter of the law at issue between the parties in the present case.

16. The plain fact is that the Georgian authorities have jurisdiction in this case because by operation of Georgian civil law the decedent's death resulted in the opening of an estate

in Georgia from the moment of death. Mr Korff's concentration upon the "criminal-legal context" (para. 28) is misplaced here. This is the branch of law in any legal system which demonstrates the degree of tension between the regime of the day in any country and its determination to impose order or ideology, stifle opposition or dissent, and deal with what is considered to be deviance in society. Those of us who worked on Soviet law were well aware of the distinctions between the quality of justice in criminal matters versus cases involving interpersonal civil disputes. The three reasons that Mr. Korff gives (para. 28) for concentrating upon criminal cases in fact differentiate the criminal from the noncriminal sphere and undermine his analysis for the purposes of this case. One cannot make the assumptions which he wishes to make about judicial behavior in paragraph 28; these propositions he advanced must be proved, and no one, so far as I am aware, has done so.

17. Insofar as Mr. Korff's materials purport to touch upon civil matters (e.g., para. 68) we are given a hodgepodge of "anecdotes" in which the informants decline to disclose details. Whether their impressions of what is happening are correct or not cannot be independently verified.

**Conclusions**

18. Mr Korff's repeated references to the "law on paper" are unconvincing. What he is referring to is the substantive law. While I have no doubt that he is correct in saying that in principle the quality of legislative provision could be improved. I know of no legal system where that is not the case. We work in an imperfect legal world everywhere, and the fact that legislation can always be improved is not an argument against the duty of courts to apply the law as they find it at the time.

19. Whether the Georgian Government's policies with respect to the judiciary are a form of reprisal against opposition elements is a political judgment and not one that either I or Mr Korff is qualified to make. On the whole, these judicial reforms appear to be an attempt to upgrade the quality of the judiciary. Whether they met the expectations of their architects, or will do so, is another matter. These are pure speculations, however, and they are the kind of speculations that can be made about any legal system.

20. The anecdotes about Georgian criminal justice are simply irrelevant to the present case. And the suggestion that "the same submissive attitudes have come to taint the judges in civil and administrative cases" remains unproved and unprovable.

21. It is not the case, as alleged, that "... the American Bar Association has found, in cases where one of the parties has a strong connection to the government, where there is a particularly strong government interest, or in cases involving a significant amount of money, the judges are pressured to rule in favour of the ruling elite – and they succumb to this pressure". First, this is not an official position of the American Bar Association; at best, it is an opinion of the authors of a report published by the ABA because the ABA, having supported the study, considered it to be worthy of discussion and deliberation. Second, no "national and international observers" are in a position to "confirm" that this

is the case. They may have this impression, based on anecdotal materials, but they otherwise have no evidence of this being the case. The conclusion drawn by Mr. Korff is as inflammatory as it is sweeping.

22. And indeed this is the dominant impression which I receive when reading Mr Korff's report. In journalism it would be called a "hatchet job", a selective assemblage of materials produced mostly by outside observers as part of the law reform process in an effort to arouse sufficient public concern and even outrage so that reform policies will be supported. This has its place in law reform dialogue and policy advocacy. But I do not believe that I have seen these materials "spun" with a view to persuading a United States court not to recognize the adequacy of a foreign jurisdiction on the grounds that the entire judicial system is contaminated. None of the Reports cited by Mr. Korff comes to that extreme conclusion. And the burden of Mr. Korff's argument is not only that the judicial system is contaminated, but so too are the Plaintiffs and Defendants in this proceeding and their local counsel. Mr. Korff sees no grays and whites in Georgia, only black, and he is bold enough in his conclusion to predict what he believes the outcome will be.

23. The spin which Mr. Korff gives in para. 77 to the statements of President Saakashvili is in the present context unjustified. The leadership of every CIS country without exception is making similar statements, as is the leadership of the judicial systems within each CIS country, because all recognize and acknowledge that for all of their merits no judicial system has yet reached the quality of excellence which is desired. Similar sentiments of reform can be found within the American and British legal systems. While I am confident that the Georgian courts do not enjoy esteem in the public image, the same is true throughout the CIS. But public image is one thing, and the law and legal process is another. The image commonly results in exaggeration and misimpression.

**Application of General Conclusions to Present Case**

24. Having assembled his sundry impressions from secondary sources and formed his own with respect to a country where he does not understand the language nor have a background in the local law, Mr. Korff offers his predictions of the outcome in this case. He gives evidence of a profoundly political perception of the case based on the background, activities, and purported connections of the deceased and his understanding of the interests of the present Government. Having dismissed ex cathedra and ab initio the ability of Georgian judges to "... assess evidence independently, objectively and dispassionately" (para. 84), he has no doubts that "... the Georgian courts will not act independently or impartially in the matter" (para. 89).

25. Even in the worst times of the Soviet era, I would not as an expert have indulged in so extravagant a characterization of the Soviet legal system, and that is without the undoubted progress that Mr. Korff himself credits to Georgian judicial reforms over the past fifteen or so years. He thinks that the rulings in which applications by Mr Kay have been denied by the Georgian courts are a "ploy" by the Georgian judiciary: "... appear to all be aimed at keeping him on a short leash ..." (para. 87). He continues: "If anything, these rulings are therefore likely, and possibly intended, to make him even more

compliant with the wishes of the authorities" (para. 87). I suppose that these views represent the "political analysis" of Georgian judicial decisions, but they in fact impugn both parties to the case and the judiciary: they suggest that the early rulings have somehow been "managed" from outside, or that one or the other of the parties (and their counsel) is implicated in such happenings, and that the judge in the case is corrupt.

26. He does not analyze the legal issues inherent in the early rulings because he does not know Georgian law and is not in a position to evaluate whether they were well-founded or not. He is not able to identify the "extremely strong political side to the whole case" (para. 83), establish a "particularly strong government interest" (para. 82), or determine what is a "significant amount of money". Most important, he does not identify and establish what "those in power" would "prefer".

27. Mr Korff's statements in para. 86 demonstrate his unfamiliarity with Georgian law as relevant to the case. He notes that on 15 September 2008 "the courts refused Mr Kay's application to prevent the widow from claiming her 50% interest in Mr Patarkatsishvili's assets (although this did not mean she was actually given her due) ...". But of course she would not be "given her due"; ultimately of interest here, under Georgian law, is the issuance of a certificate of the right to inherit, and it would be premature, given the demands being advanced by both sides in this case, to expect such a certificate to have been issued.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Dated: Executed this 10th day of December 2008, in Carlisle, Pennsylvania.

_W E Butler_
William Elliott Butler